IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

95-7207-CIV-GRAHAM

TIMOTHY BROWN,                          :

      Petitioner,                       :

vs.                                     :

HARRY K. SINGLETARY,                    :

      Respondent.                       :

_____/

**NIGHT** ......
**FILE** .....

MAY - - ....

CLARENCE .......
CLERK, USDC / SD. ........

---

## BROWN'S MOTION FOR CONSIDERATION OF ACTUAL INNOCENCE AS A "GATEWAY" PURSUANT TO *SCHLUP V. DELO*

---

The Petitioner, TIMOTHY BROWN, through counsel, respectfully requests that the Court consider newly-discovered evidence of his "actual innocence," and that pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995), the Court set this case for a hearing on the issue of his "actual innocence" – which, if proved, will provide a "gateway" allowing the Court to hear his "procedurally defaulted" claims, on the merits. In support of this motion, Brown states:

### I. OVERVIEW OF "INNOCENCE" IN § 2254 PROCEEDINGS

The Supreme Court has "adhered to the principle that habeas corpus is, at its core, an equitable remedy." *Schlup v. Delo*, 513 U.S. 298, 319 (1995). It is for this reason that the Court has consistently recognized exceptions to strict procedural rules, where that is necessary to prevent "a miscarriage of justice." Of course, "the individual interest in avoiding injustice is most compelling in the context of actual innocence." *Schlup*, id. at 325. While the Court has refused to recognize "innocence" as a "free-standing" claim – that is, a separate ground for federal habeas relief – at least



in non-capital cases, *Herrera v. Collins*, 506 U.S. 390, 404-405, 417 (1993), the Court has nonetheless held that a petitioner's "actual innocence" may provide a "gateway" to allow federal constitutional claims to be heard in a § 2254 proceeding, where they are "procedurally defaulted" and would otherwise be barred from federal review.  In conducting this inquiry, the distinction between "exhaustion" and "procedural default" is a crucial one:

> • **Exhaustion of State Remedies:** refers to the requirement that a federal habeas petitioner adequately "present" his claims to the state courts before seeking relief from the federal courts.  To properly "exhaust" a claim, a petitioner must (1) "fairly present" his claim to the state courts (which means, apprising the state court system of both the factual and legal bases of his claim, *Picard v. Connor*, 404 U.S. 270 (1971); *Galtieri v. Wainwright*, 582 F.2d 348, 353 (5th Cir. 1978) (en banc), *or* (2) demonstrate that no available or effective state remedies remain. 28 U.S.C. §§ 2254(b), (c).

> • **Exhaustion due to "Futility":** The exhaustion doctrine requires only exhaustion of "available" and "effective" state remedies: the requirement is fulfilled if "there is either an absence of available state corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the petitioner." § 2254(b).  If the state court remedy is "unavailable" due to petitioner's failure to present the claim to the state courts in compliance with state rules of procedure, the claim is deemed "exhausted," in that no state remedies remain.  *Coleman v. Thompson*, 501 U.S. 722, 732 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer "available" to him."); *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

> • **Procedural Bar:** A state "procedural bar" exists where a state procedural rule (either a statute, or a judge-made rule) bars a petitioner from having the merits of his claim heard.  For

2

example, Florida Rule of Appellate Procedure 9.140 provides that a defendant in a criminal case file

a notice of appeal within 30 days of rendition of a written order imposing sentence. If a defendant

fails to file a direct appeal within that time period, the state appellate court is jurisdictionally barred

from hearing issues which should have been raised on direct appeal – at any later time. If a petitioner

attempts to raise on collateral review, an issue which "could" have been raised on direct appeal, but

was not, a procedural bar would arise. *Smith v. State*, 445 So.2d 323, 325 (Fla. 1984) ("Issues which

. . . could have been litigated at trial and upon direct appeal are not cognizable through collateral

attack.") If on the other hand, an issue is raised on collateral review that "could not" have been raised

on direct appeal, a post-conviction motion for new trial under Rule 3.850 must be filed within two

(2) years from the finality of the judgment and sentence, unless "the facts on which the claim is

predicated were unknown to the movant or the movant's attorney and could not have been

ascertained by the exercise of due diligence"(in which case the 2-year time limit does not apply). Rule

3.850(b). Any 3.850 motion which is *not* based upon newly-discovered evidence, and is filed beyond

the 2-year time limit, is "procedurally barred."

　　　　• **Procedurally Defaulted Claim:** A federal constitutional claim is deemed "procedurally

defaulted" or "procedurally barred" if a federal habeas petitioner at one time could have raised that

claim in state court, but did not, and is now barred from doing so by a state procedural rule. *Caldwell*

*v. Mississippi*, 472 U.S. 320, 327 (1985); *Wainwright v. Sykes*, 433 U.S. 72 (1977). Under the

"procedural default" doctrine, a federal habeas court is barred from reviewing the merits of a

"procedurally defaulted" claim unless the petitioner can show "cause and prejudice" for his default,

or that "the constitutional violation has probably resulted in the conviction of one who is actually

innocent." *Murray v. Carrier*, 477 U.S. 478, 495-496 (1986); *Schlup v. Delo*, 513 U.S. 298, 321

3

(1995).  The following chart illustrates the interplay of the concepts of exhaustion and procedural default:



As noted *supra*, assuming that a petitioner has asked the federal habeas court to grant him relief based upon claims which are "exhausted" – but "procedurally defaulted" – the Court may hear those claims if the petitioner proves his "actual innocence."  However, the difference between a *Schlup* "innocence as a gateway" claim, and a *Herrera* "substantive innocence" claim, is a crucial one:

• ***Schlup* Claim (Innocence as a "Gateway"):** In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court held that although a federal habeas petitioner's innocence is not itself a constitutional claim justifying habeas relief, it *is* considered a "gateway" which allows the petitioner to have otherwise procedurally defaulted constitutional claims considered on the merits. *Id.* at 315. A *Schlup* "claim" of innocence, "does not by itself provide a basis for relief." *Id.*   It is a "procedural rather than substantive" claim, *id.* at 314, in that innocence is offered merely as a ground to bring the petitioner within the "'narrow class of cases . . . implicating a fundamental miscarriage of justice,'" *id.* at 315, and thereby, permit consideration of procedurally defaulted constitutional claims on the merits (even if those claims would otherwise be barred from federal habeas review).  Ultimately, where a petitioner asserts a *Schlup* innocence "claim," his "relief depends critically on the validity of his [defaulted constitutional claims.]" *Id.*

• ***"Herrera* Claim":** refers to a free-standing claim of "innocence" – that is, "innocence" asserted as an independent ground for habeas corpus relief – which was the type of claim raised, and squarely rejected by the Supreme Court, in *Herrera v. Collins*, 506 U.S. 390 (1993).  Unlike Mr. Brown here, the petitioner in *Herrera* asserted no constitutional errors in his conviction, but nonetheless, argued that his execution would violated the 8th and 14th Amendments because he was actually innocent of the crime.  In rejecting this claim, the Court in *Herrera* reiterated its prior holdings that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway

although Brown's habeas petition must first have his otherwise barred constitutional claim

considered on the merits." *Id.* at 404. The Court assumed *arguendo* in *Herrera*, that "*in a capital case* a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417 (emphasis added). In *Herrera*, however, the petitioner did not make the persuasive showing necessary to prevent his execution. Even assuming that a free-standing innocence claim could be brought in a capital case, it is definitely *not* cognizable as a ground for federal habeas relief in a non-capital case – such as this one:



Presuming that there are procedurally defaulted claims which may be heard if a petitioner is "actually innocent," what showing does a petitioner have to make to open the "innocence gateway"?

• **Actual Innocence:** Pursuant to *Schlup*, a petitioner seeking to establish his "actual innocence," must show with "new reliable evidence" "that was not presented at trial," 513 U.S. at 324, ***that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.*** *Id.* at 327. What this means is that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329. The use of the term "actual" innocence is intended to imply "factual" innocence of the crime charged, and to be distinguished from "legal innocence" (*i.e.*, insufficiency of the evidence presented at trial to prove guilt beyond a reasonable doubt). By contrast to appellate review of an insufficiency claim, a federal habeas court assessing a showing of "actual innocence" "is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Id.* at 327-328. And indeed, "under the gateway standard . . . the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments." *Id.* at 330. Thus, the focus of the inquiry under *Schlup* is qualitatively different from a simple insufficiency claim. Rather than focusing upon "the power of the trier of fact to reach its conclusion," *id.*, under *Schlup* the inquiry weighs credibility, and focuses "upon the likely behavior of the trier of fact." 513 U.S. at 330. In thus weighing "probabilities" under *Schlup*, the legal sufficiency of the evidence to convict is ***non***-dispositive, and indeed, not even relevant. The ultimate question for the Court under *Schlup* is whether reasonable jurors considering ***all*** of the evidence – evidence previously admitted, evidence

7

previously excluded, evidence available but never presented, and evidence newly discovered – would or would not have had a reasonable doubt as to the petitioner's guilt. *See id.* at 328. In simple terms, would they or would they not have convicted?

## II. BROWN IS ASSERTING HIS "ACTUAL INNOCENCE" AS A "GATEWAY" TO HAVE HIS PROCEDURALLY DEFAULTED CLAIMS HEARD ON THE MERITS

In the Florida Attorney General's March 2, 2001 response to the Third Amended Petition, the Attorney General asked this Court to resolve Brown's case on the narrowest of legal grounds. Essentially, the Attorney General asked this Court to turn the clock back to December 1995, when Brown filed his *pro se* § 2254 motion based solely on the insufficiency of the evidence to sustain his conviction. Even though the Third Amended Petition contained a second ground, (Ground B), deriving from Brown's unknowing and unintelligent waiver of his *Miranda* rights, the Attorney General claimed that this claim (just like Grounds B and D-K of the May 1999 Amended Petition) was a "procedurally defaulted" claim, and could not be considered by this Court because Brown had not pled and proved his "actual innocence." (D.E. # 139 at 14-16). Accordingly, in its Response to the Third Amended Petition, the Attorney General addressed *only* the insufficiency of the evidence claim (Ground A) on the merits, and asked the Court to deny Brown relief on that single ground. (D.E. # 139 at 54-63).

That was all before February 8, 2002. On that date, Tim Brown, the Attorney General, and this Court learned for the first time that another individual – Andrew Hughray Johnson – had repeatedly and voluntarily admitted to having killed Deputy Behan. The evidence disclosed in the aftermath of February 8th has forever changed this case. As discussed more fully *infra* III, with another individual credibly admitting to having committed the crime – and with the demonstrable

falsity of Brown's statement – the Court now has compelling proof that Brown is "actually innocent" of the crime for which he was convicted and sentenced to life in jail.  With "actual innocence" now at the forefront of the parties' discussion, that discussion necessarily turns to the question of Brown's "procedurally defaulted" claims.  For the existence of even a single procedurally defaulted claim – such as Ground B (the *Miranda* claim) in the Third Amended Petition – would empower  the Court to hear evidence of Brown's actual innocence.  And, "actual innocence" in turn, would empower the Court to hear all of Brown's procedurally defaulted claims (even those raised in the original Amended Petition) on the merits.

The Court need not – at this juncture – decide "which" petition, and "which" claims, Brown should actually proceed upon. The threshold questions that it must first decide are: (1) Are all of Brown's possible claims for relief "exhausted"? (2) Are there any procedurally defaulted claims? and (3) Has Brown made a sufficient showing of "actual innocence" pursuant to *Schlup* to warrant the grant of an evidentiary hearing on "actual innocence"?  Each of these questions must be answered affirmatively here.

### 1. All of Brown's Possible Claims for Relief are "Exhausted"

**A. To the extent Brown's claims for relief are "new," they must be deemed "exhausted" because there is no longer any mechanism for "exhausting" given that the 2-year time period for filing a Rule 3.850 motion has run**.  The parties agree in this case that the Third Amended Petition is "fully exhausted."  (D.E. #172 at ¶ 1).  Although the Attorney General has argued that Ground B of that petition (the *Miranda* claim) "contains new arguments which were not raised on

direct appeal, but could have been," (D.E. # 139 at 12),[1] nevertheless, the Attorney General concedes that "Brown's two year time limit ran prior to August 18, 1997. As a result, a motion for post-conviction relief would be denied by the state court on a procedural bar basis." Accordingly, Ground B of the Third Amended Petition is "exhausted" as it would be "futile" to attempt to further exhaust this claim.

And in fact, all of the "new" grounds for relief in the May 1999 Amended Petition were "exhausted" due to "futility" as well. The Amended Petition contained the following new legal claims:

> – the trial court's erroneous jury instruction (Ground D);
>
> – ineffectiveness of trial counsel vis-a-vis the motion to suppress (Ground E);
>
> – ineffectiveness of trial counsel in defending the case at trial (Grounds F, G, H, I);
>
> – ineffectiveness of trial counsel in failing to move for a new trial (Ground J); and
>
> – ineffectiveness of appellate counsel (Ground K).

In addition, the Amended Petition amended the coerced confession claim Brown had raised in state court to assert additional facts (*e.g.*, that he was beaten, and threatened with the electric chair) (Ground B). While these facts were newly-asserted, they were *not* "newly-discovered." And indeed, *none* of the new legal claims in the Amended Petition was based upon "newly discovered evidence" either. Accordingly, the 2-year time period for a Rule 3.850 motion ran in 1997. Since no other avenues for exhaustion were available when the Amended Petition was filed, all of these claims were

_____

[1]Specifically, the state argues, "The facts of Brown's intelligence, age, and race in relation to other persons as well as the absence of his mother from the interrogation room and the timing of the police notifications of her were all known at the time of the state court litigation. These matters could have been raised on direct appeal, but were not." (D.E. # 139 at 12-13).

clearly "exhausted" (due to "futility") – but, as Brown conceded, they were "procedurally defaulted," *see, e.g., Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *Pitts v. Cook*, 923 F.2d 1568, 1570 n. 2 (11th Cir. 1991), and not cognizable unless Brown could prove his "actual innocence."

**B. Brown is not required to "exhaust" newly-discovered evidence which is asserted ONLY to prove actual innocence as a "gateway" which will allow defaulted claims to be heard.** The exhaustion requirement relates *only* to actual "claims" for relief. "Actual innocence" is *not* an actual "claim" for relief in this case. The Attorney General's assertion in prior pleadings, that Brown is seeking to raise a *Herrera* innocence "claim," and that such "claim" should be found "unexhausted," D.E. # 166 at 5, 7, is incorrect. Brown is *not* raising a *Herrera* innocence "claim." He has never asserted – and is *not* now asserting – his innocence as a substantive ground for relief. Rather, consistent with his prior pleadings, *see* D.E. ## 79, 94, 104, and 124, and *precisely as the petitioner did in Schlup*, he is asserting his innocence – here, supported by Andrew Johnson's own admissions of guilt – *only* as a "gateway" which will permit the Court to hear his procedurally defaulted constitutional claims. *See Schlup*, 513 U.S. at 314-315 ("Schlup's claim of innocence [] is procedural, rather than substantive. His constitutional claims are not based on his innocence, but rather on his contention that the ineffectiveness of his counsel, and the withholding of evidence by the prosecution, denied him the full panoply of protections afforded to criminal defendants by the Constitution;" "Schlup's claim of innocence is thus 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits'") (Emphasis added).

The newly-discovered evidence from the re-opened Behan investigation here is relevant *only* to the issue of Brown's innocence. It is *not* relevant to *any* of the substantive constitutional claims

11

for relief Brown has ever raised.  It does *not* support his coerced confession claim; it does *not* support his *Miranda* waiver claim; it does *not* support his erroneous jury instruction claim; and it does *not* support any of his claims of ineffectiveness of counsel. The newly-discovered evidence is relevant only to the issue of Brown's innocence, which here is asserted as a procedural "gateway," rather than a substantive ground for relief. *Schlup* does *not* require that newly-discovered evidence relating only to ***innocence as a gateway***, be exhausted in state court first.  Indeed, in *Schlup*, the petitioner presented to the federal district court affidavits of two state correctional officers, to support his showing of actual innocence. *Schlup*, 513 U.S. at 307-312.  The Supreme Court remanded the case to the district court to take testimony on the issue of actual innocence.  *Id.* at 332.  There was no suggestion whatsoever by the Court, that Schlup should go back to state court to exhaust this new evidence – or to file a substantive innocence claim in state court – before the federal district court could determine his actual innocence.

**C. Although there *is* an "available" state court remedy for a petitioner with newly-discovered evidence of innocence, it is a parallel, alternative remedy.  Brown is *not* required to "exhaust" a substantive innocence claim in state court prior to having the issue of his "actual innocence" as a "gateway" heard by this Court.** Although Florida law allows a defendant to file a substantive innocence claim based upon newly-discovered evidence, *see Jones v. State*, 591 So.2d 911, 915 (Fla. 1992), that remedy is irrelevant here, because the Supreme Court held in *Herrera* that a substantive innocence claim is *not* a cognizable claim for relief before a *federal* habeas court.  Because such a claim is *not* cognizable in federal habeas, it need not be "exhausted" in state court first.  It would be error to stay this federal proceeding pending "exhaustion," where no "claim" for relief in Brown's petition, can or should be further "exhausted."

## 2. All of Brown's Claims
### – Other Than His Insufficiency Claim --
### are Procedurally Defaulted

The parties in this case agree that with regard to the May 1999 Amended Petition, all of Brown's claims for relief – other than his claim of insufficiency of the evidence (Ground A) and his *Miranda* claim (Ground C) – were "procedurally defaulted." *See*

> – Brown's Memo of Fact and Law on Exhaustion (D.E. # 79) at 3: ("While it is true that certain additional facts relevant to the . . . voluntariness/coercion claim, and Grounds D-K for relief (as a whole) were not presented to the state court system, these facts and claims may be deemed 'defaulted'");

> – State's Response to Amended Petition (D.E. # 78) at 13-17 ("Grounds B and D through K are procedurally barred;" "Petitioner would be barred procedurally in state court from raising these claims");

> – State's Resp. to Petitioner's Memo of Fact and Law on Exhaustion (D.E. #84) at 4-5)("Based upon the futility doctrine [], Petitioner's claims [Grounds B, and D-K of the Amended Petition] are procedurally defaulted in this action. When an issue meets the procedural default requirements, the burden rests with the petitioner to establish . . . that he is *factually innocent* of the crime.").

The Attorney General has argued, and Brown now concedes, that the *Miranda* claim set forth in the Third Amended Petition (Ground B of that petition) is different from the one Brown raised to the Florida Fourth DCA, in that it contains new facts and legal arguments "which were not raised on direct appeal, but could have been." D.E. # 139 at 12. For instance,

> The facts of Brown's intelligence, age, and race in relation to other persons as well as the absence of his mother from the interrogation room and the timing of the police notifications of her were all known at the time of the state court litigation. These matters could have been raised on direct appeal, but were not.

D.E. # 139 at 12-13. *See also* D.E. # 139 at 10 ("In addition to his claim of a violation of a state law notice requirement, Brown points to how other juveniles of the same age, race, and intelligence level might comprehend their *Miranda* rights to establish that he did not waive his rights (TAP 49-50 ¶ 62

13

c-f). These issues were not included in his direct appeal in the Fourth District. On appeal, Brown's challenge to the admission of his confession rested upon the fact he was 15 years old when questioned, was mildly retarded with an IQ between 54 and 60, had flunked two grades in school, was administratively promoted, and had been reminded of his November 15, 1990 confession before he gave his July 16, 1991 statement.")

The Attorney General is correct that Brown cannot "show a basis for not bringing these allegations to the Fourth District's attention or for not raising them in a collateral relief action." D.E. # 139 at 13. Accordingly, the Attorney General correctly states that "Brown's two year time limit ran prior to August 18, 1997," D.E. # 139 at 14, "[a]s a result, a motion for postconviction relief would be denied by the state court on a procedural bar basis." D.E. # 139 at 14. Therefore, as the Attorney General explains, "Based upon the futility doctrine outlined above, Brown's Ground B [unknowing and unintelligent *Miranda* waiver] is procedurally defaulted in this action. . . .When an issue meets the procedural default requirements, the burden rests with the petitioner to establish . . . 'actual innocence' to overcome the procedural bar attached to that claim").

Given the parties' agreement that all of the claims in this case other than the insufficiency of the evidence are thus "procedurally defaulted," and can only be heard by this Court if Brown proves that he is "actually innocent" under *Schlup*, the Court should proceed to determine whether indeed, Brown meets the *Schlup* standard of "actual innocence," and thus whether he has a "gateway" to having his "procedurally defaulted" claims heard.

The chart on the next page illustrates how the "innocence gateway" would work in Brown's case:

14

## HOW THE INNOCENCE "GATEWAY" WOULD WORK IN BROWN'S CASE



Newly discovered evidence of a § 2254 petitioner's innocence

May provide a "gateway" to have "procedurally defaulted" federal constitutional claims heard in a § 2254 proceeding  - Schlup v. Delo

Has the Petitioner raised any "procedurally defaulted" federal constitutional claims in the § 2254 proceeding?

No

Yes

District Court may not consider the issue of Petitioner's innocence in the § 2254 proceeding, because a "free-standing" claim of innocence is not cognizable in a § 2254 proceeding. Herrera v. Collins

District Court must consider whether Petitioner can prove his "actual innocence" as a "gateway" to allow his "procedurally defaulted" constitutional claims to be heard. "Exhaustion" of newly discovered evidence is not required before issue of "actual innocence" as a "gateway," is determined by the District Court.  Schlup v. Delo

If Petitioner demonstrates he is "actually innocent," District Court must hear all procedurally defaulted constitutional claims on the merits. Schlup v. Delo

15

### III.  BROWN IS "ACTUALLY INNOCENT"
### OF ANY INVOLVEMENT IN THE BEHAN HOMICIDE

As noted *supra*, in order for a petitioner to prove that he is "actually innocent" so as to create a "gateway" around any of his "procedural defaults" in the case, he must prove "*that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence*." *Schlup*, 513 U.S. at 327.  Brown can easily meet the *Schlup* standard here.  No reasonable juror could or would have convicted Brown, in light of the evidence that Brown – a boy of 15 with an I.Q. of 56 and no motive to kill anyone – gave a demonstrably false statement to his BSO interrogators after being handcuffed and having his feet shackled, while Andrew Johnson – a man of 30, with no mental deficiencies whatsoever, but with an overpowering hatred of BSO, and an admitted motive to kill a deputy – made repeated, voluntary, and consistent admissions to his wife, his friend China, and individuals whom he thought were drugs dealers, that indeed, he had been the one who killed Deputy Behan.  Importantly, Johnson – unlike Brown – knew facts that *only* the true killer would have known.

### A. Tim Brown's Taped Statement is Inconsistent with Eyewitness Testimony, Demonstrably False, and as a Whole, Not Credible

The state's case against Timothy Brown at his trial consisted entirely of the July 13, 1991 audiotaped (but not videotaped) statement that he made to Detectives James Carr and Eli Thomasevich in a BSO interrogation room, after an unrecorded "pre-interview."  Brown was 15 at the time of his interrogation.  His I.Q. was 56 – well within the mentally retarded range.  His reading ability at that time was at a third grade level.  His verbal understanding was – and is to this day – in the lowest 1% of our population.  (Exs. 15, 16, 23, 27).

16

BSO had known of Brown since November of 1990 – just days after the shooting – when Brown was asked what he knew about the Behan homicide, and Brown stated that indeed, he had shot the deputy. Sergeant Richard Scheff of the BSO Homicide division spoke further with Brown, and determined that Brown was either under the influence of narcotics, suffering from "some organic brain disfunction," or at the very least, "not in possession of all of his faculties." Scheff so concluded, he explained, because Brown was "like clay" in his hands. He realized that he could get Brown to "say whatever he wanted him to say." Scheff clearly "was not satisfied that Brown was the person who shot Patrick Behan," as he had been unable to provide any specific details about the shooting – details that could be compared to the physical evidence. He therefore let Brown go. (Ex. 12).

BSO did not speak to Brown again until eight months later. Notably, they did *not* make any immediate effort to confront him when Keith King told them on June 4, 1991, that he had been with Brown on the night of November 13th, and that Brown had killed the deputy. (Ex. 3). The reason was obvious. Much of King's account was false – and the detectives knew it. King claimed that he left the crime scene (at the corner of Hallandale Beach Boulevard and S.W. 40th Ave.), *see* Ex. 2 (map of the crime scene), by running south on S.W. 40th, and then walking 12-14 miles north from Hallandale Beach Boulevard to Ft. Lauderdale, while high on crack, lace, and marijuana. A crucial witness, Philip Howard, however, was strategically positioned on S.W. 40th Avenue, and walking north, in such a way that he would have seen Keith King run south on 40th had he done so. Howard, however, saw no one running south on 40th -- only a yellow cab turning south onto 40th. (Exs. 7, 8).[2] And it strained logic to believe that a limping, insulin-dependent diabetic like King could walk 12-14 miles while high on crack, lace, and marijuana. In addition, King told the officers that he and

---

[2] Howard's statement will be discussed in greater depth, *infra*.

Brown were "friends."  However, Detectives Carr and Thomasevich went to King's foster-mother

at the time, Mary Pendergrass, who told the detectives she did not know Brown, could not identify

his picture, and had never before seen Brown with King.  (Ex. 4).  Moreover, King had also said that

he met up with Brown at Brown's parents' house on Mayo Street, and after the crime had returned

there and spoke with Brown's parents after the shooting.  In actuality, however, and as the detectives

learned as well, Brown's parents had not lived on Mayo Street for close to a year prior to the

shooting.  When the detectives went to the Mayo Street address, Monica Cherise Willis (the current

resident who had lived there at the time of the deputy's murder as well), told the detectives that King

had *not* come to the Mayo Street residence, and had not met either Brown or his parents there on the

night of the homicide – as neither had lived there at that time.  (Ex. 5).[3]

Despite the apparent falsity of King's statement in crucial respects, Detectives Carr and

Thomasevich decided to go ahead, five weeks later, and arrest 15-year old Tim Brown – hoping that

he would make an inculpatory statement as well.  On July 16, 1991, just as Brown was leaving the

Covanent House (a juvenile facility), several BSO homicide detectives grabbed Brown, placed him

under arrest for the murder of Deputy Behan, handcuffed him with his hands behind him, and threw

him into the back of a police car.  Brown was brought to the BSO Homicide Unit interrogation room,

where he was placed at a table with his feet shackled.  He was repeatedly accused by Carr and

---

[3]After King's arrest, he stated that the statement he had made was false, and that he had made it only under coercion from Detectives Carr and Thomasevich.  On May 20, 1999, King made a formal taped statement to FPD Investigator Dennis Stinson, in which he recanted his entire June 1991 statement, and explained that while he had seen Tim Brown before, he never actually knew Brown, never hung around with Brown, never went to the Circle K on the night of the shooting with Brown, and that his sworn taped statement placing himself with Brown at the scene of the crime was coerced by Detective James Carr who physically beat him, threatened him with the death penalty, and falsely told him that Brown had previously made a statement implicating him.  (Ex. 6).

Thomasevich of having been involved in the Behan homicide. They reminded him of November 1990 statement to Sgt. Scheff admitting he had shot the deputy. They told him that Keith King had told them that he (Brown) had killed Behan. And they told him that a number of his (Brown's) friends "on the street" had said that he had admitted to them that he shot the deputy.[4]

Although Brown (15 at the time) stated on tape that he did not want his mother present with him during his interrogation, he thereafter told psychologist Elizabeth Kaprowski that indeed, he had wanted his mother present. (Ex. 15). In any event, his mother was *not* present at any time during Brown's interrogation – and she says, she *was not even contacted* until it was dark, approximately 9:00 p.m. (well after the taped statement concluded at 8:35 p.m.). When Mrs. Brown finally arrived at the police station, she was told that she could not see T ima as the interrogation was over, and Tim was no longer there. (Ex. 29). Sgt. Scheff later conceded that Mrs. Brown appeared at the station, but he claimed that she only came to "hear in person" that her son had been arrested. (Ex. 12). Scheff claimed – incredibly – that Mrs. Brown did not want to see her son. (Ex. 12).[5] Mrs. Brown emphatically denies this claim. (Ex. 29).

_____

[4] All of these "street kids" ultimately recanted their statements, with some explaining that they had only said what they said because Carr and Thomasevich pressured them. One of these individuals, Andre Butler, actually recanted in front of the grand jury, reporting to them that he had been handcuffed, shackled, pressured, and even threatened by Carr and Thomasevich into giving the derogatory statement about Brown. Presumably, the state attorney agreed that the statements Carr and Thomasevich had taken from Butler and his friends were not credible. None of these individuals was called as a witness at Brown's trial.

[5] Judge Frusciante found Scheff's testimony in this regard, troubling. He questioned Scheff himself, extensively on the issue of notice. (Ex. 17).

Brown initially denied any involvement in the crime, but then Carr hit him, and threatened him with the electric chair. (Exs. 28, 29).[6] Finally, after 20-25 minutes of threats, physical assaults, and accusations, he finally broke down and told Carr and Thomasevich that he had been with Keith King at the Circle K when the deputy was shot. At some point, "after he made his [unrecorded] verbal statement," the detectives showed Brown crime scene photos showing where Behan's car was parked, and how it was backed into the lot, "to get his story straight." (Ex. 13 at 369; Ex. 14 at 399). Thereafter, Brown went on tape, and told the detectives that he was riding King on his bicycle along Hallandale Beach Boulevard. King had a .38 gun in his waistband, and approximately two blocks before the Circle K, spontaneously stated to Brown that he (King) was going to kill some one. At that point, Brown stated, he had called King's "bluff" – meaning that he did *not* believe King would do it. And in fact, as they continued to ride along Hallandale Beach Boulevard towards the Circle K, Brown stated, King jumped off of the bicycle, limped over the deputy's car, and after the deputy made a movement to grab his stick, King shot him. (Ex. 1).

According to Brown's statement, they then both jumped back onto the bicycle, headed north across Hallandale Beach Boulevard, onto 40th Street, traveling in the center of the road. Before they got to the first block, they fired a second shot, and thereafter threw the gun near the gate to the rock pit. (Ex. 1). After Brown made that taped statement, he went with detectives to the rock pit to point out where the gun had been thrown. BSO dredged the rock pit and searched surrounding area repeatedly. No gun was ever found.

Brown's account of the disposal of the gun was thus uncorroborated. It appeared to be false. And indeed, that his statement was, and is, *demonstrably false* with regard to:

---

[6]Detective Carr denied such misconduct. (Ex. 13).

20

– his escape route

– the firing of a second shot

– and the deputy's movement prior to being shot,

is shown by the following *four* witnesses – *three* of which, never testified at trial:

• **The Circle K Store Clerk, Timothy Van Hoesen**: Had Brown and King been at the Circle K at 1:45 a.m. on November 13, 1990, and had they escaped from the scene by jumping back on the bicycle and riding north down the center of S.W. 40th Avenue, across Hallandale Beach Boulevard as Brown claimed, they would undoubtedly have been seen by the store clerk, Timothy Van Hoesen, who – the Circle K video indicates – was positioned by the front window when he heard the shot, and immediately looked out and across Hallandale Beach Boulevard.  Van Hoesen, however, never saw two boys on a bicycle.  And that is why the state did not call him as a witness at trial. Unfortunately, defense counsel did not think to call Van Hoesen either, or even attempt to discredit Brown's account.

And indeed, neither party called Philip Howard, who could have thoroughly discredited the alleged "escape route" Brown described to Detectives Carr and Thomasevich.

• **Philip Howard**: Sometime after 1:00 a.m., on November 13, 1990, Philip Howard left the home of a friend who lived at S.W. 40th Ave. and 33rd Court in Hallandale.  Howard was proceeding home, walking north on S.W. 40th, and was approaching the Circle K store, located at the corner of 40th and Hallandale Beach Boulevard, when he heard one gunshot.  At the time of the gunshot, Howard was approximately ½ block south of the store.  Upon hearing the shot, he continued north, quickened his pace, and arrived at the Circle K store shortly after hearing the shot.  At the Circle K, Howard was told by a tow truck driver to stay back because a man had been shot.  Howard

subsequently flagged down a deputy and told him what he had seen and heard.  Later that morning, he gave a taped sworn statement to Detective Gucciardo of the Broward Sheriff's Office, in which he recounted these same facts.  (Ex. 7).

What is important about Howard's testimony is what he did *not* see.  Specifically, what he did *not* see, was two black males on a bicycle, crossing Hallandale Beach Boulevard, and then travelling northward on 40th Ave in the center of the road.  Howard had an unobstructed view of the southern part of S.W. 40th approaching the intersection with Hallandale Beach Boulevard, of the intersection itself, and of S.W. 40th north of the intersection.  The area was well lit as it was a major intersection.  Clearly, Howard would have seen two boys on a bicycle crossing that intersection and hearing north on S.W. 40th Ave. if that had been true.  We know from his testimony that IT IS NOT.

And indeed, Howard was at the time, and remains to this day, a credible witness.  Howard reaffirmed his account in a December 20, 1999 interview with Marlon Johnson, where he affirmatively stated that there were *no* black males on bicycles crossing Hallandale Beach Boulevard or traveling north on S.W. 40th after the gunshot.  (Ex. 8).  And indeed, most compelling is BSO's own assessment of Howard.  In their view, he was the most credible eyewitness to this crime – credible enough to thoroughly discredit the confession of Jackie Bain (whose claimed flight path, south on S.W. 40th, was right in Howard's path):

> SGT. SCHEFF: At that point I tell her that I don't think that – she's telling us that she left the scene going south on 40th Avenue.  Now we had this kid, Philip Howard, that's walking up 40th Avenue.  So I asked her – I said, "Look.  I've got a witness that's walking up from 40th Avenue.  You're telling me that you ran down 40th Avenue to County Line Road, you'd have had to have passed him.  It's very doubtful to me that this kid would have missed you.  You attract a lot of attention."
>
> And so that was doubtful – again, I don't don't think she's telling us the truth.

(Ex. 9). It is troubling that the state attorney did not call Howard as a witness at trial. It is even more troubling, however, that defense counsel did not call him. Defense counsel did not demonstrate in any way for the jury how Brown's confession was false. Calling Philip Howard as a witness could easily have done so.

• **Edward Davis**: Sometime before 2:00 a.m. on November 13, 1990, Edward Davis left his mother's home located at 4110 S.W. 28th Street in Hollywood, Florida. This residence is one block north of Hallandale Beach Boulevard and ½ block west of 40th Avenue. Davis walked east on 28th Street toward 40th Avenue, as he headed toward the Circle K store to get coffee and cigarettes, before going to work for a garbage company on the early morning route. As Davis was hearing east and rounding the corner to go south on 40th Avenue – approximately one block north of the Circle K at the time – he heard a gunshot. He immediately ran south on 40th, toward the store, stopping by a tree located a short distance down the block. He had a clear, unobstructed view of the Circle K and surrounding parking lot area. Shortly after hearing the gunshot, he observed a lone black male run eastward, from an area behind the patrol car, to a gap between the back of the Circle K and the wall behind it.[7] The man disappeared behind the store, and Davis did not see him again. Davis did, however, see that there were two people in the store, and recognized one as the "clerk with reddish blond hair." He also observed another man exit the Circle K and come out into the parking lot after the shot. Davis also noted that the police cruiser was backed into the parking space.

Shocked by what he had seen, Davis ran back to his mother's house. After calming himself, he returned to the area where he had heard the shot and dropped his radio. While searching for his

---

[7]The wall is located a couple of feet south of (behind) the store. (Ex. 2).

radio, he was stopped by a deputy who asked him if he had seen anything. Davis, who was afraid of getting involved, stated that he had not seen anything.

During the trial of Tim Brown in 1993, Edward Davis who was in the Broward County Jail, felt obligated to contact authorities to report what he had seen. He told a corrections deputy and his public defender that he had information on the Behan case. Unfortunately, by the time Brown's counsel received the message, it was too late. Trial counsel, however, did not endeavor to bring Edward Davis' information to the attention to the court in a post-trial motion. Thereafter, Dennis Stinson, an investigator with the Federal Defender's Office, found Mr. Davis' name in trial counsel's file. He followed up on the information and located Davis. On May 21, 1999 Stinson interviewed Davis, and Davis described the facts as set forth above. (Ex. 10). On February 28, 2002, BSO took a 49-page sworn taped statement from Mr. Davis, in connection with the re-opened Behan investigation. (Ex. 11). Davis' testimony in both statements is consistent, and compelling.

Indeed, Davis' testimony is important in this case in *three* critical ways. First, he affirmatively states that there were *never* two black males on a bicycle crossing Hallandale Beach Boulevard and traveling north on 40th – as Brown had described. Had Brown and King been at the Circle K, and left the scene as Brown described, they would have had to pass right by where Edward Davis was standing on 40th. Second, if Brown and King had fired off the shot where Brown claimed – on 40th, just after they crossed Hallandale, before they got to the first block – Davis was right there at that time and would have seen them do so (and heard the shot). Importantly, he did *not*.[8] Thus, as illustrated in the attached photos, Davis' testimony directly contradicts Brown's on these key points:

---

[8]No one in this case – the clerk, Van Hoesen; the towtruck driver, Antonio; or Philip Howard – ever heard a second shot.

24



Aerial View of Ⓚ with Witness Positions

Tim Brown vs Harry Singletary
95-7207-CIV-GRAHAM



Tim Brown  vs  Harry Singletary

95-7207-CIV-GRAHAM

Alleged Flight of Brown & King

Fired Gun Second time

Clearly, when the testimony of Edward Davis is considered together with that of Philip Howard – *testimony that the jury in this case never heard* – Brown's July 16, 1991 account is utterly *impossible.*

Finally, and this will be discussed more fully *infra* in connection with the evidence from the re-opened Behan investigation, Davis' testimony gains even more significance still, in light of the fact that his description of the flight path of the lone black gunman matches the precise escape route described by Andrew Johnson.  Notably, Johnson states that he approached the cruiser from the area "in the wall," shot the deputy, and then fled behind the store back to his parked car, in an easterly direction.  Johnson even tracked his escape route for undercover agents, pointing out the wall and his path – which matches Davis' description exactly.   And importantly, Davis gave his sworn statement to Dennis Stinson two full years before Andrew Johnson recounted that same path to the undercover agents.

• **The Medical Examiner's Testimony:** As the autopsy report shows and the medical examiner described at trial, just before the bullet entered Deputy Behan's head, through his left upper cheek (approx. an inch from the temple),  Behan suffered a graze-type gunshot wound to the 3rd and 4th digits of the left hand, with stippling "throughout the palm of the left hand."  The pathway of the projectile was "front to back" on the hand.  What had happened, the medical examiner explained, was that Behan raised the palm of his hand up between the gun and his face, just before the bullet hit. According to the medical examiner, the barrel of the gun was pointing towards the palm of the deputy's hand when it was discharged.  (Exs. 18, 19).

Brown told Carr and Thomasevich that the deputy had made a movement as King approached his car with the gun, but the movement Brown described – "He tried to grab his stick" -- is a

25

downward movement.   Such a movement is *not* the movement described by the medical examiner, *nor* is it  consistent with the physical evidence.   Critically, Brown had no knowledge of Behan's actual last movement – placing the left hand up.   His statement on this point – as well as on the escape route, and the second shot – was clearly false.

And again, the inconsistency of Brown's account with the actual facts of the case, is highlighted further still by contrasting it with Andrew Johnson's detailed, and thoroughly correct statement as to every detail of the crime.   Brown made a "guess" at the kind of movement a deputy might make just before being shot, and his guess was a wrong one.   Andrew Johnson, however, knew the *exact* movement the deputy made.   He told the undercover officers that Behan put his hands up, and that Johnson told him to keep his hands up – which he did until he was shot.   (See Appendix B-7, B-8).   And this detail – like the escape route witnessed by Edward Davis – is the kind of detail of a crime that only the true perpetrator would know.   And Brown did *not* know it.

This is important, because in attempting to determine whether a confession is false, one crucial question false confession experts ask is:  "Did the defendant provide information that only the true perpetrator would know?"   (Ex. 26).  Dr. Richard Leo, Ph.D., J.D., Assistant Professor of Criminology, Law and Society and of Assistant Professor of Psychology and Social Behavior at the University of California, Irvine, and an expert in the area of police interrogation, coercive influence techniques, and false confessions, states:

> It is generally recognized that a reliable admission should be corroborated by existing physical evidence, should lead to credible derivative evidence, should be able to explain anomalies, should be inherently plausible, and most importantly, should demonstrate guilty knowledge (in the suspect's post-admission narrative).   By contrast, a false admission should not be corroborated by the crime scene or physical evidence, may mis-describe the crime facts or strain plausibility, should not lead to any derivative evidence, or explain away anomalies, and most importantly, should fail to

demonstrate guilty knowledge (but instead will demonstrate ignorance) in the suspect's post-admission narrative.

(Ex. 26).

At least two years prior to the re-opened Behan investigation, and disclosure of Andrew Johnson's admissions to killing Behan, Dr. Leo reviewed Tim Brown's taped statement against the available evidence at that time, and opined that the statement given by Brown was "likely a false confession." As a basis for his opinion in this regard, Dr. Leo noted that Brown's recitation of the facts was inconsistent and in conflict with the known facts of the case, it did not lead to any derivative evidence, did not explain away any anomalies or disclose any detail that only the true perpetrator of the crime would know, and importantly, was *disconfirmed* by the physical and medical evidence. (Ex. 7).

True, Brown stated on tape that Behan's car had been backed into the spot, that he was shot in the head, and that he was shot while he was doing paperwork. However, Brown made these statements after being shown crime scene photos which clearly demonstrated these facts. In addition, these were facts generally reported in the news media at the time. When the demonstrably false facts are omitted from Brown's statement, it is remarkable how vague it truly was. Not only did he *not* know that the deputy's hand had been raised when he was shot. He did not specify where in the head he was shot, or from what distance King pointed the gun. Indeed, there was nothing that Brown specifically recounted, that could have proved that he was at the Circle K on November 13th, and that he had been involved in the shooting.

According to Dr. Leo, mentally deficient individuals are highly susceptible to giving statements that are false, as they are more vulnerable to the psychological pressures often used in modern accusatorial interrogations. (Ex. 26) It is for that reason that the Broward Sheriff's Office

27

has recently instituted new policies and procedures for interrogating mentally disabled suspects.[9] One of the new crucial protections for mentally disabled individuals is the new policy that "A developmentally disabled subject *may not waive* BSO's policy to notify an appropriate adult." This policy requires that

> Prior to interrogating a subject who is considered to be developmentally disabled, detectives will make a reasonable effort to notify and afford an appropriate adult the opportunity to be present during all questioning. If unable to make contact, detectives will record the date and time attempts were made and reason the effort failed. If contact is made and the appropriate adult declines, the detective will document the date and time and reasons why.

(Ex. 30). Now, "when advising developmentally disabled subjects of their constitutional rights, detectives will speak slowly and clearly and ask subjects to explain their response rather than simply answer yes and no." Detectives are now directed to "avoid questions that tell the subject the answer detectives expect," "minimize questions that require a simple yes or no response," and "realize developmentally disabled are eager to please and often respond to questions in a manner they think pleases the detective." (Ex. 30). *All* of these new directives were violated in Brown's case.

There should be no question in this case that Brown was – and is – developmentally disabled. At the time of his arrest Dr. Kaprowski determined that Brown's verbal I.Q. was 60, his performance I.Q. was 60, and that his full scale I.Q. was 56 – which places him in the mentally retarded range. (Exs. 15, 16). She also deemed him "very easily led by others." (Ex. 16). Dr. Bruce Frumkin, examining Brown as an adult, years later in 1999, agreed. According to Dr. Frumkin (who re-examined Brown in 1999), Brown's verbal intelligence scores remain in the lowest 1st percentile of

---

[9]Apparently, the new policy is a direct response to the Frank Lee Smith, and Jerry Townsend cases, in which BSO secured false confessions from mentally retarded individuals, who were subsequently exonerated with DNA evidence.

the population. His knowledge of the meaning of vocabulary words is in the lowest 1st percentile as well, his verbal abstract reasoning skills are even lower, his judgment and common sense is in the lower 2nd percentile range, and his short-term memory, attention, and concentration are in that range as well. (Ex. 27). Notably, Dr. Frumkin has stated, after examining Brown *as an adult* in 1999 in a thoroughly *non-coercive setting*, that Brown is a highly "suggestable" individual. Specifically, on the Gudjonsson Suggestibility Scale, Brown did not yield significantly to misleading questions, *but when told that his answers were incorrect (whether or not they were, in actuality), Brown shifted to a different response to an extreme degree (99th percentile – meaning only 1% of the population had a more extreme response)!* The research conducted by Gudjonsson shows that individuals who give false confessions have significantly higher suggestibility scores than those who have not given false confessions. (Ex. 27). Here, Brown's extreme suggestibility helps explain "why" and "how" his false confession occurred.        Finally, as explained by Dr. Lenore Walker, an expert in the "Battered Child Syndrome," years of physical and verbal abuse at the hands of his father created in Brown a Post Traumatic Stress Disorder of tremendous proportions, making him "psychologically vulnerable" to being coerced into "saying anything those police detectives wanted him to say, including taking blame for a murder that he did not commit nor was present at when it occurred." (Ex. 28). According to Dr. Walker, the abuse Brown received from the detectives during his interrogation, would trigger a "trauma response," which would cause him to tell his abusers whatever they wanted to hear, since he could not run away -- as was his reaction to his father's abuse in the past. (Ex. 28).

In his interview with Dr. Walker, Brown recalled that the officers refused his protestations of innocence, and kept telling him "We know you did it." They showed him pictures of the car scene showing how the detective had the car parked, and they told him how to answer certain questions by

29

their head movements. But other details he simply "made up," because he believed that if he told them what they wanted to hear, they would let him go.  (See Dr. Walker affidavit, Exhibit 9).

The jury in this case *never* heard from Dr. Leo, Dr. Frumkin, Dr. Walker, or Othalean Brown. They *never* heard of the new BSO guidelines for interrogating mentally disabled subjects, or heard that crucial procedures for insuring against false confessions, were not followed in this case.  They did *not* hear from a false confession expert – or from BSO itself – that in determining whether a confession by a developmentally disabled is false they should ask:

> – Was the developmentally disabled subject able to provide an accurate description of the major and minor details of the crime and its scene?

> – Were there any unusual or unique elements to the crime or its scene that were not publicly known that the developmentally disabled subject was able to provide?

> – Are the witness accounts consistent with the subject's account of what happened?

(Ex. 30).  And in that regard, they *never* heard from Philip Howard, Edward Davis, or Timothy Van Hoesen that Brown's account of the crime could not have occurred..  They heard from Dr. Vila, the medical examiner, but they *never* heard from Brown's attorney how Brown's statement was at odds with the medical evidence in this case.

Most importantly, however, the jury here *never heard from Andrew Johnson*.  They did not hear how his account was consistent with the facts of the crime in every detail, and that he repeated it over and over again, without any coercion whatsoever, to his wife, to his friend China, and to people whom he believed to be drug dealers.  They did not hear that Andrew Johnson had an overpowering motive to kill a BSO deputy execution-style – a motive Brown and King indisputably lacked.  Had the jury in this case heard *all* of this evidence, they clearly could not have found proof beyond a reasonable doubt that Brown murdered Deputy Behan.  They *would* have acquitted him.

**B. Andrew Johnson's Repeated, Voluntary, and Corroborated Statements are Consistent with the Eyewitness Testimony, with the Medical Examiner's Testimony, and with all of the Relevant Facts in the Case**

At the time it was top-secret, but it is now publically-known that the Broward Sheriff's Office reopened its investigation of the Began homicide in April of 2001. Unbeknownst to anyone – even the State Attorney's Office for some time – the Sheriff's Office spent approximately $250,000 and 6,000 man-hours investigating whether in fact, it had been former detention deputy Andrew Johnson – terminated from BSO only months before the Began homicide – who had actually killed Deputy Behan 11 years earlier. From this unprecedented expenditure of resources alone, it is obvious that the BSO had reasonable – and even substantial – doubt, as to who had actually committed this crime.

**Re-Opening of the Behan investigation.** As recounted in BSO's 99-page report of the investigation (Ex. 31), the re-investigation was sparked in April of 2001 by statements made by Johnson's estranged wife, Gwenda ("Gwen"), to an individual known as "China" – a friend from church with whom she was having an affair. In April of 1999, Gwen told China that her husband Andrew, a former BSO detention deputy, had killed another sheriff's deputy at a convenience store in Broward County years earlier. Unbeknownst to Gwen, China was a confidential informant for Metro-Dade police. Metro-Dade suspected that Gwen was talking about the Behan homicide. They contacted BSO, turned over "China" to work with BSO, and the "re-opened" investigation commenced.

**Overview of Gwen's discussions with China (April-July, 2001)**. Beginning April 25, and over the next three months, China – wearing a wire monitored by BSO – met repeatedly with Gwen. They drove around together, ate together – at one point, even went to a motel room together. Gwen recounted for China how AJ had had repeated run-ins with a racist cop who had gotten him fired

from BSO after an Internal Affairs investigation, and that Andrew wanted to kill that cop. (*See, e.g.*, Ex. 38 at 1-2, 4, 6). According to Gwen, AJ was a "major stalker," who watched the deputy, crept up on him where he was parked, and shot him once in the head. (Ex. 39 at 8; Ex. 40 at 24).    When AJ came home, he woke her up from his sleep, told her that he had shot the wrong deputy, and asked her to go with him to dispose of the gun. (Ex. 42 at 12). Gwen agreed. AJ apparently had broken the gun into three parts, and they drove to a distant area of Miami, where he threw them in three different places. (Ex. 31 at 36-37). China went with Gwen back to the area (at 22nd Avenue, and 168th Street, near the New Way Church), and she showed him the general spot. (Ex. 31 at 36-37). Gwen was sure that AJ had killed the deputy, because he was "in love with that gun" and would not have gotten rid of it otherwise. (Ex. 51 at 12-13). Gwen feared for her life if AJ ever learned that she told anyone about the crime, or if he ever found out about her affair. She and China repeatedly discussed that he was "a killer."   Gwen said that she had prepared a written will that described how AJ had killed the deputy, in case anything suspicious ever happened to her. (Ex. 40 at 6, 16, 25, 36, 50-51).   China said he was scared of AJ too, and therefore, Gwen helped China draw up an "insurance letter" stating that AJ had killed a cop in at a convenience store in Broward County – just in case anything happened to him. (Ex. 41)

**The Important August 2, 2001 Traffic Stop**.  Towards the end of July, BSO determined that contact needed to be made with AJ.  The ruse devised, was that China (who was also a friend of AJ's from church), would somehow get AJ into his car, and BSO would then conduct a fake traffic stop – with the hope that would AJ would start to discuss the circumstances under which he was terminated.  BSO, got that, and much more on August 2, 2001.  (Ex. 45).

32

Since AJ was trying to get into the video business, China called AJ and asked him if he would be interested in videotaping a bachelor party for a "high roller." AJ agreed to meet with China on August 2nd, and as agreed, China introduced him to the undercover officers Chico (BSO Detective Cedeno) and "T" (ATF Agent Curry). AJ agreed to perform videotaping work for Chico and "T" at a later time. Upon leaving the meeting, as arranged, BSO Deputy Sudler initiated a traffic stop. Seeing a BSO deputy at the window, AJ told him, "I used to do the job what you do" and stated proudly, that he had been a "Deputy Sheriff." Deputy Sudler, in turn, took their ID, and then went back to his patrol car to run them in the computer. Just before he returned, China told AJ that he thought the cop was "nasty," and that he had "disrespected" AJ. To that, AJ responded "Guess what? That's what, that's when you see them on the news dead, cause somebody kill em." (Ex. 45 at 11).

When Dep. Sudler returned to the car, and he stated, "Now I know where I know you from," and "You didn't leave, you got shit-canned," AJ launched into a long explanation of what "really" had happened to him – how he had been wrongly accused of "playing road patrol" by Deputy Brian "McNulty." (Ex. 45 at 14). AJ said "And he's a Sergeant now I think in Pompano." (Ex. 45 at 14). Sudler said that he knew who AJ was talking about, and that in fact, "the dude you're talking about man" had been the one to train him. (Ex. 45 at 14).

AJ told Dep. Sudler that he had initially met "McNulty" when he (AJ) lived in Carver Ranches and he was studying to become a deputy. "McNulty" came to his house when AJ reported a burglary. When "McNulty" saw his police books out on the table, he told AJ, "You'll never make it. I said why? He said look where you come from, look where you live." (Ex. 45 at 14). When Sudler went back to his car to check the computer, AJ and China alone again. After some further discussion with

33

China about the false charges against him, and the fact that Dep. Sudler was a bigot, AJ *spontaneously* started to speak about, and describe in detail, the Behan homicide. He told China that he "knew" who had "smoked" the cop in his car – although that "dude" had never gotten caught:

AJ: Their partner right down here why got killed and I was there shootin' it.

CI: Which one?

AJ: The one. . . the one that I know who smoked him.

CI: He got smoked?

AJ: Yea he got smoked, sittin' in his car.

CI: His partner?

AJ: One of his partners used to work right here, District one.

CI:   Some nigger knocked him off?

AJ: No . . . knocked him off.  Killed him, shot him in the head, 357.

CI: G-ddamn.

AJ: Blew his head off.

CI: Cause he was the same kind of redneck like that.

AJ: Same kind of redneck like that. . . .

CI: What about the dude that knocked him off.

AJ: They never got him.

CI: Huh?

AJ: They never got him.

CI: What?  He in Miami?

AJ: He down here.

34

CI: Damn.

AJ: That's why I tell you, a lot of people don't know the things I know, and don't know what I've been through and what I've seen.

CI: 357?  How many times did he hit him?

AJ: One time.

. . .

CI: The dude that popped him with that 357, he beat him up or somethin?

AJ: He did something to him.  Did something to him, the guy got pissed off, came back, and killed him.

(Ex. 45 at 18-19, 23).  At this point, AJ's rage – at what BSO had done to him – overtook him.  His

blood started to boil.  Seething, he spoke about cop killings, with passion, personal feeling, and an

air of "experience" – telling China of his desire, and ability, to kill cops who "treat you like you ain't

nothing:"

AJ: They don't want to cross me, cause they don't want me going into gangster mode.  They can be in a patrol car, I don't care, I'll go at them in their unit and all before you get to that radio (inaudible) off. . . . (Ex. 45 at 21);

AJ: Yea they get away with it until, you gotta understand, why you think I don't feel sorry for cops that get killed.  Because they did something wrong in the past and it . . . it just came back to them, (inaudible) (Ex. 45 at 20);

CI: Crazy . . . dude killed a cop.

AJ: Yea, (inaudible) you know you get the death penalty for that.

CI: For what?

AJ: Killing a cop.

CI: Oh yea.

AJ: Yea you get the death penalty, but killing a cop, to me killing a cop is like killing the next man the street he ain't nobody better than me, he ain't no better than the next man.

CI: Not when you got that uniform and that badge on he going to treat you like you ain't nothing.

CI: Yea.
AJ: That's what make me want to kill them more.  (Ex. 45 at 23).

**The August Meetings with AJ.**  AJ's extremely specific knowledge of the Behan homicide – knowledge of facts which *only* the true killer would have known – became even more apparent in the ensuing weeks.  As agreed, AJ met with Chico and "T" on several dates – August 14th, August 16th, August 23rd, and August 31st – at first, videotaping an apparent drug transaction for them (August 14th), and thereafter, attempting to be hired by their "organization."  AJ was told by Chico, that he would have to come clean with them about his past, because the organization wanted to make sure that there was nothing that could "come back to them."  AJ proceeded to tell Chico on August 16, and then on August 23rd and August 31st in even greater detail (discussed more fully, *infra*), that he had killed the BSO deputy who was responsible for firing him – why he had done it, how he had done it, and how he had gotten away with it.  With specific and accurate detail, he went through his run-ins with the "racist cop," the Internal Affairs investigation, and his firing; he described how he stalked the officer, how he knew where he would be, the weapon he used to shoot him (a .357 Smith and Wesson); the bullets he used (hollow points); how the deputy was sitting in the car, doing paperwork when he was shot, and a final crucial detail:

AJ.      I did him in uniform.

Unk.   Come on now.  Straight up?

AJ.      As God is my witness as I'm sitting here.

36

Unk.   So he didn't see ya coming?

AJ.    Oh yeah he saw me . . .

Unk.   . . . (Did he rap to you)?

AJ.    . . . I was the last person he saw.

Unk.   Did he rap to you before?

AJ.    *No he just, put his hands up, like I asked him to, and I off him.*

(Ex. 47 at 21).  Consistent with the account Gwen had told China, AJ described how he had broken

the gun into three pieces following the crime, and disposed of them by throwing one part into a field,

one part into a lake (now an apartment complex), and another part into a dumpster. [The area AJ

identified (southeast of the intersection of N.W. 27th Ave. and N.W. 175th Street in Miami-Dade), was

– in the words of BSO – near the "exact spot," or "only a few blocks away" from the spot identified

by Gwen. (Ex. 59 at 49)]. In their reports of the August 23rd and August 31st conversations, BSO

describes AJ's admissions as a "full confession." (Ex. 48, and 50).  Finally, Chico told AJ that he was

ready to introduce him to "Rollie," the big boss, but he would have to explain everything to Rollie

all over again, and answer Rollie's questions.   Rollie would be concerned, he said, that AJ was a

former cop.

**The October 4th meeting with "Rollie" at the undercover office.** The meeting with Rollie

(ATF Agent Steve McKeen) took place on October 4, 2001.  BSO rented a Lear jet to taxi down the

runway with Rollie aboard, to impress AJ.  When Rollie arrived, they took him to an undercover

office, equipped with videotape.  Sitting across the table from Rollie and Chico, AJ proceeded to tell

them again, what he had already told Chico and "T."  (Ex. 52).  And this time, he provided even more

detail about the murder – all of which was accurate.  He explained that the deputy's window was

37

partially down, and that he did not shoot through any glass.  (Ex. 52 at 28-30).[10]  He explained to

them, that when the bullet hit, he was standing the same distance from the deputy, as he was at that

moment from the back of Chico's chair (a distance of 3-4, as seen on the video).  (Ex. 52 at 29).

Finally, he demonstrated for them all, precisely how the deputy had put his hands up – as he had

ordered him to do.  (Ex. 47 at 28, 56-57).  Seeing AJ reenact this on the video is chilling.[11]

But then the showdown came.  As AJ continued to reaffirm, over and over again, that the

deputy that he had shot was the one that had gotten him terminated – a deputy named "Brian" –

Rollie opened a briefcase, and flung down a newspaper article about the Behan case (Ex. 52 at 37-41;

Ex. 53), asking AJ to explain what was going on – because the murdered deputy's name was *not*

"Brian," it was "Behan."  (Ex. 52 at 37-38).  At that point, AJ carefully studied the article, pointed

to the picture of Deputy Behan and said: "This the guy I did.  I know that for a fact."  (Ex. 52 at 39).

When Chico suggested to him that he might have "snuffed the wrong dude," AJ conceded, stating:

> This the guy I snuffed and that's possible, I can't deny that.  That's possible, but I
> know this the guy.

(Ex. 52 at 46).  He admitted, sheepishly, that his intention was to get Brian (Ex. 52 at 52).  At that

point, Chico tried to clarify the issue:

> Chico:  A, so then, this is what, I mean I might be wrong bro but, what it, what it
> sounds like to me is that, you, you got, you got the hammer on this dude and and and
> you realized it wasn't him and said fuck it it's too late now I gotta pull it (on).

---

[10]On this point, as on many other crucial ones, the transcript prepared by BSO is inaccurate
– indeed, contrary to the actual statement made by AJ.  Undersigned counsel and FPD investigators
have listened to all of the tapes, compared them to the transcripts, and are in the process of having
correct transcripts prepared.  On the exhibits attached to this motion, the changes to the transcript
are marked by hand. In the excerpts from the transcripts included in Appendix B to this motion (App.
B-1 through B-28), corrections are noted in *bold italics*.

[11]Counsel will be filing a copy of the October 4th video with the Court, forthwith.

AJ: Yeah.

Chico: It's I mean . . .

AJ: . . . No at the time when I did it, when he turned his head, I did what I did, I just stayed long enough to shoot him.  All I saw was (making a noise) . . .

Rollie: . . . .Where'd he get shot?

AJ: Bout right here (demonstrating the left temple).

(Ex. 52 at 52-53).

As AJ started to describe for them where the deputy was parked at the Circle K, and where he was facing, and so forth, they told him to take a pen and draw the crime scene, showing them what had occurred.  AJ did as they requested, creating a sketch on the back of the newspaper article, he drew the crime scene from memory, as it had indeed existed.  (Ex. 52 at 55; Ex.54).  Notably, in describing how he escaped from the crime scene, he made a "S" motion with his hand, showing that he darted in between the Circle K and the wall behind it – running eastward, then on the street behind the Circle K.  (Ex. 52 at 55).  And this was precisely what Edward Davis had described.

**The October 4th "car tour."**  Chico and Rollie told AJ that they wanted him to take them back to the Circle K to show them everything he had just described. They also wanted to him to take them back to the spot(s) where he said he had disposed of the gun.  And he complied.  When the got to the Circle K, AJ showed them how he "came up from behind in the wall."  (Ex. 55 at 31). He showed them where Behan's car had been parked, and how he had ran back to his own parked car, and thereafter eastward along S.W. 30th Street (behind the Circle K) after he had shot Behan.  (Ex. 31 at 68).  A surveillance video taken of their car clarifies what AJ was describing on these points. And again, it confirms that *what AJ described, is precisely what Edward Davis described years earlier.*  The following show AJ's escape path, and the line of vision of both Davis and Howard:

39



Flight Path As Described By Andrew Johnson

Tim Brown vs Harry Singletary
95-7207-CIV-GRAHAM



Flight Path As Described By Andrew Johnson

Tim Brown vs Harry Singletary
95-7207-CIV-GRAHAM

**Gwen speaks with BSO**.  When AJ thereafter took the group back to the area where he disposed of the gun, he took them back to the same general area where Gwen had taken the CI several months earlier.  In December, the CI informed BSO that AJ had moved out of his apartment with Gwen, and that she was quite upset – and ready to speak with someone in law enforcement about AJ's role in the Behan homicide.  (Ex. 31 at 73).  Gwen's first meeting with BSO was on December 13th.  Although their discussion was not recorded, BSO reports that Gwen told them at that time that she recalled how Deputy Montgomery had gotten AJ fired, and that AJ used to sleeptalk, saying "that he was going to 'get' Montgomery for costing him his job with BSO."  (Ex. 31 at 74).  AJ spoke in his sleep as well about events which she perceived to be those of the Behan homicide.  "She went on to state the sleep talking usually began with AJ repeating the words 'Wrong guy,' 'Wrong guy.'"  (Ex. 31 at 74).  In addition,

> When specifically asked about whether or not she accompanied AJ to dispose of the gun on the night of the murder she described the following incident: She recalled a night when AJ came home very late and woke her up and telling her he just killed someone.  He requested that she accompany him to dispose of a gun.  She remembered he was wearing military type clothing and had applied face paint around his eyes.  He was wearing a "skully" type of headgear.  Apparently, AJ had already "broken" the gun apart prior to Mrs. Johnson accompanying him.  The gun was thrown in a field not far from somewhere in Dade County not far from where they were living at the time.  The car AJ was driving was a Ford Probe."

(Ex. 31 at 75-76).  Gwen told BSO that she would attempt to convince AJ "to move back home and that she would record his sleep talking.  She further agreed to allow a hidden recording device to be installed in her bedroom."  (Ex. 31 at 77).

Over the next month or so, Gwen tried to get AJ to move back home, but to no avail.  Gwen continued to meet with Detective Bole and Major Fantigrassi, and assured them that she would continue her efforts to get him to move home.  (Ex. 31 at 78).  By the end of January, however,

40

Gwen had heard definitively from AJ that he would not be moving home.  (Ex. 31 at 79).  BSO needed a new ploy.  After informing the Broward State Attorney "as to the progress of the investigation," (Ex. 31 at 79), BSO decided to use the ruse of a BSO "recruitment" – to lure AJ back to BSO for a job interview and pre-employment polygraph.  (Ex. 31 at 79-80). Gwen believed AJ would leap at the opportunity to work for BSO again.  (Ex. 31 at 80).

Gwen came back to BSO for a final discussion on January 31, 2002, at which time "she admitted that AJ had directly confronted her (not in his sleep) about shooting the wrong officer.  He swore her to secrecy and threatened her life if she ever told anyone."  (Ex. 31 at 81).

**February 8, 2002: AJ's "job interview"/polygraph at BSO – and the media leak.**  AJ did indeed call to set up a job interview at BSO, and as part of a pre-interview, Det. Bole met with Johnson at a Denny's restaurant on February 5 – at which time, AJ told Bole up front about the various incidents with Deputy Brian Montgomery. Not mincing words, AJ described Montgomery as a "racist." (Ex. 31 at 82).  When AJ showed up for his official interview on February 8, and Polygrapher Richard Hoffman began to interview him, and ask about his feelings towards Montgomery, AJ could not contain his anger.  *Even after* being told that Montgomery was back working at BSO, and *despite* the fact that AJ too wanted to be rehired more than anything, he again called Montgomery a "racist," and admitted that he had wanted to kill him, and that he had hoped that "something bad would have happened to him" – that he would be "gun down:"

Poly:   All right, let me ask you something, do you think that uh... Montgomery did this, you had said before you thought he was racist.
AJ:     Yes, I did.
Poly:   All right, you think that he did this because of the area that you lived in, or was he just a racist person or...
AJ:     I think he was... the immediate assessment of what he said can be taken as where I lived.
Poly:   Yeah.
AJ:     But the fact that he proceeded to do what he did...

41

Poly:   Made you feel that he was racist.

AJ:     ...I know for a fact he was racist.

Poly:   All right, I, I, I was just wondering because, I think (ui) put myself in that position and I, I
        ma... I'm thinking that, do you think it would have been different if when Montgomery saw
        you uh... outside the vehicle that one time there, you had gun on and what have you?

AJ:     Yeah, yea.

Poly:   ...do you think that if you weren't wearing a gun at that time it would have ended in the same
        results?

AJ:     I don't think so.

(Ex. 56 at 50-51).

Poly:   Well how did you feel about this incident with BSO, I mean do you have... uh... you're back
        here now...

AJ:     Yes.

Poly:   Uh... do you have bad feelings?

AJ:     I have bad feelings for that officer.  I have bad feelings because Nick Navarro never sat and
        actually read what happened to me...

Poly:   Uh-huh.

AJ:     ...signed off on my termination.  So I have no feelings for Nick Navarro and I definitely have
        no feelings for this particular deputy . . .

(Ex. 56 at 56).

Poly:   Well let me ask you this if you come back to, to BSO and then you run in to uh...

AJ:     I'll turn and go, I'll turn and go.

Poly:   ...this Sergeant Montgomery, you're going to punch him out or something like that?

AJ:     No, no I'm not.

Poly:   ...you're not going to do anything ridiculous, are you?

AJ:     of course, assault on a LEO hell no, excuse my language, but no.

Poly:   Well...

AJ:     It doesn't matter.

Poly:   ...bitter feelings run deep sometimes.

AJ:     Yeah, but it's not going to run deep enough for me.

Poly:   Did you ever see him again after you were terminated?

AJ:     No.

Poly:   No?

AJ:     Never seen him again, never saw him again.

Poly:   What would you have done if you did see him?

AJ:     Probably told him he was a lying bastard and kept going.

Poly:   I think he'd be getting off easy, what do you think?

AJ:     Yeah, he would.

(Ex. 56 at 57-58).

42

Poly:  Okay.  The (ui) instance uh... with Montgomery you go... right now today if you would uh... run into him you would just go the other way?

AJ:  Absolutely.

Poly:  All right.  How about back then?

AJ:  Back then?

Poly:  Yeah.

AJ:  Uh... to be honest with you, I would've, I would've cussed him from amazing grace to sweet opportunity.  Cause from one thing I still know the law, you can't assault a LEO and...

Poly:  Yeah...

AJ:  ... you can definitely can't uh... you know, there's nothing I can do about it, I was out of a job, bottom line I was out of a job.  But I would have prayed to god that he would have been a statistic.  And I'm being honest, I would have.  I would have prayed to God that (ui)...

Poly:  You mean if, if, if something bad would have happened to him you wouldn't have...

AJ:  ...back then...

Poly:  ...felt bad at all.

AJ:  ...I would have to do what I do now...

Poly:  Uh-huh.

AJ:  ...with no emotions. Stand over his body and shoot it and shoot it well.

Poly:  Are you talking about with a camera or with a gun?

AJ:  With a camera, camera.

Poly:  Did you want to kill him?

AJ:  My personal feelings, I felt like that, I felt, I said Jesus.  I didn't want to.  I didn't, you know I didn't want, I just wanted something bad to happen to him.  I wanted him either loose his job just like I did and know what it felt like or to... probably to be honest, I, I, I think I may have felt like I wanted him to get gun down, I really did.

Poly:  Uh-huh.

AJ:  And I just, I'm being honest.

(Ex. 56 at 63-65).

Poly:  So my concern is with Brian Montgomery.

AJ:  Yes.

Poly:  All right?  Now back then you would've not cared whether he lived died or.... actually you would've preferred to see him dead.

AJ:  To be honest, back then I would've...

Poly:  Did you ever think of killing him?

AJ:  No.  Hey it probably ran through my mind but it's not nothing that stayed. I'm not going to commit a crime.

Poly:  Uh-huh.

AJ:  I felt I can move on and get a job else where, so.  It's not nothing, it probably ran in my mind but I'll be honest, I can't say I sit down and say it was an in depth thing.  Absolutely not.

Poly:  Did you ever tell anybody you were killing him?

AJ:  Na, na, no.  Why would you say that?

Poly:  Well I don't know.  That's what I... I...

43

AJ:      Incriminating yourself?
Poly:    ...sort of, this sort of, it sort of bothers me in a way, that's why I'm pursuing this area.
AJ:      Oh, that's fine, you know I never did that.
Poly:    Okay.   In the area that you live, he was not the only uh... officer that rode your area.
AJ:      No.

(Ex. 56 at 69).

Poly:    ...a proper assessment and everything.  So that your (ui) I, I need to know uh... back then
         yeah, you had bad feelings towards uh... Brian Montgomery uh... back then uh... if something
         bad happened to him, if he got killed you would not have shed a tear you would have stood
         there and taken the photographs like you said...
AJ:      Yeah.
Poly:    ...uh... but also you know the thought may have passed thru your mind as to whether or not
         you would want to kill him, but you... you certainly uh... would not...
AJ:      Would not...
Poly:    ...go around and tell anybody that .
AJ:      Of course not, and I would not (ui)...
Poly:    Huh?
AJ:      ...try to execute that kind of thought.  Still (ui)...
Poly:    Well when we're young...
AJ:      ...(ui) still (ui)...
Poly:    ...we do (ui) foolish things.
AJ:      ...(ui) yeah but, that was, that was more than foolish, that was criminal and you just don't do
         stuff like that.
Poly:    (ui).
AJ:      (ui) let the record state I still don't have great feelings towards him.
Poly:    You still don't have great feelings towards him.

(Ex. 56 at 74-75).

Then, Hoffman started to administer the polygraph.  Amidst a number of other questions, he

asked AJ the following key questions over and over again in various forms:

          – Did you ever consciously kill anyone in authority?

          – Did you ever shoot anyone in authority?

          – Did you ever commit a crime the police do not know about?

(Ex. 58). When AJ answered "no" to all of these questions, and his answers indicated clear deception

each time, Hoffman asked AJ whether he had ever "told" anyone that he killed a deputy.  At first AJ

44

denied that as well (Ex. 56 at 150-161). However, he had previously stated in response to the question "Have you ever consorted with felons?" that he had in fact associated with drug dealers, in connection with video production. (Ex. 56 at 148-150). Later, AJ admitted that these dealers were interested in bringing him into his organization. (Ex. 56 at 150-161). Therefore, when AJ registered deception in response to the questions about killing a deputy, Hoffman stated, "I bet I know what happened. I bet you told those guys that you killed the deputy." (Ex. 56 at 150- 161). AJ repeatedly denied, but after prodding from Hoffman, admitted that that was what had occurred. (Ex. 56 at 162). He had stated that on a single occasion to the big boss. (Ex. 56 at 162-164). At that point, Hoffman asked AJ questions such as:

– Other than telling someone you shot a deputy, did you really shoot a deputy?

– Other than telling someone you killed a deputy, did you ever really kill a deputy?

Hoffman repeated the questions in different forms. Each time, however, AJ's response registered as deceptive. (Ex. 58).

Hoffman asked AJ specifically what he had told the drug dealers about the shooting. AJ told Hoffman that he had described the gun he used as a Glock 9 millimeter. (Ex. 56 at 252). He denied giving much further detail, and falsely stated that he had said that he had only identified Montgomery. He did not admit to Hoffman, that he had said that he killed Patrick Behan. (Ex. 58).

At that point, Det. Bole and Major Fantigrassi came into the room. They told AJ that they had him on tape. They asked him how he got the information he provided them on the tapes. AJ told them, that he had learned it, while working from the media and assigned to an accident that had occurred at the very same Circle K where Behan had been killed. AJ claimed that he learned all of the facts he had recounted, from other BSO deputies who were on the scene of the an accident a few

years back at the Circle K.  (Ex. 57 at 3).  One detail that he learned, he said, was that the deputy was "getting in his car or getting out of his car at the time he was shot."  (Ex. 57 at 5).

While AJ was at BSO, involved in this polygraph examination, the media became aware of the investigation, and later that afternoon, the Sheriff held a press conference announcing that the Behan investigation had been reopened.

**There is no evidence to support Johnson's account as to where he had received the information about the Behan homicide**.  While BSO Deputy Wood remembered the accident at the Circle K on September 30, 1999, and "being assigned to the southwest corner of the intersection of Hallandale Beach Boulevard and Southwest 40th Avenue, across the street from the Circle K," which was "where the media had set up their cameras," he "did not have a specific recollection of speaking to anyone from the media about the case."  (Ex. 31 at 93-94).

**Gwen recants everything she told China, and BSO thus far, and claims that AJ must have learned all of the facts he had described, by reading her "mystery novel."**  As the Court is aware, after the disclosure of the re-opened investigation, and indeed, after the Sheriff announced that he was closing it, BSO made public the undercover tapes.  On the morning of March 13, 2002, the frontpage lead headline in the Miami Herald read: "Guard's wife says he shot deputy."  That same morning, Gwen Johnson came back to BSO and recanted her entire statement – claiming that AJ had told her to come in and "just tell the truth."  (Ex. 59).

Gwen emphatically denied ever being told by AJ that he had killed Behan, or any deputy.  She denied as well telling China most of the detailed facts she had indeed told him about the crime.  She also denied telling BSO detectives AJ had said he killed a deputy.  (Ex. 59 at 45-49).  When confronted by Bole and Fantigrassi, however, on the fact that she had indeed told both of them that

46

AJ told her that he had killed a deputy, she denied having told them that. Bole pressed her, reminding her that she had given all the same facts that AJ gave, including remarkably similar facts concerning disposal of the weapon. Bole noted that this was "one heck of a coincidence." (Ex. 59 at 45-49). When asked how she could explain the facts she had recounted, she told them that she had made them all up for "her book." (Ex. 59 at 45-49). When asked, therefore, to explain how AJ's account mirrored hers on every crucial fact, she told them: "He must have read my book." (Ex. 59 at 45-49).

### C. No reasonable juror could have convicted Tim Brown of the Behan homicide, after hearing all of the evidence from the re-opened investigation – particularly, AJ and Gwen's repeated, detailed, and thoroughly consistent accounts of the homicide.

While noting numerous "consistencies" between the actual facts of the Behan homicide, and the facts recounted by Andrew Johnson on the undercover tapes – which they note include, for instance, the potential motive, the type of gun used, the number of shots fired, the type of projectile used, the bullet's point of impact, the deputy's attire, and where the deputy was parked (Ex. 32) – BSO ultimately claimed that they did not have sufficient evidence to charge Johnson. First, they stated that there were many "notable" and "troubling inconsistencies" between Johnson's account, and the actual facts of the Behan homicide. (Ex. 31 at 66, 98; Ex. 33). As it turns out, however, all of the truly "notable" and "troubling inconsistencies" which BSO points to – as detailed in Exhibit 33 – are either based upon glaring transcription errors, or a misreading of relevant evidence. In Appendix A, attached hereto, undersigned counsel have prepared a detailed response to each of these alleged "inconsistencies." What careful examination of the actual tape recordings and video recordings shows in each case, is that AJ's account of the homicide is consistent – eerily consistent – with what actually occurred.

47

As indicated in Appendix B (B-1 through B-28), in statement after statement, month after month, AJ repeatedly provided correct, detailed information on the following points – most of which Gwen corroborated as well:

• **B-1: What motive did Johnson have to kill a deputy?** Johnson was seething with rage after being fired by BSO.  He viewed Montgomery as a racist, blamed him for his termination from BSO, and admitted – even in his job interview at BSO – that had he wanted to kill him.  AJ's account of his run-ins with Montgomery, and his firing by BSO is confirmed in the Internal Affairs complaint and Report.  (Exs. 34, 35).  Gwen confirmed AJ's anger towards BSO, and his wish to kill Montgomery.

• **B-2: When did the shooting occur?** AJ acknowledged that he shot the deputy only a few months after he was fired from BSO.  AJ was fired on July 13, 1990, and Behan was shot on July 13, 1990.

• **B-3: Where did the shooting occur?** AJ acknowleged that the crime occurred at the Circle K.  Gwen recalled that it was "at a 7-11."

• **B-4: What time did the shooting occur?** AJ recalled that the crime occurred at night, between 1:00 and 2:00 in the morning.  Gwen recalled that it was after midnight, in the early morning, like 2:00 or 3:00 a.m. when AJ came home and awakened her from her sleep.  The actual time of the shooting was 1:45 a.m.

• **B-5: How (and from where) did Johnson approach the deputy?** AJ described parking away from the scene, creeping up from behind in the wall – which would have precluded Behan from seeing him approach.  His covert approach to the scene is credible.  (The overt approach described by Brown is not).  Gwen confirmed repeatedly as well, that AJ was a "creeper" and a "major stalker."

• **B-6: What was the deputy doing when Johnson walked up on him?** Both AJ and Gwen correctly recounted that the deputy was sitting in his car doing paperwork, at the time he was shot.

• **B-7: What did Johnson say to the deputy just prior to shooting him?** AJ said that he told the deputy to put his hands up, and keep them up. This, as noted *supra*, is consistent with the medical evidence, and a crucial detail of the crime that only the true killer would have known. See also the discussion on this point in Appendix A.

• **B-8: What was the position of the deputy's hands at the time he was shot?** Again, AJ's account – and demonstration on the October 4 video – is chillingly consistent with the medical evidence.

• **B-9: Where was the deputy's car parked?** AJ correctly recounted that the deputy's car was sitting just near the corner of the Circle K. In the October 4th visit to the Circle K, he pointed out the spot to Det. Cedeno, Agt. Keen, and Agt. Curry.

• **B-10: How was the deputy dressed?** AJ correctly recalled that he "did him in uniform."

• **B-11: How many shots did Johnson fire?** AJ consistently recounted that he only fired one shot, and that the deputy was killed instantly.

• **B-12: Where did the bullet strike the deputy?** AJ recounted that the bullet struck the deputy right in the temple. That was within an inch of the actual point of impact. Brown had no such specific information.

• **B-13: How was Johnson dressed? Was he disguised in any way?** Although AJ stated that he was not masked, both he and Gwen alluded to some kind of head covering. They also both described his wearing black, and camouflage clothing. This is consistent with premeditated

execution-style murder.  It is also consistent with the type of clothing and headgear Edward Davis glimpsed.

• **B-14: What type of gun did Johnson use?  What was Johnson's knowledge about guns in general, and feeling towards his gun?** AJ had a model 66, .357 Smith and Wesson at the time he was terminated from BSO, and said that he used that same weapon four months later when he shot the deputy.  Ballistics expert Dennis Grey testified at trial that the projectile could have come from a Smith and Wesson .357.  Gwen told China that AJ was an expert on guns.  AJ held himself out to be such an expert to the "drug dealers" as well.  Moreover, AJ would later qualify as a sharpshooter in the Marines.  Finally, both AJ and Gwen describe AJ's feeling about guns with the same terminology. Independently, they both describe AJ as being "in love with that gun."  According to Gwen, it was because AJ loved his gun so much – but nevertheless threw it away – that she knew he had killed Behan.

• **B-15: Where did Johnson get the gun?**  AJ repeatedly described how he purchased the gun, for $200, from a sergeant.  He learned that the gun was for sale from a bulletin board at the police academy.  Johnson confirmed these facts to the polygrapher at BSO, on February 8.

• **B-16: What type of bullet did Johnson use?** Johnson consistently described the bullet he used as a hollow point bullet.  BSO acknowledges that the bullet that killed Behan could have been a hollow point.  At this point, the projectile is too shattered to make this determination for certain.

• **B-17: How far was the gun from the deputy?**  AJ recounted that he shot the deputy at point blank range, and later described that he was standing approximately 3-4 feet from him at the time he was hit.  This is absolutely consistent with the medical evidence, that the gunshot wound to the head was a distant one (inflicted from more than 18 inches away) , but that the gunshot wound

to the hand was an intermediate one (inflicted from a distance of anywhere from 2 inches to 3 feet). (*See* detailed discussion on this point in Appendix A. *See also* Exs. 18, 19, 20, 20). Again, this is a detail of the crime, that only the true perpetrator would have known. Brown, of course, provided no information in this regard.

• **B-18: Was the deputy's window open?  Did Johnson shoot through any glass?**  On October 4, AJ thrice acknowledged that he shot the deputy through the open portion of the window, and did not shoot through the glass.  That is precisely how Behan was shot.

• **B-19: How did Johnson know where to find the deputy?**  Both AJ and Gwen described AJ as stalking Montgomery.  He knew Montgomery's schedule, and indeed, Montgomery was scheduled to be on duty on November 13.  As it turned out, however, Montgomery did not work that night.  Behan agreed to cover for him.  (Ex. 37).

• **B-20: Did Johnson act alone?**  AJ repeatedly affirmed that he had acted alone.  And indeed, Edward Davis saw a lone black male, darting behind the Circle K.

• **B-21: How did Johnson escape?  What route did he take?**  The escape route Johnson described is the precise escape route witnessed by Edward Davis.  This is a detail of the crime that only the true perpetrator would have known.  Brown's purported escape route, was disconfirmed by Edward Davis and Philip Howard.

• **B-22: What did Johnson do with the gun (and other evidence) after shooting the deputy?**  Both AJ and Gwen consistently described, AJ's breaking the gun into three pieces, and disposing of each of the pieces in a distant area.  They both described disposing of the gun in the same area.  As Det. Bole told Gwen on March 13, the mentioning of the exact same spot in all of Dade County, was certainly "one heck of a coincidence."

51

• **B-23: Is Gwen's "book" true to life about A.J.'s crime, or fiction?  Has AJ read the book?**  Gwen repeatedly told China that she was writing a book about AJ, and that she feared what would happen if he read it, as it truthfully recounted his killing of Deputy Behan.  It is only in her recantation, that Gwen changed her tune, and claimed it was a fictional "mystery novel," and that AJ had obviously read it.  Incidentally, AJ never stated for a moment that he knew of Gwen's book, that he had read Gwen's book, or that he had learned any of the facts about the Behan homicide from Gwen.  His explanation was that he learned these facts from BSO deputies at a Circle K crime scene years later.  BSO discounted that explanation, and it carries as little credulity Gwen's purported "mystery novel."

• **B-24: Did Johnson tell his wife?**  AJ claimed that he did not tell Gwen.  She, of course, repeatedly told China that he had told her all about the homicide.  If he did not tell her, it is unclear how she could have known all of the minute details she knew – and mirrored AJ's account of the disposal of the gun.  Her suggestion that she made up all of the facts, which matched the facts of the Behan homicide "to a tee," is ludicrous.   And that AJ learned them from reading her fictional "mystery novel" is more ludicrous still.  That she realized – after the fact – that she has admitted having been an accessory to murder, and that she was in fear for both her and AJ's life – explains her March 13th turnaround.

• **B-25: Has AJ threatened to kill Gwen?  Is she afraid he'll kill her?**  Gwen repeatedly told China and BSO deputies that AJ had threatened to kill her.  AJ himself told Chico and friends, that he would have had to kill Gwen, if she knew about his crime.  Gwen's stark turnabout on March 13th is most plausibly explained by her fear of AJ.

• **B-26: Does AJ talk in his sleep?  What has he said in his sleep about killing the deputy?**   Gwen told both China and BSO that AJ talked in his sleep about wanting to kill Montgomery, and then having killed the "wrong guy."   While she recanted as to "wrong guy" on March 13, even then she reaffirmed that AJ talked in his sleep, and had mentioned the name Montgomery while sleeping.

• **B-27: Did Johnson ever commit/ was he ever accused of other violent conduct?**   Both AJ and Gwen acknowledged that AJ was charged with (although acquitted of) a brutal rape, and that while he was in the marines, he hit another marine so hard that the man had to have his jar re-wired.

• B-28: Who was the deputy that was shot, Behan or Montgomery?  Did Johnson shoot him? Although AJ admittedly wanted to kill Montgomery, ultimately, it was Behan who was shot.  AJ admitted this candidly to his friend China on August 2, 2001 – but claimed to know all of the details of the shooting, including who shot Behan.  It was only when AJ was jockeying for a job with a drug organization, that he fudged the facts a bit, and told everyone that he had killed Montgomery.  The reason is obvious.  Who would hire a hitman, who hit the "wrong guy"?  AJ was trying to impress Chico, Rollie, and T with his competency – not with his incompetency.  When they finally called him on the issue, however, he candidly admitted that it was Behan who he had shot – even he had intended to kill Montgomery.  Gwen told China that AJ had shot the wrong guy.  Her March 13 recantation is not credible for the reasons stated above.  Nor is AJ's explanation for where he learned all of the facts about the Behan case, credible.  The credible evidence on this issue, is that no matter how polygrapher Richard Hoffman posed the question to AJ as to whether he killed a deputy, AJ was decidedly DECEPTIVE.  Furthermore, AJ's unsolicited August 2, 2001 admissions about the Behan

homicide to China – whom he regarded as a friend – undercut any purported defense of "puffing" or "fool's talk" for the sole purpose of entering a drug organization.

To conclude, had the jury in Brown's case heard the evidence as to the demonstrable falsity of his statement, and then compared Brown's statement against the numerous detailed statements of both AJ and Gwen Johnson – statements which were absolutely consistent with the details of this case, in just about every respect – that jury could not have found beyond a reasonable doubt that Brown committed this crime. This is not mere speculation at this point. Several of the actual jurors who served on Brown's actual jury have now spoken. They have said, that in light of the newly discovered evidence about Andrew Johnson, they would not have and could not have convicted Timothy Brown. (Appendix C).

Brown has made a sufficient showing under *Schlup*, to warrant an evidentiary hearing on actual innocence.

WHEREFORE, the petitioner, TIMOTHY BROWN, respectfully requests that the Court set this matter for an evidentiary hearing on the issue of actual innocence, and writ Mr. Brown into this district for that hearing.  If at the hearing, Brown proves that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence, the Court should proceed to hear all of Brown's procedurally defaulted claims, on the merits.

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: Brenda G. Bryn
Brenda G. Bryn
Timothy Day
Fla. Bar Nos. 0708224, 360325
Assistant Federal Public Defenders
One East Broward Boulevard, Suite 1100
Ft. Lauderdale, Florida 33301
Tel./FAX: (954) 356-7436/7556

55

| BSO's List of Johnson's Alleged "Inconsistencies" | The Evidence | Johnson's Actual Taped Statements | Comment/ Analysis |
|---|---|---|---|

ATTACHMENT / EXHIBIT A

| **BSO's Claim re: Position of the Deputy's Window**: "Johnson states he shot the deputy through the glass. BSO U/B - page 28 and BSO U/B - page 30. Behan's window was partially down and he was shot through the open window space." | **The Evidence**: The window was partially down , and Deputy Behan was shot through the open window space. | **Johnson's Actual Taped Statements**: <br><br>**BSO U/B (10/4/01) at 28 (as corrected)**: <br><br>Agent: . . . So did you shoot through the glass (inaudible)? <br><br>AJ: *(Nods "No")*. <br><br>**BSO U/B at 29 (as corrected)**: L/M: So is, so basically you walked up, the window was down? <br><br>AJ: *(Nods "Yes")*. <br><br>**BSO U/B at 30 (as corrected)**: <br><br>L/M: The window was down *cause you ain't* shoot*ting through* glass. Nothing got on you, none of your clothes, ain't nothing they can *come back* . . . <br><br>AJ: *(Nodding head "No" simultaneously)* (Inaudible) anything. I can assure you. | **Johnson's Account is Consistent with the Evidence**: It is clear from the video of the 10/4/01 meeting, that Johnson is telling the agents that he did *not* shoot through the portion of the glass that was up. BSO's transcript is inaccurate in reporting AJ's first answer to be "Yeah," and the ensuing answers to be "inaudible." |

| BSO's Claim re: Location of the Deputy at the Time of the Shooting: "Johnson indicates that the deputy was **getting into** his car when he walked up and did him. PE - page 18." (Emphasis added) | The Evidence: Deputy Behan was sitting inside his police cruiser, working on a report, when he was shot. | Johnson's Actual Taped Statements: | Johnson's Account is Consistent with the Evidence: |
|---|---|---|---|
| | | **PE (8/23/01) at 18 (as corrected):** AJ: Cause, I see them all the time. I used to live in the same area, and they patrol that area, so I see 'em all the time so just cause you in uniform and you work for the department, do**n't** make you impervious to a bullet. Chico: O I hear ya, but I'm saying bro . . . AJ: . . . (Talking together) oh I didn't care nothin' about it Chico: . . . you know more, AJ: He was **sitting there** in his car I walked up on it, and did him.<br><br>**PE (8/23/01) at 23:** AJ: . . . All I do I do clean. He was sitting in the unit just like this. I walked up to him, I did him, while he was in uniform in **the** car and I left.<br><br>**BSO U/C (10/4/01) at 21** L/M: Where was the dude at? (Was) he at that place that you told me about? AJ: He was sitting at the Circle K at the corner, by a wall.<br><br>**BSO U/C (10/4/01) (as corrected):** **P. 26-27:** L/M: What was the, when the dude was at the place was he parked, what (inaudible) what the hell was he doing? AJ: . . . He was parked **doing paperwork (handmotion of writing).**<br><br>**P. 28:** L/M: They usually what what, but was it, I mean, when he was sitting in his car, did you have to **tap** on the window or what? AJ: **"No" (nodding no)**. | The BSO transcript of 8/23/01 at page 18 is inaccurate. The transcript claims AJ said "He was **getting' in** his car I walked up on it, and did him," when in fact, the audiotape is clear that AJ said "**sitting there in** his car," **not** "getting in his car." Indeed, five (5) pages later in the same transcript, AJ confirms the deputy was "sitting in the unit," when he "did him." On 10/4 AJ twice re-confirmed that the deputy was sitting in his car when he shot him. As indicated by L/M's (Det. Cedeno's) final question, he correctly understood AJ to have said that the deputy was sitting in his car, not "getting in." |

| **BSO's Claim re: Distance from the Deputy when the Shot was Fired**: "At one point Johnson describes how he shot the deputy at point blank range. PE- page 22. At a later time, he estimates the distance to be six (6) feet away. BSO U/B - page 29.<br><br>Findings that describe gunpowder stippling on Behan's hand wound suggest the distance to have been about 6-12" from his extended fingertips. The gunshot wound to the left side of the face would have been from a distance of about two (2) feet. This is estimated by the *autopsy report findings, which describes the injured areas with stippling*." (Emphasis added) | **The Evidence**:<br>In the autopsy, the ME reported a graze type gunshot wound to the 3rd and 4th digits of the left hand, with stippling throughout the left palm. While noting that the "pathway of the projectile of this graze type gunshot wound is front to back," the ME drew no conclusions in the autopsy as to the gun's distance. At trial, the ME testified that due to the absence of stippling, the head wound was a "distant" wound (inflicted from more than 18" away, until "forever"); but the wound to the hand was "intermediate" (inflicted from 1-2" to 24"-36" away). Ballistics expert Grey agreed that the gun was within 3 ft. of the hand. Blood-spatter expert Edel opined that the left palm was extended in an upright position out the window. Together, this testimony shows that the gun was anywhere from 18" to 4-5 ft. from Behan's head. | **Johnson's Actual Taped Statements**:<br><br>**PE at 22 (8/23/01)**:<br><br>AJ: . . . it was point blank range. If he gone survive ah, hollow point, model 66 357, then he need to, then I need to go (down).<br><br>**BSO U/B (10/4/01) at 29**:<br><br>L/M: *What you wore* that night or did anything get on you?<br><br>AJ: No, Cause I was at a distance. And where I was from here to, probably the back of your chair *when it hit*.<br><br>L/M: (Inaudible) six feet?<br><br>AJ: *Yeah*, when it hit, it goes (uses hands to demonstrate). | **Johnson's Account is Consistent with the Evidence**:<br>Firing from "point blank *range*," does not mean AJ held the gun to Behan's head. Webster's defines it as meaning he was close enough to fire "in a straight line to the mark." That is consistent with the evidence. On 10/4 AJ explained that he stood as close to Behan as he was to the back of the undercover's chair (which the video shows to be a distance of approx. 3-4 feet, *not* 6 feet as the agent suggests). Since AJ presumably shot with his arm outstretched (1-2 feet), and Edel found Behan's upright hand to be extended out the window, the *distance from which the gun was fired* would have been 18" to 4 or 5 feet from Behan's head. |

| BSO's Claim re: Position of the Deputy's Hands: | The Evidence: | Johnson's Actual Taped Statements:: | Johnson's Account is Consistent with the Evidence: |
|---|---|---|---|
| "Johnson instructed the deputy to put his hands up prior to shooting him. PE - page 21 and BSO U/C - page 56. The crime scene evidence shows Behan's left hand was actually outside of the partially open window when shot. The location of the stippling on the fingertips would further suggest Behan's fingers were more likely extended towards the gun when shot. This is suggested by the autopsy report findings and the crime scene findings." | On Nov. 13, 1990, BSO crime scene investigator Charles Edel was asked to examine the bloodspatter evidence to determine what position Behan was in when he was shot. Edel opined that Behan extended his left hand out the window to deflect the muzzle of the gun when it was discharged. Contrary to BSO, however, Edel did *not* state that Behan's fingers were likely extended towards the gun. Rather, Edel's diagram shows an upright hand, with *no* extension of the fingers. The gun is merely aimed closer to the fingertips, than to the lower palm. The autopsy report concludes that the "pathway of the projectile of this graze type gunshot wound is front to back" – which also indicates an upright hand. | **PE (8/23/01) at 21:**  <br><br> AJ: . . . I was the last person he saw. <br><br> Unk: Did he rap to you before? <br><br> AJ: No he just, put his hands up, like I asked him to, and I off him. <br><br> **BSO U/B (10/4/01) at 56:** <br><br> L/M: You didn't say nothing? <br><br> AJ: . . . When he turned (inaudible), oh put your hand up. <br><br> L/M: Is that what you told him? <br><br> AJ: Yeah, let me see your hands. <br><br> L/M. (Inaudible) <br><br> AJ: He put his hands up, it didn't matter (inaudible/talking together). . . <br><br> Agent: . . . Police officer man how could you say. <br><br> AJ: (He did like this) [*demonstrating, hands up*] <br><br> L/M: Yeah bro but you told him to put his hands up. <br><br> AJ: When he first (inaudible/like this), keep your hands up. <br><br> Agent. Oh keep it up? <br><br> AJ: Yeah. | Johnson's admission that he told Behan to put his hands up, and keep them up is consistent with Edel's and the medical examiner's testimony that the barrel was pointing towards Behan's left raised palm – in particular, the fingertips. [Note: If Behan's hands were raised up already, it would have been a split second reflexive motion to extend the left hand outward at the moment of discharge in an attempt to block the shot. Brown, by contrast, mentioned nothing about a raised hand. Rather, the movement he described – reaching "for his stick" – was *inconsistent* with the medical evidence.] |

| BSO's Claim re: Date of the Murder: "Johnson puts the time of the incident in the early part of 1991 around January or February. BSO U/B - page 20 and PE - page 2." | The Evidence: <br><br> Behan was shot on November 13th, 1990 <br><br> Johnson was fired from his job at BSO on July 10, 1990 (4 months prior to the homicide) | Johnson's Actual Taped Statements: <br><br> **PE 8/23/01:** <br><br> Chico: They, they got your name on it or what? <br><br> AJ: No. This was, this was, in ninety. <br><br> Chico: Right. <br><br> AJ. It's a done deal. Actually, (inaudible), the beginning of I think it was the beginning of ninety one, that was it. <br><br> **BSO U/B (10/4/01) at 19-20:** <br><br> L/M: . . . When he got, how long, when you finished whatever that job with, with, with the sheriff when you finished your job with the sheriff, how long, that was in ninety? <br><br> AJ: That was in ninety. <br><br> L/M: And then when did you hook up with this dude again? Or when did you when did this thing . . . <br><br> AJ: . . . (Inaudible) four or five months later. <br><br> L/M: So it musta been ninety one, early ninety one? <br><br> AJ: Early ninety one, (inaudible) probably the end of January, the beginning of February. | Johnson's Account is Consistent with the Evidence: AJ's initial responses – on both 8/23 and 10/4 – are correct: Behan was killed in 1990, 4-5 mo. after AJ was fired from BSO. While AJ thereafter evidences some confusion as to whether the crime occurred in late '90 or early '91, that is immaterial, in light of the fact that he is then shown a Sun Sentinel article concerning the Behan homicide, and he points to the photo of Behan, stating: "this is the guy I shot and that's possible [that I snuffed the wrong guy] and I can't deny that. That's possible, but I know this the guy." By this admission, AJ admits that he committed the crime on Nov. 13, 1990. |

| **BSO's Claim re: Who was part of the Internal Affairs Complaint?** | **The Evidence**: | **Johnson's Actual Taped Statements**: | **Johnson's Account is not Inconsistent.** |
|---|---|---|---|
| "Johnson states he knows for a fact that Behan was part of the complaint that got him fired.  BSO U/B - page 69.  Johnson said he knows that he (Behan) was one of the officers on the scene (referring to his burglary he reported originally to Brian Montgomery.)  BSO U/B - page 47.

Employment records and the Internal Affairs Report confirm Behan was not part of the complaint against Johnson.  Behan could not have been present when Johnson claimed he reported a burglary at his home prior to his employment with BSO on July 31, 1989.  Deputy Behan did not begin employment with BSO until September 4th, 1990.  Johnson was terminated on July 10th, 1990, nearly two (2) months before Behan was hired.  The actual burglary report Johnson claimed he filed has never been confirmed nor has any record of it ever been found." | Deputy Behan started with BSO in September of 1990.  He therefore could not have been involved in the incident where Montgomery allegedly took a report of a burglary at Johnson's residence, or in the later internal affairs inquiry – as that concluded in July of 1990 with Johnson's termination from BSO.

However, at the time of the homicide, Behan and Montgomery worked together; they covered the same zone. | **BSO U/B at 46-47 (as corrected)**: Agent: That's the guy [*pointing to picture of Behan*] that gave you all the shit? AJ: That's the guy that (talking together) . . . Agent: . . . Came to your house? AJ: he was there too.  He was (inaudible) you know one of the officer on the scene *when I was being investigated*.  They all work together. Agent: Uh huh. AJ: (Inaudible) so I know . . . Agent: . . . This the guy that gave you shit and said . . . Agent: . . . cause you live, or you don't live in the right place or something like that? AJ: *That's the guy I did* but that's not the guy *that came to my house*... L/M: So okay, this is the dude you took out? AJ: Uh huh. L/M: But this dude was somehow related to that Brian dude you're talking about? AJ: Yeah.

**BSO U/B at 51**: AJ: Do you understand what I'm saying.  So, this guy worked with (him). | BSO's transcripts – and therefore, their conclusions – are incorrect.  First, the BSO transcript has AJ saying that Behan was "one of the officer on the scene but I (inaudible)." AJ did *not*, however, say that Behan showed up at his house when he reported a burglary.  What AJ actually stated was that Behan was "one of the officer on the scene *when I was being investigated.*" BSO missed the point, because it reported the italicized words as "inaudible." Indeed, right after this, AJ clarifies: "*This the guy I did* but that's not the guy *that came to my house*." BSO's transcript has the italicized words as "inaudible." |

| | | **BSO U/B at 69**: | As to whether |
|---|---|---|---|

**BSO U/B at 69**:
L/M: . . . And we, can all be satisfied that that is not Brian?
AJ: Yeah but whoever that is (inaudible) one of the liars.
L/M: That's not Brian.
AJ: That's also one of them liars too. That helped.
L/M: He was involved in the complaint that got you, terminated? This dude here?
AJ: That dude there too.
L/M: You sure?
AJ: I know that for a fact. And in fact I need to go home and look at my, my *papers* cause I remember *it*. .
Agent [*to Chico*]: *He will get you those* papers right? (Inaudible/talking together) fired?
AJ: Yeah.
Agent: (As proof)? Hey you know what, I want it like fast okay.
L/M: Listen to me . . .
AJ: . . . (Inaudible) we can go get 'em. *No problem.*
Agent: And also ah the papers of ah, of ah, this Brian guy and (see if this) guy . . .
L/M: . . . Is this dude (inaudible) in the complaint, against you?
AJ: I'll see.
Agent: You don't *remember*?
*AJ: (Nods No).*
L/M: You still got that paperwork you say?
AJ: I still got that paperwork. I'll see.

As to whether Behan was involved in the Internal Affairs complaint, AJ states at first that he knows for a fact that Behan was involved, but immediately thereafter he states "And in fact I need to go home and look at my papers." When Chico asks him again whether Behan is the one who made the complaint against him, he states only "I'll see." When Rollie then asks him, "You don't remember?" *he nods his head "No."* This is easily seen in the video, but omitted in the BSO transcript. In short, AJ has no independent recollection on this issue. He needs to check his papers. His ultimate answer on this point is not inconsistent with the known evidence.

| **BSO's Claim re: Other vehicles in the Circle K Parking lot**: "Johnson states there were no other vehicles in the parking lot at the time of the shooting. BSO U/B - Page 21 and BSO U/B - page 41 and 42. There was at least one tow truck present. This is confirmed by the 1990 witness statement of Stephan Antonio." | **The Evidence**: Stephen Antonio's towtruck was parked in front of the Circle K at the time of the shooting. | **Johnson's Actual Taped Statements:**<br><br>**BSO U/B at 21:**<br><br>L/M: And, and there was nobody in the parking lot bro? That you saw no cars . . .<br><br>AJ: *Nods no*.<br><br>**BSO U/B at 41-42:**<br><br>L/M: And nobody saw you there, you didn't see no cars in the, in the parking lot?<br><br>AJ: No<br><br>L/M: You saw nothing there?<br><br>AJ: No. | **This is not an Actual Inconsistency; If it is Viewed as an Inconsistency, it is Explainable:** Technically, AJ's answer is correct – there were neither people, nor cars in the parking lot. There was only a truck.<br><br>If AJ recalled that truck, he would not have wanted the "drug lords" he was trying to impress, to think there may have been a witness to the crime, who could identify him. |

| **BSO's Claim re: Name of the Deputy Killed**: | **The Evidence**: | **Johnson's Actual Taped Statements**: | **Johnson's Initial and Final Accounts are Consistent. The Interim "Inconsistency" is Explainable** |
|---|---|---|---|
| "Although Johnson consistently claimed he killed Brian (Montgomery) he never admitted he might have shot the wrong person until confronted by the undercover officers.  It would also appear by Johnson's comments, he was certain that he had killed the deputy he had intended to kill.  At some point following the murder, it would seem reasonable to think Johnson would have learned from the overwhelming media accounts that Deputy Patrick Behan (not Brian Montgomery) was killed. Obviously, Patrick Behan was killed and not Brian Montgomery." | Deputy Patrick Behan was murdered – not Deputy Montgomery. On the night he was murdered, Deputy Behan was *covering* for Deputy Brian Montgomery, who needed to take the night off.  This is confirmed by Montgomery himself, in his July 8, 1992 Deposition at 6, where he states: "[S]omehow he [Behan] had to work that night and ended up working my zone while I was off." | **BSO U/B at 39:**<br>AJ: But I didn't know the guy was name Behan, I thought it was Brian.  That's what I, that's all I remember but I know this the guy.  And this is what was done (inaudible).<br>L/M: (Speaking Spanish).<br>Agent: *That's a better shot*.<br>AJ: That's him.<br>**BSO U/B at 45-46 (as corrected)**:<br>L/M: Could, could it have been the wrong due bro that you got?<br>AJ: (inaudible/talking together). *This the guy I did (pointing to paper)*.<br>L/M: Okay could this, could this Brian dude be somebody else in this is, I under*stand AJ*.<br>AJ: (Inaudible/talking together) I know what you saying.  I know what you're saying.<br>L/M: . . . I'm I'm you just you know don't get me wrong, could there have, you mighta smoke somebody that looked like this dude.<br>AJ: And that's possible.<br>L/M: And that's what I'm trying (talking together) to find out cause you're telling me . . .<br>AJ: . . . (Inaudible).<br>L/M: (Speaking Spanish). Cause the dude that fire, the dude that got you *hammered* was, was a dude name Brian?<br>AJ: Yeah. *I remember*.<br>L/M: So you believed (inaudible) I don't know where your head was that night or what what what, what made you react that night for whatever reason you wanted Brian?<br>AJ: Yeah.<br>. . .<br>Agent: *Maybe its not* Brian.<br>L/M: . . . You might snuffed the dude | Although AJ had told the CI on 8/2 that he knew who killed the deputy sitting in his car, and also, that he knew "Brian" was now a Sgt. in Pompano, for obvious reasons, AJ did not want to admit up front to "drug lords" that he had killed the wrong deputy. But, when he was confronted, AJ *did admit that he had killed **Behan**, and that he knew "Brian" was still "somewhere."* BSO is *wrong* in claiming that AJ *consistently* said he killed Montgomery, and *never* said that he shot the wrong person, until confronted. For 11 months, AJ's wife had told both the CI and BSO that AJ |

| | | That wasn't (him). AJ:(Inaudible) this is the guy I *snuffed* and that's possible, and I can't deny that. That's possible, but I know this the guy. **BSO U/B at 47-48**: L/M:So okay, this*(pointing to Behan photo)* is the dude you took out? AJ: Uh huh. L/M: But this dude was somehow related to that Brian dude that you're talking about? AJ: Yeah, L/M: So the, the Brian dude is somewhere? AJ: Somewhere. Right. L/M: You know what I mean? AJ: (Not in my area) (inaudible) area. L/M: You don't know where he's at? (Talking together). AJ: I I last thing I heard of him, he got knocked out (*with* his) partner, and was knocked out face down . . . **BSO U/B at 52-53**: L/M: A, so then, this is what, I mean I might be wrong bro but, what it sounds like to me is that, you, you got the hammer on this dude and and you realized it wasn't him and said fuck it it's too late now I gotta put it (on). AJ: Yeah. L/M: It's I mean . . . AJ: . . . No at the time when I did it, when he turned his head, I did what I did, I just stayed long enough to shoot him. . . . . **BSO U/B at 68 (as corrected)**: AJ: Like I said, yeah that's one thing, may or may not have been the right guy, but I still did the job, and I did it clean . . . L/M: AJ, but where is Brian now, you don't know? AJ: No. | killed the "wrong guy." Gwenda Johnson's March 13th, recantation of those repeated admissions – and claim that Johnson must have learned all of the facts from the "mystery novel" she was writing – is patently incredible. |

| **BSO's Claim re: Description of Hallandale Beach Boulevard**: "Johnson states the road was only one lane in each direction and has since been widened. Hallandale Beach Boulevard has always been a four (4) lane road. BSO U/B - page 23." | **The Evidence**: Hallandale Beach Boulevard was a four lane road in November of 1990. | **Johnson's Actual Taped Statements**::<br><br>**BSO U/B at 22-23**:<br><br>AJ: I was living in (inaudible) it wasn't quite you know it was like five minutes drives.<br><br>Agent: So you just, you went on foot?<br><br>AJ: Uh uh.<br><br>Agent: From the house?<br><br>AJ: I drove. But where I parked at was away from the scene when I . . .<br><br>L/M: . . . Cause that's busy bro (inaudible/talking together) that's that's that's (inaudible)<br><br>AJ: . . . that time, you gotta remember the street wasn't that wide.<br><br>L/M: (Why?)<br><br>AJ: They, they weren't that wide they were only one lane going and one lane coming.<br><br>(Inaudible) . . .<br><br>L/M: . . . That was one, though I know, I I'll (guess) I understand.<br><br>**October 4, 2001/Car Tour:**<br>P1: But you said something, you said something A, it was a two lane back then?<br><br>AJ: It was ah, yeah well, I guess it was two lanes but I know it wasn't like this they just redid all this. | **This "Inconsistency" is Immaterial**: This is probably an innocent mistake due to the passage of time (AJ admits his statement at the U/B was only a *guess*). If not, it could be an attempt on AJ's part to assure the "drug dealers" that no one was around to witness the crime. In neither case, however, does it prove that AJ was not at the Circle K on Nov. 13th -- as he lived in the area and would certainly have known what Hallandale Beach Blvd. looked like. The error is irrelevant however, as AJ did not state that he escaped down Hallandale Beach Blvd. Whether mistake or inconsistency, this is *not* a reason to discredit AJ's detailed, correct account of the actual homicide. |

| **BSO's Claim re: Who Was Arrested**. "Johnson first said that no one was ever arrested and further stated he wouldn't know if any one took the fall. PE - page 3 & 4. At one point Johnson claimed they pinned it on the fact that a hooker did it. BSO U/B - page 15 and PE - page 23. Johnson later states he knows two kids, who confessed, are in jail for this who [sic]. BSO U/B - page 37. Johnson then later claims he never followed it and that he knew that they had "snagged" somebody, but he never cared. BSO U/B - page 69. Johnson claims he heard they had arrested somebody but they had to let him go because he had an alibi. VEH - page 19. These particular inconsistencies are pointed out because it seems odd that Johnson would not have followed any arrests for his alleged crime more closely. He remained in the local area in the years following the murder of Behan and continued to seek employment with other police agencies. Regardless, Keith King and Tim Brown were arrested for the murder of Patrick Behan. This is confirmed by the original investigative report." | **The Evidence**: Initially, in the 8-month investigation, there were reports of other suspects, but ultimately, Brown and King were arrested and convicted. | **Johnson's Actual Taped Statements**: Johnson's statements are fairly summarized in the BSO report. However, the statement listed fifth (VEH at 19), actually occurred third – prior to his statements acknowledging that two kids who confessed were in jail for this crime. | **This "Inconsistency" is Immaterial**. Clearly, when confronted with the fact that Brown and King had been convicted, AJ admitted that he knew that. In fact, he guessed that BSO had beaten both boys until they confessed, stating: "... make 'em confess, when they start beating you in the cell, you're say anything to keep 'em from beating you. Especially kids. I worked in Corrections I've seen 'em do it. I've seen 'em come in beat people half the death. And make 'em say anything. So that's how I know." (10/4 at p. 41). That AJ was not initially forthcoming as to who took the fall, has no relevance to the question of whether he killed Behan. |
|---|---|---|---|

## INDEX TO STATEMENTS BY ANDREW JOHNSON AND GWEN JOHNSON
## IN BSO'S RE-OPENED BEHAN INVESTIGATION

B-1   What motive did Johnson have to kill a BSO deputy?

B-2   When did the shooting occur?

B-3   Where did the shooting occur?

B-4   What time did the shooting occur?

B-5   How (and from where) did Johnson approach the deputy?

B-6   What was the deputy doing when Johnson walked up on him?

B-7   What did Johnson say to the deputy just prior to shooting him?

B-8   What was the position of the deputy's hands at the time he was shot?

B-9   Where was the deputy's car parked?

B-10  How was the deputy dressed?

B-11  How many shots did Johnson fire?

B-12  Where did the bullet strike the deputy?

B-13  How was Johnson dressed?  Was he disguised in any way?

B-14  What type of gun did Johnson use?  What was Johnson's knowledge about guns in
      general, and feeling towards his gun?

B-15  Where did Johnson get the gun?

B-16  What type of bullet did Johnson use?

B-17  How far was the gun from the deputy?

B-18  Was the deputy's window open?  Did Johnson shoot through any glass?

B-19  How did Johnson know where to find the deputy?

B-20  Did Johnson act alone?

B-21  How did Johnson escape?  What route did he take?          ATTACHMENT / EXHIBIT B

B-22   What did Johnson do with the gun ( and other evidence ) after shooting the deputy?

B-23   Is Gwen's "book" true to life about A.J.'s crime or fiction? Has A.J. read the book?

B-24   Did Johnson tell his wife?

B-25   Has A.J threatened to kill Gwen? Is she afraid he'll kill her?

B-26   Does A.J. talk in his sleep? What has he said in his sleep about killing the deputy?

B-27   Did Johnson ever commit/ was he ever accused of other violent conduct?

B-28   Who was the deputy that was shot, Behan or Montgomery? Did Johnson shoot him?

| **Taped Statements** | **What motive did Johnson have to kill a BSO deputy?** |
|---|---|
| 4/25: Gwen & China (CI) | **P. 1-2:**<br>CI: Yea tell me about that – what about that man, the one that cost him his job?<br>Gwen: What – which one?<br>CI: The one that cost him his job, he had to, he had to walk *up on at 7-11*.<br>Gwen: Which one?<br>CI: He said 7-11 or something.<br>Gwen: Oh yeah, that's the one he killed, that was a officer, he killed that *police officer*.<br>CI: Yeah, at a 7-11.<br>Gwen: Yeah he was sittin in his car, you *don't* remember that.<br>CI: No.<br>Gwen: Yea, officer was sittin in his car, 7-11, blow his head off.<br>CI: Over a job?<br>**P. 4-5:**<br>CI: What the other one done to him.  He must a really crossed him up?<br>Gwen: Yeah.<br>CI: What he do?  Did he tell you?<br>Gwen: What?  The Officer?<br>CI: Yeah.<br>Gwen: It's something about they both – he went . . . he showed up on the scene where he wasn't supposed to show up on . . . he was off duty and he showed up, on the scene and the officer, he was helping the other officer subdue the criminal or sumpin.  And then this officer seen him there and say, hey you're not even supposed to be here, white guy.  He said man I'm helping a fellow officer, he said, we'll see about that.  The next thing uhm . . . internal affairs calling him it's a big thing.<br>CI: And just got rid of him, just like that?<br>Gwen: Mmmmmmmm. |
| 5/3: Gwen & China (CI) | **P. 10-12:**<br>Gwen: After he had already did it, he came back home.<br>CI: He told you?  Or you just figured it out?<br>Gwen: Uh uh, he told me and I know the officer.  I know who it is, I (inaudible).<br>CI: What you (inaudible) for?  You know him personally?<br>Gwen: No I just know him, for what he look, what he looked like. . .<br>. . .<br>CI: Oh, so he must be was at that ah Internal Affairs thing when he cost what's his name that job.<br>Gwen: Umm?<br>CI: AJ his job.  He was, he was a redneck?<br>Gwen: Yep. |
| 5/3: Gwen & China (CI) (continued) | CI: He was nasty?<br>Gwen: Nasty, nasty, nasty.  They should think about that, and they (can come) up dead.  (Both laughing). It coulda been another officer!  Right? |

| | |
|---|---|
| 5/31: Gwen & China (CI) | **P. 32:**<br>Gwen: Only thang is that if he trying to hurt somebody, that I know, you know is not necessary that's, that's not good don't do that.  Now I told him don't bother that guy because it's too soon, but it's eatin' at him.  Everyday he be sitting like in a zone like.<br>CI: Yeah?<br>Gwen: Yeah?<br>CI: Uh huh, and he be telling me (inaudible) don't come in this space right here!  You know that's when I know he like really tripping out real bad.  So I just stay away I don't even walk (inaudible) if I have to get something. . . |
| 6/6: Gwen & China (CI) | **P. 11-14:**<br>Gwen: I was sleep.<br>CI: You was sleep.<br>Gwen: And I woke up and he was gone.  So when he came back, and I saw the way he was dressed and (inaudible), oh my G-d this man (inaudible) and he said uhm, he say I just got through doing a job come help me I gotta go get rid of the gun.  I say doing, you just got through doing what?  Taking care of business.  Come go with me so me and him got in the car and, we start taking the gun a loose, we start throwing it and, I said what happened.  Which I really knew what had happened to tell you the truth.  I already knew he had just, got through offing somebody.  He say I got him, I got that cop, he was sitting in the car.  He said I got him!<br>CI: Oh yeah?<br>Gwen: And then, this the part, the actual guy!  That wrote the report up, he didn't get him.  He got the guy, the actual one that testified, that's who he got.  The one that he shoulda got was the one that wrote, wrote it up and stuff like that, that's who he shoulda got.<br>CI: It was two of 'em?<br>Gwen: (But), yeah but he settled for him.  And then I read in the paper I read the incident, and they say the guy walked away on foot, they had a sketch of a guy with a skully on and all like that.<br>CI: Uh huh.<br>Gwen: That had that. (Inaudible).<br>CI: Well what about the other guy?<br>Gwen: The one that he didn't get?<br>CI: Yeah.<br>Gwen: Oh I don't know.<br>CI: But he he one that did the most damage to AJ didn't he?<br>Gwen: Yep.<br>CI: Well why he oh I guess had, he settled for him huh? (But), damn. |

| | |
|---|---|
| 6/6: Gwen & China (CI) (continued) | Gwen: He was sitting in his car writing his report.  (AJ) put that gun to his head, (bloop/making a noise).<br>CI: What the other one name?<br>Gwen.  I don't know.<br>CI: Oh but these, they was buddies?<br>Gwen: Partners.<br>CI: And they just both got together to, to, to, to make him loose his job?  Just like that?  Shhh.<br>Gwen: Broward County used to be real prejudice during that time.  Nick Navarro was the sheriff.<br>CI: I remember Nick.  (Damn shole' remember Nick).<br>Gwen: Like (he) said if he coulda killed Nick he woulda killed him. |
| 8/2: AJ & China (CI) (Traffic Stop by Dep. Sudler) | **P. 11**:<br>CI: Yea, but what happens when they disrespect you in the . . . in the worst way?<br>AJ: Guess what?  That's what, that's when you see them on the news dead, cause somebody kill em.<br>**p.12**:<br>AJ: "I never did anything they accused me of"<br>Dep. Sudler: What did they accuse you of.<br>AJ: They accused me of playing road patrol in my personal vehicle.<br>Dep. Sudler: Dude, cause I was there one night.<br>AJ: No. I . . .was you know I live right off from Miramar off Hallandale, and every time y'all had something and I was coming home and Lt. what's his name, god I cannot remember his name, but he sent me home late me one, the night when Brian McNulty, when Brian . . . I think it's McNulty, but Brian he ah asked me what was I doing cause he saw me pass by, and I said I'm coming from work.<br>**P. 14**:<br>AJ:  "I'm still capable of going to any agency, but I chose not to."<br>. . .<br>AJ: "He's the same one, when I first met him and I told him that I was going to be on BSO he told me you will never make the department.  I was living in Carver Ranches at the time and they broke into my house and he came and he was the investigative officer.  And I had my corrections and police book sitting there (inaudible) sitting there, and he told me ah you'll never make it.  I said why?  He said look where you come from, look where you live."<br>Dep. Sudler: You what I . . . you know what I remember.  I remember that I don't know you was working. . . you were coming home and shit and you were wanting to be a police so bad and that's you know you were stopping people and you know.<br>AJ: I never stopped anybody.  That was a lie.  I never stopped anybody.  And that was a lie.  And if you look at my file, then you go (inaudible) |

| | |
|---|---|
| 8/2: AJ & China (CI) (Traffic Stop by Dep. Sudler) (continued) | **P. 15:**<br>AJ: "He told me I would never make the department, and I was wearing the same uniform . . . (inaudible)<br>**P. 17:**<br>AJ: "that same cop filed falsified charges against me."<br>**P. 21:**<br>AJ: "Yea they get away with it until, you gotta understand, why you think I don't feel sorry for cops that get killed.  Because they did something wrong in the past and it . . . it just came back to them (inaudible)"<br>**P. 22:**<br>AJ: "Yea, I know, but you what, as long as they got a badge they think their superman."<br>. . .<br>"White boys always think they are better than you when they got a badge."<br>**P. 23:**<br>AJ: He did something to him.  Did something to him, the guy got pissed off came back and killed him."<br>CI: Crazy . . .dude killed a cop.<br>AJ: Yea, (inaudible) you know you get the death penalty for that.<br>CI: For what?<br>AJ: Killing a cop.<br>CI: Oh yea.<br>AJ: Yea you get the death penalty, but killing a cop, to me killing a cop is like killing the next man the street.  He ain't nobody better than me, he ain't no better than the next man.<br>CI: Not when you got that uniform and that badge on he going to treat you like you ain't nothing.<br>CI: Yea.<br>AJ: That's what make me want to kill them more. |
| 8/16: AJ & China (CI), Chico (Det. Cedeno) | **P. 1:**<br>AJ: ". . . I wanted to blow that place up right there . . .<br>I hate them cats."<br>**P.2:**<br>AJ:  "I hate fuckin' cops period." |
| 8/23: AJ & Chico (Det. Cedeno) | **P. 13-18:**<br>In 1989, I joined the Broward Sheriff's Department. . . . I was a Corrections Officer. . . . As I was working, and I'm, going home, the officer that got me fired, was the officer that was investigating an officer for a burglary in my house.  He told me to . . . I was in (inaudible), in Carver Ranches, and they broke into my house.  I called the police.. . . And a deputy came, and when he came, that's when I was working at the bank.  I had my books that I was studying to be a corrections officer. . . . Cause they were hiring. Needless to say he comes in and he tried to tell me oh you're never make it, you never (be), I says yeah I was trying to get on with the department that you work (with). . . . He's telling nah you're never make it. So I said ah, why would you say that?  He said |

| | |
|---|---|
| 8/23: AJ & Chico (Det. Cedeno) (continued) | police. So I turned around, and . . .I was working going home, and I saw the same deputy and, it was a trooper out there that I knew.  His name is Trooper Tony Lee.  I say what's up Tony?  And Tony was arresting somebody and that same deputy that I knew from before I said hey how ya doing?  (I say), I made the department, and he was like all pissed off about it, so he files a bogus ah, ah, thing, charges against me saying that I was playing, road patrol cop in my own personal car.  And I say what are you talking about?  I'm coming from working overtime for Leutenant, (inaudible) Lieutenant Crane, who was a lieutenant then. . . . Yeah, no I'm just saying, and he still tried to say that he see me all the time and I'm playing police officer and ah, and he had a, he called a seargent because he's a, he's a, senior officer, and a sergeant took his words for it, they filed charges against me saying that I was, had launched an investigation against me through I A saying that I was playing police officer, needless to say, two months later I'm under investigation I'm not even working in the regular station where I worked they had me working in the front of the main jail in Broward, sitting there you know waiting on my investigation ah, to be over with.  Bottom line is they got me fired.  That was my real first job . . . I was nineteen years old.  That was my first real job.<br>Chico: . . . Dam bro you were young.<br>AJ: Yeah (bro) and he got me fired.  You know I was hot.. . .I'm Jamaican bro I still know how to get down. . . .<br>Chico: . . . So what happened?<br>AJ: . . . I got pissed off that junk, was up in me, later on I, I went and handled my business. . . Needless to say he won't be getting nobody else fired.<br>Chico: That due, who was (inaudible)<br>AJ: No I didn't like that bro, don' don't launch no false investigation . . . against me. |
| 8/31: AJ, Chico (Det. Cedeno), & "T" (Agt. Curry) | **P.6-10:**<br>AJ: I was young. . . You know all them jobs I tell you I was dong?. . . I stopped doing all those jobs and got ah, (you know hired) and (inaudible) I end up getting a job. . . I was alright with it, I was making decent money.  I was young.. . . (Inaudible) racist cop (inaudible) first met me, first met me (inaudible) . . . this cop, a sheriff, a deputy sheriff he was *a* investigating officer on a burglary at my house.. . . He came to my house and (inaudible) studying, and ah he said oh you want to be a officer?  I say yeah I would like to be an officer (inaudible) I say I'm trying to study and pass the test.  He gone tell me (inaudible) you'll never make it.  I say why would you say that?  (Inaudible) put me down automatic.. . . Okay I ain't say nothing else about it. . . . I'll prove him different.. . . (Inaudible) I got the job, nine months later uhm, they always stopping people right by, by ah ***track on Hallandale***. . . . They see me all the time passing by. (Inaudible) traffic driving slow like this. . . . And (Inaudible) suppose to be, *one of your* boys, you know, (inaudible) hey what's up?  You alright over there? . . . I worked three to eleven so, uhm, they used to see all the time.  And one day, a trooper who *I knew* . . . (inaudible) had somebody pulled over so I know I was coming from work (inaudible) over time (inaudible) the lieutenant didn't give me my overtime slip . . .so I didn't have it on me, |

| | |
|---|---|
| 8/31: AJ, Chico (Det. Cedeno), & "T" (Agt. Curry) (continued) | (inaudible) so I was coming home and I stopped (inaudible) Tony. How you doing my man?  The deputy (was there), and Tony went ahead and took the guy that he was arresting to jail and (inaudible) . . . The Trooper, yeah.  Deputy (standing there, start) interrogating me in the middle of Hallandale Beach Boulevard. . . .The same guy that did the arresting and when I saw him, I was like hey, what's up, you know I made the department.  I thought he'd be happy for me. . . .<br>Chico: That's the same dude that went to your house?<br>AJ: Yes!. . . . And I said yo, bro, and I'm trying to rap thinking that he'll be like, damn, glad you make it, I didn't think you would make it, you know.. . . Naw, he's just standing there interrogating me (unintelligible) start saying I'm playing police officer in my own personal car and knowing that I'm a correctional officer and all this crap. . . . And that I'm violations of code this and code that and he called a sergeant on the scene and told him his story (inaudible).  And the next thing you know I was being brought up before internal affairs.   And they had me on the desk, didn't even work my regular shift, they had me on the desk ahh for about a month and a half. . . . (inaudible) any investigation brought up against you in your first year, probation. . . .I was 11 months and some days.<br>Chico: Damn, and then they fired you?<br>AJ: And they fired me bro.  Do you know how devastating that is for a young man?<br>**P. 14-15:**<br>AJ: No, person they get you, you file accusation against somebody and that gonna go for months and months.  See, I don't have to get you right then.<br>Chico: Yes.<br>AJ: (Unintelligible) Don't have to get you right then.  That's the problem for me.  They go and do revenge right then and there.<br>**P. 57:** AJ: The person that, ah the victim got to be a target.  Can't be no I'm trying to get with some stupid.<br>Chico: Oh, you mean like just spur of the moment shit?<br>AJ: Yeah |
| 9/27: Gwen & China (CI) | **P. 15:**<br>CI: And he hate cops?<br>Gwen: Yeah he hate cops.<br>CI: (Laughing) We went by the place he talk bout, he wanna blow the place up I say man you crazy.<br>Gwen: Umm.  He'll try to. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | AJ: I got fired.<br>**P. 11:**<br>AJ: Nobody wants to hire you, for anything no matter working in a hotel as a bus boy nobody wants to hire you.  (No) you got fired (for being a cop) you musta been a bad cop.  I didn't do anything.  I never did anything wrong.<br>**P. 18:**<br>Chico: Uhm, and that dude Brian was the cause of why whatever happened to you?<br>AJ: Yeah. |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | Chico: Right?  So that's the dude you had the beef with?<br>AJ: Yes. . . . I didn't have the beef with the sergeant.  Cause the sergeants were being told false information by Brian. |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 3:**<br>?: The police stopping us?<br>AJ: Yeah, this is still, BSO the people I hate the most.<br>**P.4:**<br>P1: . . . This dude has got nothing but hate.<br>*S/M*: . . .(inaudible) you see this building right there?  I say what building?  That's BSO headquarter, I hate them mother fuckers.  (Laughing in background)<br>AJ: I ain't lying boy (inaudible) take it out.  (Laughing).<br>P1: Come on man with all this terrorist stuff. . .<br>AJ: I don't care.<br>**P. 9:**<br>AJ: . . . I hate them cats don't get in no accident with them cats.  That's where they headquarters at see where that guy is?<br>P1: (Inaudible)<br>AJ: That's where it used to be.<br>P1: You know where everything was and everything used to be.<br>AJ: That's cause that's where I went to get my interview.  To get the job. . .<br>**P. 26-27:**<br>P1: You used to stay out this way A?  In the Ranches?<br>AJ: Yeah.<br>P1: Where?<br>AJ: (That's why he though I was) I was scum cause I lived in the Ranches but I had just came (here to) Florida.  (I lived here) a year. |
| 12/13: Gwen & BSO (Det. Bole and Maj. Fantigrassi) (unrecorded) | **BSO's 99-page Report at 74:**<br>"According to Mrs. Johnson, she was aware of the circumstances surrounding 'A.J.'s' termination as a BSO Corrections Deputy.  She recalled how a Deputy named Montgomery had made a complaint to Internal Affairs concerning A.J. showing up at police calls and traffic stops.  She described A.J. repeatedly talking in his sleep about how he was going to 'get' Montgomery for costing him his job with BSO.  She specifically recalled A.J. using Montgomery's name in his sleep.  She estimated A.J. dreamt the same dream and talked in his sleep approximately two (2) to three (3) times per month." |

| | |
|---|---|
| 2/5/02:<br>(Meeting at Denny's): AJ & Det. Bole (unrecorded) | **BSO 99-Page Report at 82:**<br>"I met with Andrew Johnson at the Denny's restaurant. I reviewed his application and related materials. He spoke briefly about the circumstances surrounding his termination, specifically the incidents involving Deputy Brian Montgomery.<br><br>He stated Montgomery was a 'racist.' He described an incident that occurred prior to his being hired as a corrections deputy. Johnson had been the victim of a residential burglary and Montgomery was dispatched to take the report. When Montgomery left Johnson's residence, he observed Montgomery rip up the burglary report he had just filled out. In addition, Montgomery made comments to Johnson suggesting Johnson did not stand much of a chance of obtaining employment with BSO.<br><br>During another encounter, Johnson approached Montgomery just to say 'Hello' and 'Do you remember me?' when he saw him in the Circle K store at 56th Avenue and Hallandale Beach Boulevard. He cited this incident as being what sparked Montgomery to make the Internal Affairs Complaint.<br><br>At the conclusion of the meeting, I told Johnson I would be contacting him in reference to setting up appointments for the various stages of the BSO hiring process." |
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) | **P. 42:**<br>AJ:    Um... I was accused of playing road deputy in my own personal vehicle by a detective who was, and I was and I quote racist.<br>Poly:  Think so?<br>AJ:    I know so. And his background and is life right now, and it's, his uh... personality is not well liked and right now in the department and it's known.<br>Poly:  Okay. So...<br>AJ:    He falsified a statement to uh... to gain ground and because he was a senior officer and he uh... complaint against me while on probation it was grounds for termination and that why I was uh... terminated.<br>Poly:  How did you feel about that?<br>AJ:    I hated it. (UI)<br>. . .<br>**P. 44-50:**<br>Poly:  All right? All right where were we? Okay, you were accused... of playing road deputy and he falsified a complaint about you.<br>AJ:    Yeah.<br>Poly:  All right. Would it bother you if I go ahead and ask you, would you explain that situation?<br>AJ:    No.<br>Poly:  Okay. Please do.<br>AJ:    I lived in the area where the road deputy patrolled.<br>Poly:  Uh-huh. |

| | | |
|---|---|---|
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | AJ: | Um... he seen me all the time. And I was a deputy sheriff at the time, uh... detention deputy at the time, on two occasions um... a state trooper which was a good friend of mine his name is trooper Tommy Lee he had an altercation with some one he stopped and as I was going home, I see trooper Lee struggling with this individual um.. As I saw him while in uniform, now this is what they teach you in the academy if you see another officer in a struggle with some one and it's a struggle and you are in uniform whether in uniform or not, and you can assist that officer you're suppose to, which is only right. Um... I.. By the time I made a U-turn Trooper Lee had it under control no problem, person in the vehicle. |
| | Poly: | Okay. |
| | AJ: | Um... when I made a U-turn Deputy Brian Montgomery pulled up and he saw me, I wasn't even . . . he saw me in my new car Ford Probe that's the first occasion he saw me... |
| | Poly: | Uh-huh. |
| | AJ: | Next time, I saw deputy Brian Montgomery myself I stopped and said, hey Brian how are you? I'm deputy Johnson, do you remember me? The reason why he should remember me, because six months prior he was the investigating officer on a burglary that took place in my house, where I was living, a crack head... |
| | Poly: | Oh, he was the investigator in.. In... |
| | AJ: | He was uh... |
| | Poly: | ... in the vicinity. |
| | AJ: | ...he came to the scene. |
| | Poly: | Okay. |
| | AJ: | He was called out, (ui) called out to the scene. |
| | | |
| | Poly: | All right. |
| | AJ: | Um... A thug,  crack head, what ever you want to call him broke in to my house stole my television VCR, I knew who it was, I saw him surveilling (ph) the area... |
| | Poly: | Uh-huh. |
| | AJ: | ...I called the police department.  Brian Montgomery showed up, at the time I had my  ARCO corrections book and my ARCO police book sitting on my desk.  My dresser in my apartment and when he approached, he came in he saw, he said, Oh, you want to be an officer, and I took that opportunity, I was pleased and... |
| | Poly: | Yeah exactly. |
| | AJ: | ...he asked cause he was in uniform and I was impressed, he was looking sharp... |
| | Poly: | Uh-huh. |
| | AJ: | ...I said, I actually want to be what you are, you know, a deputy like you, huh.  I felt good about saying that to him and, and any officer (ui) would like would you like to come over to our department? |
| | Poly: | (ui)... absolutely. |
| | AJ: | ...(UI) he looked me straight in the eye and said you'll never make it. And I quote, repeat, he said to me you'll never make it.  And totally, he just totally squashed my enthusiasm and my feeling right there.  And I said why would you say that?  He said look where you live, then he left. . . . (ui) |

| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | Poly: | What did you say? |
|---|---|---|
| | AJ: | (UI) I didn't say anything else, I said well any way, I was hurt, I was very much hurt. And he proceeded to ask me about the burglary in my house. And I still at the porch at my house the report that he was writing, I saw him myself took that report... (motions as if he is tearing paper) |
| | Poly: | He ripped it up! |
| | AJ: | ...and called in and said, and apparently he said it was nothing. I saw him myself. |
| | Poly: | Did you uh... make any type of complaints (ui)... |
| | AJ: | No I did not. That was... I, I stated that to him. I when I was called in but they didn't care. Um... I didn't bother to complain about it, so six months later when he saw me for the second time I was coming from work from the stockade Lt. Huff, I mean not Lt. Huff, Lt. Crane, asked me to work a couple of hours over time cause there was a deputy coming from the main jail to take my position cause some one hadn't come in that night. So I worked a couple of hours over time till that other deputy came. As I was leaving back then you're suppose to get a pink slip or something stating you did your over time (ui) turn in his portion, (ui) get my pay. Oh, Johnson I forgot, the paperwork, I'll give it to you tomorrow. All right, what am I going to say to Lt. Crane? Sure man, no problem. This is two o'clock in the morning. As I'm coming home, I work 3 to 11 so two o'clock in the morning, three hours later I'm still in Oakland in my personal vehicle coming home, I've... at the time I had purchased a... holster and before I graduated the academy I had purchased a weapon a revolver from a Sergeant that was selling one, don't know his name don't know (ui) it was just up, up on the board, you know how you see weapons to be sold. |
| | Poly: | First weapon I bought I bought from another officer that I didn't even know. |
| | AJ: | Didn't know. |
| | Poly: | Uh-huh. |
| | AJ: | (UI) If I would have gotten (ui) so I had a weapon and I had my ca... my holster and I was going home, during that time a couple of deputies where killed in uniform. |
| | Poly: | Really? |
| | AJ: | Yeah, during that time in '89 and '90 a couple of deputies where shot coming from detention special and road, one was shot right off of Oakland or commercial, I think it was Commercial or Oakland, Broward Blvd., I'm sorry it was Broward, and was shot in a Kentucky Fried Chicken... |
| | Poly: | I remember that. |
| | AJ: | Remember that so.... |
| | Poly: | So... |
| | AJ: | ...this was what was going on so I did not, you know, you know think anything of it, so I said well I'm going to keep my weapon with me, you know, when I'm getting off of the car, the appearance alone no one should bother me, I am armed I am going in, don't try to uh... do anything I'm officer, I'm going tn to my house, I never did anything other than get out of my car go home get in my car went to work, that's it. So and I was coming home I saw d... deputy |

| | | |
|---|---|---|
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | | Montgomery, and I said, let me stop and say Hi to him, I feel good I made it, I am a deputy, I am wearing the same uniform he is wearing... I stopped... |
| | Poly: | And you were proud. |
| | AJ: | ...and I was very proud, and I stopped and hoping he... he would be proud to see me in the situat... even though he (ui) my feeling before... He said, oh (ui) I said, yeah you remember when we ... came to my house and... well (ui) situation and... and I'm, you know I'm with the department. (ui) you know the routine, I like, what's going on. So I said, all right then (ui) He said wait a minute hold on. So I'm thinking he wanted to finish talking with me... |
| | Poly: | Uh-huh. |
| | AJ: | ...(UI). |
| | Poly: | Really... |
| | AJ: | ...(ui) so he said uh... took off his pad and I kid you not and took out this pad and said, what's your name? Deputy A. Johnson, what's the A. for Andrew? Immediately started interrogating me in Hallandale Beach Blvd., at two o'clock in the morning about 2:15 or so 2:30 in the morning, while I'm in uniform and a senior officer in... ask you to stop 'cause he want to talk to you. You're suppose to acknowledge what ever whether he's a sergeant or not he's a senior officer. |
| | Poly: | Right. |
| | AJ: | So... |
| | Poly: | What was he asking? |
| | AJ: | Just started asking me, what I'm doing here at two o'clock in the morning, why I'm still in uniform, why am I driving around in my own car if I'm in detention, uh... playing road cop, I said, what are you talking about? As he was questioning me, a sergeant who pulls up, Sgt. Kenny (ph) I think his name was... |
| | Poly: | Uh-huh. |
| | AJ: | ...Pulls up, (ui) what's going on. And I know the deputy pulling up. So now I'm out there with two deputies and a sergeant and they are interrogating me. So the Sgt. proceeded to ask me the same questions. I answered, he also took out his pad. I felt bad about it. I said, Jesus, this is... this is... |
| | Poly: | This is getting serious. |
| | AJ: | ...cause I just stopped to say hi. About two, three weeks later as, during the same time, and still during the same time deputies were killed and I said well, I'm coming out of the stockade from work. And I noticed a vehicle came out right behind me. |
| | Poly: | (ui) a vehicle. |
| | AJ: | But not very good (ui) pulled over behind me, I got in the next lane, the vehicle did the same thing, try to gradually do it, but I saw it. I notice everything. I got on Commercial to make a left on Commercial coming from North... |
| | AJ: | ...Commercial to make a left on Commercial coming from north and Power Line coming out of the stockade I know you know the roads (ui)... |
| | Poly: | Yeah. |

| | | |
|---|---|---|
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | AJ: | ...and I hit I-95 that vehicle sped up got right behind me.  So I noticed that this person is following me, so I proceeded to exceed the speed limit 65 in the 55 then, and vehicle still following me.  You know some what distant but I see him, every time I (ui) the vehicle (ui) so it got closer and I proceeded to speed exceeding the speed limit 95 miles an hour, yes I was and I admit to that I was, I didn't know what was going on and I exceeded the speed limit.   About a minute later I noticed that vehicle wasn't behind me. |
| | Poly: | No problem. |
| | AJ: | About another 2 weeks later I'm being called in to IA.  Internal affairs, that was them on the report, the detective Montgomery stated that I was playing road deputy in my own personal vehicle while off duty, corrections.  So they were following me to see if that is what I was doing.  In that process because I smoked them and technically I did on I 95 they were pulled over while I didn't see them, but I saw the Highway Patrol who cited them for no lights, which they did not have on, did not identified themselves as officers when he approached them and got out with an attitude, fuck you!  So this is what happened and they were also cited for exceeding speed limit. |
| | Poly: | And how did you find that out? |
| | AJ: | When I went to FDLE, when the Broward sheriff tried to get me um... um... decertified. |
| | Poly: | Oh, Okay. |
| | AJ: | They were sitting on the board FDLE members and they had the report... |
| | Poly: | Everything... |
| | AJ: | ...everything and I was later interrogated by um... IA, two detectives, I was nervous as hell cause I'm 19 years of age... |
| | Poly: | You were a kid. |
| | AJ: | ...I'm 20 I just turned 20, I'm 20 years old, I don't know what the hell is going on, I'm proud of what I do, I'm a deputy, I'm... I work for you guys.  I didn't do anything wrong, I haven't done any drugs, I haven't shot anybody.  Cary Nuttal PBA attorney, advised me, do not volunteer to take (points to polygraph instrument).  And I said why not?  He came and he met me just that day.  I want to go in to IA and they told me call if I you have a PBA attorney call him.  So I said why not?  Because uh... just don't take it, it may not be in your favor.  You are nervous you're a kid, you just don't know what they might do.  I said well, I have nothing to hide, really.  And I don't want it to seem like, cause they told me, if you don't take it it's not going to look good in our final report. |
| | Poly: | Uh-huh. |
| | AJ: | ...but if you do take it it's going to look good specially if you pass I'm like what the hell (ui) I have nothing to be ashamed of I didn't do anything wrong, take the damn thing, excuse my language, I'm sorry.   And I took the test, I was nervous as hell it was off the charts, and you probably notice that, it was just off the charts.   And most of the... things came back inconclusive.  Anyway it was grounds the final assumption , an assessment of my polygraph and the investigation after it the complaint.  Because a sergeant backed up detective |

| | |
|---|---|
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | Montgomery statement cause he told they were good.  He had an experienced officer who worked under my command.<br>Poly:   Uh-huh.<br>AJ:      I'm going to believe him.<br>Poly:   Huh.<br>AJ:      Of course.  So, he wrote the report as well.    As he saw fit.<br>**P. 50-51:**<br>Poly:   All right, let me ask you something, do you think that uh... Montgomery did this, you had said before you thought he was racist.<br>AJ:      Yes, I did.<br>Poly:   All right, you think that he did this because of the area that you lived in, or was he just a racist person or...<br>AJ:      I think he was... the immediate assessment of what he said can be taken as where I lived.<br>Poly:   Yeah.<br>AJ:      But the fact that he proceeded to do what he did...<br>Poly:   Made you feel that he was racist.<br>AJ:      ...I know for a fact he was racist.<br>Poly:   All right, I, I, I was just wondering because, I think (ui) put myself in that position and I, I ma... I'm thinking that, do you think it would have been different if when Montgomery saw you uh... outside the vehicle that one time there, you had gun on and what have you?<br>AJ:      Yeah, yea.<br>Poly:   ...do you think that if you weren't wearing a gun at that time it would have ended in the same results?<br>AJ:      I don't think so.<br><br>**P. 56:**<br>Poly:   Well how did you feel about this incident with BSO, I mean do you have... uh... you're back here now...<br>AJ:      Yes.<br>Poly:   Uh... do you have bad feelings?<br>AJ:      I have bad feelings for that officer.  I have bad feelings because Nick Navarro never sat and actually read what happened to me...<br>Poly:   Uh-huh.<br>AJ:      ...signed off on my termination.  So I have no feelings for Nick Navarro and I definitely have no feelings for this particular deputy who is now a Sgt, working out of Pompano district, so I was told...<br>Poly:   How do you know that?<br>AJ:      ...because I was told by... and remember I work for the news.<br>Poly:   Right and you could find out....<br>AJ:      I find out a lot of stuff. |

| | |
|---|---|
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | **P. 57-58:**<br>Poly:  Well let me ask you this if you come back to, to BSO and then you run in to uh...<br>AJ:  I'll turn and go, I'll turn and go.<br>Poly:  ...this Sergeant Montgomery, you're going to punch him out or something like that?<br>AJ:  No, no I'm not.<br>Poly:  ...you're not going to do anything ridiculous, are you?<br>AJ:  of course, assault on a LEO hell no, excuse my language, but no.<br>Poly:  Well...<br>AJ:  It doesn't matter.<br>Poly:  ...bitter feelings run deep sometimes.<br>AJ:  Yeah, but it's not going to run deep enough for me.<br>Poly:  Did you ever see him again after you were terminated?<br>AJ:  No.<br>Poly:  No?<br>AJ:  Never seen him again, never saw him again.<br>Poly:  What would you have done if you did see him?<br>AJ:  Probably told him he was a lying bastard and kept going.<br>Poly:  I think he'd be getting off easy, what do you think?<br>AJ:  Yeah, he would.<br>Poly:  While you were in the police field did you ev... ever associate, or since you had been in the police field and by police...<br>AJ:  (ui)...<br>Poly:  ...I mean correction...<br>AJ:  Yes...<br>Poly:  ...cause we're all one family.<br>AJ:  ...we're one family.<br>Poly:  You know, since you were in the police field and in corrections did you... or... uh... afterwards...<br>AJ:  Yes...<br>Poly:  ...because now this is a new time frame...<br>AJ:  Exactly.<br><br>**P. 63-65:**<br>Poly:  Okay.  The (ui) instance uh... with Montgomery you go... right now today if you would uh... run into him you would just go the other way?<br>AJ:  Absolutely.<br>Poly:  All right.  How about back then?<br>AJ:  Back then?<br>Poly:  Yeah.<br>AJ:  Uh... to be honest with you, I would've, I would've cussed him from amazing grace to sweet opportunity.  Cause from one thing I still know the law, you can't assault a LEO and...<br>Poly:  Yeah...<br>AJ:  ... you can definitely can't uh... you know, there's nothing I can do about it, I was |

| | |
|---|---|
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | out of a job, bottom line I was out of a job. But I would have prayed to god that he would have been a statistic. And I'm being honest, I would have. I would have prayed to God that (ui)...<br><br>Poly: You mean if, if, if something bad would have happened to him you wouldn't have...<br>AJ: ...back then...<br>Poly: ...felt bad at all.<br>AJ: ...I would have to do what I do now...<br>Poly: Uh-huh.<br>AJ: ...with no emotions. Stand over his body and shoot it and shoot it well.<br>Poly: Are you talking about with a camera or with a gun?<br>AJ: With a camera, camera.<br>Poly: Did you want to kill him?<br>AJ: My personal feelings, I felt like that, I felt, I said Jesus. I didn't want to. I didn't, you know I didn't want, I just wanted something bad to happen to him. I wanted him either loose his job just like I did and know what it felt like or to... probably to be honest, I, I, I think I may have felt like I wanted him to get gun down, I really did.<br>Poly: Uh-huh.<br>AJ: And I just, I'm being honest.<br>Poly: That's all I'm hoping<br>AJ: I was a 19 year old kid who turned 20...<br>Poly: And then...<br>AJ: ...and he took away... I quit a job working in the bank was unemployed for 3 months to get this job. Because the reason why I had to quit, because they wouldn't let me go and apply for BSO so I had to quit and I took a chance. Saved my money (ui) again.<br>Poly: I know.<br>AJ: Save my money and you turn around and cause me my job which I loved.<br>**P. 67-68:**<br>Poly: All right? And, you know how do you feel toward BSO right now today?<br>AJ: Me personally?<br>Poly: Uh-huh.<br>AJ: I still love the department.<br>Poly: Great department, huh?<br><br>**P. 69:**<br>Poly: So my concern is with Brian Montgomery.<br>AJ: Yes.<br>Poly: All right? Now back then you would've not cared whether he lived died or.... actually you would've preferred to see him dead.<br>AJ: To be honest, back then I would've...<br>Poly: Did you ever think of killing him? |

| | | |
|---|---|---|
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | AJ: | No.  Hey it probably ran through my mind but it's not nothing that stayed.  I'm not going to commit a crime. |
| | Poly: | Uh-huh. |
| | AJ: | I felt I can move on and get a job else where, so.  It's not nothing, it probably ran in my mind but I'll be honest, I can't say I sit down and say it was an in depth thing.  Absolutely not. |
| | Poly: | Did you ever tell anybody you were killing him? |
| | AJ: | Na, na, no.  Why would you say that? |
| | Poly: | Well I don't know.  That's what I... I... |
| | AJ: | Incriminating yourself? |
| | Poly: | ...sort of, this sort of, it sort of bothers me in a way, that's why I'm pursuing this area. |
| | AJ: | Oh, that's fine, you know I never did that. |
| | Poly: | Okay.   In the area that you live, he was not the only uh... officer that rode your area. |
| | AJ: | No. |
| | **P. 74-75:** | |
| | Poly: | ...a proper assessment and everything.  So that your (ui) I, I need to know uh... back then yeah, you had bad feelings towards uh... Brian Montgomery uh... back then uh... if something bad happened to him, if he got killed you would not have shed a tear you would have stood there and taken the photographs like you said... |
| | AJ: | Yeah. |
| | Poly: | ...uh... but also you know the thought may have passed thru your mind as to whether or not you would want to kill him, but you... you certainly uh... would not... |
| | AJ: | Would not... |
| | Poly: | ...go around and tell anybody that . |
| | AJ: | Of course not, and I would not (ui)... |
| | Poly: | Huh? |
| | AJ: | ...try to execute that kind of thought.  Still (ui)... |
| | Poly: | Well when we're young... |
| | AJ: | ...(ui) still (ui)... |
| | Poly: | ...we do (ui) foolish things. |
| | AJ: | ...(ui) yeah but, that was, that was more than foolish, that was criminal and you just don't do stuff like that. |
| | Poly: | (ui). |
| | AJ: | (ui) let the record state I still don't have great feelings towards him. |
| | Poly: | You still don't have great feelings towards him. |
| | AJ: | But I wouldn't, you know I wouldn't wish anything on him now because of course he is a Sergeant, and obviously with the department saw fit to make him a Sgt. (ui)... |
| | Poly: | Well you know for those of us that never get promoted... |
| | AJ: | (LAUGHS) |
| | Poly: | ...we always look at it like they promoted the wrong person. |

| | |
|---|---|
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | AJ:     The wrong person (ui)...<br>Poly:   ...okay so (ui)...<br>AJ:     ...but I'm not (ui)...<br>Poly:   ...(ui)...<br>AJ:     ...I do feel like that.<br>Poly:  It had, you ha... you have mixed feelings about that...<br>AJ:     I do feel like that, I do feel like they've promoted the wrong person. |
| 3/13/03: Gwen & BSO (Det. Bole and Major Fantigrassi) (Recantation) | **P. 14-19:**<br>Q: . . . And, what happened, why was why did he leave employment with the ah Sheriff's Department? From what you know?<br>A: Uhm he didn't ah, complete probation.<br>Q: Do you know why?<br>A: Ah, he, I was told that he ah, was seen in his clothes off duty ah trying to assist in, ah, I think they had someone stopped or something and he tried to assist and ah, detaining somebody or something I don't know. That's . . .<br>Q: . . . Who . . .<br>A: . . . I can't remember too good but I, I was told this.<br>Q: Uh huh. Who, who told you that?<br>A: I came here to the BSO office and I was told that.<br>Q: Well beyond BSO though, I mean, when he, I'm talking about back then, when he get, when he lost his job what did he tell you? Why why did he loose his job?<br>A: Oh he told me that ah, this guy Montgomery, ah caused him to loose his job. That's what he told me.<br>Q: Okay. What detail did he provide to you as to why, this guy Montgomery, had caused him to loose his job?<br>A: I can't remember. I think he said he didn't like him, but I can't remember, I really can't remember that. But I believe he said he didn't that he didn't like him.<br>Q: Did he say why, Montgomery didn't like him?<br>A: No I don't remember that.<br>Q: Well what were they an circumstances that led to him, leaving BSO? Was he fired?<br>A: Oh yeah he was uhm, yeah they, they let him go.<br>. . .<br>Q: Now, he told you that you Montgomery was responsible for, him losing his job?<br>A: Yeah.<br>Q: How did he feel about that?<br>A: Um, he was upset. About it.<br>Q: Gwen I want to you remind you that you're testifying under oath, and it's absolutely important that you, tell me everything you know, and not what's convenience to remember. So . . .<br>A: . . . I'm trying to remember . . .<br>Q: . . . I'm (gonna) ask you (talking together) . . .<br>A: . . . I'm trying to remember.<br>Q: . . . (inaudible) ask you to, to try to, to remember a lil bit more. . . |

| | |
|---|---|
| 3/13/03:<br>Gwen & BSO<br>(Det. Bole<br>and Major<br>Fantigrassi)<br>(Recantation)<br>(continued) | A: I'm trying to remember.<br>Q:  What were his feelings towards Montgomery?<br>A: He, he didn't like him.  He didn't like Montgomery.<br>Q: Did he make it clear to you that he didn't like Montgomery?<br>A: Yeah he told me that he didn't, that he didn't like him.<br>Q: Uh huh.  Did he tell you ah anything beyond that, as to his feelings toward Montgomery?<br>A: No.  That's it, he just said that he didn't like Montgomery.<br>Q: Did he tell you that he wanted to harm Montgomery in any way?<br>A: Yeah I, I think he said something to me about like he was gonna get him.<br>Q: When did he say that?<br>A: That's it I, I don't remember when he said it but, it seem like vaguely I remember him saying something about that he was gonna get him.<br>Q: Do you remember where that was said in what context?  It was said.<br>A: No I don't.<br>Q: Beyond saying that he was gonna get him, did he ever say, that he was gonna kill him?<br>A: No he never said that.  He never said he was gonna kill him.<br>Q: Now the name Montgomery.<br>A: Uh huh.<br>Q: Where, where have you gotten that name from?  Is that a name that he provided to you right from the beginning?<br>A: Yes that's the name that he provided to me, Montgomery.<br>Q: Okay.  Now had he ever express ah, any hatred for anyone beyond Montgomery?<br>A: No he didn't.<br>Q: Did he blame anybody else that was part of that ah, ah, investigation that led to his dismissal?  Did he ever blame anybody else for that that you're aware of?<br>A: Not that I'm aware of. |

| | **When did the Shooting Occur?** |
|---|---|
| 8/23: AJ & Chico (Det. Cedeno) | **P. 2:**<br>Chico: They got your name on it or what?<br>AJ: No.  This was, this was, in ninety.<br>Chico: Right.<br>AJ: It's a done deal.  Actually (inaudible) the beginning of I think it was the beginning of ninety one, that was it.<br>**P. 5:**<br>Chico: . . . we're talking about eleven years.<br>AJ: Yeah (that's true).  Ten years ago. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 13-14:**<br>AJ: . . . they uhm they terminated me.<br>Rollie: Uh huh.<br>AJ: After that then like two to three, four months later.<br>Rollie: Uh huh.<br>AJ: I thank they followed (inaudible) and I decided to take action.<br>**P. 17-18:**<br>Rollie: Now now this was AJ, this was back when?  In eighty what?<br>AJ: Eighty (inaudible) . . .<br>Chico: . . . When did you get, when did you get, when did this whole thing come down that they cut you loose from the department?<br>AJ: Nineteen ninety.<br>Chico: In 1990? And 1990 is when you had the, the whole problem came to an end with this dude (Brian)?<br>AJ: Uh huh.<br>**P. 19-20:**<br>Chico: [H]ow long, when you finished whatever that job with, with, with the sheriff when you finished your job with the sheriff, how long, that was in ninety?<br>AJ: That was in ninety.<br>L/M: And then when did you hook up with this dude again?  Or when did you when did this thing. . . .<br>AJ: . . . (Inaudible) four or five months later.<br>Chico: So it musta been ninety one, early ninety one?<br>AJ: (Early) ninety one, (inaudible) probably the end of January, the beginning of February.<br>**P. 39:**<br>AJ: *[Looking at Sun Sentinel article (7/18/91) re: Behan homicide]* (Inaudible) Behan (that's the guy).<br>L/M: Circle K?<br>AJ: (It look like the guy.<br>Chico: 1990. . . . (Talking together inaudible).<br>Rollie: Is that him? |

| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | AJ: The guy . . . <br> Chico: **_Que dice? ("What's it say?") (Pointing to new document)_** Ninety one? <br> AJ: I remember his name (would have been) Brian so I . . . <br> Chico: (Talking together/inaudible). <br> AJ: I know that **_this the guy I did.  I know that for a fact!  (Holding up picture)_**. <br> Rollie: . . . This **_is_** the guy **_he_** shot? <br> AJ: But I didn't know the guy was name Behan, I thought it was Brian.  That's what I that's all I remember but I know this the guy.  And this is what was done. <br> **P. 62:** <br> Rollie: . . . [I]f cops been knocking on your door, behind you, if someone's . . watching you.     AJ: I've never (inaudible) after eleven years I should have (inaudible) if the cops want to talk to me. |

| | **Where did the shooting occur?** |
|---|---|
| 4/25: Gwen & China (CI) | **P. 1-2:**<br>CI: . . . Yea tell me about that – what about that man, the one that cost him his job?<br>Gwen: What – which one?<br>CI: The one that cost him his job, he had to, he had to walk *up on at 7-11*.<br>Gwen: Which one?<br>CI: He said 7-11 or something.<br>Gwen: Oh yeah, that's the one he killed, that was a officer, he killed that *police officer*.<br>CI: Yeah, at a 7-11.<br>Gwen: Yeah he was sittin in his car, you *don't* remember that.<br>CI: No.<br>Gwen: Yea, officer was sittin in his car, 7-11, blow his head off.<br>CI: Over a job? |
| 8/31: AJ, Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 14:**<br>T: So that's how you did that other mother fucker?<br>Chico: Where was that, in Miami?<br>AJ: Huh?<br>Chico: Where was this dude at in Miami?<br>AJ: No. (Inaudible)<br>Chico: (Inaudible) one of the, one of . . .<br>AJ: . . . Yeah.<br>Chico: . . . Patrol guys from up here?<br>T: Fuckin dude got him fired, man.  Right?<br>AJ: Yeah.<br>**P. 44-45:**<br>Chico: "A".  Is that place far from here where this dude was, taken off or what?<br>AJ: (Yeah)<br>Chico: Is it far?  How far?<br>AJ: (Inaudible)<br>Chico: Wanna handle business right now?<br>AJ: (Inaudible)<br>Chico: Huh?<br>AJ: I'll tell you where it's at, man.<br>Chico: Huh?<br>AJ: 40th Street (Inaudible).<br>Chico: That's were the dude took the hit at?<br>AJ: (Inaudible)<br>Chico: Where's that at?  That's ah. . .<br>AJ: . . . (Inaudible)<br>Chico: And, and ah, isn't that where we're at by?<br>AJ: (Inaudible)<br>Chico: Where were we at then (inaudible)?<br>AJ: It's not the one that's closest to (Inaudible) and that's 56th. |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 21:**<br>AJ: He was sitting at the Circle K at the corner by a wall.<br>**P. 39:**<br>AJ: *[Looking at the Sun Sentinel article re: Behan homicide]* (Inaudible) Behan (that's the guy).<br>Chico: Circle K?<br>AJ: (It) look like the guy.<br>. . .<br>AJ: . . .I know this the guy.  And this is what was done (inaudible). |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 1:**<br>P1: . . . Where we going?  (Laughing in the background)<br>S/M: (Inaudible) Circle K, (inaudible) Circle K.<br>**P. 28:**<br>AJ: . . . .okay Circle K right here.<br>P1: Where at?<br>AJ: Left.<br>P1: Hang a left here?<br>AJ: Yeah.  (Inaudible/talking together). *It wasn't* there, *then*<br>P1: Where?<br>AJ: Right there.<br>P1: See 40th. . . .<br>AJ: . . . (Inaudible) . . .<br>P1: . . . I told you it was 40th Ave.<br>AJ: (Well, I though it was 40th Street) it was (I don't I haven't been here/inaudible). |
| 3/13/02: Gwen & BSO (Det. Bole and Maj. Fantigrassi) (Recantation) | **P. 22-23:**<br>Q: Well did you know anything about the crime and how it was committed (at all)?  For example did you know where it happened at?<br>A: Um, I think so, yes.<br>Q: Uh huh.  And where was that?<br>A: It was in Broward County.<br>Q: I'm sorry what?<br>A: It was in Broward County, Broward County.<br>Q: Okay where specifically n Broward County?<br>A: I think they said it was at a store.<br>Q: A store? What type of store do you remember?<br>A: During that time no bot now I know what the type store it was.  But before I didn't know what type of store it was.  But now I know.<br>Q: Alright now you know.<br>A: Uh huh.<br>Q: And how do you know now?<br>A: During this investigation.<br>Q: Uh huh.  But at that time, you, you, you didn't know what type of store it was?<br>A: Nah I ain't know what type of store it was. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole<br>and Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | **P. 29:**<br>Q: Do you recall telling China that ah, he had done this at a seven eleven?  Leading China to believe that it was a convenient store?  Do you remember telling him that?<br>A: I don't remember telling him that.<br>Q: You're captured on video telling him that.  Audio.  You don't have a recollection of saying that to China?<br>A: No but I might have said it.  But I don't remember saying it. |

| | **What time did the shooting occur?** |
|---|---|
| 6/6: Gwen & China (CI) | **P. 11-12:**<br>Gwen: I was sleep.<br>CI: You was sleep.<br>Gwen: And I woke up and he was gone.  So when he came back, and I saw the way he was dressed and (inaudible), oh my G-d this man (inaudible) and he said uhm, he say I just got through doing a job come help me I gotta go get rid of the gun.  I say doing, you just got through doing what?  Taking care of business.  Come go with me so me and him got in the car and, we start taking the gun a loose, we start throwing it and, I said what happened.  Which I really knew what had happened to tell you the truth.  I already knew he had just, got through offing somebody.  He say I got him, I got that cop, he was sitting in the car.  He said I got him! |
| 8/31: AJ, Chico (Det. Cedeno), and "T" (Agt. Curry) | **P 29:**<br>T: What time was this at night?<br>AJ: (Inaudible).  Yeah.  (Inaudible)/talking together). |
| 9/27: Gwen & China (CI) | **P. 59:**<br>CI: He just came and woke you up in the middle of the night.<br>Gwen: He just crazy.  If he (wanna kill ha), he got to killa.  If he wan somebody to do his dirty work for him he got it.<br>CI: You wasn't scared when he say get up get up get up get up?  I'd a say nooo!  I'll stay right (laughing).  You wasn't scared?<br>Gwen: Uh uh.<br>CI: *Golly*, cause they probably had the whole area surrounded that, by that time.<br>Gwen: But he was already gone he was here in Miami.  He, that, he did that in Broward County.<br>CI: Oh and he came.<br>Gwen: And he was already in Miami.<br>CI: Oh he came back, to Miami?<br>Gwen: Uh huh.<br>**P. 60:**<br>What it was after midnight, 12?<br>Gwen: Yeah it was in the morning sometime.<br>CI: In the morning?<br>Gwen: Uh huh.  You know like 2 or 3:00 I can't remember the exact (inaudible) . . . |

ATTACHMENT / EXHIBIT B-4

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), & "T" (Agt. Curry) | **P. 20:**<br>Chico: And what, what, what, night time day time?<br>AJ: Night.<br>Chico: And that's . . .<br>AJ: . . . (Inaudible),you know the way I did it, (there was) nobody out there, nobody around, (inaudible) night, and I know, (inaudible) I wasn't seen, you know. |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), & "T" (Agt. Curry) | **P. 9:**<br>P1: Was it, what what uhm, when this shit went down AJ was it at night?<br>AJ: (Yes).<br>**P. 29:**<br>P1: . . . Yeah but what time (inaudible) it was.<br>AJ: 1:00 in the morning.<br>*S/M*: Oh!<br>AJ: 1 or 2:00 in the morning. |

| | How (and from where) did Johnson approach the deputy? |
|---|---|
| 5/3: Gwen & China (CI) | **P. 8:**<br>Gwen: That's right he real slick, when he kilt that officer.<br>CI: (Man).<br>Gwen: He creeped up on him, killed him. |
| 5/31: Gwen & China (CI) | **P. 24:**<br>Gwen: I now how he, he creep. . . |
| 8/23: AJ & Chico (Det. Cedeno) | **P. 18:**<br>AJ: . . . He was he was *sittin' there* in his car I walked up on him, and did him. |
| 9/27: Gwen & China (CI) | **P. 58:**<br>Gwen: A cop killa.  He probably told 'em how he did it creeped up on him.<br>CI: Umm.  What you say he had that military paint on?<br>Gwen: (Inaudible).<br>CI: How he got up on it that's what I don't know he just walked by and saw him over there?<br>Gwen: Sneaked up on it.<br>**P. 60:**<br>And he did it on foot, he didn't he parked his car way off somewhere.  That what he told me.<br>CI: (Inaudible) (smooth). |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 22-23:**<br>AJ: I was living in (inaudible) it wasn't quite you know it was like five minutes drives.<br>Rollie: So you just, you went on foot?<br>AJ: Uh uh.<br>Rollie: From the house?<br>AJ: I drove.  But where I parked at was away from the scene when I . . .<br>**P. 24:**<br>Chico: And you, and and you, I mean just out of, this is just (me here), the uhm, but if you stayed, (but if you stay), where, where were you staying at from in relations (inaudible/inaudible) . . .<br>AJ: . . . I was . . .<br>Chico: . . . to that . . .<br>AJ: . . . I stayed in Miramar.<br>Chico: So you parked away?<br>AJ: I parked away.<br>Chico: *Just crept up?*<br>AJ: Yeah.  I did my job.<br>**P. 54:**<br>AJ: I'm sitting here facing towards (inaudible) this is where the wall *ends*, right here, this is 40th Street, right here. |

| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | AJ: 40th Avenue, (on your left). (Inaudible), this where the wall was, I was parked way back here *bout right* I did what I did. . . .<br>Chico: . . . Behind here?<br>AJ: No not right behind (inaudible), right here. |
|---|---|
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), & "T" | **P. 30-32:**<br>AJ: . . . (Inaudible) this is what happened he was in this first parking space right here. Right at the corner.<br>P1: Come on man (inaudible/inaudible).<br>*S/M: Why we going in there for?*<br>*P1: Show me here A. Over here. He was where?*<br>AJ: He was right here. In this *first* spot.<br>P1: In this spot?<br>AJ: *In* this spot.<br>P1: And you were where?<br>AJ: And I came up from behind *in the wall* all those bushes wasn't there. That's all new.<br>P1: Was the wall there?<br>AJ: That wall was there. I told you there was a wall.<br>*S/M: I (inaudible)*<br>P1: . . . Alright so the dude was there? Alright you were where, you were on foot to where?<br>AJ: Go left.<br>*S/M: . . . Nobody was out there?*<br>AJ: (Inaudible) go through (this dirt) . . .<br>P1: . . . Alright hold on hold on (inaudible) watch out, watch out man we're coming through. And where were you? Where'd you go on foot?<br>AJ: I went on foot, go down.<br>P1: Down here?<br>AJ: Down there.<br>P1: Through here?<br>AJ: Yep. I parked way down there I guess by where that, that bulldozer is at.<br>**P. 35:**<br>*S/M: This a busy street man you just walked across there at night man? **And no one saw you? No one saw you?***<br>AJ: Yeah but it wasn't like that . . .<br>*S/M: You just walk across there at night man? (Inaudible).*<br>AJ: (Inaudible), but it wasn't like this. It's busy (today) I got to admit that yeah.<br>*S/M: So **when** you drove by you saw the car then you went and parked and walked over?*<br>AJ: Yeah.<br>*S/M: So you just straight up walked up there?*<br>AJ: I straight up walked up. Well, you can call it fast trotting (inaudible), disappeared. |

| | **What was the deputy doing when Johnson walked up on him?** |
|---|---|
| 4/25: Gwen & China (CI) | **P. 1-2:**<br>CI: Yea tell me about that – what about that man, the one that cost him his job?<br>Gwen: What – which one?<br>CI: The one that cost him his job, he had to, he had to walk **up on at 7-11**.<br>Gwen: Which one?<br>CI: He said 7-11 or something.<br>Gwen: Oh yeah, that's the one he killed, that was a officer, he killed that **police officer**.<br>CI: Yeah, at a 7-11.<br>Gwen: Yeah he was sittin in his car, you **don't** remember that.<br>CI: No.<br>Gwen: Yea, officer was sittin in his car, 7-11, blow his head off.<br>CI: Over a job? |
| 5/3: Gwen & China (CI) | **P. 5-6:**<br>CI: Talkin' bout run him over.  I'm surprise he didn't get no shots off.  He (inaudible) . . .<br><br>Gwen: . . . Who the cop?<br>CI: Yeah to buss his butt, you know usually cops shoot back.<br>Gwen: How you gone shoot back when you sittin in the car?<br>CI: He got a gun right on his hip.<br>Gwen: (But you don't ever) suspect nobody gonna put a gun (through) your head and blow your, blow your head off like that.  Huh? |
| 6/6: Gwen & China (CI) | **P. 12:**<br>Gwen: . . .  He say I got him, I got that cop, he was sitting in the car.  He said I got him!<br>**P. 13:**<br>Gwen: He was sitting in his car writing his report.  (AJ) put) that gun to his head, (bloop/making a noise). |
| 8/2: AJ & China (CI) (Traffic Stop by Det. Sudler) | **P. 18:**<br>AJ: The one . . . the one that I know who smoked him.<br>CI: He got smoked?<br>AJ: Yea, he got smoked, **sittin' in his car.** |
| 8/23: AJ & Chico (Det. Cedeno) | **P. 18:**<br>AJ: . . . He was he was **sittin' there** in his car I walked up on him, and did him.<br>**P. 23:**<br>AJ: . . . All I do I do clean he was sitting in the unit just like this.  I walked up to him, I did him, while he was in uniform in **the** car and I left. |

ATTACHMENT / EXHIBIT B  6

| 10/4(Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Det. Curry) | **P. 21:**<br>Chico: Where was the dude at? (Was) he at that place that you told me about?<br>AJ: He was sitting at the Circle K at the corner, by a wall.<br>**P. 26-27:**<br>Chico: What was the, when the dude was at the place was he parked, what (inaudible) what the hell was he doing? . . .<br>AJ: . . . He was parked ***doing paperwork (uses hand motion of writing)***. |

|  | **What did Johnson say to the deputy just prior to shooting him?** |
|---|---|
| 8/23: AJ & Chico (Det. Cedeno) | **P: 21:**<br>Unk: So he didn't see ya coming?<br>AJ: Oh yeah he saw me. . .<br>Unk: . . . (Did he rap to you)?<br>AJ: . . . I was the last person he saw.<br>Unk: Did he rap to you before?<br>AJ: No he just, put his hands up, like I asked him to, and I off him. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 28:**<br>*T: What did he do when he saw you?*<br>AJ: Like that *(raising both hands up, looking to the left).*  And it was over.<br>Chico: That's it?  No conversation?  *He ain't rap to you?  I mean* . .<br>Rollie: . . . Why , why did he go like that though, I mean.<br>*AJ: When somebody . . . (pauses)*<br>*Rollie: He heard the shot, I mean?*<br>AJ: *When somebody run up on you with a* gun.<br>Rollie: *He* saw the gun?<br>*AJ: (Nods "Yes")*<br>Rollie: *I mean,* (inaudible) that's what I'm saying.<br>Chico: You ain't said nothing to him?  Nothing?<br>AJ: *(Nodding "no") Cause ya know, who are you doing (inaudible), know who I am, I* was *the last . . . (inaudible) . . .*<br>**P. 55-57:**<br>Chico: . . . but AJ when you told me when he talked last time, when you went up to this dude, what'd you (inaudible), did you order him to do. . .<br>AJ: . . . I said nothing.<br>Chico: You didn't say nothing to him?<br>AJ: I said nothing.<br>Chico: You didn't tell him, cause I remember the last time (inaudible) . . .<br>AJ: . . . Other than, no I wouldn't **said** anything.<br>Chico: You didn't say nothing?<br>AJ: When he turned (inaudible), oh put your hand up.<br>Chico: Is that what you told him?<br>AJ: Yeah, let me see your hands.<br>Chico: (Inaudible)<br>AJ: He put his hands up, it didn't matter (inaudible/talking together) . . .<br>Rollie: . . . Police officer man how could you say.<br>AJ: (He did like this) *(demonstrating).*<br>Chico: Yeah bro but you told him to put his hands up.<br>AJ: When he first (**do**/like this), keep your hands up.<br>Rollie: Oh keep it up?<br>AJ: Yeah.<br>Chico: So he wasn't, so I'm not worried about him having anything on him.<br>AJ: (Inaudible/talking together) . . . |

ATTACHMENT / EXHIBIT B-7

| | **What was the position of the deputy's hands at the time he was shot?** |
|---|---|
| 8/23: AJ & Chico (Det. Cedeno) | **P. 21:**<br>Unk: Did he rap to you before?<br>AJ: No he just, put his hands up, like I asked him to, and I off him. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 28:**<br>*T: What did he do when he saw you?*<br>AJ: Like that *(raising both hands up, looking to left).*  And it was over.<br>**P. 56-57:**<br>AJ: When he turned (inaudible), oh put your hand up.<br>Chico: Is that what you told him?<br>AJ: Yeah, let me see your hands.<br>Chico: (Inaudible)<br>AJ: He put his hands up, it didn't matter (inaudible/talking together) . . .<br>Rollie: . . . Police officer man how could you say.<br>AJ: (He did like this) *(demonstrating)*.<br>Chico: Yeah bro but you told him to put his hands up.<br>AJ: When he first *(do*/like this), keep your hands up.<br>Rollie: Oh keep it up?<br>AJ: Yeah. |

ATTACHMENT / EXHIBIT 58

|  | **Where was the deputy's car parked?** |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), & "T" (Agt. Curry) | **P. 21:**<br>Chico: Where was the dude at?  (Was) he at that place that you told me about?<br>AJ: He was sitting at the Circle K at the corner, by a wall.<br>P. 53-54:<br>*[AJ draws diagram of Circle K, showing how car was parked, to the right of Circle K]* |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 30:**<br>AJ: . . . (Inaudible) this is what happened he was in this first parking space right here.  Right at the corner.<br>P1: Come on man (inaudible/inaudible).<br>*S/M: Why we going in there for?*<br>*P1: Show me here A.  Over here.  He was where?*<br>AJ: He was right here.  In this *first* spot.<br>*P1: In this spot?*<br>*AJ: In this spot.* |

ATTACHMENT / EXHIBIT B-9

| | **How was the deputy dressed?** |
|---|---|
| 8/23: AJ & Chico (Det. Cedeno) | **P. 20-21:**<br>Unk: AJ, you did him in uniform?<br>AJ: I did him in uniform.<br>Unk: Come on now.  Straight up.<br>AJ: As God is my witness as I'm sitting here.<br>**P. 23:**<br>AJ: . . . All I do I do clean he was sitting in the unit just like this.  I walked up to him, I did him, while he was in uniform in ***the*** car and I left. |

ATTACHMENT / EXHIBIT B-10

| | **How many shots did Johnson fire?** |
|---|---|
| 8/2: AJ & China (CI) (Traffic stop by Det. Sudler) | **P. 19 :**<br>CI: How many times did he hit him?<br>AJ: One time. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 24:**<br>**T:** You said you did your job? ***Did you get him on the*** first shot?<br>AJ: (Inaudible) one shot.<br>**P. 29:**<br>AJ: ***Yeah***, when it hit, it goes ***(uses hands to demonstrate).***<br>Rollie: Why'd you only shoot him one time though?<br>AJ: ***Oh, when you use*** hollow points, 357 ***it pretty much does the job.*** |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 43-45:**<br>P1: (Alright).  Hey hey when you hammered this . . . When you ah, shot this dude were you sure he was done when, when, when . . .<br>AJ: . . . He was done.<br>P1: . . . when you shot him once?<br>AJ: He was done.<br>P1: That dude could have lived man.<br>AJ: No.<br>P1: No?<br>AJ: Point blank.  ***Temple***, 357, with hollow points?<br>P1: Oh I know he . . .<br>AJ: (He gotta) be a six million dollar man.<br>P1: (Inaudible) but one round bro.<br>    (Laughing in background).<br>AJ: (If I) put one round in the engine of this truck it's stopping.  Just one, hollow point 357.  It'll stop it.<br>    (Inaudible).<br>AJ: Yes sir. |

ATTACHMENT / EXHIBIT B-11

| | **Where did the bullet strike the deputy?** |
|---|---|
| 4/25: Gwen & China (CI) | **P. 2:**<br>Gwen: Yeah he was sittin in his car, you **don't** remember that.<br>CI: No.<br>Gwen: Yea, officer was sittin in his car, 7-11, blow his head off. |
| 5/3: Gwen & China (CI) | **P. 5-6:**<br>Gwen: How you gone shoot back when you sittin in the car?<br>CI: He got a gun right on his hip.<br>Gwen: (But you don't ever) suspect nobody gonna put a gun (through) your head and blow your, blow your head off like that.  Huh? |
| 6/6: Gwen & China (CI) | **P. 11-14:**<br>Gwen: He was sitting in his car writing his report.  (AJ) put) that gun to his head, (bloop/making a noise). |
| 8/2: AJ & China (CI) (Traffic Stop by Det. Sudler) | **P. 18:**<br>AJ: "Blew his head off" |
| 9/27: Gwen & China (CI) | **P. 71:**<br>Gwen: And he know how to take your head off, in certain situation, stuff like that.  AJ know all that stuff.<br>CI: That's why the (inaudible) didn't have a chance to shoot back that's what um keep thanking.  He musta hit him, dead center or somethin'.  He ain't had a chance to shoot back.<br>Gwen: Inaudible. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 53:**<br>Rollie: . . . Where'd he get shot?<br>AJ: Bout right here **(demonstrating left temple)**.<br>Rollie: On the left side. |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 44:**<br>AJ: Point blank.  **Temple**, 357, with hollow points? |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation) | **P. 23:**<br>Q: Did you know anything else about the circumstances in the crime?  Did you know how he was killed?<br>A: Uhm, yeah I know that he was shot.<br>Q: Uh huh.  And uhm, beyond knowing that he was shot, what else did you know?<br>A: Um, I guess that's about it I just knew he was shot, he got shot. |

| | How was Johnson dressed?  Was he disguised in any way? |
|---|---|
| 4/25: Gwen & China (CI) | **P. 6:**<br>Gwen: They had another guy in jail for that, you know that.<br>CI: They did what?<br>Gwen: They had another guy in jail for that.<br>CI: Oh.<br>Gwen: And the guy didn't even look like. . . the picture that they had of him – the sketch.<br>CI: Yeah.<br>Gwen: The (inaudible) of seeing him, but he had on like all black, yeah he had on all black I think, he had a scully on . . .<br>CI: Jamaican trait (laughing) . . . |
| 5/31: Gwen & China (CI) | **P. 30-31:**<br>Gwen: He got some fatigues (inaudible).<br>CI: Army fatigues or black fatigues?<br>Gwen: Army fatigues and he got some black to put on, all black (inaudible) and he paint his face black, everythang.<br>CI: Paint his face black!<br>Gwen: Cause he got some black stuff that he use, which he got from the military.  He can paint his self green like the trees, you know he look like the trees. . .<br>CI: . . . That's what he had that night when he creeped up on the (officer)?<br>Gwen: Yeah.<br>CI: What?<br>Gwen: He had on black.<br>CI: Yeah?<br>Gwen: **He had on** black.  He had on a skully a black skully.<br>CI: (Inaudible). . .<br>Gwen: . . . He is something else (I'm telling ya).<br>CI: Damn!<br>Gwen: He is something else.<br>CI: So he came home with all that junk on his face?  (Laughing) Why you ain't run? (Coughing)<br>Gwen: Cause I know him.  I know AJ.  I know him good.  And he know the type of person I am he know that I'm not gone tell on him, I'm not gone bother him.  He know that. |
| 6/6: Gwen & China (CI) | **P. 11-14:**<br>Gwen: I was sleep.<br>CI: You was sleep.<br>Gwen: And I woke up and he was gone.  So when he came back, and I saw the way he was dressed and (inaudible), oh my G-d this man **killed the cop** and he said uhm, he say I just got through doing a job come help me I gotta go get rid of the gun.  I say doing, you just got through doing what?  Taking care of business.  Come go with me so me and him got in the car and, we start taking the gun a loose, we start throwing it and, I said what happened.  Which I really knew what had happened to tell you the truth.  I already knew |

| | |
|---|---|
| 6/6: Gwen & China (CI) (continued) | he had just, got through offing somebody.  He say I got him, I got that cop, he was sitting in the car.  He said I got him!<br>CI: Oh yeah?<br>Gwen: And then, this the part, the actual guy!  That wrote the report up, he didn't get him.  He got the guy, the actual one that testified, that's who he got.  The one that he shoulda got was the one that wrote, wrote it up and stuff like that, that's who he shoulda got.<br>CI: It was two of 'em?<br>Gwen: (But), yeah but he settled for him.  And then I read in the paper I read the incident, and they say the guy walked away on foot, they had a sketch of a guy with a skully on and all like that.<br>CI: Uh huh.<br>Gwen: That had that. (Inaudible). |
| 8/23: AJ & Chico (Det. Cedeno) | **P. 21-22:**<br>Chico: And he didn't know who you were?<br>AJ: Of course he knew who I was.<br>Chico: He knew you?<br>AJ: I was the last person he saw.<br>Chico: But he knew you who you were when he saw, I mean you didn't hood up or nothing?<br>AJ: No bro!  Just cause I'm not expecting him to leave from there.<br>Chico: Cause you, cause he knew who the hell you were.  That's why. . .<br>AJ: . . . What I'm a hood up for? |
| 8/31: AJ, Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 27:**<br>Chico: Did the dude know it was you?<br>AJ: He looked me dead in the face.<br>Chico: Was there and, and, and he didn't say notin to ya?<br>AJ: I didn't want him to talk.  I just wanted him to see who it was.<br>**P. 28:**<br>T: He must of shit when he saw you?  What you have on?  You were all masked up and stuff (laughing)<br>AJ: No.<br>T: What'd you have on, like regular shit.<br>AJ: Yeah.<br>**P. 29:**<br>Chico: but that dude, you knew that, that, that dude was ah.  You guys knew each other by name and shit.<br>AJ: (Inaudible) I knew him because he was the one that launched the investigation against me.  But as far as, ah we down, no. |
| 9/27: Gwen & China (CI) | **P. 13:**<br>And what about the army clothes?  He got rid of the army clothes too?<br>Gwen: He can't fit 'em no more. |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 19:**<br>Rollie: (Inaudible) did he know you when you walked up on him or what?  What, what'd you do?<br>AJ: I was the last person he saw.<br>**P. 21:**<br>*T:* What you have, what you have on?<br>AJ: Black. . . .<br>**P. 27:**<br>Chico: Did he talk to you?<br>AJ: No.<br>L/M (He ain't), did he know who you were?<br>AJ: Yeah he look me dead in the face. |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 46-47:**<br>*Agent*: Your fingerprints on it cause otherwise?<br>AJ: (No).<br>P1: (So you used rubber right)?<br>AJ: Yeah its rubber, and I don't leave fingerprints.  When I did my job (uhm, I had on, I had on gloves).<br>P1: You did wear gloves?<br>AJ: Yeah I was, gloves, (I was covered up), hood, just my face wasn't covered (cause I knew ***I was the last***/inaudible).  I don't do (work/***without caution***).<br>P1: ***Did*** you wear all black?<br>AJ: I kinda like, ***I'm partial to*** camouflage.<br>P1: Military stuff?<br>AJ: (Inaudible). |
| 12/13: Gwen & BSO (Det. Bole and Maj. Fantigrassi) (unrecorded) | **BSO 99-page Report at 75-76:**<br>"She recalled a night when A.J. came home very late and woke her up and telling her he just killed someone.  She requested she accompany him to dispose of a gun.  She remembered he was wearing military type clothing and had applied face paint around his eyes.  He was wearing a 'skully' type of headgear." |

| | **What type of gun did Johnson use? What was Johnson's knowledge about guns in general, and feeling towards his gun?** |
|---|---|
| 8/2: AJ & China (CI) (Traffic stop by Det. Sudler) | **P. 18:**<br>AJ: [K]nocked him off.  Killed him, shot him in the head, 357. |
| 8/16: AJ, China (CI), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 5:**<br>L/M: . . .. AJ but the 66 is only Smith and Wesson.<br>AJ: Yeah.<br>**P. 6:**<br>I carry the stainless, and I *put pachmayr grips on it.*<br>**P. 7-8:**<br>L/M: Oh.  But that's not the common thing to do you, you buy, you buy a 357 you load it with (talking together).<br>AJ: A lot of people like the (look) of having a big gun, (like when you) you shoot it *a .38 round.*<br>L/M: Oh okay I gotcha.<br>AJ: Cause you can get in trouble . . .<br>L/M: . . . And when you gotta service, that's ah that's what you always carry?<br>AJ: That's what I carry.<br>L/M: No, no automatics or nothing, huh?<br>AJ: Nah.  I don't need all that (inaudible) |
| 8/23: AJ & Chico (Det. Cedeno) | **P. 22:**<br>AJ: . . . it was point blank range.  If he *gonna* survive ah, hollow point, model 66, 357, then he need to, then I need to go (down). |
| 8/31: AJ, Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 36-37:**<br>AJ: Called him [the police sergeant who sold him the gun] up and he said yeah, I'll, I'll come and meet you, Saturday Morning.   (Inaudible) right in the Academy.  (Inaudible) two hundred.<br>Chico: And that was a 66.<br>AJ: (66.) |
| 9/27: Gwen & China (CI) | **P. 12-13:**<br>Gwen: Maybe he tol' him [Chico] but I'll be shocked if.  AJ don't tell nobody that.<br>CI: He know it ain't true.  He lied (laughing).<br>Gwen: It is true, I know it's true.<br>CI: Oh man here we go again.<br>Gwen: It is true I know it's true.  The nigga woulda never got rid of that gun he love that gun!  I know it's true.  He love that gun. |

ATTACHMENT / EXHIBIT B-14

| | |
|---|---|
| 9/27: Gwen & China (CI) (continued) | **P. 14:**<br>Gwen: . . . Boy looka here.  I don't believe AJ told him that.  I'm telling ya AJ don't tell nobody that.<br>CI: Well you say he love that gun.  I thought. . .<br>Gwen: (Inaudible) and he got rid of that gun.<br>**P. 30:**<br>CI: Boy.  He fell in love with his lil gun huh?  He, he kept talking bout a model 66 a model 66 gun.  He fell in love with it.<br>Gwen: (He had a gun) he was in love with that gun.  He loved that gun!  That's how I know he did it! He just didn't rid of his gun for nothin'.<br>**P. 69-70:**<br>CI: About the (inaudible) naming all this shit I say damn!  He was naming all the weapons and how you break 'em down and, the (inaudible) and, ah man.  And and put (inaudible) and say, and he say the (inaudible) which is called the so and so and from a hundred, three hundred yards you can, oh.  Sayin' all that and then (inaudible) and Chico was like, (inaudible), I'm eattin' my lobster looking at them you know and he was (inaudible) sayin' yeah that *sure* is true, it's called, it's called model 66, and they was going ah man.  He say no I rather, I have, I rather go to anybody with this model (inaudible) not that model, why that's a big (caliber).  No but this is *more accurate* backup.  He was just saying all that shit.<br>Gwen: That's right and he know how to shoot somebody, and leave the back of them open.<br>CI: *What you mean?*<br>Gwen: He he know what gun to use to, if you wanna leave a hole in the back, he know what gun to use don't use no (hole), don't loose so much blood.  He know how to shoot, he know how to use the gun and all stuff.  He be tellin' me all that stuff I say boy I don't wann know all that stuff.  Well I'm tell' ya in case you, you have to do this one day I say I, what I'm a have to do that for?  Well you never know.<br>CI: Damn.<br>Gwen: He used to be tellin' me that, what gun to use for this, how to.<br>CI: So in other words you he choose the gun he use (inaudible) make a hole on the other side?<br>Gwen: Yeah.  Yeah, he, which ever one if you want to blow a hole in somebody, it come in from this way and then in the back you see a big hole, he know what gun to use for that, he know, AJ know all that stuff!  And he's . . .<br>CI: . . . He was tellin' them that too.<br>Gwen: He studies this stuff!  Okay?  He studies this stuff. . .<br>CI<br>Gwen: He studies this stuff!  Okay?  He studies this stuff. . .<br>CI: . . . (Inaudible).<br>Gwen: . . . what he gone do.  He is a criminal.  AJ in his mind.<br>CI: Yeah that's probably what that cop ain't have a chance to shoot back huh?<br>Gwen: AJ um tell' ya so.  If he, if the man think he doing a bunch of lyin then, the man gonna try him out but so far the stuff that he's sayin' bout the guns and stuff, a lot of people don't this stuff what AJ know. |

| | |
|---|---|
| 9/27: Gwen & China (CI) (continued) | CI: **Sure** don't.<br>Gwen: They don't know nothin' bout them guns.  And he study all this stuff but he know what to use when to use it and you know what would do what.  What would hurt the most, and what to bring the blood from where you know he know all that stuff. . . .<br>**P. 71:**<br>Gwen: And he know how to take your head off, in certain situation, stuff like that.  AJ know all that stuff.<br>CI: That's why the (inaudible) didn't have a chance to shoot back that's what um keep thanking.  He musta hit him, dead center or somethin'.  He ain't had a chance to shoot back.<br>Gwen: Inaudible. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 22:**<br>Chico: He had a, he had a, what was it . . .<br>AJ: . . . (A six inch 357).  Six inch barrel.<br>**P. 29:**<br>Rollie: Why'd you shoot him one time though?<br>AJ: *Oh, when you use* hollow points, 357 *it pretty much does the job*.<br>**P. 43:**<br>Rollie: *Was there ah*, was it a ah, what *you* call[] *it*.  (Inaudible), the pistol, did *it* shoot out the *thing*?  *No!*<br>AJ: No, *revolver*.<br>Rollie: *Then it didn't shoot in the street, right?*<br>AJ: (Inaudible).<br>**P. 52:**<br>AJ: Yeah.   But when you, when you run up on somebody, *357*. |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 44-45:**<br>P1: That dude could have lived man.<br>AJ: No.<br>P1: No?<br>AJ: Point blank.  *Temple*, 357, with hollow points?<br>P1: Oh I know he . . .<br>AJ: (He gotta) be a six million dollar man. |
| 2/8: AJ & BSO ("Job Interview/ Polygraph) | **P. 51:**<br>Poly:   You think that, that...<br>AJ:      ...cause when he pulled up I was getting ready to get in my car I was talking...<br>Poly:   Cause you know...<br>AJ:      ...to trooper Jones.<br>Poly:   ...you had a, a revolver.<br>AJ:      Yes.<br>Poly:   ...what kind of revolver was it?<br>AJ:      Um... 357 Smith and Wesson model 66, 4 inch barrel<br>Poly:   with the barrel... |

| | |
|---|---|
| 2/8: AJ & BSO ("Job Interview/ Polygraph) (continued) | AJ:      ...barrel.<br>Poly:   ...4 inch<br>AJ:      Four inch barrel.<br><br>**P. 52:**<br>Poly:   Two hundred well you try to buy one like that now, you... cause nobody uses revolvers anymore.<br>AJ:      Exactly, I still love them.<br>Poly;   Oh, I do too.<br>AJ:      I still love 'em.<br><br>**P. 217:**<br>AJ:      Well the fact that a deputy was killed.  Of course that was real.<br>UM:      Okay.<br>AJ:      Everything else as far as me having any involvement in anything, that was a whole fabrication I just . . . made it up to get in, you know with them . . .<br>MIKE: Uh-huh.<br>AJ:          . . . and then . . .<br>MIKE: What kind, what kind of a gun did you tell 'em you used?<br>AJ:         . . . I just told 'em I used a . . . a regular 9, and I think, I think I had told 'em a 9 millimeter, (ui) something (ui).<br><br>**P. 230:**<br>AJ:      I just fabricated the 9.  So, and they asked me what gun, I told them in was a glock.  The reason that it came to my mind, cause my brother in law use a glock, (ui).  I couldn't say Smith & Wesson, whatever, cause I don't know any numbers. . . |
| 3/13/02: Gwen & BSO (Det. Bole and Maj. Fantigrassi) (Recantation) | **P. 12-13:**<br>Q: Alright.  And ah, was he armed as well?  Did he carry a weapon ah . . .<br>A. Ah no. . . .<br>Q: . . . with this job duties?<br>A: . . . he didn't carry a weapon.  No.<br>Q: I'm sorry what?<br>A: No he didn't carry a weapon.<br>Q: No he didn't?<br>A: Uh uh.<br>Q: Uhm, during that time that you were married to you him, early on, ah when he had his employment with the Broward Sheriff's Office, office, do you remember him being, having a weapon, of any type?<br>A: No not really, no.<br>Q: Have you, well can you tell me this, can you ever recall him being in possession of a weapon, during the course of your marriage with him?<br>A: Ah vaguely I remember him having a weapon, but, I don't remember too much about it I know he had, he had, I believe he had a weapon but, I don't remember. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole<br>and Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: Uh.<br>A: Too much about the weapon.<br>Q: Can you remember actually seeing the weapon?  (Inaudible) . . .<br>A: . . . No I don't.<br>Q: How do you know he had it then?<br>A: Ah, I know he had a weapon because, I could remember him, him saying ah his gun. That's all.<br>Q: You remember him doing what?<br>A: He said his gun.  That's all.<br>Q: He would say his gun. . . .<br>A: . . . My gun my gun my gun (Inaudible).<br>Q: And when he would say that he wouldn't be showing you a weapon or displaying one to you?<br>A: No.  I don't even remember seeing a weapon.<br>Q: Uh huh.<br>A: I don't remember seeing the weapon.<br>Q: Do you know if it was a hand gun or a ah rifle shotgun or something?<br>A: I don't remember.  I don't remember what it was. |

| | **Where did Johnson get the gun?** |
|---|---|
| 8/16: AJ, China (CI), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P.16:**<br>L/M: Yeah but when he had his 66 didn't you buy it from somebody else?<br>AJ: I bought it from someone else yeah, but I bought it, guess who I bought it from?<br>L/M: Who?<br>AJ: A police sergeant.<br>L/M: Come on now.<br>AJ: I'm dead serious.  He was (strapped) for money.  Yeah?<br>AJ: Yeah he was strapped for money.<br>L/M: Here in Miami or in Broward?<br>AJ: In Broward. |
| 8/31: AJ, Chico (Det. Cedeno), & "T" (Agt. Curry) | **P. 34-37:**<br>Chico: Hey A and that gun they can't they can't fuck you up with that gun with ah.  Is that the gun you had when you were with the Five-0?<br>AJ: No, that was never registered.<br>Chico: I know, but is that the one you used.<br>AJ: I registered to that, I told you (inaudible) registered to ah sergeant.<br>Chico: So that's the only thing they can trace that to.<br>AJ: To a sergeant.<br>Chico: To a sergeant from Five-0?<br>T: Now how you get his shit?  Did you take it from him?  Or he sold it?<br>AJ: He sold it (inaudible).<br>Chico: Oh (inaudible)<br>AJ: He sold it to me he was in (inaudible) for money.<br>Chico: That dude still around?<br>AJ: (I don't know).<br>Chico: You don't rap to none of them people?<br>AJ: You don't rap to none of them people?<br>AJ: (Unintelligible)<br>Chico: They don't rap to you, they don't call you up and shit?  I'm just saying.<br>AJ: (No, I don't have nothing in common with (inaudible)).<br>Chico: So even if , even if there was shit with that cause I can tell Rollie (inaudible).  Even if that shit did come about.  That would never come back to AJ.<br>AJ: Yeah.<br>Chico: That come back to whoever it was at Five-0.<br>AJ: And by right, by right he could go to jail for the simple fact that he sold a weapon as a sergeant, law enforcement officer of the state.  He sold a weapon illegally (inaudible) and never transferred the original paperwork.<br>Chico: Right, right, right.  Well, you and him were straight when you were working together.  No?<br>AJ: I never met him but that one time.<br>T: Oh, so you were just lookin for a piece and ah. |

ATTACHMENT / EXHIBIT D-15

| | |
|---|---|
| 8/31: AJ, Chico (Det. Cedeno), & "T" (Agt. Curry) (continued) | AJ: I just saw it up on the thing.<br>T: Oh okay.  Oh.<br>AJ: Called him up and he said yeah, I'll I'll come and meet you Saturday morning.(Inaudible) right in the Academy.  (Inaudible) two hundred.<br>Chico: And that was a 66.<br>AJ: (66.)<br>T: (Inaudible) He didn't ask no fuckin questions?<br>AJ: He didn't have no time to (inaudible). |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 22:**<br>Chico: He bought it from who was the sergeant you (talking in background) bought it from?<br>AJ: I don't know.<br>Chico: You don't know.<br>AJ: I don't know I bought it from a sergeant when I was (inaudible) . . .<br>**P. 43:**<br>AJ: And you know the sad part, you know the worst part about it, well I won't say worst part, the best part about it.  It wasn't *traceable* to me.  *It wasn't even my weapon in the first place*, it was sold to me by a sergeant, that needed cash right away.  I saw it (inaudible) . . . I called the number he say heah, I got it, I need the money now.  He sold it to me.  *I got it, that was it.  And* they weren't *extensive* as they are now because *a round being triggered* you know because of the *certain pattern when a round hit a chamber they can trace that when it hits the body.  They can trace that, back then they weren't that extensive.* |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 60:**<br>AJ: I had a gun, that was the gun.  That's the gun that I purchased when I was graduating out (the academy).  I was like two weeks away from the academy, to graduate.<br>**P. 61:**<br>P1: Who was the dude that sold it, a sergeant or . . .<br>AJ: . . . Some sergeant (inaudible).<br>P1: White dude black dude?<br>AJ: Yeah a white dude.<br>**P. 62:**<br>P1: And the dude that, dude that had the gun was (where) was out of the, Stockade working with you?<br>AJ: No he was uhm, he had it up on the board . . .<br>        . . . (Inaudible).<br>P1: Huh?<br>AJ: He had it up on the board at ah, the academy.<br>P1: Oh alright.<br>AJ: Ah, like a bulletin.  (Inaudible) always (inaudible) for sale, guns for sale, cars and stuff like that. |

| | |
|---|---|
| 2/8/02: AJ & BSO ("Job Interview/ Polygraph) | **P. 52:**<br>Poly:  First gun I bought was a... model 60.  It was a 4" barrell.  I paid sixty dollars for it.<br>AJ:  Really?<br>Poly:  From another officer, what did you pay for yours?<br>AJ:  Paid two hundred. |

|  | **What type of bullet did Johnson use?** |
|---|---|
| 8/16: AJ, China (CI), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 4:**<br>AJ: Make you sure you ah, what's his name.<br>B/M: What?<br>L/M: What?<br>AJ: Hollow points.<br>B/M: Hollow point.<br>L/M: Why, what's the difference A?<br>AJ: Hollow points will blow (inaudible/noise in background) a hole out a barn door.<br>**P. 6:**<br>L/M: And with hollow points is the best way to go?<br>AJ; Hollow points if you wanna, you already doing damage with a Smith and Wesson, with a 66, . . . (talking together)<br>L/M: . . . But why . . .<br>AJ: . . . Hollow points . . .<br>L/M: . . . but why is that cause the 66 is just a 357 or you load 357 rounds in it?<br>**P. 8:**<br>A/J: Na, **load** 357 rounds.<br>L/M: But it is a 357 weapon?<br>AJ: Yeah.<br>L/M: Okay.<br>AJ: You can put . . .<br>L/M: . . . but why is it, why is it that it takes a 38?<br>AJ: Because **it can**.<br>L/M: But does it damage anything in the, in the gun?<br>AJ: No. |
| 8/23: AJ & Chico (Det. Cedeno) | **P. 22:**<br>AJ: . . . it was point blank range.  If he **gonna** survive ah, hollow point, model 66, 357, then he need to, then I need to go (down). |
| 9/27: Gwen & China (CI) | **P. 70:**<br>Gwen: He studies this stuff!  Okay?  He studies this stuff. . .<br>CI: . . . (Inaudible).<br>Gwen: . . . what he gone do.  He is a criminal.  AJ in his mind.<br>CI: Yeah that's probably what that cop ain't have a chance to shoot back huh?<br>Gwen: AJ um tell' ya so.  If he, if the man think he doing a bunch of lyin then, the man gonna try him out but so far the stuff that he's sayin' bout the guns and stuff, a lot of people don't this stuff what AJ know.<br>CI: **Sure** don't.<br>Gwen: They don't know nothin' bout them guns.  And he study all this stuff but he know what to use when to use it and you know what would do what.  What would hurt the most, and what to bring the blood form where you know he know all that stuff. . . . |

ATTACHMENT / EXHIBIT B-16

| | |
|---|---|
| 9/27: Gwen & China (CI) (continued) | **P. 71:**<br>Gwen: And he know how to take your head off, in certain situation, stuff like that.  AJ know all that stuff.<br>CI: That's why the (inaudible) didn't have a chance to shoot back that's what um keep thanking.  He musta hit him, dead center or somethin'.  He ain't had a chance to shoot back.<br>Gwen: Inaudible. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 29:**<br>Rollie: Why'd you only shoot him one time though?<br>AJ: ***Oh, when you use*** hollow points, 357 ***it pretty much does the job.*** |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T) (Agt. Curry) | **P. 44-45:**<br>P1: That dude could have lived man.<br>AJ: No.<br>P1: No?<br>AJ: Point blank.  ***Temple***, 357, with hollow points?<br>P1: Oh I know he . . .<br>AJ: (He gotta) be a six million dollar man. |

| | **How far was the gun from the deputy?** |
|---|---|
| 8/23: AJ & Chico (Det. Cedeno) | **P. 22:**<br>AJ: . . . it was point blank range. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 29:**<br>Chico: *What you wore* that night or did anything get on you?<br>AJ: No.  Cause, I was at a distance.  And where I was from here to, probably the back of your chair *[Note: a distance of approx. 3-4 feet] when it hit*.<br>Chico: (Inaudible) six feet?<br>AJ: *Yeah*, when it hit, it goes *(uses hands to demonstrate)*. |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 44-45:**<br>P1: That dude could have lived man.<br>AJ: No.<br>P1: No?<br>AJ: Point blank.  *Temple*, 357, with hollow points?<br>P1: Oh I know he . . .<br>AJ: (He gotta) be a six million dollar man. |

ATTACHMENT / EXHIBIT D-17

|  | **Was the deputy's window open? Did Johnson shoot through any glass?** |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 28:**<br>Chico: They usually what what, but was it, I mean, when he was sitting in his car, did you have to *tap* on the window or what?<br>AJ: **No (nodding "no").**<br>. . .<br>T: . . . So did you shoot through the glass, bro?<br>AJ: *(Nods "no").*<br>**P. 29-30:**<br>Chico: So is, so basically you walked up, the window was down?<br>AJ: *(Nods "yes").*<br>Chico: The window was down *cause you aren't shooting though* the glass.  Nothing got on you, none of your clothes, ain't nothing they can *come back*.<br>AJ: *(Nods "no")* (Inaudible) anything.  I can assure you. . . . |

ATTACHMENT / EXHIBIT B-88

| | How did Johnson know where to find the deputy? |
|---|---|
| 4/25: Gwen & China (CI) | **P. 6:**<br>CI: *Where he* caught *up* with *the* white dude *a* cracker?<br>Gwen: *Where he* caught *up* with the dude?<br>CI: Yeah.<br>Gwen: He must a watched him and know where he be at *and* what time. |
| 5/31: Gwen & China (CI) | **P. 25-26:**<br>CI: (Inaudible) what trip me out is how he found out, (inaudible) found out how that uhm, where he was that night?  He followed him?<br>Gwen: He studied him.  He (get) your schedule where you gone be at.<br>CI: Your schedule!  How the *hell* he gone get a man schedule?<br>Gwen: He used to work! He used to work for the police department, he know, find out where you gone be at, stuff like that.  What area you in.<br>CI: Damn.<br>Gwen: What night you off.<br>CI: Lord *have* mercy.<br>Gwen: He fina get, he fina get that guy on the job.  Another guy. |
| 8/23: AJ & Chico (Det. Cedeno) | **P. 18:**<br>Chico: . . . how the hell you, how'd you managed to hook up with this dude afterwards bro?  Once you were off.  Once you were off the job, how you know where this dude's at?<br>AJ: Cause, I see them all the time.  I used to live in the same area, and they patrol that area, so I see 'em all the time [] just cause you in uniform and you work for the department do*n't* make you impervious to a bullet. |
| 8/31: AJ, Chico (Det. Cedeno), & "T" (Agt. Curry) | **P. 13:**<br>AJ: You know the good part about knowing what those cops (unintelligible) *when you are* on a crime scene?  You get to hear all the spots that they go and hang out in and sleep out.<br>Chico: Right.<br>AJ: And where they go and park and<br>Chico: Right, right, right.<br>AJ: And spose to be watching each others back and both of them sleep and all that junk.<br>Chico: What ah with the radio?<br>AJ: No.<br>Chico: From what?<br>AJ: (Unintelligible) be standing around talking.<br>Chico: Oh, okay just talking.<br>**P. 13:**<br>AJ: You know, so I've rode up on many spots where they suppose to be hanging.<br>Chico: Right, right, right, right.<br>AJ: Where they suppose to be awake and they're knocked out.<br>Chico: I got you.<br>AJ: I put the hammer down on him right there. |

| | |
|---|---|
| 9/27: Gwen & CI | **P. 15**<br>Gwen: One time this lady *pastor* had some problems with this lady, and ah, AJ was walking on the lady roof, he was *gonna* come in her room, where she was and break her neck while she *a*sleep, and she saw him on the roof, and she called *pastor and say* and she said please tell your son in law don't come by my house poleeease! . . .<br>**P. 16:**<br>CI: (Laugh).  So he watch so in other words you sayin he like to watch victims fore he get 'em?<br>Gwen: *Yeah*.<br>**P. 18:**<br>CI: What he doing on the roof though?<br>Gwen: Cause he had to find out where her bedroom at.<br>**P. 19:**<br>Gwen: AJ scared that woman half to death.  She called Dot say he on my roof!<br>CI: (Laugh) He told you bout it?<br>Gwen: Who him?<br>CI: Yeah.<br>Gwen: He say I'm a kill *her*.<br>**P. 21-22:**<br>Gwen: AJ used to be out late at night.  I wake up AJ be gone.  He don't even be *working*.<br>CI: He got out the bed and, and leave?<br>Gwen: (Inaudible) be working.<br>CI:  I wonder what he'll do if run into the re, the real one he wanted to get?  I wonder what he'll do 'den?<br>Gwen: Umm.  Ain't no tellin'.<br>CI: Probably a following him huh?<br>Gwen: Uh huh.  He probably done killed that (other guy).  And I don't think they *know* bout that.<br>CI: Who?  The other cop?<br>Gwen: No another guy.<br>CI: Another guy?<br>Gwen: Uh huh.  Somebody *else* (inaudible) junk I don't know.  (I try to know) like he told me, Gwen, the less you know the betta.  I say you right, son lets keep it that way.<br>**P. 28-29:**<br>Gwen: That's how he do all that, he sit back, he watch, then he figure out how to do stuff.<br>CI: Before he move?<br>Gwen: Uh hun.<br>Gwen: That's how he did that cop.  (You know) how long waited looked at him fore he got him?<br>Gwen: Uh uh.<br>CI: He ain't no scanner or nothin'?<br>Gwen: Ain't had no what? |

| | |
|---|---|
| 9/27: Gwen & China (CI) (continued) | CI: A scanner, to find out where he at?<br>Gwen: *I don't know.*<br>CI: I thought you said he had a scanner one time (and they was) watching him?<br>Gwen: He, he had some stuff watching (him) I don't remember, all I know is, he figure out when you go to work, (chewing/), when you do this when you do that. And the part that get me is when he get on that computer and start puttin' stuff together, I *said*, (inaudible).<br>CI: (Laugh) Umm.<br>Gwen: I say how you did that?<br>CI: And then he laughed? (Laughed) Got damn.<br>Gwen: He laughed. And I say you got a criminal mind you know that.<br>CI: I know one thang, he'll, he'll *major stalker*.<br>Gwen: Hum.<br>CI: I feel for the other one if he ever surface boy.<br>Gwen: (Laugh).<br>CI: (Inaudible) major stalker.. . .<br>**P. 58-59:**<br>Gwen: A cop killa. He probably told' em how he did it creeped up on him.<br>CI: Umm. What you say he had that military paint on?<br>Gwen: (Inaudible).<br>CI: How he got up on it that's what I don't know he just walked by and saw him over there?<br>Gwen: Sneaked up on it.<br>CI: I'm talkin' bout before he found out he was there.<br>Gwen: Oh I don't know.<br>CI: I mean, you don't just shoot 'em unless you got a police scanner or find out.<br>Gwen: I don't know, that AJ.<br>**P. 60:**<br>Gwen: And he did it on foot, he didn't he parked his car way off somewhere. That what he told me. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 18-19:**<br>Rollie: What was the guy's name though? If you really, you really hated those guys *so* much what you following them around? How'd you know he, you know what'd you do?<br>AJ: Nah, uhm, because of where I worked, but where he worked and where I live, he lived in the same area where I, I mean he worked in the same area where I live . . .<br>Rollie: . . . Uh huh.<br>AJ: So I know it was him. So, one night I decided to, and I did it two nights actually, I think it was two nights, I passed by, I saw where he was sitting, (inaudible), and because I used to see them always sitting out there (inaudible) everybody (inaudible) street, Hallandale Beach Boulevard.<br>**P. 20-21:**<br>Rollie: . . . So you, you checked out the area before you (inaudible)?<br>AJ: Yeah, (inaudible).<br>AJ: *I paid* close *attention* to the surroundings. |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | **P. 42:**<br>Chico: And did, and you said you put, you knew it was him cause the dude stayed in your area and that's when you scouted him out for a few days?<br>AJ: I scouted him out for a couple of weeks, (inaudible).<br>**P. 44:**<br>Chico: Did you ever ah, I mean you cause you used to work with 'em bro did you have radio communication or anything?<br>AJ: No.<br>**P. 45:**<br>AJ: My thing was when I did what I did, (inaudible), I knew where he was sitting, I knew that he was ***going to be there*** a couple of times.   Remember, I seen the same person, you know I always saw cars in there I didn't know exactly who it was.  I always saw a car at a certain time, when I go out at night some time.<br>Chico: What time?<br>AJ: Well, (inaudible)1, 2:00 in the morning, you know certain days 12:00 (inaudible) and you'll see the car cause when you come on duty you know most of the time, after they leave roll call (inaudible), ah I knew there was usually a car sitting out there, (somebody reading the paper), sometimes there's two or three.  But I did what I did and I knew and I saw that person.  (And), and I knew what I saw. |

|  | **Did Johnson act alone?** |
|---|---|
| 8/23: AJ & Chico (Det. Cedeno) | **P. 4:**<br>Chico: And nobody else everybody walked away?<br>AJ: It, it wasn't nobody else just me.<br>**P. 7:**<br>AJ: [W]hatever I do I do alone and I do it clean.<br>**P. 24:**<br>Chico: You had somebody waiting for you?<br>AJ: No bro I drove (home).  I parked somewhere else, and I went to my vehicle. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 15:**<br>AJ: No one see me.  I told ya what I do I do clean by myself. . . .<br>**P. 21:**<br>*Rollie: Did someone drive for you or something?*<br>AJ: *Nods ("no").* |

ATTACHMENT / EXHIBIT B-30

| | How did Johnson escape?  What route did he take? |
|---|---|
| 8/23: AJ & Chico (Det. Cedeno) | **P. 18-19:**<br>AJ: . . . He was he was ***sittin' there*** in his car I walked up on him, and did him.<br>Chico: (Laugh)<br>AJ: And walked away.<br>**P. 24:**<br>Chico: You had somebody waiting for you?<br>AJ: No bro I drove (home).  I parked somewhere else, and I went to my vehicle. |
| 9/27: Gwen & China (CI) | **P. 59-60:**<br>CI: He just came and woke you up in the middle of the night.<br>Gwen: He just crazy.  If he (wanna kill ha), he got to killa.  If he want somebody to do his dirty work for him he got it.<br>CI: You wasn't scared when he say get up get up get up get up get up?  I'd a say nooo!  I'll stay right (laughing).  You wasn't scared?<br>Gwen: Uh uh.<br>CI: ***Golly***, cause they probably had the whole area surrounded that, by that time.<br>Gwen: But he was already gone he was here in Miami.  He, that, he did that in Broward County.<br>CI: Oh and he came.<br>Gwen: And he was already in Miami.<br>CI: Oh he came back, to Miami?<br>Gwen: Uh huh.<br>CI: Oh.  Man, I was fina say.<br>Gwen: (Inaudible) did that in Broward County.  Well not really Broward, but right up here, up here.  Up.<br>CI: Oh so they had already had the, the area roped off he was outta the area and gone then?<br>Gwen: Yeah he was gone.<br>CI: Boy.<br>Gwen: And he did it on foot, he didn't, he parked his car way off somewhere.  That what he told me.<br>CI: (Inaudible) (smooth).<br>Gwen: And walked back to his car that's what he told me he walked back to his car.  And left.<br>CI: What it was after midnight, 12?<br>Gwen: Yeah it was in the morning sometime.<br>CI: In the morning?<br>Gwen: Uh hun.  You know like 2 or 3:00 I can't remember the exact (inaudible) . . .<br>**P. 60:**<br>And he did it on foot, he didn't he parked his car way off somewhere.  That what he told me. |

ATTACHMENT / EXHIBIT B-31

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 31:**<br>Chico: Now when, you also have to watch AJ, but when you left there, what'd you do? When, when this shit happened, (inaudible) . . .<br>Oh when it happened, I know what you mean (inaudible), I drove, to 95.<br>**P. 33:**<br>Chico: Did you go back to your car?<br>AJ: *I went back to my vehicle, which was parked at a distance.*<br>Rollie: So you had to creep around . . .<br>AJ: I *crept away.*<br>**P. 55:**<br>Chico: And what did you do?  What'd you I mean which way you bolted (inaudible) . . .<br>AJ: . . . *Did my job* went through, went through exactly where I got to *(taps his pen on paper)* I never left *where people can say He went straight that way.  If I was* . . . I never left (inaudible)*[AJ demonstrates on the map he has drawn, how he ran in an "S" direction eastward behind the Circle K]*<br>Chico: . . . Straight which way where?  Straight which way where?<br>AJ: No I'm saying if a person say you went straight down 40th Avenue or you went straight down . . .<br>Chico: . . . Oh okay okay I got ya.<br>AJ: *You know what I'm sayin*, and then when I left, I left *right through here. Countyline is over here (pointing with pen).*  I came back up, and I still came, I got to I 95 and went down I 95 (inaudible) drove back, came back to my house, (inaudible). |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 30-33:**<br>AJ: . . . (Inaudible) this is what happened he was in this first parking space right here.  Right at the corner.<br>P1: Come on man (inaudible/inaudible).<br>*S/M: Why we going in there for?*<br>*P1: Show me here A.  Over here.  He was where?*<br>AJ: He was right here.  In this *first* spot.<br>*P1: In this spot?*<br>AJ: *In* this spot.<br>P1: And you were where?<br>AJ: And I came up from behind *in the wall* all those bushes wasn't there.  That's all new.<br>P1: Was the wall there?<br>AJ: That wall was there.  I told you there was a wall.  I (inaudible)<br>P1: . . . Alright so the dude was there?  Alright you were where, you were on foot to where?<br>AJ: Go left.<br>    . . . Nobody was out there?<br>AJ: (Inaudible) go through (this dirt) . . .<br>P1: . . . Alright hold on hold on (inaudible) watch out, watch out man we're coming through. And where were you?  Where'd you go on foot?<br>AJ: I went on foot, go down. |

| | |
|---|---|
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | P1: Down here?<br>AJ: Down there.<br>P1: Through here?<br>AJ: Yep.  I parked way down there I guess by where that, that bulldozer is at.<br><br>**[BSO's 99-page Report at 68:**<br>"Johnson directed Detective Cedeno to drive east on the street directly behind the Circle K (SW 30th Street).  Johnson indicated he had parked his car on this street, east of the Circle K on the night of the incident."<br><br>*[The surveillance also shows Cedeno driving east behind the Circle K on SW 30th St.]*<br><br>P1: By what?<br>AJ: By where that bulldozer at, but what I did was *I* went *back through here, it was a street* down. . . . I guess it's on the *main* street I went, I made sure I didn't go right to my vehicle.  Cause boy I tell ya (inaudible) I went down this street, came back.<br> ?:  This street here?<br>AJ: Yeah.  And I came around I just walked around.<br>*S/M:*  Where was your car at?<br>AJ: *Down here* (inaudible/talking together) . . .<br>　　. . . This dude ain't even . . .<br>AJ: . . . this stuff is new.<br>P1: (Horn blowing in background).  I'm gonna five you around mother fucker.  Where was your car at?<br>AJ: It was right here.  But all this was abandoned, that wasn't there.  All this is new.<br>was your car at?<br>AJ: It was right here.  But all this was abandoned, this wasn't *here*.  All this is new.<br>P1: And when you go it where'd you go?<br>AJ: When I got in I drove around and made sure I came around somewhere and I came out one of these back streets here.<br>P1: Right.<br>AJ: Went straight up I 95 from Hallandale, and then I went, went down to Ives Dairy Road. |

| | **What did Johnson do with the gun (and other evidence) after shooting the deputy?** |
|---|---|
| 4/25: Gwen & China (CI) | **P. 1:**<br>Gwen: Ain't got no gun. ***Every time he*** shot somebody he throw it away.<br>CI: What gun? The one ***you say*** they throw up, he broke up?<br>Gwen: Hum-Mmmm.<br>**P. 3:**<br>Gwen: . . . [H]e crazy. You don't know how crazy ones gonna act.<br>CI: Hmm. At least he throwed all the guns away, hun.<br>Gwen: Mmmmmm.<br>. . .<br>CI: May try to double back. Long as he ain't got no more guns. . . (inaudible).<br>Gwen: He ain't got no more guns. |
| 5/3: Gwen & China (CI) | **P. 4-5:**<br>CI: . . . (Fool) over, he like to sneak up on people, and shoot he ain't fina (inaudible) I ain't got nothing to shoot back.<br>Gwen: He ain't got nothin' to shoot with either.<br>CI: How you know? You don't know. The man probably got another gun and didn't even tell you nothing.<br>Gwen: Well he got it hidden real good (from me).<br>**P. 8-9:**<br>CI: What he do with the gun?<br>Gwen: I told you he broke it all to pieces.<br>CI: Shit.<br>Gwen: Over there by New Way Church, dropped some pieces there, dropped them in different places.<br>CI: New Way? Talkin bout Victor Curry church?<br>Gwen: Uh uh, 22nd Avenue and 167th (inaudible) down there.<br>CI: Ain't no New Way over there.<br>Gwen: New Way is on 22nd Avenue and a hundred and uhm 67th, 22nd Avenue. There's a church right there, big church right there on the corner, and there's another church across the street from there.<br>CI: Oh those two where the, the pastor shot his woman? (Inaudible) where the pastor wife shot him?<br>Gwen: (May be.) In this, that big open field, he dropped some of it there and some of it.<br>CI: Man<br>Gwen: He better be glad I ain't no tattletale, call anonymous and tell on him (inaudible). |
| 5/24: Gwen & China (CI) (unrecorded) | BSO's 99-page report at 24:<br>"The CI told us he reiterated to Mrs. Johnson the importance of knowing details of the homicide in the event Andrew Johnson should retaliate against either one of them. Mrs. Johnson agreed to show the CI where Andrew Johnson threw the gun pieces on the night of the incident. She also agreed to sit down and write down the events surrounding the |

| | |
|---|---|
| 5/24: Gwen & China (CI) (unrecorded) (continued) | Behan homicide.  When detectives attempted to make copies of the recording they found the recording device was inoperable and the conversation had not been recorded." |
| 6/6: Gwen & China (CI) | **P. 11-14:**<br>Gwen: I was sleep.<br>CI: You was sleep.<br>Gwen: And I woke up and he was gone.  So when he came back, and I saw the way he was dressed and (inaudible), oh my G-d this man ***killed the cop*** and he said uhm, he say I just got through doing a job come help me I gotta go get rid of the gun.  I say doing, you just got through doing what?  Taking care of business.  Come go with me so me and him got in the car and, we start taking the gun a loose, we start throwing it and, I said what happened.  Which I really knew what had happened to tell you the truth.  I already knew he had just, got through offing somebody.  He say I got him, I got that cop, he was sitting in the car.  He said I got him! |
| 6/14: Gwen & China (CI) | **P.2:**<br>CI: He came home, destroyed the gun, where the gun was?  Where he throwed the gun?<br>Gwen: (All by New Way) and everywhere.<br>CI: One piece by New Way?  New Way.<br>Gwen: New Way over there in that empty (inaudible).<br>CI: New Way, Church.<br>Gwen: Bet not let your wife get to that.<br>CI: You just gone type it up tomorrow after, tomorrow afternoon after we gone (inaudible) morning and the the (inaudible) and where the other piece went?<br>Gwen: It's (inaudible) by difference parts anyway baby, all down there (inaudible) down there, difference places (inaudible).<br>CI: By the church?<br>Gwen: Baby you thank they gone cut down all that grass and stuff look for that?<br>CI: I don't know.<br>Gwen: They gone (comb) that area for that?<br>**P. 3:**<br>CI: . . . I may go over there and find that lil piece myself and put it in a safety deposit box. You thank it's still over there?<br>Gwen: I thank it's still there.<br>CI: What part he threw over there all the whole piece or?<br>Gwen: I'll show you (where it's at).<br>**P. 18:**<br>CI: . . . So tomorrow, so tomorrow (inaudible) wrapped up, we go head and take care this and ah, and ah that'll be it, (inaudible), and I'll get me a ziplock bag out there, and find . . .<br>Gwen: . . . (For what)?<br>CI: . . . and find me a piece of the gun and . . . |

| | |
|---|---|
| 6/14: Gwen & China (CI) (continued) | Gwen: . . . It's tall grass and stuff.<br>CI: How tall?  It ain't been cut?<br>Gwen: Nope I thank it's been cut.<br>CI: Well then that's good.  I'll find it. |
| 7/5: Gwen & China (CI) (Car Tour) | **P. 3-5:**<br>Gwen: I told you.  It's on the east side, right here.  It's all around . . .<br>CI: . . . That's, that's the front.<br>Gwen: That's the front of the church.<br>CI: See there.<br>Gwen: (The church) the eastside, coming from which way?  Which way are?  Okay you doing it. . . .<br>CI: . . . Facing it.<br>Gwen: The church is on this-side, right, 22nd Avenue.  So, that would have to be the . . .<br>CI: . . . See this is west and the back of it, facing it is the west.<br>Gwen: Yeah it have to be the west.<br>CI: That's right.<br>Gwen: The west, it's on the west side.<br>CI: Back there?<br>Gwen: Back there on that side all (inaudible) but it's near, near the ah, that express way, 826.<br>CI: The Expressway right there!<br>Gwen: Okay.  So it's (inaudible)<br>CI: . . . Man (inaudible) you don't even know where it's at.<br>Gwen: Yes I do!<br>CI: You talk bout west, first you said east. . .<br>Gwen: . . . Because I was coming from, I was coming from the, that's the west, that's west – I got it wrong.  It's on the west.<br>**P. 5-7:**<br>Gwen: Okay that's the church way over there.<br>CI: Right.<br>Gwen: I told you long here, then he started dropping the pieces along here.<br>CI: (Inaudible).<br>Gwen: I told you that.<br>CI: Around where?<br>Gwen: (Inaudible) any of these trees, all out here.<br>CI: Oh pull over.<br>Gwen: What (inaudible). . .<br>CI: . . . Where (talking together). . .<br>Gwen: . . . Right here!<br>CI: Right on the side right here in this lil old grass?<br>Gwen: Right, right over there, it wasn't like that, this grass was tall.  They just cut this stuff.  When he threw all that stuff out there it was tall, he threw it all long (there).<br>CI: Just throw'd, just throw's it out the window right here?<br>Gwen: Throw'd yeah throw'd it all way back over there. |

| | |
|---|---|
| 7/5: Gwen & China (CI) (Car Tour) (continued) | CI: (Slow down).<br>Gwen: Baby it's 24th Avenue if you wanna say between 24th and 27th, see, they done cut this stuff, this stuff was not like this it was all . . .<br>CI: . . . Was it right here or back there is that's what I'm . . .<br>Gwen: . . . All along here he throw'd the pieces form, from 24th Avenue all the way up here to 27th, bout right here I guess, 25th.<br>CI: 25th he stopped?<br>Gwen: He throw'd the pieces all along there.<br>CI: Well that's close to the edge of the street then.<br>Gwen: Yeah.<br>CI: He didn't get out and (slang) 'em or just slung 'em from . . .<br>**P. 8-9:**<br>CI: (Inaudible) that lil spot we just (inaudible) that ain't no way, ain't no way I'll find nothing over there it's gone huh?<br>Gwen: What baby?<br>CI: The lil pieces of gun?<br>Gwen: I don't know.<br>CI: I thought he got out and threw 'em.<br>Gwen: With a metal detector they can find (anything).<br>CI: (Inaudible) right there, all that traffic going by unless a car ran out and mashed it in the dirt.<br>Gwen: Up in the thing?  It's, it's.<br>CI: What?<br>Gwen: He threw it up in the sand, up in the, in, up in between them trees (inaudible).  If anything metal over there they'll pick it up.   But I don't even know why you worried about this.  I don't even know why you (inaudible ) stuff.<br><br>**BSO's 99-page report at 36:**<br>"According to Mrs. Johnson, the gun had been 'broken down' in several pieces and was thrown from their moving car by (passenger) Andrew Johnson.  Mrs. Johnson was driving at the time.  Specifically, the gun was thrown into the swale/field area (the north side of the roadway) while the couple was driving westbound in the 2300 to 2500 block of NW 167th Street)." |
| 8/16: AJ, China (CI), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 6:**<br>AJ: I carry the stainless, and I *put pachmayr grips on it*.<br>B/M: You still got that shit man?<br>AJ: Nah, I got rid of it.<br>**P. 8:**<br>L/M: And you got what what you do sell the gun or what?<br>AJ: No, I just took it apart and got rid of it, cause I knew I was (gone do, I was gone do a lot of damage).. . .<br>AJ: . . . Remember I told you nobody push me to that point?<br>L/M: What what what? |

| | |
|---|---|
| 8/16: AJ, China (CI), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | **P. 9:**<br>AJ: (Inaudible) told you nobody push me to that point (inaudible). . .<br>L/M: . . . Oh okay yeah I gotcha.<br>AJ: (Inaudible), they pushed me to the point, but I had to get rid *of it* (inaudible)<br>**P. 11:**<br>L/M: So you done tore your shit up and got rid of it?<br>AJ: Yeah I took it apart.<br>**P. 12-13:**<br>L/M: . . . But you dump the other one what did, what, what (talking together/inaudible) but AJ if you take apart your gun what are you gonna do what toss it out (inaudible) freakin', in the sewer?<br>AJ: Some parts *went somewhare, some parts* (inaudible).<br>L/M: No but I know what, why, why, I mean man bro?<br>(Inaudible) fuckin' think.<br>AJ: . . . go back and get it.<br>Bro I *was in* love *with* the gun bro.<br>(Laughing)<br>L/M: I hear ya I hear ya (talking together) then why you getting' rid of it?. . . (piece of shit or what?) . . .<br>AJ: . . . I was in love with my gun (inaudible) I had to throw, I threw it different places I didn't look where it landed. . . To make sure I didn't go back and get it.<br>**P: 17:**<br>AJ: Yeah.  He [the sergeant he bought the gun from] was strapped for money.<br>L/M: So you bumped it off him?<br>AJ: Yeah (inaudible).<br>L/M: And then you got frustrated and you took the bitch apart and threw it away?<br>AJ : (inaudible) year later.<br>**P. 20-21:**<br>L/M: The Russian girl.<br>AJ: Yeah.<br>L/M: With the rape shit.<br>AJ: That's that's why I got out of it.<br>L/M: But that's when you had the sixty six?<br>AJ: Nah I got, I got rid of it. |
| 8/23: AJ & Chico (Det. Cedeno) | **P. 7:**<br>AJ: [W]hatever I do I do alone and I do it clean.<br>. . .<br>AJ: That what I that's why got rid of the sixty six.<br>Chico: Oh (for) that thing?<br>AJ: Yeah.<br>Chico: (Inaudible) you gotta be. . .<br>AJ: . . . Took it apart and and dispersed it in different areas.<br>. . .<br>AJ: . . . it was dispersed right. |

| | |
|---|---|
| 8/23: AJ & Chico (Det. Cedeno) (continued) | Chico: Okay.<br>AJ: It was gotten rid of right.<br>**P. 20:**<br>Chico: And that's when you got, that's (inaudible) see I knew something was up bro, when you said that that, you, you stripped that, when you tossed that thing out I said bro, that was . . .<br>AJ: . . .Yeah.<br>Chico: . . .told me you tossed that gun out, remember T kept bussin' your chops saying ah, why you get rid of the gun you love!<br>AJ: Yeah.<br>Chico: That's crazy bro.<br>**P. 24-25:**<br>Chico: . . . I'm I'm I'm I'm hoping, and did you, did you toss, I mean, I (inaudible), tell me I don't have to go back and, and get this, this thing you tore up and have it melted bro.  That's all I'm asking.<br>AJ: No bro it's gone.<br>Chico: Don't have me, you know.<br>AJ: It's gone, it's gone.  I couldn't find it.  (Inaudible) different parts (inaudible) including the grips.<br>Chico: Yeah bro but you can't just, did you (inaudible) did you hack it up?<br>AJ: (Inaudible).  I took it apart.<br>Chico: Yeah bro but a revolver only comes apart certain.<br>AJ: Exactly.  But the main ingredients is in the bottom of a lake somewhere.<br>**P. 26:**<br>AJ: I, I can't get to it.  And I'm a marine and I know I can't get to it. |
| 8/31: AJ, Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 22-23:**<br>Chico: No, no, but this is the thing bro cause AJ got rid of that, and he dumped, where did you dump that shit at AJ?  (Right?) You dumped.<br>AJ: Parts into lakes, parts in (unintelligible).<br>**P. 25:**<br>Chico: . . . But I told them I'll toss them wherever A tossed his shit.  That way.<br>AJ: That place don't even exist no more. (Unintelligible).<br>Chico: I ain't gonna worry about it.<br>T: So that shit used to be a lake and they made a fuckin (inaudible).  How that ship happened?<br>AJ: *Swampland* Everglades.  Building houses like crazy.<br>**P. 37:**<br>T: Well how you fuckin take that shit apart?<br>AJ: I'll show you.  I'll take out your piece.<br>**P. 46:**<br>Chico: And then from there [where the deputy was shot] where you dumped it in the lake, is it far? |

| | |
|---|---|
| 8/31: AJ, Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | AJ: (Yeah that's that's far).<br>Chico: Here in Broward?<br>AJ: (Inaudible)<br>Chico: Too far?<br>AJ: (Yeah)<br>Chico: That far bro?<br>T: Must be in the Keys or somewhere?<br>Chico: Down towards 27th?<br>AJ: (Close to it).<br>**P. 48:**<br>AJ: From here it's like. . .<br>Chico: . . . How the Hell ya . . .<br>AJ: (Inaudible) where we're at now? (Inaudible)<br>Chico: Where's that, in Homestead?<br>AJ: It's northern (inaudible) . . .<br>Chico: Who the hell lives out there?  How the hell did you find that place?<br>AJ: (Inaudible/I was driving, trying to clear my head).<br>**P. 49:**<br>AJ: You know when you go out west by the turnpike?<br>T: Uh huh.<br>AJ: Take that all the way down 41st Street.<br>T: Alright.<br>AJ: 41st Street on the left hand side going south, on the left hand side where you see all the complexes and homes.<br>Chico: Yeah.<br>AJ: That's where that is (inaudible).<br>**P. 50:** AJ: And the other parts was dumped, on the way. |
| 9/27: Gwen & China (CI) | **P. 12-13:**<br>Gwen: Maybe he tol' him [Chico], but I'll be shocked if.  AJ don't tell nobody that.<br>CI: He know it ain't true.  He lied (laughing).<br>Gwen: It is true, I know it's true.<br>CI: Oh man here we go again.<br>Gwen: It is true I know it's true.  The nigga woulda never got rid of that gun he love that gun!  I know it's true.  He love that gun.<br>CI: And what about the army clothes?<br>He got rid of the army clothes too?<br>Gwen: He can't fit 'em no more.<br>**P. 14:**<br>Gwen: . . . Boy looka here.  I don't believe AJ told him that.  I'm telling ya AJ don't tell nobody that.<br>CI: Well you say he love that gun.  I thought. . .<br>Gwen: (Inaudible) and he got rid of that gun.<br>CI: (Inaudible) 'dem (inaudible) hard to (inaudible) you breakin' the thangs up like you got a hamma. |

| | |
|---|---|
| 9/27: Gwen & China (CI) (continued) | Gwen: Took it loose took it apart.  (noise in background).  Now, AJ really is a military person now.<br>CI: Yeah.<br>Gwen: And he is crazy.<br>**P. 30:**<br>CI: Boy.  He fell in love with his lil gun huh?  He, he ah kept talking bout a model 66 a model 66 gun.  He fell in love with it.<br>Gwen: (He had a gun) he was in love with that gun.  He loved that gun!  That's how I know he did it!  He just didn't rid of his gun for nothin. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 30:**<br>AJ: I went home.<br>Rollie: Your wife was home?<br>AJ: Yeah.<br>Rollie: You got rid of all the shit before you got home?<br>AJ: No.  I still had it, but I had. . .<br>Rollie: . . . Huh?<br>AJ: . . . but, I disposed of it. (Inaudible/talking together).<br>**P. 57-59**<br>Chico: . . . AJ what'd you do with you wee wearing?  What what you . . .<br>AJ: . . . The clothes the car the gun, all gone.  The clothes (talkng together) . . .<br>Chico: . . . What'd you do with the clothes?<br>AJ: The clothes was dumped, (inaudible).<br>Chico: Burned?<br>AJ: Burned went to, the incinerator garbage.  The car, gone, totally . . .<br>T: ***What car were*** (inaudible)<br>AJ: ***Ford Probe.***<br>Rollie: You're sure it's sold?<br>Chico: Did you sell it?<br>AJ: I didn't sell it, I, my cousin had it and, it turned around and destroyed it completely, chopped it up, parts and everything (inaudible) they took parts off it and (left it).<br>Chico: What else are we worried about?<br>Rollie: The gun.<br>AJ: The weapon was disposed of in separates (inaudible). . .<br>Chico: . . . Do you remember where though?<br>AJ: Oh I remember all the places where I threw it.  I threw it here, I threw it here and I threw it here. . .<br>Chico: . . . Each piece (talking together).<br>AJ: The revolver went here, the full frame went in a lake (to here somewhere).<br>Rollie: Yeah.<br>AJ: And ah the grips (inaudible).<br>(Inaudible/talking together) . . . |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | AJ: . . . (you know) I never kept them around.<br>Chico: Oh but you also told you told me that ah, before you got rid of it, what'd you do with the gun.<br>AJ: Oh cleaned it up.  Spot clean. |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 33-35:**<br>AJ: Went straight up I 95 from Hallandale, and then I went, went down to Ives Dairy Road.  Came (inaudible).<br>P1: Show me exactly what, what would, that's when you dumped the gun?<br>AJ: No.  I dumped the gun a couple of days later.<br>P1: Oh so you held onto it?<br>AJ: I held on to it.<br>P1: Do your wife know you had a gun?<br>AJ: Yeah she know I had a gun.  And she know (inaudible) . . .<br>    . . . (Inaudible).<br>P1: She knows you got rid of it?<br>AJ: Yeah, she know I got rid of it.<br>    (Inaudible)<br>AJ: I didn't want to have nothing else to do with it.  I mean it wasn't doing me no good.<br>P1: Did you sell it, she thinks (you sell it?)<br>AJ: No. Actually they broke into the car, and (she), **then** thought it was it was stolen out of there cause she had the car, and I told her I had a gun in there.<br>**P. 36-37:**<br>P1: Who uhm.  Now where'd you dump the shit at?<br>AJ: Well you're going in the wrong direction, but it's (inaudible) . . .<br>P1: . . . alright I'll get out, what's the best way to get there?<br>AJ: (Inaudible) go down there.  I'll show you where the first part of it's dumped.  It the other part was dumped, it's way down in Miami, out west off the turnpike.<br>P1: Okay.<br>AJ: At which it's built up now, and that is in a lake, some (swampish) lake.  And then (inaudible) . . .<br>P1: . . . And you said there's other parts that you got rid of?<br>AJ: Yeah, was dumped off ah, 175th Street, behind, behind Church's.  In a lake.<br>P1: That lake's still there?<br>AJ: Yeah that lake is still there.<br>P1: What'd you dump in there?<br>AJ: The revolver.<br>P1: The frame or the?<br>AJ: No the revolver. |

| | |
|---|---|
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | P1: The little. <br> AJ: The revolver. <br>      Cylinder. <br> AJ: The cylinder. <br> P1: The cylinder. <br> AJ: Excuse me.  The revolver is *the whole thing*. <br> P1: Alright, we're take care of all this and then we'll go eat alright? <br> **P. 45:** <br> AJ: ***South*** down there by ah, like you going, towards ah Homestead. <br> P1: That's where you took the frame? <br> AJ: The frame.  But it's built up, I mean if you wanna, its . . . <br> P1: . . . No no I know what you're saying? <br> AJ: You understand? <br> P1: How bout uhm, what else was taken apart? <br> AJ: ***Pachmayer grips*** that's a ***rubber***, that's garbage. <br> P1: Did you toss that out or what? <br> AJ: Yeah. <br> P1: On the road. <br> AJ: *No*, it was garbage. <br> P1: You put that in your garbage? <br> AJ: (Not my garbage).  (Inaudible) <br> **P. 51-58:** <br> P1: (Tell me) we're on 17th? <br> AJ: Yeah. <br> P1: Keep going? <br>      (Inaudible) 27th? <br> . . . . <br> P1: The second left? <br> AJ: Yeah the second. . . .Yeah make a (left).  (Inaudible).  (Get) pass that first stop sign that you see up there. <br> P1: Yeah. <br> AJ: (Slow down/inaudible). <br> P1: In here? <br> AJ: Right here. (Inaudible).  (They all sitting in box).  Park, Parkview Elementary. Parkview Elementary.  Parkview Elementary).  (Inaudible) make a right. <br> P1: On 175? <br> AJ: Yes sir. <br> P1: Damn what brought you all the way out here bro?  Huh? <br> AJ: When you driving around bro (inaudible).  Slow down (inaudible) slow down, (inaudible), slow down, (to your left)? <br> P1: To my left? <br> AJ: Keep going.  To your left. <br> P1: Right in here. <br> AJ: Okay. |

| | |
|---|---|
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | P1: Right there?<br>AJ: (Inaudible).<br>P1: Where'd you *chuck* it from right from the side of the road?<br>AJ: From the side of the road, at night, nobody ain't see nothing.  (Inaudible) did see it people out there *chucking* stone and stuff all day (inaudible) so what they seen silver, so what?  I made sure (talking together).<br>P1: . . . This two seven Ave here.<br>AJ: Yeah.<br>P1: Now, where (talking together) *75*?<br>AJ: Yeah.<br>P1: Where do I go to this other place?<br>AJ: (Left).  That's way down south (inaudible) . . .<br>P1: . . . So right there is where you stood and just *chucked* that shit?<br>AJ: Yeah. (Inaudible).<br>P1: What's this up here the Palmetto?<br>AJ: (That's it.)<br>P1: That same, when you chucked the cylinder did you (jump on here) also?<br>AJ: (Inaudible) I went to ah (inaudible) yeah, from here to, I went all the way down and, was coming back up.<br>P1: Oh you were coming from down there . . .<br>AJ: . . . Yeah.<br>P1: . . . up here?<br>AJ: Trying to find a good spot.  (Inaudible).<br>*S/M:* How you know about (that spot you just)?<br>AJ: I didn't.  I just drove (inaudible) think of all the places you can drop . . . (Yeah)..<br>AJ: (get rid of 'em).<br>P1: How long afterwards did you wait though A?<br>AJ: About a week.  Honestly.  I didn't really keep it on me or at my residence, I kept it some (inaudible).<br>P1: *Bury that fucker*.<br>AJ: (Inaudible), it was, it was *well* cleaned *after I did the job*.<br>*Agent*: Was it all bloody or something?<br>AJ: No. It was nothing.<br>S/M: (Talking together/*gun power and stuff*)<br>AJ: Yeah.<br>*S/M: You got a cleaning kit?*<br>*AJ: I did yeah, I did.*<br>*S/M: Get rid of that too?*<br>*AJ: Overtime.*<br>*P1: Ya ain't* got no gun now?<br>AJ: No.  *I'm getting one* cause if somebody piss me off (I might) go back in my (mode). (Inaudible). |

| | |
|---|---|
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | P1: So that's the only places then?  175 and 27 and, and this place out here that you're taking me to now?<br>AJ: Yeah.<br>P1: The grips you said you dropped in the dumpster?<br>AJ: (Inaudible) dumpster.  And that was actually by Palmetto too, but back that way.<br>P1: The other way?<br>AJ: In the dumpster yeah (which was dumb/inaudible).  See the object was, to be no where in the vicinity if, they did think to look.<br>**P. 63:**<br>P1: Do they have an exit here for 41st?<br>AJ: Uhm, yes it's called (36th) Street.  (Inaudible).<br>**P. 67:**<br>P1: . . . Back there could you get across that canal? . . .<br>AJ: by the turnpike?  Back then?  Yeah but there was a way you had to do it you'd have to drive straight down 41st, ah which is thirty. . . .Across to the prison.  It's a county jail and a prison right next to each other.<br>**P. 91:**<br>P1: Boy you came way out here.<br>AJ: Yeah well actually I went down to 836 went over to the express way, and came across.<br>P1: By what?  By 107 Ave?. . .<br>AJ: (Inaudible) yeah.<br>**P. 96:**<br>P1: . . . I'm down in Miami I'm off of ah, I'm off of 41st and 97th Ave.. . . .  But I'm heading towards the turnpike.<br>**P. 97-98:**<br>AJ: Okay this is now officially 42nd Street.  (Inaudible)<br>P1: The turnpike should be up ahead.<br>AJ: Yeah it's up ahead.<br>P1: What side of the turnpike it's on the east or west?<br>AJ: It's on, it's on east side.  Heading north.<br>P1: From that side?<br>AJ: Yeah.<br>P1: Is it close to the turnpike?<br>AJ: (Inaudible)<br>P1: And this road was here AJ back then?<br>AJ: Nah it was all dirt.  This is all dirt, this was only two lanes.<br>P1: This was a dirt road?<br>AJ: Yes this was all dirt and the two lane going one, well not so much dirt, but it wasn't paved like this. It was dirt most of it.  Ah you hit dirt spots, (here and) dirt spots there. And this . . .<br>P1: . . . None of this was here.<br>AJ: None of this was here this was all swamp.  This was all swamp. |

| | |
|---|---|
| 10/4 (Car):<br>AJ, Rollie<br>(Agt.<br>McKeen),<br>Chico (Det.<br>Cedeno), and<br>"T" (Agt.<br>Curry)<br>(continued) | **P. 99-102:**<br>AJ: It's around over there.<br>P1: How'd you get back there?<br>AJ: (Inaudible) on the, on the turnpike?<br>P1: Yeah.<br>AJ: (Inaudible) you pull off to the side of the road.<br>P1: And you walked?<br>AJ: Yeah!  You just . . .<br>      . . . (And you just threw it off the side right?)<br>AJ: . . . get out (inaudible), yeah you get out.<br>P1: Oh you had to stop on the actual. . .<br>AJ: . . . Yeah.<br>P1: . . . turnpike?<br>AJ: Yeah.  (As if) I was having problems with my car it's dark and (inaudible) ain't no (light)!<br>P1: But you, you can get on the turnpike here, back then?<br>AJ: No! This was not an exit.<br>P1: So you were already on the turnpike?<br>AJ: I was already on the turnpike I told you I was coming from . . .<br>P1: . . . Right here.<br>AJ: Yeah!  I was on this.  See I didn't know this exit at this uhm, lane, this thing existed.<br>P1: You see that right there?<br>AJ: Yeah but when you get over here, you see all that?  That wasn't no road.  That wasn't no road. . .<br>      . . . (You just walked out).<br>AJ: I just walked out!  All of this was swamp!  There was not no road no building no nothing, all of this was the same as that water and lake and all of (that).<br>P1: Right.<br>AJ: All this was the same.<br>P1: How far can you get?  You just . . .<br>AJ: . . . (Inaudible) and all that and I (tracked) it, I chunked it.  So when it (inaudible) probably where it was.<br>P1: So right out here?<br>AJ: Yeah!  Right above, in between. . .<br>P1: I hope it's under the road.<br>AJ: Yeah.<br>P1: You think it might be under the road?<br>     (Inaudible/talking together).<br>AJ: It goes down, it was in swamp it was all swamp.  Water. . .<br>P1: . . . Right in this area here?<br>AJ: Right in this area.  (Yep).<br>P1: It's all houses man.<br>**P. 103:**<br>P1: And you're sure it was this area? |

| | |
|---|---|
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | AJ: I'm telling ya.  I know, cause I came right above 41st Street. (Inaudible). <br> P1: Yeah (let's go).  The only place that's still water is 175 and 27. <br> **P. 105:** <br> P1: So you walked to the edge? <br> AJ: Yeah! <br> P1: And just ***chucked*** it over but it probably went on land. <br> AJ: (Inaudible/I saw what happened). . . <br> . . . (Inaudible). <br> AJ: I witnessed! <br> (Inaudible/ talking together). <br> P1: I got it I got it, I got it. <br> AJ: I don't need nothing that can hold me down.  (Inaudible). |
| 12/13: Gwen & BSO (Det. Bole & Maj. Fantigrassi) (unrecorded) | **BSO 99-page Report at 75-76:** <br> "When specifically asked about whether or not she accompanied A.J. to dispose of the gun on the night of the murder she described the following incident: She recalled a night when A.J. came home very late and woke her up and telling her he just killed someone.  He requested she accompany him to dispose of a gun.  She remembered he was wearing military type clothing and had applied face paint around his eyes.  He was wearing a 'skully' type of headgear.  Apparently, A.J. had already 'broken' the gun apart prior to Mrs. Johnson accompanying him.  The gun was thrown in a field somewhere in Dade County not far from where they were living at the time.  The car A.J. was driving was a Ford Probe she described as being 'airplane blue' in color." |
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) | **P. 44:** <br> AJ: (describing his new car at the time of his first encounter with Montgomery): "he saw me in my new car, Ford Probe . . . <br> **P. 52-53:** <br> Poly:   Two hundred well you try to buy one like that now, you... cause nobody uses revolvers anymore. <br> AJ:   Exactly, I still love them. <br> Poly:   Oh, I do too. <br> AJ:   I still love 'em. <br> Poly:   You still have yours? <br> AJ:   No. <br> Poly:   What did you do with it? <br> AJ:   I was... my vehicle was broken into and they... one time '98, left  my wife's purse was underneath the seat (ui) found the weapon and it was gone. <br> Poly:   Really?  Why did you leave it (ui) there? <br> AJ:   (ui) because I was going in to a club I, I, and trust I went from (ui) officer at the time, I mean I wasn't, I was still (ui) but I wasn't with a department and I (ui) <br> Poly:   Where you still with BSO at the time? <br> AJ:   No.  No. <br> Poly:   Well how was... you were still certified. |

| | |
|---|---|
| 2/8: AJ & BSO ("Job Interview"/ Polygraph) (continued) | AJ:    I was still certified yeah.<br>Poly:  Okay.<br>AJ:    And, I left it in the vehicle and underneath the seat...<br>Poly:  You (ui)...<br>AJ:    ...and in a case...<br>Poly:  So they took everything.<br>AJ:    They (ui) yeah they (ui), not in the holster from, BSO...<br>Poly:  No, no, no.<br>AJ:    ...it was in another holster...<br>Poly:  in a holster and you put it inside of a case...<br><br>**P. 65:**<br>Poly:  When you... when uh... you said your van was broken into...<br>AJ:    My car.<br>Poly:  ...your car.<br>AJ:    It wasn't my car it was my... my wife's car.<br>Poly:  Your wife's car?  She lost her purse...<br>AJ:    She lost her purse...<br>Poly:  ...you lost your gun...<br>AJ:    ...Yeah.<br>Poly:  ...did you do a uh... police report (ui)?<br>AJ:    Yeah...<br>Poly:  with what agency?<br>AJ:    ...Um.... I think it was, Miami, Miami Dade.<br>Poly:  With Metro?<br><br>**BSO 99-Page Report at 89**:<br>"Tuesday, February 12, 2002.  Miami-Dade Police Records faxed all the incidents involving Andrew Johnson No record of a car burglary or stolen gun was found.  Johnson's wife, Gwenda, made no record of a stolen gun either.  I left a message for Johnson asking him to call me with the correct information.  (Note: Several additional checks using Gwenda Johnson's maiden name [Ealey], as well as the names of other members of her family were done.  No record of a vehicle burglary, involving Andrew Johnson's Swith and Wesson, Model 66 firearm could be located)" |
| 3/13/02: Gwen & BSO (Det. Bole & Maj. Fantigrassi) (unrecorded) | **P. 34:**<br>Q: Gwen, in previous ah interviews, with myself and Detective Bole' you've also indicated that ah there was an occasion when ah he came home and you went with him to discard a ah, a weapon, and you, you described for us how he broke it down into three pieces and threw it away.<br>A: That's not true.  That's not true.<br>Q: Then why would you have offered that?  And why would you have said that if it wasn't true?<br>A: My, my thing was with AJ was that he had hurt me real bad during the marriage, so I, was trying to hurt him.  That's what it was about I was trying to hurt him. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(unrecorded)<br>(continued) | **P. 41:**<br>Q: Uh huh.  Is there anything that's he's shared with you?  Is there any actions that you've observed, at all, Gwen, that would suggest to you, he was involved in the murder of a deputy?  Any deputy.<br>A: No.  Nothing that I saw.<br>**P. 42:**<br>Q: Has there ever been anything said to (you) by him or, or anything you've observed that would lead you to believe that he's killed anybody at all?  Beyond a police officer?<br>A: No.<br>**P. 45-46:**<br>Q: . . . He tells us undercover, that he took the gun and he broke it apart and he threw it all different places.<br>A: Uh huh.<br>Q: You tell the undercover people, you broke up the gun, and he threw in all different places.  You!  Show somebody, where that gun is thrown.  AJ shows somebody where that gun is thrown.<br>A: Uh huh.<br>Q: I'm here to tell you the two places are not far apart, okay?  Now forget Tony . . .<br>A: . . . Uh huh.<br>Q: . . . forget me, forget the gentleman from the State Attorney's Officer Mr. Gardner. . .<br>A: . . . (Inaudible).<br>Q: There's people out there they're gonna say wait a second.  You got the husband telling the cops undercover, all these things, you've got you telling people undercover these things.<br>A: Uh huh.<br>Q: Somehow or another these two had to get their story together, so you just gotta . . .<br>A: . . . (Well no) . . .<br>Q: . . . Take a deep breath . . .<br>A: . . . This.<br>Q: . . . and explain it<br>A: No, this is what happened I believe, I was writing a book, and like I told you, I believed AJ read the stuff I was writing, he read the, book or whatever, and that's where he coulda gotten this stuff from.  Cause he probably read my book.  Which I couldn't find, I, computer was broke down, the uhm, tapes and stuff was lost (laugh), so evidently he musta gotten that from my book.<br>**P. 48-49:**<br>Q: Now you know that whoever listens to you or watches you or . . .<br>A: . . . Uh huh.<br>Q: . . . whatever is gonna say that is one, heck of a coincidence.<br>A: (Uh huh).<br>Q: Am I right?<br>A: I know but what can I do!<br>Q: The fact that the husband . . .<br>A: . . . I have to tell the truth. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(unrecorded)<br>(continued) | Q: . . . and the wife, even take the police.<br>A: Uh huh.<br>Q: Through undercover operations.<br>A: Uh huh.<br>Q: To the exact same of all of south Florida, of all of Dade County, okay.  We're a few blocks away where this gun.<br>A: Uh huh.<br>Q: Was not thrown, but parts of the gun were thrown.  We both agreed the gun was used, we both, you and him both say it was broken down and then you both take us to one exact spot.<br>A: That's strange.<br>Q: And I mean it it, it sounds like you two got your stories straight.<br>A: He read it.  He had to read it!  I wrote and, I, typed it up and stuff, he musta read it, then that let's me know, that he read the stuff (inaudible).  That's all.  But you know for him, to talk to me, he didn't talk to me about it or nothing you know he didn't, admit to nothing or nothing you know.<br>**P. 52- 53:**<br>Q: Three chapters?<br>A:  I had three chapters.<br>Q: Do you. . .<br>A: . . . (Inaudible).<br>Q: . . . specifically talk about the, how the, how the murder weapon was, was disposed of?<br>A: Yeah!  After, I talked about uhm, I talked about uhm, yeah I talked about (inaudible)...<br>Q: . . . What did you write specifically about how the murder weapon was disposed of?<br>A: Ah, I think I put, I had put down there about the weapon was broke down and about, I think in about four pieces or something I said, the weapon was broke down in about four pi, pieces the weapon was discarded ah.<br>Q: Wehre was it discarded?<br>A: Uhm, um, I think it's, I think I said something about 27th, 27th Avenue and something like that 27th, 27th Avenue.<br>Q: So you and you're and you're ah.<br>A: 167 27th Avenue something like that I think I said something like that.<br>Q: So in . . .<br>A: . . . (Inaudible).<br>Q: . . . your book you actually described where, how, how the gun's ah.<br>A: Uh huh.<br>Q: Ah broken down (talking together) . . .<br>A: . . . I talked about the gun being broken down, I talk about, ah, talk about, other weapons, you know that coulda been used, stuff like that, I you know, it was a book! pi, pieces the weapon was discarded ah.<br>Q: Where was it discarded?<br>A: Uhm, um, I think it's, I think I said something about 27th, 27th Avenue and something like that 27th, 27th Avenue. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(unrecorded)<br>(continued) | Q:  So you and you're and you're ah.<br>A: 167 27th Avenue something like that I think I said something like that.<br>Q: So in . . .<br>A: . . . (Inaudible).<br>Q: . . . your book you actually described where, how, how the gun's ah.<br>A: Uh huh.<br>Q: Ah broken down (talking together) . . .<br>A: . . . I talked about the gun being broken down, I talk about, ah, talk about, other weapons, you know that coulda been used, stuff like that, I you know, it was a book! |

|  | **Is Gwen's "book" true to life about AJ's crime, or fiction?  Has AJ read the book?** |
|---|---|
| 5/31: Gwen & China (CI) | **P. 50-51:**<br>Gwen: Don't worry about it.  And I told him before too.  I say anything happened to me, I got everything written down, my whole life.<br>CI: So what he said bout that?<br>Gwen: He talkin bout yeah, you did that?  Talkin bout who got that?  And I said. . .<br>CI: . . . Who got, see that, wee that who got that?<br>Gwen: I say it's sealed up and put away.  I say cause I I never know what may happened, so I got everythang my life, talking bout me too?  I say yeah bout you I had to, had to put everythang in there.  He talking bout ah man . . .<br>CI: . . . That was smart.<br>Gwen: . . . he talking bout . . .<br>CI: . . . he ain't know you was that smart.<br>Gwen: He talking bout ah man, why you did something like that?  I say I never know.  Anythang might happened.  I never know.<br>CI: And he ain't . . .<br>Gwen: . . . he say but you not, you not putting all that stuff in the book are you?  I say no I'm not putting it in the book, but I had to do that, I had to ***what you sitting there looking at?***, and boy he was sitting (inaudible), man if I was bout to kill ha I betta do it. |
| 6/6: Gwen & China (CI) | **P. 8-10:**<br>CI: Then he gone feel like (you) forcing his hand, you leaving with, all his business you know.<br>Gwen: I'm not gone tell on him like that.  I told him I'm writing a book.<br>CI: You gone write a book.<br>Gwen: I started already.<br>CI: You can't put (no junk) like that in no book.<br>Gwen: Don't tell me I can't.  You'll be reading it.<br>CI: (Inaudible) what . . .<br>Gwen: . . . (And then I'll) be using my name and stuff man you (inaudible).  (Inaudible) it ain't gone be like that.<br>CI: You got it detail by detail?  Huh?<br>Gwen: Yeah but it's gone be different.<br>CI: Different name I know.<br>Gwen: It's gone be different names and its gonna be different.  It's gonna be different.  Names gonna be changed.<br>. . .<br>CI: (Ain't) you gotta see a publisher about a book?<br>Gwen: I got a publisher.  My auntie is a publisher.<br>CI: Damn you serious huh?<br>Gwen: Uh huh.<br>CI: You got you a title?<br>Gwen: I don't have a title for it yet.  That's what really holding me up.<br>CI: (Dog). |

| | |
|---|---|
| 6/6: Gwen & China (CI) (continued) | **P. 10-11:**<br>He was, he was kinda upset a lil bit but he tried to not show it.  Bout that.<br>CI: That you . . .<br>Gwen: . . . Man!<br>CI: . . . that you was gone sugar coat it though you can put it in a way where ain't nobody gone know nothing.<br>Gwen: I know.<br>CI: Then you . . .<br>Gwen: . . . I had the raw version but I'm a change it.<br>CI: The raw version?<br>Gwen: Of the incident I had the raw version, but I know I can't use that.<br>CI: Tell me the raw version.<br>**P. 14:** [After Gwen has told the CI the "raw version"]<br>Gwen: Like (he) said if he coulda killed Nick [Navarro] he woulda killed him.<br>CI: (Laugh) He couldn't get to Nick (laugh).  Uhh, uhh, so that's how you, you can hook it up in the book but you just use different names and just use any old, any old state.<br>Gwen: Yeah.<br>CI: That'll throw, throw people off.<br>Gwen: Yeah. |
| 9/27: Gwen & China (CI) | **P. 46:**<br>Gwen: . . . how they gave (talking together) this money, that one money, helped people when they get put they house they stayed with Dot.  All kind, you how people in there now.<br>CI: You gone put that in your book you gone do?<br>Gwen: Yeah!<br>CI: Every now and then you'll tighten up somethin' a page or somethin'?  That's good.<br>Gwen: I got all that.  The book I'm a really do, the one that I got for Dot on Dot life, I can't put that out till Dot die.  When Dot die then I'll put that out.  But ah (inaudible), but mine, when I put my book out, I can't be AJ no mo'.<br>CI: Why?<br>Gwen: I can't be with him!  Cause he gone read the book.<br>CI: So!  That means you making money.<br>Gwen: But he gone know it's about him.<br>CI: That nigga, man.  (Inaudible) you really thank, (inaudible) man I don't know bout that man.  He . . .<br>Gwen: . . . AJ gone know that book is about him. |
| 12/13: Gwen & BSO (Det. Bole & Maj. Fantigrassi) (unrecorded) | **BSO 99-page Report at 76:**<br>"Mrs. Johnson also described how she had started to write a book about her life, which included her married life to A.J.  She stated she was not able to locate two (2) computer disks on which the book was being written.  She suspected A.J. might have taken them from her possession." |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation) | **P. 45-49:**<br>Q: AJ says, he involved in the killing of a police officer.  You say he's involved in a killing of a police officer.<br>A: Uh huh.<br>Q: AJ tells us it was a ah convenient store.  You tell us it was a 7 11.<br>A: Uh huh.<br>Q: AJ says, he killed the guy that made the complaint against him.<br>A: Uh huh.<br>Q: You say, he killed the guy that made the complaint against him.  He tells us undercover, that he took the gun and he broke it apart and he threw it all different places.<br>A: Uh huh.<br>Q: You tell the undercover people, you broke up the gun, and he threw in all different places.  You!  Show somebody, where that gun is thrown.  AJ shows somebody where that gun is thrown.<br>A: Uh huh.<br>Q: I'm here to tell you the two places are not far apart, okay?  Now forget Tony . . .<br>A: . . . Uh huh.<br>Q: . . . forget me, forget the gentleman from the State Attorney's Officer Mr. Gardner. . .<br>A: . . . (Inaudible).<br>Q: There's people out there they're gonna say wait a second.  You got the husband telling the cops undercover, all these things, you've got you telling people undercover these things.<br>A: Uh huh.<br>Q: Somehow or another these two had to get their story together, so you just gotta . . .<br>A: . . . (Well no) . . .<br>Q: . . . Take a deep breath . . .<br>A: . . . This.<br>Q: . . . and explain it<br>A: No, this is what happened I believe, I was writing a book, and like I told you, I believed AJ read the stuff I was writing, he read the, book or whatever, and that's where he coulda gotten this stuff from.  Cause he probably read my book.  Which I couldn't find, I, computer was broke down, the uhm, tapes and stuff was lost (laugh), so evidently he musta gotten that from my book.<br>Q: But you gotta understand something also.<br>A: Uh huh.<br>Q: A police officer was killed.<br>A. Uh huh.<br>Q: He was killed in a convenient store.<br>A: Uh huh.<br>Q: He was sitting in his car, and somebody did sneak up on him and kill him and that, that, this is a fact that.<br>A: Right.<br>Q: Right?<br>A: Right, uh huh. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: Now, is that what your book was about?<br>A: Yeah!  My book was about the, the, book, the book was about (suspense), it was a<br>(pense) murder, it was you know, and the end of it which, he didn't give me a chance  to<br>finish writing it, the end of it was gonna be, about him.<br>Q: About who?<br>A: AJ. See and him didn't give me a chance to finish with all the stuff that I was doing.<br>Q:  Okay.<br>A: But that's where he coulda gotten this information from (tapping noise), that.  You<br>know that's the only thing I can think cause I was writing a book you know.<br>Q: Do you understand where I'm going though?<br>A: I, understand what you're saying but, evidently he musta (tapping noise) read the<br>same stuff (tapping noise) and took that and ran with it, that's all I can think.<br>Q: Do you have a copy that we, obviously we would need to . . .<br>A: . . . I<br>Q: . . . get a copy of that. . .<br>A: . . . I know.<br>Q: . . . (talking together) tapes or something.<br>A: I don't have nothing.  I don't know what happened to it.  He said the computer, you<br>know.<br>Q: Now you know that whoever listens to you or watches you or . . .<br>A: . . . Uh huh.<br>Q: . . . whatever is gonna say that is one, heck of a coincidence.<br>A: (Uh huh).<br>Q: Am I right?<br>A: I know but what can I do!<br>Q: The fact that the husband . . .<br>A: . . . I have to tell the truth.<br>Q: . . . and the wife, even take the police.<br>A: Uh huh.<br>Q: Through undercover operations.<br>A: Uh huh.<br>Q: To the exact same of all of south Florida, of all of Dade County, okay.  We're a few<br>blocks away where this gun.<br>A: Uh huh.<br>Q: Was not thrown, but parts of the gun were thrown.  We both agreed the gun was used,<br>we both, you and him both say it was broken down and then you both take us to one<br>exact spot.<br>A: That's strange.<br>Q: And I mean it it, it sounds like you two got your stories straight.<br>A: He read it.  He had to read it!  I wrote and, I, typed it up and stuff, he musta read it,<br>then that let's me know, that he read the stuff (inaudible).  That's all.  But you know for<br>him, to talk to me, he didn't talk to me about it or nothing you know he didn't, admit to<br>nothing or nothing you know. |

| | |
|---|---|
| 3/13/02 | **P. 50-52:**<br>Q: Uhm, you said he didn't give you a chance to finish the book, why why do you say that?<br>A: Because he told me that the computer broke, and I asked him what happened to the disk and stuff, he don't know.  He didn't give me chance to finish.<br>Q: Was he aware that you were writing a book, to begin with?<br>A: yeah he had to be aware because he seen me working on the computer, working working working working.<br>Q: Uh huh.  Did he, were you there at times when he actually read parts of the transcript to see what was in there?<br>A: Umm, no but, he'd go in, he'd go on right after, I get off and he'd go on.<br>Q: Uh huh.<br>A: So.<br>Q: Did he ever comment to you while you were writing the book about ah, you know don't what are you saying this about me?  Or what are you saying that or . . .<br>A: . . . No.<br>Q: . . . don't put that stuff in there Gwen, it may, might ah look like I did something that I . . .<br>A: . . . No.<br>Q: . . . shouldn't have done.<br>A: He never said nothing to me.<br>Q: Was he aware that you were writing about him possibly killing a police officer?  Is that what the book part of the book was?<br>A: It wasn't really about, him, killing a police officer you know it wasn't him!  Per *se*, I was, at the end I was gonna write about him and way that he is.  It was just a murder that, took place, you know like that and I . . .<br>Q: . . . Tell, tell me about this script, tell me about the story, what, what did the story entail?<br>A: It entailed uhm, ah, it entailed someone being killed and uhm, and it tells someone being kilt an dit was about uhm . . .<br>Q: . . . Someone being who?<br>A: Someone being, I didn't put no, no name . . .<br>Q: . . . Was it somebody in authority that was killed?  Was it ah.<br>A: It was ah, it was really a detective, it was a detective, and uhm, a detective ah, it was really a friend of his, sne, sne, sne, sneaks up and kill him.  And ah you know nobody knows you know, who killed him, that's what it was really it was mostly about, a person being killed unaware.<br>**P. 52- 53:**<br>Q: Three chapters?<br>A:  I had three chapters.<br>Q: Do you. . .<br>A: . . . (Inaudible).<br>Q: . . . specifically talk about the, how the, how the murder weapon was, was disposed of? |

| | |
|---|---|
| 3/13/02 | A: Yeah!  After, I talked about uhm, I talked about uhm, yeah I talked about (inaudible)... |

A: Yeah!  After, I talked about uhm, I talked about uhm, yeah I talked about (inaudible)...
Q: . . . What did you write specifically about how the murder weapon was disposed of?
A: Ah, I think I put, I had put down there about the weapon was broke down and about, I think in about four pieces or something I said, the weapon was broke down in about four pi, pieces the weapon was discarded ah.
Q: Where was it discarded?
A: Uhm, um, I think it's, I think I said something about 27th, 27th Avenue and something like that 27th, 27th Avenue.
Q:  So you and you're and you're ah.
A: 167 27th Avenue something like that I think I said something like that.
Q: So in . . .
A: . . . (Inaudible).
Q: . . . your book you actually described where, how, how the gun's ah.
A: Uh huh.
Q: Ah broken down (talking together) . . .
A: . . . I talked about the gun being broken down, I talk about, ah, talk about, other weapons, you know that coulda been used, stuff like that, I you know, it was a book!
**P. 54-57:**
Q: When did you write this book?
A: Ah, I wrote, I started on that book about, uhm, I guess it's ben now about, I guess about, I started on that book about, let's see I first started on it's been bout seven or eight years something like that, eight, nine years, I started on it with the scribbling and, I started putting it in the computer, maybe about ummmm, maybe about four years now, four, four, I can't remember exactly.
Q: Okay, the script that you talked about that you wrote out first.
A: Uh huh.
Q: What became of the script?  Do you have that?
A: No, I don't have that, I don't know . . .
Q: . . . Why not?
A: I don't know I don't know where it is.  Or I don't know where it is. I don't know where (tapping noise) it is.
Q: I'm sorry Mike go ahead.
A: Uh huh.
Q: The ah, what was the name of the book?  Or did it have a name?
A: It didn't have a title, it didn't have a title but it was going to be, I really didn't have a name for it yet that was my reason for not getting it published.
Q: (Talking together) You were gonna publish it anonymously right?
A: Yeah.
Q: That was under one of the undercover tapes too.
A: (sound of laughing).
Q: And ah there was purpose in you writing this book was there not?
A: Uhm, um.
Q: I prefer if you remember but I can refresh your memory if you like.
A: Well refresh my memory.

| 3/13/02 | Q: You made a comment to the fact that ah you want to caution other women who were going through what you were going through.  Did that ring a bell? |
|---|---|
| | A: Um, yeah. |
| | Q: What was that all about? |
| | A: That wasn't the murder ah mystery book. . . |
| | Q: . . . No no. |
| | A: . . . That was something (inaudible/talking together). |
| | Q: . . . you were writing it. |
| | A: That wasn't that was gonna be uhm, just a strictly book on ah, Andrew.  Straight on Andrew.  That book was gone be strictly on him. |
| | Q: Explain that a lil more there, I (inaudible). |
| | A: I was gonna write a book on Andrew. |
| | Q: Uh huh. |
| | A: And the way he treated me. |
| | Q: Right. |
| | A: Stuff like that and I wanted to get the book out to a lot of people so they could see, you know how I was treated and stuff, that's (inaudible). . . |
| | Q: . . . And in that book, was the character who ah, is Andrew whether you used his name or not? Was he gonna be the one who ah killed someone? |
| | A: Umm, no I, I wasn't using his name, no I wasn't gonna use his name. |
| | Q: Tell me some of the names ah, you used in the book I mean who, what was the name of the person who was killed? |
| | A: Ah, I had a name I think it was ah, ah, something like Rutherfor, Rutherford, something like that. |
| | Q: Was he, what was his occupation? |
| | A: Ah he was a private detective. |
| | Q: Was he white or black? |
| | A: My book didn't (laughing) distinguish whether he was white or black (laughing). |
| | Q: And what was the per, name of the person who killed him? |
| | A: Ah, I think it something like Fernand, Fertinand (inaudible). |
| | Q: What was the motive and for the murder in the book? |
| | A: Ah, the motive was, what I was trying to do was do something with ah, like someone, ah, blaming you for something that you didn't do.  And that what it about. |
| | Q: And that sounds a lil familiar.  Is that because, and I'm asking you, is that because Andrew feels he's unjustly terminated from BSO?  Is blamed for something he didn't do? |
| | A: Um, I don't think so, I don't think I was I thinking in those terms when I writing. . . . |
| | Q: . . . Let me just say this to you. |
| | A: Uh huh. |
| | Q: Now stranger things have happened in life. |
| | A: Uh huh. |
| | Q: I mean you don't know where that computer is? |
| | A: No. |
| | Q: You don't know where those disks. . . |
| | A: . . . Uh uh. |

| | **Did Johnson tell his wife?** |
|---|---|
| 5/3: Gwen & China (CI) | **P. 9:**<br>Gwen: He better be glad I ain't no tattletale, call anonymous and tell on him (inaudible).<br>CI: If he start botherin (inaudible) when you leave.<br>Gwen: (Laugh)<br>CI: You might have no choice (laugh) shoot. Cause ah. . .<br>Gwen: . . . (Tell on him/inaudible huh?)<br>CI: . . . he sneaky like that, he feel like you, you the only one know.<br>Gwen: Uh huh.<br>**P. 10-11:**<br>Gwen: I told you that guy didn't do that, I done told you who did it. I remember that one real good. When he came back.<br>CI: When he came back?<br>Gwen: After he had already did it, he came back home.<br>CI: He told you? Or you just figured it out?<br>Gwen: Uh uh, he told me and I know the officer. I know who it is, I (inaudible).<br>CI: What you (inaudible) for? You know him personally?<br>Gwen: No I just know him, for what he look, what he looked like. . . |
| 5/31: Gwen & China (CI) | **P. 19:**<br>Gwen: AJ know I know all his business and everything, okay?<br>CI: That's that's why he ain't gone let you go and you know it. You know he ain't gone let you go.<br>**P. 24:**<br>Gwen:. . . I know all this stuff! He ain't got nothin' new, I know everythang he do. I know how he, he creep, I know what he do I know how he do it, I know what color to wear, I know I been with him! I know I know everythang he done done, I know all his criminal acts, I know, (inaudible). I know everythang! Okay?<br>**P. 25:**<br>Gwen: He know I can turn him in, he know. . .<br>CI: Well, that's what I'm saying'!<br>Gwen: He know I know.<br>CI: You can't turn him in with no bullets in your butt.<br>**P. 31:**<br>CI: So he came home with all that junk on his face? (Laughing) Why you ain't run? (Coughing)<br>Gwen: Cause I know him. I know AJ. I know him good. And he know the type of person I am he know that I'm not gone tell on him, I'm not gone bother him. He know that.<br>**P. 43:**<br>CI: And he feel like you gone be safe with his secret?<br>Gwen: Yeah because he know, he know me he know that I'm not gone tell on him.<br>CI: Oh okay. |

ATTACHMENT / EXHIBIT $\underline{B-24}$

| | |
|---|---|
| 5/31: Gwen & China (CI) (continued) | Gwen: He know I'm not gone tell on him, I never, thirteen years we been together I never told on him, I never, told, no law 'nem or nothin', in fact when it was time for me to testify for him I just said good things about him and (inaudible), he know that.<br>CI: Oh.<br>Gwen: He know that like he know his name.  He said now Gwen, she ain't gone rat me out.  She ain't gone tell on me.<br>CI: He got too much sense or too much slick.<br>Gwen: Well he know that, see he know that I'm I was his friend first, see he know I'm a friend.<br>CI: What?<br>Gwen: (Inaudible) friend, a real friend, you friend ain't gone do that they gone be down with you.  They gone tell you when you wrong.  But they gone be down with you. |
| 6/6: Gwen & China (CI) | **P. 11-14:**<br>Gwen: I was sleep.<br>CI: You was sleep.<br>Gwen: And I woke up and he was gone.  So when he came back, and I saw the way he was dressed and (inaudible), oh my G-d this man ***killed the cop*** and he said uhm, he say I just got through doing a job come help me I gotta go get rid of the gun.  I say doing, you just got through doing what?  Taking care of business.  Come go with me so me and him got in the car and, we start taking the gun a loose, we start throwing it and, I said what happened.  Which I really knew what had happened to tell you the truth.  I already knew he had just, got through offing somebody.  He say I got him, I got that cop, he was sitting in the car.  He said I got him!<br>CI: Oh yeah?<br>Gwen: And then, this the part, the actual guy!  That wrote the report up, he didn't get him.  He got the guy, the actual one that testified, that's who he got.  The one that he shoulda got was the one that wrote, wrote it up and stuff like that, that's who he shoulda got.<br>CI: It was two of 'em?<br>Gwen: (But), yeah but he settled for him.  And then I read in the paper I read the incident, and they say the guy walked away on foot, they had a sketch of a guy with a skully on and all like that.<br>CI: Uh huh.<br>Gwen: That had that. (Inaudible).<br>CI: Well what about the other guy?<br>Gwen: The one that he didn't get?<br>CI: Yeah.<br>Gwen: Oh I don't know.<br>CI: But he he the one that did the most damage to AJ didn't he?<br>Gwen: Yep.<br>CI: Well why he oh I guess had, he settled for him huh? (But), damn.<br>Gwen: He was sitting in his car writing his report.  (AJ put) that gun to his head, (bloop/making a noise). |

| | |
|---|---|
| 6/6: Gwen & China (CI) (continued) | CI: What the other one name?<br>Gwen.  I don't know.<br>CI: Oh but these, they was buddies?<br>Gwen: Partners.<br>CI: And they just both got together to, to, to, to make him loose his job?  Just like that?  Shhh.<br>Gwen: Broward County used to be real prejudice during that time.  Nick Navarro was the sheriff.<br>CI: I remember Nick.  (Damn shole' remember Nick).<br>Gwen: Like (he) said if he coulda killed Nick he woulda killed him. |
| 8/31: AJ, Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 2-3:**<br>Chico: . . . They wanna know if anybody else, aside from you, me, us in the car, if anybody else knows.  Your old girl don't know?<br>AJ: No.<br>Chico: You sure?<br>AJ: Yeah.<br>**P. 24:**<br>Chico: I mean, if anybody else knows AJ, we need to know bro, just to know.<br>AJ: (Unintelligible).<br>Chico: As long as and the old lady don't know?<br>AJ: (Unintelligible)<br>Chico: You're positive?<br>AJ: (Inaudible)<br>Chico: Not for anything bro, but, but, but if, but, but if she fuckin gets pissed at you for any reason (unintelligible)<br>AJ (Unintelligible) yeah.<br>Chico: You know what I'm saying?<br>T: Remember how tight you say women are, man?<br>AJ: (Uhun). |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 16:**<br>Rollie: Were you married when this happened?<br>AJ: I was married.<br>Rollie: And you didn't say nothing?<br>AJ: Straight up.<br>**P. 51:**<br>Chico: . . . (Inaudible) yeah do you, do you have, did you have an alibi?<br>AJ: Yeah!<br>Rollie: What was your alibi?<br>AJ: (Laugh) I was home.<br>Rollie: Your wife would stick with you?<br>AJ: My wife was (inaudible) she was right there.  I know people that, the place I was renting the, place from.<br>Rollie: Uh huh |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) (continued) | AJ: They, they knew I was home.<br>**P. 63-65:**<br>Chico: If the old lady don't know.  The old lady don't listen if the old lady knows I don't care. . .<br>AJ: . . . She woulda been gone.<br>Chico: Huh?<br>AJ: She woulda been gone.<br>Chico: Why?  *Just for that?*<br>AJ: She she *loves me* but (talking together) . . .<br>Chico: . . . Oh I know but I'm just saying . . .<br>AJ: . . . *She's not gonna* she *is* not gonna be nervous over heat like that.  And you know . . .<br>Chico: . . . Yeah but bro . . .<br>AJ: . . . *and you know, when you* (inaudible) somebody . . .<br>Chico: . . . That's still your wife.<br>. . .<br>AJ: . . . She didn't know I was (gone) . . .<br>Chico: . . .Hey, Rollie's does things that I'm sure my sisters knows (laughing/talking together)<br>AJ: You know what I'm saying is . . . (Laughing in background).<br>AJ: But what I'm saying is at that time I had just gotten married, you know, you k now, at that time when you do something like that, most of the time it'll spook your spouse, (inaudible) they'll probably be like I wanna get out of this, I ain't gone say nothing but I just wanna get out of this.<br>Chico: Could she have, (nobody has) no relatives no cousins or nothing?<br>. . .<br>AJ: . . . You don't brag about stuff (inaudible).<br>Chico: Oh yeah about certain things you can, you know.<br>AJ: But I don't care, (inaudible) |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 34-35:**<br>P1: Do your wife know you had a gun?<br>AJ: Yeah she know I had a gun.  And she know (inaudible) . . .<br>     . . . (Inaudible).<br>P1: She knows you got rid of it?<br>AJ: Yeah, she know I got rid of it.<br>     (Inaudible)<br>AJ: I didn't want to have nothing else to do with it.  I mean it wasn't doing me no good.<br>P1: Did you sell it, she thinks (you sell it?)<br>AJ: No. Actually they broke into the car, and (she), *then* thought it was it was stolen out of there cause she had the car, and I told her I had a gun in there. |

| 12/13: Gwen & BSO (Det. Bole & Maj. Fantigrassi) (unrecorded) | **BSO 99-page Report at 74-75:**<br>"In addition to talking in his sleep about Deputy Montgomery, Mrs. Johnson stated A.J. also spoke in his sleep about, what she perceived to be, the night of the Behan homicide. She described how A.J. appeared to be 'narrating' his actions that night saying things such as: 'I am walking,' 'I kneel down to ask the officer a question' 'I shoot the officer,' 'I am running.' She went on to state the sleep talking usually began with A.J. repeating the words, 'Wrong guy,' 'Wrong guy.' When asked if she ever attempted to verbally communicate with A.J. during his sleep talking, she stated she had tried. However, she was not able to obtain any definitive answers from him. When she specifically asked him whether or not he killed a cop, he replied, 'Don't ask me anything crazy.' Apparently, he was aware of his sleep talking and ordered her not to talk to him during such occurrences."<br><br>**BSO 99-page Report at 75-76:**<br>"When specifically asked about whether or not she accompanied A.J. to dispose of the gun on the night of the murder she described the following incident: She recalled a night when A.J. came home very late and woke her up and telling her he just killed someone. He requested she accompany him to dispose of a gun. She remembered he was wearing military type clothing and had applied face paint around his eyes. He was wearing a 'skully' type of headgear. Apparently, A.J. had already 'broken' the gun apart prior to Mrs. Johnson accompanying him. The gun was thrown in a field somewhere in Dade County not far from where they were living at the time. The car A.J. was driving was a Ford Probe she described as being 'airplane blue' in color." |
| 1/31/02: Gwen & BSO (Det. Bole) (unrecorded) | **BSO 99-page Report at 81:**<br>"During this interview she admitted that A.J. had directly confronted her (not in his sleep) about shooting the wrong officer. He swore her to secrecy and threatened her life if she ever told anyone." |
| 3/13/02: Gwen & BSO (Det. Bole & Maj. Fantigrassi) (Recantation) | **P. 21:**<br>Q: Alright. Let, let me ask you this. When, did you first become aware, that a deputy sheriff had been murdered . . .<br>A: . . . Ummm.<br>Q: . . . during that period of time?<br>A: I think I went to, I think I went to somewhere and I saw a picture, somebody, they had a poster up in a office somewhere.<br>**P. 24-27:**<br>Q: . . . Now, during that same period of time that we're talking about now, from the time that he's fired until the time he goes into the military. Are you aware that AJ's aware that a police officer had been killed? Or a deputy more specifically had been killed?<br>A: I don't remember.<br>Q: Does he express to you, at all during that time frame that he's got, knowledge about a police officer being killed? |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | A: No.<br>Q: Do you know the name of the officer that was actually killed?  The deputy.<br>A: Now I know.<br>Q: Did you know then?<br>A: No I didn't.<br>Q: Now, regarding the killing of the police officer, when are you first aware that AJ knows about it?<br>A: (Inaudible).<br>Q: When does AJ first tell, tell you, that he's responsible for killing a deputy?<br>A: He never told me that.<br>Q: What did he share with you that led you to believe, that he killed a deputy?<br>A: I don't remember.<br>Q: You don't remember?<br>A: Uh uh.<br>Q: Alright, Gwen, I want you to look at me.  We have a number of undercover surveillance tapes, where you're captured either by video, or audio, talking about your knowledge, concerning AJ's role, in this murder.  Specifically in the murder of a deputy. And your memory during those undercover operations (inaudible), is a lot clearer than it is today, and ah, those tapes are a series of tapes that have been conducted recently over probably less than the last ah year or so.  Now, I would like for you, you're gonna have to explain to me why it is that you had such a clear, understanding during those tapes of what AJ's role was, in this murder as, oppose to what you're gonna have to explain to me why it is that you had such a clear, understanding during those tapes of what AJ's role was, in this murder as oppose to what you're saying to me today.  (Talking together) So let me, let me ask you this, and I don't mean to interrupt.<br>A: Uh huh.<br>Q: But let me ask you why would you say, that you had specific knowledge that AJ was involved in the murder of a deputy?<br>A: Why?<br>Q: Yeah why?<br>A: Oh, first of all, I was trying to write a book, and AJ was like I say he, he when he goes to sleep, he talks in his sleep, and he called out Montgomery name, a lot in his sleep, that was true he he, called out his name a lot, and uhm.<br>Q: Take your hands away from your mouth.<br>A: And ah, you asked me if told me that, he never told me that he killed a deputy, he never told me that, or a sheriff's officer, he never said that, so he never said that to me, that's why I'm saying to you he never said it to me.<br>Q: But you've told others that you has?<br>A: But he hasn't.  He never, under oath, he never told me that he kilt a ah officer, he never told me that.  He never, told me that he killed the officer.<br>Q: Well why would you, tell somebody, that he had?  And provide specific details?  And where would you have gotten those details, to provide to the person that you shared the information with Gwen?  You need to explain that.<br>A: I don't know but it didn't come from AJ.  AJ didn't tell me that. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: Then where did it come from?  It had to come from someplace Gwen.  You had information that you shared, it's in, it's on tape, it's in a number of undercover operations, where you're providing information that that, supposedly AJ shared with you now if it didn't come from AJ where'd it come from?<br>A: Didn't from him.<br>Q: Then where did it come from?<br>A: I think most of it was just made up.<br>**P. 27-30:**<br>Q: And, what did you say to China?<br>A: I don't really remember I just told him that.<br>Q: It's important that you remember Gwen.<br>A: I told him that ah, that AJ killed that, that, that deputy in (inaudible) I thank that's what I told him he killed the deputy.<br>Q: Well, there's, there's a lot of things that you coulda said, to China, bad about AJ.  Why do you choose to tell him about a deputy?<br>A: I don't know.<br>. . .<br>Q: Did you lead China to believe that the deputy he killed was Montgomery?<br>A: I don't think so.<br>Q: Uh huh.  Well what did you lead China to believe?<br>A: I don't remember.  I don't remember but, it was you know, it was a made up story, that I made up.  To make AJ look bad.<br>Q: What specifically did you make up?  (But) I, I gotta understand this now.<br>A: I made, I made it up you know.  I knew that he was upset with Montgomery and so, I just made (inaudible), made the story up.<br>Q: Do you recall telling China that ah, he had done this at a seven eleven?  Leading China to believe that it was a convenient store?  Do you remember telling him that?<br>A: I don't remember telling him that.<br>Q: You're captured on video telling him that.  Audio.  You don't have a recollection of saying that to China?<br>A: No but I might have said it.  But I don't remember saying it.<br>Q: Do you recall telling China that he killed a deputy but it was the wrong one.  Do you remember saying that Gwen?<br>A: Yeah I remember saying that.<br>Q: And why would you say that?  And how would you know that?<br>A: How would I know that?  From, from the ah, from the TV and the news and stuff like that I guess.  I don't know.<br>Q: Well I don't want you to guess I want you to know.<br>A: I can't remember.  I can't remember, ah (inaudible), I can't remember where it came from or what, where it came but, but, I know that I made it up.<br>**P. 31:**<br>Q: Okay.  Your testimony here today and what you're telling me, is that, everything you conveyed, to China and anyone else, concerning AJ's role in killing a deputy is not true?<br>A: It's not true. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: Is that what you're saying?<br>A: It's not true. It's made up stuff.<br>. . .<br>Q: That, AJ had come home one night, and then told you he just killed somebody. You also expressed to us that it was a police officer. He had come home and he had killed a police officer. And.<br>A: I never said that. I never said that he had came home and said he killed a police officer. I never said that to you all, I never said that, I never said that. I told y'all that I said he came home, he came home and said he had killed somebody, but that wasn't the only time he came home and said he had kilt somebody. He always used to say I kil, I just kilt somebody! (Inaudible).<br>**P. 38:**<br>Q: Okay. You also, told us, you you've mentioned this already but I want to cover it again a lil more thoroughly you also mentioned, that he was a sleep talker. . .<br>A: . . . (I did).<br>Q: . . . and that he had talked specifically how he ah killed the wrong person and how he had snuck up on the car, and ah you you, the way you described it you said that he would say this over and over again I'm sneaking up on the wrong guy or I'm, I'm coming up on the car, I'm shooting it's the wrong guy it's the wrong guy, and you you, and you told us in previous interviews that ah, he did this, several times a month. Explain that to me.<br>A: That was all made up. He never said, he never had no dreams said that, not the wrong guy none of that stuff.<br>**P. 40:**<br>Q: Do you know for sure, if, your husband.<br>A: Uh huh.<br>Q: AJ Johnson, do you know for sure, if he killed, ever killed a police officer?<br>A: To my knowledge I know nothing about that. About him killing a officer I know nothing about that.<br>**P. 41:**<br>Q: Uh huh. Is there anything that's he's shared with you? Is there any actions that you've observed, at all, Gwen, that would suggest to you, he was involved in the murder of a deputy? Any deputy.<br>A: No. Nothing that I saw.<br>**P. 41-42:**<br>Q: Do you believe he killed, that police officer?<br>A: No I don't.<br>Q: Do you believe he's killed anybody?<br>A: No. I don't believe he killed nobody.<br>Q: Has there ever been anything said to (you) by him or, or anything you've observed that would lead you to believe that he's killed anybody at all? Beyond a police officer?<br>A: No.<br>**P. 45-49:**<br>Q: AJ says, he involved in the killing of a police officer. You say he's involved in a killing of a police officer.<br>A: Uh huh. |

| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: AJ tells us it was a ah convenient store.  You tell us it was a 7 11.<br>A: Uh huh.<br>Q: AJ says, he killed the guy that made the complaint against him.<br>A: Uh huh.<br>Q: You say, he killed the guy that made the complaint against him.  He tells us undercover, that he took the gun and he broke it apart and he threw it all different places.<br>A: Uh huh.<br>Q: You tell the undercover people, you broke up the gun, and he threw in all different places.  You!  Show somebody, where that gun is thrown.  AJ shows somebody where that gun is thrown.<br>A: Uh huh.<br>Q: I'm here to tell you the two places are not far apart, okay?  Now forget Tony . . .<br>A: . . . Uh huh.<br>Q: . . . forget me, forget the gentleman from the State Attorney's Officer Mr. Gardner. . .<br>A: . . . (Inaudible).<br>Q: There's people out there they're gonna say wait a second.  You got the husband telling the cops undercover, all these things, you've got you telling people undercover these things.<br>A: Uh huh.<br>these things.<br>A: Uh huh.<br>Q: Somehow or another these two had to get their story together, so you just gotta . . .<br>A: . . . (Well no) . . .<br>Q: . . . Take a deep breath . . .<br>A: . . . This.<br>Q: . . . and explain it<br>A: No, this is what happened I believe, I was writing a book, and like I told you, I believed AJ read the stuff I was writing, he read the, book or whatever, and that's where he coulda gotten this stuff from.  Cause he probably read my book. Which I couldn't find, I, computer was broke down, the uhm, tapes and stuff was lost (laugh), so evidently he musta gotten that from my book.<br>Q: But you gotta understand something also.<br>A: Uh huh.<br>Q: A police officer was killed.<br>A. Uh huh.<br>Q: He was killed in a convenient store.<br>A: Uh huh.<br>Q: He was sitting in his car, and somebody did sneak up on him and kill him and that, that, this is a fact that.<br>A: Right.<br>Q: Right?<br>A: Right, uh huh. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: Now, is that what your book was about?<br>A: Yeah! My book was about the, the, book, the book was about (suspense), it was a (pense) murder, it was you know, and the end of it which, he didn't give me a chance to finish writing it, the end of it was gonna be, about him.<br>Q: About who?<br>A: AJ. See and him didn't give me a chance to finish with all the stuff that I was doing.<br>Q: Okay.<br>A: But that's where he coulda gotten this information from (tapping noise), that. You know that's the only thing I can think cause I was writing a book you know.<br>Q: Do you understand where I'm going though?<br>A: I, understand what you're saying but, evidently he musta (tapping noise) read the same stuff (tapping noise) and took that and ran with it, that's all I can think.<br>Q: Do you have a copy that we, obviously we would need to . . .<br>A: . . . I<br>Q: . . . get a copy of that. . .<br>A: . . . I know.<br>Q: . . . (talking together) tapes or something.<br>A: I don't have nothing. I don't know what happened to it. He said the computer, you know.<br>Q: Now you know that whoever listens to you or watches you or . . .<br>A: . . . Uh huh.<br>Q: . . . wahtever is gonna say that is one, heck of a coincidence.<br>A: (Uh huh).<br>Q: Am I right?<br>A: I know but what can I do!<br>Q: The fact that the husband . . .<br>A: . . . I have to tell the truth.<br>Q: . . . and the wife, even take the police.<br>A: Uh huh.<br>Q: Through undercover operations.<br>A: Uh huh.<br>Q: To the exact same of all of south Florida, of all of Dade County, okay. We're a few blocks away where this gun.<br>A: Uh huh.<br>Q: Was not thrown, but parts of the gun were thrown. We both agreed the gun was used, we both, you and him both say it was broken down and then you both take us to one exact spot.<br>A: That's strange.<br>Q: And I mean it it, it sounds like you two got your stories straight.<br>A: He read it. He had to read it! I wrote and, I, typed it up and stuff, he musta read it, then that let's me know, that he read the stuff (inaudible). That's all. But you know for him, to talk to me, he didn't talk to me about it or nothing you know he didn't, admit to nothing or nothing you know. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: . . . whatever is gonna say that is one, heck of a coincidence.<br>A: (Uh huh).<br>Q: Am I right?<br>A: I know but what can I do!<br>Q: The fact that the husband . . .<br>A: . . . I have to tell the truth.<br>Q: . . . and the wife, even take the police.<br>A: Uh huh.<br>Q: Through undercover operations.<br>A: Uh huh.<br>Q: To the exact same of all of south Florida, of all of Dade County, okay. We're a few blocks away where this gun.<br>A: Uh huh.<br>Q: Was not thrown, but parts of the gun were thrown. We both agreed the gun was used, we both, you and him both say it was broken down and then you both take us to one exact spot.<br>A: That's strange.<br>Q: And I mean it it, it sounds like you two got your stories straight.<br>A: He read it. He had to read it! I wrote and, I, typed it up and stuff, he musta read it, then that let's me know, that he read the stuff (inaudible). That's all. But you know for him, to talk to me, he didn't talk to me about it or nothing you know he didn't, admit to nothing or nothing you know. |

| | Has AJ threatened to kill Gwen? Is she afraid he'll kill her? |
|---|---|
| 5/3: Gwen & China (CI) | **P. 7:**<br>Gwen: I told you, anything happen to me, car accident, whatever . . .<br>CI: Uh huh<br>Gwen: . . . that nigga killed, he too slick, he killed me. |
| 5/31 Gwen & China (CI) | **P. 6:**<br>Gwen: What kinda letter I need to leave?<br>CI: A letter in case somethin' happened . . .<br>**P. 25:**<br>Gwen: He know I can turn him in, he know . . .<br>CI: . . . Well that's what I'm saying!<br>Gwen: He know I know.<br>CI; You can't turn him in with no bullets in your butt.<br>**P. 16:**<br>CI: . . . Why can't we, why can't we just back him off with with with with, with, with the truth?  Flash it in (the) face say, we'll turn your butt in if you try something.  Then he may go (inaudible) and just leave.<br>Gwen: Uh uh.  He ain't gone do that.<br>CI: What he'll do?<br>Gwen: Try to get one of us.<br>CI: He'll try to what?<br>Gwen: Try to kill us.<br>**P. 36:**<br>Gwen: Don't trust that don't ride with him.  Because he ain't been round your house right?<br>CI: Uh uh.<br>Gwen: Riding off with you no where right?<br>CI: Nah.<br>Gwen: Okay.  So I wouldn't even trust that.  I don't trust, don't trust him.  Don't trust him.<br>CI: (Inaudible).<br>Gwen: See the way he get rid of me he gotta get rid of me, (inaudible) . . .<br>CI: . . . Accidentally?  An accident?<br>Gwen: Yeah, see he can't just kill me like that.  He has got to, slowly poison me, you know he got to do something' like that he can't just kill me cause they gone know he did it.  So he got to, do it a slick way. |

ATTACHMENT / EXHIBIT B-35

| | |
|---|---|
| 5/31: Gwen & China (CI) | **P. 50-51:**<br>Gwen: Don't worry about it.  And I told him before too.  I say anything happened to me, I got everything written down, my whole life.<br>CI: So what he said bout that?<br>Gwen: He talkin bout yeah, you did that?  Talkin bout who got that?  And I said. . .<br>CI: . . . Who got, see that, wee that who got that?<br>Gwen: I say it's sealed up and put away.  I say cause I I never know what may happened, so I got everythang my life, talking bout me too?  I say yeah bout you I had to, had to put everythang in there.  He talking bout ah man . . .<br>CI: . . . That was smart.<br>Gwen: . . . he talking bout . . .<br>CI: . . . he ain't know you was that smart.<br>Gwen: He talking bout ah man, why you did something like that?  I say I never know.  Anythang might happened.  I never know.<br>CI: And he ain't . . .<br>Gwen: . . . he say but you not, you not putting all that stuff in the book are you?  I say no I'm not putting it in the book, but I had to do that, I had to, ***what you sitting there looking at?***, and boy he was sitting (inaudible), man if I was bout to kill ha I betta do it.<br>**P. 54:**<br>Gwen: I have a last will and testament I have an addendum, to it. . .<br>CI: . . . I can go (both talking) I can go right to the ah (inaudible) and get me and last will and testament, and put it right there.<br>Gwen: I'll put you one together.  You want me to put it together for (ya)?<br>**P. 55:**<br>CI: . . . I'm, I'm serious cause I ain't fina be hanging without nothin' to fall back on.  Okay, I do that and than ah I want the letter, with the goods on him attached to mine.  That's right we'll do that next week.  Done deal?  Um for real . . . |
| 9/27: Gwen & China | **P. 30:**<br>Gwen: I know one than if he kill me.<br>CI: All us'll be at him.<br>Gwen: He betta go where ever he gotta go he betta go far away from here.  I told him if I come up missing, it's him.<br>**P. 46:**<br>Gwen: . . . how they gave (talking together) this money, that one money, helped people when they get put they house they stayed with Dot.  All kind, you how people in there now.<br>CI: You gone put that in your book you gone do?<br>Gwen: Yeah!<br>CI: Every now and then you'll tighten up somethin' a page or somethin'?  That's good.<br>Gwen: I got all that.  The book I'm a really do, the one that I got for Dot on Dot life, I can't put that out till Dot die.  When Dot die then I'll put that out.  But ah (inaudible), but mine, when I put my book out, I can't be AJ no mo'. |

| | |
|---|---|
| 9/27: Gwen & China (continued) | CI: Why?<br>Gwen: I can't be with him!  Cause he gone read the book.<br>CI: So!  That means you making money.<br>Gwen: But he gone know it's about him.<br>CI: That nigga, man.  (Inaudible) you really thank, (inaudible) man I don't know bout that man.  He . . .<br>Gwen: . . . AJ gone know that book is about him.<br>**P. 71-72:**<br>Gwen: I don't thank he'll kill you.  He'll kill me first!<br>CI: (Laughing) You want your soda?<br>Gwen: Yeah.  He'll kill me first fore he kill you.<br>CI: I'm tellin' ya.<br>Gwen: Cause he'll feel like, you know it's all me. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen); Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 63-65:**<br>Chico: If the old lady don't know.  The old lady don't listen if the old lady knows I don't care. . .<br>AJ: . . . She woulda been gone.<br>Chico: Huh?<br>AJ: She woulda been gone. |
| 1/31/02: Gwen & BSO (Det. Bole) (unrecorded) | **BSO 99-page Report at 81:**<br>"[S]he admitted that A.J. had directly confronted her (not in his sleep) about shooting the wrong officer.  He swore her to secrecy and threatened her life if she ever told anyone." |
| 3/13/02: Gwen & BSO (Det. Bole & Maj. Fantigrassi) (Recantation) | **P. 43-44:**<br>Q: So let, let's clear up one thing ah, I tried to call you several times last week to set up an interview.<br>A: Right.<br>Q: Do you remember that?<br>A: Right.<br>Q: And what was the reason that we couldn't make that last week?<br>A: I was sick.<br>Q: You were very sick.<br>A: Uh huh.<br>**P. 41:**<br>Q: Have you had conversations with ah, your husband AJ since ah, this investigation became public?<br>A: Yes I did.<br>Q: What has, what has he shared with you?  Or what have you shared with him?<br>A: I haven't really shared anything with him, but he, he told me Gwen just tell the truth.  Just simple as that, tell the truth. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: Uh huh.<br>A: And that's it.<br>Q: He asked you to simple tell the truth?  Knowing AJ as you do.<br>A: Uh huh.<br>**P. 61:**<br>Q: . . . [Y]ou were captured making some very specific statements as to the fact that you had a letter of insurance, that in case something happened to you, that ah everybody would know it was AJ and ah, you remember that day?<br>A: I remember that day. . .<br>Q: . . . (Do you) . . .<br>A: . . . but I don't have no letter.<br>Q: But do you remember making those statements?<br>A: I remember a lil but, I don't have no letter. . .<br>Q: . . . People are gonna look at those statements, and say here's a wife is deathly afraid of her husband that, that, that she ah, she knew he was a killer and she made a letter of insurance just in case something happened to her.<br>A: I don't have no letter.  I never made a letter and I don't have a letter.  I never, made a letter and I don't have a letter.<br>**p. 62:**<br>Q: Were you ever in fear of your own personal life from your husband?<br>A: Ah, not really.  Not really.  He never laid a hand on me he never hit me, he just did thangs to me mentally. |

| | **Does AJ talk in his sleep?  If so, what has he said in his sleep about killing the deputy?** |
|---|---|
| 9/27: Gwen & China (CI) | **P. 50:**<br>CI: He musta fina do somethin'.<br>Gwen: I was fina say AJ probably fina do somethin'.<br>CI: Yeah and see what's a name ain't tellin' (inaudible) cause cause see cause Chi Chi Chico called me out the blue.<br>Gwen: Let me tell ya somethin' AJ sl, AJ talk in his sleep, so if somethin' fina jump down, I'll ask him in his sleep.  I'll ask him, he'll tell me in his sleep, when he sleep he'll tell me I'll ask him. |
| 12/13: Gwen & BSO (Det. Bole & Maj. Fantigrassi) (unrecorded) | **BSO 99-page Report at 74-75:**<br>"In addition to talking in his sleep about Deputy Montgomery, Mrs. Johnson stated A.J. also spoke in his sleep about, what she perceived to be, the night of the Behan homicide. She described how A.J. appeared to be 'narrating' his actions that night saying things such as: 'I am walking,' 'I kneel down to ask the officer a question' 'I shoot the officer,' 'I am running.'  She went on to state the sleep talking usually began with A.J. repeating the words, 'Wrong guy,' 'Wrong guy.'  When asked if she ever attempted to verbally communicate with A.J. during his sleep talking, she stated she had tried.  However, she was not able to obtain any definitive answers from him.  When she specifically asked him whether or not he killed a cop, he replied, 'Don't ask me anything crazy.'  Apparently, he was aware of his sleep talking and ordered her not to talk to him during such occurences."<br><br>**BSO 99-page Report at 75:**<br>"Other than the night of the officer's murder, Mrs. Johnson stated sometimes A.J. spoke in his sleep about killing a man by breaking his neck from the back seat of a vehicle.  At the time of this dream he spoke of wearing fatigues.  He also spoke of killing a person with a knife in a field.  It was due to these self-described 'crazy stories' that she was not completely convinced whether or not A.J. had actually killed the officer."<br><br>**BSO 99-page Report at 76:**<br>"Mrs. Johnson also stated she believed the sleep talking incidents began approximately two (2) years after the Behan homicide."<br><br>**BSO 99-page Report at 77:**<br>"At the conclusion of the interview she agreed to try to assist investigators in determining whether or ont A.J. was involved in the Behan homicide.  She stated she would attempt to convince him to move back home and would record his sleep talking. She further agreed to allow a hidden recording device to be installed in her bedroom." |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Maj.<br>Fantigrassi)<br>(Recantation) | **P. 38-40:**<br>Q: Okay.  You also, told us, you you've mentioned this already but I want to cover it again a lil more thoroughly you also mentioned, that he was a sleep talker. . .<br>A: . . . (I did).<br>Q: . . . and that he had talked specifically how he ah killed the wrong person and how he had snuck up on the car, and ah you you, the way you described it you said that he would say this over and over again I'm sneaking up on the wrong guy or I'm, I'm coming up on the car, I'm shooting it's the wrong guy it's the wrong guy, and you you, and you told us in previous interviews that ah, he did this, several times a month.  Explain that to me.<br>A: That was all made up.  He never said, he never had no dreams said that, not the wrong guy none of that stuff.<br>Q: Why would you made that up?  Gwen.<br>A: Again?<br>Q: Yes again.<br>A: I made that up to try to, really crucify him really, I wanted to really just, I was doing, anything that I could think that would hurt, that's why I was, I made all that stuff up.  I made it up.<br>Q: What was true that you shared with us?<br>A: That uhm, what was true is that, he would talk in his sleep but he didn't talk about none of that he just talked about, women that he been with and stuff and I would ask him about women and stuff.  That's it.<br>Q: Uh huh.<br>A: That's the only true part of that.  I would only use that to my advantage to find out what he was going, that's it.<br>Q: So he would talk in his sleep about other women?  Is that what you're telling (us)?<br>A: Yes.<br>Q: Alright beyond that, would he talk in his sleep about ah why he was fired from BSO?<br>A: No he didn't.<br>Q: Did he ever talk in his sleep concerning ah an individual name Montgomery?<br>A: He yelled out Montgomery one time in his sleep.<br>Q: One time?  That's it?<br>A: One time in his sleep that I remember that I recall he yelled out Montgomery in his sleep, and that was it.  (Inaudible) . . .<br>Q: . . . When was that?<br>A: Umm, but it's been a good while it's been like oh, maybe years, and years maybe, I don't know, bout six years, seven years ago or something like that it's been a while I can't pin point when it was but I do remember him, yelling out Montgomery's name.<br>Q: Uh huh.<br>A: In his sleep. So after I, after I know that he talks in his sleep, then that's when I made up the stuff about him. |

| | **Did Johnson ever commit/was he ever accused of other violent conduct?** |
|---|---|
| 5/31: Gwen & China (CI) | **P. 39-40**:<br>Gwen: He gone hit you, the last guy, that he hit, he knocked all his teeth a loose and every thang, he got, ooh man he got in trouble for that.  They had to wire that guy's mouth ah man he got in trouble for that.<br>CI: What guy?<br>Gwen: A guy, that he did that to.<br>CI: When at a club?<br>Gwen: When he was in the military.<br>CI: Oh so now he a marksman with his hand he.<br>Gwen: If he do it again, they say he gone have to register, his hands.<br>CI: Yeah?<br>Gwen: I'm tryin' to tell ya!  You don't believe me.<br>CI: I believe you now.  Se you ain't tell me bout that.<br>Gwen: He knocked that guy teeth out . . .<br>CI: . . . And then you tell me I'm I'm worrying.<br>Gwen: He. . .<br>CI: . . .Looka me.<br>Gwen: He knocked that guy teeth, all a loose and all that they had to wire his mouth (inaudible) he got in trouble fore that.  He almost got put out. |
| 8/16: AJ, China (CI), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 20-21**:<br>L/M: Ah, AJ that's when the ah, when the thing you were talking about the ah about the high rise thing.  The Russian.<br>AJ: Yeah.<br>L/M: The Russian girl.<br>AJ: Yeah.<br>L/M: With the rape shit.<br>AJ: That's that's why I got out of it.<br>L/M: But that's when you had the sixty six?<br>AJ: Nah I got rid of it.<br>L/M.  Before the sixty six?<br>AJ: (Inaudible)<br>L/M: But don't you need the sixty six to work in the . . .<br>AJ: . . . No.<br>L/M: . . . freakin' high rise?<br>AJ: When you work in the (inaudible) they give you the weapon.  They lil thirty eight (inaudible). |

ATTACHMENT / EXHIBIT B-27

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 71:**<br>AJ: . . . In fact when I got arrested.<br>Chico: For what for that?<br>AJ: Remember. . .<br>Chico: . . . Yeah.  (Inaudible).<br>AJ: That false, uhm, some chick wanted to make a lawsuit on (our) apartment complex, so she just said a black guy raped her.  And because I was in the area (talking to/inaudible) you know that I knew, (inaudible) the area, she, (inaudible) that, that gotta be the guy and she's from Russia so she (inaudible) yeah yeah whatever.  Cause she was trying to sue 'em cause she had already had a lawsuit set up before she even filed the complaint.<br>Rollie: When was this?<br>AJ: This was in ninety, four, ninety five.<br>Rollie: And you aint got no problems with that no more?<br>AJ: In fact, the time when, (phone ringing in background) a week after OJ went to jail OJ Simpson. . .OJ went to jail on Tuesday . . . OJ was released on a Tuesday at 10:00 in the morning. . .That following . . .AJ was released on a Tuesday at 2:00 so. . . . I just telling ya I don't know what it is my link with him. . . |
| 10/4 (Car): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Agt. Curry) | **P. 19-20:**<br>P1: (Speaking Spanish).  Those two people up the road, they're they're ***cased*** up on the house man.<br>***Agent***: Tough luck.<br>AJ: ***But ah, it wasn't back then it*** wasn't ***now could get the death*** (inaudible) they get out after twenty (years), (inaudible) ten years (inaudible).<br>P1: What the dudes I don't know, well I don't know what . . . ***the dudes***<br>AJ: . . . (Inaudible)<br>P1: . . . they got.<br>AJ: ***I wonder what they confessed to. I know*** what they did (inaudible) they tried the same thing with me ***with that rape***.<br>P1: For what for that thing with the (Russian) girl?<br>AJ: Yeah.  ***I look at them like*** they out they freakin mind.<br>***S/M***: They tried to make you confess?<br>AJ: I ain't confessing to nothing, I didn't do nothing.  Yeah we know you did it.  Yeah Okay.  She pointed you right out.  Yeah I know, thank you (inaudible).<br>P1: You went to trial on that huh?<br>AJ: Yeah.  (Inaudible) not guilty not guilty not guilty not guilty.<br>***P1: They had nothing***.<br>AJ: Five counts.  They had nothing, that's why they offered me time ***served*** two years probation. . . . |

| | |
|---|---|
| 2/8/02: AJ & BSO ("Job Interview"/ Polygraph) | **P. 29-30:**<br>Poly: Where you busted at all?<br>AJ: Yes.<br>Poly: For what?<br>AJ: Um... breaking the jaw of another man, breaking both jaws of another man (ui) I was (ui) in 4 months.<br>Poly: Oh, what happened?<br>AJ: He tried to assault me (ui) in uh... (ui) up there (ui) when we were (ui) in front of my entire unit and I was...<br>Poly: He tried to what?<br>AJ: ...assault me.<br>Poly: (ui)<br>AJ: (ui) body came at me personally he tried to assault me physically. And Marine Corps (ui) never man another man hit you, never let another man hit you! That's our rule, that's our motto.<br>Poly: Where you... a good size guy then...<br>AJ: No.<br>Poly: ...at that time?<br>AJ: I was only 190 pounds, actually 100, 185.<br>Poly: So if he tried to assault you and, and you punched him out and you are the winner and he is the looser...<br>AJ: He was totally off guard and...<br>Poly: Why did (ui)...<br>AJ: ...(UI)...<br>Poly: ...why did you get busted?<br>AJ: Um... for the simple reason, because Marines have to answer to the Navy for any medical approval we do...<br>AJ: Um... they had to use six... four feet of wire and they have to account for that wire.<br>Poly: You mean to...<br>AJ: ...to wire him...<br>Poly: ...fix himself?<br>AJ: ...to wire him back. |

| | **Who was the Deputy that was shot, Behan or Montgomery?  Did Johnson shoot him?** |
|---|---|
| 4/25: Gwen & China (CI) | **P. 1-2:**<br>CI: Yea tell me about that – what about that man, the one that cost him his job?<br>Gwen: What – which one?<br>CI: The one that cost him his job, he had to, he had to walk **up on at 7-11.**<br>Gwen: Which one?<br>CI: He said 7-11 or something.<br>Gwen: Oh yeah, that's the one he killed, that was a officer, he killed that **police officer.**<br>CI: Yeah, at a 7-11.<br>Gwen: Yeah he was sittin in his car, you **don't** remember that.<br>CI: No.<br>Gwen: Yea, officer was sittin in his car, 7-11, blow his head off.<br>CI: Over a job? |
| 5/3: Gwen & China (CI) | **P. 2**<br>Gwen: You wanna solve that one?<br>CI: How you gonna solve a case like that?<br>Gwen (Inaudible/what you gonna do)?<br>CI: (Laugh) That fool might kill both of us.<br>Gwen: I know (laugh)<br>CI: Shoot.<br>Gwen: (Me and you) know who did it.<br>**P. 10-12:**<br>Gwen: I told you that guy didn't do that, I done told you who did it.  I remember that one real good.  When he came back.<br>CI: When he came back?<br>Gwen: After he had already did it, he came back home.<br>CI: He told you?  Or you just figured it out?<br>Gwen: Uh uh, he told me and I know the officer.  I know who it is, I (inaudible).<br>CI: What you (inaudible) for?  You know him personally?<br>Gwen: No I just know him, for what he look, what he looked like. . .<br>. . .<br>CI: Oh, so he must be was at that ah Internal Affairs thing when he cost what's his name that job.<br>Gwen: Umm?<br>CI: AJ his job.  He was, he was a redneck?<br>Gwen: Yep.<br>CI: He was nasty?<br>Gwen: Nasty, nasty, nasty.  They should think about that, and they (can come) up dead. (Both laughing). It coulda been another officer!  Right?<br>CI: Yeah but shoot. . .<br>Gwen: . . . No they always. . . |

ATTACHMENT / EXHIBIT ___

| | |
|---|---|
| 5/3: Gwen & China (CI) (continued) | CI: . . . the way it was done . . .<br>Gwen: . . . wanna think it's civiilan. . .<br>CI: Yeah that's right, and them two dudes probably got a long record.<br>Gwen: Umm huh.<br>CI: And they put it right on them.<br>Gwen: Umm huh.<br>CI: I wonder how they got it to stick.<br>Gwen: I don't know . . . I know they didn't do it, I know who did it. |
| 5/31: Gwen & China (CI) | **P. 25-26:**<br>CI: (Inaudible) what trip me out is how he found out, (inaudible) found out how that uhm, where he was that night?  He followed him?<br>Gwen: He studied him.  He (get) your schedule where you gone be at.<br>CI: Your schedule!  How the *h*ell he gone get a man schedule?<br>Gwen: He used to work! He used to work for the police department, he know, find out where you gone be at, stuff like that.  What area you in.<br>CI: Damn.<br>Gwen: What night you off.<br>CI: Lord **have** mercy.<br>Gwen: He fina get, he fina get that guy on the job.  Another guy.<br>CI: Well we betta pull out fore he, fore he, if he fina get that other guy then we betta pull out.<br>Gwen: He fina get that guy . . . |
| 6/6: Gwen & China (CI) | **P. 11-14:**<br>Gwen: I was sleep.<br>CI: You was sleep.<br>Gwen: And I woke up and he was gone.  So when he came back, and I saw the way he was dressed and (inaudible), oh my G-d this man **killed the cop** and he said uhm, he say I just got through doing a job come help me I gotta go get rid of the gun.  I say doing, you just got through doing what?  Taking care of business.  Come go with me so me and him got in the car and, we start taking the gun a loose, we start throwing it and, I said what happened.  Which I really knew what had happened to tell you the truth.  I already knew he had just, got through offing somebody.  He say I got him, I got that cop, he was sitting in the car.  He said I got him!<br>CI: Oh yeah?<br>Gwen: And then, this the part, the actual guy!  That wrote the report up, he didn't get him.  He got the guy, the actual one that testified, that's who he got.  The one that he shoulda got was the one that wrote, wrote it up and stuff like that, that's who he shoulda got.<br>CI: It was two of 'em?<br>Gwen: (But), yeah but he settled for him.  And then I read in the paper I read the incident, and they say the guy walked away on foot, they had a sketch of a guy with a skully on and all like that.<br>CI: Uh huh. |

| | |
|---|---|
| 6/6: Gwen & China (CI) (continued) | Gwen: That had that. (Inaudible).<br>CI: Well what about the other guy?<br>Gwen: The one that he didn't get?<br>CI: Yeah.<br>Gwen: Oh I don't know.<br>CI: But he the one that did the most damage to AJ didn't he?<br>Gwen: Yep.<br>CI: Well why he oh I guess had, he settled for him huh? (But), damn.<br>Gwen: He was sitting in his car writing his report.  (AJ put) that gun to his head, (bloop/making a noise).<br>CI: What the other one name?<br>Gwen.  I don't know.<br>CI: Oh but these, they was buddies?<br>Gwen: Partners.<br>CI: And they just both got together to, to, to, to make him loose his job?  Just like that?  Shhh.<br>Gwen: Broward County used to be real prejudice during that time.  Nick Navarro was the sheriff.<br>CI: I remember Nick.  (Damn shole' remember Nick).<br>Gwen: Like (he) said if he coulda killed Nick he woulda killed him. |
| 8/2: AJ & China (CI) (Traffic Stop by Det. Sudler) | **P. 14:**<br>AJ: (to Dep. Sudler): [The dude I was talking about] he's a Sergeant now I think in Pompano . . .He's the same one when I first met him and told him I was going to be BSO and he told me you will never make the department."<br>**P. 15:**<br>AJ: (to CI): . . . .somebody hurt him.. . knock him out and put him over by the Ranches while he was talking junk, him and his partner. . . . and then knocked him out.<br>CI: What you mean knock him out.<br>AJ: Knock him out when he's trying to pull over somebody, hit him the head and knocked him out and put the . . . and emptied the gun and put it right there by there dead, by there head.<br>**P. 18:**<br>AJ: One of his [Dep. Sudler's] partner's used to work right here.  District one.<br>CI: Some nigger knocked him off?<br>AJ: No. . . . knocked him off.  Killed him shot him in the head, 357.<br>. . .<br>CI: Cause he was the same kind of redneck like that.<br>AJ: Same kind of redneck like that.<br>**P. 19:**<br>CI: So what about the guy that just ran up the false report and cost you your job?<br>AJ: Now he's a Sergeant in Pompano.  I now who he is.  He's the one that got knocked out.  That's his buddy [Dep. Sudler]. He love him. |

| | |
|---|---|
| 8/2: AJ & China (CI) (Traffic Stop by Det. Sudler) (continued) | **P. 24:**<br>AJ: I walk up on one of them at my video store, the one that was doing me wrong when I was locked up.<br>CI: He didn't even know you.<br>AJ: He didn't know me.  And every time he see me he turn his head and tried to walk the other way.  He don't try to be around cause he know how bad he did me and he know I smoke him, and he know I'm a Marine, and he know I see it one way or the other, but I tell him to, I don't see. . . .I don't care nothing care nothing about you nigger cause you got a badge.  I had a badge, I kill you just the way you stand, and I'll kill you before you can get to your gun.<br>CI: Yea.<br>AJ: I don't need no gun to shoot you.  I'll cut your throat, give you a Colombian necktie.  You ***don't know me***. |
| 8/23: AJ & Chico (Det. Cedeno) | **P. 12:**<br>Unk: You knew him?<br>AJ: Yep.<br>Chico: You did know him!<br>AJ: Used to know him (inaudible)<br>Chico: And what happened?<br>AJ: Alright, I'm a be right up front with cha. . . .<br>**P. 17-18:**<br>AJ: Yeah (bro) and he got me fired.  You know I was hot.<br>. . .<br>Chico: . . . So what happened?<br>AJ: . . . I got pissed off that junk, was up in me, later on I, I went and handled my business.<br>Chico: (Inaudible)<br>AJ: Okay.  Needless to say he won't be getting nobody else fired.<br>Chico: That dude, who was, (inaudible).<br>AJ: No. I didn't like that bro, don't launch no false investigation. . .<br>Chico: . . . So, so how . . .<br>AJ: . . . against me. |
| 8/31: AJ, Chico (Det. Cedeno), and "T" (Det. Curry) | **P. 11:**<br>Chico: And then, what, the dude, this, the the dude that ca, alright go ahead<br>AJ: So, I turn around and I went ahead and (unintelligible)<br>T: Uh huh.<br>AJ: (I put the hammer on him)<br>**P. 12:**<br>AJ: You know that piece I told you I got rid of?<br>T: Yeah.<br>AJ: That was it.<br>Chico: And was it the same.  Was that; Was it the dude that cost you your job bro?<br>AJ: Yeah. |

| 8/31: AJ, Chico (Det. Cedeno), and "T" (Det. Curry) (continued) | **P. 14:**<br>AJ: I put the hammer down on him right there. . . .<br>Chico: . . . Patrol guys from up here?<br>T: Fuckin dude got him fired, man.  Right?<br>AJ: Yeah. |
|---|---|
| 9/27: Gwen & China (CI) | **P. 6:**<br>CI: [recounting to Gwen his conversation with "T"] Yeah.  And he [AJ] said bout some heavy shit I say damn, I say damn you mean I just, if I'd a tol' dem bout, bout that cop thang when he talkin' bout some heavy duty shit.  You know what I'm sayin'?  You thank he, you thank he, won 'em over by over like sayin' he this and that?  And what he'll do?  You never know.<br>Gwen: I don't know he don't *talk* too much *a*bout that cop thang.<br>CI: No?<br>Gwen: Uh uh, He ain't even told you bout that either.<br>CI: *Sure* didn't.<br>Gwen: Uh uh he (ain't) tell nobody bout that I don't thank so.<br>CI: He probably lyin from the beginning you thank he, he probably lyin.  That what I thank.<br>Gwen: He ain't lyin.<br>CI: What?  (That nigga there).<br>Gwen: He ain't lyin.<br>**P. 12-13:**<br>Gwen: Maybe he tol' him but I'll be shocked if.  AJ don't tell nobody that.<br>AJ: He know it ain't true.  He lied (laughing).<br>Gwen: It is true, I know it's true.<br>CI: Oh man here we go again.<br>Gwen: It is true I know it's true.  The nigga woulda never got rid of that gun he love that gun! I know it's true.  He love that gun.<br>**P. 14:**<br>Gwen: . . . Boy looka here.  I don't believe AJ told him that.  I'm telling ya AJ don't tell nobody that.<br>CI: Well you say he love that gun.  I thought. . .<br>Gwen: (Inaudible) and he got rid of that gun.<br>**P. 21-22:**<br>CI:  I wonder what he'll do if run into the re, the real one he wanted to get?  I wonder what he'll do 'den?<br>Gwen: Umm.  Ain't no tellin'.<br>CI: Probably a following him huh?<br>Gwen: Uh huh.  He probably done killed that (other guy).  (Inaudible) *know* bout that.<br>CI: Who?  The other cop?<br>Gwen: No another guy.<br>CI: Another guy?<br>Gwen: Uh huh.  Somebody *else* (inaudible) junk I don't know.  (I try to know) like he told me, Gwen, the less you know the betta.  I say you right, son lets keep it that way. |

| | |
|---|---|
| 9/27: Gwen & China (CI) (continued) | **P. 30:**<br>CI: Boy.  He fell in love with his lil gun huh?  He, he kept talking bout a model 66 a model 66 gun.  He fell in love with it.<br>Gwen: (He had a gun) he was in love with that gun.  He loved that gun!  That's how I know he did it! He just didn't rid of his gun for nothin'.<br>**P. 48:**<br>Gwen: I'm a tell ya you his nigga.  He like you man.   Ain't too many people he like now.  He like you boy.<br>CI: You thank he'll put me on the next cop caper?  (Laughing)<br>Gwen: Yeah he'll put you on a caper.<br>CI: Umm, well **if** you see **that one that done him wrong** boy, he probably wouldn't know how to act.<br>**P. 64:**<br>CI: I feel sorry if he see that other officer (laughing) I feel sorry for him.  He only if he knew man look here.  **G-d** damn. |
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Det. Curry) | **P. 12:**<br>Chico: Uhm, who was that dude?  The the dude that that that got you in the mix?<br>AJ: Uhm . . .<br>Chico: . . . What's the dude's name? (Inaudible)<br>AJ: I can't remember his last name.  (Inaudible/Brian).<br>AJ Some Brian, yeah and (inaudible) and I smoked him.<br>**P. 21:**<br>Agent: You shoot him?<br>AJ: Yep, I did him.<br>**P. 37-41**<br>Chico: Is this, is this the dude *[showing him Sun Sentinel article (7/18/91) re: Behan homicide]* that (inaudible/talking together). . . My paperwork (inaudible/talking together).  My paperwork (inaudible) Library alright? . . . Is that him?<br>AJ: (inaudible) no this is, (inaudible).  Two kids are in jail for this okay.<br>Chico: Oh I know.<br>AJ: (They confessed).<br>T: (Speaking Spanish).<br>Chico: That's what you were telling me.  Is this, is this the . . .<br>AJ: . . . Let me tell you something (inaudible) . . .<br>Chico: . . . That's the first Circle K?<br>AJ: I know what you're thinking.  That's why, that's why . . .<br>Chico: . . . And that's why we're wondering what the hell's. . .<br>AJ: I know what you're saying.  I told you they got somebody for it, I never care.<br>Chico: **To** this the dude?<br>*Rollie: (Inaudible)*<br>*AJ: (Inaudible) (while looking at document)*<br>Chico: Is this the dude? (Pointing to a different spot on the document)<br>AJ: *(Nods "no") No.  I know the guy who gave me a hard time was* Brian *something*. . . . (Inaudible) *(appears to be reading the article)* |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Det. Curry) (continued) | Chico: *that's what* . . . (Inaudible) . . . *Si pero tu no tiene algo a y que dice ("Yes, but do you have anything there that says . . .")*<br>*Rollie: (Interrupting and in forceful voice – Me acaba decir, me acaba decir que es* "Brian" okay. *("He just finished telling me it's Brian, okay")*<br>Chico: . . . I know I know.<br>*Rollie: Y este no se llama* "Brian." *("And this one's name is not 'Brian'")*.<br>Chico: *Abre' me aqui pa ver ahi lo que' tiene ahi.  ("Open this for me to see, see what you have here.") (He hands Rollie a valise).*<br>*AJ: (Inaudible).*<br>*T: (Inaudible) – You said* "Brian."<br>*(Rollie opens the valise)*<br>*AJ: I think it's* "Brian."<br>*T*: It's not "Brian."<br>T: (Speaking Spanish).  He says Brian.<br>AJ: (Inaudible) Brian.  It's not Brian.<br>(Talking together/speaking Spanish).<br>AJ: (Inaudible) Behan (that's the guy).<br>Chico: Circle K?<br>AJ: (It look like the guy.<br>Chico: 1990 . . . .<br>. . . (Talking together/inaudible).<br>Rollie: Is that him?<br>AJ: The guy . . .<br>Chico: *Que dice ("What's it say?") (Points to new document just produced)*. Ninety one?<br>AJ: I remember his name (would have been) Brian so I . . .<br>Chico: (Talking together/inaudible).<br>AJ: I know that *this the guy I did.  I kn ow that for a fact! (Holding up the picture).*<br>Rollie: . . . This *is* the guy *he* shot?<br>AJ: But I didn't know the guy was name Behan, I thought it was Brian.  That's what I, that's all I remember but I know this the guy.  And this is what was done (inaudible).<br>Chico: (Speaking Spanish).<br>Rollie: *That's a better shot.*<br>AJ: That's him.<br>T: (Speaking Spanish) complaint (inaudible) no?<br>Chico: Right right right.<br>T: (Speaking Spanish).<br>T: Is this the dude that, that did the complaint?<br>AJ: Yeah.  (Inaudible). . . .<br>Rollie: . . . (Inaudible) when you say this guy made a complaint against you, and got you fired right, and you don't know his name?<br>Chico: (Speaking Spanish).<br>AJ: (Inaudible) I don't try to remember everybody's name. |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Det. Curry) (continued) | Rollie: Isn't that kind of important name?<br>AJ: Yeah (it is an) important name, (inaudible) I thought it was Brian (inaudible) I know what I mean (inaudible) . . .<br>Rollie: . . . But you got the right guy?<br>AJ: So I know (talking together). . .<br>Rollie: . . . You got the right, this is the right guy?<br>Chico: (Inaudible) but there's dudes serving time for this bro?  He's gonna get ah, (inaudible)<br>*Rollie*: Eleven years.<br>AJ: (Inaudible) . . .<br>Chico: (Talking together) . . .<br>AJ: . . . (inaudible) make 'em confess, when they start beating you in the cell, you're say anything to keep 'em from beating you. Especially kids.  I worked in Corrections I've seen 'em do it.  I've seen 'em come in beat people half to death.  And make 'em say anything.  So that's how I know.<br>**P. 45-49:**<br>AJ: . . . But I did what I did and I knew and I saw that person.  (And), and I knew what I saw.<br>Chico: Could, could it have been the wrong dude bro that you got?<br>AJ: (Inaudible/talking together). . . ***This the guy I did (pointing to newspaper article)***.<br>Chico: Okay could this, could this Brian dude be somebody else in this is, I under***stand***, AJ.<br>AJ: (Inaudible/talking together) I know what you saying.  I know what you're saying. . .<br>Chico: . . . I'm I'm you just you know don't get me wrong, could there have, you mighta smoked somebody that looked like this dude.<br>AJ: And that's possible.<br>Chico: And and that's what I'm trying (talking together) to find out cause you're telling me . . .<br>AJ: . . . (Inaudible).<br>Chico: (Speaking Spanish).  Cause the dude that fire, the dude that got you ***hammered*** was, was a dude name Brian?<br>AJ: Yeah.  (Inaudible).<br>Chico: So you believed (inaudible) I don't know where your head was that night or what what what, what made you react that night for whatever reason you wanted Brian?<br>AJ: Yeah.<br>Chico: (Inaudible) had been there you took this dude cause I don't know what Brian looks like Bro.  But could it have been . . .<br>***Rollie: Maybe its not*** Brian.<br>Chico: . . . You might ***snuffed*** the dude that wasn't (him).<br>AJ: (Inaudible) this is the guy I ***snuffed*** and that's possible, and I can't deny that.  That's possible, but I know this the guy.<br>Rollie: That's the guy that gave you all the shit?<br>AJ: That's the guy that (talking together) . . .<br>Rollie: . . . Came to your house? |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Det. Curry) (continued) | AJ: . . . he was there too.  He was *at* you know one of the officer on scene *when I was being investigated*.  They all work together.<br>Rollie: Uh huh.<br>AJ: (Inaudible) so I know. . .<br>Rollie: . . . This the guy that gave you shit and said . . . cause you live, or you don 't live in the right place or something like that?<br>AJ: *That's the guy I did* but that's not the guy *that came to my house*.<br>Chico: Now you understand?  Cause I understand a little better (talking together) you know what I'm sayin?  (Talking together) . . .<br>**T: You don't want any loose end now.**<br>Chico: So okay, this is the dude you took out?<br>AJ: Uh huh.<br>Chico: But this dude was somehow related to that Brian dude that you're talking about?<br>AJ: Yeah.<br>Chico: So the, the Brian dude is somewhere?<br>AJ: Somewhere.  Right.<br>Chico: You know what I mean?<br>AJ: (Not in my area) (inaudible) area.<br>Chico: You don't know where he's at?  (Talking together).<br>AJ: I I last thing I heard of him, he got knocked out, (*with* his) partner, and was knocked out face down, face down, (inaudible) weapons, rounds, ah clips taken out (inaudible), by the time backup showed up, they was (both) knocked out, laying down, lights flashing.<br>Chico: When was that?<br>AJ: Some guy jumped him, in Carver Ranches.<br>Chico: But that was back in the day?<br>AJ: Yeah, that was back in the day.<br>Chico: It wasn't you?<br>AJ: No, but I *laughed* . . .<br>Chico: (Laugh/talking together) where's he at now bro?  Cause if there's a . . .<br>AJ: . . . I don't . . .<br>Chico: . . . You don't know?  You have no idea? . . . He ain't got no beef with you?<br>AJ: He ain't got no beef for me. . . .<br>**P. 51-52:**<br>Chico: So, so, okay so, let me, now that we're getting, I think I'm understanding what happened.  Did, was this an example?  Did you make an example out of this *dude*?<br>AJ: I made an example out of somebody.<br>Chico: So your, you, so your (inaudible) ah I mean I'm just saying, I'm just guessing bro.  AJ: Yeah. (Inaudible).<br>Chico: So you believed (inaudible) I don't know where your head was that night or what what what, what made you react that night for whatever reason you wanted Brian?<br>AJ: Yeah.<br>Chico: (Inaudible) had been there you took this dude cause I don't know what Brian looks like bro.  And from what you just told me, your intention wasn't to get Brian. |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Det. Curry) (continued) | AJ: Yeah my intention was.<br>Chico: Was to get Brian?<br>AJ: Yeah. But when you, when you run up on somebody, *357*.<br>Chico: And you ran, you ah, you you saw somebody *that you* . . .<br>AJ: *He's not going to give you a* second chance to come *to him*.<br>Chico: Right right right.  (Inaudible/talking together) . . . Brian . . .<br>AJ: From what I (inaudible/talking together).<br>Chico: A, so then, this is what, I mean I might be wrong bro but, what it, what it sounds like to me is that, you, you got, you got the hammer on this dude and and and you realized it wasn't him and said fuck it it's too late now I gotta put it (on).<br>AJ: Yeah.<br>**P. 68-70:**<br>AJ: Like I said, yeah that's one thing, may or may not been the right guy, but I still did the job, and I did it clean.  And that's all I *can honestly say* and I did a clean job and I'm quite sure if (inaudible) like I did when I was in the marines, (inaudible/talking together), it's different there.<br>Chico: AJ, but where is Brian now, you don't know?<br>AJ: No.<br>Chico: Is he still working?<br>AJ: I don't know.<br>Chico: You have no idea?<br>AJ: No I don't.<br>Rollie: There's two kids in jail now (inaudible)?<br>AJ: (Inaudible) as long as they (inaudible) . . .<br>Chico: . . .Did you ever know that there was the two people in jail?  You didn't follow it?<br>AJ: Never followed it.  I knew that they had snagged somebody but I never cared.  In that frame of mind at the time I was still angry I didn't care.  I was angry but I was *efficient* , angry but I was clean, I was angry but I was (inaudible)<br>Chico: . . . And we, we can all be satisfied that that is not Brian?<br>AJ: Yeah but whoever that is (inaudible) one of the liars.<br>Chico: That's not Brian.<br>AJ: That's also one of them liars too.  That helped.<br>Chico: He was involved in the complaint that got you terminated?  This dude here?<br>AJ:<br>AJ: That dude there too.<br>Chico: You sure?<br>AJ: I know that for a fact.  And in fact I need to go home and look at my, my *papers* cause I remember *it.*<br>Rollie: *(to Chico) He will get you those* papers right?  (Inaudible/talking together) fired?<br>AJ: Yeah.<br>Rollie: (As proof)?  Hey you know what, I want it like fast okay.<br>Chico: Listen to me . . .<br>AJ: . . . (Inaudible) we can go get 'em.  *No problem.*<br>Rollie: And ah. |

| | |
|---|---|
| 10/4 (Office): AJ, Rollie (Agt. McKeen), Chico (Det. Cedeno), and "T" (Det. Curry) (continued) | AJ: (Inaudible).<br>Rollie: And also ah the papers of ah, of ah, this Brian guy and (see if this) guy . . .<br>Chico: . . . Is the dude (inaudible) in the complaint, against you?<br>AJ: I'll see.<br>Rollie: You don't **remember**?<br>**AJ: (Nods "no").**<br>Chico: You still got that paperwork you say?<br>AJ: I still got that paperwork. **I'll see.** |
| 12/13: Gwen & BSO (Det. Bole and Maj. Fantigrassi) (unrecorded) | **BSO 99-page Report at 74-76:**<br>"In addition to talking in his sleep about Deputy Montgomery, Mrs. Johnson stated A.J. also spoke in his sleep about, what she perceived to be, the night of the Behan homicide. She described how A.J. appeared to be 'narrating' his actions that night saying things such as: 'I am walking,' 'I kneel down to ask the officer a question' 'I shoot the officer,' 'I am running.' She went on to state the sleep talking usually began with A.J. repeating the words 'Wrong guy,' 'Wrong guy.' When asked if she ever attempted to verbally communicate with A.J. during his sleep talking, she stated she had tried. However, she was not able to obtain any definitive answers from him. When she specifically asked him whether or not he killed a cop, he replied, 'Don't ask me anything crazy.' Apparently, he was aware of his sleep talking and ordered her not to talk to him during such occurrences." |
| 1/31/02: Gwen & BSO (Det. Bole, and Polygrapher) (unrecorded) | **BSO 99-page Report at 81:**<br>"[S]he admitted that A.J. had directly confronted her (not in his sleep) about shooting the wrong officer. He swore her to secrecy and threatened her life if she ever told anyone."<br><br>**Interview with Polygrapher Richard Hoffman**<br>Gwenda Johnson told BSO Polygrapher Richard Hoffman "that six or seven years ago her husband Andrew came home in the middle of the night and woke her up. He told her 'wake up, I killed someone, I killed the wrong guy, I thought it was Montgomery.' Gwenn said she did not question him about the incident and he only told her this on that one occasion. . . . Gwenn stated after that night Andrew would talk in his sleep. He would say things such as 'he killed the wrong person.'" However, Hoffman stated, Gwenda Johnson only gave him this information "reluctantly," and "in bits and pieces." When he attempted to administer a polygraph, Gwenda did not answer some of the questions, and "slumped in the polygraph chair thus making the upper pneumo reading invalid." As a whole, therefore, the polygraph was "inconclusive." |

| 2/8/02: AJ & BSO ("Job Interview"/ Polygraph) | **According to the report of polygrapher Richard S. Hoffman:**<br>Johnson was asked the following questions repeatedly, in various form:<br>    1.  Did you ever consciously kill anyone in authority?<br>    2.  Did you ever shoot anyone in authority?<br>    3.  Did you ever commit a crime the police do not know about?<br>    4.  Other than telling someone you shot a deputy, did you really shoot a deputy?<br>    5.  Other than telling someone you killed a deputy, did you ever really kill a deputy?<br>Johnson answered "no" to each question each time it was asked and deception was noted each time. |
|---|---|
| 3/13/02: Gwen & BSO (Det. Bole & Major Fantigrassi) (Recantation) | **P. 24-27:**<br>Q: . . . Now, during that same period of time that we're talking about now, from the time that he's fired until the time he goes into the military.  Are you aware that AJ's aware that a police officer had been killed?  Or a deputy more specifically had been killed?<br>A: I don't remember.<br>Q: Does he express to you, at all during that time frame that he's got, knowledge about a police officer being killed?<br>A: No.<br>Q: Do you know the name of the officer that was actually killed?  The deputy.<br>A: Now I know.<br>Q: Did you know then?<br>A: No I didn't.<br>Q: Now, regarding the killing of the police officer, when are you first aware that AJ knows about it?<br>A: (Inaudible).<br>Q: When does AJ first tell, tell you, that he's responsible for killing a deputy?<br>A: He never told me that.<br>Q: What did he share with you that led you to believe, that he killed a deputy?<br>A: I don't remember.<br>Q: You don't remember?<br>A: Uh uh.<br>Q: Alright, Gwen, I want you to look at me.  We have a number of undercover surveillance tapes, where you're captured either by video, or audio, talking about your knowledge, concerning AJ's role, in this murder.  Specifically in the murder of a deputy.  And your memory during those undercover operations (inaudible), is a lot clearer than it is today, and ah, those tapes are a series of tapes that have been conducted recently over probably less than the last ah year or so.  Now, I would like for you, you're gonna have to explain to me why it is that you had such a clear, understanding during those tapes of what AJ's role is, in this murder as, oppose to what you're gonna have to explain to me why it is that you had such a clear, understanding during those tapes of what AJ's role was, in this murder as oppose to what you're saying to me today.  (Talking together) So let me, let me ask you this, and I don't mean to interrupt. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Major<br>Fantigrassi)<br>(Recantation)<br>(continued) | A: Uh huh.<br>Q: But let me ask you why would you say, that you had specific knowledge that AJ was involved in the murder of a deputy?<br>A: Why?<br>Q: Yeah why?<br>A: Oh, first of all, I was trying to write a book, and AJ was like I say he, he when he goes to sleep, he talks in his sleep, and he called out Montgomery name, a lot in his sleep, that was true he he, called out his name a lot, and uhm.<br>Q: Take your hands away from your mouth.<br>A: And ah, you asked me if told me that, he never told me that he killed a deputy, he never told me that, or a sheriff's officer, he never said that, so he never said that to me, that's why I'm saying to you he never said it to me.<br>Q: But you've told others that you has?<br>A: But he hasn't.  He never, under oath, he never told me that he kilt a ah officer, he never told me that.  He never, told me that he killed the officer.<br>Q: Well why would you, tell somebody, that he had?  And provide specific details?  And where would you have gotten those details, to provide to the person that you shared the information with Gwen?  You need to explain that.<br>A: I don't know but it didn't come from AJ.  AJ didn't tell me that.<br>Q: Then where did it come from?  It had to come from someplace Gwen.  You had information that you shared, it's in, it's on tape, it's in a number of undercover operations, where you're providing information that that, supposedly AJ shared with you now if it didn't come from AJ where'd it come from?<br>A: Didn't from him.<br>Q: Then where did it come from?<br>A: I think most of it was just made up.<br><br>**P. 27-30:**<br>Q: And, what did you say to China?<br>A: I don't really remember I just told him that.<br>Q: It's important that you remember Gwen.<br>A: I told him that ah, that AJ killed that, that, that deputy in (inaudible) I thank that's what I told him he killed the deputy.<br>Q: Well, there's, there's a lot of things that you coulda said, to China, bad about AJ.  Why do you choose to tell him about a deputy?<br>A: I don't know.<br>. . .<br>Q: Did you lead China to believe that the deputy he killed was Montgomery?<br>A: I don't think so.<br>Q: Uh huh.  Well what did you lead China to believe?<br>A: I don't remember.  I don't remember but, it was you know, it was a made up story, that I made up.  To make AJ look bad. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Major<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: What specifically did you make up?  (But) I, I gotta understand this now.<br>A: I made, I made it up you know.  I knew that he was upset with Montgomery and so, I just made (inaudible), made the story up.<br>Q: Do you recall telling China that ah, he had done this at a seven eleven?  Leading China to believe that it was a convenient store?  Do you remember telling him that?<br>A: I don't remember telling him that.<br>Q: You're captured on video telling him that.  Audio.  You don't have a recollection of saying that to China?<br>A: No but I might have said it.  But I don't remember saying it.<br>Q: Do you recall telling China that he killed a deputy but it was the wrong one.  Do you remember saying that Gwen?<br>A: Yeah I remember saying that.<br>Q: And why would you say that?  And how would you know that?<br>A: How would I know that?  From, from the ah, from the TV and the news and stuff like that I guess.  I don't know.<br>Q: Well I don't want you to guess I want you to know.<br>A: I can't remember.  I can't remember, ah (inaudible), I can't remember where it came from or what, where it came but, but, I know that I made it up.<br>**P. 31:**<br>Q: Okay.  Your testimony here today and what you're telling me, is that, everything you conveyed, to China and anyone else, concerning AJ's role in killing a deputy is not true?<br>A: It's not true.<br>Q: Is that what you're saying?<br>A: It's not true.  It's made up stuff.<br>. . .<br>Q: That, AJ had come home one night, and then told you he just killed somebody.  You also expressed to us that it was a police officer.  He had come home and he had killed a police officer.  And.<br>A: I never said that.  I never said that he had came home and said he killed a police officer.  I never said that to you all, I never said that, I never said that.  I told yall that I said he came home, he came home and said he had killed somebody, but that wasn't the only time he came home and said he had kilt somebody.  He always used to say I kil, I just kilt somebody!  (Inaudible).<br>**P. 38:**<br>Q: Okay.  You also, told us, you you've mentioned this already but I want to cover it again a lil more thoroughly you also mentioned, that he was a sleep talker. . .<br>A: . . . (I did).<br>Q: . . . and that he had talked specifically how he ah killed the wrong person and how he had snuck up on the car, and ah you you, the way you described it you said that he would say this over and over again I'm sneaking up on the wrong guy or I'm, I'm coming up on the car, I'm shooting it's the wrong guy it's the wrong guy, and you you, and you told us in previous interviews that ah, he did this, several times a month.  Explain that to me.<br>A: That was all made up.  He never said, he never had no dreams said that, not the wrong guy none of that stuff. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Major<br>Fantigrassi)<br>(Recantation)<br>(continued) | **P. 40:**<br>Q:  Do you know for sure, if, your husband.<br>A: Uh huh.<br>Q: AJ Johnson, do you know for sure, if he killed, ever killed a police officer?<br>A: To my knowledge I know nothing about that.  About him killing a officer I know nothing about that.<br>**P. 41:**<br>Q: Uh huh.  Is there anything that's he's shared with you?  Is there any actions that you've observed, at all, Gwen, that would suggest to you, he was involved in the murder of a deputy.  Any deputy.<br>A: No.  Nothing that I saw.<br>**P. 41-42:**<br>Q: Do you believe he killed, that police officer?<br>A: No I don't.<br>Q: Do you believe he's killed anybody?<br>A: No.  I don't believe he killed nobody.<br>Q: Has there ever been anything said to (you) by him or, or anything you've observed that would lead you to believe that he's killed anybody at all?  Beyond a police officer?<br>A: No.<br>**P. 45-49:**<br>Q: AJ says, he involved in the killing of a police officer.  You say he's involved in a killing of a police officer.<br>A: Uh huh.<br>Q: AJ tells us it was a ah convenient store.  You tell us it was a 7 11.<br>A: Uh huh.<br>Q: AJ says, he killed the guy that made the complaint against him.<br>A: Uh huh.<br>Q: You say, he killed the guy that made the complaint against him.  He tells us undercover, that he took the gun and he broke it apart and he threw it all different places.<br>A: Uh huh.<br>Q: You tell the undercover people, you broke up the gun, and he threw in all different places.  You!  Show somebody, where that gun is thrown.  AJ shows somebody where that gun is thrown.<br>A: Uh huh.<br>Q: I'm here to tell you the two places are not far apart, okay?  Now forget Tony . . .<br>A: . . . Uh huh.<br>Q: . . . forget me, forget the gentleman from the State Attorney's Officer Mr. Gardner. . .<br>A: . . . (Inaudible).<br>Q: There's people out there they're gonna say wait a second.  You got the husband telling the cops undercover, all these things, you've got you telling people undercover these things.<br>A: Uh huh. |

| | |
|---|---|
| 3/13/02:<br>Gwen & BSO<br>(Det. Bole &<br>Major<br>Fantigrassi)<br>(Recantation)<br>(continued) | Q: Somehow or another these two had to get their story together, so you just gotta . . .<br>A: . . . (Well no) . . .<br>Q: . . . Take a deep breath . . .<br>A: . . . This.<br>Q: . . . and explain it<br>A: No, this is what happened I believe, I was writing a book, and like I told you, I believed AJ read the stuff I was writing, he read the, book or whatever, and that's where he coulda gotten this stuff from.  Cause he probably read my book.  Which I couldn't find, I, computer was broke down, the uhm, tapes and stuff was lost (laugh), so evidently he musta gotten that from my book.<br>Q: But you gotta understand something also.<br>A: Uh huh.<br>Q: A police officer was killed.<br>A. Uh huh.<br>Q: He was killed in a convenient store.<br>A: Uh huh.<br>Q: He was sitting in his car, and somebody did sneak up on him and kill him and that, that, this is a fact that.<br>A: Right.<br>Q: Right?<br>A: Right, uh huh.<br>Q: Now, is that what your book was about?<br>A: Yeah!  My book was about the, the, book, the book was about (suspense), it was a (pense) murder, it was you know, and the end of it which, he didn't give me a chance  to finish writing it, the end of it was gonna be, about him.<br>Q: About who?<br>A: AJ. Se and him didn't give me achance to finish with all the stuff that I was doing.<br>Q:  Okay.<br>A: But that's where he coulda gotten this information from (tapping noise), that.  You know that's the only thing I can think cause I was writing a book you know.<br>Q: Do you understand where I'm going though?<br>A: I, understand what you're saying but, evidently he musta (tapping noise) read the same stuff (tapping noise) and took that and ran with it, that's all I can think.<br>Q: Do you have a copy that we, obviously we would need to . . .<br>A: . . . I<br>Q: . . . get a copy of that. . .<br>A: . . . I know.<br>Q: . . . (talking together) tapes or something.<br>A: I don't have nothing.  I don't know what happened to it.  He said the computer, you know.<br>Q: Now you know that whoever listens to you or watches you or . . .<br>A: . . . Uh huh.<br>Q: . . . wahtever is gonna say that is one, heck of a coincidence.<br>A: (Uh huh). |

Q: Am I right?

A: I know but what can I do!

Q: The fact that the husband . . .

A: . . . I have to tell the truth.

Q: . . . and the wife, even take the police.

A: Uh huh.

Q: Through undercover operations.

A: Uh huh.

Q: To the exact same of all of south Florida, of all of Dade County, okay. We're a few blocks away where this gun.

A: Uh huh.

Q: Was not thrown, but parts of the gun were thrown. We both agreed the gun was used, we both, you and him both say it was broken down and then you both take us to one exact spot.

A: That's strange.

Q: And I mean it it, it sounds like you two got your stories straight.

A: He read it. He had to read it! I wrote and, I, typed it up and stuff, he musta read it, then that let's me know, that he read the stuff (inaudible). That's all. But you know for him, to talk to me, he didn't talk to me about it or nothing you know he didn't, admit to nothing or nothing you know.

99th YEAR, No. 200
Copyright © 2002 The Miami Herald
B

# The Herald

TUESDAY, APRIL 2, 2002 ▶ FINAL EDITION

www.broward.com

# Verdict in Behan murder case haunts some jurors

BY DANIEL de VISE, LARRY LEBOWITZ
AND WANDA J. DeMARZO
ddevise@herald.com

If the jury that convicted Timothy Brown of murder had known then what they know now — that another man would claim he was the killer — at least two jurors contend, the dilemma would have raised enough "reasonable doubt"

to derail the conviction.

"If I had had this information back then, I would have definitely not been able to convict him," said Diane Nickum, 53, a Davie resident who served on the 1993 jury. "It's too compelling."

Fellow juror Giovanna Alessi said: "Obviously, if all of this stuff had come out back then, there would have been reasonable doubt."

Defense attorneys want to persuade a federal judge that a jury would not have sent Brown to prison for the November 1990 murder of Broward Sheriff's Deputy Patrick Behan if it had heard the incriminating statements of former BSO jail guard Andrew Hughray Johnson.

Sheriff's investigators, tipped off by Johnson's estranged wife, collected clandestine tape recordings last year of John-

son bragging he had killed a sheriff's deputy and later identifying the victim as Behan.

If they hope to win freedom for Brown, his attorneys must demonstrate that the statements by Johnson and his wife would have been powerful enough to raise reasonable doubt of guilt in the

▶ PLEASE SEE BEHAN, 2A

---

## Suit: Corpse illegally sent to students for embalming

BY WANDA J. DeMARZO



BOB EIGHMIE/HERALD STAFF

---

## Four jailed exiles say alleged plot to kill Castro was a Cuban trap

BY JUAN O. TAMAYO
jtamayo@herald.com

PANAMA CITY, Panama — After languishing in jail for 16 months, four Cuban exiles accused of plotting to assassinate Fidel Castro now believe they were

Castro agent confided in mid-2000 that Cuba's top spy planned to defect when Castro visited Panama later that year.

"He will do this only if you pick him up in person," the man allegedly told one of the men arrested, Luis Posada Carriles, because the spy chief knew that

# Behan jurors have doubts about verdict

**▶ BEHAN, FROM 1A**

jury that convicted Brown in October 1993.

A single dissent would have been enough for Brown to escape conviction.

Alessi, Nickum, and Rosemary Johnson, interviewed by The Herald last week, all described a wave of shock and self-doubt when they heard about the reopened Behan murder case in February.

"It's very painful to go back," Alessi, now a 50-year-old Wilton Manors resident, said of the Timothy Brown trial. "If he's innocent, then I pray that he is set free."

Some of the 15 jurors and alternates assigned to the Brown trial found it too painful to revisit at all. Jurors Craig Branston, Gary Lazan, and Melody Rhoads declined to be interviewed. Public records indicate three others have died. The remainder did not answer the door or the telephone or could not be found.

Experts on jurors and jury behavior say it's common for panelists to feel some pangs of conscience when their guilty verdict is called into question later. It is important for jurors to believe they have dispatched their duty fairly, particularly in cases that send a defendant to prison for life or to Death Row.

"Should the jury be blamed? No. But they may have some guilt," said Neil Vidmar, a law professor at Duke University who studies jurors. "Unfortunately, that's the way the system works, and there are going to be mistakes made."

Jurors deliberated for 14 hours before delivering a guilty verdict in the Brown trial. The case against Brown and convicted collaborator Keith King was built upon taped confessions from two teens with borderline mental retardation.

While it wasn't an issue at trial, both Brown and King now say BSO detectives gained false confessions through

  

**BEHAN**   **BROWN**   **JOHNSON**

physical violence and psychological manipulation.

Brown, now 26, is serving a life sentence. King, now 28, pleaded guilty to a reduced charge of manslaughter, served nine years, and is now free.

The jury might have convicted Brown more quickly if not for Nickum.

She wondered about how voluntary Brown's confession was.

She and another skeptical juror persuaded the panel to review it line by line, comparing it against the testimony of lead Detective James Carr.

"From the beginning, I didn't like the demeanor of the detective who took the confession," Nickum said. "When he was questioned again and again, he became kind of aggravated and showed another side of himself."

In the end, Nickum relented and went along with the guilty verdict. Now she wishes she had not.

"I can't speak for anyone else, but I can't imagine the jury coming to the same decision," she said. "I kind of take it a little personally because I just don't know if we were given all the information we should have been."

Timothy Brown's jurors ultimately decided to believe in the key piece of evidence against him — his muddled confession.

They rejected Brown's defense, built on a shaky theory of widespread BSO corruption in the Pembroke Park district where Behan died.

Legal scholars say juries have a hard time accepting the notion that an innocent person could confess.

"In the absence of electronic videotaping, it is very hard to get someone to believe that someone confessed to something they didn't do," said Saul Kassin, a psychology professor at Williams College and an expert on jurors and coerced confessions. "Confessions are very powerful."

Andrew Johnson's possible role in the Behan slaying did not become known to police until April 2001, when his wife told a police informant he had killed a deputy years earlier. Gwenda Johnson said Andrew came home one night to tell her he had just killed a cop. She said the two went off together to scatter pieces of the murder weapon, according to investigative documents.

But Gwenda Johnson

recanted her story after it appeared in published reports. Even though her original statements matched many remarks that undercover agents independently obtained from her estranged husband, Gwenda Johnson later said she'd made them up.

To Nickum, Gwenda Johnson's original account remains the most compelling piece of the Andrew Johnson puzzle.

"He could have been just boasting," Nickum said. "But the wife going against him . . . I don't know. She gave too much information. And now I'm really questioning."

BSO halted its investigation of Andrew Johnson in March. Sheriff Ken Jenne said the agency lacked sufficient evidence to seek criminal charges.

Defense attorneys for Timothy Brown contend the sheriff has more evidence against Johnson than it ever had against Brown.

One member of the 1993 jury says she doesn't know quite what to make of the new revelations.

Unlike Alessi and Nickum, Rosemary Johnson says she remains reasonably assured that the Brown conviction is valid. But she also recalls how difficult it was to reach a decision.

"Each day, you'd go in there and say: 'There's no way they could be guilty.' And the next day, you'd go in and say: 'Of course, they're guilty.' You'd sort of go back and forth and back and forth," said Rosemary Johnson, 57, of Plantation.

It's easy, she said, for someone who wasn't on the jury to say, " 'Oh, he's totally not guilty or he's totally guilty.' But you have to follow the instructions you're given from the court and look at the evidence given. We can't go on your gut feelings or emotions. You have to do what the court instructed and make a decision on the evidence given."

She added: "I'd hate to think we had the wrong man sitting in prison."

**Three jurors interviewed last week all described a wave of shock and self-doubt when they heard about the reopened murder case.**



RSONAL
:-0121.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was mailed and faxed this _2nd_ day of May, 2002 to Assistant Attorney Generals Celia Terenzio and Lesley Campbell, 1515 N. Flagler Drive, Suite 900, West Palm Beach, Florida 33401.

56