IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 955-7207-CIV-GRAHAM

TIMOTHY BROWN,                          :

     Plaintiff,                        :

vs.                                     :

HARRY K. SINGLETARY,                    :

     Defendant.                        :

_____/

NIGHT BOX
FILED

MAY - 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## EXHIBITS TO TIMOTHY BROWN'S MOTION FOR CONSIDERATION OF ACTUAL INNOCENCE

### VOLUME I

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By:_____
Brenda G. Bryn
Timothy M. Day
Fla. Bar Nos. 0708224, 360325
Assistant Federal Public Defenders
One E. Broward Boulevard
Suite 1100
Fort Lauderdale, Florida  33301
(954) 356-7436
(954) 356-7556 (fax)

# INDEX TO EXHIBITS

1.   Timothy Brown's July 16, 1991 Statement to Detectives Carr and Thomasevich

2.   Crime Scene Map (Drawn by FPD Investigator Dennis Stinson)

3.   Keith King's June 4, 1991 Statement to Detectives Carr and Thomasevich

4.   Mary Pendergrass' June 10, 1992 Statement To Defense Investigator Gary Brodlieb

5.   Monica Cherise Willis' January 15, 1992 Affidavit

6.   Keith King's May 20, 1999 Statement to FPD Investigator Dennis Stinson

7.   Philip Howard's November 13, 1990 Statement to Detective Gucciardo

8.   Affidavit of FPD Investigator Marlon Johnson (December 20,1999)
     re: Interview with Philip  Howard

9.   Excerpt from March 4, 1992 Deposition of Sergeant Richard Scheff

10.  Affidavit of FPD Investigator Dennis Stinson re: May 21, 1999
     interview with Edward Davis

11.  Edward Davis's February 28, 2002 Statement to BSO Major Tony Fantigrassi

12.  Testimony of Sergeant Richard Scheff at Suppression Hearing (Excerpt re: Tim Brown)

13.  Testimony of Detective James Carr at Suppression Hearing (Excerpt re: Tim Brown)

14.  Testimony of Detective Eli Thomasevich at Suppression Hearing (Excerpt re: Tim Brown)

15.  Testimony of Dr. Elizabeth Kaprowski at Suppression Hearing (Excerpt re: Tim Brown)

16.  Dr. Kaprowski's Memo (12-6-92) re: Psychological Evaluation of Tim Brown

17.  Findings of Judge John Frusciante, (Denying Motion to Suppress
     Tim Brown's July 16, 1991 Statement)

18.  Behan's Autopsy Report

19.  Trial Testimony of Medical Examiner Raul Vila

20.  Trial Testimony of Bloodspatter Expert Charles Edel

21.     Trial Testimony of Ballistics Expert Dennis Grey

22.     Trial Testimony of Det. James Carr (Excerpt re: Tim Brown)

23.     Trial Testimony of Dr. Elizabeth Kaprowski

24.     Jury Instructions Re: Aiding/Abetting and Voluntariness of Defendant's Statement

25.     Jury Deliberations (Including Questions from the Jury and the Court's Answers)

26.     Affidavit of Dr. Richard Leo (December 22, 1999)

27.     Affidavit of Dr. I. Bruce Frumkin (December 21, 1999)

28.     Affidavit of Dr. Lenore E. Walker (December 22, 1999)

29.     Affidavit of Othalean Brown (December 21, 1999)

30.     BSO's New Policy and Procedure re: Interrogation of Suspects with Developmental Disabilities (November 17, 2001)

31.     BSO's "99-Page Report" of the Re-opened Investigation of the Behan Homicide

32.     Appendix D to the 99-Page Report -"Noteworthy Consistencies"

33.     Appendix C to the 99-Page Report - "Noteworthy Inconsistencies"

34.     Internal Affairs Complaint Against Detention Deputy Andrew Johnson (July 10, 1990)

35.     Internal Affairs Findings, Recommendation, and Order of Termination Of Detention Deputy Andrew Johnson (July 10, 1990)

36.     BSO's Flow Chart Re: Andrew Johnson's Motive in Behan Homicide

37.     Deposition of Brian Montgomery (July 8, 1992)

38.     Transcript of April 25, 2001 Conversation between Gwen Johnson and China (CI)

39.     Transcript of May 3, 2001 Conversation between Gwen Johnson and (CI)

40.     Transcript of May 31, 2001 Conversation between Gwen Johnson and China (CI)

41.     China's "Insurance" Letter

42.     Transcript of June 6, 2001 Conversation between Gwen Johnson and China (CI)

43.     Transcript of June 14, 2001 Conversation between Gwen Johnson and China (CI)

44.     Transcript of July 5, 2001 Conversation between Gwen Johnson and  China (CI)

45.     Transcript of August 2, 2001 Conversation between Andrew Johnson (AJ) and China (CI)
        (Traffic Stop by BSO Deputy Sudler)

46.     Transcript of August 16, 2001 Conversation between AJ, China (CI), Chico (Det. Cedeno),
        And "T" (Agt. Curry)

47.     Transcript of August 23, 2001 Conversation between AJ and Chico (Det. Cedeno)

48.     BSO's Report of August 23, 2001

49.     Transcript of August 3, 2001 Conversation between AJ, Chico (Det. Cedeno),
        and "T"(Agt. Curry)

50.     BSO's Report of August 31, 2001

51.     Transcript of September 27, 2001 Conversation between Gwen Johnson and China (CI)

52.     Transcript of October 4, 2001 Meeting in the BSO Undercover Office between AJ,
        Rollie (Agt. McKeen), Chico, (Det. Cedeno), and "T" (Agt. Curry)

53.     Newspaper Article (Sun Sentinel July 18, 1991) Shown to AJ
        during the October 14, 2001 Meeting in the Undercover Office

54.     AJ's Map of the Crime Scene (Drawn during the October 4, 2001
        Meeting in the Undercover Office)

55.     Transcript of October 4, 2001 Conversation between AJ, Chico (Det. Cedeno), Rollie (Agt.
        McKeen) and "T" (Agt. Curry) (Car Tour of Circle K)

56.     Transcript of AJ's February 8, 2002 "Job Interview" and Polygraph at BSO
        (Transcript prepared by Petitioner)

57.     Transcript of Final Portion of AJ's February 8, 2002 "Job Interview" and Polygraph at BSO
        (Partial Transcript prepared by BSO)

58.     Report of BSO Polygrapher Richard Hoffman re: AJ's February 8, 2002 Polygraph

59.     Transcript of March 13, 2002 Statement of Gwen Johnson to BSO Detective Bole and Major
        Fantigrassi (Recantation)

# (Index to Volume I)

1.   Timothy Brown's July 16, 1991 Statement to Detectives Carr and Thomasevich

2.   Crime Scene Map (Drawn by FPD Investigator Dennis Stinson)

3.   Keith King's June 4, 1991 Statement to Detectives Carr and Thomasevich

4.   Mary Pendergrass' June 10, 1992 Statement To Defense Investigator Gary Brodlieb

5.   Monica Cherise Willis' January 15, 1992 Affidavit

6.   Keith King's May 20, 1999 Statement to FPD Investigator Dennis Stinson

7.   Philip Howard's November 13, 1990 Statement to Detective Gucciardo

8.   Affidavit of FPD Investigator Marlon Johnson (December 20,1999)
     re: Interview with Philip  Howard

9.   Excerpt from March 4, 1992 Deposition of Sergeant Richard Scheff

10.  Affidavit of FPD Investigator Dennis Stinson re: May 21, 1999
     interview with Edward Davis

11.  Edward Davis's February 28, 2002 Statement to BSO Major Tony Fantigrassi

12.  Testimony of Sergeant Richard Scheff at Suppression Hearing (Excerpt re: Tim Brown)

13.  Testimony of Detective James Carr at Suppression Hearing (Excerpt re: Tim Brown)

This is to be a sworn taped statement in reference to BSO case number PK90-11-314. The offense is classified as a homicide of a deputy sheriff which occurred on November 13, 1990, on a Tuesday morning in or around 1:45 in the a.m. This incident occurred in the Circle K parking lot located at 3990 West Hallandale Beach Boulevard. This statement's being taken by Detective Carr and Detective Thomasevich of the Broward County Sheriff's Homicide Division. It's being taken on the 16th of July, 1991 at approximately 2015 hours. This will be a statement of one Timothy Brown, being taken at this time.

Q:   Okay sir, for the record, would you please state your full name?
A:   Timothy Brown.

Q:   Okay Timothy, what's your date of birth and your home address?
A:   11/23/75, 6640 Perry Street.

Q:   Okay and a phone number there?
A:   963-9919.

Q:   Okay Timothy, before I go any further and I speak to you in regard to this incident, a little earlier I had advised you of your rights, is that correct and you had filled out this form that's in front of us here tonight?
A:   Yes sir.

Q:   Okay, just for the purposes of the record, I'm gonna read this here. It says Timothy Brown, before I ask you any questions, I want to advise you of your rights under the law. Do you understand that I'm a deputy sheriff and there's a yes next to that after that. Did you write that yes?
A:   Yes sir.

Q:   And you understand that? Are you comfortable at this time?
A:   Yes sir.

Q:   Have we treated you right, you had cigarettes, you had water, you got to go to the bathroom?
A:   Yes sir.

Q:   Okay, has anyone threatened you?
A:   No sir.

Q:   Okay, can you read and write the English language and you wrote yes, is that correct?
A:   Yes sir.

Q:   Okay, and it says what school do you go to and you put no. You're not attending school now?
A:   No sir.

ATTACHMENT / EXHIBIT __1__

Q:   And you finished at the 8th grade?
A:   Yes sir.

Q:   Okay, and then we put...have we tried to contact your parents or guardian and you answered yes and we have, correct?
A:   Yes sir.

Q:   Okay, do you want your parents, guardian or legal custodian here before we proceed any further and you wrote in no.
A:   No sir.

Q:   Okay, okay, then it goes on to say your rights.  You have the right to remain silent, that is you don't have to talk to me or answer any of my questions if you do not want to and I asked do you understand and you wrote a little yes?
A:   Yes sir.

Q:   Okay, you have the right to talk to an attorney and have him here with you before we ask you any questions.  Then the form states do you know what an attorney is and we discussed that and you put yes, that you do.
A:   Yes sir.

Q:   Okay, do you understand that and it says yes.
A:   Yes sir.

Q:   Okay, if you cannot afford an attorney, and you want one, one will be appointed to you before we ask you any questions and it says do you understand and your wrote a yes?
A:   Yes sir.

Q:   And you understand that?
A:   Yes sir.

Q:   Okay, if you decide to answer my questions now without an attorney present, you will still have the right to stop answering questions at any time, okay, until you talk to an attorney. Do you understand that?
A:   Yes sir.

Q:   Okay, should you talk to me, anything you say can and will be used against you in a...either for you or against you, it states, okay, and it says do you understand that?
A:   Yes sir.

Q:   Okay, and you put a yes there.  Are there any questions at this time?
A:   No sir.

2

Q:   Okay, knowing and understanding these rights, are you willing to answer questions now without an attorney here and you put yes?

A:   Yes sir.

Q:   Okay, then it says I and it's printed Timothy Brown, you wrote that?

A:   Yes sir.

Q:   Have read that statement of my rights or have had it read to me and I understand what my rights are. I am willing to make a statement and answer questions. I do not wish an attorney present at this time. No threats or promises have been made to me, no pressure of any kind has been used against me nor have I been tricked or fooled into giving this statement. I understand and I know what I am doing. Okay and then it goes on with the signature here. Okay and it says Timothy Brown.

A:   Yes sir.

Q:   And you signed that?

A:   Yes sir.

Q:   Okay, and then I...myself and Det. Thomasevich had signed that as witnesses. Okay, also Timothy, before we go on, I need to advise you as well as being a detective with the Broward County Sheriff's Homicide Division, I'm also a Notary Public with the State of Florida at large. What this means is I'm empowered to take a sworn statement from you. Okay?

A:   Yes sir.

Q:   I'm gonna be placing you under oath and you're gonna be swearing to tell me the truth in regard to this incident. Okay, also if we found that you lie, okay, a charge of what's called perjury can be weighed against you, which means that's when you lie under oath and you understand that?

A:   Yes sir.

Q:   Okay, would you raise your right hand please. Let the record reflect that the subject has raised his right hand. Do you solemnly swear to tell the truth and nothing but the truth so help you God?

A:   Yes sir.

Q:   Okay, put down your hand. Timothy, let's go back eight months ago, back to November 13, 1990. We had been discussing an incident that occurred at the Circle K convenience store in reference to a deputy sheriff. I want you, in your own words, tell me what happened on that night, who you were with and where you first met this individual that evening and take it from there.

A:   Keith King.

Q:   Okay, Mr. Keith King and you identified Keith King earlier from a photographic lineup?

3

A:     Yes sir.

Q:     Okay, tell me about that, how long have you known Keith King?
A:     Since I lived down here.

Q:     About how many years ago was that?
A:     Say five years now.

Q:     Okay, so on this night, you meet Keith...Keith King, where do you meet him at?
A:     On Wiley Street.

Q:     Alright, tell me what happens.
A:     So alright, we already been drinking and all that, snorting powder, and smoking lace...

Q:     You were smoking what?
A:     Lace.

Q:     Okay.
A:     "UNINTELLIGIBLE" so then we just get in the black bicycle and we go up to the Circle K. He...we...he had a .38 on him.  It was black with a brown handle.  It was rusted a little bit, even though it was already used.

Q:     Okay, now how...who has the gun him?
A:     Keith King.

Q:     THOMASEVICH: Where does he carry it on him?
A:     Right here.

Q:     THOMASEVICH: In his waist band.
A:     Yes sir.

Q:     Okay now, how.....who's riding the bike; how are you two riding on the bicycle?
A:     I'm pulling him.

Q:     You're pulling him.  That means you're peddling and he's on what, the handle bars?
A:     The handle bars.

Q:     Okay, what happens then?
A:     So we just riding, we go up to the Circle K right there on the street of Hallandale Beach Boulevard.  As we ride up, he say I'm gonna kill somebody.

Q:     Okay now, when is the first time that you start having conversations about him stating that he's gonna kill somebody?

4

A:        About two blocks before we got to Circle K.

Q:        Okay, and tell me exactly what you recall Keith King saying to you.
A:        He gonna kill somebody.

Q:        Okay, what did you say to that?
A:        I called his bluff.

Q:        So you're calling his bluff.  You don't believe it?
A:        Yes sir.

Q:        Okay, you're basically telling him that you don't believe he's got like the nerve to do it?
A:        Yes sir.

Q:        Okay, so what happens then?  What does he say?
A:        We get...we pulled up and saw the police so he say don't go out that way.  So we ride that way.  I pulled up anyway, you know what I'm saying.  I wasn't no paying attention around there.  As I was still pulling, he jumped off the bicycle...

Q:        Now, let me just stop you for a minute.  Okay, does he say anything before he jumps of [sic] the bike?
A:        He told me to look up.  I looked up.  He say he got him.

Q:        He says he's got him?
A:        He got him.

Q:        What does that mean to you?
A:        He gonna kill somebody.  That mean...

Q:        That that's the person he's gonna kill?
A:        Yes sir.

Q:        And do you see that police officer?
A:        Yes sir.

Q:        And you know that that's who he's directing that comment to, that that's who he's got, that who he's gonna kill?
A:        Yes sir.

Q:        Okay.
A:        And when he jumped off the bicycle, he made a limp over there to the car, like you know how he walk, he was limping over there to the car and he fired it and after he fired it, I panicked and we jumped on the bicycle, we got across the street from the Circle K and he

5

fired the gun again.

*Q:*     *Okay, you say that you jumped back on the bicycle?*
*A:*     *Yes sir.*

*Q:*     *And is he on the bicycle or is he running?*
*A:*     *He's on the bicycle.*

*Q:*     *Okay, and you go across what, Hallandale Beach Boulevard?*
*A:*     *Yes sir, going back to Carver Ranches.*

*Q:*     *Okay, now what's over there across Hallandale Beach Boulevard?*
*A:*     *A rock pit on this side here.*

*THOMASEVICH: Before that.*

*Q:*     *Alright, but before we hit the rock pit, you're telling me there was another...*
*A:*     *There's a car...a car place and a pawn shop on this side.*

*Q:*     *Okay, so you're actually...when you cross Hallandale Beach Boulevard, you're going past the pawn shop?*
*A:*     *Yes sir.*

*Q:*     *Okay.*
*A:*     *And we in the center.  Cross up over here, the pawn shop right here.  We going straight down here and the rock pit on this side here.*

*Q:*     *Okay, now what do you's do?*
*A:*     *We fired...before we got back to the first block, we fired it off again.*

*Q:*     *And this is after you're across and away from the Circle K?*
*A:*     *Yes sir, yes sir.*

*Q:*     *And he fires the gun, what, up in the air?*
*A:*     *Yeah.*

*Q:*     *Okay.*
*A:*     *Then we get half way down...we get half way down on 40 and he throw the pistol.*

*Q:*     *Where does he throw the pistol?*
*A:*     *By the rock pit, by the gate.*

*Q:*     *Now you know where that pistol is?*

**A:**      *If we go back and look for it, yes sir.*

**Q:**      Okay, now let me back up and go over a couple of things that I just want to clarify.  Do you remember what you were wearing that night?

**A:**      Yes sir.

**Q:**      What?

**A:**      White T-shirt, some burgundy "UNINTELLIGIBLE" and some blue cut-off pants.

**Q:**      Okay, you're talking...

**A:**      A white T-shirt...

**Q:**      Work pants, cut-offs?

**A:**      Yeah.

**Q:**      Okay, and you indicated that the same sneakers that you have on here tonight are the sneakers you were wearing then?

**A:**      Yes sir.

**Q:**      And you remember that?

**A:**      Yes sir.

**Q:**      Now you said you had a white T-shirt on?

**A:**      Yes sir.

**Q:**      Now, do you remember what you did with that T-shirt that night?

**A:**      I took it off and put it in my back pocket.

**Q:**      Okay, so you didn't have a shirt on?

**A:**      I took it off when we got across "UNINTELLIGIBLE" and I put it in my back pocket like it's hanging out now.

**Q:**      Okay, do you remember what Keith King was wearing?

**A:**      Bugle Boy and a silk and he had on...

THOMASEVICH: Bugle Boy pants?

**A:**      Bugle Boy shorts.

THOMASEVICH: Cut-offs?

**A:**      No, they were, they were made shorts, Bugle Boy short "UNINTELLIGIBLE"....

THOMASEVICH: Okay.

**A:**      And white silk.

7

THOMASEVICH: White silk what?
A:      Silk shirt, one of them silks.

THOMASEVICH: Was it...is it a collared shirt or is it an open shirt or...
A:      No, it's like...it's one of those...

Q:      V necks?
A:      Yeah.  Yes sir.

Q:      Okay, now neither one of you's went into the Circle K store?
A:      No sir.

Q:      Okay.

THOMASEVICH: Do you remember how the deputy's car was parked?
A:      Backwards.

THOMASEVICH: Okay, so he was backed into the spot?
A:      Doing some paperwork.

THOMASEVICH: Okay, you saw him doing the paperwork when you pulled up there?
A:      Yes sir.  The guy had it...he had his passenger's light on with his head down with a pen in his hand.

THOMASEVICH: Okay, when you said passenger's light, you mean the light inside the car?

Q:      The dome light it's called?
A:      Yes sir.

THOMASEVICH: Okay, and that was on?
A:      Yes sir.

*THOMASEVICH: Alright, now when he...when Keith King goes up to the car, does the deputy see him or does the deputy say anything to him or anything like that to him?*
*A:      When the deputy tried to make a move, he fired his gun, a shot.*

*THOMASEVICH: Did you see the deputy move?*
*A:      Yes sir.*

*THOMASEVICH: Did you see where the deputy was hit?*
*A:      In the head.*

*THOMASEVICH: Okay, what happened after he hit the deputy, did you see what happened to*

8

*the deputy? Did he, you know....*
*A:*    *No sir...*

*THOMASEVICH: Did he try to move or did he...*
*A:*    *No sir.*

*THOMASEVICH: Okay.*
*A:*    *He tried to grab his stick, that's all I remember.*

*THOMASEVICH: But what I'm saying is, you didn't stay around long enough to see what he did?*
*A:*    *No sir.*

*THOMASEVICH: After he was shot?*
*A:*    *No sir.*

*Q:*    *Okay, so you go back down 40th towards that rock pit?*
*A:*    *Yes sir.*

*Q:*    *And you say that, that you's hide the gun down there somewhere?*
*A:*    *Threw it.*

Q:    Okay, but you can show us.  What do you do after that?
A:    We go back to Wiley Street.

Q:    Two of you's go back down Wiley Street?
A:    He...he get off...he get off up there and I went back...I went to the Godfather.  I see nobody up there so I went to Wiley Street.

Q:    Alright, are you saying that you's actually separate when you get back down there?
A:    Yes sir and I bumped into a Terrance Warner.

Q:    A Terrance who?
A:    Warner.

Q:    Warner?
A:    Yeah.

Q:    Okay.

THOMASEVICH: Did you tell Terrance about this?
A:    No sir.

THOMASEVICH: We...originally when took you in here, we told you about all these people that we had spoken to....
A:    Yes sir.

THOMASEVICH:  That you had told about the killing of the deputy.
A:    Yes sir.

THOMASEVICH: Is that correct?
A:    Yes sir.

THOMASEVICH: Okay, did you, in fact tell these people about the killing of the deputy?
A:    Yes sir.

THOMASEVICH: Okay, where did you tell most of these people?  Where was it when you told them the story?
A:    On Wiley Street.

THOMASEVICH: Okay, any place else?
A:    No sir.

THOMASEVICH: Okay, what about the Detention Center?
A:    Yeah, Wilmouth Hughes was there and Ray Adderly.

THOMASEVICH: Okay, now did you ever tell Tony Hayes about this?
A:    Yes sir.

THOMASEVICH: Okay, tell me about that, how did you see Tony Hayes?
A:    I had...when me and Keith met up, you know how you got to wait three days now to buy a gun out the pawn shop, he bought me a 25 and so he told me, you know what I'm saying, take the gun back and get you another from three days up, only you gotta take that one back up there with the paper,    saying you bought the gun and wait three days for it.  So the guy...as I...as I happen...he got mad at me about and he called the police and Tony Hayes got stopped with the gun in the car and he went to jail for the gun.

THOMASEVICH: Okay, but when did you tell Tony Hayes about the deputy being killed?
A:    Before I "UNINTELLIGIBLE."

THOMASEVICH: Okay, where was it that you told him?
A:    Over there 'UNINTELLIGIBLE" over there by that pawn shop.

THOMASEVICH: Did you ever go over to his house and talk to him about it?
A:    Huh huh, talk..we used to go to....one time we go to his house and "UNINTELLIGIBLE" he used to let us use his car a lot.  It's a blue Nova.

10

THOMASEVICH: Okay.

Q:      Okay.

THOMASEVICH: Now, the incident with the 25, that was after the deputy was killed, right?
A:      Yes sir.

THOMASEVICH: Okay.  Now originally, in fact I believe it was...it was a day or two after the
        deputy was killed, you had spoken to some detectives from our unit here, right, from the
        Homicide Unit?
A:      Yes sir.

THOMASEVICH: Okay and as a result, they had let you go that night, right? They had talked....
A:      Yeah.

THOMASEVICH: To you for a little while and let you go?
A:      Yeah, "UNINTELLIGIBLE."

THOMASEVICH: Okay now, you told them a story at that time....
A:      Yes sir.

THOMASEVICH: But it was a misleading story, is that correct?
A:      Yes sir.

THOMASEVICH: Okay, basically, what did you do; you lied about the facts of the case?
A:      Yes sir.

THOMASEVICH: And never really told them what actually took place?
A:      Yes sir.

Q:      Actually, you first blamed someone else, is that correct?
A:      Yes sir.

Q:      And who is that?
A:      Keith Maddox.

Q:      Now you...you remember what you told me why you blamed him?
A:      Yeah, me and him had "UNINTELLIGIBLE" that night.

Q:      Because you had a falling out that night?
A:      Yes sir.

Q:      Okay, was it about that gun?

11

A:      Yes sir.

Q:      Okay.

THOMASEVICH: Over the fact that Keith was saying that you stole the gun?
A:      Yes sir.

THOMASEVICH: When in actuality, he had bought the gun for you?
A:      Yes sir.

THOMASEVICH: So that's why you told the detective at that time that Keith Maddox was the suspect in this case?
A:      Yes sir.

Q:      And then later on, you had turned around and you had confessed to shooting the deputy yourself, but you said that Keith was with you?
A:      Yes sir.

Q:      And you knew that we would check with Keith and find out that that was a lie and Keith was never there?
A:      Yes sir.

Q:      Okay.

THOMASEVICH: Now, you know, we're saying these things to you, Timmy and you keep saying yes sir, alright, but I want...I wanted to...you know, I want you to understand that we don't want to put words in your mouth, okay.  Is that what had happened?
A:      Yes sir.

THOMASEVICH: Okay, now the reason why we're repeating this to you is because you told us this earlier, right?
A:      Yeah.

THOMASEVICH: Before we went on tape?
A:      Yes sir.

THOMASEVICH: Okay, is there anything that we're saying that is not true or not so?
A:      Everything true on this tape here.

THOMASEVICH: Okay, I'm saying what we've been discussing with you and what we are saying that you told us before, is it all true?
A:      Yeah, some of it.

12

THOMASEVICH: What do you mean some of it?
A:    Well, this part here, yes sir.  All this here, yeah.

THOMASEVICH: Alright, what you're saying is you lied the first time, is that what you're saying?
A:    Yes sir.

THOMASEVICH: Okay.

Q:    Okay, we had been talking here for about an hour before the tape, is that correct?
A:    Yes sir.

Q:    Okay, and we basically were telling you about the investigation and things we had known?
A:    Yes sir.

Q:    And in the beginning you were denying it and saying that you weren't involved and saying that...
A:    Yes sir.

Q:    Now, basically you were lying at that time.
A:    Yes sir.

Q:    Okay and now you're telling us the truth?
A:    Yes sir.

Q:    Okay.

THOMASEVICH: Is there anything else that you want to add to this tape, Timmy, that maybe we're forgetting to ask you that would be important to the case?
A:    No sir.

THOMASEVICH: Is that just about everything that happened that night?
A:    Yes sir.

Q:    Okay Timmy, we had . . .we had mentioned some people that we had spoken to, people you had spoken to and told about this.  Are there other people that you had confided in about the being involved in the death of the deputy sheriff that you had told?
A:    No sir. . . .

THOMASEVICH:  Let me ask you something, Timmy.  Did you ever tell your mother about this?
A:    No, sir.

THOMASEVICH:  Were there ever some letters that were written back and forth between you and your mother, where you mentioned about the fact that you were involved with this deputy?

13

A:      No, sir.

THOMASEVICH:  The reason I am saying that is because one of the boys mentioned something to him about letters with your mother?

A:      No, sir.

THOMASEVICH:  Okay.  Did your step-mother know about it?

A:      No, sir.

THOMASEVICH: Okay, did you ever talk to Andre Butler about this?

A:      Yes sir.

THOMASEVICH: Okay, when did you talk to him about that?

A:      After the incident happened.

THOMASEVICH: Alright.

A:      That was about . . .the day . . .I forgot what day it happened on.  Like a week later.

Q:      It was actually early Tuesday morning.  It was a Monday night into the early part, 1:45 on a Tuesday morning.

A:      Yes sir.

Q:      So that would have been what, that actual day, that Tuesday?

A:      Yes sir.

Q:      Well, how did you know about that rock pit, you lived in that area a while?

A:      Yes sir.

Q:      You used to swim there?

A:      Yes sir.

Q:      Okay, and you never told any of these people what you did with the gun or what was done with it with you and Keith?

A:      No sir.

THOMASEVICH: Did you ever see Keith after the night that this happened?

A:      No sir.

THOMASEVICH: So in other words, after the shooting happened, I believe that you went to the Detention Center, pretty much right after this, right?

A:      Friday morning, yes sir.

THOMASEVICH: Okay and Keith King, I believe was . . .was he in jail at the time or did he go to

14

jail?

A:      I don't know, sir.

THOMASEVICH: Okay, but what I'm asking you is the night that this happened or the morning that this happens, Tuesday morning, okay. Now you guys finally split up, right?

A:      Yes sir.

THOMASEVICH: Did you ever see Keith King again. . . .

A:      No sir.

THOMASEVICH: From that day til today?

A:      No sir.

THOMASEVICH: Okay, so you've never sat down and talked about the story about what happened?

A:      No sir.

THOMASEVICH: Okay.

Q:      Okay Tim, is there anything else we forgot to ask you, anything you can think of that may be important?

A:      No sir.

OKAY, THE TIME CONCLUDING THIS STATEMENT IS GONNA BE AT APPROXIMATELY 8:35 HOURS THIS DATE.

15

ATTACHMENT / EXHIBIT __2__

STATEMENT OF: <u>Keith D. King</u>  <u>PK90-11-314</u>
Homicide

This is to be a sworn taped statement in reference to BSO case
number PK90-11-314.  The offense is classified as the shooting
death of a Broward County Sheriff's Deputy, which occurred on
November 13, 1990. a Tuesday morning in or around approximately
1:45 a.m.  This incident occurred in front of the Circle K
convenience store located at 3990 West Hallandale Beach Boulevard.
This statement's being taken by Detective Carr and Detective
Thomasevich, members of the Broward County Sheriff's Homicide
Division.  It's being taken on June 4th, 1991.  This will be a
statement of one Keith Donahue King being taken.

Q:   Okay sir, for the record  would you please state your full
     name?
A:   Keith Donahue King.

Q:   Okay Keith, what is your current home address?
A:   2680 Northwest 21st Court.

Q:   Ft. Lauderdale?
A:   Ft. Lauderdale, Florida.

Q:   Okay, is there a phone number there?
A:   484-3225.

Q:   Okay Keith, what is your date of birth?
A:   5-25-73.

Q:   And you're 18 years of age?
A:   Yes.

Q:   Okay Keith, before I ask you any questions in regard to this
     incident, I need to advise you as well as being a detective
     with the Broward County Sheriff's Department. I'm also a
     Notary Public with the State of Florida at large. What this
     means is I'm empowered to take a sworn statement from you at
     this time.  I'm gonna be placing you under oath and you'll be
     swearing to tell me the truth in regard to this incident.  Do
     you understand?
A:   Yes.

Q:   Okay, Keith would you raise your hand please.  Do you solemnly
     swear to tell the truth and nothing but the truth so help you
     God?
A:   Yes.

ATTACHMENT / EXHIBIT 3

STATEMENT OF: Keith D. King                      PK90-11-314
                                                 Homicide


Q:   Okay.  Also Keith, before I speak to you in regard to this
     incident, upon making contact with you, I had advised you of
     your Constitutional rights, is that correct?
A:   Yes.

Q:   Okay, do you understand those rights?
A:   Yes.

Q:   Okay, is there anything about your rights that you don't
     understand that I can clarify with you or do you understand
     them?
A:   I understand.

Q:   Okay, are you giving this statement of your own free will?
A:   Yes.

Q:   Okay.

THOMASEVICH:  Okay Keith, also before we go on, as Det. Carr said,
     and you answered yes that you're giving this statement of your
     own free will, is that correct?
A:   Yes.

THOMASEVICH:  Okay, have you been forced or tricked in any way to
     give this statement?
A:   No sir.

THOMASEVICH:  Okay, also while you've been here talking with us
     about this, have you been given water to drink?
A:   Yes.

THOMASEVICH:  And I believe we also gave you pizza to eat, you had
     dinner?
A:   Yes.

THOMASEVICH:  Okay and you've been to the bathroom several times,
     you explained that you have a problem, something about going
     to the bathroom kind of often?
A:   Yes.

THOMASEVICH:  And you've been to the bathroom at least three times,
     right?
A:   Yes.


dah                          2   of 15

Homicide

THOMASEVICH:  Okay, so we've treated you properly since you've been here?
A:   Yes.

THOMASEVICH:   Okay.

Q:   Okay Keith, bringing your attention back to November 13, 1990. Okay, we had been discussing that date with you in regard to the shooting death of a deputy sheriff at a Circle K conveinence store.  Could you tell me in your own words who you were with and what happened in regard to that night, or actually early morning?
A:   I was with Timothy Brown.

Q:   Okay, how do you know Timothy Brown?  Let's start off with that.
A:   I know him when I was staying in Hollywood.

Q:   Okay, and where do you know him from, the Wiley Street area?
A:   From Mayo Street.

Q:   Okay, he lived on Mayo Street?
A:   Yes.

Q:   Okay, tell me about the...the early morning of November 13, 1990; when you came in contact with him and what happened at that time?
A:   Um....I had went over there and then...

THOMASEVICH:  Okay, where were you at?
A:   I was at his house.

THOMASEVICH:   On Mayo Street?
A:   On Mayo Street.

THOMASEVICH:   Okay.  What happened when you were at his house?
A:   "UNINTELLIGIBLE" and then he just told me he say I'm gonna hurt somebody and then so I say for what and he didn't say and then...and then so....so we had...had a bicycle, a black bicycle, a beach cruiser and then so we had....and then so he got on the bicycle and I got on the handlebars....

dah                              2  of 15

Homicide

Q:   Okay, before we...before we go into that getting on the bicycle, when you're at Tim's house and he tells you that he's gonna hurt somebody, does he go in more in detail that...that who he wants to hurt?

A:   He said a police officer.

Q:   Okay, so he tells you that specifically he wants to hurt a police officer?

A:   Yes.

Q:   Okay, do you ask him why?

A:   No sir.  I didn't ask him why.

Q:   Okay, do you ask him how he wants to hurt the police officer, what he wants to do?

A:   He...he just showed me a...ah...a hand gun.

Q:   Okay, he shows you a hand gun?

A:   Yes.

Q:   Okay, what kind of gun was it; we had a discussion and I showed you a...a revolver type gun, earlier.  Is that correct?

A:   Yes.

Q:   Is...was that the type of gun?

A:   Yes.

Q:   But you told me there was some differences about the gun that I had shown you in relationship to the gun that Tim Brown had shown you, is that correct?

A:   Yes.

Q:   What was the difference?

A:   It was a black gun and it had a brown handle on it.

Q:   Okay, and that was a snub nose .38 revolver like the one I showed you, is that correct?

A:   Yes.

Q:   But it had the brown handle.  That was the difference?

A:   Yes.

Q:   Okay, so Tim Brown shows you this gun and what does he tell you specifically that he wants to do with that gun?

A:   He said I'm gonna shoot a police officer.

dah                              4  of 15

HOMICIDE

Q:  That he was gonna shoot a police officer?
A:  Yes.

Q:  Okay, is it at that time that you leave the house on this bicycle?.....I'm saying, do you...after he tells you this, do you...you said that you got on a bicycle...
A:  Oh, yes.

Q:  Now, whose bicycle was that that you described?
A:  His bicycle.

Q:  His, Tim Brown's?
A:  Yes.

Q:  Okay, now how did both of yous ride on it?  Whose riding the bike and where are you sitting?
A:  I was on the handle bars and he was on....he was on the seat of the handle bars peddling.

Q:  Okay, so he's peddling the bicycle and where do you go; you leave Mayo Street and where do yous go?
A:  On to Circle K.

Q:  The Circle K on what, on Hallandale Beach Boulevard?
A:  Yes.

Q:  Okay now, we were talking about this earlier; the Circle K is on Hallandale Beach Boulevard and 40th, is that correct?
A:  Yes.

Q:  Okay and we had shown you pictures and you indicated different positions of where you were and stuff at that Circle K, which we'll get into, but that is the Circle K that we showed you in the photographs?
A:  Yes.

Q:  Okay, okay that's a little distance from Mayo Street.  Do you remember about how long it takes you to ride your bike over there?
A:  On the bicycle, um.....

Q:  Just approximate.
A:  Um, about an hour or...

Q:  Okay, so basically, you're just riding around that night?

dah                              5   of 15

<u>Homicide</u>

A:    Yes.

Q:    Okay, is there any particular reason why yous go to that
      Circle K?
A:    No sir.

Q:    No...
A:    We just went to a Circle K.

Q:    Okay, you just go to a Circle K.  So basically, you're just
      riding around?
A:    Yes.

Q:    Okay and you're not actually in control where you're going:
      Tim Brown is?
A:    Yes.

Q:    Okay, you get to this Circle K and what happens when you
      arrive in the area of the Circle K?
A:    We see the...a police officer.

Q:    Okay, where is the police officer when you see him?
A:    He was um...right in front of the Circle K.

Q:    Okay now, is he in a car, is he on foot, what is he doing?
A:    He was in a car.

Q:    Okay, and what is the police officer doing?
A:    He was...he was sitting in the car...he was sitting in the car
      and he was doing some paperwork.

Q:    Okay, he's doing some paperwork, he looks like he's writing
      something?
A:    Yes.

Q:    Okay, how is the car parked?
A:    Backwards.

Q:    Okay, so it's backed into the parking space?
A:    Yes.

Q:    Okay, do you remember if the inside light to the...to the
      car...the dome light that they call...what that on or off?
A:    It was on.

dab                                    6  of 15

MXXX-11-314
Homicide

Q:    Okay.

THOMASEVICH:  Did you actually...you were actually able to see him
        writing in there?
A:    Yes cause....no, I seen him like he had his head down....

THOMASEVICH:  Okay.  So he had his head down looking at the
        paperwork that he was doing?
A:    Yes.

THOMASEVICH:  Okay, now where is it that you finally park the
        bicycle?
A:    On the...on the side of the building.

THOMASEVICH:  Okay, show me in this photograph as we're talking,
        where are we talking about?
A:    Like....like came through here.

Q:    Okay, you're indicating that behind the wall; you're pointing
        to a wall with your fingers, is that correct?
A:    Yeah, the wall.

Q:    Okay.
A:    And then so I was, you know I say I was right there with the
        bicycle.

Q:    On the grass area back there?
A:    Yeah, back there in the grass area.

THOMASEVICH:  Now let me ask you something.  Do you come from
        behind the wall when you come with the bike or do you come up
        from the front?
A:    No, we had came from...from one of these ways.

THOMASEVICH:  Okay.

Q:    From one of the back streets here?
A:    Yeah.

THOMASEVICH:  Alright, so you come up from behind this wall...
A:    Uh huh.

THOMASEVICH:  And then you come around the wall.....
A:    And come around...right....

dah                                    ? of 15

Homicide

THOMASEVICH:  And put the bike in front of the wall but it's still
     on the side of the store?
A:   Yes.

THOMASEVICH:  Okay, and as we're talking about this, you're showing
     me on a photograph, right?
A:   Yes.

THOMASEVICH:  Okay now, what happens at that point: what is Timmy
     do and what do you do?
A:   Well, I get off the bicycle first so he can get off...

THOMASEVICH:  Right.
A:   And, you know what I'm saying, and I had to stay around there
     with the bicycle.

THOMASEVICH:  Okay, so you stay on the side of the Circle K with
     the bicycle?
A:   Yes.

THOMASEVICH:  And what does Timmy do?
A:   And then he just, you know what I'm saying, like he just get
     off the bicycle.

THOMASEVICH:  Okay and then what does he do?
A:   And then...and then.....and then he just walk up, you know, no
     but I ain't know what he was saying to the police officer.

THOMASEVICH:  Okay, show me where Timmy walks.
A:   You know what I'm saying, like...he got off the bicycle and
     I'm right there.

THOMASEVICH:  Right.
A:   He walked out...

THOMASEVICH:  So he walks right along the side of the building
     here?
A:   Yes.

THOMASEVICH:  And that's across the grass?
A:   Yes.

THOMASEVICH:  So he's actually coming up to the...to the back of
     the car on the driver's side?
A:   Yes.

dah                              8  of 15

THOMASEVICH:  When he gets to the car.
A:    Yes.

THOMASEVICH:  Okay, so then he walks up to the side window?
A:    Yes.

THOMASEVICH:  And what happens when he gets to the side window?
A:    And then, but I don't know what he was saying to the police
      officer, but you know he had the gun stuck down in
      his....ah..pants...

THOMASEVICH:  Okay.
A:    And then that's all I know, he just pulled it out and he had
      shot it one time.

THOMASEVICH:  Okay, so when he gets to the side window where the
      police officer is sitting, he...he actually talks to the
      police officer?
A:    I don't know what he was saying....

THOMASEVICH:  Okay, but what I'm saying is can you see his mouth:
      was he talking to him?
A:    Yeah, I seen his mouth moving but I don't know what he was
      saying cause....

THOMASEVICH:  Okay.
A:    I don't know how to read their mouth language.

THOMASEVICH:  You couldn't hear what he was saying?
A:    No sir.

THOMASEVICH:  Okay, but then you see him pull the gun out?
A:    Yeah, I seen him pull the pistol out.

THOMASEVICH:  Okay, and you said that the gun was in his pants?
A:    Yes.

THOMASEVICH:  Now, did he have his shirt on over it or did he have
      the gun showing or...
A:    No, he had his shirt like....shirt over it.

THOMASEVICH:  So he had the gun under the shirt and tucked in his
      pants?
A:    Yes, so nobody come and see what he had.

dah                              9  of 15

THOMASEVICH:  Okay, now when he takes the gun out, what does he do, you just...well, you tell me what...what he does.
A:   He just takes it out and he just shoot.

THOMASEVICH:  Okay and he fires it how many times?
A:   Once.

THOMASEVICH:  One time?
A:   And then he ran back and got the bicycle and then he dipped the other way and I had ran the other way....

THOMASEVICH:  Okay, now on this photograph again, which way does Timmy go with the bicycle?  You show me with your finger. Okay, so he's heading east....
A:   Uh huh.

THOMASEVICH:  On the back street behind the Circle K, which I believe is Southwest 30th Street?
A:   Uh huh.

THOMASEVICH:  Which way do you run; show me with your finger.
A:   Straight up.

THOMASEVICH:  Okay, and you're indicating....you're running south on 40th Avenue?
A:   Uh huh...but.....but on the...on the day like I had told you all the first time, but I couldn't tell which way I was running cause I was, you know what I'm saying, like high.

THOMASEVICH:  Okay, alright, tell me about that.  You said that you were high at the time?
A:   Yes.

THOMASEVICH:  Okay, what were you high on?
A:   On..on lace....on crack and on crack and...reefer.

THOMASEVICH:  Okay, now was Timmy taking any kind of crack cocaine as far as you know?
A:   Not that I know of.

THOMASEVICH:  Okay, did he seem like he was on crack at the time?
A:   No sir.

THOMASEVICH:  Okay, did he seem like he know...he knew what he was doing and what he was talking about?

dah                              10 of 15

A:   Yes.

THOMASEVICH:  Alright, now after the two of you split up, where do
     you go after you run off?
A:   No, I say I run....I ran and then..and then I..and then he was
     already at his house.

THOMASEVICH:  Alright, so you go back to Timmy's house?
A:   Yes.

THOMASEVICH:  How do you get back there?
A:   We run.

THOMASEVICH:  Okay, so you're on foot?
A:   I run then I stopped and then I walked.

THOMASEVICH:  Okay.
A:   And then I run again.

THOMASEVICH:  Well, what I'm saying is you didn't take no bus or a
     car or anything?
A:   No, no sir.

THOMASEVICH:  You went back on foot?
A:   Yes.

THOMASEVICH:  Okay, now when you get back to Timmy's house, you
     said he's already there?
A:   Yes.  I knock on the door and then I say...and then I ask his
     parents was he home and they say yes and then so I ask may I
     speak to him.  And then, so they had called him.  He came to
     the door and say...and then so he say yeah and then so I ask
     him man, why you did that.

THOMASEVICH:  And what'd he say?
A:   And then so he told me just don't worry about it and then so
     I just say alright.  Then I had left.

THOMASEVICH:  Okay, so you didn't actually stay at his house then?
A:   No sir.

THOMASEVICH:  Where did you go after you left his house?
A:   I had went home.

THOMASEVICH:  And how did you get home?

dah                              11 of 15

Homicide

A:      Wait...wait...it was late, but I had to walk.

THOMASEVICH:   Okay, so you walked all the way back home?
A:      Yes.

THOMASEVICH:   To Ft. Lauderdale?
A:      Yes.

THOMASEVICH:   Okay.
A:      I had to walk cause like "UNINTELLIGIBLE" you know what I'm saying. Like I go up there and see Miss Pentigrass....

THOMASEVICH:   Uh huh.
A:      And then your thing got in the way back home but then again she usually she give me money but this time, see I don't....I...

THOMASEVICH:   Okay.
A:      So I had to walk.

THOMASEVICH:   So you didn't have no money on you?
A:      No....

Q:      And you went to Miss Pentigrass' house that day, that morning?
A:      Well that morning, you talking about when I got there or you talking about when I had came from...

Q:      From Tim's house.
A:      Oh....

THOMASEVICH:   Now, after Tim's house, did you go to Mister...Mrs. Pentigrass' house?
A:      Oh, you're talking about....oh, yeah.

THOMASEVICH:   After....after the deputy was already shot....
A:      Yeah.

THOMASEVICH:   Did you go after that to...to Mrs. Pentigrass or did you just walk home?
A:      I went to....alright, when he got shot....

THOMASEVICH:   Right.
A:      And then I went to Timothy house....

THOMASEVICH:   Okay, but you didn't go to Mrs. Pentigrass' house?

dah                          12  of 15

Homicide

A:   No, but I usually go over there but I ain't go over there.

THOMASEVICH:  Okay, so you just walk home at that time?
A:   So I just had walked home.

THOMASEVICH:   Okay, did you ever see Timmy Brown after this happened?
A:   No sir.

THOMASEVICH:  How come you never saw him again?
A:   I just I never go back up there.

Q:   Did you ever talk to anybody about this incident; tell them what had happened?
A:   No sir, but I usually talk, but you know...when I had got back down here, you know, I usually talk to somebody about it but I just...I ain't talk to nobody cause....

THOMASEVICH:  So you never had a conversation with anybody about this?
A:   No sir.

Q:   Did you ever tell your buddy that you hang around with over there by Mrs. McCoy's house; is his name Richard?
A:   No sir.

Q:   You never told him about this?   You just kept this to yourself?
A:   Yes.

Q:   Did you ever try to make contact with Tim Brown?
A:   No sir.

Q:   Do you know why Tim Brown did this and what his reasoning was?
A:   No sir, he just told me, he say he...he just told me say I'm mad, and I'm gonna...you know what I'm saying, hurt somebody.

Q:   That he was just mad and he was gonna hurt somebody?
A:   Yes, but he ain't tell me the reason why he was gonna do it.

THOMASEVICH:  Do you know if he...if he had any trouble with any police officer?
A:   What?

dah                          13 of 15

THOMASEVICH:  That, you know, meaning, you know that he had
     problems that night or anything with a police officer, that
     that's why he was mad?
A:   Not that I know of, but I know he was just mad, you know what
     I'm saying, like angry.

THOMASEVICH:  So now this police officer that was shot, do you
     believe that Timmy wanted to kill that particular police
     officer or was it just any police officer he came across?
A:   Well...well, what I think it was just any, any police...

THOMASEVICH:  Okay, you think...you think he just...when you
     guys saw the car parked there, it was just an opportunity
     and...and he took that opportunity?
A:   Yes.

Q:   Okay Keith, is there anything else about this incident that
     you can recall?  Possibly something we forgot to ask you,
     anything at all that you remember?
A:   No sir.

THOMASEVICH:  I have one other question that we forgot to ask you:
     we asked you before we went on tape and I know the answer.
     Did Timmy Brown ever tell you what he did with the gun?
A:   No sir.  He...no...like...alright now remember I had told you
     when I had went over to his house?

THOMASEVICH:  Yes.
A:   But...but I ain't say that part.

THOMASEVICH:  Okay.
A:   You know what I'm saying, but...but like I had asked him and
     then he...he tell me he say he didn't know what he did with
     and that and then so I say, you know what I'm saying, I say
     like at least you should, you know what I'm saying, like tell
     somebody where you put the gun at and then he just said no,
     I ain't telling nobody so I say fuck it.

THOMASEVICH:  Okay, did he...did he say what he did with it,
     whether he threw it somewhere or did he, you know...
A:   He just...he just ain't tell me nothing.

THOMASEVICH:  Alright, he wouldn't tell you what he did with the
     gun?
A:   He just ain't tell me nothing.

_____ _ _. __ _ _ _. Keith D. King

THOMASEVICH:  Okay.

Q:    Keith, have you been truthful with this statement?
A:    Yes.

Q:    Okay.

THOMASEVICH:  Okay. we have no further questions at this time.
This statement is concluded at.....

Q:    Nine minutes after eight. this date..

# Federal Public Defender
# Southern District of Florida

Statement of Mary Pendergrass taped on June 10, 1992

**BRODLEIB:** Let the tape reflect that this statement is being taken on June 10, 1992 at approximately 3:44 p.m. at 5844 Wiley Street, Hollywood.  This is a taped statement taken from on **Mary PENDERGRASS**, a B/F who resides 5844 Wiley Street in Hollywood, Florida.  Her phone number is 966-8487.  This statement being taken with regards to certain knowledge that **Ms. PENDERGRASS** has with regard to a **Keith KING** and a **Timothy BROWN**.  **Ms. PENDERGRASS** at this time I would like to place you under oath by virtue of my commission as a Notary Republic for the State of Florida at large.  Will you please raise your right hand?  Let the record reflect that **Ms. PENDERGRASS'** right hand is raised at this time.  Do you solemnly swear to tell the truth the whole and nothing but the truth so help you God?

**Ms. PENDERGRASS:**        Yes I do.

**BRODLEIB:** Ok thank you, you can put your hand down now.  Are you aware that it a crime under Florida law to knowingly furnish false information while under oath?

**Ms. PENDERGRASS:**        Yes I do.

**BRODLEIB:** Ok, can you talk a little louder.

**Ms. PENDERGRASS:**        Oh, yes I do.

**BRODLEIB:** Um, I wanna ask you a couple of questions um.  We spoke before and you were **Keith KING'S** foster mother?

**Ms. PENDERGRASS:**        Yes.

**BRODLEIB:** Approximately how long were you his foster mother?

**Ms. PENDERGRASS:**        Three to four years.

**BRODLEIB:** And what time frame are we talking about?  What years?

**Ms. PENDERGRASS:**        Um, end of 80's, um late 80's.

**BRODLEIB:** In the late 80's.

**Ms. PENDERGRASS:**        Uh huh.

**BRODLEIB:** Like 87, 88

ATTACHMENT / EXHIBIT

**Ms. PENDERGRASS:**     Uh huh.

**BRODLEIB:** 89

**Ms. PENDERGRASS:**     Something like that.

**BRODLEIB:** Ok. Um, I'm going to be showing you a few pictures right now of a **Timothy BROWN**. Have you ever seen this person before?

**Ms. PENDERGRASS:**     No, I have never seen him before.

**BRODLEIB:** Ok.

**Ms. PENDERGRASS:**     I have never seen (inaudible).

**BRODLEIB:** Uh, **Keith KING** had friends over the house or had people over the house? This **Timmy BROWN** was he ever one of these people that were over your house?

**Ms. PENDERGRASS:**     No. **Timmy BROWN** was never there.

**BRODLEIB:** Did you ever hear of **Keith** talking about a **Timmy BROWN**?

**Ms. PENDERGRASS:**     Never.

**BRODLEIB:** Ok. Did it come a time when uh you spoke to a Broward Sheriff's Office Homicide Detective?

**Ms. PENDERGRASS:**     Yes, over the phone.

**BRODLEIB:** Did you ever speak them in person?

**Ms. PENDERGRASS:**     No. Never.

**BRODLEIB:** Did they attempt to come to your house?

**Ms. PENDERGRASS:**     Yes.

**BRODLEIB:** They left cards at the front door?

**Ms. PENDERGRASS:**     Yes. Uh um.

**BRODLEIB:** Ok. But they never came into your house and spoke to you personally?

**Ms. PENDERGRASS:**     Never.

**BRODLEIB:** Ok. The only time you spoke to them in other words was never face to face was just via the telephone.

**Ms. PENDERGRASS:**       Over the phone.

**BRODLEIB:** Ok. Did they ask you if you knew **Timmy** BROWN? Is that what they spoke to you about?

**Ms. PENDERGRASS:**       Oh yes. They asked me did I know **Timmy** and I told them no.

**BRODLEIB:** So in other words they never came to the house and spoke to you personally?

**Ms. PENDERGRASS:**       Personally.

**BRODLEIB:** They only spoke to you over the telephone?

**Ms. PENDERGRASS:**       Over the telephone.

**BRODLEIB:** And they asked you about if you knew a **Timmy BROWN**?

**Ms. PENDERGRASS:**       A **Timmy BROWN**.

**BRODLEIB:** And your answer was?

**Ms. PENDERGRASS:**       No. I don't know a **Timmy BROWN**.

**BRODLEIB:** They showed you a photo or a photo lineup of anybody?

**Ms. PENDERGRASS:**       No. Never.

**BRODLEIB:** Never. You also mentioned to me yesterday, uh, that foster parents have to have a curfew on their kids.

**Ms. PENDERGRASS:**       Yes.

**BRODLEIB:** Could you go into that a little bit?

**Ms. PENDERGRASS:**       Yes. With HRS Foster parents have to have a curfew. Say like 11:00 p.m. if the kid is not in at 11:00 by 11:30 no later than 12:00 you have to call for a police pickup order on a foster child, because you are responsible when HRS place the children in your home. Say for instance if the kid is not home and the kid, if something happen to him, you know the kid get in a bad accident or anything. Then they gonna say, why you didn't call for a police pick up order on him.

**BRODLEIB:** So, it's your responsibility?

**Ms. PENDERGRASS:**       Yeah.  It's, it's the foster parents responsibility to always call for a pickup order if the kid is not home be curfew.

**BRODLEIB:** Uh, did there ever come a time when **Keith** was here that he didn't come home on time?

**Ms. PENDERGRASS:**       Yes.  Many times.

**BRODLEIB:** And what did you do?

**Ms. PENDERGRASS:**       I call for a pickup order, police pickup order.

**BRODLEIB:** So that's just a normal operating procedures?

**MS. PENDERGRASS:**       Yes.  That you have to do.  Uh, um.

**BRODLEIB:** Ok, Uh, just to reiterate on uh, one important point again.  Uh, the Broward Sheriff's Departments, the Homicide Investigators or any other type of Broward Sheriff's Office never came to your house and never saw you personally, did they?

**MS. PENDERGRASS:**       Never, they never.

**BRODLEIB:** Never showed you any pictures, did they?

**MS. PENDERGRASS:**       No.  No pictures.

**BRODLEIB:** They only spoke to you on the telephone?

**MS. PENDERGRASS:**       Once.  Just once on the phone.

**BRODLEIB:** They asked you about Timmy Brown?

**MS. PENDERGRASS:**       Yes.

**BRODLEIB:** And you replied that you did not know a Timmy Brown?

**MS. PENDERGRASS:**       Did not know a Timmy Brown?

**BRODLEIB:** And the pictures that I showed you today of Timmy Brown, you stated to me that you have never seen this person before?

**MS. PENDERGRASS:**       I have never seen Timmy Brown before.

**BRODLEIB:** Have I or anybody threatened you, paid you, or cohorts you to give this statement?

**MS. PENDERGRASS:**        No.

**BRODLEIB:** Are you giving this statement of your own free will?

**MS. PENDERGRASS:**        Yes I am.

**BRODLEIB:** This statement will be concluded at 3:51 p.m. Thank you.

# FEDERAL PUBLIC DEFENDER
## Southern District of Florida

## STATEMENT OF
### MONICA C. WILLIS

I, **Monica Cherise Willis**, DOB: 11 November 1966 am presently residing at 2250 S W 52nd Ave, #1, Hollywood, Florida. I am giving this statement in regard to an incident which occurred in the summer of 1991. At the time I was living at 5717 Mayo Street in Hollywood, Florida with my husband Donald and three children. I had moved into the residence prior to October 1990. The previous occupant was Othalean Brown.

Sometime during the summer of 1991 several plainclothes officers from the Broward County Sheriffs Office came to my home sometime after midnight. I am not sure of the exact time. I went to the door and they asked me questions about Ms. Brown and Timothy Brown. At first they questioned me about Tim Brown being in the house or if he had ever stayed there. I explained that I did not know them that well and that Tim Brown had never stayed in the house since I rented it. They also asked if I was familiar with the killing of a Deputy Sheriff. I told them I remember the shooting happened at the Circle K store on Hallandale in November. I remember hearing about it the following day on the news. They then asked me if a black male had come to my house on Mayo Street in the early morning hours after the shooting looking for Tim Brown. I told them no one did at that time or any time since then. While I was being questioned there appeared to be several other officers around the outside of my house with flash lights. The officers did not ask to come into my house and did not tell me if they had a search warrant or an arrest warrant. After the conversation they left my house and I did not speak to them again.

ATTACHMENT / EXHIBIT 5

The above statement is true to the best of my knowledge. I have not been promised anything or threatened in any way to make this statement.

This statement was prepared by Investigator Dennis Stinson of the Federal Public Defender's Office based on information I provided to him during a telephone conversation in December, 1998.

Monica Cherise Willis

**Monica Cherise Willis**

Date: _____4/15/99_____

Witness: _____
Dennis Stinson

Date: _15 January 1999_

Sworn Taped Statement by Keith Donahue King, taken at Hamilton Correctional Center in Jasper, Florida on May 20, 1999 at approximately 1:00PM. Present during this taped statement is myself Dennis Stinson, Investigator with the Public Defender, Southern District of Florida and Investigator Jerry Cribbs who is with the Federal Public Defender out of the Central District of Florida, Jacksonville office. At this time, Mr. Cribbs will put Mr. King under oath.

Keith I'm going to ask you to raise your right hand and I'm going to put you under oath for this statement. Do you solemnly swear that the information that you are about to give in this cause is the truth the whole truth and nothing but the truth so help you God?

King: Yes sir.

Cribbs: Thank you.

Stinson: Alright Keith, we're going to go back to an incident on November 13, 1990 in Hallandale, Florida. The incident was the killing of a Broward Co. Sheriff's Deputy by the name of Patrick Behan. This occurred at the Circle K store at 3990 Hallandale Beach Blvd. During the course of your investigation by the Broward Co. Sheriff's Dept. you were eventually picked up and charged as being either the killer of Deputy Behan or being involved with the killing of Deputy Behan with another individual by the name of Timothy Brown. Is that correct?

King: Yes sir.

Stinson: As I understand it, you were picked up at the Mable McCoy residence by two detectives. One being Detective James Carr the other being Detective Eli Thomas Evich of the Broward Co. Sheriff's Office. Is that correct?

King: Yes sir.

Stinson: You were transported from that house on June 4, 1991 and you were taken to the Broward Sheriff's Office homicide unit to be interrogated. Is that correct?

King: Yes sir.

Stinson: Let's start with while you were being taken to the Broward Sheriff's Office in the back of a patrol car which was being, you think, driven by Detective James Carr but Thomas Evich was also in the car. Is that correct?

King: Yes sir.

Stinson: While you were being transported, did either one of those detectives make any statements to you about what was going to happen to you?

King: Yes sir.

ATTACHMENT / EXHIBIT _6_

Stinson: Which one?

King: Detective Carr.

Stinson: Was that the one with the dark mustache?

King: Yes sir.

Stinson: Now the other one was Mr. Thomasevich, he was a tall slender fellow?

King: Yes sir.

Stinson: OK. Now did Detective Carr say anything to you while you were in route to the sheriff's department?

King: Yes sir.

Stinson: What did he say to you?

King: He told me that gonna watch you fry in the fucking electric chair.

Stinson: That you're going to fry in the electric chair?

King: Yes sir.

Stinson: And prior to him making that statement, had he told you anything about why you were going to fry in the electric chair?

King: No sir.

Stinson: So when that statement was made to you, you didn't know what he was talking about?

King: No sir.

Stinson: Did he make any other statements other than that before you got to the sheriff's dept?

King: No sir, he just kept saying we're gonna watch you fry in the electric chair.

Stinson: And you said what?

King: I said, I don't know what you're talking about.

Stinson: OK, you get to the sheriff's dept and you're taken into an interview room?

2

King: Yes sir.

Stinson: When you get in the interview room, there was three people there at first?

King: Yes sir.

Stinson: Do you know the individual's name who is the third person besides Thomasevich and Carr?

King: ah -- he was like a lieutenant or sergeant

Stinson: OK, would you remember him if you saw his face again?

King: Yes sir.

Stinson: Did that individual make any statements to you at the homicide unit?

King: Yes sir.

Stinson: What did he say to you?

King: He told me that -- ah -- that a police -- ah -- sheriff's deputy had been killed and -- ah-- do I know anything about it. I told him no sir.

Stinson: OK. Did he say anything else to you? Or did he leave the room?

King: Then he left the room.

Stinson: Alright, who came into the room then?

King: Detective Carr.

Stinson: And did Mr. Thomasevich come in the room also?

King: Yes sir.

Stinson: Were those the only two people that stayed in the room with you?

King: Yes. During that time

Stinson: OK. Now apparently one of them or both of them started questioning you without a tape recorder being played?

King: Yes sir

3

Stinson: Now did they come in there with any photographs or anything and start discussing something with you?

King: Yes

Stinson: What did they do?

King: They came in there with some pictures of the crime scene, big photos blown up.

Stinson: OK were they daytime photos or nighttime photos?

King: Nighttime.

Stinson: OK and what did they show you on those pictures, and what did they tell you?

King: Ah -- they told me a police officer had been killed and they told me the crime scene where the car was and the Circle K store and he ask me do I remember of the store -- and I told him I said yea I remember the store

Stinson: Why do you remember the store?

King: Cause it looked familiar, it looked familiar

Stinson: Had you ever been in that Circle K?

King: No sir.

Stinson: You've never gone to that Circle K store in your entire life?

King: Never went there, not a day in my life.

Stinson: OK, you knew where it was though?

King: Yes

Stinson: OK, alright did anyone ever show you photographs and telling you certain things?

King: Yes

Stinson: Did they talk to you about the sheriff's deputy vehicle and how it was parked?

King: Yes

Stinson: What did they say?

4

King: They had told me it was parked on the side of the store.

Stinson: Did they tell you how it was parked?

King: They said backed up.

Stinson: It was backed up? This is them telling you that?

King: Yes

Stinson: And did they ever talk to you during this time while they were showing you photographs? Did they ever mention to you about a bicycle?

King: Yes.

Stinson: What did they say about a bicycle?

King: They said it was bicycle that was riding in the area.

Stinson: Did they tell you how they knew that?

King: Um - yea. They -- um -- had told me -- said there was a bicycle riding in the -- um -- area and -- um -- I told them yep and he said well was you (unintelligible) all was on it and I said yep.

Stinson: OK now wait a minute. You didn't tell him that until after something else happened to you. These are the initial pictures that you're showing at first, right?

King: Yea.

Stinson: OK lets not jump ahead of ourselves. After they show you pictures of the crime scene and these looked like aerial photographs that came down from the sky?

King: Yea.

Stinson: Looked like a helicopter had taken them?

King: Yea, yea.

Stinson: And they're all nighttime photographs?

King: Nighttime.

Stinson: Now all this time they're trying to tell you or asking you to talk about the killing of the

5

deputy?

King: Yes.

Stinson: And what were you doing at that time, were you saying OK or were you denying it or what?

King: I telling them I didn't know what they were talking about.

Stinson: Did this go on for a few minutes?  Were they getting upset with you or what?

King: Yea and like really upset.

Stinson: Which one was getting upset, Mr. Carr or Mr. Thomasevich?

King: Detective Carr.

Stinson: How far were they sitting away from you at the table?

King: They were like sitting like close on detective Tommy (unintelligible) sitting on the other side of the table and detective Carr was sitting right next to him.

Stinson: OK- now when you were sitting there, were you handcuffed or shackled in any way?

King: All- I was handcuffed to the table at one side.

Stinson: OK-which hand did you have handcuffed to the chair?

King: Right hand.

Stinson: And why is that? Do you write left handed?

King: Yes.

Stinson: OK. Now you admit signing a waiver form?

King: Yes.

Stinson: OK. Do you believe that at that time you understood what your rights were?

King: No sir.

Stinson: Alright, your being questioned by Detective Carr?

6

King: Yes.

Stinson: You said Detective Carr was getting upset with you?

King: Yes.

Stinson: Did something happen that upset you that Detective Carr may have done to you?

King: Yes.

Stinson: What did he do?

King: He punched me in my eye.

Stinson: Which eye?

King: Ah..

Stinson: You're showing me the left eye?

King: Left eye.

Stinson: Did he punch with an open hand or did he punch you with a closed fist?

King: With a fist- with his fist closed.

Stinson: And what did he say to you when he hit you, do you remember anything he said to you?

King: He telling me I'm lying.

Stinson: Whatever you remember him saying. You just remember his saying that you're lying to me?

King: Yep. He say I know you did it, I know you're lying

Stinson: OK. You told me earlier that you started crying

King: yep. I started crying because I told 'em I didn't know what they were talking about.

Stinson: OK now at some point in time also after this before they went on to the tape recorded confession that they say you gave, there came a point in time where they took a tape player and played a voice to you. This is also before you gave the taped confession. Is that correct?

King: Yes sir.

7

Stinson: Tell me what happened with the tape recorder with the voice you heard and what they said to you?

King: They had played -- um -- and they told me to say well -- I got somebody on tape (unintelligible) but at that time they didn't know who it was but they played it for me. So when they played it, it was a guy on the tape recorder -- um -- one of the detectives had asked him "You know Keith King?" He said yea and he said can you describe him? He said yea he walked with a limp and he had stopped -- um -- the tape.

Stinson: Who stopped the tape?

King: Detective Carr.

Stinson: Detective Carr. Alright so the tape is off?

King: Yep.

Stinson: What you heard this black male say on the tape was yes I know who Keith King is, I know him because he walks with a limp. Is that all you heard?

King: Yes.

Stinson: Alright now the tape is off, what did Carr say to you then?

King: They he had told me do I know who that guy was on that tape, I told him no. He had told me a guy named Solomon Gibbs.

Stinson: Solomon Gibbs?

King: Yes sir.

Stinson: Alright, do you know who Solomon Gibbs is?

King: Yes sir.

Stinson: Did you ever pal around with Solomon Gibbs?

King: No sir.

Stinson: Did you ever pal around or be friends with a brother of Solomon Gibbs?

King: Yes sir.

8

Stinson: And what was his name?

King: His name was Kevin Williams.

Stinson: Kevin Williams?

King: Yes sir.

Stinson: So were you shocked at that point in time to hear the voice of Solomon Gibbs?

King: Yes sir.

Stinson: But you never heard Solomon Gibbs say anything other than what you said just a minute ago?

King: No sir.

Stinson: Did there also come a point in time in this conversation with Detective Carr before you went on tape with your confession that he told you that you were linked with Timothy Brown because Timothy Brown had made an earlier confession?

King: Yes sir.

Stinson: And what did he say about that confession?

King: He told me that he had made a confession but they had thrown it out.

Stinson: OK, but did he also tell you that Timothy Brown used your name in his confession or that he just said you and Timothy Brown are linked together somehow?

King: He just like told me like me and him were like kinda linked in some kinda way.

Stinson: And did you ever tell them at that point in time whether you knew Timothy Brown or not that well?

King: I told them I know him but I ain't never hung around him or nothin like that there.

Stinson: Okay. Did they try to convince you that they had witnesses that say otherwise?

King: Yes.

Stinson: Did they ever give you names of people that would say you two hung around together?

9

King: The only one that I know of is Solomon Gibbs.

Stinson: That's the only one that they said would testify or they knew by Solomon Gibbs' statement that you two must hang around together. Is that what they lead you to believe?

King: Yes.

Stinson: OK, but that was not true?

King: No sir. Cause me and Tim ain't never hung around together.

Stinson: OK. So after they showed you the photographs they tell you about the car backed in they tell you about Solomon Gibbs they tell you about Mr. Brown's previous confession that they threw out?

King: Yes.

Stinson: They told you about a bicycle scene in the area of the store, so there must be a bicycle involved?

King: Yes.

Stinson: Did there come a point in time when either one of the detectives showed you a pistol or a firearm?

King: Yes.

Stinson: Which one showed you the gun?

King: Detective Carr.

Stinson: And where did he get the gun from?

King: From down in his ankle holster.

Stinson: He pulled out a gun from his ankle holster?

King: Yes.

Stinson: And would you describe that gun to me?

King: It was chrome like revolver.

10

Stinson: OK do you remember him talking what kind of caliber it was?

King: A .38 caliber.

Stinson: It was a .38? And he showed you his gun?

King: Yes sir.

Stinson: And do you remember what he said about that gun? Anything about it in relationship to the crime?

King: He told me it was the same kinda gun that was used in the killing of the police officer.

Stinson: Of Deputy Behan?

King: Yes.

Stinson: Have you ever owned or been in the possession of a .38?

King: No sir.

Stinson: What did he do with the gun after he showed you and said that is the kind of gun that killed Deputy Behan?

King: After he showed it to me he put it back where he got it from out of his gun holster down at his ankle.

Stinson: OK. It's my understanding then from this point in time after they showed you the pictures, did they make threats or anything to you during this time also about anything that you would get if you didn't cooperate?  Were you still denying what's going on?

King: Yes.

Stinson: After they hit you did you now decide to cooperate?

King: Yes.

Stinson: And why did you decide to cooperate?

King: Because I was scared and then ah then when he had hit me that's when he had hit me then that's when I felt that I should go ahead and say something because even though I thing didn't do it -- If it's something they want to hear just go on ahead and make a statement but at the same time I was scared.

11

Stinson: OK–were you afraid for your safety at that time because of the way Detective Carr was acting?

King: Yes.

Stinson: Was he close to you & in your face?

King: He was um telling me that I killed Deputy Patrick Behan. He was like in my face and I kept telling him no I didn't do it, I didn't do it. Then he like hit me in my face but he was like closer like we sittin now.

Stinson: So he was within arm's reach of you?

King: Yes.

Stinson: Was he less than three feet away? Like we are right now?

King: Yes.

Stinson: Was he ever yelling at you?

King: Yes.

Stinson: Did Thomasevich ever yell at you?

King: Not that much but he was like somebody who was just sittin over there and listening.

Stinson: He was like a witness to what you were saying?

King: Yes.

Stinson: OK. Did you also tell them at this time before you went on the taped confession that you were not involved in this case in any way, shape, or form with Timothy Brown?

King: Yes.

Stinson: And they didn't believe you?

King: No sir, they didn't believe me I just kept telling them I don't know what you all talking about I wasn't there, so they acting like where I was and I guess I had to be at home.

Stinson: At Ms. McCoy's house?

12

King: Yes, I think I was in her home, he like kept telling me, he talkin about ye you was there you was there, you was there and I wasn't there I don't know what you're talking about cause I had kept telling him I had seen it on the news probably like seen it on the news, but I hadn't really paid no attention to it so . . .

Stinson: Now during the course of your, you eventually went on the tape to give them the information that you thought they wanted to hear?

King: Yes.

Stinson: In your confession you said as we talked about it, I read it to you. One of things that you said was that you both decided to go down there on a bicycle and you told me the reason why the bicycle  was used was because of why?? The information that they had given you, was that correct?

King: Yes

Stinson: OK so they talked about a bicycle?

King: Yes.

Stinson: Did you own a bicycle?

King: No.

Stinson: How many times have you ever seen Timothy Brown face to face in your life? Just a very few times or (unintelligible)?

King: The only time I have seen him was like when I was staying in Hollywood a long time ago. That was about '88 or something like that. The last time I had seen him until both of us in the county jail.

Stinson: OK. So now they said that there was a bike involved so you said you went down there on a bike and you said you rode down there on the handle bars and Timothy Brown pedaled the bicycle. They said that after the incident where you said you saw Timothy Brown go up and shoot the deputy that he fled from the scene and that you said you fled from the scene and ran another way. And then you said in your confession that you went back to Mr. Timothy Brown's house and talked with his parents and then also had a conversation with Timothy and asked him why he killed the deputy. Is that true or false?

King: False.

Stinson: It never happened?

King: It never happened.

13

Stinson: OK. So you never ran back to Timothy Brown's house that night or any other night?

King: No sir.

Stinson: You've never...how many time have you ever been to Timothy Brown's house inside his house in your life?

King: I ain't never been inside his house

Stinson: Alright, when you were living on Wylie Street with Ms. Pendergrass in the foster home, I think you said you knew about where Timothy Brown lived at one time?

King: Yes.

Stinson: Is that because of why? Why did you know that?

King: Because I used to ah -- see him -- ah -- stand like in front of his house, he like stayed on Mayo Street and I used to see him lot around in there.

Stinson: So the only place you knew that Timothy Brown ever stayed was Mayo Street. Is that why you said Mayo Street in your confession?

King: Yes.

Stinson: Cause that's where you knew he lived at one time?

King: Yes.

Stinson: Did you know if Timothy Brown was living on Mayo Street the night the deputy was killed?

King: No sir.

Stinson: You don't know if he was or not?

King: No sir.

Stinson: Has anyone ever told you that he was or was not living on that street at that time?

King: No sir.

Stinson: Nobody's ever told you that?

King: No sir.

14

Stinson: One way or the other?

King: No sir.

Stinson: So what you're telling Mr. Cribbs and myself here today that everything that I have shown you and what you confessed to on tape on June 4, 1991 is a lie. It's a false confession. You didn't confess because you wanted to?

King: No. Everything I said back then when it first started happening it was a lie, everything was a lie, everything was a lie.

Stinson: And it was a lie because of what, what made you do it?

King: Because I was really I was scared and the thing the thing that -- ah -- Detective Carr was doing.

Stinson: So you're telling me now that you were scared because of what Carr did to you and the threats of getting the electric chair if what, you didn't cooperate or what?

King: Yes.

Stinson: OK. There comes a time down the road here you're going to trial. As I understand it from taking with you today you were still saying that you were innocent of being involved in Deputy Behan's murder and you were preparing to go to trial in that charge in 1992 in think March of 1992. Is that correct?

King: I was going in like March of 1994, I go to trial in March of 1994

Stinson: And you had decided to go to trial why?

King: Cause I felt like I didn't do it.

Stinson: You feel like you didn't do it?

King: I ain't did it

Stinson: OK, no doubt in your mind that you're not involved in any way, shape, or form?

King: No sir.

Stinson: And you wanted to go to trial?

King: Yes.

15

Stinson: Alright, something happened in the courtroom that day when the jury had already been picked. You said you were approached by Randy McCoy the investigator assigned in your case.

King: Yes.

Stinson: Did he make a statement to you, did he ask you a question?

King: Yes.

Stinson: What did he ask you?

King: He asked me that they wanted to offer me how much time that I was willing to take and I had told them five years.

Stinson: And that was on the murder of Deputy Behan?

King: Yes.

Stinson: Cause that's the one you were going to trial for at that time.

King: Yes.

Stinson: Alright, so what happened then?

King: He had went back and told the lawyer and the lawyer had told the prosecutor Chuck Morton.

Stinson: Alright, who was your lawyer you're talking about?

King: Victor Tobin.

Stinson: So then Mr. McCoy, from what you're saying to me had a conversation with those two who then Mr. Tobin and maybe Mr. Grillo had a conversation with Mr. Morton the prosecutor and then what happened?

King: And then they had told them -- ah -- then they told them -- ah -- Randy came back and told me . Ah said how would you like to take 15 years. I said 15 years, that's a long time. So he told me not really. He said you could get a third off on 20 days a month.

Stinson: Good time?

King: Yea.

Stinson: Did he tell you how much he thought you'd have to serve?

16

King: Yea.

Stinson: How much?

King: Eight years off 15.

Stinson: Who told you this?

King: Randy McCoy.

Stinson: The investigator?

King: Yes.

Stinson: Assigned to your case?

King: Yes.

Stinson: And what did you decide to do?

King: I told him alright. I signed after I seen how he did it. I signed the papers and that was that.

Stinson: You said it before the judge and the judge explained to your pleading guilty to?

King: Yes.

Stinson: He read the charges and you agreed to plead guilty to those charges to get an agreed upon 15 year sentence?

King: Yes.

Stinson: And you agreed to the 15 years even though you admitted in some way, shape, or form of involved in the killing of this police officer, you admitted to that part and getting the 15 years for what reason?

King: Because I was . . .ah instead of like gettin all that time for the ahh other cases that I had just want to be home like gettin 15 years and be home with my mom.

Stinson: OK, before you went to trial or before you make the plea, lets say. Did there come a point in time in the Broward Co Jail where Mr. Randy McCoy the investigator assigned to your case came into the jail and interviewed you and also conducted a polygraph exam which is also known as a lie detector. Did he do that?

17

King: Yes.

Stinson: Do you remember being hooked up to the equipment?

King: Yes.

Stinson: And do you remember him asking you some what they call test questions first about is your name Keith King? Were your born a certain date? To see if you're telling the truth?

King: Yes.

Stinson: Did Mr. McCoy then ask you a lot of questions about the shooting of Deputy Behan?

King: Yes.

Stinson: Did he ask if you were involved in the shooting of Deputy Behan?

King: Yes.

Stinson: Did he ask you if you shot Deputy Behan?

King: Yes.

Stinson: Did he ask you if you was even at the Circle K during the shooting of Deputy Behan?

King: Yes.

Stinson: Did he ask you if you were with Timothy Brown on the night of the killing of Deputy Behan?

King: Yes.

Stinson: Did he ask you if you saw Timothy Brown shoot Deputy Behan?

King: Yes.

Stinson: And what was your answer to all those questions?

King: No sir.

Stinson: And why did you answer no? That you didn't see or take part in it? Why did you . . . .

King: Cause I wasn't there.

18

Stinson: You weren't there?

King: I wasn't there.

Stinson: You're not involved in this in any way, shape, or form?

King: Not in any way

Stinson: After the lie detector or the polygraph exam was conducted by Mr. McCoy did he make a comment to you after the exam, say anything to you at all? Like something reflecting you that you may have done well?

King: He was like OK Keith, whatever, that's it.

Stinson: OK, did he ever tell you you flunked the polygraph?

King: No sir.

Stinson: Did he ever tell you you passed the polygraph?

King: No sir.

Stinson: So you didn't know for sure but you told me earlier that you found out by what?

King: Ah, I thought that when I had read on the news paper they said that I had passed the polygraph test, but at that time he had told me that nobody was going to know about it, that... you know... so I am like... ok.

Stinson: But then you read about it in the news paper?   That would have been the Sun Sentinel, the Fort Lauderdale Newspaper?

King: Yes.

Stinson: Where you shocked to see that you passed the polygraph?  At least a statement was made in the paper that you passed the polygraph?

King: Yes.

Stinson: And how, lets put it this way, Did Mr. Tobin ever discussed with you, what you had passed or failed on the polygraph?   The attorney, did he ever discussed that with you?

King: No.

Stinson: During the confession also, Keith, a comment made by I think Detective Carr or maybe Thomasevich about the gun, you said well the gun I think was black with brown, as opposed to what you said Carr showed you.  Why did you pick black and brown?

King: Cause I... Cause I was scared, and wanted to get out of there.

Stinson: But they just showed you a .38. With chrome, you said.  But you said in your confession that the gun that you had, or that Timothy Brown had was black with brown, what would make you say that?

King: Just tell them anything.

Stinson: Because you wanted to say it in your words?

King: Right.

Stinson: Would that make it more believable, or what?  Why would you think they want to hear that?

King: I don't know.  I did, I did, after what they were doing, I just told them anything, really just anything to get out of there, cause I was, I was, beat up on, and..

Stinson: So you were sick?  Why were you sick?

King: Cause I had diabetes.

Stinson:   Do you remember taking your shots that day?   Or did you not take your shots?

King: I did not took it that day

Stinson: You had not taken which one of these, you were picked up early in the evening, so you did not have an opportunity to take your shots because they had taking you from the house,

King: Yes

Stinson: What happens to you if you don't take your second insulin shot because you are a diabetic?  What happens to you?

King:  You get really sick.

Stinson: And in fact did you get sick?

King: Yes.

20

Stinson: Did they know you were a diabetic?

King: I told them I was a diabetic and that I needed my medicine.

Stinson:  What they say?

King: They told me that.  Ah... that they would get it for me.  But they never did.

Stinson: They never got the medication for you?

King: No, sir.

Stinson: So before. . . .

[Tape changed to Side B]

Stinson: We were talking about the fact that you were a diabetic and that they told you they would get you medication, now did they know this from you prior to getting the taped confession?  Before you went on tape, like today, did you tell them you were a diabetic?

King: Yes.

Stinson: Can you remember the best you can, when you told them, how long you were in the jail before you told them before the interviews concluded?

King: Ah... It probable been like, let's say about ½ hour, 20 or 30 minutes,

Stinson: So you told them fairly quickly that you were a diabetic

King: Yes

Stinson: And that you needed to take your shot?

King:  Yes

Stinson: And they told you don't worry we will get the medicine later?

King: Yes

Stinson: O.k.

King: During the course of your confession and the confrontation you had with Detective Carr, he struck you and threatened you with the electric chair were you getting sick at that time?

21

King: Yes, I was -- ah -- like I was already nauseous, like at the time cause when you are a diabetic (unintelligible)  And a diabetic know like themselves the blood sugar starts getting high, cause when it is very high or low they either passed out or get nauseous.

Stinson: All right, so you were at the stage of getting nauseous?

King: Yeah.

Stinson: What did that tell you the next stage was?

King: I was going to get sick.

Stinson: OK, have you ever passed out before?

King: No.

Stinson: Or did you always get your shot on time?

King: Yeah, I get my shot before it happened or I ate, I, I, usually take my medicine and then eat, but in that case what they had done, the only thing they had gave me a little piece of Pizza.

Stinson: A small piece?  Just one?  Very Small?

King: Yeah.

Stinson: Anything to drink?

King: A cup of water.

Stinson : A cup of water?

King: Yes.

Stinson: Would that be sufficient enough from getting diabetic sickness?

King: No.

Stinson: It would not?

King: No.

Stinson: Were you being treated by a Doctor?

22

King: When I got to the county jail, I had told them that I was a diabetic and they had told me that they would get me up to the 3rd floor as soon as they can, but they gave me a snicker bar to eat.

Stinson: This was on the night of the confession?

King: Yes.

Stinson: Ok what I am saying is... During this time frame before you were arrested, were you under the treatment of a doctor for this diabetes, and there was a doctor where at?

King: Ah.  The clinic at Broward Boulevard.

Stinson: and how did you get to that clinic for your appointments?

King: Ah, a lady named (unintelligible) from HRS, she'll come and get me cause they give you like an appointment.    Like when I gonna go the doctor and stuff and when I have a doctors appointment they'll come and get me

Stinson: OK. Have you been going to your appointments regularly?

King: Yes

Stinson: And were you injecting yourself with the insulin, did they show you how to do it?

King: Yes

Stinson: So the day they picked you up and Ms. McCoy's house, and handcuffed you and took you to the Broward Sheriff Office Homicide to be interrogated you had not had your second shot for that day?  When did you normally take that shot? What time?

King: About right before I had eaten.

Stinson: And what time would that be?

King: That would be like about 5:00 o'clock.

Stinson: So it was around 5:00 o'clock when they picked you up that day wasn't it?

King: Yea.

Stinson: Wasn't it? But you hadn't had the shots yet?

King: But it was like 4:00 o'clock like I sometime I take it early before I eat

23

Stinson: OK but that day you had not taken it yet?

King: No. On that day I was just in the TV room watchin the TV and I hadn't took it yet

Stinson: OK let me ask you this. Did the doctors when they were training you for your diabetes tell you there were certain things you definitely should not do?

King: Yes.

Stinson: what did they tell you about drugs?

King: not to take them. They said I can't do no kind of drugs like crack and cocaine.

Stinson: And why, what would happen to you, did they tell you?

King: because it would make me real sick

Stinson: did anyone ever tell you it might threaten your life?

King: yes

Stinson: OK. Did you do what the doctors told you to do? That you didn't do crack cocaine?

King: Ah crack cocaine I ain't never did. I tried snort cocaine about two times, one time when I got out Okeechobee and I went to Covenant House.   The second time when I was staying with Mable

Stinson: OK, that's Ms. McCoy up in Ft Lauderdale?

King: Yes.

Stinson: When you're taking your insulin shots would it be very difficult for you to run fast and then walk 14 or 16 miles without getting sick or could you do it OK?

King: If I don't take my medicine at a certain time, my nothing like that there.  I get real sick and I start losing energy and like weigh some down.

Stinson: Have you ever walked 14 -16 miles without stopping, while you were a diabetic?

King: I didn't walk like they see I don't need the exercise to keep myself healthy.

Stinson: OK, when you took the powder cocaine you snorted a couple of times you said, you tried it. You never used crack cocaine?

24

King: No sir

Stinson: What happened to you when you took the powder cocaine? How did you feel?

King: Real weak. I got real weak and like I didn't wanta do nothing. So when I get like that I like start throwing up and stuff like that.

Stinson: OK earlier today I showed you a photograph, a colored photograph of a young black male. And I'll show it to you again, who is this young black male?

King: He is Timothy Brown

Stinson: OK, this is the same Timothy Brown that you saw in the Broward Co Jail that you had been charged with in the death of deputy Behan, is that correct?

King: Yes sir

Stinson: Now today you're telling myself and Mr. Cribbs that you never ever hung around with Timothy Brown?

King: No sir.

Stinson: Did you ever go anywhere with Timothy Brown?

King: No sir.

Stinson: Are you telling us the truth today?

King: Yes sir.

Stinson: So help you God?

King: Yes sir, yes sir

Stinson: Are you making any statements to us today in the hopes of getting some kind of special treatment?

King: No sir

Stinson: Because I believe that when we first came in here myself and Mr. Cribbs and I told you that we're here representing Mr. Brown and that I wanted to talk to you about the case

King: Yes sir

25

Stinson: And you agreed to talk to us.

King: Yes sir.

Stinson: And I asked you if you were being represented by an attorney, and you said you were not, and I asked you if you had any cases pending and you said you did not.

King: Yes sir.

Stinson: And you voluntarily talked to us today?

King: Yes sir

Stinson: Mr. Cribbs do you have anything?

Cribbs: No

Stinson: Keith I want to reiterate to you at this time that myself and Mr. Cribbs came in here and you said you'd voluntarily talk to us. At no time did we threaten you or make any promises to you that you'd get any benefit from this?

King: No sir

Stinson: And the reason that you're talking to us today is because you want to get it off your chest, you want tell the truth because this is the truth?

King: Yes sir, yes sir

Stinson: I just want to touch briefly on one other aspect of your confession. I know that you said you weren't there but they also say in the confession here where you're stating the fact that you ran back to Timothy Brown's house in your confession and talked with his parents and asked to speak to him when he came to the door and you're saying that never happened?

King: Yes.

Stinson: Because you didn't know where he lived?

King: I knew where he lived but I never go over to his house. I used to like see him outside but I never went inside his house, I walked past his house.

Stinson: Did you ever meet his mother personally?

King: No sir.

26

Stinson: Would you know her if she walked in here today?

King: No sir.

Stinson: And you never ran into nobody's house on that evening to do anything because this never happened?

King: Never in my life, never in my life.

Stinson: There was some comments made during the review of your case and Timothy Brown's case where you were supposedly making some statements to jailhouse inmates that you had killed a police officer or that you saw yourself on TV and made the statement. Yea that's me and I'm the one they say killed the police officer and you said today what about those statements. Did you make them or did you not make those statements?

King: No sir, I never made them

Stinson: Could there be any reason why those people in the jail may have said you said that?

King: A guy had told me they were working for the state attorney. I guess like the state attorney (unintelligible) talk about my case so that we have something to go on

Stinson: OK, but did you ever talk to any inmate and make any confessions to any inmate about being involved in the murder of deputy Behan?

King: No sir

Stinson: So if somebody stood up today and said Mr. Keith King told me that on so and so date they would be a liar?

King: They lie, I tell them that to their face. They're lying

This will conclude the statement of Keith Donahue King. It is now approximately 1:43PM

27

STATEMENT OF: Phillip Howard                          PK90-11-314

The following is a tape recorded statement being taken by Detective
Dominick Gucciardo ID 1304 of the Broward County Sheriff's Office.  This
statement's in reference to BSO case number PK90-11-314, it's a police
shooting homicide.  This statement is being taken from a witness by the
name of Phillip P-H-I-L-L-I-P Rapheal R-A-P-H-E-A-L Howard H-O-W-A-R-D,
date of birth of 4-25-70.  He resides at 6012 Southwest 38th Street in
Miramar.  This statement is being taken in unmarked unit 170 in front of
3990 West Hallandale Beach Boulevard in Pembroke Park, which is the scene
of the shooting.  The date is November 13, 1990 which is a Tuesday and the
time now is approximately 3:58 a.m.

Q:       Okay, Phillip do you understand that I am a police officer and
         a detective investigating this case?
A:       Yes I do.

Q:       I'm also a Notary Public at large for the State of Florida and
         as such I am authorized to administer oaths and take sworn
         testimony.  At this time, I'd like to swear you in.  Can you
         please raise your right hand.  Let the record reflect that the
         witness has raised his right hand.  Do you solemnly swear to
         tell the truth, the whole truth and nothing but the truth so
         help you God?
A:       Yes I do.

Q:       Okay, can you please state your full name for me and date of
         birth?
A:       Phillip Rapheal Howard, 4-25-70.

Q:       Okay Phillip, do you understand the meaning of perjury?
A:       Yes I do.

Q:       Can you explain to me what perjury is?
A:       When you tell a lie under oath.

Q:       Okay, I just swore you in to tell the truth and if you decide
         at any point that you are going to lie to me, you are subject
         to arrest, do you understand that?
A:       Yes I do.

Q:       Okay now knowing that, is the following information that
         you're about to give me going to be the truth?
A:       Yes it is.

Q:       Okay Phillip, bringing your attention to earlier on this
         morning, you had an occasion to be in this area and can you
         explain to me why?
A:       Yes, I was going to see a friend.  Actually, coming from
         seeing a friend.  I had gone to see her because she was sick.

dah                          1 of 10              ATTACHMENT / EXHIBIT 7

STATEMENT OF: Phillip Howard                    PK90-11-314

Q:      What's her name?
A:      Tina.

Q:      And where's she live?
A:      She lives at..she lives on 40th Avenue and 33 Court.  I don't know the address, I can't remember it.

Q:      Okay, you know her last name?
A:      No, I don't.

Q:      Did...what time did you leave her house?
A:      About 1:30.

Q:      Okay now, you don't have a vehicle if you don't...do you drive?
A:      I did drive, but the car engine blew up.

Q:      Okay, so you walked basically from your house in Miramar to Tina's house?
A:      Yes I did.

Q:      Okay and at what time again did you leave her house?
A:      About 1:30.

Q:      About 1:30.  Okay and you were walking towards Hallandale Beach Boulevard on Southwest 40th Avenue?
A:      Yes I was.

Q:      Okay and what happens at that point and where are you when...
A:      I'm about in the middle of the block with this big...there's this big tree.

Q:      In the middle of what block?
A:      40th Avenue.

Q:      40th Avenue is long now.  Were you...
A:      I was closer to the Circle K where the incident took place.

Q:      So, okay, so you were like a block away?
A:      Yes.

Q:      Okay, there's a street that intersects the first street.  You were right there?
A:      Ah, okay.

Q:      The first street south of Hallandale Beach Boulevard on 40th Avenue?
A:      No, I wasn't there.  I was further down towards 2nd Street.

dah                              2 of 10

STATEMENT OF: Phillip Howard                          PK90-11-314

Q:      Towards 2nd Street, okay.  And you're walking...
A:      I'm walking towards and I hear a gunshot and I said to myself
        it sound like somebody got shot so I started to look to see if
        I seen anybody run away or anything, when I noticed a black
        taxi or a brown taxi ride by me with yellow doors.

Q:      Okay.  Alright, well there's a lot there that we're gonna have
        to talk about.  Um, you hear a gunshot?
A:      I only heard one gunshot.

Q:      Okay do you know if it was a gunshot or a...do you know what a
        gunshot sounds like?
A:      Yes I do.

Q:      Okay, so that was...it wasn't a firecracker or or anything
        like that?
A:      No, it...

Q:      So you familiarized yourself with it..with that noise as a
        gunshot?
A:      Yes.

Q:      Okay so you continue walking.  What do you see besides that
        cab?  What else do you see at that point?
A:      I see a tow truck coming out of Circle K, I see a man coming
        out of his house, putting his shoes on to go and see what
        happened and the tow truck driver tells him to stay...tells me
        and him, rather him mostly to stay back because a man's been
        shot.

Q:      I see.
A:      At that point, I decide to cross the street and go the other
        way.

Q:      Go the other way where?
A:      I was going towards Franco's.  I wasn't...

Q:      You mean you were going east on Hallandale Beach Boulevard?
A:      Yes.

Q:      Or west I mean, on Hallandale Beach Boulevard?
A:      West.

Q:      Okay and who stops you?
A:      I stop myself and turned around and decide to flag down a
        officer and tell him what I seen.

Q:      Okay now officers had already been responding, is that right?

dah                          3 of 10

STATEMENT OF: Phillip Howard                      PK90-11-314

A:        Yes.  Three cop cars pulled up and then more followed.

Q:        Okay, okay now that man that was putting on his shoes, was he
          a white man or a black man?
A:        Black man.

Q:        Black man and did he go to the scene?
A:        No, he stayed back after he heard, he stood in his yard and
          looked around.

Q:        Okay, okay and where's his house in relationship to the Circle
          K?
A:        Right across...right behind Circle K.

Q:        Right behind Circle K.  Okay, okay, did he appear that he was
          going in the house or coming out of the house?
A:        Coming out of the house.

Q:        Out of the house.  Did it seem like that he was alerted to the
          gunshot also?
A:        Yes.

Q:        Okay, alright as you're approaching and you hear the gunshot,
          you see a cab?
A:        Yes.

Q:        Okay now let's go into detail as to what color the cab is, how
          many doors it had, etcetera, okay?
A:        Okay.

Q:        Let's start off with the make.  What make vehicle was it?
A:        It was a Chevy Impala.

Q:        Okay, a late model meaning new or an older model?
A:        An older model.

Q:        Older model.  How do you...how can...you associate yourself
          with an older model as apposed to a new model.  How do you
          know that?
A:        The newer models have different shape lights then the older
          models.  This one, remember now, it has square lights in the
          front and in the back it had the long lights going across the
          back instead of the short lights, like the patrol cars.  Most
          of the...some of the patrols had.

dah                              4 of 10

STATEMENT OF: Phillip Howard                          PK90-11-314

Q:      Okay, it had, what you're saying, it had longer lights across
        the back?
A:      Yeah.  It like, it wasn't all the way, it went to the edge and
        that was it.  It went so far.

Q:      Okay, so that's how you're saing it's an older model.
A:      Uh huh.

Q:      Okay.  But you're positive that it was a Chevy Impala?
A:      Yes.

Q:      Okay it wasn't a Dodge?
A:      It didn't look like a Dodge.  It looked more like a Chevy
        Impala than a Dodge.

Q:      Okay, okay so, um...we determined that the vehicle was a Chevy
        Impala, right?
A:      Yes.

Q:      Okay and what color was it?
A:      It was a dark brown.

Q:      Well, first of all, what color were the doors?
A:      Yellow.

Q:      Yellow, have any lettering on it?
A:      It had some numbers, but I didn't, couldn't make out the
        numbers.

Q:      And what color were the numbers?
A:      Black.

Q:      Okay, but you couldn't make out the numbers?
A:      No.

Q:      Okay and what color was the rest of the vehicle?
A:      A dark brown or a black.

Q:      Dark brown or black.  Okay, that would mean the hood, the roof
        and the trunk is black or brown?
A:      Yes.

Q:      Okay and the fenders were also black and brown?
A:      No, they were a chrome color.

Q:      They were chrome color?
A:      Chrome with black strip.  But I couldn't really...it..from a
        distance, it looked like chrome or black strip.

dah

STATEMENT OF: Phillip Howard                          PK90-11-314

Q:      I never seen a car with chrome fenders, especially a taxi cab.
A:      The front end, instead of being the same color as the car, it
        looked like it had a chrome tint to it.  Not, you know, a
        silverly tint.  The regular, a regular fender.  A metal
        fender going across the front.

Q:      Okay, in other words, what you're saying is, the fender is a
        different color then the rest of the body?
A:      Yes.

Q:      Okay, both fenders or just one?
A:      Not, not the fender..not the...

Q:      The passenger side.
A:      Not, not these.

Q:      Oh.
A:      But the bumper in the front was the only that had the chrome
        on it.

Q:      Okay.
A:      The bumper in the front and the back.

Q:      Bad chrome?
A:      Yeah.

Q:      Alright.
A:      With black strips.

Q:      What do you mean black strips?
A:      The black rubber piece..

Q:      Oh yeah, the rubber pieces?
A:      Yeah.

Q:      Okay and what about...what about the fenders themselves?
A:      They were all brown.  The...all...the whole car except for the
        fender...the bumpers were brown.

Q:      Okay, so when I asked you about fenders before, you
        misunderstood...
A:      Fenders as the bumpers.

Q:      As the bumpers.  Okay, great.  So the fenders were all brown..
A:      Uh huh.

Q:      The hood was brown, the trunk and the...and the..the hood was
        brown?

dah                              6 of 10

**STATEMENT OF: Phillip Howard**                           PK90-11-314

A:        Yes.

Q:        Okay, dark brown?
A:        It looked like a dark brown.  Could be mistaken for black.

Q:        Could be mistaken for black, okay.  Now, where you were, it
          wasn't lighted at all, was it?
A:        No.

Q:        Okay, did you see anybody driving the vehicle?
A:        I couldn't see anything because it had tinted windows.

Q:        Okay, real dark tinted windows?
A:        Yes.

Q:        Okay, um...what other distinctive features did the car have?
          What about the taxi sign.  Where's that located?
A:        It was lo...the taxi sign was located in the middle of the
          roof.

Q:        Was it on?
A:        No, it was off.

Q:        It was off.  Those type of taxi cabs, prior to turning on the
          tape, you had mentioned you had seen them where?
A:        In the heart...deep heart of Miami.

Q:        Downtown Miami?
A:        Yeah, by Miami Airport.

Q:        By the Miami Airport, okay.  What..what else do you remember
          about the cab?  Was it speeding off, hurriedly?
A:        It wasn't like it was in a hurry, it's like it was taking it's
          time.

Q:        Or was it gaining speed?
A:        Mostly gaining speed, but it..when I looked at it, it looked
          like it was taking it's time going.

Q:        Okay, um...and it was going southbound on 40th Avenue?
A:        Yes it was.

Q:        Towards County Line Road?
A:        Yes.

Q:        Okay, what about the wheels?  Did it have hub caps on, I mean,
          do you remember?
A:        No, I didn't look that far.  I just seen the body of the car.
          I couldn't see anything else because where I was standing it
          was real dark.

dah                           7 of 10

STATEMENT OF: Phillip Howard                    PK90-11-314

Q:      And it was four doors, wasn't it?
A:      Yeah.

Q:      Okay and you feel confident that it was an Impala, a Chevy
        Impala type vehicle?
A:      Yeah.

Q:      But if it was small than that, you would be able to..to
A:      Tell the difference, yeah.

Q:      Alright, and you familiar with cars?
A:      Yes.

Q:      How are you familiar with cars?
A:      Some of my friends have Impalas, older models like 78 model
        Impalas and up and some of the patrol cars are older model
        Chevys and Dodges and I noticed the difference.

Q:      While I was interviewing you prior to turning on the tape,
        there was a cab that stopped at the intersection and it was a
        blue and white cab out of Miami, I believe and you had
        mentioned that the cab..the color...not the colors, but the
        cab looked similar to that and that was a Dodge cab.
A:      Yeah, the Chevy Impala and the Dodge sort of like look just
        alike, but that was an Impala instead of a Dodge.

Q:      Okay, so based on you looking at that vehicle, you...now in
        your mind, are satisfied with the fact that that vehicle was a
        Chevy Impala?
A:      Yes.

Q:      Okay, did you have an occasion to see the deputy?
A:      When I was crossing the street, I seen the deputy.

Q:      And what...what did he look like?
A:      He looked like he was hurt.  He had blood down the side of
        his...left side of his face and it looked like there was some
        on the door.

Q:      How close did you get to it?
A:      I didn't get too close.  I was, stood across...I was across
        the street looking at first, then I started walking.

Q:      Okay, was he moving?
A:      No.

Q:      Now, you were on the east or west side of 40th Avenue?
A:      West side.

STATEMENT OF: Phillip Howard                    PK90-11-314

Q:      You were on the west side, walking...
A:      I was in the east side at first, walking...

Q:      Right.  That's right, you were on the..
A:      North.

Q:      North, right.
A:      Then, when I heard that someone had been shot, I walked over
        to the west side.

Q:      West side, I see.  Okay, but when you heard the gunshot?
A:      No.  I kept walking down the street.

Q:      Okay and then who told you that he was shot?
A:      The tow truck driver.

Q:      Is he white or black man?
A:      White.

Q:      White male, so you just waited for the police officers to
        respond, basically?
A:      I was gonna wait, but then I said well, this person might
        still be around so I kept walking and I seen two cops come
        from east and a third come from the west.

Q:      Okay, how soon after, try to put it...try to get it down as
        close as you can, how soon after you hear the gunshot do you
        see this cab take off?
A:      No more than 5 seconds after.  Like 15, 20 seconds after I
        heard the gunshot, I seen the cab coming up.

Q:      About 15 or 20 seconds?
A:      Uh huh.

Q:      Okay, okay is there anything else you want to add to this
        statement that I may of possibly forgotten to ask you?
A:      Ah, you ask...before you asked me about the white car over
        there.

Q:      Yes.
A:      Did I see when it pulled in?  No.  I seen it after the tow
        truck driver pulled his car in front and was blocking off
        Circle K's driveway.

Q:      Okay now that white vehicle is a Maverick, a Ford Maverick
        and it's parked on the swale of the roadway next to the Circle
        K, is that right?
A:      Yes.

STATEMENT OF: Phillip Howard                          PR90-11-314

Q:        And you never seen that vehicle before?
A:        No, I didn't see it until after the tow truck pulled..

Q:        After the tow truck...
A:        Pulled itself and blocked off.

Q:        Alright.  Okay and that vehicle was not following the cab or
          anything like that?
A:        No.

Q:        Okay, okay, is there anything else you want to add?
A:        No.

Okay, this statement concludes at 4:10 a.m. on November 13, 1990.

dah                          10 of 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 95-7207-CIV-GRAHAM

(Magistrate Judge Sorrentino)

TIMOTHY BROWN,                    :

     Petitioner,                  :

vs.                               :

HARRY K. SINGLETARY,              :

     Respondent.                  :
_____/

## AFFIDAVIT OF MARLON JOHNSON

BEFORE ME personally appeared Marlon Johnson, who after being duly sworn deposes and says:

1.    My name is Marlon Johnson. I am an Investigator with the Federal Public Defender, Southern District of Florida.

2.    I have participated in the investigation of the case of <u>Timothy Brown v. Harry K. Singletary</u>.

3.    I interviewed Phillip Howard, B/M, D/O/B 4/25/70. Mr. Howard stated to me that on November 13, 1990 he was living in Miramar, Florida at 6012 S.W. 38th Street. Shortly before 1:45 a.m. on November 13, Mr. Howard left the home of a friend which was located south of Hallandale Beach Blvd. off S.W. 40th Avenue and proceeded to go home walking north on S.W. 40th Avenue. As he was walking north on S.W. 40th Avenue he heard a single gunshot coming from the Circle K convenience store located at the southeast corner of S.W. 40th Avenue and Hallandale

ATTACHMENT / EXHIBIT 8

Beach Blvd.  Mr. Howard was approximately ½ block south of the store when he heard the gunshot.

He continued north toward the store.  Mr. Howard never saw anyone, including black males, cross

Hallandale Beach Blvd., on a bicycle or on foot.  Furthermore, he stated that if anyone had crossed

Hallandale Beach Blvd. or traveled north on 40th Avenue after the shooting he would have seen

them. Furthermore, he saw no black males or a bicycle traveling south on 40th Avenue.

FURTHER AFFIANT SAYETH NAUGHT.


_____
Marlon Johnson


Sworn to and subscribed before me by ___Marlon Johnson___ who is personally

known to me/produced the following form of identification: _____ on this 2 0

day of ___Dec___, 1999.


_____
Notary Public, State of Florida

My Commission Expires: 8/12/00


LEE LAHLA
My Comm Exp. 8/12/00
Bonded By Service Ins
No. CC576546
Personally Known [ ] Other I.D.

2

1

2

IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT     IN AND FOR BROWARD
COUNTY                          FLORIDA

3

FELONY DIVISION

CASE NO. 91-14793CF10A

4

JUDGE FRUSCIANTE

5

6

7     STATE OF FLORIDA,        )
              Plaintiff,       )
                               )
8     vs.                      )
                               )
9     KEITH DONAHUE KING,      )
              Defendant.       )
10    _____  )

11

12                          Office of Electronic Court Reporters
                            16 Southeast 6th Street
13                          Fort Lauderdale, Florida
                            March 4, 1992      2:05 p.m.
14

15

16                          CONTINUED DEPOSITION OF:

17                          SERGEANT RICHARD SCHEFF

18

19    APPEARANCES:              (No appearance on behalf of the State.)

20                              VICTOR TOBIN, ESQ.,
                                Special Public Defender,
21                              Appearing on behalf of the Defendant.

22                              LARRY S. DAVIS, ESQ.,
                                Special Public Defender,
23                              Appearing on behalf of codefendant
                                Timothy Brown.

24

25

ATTACHMENT / EXHIBIT 9

but it got to a point where he just was basically saying, "All right. Look. This is it." and he's being much more direct and really changed the tenor of the conversation.

Q    None of this is on tape.

A    No.

Q    Did you ever think about bringing a tape recorder in and memorializing some of this?

A    No.

Q    Okay.

A    We'll discuss that at the trial. I'm sure you'll ask me.

At that point, we tell her, "Look. If you don't tell us that you killed the deputy, we're going to stop talking to you. That's it."

Because she's hinting to us, I mean, that she's killed the deputy but she's not really saying it. So, basically, what we're saying to her is, "All right. Look. You're either going to tell us that you killed him" or like "That's it. We're not going to talk to you anymore."

And at that point, she goes and she says, "Okay. I killed the deputy. I saw him sitting in the car," and, of course, as what it says in my report here, she takes the gun, she shoots the deputy. And when we ask her to recount the incident, to walk us through how she goes out and does this thing, she does. The factual occurrences, the way she's

explaining it, are incorrect.

Q   So then you tell her, "Listen.  You didn't do it.
This isn't how it happened"?  Or what do you say to her?

A   Then we get into what she does with the revolver and
she says she doesn't remember what she did with the revolver.
Then she said if she would go home, she would get the firearm
and she would mail it to us.  And then again she starts to
laugh and carry on and act in the way that only Jacqueline
Bain can act.

Q   So what do you do?  You let her go home?

A   No.  At that point in time, John --

MR. TOBIN:  Couldn't this all just be a ruse on her
part to throw you off the trail?

THE WITNESS:  Very clever ruse coming in and
bringing her to our attention and saying she did it and
all that kind of stuff.

MR. DAVIS: Sort of like Tim Brown was sort of a
ruse.

MR. TOBIN:  Well, I mean, the reason I think it is a
very clever ruse is it obviously worked.

A   (continuing)  Anyway.  We're telling her that,
"Look.  You've got your facts all wrong.  Didn't happen that
way."

At that point she wants to know what she got wrong.
So John is telling her, "All right.  Look.  He's shot from the

driver's side, not the passenger side."

Q    He's telling her this at this point?

A    Yeah.  Look.  Talk to him about it.

Then she's going on to say, okay, right, that she lied to us and that she was standing on the driver's side, she just lied to us that she was on the passenger side.

Q    Right.  Now that you mention it.

A    At that point I tell her that I don't think that -- she's telling us that she left the scene going south on 40th Avenue.  Now we had that kid, Phillip Howard, that's walking up 40th Avenue.  So I asked her -- I said, "Look.  I've got a witness that's walking up from 40th Avenue.  You're telling me that you ran down 40th Avenue to County Line Road, you'd have had to have passed him.  It's very doubtful to me that this kid would have missed you.  You attract a lot of attention."

And so that was doubtful -- again, I don't think she's telling us the truth.  At that point she says, "Well, you know, maybe I'm wrong.  Maybe I didn't go down 40th Avenue."

Q    Another ruse on her part.

A    Not a ruse.  You're talking about an extremely disturbed --

MR. TOBIN:  Person.  She just shot somebody.  She doesn't know which way she went.

Q    Basically, you knew on November 22nd that this was

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 95-7207-CIV-GRAHAM

(Magistrate Judge Sorrentino)

TIMOTHY BROWN,                          :

      Petitioner,                       :

vs,                                     :

HARRY K. SINGLETARY,                    :

      Respondent.                       :
_____/

### AFFIDAVIT OF DENNIS STINSON

BEFORE ME personally appeared Dennis Stinson, who after being duly sworn deposes and says:

1.    My name is Dennis Stinson. I am an Investigator with the Federal Public Defender, Southern District of Florida.

2.    I was assigned the case of Timothy Brown v. Harry K. Singletary.

3.    On May 21, 1999 I interviewed Edward Keith Davis, B/M. Mr. Davis stated to me that on November 13, 1990 he was living in Hollywood, Florida at 4110 S.W. 28th Street. Shortly before 1:45 a.m. on November 13, Mr. Davis left his house and proceeded to go to the Circle K convenience store to get a drink. Mr. Davis was on his way to work and while walking eastbound on 28th Street toward S.W. 40th Avenue he heard a single gunshot coming from the general area of the Circle K convenience store located at the southeast corner of S.W. 40th Avenue and Hallandale Beach Blvd. Mr. Davis was approximately one block north of the store when he heard the gunshot.

ATTACHMENT / EXHIBIT 10

He immediately ran south toward the store to a large tree located south of the corner of S.W. 28th Street and 40th Avenue. Mr. Davis had a clear view of the Circle K store and the surrounding parking lot area. Seconds after the gunshot he observed a lone black person run from an area behind the police cruiser to a "gap" between the Circle K and the wall behind it. That black person ran in an easterly direction behind the store and as he did Mr. Davis lost sight of him. This wall is about two feet south behind the Circle K store. At no time did Mr. Davis ever see two black males at the scene. Additionally, Mr. Davis never saw anyone, including black males, cross Hallandale Beach Blvd. on a bicycle. Furthermore, he stated that if anyone had traveled north on 40th Avenue after the shooting they would have passed him and he would have seen them. Mr. Davis did not see anyone travel north on 40th Avenue on foot or on bicycle, after the shooting. Furthermore, he saw no black males or a bicycle traveling south on 40th Avenue.

FURTHER AFFIANT SAYETH NAUGHT.

Dennis Stinson

Sworn to and subscribed before me by Dennis Stinson who is personally known to me _____ 6th day of July, 1999.

C. DIANNE ADAMS
My Comm Exp. 8/01/99
Bonded By Service Ins
No. CC485081

Notary Public, State of Florida

My Commission Expires:

2

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

The following will be a tape recorded statement taken by Major Tony Fantigrassi of the Broward County Sheriff's Office.  This concerns an - a homicide case number PK90-11-314.  The original incident occurred on November 13th, 1991, and concerns the, ahm, shooting death of a, ahm, deputy sheriff, Patrick Behan.  This statement is being taken on February 28th, 2001 at approximately 1:08 – 2002, thank you, at approximately 1:08 P.M. in the afternoon.  The statement is being taken from one Edward Keith Davis, black male, date of birth, 12/8/69, whose current address is 1106 Northwest 2nd Street in Dania.  His phone number is 927-3066.  This statement is witnessed by, Detective Doug Lashbrook, also, with the Broward County Sheriff's office.  The statement is being taken at the Public Safety building.

Q.    Keith – or rather Edward, for the record, would you state your full name, please?
A.    Edward Keith Davis.

Q.    Okay, and, ahm, provide me with your address again, please?
A.    1106 Northwest 2nd Street, Dania, Florida 33004.

Q.    Thank you, and, ahm, your phone number?
A.    927-3066.

Q.    Okay, and you've indicated to me that you're unemployed at this time?
A.    Right.

ATTACHMENT / EXHIBIT 11

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    Okay, is there any other contact numbers that we could reach
      you from, Ed, if we needed to?
A.    Ahm, I have a cell, but it's not on.  It's not on.  I got to get a
      card (unintelligible).

Q.    You have no service right now?
A.    No sir.

Q.    Do you have a pager?
A.    I have it, but it's not on.

Q.    Okay.
A.    Uh uh it's not on.

Q.    Okay, if we need to reach out for you again what would be the
      best way to reach out for you?
A.    Ahm, well, I guess, call my mom's crib, and, ahm, ask for me.
      If my phone is on she'll tell you to call my cell, but my mom is
      like the, the best way to reach me.

Q.    Okay, all right, Ed, before we proceed any further, ahm, I want
      to place you under oath.  Would you raise your right hand,
      please?  Do you solemnly swear that the information you're
      gonna provide will be the truth the whole truth, and nothing,
      and nothing but the truth so help you God?
A.    I do.

Q.    Thank you.  Ed, I want to direct you back to, ahm, some
      information that, ahm, you have provided in the past that
      concerns, ahm, the, ahm, shooting death of Patrick Behan.
      Patrick Behan as you, as you may know was a deputy sheriff
      that was employed –
A.    Yeah.

STATEMENT OF:  EDWARD KEITH DAVIS                PK90-11-314

Q.    ahm, with the Broward County Sheriff's Office.  He was killed
      on November 13th, 1991.  Ahm, it's my understand that, ahm,
      you, ahm, were in position to have wit., witnessed a part of
      that, ahm, incident that morning.  Is that correct?

A.    Yes.

Q.    Okay, ahm, can - rather than me asking you a series of
      questions to begin with, what I'd like for you to do is, is,
      basically, tell me in, in a brief synopsis what it is that you saw
      that morning, and how you were in a position to see what you
      did.

Q.    Okay, ahm, I was getting ready to go to work for a garbage
      company I was working at, and I usually get up between –
      anywhere from like 12:00 to 5:00.  So this morning, ahm, I had
      my radio, and I was going to Circle K to get some coffee, and
      was coming down 28th Street, stepped around a corner, heard
      a gun shot.  And it was a tree there.  I got behind the tree, and
      I was already looking toward Circle K like the clerk, and stuff
      like that.  Cause that's where I first looked for the, you know,
      gun shot to be coming from.  And I looked over like to my right
      to the police car, and I just saw a dude run behind Circle K.
      And that's how the whole thing went down.  I left, ahm, left my
      radio, ran down the street, hit another corner, came through
      the alley, went through the back yard, and smoked some
      cigarettes, went back to get my radio.  Ahm, when I came
      around the corner of 28th Street, and 40th Avenue, I walked
      toward Hallandale Beach Boulevard, and got my radio.  And
      an officer he saw me, and called me, and asked me if I know
      what happened.  And, you know, I told him no.  And he said,
      well, a Broward Sheriff's deputy just got killed.  And that was
      the last, you know, that was like the first thing right there of it.
      And then, you know, the interviews, and stuff like that.  And it
      just got crazy, but, you know, that, that was the first time, ahm,
      on that, that night that I witnessed that right there.

Bp                            Page 3 of 45

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    Edward, you, you told me that you were, ahm, out at that time, because you were on your way to work.  Is that correct, you said?
A.    Right.

Q.    And, and were you on foot, ahm —
A.    I was on foot with a radio, a radio in my hand, and some cigarettes in my pocket.

Q.    Okay, what were the, ahm, weather conditions that night?  Do you remember?
A.    Ahm, it was, it was like breezy, because I had, I had like a, ahm, this type of flannel shirt on, a, a thicker, but light flannel shirt.  So, you know, I remember it was, it was like cool.  It was breezy.

Q.    Cool, and breezy?
A.    Right.

Q.    And, ahm, was it, ahm, clear at night or was it a rainy night?
A.    Ahm, no it wasn't raining.  It wasn't raining.  No it wasn't raining, because, ahm, on the — I, I remember sitting in the garbage truck, and not, you know, mentioning it to nobody especially the guy I was with.  I wanted to mention it to him, but I was like no he, he wouldn't believe this or he gonna tell somebody.  I just — you know, I was —

Q.    This is much, this much later now when you —
A.    Yeah this was — well, this was, ahm, when I went to work.

Q.    When you finally went to work?
A.    Yeah I went to work.

STATEMENT OF: EDWARD KEITH DAVIS          PK90-11-314

Q.   Okay, let, let's, ahm - going back to, to the morning, ahm, when you're – when you're on your way to work –

A.   Uh huh.

Q.   Ahm, I think you mentioned would - had to be between, ahm, 12:00, and 4:00 A.M.  Why is that?

A.   Uh huh, because – okay, the route that we had to do we had to go all the way down to Miami, deep down in Miami.  So we had to start early at 12:00.  So we start at 12:00 we'll get done like 7:00 in the morning, but I started working with the dude, and we'll like hustle, and everything.  So like, you know, we can lay back.  You know what I mean?  Well, okay, meet me here at such, and such time, and this, and that.  So I got a, you know, like three, four hours difference, you know, that I can chill –

Q.   Okay.

A.   and not go to work yet.

Q.   All right.

A.   You know.

Q.   And, ahm so I, I - I'm assuming the hours would vary, ahm, but it would be any –

A.   Yeah.

Q.   time between 12:00, and 4:00 A.M.?

A.   Right, any, anytime between 12:00, and 4:00 I would leave, ahm, my mom's house, and go to work.

Q.   Now, at that time, where was your mom's house, and where were you living?

A.   That was 4110 Southwest 28th Street.

Q.   Okay.

Bp                              Page 5 of 45

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

A.     And that's in Carver Ranches uh huh the –

Q.     Okay.
A.     other side of Pembroke Park.

Q.     And just for the record, ahm, this incident occurred at the, ahm, Circle K which is located at, ahm, Southwest, ahm, 40th Avenue is it?
A.     Avenue.

Q.     And, and Hallandale Beach Boulevard.
A.     Right.

Q.     How far was your residence, at that time, from the location of the Circle K that I just described to you?
A.     Ahm, right around the corner.  Right, ahm - right in the middle of the block, dead in the center of the block.  And like, ahm –

Q.     Okay.
A.     I can't say feet wise.  I, I really don't know, but, I guess, a hundred feet –

Q.     Okay.
A.     from house up there.

Q.     Right, now, the – you, you indicated, also, that you ultimately did go to work that, that morning.
A.     Uh huh.

Q.     Ahm, is there – now, when you, when you – where did you work at?
A.     Well, I was working at a garbage company called County Waste.

Q.     County Waste, and where –

Bp                          Page 6 of 45

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

A.   Right.

Q.   where were they located at?
A.   Well, it was on like 2 – ahm, 211 – 2111 57th or 58th Way, but BFI owns the company now.  So that's out in Davie, Brown, and Ferran Industry that's out in Davie.  So they bought the company out.

Q.   Is that down in Carver Ranches, as well?
A.   What the company now?

Q.   They – no the location at that time where you were working at?
A.   Yeah the old company, yeah that was in Carver Ranches.

Q.   And that would have been off of 58th Way, and –
A.   58th or 20 something –

Q.   and the 2100 block?
A.   Right.

Q.   And that would have been, ahm, west –
A.   Between 21st, 21st Street, and 23rd Street.

Q.   All right, now, that would have been west of this location.  Is that correct?
A.   West of what?

Q.   West of –
A.   Of Circle K, yeah?

Q.   Yes, and West of your house?
A.   Yeah, right.

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    In other words, to get there you would have had to walk in the
      opposite direction –
A.    West south.

Q.    from the Circle K to get to where you had to go that morning?
A.    I mean, west north - yeah, northwest.

Q.    Yeah, okay, ahm, and how long had you worked for them?
A.    Ahm, like from sixteen, seventeen.  I was a juve. man.  I was
      young.

Q.    So you had been there.  You had been employed with them
      for several years?-
A.    Yeah, yeah.

Q.    Ahm –
A.    But it was through like a labor company, also, but still –

Q.    I see.
A.    you know, working there.

Q.    What happened – now, how did they track your hours worked
      when you worked?

A.    How?

Q.    Yeah.
A.    Okay, ahm –

Q.    Did you have to like clock in or do something like that?
A.    No sometimes I just come in, and, and get it checked for the
      day like fifty something dollars.  No matter – if I worked twelve
      hours, if I worked three hours I got a check for fifty dollars.

Q.    Yeah.

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

A.      Plus my tips.

Q.      Yeah.
A.      But, ahm, they put me down on some kind of, some kind of
        log, but at the, ahm, the labor pool, ahm, Ready Workers, they
        use to give me a ticket, and put my hours down.  Like okay I
        work six, and a half today, ahm, twelve that day, ahm, ten that
        day, and whatever five days I work or six days it's all down on
        the sheet.  They just add it up, and times that by like, you
        know, whatever I was making an hour.

Q.      So the labor pool, ahm, where were they located at?
A.      Ahm, that was on, ahm, Broward Boulevard.

Q.      But you didn't go down there?  I mean, you were –
A.      Right, I (unintelligible) –

Q.      you were going directly to the business?
A.      Yeah, at the time I was going to County Waste, but –

Q.      Going right to County Waste?
A.      Right, but after then they, you know, for the insurance, and
        stuff I would have to get my tickets from the labor pool then
        bring it there.

Q.      Right.
A.      So I just got a whole bunch of tickets, and brought them to
        County Waste, and went to work (unintelligible) –

Q.      Okay, I guess, I guess, what I'm trying to determine is, ahm, is
        there a way that – would, would there be records –
A.      Yeah, you concerned if I worked that day?

Q.      Yeah does, does anybody have that information?

STATEMENT OF: EDWARD KEITH DAVIS          PK90-11-314

A.    You probably could talk to, ahm, a guy name Lou, a supervisor
      out at BFI. That's somewhere out like in Davie. It's a big
      garbage company. Almost -

Q.    Ahm, Luke, Luke is his name?
A.    Yeah Luke.

Q.    Is he a white guy or black guy?
A.    Black dude.

Q.    And he –
A.    Kind of light skinned.

Q.    He – and okay, and he's the supervisor where? What's it
      called now?
A.    Yeah he was the supervisor, ahm, it's BFI now.

Q.    BFI yeah.
A.    But it was County Waste, but, you know, BFI bought them.

Q.    Yeah. Did you know that in – what you, you mentioned to me
      that at, at one point that you had, ahm, been interviewed by,
      ahm, ahm, ahm – you didn't know if it was a private detective
      or not, but somebody that was, ahm, with the Public
      Defenders office. Is that correct?
A.    Uh huh.

Q.    Ahm, do you know, at any point, did they make an attempt to,
      ahm, verify your work records on that day, Edward?
A.    Ahm –

Q.    Did they ask these questions in an effort to determine if you
      were working that day or not?
A.    Well, it depends on – you talking about the first (unintelligible)
      –

STATEMENT OF:  EDWARD KEITH DAVIS              PK90-11-314

Q.   Yeah during the whole series – the whole time that they dealt with you?

A.   No the, ahm, the, ahm, lawyer – the – well, the public defender –

Q.   Right.

A.   from Palm Beach, the federal guy he, ahm, he asked me the same thing.

Q.   Yeah.

A.   And asked me where the company was, and –

Q.   Okay.

A.   you know, the, the, the check, and see what – where I was that day, and stuff like that.  So –

Q.   Right.

A.   I don't know.  It's apparent that he did it, because you, know, he –

Q.   He asked those questions.

A.   Yeah, he asked – he – you, you know, and calling, and, and stuff like that.  So –

Q.   Okay, I'll, I'll check with them then to, to see if they might be able to save us the time of, ahm, researching that again.  Now, that morning, ahm, your business was, was located down towards 441 –

A.   Uh huh.

Q.   and 56th.  Ahm, why were you going to the, ahm – towards the Circle K which would have been the opposite direction of where you actually needed to go to get (inaudible).

Bp                            Page 11 of 45

STATEMENT OF:  EDWARD KEITH DAVIS                PK90-11-314

A.    Right, I use to stop there like get coffee, ahm, get cigarettes, bag of chips.  You know, something like that. I Actually, I use to get on Hallandale Beach Boulevard, and just walk down, and catch the truck coming form the yard –

Q.    Right.
A.    Cause they leave the truck parked at the yard.

Q.    Right.
A.    But some mornings the truck a come, and pick me up -

Q.    Uh huh.
A.    and we'll go to Circle K.  We'll go to Circle K down there.  You know what I'm saying?

Q.    Right.
A.     Just get coffee, and shit like that.  Just a routine stop.

Q.    I guess, that's – I guess, that was my – gonna be my next question –
A.    Yeah.

Q.    and that is that there is a Circle K, at that time, that was located down at 56th Avenue, and Hallandale Beach Boulevard.
A.    Uh huh, right.

Q.    Ahm, which would have been a longer way –
A.    Uh huh.

Q.    that you would have had to go in that direction.  What – ahm, I mean did you –
A.    Well, see I could have went there, but like it's a trailer park wall, right?

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    Yeah.
A.    Okay, I can take the trailer park wall straight down, ahm, 28th
      Street to what is that 40 – 48th, yeah 48th Avenue, make a right
      on 48th Avenue, and go down 25th Street.  And go all the way
      like to the job, because the job is like of 21st Street.

Q.    Right.
A.    So you got 21st, and 28th.

Q.    Right.
A.    You got seven streets.

Q.    Right, right.
A.    When I can just go to the store real quick then walk down
      Hallandale Beach Boulevard, and maybe see the truck.  You
      know what I'm saying?

Q.    I see.
A.    Or turn this way, and go down 25th.

Q.    Right.
A.    Cause that's – okay, 40th Avenue wasn't a hot spot, but –

Q.    Oh.
A.    56th –

Q.    Right.
A.    All of that right there.  You couldn't even walk on Hallandale
      Beach Boulevard, because they'll pull you over.

Q.    Yeah.
A.    You know what I'm saying.  And warrants or no warrants,
      clean I.D. or whatever –

Q.    Right.

STATEMENT OF:  EDWARD KEITH DAVIS                PK90-11-314

A.      You don't even want to go through there.

Q.      Okay, I, I got you.  So you would, ahm, head over to this Circle
        K –
A.      Uh huh.

Q.      And then from there head, ahm, west on Hallandale Beach
        Boulevard.  Ahm, if the truck was traveling down east on
        Hallandale they would catch you up there.  If not you just
        continue –
A.      Yeah sometimes they would.

Q.      Sometimes they would, sometimes they wouldn't.
A.      Right, right.

Q.      Ahm, and, ahm, do you know on this morning that, that was
        the plan or not or –
A.      No the plan was to get to the yard -

Q.      Get to the yard.
A.      just to try to get me some work, and I know if I can get there
        early the guy I was working with I can go out, and work with
        him.

Q.      I see.
A.      You know what I'm saying or –

Q.      Right.
A.      stay to 7:00 o'clock, and go out, you know, on the regular
        garbage route.

Q.      Right, okay, that being said, and, and, ahm, me having clearer
        understanding now, ahm, sometime between 12:00, and 4:00
        A.M., ahm, you leave your, your home which on 28th you told
        me?

STATEMENT OF: EDWARD KEITH DAVIS          PK90-11-314

A.     Uh huh.

Q.     And you were heading towards the Circle K. Now, I've got an
       areal photo here that I – that I'll use for clarity purposes so
       we're both, ahm, you know, certain we're talking about the
       same –
A.     Uh huh.
Q.     the same thing. And what we've done is identified, ahm, key
       points on this photo with black dots that you, ahm, showed me
       where you were at the time.
A.     Uh huh.

Q.     Are you, are you with me on this?
A.     Uh huh.

Q.     Okay, now, are you more comfortable using this areal or this
       one here with the two black dots? Ahm, the same, the same
       view – I mean, same, ahm –
A.     Oh we're coming from a –

Q.     the same corner just –
A.     Well, this one look more better, because –

Q.     yeah, same corner, but different, different views.
A.     it's only got one, okay.

Q.     Okay, we're gonna use – work this one here. Okay, now,
       you've got a, ahm – we've got a dot marked over here, and it's
       – it seems to be close to the corner of 28th, and 40th Avenue.
       Is that correct?
A.     Uh huh.

Q.     And what – now, what does this represent, this dot here in
       relation to the store which is over here, the Circle K store?
       And, and between the dot, and the store we've got the

STATEMENT OF:  EDWARD KEITH DAVIS                    PK90-11-314

Q.    intersection of 40th Avenue, and Hallandale Beach Boulevard, correct?
A.    Uh huh.

Q.    Okay, so –
A.    Well, that repre. – this represents where I was standing at.

Q.    When you saw what you described?
A.    Right to get the clear view, but I –

Q.    Okay.
A.    came around the corner.  It's a tree.  I know it's a big tree right there.

Q.    Right.
A.    And soon as I heard the shot I was already looking, you know, toward the store –

Q.    Okay.
A.    heard the shot, and like a split, you know, reaction, a quick reaction –

Q.    Right.
A.    just looked over –

Q.    Okay, now, I'm, I'm gonna estimate this, and you correct me if I'm wrong.  But it looks to me like it could be, ahm, a couple of hundred yards, ahm, maybe, the distance from there to there?
A.    Well, no, no.

Q.    What's your, what's your estimate?
A.    I think it's about fifty yards.  About a hundred -

Q.    Using a, using a – you think it's about a half –
A.    About a hundred –

Bp                          Page 16 of 45

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    a half of a football field distance from there -
A.    Yeah.

Q.    to the store?
A.    A hundred or maybe – I don't know.  That's a small, you know, that's a small distance.  It's not –

Q.    Yeah.
A.    You know, it's not big.  You figure, ahm, it's three of those lengths, and one block.

Q.    Yeah.
A.    So, ahm –

Q.    All right, we'll say anywhere between fifty, and, and two hundred yards for now.
A.    Okay.

Q.    Based on your estimate, and my estimate.  And, you know, of course, we'll, we'll determine exactly what it is at a later time.  Now, let's talk about exactly what you saw.  You, you said you were coming around the corner if I understood you right.
A.    Uh huh.

Q.    And you were kind of looking towards the store –
A.    Uh huh.

Q.    when you heard the shot.
A.    Right.

Q.    What, what – in your mind, I'd like for you to visualize for me, once again, what it is you were looking at, at the store when you heard the shot?

STATEMENT OF:  EDWARD KEITH DAVIS              PK90-11-314

A.    Well, basically, like damn I wonder if they open this morning.
      You know what I'm saying?  Cause, you know, you'll go up
      there, and the store is closed.

Q.    Uh huh.
A.    You know, so it's just, you know, one of those things you see –

Q.    Had there been occasions in the past when you've gone to the
      Circle K at that hour, and it was closed?
A.    Yeah, yeah plenty times.

Q.    Plenty of times?
A.    Plenty times, yeah.  So, you know, ahm, I don't know man.  I
      just, you know, head – that – that's what I thought of just
      looking.  You know, damn I wonder if it's open.

Q.    Okay.
A.    You understand, but not looking here, not looking –

Q.    Right.
A.    You know what I'm saying at this here in front of the ice
      machine.  That's –

Q.    I understand.
A.    I ain't even –

Q.    But, ahm, what led you to believe as you were approaching
      the store that it was open then?
A.    Oh that it was open?

Q.    Yeah.
A.    Oh the, ahm, the clerk.  Ahm, what we use to call him, ahm,
      Simply Red.  I think he had all red hair, red hair, and freckles
      or something.  I done forgot, something like that.  But I saw
      him in the store.  It was somebody up in the front.  I don't know

Bp                        Page 18 of 45

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

A.    if they was right there to the door talking to him or over here at
      the hot dog machine or in the middle.  But I seen, you know,
      another person talking.

Q.    Okay.
A.    So and I, I could see the clerk more clearer than whoever was
      in the store.

Q.    So you saw – you, you, you recall seeing two people in the
      store -
A.    Uh uh.

Q.    as you were approaching the store.  Now, at what point as you
      were approaching you, you know, you're looking to see if it's
      open.  You're seeing some activity in there as you described
      two people.  At what point do you hear the gun shot?
A.    Well, like, like I'm getting ready to look to the store pow.  Look
      at the store, and look over like that just real quick.  And just
      see the dude running behind the back of the store.

Q.    Okay, now, you motioned with your face, and head that – you,
      you gave me the impression anyways – correct me if I'm
      wrong.  You gave me the impression though that you're
      looking at the store when the shots fired, and the shot gets
      your attention, and you look to your right I believe –
A.    Uh huh.

Q.    is the way you turned your head?
A.    Right, and looked to – ahm –

Q.    So you weren't – you did you – ahm, I guess what I'm getting
      ready to ask next then that is did you actually see the shot
      fired?
A.    No, ahm, see I saw a flame.  You know what I'm saying, but
      looking – you know what I'm saying?  Just looking.  Okay, I'm,

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

A.    I'm walking.  I'm looking at the store before I get there.  So know what I'm saying.  I'm looking, and I remember like fucking with my radio, and shit rewinding the song.  Then looked back up, you know.  Okay, the store is open pow just that quick.  But like on the way to looking at the store it just happened right then, and there.  But like from this way you could see, you can see the fucking, you know, the light man.  I mean, bang it's loud as fuck.

Q.    But you mean – when you say light you mean the flash from the gun?
A.    Yeah the flash.  It, it had to be – it couldn't have been a flash light.  You know what I mean?

Q.    Right.
A.    Well, I can't say, ahm – like I was telling him I can't say okay yeah I – that, that was gun fire.  I saw that.

Q.    Right.
A.    But what I can say is, you know, ahm, what I'm saying is from my, you know, side view that I saw a flash.

Q.    I see what you're saying.
A.    And you can just (unintelligible) –

Q.    Right out of the corner of your eyes –
A.    Right.

Q.    You're looking at the store.  Off to the side of your vision to the right –
A.    Uh huh.

Q.    you hear it.  You see a flash, and then you look over.
A.    Uh huh.

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    All right, my next question, when you look over, ahm, because you hear the shot?

A.    Uh huh.

Q.    At the same time you see this – I'll say (unintelligible) a, a, a muzzle flash.  What's the first thing you see when you look in that direction?  What's the first thing you see?

A.    Well, ahm, police cars you, you, you know, is over there.

Q.    Uh huh.

A.    And the guy running behind the Circle K.

Q.    Okay, the guy running behind the Circle K – the police car –

A.    Uh huh.

Q.    How, how is the police car positioned?

A.    Well, it was backed up, and – backed up right there on the corner.

Q.    Okay, it's backed up on the corner.

A.    Right like on the side of the building like direct –

Q.    Right.

A.    And you're kind of pointing at this area of photograph right now, and you're putting it on the west side, just for the record?

A.    Uh huh.

Q.    Now –

A.    Yeah on the west.

Q.    Yeah, because this is 441 down here, and 95 is that way.

A.    Right, right, uh huh.

Q.    95 is to the east, and 441 is to the north.  Now, where exactly is the person you see when you're able to first see him?  How

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    close to the car is he?  Let me ask you that.  (Unintelligible) a little easier.  How close, close to the police car?

A.    Ahm, oh it's close man like, like right there.  Just like back door, but in an angle.  Not – he, he ain't holding no gun or nothing.  It – you know what I'm saying?  He like getting out of there right then.

Q.    Okay.

A.    You know what I'm saying?  But I mean, he was right there man.

Q.    Right.

A.    I'm like, you know, oooh shit.

Q.    Do you see anything in his hands?

A.    No I can't, ahm, I can't say that I did.  I know – no I can't.

Q.    Okay.

A.    I can't say I saw a gun or anything, but –

Q.    Did you see his face?

A.    Well, see it's, it's, it's it's, it's been so long, but, ahm, I know he's black, and I know he was stocky at the time.  That's the only, you know, two things that –

Q.    Black, and stocky.

A.    You know.

Q.    Do you – but at – do you remember – and, and you said as early as 1995, ahm, you had first provided this information to, I believe, it's the Public Defenders office?

A.    Uh huh.

Q.    Ahm, at that time, do you recall ever expressing to them that you had seen the, ahm, subject's face?

Bp                          Page 22 of 45

STATEMENT OF:  EDWARD KEITH DAVIS            PK90-11-314

A.   I can't, I can't say that I did say it or, or what, but it's been so long.

Q.   Okay, cause you're giving me some –
A.   You know what I mean?

Q.   pretty good details now, ahm, as far as your, your memory. Ahm, what portion of the face, if you can help me here, did – do you think you may have saw on him?  The side view, a front view?
A.   No the – like the, you know, the hair.  You know what I'm saying?  I didn't see like –

Q.   You're pointing to the back of your head now.
A.   Right.

Q.   You said you saw the back side of him?
A.   Like the – yeah the hair.  You  know what I'm saying?

Q.   So you saw the –
A.   You know, ahm, that the hair was low unless he had on something black.  You know what I'm saying.  So I could tell you yeah, ahm, he did have short black hair, and this, and that –

Q.   Right.
A.   but you know what I'm saying?  You know what I mean?  I mean, I, I'm looking dead at the guy.  You know what I'm saying, but like from the back, ahm, he could have had a do-rag on.

Q.   Right.
A.   But the way I took it when I saw it –

Q.   Right.

STATEMENT OF:  EDWARD KEITH DAVIS                    PK90-11-314

A.   He had black hair –

Q.   Uh uh.
A.   and he's a black person.

Q.   Okay, I guess, what I'm trying to go – what I'm trying to determine here is now you, you said you're looking right at him, and I understand that.
A.   Uh huh.

Q.   But what profile of him are you looking at?  Are you looking at his side?  Are you looking at his back?  Are you looking at his front?
A.   No he looking at – I'm looking at his back, because he's hauling ass -

Q.   I got you.
A.   toward the, the, ahm, back of Circle K.

Q.   Okay, now, you say he looked balky.  What gave you that impression that he looked balky?
A.   Well, just his – like, ahm, his figure, and the – like the lumber jack or the flannel jacket as they call it.  It was just kind of big.  You know, it just looked –

Q.   Are you describing – can you say if he was big or if the lumber jacket was big?
A.   Ahm, I'll have to say he, he had to be – he had to be stalky for real, because it's, it's a fit that you can have with a flannel on.  You know what I'm saying?  And if it's tight or whatever –

Q.   Right.
A.   You know what I'm saying?  Or if it's big it's gonna make you look big regardless.

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.  Right.
A.  But this wasn't – it was like, ahm – it wasn't tight.  It didn't like small on him.  He just looked, you know, big.

Q.  Right.
A.  He just looked stalky.  I just could tell.

Q.  Okay.
A.  You know what I'm saying.  Kind of like almost like – I don't know like muscles or something like that.

Q.  Uh huh.
A.  Or something.  I don't know, but he just looked like a big dude bigger than me.

Q.  Like a big dude.  Did he – could you tell how tall he looked?
A.  How tall?  Ahm, I don't know I – I don't know.  I probably, I probably gave them a height.  I probably remember the height long time ago, but it's just a lot of this stuff is – you know what I mean?

Q.  Yeah, do you remember what else he was wearing besides the lumber jacket as you call it?
A.  Probably, probably had on some pants, some black pants.

Q.  When you say probably now –
A.  Yeah –

Q.  are you just not sure?
A.  It was dark colored.  Yeah, I'm unsure, but it was dark colored.

Q.  All right, would you just – would you characterize everything he was wearing as being dark color or a combination of light, and dark or, ahm (unintelligible) –

STATEMENT OF:  EDWARD KEITH DAVIS                    PK90-11-314

A.    Yeah, it was lumber jack. It could have been, ahm, ahm, blue. You know what I'm saying?  And gray or, or blue, and white. But I know it was flannel.

Q.    Okay.
A.    So – well, well, see I can't, you know, say, you know, exactly, but I know it was flannel.

Q.    Right.
A.    And I know he had dark colors on.  Because if he had – would a, would a had, ahm, light colors on I could say, oh his pants was white or beige.

Q.    I see.
A.    But I can't say that, because, you know, his pants was dark.

Q.    Uh huh.
A.    He didn't have on no light clothes.

Q.    Can you say if he had anything on his head?
A.    Ahm, just black hair, just black hair.  Like I said it could have been a – it could have been a do-rag.

Q.    Right.
A.    It could have been a black stocking cap, but how I seen it his hair was black.

Q.    All right, now, what – where – when is the last time you see this individual?
A.    The last time?

Q.    Uh huh.
A.    Right then, and there.  That was the first time, and the last time when he went around the back of that building.

STATEMENT OF:  EDWARD KEITH DAVIS                    PK90-11-314

Q.     Okay, that – I guess, that's my next question.  Did you actually see him make it behind the building or did you see him going in that direction?

A.     Well, see you got to – you got to look at the building.  You know what I'm saying a little bit, because – okay, I'm over here.  If he would have went behind, right.  You can't see him go around this piece right here.

Q.     Right.

A.     But he just disappeared.

Q.     Okay.

A.     You know what I'm saying?  Like he's trying to get there.

Q.     So you saw him leave your sight, and disappear?  Exactly what I'm saying?

A.     Yeah, just disappear, and go behind the building.

Q.     And it was somewhere behind the building?

A.     Uh huh.

Q.     Okay, now, what did you see next?

A.     Ahm –

Q.     Did you see him come out from the other side of the building?

A.     No.

Q.     Okay.

A.     No, because I hauled ass.  I turned around.  You know what I'm saying?  Ran down here, ran pass my house all the way down to 42nd Avenue, and Hallandale Beach Boulevard.  No not Hallandale Beach Boulevard.  The alley way right there.

Q.     Right.

A.     I ran in back of the ally, and the house as you can see is there.

Bp                            Page 27 of 45

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    Okay, so when you took off, how soon after the shot did you start running away?

A.    Oh it was about – let me see, ahm, ahm, the time it would take him to run from the car (unintelligible) -

Q.    No I'm not asking that.  I'm just asking, you know –

A.    How long did it take me to get there?

Q.    Yeah, I mean, you hear the shot.  I mean, did you start to run immediately or did you wait a second?  Did you freeze?

A.    Oh no.  I, I visualize a little bit.  You know what I'm saying?  To see the dude like, ahm, go behind, ahm, the Circle K.  And I remember looking at the door, and like I said, it was two people in the store, but somebody came out.  And they was like looking at the door like what the fuck.

Q.    Uh huh.

A.    And then looked over this way, and just like went back in.  Out of there gone.

Q.    And you took off?

A.    But see, ahm, I don't know if they got on the phone.  I don't know who called the police.  I don't know what happened after then, but from that point where the two dudes right there – it was two dudes in there.  Somebody came out the door.

Q.    Two dudes in the store?

A.    Yeah, but it was either two clerks or a customer, and the clerk.

Q.    Can you say if they were white or black?

A.    Ahm, white.

Q.    Okay.

A.    White.

Bp                              Page 28 of 45

STATEMENT OF:  EDWARD KEITH DAVIS              PK90-11-314

Q.    Okay.
A.    Yeah I remember one, one had red hair or –

Q.    Uh huh.
A.    gold hair or something like that.

Q.    Uh huh.
A.    Something about his hair.

Q.    Okay.
A.    But, ahm, I was out of there maybe (inaudible).  I was there probably a good five or six seconds.

Q.    Okay.
A.    Just like stuck.

Q.    Right.
A.    You know what I mean?

Q.    Okay, now, what makes you run away after you saw –
A.    What?

Q.    you - what you saw?
A.    Well, I mean, you know, you don't, you don't go through nothing like that everyday.  You know what I'm saying?  And, and then a police at that, and, ahm, BSO man they – back then – I don't know what they do now man, but back then they was straight.  Blondie was straight Robo Cop was straight, everybody.  You know what I'm saying?

Q.    Uh huh.
A.    So, you know, for that to happen it kind of, you know, it, it just – it messed me up man, and I was like man shit.  I ain't – I don't know nothing.  I ain't seen nothing.

Bp                          Page 29 of 45

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    Uh huh.
A.    And I wasn't gonna say any –

Q.    Ed, I'm sorry.  The, ahm, the tape, ahm, ran out.  We had to flip it over.  During the time we had the tape off did you, and I discuss the case at all?
A.    No.

Q.    Okay, we're gonna go back on record, and the, ahm, time is, ahm, 1:39 P.M.  The date is still February 28th, 2002.  All right, you were explaining to me how, ahm – the reasons why you ran off.  And you were, you were, ahm, going into the, ahm, ahm, the reasons why you spoke up when you did which we'll come back to.
A.    Uh huh.

Q.    Ahm, but I want to keep you right now on this, ahm, on this, ahm – on the events, ahm, right after the shooting.  Cause I want to make sure it's clear in my mind.  Ahm, so you took off running.  Now, just for the record, you, you showed – you, you, you showed this on the, ahm, on the, ahm, on the, ahm, photograph here, but they can't see that on tape.
A.    Uh huh.

Q.    But you've indicated that you took off running down 28th Street it look like, back down 28th Street in a westerly direction all the way down to 42nd Avenue you said?
A.    Uh huh.

Q.    And then you looped around –
A.    Made a left.

Q.    Made on a left on – actually, on Hallandale Beach Boulevard?
A.    No two lefts.

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.    Two lefts right –
A.    Right there in the alley.

Q.    into the alley way there, right between this alley?
A.    Uh huh.

Q.    And you ran up through the alley, and then came back to a
      location where there's a fence that leads into your yard.  Is
      that correct?
A.    Uh huh, made another right.

Q.    And we have that, we have that spot marked with a black dot
      on this –
A.    Right.

Q.    photograph here.  And, ahm, you're telling me that, that's
      where you stood, and remained for how long?
A.    Ahm, maybe thirty, thirty minutes, forty-five minutes.

Q.    Okay.
A.    An hour.

Q.    Now, why did you hang out there?
A.    Well, I don't know.  I was kind of afraid.  I wanted to go back,
      and get my new Ice Cube tape, man back there.  And so I had
      put it in  my mind like man I'm going back to get my shit.  And
      I'm a do it.  Then I just – I smoked the cigarettes, and I don't
      know.  I was feeling like, you know, a big guy like man I, I ain't
      scared.  I ain't did nothing, you know.  I saw this so what.' I
      ain't gonna say nothing.

Q.    Uh huh.
A.    So when I came back around the corner, and the police was
      there I was just – I was like scared shit (unintelligible).

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.   Okay, now, when you came back around, did the police ever stop you, and talk to you that evening?

A.   Yeah this, ahm, after I smoked the cigarettes.  Like thirty minutes, forty-five minutes to an hour.

Q.   And that would have been when you were getting ready to come back over to try to get your tape back?

A.   Right.

Q.   All right, when you were stopped during that time, did you tell the officer you had witnessed anything?

A.   No.

Q.   Why not?

A.   No I didn't say anything, because I was scared at the time. You  know what I'm saying, paranoid.  You know, that, that type of thing, and it's like know the biggest secret, and only you know it, man.

Q.   Uh huh.

A.   You know what I'm saying?  You can't really tell nobody.

Q.   Uh huh.

A.   So that's how I looked at it.

Q.   Did the officer take  your name or information from you when he confronted you that night?

A.   Ahm, I can't ex., exactly remember, but, ahm, I would have to say no, because he let  me go.  You know what I mean? Ahm —

Q.   You don't remember him asking for any identification from you or anything like that?

STATEMENT OF: EDWARD KEITH DAVIS          PK90-11-314

A.     Right I don't remember nothing like that.  All I remember is, is
       coming around the corner.  I had got my radio in my hand.
       Ahm, he was like hey come here.  So I come over there.  I'm
       like yes sir.  And he was like you know what happened over
       here just now.  I'm like no sir.  He was like a Broward deputy
       from the Sheriff's Office just got killed.  He was upset with it,
       but more like, ahm, questioning me, also.  You know, but like
       since I said, no he gonna let me know what happened like
       that.

Q.     Uh huh.
A.     So, ahm, I just – I don't know.  I left.

Q.     Okay.
A.     I left.

Q.     Now, did you tell anybody else what you had saw beyond the
       police officers?  Did you tell your mother?
A.     No.

Q.     Did you tell your girlfriend, your wife or any –
A.     Nobody.

Q.     any close friends, anybody?
A.     Nobody.

Q.     You never shared with this anybody at all until –
A.     Uh uh.

Q.     that time in the jail which we're gonna get into?
A.     Right.

Q.     All right, the five to six seconds that you described for me that
       you saw the events that you saw take place in the Circle K –
A.     Uh huh.

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

Q.   that night from the location that you described it to me, did you recognize or did you – were you able to identify the shooter? Did you know who the shooter was?

A.   No.  As far as seeing him on the street or ever saw him before, no.

Q.   Right, did you – could you say if he was or wasn't somebody that you may have known before?

A.   No I can't really – no I can't say it like that, no.  Because I didn't get a, you know, a face.

Q.   Okay.

A.   You know what I mean.

Q.   Let – well, let me ask you this.  You, you, you followed the case in the papers.  Is that correct?

A.   Uh huh.

Q.   Recently as well as in the past?

A.   Uh huh.

Q.   All right, you know the two people that, ahm, were convicted for the murder.  You know of them, right?

A.   Right.

Q.   And you know of the new person that, ahm, information has been developed on.  Is that correct?

A.   Yeah know of now.  I don't know him.

Q.   Know of.  I understand.

A.   Yeah I don't know him personally, and stuff like that.

Q.   I know you don't know him personally, but you know of him. You've seen his picture in the papers, and all that?

STATEMENT OF: EDWARD KEITH DAVIS          PK90-11-314

A.    Uh huh.

Q.    Can you tell me, ahm, anything of those, can you say one way
      or the other if it was anyone of those three people that you
      saw that night?

A.    I, I could, but, you, you know, ahm, whether it would be, ahm,
      taken as an accurate, ahm, statement or not.  I, I could say it's
      the, the guy that's in the paper now, because he's fucking
      stalky man.  You know, just – I mean, like, you know, when I
      seen him I was like oh shit.  You know what I'm saying, but –

Q.    Uh huh.

A.    when I seen, ahm, the, ahm, other two dudes man I was like
      what.  You know what I'm saying.  This dude here that's the
      first thing I did was look at, at – for body size.

Q.    Well, let me ask you.  Let me put it this way then, you know,
      body size is important.  Ahm, Tim Brown.

A.    Uh huh.

Q.    I'm sure you've heard the name.  Can you say to me – could
      you have said it in the past?  Did you say it in the past?  Can
      you tell me now that the person you saw that night was or was
      not Tim Brown?  Can you say that based on what you saw,
      and explained?

A.    Back then I probably – yeah.

Q.    Based on those five to six seconds that you saw the back of
      this persons head can you say for sure if it was or wasn't Tim
      Brown?

A.    No I can't say that.

Q.    Okay.

A.    I can't say that.

STATEMENT OF:  EDWARD KEITH DAVIS                PK90-11-314

Q.    Can you say for sure based on the five to six seconds that you
      saw the back of that person's head, in the back, ahm, that it
      was – was or wasn't Keith King?
A.    Well, I mean, by size.  You know   what I mean?

Q.    Not by size.  I'm talking about you just knowing, and, and –
A.    No, no, no.

Q.    by their faces?
A.    No it, it – I don't know.  Just for some reason man.  It wasn't, it
      wasn't them two man.  I know it wasn't man.

Q.    But what do you – okay, what do you base that on?
A.    I don't know it just – I don't know.  Like I said man, ahm, you
      know, if, if they came back here, and left on the bike man they
      didn't come this way man.

Q.    Uh huh.
A.    You know what I'm saying?  So –

Q.    Let, let, let, let me ask you this then.  Ahm, you ran away from
      the Circle K to the west.  Is that correct?
A.    Uh huh, first a little, ahm, a little north, and then west.

Q.    Right a little north –
A.    Right.

Q.    down on 40th Avenue –
A.    Right.

Q.    away from the Circle K, and then you would have turned west,
      and ran even further away from it?
A.    Uh huh.

STATEMENT OF:  EDWARD KEITH DAVIS            PK90-11-314

Q.  Now, if the people that committed the murder had escaped along 40th Avenue going to the north or 40th Avenue going to the south or Hallandale Beach Boulevard going to the east, would you have been able to see that if you were running in the opposite direction, away?

A.  No, no.

Q.  All right, so you have no idea of really knowing, ahm, where this person that you saw go behind the building may have ended up afterwards?

A.  Right.

Q.  Is that true?

A.  Right.

Q.  All right, ultimately, you do reveal that you saw something.

A.  Uh huh.

Q.  Tell, tell me the circumstances behind that, Ed?

A.  What, what you mean?

Q.  Yeah ultimately, you know, you tell somebody that you, you saw what happened here?

A.  Yeah, yeah.

Q.  When, when was that?

A.  Well, ahm, the first time, ahm, it came up like in the county jail. And something came on TV about them.  And, you know, they was like yeah they caught him, and this, and that, and blah, blah, blah.  But it was like people taking sides in there.  So I just flipped the lid like, you know, and yelling like man they ain't do it.  Naa one of them did it.  So they was like oh aah how you  know man.  You don't know what you're talking about.  And so I'm like I was there man.  So then, you know, they was like – I mean, that's when it's started.  They was like

STATEMENT OF:  EDWARD KEITH DAVIS                PK90-11-314

A.      man you got to get your ass on the door.  Tell these people
        what you know man.  Don't let these boys go down like that,
        and this, and that.  So you know.

Q.      Uh huh.
A.      That's when it all started, man.  I just, you know –

Q.      When were you in the county jail?  What period of time?
A.      Ahm –

Q.      When this happened?
A.      Ahhh man.  I, I remember I was getting ready to go to prison,
        ahm, for the first time.

Q.      Okay.
A.      I think I had a feeling like I was gonna get a lot of time.  I
        would never be able to talk nobody else, and this, and that.
        So what I did was tell the dude.  We had already had a plea.
        That was already done.  So I say, okay we're gonna take that.
        So I tell the, ahm - my, my PD.  I'm like, but man look.  I, I got
        to tell you something man, cause I was going back to my cell.
        I don't know.  You know, cause somebody might try to hurt
        me.  You know what I'm saying.  So he like what's up.  What's
        up.  So, ahm, I said, man I got some information man about
        the police that got shot, man.  He was like well, tell me what
        you know, and this, and that.  And we went on the side of the,
        ahm, Judge Shapiro chambers like -

Q.      Uh huh.
A.      and went in the room, and talked.

Q.      Uh huh.
A.      And after that he was just like somebody gonna come, and
        talk to you or something like that.

STATEMENT OF:  EDWARD KEITH DAVIS                PK90-11-314

Q.   I see.  Did you, ahm, - when you spoke to your public
     defender, and you spoke to the person that came to see you
     later, did you, ahm, ask them to, ahm, see what they could do
     to reduce your time in prison since you had some concerns
     about that in, in exchange –
A.   Uh uh.

Q.   for the information you were gonna offer?
A.   No man, no.

Q.   Did you – were you offered any, ahm, reduced sentencing or,
     or were you –
A.   Hell no.

Q.   made any promises that they would try to, ahm, reduce your
     sentence or do anything for you if, ahm, you simply told the
     truth about what you had saw?
A.   No, no.

Q.   Nothing like that?
A.   It was, it was never nothing like that.  I did that totally like on
     my own, but like out of fear, you know, going back to the cell
     or whatever.

Q.   Uh huh.
A.   And, and then when I got to the cell man it was no beef.  It
     was no static or nothing.  So I felt like a jack ass telling the,
     the, the PD this, and then he told like the other guy or
     something.  And, you know, they interviewed me, and I saw
     the, ahm, shift commander or whatever he was.  But that"s
     when everything started.  But the year, ahm, I ain't even clear
     on that.  I remember I was getting ready to go o prison, but it
     was no time.  It was nothing.  You know what I'm saying, a
     couple of months.

STATEMENT OF:  EDWARD KEITH DAVIS                    PK90-11-314

Q.      Did you, ahm, think to yourself or did it ever cross your mind
        that you might be able to help yourself by revealing what you
        knew at that point, and time to the public defender?
A.      Well, I thought if, ahm, you know, really – I, I – like I said, I
        was thinking about the dudes back at the cell, but I was
        thinking like later on like after.  You know what I mean like –

Q.      Right.
A.      man, you know.  Damn I wonder how they'll take this, and this,
        and that.  You know, this probably could like, you know, help
        me out.  But like I say, I was going to prison for like seven
        months.  Got eighteen months, but I only did like six, six, and a
        half months.  But, ahm, I just thought I was going to a place
        where I couldn't see no family, couldn't get no phone calls.

Q.      Uh huh.
A.      Where people get stabbed, and everything like that.  So I just
        wanted to, you know, help this guy out, and that's it.

Q.      Okay, ahm, so going back to the cell now, and the
        conversation that you had.  You, you, you were mentioning to
        me that, ahm, you saw something on TV I think you said?
A.      Uh huh.

Q.      And that kind of, ahm, just frustrated you at that point.  Now,
        and you, and you, and you decided to, ahm, go ahead, and,
        and say something.  What frustrated you at that point, and
        time that, that, you know, that you –
A.      The dude – the other, ahm, inmates in there saying that they
        did it.  Saying that they did it.  Just like they knowed what they
        talking about.  Yeah, man I, I knew they did it.  And this person
        here yeah man.  Ahm, he – man he been rough from back in
        the day.  Ahm, he told me such, and such.  I'm telling you I
        seen them.  You know, I'm like that's bull shit man.  They
        didn't do it man.  Naa one of them did it.  You know, just

Bp                              Page 40 of 45

STATEMENT OF:  EDWARD KEITH DAVIS          PK90-11-314

A.   screamed it, and then, you know, they was like how you know. You wasn't even there, man.  Aaah man you just talking.  I say, I was there man.  I seen it.  I seen everything.  And after then when it was lock down, and all of that they was like yeah we gonna get you in lock down boy.  You better help them boys out, and this, and that.  So, you know.

Q.   But at that time, how, how, did you – how, how, how come you were so certain that it wasn't them.  I mean, what –
A.   Well, it's just – okay, really, ahm, they coming, and the bicycle thing, the truth or dare thing.  That thing right there.  That's –

Q.   The truth or dare thing?
A.   No the truth or dare.  They, they, they had like a truth or dare.

Q.   Oh I see what you're saying.
A.   You know, like, ahm –

Q.   Truth or dare?
A.   Yeah truth or dare, and they came up.  Okay, I'm a shoot a police, but I  just –

Q.   Well, beyond that though.  I'm, I'm more curious about, you know, your actual observations that would have, ahm – you know, being an eye witness –
A.   Uh huh.

Q.   you know, you, you know in your heart what you saw, and what you didn't see.  And, you know, just based on your observations –
A.   Uh huh.

Q.   Ahm, that night, you know, what convinced you that it wasn't these two guys?
A.   Cause I only seen one dude.

STATEMENT OF:  EDWARD KEITH DAVIS            PK90-11-314

Q.    You only saw the one dude?
A.    Uh huh.

Q.    Okay, and you only saw the one dude during that five to six
       second period that –
A.    Uh huh.

Q.    you were standing here, ahm, ahm, near 28th, and, and 40th,
       and looking over at the Circle K, correct?
A.    Correct.

Q.    And – right.  And then you fled after you heard the gun shot –
       or is that by the six second period you fled back west away
       from the, ahm, location?
A.    Uh huh.

Q.    All right, and I think you've already told me that, because of
       the direction you went in you wouldn't have been in the
       position to see –
A.    Right.

Q.    this person or any other persons, for that matter, after that
       point?  Anyone along 40th Avenue in neither direction north or
       south or east.  Is that correct?
A.    And, and – I ran around there.  I could do this again.  I could
       run as fast as I could –

Q.    Yeah.
A.    down this whole stretch.

Q.    Right.
A.    back down through the alley way to the house.  And right there
       to the front fence from the – walk from the back –

STATEMENT OF:  EDWARD KEITH DAVIS                PK90-11-314

Q.   Right.
A.   To the front, lean right against the front, smoke cigarettes.  I
     came out the gate looking down that way, came back in the
     gate, and just leaning against the fence smoking.  Then I
     remember getting in the corner of the fence –

Q.   Right.
A.   And just looking down this way waiting for the – like the, the
     police.

Q.   Right.
A.   You know, sound, and stuff like that.

Q.   Right.
A.   And that's where I was all that time.

Q.   All right, beyond what you saw during that 5 to 6 second time
     frame, ahm, did you see anything else, ahm, afterwards?
     After that time, did you see anything else?  Ahm, in other
     words, did you see anyone fleeing in any, any other
     directions?  Any other people?  Anything else that was
     suspicious in your mind –
A.   No.

Q.   as you stood over here, and smoke the cigarettes?
A.   No.

Q.   That was it?
A.   No.

Q.   What you saw during that 5 to 6, ahm, second time frame is
     what you saw?
A.   Right.

Bp                           Page 43 of 45

STATEMENT OF:  EDWARD KEITH DAVIS              PK90-11-314

Q.     Okay, ahm, Detective Lashbrook, you have any, ahm, questions?

Q2.    No I do not.

Q.     Ahm, Ed, is there anything else that, ahm, you need to say that I haven't asked that you think maybe important here that might help us?

A.     No not – you know, that's just the basic – everything right here.  I done went through this like so many times.  You know what I mean?  But some things that I, I, I thought was not important - you know what I'm saying, have not been on my mind.  You know what I mean?  Like, ahm, ahm, you see – ahm, you hear a gun shot, and you see a police car there, and a dude running.  And then you hear this big case.  Okay, that's locked in my head forever, but like the little – you know, the little stuff.  Like I probably remember something before that I do not remember now that might just come up next week or something or tomorrow.  I don't know, cause I don't think about it like that.

Q.     Uh huh.

A.     You know, but a police getting shot that's a big, big ordeal.  So, you know, it's, ahm, it's things that – ahm, I've been interviewed before that I probably didn't say now.  Ahm, I probably didn't say the last time, but everything is - like the main, the main stuff is right there, the main stuff.

Q.     All right, but everything, everything you've told me today has been the truth –

A.     Uh huh.

Q.     and the whole truth to the best of your knowledge.  Is that correct?

A.     Exactly, exactly.

STATEMENT OF:  EDWARD KEITH DAVIS

PK90-11-314

Q.    You haven't intentionally withheld information –
A.    Right.

Q.    or lied to me about anything?
A.    Right.

Q.    Okay, all right, that being said then I'll, ahm, close this statement.  The time is now 1:57 P.M., and the date is, ahm, February 28th, 2002.

Bp

```
 1    State of Florida      )
                            :ss        J. John Frusciante
 2    County of Broward     )

 3
                    IN THE CIRCUIT COURT OF THE
 4                 SEVENTEENTH JUDICIAL CIRCUIT,
             IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6
      STATE OF FLORIDA,          )
 7                               )
             Plaintiff,          )
 8                               )
      vs.                        )   Case No.   91-14793 CF B
 9                               )
      TIMOTHY BROWN,             )
10                               )
             Defendant.          )
11    ------------------------X

12

13         Proceedings had and taken before the Honorable John

14    Frusciante, one of the Judges of said Court, Ninth floor,

15    Room 950, Broward County Courthouse, Fort Lauderdale,

16    Broward County, Florida, on the 7th day of January, 1993

17    commencing at or about the hour of 10:00 o'clock a.m. and

18    being a Motion to Suppress hearing.

19

20

21    APPEARANCES:

22         CHARLES B. MORTON, JR., Esquire
           Assistant State Attorney,
23         On behalf of the Plaintiff.

24         LARRY S. DAVIS, Esquire,
           Appearing on behalf of the Defendant.
25
```

ATTACHMENT / EXHIBIT 12

```
 1         both sides agreed who has the burden here?
 2              MR. DAVIS:  State does, Judge.
 3              MR. MORTON:   I am ready to proceed, Judge.
 4         Detective Scheff.
 5              THE COURT:  Mr. Davis, I do assume that
 6         you're ready?
 7              MR. DAVIS:  Yes, Judge.
 8    Thereupon,
 9                        RICHARD SCHEFF,
10    having been first duly sworn, was examined and testified
11    upon his oath as follows:
12              THE CLERK:  State your name and spell your
13         last name for the record.
14              THE WITNESS:  My name is Richard Scheff,
15         S-c-h-e-f-f.
16                        DIRECT EXAMINATION
17    BY MR. MORTON:
18         Q.   Mr. Scheff, can you tell us who you work for?
19         A.   I am employed by the Broward Sheriff's office.
20         Q.   What capacity?
21         A.   At the moment, I am a Detective, Lieutenant.  I
22    work in the Criminal Investigation Division.
23         Q.   Did you get involved in working with the Broward
24    Sheriff's office in investigating the death of police
25    officer Pat Behan?
```

1         MR. DAVIS:  Objection, Judge, that's not

2    in response to the question.  I don't think

3    the --

4         THE COURT:  When?

5    BY MR. MORTON:

6    Q.    When, just specifically when?

7    A.    The first time I became aware of the name Timothy

8    Brown would be November 14th of 1990.

9    Q.    All right.  And tell us how that came about.

10   A.    That came about through an individual by the name

11   of Rob McGriff.  Mr. McGriff had contacted the Sheriff's

12   office indicating that he had information concerning the

13   death of Patrick Behan.  Detectives were assigned to pick

14   up Mr. McGriff and interview him.  In fact, he was brought

15   to my office and we were given information from Mr. McGriff

16   that he knew who had shot Deputy Patrick Behan and

17   identified the people who had been shot or had been

18   involved in the incident that led to the shooting of Deputy

19   Behan.  He identified those people as Tim Brown and another

20   individual by the name of Keith Maddox.

21   Q.    All right.  Then what did you do then when you

22   first heard that information or found out that information?

23   A.    Other detectives were assigned, and Keith Maddox

24   was located and brought to the office for an interview.

25   Further conversations or interviews were being conducted

14

1    Behan, although he did indicate that he knew Tim Brown and

2    knew Rob McGriff, I thought that it might be appropriate to

3    have Rob McGriff confront Keith Maddox face to face and see

4    what the reaction was.  And, in fact, I brought Mr. McGriff

5    into the interview room where Mr. Maddox was, and I asked

6    him to repeat the allegation in Mr. Maddox's presence.

7         Q.   And?

8         A.   Mr. McGriff was very reluctant to.  He ultimately

9    did.  He would not make eye contact with Mr. Maddox.  Mr.

10   Maddox was vehement, was calling Mr. McGriff a liar.  I

11   terminated the contact.  I brought Mr. McGriff into my

12   office, and I told him that he failed his polygraph test.

13   I told him that his whole contact did not seem to

14   believable, and I asked him what was up, what the real

15   story was.  At that point in time, he told me that he was

16   dying from Aids, that he was aware of the fact that there

17   was a large reward posted, and that he hoped through his

18   testimony to obtain the money and live out his last days in

19   style.

20        He further told me that he had gotten this

21   information about Keith Maddox and Tim Brown's involvement

22   from the brief contact that he had had on the night, or

23   rather the early morning hours of November 13th from Tim

24   Brown when he bumped into Tim Brown at a bar in the area

25   near where the crime occurred, a place called the

JUSTICE REPORTING SERVICE, INC.      523-6114

1    Godfathers.  And at that point in time, Tim Brown had told

2    him that he and Keith Maddox had been involved in shooting

3    the deputy.  Then after hearing that Mr. McGriff decided

4    that his value as a witness would be enhanced if he would

5    indicate that he was an eyewitness, that he actually seen

6    this incident occur, and so he decided to embellish on the

7    truth.

8         Q.   So basically he told you he didn't.  Initially he

9    told you he saw it; then he said, no I heard from Mr.

10   Brown?

11        A.   That's correct.

12        Q.   Did you then follow up that particular lead, and

13   at some point in time talk to Mr. Timothy Brown?

14        A.   Yes, that's correct.

15        Q.   When did you do that in relationship to the first

16   time that you got this information and you completed your

17   investigation with Mr. McGriff?

18        A.   Mr. Tim Brown was located by the City of Hollywood

19   Police Department on the morning of November 15th, 1990;

20   and I became aware of the fact that he was at the Hollywood

21   Police Station and I dispatched two of my detectives which

22   were Detective Gill and Illaraza to meet with him.  At the

23   time that I learned this, I was in the area of our District

24   1 substation in the  Hollywood Police Department.  They are

25   maybe five hundred yards apart, very, very close on

1    Hollywood Boulevard.

2         And perhaps twenty minutes fifteen, twenty minutes

3    after Detective Illaraza arrived at the Hollywood Police

4    Station with Tim Brown, Sergeant Auer and I had the

5    opportunity to break free from whatever it was that we were

6    doing at the District 1; and then we went over to Hollywood

7    Police station to find out what was going on with the

8    interview of Tim Brown.

9         Q.   Why did the Hollywood Police Department notify

10   your department, to tell you that Mr. Brown was in custody?

11        A.   We had asked them -- we had asked Hollywood Police

12   Department to notify us when they came into contact with

13   Mr. Brown, because we, in our background check, had

14   discovered that there was a pick-up order on him, juvenile

15   pick-up order on him.  And Hollywood seemed to know who he

16   was.  Some of the officers there had some past knowledge of

17   him, and it seemed to be more appropriate to ask them to

18   find him since they knew him and he lived in their city.

19        So we asked for their assistance and just asked

20   them when they came into contact with him if they would

21   notify us.  And, of course, within essentially a matter of

22   hours, they were able to locate him.

23        Q.   All right.  So ultimately, did you go over to the

24   police station to talk to him?

25        A.   Yes, I did.

1      Q.    And what day was that again?

2      A.    November 15th, 1990.

3      Q.    Tell us what happened when you got there,

4    initially?

5      A.    When I got there, I found that Mr. Brown was in an

6    interview room.  My detectives were in talking to him.  I

7    was kind of pointed off in the direction, and I was told if

8    I went around the corner I would find a room.  I walked

9    around the corner.  I thought it came to the right door.  I

10   knocked on it, kind of opened up the door, looked in to

11   make sure I was walking into the right place, and I found a

12   gentleman I later learned to be Tim Brown because I

13   recognized my detective sitting there talking to him.  When

14   I realized I had come to the right place, I walked in with

15   John Auer; and the two of us kind of walked in.

16     Q.    What happened at that point?

17     A.    At that point in time, Tim Brown was in the

18   process of speaking to Detective Gill.  And I can't tell

19   you whether Tim was speaking or Tom Gill was speaking, but

20   the gist of what was happening when I walked in was that

21   Tim Brown was telling my detectives that Keith Maddox had

22   shot Deputy Behan.

23     Q.    All right.  So what did you do then at that point?

24     A.    I asked Tim Brown how he knew that Keith Maddox

25   was involved in the shooting.

1      Q.    Now, at this point, had you or any of your

2    detectives advised Mr. King of any rights -- I am sorry,

3    Mr. Brown of any rights he may have had?

4      A.    No, I was unaware.    I did not know whether my

5    detectives had advised him of his rights or not.    I

6    subsequently came to learn that they had not, but that's

7    not until like several statements, you know, later.

8      Q.    Let's talk about those several statements and what

9    happened.

10     A.    Okay.   As I said I asked --

11          MR. DAVIS:   Excuse me, Judge, I don't know

12     if the question was answered.   I don't know if

13     the rights were read to Mr. Brown at that --

14          MR. MORTON:   I believe the answer was no.

15          THE COURT:   I believe that was the answer,

16     no rights were made.

17          THE WITNESS:   Well, actually, my answer

18     was I later learned that no rights -- I did not

19     know whether rights had been given to him.    But

20     I can say to you that I subsequently learned

21     that he had not been given his rights at that point in

22     time.   But I didn't know at that point.

23   BY. MR. MORTON:

24     Q.    Right.   And you had not given him any rights

25   yourself?

1     A.   No.

2     Q.   Tell us how your conversation proceeded.

3     A.   I asked Mr. Brown how he knew that Keith Maddox

4  was the person that shot the deputy.  He said that he had

5  heard it.  I said, "Well, where did you hear it from?"  I

6  expected to hear the name Rob McGriff, but I didn't.  He

7  said, "I heard it on the street."  I started pressing him

8  as to, "Well, who told you on the street that Keith Maddox

9  was the one that shot the deputy?"  There was no response

10 to that question immediately.  He sat, he looked down, he

11 waited a minute or two, and he looked back up and he said,

12 "Keith didn't shoot the deputy.  I did."

13    Q.   All right.  And what did you do?

14    A.   At that point in time, not knowing if Miranda had

15 been given, I decided to withdraw, and I had my other

16 detectives or Detective Illaraza and Gill step out of the

17 interview room along with myself and John Auer.  I asked

18 them, you know, what had transpired; and at that point in

19 time, I had learned that Miranda had not been given,

20 certainly during the period of time I had been in with Mr.

21 Brown, beyond what he was saying he --

22    Q.   How long were you with him?

23    A.   Several minutes.  I had the distinct impression

24 that he was very much under the influence of narcotics.

25    Q.   Tell us why.

20

1        A.    He would start a statement and jump to something

2    else.  He did not seem to be terribly responsive.  It was

3    just a bizarre quality to me, and I wanted to explore that

4    aspect of the situation before we proceeded on in what was

5    at that point going to become an interrogation.

6        Q.    Now, initially when you spoke to him, he had not

7    made himself a suspect in that case, correct?

8        A.    He was not a suspect in my mind until he uttered

9    the statement that he had shot the deputy.

10       Q.    All right.  So when you went outside, what

11   happened?  What did you do after you withdrew?

12       A.    We withdrew.  The decision was made that we would

13   just talk with Mr. Brown about matters not pertaining to

14   the death of Patrick Behan.

15       Q.    Why?

16       A.    Because I wanted to get a better feel for Tim

17   Brown in reference to a mental state at that point in time.

18       Q.    So what did you do to find that out?

19       A.    I talked to him about how he had come to be

20   arrested in the first place, because, you know, that

21   Hollywood had arrested him and I was just asking questions

22   having to do with the juvenile pick-up order.  I asked

23   him -- I mean, a lot of what I was asking was also just

24   casual in nature just to try and see if I asked him a

25   question what kind of response I was going to get.  And

1   after maybe five minutes of talking with him, I became very

2   uncomfortable of the thought of proceeding at that point in

3   time.

4        Q.   Why?

5        A.   Because I did not believe that in good faith I

6   could give him his rights and expect that he could waive

7   them.

8        Q.   Why did you not believe that and why did you --

9        A.   Because he seemed to be very, very high.  Matter

10  of fact, I asked him.  He told me he was high on crack

11  cocaine.

12       Q.   I was going to ask you if you asked him

13  specifically.

14       A.   Yeah, I did.

15       Q.   And what did he tell you?

16       A.   That he was on crack cocaine.

17       Q.   So then what happened at that point?

18       A.   We withdrew again, same four detectives which

19  included me.  I gave the other detectives my opinion, that

20  it would be a mistake to proceed for several reasons.  One,

21  I didn't think I could give him his rights; and that if he

22  waived them, then I could see that he wasn't going to make

23  any sense.

24       Q.   You would have to come in here and say he was, in

25  your opinion, highly intoxicated at that point in time?

1    A.    That's correct.  I didn't think that he could.   If

2    he was involved in the death of Deputy Behan, I didn't

3    think he could give us details that I was going to require.

4    I didn't know whether he was involved or not.  But if he

5    was involved, I certainly wanted to be able to interview or

6    interrogate him in a very detailed fashion.  And clearly

7    from his statement that point in time, if he was involved,

8    he wasn't going to be able to tell me, even if he chose to,

9    in any sort of detail what had transpired.

10    Q.    So you could see if that was corresponding to the

11    physical facts?

12        MR. DAVIS:  Judge, I am going to object that Mr.

13        Morton is testifying.  It's his witness.

14        THE COURT:  Counsel, I think, Mr. Morton, if you

15        could be just a little cautious regarding the matter,

16        please proceed.

17    BY MR. MORTON:

18    Q.    Why did you want him to be able to give a detailed

19    account?

20    A.    Because this was a murder case that involved the

21    death of a deputy sheriff.  Even at this stage of the

22    investigation, I could see that we did not have a great

23    deal to work with.  I wanted to be sure in my mind and in

24    my heart that we were going to arrest -- if we arrested

25    somebody -- the right person.  And I wanted that person, if

1    they were going to make a confession, to be able to give me

2    a detailed account of the incident so that I could compare

3    it to whatever physical evidence we had or don't, or other

4    witnesses that might come forward, I wanted to have

5    something to work with other than a singular statement, "I

6    shot him."

7           And after spending a few minutes with him, I could

8    see that he was in no condition, even if he chose to, to

9    try and tell me what had happened.

10     Q.   All right.  Then tell us where did you go from

11   there, after you made that decision?

12     A.   Okay.  Pursuant to the juvenile pick-up order, Tim

13   Brown was transported into the custody of HRS.

14     Q.   Now, how long was it after that, before you

15   continued to investigate or focus your investigation on

16   Timothy Brown?

17     A.   I would say probably about a matter of several

18   weeks.

19     Q.   Tell us why.

20     A.   Immediately following our interview with Tim

21   Brown, we came into contact with another individual who

22   claimed to have information about the death of Patrick

23   Behan.

24     Q.   Who was that person?

25     A.   Jacqueline Bain.

30

1          individuals were individuals that were incarcerated,

2          housed with Tim Brown while he was at the Juvenile

3          Detention Center.

4     BY MR. MORTON:

5          Q.   And were there any other individuals who were not

6     in custody or who came forward and said that they had

7     talked to Mr. Brown?

8          A.   Yes, I believe that some of them were just friends

9     of Tim Brown.

10         Q.   So how long then did you continue to wait before

11    you sought an opportunity to talk to Mr. Brown?

12         A.   Our first opportunity to speak to Mr. Brown was on

13    July 16th of 1991, which was, in fact, the date that he was

14    spoken to.

15         Q.   Why did you wait until that point in time?

16         A.   We waited until his other criminal case was

17    disposed of and he was sentenced to the Covenant House.   I

18    think he was waiting space at a juvenile facility that was

19    going to be a residential program, but they couldn't fit --

20    they didn't have space for him, so they had him stay at the

21    Covenant House.  My detectives were out at the Covenant

22    House; and apparently, Mr. Brown walked out of the Covenant

23    House about an hour after he got there and he was -- they

24    came into contact with him and brought him down to my

25    office.

1    Q.   So at this point, based on the information you had

2    received and following the disposition of Mr. Brown's case

3    in the Juvenile Center, it had been disposed of and he had

4    been sentenced, and he was waiting to be sent to where ever

5    he was going to be sent to?

6    A.   Based on the the advice given to us by the Broward

7    State Attorney's Office --

8    Q.   Juvenile Division?

9    A.   Juvenile Division, Minnick versus Mississippi was

10   no longer a factor then at that point in time.  We could

11   proceed with our plan to interview Mr. Brown.

12   Q.   So then tell us how that came about.

13   A.   Detectives Thomasevich and Carr were able to make

14   contact with Mr. Brown in the vicinity of the Covenant

15   House in Fort Lauderdale.  He was brought back to the

16   Homicide Unit.  I saw him when they brought him in.  I

17   spent several minutes with him prior to allowing them,

18   Detective Carr and Thomasevich, to interview him.  I just

19   wanted to get a feel for him.  I didn't know how much of

20   what I had seen on November 15th was the product of

21   intoxication due to cocaine from crack cocaine usage, if

22   any of it was some organic brain dysfunction.  And I just

23   wanted to assure myself that I could in good conscious

24   allow my detectives to continue with an interrogation.  And

25   the difference between the Tim Brown that I saw on July

1   16th and on November 15th, was in deed a very, very

2   different person.  I was comfortable after just talking to

3   him for a short period of time that I could allow this to

4   continue.  So I backed out of the interview room and

5   allowed my detectives to continue.

6       Q.   How long did you talk to Mr. Brown?

7       A.   Three, four, maybe five minutes.

8       Q.   Did you talk to him about the case at all?

9       A.   No.

10      Q.   Was he under arrest, in your custody at that point

11  in time concerning the shooting of Deputy Behan?

12      A.   I do not believe he was, no.

13      Q.   Was he handcuffed when they brought him in?

14      A.   No.

15      Q.   Was he free to leave at that time if he wanted to?

16      A.   I would say that yes, he was.  He was free to

17  leave, although that never became an issue; although what

18  would have happened had he wanted to leave, I would have

19  undoubtedly sat down with my detectives and discussed the

20  situation, because we had the statements of Keith King.  I

21  would have been reluctant to effect an arrest at that point

22  in time, although probable cause certainly existed.

23      Q.   Well, let's talk about that.  What information,

24  even additional information you had in addition to the

25  people that had come forth, you mentioned earlier, that Mr.

33

1    Brown had made statements to them?   In addition to that,

2    what else did you have when you sat and talked to him on

3    July 16th?

4        A.   Keith King, Keith King was probably the best

5    single break that we received, at least in my opinion, in

6    the case was when Detectives Thomasevich, and Carr were

7    able to establish the fact that the Keith -- that people

8    were talking about the witnesses, were talking about that

9    the Keith Tim had spoken to was not Keith Maddox, but

10   another Keith, another young man named Keith King.

11       Q.   And we will talk about that with the other

12   detectives since they broke that.   But essentially,

13   everyone was under the impression that it was Maddox?

14       A.   That is correct.

15       Q.   And it was a different Keith, which was Keith

16   King?

17       A.   That is correct.   And my detectives had, in fact,

18   had an opportunity to take a post miranda statement from

19   Keith King, in which he admitted his involvement and

20   identified Tim Brown as being another person involved in

21   the death and murder of Patrick Behan which was known to us

22   on July 16th.

23       Q.   About what time of day was it that you brought Mr.

24   Brown into the office to speak to him?

25       A.   He came in, I would say, maybe about 7:00 o'clock

 1      at night, maybe 6:45, 7:00 p.m., something like that.

 2           Q.    And based on your observations and your

 3      discussions with him, did he appear to be under the

 4      influence of any kind of intoxicant whatsoever?

 5           A.    No, none whatsoever.

 6           Q.    Was he responsive with your discussions with him

 7      which were not about this case?

 8           A.    Yes, he was.

 9           Q.    And could he communicate with you effectively to

10      the point where you could understand him?

11           A.    Yes.

12           Q.    Did you make any promises at that time

13      in any way, in order to get Mr. Brown to speak to you?

14           A.    No, none whatsoever.

15           Q.    Was he shackled?

16           A.    No.

17           Q.    Chained to the chair?

18           A.    No.

19           Q.    Floor?

20           A.    No.

21           Q.    Beaten in any way?

22           A.    No.

23           Q.    In your presence?

24           A.    No, not in my presence.

25           Q.    And then after you spoke to him for those few

1    minutes, then who took over after that?

2         A.    Detective Carr and Thomasevich.

3         MR. MORTON:   I don't have any further questions of

4    this witness, Your Honor.

5         THE COURT:   Defense?

6                   CROSS EXAMINATION

7    BY MR. DAVIS:

8         Q.    You didn't arrive on the scene for about four

9    hours after the death of Deputy Behan; is that correct?

10        A.    I would say that is probably accurate.

11        Q.    You were at home, your car wouldn't start so you

12   couldn't respond?

13        A.    That's correct.

14        Q.    All right.  Let's talk for a moment about Jackie

15   Bain.  You brought her up.  Now, your original contact with

16   the Sheriff's Office on Jackie Bain was on November 14th,

17   is that correct, the day after Patrick Behan was shot?

18        A.    When you say the original contact on November

19   14th, I believe she made a phone call to the Sheriff's

20   office.

21        Q.    She called Gary Celleti of the Sheriff's Office?

22        A.    I know she called someone in the Sheriff's Office.

23   I don't believe it was Gary Celleti though.  I know the

24   call went to District 1; and Gary at that time was the

25   detective assigned to District 1, and it was through Gary

```
1    relevant to the taking of the statement that Steven

2    focused on him as a suspect, that doesn't mean that Mr.

3    Davis can ask every single question.  But I'll tell you

4    what it has to relate to relevance on the issue at

5    hand, and that is he's a suspect, and he was focussed

6    on as a suspect, and then when he was focussed on as a

7    suspect that was the circumstances of taking that

8    statement.

9         Now, if Mr. Davis can tell us why all these

10   questions, that is every single fact that I think he

11   knew means now that that statement was not voluntary,

12   if he could just proffer to the Court the relevance

13   I'll just sit down and keep quiet.  But, so far all

14   we're doing here is --

15        THE COURT:  One thing I'm concerned about here is

16   apparently we have some statements that were taken from

17   Mr. Brown inappropriately at some point in time,

18   January 13th --

19        MR. DAVIS:  November 15th.

20        MR. MORTON:  I'm not so sure that I have reached

21   that conclusion.  If I recall the officer said that

22   they did not speak to him after he concluded that he

23   was intoxicated.

24        THE COURT:  Let me say this, that he made a

25   statement, Mr. Brown, made a statement to a deputy.
```

17

1          MR. MORTON:  That's correct.

2          THE COURT:  They received that statement while he

3      was in custody?

4          MR. MORTON:  On other charges.

5          THE COURT:  They are talking about this case too,

6      okay.

7          MR. MORTON:  But he was not in custody under these

8      charges.

9          THE COURT:  He's in custody  as far as this

10     Court's concerned, I think by you two --

11         MR. MORTON:  He's in custody, in jail on other

12     charges.

13         THE COURT:  The question I have in my mind is what

14     is being done to create other independent information

15     regarding his involvement in this case separate from

16     that statement?  Or did he remain to be a suspect in

17     this case because of that statement, or was he

18     remaining to be a suspect in this case based upon his

19     original investigation?

20         MR. MORTON:  Before the --

21         THE COURT:  Before you present the --

22         MR. MORTON:  Before the Court goes off on that

23     answer, the Court should keep in mind that Timothy

24     Brown's name came up as a suspect from an individual

25     that they questioned about his involvement.  And when

1    they went to speak to him it was because of that,

2    that's why they notified him.

3        THE COURT:  That's exactly my point.  What I'm

4    trying to determine --  Listen that's exactly the

5    point, I'm trying to see if he remained a suspect.

6    Forget about that statement, he was legitimately a

7    suspect without that statement.

8        The question is what influence did that statement

9    have on his future on the pursuit of him in the future,

10   and is there anything else that may have made them

11   aware or brought them to Mr. Brown as a suspect in this

12   case.  To the extent that these questions shed some

13   light on that matter for the Court I will allow them to

14   proceed.  If they, in other words, if this

15   investigation that he's talking about has some

16   relevance here to the Court, or if he's trying to show

17   perhaps that, perhaps that this whole investigation

18   should have exempted Mr. Brown from being a suspect, or

19   somehow brought him into it now would make sense.  He's

20   asking the questions it should be exempting him from

21   it.

22       MR. MORTON:  And I'll show that, Judge.

23       THE COURT:  And perhaps then I'm left with the

24   only conclusion that I could reasonably have, and that

25   is that the only way he remained as a suspect in this

58

1     case is because of the statements he made to the police

2     on November 15th.  So that's where I am.

3          MR. MORTON:  I see that, but I fail to understand

4     how the Court can say that every investigative step

5     that was taken was a result of that statement -- excuse

6     me, may I finish?

7          THE COURT:  I don't think it does, okay, I don't

8     think it does, and I think again I go back to the

9     original comment I made to Mr. Davis and that is that

10    Mr. Davis, it's fine to go ahead and go through these

11    and --

12         MR. DAVIS:  That's not what I do I questioned --

13    The investigation went on for eight months, and I have

14    boxes and boxes; I have just two of them here, I have

15    seven or eight more boxes at my office and they're all

16    different things that they did.  I limited my

17    investigation of this witness to the things that they

18    knew and why they didn't go further in their

19    investigation at that point, and the relevance to it;

20    and again each time I get into something I'm getting

21    objections from Mr. Morton.

22         THE COURT:  The concern here for the Court is that

23    these action by these other individuals are

24    extremely -- you're telling me that they were

25    dismissed, it sounds to me that there should be more

1    Q.   And I asked you whether or not you had ever run

2    any elimination prints on Curtis McGill as far as Behan's

3    car is concerned?

4    A.   I know that issue came up.

5    Q.   Right.  And you told me at that point, did you

6    not, that you had run elimination prints but that you had

7    run the prints of Curtis McGill the day before the depo

8    which would have been October 27th, 1992?

9    A.   I know that the prints were run a day or two prior

10   to the deposition.  I don't recall the date but that's -- I

11   am not going to quibble with a day or two or something.

12   Whatever it was that I said in deposition would be the

13   accurate time.

14   Q.   Yes, when I asked you on page 9, when did you

15   compare Curtis McGill's prints and you answered yesterday.

16   That would have been the 28th of October, correct?

17   A.   The 27th.

18   Q.   Of 1992.  I guess you didn't come up with a hit on

19   the prints on the car, did you?

20   A.   No.

21   Q.   I mean, it's a fair statement, isn't it,

22   Detective, that I mean you don't have any prints involving

23   anybody that is a suspect in this case, do you?

24   A.   We could not --

25   Q.   You don't have any forensic evidence whatsoever to

JUSTICE REPORTING SERVICE, INC.       523-6114

1    link Tim Brown into this case?

2       A.   No.

3       Q.   You testified this morning that there were I guess

4    two confessions by Tim Brown, correct?

5       A.   Well, if you're referring to the statement that he

6    made on November 15th?

7       Q.   Right, I am talking about November 15th.

8       A.   I would not characterize that as a confession.

9       Q.   Well, let me ask this.  If someone admits to

10   shooting someone, to robbing someone in front of four

11   homicide detectives, you don't consider that a confession?

12      A.   I would say again, not to get into some antics, I

13   would just consider that to be some admission of guilt.  To

14   me, a confession is a detailed account, at least an account

15   that has a certain amount of substance to it beyond simply

16   a one-sentence statement.

17      Q.   Beyond in other words?

18      A.   Of commit.

19      Q.   Are you telling this Court, Judge Frusciante, that

20   when someone says, when Tim Brown says that he shot the

21   deputy on the 15th of November that you didn't considered

22   that an admission or confession?

23      A.   An admission.  I am saying -- I am not trying to

24   quibble with you.  You asked me about the confession, I

25   would characterize and I would say that we have a

1    confession which we got on July 16th and a statement or an

2    admission --

3          Q.   Let me ask you a couple questions about that

4    because it's confusing to me to understand why this would

5    have been let go so easily but maybe you can clarify this.

6    Now you stated you were contacted by Hollywood, you called

7    Hollywood, which was it?  In other words, did they tell you

8    they had Tim Brown or did you tell them you were looking

9    for Tim Brown?

10         A.   Both.  We told them we were looking for Tim Brown.

11         Q.   Right.

12         A.   Then they contacted us an told us that they had

13   taken him into custody pursuant to a juvenile pick-up

14   warrant.

15         Q.   At this time, the juvenile Tim Brown on November

16   15th is what, 14 years' old, right?

17         A.   Yes.

18         Q.   And first you sent over Detectives Gill and

19   Illaraza, they were homicide detectives?

20         A.   That's correct.

21         Q.   And they were working in your unit at that point?

22         A.   That's correct.

23         Q.   And apparently, you followed over some 20 minutes

24   later with Captain Auer?

25         A.   That's correct.

1      Q.   Now, this was, I think you testified, about 8

2    a.m., correct?

3      A.   Approximately.

4      Q.   Okay.  Now, isn't it a fact that Detective Gill --

5    Do you have Gill's report?

6      A.   Yes I do.

7      Q.   Doesn't Gill say in his report that they were with

8    Brown around 11:00 o'clock in the morning?

9      A.   That's correct.

10      Q.   So Gill says 11:00 o'clock you say 8 a.m.?

11      A.   Uh-huh (affirmative response).

12      Q.   So somewhere in that period of time, four of you

13    show up in the Hollywood --

14      A.   That's correct.

15      Q.   When you get there, by the way, was Tim in the

16    interview room?

17      A.   Yes.

18      Q.   And you kind of just sort of walked in, is that

19    what you're saying?

20      A.   Right.

21      Q.   And at that point Gill and Detective Thomasevich

22    are speaking to Tim?

23      A.   Well, what I would say is that they were speaking

24    to each other.

25      Q.   But it was Gill doing the interview at that point?

1      A.   Yes.   It was my impression that Gill was the one

2   that was speaking to Tim Brown.

3      Q.   And then he admits to being involved, Tim does.

4   Did you hear that?

5      A.   You mean when I first walked in, no.

6      Q.   Didn't you hear the fact that he says first Keith

7   shot the guy?

8      A.   Right.

9      Q.   Then Keith Maddox shot the guy.   Then you hear him

10   say that no, no, it wasn't Keith, "I shot the deputy, I

11   shot him"?

12      A.   That's somewhat the synopsis, yes, essentially

13   what happened.

14      Q.   And at that point Tim Brown is in custody, is he

15   not?

16      A.   He is in custody for the Hollywood case.

17      Q.   Well, he is not free to leave, was he?

18      A.   No, of course not.

19      Q.   And you told us earlier that he was not given any

20   Miranda warnings?

21      A.   That is correct.

22      Q.   And I think you testified in deposition that one

23   of the problems you have with Tim Brown is he seems to be

24   like clay, you could mold him to say anything you wanted

25   him to say?

1        A.    I know the statement that you're referring to.  I

2    don't think -- that's not exactly what I meant.  Matter of

3    fact, if I can see it again?

4        Q.    It's page 78.

5        A.    78.  What I was saying -- what I was trying to

6    elude to in that statement was not that he was so easy to

7    mold that you could just get him to say whatever you wanted

8    him to, but that I was concerned that, that clearly he was

9    not in possession of all his faculties; and whatever

10   statement we got from him, I wanted it to be coming from

11   him not from anything that we were suggesting to him.

12       Q.    In other words, he was easy to suggest things to.

13       A.    No, I am not saying that, I just expressed myself

14   poorly in the deposition.  I did not get the impression

15   from him that it was easy to plant a suggestion and then

16   get him to say them.

17       Q.    You know people who are like that, right?

18       A.    Yes.

19       Q.    Tim wasn't that way?

20       A.    No, he definitely -- was, if anything, it was very

21   difficult to speak to him because you would ask him a

22   question, he would start out on the topic, then suddenly

23   jump to something that was completely --

24       Q.    Well, he's in the room with four of the Broward

25   Sheriff's office homicide detectives, right, you and Scheff

1   who are supervisors of Gill and Illaraza, correct?

2      A.   That's correct.

3      Q.   Okay.  So when I asked you the question, I thought

4   you stated that you could not get a statement because he

5   was like clay and you could get him to say whatever you

6   wanted to.  I mean if it was just a matter semantics,

7   that's fine if I meant something else.

8      A.   I said I wanted to resolve the circumstance, where

9   I could be comfortable that we are going do come to true

10  resolution and not get a statement from him, because he was

11  like clay and I could get him to say whatever I wanted him

12  to.  Do you understand what happened?  I wanted to know at

13  the end of Tim Brown's interview that Tim Brown confessed.

14  I wanted to know in my heart that he was the one that did

15  it.

16     Q.   And then you ask --

17          MR. MORTON:  Let him finish explaining.

18          MR. DAVIS:  That's the end of it.

19          MR. MORTON:  Can you finish it?

20          THE COURT:  One at a time, Mr. Davis, the

21          court reporter can only take one down.  Let's

22          please proceed.

23  BY MR. DAVIS:

24     Q.   When you're taking these statements from Tim

25  Brown, there is no tape player in there, is there?


JUSTICE REPORTING SERVICE, INC.      523-6114

1    A.   No.

2    Q.   There is nothing, matter of fact there is nothing,

3    no police reports in regard to this.  Other than what

4    Detective Gill put on and he put down the fact that it

5    happened at 11:00 o'clock?

6    A.   That's correct.  Essentially the interview with

7    Tim Brown was what I had considered to be a witness

8    statement.  We were not going there to do an interrogation

9    of Tim Brown.  We had gotten his name from a source that I

10   considered to be very unreliable and we were simply

11   attempting to contact him because he was somebody that we

12   could find relatively easy.

15

13        Hollywood indicated that they were going to go out

14   looking for him anyway, and I had hoped it would help us

15   resolve the -- to complete the situation with Rob McGriff.

16   Now, we had allowed Keith Maddox to go home.  Keith Maddox

17   agreed to come back to my office later that day; and in

18   fact, he did to take a polygraph test.  But when we were

19   going do speak to Tim Brown that morning, I was not

20   prepared for him to say that he was the one that killed the

21   deputy.  I was very, very surprised when he said that.

22   Q.   All right.  But here's my problem.  I mean, you

23   have this confession where he is saying, "I killed the

24   deputy."  This information is being passed up the chain of

25   command, correct?

1      A.    Certainly.

2      Q.    You didn't say -- well, I talked to the four of

3    you.  Did you subsequently go outside in the hallway with

4    Auer and Gill, and Illaraza, and say "Listen, we didn't

5    read this guy Miranda.  I don't want to get in a problem.

6    Let's not tell anybody about Tim Brown's statement," did

7    you?

8      A.    No, of course not.

9      Q.    Of course not.  So everybody in the Sheriff's

10   office -- I mean your homicide detectives know about the

11   statement, did they not.

12     A.    I didn't think Miranda was a requirement at that

13   point in time, because if I had been the first one to speak

14   to Tim Brown that morning, which I was not, I was simply

15   going to go up to him and say, "Look, Tim, you know, we

16   understand you may know something about it.  What have you

17   heard on the street, what have you heard about it?"

18     Q.    But what you said in direct testimony is that you

19   weren't in the room, you heard the statement.  You all come

20   out and huddle up, then you go back in the room and you

21   still don't read the Miranda warnings?

22     A.    Well, I am not going -- there is a reason why I am

23   not reading Miranda warnings at that point in time.  It is

24   not because I am trying to get information out of him.  I

25   am trying to make a determination in my mind whether in

1    good conscious I can read him the Miranda warning.

2        Q.    This is a cop killing case.  You're telling us,

3    you're telling Judge Frusciante and looking him in the eyes

4    and saying, "We have a confused kid, we are going to let

5    him go"?

6        A.    That exactly right, not --

7        Q.    Not even come back to him --

8        A.    May I finish answering the question?

9        THE COURT:  Please allow him to finish, counsel.

10   Go ahead, Detective.

11       THE WITNESS:  My inability to get back to Tim

12   Brown until July was based upon a Supreme Court

13   decision which, when discussed with the State

14   Attorney's Office, I was advised it would be a

15   violation.  That created a delay of probably from about

16   December 15th through July.  There was a number of

17   contacts that were had, a number of meetings that were

18   had in reference to the amplification of Minnick versus

19   Mississippi as it pertained to Tim Brown.

20       Now, did I think after hearing what Tim Brown said

21   that morning that he was the guy that killed Pat Behan,

22   I didn't know what to make of it.  He was somebody that

23   I was interested in, absolutely.

24   BY MR. DAVIS:

25       Q.    All right.  Well you talk about Minnick, first of

130

1    all, this confession of Tim Brown is known up through the

2    chain of command.  Also, you share this with the homicide

3    detectives; it's not a secret, correct?

4        A.   No, it wasn't a secret.

5        Q.   I mean, Jimmy Carr and Thomasevich would have

6    known about the fact that Tim Brown confessed on November

7    15th?

8        A.   I don't know that they were specifically told.  I

9    don't know who was told.  I know that we passed this

10   information up the chain.

11       Q.   Well, when I asked you that question --

12            THE COURT:  Excuse me, Mr. Davis, please

13       give him the opportunity to finish.

14            MR. DAVIS:  Okay.

15            THE WITNESS:  I believe that they knew, they

16       should have known.

17   BY MR. DAVIS:

18       Q.   When I asked you that question, you said that all

19   the homicide did, on page 77.

20       A.   Well, then that would be -- in other words, we did

21   not keep it a secret.

22       Q.   Let me see on page 77, line six, the question was,

23   certainly all of the homicide detectives knew of Tim Brown

24   at that point, did they not?  Your answer was, "I would say

25   all the homicide detectives knew of Tim Brown."

1    A.    Exactly what I am saying now.

2    Q.    Now, you stated to the Court and to Mr. Morton and

3  just now again that, well, you had a problem because you

4  didn't want to interview Tim Brown because of the Minnick

5  decision, correct?

6    A.    Correct.

7    Q.    Now, you're taking a statement from Tim Brown on

8  November 15th of 1990, correct?

9    A.    Correct.

10   Q.    The Minnick decision isn't even handed down until

11  sometime in December of 1990?

12   A.    December 7th.

13   Q.    Right, so Minnick -- at least as far as Tim

14  Brown's statement after November 15th until sometime in

15  December -- Minnick is not an issue, is it?

16   A.    Absolutely, correct.

17   Q.    And as a matter of fact, the first time you talked

18  to the State Attorney's Office about the Minnick decision

19  was after Keith King gave you a statement and you contacted

20  Susan Aromony (phonetic) about when you could then pick up

21  Tim Brown because he was in custody?

22   A.    As a matter of fact, I don't remember who I spoke

23  to; but I spoke to whoever was running the Appellate

24  division.  I spoke to several people at the State

25  Attorney's office before Susan Aromony became involved,

1    although Susan Aromony certainly did become involved.

2        Q.   I thought when you testified before to Mr. Morton,

3    you answered the question that you talked about the Minnick

4    decision with Susan Aromony because she was in the Juvenile

5    department in the State Attorney's office.

6        A.   Yes, I did.  But she was not the only person that

7    I spoke to, and she was not the first person that we spoke

8    to at the State Attorney's Office regarding the Minnick

9    versus Mississippi.

10       Q.   So -- but Susan Aromony was not until after you

11   already talked to Keith King, correct?

12       A.   I don't recall the chronological order as far as

13   Susan and Keith king, but I know Susan became involved

14   latter on.

15       Q.   Now, who was it that you spoke with first in the

16   State Attorney's Office, do you have any names, any notes,

17   anything about that?

18       A.   No.  All I can tell you is that it was a gentleman

19   who was involved with your Appellate --

20       Q.   Wasn't Mr. Morton?

21       A.   No, it was not.

22       Q.   Now, after Tim Brown gives you this statement on

23   November 15th admitting to shooting Patrick Behan, no one

24   was assigned to speak with him again, were they?

25       A.   No, not at that point until we felt we could go

133

1    see him again.  As I said this morning he was going to --

2          Q.   Was in HRS detention and until --

3          A.   In other words, if he had been released the next

4    week and had gone back out into the community and I was

5    aware of that, I would have assigned detectives to go out

6    and speak to him.  Who I would have assigned, I don't know,

7    would have been who was available and free.

8          Q.   Who was checking?

9          A.   Jimmy Carr.

10         Q.   So your answer is today that there was no

11   immediate follow up, correct?

12         A.   Immediate follow up?

13         Q.   On Tim Brown?

14         A.   Well, no.  I would disagree with that.  I would

15   have considered the fact that we were checking on his

16   whereabouts to be some sort of follow up.

17         Q.   Now, you said Jimmy Carr, was he checking on a

18   daily basis?

19         A.   That's my recollection.

20         Q.   And is it your testimony, understanding Tim Brown

21   was in custody from November 15th until July 16th when you

22   picked him up?

23         A.   No.  The issue of his custody became moot when we

24   learned of Minnick so what we were talking about in terms

25   of where he is was whether he was in custody or released

134

1    back into the community is a time frame from about November

2    15th until some time in the middle of December.  Because

3    quite frankly, I did not hear the Minnick decision when the

4    Supreme Court released it on December 7th, it took us maybe

5    about a week.

6         So before I became aware of it, one of the

7    problems that we had, and you can discuss this with

8    Detective Carr if you choose to, is that we were being told

9    that he was in custody.  We were finding out subsequently

10   that he was in custody.  Then we would find out from

11   Hollywood Police Department that he had been free, but he

12   was back in custody.  And we found that we were having a

13   great deal of trouble dealing with HRS and finding out what

14   his status was in terms of where he was at any given time.

15        Q.   Detective, let me see if we can get this straight.

16   We are dealing with the murder of a police officer,

17   correct, yes?

18        A.   You know we are, Mr. Davis.

19        Q.   Now, are you telling us that you didn't have

20   the -- at that point after January or so, I guess really

21   after November, I mean Jackie Bain was no longer a suspect

22   in your mind after she is Baker Acted, fair statement,

23   correct?

24        A.   Fair statement.

25        Q.   So after November 25th or 27th when Jackie Bain is

1    put in a mental hospital, you really don't have any prime

2    suspect that you're looking at, correct?

3        A.    Until what point in time?

4        Q.    Well, I don't know.   I mean I don't think there is

5    ever any prime suspect until you pick up Tim Brown again?

6        A.    I would say that's a fair statement.   We started

7    getting the phone calls from Alvis Crostwaite and Solomon

8    Gibbs, and we started getting information about Tim Brown;

9    and some of it would probably be directed towards Detective

10   Carr and Thomasevich, because as I said earlier today one

11   of the key factors in this case was identifying Keith King

12   as opposed to Keith Maddox as the second participant in

13   this incident.   That was a significant break in this

14   investigation for us.

15       Q.    We'll talk about that in a minute.

16   But the point is that there is really at that point up

17   until the time when these people start getting spoken to by

18   Carr and Thomasevich which I believe is at the end of

19   April.   I mean there is like a five, almost six-month

20   period there where -- not that there isn't any activity,

21   but there didn't seem to be any movement in this case; is

22   that a fair statement?

23       A.    Yes, that would be a fair statement.

24       Q.    And then you talked about earlier that you had an

25   opportunity to review press reports and things like that.

136

1    I mean, it's a fair statement, is it not, that there was a

2    considerable amount of press attention paid to this case in

3    regard to the fact that there didn't seem to be any

4    movement, correct?

5         A.   There was a lot of press initially when it first

6    occurred.  It died off; occasionally, it would pick up

7    again, but I gave interviews to reporters that would say

8    this is, you know, is there any progress things like that

9    so I would say, yes, there was press attention.

10        Q.   Right.  And there was also, was there not, there

11   was this ongoing reward that was offered.  Matter of fact,

12   if I remember correctly, there was a billboard  over the

13   area where these kids all live offering a hundred and

14   thirty thousand dollar reward for information, correct?

15        A.   I know there was a very substantial reward.  I

16   believe there was a billboard taken out on him.

17        Q.   And during this time when we had a billboard

18   reward, we had the Behan family and other people wondering

19   what's going on, you have this statement from Tim Brown,

20   and there is no follow-up on it, fair statement?

21        A.   Again, I disagree with you.

22        Q.   No follow-up on it until the end of April when

23   Carr and Thomasevich start dealing with the individual?

24        A.   No, I would say that the follow-up that was done

25   on this case, as far as Tim Brown subsequent to November

1     15th, was immediate and in the sense that we were trying to

2     keep track of him and we were waiting for him to be

3     released from HRS when we intended to go back out and chat

4     with him again and see if we could resolve the issue that

5     had come up; and that that game plan was, that option was

6     removed from us several several weeks later when we learned

7     of the Minnick versus Mississippi decision.  I was advised

8     by the State Attorney's Office that it would be ill advised

9     to try and come into contact with Tim Brown.

10         Q.   Because you couldn't do that without him having an

11    attorney there?

12         A.   Yes, sir.

13         Q.   I mean that's what you're saying, you don't want

14    to talk to Tim Brown at that point during this 7-month

15    period because you're concerned about the fact that he

16    might have an attorney there and might not give you a

17    confession, correct?

18         A.   Not that he might not give me a confession, but

19    that he might not be willing to discuss the case with us

20    and tell us the truth, whatever the truth was.

21         Q.   There was no further contact with the Sheriff's

22    office and Tim Brown until July 16th when he was picked up,

23    correct?

24         A.   Correct.

25         Q.   Now, you were involved in the decision to pick him

JUSTICE REPORTING SERVICE, INC.      523-6114

1    up, were you not?

2         A.   I was involved.

3         Q.   Okay.  And you didn't get an arrest warrant for

4    Mr. Brown, did you?

5         A.   No.

6         Q.   I mean you could have contacted a magistrate and

7    gotten a warrant for Mr. Brown's arrest?

8         A.   Yes.

9         Q.   I mean that is a procedure that is used in some

10   cases, getting an arrest warrant, right.

11        A.   That's correct.

12        Q.   And you had plenty of time to effectuate getting

13   that warrant, correct?

14        A.   If we had -- yes, in other words, that was --

15   would have been -- we would have been capable of doing

16   that.

17        Q.   I mean you had Keith King's statement implicating

18   Tim back on June 4th six weeks prior to the time you picked

19   him up, correct?

20        A.   I would agree with you, Mr. Davis, in that there

21   was an abundance of probable cause and we would have had no

22   problem obtaining an arrest warrant.

23        Q.   But you decided -- I guess you and Detectives Auer

24   and Thomasevich and Carr, -- not to get that arrest

25   warrant?

1      A.   I don't recall if there was a reason behind it.   I

2    don't recall a discussion being had about whether or not an

3    arrest warrant should be obtained prior to coming into

4    contact with Tim Brown.

5      Q.   Well?

6      A.   There would have been no objection to it if anyone

7    had discussed it with me.   I would have had no objections

8    that I can think of at this point in time where I couldn't

9    have gotten an arrest warrant.

10      Q.   Didn't anybody say well, let's go ahead and get an

11    arrest warrant, have the judge sign off a probable cause so

12    we can pick him up with the warrant?

13      A.   I will say this.   I would have advocated had we

14    not gotten a confession from Tim Brown that was consistent

15    with the confession obtained from Keith King.   I would have

16    advocated that we release Tim Brown.

17      Q.   But --

18          THE COURT:   I'm missing something, he couldn't

19    know the inner connection between the King and Brown

20    confession when you said just now, Detective, the Brown

21    confession.   Are you referring to the first confession?

22          THE WITNESS:   The second.

23          THE COURT:   The first statement that you call a

24    statement versus confession, or second confession?  you

25    talked about the second confession?

140

1          THE WITNESS:  Right.  In other words, we had

2     obtained a detailed confession from the co-defendant

3     Keith King prior to July 14.

4          THE COURT:  For the record let's refer to -- I'll

5     utilize the Detective's terminology to keep things

6     separate.  The first statement from Mr. Brown versus

7     the confession of Mr. Brown in July.  Okay, Mr. Davis?

8          MR. DAVIS:  Thank you, Judge, could I have one

9     minute?

10          THE COURT:  Sure.

11   BY MR. DAVIS:

12       Q.  Now, did your detectives compare the statements

13   that were given by Keith King and Tim Brown?

14       A.  I am not sure I --

15       Q.  In other words, you stated to the Court just a

16   second ago that if the statements would have been in

17   conflict that you would have let Tim Brown go?

18       A.  I didn't say that I would have let him go if they

19   were in conflict.  I said if the confession that we got

20   from Tim Brown was not, in other words, if they were not in

21   large measure consistent.  In other words, if Tim Brown

22   doesn't say the name Keith King to us, if Tim Brown doesn't

23   describe, you know, going there on the bicycle, that is

24   what I would considered significant issue.

25       Q.  Well, there is a significant number of

JUSTICE REPORTING SERVICE, INC.      523-6114

1    inconsistencies also, were there not?

2        A.   I am aware of some inconsistencies.  I did not

3    expect to see a completely consistent statement between the

4    two of them; but clearly, when one reads both statements,

5    one can come away with the fact that the two individual

6    people are talking about a similar event.  They are

7    certainly casting the roles.

8        Q.   Forget about the roles for a second.  Doesn't

9    Keith King tell you that Tim got on the bicycle and that

10   Keith King ran, remember him saying that?

11       THE COURT:  Who said what, say it again.

12   BY MR. DAVIS:

13       Q.   That Keith King in his statement to you which was

14   taken by Thomasevich and Carr, he stated that after this

15   happened, Tim got on the bike and that Keith ran, correct?

16       A.   As I said before, there are inconsistencies; but

17   on the other hand, you've got them agreeing that there is a

18   bicycle involved, and arriving on the scene on a bicycle.

19   Exactly what's happening after the shot, there is two

20   discrepancies.  I am not trying to testify that Tim Brown's

21   statement to us is a confession and Keith King's confession

22   are consistent in every detail.  I am saying in some key

23   insignificant ways they were consistent.

24       Q.   Well, but they are also -- this is the question,

25   they are also inconsistent in some key and significant

1    ways, for example, does not Keith King, say as I stated

2    before, that Tim got on the bicycle and Keith ran, correct?

3         A.    Tim got on the bike and Keith, yes,

4              MR. MORTON:  At what point?  After the

5         shooting?

6              MR. DAVIS:  Yes.

7    BY MR. DAVIS:

8         Q.    And does not Keith King say that well, that he ran

9    to -- Keith says that he ran to Tim's house, correct?

10        A.    Start that one again.

11        Q.    That Keith King says in his statement on page 11

12   that he goes back to Tim Brown's house, correct?

13        A.    That's what he said.

14        Q.    And that's not what Tim said, correct?

15        A.    That's correct.

16        Q.    And then you stated Keith King did that -- not

17   only did he go back to Tim's house, that he spoke to his

18   parent, correct?

19        A.    That's correct.

20        Q.    Okay.  And the fact of the matter is that Tim

21   wasn't even living at his house, was he?

22        A.    I don't recall where he was living.

23        Q.    Well, yes, you do, because we've gone through that

24   in your direct testimony, you said that he was living at

25   Keith Maddox's house.

```
 1        A.    I take it back, he was living at Keith Maddox's

 2   house.

 3        Q.    So Tim was --

 4        THE COURT:  He being Timothy Brown living at Keith

 5        Maddox's house.

 6   BY MR. DAVIS:

 7        Q.    Now, you have an absolute inconsistency as to what

 8   happened afterwards.  Did you follow that up, I mean, Tim,

 9   his mother is around, but he doesn't live with his parents,

10   does he?

11        A.    That's correct.

12        Q.    And as a matter of fact, he wasn't even living at

13   home during the timeframe, was he?

14        A.    That's correct.

15        Q.    Was your statement to Judge Frusciante that if Tim

16   Brown would have given you an inconsistent statement -- god

17   forbid, no statement -- at all you would let him go home?

18        A.    I didn't say let him go.  I would have advocated

19   the decision on whether or not Tim Brown was going do be

20   arrested, was not mine to make ultimately.

21        Q.    When was he arrested?

22        A.    He was arrested on July 16th.

23        Q.    Where?

24        A.    At our office.

25        Q.    You testified before he wasn't arrested before
```

144

1      that?

2          A.   That's correct.

3          Q.   And that you basically felt that when he came into

4      the homicide office on July 16th, he was free to leave?

5          A.   As far as I was concerned.  I mean, the position

6      that I advocated was that we not make an arrest, that we

7      bring him in, that we give him his rights, and we give him

8      an opportunity to make a statement to us and see what he

9      had to say for himself at a time when I felt that he was

10     mentally capable of doing so.

11              If -- and again, you know this is all

12     hypothetical -- I don't know what I would have done if he

13     had made no statement to us.  I think that the position I

14     would have advocated at that point is that we refrain from

15     arresting him.  If he had given us a statement that

16     differed drastically from the statement Keith King gave us,

17     I stipulate to the fact that there is a difference.  Some

18     differences are significant, but some of the similarities

19     are significant as well.

20         Q.   Now when --

21              THE COURT:  Excuse me.  I want to make sure I get

22         this clear myself.  What was your statement regarding

23         if he didn't give you a confession?

24              THE WITNESS:  If he did not give us a confession,

25         I would have advocated the position that we consider

1        not arresting him.

2                THE COURT:  Okay.

3                THE WITNESS: But that decision on whether to

4        arrest him or not was not my decision to make.  But

5        that's what I would have advocated.

6    BY MR. DAVIS:

7        Q.    Not your decision?

8        A.    Not my decision.

9        Q.    Who's making it, the Sheriff?

10       A.    The Sheriff did not make the decision.

11       Q.    Then no one had to make that decision.  Who makes

12   the decision if it's not you?

13       A.    Well, you know, it depends on what decision you're

14   talking about.  Obviously, certain decisions in this case I

15   made.  Some decisions I delegate to my detectives but the

16   decision on whether to arrest Tim Brown, you know, based

17   upon no confession at all, I didn't.  First of all, we are

18   dealing --

19               THE COURT:  Excuse me, that was a hypothetical

20       that was being presented, counsel, and so that no one

21       made that decision, so a decision has to be made.  I'm

22       not sure of the relevancy of the questions.

23               MR. DAVIS:  Judge, the Court asked the question

24       well, what would happen, and he stated, you know, he

25       would advocate the position of letting him go.  But

1        then he's saying that's not his call.

2    BY MR. DAVIS:

3        Q.   I am just trying to find out whose call it would

4    have been.   As the lead detective of homicide --

5        A.   Why do you keep referring to me as lead detective

6    in homicide?   I am not the lead detective in homicide.   I

7    have never been the lead detective in homicide.   I was a

8    detective in homicide during my ten years with homicide.   I

9    was occasionally at a time a lead detective on a case.   I

10   am a supervisor.   I was a supervisor in homicide, and I had

11   a responsibility to oversee investigations and most of

12   those investigations not having to do with the death of

13   Deputy Behan.   The lead detective would have been any one

14   of ten different detectives.

15       Q.   On July 16th?

16       A.   Correct.

17       Q.   When Tim Brown was brought in to the office, you

18   were the supervising homicide detective at that point?

19       A.   I was one of two supervisors in homicide.   And

20   there were people in the chain of command that were also

21   involved in making decisions in this case.

22       Q.   Was the other one John Auer?

23       A.   John Auer.

24       Q.   But wasn't John Auer already out on July 16th?

25   Hadn't he already been transferred out to District 8?

1    A.    No.

2    Q.    You sure of that?

3    A.    I don't think he was gone on July 16th.

4    Q.    I mean you were there when Tim Brown was brought

5    in, were you not?

6    A.    I was there when he was brought in.  I first met

7    him when he was in the interview room.

8    Q.    Okay.  You went back into the interview room, sort

9    the reacquainted yourself with him?

10   A.    That's correct.

11   Q.    Hi, Tim, remember me from the 15th when you

12   confessed, something like that, remember me from Hollywood?

13   A.    No, I didn't ask him --

14   Q.    Now, you were in the interview room?

15   A.    Yes.

16   Q.    And, I mean, John Auer wasn't in the interview

17   room, was he?

18   A.    I don't believe he was.

19   Q.    You are sure that John Auer was even there?

20   A.    I believe he was.

21   Q.    Now, you know Tim Brown's age, did you not?

22   A.    Yes.

23   Q.    I mean from your previous contacts and records

24   check, et cetera?

25   A.    That's correct.

1     Q.   Now, doesn't there come a time when his mother

2     is -- you contacted his mother?

3     A.   His mother was contacted, and she came to the

4     office.

5     Q.   But she was there and she wasn't allowed to see

6     him, and then she left prior to the time Tim confessed; is

7     that not fair?

8     A.   That is not fair.  I know she was contacted.  We

9     advised her what the situation was.  She indicated that she

10    was going to come down.  She -- Tim did not want her to be

11    present.  I had a lengthy talk with her, and she was at our

12    office for a half hour, maybe an hour.

13    Q.   She never saw Tim that evening?

14    A.   I don't recall.  If she did not it was because she

15    did not make a request to do so and he specifically did not

16    want to.  Had she wanted to see him, I certainly would have

17    allowed her to see him.

18         MR. DAVIS:  I have nothing further, Judge, thank

19    you.

20         THE COURT:  Mr. Morton?

21    MR. MORTON:  Re-direct examination?

22         THE COURT:  Do you want to break right now?

23         MR. MORTON:  Whatever you like to do, Judge.

24         THE COURT:  I'll proceed, let me ask you this, do

25    you anticipate a lengthy re-direct?

1          MR. MORTON:  What do you mean by lengthy?

2          THE COURT:  Over fifteen minutes?

3          MR. MORTON:  No.

4                    RE-DIRECT EXAMINATION

5     BY MR. MORTON:

6          Q.   Did Mr. Brown tell you in that initial --

7     conversation you have with him on November 15th, 1991 any

8     specifics about how he killed, shot deputy Behan?

9          A.   No, nothing whatsoever.

10         Q.   Were any statements made by Mr. Brown to you

11    concerning the names of people who he had talked to

12    concerning Deputy Behan?

13         A.   No.

14         Q.   Did you give --

15         MR. DAVIS:  Judge, I am going to object this is

16         re-direct, it's not cross-examination.  Mr. Morton is

17         leading this witness.

18         THE COURT:  Overruled.

19    BY MR. MORTON:

20         Q.   Did he give you names of any of those people that

21    ultimately called and spoke to you or spoke to some of your

22    investigators in your department concerning their knowledge

23    of Mr. Brown's involvement in Deputy Behan's death?

24         A.   No, he did not.

25         Q.   So those people then that you contacted or

150

1    contacted you were never mentioned on November 15th in MR.

2    Brown's statement?

3        A.    That's correct.

4        Q.    The .38 caliber or the discussion, about the .38

5    caliber gun that was used in this case with Jacqueline

6    Bain, was that the first witness or person that you spoke

7    to that mentioned a .38 caliber was used?

8        A.    No, it was not.   Rob McGill mentioned it on

9    November 14th.

10       Q.    You mentioned that there were newspaper articles

11   that talked about this .38 caliber as early as November

12   14th, the next day?

13       A.    That's correct.

14       Q.    The one that said it was Miami Herald, am I

15   correct?

16       A.    I believe it was the Herald.

17       Q.    Let me just show you a photo copy of the article

18   from the Miami Herald, the date was Wednesday, November

19   14th of 1990.

20           THE COURT:   Does it need to be marked?

21           MR. MORTON:   I don't want it marked now.

22   BY MR. MORTON:

23       Q.    Describe what you have in your hand now?

24       A.    It's a photo copy of the Miami Herald of

25   Wednesday, November 14th, 1990.

1   Q.   Could you examine it and tell us if you see the

2   portion in that article that discussed the fact that a .38

3   caliber was possibly used in this case?

4   A.   I know it's here someplace.  Oh yeah, there it is,

5   I am sorry.  Yes, it says the bullet was believed to be a

6   .38 caliber.

7   Q.   And that was an article entitled, "Broward officer

8   shot to death, victim is found in car, motive, suspect

9   lacking"?

10   A.   That is correct.

11   MR. MORTON:  Can I get a stipulation from Mr.

12   Davis that it does in fact mention the .38 caliber?

13   MR. DAVIS:  I so stipulate.

14   THE COURT:  So stipulated.

15   MR. MORTON:  Can I get another stipulation from

16   Mr. Davis that I have another article from the

17   Hollywood Sun-Sentinel, I believe?

18   THE COURT:  Hollywood Sun-Sentinel?

19   MR. MORTON: Yes, I believe it was the Sun-Tattler,

20   that's what it is, on November 15th, entitled, "This

21   day, November 15th, slain officer serviced today,

22   reward tops thirty thousand."  And a paragraph that

23   reads, "Investigator says a .38 caliber hollow tip

24   bullet was believed to have been used," stipulation

25   that there was such an article.

```
 1              MR. DAVIS:  Yes.

 2              THE COURT:  So stipulated to, so accepted by the

 3         Court.

 4              MR. MORTON:  And the statement that Detective

 5         Wiley took from Jacqueline Bain was November 15th,

 6         correct?  Am I correct, is that the date that you have?

 7              MR. DAVIS:  So stipulated.

 8    BY MR. MORTON:

 9         Q.   You mentioned on cross examination that you had

10    not gone initially to talk to Mr. Brown as a suspect, am I

11    correct?

12         A.   That's correct.

13         Q.   And you went to talk to him, why was that again?

14         A.   His name had come up in the investigation, and we

15    thought that he might know something about it and he might

16    be able to provide us with some information, and he might

17    be able to provide us with some information in reference to

18    Keith Maddox who had not yet taken a polygraph, which he

19    did ultimately take and pass, but I did that later that

20    day.

21         Q.   And before that, before you went to talk to him,

22    you are having doubts about Mr. McGriff giving his name, am

23    I correct?

24         A.   Doubts, I had great doubts about Rob McGriff.

25         Q.   When you spoke to Mr. Brown that day, was he under
```

153

1    arrest for the death of Patrick Behan?

2         A.    No, he was not.

3         Q.    He was under arrest on unrelated charges from

4    Hollywood?

5         A.    That's correct.

6         Q.    You said when he made that admission or statement

7    that he shot and killed Deputy Behan; was that the first

8    you heard any admission or statement from him that he

9    himself was involved in the Deputy Behan shooting?

10        A.    Yes, it was.

11        Q.    Prior to that time, the only thing you had heard

12   from him, tell me if I am wrong, was that he knew of other

13   people who were involved?

14        A.    That is correct.

15        Q.    Mr. Davis asked you a lot of questions about the

16   McGill/Duhart connection with the cigarettes?

17        A.    Yes.

18        Q.    Explain to us over the course of your

19   investigation how, and when you found out and how it

20   related to your decision and your conclusion as to whether

21   or not McGill or Duhart were involved in the death of

22   Deputy Behan?

23        A.    Okay.  I am trying to understand your question.

24   As far as --

25        Q.    You answered some pretty specific questions about

1    what the department did know and when you knew it, and what

2    I want to know is if you could follow up with that by

3    telling us what you know, when you knew it, and why it

4    effected your decision either to continue to investigate

5    the connection or not to investigate the connection to the

6    Deputy Behan murder.

7        A.    Well, I did not know anything about a connection

8    between Duhart and McGill until my detectives returned from

9    the trip to Avon Park.  At that point in time, it was my

10   understanding that McGill had denied any involvement had

11   been very forthcoming; but the fact that he had gotten the

12   cigarettes, who he had gotten the cigarettes from, which

13   was a surprise to me.  Again, we had gotten McGill's name

14   from a source that I thought was even more impeachable or

15   unreliable.

16       Q.    That being?

17       A.    Jacqueline Bain, then Rob McGriff, because

18   clearly, as we dealt with Jacqueline Bain, her allegations

19   or her knowledge went through metamorphose.  At first she

20   accused Steven McGill of committing the crime then she

21   accused Curtis McGill of committing the crime when she was

22   questioned as to, I mean, that is a very serious thing to

23   do, to intentionally misidentify somebody for a commission

24   of the murder of a police officer.  Her reaction to the

25   question about why she did it was strange.  It was

JUSTICE REPORTING SERVICE, INC.       523-6114

155

1     laughing.  She thought it was rather amusing; and the more

2     time we spent with her, the more I became convinced that

3     she was a very disturbed young woman.

4          Q.   Were the allegations about corruption the specific

5     allegations by Mrs. Bain and Duhart and McGill, and were

6     those the only lead you had on this case as to who killed

7     Deputy Behan?

8          A.   No.

9          Q.   Approximately how many leads did you have?

10         A.   You mean in terms of possible people that could

11    have been listed as potential suspects?

12         Q.   Yes.

13         A.   Fifty, I don't know.  It was an extensive number

14    of people whose names came to us from one source or

15    another.

16         Q.   To whatever extent that you felt it was necessary,

17    did you try to follow those leads or investigate those

18    leads to the extent that you thought you could be

19    successful?

20         A.   That's correct.

21         Q.   Were any of these leads also brought to your

22    attention after Mr. Brown made his November 15th statement

23    that he shot and killed Deputy Behan?

24         A.   Certainly.

25         Q.   And did you stop investigating those leads as  a

1    result of Mr. Brown's statement?

2        A.    On the 15th, no, absolutely not.

3        Q.    Why not?

4        A.    Because we weren't satisfied that he was the

5    person that was involved with it, simply because of the

6    statement that he made on the 15th.

7        Q.    What, under the circumstances that you described?

8        A.    Exactly.

9        Q.    Even after you got all of this information

10   concerning who killed Deputy Behan, all the different leads

11   including the information from Jacqueline Bain, would you

12   have not continued or sought an interview with Mr. Brown if

13   he had not made that statement to you?

14       A.    Yes.

15       Q.    Let me rephrase the question.  Did you have any

16   intentions of re-interviewing Mr. Brown regardless of

17   whether or not he made the statement to you?

18       A.    Yes, I never felt we really interviewed him.  He

19   was somebody that we had wanted to interview, and I

20   certainly didn't considered the time that we spent or the

21   conversations that occurred on November 15th to be

22   satisfactory.

23       Q.    And if I can rephrase the question again, because

24   you rephrased it so that I had a double negative, that's

25   why I was not understood in the affirmative.  All the

1    misconduct that I am aware of I read about in the

2    newspapers, so I don't know if there was a cover up.   I

3    don't know what was covered up.

4         Q.   Did you yourself particularly at all discuss with

5    anyone any reason for members in the Homicide Division or

6    Internal Affairs division or any people involved in the

7    upper administration that they should not investigate any

8    corruption so that you could cover up any possible

9    connection to the Patrick Behan murder?

10        A.   No.

11        Q.   Did you make that suggestion to anybody?

12        A.   Never.

13        Q.   Anybody ever make that suggest to you?

14        A.   No.

15        Q.   You talked about the consistent and inconsistent

16   statements between these two statements given by Mr. King

17   and Mr. Brown?

18        A.   Correct.

19        Q.   Tell us what you meant when you said the

20   statements were relatively consistent even though there

21   were some inconsistencies in areas and why you considered

22   that to be of evidentiary value?

23        A.   Well, they both indicated -- first of all, they

24   both named each other which I think was of primary

25   importance.   They both described this attempt to go out and

1    shoot somebody, almost a random, meaningless type of crime.

2    They arrive on the bicycle together, one of them is being

3    carried on the handle bars the other one is riding by  --

4         Q.   Were they consistent as to who was riding the

5    bicycle and who was on the handle bars?

6         A.   I believe they were, yes.

7         Q.   Continue.

8         A.   And they also agreed on -- again for whatever it

9    is worth, the type of weapon that was used.

10        Q.   What about as to who did the shooting?

11        A.   They disagreed on that.

12        Q.   Is that uncommon?

13             MR. DAVIS:   Objection to "uncommon" in other

14        cases.

15             THE COURT:   Sustained.

16   BY MR. MORTON:

17        Q.   How long have you been investigating homicide?

18        A.   Ten years.

19        Q.   How many statements have you taken in homicide

20   when more than one person was involved?

21        A.   Hundreds.

22        Q.   And have you taken statements from these

23   individuals where they give confusing, meaning detailed

24   statements when you have more than one person involved?

25        A.   Yes.


                JUSTICE REPORTING SERVICE, INC.     523-6114

1    Q.   Based on your experience, is that uncommon to have

2    the co-defendants blame the other one for the shooting?

3    A.   No, it's fairly common for the individual to try

4    and lessen their responsibility and put the greater blame

5    on the co-defendant.  It's probably the most singular

6    problem we have, you know, in dealing with this type of

7    situation.

8         MR. MORTON:  I don't have any further

9    questions.

10                  RE-CROSS EXAMINATION

11   BY MR. DAVIS:

12   Q.   You stated that the allegations about Jackie Bain

13   came out in the paper, correct?

14   A.   I believe it did, yes.

15   Q.   That came out in sometime pretty early on in the

16   investigation, but isn't it a fact that the allegations

17   that were generated by Rockwell and Middleton didn't come

18   out in the newspapers until very recently?  As a matter of

19   fact, it was within the last three or four months?

20   A.   To be honest with you, Larry, I don't know when

21   they came out.  I know that they came out, I didn't --

22   Q.   Well, weren't you aware of the fact that this

23   court --

24   A.   I think they came out before, didn't they come

25   out -- they may have been -- they may have re-surfaced as a

6

1          THE COURT:  All right, Detective, I have

2     just a couple matters that I -- first of all, Counsel,

3     are you finished?

4          MR. DAVIS:  Yes, Judge, I am.

5          THE COURT:  Mr. Morton, do you have anything

6     further?

7          MR. MORTON:  No?

8          THE COURT:  You mentioned that the

9     defendant's mother came down to the station, but

10    it was my understanding she didn't want to see

11    him, and he didn't want to see her.  Why would

12    she come down to the station and not want to see

13    him unless you asked her specifically to do so?

14         THE WITNESS:  She wanted an explanation

15    of what had happened here.  Her son was being

16    arrested for murdering a police officer; I guess she

17    just didn't want to hear it over the telephone, she is

18    a very nice lady.

19         THE COURT:  Was he arrested before the

20    confession?

21         THE WITNESS:  No, not in my opinion I

22    mean --

23         THE COURT:  Well, you just said that he

24    was arrested.  She wanted to come down because

25    he was being arrested.  Does that mean that the

1   confession took place before she was in the

2   police station?

3       MR. MORTON:  Judge, I don't want to object

4   to the Judge's question, but I do want to point

5   out that you're asking him to speculate on the

6   works of her mind as to why she came down and

7   did not want to see him.

8       THE COURT:  I'm not asking him what she

9   was thinking, I'm asking him if he has an

10  explanation for how did she show up, how did she

11  know to show up at the police station.  What I

12  want to know is how she ended up being there,

13  and I want to know if he had any contact with

14  her, or if one of his detectives had some contact

15  with her to solicit her to be there, okay.  I am

16  not asking you what they thought.

17      THE WITNESS:  We called her and explained to her

18  the situation and that Tim had been linked to, the

19  homicide; that we had him in our office and asked if

20  she wanted to come down, and she said that she did and

21  she did in fact drive down to our office.  She got

22  there, I don't know, maybe 20 minutes or so after we

23  made the phone call.  I met with her and this started.

24  She seemed to be -- she wasn't surprised by what had

25  happened.  She didn't -- I asked if she had any

1    knowledge of what had happened because I believe we had

2    some information that she might know something about

3    it.  She indicated she did not have any specific

4    knowledge of Tim's involvement in this case, but that

5    he had been very troublesome.  She felt that the system

6    had failed her in helping her raise him, and she did

7    not want to see him.  She didn't --

8        THE COURT:  She didn't want to see him then, and

9    he didn't want to see her?

10       THE WITNESS:  Right.

11       THE COURT:  And the other matter is you said there

12   was other information that you sought about Mr. Brown

13   subsequent to November 15th.  Apparently, his name came

14   up in discussions with other individuals along the way?

15       THE WITNESS:  That's correct.

16       THE COURT:  And my question to you is would you

17   have pursued any of this other information even if Mr.

18   Brown did not make his statement of November 15th?

19       THE WITNESS:  Yes, certainly, because the

20   information that we were getting was that he was making

21   statements that he was involved.  This is what was

22   being conveyed to us.

23       THE COURT:  You mean to others, aside from his

24   statement to you?

25       THE WITNESS:  That's correct.  In other words, we

1 were being told by these independent witnesses that he

2 was telling them that he is the one that shot the

3 deputy.

4   THE COURT:  And he did not give you those

5 individuals names?

6   THE WITNESS:  No, never, no.

7   THE COURT:  Either side have any other questions?

8   MR. DAVIS:  No, Your Honor.

9   MR. MORTON:  No.

10   THE COURT:  Detective, I think you can be

11 excused at this time.

12   THE WITNESS: Thank you.

13   THE COURT:  You're welcome.  We'll stand in recess

14 for a few moments, State do you have another witness

15 you can put on?

16   MR. MORTON:  Two witnesses.

17   THE COURT:  If they're going to be like this one I

18 think we wouldn't be able to get to them.

19   MR. DAVIS:  Are we going to be able to finish up

20 Detective Carr today, or are we just going to go to --

21   THE COURT:  I've been here, and I have a court

22 reporter that's been here since --

23   MR. MORTON:  Judge, basically it just depends on

24 cross, my direct examinations are relatively normal and

25 what's involved in the confession, but obviously you

```
 1   State of Florida      )
                           :ss        J. John Frusciante
 2   County of Broward     )

 3

 4                 IN THE CIRCUIT COURT OF THE
                   SEVENTEENTH JUDICIAL CIRCUIT,
                 IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6

     STATE OF FLORIDA,         )
 7                             )
           Plaintiff,          )
 8                             )
     vs.                       )   Case No.  91-14793 CF B
 9                             )
     TIMOTHY BROWN,            )
10                             )
           Defendant.          )
11   -------------------------X

12

13           Proceedings had and taken before the Honorable John

14   Frusciante, one of the Judges of said Court, Ninth floor,

15   Room 950, Broward County Courthouse, Fort Lauderdale,

16   Broward County, Florida, on the 7th day of January, 1993

17   commencing at or about the hour of 10:00 o'clock a.m. and

18   being a Motion to Suppress hearing.

19

20

21   APPEARANCES:

22           CHARLES B. MORTON, JR., Esquire
             Assistant State Attorney,
23           On behalf of the Plaintiff.

24           LARRY S. DAVIS, Esquire,
             Appearing on behalf of the Defendant.
25
```

ATTACHMENT / EXHIBIT 13

JUSTICE REPORTING SERVICE, INC.      523-6114

1    what an attorney was?

2        A.   No, no.  He does understand those things.  I think

3    it is totally misrepresenting his level of ability to say

4    that he wouldn't know what an attorney is or wouldn't know

5    right or wrong or any of those issues.  He had been

6    questioned by attorneys, by police before, and I think he

7    felt that this was, if I said what they wanted him to say

8    and I am not speaking to the variety of it, just his

9    attitude, that if he said what they wanted him to say, it

10   would be over and he would be going on as he had before.

11              MR. DAVIS:  That's all, I have nothing further.

12              MR. MORTON:  No questions.

13              THE COURT:  Thank you, Doctor, have a good flight.

14              MR. DAVIS:  I want to thank you doctor, I know you

15       had to make a lot of changes in your schedule.

16              THE COURT:  Mr. Morton, back to you.

17              MR. MORTON:  We might as well get started I guess

18       before lunch time.

19              Detective Carr, please.

20              THE COURT:  For those of you not present earlier

21       we have decided to take a lunch break for approximately

22       an hour-and-a-half at 12:00.

23   Thereupon,

24                    JAMES CARR,

25   having been first duly sworn, was examined and testified

1    upon his oath as follows:

2                        DIRECT EXAMINATION

3         THE CLERK: State your name and spell your last

4    name for the record, please.

5         THE WITNESS:  James Francis Carr, C-a-r-r.

6    BY MR. MORTON:

7         Q.   Now, sir, you told us who you were.  Tell us who

8    you work for?

9         A.   Broward County Sheriff's Homicide Division.

10        Q.   How long have you been working at the Broward

11   County Sheriff's Office?

12        A.   For approximately five-and-a-half years.

13        Q.   How long have you been in the Homicide Division?

14        A.   April 1st will be seven years.

15        Q.   You are a Detective, correct?

16        A.   Yes, sir, I am.

17        Q.   In that capacity, did you get involved in

18   investigating the shooting death of Deputy Patrick Behan?

19        A.   Yes, I did.

20        Q.   When and how?

21        A.   November 13th, 1990, I was dispatched by our

22   communications division to respond to the Circle K store at

23   3990 West Hallandale Beach Boulevard.

24        Q.   And what time did you get there?

25        A.   Approximately, I believe around 1:47 in the a.m.

1    Q.    Hadn't you talked to any of these people?

2    A.    No, sir.

3    Q.    When you picked the investigation up as lead

4    detective by the way, was anyone else assigned to assist

5    you as well?

6    A.    Yes, Detective Thomasevich.

7    Q.    Same partner?

8    A.    Yes.

9    Q.    When you picked up the investigation then on

10   February 5th then tell us what you did at that time, how

11   you started?

12   A.    Meeting with the supervisor that I had named, we

13   went over the case file and basic information that was

14   relayed to us, studied the case file with Detective

15   Thomasevich for quite some time, when we made a

16   determination what leads at that point in time we would

17   take.

18   Q.    By the way, before we proceed, I just want to make

19   sure I ask you this.  Did you at anytime in the course of

20   your investigation up until February 5th when you began and

21   you were assigned as the lead detective, one of the two

22   lead detectives, had you ever seen or talked to Timothy

23   Brown?

24   A.    No, I had not.

25   Q.    And do you see Timothy Brown in the courtroom

1   today?

2        A.   Yes, I do, at the defense table in the middle with

3   the white T-shirt on.

4            MR. MORTON:  Let the record reflect that the

5        witness has pointed to the accused.

6            THE COURT:  It shall reflect.

7   BY MR. MORTON:

8        Q.   So you never talked to him when you started your

9   investigation?

10       A.   No, I did not.

11       Q.   So you reviewed the case I presume?

12       A.   That is correct.

13       Q.   And you had discussions with Scheff and Auer.

14           MR. DAVIS:  Objection, Judge, again this is his

15       witness, he's leading his witness.

16           MR. MORTON:  I'm just trying to make a

17       transition.

18           THE COURT:  Overruled, please proceed.

19   BY MR. MORTON:

20       Q.   Tell us how you went about reviewing the case

21   after you had discussions with him, what did you do?

22       A.   We went over what was called lead sheets, things

23   that I felt needed some more attention, possibly that had

24   been looked at, other things, calls that were coming into

25   the office; and I made a determination prioritizing what I

1    wanted to do at that time.

2        Q.    Tell us then how you proceeded.

3        A.    At that time, I made a determination to look back

4    into some information that was given to me that I was aware

5    of in reference to Mr. Brown; and I started to go over some

6    of the task sheets.  And up around April, I went back out

7    with Detective Thomasevich; and we met with an individual

8    who we had spoken to earlier Solomon Gibbs --

9        Q.    How did you come to talk to Solomen Gibbs?

10       A.    Back in November I believe it was when the task I

11   referred to earlier had come in Detective Thomasevich and I

12   were assigned which was information developed from the

13   Hollywood Sergeant, Sergeant Allen, who called our office

14   with some information that there was two juveniles in the

15   halfway house, that we are talking about information in

16   reference to the deputy's shooting.

17       Q.    And that information came from Sergeant Allen,

18   correct?

19       A.    Yes.

20       Q.    Not from Mr. Brown, am I right?

21       A.    Absolutely not.

22       Q.    Or anything in your investigation that you had,

23   did it come from anything in your investigation that you

24   discovered before that?

25       A.    No, sir.

1      Q.   What did you do?

2      A.   At that time in April, I believe it was April

3   26th, I had responded and met with Solomen Gibbs, myself

4   and Detective Thomasevich.  We picked him up at the

5   residence, we interviewed him at that time.

6      Q.   What did you find out just briefly as a result to

7   the investigation or the rest of the case?

8      A.   He had information pertaining to Timothy Brown, a

9   conversation that transpired between himself and the

10   defendant in reference to the shooting of the Deputy.

11   Also, he provided information in regard to another

12   individual.

13      Q.   What name did he give to you?

14      A.   At that time, he give the name Keith.

15      Q.   All right.  And did he give you a last name?

16      A.   Not at that time.  However, after some time, he

17   had identified someone in the photographic line-up.

18      Q.   And who did he identify?

19      A.   Keith King.

20      Q.   Well, up until that point in time what Keith's had

21   you been investigating?

22      A.   I myself had not investigated, but there was

23   information in reference to the Keith Maddox that was

24   supposed to have been involved in this incident and through

25   the other investigators, that lead was diminished and they

1    felt that that was not true at that time.

2        Q.    They talked to him and he had taken a polygraph

3    and he had passed, correct?

4        A.    That's correct, sir.

5        Q.    And when you spoke to Solomen Gibbs, were you

6    under the impression initially that he meant Keith Maddox?

7        A.    Yes, originally I was.  Matter of fact, I showed

8    him a photographic line-up with Keith Maddox in that photo

9    line-up and the individual witness Solomen Gibbs said that

10   the subject he was referring to was not in that

11   photographic line-up.

12       Q.    All right.  Then how did you come up with Keith

13   Maddox?

14       A.    He was able to bring us to the foster home, the

15   Wiley Street and Hollywood area, at which time we spoke

16   with a Mrs. Pengrass (phonetic) who was the foster mother

17   of some children; and she gave us the last name of Keith

18   King as the fellow that Solomen Gibbs was referring to.

19       Q.    What did you do then?

20       A.    Well, based on some information that Mrs. Pengrass

21   gave us, we responded to the Fort Lauderdale area, at which

22   time to another foster home.  And we spoke with a Mrs.

23   Mabel May (phonetic) who was supposed to be at the foster

24   home where Mr. King was residing at that time.

25       Q.    Then what happened?

1    A.    Sometime after that and after identifying this

2    individual, we showed a photographic line-up to Mr. Solomen

3    Gibbs, and he positively identified Mr. King.

4        Q.    You got a photographic line-up from somewhere for

5    Mr. King, photograph of him, right?

6        A.    That's correct.

7        Q.    And were you finally able to do that?

8        A.    Sometime in the interim thereafter, April 26th.

9        Q.    All right.  Did you have problems ultimately

10    making that photographic identification that whatever time

11    lapse there was or anything like that?

12       A.    No, sir.

13       Q.    Now, you mentioned earlier that you had -- you

14    were given a task as well, or I don't know if you were

15    given a task; but you, at some point, when you started the

16    investigation, you were asked to do something, to look into

17    Timothy Brown as well, am I correct?

18       A.    That's correct.

19       Q..   What was that?

20       A.    Going over the case information back on February

21    5th Sergeant Scheff had requested, he had told us about

22    some information, a reference to Mr. Brown and told me to

23    keep a check on Mr. Brown's whereabouts and that there may

24    come a point in time that we might want to speak to him.

25       Q.    What did he tell you basically that information

1    was?

2         A.    He had told us about an incident that had occurred

3    approximately a day or two after the shooting of Patrick

4    Behan in regard to speaking to you with Mr. Brown in

5    reference to statements that were made at that point in

6    time.

7         Q.    To him?

8         A.    To him, yes, and he told us about his feelings as

9    far as what had transpired at that time and --

10        Q.    What did he tell you?

11        A.    Well, he told us that based on the information

12   that Mr. Brown had supplied them, in fact, that he was

13   under the influence at that time.  He did not weigh too

14   heavily on what he was told.  He told us about Mr. Keith

15   Maddox and bringing him in and interviewing him, also about

16   polygraphing him and felt that the information at that time

17   possibly was not true.  However, he wanted us to beware of

18   it and, you know, appraise the situation ourselves.

19        Q.    And keep an eye on him?

20        A.    That's correct.

21        Q.    That was based on Keith Maddox?

22        A.    That's correct, sir.

23        Q.    Based your reasons on --

24        MR. DAVIS:  Objection he's leading the witness,

25        these are not transition points.

1          THE COURT:  I'll agree with that one, counsel.

2     Mr. Morton, if you were summarizing it's one thing.

3   BY MR. MORTON:

4     Q.   Did he talk to you about Keith Maddox, was that

5   one of his concerns?

6     A.   Yes, he told me he had interviewed Keith Maddox.

7   He had interviewed his wife.  She had confirmed an alibi

8   that Mr. Maddox had told him.  He took another step further

9   and polygraphed Mr. Maddox.  He felt that he was showing no

10   deceptions whatsoever on his polygraph and basically ruled

11   out Mr. Maddox being involved in the incident based on

12   information from Mr. Brown.

13     Q.   Did he talk to you about Mr. McGriff at all?

14     A.   Yes, he did.  He explained to us what had happened

15   with a Mr. McGriff.  He told us about speaking with him and

16   the story that he had told them at that time.

17     Q.   Now, here's the question.  Even though he told you

18   to keep an eye out on him, correct?

19     A.   That's correct.

20     Q.   Did he tell you that he did not want to speak to

21   Mr. Brown or want you to talk to Mr. Brown again because he

22   was no longer a suspect?

23     A.   No sir.

24     Q.   Did he tell you he had dismissed Mr. Brown as a

25   suspect in the case?

1      A.    No, he did not.

2      Q.    Why didn't you go talk to him immediately, and

3  this is when, April?

4      A.    This is in April.  Mr. Brown was incarcerated at

5  that time.

6      Q.    Did you ever discuss the possibility of speaking

7  to Mr. Brown?

8      A.    Yes, we did, numerous times.

9      Q.    And who did you discuss it with?

10     A.    Well, for one Susan Aramony of Juvenile State

11  Attorney's Office, there were conversations with the State

12  Attorney's Office, there were conversations going back with

13  Sergeant Scheff and John Auer.

14     Q.    And then in April of, we are talking 1992 now,

15  right?

16     A.    '91.

17     Q.    Oh, I am sorry, April of 1991.  Then at this point

18  he was in custody, am I correct?

19     A.    That's correct.

20     Q.    What was the concern, why didn't you want to go

21  talk to him based on the people you were talking to?

22     A.    Well, in the interim some time had elapsed while

23  we were involved with Mr. Solomen Gibbs and other leads

24  that was set forth for us, a decision came in I believe

25  December 7th of that year in reference of the Minnick

1    decision at which time we met with the State Attorney's

2    Office and we had concerns about speaking with an

3    individual that was incarcerated.

4        Q.    Now, you mentioned also that you got other

5    information?

6        A.    Yes.

7        Q.    Other then Mr. Solomen Gibbs?

8        A..    Yes.

9        Q.    What was -- first of all, lets just back up a

10   little Solomen Gibbs not only identifies for you Keith

11   King, correct, instead of Keith Maddox?

12       A.    That's correct.

13       Q.    And at that point, what other information, if any,

14   did you have concerning Mr. Brown and Keith King?

15       A.    Well, at that time, it had more or less a snowball

16   effect.  Solomen Gibbs led us on to Alvis Crostwaite who

17   basically gave us information pertaining to the defendant

18   in regard to conversations that he was privy to.

19       Q.    Between him and Mr. Brown, according to him?

20       A.    No, from an Andre Butler concerning Mr. Brown

21   which led us to a Christopher Ott then on to Andre Butler

     and so on.  We spoke to approximately eight other people

     who either directly or indirectly spoke to Mr. Brown.  At

     which time he had told them directly or indirectly that he

     was involved in this incident.

1     Q.    And so it all started by Solomen Gibbs?

2     A.    That's correct.

3     Q.    And you never got the name Solomen Gibbs from Mr.

4  Brown or anything Mr. Brown said to Detective Scheff?

5     A.    No, sir, did not.

6     Q.    And from Solomen Gibbs then these other people

7  went after.

8     A.    That's correct, sir.

9     Q.    Any of those names brought up mentioned by, in

10  investigation by Timothy Brown?

11     A.    No sir.

12     Q.    Or from anything that Mr. Brown said to Detective

13  Scheff two days later?

14     A.    No, sir, absolutely not.

15     Q.    Tell us what happened. Well, I guess we could

16  break now, Judge.

17          MR. DAVIS:  Fine with me, Judge.

18          THE COURT:  All right we'll have a break and we'll

19  return at 1:30.

20          MR. DAVIS:  Judge, may I approach with Chuck?

21  Chuck, I'm going to need a video for this afternoon.

22          MR. MORTON:  I'll bring one.

23          MR. DAVIS:  Okay, thanks.

24          THE COURT:  Anything you want me to say to the

25  witness?

1        oath.

2                THE WITNESS:  Yes.

3    BY MR. MORTON:

4        Q.    Now, Detective, you told us about several

5    individuals you spoke to after you picked up this

6    investigation on February 5th, who told you about either

7    conversations they heard directly or indirectly with Mr.

8    Brown concerning his involvement in the Patrick Behan

9    murder, correct?

10       A.    Yes, sir.

11       Q.    And you mentioned also that you had an

12   identification on a different Keith, the name of Keith

13   King, correct?

14       A.    That's correct.

15       Q.    Mr. King is now charged as a co-defendant in this

16   particular case?

17       A.    Yes, sir, he is, sir.

18       Q.    Did you pursue your investigation against or, that

19   is, in looking at Mr. King as a suspect in this case when

20   you found out that?

21       A.    Yes, I did.

22       Q.    Tell us what you did?

23       A.    Around June 4th of 1991, Mr. Keith King was placed

24   under arrest, at which time he was transported back to our

25   office and interviewed.  During that course of that

```
1    interview, he gave a sworn taped confession, at which time

2    he implicated not only himself but Timothy.

3              MR. DAVIS:  Judge, I'm objecting to testimony

4    regarding Mr. King's statement, I don't think there's

5    been any evidence that the --

6              THE COURT:  I'll sustain the objection.

7              MR. MORTON:  One of the allegations in the motion

8    is that there be probable cause to make an arrest on

9    Timothy Brown.  All this information goes towards

10   probable cause.

11             THE COURT:  Do you have any objection to the way

12   it's coming in or do you --

13             MR. DAVIS:  Well, I just think that they're not

14   allowed to use a prudent type case, and also there

15   hasn't been any determination that Mr. King's statement

16   was freely and voluntarily made.

17             THE COURT:  Well, sir, if you're stating that it's

18   a lack of predicate maybe we could deal with that at

19   some point here, but it's a co-defendant in the case

20   and they're not being tried together and I don't really

21   see that we need to spend a lot of time with it.

22             MR. DAVIS:  Can you do this, Judge, maybe Mr.

23   Morton would accept a stipulation that Mr. King had

24   mentioned Mr. Brown as his co-defendant in that case?

25             MR. MORTON:  I don't have a problem with that
```

1    stipulation, I don't need to go into any details.

2         THE COURT:  So stipulated.

3         MR. MORTON:  My point was to establish probable

4    cause for the arrest.

5         THE COURT:  At this point there's no motion then

6    before me, please proceed.

7    BY MR. MORTON:

8    Q.    Based on your conversation then with Mr. King,

9    your discussions with him, did Mr. Brown's name come up as

10   being involved in the Patrick Behan murder?

11   A.    Yes, he did, sir.

12   Q.    And as a result of your investigation with and

13   your discussions with Mr. King, as well as the other

14   witnesses and the individuals you spoke to, what was your

15   conclusion at that time?

16   A.    At that time, we pursued information on Mr.

17   Timothy Brown, at which time placing us up to around

18   December 16th.  Information was learned through a Juvenile

19   State Attorney's Office that Mr. Brown was being released

20   from the Juvenile Detention Center, and would be put in the

21   Covenant house in Fort Lauderdale.

22   Q.    When did you actually start to then keep a

23   watchful eye, so to speak, on Mr. Brown?

24   A.    It was sometime after the arrest of Mr. King, and

25   we had met with members of the State Attorney's Office at

1    that time.

2         Q.    When was he arrested?

3         A.    Mr. King?

4         Q.    Mr. King, yes.

5         A.    That was on June 4th, 1991.

6         Q.    All right.  And how did you go about keeping an

7    eye or how did you go about watching Mr. Brown?  What was

8    happening with his case?

9         A.    We checked with Susan Aramony of the Juvenile

10   State Attorney's Office, and she kept us apprised about Mr.

11   Brown's situation in the Juvenile Detention Center.

12        Q.    And during this course of watching Mr. Brown's

13   case, were you still holding back on contacting him because

14   of, based on the State Attorneys Office's advice?

15        A.    Yes, sir, that is correct.

16        Q.    Minnick versus Mississippi?

17        MR. DAVIS:  Judge, I'm going to object again he's

18        leading his witness here, it's been asked and answered

19        a number of times.

20        THE COURT:  Overruled at this point in time.  I

21        realize what you're trying to do, and I don't see the

22        difference in the outcome of what you're looking for.

23        MR. MORTON:  He mentioned Minnick versus

24        Mississippi

25        in his own motion.

1             THE COURT:  I understand, please proceed.

2    BY MR. MORTON:

3        Q.   So you held off, and when did you finally have

4    your opportunity to talk to Mr. Brown and why?

5        A.   On July 16th, 1991, at approximately 20 minutes

6    after six in the evening myself an Detective Thomasevich

7    watched Mr. Brown leave the Covenant House in Fort

8    Lauderdale, at which time we followed him.

9        Q.   Okay.  Now, let's back up just a little because we

10   want to know how that came about.  You told us that after

11   June or so, you were keeping an eye on Mr. Brown in

12   following his case with the Juvenile Detention system,

13   correct?

14       A.   That's correct.

15       Q.   That's you and the States Attorney's Office?

16       A.   That's correct, sir.

17       Q.   What I want to talk about is how did you come to

18   the decision July 16th to try and speak to Mr. Brown?

19       A.   I was contacted July 2nd, 1991, by Susan Aramony

20   of the State Attorney's Office, at which time she advised

21   me that Mr. Brown would be in the near future being

22   released from the Juvenile Detention Center, at which time

23   he was going to be placed in a shelter type of home in the

24   interim.

25            On July 16th in the early morning, I was

JUSTICE REPORTING SERVICE, INC.    523-6114

1    recontacted by Susan Aramony's office, at which time they

2    advised me that on that day he would be leaving the

3    Juvenile Detention Center going to the Covenant House.   At

4    that time, myself and Detective Thomasevich responded to

5    that location.   We were awaiting the arrival of Mr. Brown.

6    After sitting there approximately 20 minutes 25 minutes,

7    Mr. Brown was observed leaving the Covenant House, at which

8    time myself and Mr. Thomasevich followed him.

9        Q.   Back up just for a second.   On July 2nd were you

10   told how Mr. Brown's case or cases with the juvenile system

11   were resolved?

12       A.   Yes, we are advised that they had been pled out at

13   that time in front of Judge May, and that he would be going

14   for six months to the Youth Defendant Center, at which time

15   they advised us that there was not room there and he would

16   be staying at the Covenant Home until they could find

17   placement for him at that location.

18       MR. MORTON:   Judge, at this time I have in my

19       hand, I'd like to have this marked for the record.

20       It's certified copies of commitment papers signed by

21       Judge Melanie May in the disposition of the armed

22       robbery case and the burglary of a residence which Mr.

23       Brown was in custody on at the time, or at least facing

24       charges on; and on July 2nd that case was disposed of,

25       it was pled out, and had Judge May's signature on it.

1     For the record it's an authentic and certified from the

2     clerk's office, and in addition I have the State

3     Attorney's file which I can represent as an officer of

4     the Court that shows the disposition on the files, and

5     the date of the disposition, and what was to happen on

6     this particular case.

7          MR. DAVIS:  Number one, I haven't had an

8     opportunity to review the file at all.

9          THE COURT:  This is not something that you have

10    given to him previously?

11         MR. MORTON:  Judge, this is not for trial this is

12    for response to his motion to suppress.

13         MR. DAVIS:  I still have the right, Judge.

14         MR. MORTON:  I don't have to when it's a motion to

15    suppress, Judge.  I have to prove a voluntary

16    confession pursuant to the law, and I gathered public

17    records and documents accessible to Mr. Brown, and it

18    is rebutting the Minnick versus Mississippi decision

19    and I don't have to put it in the discovery.

20         THE COURT:  Hold on a second, as far as talking

21    about --

22         MR. MORTON:  One other think, and it's in the

23    officer's police report as well, and it's in your

24    police report, and that is that you put the date on the

25    disposition when you were contacted?

JUSTICE REPORTING SERVICE, INC.    523-6114

1        THE WITNESS:  Yes, it's on page 23 of my report.

2        THE COURT:  If you want some more time to review

3   that, counsel, again I'll be glad to do it.

4        MR. DAVIS:  If the Court would allow these

5   juvenile records in which we won't have access to, if

6   the Court is going to allow in the results of this that

7   he was committed, we do that without putting --

8        THE COURT:  I don't think that the purpose that it

9   was going in is because he was committed, that's not

10   the reason is it, Mr. Morton?

11        MR. MORTON:  No, the case was disposed on that

12   date.

13        THE COURT:  Are you only trying to show

14   familiarity with the system, and his being with lawyers

15   et cetera?

16        MR. MORTON:  No, sir.  Mr. Davis has made an

17   argument that in violation of Minnick versus

18   Mississippi, the officers reinstituted contact with the

19   defendant.  And Minnick versus Mississippi we can have

20   all these legal arguments re-initiating contact based

21   on someone who was, as far as --

22        MR. DAVIS:  I'll move this along, Judge, I don't

23   have any problem with the Court receiving them as

24   information.

25        THE COURT:  I'll receive them in, please proceed.

BY MR. MORTON:

Q.   So before then, you were told before he could be committed to the HRS facility, he was to be sent where?

A.   To the Covenant House in Fort Lauderdale at 733 Breakers Avenue.

Q.   So what did you decide to do?

A.   Myself and Detective Thomasevich responded to that location, waited for the arrival of Mr. Brown, at which time we sat outside and --

MR. DAVIS:  Excuse me, Judge, may I just interrupt for one moment?  Could you take a look at the files while Detective Carr is testifying?

THE COURT:  These are State Attorney's Office files you're talking about?

MR. DAVIS:  Right.

THE COURT:  Yes.

THE WITNESS:  At this time, myself and Detective Thomasevich sat in the vehicle and approximately 20 minutes 25 minutes, Mr. Brown came out, at which time we followed him to A1A where he proceeded North.  At that time, we watched him several times turn around, looking back over his shoulder, taking off a T-shirt, putting it back on.  He did that a number of times.

Just prior to approaching Sunrise Boulevard, myself and Detective Thomasevich approached Mr. Brown,

1    identified ourselves as being detectives with the

2    Broward Sheriff's Department; and he was placed under

3    arrest for the murder of Deputy Patrick Behan.

4         Than at that time, we proceeded to place him in

5    the vehicle, at which time I utilized a rights' card

6    which I keep in my wallet, and I advised Mr. Brown of

7    his rights at that point in time.

8    BY MR. MORTON:

9         Q.   So you first advised him of his rights, and you

10   immediately put him under arrest out on Sunrise Boulevard

11   you said?

12        A.   That's correct.

13        Q.   At that point, you said you had your card, am I

14   correct?

15        A.   Yes, sir.

16        Q.   Do you have the card with you?

17        A.   Yes, sir, I do.

18        Q.   Will you just tell us for the record what it is

19   that you said to him at that point on the card and, by the

20   way, did you question him at all?

21        A.   No, sir, not at that time.  The only thing that we

22   did ask him is what his name was; and he identified he was

23   Timothy Brown.

24        Q.   What happened next?

25        A.   At that time, I advised him Timothy Brown, "You

1       have the right to remain silent.  You can refuse to answer

2       questions.  Do you understand?  He acknowledged.

3           Q.   Acknowledged in what way?

4           A.   He acknowledged with a "yes."  Anything that you

5       say can be used and will be used against you in a court of

6       law.  Do you understand?  He acknowledged again with a

7       "yes."  Advised him, "You have the right to speak with an

8       attorney and have him here with you before the police ask

9       you any questions.  Do you understand?"  And he again

10      acknowledged with a "yes."  "If you cannot afford an

11      attorney, one will be appointed for you before we ask you

12      any questions."  And we asked him, "Do you wish to have an

13      attorney?"  And he said, "no, not at that time."  If you

14      decide to answer questions now without an attorney present,

15      you will give up the right to stop answering questions

16      until you speak to an attorney.  Do you understand that?"

17      He acknowledged "yes."  "Have you ever had an attorney or

18      any law enforcement officer prior to this?"  And he again

19      acknowledged with a "No."  "Do you understand these rights

20      as I have explained them to you?  Are you willing to answer

21      questions without an attorney present?"  He said, "Yes,"

22      and he wanted to know what this was about.

23          Q.   All right.  Did you respond at that point?

24          A.   He was placed in the back of an unmarked police

25      car and was told that he was being transported to our

1    office.  I requested that he not talk at that time, that

2    everything would be explained to him when we arrived down

3    to our office if he was willing to speak to us and he said

4    he agreed with that.

5         Q.    All right.  Who transported him?

6         A.    At that time, two other detectives was on, myself

7    and Detective Thomasevich and two other detectives while

8    this was going on pulled up.  And myself and Detective

9    Thomasevich were in the van, and the decision was made to

10   put him in the back of the unmarked police vehicle because

11   of comfort.

12        Q.    And there was no questioning of him at that point?

13        A.    No, there was none, sir.

14        Q.    Did you follow the car to the police station?

15        A.    Yes, we did.

16        Q.    And tell us then how long did it take you to get

17   to the station?

18        A.    Well, that is approximately twenty minutes after

19   six in the evening; and we arrived back at approximately

20   five minutes of seven to our office.

21        Q.    Tell us what happened then.

22        A.    When we had arrived in the office, Mr. Brown was

23   asked if he needed to use the restroom.  He did at that

24   time and after using the restroom, we asked him if he

25   wanted something to drink.  I myself poured him a soda from

1    the soda machine that we keep in the office.  At that time,

2    we went into the interview room, again utilizing the

3    rights' waiver form and advised Mr. Brown of his rights

4    with him responding to those questions and signing that

5    form.

6        Q.   Do you have the form with you?

7        A.   Yes, I do, sir.

8        Q.   The original copy?

9        A.   That's the original.  That's a copy (indicating).

10       Q.   I have in my left hand the original rights' and

11   waiver form, correct?

12       A.   That is correct, sir.

13       Q.   And is that what you use to advise juveniles of

14   their rights?

15       A.   Yes, that is the juvenile rights' waiver form.

16       Q.   Different than the one for adults, correct?

17       A.   Correct.

18       Q.   And there is a copy of this in my right hand of

19   this original?

20       A.   That is the copy of the original.

21            MR. MORTON:  I would like to have the copy marked,

22   Your Honor.

23            THE COURT:  So marked.

24            (Thereupon, State's Exhibit E was marked

25       for identification.)

JUSTICE REPORTING SERVICE, INC.   523-6114

1    BY MR. MORTON:

2        Q.   Let me show you what has been marked as State's

3    Exhibit E for identification, and is that a fair accurate

4    representation copy of the original?

5        A.   Yes, it is, sir.

6        Q.   Using this State Exhibit E which is now in

7    evidence.  I look to offer State Exhibit A into evidence.

8            MR. DAVIS:  Could I voir dire on that a moment,

9    Judge?

10           THE COURT:  You may.

11           MR. DAVIS:  Detective, I notice that there

12   is no time on this, is there?  I mean, so it's hard to

13   tell when this thing -- you don't mark --

14           THE WITNESS:  Are you referring to this, sir?

15   That's incorrect.  There is a time on it.  It says

16   "1910" up where it states "date."  Time it has

17   "7-16-91, 1910."

18           MR. DAVIS:  7:10 p.m. no, I have no objection,

19   Judge.

20           THE COURT:  No objection.  So admitted.

21               (Thereupon, State's Exhibit A was marked

22           into evidence.)

23   BY MR. MORTON:

24       Q.   So you get there at little after 7:00  o'clock?

25       A.   We arrived at the office in the parking lot

JUSTICE REPORTING SERVICE, INC.   523-6114

1    approximately five minutes to seven.  We went upstairs.

2    Mr. Brown used the bathroom.  I obtained a soda for him,

3    then we sat in the interview room.

4        Q.   That's when you again advised him of his rights

5    using that form?

6        A.   That's correct, sir.

7        Q.   What is the time?

8        A.   1910, ten minutes after seven in the evening.

9            MR. MORTON:  I like to offer the State's Exhibit

10   now into evidence, Your Honor.

11           MR. DAVIS:  No objection.

12           THE COURT:  What did we just enter, I thought we

13   just entered it.

14           MR. MORTON:  No, that was just marked for

15   identification purpose.

16   BY MR. MORTON:

17       Q.   Now, what is in evidence as a State's Exhibit

18   which is a copy of your original rights' waiver form?

19       A.   Yes.

20       Q.   Tell us please and read for us, show us basically

21   how you use that form to arrest and advise Mr. Brown of his

22   rights and his responses?

23       A.   Sitting down at a table similar to the defendant's

24   table, I fill out the top portion.  It says, "Name, Timothy

25   Brown," has date of birth, it has his residence, telephone

1    number.  Then it has "given by," and I printed my name and

2    Detective Thomasevich who was present, the case number, the

3    date and the time and location.  Then I went on to read the

4    form, and it states, "Before I ask you any questions, I

5    want to advise you of your rights under the law.  Do you

6    understand that I am a Deputy Sheriff?"  Mr. Brown was

7    given a pen, and he wrote, "yes," on the available line.

8    "Are you comfortable?"  "Yes."  "Has anyone threatened

9    you?"  And he wrote a "no."  "Can you read and write the

10   english language?"  He wrote a "yes."  What school do you

11   go to?"  He wrote a "No," and indicated verbally that he

12   doesn't go to school.  Was asked what grade you went to, he

13   wrote an "eight" on the line eighth grade.  "Have we tried

14   to contact your parents or guardian?  "Yes."  "Do you want

15   your parents or guardian or legal custodian here before we

16   proceed any further?"  Mr. Brown wrote on that line, "no."

17   "You have the right to remain silent, that is, you do not

18   have to talk to me or answer any questions if you do not

19   want to, do you understand?"  Mr. Brown wrote, "Yes."  "You

20   have the right to talk to an attorney and have him here

21   with you before we ask you any questions.  Do you know what

22   an attorney is?"  Mr. Brown wrote "Yes."  Then it states,

23   "Do you understand?"  And he also wrote, "yes."  "If you

24   cannot afford an attorney and you want one, we will get an

25   attorney for you before we ask you any more questions.  Do

1     you understand?"  Mr. Brown wrote a "Yes."  "If you decide

2     to answer my questions now without an attorney present, you

3     will have the right to stop answering my questions at any

4     time until you talk to an attorney, do you understand?"

5     Mr. Brown replied with a, "yes," again.  "Should you talk

6     to me anything you say can and will be used in a court of

7     law either for you or against you, do you understand?"  Mr.

8     Brown wrote, "yes."  "Are there any questions?"  Mr. Brown

9     wrote, "No."  "Now, understanding these rights, are you

10    willing to answer my questions without an attorney here?"

11    Mr. Brown wrote, "Yes."  Then it says, "I, Mr. Brown,"

12    printed Timothy Brown, "have read this statement of my

13    rights or have had it read to me, and I understand what my

14    rights are.  I am willing to make a statement and answer

15    questions.  I do not wish an attorney present at this time.

16    No threats or promises have been made to me, no pressure of

17    any kind has been used against me, nor have I been tricked

18    or fooled into giving a statement.  I understand and know

19    what I am doing.  I further expect that any statement will

20    be used for or against me in a court of law."  Timothy

21    Brown signed his name.  Then it has the officer's

22    signature, and I signed first and witness signature

23    Detective Thomasevich signed the form.

24         Q.   Your partner, Detective Thomasevich, was with you

25    during the entire reading of the rights, correct?

1    A.    Yes, sir.

2    Q.    As well as you he watched Timothy come out of the

3    Covenant House.

4    A.    That's correct, sir.

5    Q.    Have you ever seen or been around people who are

6    under the influence of intoxicants in any way, alcohol or

7    drugs?

8    A.    Yes, sir, many times.

9    Q.    And do you have an opinion as to whether or not

10   Mr. Brown appeared to be intoxicated in any  way?

11   A.    I have an opinion that he was not intoxicated in

12   any way.

13   Q.    How about his responses to you as you read him his

14   rights, did he appear to understand what you were saying to

15   him?

16   A.    Yes, he did.  He was very clear with his speech

17   very precise with his answers.

18   Q.    I notice you did read whether or not any promises

19   or threats have been made.  Did you or anyone present make

20   a promise or threats to have him speak to you at all?

21   A.    Absolutely not.

22   Q.    Any time before you began talking to him about the

23   Patrick Behan murder did he request to have an attorney

24   present?

25   A.    No, he did not.

1      Q.   During the course of your questioning him about

2  it, did he at any time request an attorney to be present?

3      A.   No, he did not, sir.

4      Q.   Anytime during the course of your talking to him

5  and speaking to him about it, did you pressure him in any

6  way to getting him to speak to you?

7      A.   Absolutely not.

8      Q.   Threaten him in any way?

9      A.   No, sir.

10      Q.   Promise anything during the entire course of your

11  speaking to him?

12      A.   No, sir.

13      Q.   When you arrested him, did you handcuff him?

14      A.   At that time, he was handcuffed.  The handcuffs

15  were removed as soon as we arrived back to our office.

16  That is a procedure that we must follow.

17      Q.   And then when you got to your office, what did you

18  do after you got into the office with the handcuffs?

19      A.   The handcuffs were taken off, I believe; possibly

20  he was shackled with leg irons.

21      Q.   When?

22      A.   After we arrived, he had used the bathroom and

23  obtained a soda and we sat down.

24      Q.   All right.  Now, at the time that you spoke to him

25  he was shackled?

1   A.   Yes, sir.

2   Q.   To the floor or to the chair or what?

3   A.   Just his feet together at that time.

4   Q.   Not to the floor or anything like that?

5   A.   No, not at that point, no.

6   Q.   Why did you have him shackled?

7   A.   That is a safety precaution, a policy in our

8   office.  Sometimes we may leave the room or something, and

9   we have had escapes.

10   Q.   People actually run?

11   A.   We have had two different incidents.

12   Q.   Now, when you spoke to him initially after you

13   read him his rights, did you record this conversation?

14   A.   Initially, we did not.

15   Q.   How long did you talk to him before you went to --

16   and did you ever record any conversations?

17   A.   Yes, we did.  We spoke to him for approximately, I

18   would say, just maybe under an hour; approximately an hour

19   and then we spoke to him, and he went on the tape recorder

20   and we taped the conversation.

21   Q.   When you spoke to him before the recorder

22   conversation, tell us what you talked about.

23   A.   Well, basically, we explained why he was there,

24   what the reference was and some of the pertinent

25   information we knew.  Mr. Brown, in the beginning, denied

1    being involved.  Again, when we hit him with pertinent

2    facts, things that we had known, then he started to advise

3    us that he was and started to give us a detailed account of

4    the incident.

5        Q.    What facts did you hit him with, what are you

6    talking to him about?

7        A.    Well, when we originally talked to him, he began

8    to deny it.  We told him that we had Mr. King, that we had

9    spoken to people like Solomen Gibbs, and we named some of

10   the people that we had statements from and some of the

11   pertinent conversations against him that he had spoken to

12   people about.  And once we hit him with some of these

13   facts, and at that point in time that's when he started to

14   tell us what had happened.

15       Q.    What did you tell you at that point?

16       A.    Basically, at that time, he told us that he was

17   there, that he was with Keith King.  They had met down at

18   his residence; and at the time that they were getting high,

19   he advised us that they had been drinking and they had been

20   smoking.

21       Q.    Smoking what?

22       A.    He called it marijuana and lace.

23       Q.    And at that time, he advised that he had a weapon

24   a .38 caliber; and they decided that they were going to

25   kill someone.  Did he tell you what happened after that?

284

 1        A.   Yes, he indicated to the point that they went out

 2   on his bike where in fact he was riding -- the other boy

 3   was Keith King -- was riding on the handlebars, at which

 4   time they were riding in the area of Hallandale Beach

 5   Boulevard; and they spotted the officer, Pat Behan, who had

 6   parked in the parking lot of Circle K.

 7        Q.   Tell me what happened after that.

 8        A.   He advised us that it was Keith King, in fact,

 9   that actually shot Patrick Behan.  And he told us that they

10   had pulled a bike up, and he tells us how they had

11   approached the police officer.  And it was a decision that

12   was made, basically, by Keith King that they were going to

13   shoot the police officer.

14        Q.   Once he began to talk to you about what happened

15   and admitted to it, did you at that point -- let me

16   rephrase it once again to talk to you about what happened.

17   Is there anything on the taped statement itself that was

18   not included in the tape statement once you began to talk

19   about it?

20        A.   No, everything we went over on the pre-interview

21   was put onto the tape.

22        Q.   Do you have the tape with you that you used?

23        A.   Yes, I do.

24        Q.   Is that the original you just pulled out?

25        A.   Yes, it is.

1     Q.   And it's in this envelope?

2     A.   Yes.

3          MR. MORTON:  I like to have this marked for

4     identification purposes, Your Honor.

5          THE COURT:  So mark it, madam clerk.

6          (Thereupon, State's Exhibit F was marked

7     for identification.)

8          THE CLERK:  Chuck, do you want this plugged in?

9          MR. MORTON:  Yes, if you don't mind.

10    BY MR. MORTON:

11    Q.   Let me show you what has been marked.  This is an

12    envelope containing cassette record or cassette State's

13    Exhibit F.  Do you recognize it?

14    A.   Yes, sir, I do.

15    Q.   What is it?

16    A.   This is the envelope that I personally put Timothy

17    Brown's statement in, cassette.

18    Q.   I show you the cassette inside.  Do you recognize

19    it?

20    A.   Yes, it's my handwriting with Timothy Brown's name

21    and date and the case number.

22    Q.   All right.  Your envelope also contains your

23    handwriting?

24    A.   Yes, it does.

25    Q.   Is this envelope and recording of this tape

1    recording substance in the same position as it was when you

2    recorded it and used it to record the conversation between

3    you and Mr. Brown?

4         A.    It appears to be, yes sir.

5         Q.    Who was present during the re-interview along with

6    you and Mr. Brown?

7         A.    Detective Thomasevich.

8         Q.    And has it been altered, modified or any deletions

9    in any way?

10        A.    No, sir.

11             MR. MORTON:  I like to offer State Exhibit F into

12        evidence, Your Honor.

13             MR. DAVIS:  No objection.

14             THE COURT:  No objection, so mark it, madam clerk.

15             (Thereupon, State's Exhibit F was marked

16        and received into evidence.)

17             MR. MORTON:  May I play it?

18             THE COURT:  I suppose so.  Regarding the court

19        reporter would you like the tape to speak for itself?

20             MR. DAVIS:  I'd like that to be recorded by the

21        court reporter.

22             MR. MORTON:  I don't intend to offer it into

23        evidence at the time of trial, but for the Court's --

24             THE COURT:  Do you disagree with what's stated in

25        this?

JUSTICE REPORTING SERVICE, INC.    523-6114

1          MR. MORTON:  There may be typos or there may be

2     things --

3          THE COURT:  Just trying to give the clerk a break,

4     you don't know what the actual clarity is.

5          (Thereupon, the cassette tape was transcribed to

6     the best of the court reporter's ability.)

7          DETECTIVE CARR:  "This is the actual taped

8     testimony 1,2,3 testing 1,2,3 testing, testing.  Tape

9     statement in reference to BSO Case Number PK90-11-314.

10    The offense is classified as a homicide of a deputy

11    sheriff which occurred on November 13th, 1990, on a

12    Tuesday morning, in or around 1:45 in the a.m.  This

13    incident occurred in the Circle K parking lot located

14    at 3990 West Hallandale Beach Boulevard.  This

15    statement's being taken by Detective Carr and

16    Detective Thomasevich in Broward County Sheriff's

17    Homicide Division.  It's being taken on the 16th of

18    July 1991 at approximately 2015 hours.  This will be a

19    statement of one Timothy Brown being taken at this

20    time."

21       "Q.   Okay.  Sir, for the record, would you please sate

22    your full name?

23       "A.   Timothy Brown.

24       "Q.   Okay.  Timothy, what's your date of birth and your

25    home address?

1       "A.   11-23-75, 6640 Perry Street.

2       "Q.   Okay.  And a phone number there?

3       "A.   963-9919.

4       "Q.   Okay.  Timothy, before I go any further and I

5    speak to you in regard to this incident, a little earlier I

6    had advised you of your rights, is that correct, and you

7    filled out this form that's in front us here tonight.

8       "A.   Yes, sir.

9       "Q.   Okay.  Just for the purposes of the record, I am

10   going do read this here.  It says 'Timothy Brown, before I

11   ask you any questions, I want to advise you of your rights

12   under the law.  Do you understand that I'm a deputy sheriff

13   and there's a 'yes' next to that after that.  Did you write

14   that 'yes'?

15      "A.   Yes, sir.

16      "Q.   And you understand that?  Are you comfortable at

17   this time?

18      "A.   Yes, sir.

19      "Q.   Have we treated you right?  You had cigarettes,

20   you had water, you got to go to the bathroom?

21      "A.   Yes, sir.

22      "Q.   Okay.  Has anyone threatened you?

23      "A.   No, sir.

24      "Q.   Okay.  Can you read and write the English language

25   and you wrote 'yes,' is that correct?

1       "A.   Yes, sir.

2       "Q.   Okay.  And it says, 'What school do you go to?'

3    And you put 'No.'  You're not attending school now?

4       "A.   No, sir.

5

6       "Q.   And you finished at the 8th grade?

7       "A.   Yes sir.

8       "Q.   Okay.  And then we put -- have we tried to contact

9    your parents or guardian, and you answered 'yes,' and we

10   have, correct?

11      "A.   Yes, sir.

12      "Q.   Okay.  Do you want your parents, guardian or legal

13   custodian here before we proceed any further and you wrote

14   a "No."

15      "A.   No, sir.

16      "Q.   Okay, okay.  Then it goes on to say your rights.

17   You have the right to remain silent, that is, you don't

18   have to talk to me or answer any of my questions if you do

19   not want to, and I asked do you understand and you wrote a

20   little 'yes?'

21      "A.   Yes, sir.

22      "Q.   Okay.  You have the right to talk to an attorney

23   and have him here with you before we ask you any questions.

24   Then the form states do you know what an attorney is and we

25   discussed that and you put 'yes,' that you do.

JUSTICE REPORTING SERVICE, INC.   523-6114

```
 1        "A.    Yes, sir.

 2        "Q.    Okay.  Do you understand that?  And it says 'yes.'

 3        "A.    Yes, sir.

 4        "Q.    Okay.  If you can not afford an attorney, and you

 5    want one, one will be appointed to you before we ask any

 6    questions, and it says, 'do you understand?'  And you wrote

 7    a 'Yes'?

 8        "A.    Yes, sir.

 9        "Q.    And you understand that?

10        "A.    Yes, sir.

11        "Q.    Okay.  If you decide to answer my questions now

12    without an attorney present, you will still have the right

13    to stop answering my questions at any time, okay, until you

14    talk to an attorney.  Do you understand that?

15        "A.    Yes sir.

16        "Q.    Okay.  Should you talk to me, anything you say can

17    and will be used against you in a -- either for you or

18    against you, it states, okay, and it says do you understand

19    that?

20        "A.    Yes, sir.

21        "Q.    Okay.  And you put a 'yes' there.  Are there any

22    questions at this time?

23        "A.    No, sir.

24        "Q.    Okay.  Knowing and understanding these rights, are

25    you willing to answer questions now without an attorney
```

1    here and you put 'yes'?

2        "A.   Yes, sir.

3        "Q.   Okay.   Then it says 'I' and it's printed, Timothy

4    Brown, you wrote that?

5        "A.   Yes, sir.

6        "Q.   'I Have read this statement of my rights or have

7    had it read to me, and I understand what my rights are.   I

8    am willing to make a statement and answer questions.   I do

9    not wish an attorney present at this time.   No threats or

10   promises have been made to me, no pressure of any kind has

11   been used against me nor have I been tricked or fooled into

12   giving this statement.   I understand and I know what I am

13   doing.'   Okay, and then it goes on with the signature here.

14   Okay and it says, 'Timothy Brown.'

15       "A.   Yes, sir.

16       "Q.   And you signed that?

17       "A.   Yes, sir.

18       "Q.   Okay.   And then I myself and Detective Thomasevich

19   had signed that as witnesses.   Okay.   Also Timothy, before

20   we go on, I need to advise you as well as being a Detective

21   with the Broward County Sheriff's Homicide Division, I am

22   also a Notary Public in the State of Florida at large.

23   What this means is I'm empowered to take a sworn statement

24   from you.   Okay?

25       "A.   Yes, sir.

1       "Q.   I'm gonna be placing you under oath, and you're

2    gonna be swearing to tell me the truth in regard to this

3    incident.  Okay, also if we found that you lie, okay, a

4    charge of what's called perjury can be weighed against you,

5    which means that's when you lie under oath and you

6    understand that?

7       "A.   Yes, sir.

8       "Q.   Will you raise your right hand, please?

9       "A.   Let the record reflect that the subject has raised

10   his right hand.  Do you solemnly swear to tell the truth

11   nothing but the truth so help you God?

12      "A.   Yes, sir.

13      "Q.   Timothy, let's go back eight months ago back to

14   November 13th, 1990.  We had been discussing an incident

15   that occurred at the Circle K convenience store in

16   reference to the deputy sheriff.  I want you, in your own

17   words, tell me what happened on that night, who you were

18   with, and where you first met this individual that evening

19   and take it from there.

20      "A.   Keith King.

21      "Q.   Okay.  Mr. Keith King, and you identified Keith

22   King earlier from a photographic lineup?

23      "A.   Yes, sir.

24      "Q.   Okay.  Tell me about that, how long have you known

25   Keith King?

```
 1        "A.    Since I lived down here.

 2        "Q.    About how many years ago was that?

 3        "A.    I say five years now.

 4        "Q.    Okay.  So on this night, you met Keith, Keith

 5   King, where do you meet him at?

 6        "A.    On Wiley Street.

 7        "Q.    All right, tell me what happens.

 8        "A.    We already been drinking and all that, snorting

 9   powder and smoking lace --

10        "Q.    You were smoking what?

11        "A.    Lace.

12        "Q.    Okay.

13        "A.    "UNINTELLIGIBLE" so we just get in the black

14   bicycle and we go up to Circle K.  He -- we -- he had a .38

15   on him.  It was black with a brown handle.  It was rusted a

16   little bit, even though it was already used.

17        "Q.    Okay.  Now how -- who has the gun him?

18        "A.    Keith King.

19   BY DETECTIVE THOMASEVICH:

20        "Q.    Where does he carry it on him?

21        "A.    Right here.

22        "Q.    In his waist band?

23        "A.    Yes, sir.

24   BY DETECTIVE CARR:

25        "Q.    Okay.  Now how -- who's riding the bike; how are
```

1     you two riding on the bicycle?

2         "A.    I'm pulling him.

3         "Q.    You're pulling him.  That means you're peddling

4     and he's on what, the handle bars?

5         "A.    The handle bars.

6         "Q.    Okay, what happens then?

7         "A.    So we just riding, we go up to the Circle K right

8     there on the street of Hallandale Beach Boulevard.  As we

9     ride up, he say, 'I'm gonna kill somebody.'

10        "Q.    Okay.  Now, when is the first time that you start

11    having conversations about him stating that he's gonna kill

12    somebody?

13        "A.    About two blocks before we got to Circle K:

14        "Q.    Okay.  And tell me exactly what you recall Keith

15    King saying to you.

16        "A.    He gonna kill somebody.

17        "Q.    Okay, what did you say to that?

18        "A.    I called his bluff.

19        "Q.    So your calling his bluff.  You don't believe it?

20        "A.    Yes, sir.

21        "Q.    Okay, you're basically telling him that you

22    believe he's got like the nerve to do it?

23        "A.    Yes, sir.

24        "Q.    Okay, what happens then?  What does he say?

25        "A.    We get -- we pulled up and saw the police, so he

1    say don't go out that way.  So we ride that way.  I pulled

2    anyway, you know what I'm saying.  I wasn't paying

3    attention around there.  As I was still pulling, he jumped

4    off the bicycle --

5         "Q.   Now, let me just stop you for a minute.  Okay.

6    Does he say anything before he jumps off the bike?

7         "A.   He told me to look up.  I looked up.  He say he

8    got him.

9         "Q.   He says he's got him?

10        "A.   He got him.

11        "Q.   What does that mean to you?

12        "A.   He gonna kill somebody that mean --

13        "Q.   That that's the person he's gonna kill?

14        "A.   Yes, sir.

15        "Q.   And do you see that police officer?

16        "A.   Yes, sir.

17        "Q.   And do you know who he's directing that comment

18   to, that that's who he's got, that who he's gonna kill?

19        "A.   Yes, sir.

20        "Q.   Okay.

21        "A.   And when he jumped off the bicycle, he made limp

22   over there to the car, like you know how he walk, he was

23   limping over there to the car, and he fired it; and after

24   he fired it, I panicked, and we jumped on the bicycle, we

25   got across the street from the Circle K, and he fired the

1    gun again.

2        "Q.    Okay, You say that you jumped back on the bicycle?

3        "A.    Yes, sir.

4        "Q.    And he is on the bicycle or he is running?

5        "A.    He's on the bicycle.

6        "Q.    Okay, and you go across what, Hallandale Beach

7    Boulevard?

8        "A.    Yes, sir, going back to Carver Ranchers.

9        "Q.    Okay, now what's over there across Hallandale

10   Beach Boulevard?

11       "A.    A rock pit on this side.

12   BY DETECTIVE THOMASEVICH:

13       "Q.    Before that.

14   BY DETECTIVE CARR:

15       "Q.    All right, but before we hit the rock pit, you're

16   telling me there was another --

17       "A.    There's a car -- a car place and a pawn shop on

18   this side.

19       "Q.    Okay, so you're actually -- when you cross

20   Hallandale Beach Boulevard, you're going past the pawn

21   shop?

22       "A.    Yes, sir.

23       "Q.    Okay.

24       "A.    And we in the center.  Cross up over here, the

25   pawn shop is right here.  We going straight down here and

1    the rock pit on this side here.

2        "Q.   Okay, now what do you's do?

3        "A.   We fired -- before we got back to the first block,

4    we fired it off again.

5        "Q.   And this is after you're across and away from the

6    Circle K?

7        "A.   Yes, sir, yes, sir.

8        "Q.   And he fires the gun, what, up in the air?

9        "A.   Yeah.

10       "Q.   Okay.

11       "A.   Then we get half way down -- we get half way down

12   on 40, and we throw the pistol.

13       "Q.   Where does he throw the pistol?

14       "A.   By the rock pit, by the gate.

15       "Q.   Now, you know where that pistol is?

16       "A.   If we go back and look for it, yes sir.

17       "Q.   Okay, now let me back up and go over a couple of

18   things that I just want to clarify.  Do you remember what

19   you were wearing that night?

20       "A.   Yes, sir.

21       "Q.   What?

22       "A.   A white T-shirt, some burgundy "UNINTELLIGIBLE"

23   and some blue cut-off pants.

24       "Q.   Okay, you're talking --

25       "A.   A white T-shirt --

1       "Q.   Work pants, cut offs?

2       "A.   Yeah.

3       "Q.   Okay, and you indicated that the same sneakers

4    that you have on here tonight are the sneakers you were

5    wearing then?

6       "A.   Yes, sir.

7       "Q.   And you remember that?

8       "A.   Yes, sir.

9       "Q.   You said you had a white T-shirt on?

10      "A.   Yes sir.

11      "Q.   Now, do you remember what you did with that

12   T-shirt that night?

13      "A.   I took it off and put it in my back pocket.

14      "Q.   Okay, so you didn't have a shirt on?

15      "A.   I took it off when we got across the street and I

16   put it in my back pocket like it's hanging out now.

17      "Q.   Okay, do you remember what Keith was wearing?

18      "A.   Bugle Boy and a silk and he had on --

19   BY DETECTIVE THOMASEVICH:

20      "Q.   Bugle Boy pants?

21      "A.   Bugle Boy shorts.

22      "Q.   Cut offs?

23      "A.   No, they were, they were made shorts, Bugle Boy

24   short "UNINTELLIGIBLE" --

25      "Q.   Okay.

1          "A.    And white silk.

2          "Q.    White silk what?

3          "A.    Silk shirt, one of them silk.

4          "Q.    Was it -- is it a collared shirt or is it an open

5    shirt or --

6          "A.    No, it's like -- it's one of those --

7    BY DETECTIVE CARR:

8          "Q.    V-necks?

9          "A.    Yeah. Yes sir.

10         "Q.    Okay, now neither one of you's went into the

11   Circle K store?

12         "A.    No sir.

13         "Q.    Okay.

14   BY DETECTIVE THOMASEVICH:

15         "Q.    Do you remember how the deputy's car was parked?

16         "A.    Backwards.

17         "Q.    Okay, so he was backed into the spot?

18         "A.    Doing some paperwork.

19         "Q.    Okay, you saw him doing the paperwork when you

20   pulled up there?

21         "A.    Yes, sir.  The guy had it -- he had his

22   passenger's light on with his head down with a pen in his

23   hand.

24         "Q.    Okay, when you say passenger's light, you mean the

25   light inside the car?

1    BY DETECTIVE CARR:

2        "Q.   The dome light it's called?

3        "A.   Yes sir.

4    BY DETECTIVE THOMASEVICH:

5        "Q.   Okay, that was on?

6        "A.   Yes, sir.

7        "Q.   All right, now when he -- when Keith King goes up

8    to the car, does the deputy see him or does the deputy say

9    anything to him or anything like that to him?

10       "A.   When the deputy tried to make a move, he fired his

11   gun, a shot.

12       "Q.   Did you see the deputy move?

13       "A.   Yes, sir.

14       "Q.   Did you see where the deputy was hit?

15       "A.   In the head.

16       "Q.   Okay, what happened after he hit the deputy, did

17   you see what happened to the deputy?  Did he, you know --

18       "A.   No sir.

19       "Q.   Did he try to move or did he --

20       "A.   No sir.

21       "Q.   Okay.

22       "A.   He tried to grab his stick, that's all I remember.

23       "Q.   But what I'm saying is, you didn't stay around

24   long enough to see what he did after he was shot?

25       "A.   No sir.

```
 1    BY DETECTIVE CARR:

 2        "Q.   Okay, so you go back down 40th towards that rock

 3    Pit?

 4        "A.   Yes, sir.

 5        "Q.   And you say that, that you's hide the gun down

 6    there somewhere?

 7        "A.   Threw it.

 8        "Q.   Okay, but you can show us.  What do you do after

 9    that?

10        "A.   We go back to Wiley Street.

11        "Q.   Two of you's go back down Wiley Street?

12        "A.   He -- he get off -- he get off up there and I went

13    back -- I went to the Godfather.  I see nobody up there so

14    I went to Wiley Street.

15        "Q.   All right, are you saying that you's actually

16    separate when you get back down there?

17        "A.   Yes, sir, and I bump into Terrance Warner.

18        "Q.   Terrance who?

19        "A    Warner.

20        "Q.   Warner?

21        "A.   Yeah.

22        "Q.   Okay.

23    BY DETECTIVE THOMASEVICH:

24        "Q.   Did you tell Terrance about this.

25        "A.   No, sir.
```

1  "Q. We -- originally when we took you in here, we told

2 you about all these people that we had spoken to --

3  "A. Yes, sir.

4  "Q. That you had told about the killing of the deputy.

5  "A. Yes, sir.

6  "Q. Is that correct?

7  "A. Yes, sir.

8  "Q. Okay, did you, in fact tell these people about the

9 killing of the deputy?

10  "A. Yes, sir.

11  "Q. Okay, where did you tell most of these people?

12 Where was it when you told them the story?

13  "A. On Wiley Street.

14  "Q. Okay, any place else?

15  "A. No, sir.

16  "Q. Okay, what about the Detention Center?

17  "A. Yeah, Wilmouth Hughes was there and Ray Adderly.

18  "Q. Okay, now did you ever tell Tony Hayes about this?

19  "A. Yes, sir.

20  "Q. Okay,  tell me about that, how did you see Tony

21 Hayes?

22  "A. I had -- when me and Keith met up, you know how

23 you got to wait three days now to buy a gun out of the pawn

24 shop, he bought me a 25 and so he told me, you know what

25 I'm saying, take the gun back and get you another from

1   three day up, only you gotta take that one back up there

2   with the paper, saying you bought the gun and wait three

3   days for it.  So the guy -- as I -- as I happen -- he got

4   mad at me about and he called the police and Tony Hayes got

5   stopped with the gun in the car and he went to jail for the

6   gun.

7      "Q.   Okay, but when did you tell Tony Hayes about the

8   deputy being killed?

9      "A.   Before I let him hold the 25.

10     "Q.   Okay, where was it that you told him?

11     "A.   Over there "UNINTELLIGIBLE" over there by the pawn

12  shop.

13     "Q.   Did you ever go over to his house and talk to him

14  about it?

15     "A.   Huh-huh, talk -- we used to go to -- one time we

16  go to his house and "UNINTELLIGIBLE" he used to let us use

17  his car a lot.  It's a blue Nova.

18  BY DETECTIVE CARR:

19     "Q.   Okay.

20  BY DETECTIVE THOMASEVICH:

21     "Q.   Now, the incident with the 25, that was after the

22  deputy was killed, right?

23     "A.   Yes, sir.

24     "Q.   Okay, now originally, in fact I believe it was --

25  it was a day or two after the deputy was killed, you had

```
 1     spoken to some detectives from our unit here, right, from

 2     the Homicide unit?

 3         "A.   Yes, sir.

 4         "Q.   Okay, and as a result, they had let you go that

 5     night, right?  They had talked  --

 6         "A.   Yeah.

 7         "Q.   -- to you for a little while and let you go?

 8         "A.   Yeah, "UNINTELLIGIBLE."

 9         "Q.   Okay, now you told them a story at that time --

10         "A.   Yes, sir.

11         "Q.   But it was a misleading story, is that correct?

12         "A.   Yes, sir.

13         "Q.   Okay, basically, what did you do; you lied about

14     the facts of the case?

15         "A.   Yes, sir.

16         "Q.   And never really told them what actually took

17     place.

18         "A.   Yes, sir.

19     BY DETECTIVE CARR:

20         "Q.   Actually, you first blamed someone else, is that

21     correct?

22         "A.   Yes, sir.

23         "Q.   And who is that?

24         "A.   Keith Maddox.

25         "Q.   Now, you -- you remember what you told me why you
```

```
 1    blamed him?

 2        "A.    Yeah, me and him had "UNINTELLIGIBLE" that night.

 3        "Q.    Because you had a falling out that night?

 4        "A.    Yes, sir.

 5        "Q.    Okay, was it about that gun?

 6        "A.    Yes, sir.

 7        "Q.    Okay.

 8    BY DETECTIVE THOMASEVICH:

 9        "Q.    Over the fact that Keith was saying that you stole

10    the gun?

11        "A.    Yes, sir.

12        "Q.    When in actuality, he had bought the gun for you?

13        "A.    Yes, sir.

14        "Q.    So that's why you told the detectives at that time

15    that Keith Maddox was the suspect in this case?

16        "A.    Yes, sir.

17    BY DETECTIVE CARR:

18        "Q.    And then later on, you had turned around and you

19    had confessed to shooting the deputy yourself, but you said

20    that Keith was with you?

21        "A.    Yes, sir.

22        "Q.    And you knew that we would check with Keith and

23    find out that that was a lie and Keith was never there?

24        "A.    Yes, sir.

25        "Q.    Okay.
```

```
1      BY DETECTIVE THOMASEVICH:

2         "Q.   Now, you know, we're saying these things to you,

3      Timmy and you keep saying yes sir, all right, but I want --

4      I wanted to -- you know, I want you to understand that we

5      don't want to put words in your mouth, okay.   Is that what

6      had happened?

7         "A.   Yes, sir.

8         "Q.   Okay, now the reason why we're repeating to you is

9      because you told us this earlier, right?

10        "A.   Yeah.

11        "Q.   Before we went on tape?

12        "A.   Yes, sir.

13        "Q.   Okay, is there anything that we're saying that is

14     not true or not so?

15        "A.   Everything true on this type here.

16        "Q.   Okay, I'm saying what we've been discussing with

17     you and why we are saying that you told us before, is it

18     all true?

19        "A.   Yeah, some of it.

20        "Q.   What do you mean some of it?

21        "A.   Well, before here, yes sir.   All this here, yeah.

22        "Q.   All right, what you're you saying is you lied the

23     first time, is that what you're saying?

24        "A.   Yes, sir.

25        "Q.   Okay.
```

1    BY DETECTIVE CARR:

2       "Q.    Okay, and we had been talking here for about an

3    hour before the tape, is that correct?

4       "A.    Yes, sir.

5       "Q.    Okay, and we basically were telling you about the

6    investigation and things we had known?

7       "A.    Yes, sir.

8       "Q.    And in the beginning you were denying it and

9    saying that you weren't involved and saying that --

10      "A.    Yes, sir.

11      "Q.    Now, basically you were lying at that time.

12      "A.    Yes, sir.

13      "Q.    Okay and now you're telling us the truth?

14      "A.    Yes, sir.

15      "Q.    Okay.

16   BY DETECTIVE THOMASEVICH:

17      "Q.    Is there anything else that you want to add to

18   this tape, Timmy, that maybe we're forgetting to ask you

19   that would be important to the case?

20      "A.    No, sir.

21      "Q.    Is that just about everything that happened that

22   night?

23      "A.    Yes, sir.

24   BY DETECTIVE CARR:

25      "Q.    Okay Timmy, we had -- we had mentioned some people

1   that we had spoken to, people you had spoken to and told

2   about this.   Are there other people that you had confided

3   in about being involved in the death of the deputy sheriff

4   that you had told?

5       "A.   No, sir.

6   BY DETECTIVE THOMASEVICH:

7       "Q.   Let me ask you something, Timmy.   Did you ever

8   tell your mother about this?

9       "A.   No, sir.

10      "Q.   Were there ever some letters that were written

11  back and forth through the Detention Center between you and

12  your mother?   Or relations about the fact that you were

13  involved with this deputy?

14      "A.   No, sir.

15      "Q.   Okay, the reason why I'm saying that is because

16  one of the -- one of the boys from the Detention Center is

17  saying that you mentioned something to him about letters

18  with your mother?

19      "A.   No, sir.

20      "Q.   Okay, did your step-mother know about this?

21      "A.   No, sir.

22      "Q.   Okay, did you ever talk to Andre Butler about his?

23      "A.   Yes, sir.

24      "Q.   Okay, when did you talk to him about that?

25      "A.   After the incident happened.

1        "Q.    All right.

2        "A.    That was about -- the day -- I forgot what day it

3    happened on.  Like a week later.

4    BY DETECTIVE CARR:

5        "Q.    It was actually early Tuesday morning.  It was a

6    Monday night into the early part, 1:45 on a Tuesday

7    morning.

8        "A.    Yes, sir.

9        "Q.    So that would have been what, that actual day,

10   that Tuesday?

11       "A.    Yes, sir.

12       "Q.    Well, how did you know about that rock pit, you

13   lived in that area a while?

14       "A.    Yes, sir.

15       "Q.    You used to swim there?

16       "A.    Yes, sir.

17       "Q.    Okay, and you never told any of these people what

18   you did with the gun or what was done with it with you and

19   Keith?

20       "A.    No, sir.

21   BY DETECTIVE THOMASEVICH:

22       "Q.    Did you ever see Keith after the night that this

23   happened?

24       "A.    No, sir.

25       "Q.    So, in other words, after the shooting happened, I

1    believe that you went to the Detention Center, pretty much

2    right after this, right?

3        "A.    Friday morning, yes sir.

4        "Q.    Okay, and Keith King, I believe was -- was he in

5    jail at the time or did he go to jail?

6        "A.    I don't know, sir.

7        "Q.    Okay, but what I'm asking you is the night that

8    this happened or the morning that this happens, Tuesday

9    morning, okay.  Now you guys finally split up, right?

10       "A.    Yes, sir.

11       "Q.    Did you ever see Keith King again?

12       "A.    No, sir.

13       "Q.    From that day 'til today?

14       "A.    No, sir.

15       "Q.    Okay, so you've never sat down and talked about

16   the story about what happened?

17       "A.    No, sir.

18       "Q.    Okay.

19   BY DETECTIVE CARR:

20       "Q.    Okay Tim, is there anything else we forgot to ask

21   you, anything that you can think of that may be important?

22       "A.    No, sir."

23           DETECTIVE CARR:  Okay, the time concluding

24   this statement is gonna be at approximately 8:35 hours this

25   date.

311

```
 1                   (Thereupon, the tape was concluded and the

 2              following proceedings were had.)

 3    BY MR. MORTON:

 4         Q.   So you started at about 8:15, correct?

 5         A.   Yes, sir.

 6         Q.   And finished 8:35 about 20 minutes later?

 7         A.   Yes, sir.

 8         Q.   So from the time you first picked up and arrested

 9    Mr. Brown until the time that you took this recorded

10    statement and finished the recorded statement at 8:35 was

11    approximately how long, sir?

12         A.   Talking about from the time we picked him up or

13    from the time we arrived?

14         Q.   Yes, from the time you picked him up to the time

15    that you finished this recording?

16         A.   Two hours and fifteen minutes.

17         Q.   Now, the names that Mr. Brown had mentioned of the

18    people he spoke to had you talked to those people before?

19         A.   Yes, sir.

20         Q.   And they told you that he did in fact talk to them

21    about his involvement in the Patrick Behan case, correct?

22         A.   Yes, sir.

23         Q.   At any time did you have any problems

24    communicating with Mr. Brown yourself?

25         A.   No, sir, not at all.
```

JUSTICE REPORTING SERVICE, INC.   523-6114

1    that you could just focus on Mr. Brown, other than the

2    evidentiary conversation?

3         A.    On the contrary, sir.  If Jacqueline Bain would

4    have been a viable suspect in this case, if that was the

5    case it would have been very easy because she as an

6    individual that would confess on a daily basis.  She was

7    not a suspect in this case at that time.

8         Q.    Did you and Detective Thomasevich have any

9    pressures from the family in this case, did you have any at

10   all?

11        A.    No sir, we met with the family numerous times kept

12   them appraised to what was going on and the cooperation was

13   just fantastic throughout the investigation with the

14   family.

15        Q.    Any pressures from anyone in your administration

16   to make an arrest right away or focus on any particular

17   individual?

18        A.    Absolutely not, this was over an 8-month

19   investigation.  There was no pressure of any kind.

20        MR. MORTON:  I don't have any further

21   questions, Judge.

22        THE COURT:  Excuse me, it's close to 3:00 o'clock,

23   what's a realistic target here as far as closing out

24   this afternoon, and do you have any material?

25        MR. DAVIS:  Judge, I have cross-examination of

1          MR. DAVIS:  May I go forward, Judge?

2          THE COURT:  Yes, sir, please proceed.

3                        CROSS EXAMINATION

4    BY MR. DAVIS:

5          Q.   One of the things, Detective Car -- is it all

6    right to use this podium over hear, Judge, so I don't have

7    to move all this stuff?

8               Detective John Auer was of the opinion that you

9    were lead detective from day one, is that not correct?

10         A.   Sir, you have told me that on occasion but I am

11   not aware of that, no.

12         Q.   Did Richard Scheff ever tell you that?

13         A.   Absolutely not sir.

14         Q.   And your testimony today was that the only time

15   you spoke with Jackie Bain in person was the one time you

16   went to pick her up?

17         A.   I didn't speak with her at that time we picked her

18   up.

19         Q.   And you were told not to speak with her?

20         A.   That's correct.

21         Q.   Who told you not to speak to her?

22         A.   I believe that was Sergeant Scheff.  At that time

23   that was an interview that they were conducting.

24         Q.   And you mentioned in direct examination that you

25   spoke to David Hoganson (phonetic), correct?  Isn't that

 1              MR. MORTON:  Yes, Your Honor.

 2              THE COURT:  Defense ready?

 3              MR. DAVIS:  Yes, Judge.

 4              THE COURT:  Please proceed.

 5     BY MR. DAVIS:

 6         Q.   Detective, we started talking moments ago about

 7     the arrest of Tim Brown.  You stated that you were aware

 8     of, were you not, of the confession that Tim had given in

 9     November two days after the shooting of Deputy Behan,

10     correct?

11         A.   I was aware of the statement he had made, yes.

12         Q.   Okay.  Now this was not followed up at that point,

13     correct?

14         A.   Not by me, no.

15         Q.   You weren't assigned the follow up at that time in

16     November?

17         A.   That's correct, sir.

18         Q.   Is it your testimony today that it wasn't followed

19     up due to the Minnick decision?

20         A.   It was followed up by the investigator involved to

21     a certain degree at that point.

22         Q.   Okay.  Because I asked you that in depo.  You said

23     it's not followed-up at that time.  Do you know the fact

24     about the Minnick decision?

25         A.   I don't know what you asked me prior to that

1    question, if you're talking about --

2       Q.  Do you know why he wasn't followed up?

3       A.  It was followed up to a certain degree.  I believe

4    I testified on direct with Mr. Morton that Sergeant Scheff

5    and Sergeant Auer did the followed-up by interviewing Mr.

6    Maddox, interviewing Mr. Maddox's wife; and they followed

7    that up with the polygraph examination, and they believed

8    at that point in time that there was no validity to it.

9       Q.  So at that point, Mr. Brown wasn't there and there

10    were some conversations with the State Attorney's Office

11    around that time in regard to the Minnick decision?

12       A.  Yes, I mean right then in February -- I mean,

13    right then in November.

14       Q.  They were talking to them about the Minnick

15    decision?

16       A.  No, the Minnick decision did not come out until

17    December 7 I believe I don't know how they could have done

18    that, sir.

19       Q.  When you became lead detective in February, did

20    you not have contact in the State Attorney's Office in

21    regard to Minnick?

22       A.  I did sometime later on.  Sergeant Scheff and I

23    believe Sergeant Auer had conversations with the State

24    Attorney's Office.

25       Q.  Well, my question on page 42 was, "When was the

1    first contact you had with Susan Aramony in relation to

2    February of '91?"  You said, "I would have -- I would say

3    right after that point in time."  "Question:  What point in

4    time?"  "Answer, February 6th, a week or two after that, I

5    had many meetings with Susan Aramony."

6        A.    That's correct.

7        Q.    Susan Aramony, according to your testimony, was

8    involved in the decision making as far as the Minnick case

9    was concerned in February, correct?

10       A.    Yes.

11       Q.    In the Minnick decision, the concern that you had

12   as far as Minnick was concerned was that you wanted to be

13   able to question Tim Brown without him having an attorney

14   there?

15       A.    This was all done prior to my getting involved in

16   the case.  There was meetings, and it was determined in

17   reference to that decision that it was better to hold off.

18       Q.    So because there would then not be a need for an

19   attorney to be present when Tim Brown was spoken to?

20       A.    For the purpose of we did not want to have the

21   conversation with Mr. Brown in a custodial setting.

22       Q.    Well, you could have spoken to Mr. Brown with his

23   attorney there, couldn't you?

24       A.    Yes, I could have spoken to Mr. Brown; but I had

25   no desire at that point in time to speak to Mr. Brown.  We

1   that, if the question is could I have an arrest warrant

2   pursuant, an arrest warrant on July 16th, I could have.

3       Q.   How about after June 4th when you get the

4   confusion of Keith King, could you not at that point gotten

5   an arrest warrant for Tim Brown?

6       A.   I had enough probable cause after June 4th, there

7   was a lot more information developed with people such as

8   Frank Adderson and so on.  There was a lot more information

9   developed.

10      Q.   Well, you talked about Andre Butler earlier, did

11  you not?

12      A.   I believe I mentioned him, yes.

13      Q.   Were you the one that drove Andre Butler to the

14  Grand Jury?

15      A.   Drove him to the Grand Jury?

16      Q.   Yes.

17      A.   I don't know.  I don't recall.

18      Q.   I mean Andre Butler was the one allegedly who

19  heard the conversation from Tim Brown, correct?

20      A.   Andre Butler is the one that told people such as

21  Solomen Gibbs, Alvis Crostwaite and stuff about the

22  conversation that he was privy to.

23      Q.   What he and Andre Butler was privy to?

24      A.   That I corrected later on when he was interviewed.

25  He denied that and said that he had obtained rumors on the

1    street, and he did tell them that story about -- it did not

2    directly come from Mr. Brown again recanting that statement

3    later on.

4         Q.   But also when he appeared in front of the Grand

5    Jury -- and, Your Honor, I got a copy of the Grand Jury

6    testimony as far as from Mr. Morton's office as Brady

7    material -- did not Andre Butler testify to the Grand Jury

8    you and Eli Thomasevich threatened him that he was going to

9    jail and put all kinds of pressure on him; is that what he

10   testified to?

11        A.   I can't say what he testified to.  It was a closed

12   procedure.  I had heard rumors to that effect.  I was not

13   there.

14        THE COURT:  Just keep in mind, one person at a

15        time.

16   BY MR. DAVIS:

17        Q.   Did he not testify in front of the Grand Jury that

18   they put so much pressure on me -- this is his quote.

19        MR. MORTON:  Let me just do this, Judge, I will

20        stipulate that at this point forward, Mr. Davis

21        can read it in the record.

22        THE COURT:  Fine, read it into the record and

23        let's not ask him.  He apparently was not present, Mr.

24        Davis, so we can't ask him what was said.  Why don't

25        you read in what you want to read in.  Read it in front

1       of the detective if you want, then ask your question.

2   BY MR. DAVIS:

3       Q.   Thank you.  Let me give you some of the things

4   that Mr. Butler testified under oath to the Grand Jury.  He

5   stated that on, "Question" I believe that they had

6   handcuffed you and took you there."  His answer was:

7   "Yeah, they handcuff me down by the leg, too."  "Question:

8   When they got you there, they asked you questions right?"

9   These are Mr. Butler's answers:  "They kept threatening me

10  that I was going to jail put all kinds of pressure on me.

11  I just couldn't take it, so then what happened, what they

12  did, they brought up about Timothy Brown.  He said

13  something about -- he told me something, but he didn't tell

14  me nothing.  Okay, I kept telling them I slipped," and

15  then, "What do you mean slipped?"  "Like they put so much

16  pressure that you told them he did it, but that Timothy

17  did."  I said, "No, I am not going to lie about that," and

18  it goes on for six pages.  "Question:  This time they put

19  you in a different room.  They still have leg chains on

20  when talking to you?"  His answer was, "Yes, sir."

21          Were you made aware by Mr. Morton that Andre

22  Butler had made this testimony in regard to the pressure

23  that allegedly you and Eli Thomasevich had put on him to

24  the Grand Jury?

25      A.   I was made aware of some of that information, not

1    exactly what you had read there; but, yes, sir, I was made

2    aware of those allegations which are totally false.

3        Q.    And he was the person that had allegedly been the

4    person that had stated that Tim Brown had said something to

5    him, correct, the first person?

6        A.    That is correct.

7        Q.    Okay.  Now, you go to the Covenant House I think

8    your testimony was that.  Did you see Tim Brown arrive at

9    the Covenant House?

10       A.    Yes, we followed him from the courthouse.

11       Q.    And you saw him exit the Covenant House?

12       A.    Yes, we did.

13       Q.    And the Covenant House is a residential program

14   run by HRS?

15       A.    I believe so.

16       Q.    Now, an approach by you and Eli Thomasevich,

17   correct?

18       A.    That is correct.

19       Q.    And when I asked you in deposition, you stated

20   that only the two of you were involved; is that a fair

21   statement of what you said?

22       A.    That's correct.  Sir, I believe also in my

23   deposition there was only the two of us present in the

24   interim two other detectives pulled up; and I believe I

25   even told you in my deposition of placing him in the back

1    seat of the car, and I thought possibly because our

2    vehicle -- we were in the van at that time.

3        Q.   Right, when I asked you that in deposition, you

4    didn't say anything about the other detectives.  You stated

5    that you had placed him in your car, correct?

6        A.   No, I don't believe I said my -- I believe a car

7    that we were driving in.  I didn't know if it was mine or

8    Detective Thomasevich.  I don't remember whose vehicle it

9    was.

10       Q.   You didn't mention to any of the deputies about

11   the other two detectives being involved?

12       A.   No, I did not even remember that they had pulled

13   up; and they did pull up at the time and transported them.

14       Q.   You do recall handcuffing Mr. Brown, hands behind

15   his back?

16       A.   Yes, sir.

17       Q.   So he was handcuffed and placed in the back seat

18   of the police car, correct?

19       A.   That is correct.

20       Q.   And he was transported to the Homicide Division in

21   handcuffs, correct?

22       A.   That is correct.

23       Q.   And he had been placed under arrest for the murder

24   of Patrick Behan on the scene on A1A, correct?

25       A.   That's correct.

1        Q.    And he had been informed of that, correct?

2        A.    That's correct.

3        Q.    And when you came into the Homicide Office

4   Detective Scheff was there, correct?

5        A.    I believe he was, yes.

6        Q.    I mean he knew that you guys were going to

7   apprehend Mr. Brown, correct?

8        A.    He knew that we were going out to pick up Mr.

9   Brown.  Whether or not we were going to place him under

10  arrest, I do not recall discussing that with Sergeant

11  Scheff.

12       Q.    Well, he saw you walk in with him with handcuffs

13  on, did you not?

14       A.    I can't answer that.  I know he was in the office

15  I don't know he has his a separate office within the

16  building.  I don't know if he was in it.  I remember him

17  being there; but where he was the minute we walked in, I

18  can't answer, sir.

19       Q.    Didn't he go in the room and speak with Tim Brown?

20       A.    At a period of time, yes, he did.

21       Q.    Wasn't Tim Brown shackled at that point?

22       A.    I don't know if he would have noticed that under

23  the table.  I can't answer that.

24       Q.    I mean, when you say "shackled," you have the

25  little bar on the floor where you shackle legs down to; is

1    that not correct?

2        A.   No, we used to have that little bar.  That has

3    been removed for quite some time.

4        Q.   So his legs you shackle to the chair and together.

5        A.   No, not to the chair just together, from best I

6    can recall.

7        Q.   But he was under arrest?

8        A.   Yes, he was.

9        Q.   And Richard Scheff was aware of that?

10       A.   I don't know if he was aware of it.  I did not

11   discuss it with Richard Scheff, but that was discussed with

12   Sergeant Scheff at that time.  He was asked if he would

13   contact Mr. Brown's parents, his mother in particular.

14       Q.   Well, someone did contact Mrs. Brown, correct?

15       A.   I believe Sergeant Scheff did.

16       Q.   And she arrived at the police station?

17       A.   Yes.

18       Q.   But this was after Tim Brown had already given a

19   statement, correct?

20       A.   I don't know when she arrived.  When we came out

21   of the room from speaking with Tim Brown, she was in with

22   Sergeant Scheff.

23       Q.   Well, let me ask you this question I asked you in

24   deposition on page 47 when we are talking about the mom.

25   "Did she arrive before or after he made a statement?"  You

1    stated, "she arrived at the office after he made the

2    statement."

3        A.    Well, after we came out of room.  I don't know

4    when.

5        Q.    That's not the question though.  Detective Carr:

6    "Did she arrive before or after he made the statement?"

7    "Answer:  I believe she arrived after he made the

8    statement."

9        A.    After he come out of the room.  I already made

10   that statement.  I can't say when she arrived.  I was

11   inside the room with the door shut.

12       Q.    But you could say on the 20th of April?

13       A.    On the 16th of April.

14       Q.    It's the 20th of April, 1992?

15       A.    I'm sorry, I thought you meant on the day of his

16   arrest which was July 16th that's when she arrived at the

17   office.

18       Q.    You stated that you spoke with him --

19            THE COURT:  Wait, was there a misunderstanding on

20       the part of the detective here regarding the previous

21       couple questions?

22            MR. DAVIS:  Maybe there is.

23   BY MR. DAVIS:

24       Q.    My question was very simple.  I questioned you

25   about Mrs. Brown, and I asked you whether she arrived

1    before or after her statement, and your answer at that

2    point was, "I believe she arrived at the office after he

3    made a statement."  Isn't that what you stated?

4        A.   That was the first time I was aware that she was

5    there.

6             THE COURT:  You're talking about the statement

7        being the confession that is the subject matter of this

8        hearing?

9             MR. DAVIS:  Correct, Your Honor.

10            THE COURT:  And he is saying now that it was after

11       the statement?

12            MR. DAVIS:  Correct.

13   BY MR. DAVIS:

14       Q.   Now, also --

15            MR. MORTON: Do you mean in the deposition

16       that's what he said?

17            THE COURT:  In the deposition it was said.

18       Now is he agreeing with that now or is there --

19   BY  MR. DAVIS:

20       Q.   Is your memory better now than it was then?

21       A.   No, my memory is the same.  What I am stating

22   there when I came out of the room, I was in the closed room

23   with the door.  When I came out of the room, that was the

24   first time I was aware that Mrs. Brown was present.  She

25   was with Sergeant Scheff.  I can not sit here and state

```
 1    what time she arrived.  When I was completed with the

 2    statement, I was aware that she was outside.

 3        Q.   You spoke off the tape with Mr. Brown for

 4    approximately one hour?

 5        A.   Approximately, yes.

 6        Q.   And at this time, he is shackled in the room at

 7    that point?

 8        A.   Right.

 9        Q.   And he is under arrest for -- I mean, he was under

10    arrest before you went into the room, correct?

11        A.   That's correct.

12        Q.   And he denied his involvement?

13        A.   In the beginning, yes.

14        Q.   Well, that went on for 20 or 25 minutes, correct?

15        A.   Somewhere around there.

16        Q.   Well, do you want to refresh your recollection?

17        A.   I am saying that's about right.  I can't say

18    specifically, say 20 minutes, 25 minutes, somewhere in

19    around that time.

20        Q.   And he did have shackles on at that point?

21        A.   Yes.

22        Q.   Now, you talked to him, did you not about the

23    earlier statement that he had given, the earlier statement

24    meaning the one in November of 1990?

25        A.   Yes.
```

1    Q.    You did talk to him about that?

2    A.    It was discussed on the tape.

3    Q.    Well, you talked to him before the tape, did you

4    not?

5    A.    Yes.

6    Q.    Prior to the time of you going on the tape with

7    Mr. Brown you're discussing with him the statement that he

8    gave to Sergeant Auer and Gill and Ilarraza on November

9    15th?

10    A.    That was mentioned.  The gist of the conversation

11    was the facts that we had pertaining to Solomen Gibbs and

12    the other people.

13    Q.    But the bottom line is he did mention the fact

14    that he had confessed earlier in November of 1990, correct?

15    A.    It was mentioned, yes.

16    Q.    As some of information that you had against Mr.

17    Brown, correct?

18    A.    As information that we had, yes.

19    Q.    And Eli Thomasevich was in the room with you the

20    entire time?

21    A.    Yes, he was.

22    Q.    You never left the room?

23    A.    I think at periods of time, myself and Detective

24    Thomasevich must have left the room.  I mean, there was

25    pizza brought in, there was soda brought in.

1      Q.   Well, you were in there the entire time the

2   statement was taken?

3      A.   When the statement was taken, yes, sir, I was.

4      Q.   No one else came into the room besides you and

5   Detective Thomasevich?

6      A.   Sergeant Scheff was in there for a very brief

7   period of time in the very beginning.

8      Q.   Sergeant Scheff came, sort of reintroduced himself

9   to Mr. Brown?

10     A.   I believe so.

11     Q.   Reminded him that he met him back in November of

12   1990 at the Hollywood Police Station, correct?

13     A.   I don't recall that, sir, it's possible.

14     Q.   Now, he didn't ask any questions about any of his

15   rights did he, Mr. Brown?

16     A.   He answered his rights as was described and then

17   again on the tape.

18     Q.   So he never asked any questions about any of those

19   rights?

20     A.   No.

21     Q.   He never asked for any details in regard to any of

22   those questions, did he?

23     A.   No, he was asked if he understood each one; and he

24   indicated with an answer.

25     Q.   But you gave no more details, and he didn't ask

1     for more details, correct?

2          A.    No, he did not, sir.

3          Q.    Now, while you were there with Mr. Brown, you're

4     showing him pictures of the scene, were you not?

5          A.    Some time during the interview.

6          Q.    And you did so prior to the time you went on tape,

7     did you not?

8          A.    I can't say that for sure.  Sometime during the

9     interview, I don't know when in the period of time.

10         Q.    I mean, the pictures of the scene that you're

11    showing him are your pictures where the Circle K was,

12    that's where the police officer's car was parked, correct?

13         A.    Yeah.

14         Q.    And how the police officer's car was backed into

15    the lot, correct?

16         A.    After he had originally told us, yes, to get his

17    story straight, so we could comprehend what he was telling

18    us.  He was being shown pictures.  That was sometime after

19    we were talking to him after he told us the pertinent

20    facts.

21         Q.    Now, do you agree with the feelings and testimony

22    of Richard Scheff yesterday when he stated that if Tim

23    Brown would have not confessed or his confession would have

24    been inconsistent with Keith King, that he would not have

25    been arrested?

1      A.   I don't know.  Is that what Lieutenant Scheff

2      said?  Do I agree with that, no.  He was placed under

3      arrest that day.  It was my decision as lead investigator,

4      and I had enough probable cause, more than enough probable

5      cause in my opinion to make the arrest, and that's exactly

6      what I did.

7      Q.   You don't know why Richard Scheff would testify

8      differently?

9      A.   If you're saying that he testified he wasn't aware

10     of it, I could say that that's very possible because I did

11     not meet with him.

12     Q.   Now, he testified that he wasn't under arrest, he

13     wasn't handcuffed, he was going to let him go if he didn't

14     confess consistently to what Keith King stated?

15     A.   That couldn't be true, because he wasn't aware of

16     it.

17     Q.   That couldn't be true?

18     MR. MORTON:  He didn't -- let him finish his

19     answer, he's agreeing with him.  The last statement was

20     what?

21     BY MR. DAVIS:

22     A.   Because he was not aware of the fact that he was

23     placed under arrest.  We did not sit down with Sergeant

24     Scheff at that time and discuss it.

25     Q.   Is it your testimony today that Richard Scheff is

1    your supervisor and you bring in Tim Brown in handcuffs

2    with four detectives from the Homicide Division, that you

3    don't think Richard Scheff was aware of what you guys were

4    doing, and he comes in the room and sees him with shackles

5    on and he doesn't know?

6        A.    I don't know that he came in the room.  I just

7    answered that I saw him with shackles on.  I have no

8    knowledge that Sergeant Scheff came into the room and seen

9    Mr. Brown in shackles.  Further more, it was my testimony

10   that he is not aware that I had placed Mr. Brown under

11   arrest.  I had been dealing with the State Attorney's

12   Office.  It was my determination when he left that Covenant

13   House to place him under arrest, I had more than enough

14   what I felt probable cause to do so.

15            MR. DAVIS:  I have nothing further.

16            THE COURT:  Mr. Morton?

17            MR. MORTON: No questions.

18            THE COURT:  Hold on a second, we just heard a

19       taped statement --

20            MR. MORTON:  Yes.

21            THE COURT:  That's the only taped statement that

22   we have with Mr. Brown, correct?

23            MR. MORTON:  Right.

24            THE COURT:  In that taped statement did Brown dare

25   Keith King to shoot the deputy, did he state that he

1     dared Keith King to soot the deputy?

2          MR. MORTON:  You have the transcript there, and

3     I'll find the portion but I don't recall that being --

4     Let me see the portion I'll show the portion of the

5     transcript that I'm referring to.

6          THE COURT:  Yes, you may.

7          MR. MORTON:  On page five of the transcript.

8          THE COURT:  I don't have my copy of the transcript

9     ready.

10         MR. MORTON:  There's another one right there, one,

11    two, three, four questions up from the bottom

12    continuing down.  "Okay, tell me what you recall Keith

13    King saying to you?"  "He is going to kill somebody."

14    Question, "Okay, what did you say to that?"  Answer, "I

15    called his bluff."  "So you're calling his bluff, you

16    don't believe it?"  Answer, "Yes, sir." Question,

17    "So, he's basically telling you that he believes that

18    he doesn't have the nerve to do it?"  "Yes, sir."  Is

19    that the portion?

20         THE COURT:  I'm concerned -- I'll tell you that

21    I'm concerned that you're telling me that you arrested

22    this defendant for murder charges --

23         THE WITNESS:  Yes, sir.

24         THE COURT:  -- prior to his giving his statement?

25         THE WITNESS:  Correct, sir.

1          THE COURT:  And stating that that's the probable

2     cause that you have.  Now I have a probable cause

3     affidavit here, I mean, stating that there was other

4     things?

5          THE WITNESS:  Correct.

6          THE COURT:  Regarding the probable cause, and then

7     I have here the probable cause, and I guess this must

8     be for the charges as opposed to the arrest, because

9     this probable cause includes his statement?

10         THE WITNESS:  Of course, sir, that was filled out

11    after his arrest and after he confessed.  I felt we had

12    more than enough probable cause prior to his giving a

13    statement.

14         MR. MORTON:  Yes, Judge, all the probable cause

15    sheets are filled out after the arrest.

16         THE COURT:  Well, I understand that, but

17    ordinarily the probable cause to be arrested is the

18    probable cause that's in the affidavit.  In this

19    particular case it's a little different, and I'm

20    concerned about that.  All right, thank you very much,

21    Detective,

22         Let's proceed now, State?

23         MR. MORTON:  Detective Eli Thomasevich.

24    Thereupon,

25                    ELI THOMASEVICH,

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed on this

2nd   day of  May, 2002 to Assistant Attorney General Celia Terenzio, 1515 N. Flagler Drive,

Suite 900, West Palm Beach, Florida 33401.

Brenda Bryn

S:\BRYN\BROWN\Exhibits.wpd