IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 955-7207-CIV-GRAHAM

TIMOTHY BROWN,                          :

     Plaintiff,                          :

vs.                                     :

HARRY K. SINGLETARY,                    :

     Defendant.                          :

_____/

## EXHIBITS TO TIMOTHY BROWN'S MOTION FOR CONSIDERATION OF ACTUAL INNOCENCE

## VOLUME II

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____
     Brenda G. Bryn
     Timothy M. Day
     Fla. Bar Nos. 0708224, 360325
     Assistant Federal Public Defenders
     One E. Broward Boulevard
     Suite 1100
     Fort Lauderdale, Florida  33301
     (954) 356-7436
     (954) 356-7556 (fax)

# INDEX TO EXHIBITS

1.   Timothy Brown's July 16, 1991 Statement to Detectives Carr and Thomasevich

2.   Crime Scene Map (Drawn by FPD Investigator Dennis Stinson)

3.   Keith King's June 4, 1991 Statement to Detectives Carr and Thomasevich

4.   Mary Pendergrass' June 10, 1992 Statement To Defense Investigator Gary Brodlieb

5.   Monica Cherise Willis' January 15, 1992 Affidavit

6.   Keith King's May 20, 1999 Statement to FPD Investigator Dennis Stinson

7.   Philip Howard's November 13, 1990 Statement to Detective Gucciardo

8.   Affidavit of FPD Investigator Marlon Johnson (December 20,1999)
     re: Interview with Philip  Howard

9.   Excerpt from March 4, 1992 Deposition of Sergeant Richard Scheff

10.  Affidavit of FPD Investigator Dennis Stinson re: May 21, 1999
     interview with Edward Davis

11.  Edward Davis's February 28, 2002 Statement to BSO Major Tony Fantigrassi

12.  Testimony of Sergeant Richard Scheff at Suppression Hearing (Excerpt re: Tim Brown)

13.  Testimony of Detective James Carr at Suppression Hearing (Excerpt re: Tim Brown)

14.  Testimony of Detective Eli Thomasevich at Suppression Hearing (Excerpt re: Tim Brown)

15.  Testimony of Dr. Elizabeth Kaprowski at Suppression Hearing (Excerpt re: Tim Brown)

16.  Dr. Kaprowski's Memo (12-6-92) re: Psychological Evaluation of Tim Brown

17.  Findings of Judge John Frusciante, (Denying Motion to Suppress
     Tim Brown's July 16, 1991 Statement)

18.  Behan's Autopsy Report

19.  Trial Testimony of Medical Examiner Raul Vila

20.  Trial Testimony of Bloodspatter Expert Charles Edel

21.    Trial Testimony of Ballistics Expert Dennis Grey

22.    Trial Testimony of Det. James Carr (Excerpt re: Tim Brown)

23.    Trial Testimony of Dr. Elizabeth Kaprowski

24.    Jury Instructions Re: Aiding/Abetting and Voluntariness of Defendant's Statement

25.    Jury Deliberations (Including Questions from the Jury and the Court's Answers)

26.    Affidavit of Dr. Richard Leo (December 22, 1999)

27.    Affidavit of Dr. I. Bruce Frumkin (December 21, 1999)

28.    Affidavit of Dr. Lenore E. Walker (December 22, 1999)

29.    Affidavit of Othalean Brown (December 21, 1999)

30.    BSO's New Policy and Procedure re: Interrogation of Suspects with Developmental
       Disabilities (November 17, 2001)

31.    BSO's "99-Page Report" of the Re-opened Investigation of the Behan Homicide

32.    Appendix D to the 99-Page Report -"Noteworthy Consistencies"

33.    Appendix C to the 99-Page Report - "Noteworthy Inconsistencies"

34.    Internal Affairs Complaint Against Detention Deputy Andrew Johnson (July 10, 1990)

35.    Internal Affairs Findings, Recommendation, and Order of Termination
       Of Detention Deputy Andrew Johnson (July 10, 1990)

36.    BSO's Flow Chart Re: Andrew Johnson's Motive in Behan Homicide

37.    Deposition of Brian Montgomery (July 8, 1992)

38.    Transcript of April 25, 2001 Conversation between Gwen Johnson and China (CI)

39.    Transcript of May 3, 2001 Conversation between Gwen Johnson and (CI)

40.    Transcript of May 31, 2001 Conversation between Gwen Johnson and China (CI)

41.    China's "Insurance" Letter

42.     Transcript of June 6, 2001 Conversation between Gwen Johnson and China (CI)

43.     Transcript of June 14, 2001 Conversation between Gwen Johnson and China (CI)

44.     Transcript of July 5, 2001 Conversation between Gwen Johnson and  China (CI)

45.     Transcript of August 2, 2001 Conversation between Andrew Johnson (AJ) and China (CI)
        (Traffic Stop by BSO Deputy Sudler)

46.     Transcript of August 16, 2001 Conversation between AJ, China (CI), Chico (Det. Cedeno),
        And "T" (Agt. Curry)

47.     Transcript of August 23, 2001 Conversation between AJ and Chico (Det. Cedeno)

48.     BSO's Report of August 23, 2001

49.     Transcript of August 3, 2001 Conversation between AJ, Chico (Det. Cedeno),
        and "T"(Agt. Curry)

50.     BSO's Report of August 31, 2001

51.     Transcript of September 27, 2001 Conversation between Gwen Johnson and China (CI)

52.     Transcript of October 4, 2001 Meeting in the BSO Undercover Office between AJ,
        Rollie (Agt. McKeen), Chico, (Det. Cedeno), and "T" (Agt. Curry)

53.     Newspaper Article (Sun Sentinel July 18, 1991) Shown to AJ
        during the October 14, 2001 Meeting in the Undercover Office

54.     AJ's Map of the Crime Scene (Drawn during the October 4, 2001
        Meeting in the Undercover Office)

55.     Transcript of October 4, 2001 Conversation between AJ, Chico (Det. Cedeno), Rollie (Agt.
        McKeen) and "T" (Agt. Curry) (Car Tour of Circle K)

56.     Transcript of AJ's February 8, 2002 "Job Interview" and Polygraph at BSO
        (Transcript prepared by Petitioner)

57.     Transcript of Final Portion of AJ's February 8, 2002 "Job Interview" and Polygraph at BSO
        (Partial Transcript prepared by BSO)

58.     Report of BSO Polygrapher Richard Hoffman re: AJ's February 8, 2002 Polygraph

59.     Transcript of March 13, 2002 Statement of Gwen Johnson to BSO Detective Bole and Major
        Fantigrassi (Recantation)

## (Index to Volume II)

14.  Testimony of Detective Eli Thomasevich at Suppression Hearing (Excerpt re: Tim Brown)

15.  Testimony of Dr. Elizabeth Kaprowski at Suppression Hearing (Excerpt re: Tim Brown)

16.  Dr. Kaprowski Memo (12-6-92) re: Psychological Evaluation of Tim Brown

17.  Findings of Judge John Frusciante, (Denying Motion to Suppress Tim Brown's July 16, 1991 Statement)

18.  Behan's Autopsy Report

19.  Trial Testimony of Medical Examiner Raul Vila

20.  Trial Testimony of Bloodspatter Expert Charles Edel

21.  Trial Testimony of Ballistics Expert Dennis Grey

22.  Trial Testimony of Det. James Carr (Excerpt re: Tim Brown)

```
 1    State of Florida      )
                            :ss        J. John Frusciante
 2    County of Broward     )

 3

 4                IN THE CIRCUIT COURT OF THE
                 SEVENTEENTH JUDICIAL CIRCUIT,
 5           IN AND FOR BROWARD COUNTY, FLORIDA

 6

 7    STATE OF FLORIDA,            )
                                   )
 8         Plaintiff,              )
                                   )
 9    vs.                          )   Case No.  91-14793 CF B
                                   )
10    TIMOTHY BROWN,               )
                                   )
11         Defendant.              )
      -------------------------X

12

13         Proceedings had and taken before the Honorable John

14    Frusciante, one of the Judges of said Court, Ninth floor,

15    Room 950, Broward County Courthouse, Fort Lauderdale,

16    Broward County, Florida, on the 7th day of January, 1993

17    commencing at or about the hour of 10:00 o'clock a.m. and

18    being a Motion to Suppress hearing.

19

20

21    APPEARANCES:

22         CHARLES B. MORTON, JR., Esquire
           Assistant State Attorney,
23         On behalf of the Plaintiff.

24         LARRY S. DAVIS, Esquire,
           Appearing on behalf of the Defendant.
25
```

ATTACHMENT / EXHIBIT 14

JUSTICE REPORTING SERVICE, INC.      523-6114

374

```
1     having been first duly sworn, was examined and testified

2     upon his oath as follows:

3               THE CLERK:  State your name and spell your

4          last name for the record.

5               THE WITNESS:  Eli Thomasevich,

6          T-h-o-m-a-s-e-v-i-c-h.

7                         DIRECT EXAMINATION

8     BY MR. MORTON:

9          Q.    E-l-i, correct?

10         A.    I am sorry?

11         Q.    E-l-i, correct?

12         A.    Correct.

13         Q.    Tell us who you work for.

14         A.    Detective for the Broward County Sheriff's Office.

15         Q.    What capacity?

16         A.    As Detective in homicide.

17         Q.    How long have you been in the Homicide Unit?

18         A.    Approximately five years.

19         Q.    How long have you been a deputy?

20         A.    A deputy for fifteen years in New York City,

21     police officer for ten years.

22         Q.    In your capacity as a detective in the Homicide

23     Division, did you get involved in investigating the death

24     of Patrick Behan, Deputy Patrick Behan?

25         A.    Yes, sir.
```

JUSTICE REPORTING SERVICE, INC.   523-6114

375

1      Q.    Did you go to the scene initially on November 13th

2    when the shooting occurred?

3      A.    Yes, I did.

4      Q.    Were you partners with Detective James Carr at

5    that time?

6      A.    Yes, sir.

7      Q.    And did you and he work together on some aspect of

8    the investigation initially and later on as lead

9    detectives?

10     A.    Yes, sir.

11     Q.    Were you present when Mr. Brown was arrested?

12     A.    Yes.

13     Q.    Were you present when he gave statements?

14     A.    Yes.

15     Q.    Both unrecorded and recorded?

16     A.    Yes, sir.

17     Q.    And during the course of your investigation, was

18   there ever any pressure at all from anyone in your

19   administration and your department to arrest Mr. Brown or

20   to ignore any evidence or other leads that you had in the

21   case?

22     A.    No, sir.

23     Q.    Any pressure from the family at all?

24     A.    No, sir, not at all.

25           MR. MORTON: No further questions.

376

```
 1                THE COURT:  Mr. Davis?

 2                MR. DAVIS:  That was brief.

 3                          CROSS EXAMINATION

 4   BY MR. DAVIS:

 5        Q.   Detective, let's start out and talk about Mr.

 6   Duhart.  Okay.  Do you recall Mr. Duhart?

 7                THE COURT:  We're going to liberal cross

 8        examination I assume.

 9   By MR. DAVIS:

10        Q.   Do you recall Mr. Duhart?

11        A.   Yes, sir, I do.

12        Q.   He was the person that stole the cigarettes from

13   the Circle K?

14        A.   Yes, sir.

15        Q.   Now he was in custody when you arrived, correct?

16        A.   Yes.

17        Q.   And several people had spoken to him, police

18   officers?

19        A.   As far as I know.

20        Q.   Was it Deputy Deguiceis who had him brought in,

21   had him in the back seat when you arrived?

22        A.   He was in the back seat of a marked unit.  I am

23   not sure whose unit it was.  I know Deguiceis was standing

24   in the area.

25        Q.   He is the one who arrested him?
```

JUSTICE REPORTING SERVICE, INC.   523-6114

396

1        Q.    You were aware, were you not after November 15th

2    that Tim Brown had confessed in the shooting of Deputy

3    Behan?

4        A.    I was told by Sergeant Scheff.

5        Q.    When was that, after, right after the confession?

6        A.    No, it was sometime later.

7        Q.    When was that?

8        A.    I believe I heard conversations about it probably

9    within a week afterwards, and then there was a discussion

10   where we were actually told, you know, what had actually

11   taken place.

12       Q.    Why, when I asked you that in deposition, did you

13   state under oath again when I asked you about the question

14   if Timothy Brown confessed in Hollywood, that you had no

15   knowledge of any of this until after February 5th when it

16   was explained to me?

17       A.    I had no knowledge of it, exactly what took place.

18   I just said to you that I heard talk in the office about

19   him making a statement.  Originally, I did not know what

20   actually took place.  I had no contact with McGriff.  I had

21   no contact with Maddox, Keith Maddox.

22       Q.    Didn't John Auer assign you as lead detective from

23   the beginning?

24       A.    No, sir.

25       Q.    There was a decision made on the 16th to pick up

1      Tim Brown, correct?

2          A.    Yes, sir.

3          Q.    And that was decided by you and Jimmy Carr and

4      Richard Scheff and John Auer, correct?

5          A.    Myself and Jimmy Carr decided to make the arrest.

6      And as far as I recall, Richard Scheff was in the office

7      and he knew what we were going out to do a surveillance on

8      Timmy Brown.

9          Q.    He knew you were going out to pick him up and

10     arrest him, isn't that a fact?

11         A.    He knew that if we were able to pick him up that

12     he would be under arrest.

13         Q.    That it would be an arrest?

14         A.    Yes.

15         Q.    And I asked you a question about what you didn't

16     get an arrest warrant, correct?

17         A.    No, sir.

18         Q.    Okay.  And I questioned you why you did not get an

19     arrest warrant on this this.  I was talking about July, you

20     had time to get an arrest warrant, didn't you?

21         A.    Yes, I am sure we did.

22         Q.    Okay.  And then your answer was decided to do it

23     on probable cause.  My question was, at that point, "Arrest

24     him on probable cause, correct?  Who made that decision?"

25     You said, "A joint decision, I would say, between myself

1    Carr and Richard Scheff," correct?

2         A.    That's what I just said.

3         Q.    So Richard Scheff knew that you were going to

4    arrest Tim Brown?

5         A.    Yes.

6         Q.    Mr. Brown, when he was brought back, when he is

7    picked up, handcuffed behind his back, correct.

8         A.    Yes, sir.

9         Q.    Four detectives out there when he was picked up?

10        A.    There were two detectives then the other vehicle

11   pulled up.

12        Q.    Those are two other homicide detectives?

13        A.    Yes, sir.

14        Q.    When he got to the homicide office, he was

15   shackled to the floor, correct?

16        A.    From what I recall, he was.

17        Q.    You knew his age was fifteen even at that point?

18        A.    Yes, sir.

19        Q.    Now, you never spoke with his parent or his mom?

20        A.    No, sir.

21        Q.    Apparently, Richard Scheff had contacted --

22        A.    I found out that his mom was there after I came

23   out of the interview room.

24        Q.    And apparently, she had left prior to the time

25   that you finished with Tim Brown?

1      A.    I didn't see her in the office.

2      Q.    Didn't you testify that she had left before you

3   finished with Tim?

4      A.    That's what I believe.

5      Q.    So you didn't see her?

6      A.    I didn't see her.

7      Q.    And you talked off the tape over an hour or an

8   hour and 20 minutes, I think you testified to?

9      A.    Somewhere around an hour, I guess an hour.

10      Q.    And you showed him pictures of the scene?

11      A.    After the verbal statement.

12      Q.    Richard Scheff came into the room while you were

13   doing the interview?

14      A.    He was in there several times, I believe, in and

15   out.

16      Q.    While you're doing the interview?

17      A.    I am not sure if he was in there when we were

18   doing the actual verbal interview, or I know he wasn't in

19   there for the taped interview.

20      Q.    And you know Scheff had taken a statement from him

21   before, correct?

22      A.    No, I wasn't told he took a statement from him.

23      Q.    Well, you know he had taken a statement from him

24   in November of 1990?

25      A.    A taped statement?

1      Q.   Yes, you know he took a confession from Tim Brown?

2      A.   As far is I know, there was an admission.   I

3  wouldn't know about the actual confession.

4      Q.   Well, an admission to having shot the deputy that

5  I mean --

6      A.   No, I believe --

7           MR. MORTON: Judge, this is going to arguments over

8      the term admission and confession.

9           THE COURT:   Sustained, let's move on, Counsel.

10 BY. MR. DAVIS:

11     Q.   You had an opportunity to evaluate Tim Brown's

12 intelligence?

13     A.   Evaluate, I spoke to him.

14     Q.   And is it your testimony the same as it was before

15 that you found him to be of average intelligence?

16     A.   Yes, sir.

17     Q.   He gave you no resistance whatsoever, is that what

18 you stated?

19     A.   That's correct.

20     Q.   And he was interviewed in shackles.

21     A.   As far as I recall and I have to keep saying as

22 far as I recall.  I believe I even said in deposition the

23 ring has been removed, I am not sure if the ring on the

24 floor was still there at the time, but I believe he was in

25 shackles.

```
 1              MR. DAVIS: I don't have anything else.

 2              THE COURT:  Thank you, Mr. Morton?

 3              MR. MORTON:  No questions.

 4              THE COURT:  Thank you, Detective.  State, anything

 5      further?

 6              MR. MORTON:  No, Your Honor.

 7              THE COURT:  Mr. Davis?

 8              MR. DAVIS:  No, Your Honor.

 9              THE COURT:  Do you wish to bring forth some cases,

10      or make any short arguments at this time?

11              MR. DAVIS:  I'd like to make an argument, but I

12      believe it's the State's burden.

13              THE COURT:  Do you want Mr. Morton to go first?

14              MR. MORTON:  It's my burden to go forward with the

15      evidence, it's Mr. Davis's motion.

16              THE COURT:  One at a time, Mr. Davis.

17              MR. DAVIS:  I would like to make some factual

18      arguments if I could, Judge, and just try to recap some

19      of the testimony that we heard.

20              THE COURT:  Okay.

21              MR. DAVIS:  First off I would like to, and this is

22      going to be somewhat jumbled because I haven't put it

23      together.  First off I would like to talk about the

24      Minnick case.  We have all kinds of different

25      inconsistencies as to when they contacted the State
```

1    State of Florida      )
                           :ss        J. John Frusciante
2    County of Broward     )

3

4                    IN THE CIRCUIT COURT OF THE
                     SEVENTEENTH JUDICIAL CIRCUIT,
                 IN AND FOR BROWARD COUNTY, FLORIDA
5

6
     STATE OF FLORIDA,            )
7                                 )
            Plaintiff,            )
8                                 )
     vs.                          )   Case No.  91-14793 CF B
9                                 )
     TIMOTHY BROWN,               )
10                                )
            Defendant.            )
11   -------------------------X

12

13          Proceedings had and taken before the Honorable John

14   Frusciante, one of the Judges of said Court, Ninth floor,

15   Room 950, Broward County Courthouse, Fort Lauderdale,

16   Broward County, Florida, on the 7th day of January, 1993

17   commencing at or about the hour of 10:00 o'clock a.m. and

18   being a Motion to Suppress hearing.

19

20

21   APPEARANCES:

22          CHARLES B. MORTON, JR., Esquire
            Assistant State Attorney,
23          On behalf of the Plaintiff.

24          LARRY S. DAVIS, Esquire,
            Appearing on behalf of the Defendant.
25

ATTACHMENT / EXHIBIT _15_

1          doing Mr. Brown?

2                 THE DEFENDANT:  All right.

3                 MR. DAVIS:  We're now prepared, Judge.

4                 THE COURT:  Mr. Morton?

5                 MR. MORTON:  We're prepared to go forward.

6                 THE COURT:  All right.

7                 MR. DAVIS:  Dr. Koprowski.

8    Thereupon,

9                        ELIZABETH KOPROWSKI,

10   having been first duly sworn, was examined and testified

11   upon her oath as follows:

12                THE CLERK:  State your name and spell your

13       last name for the record please.

14                THE WITNESS:  Elizabeth Koprowski,

15       K-o-p-r-o-w-s-k-i.

16                       DIRECT EXAMINATION

17   BY.  MR. DAVIS:

18       Q.   Dr. Koprowski, prior to your coming to the

19   courtroom, there was a stipulation that you qualify as an

20   expert psychologist in psychology so we don't have to go

21   through your resume and other things in that matter.

22                Did you perform an evaluation on Tim Brown?

23       A.   Yes, I did.

24       Q.   Now, let me ask you this, do you see Tim Brown

25   here in the courtroom?

1    A.    Yes, I do.

2    Q.    And where is he?

3    A.    Sitting at the defendant's table.

4    Q.    And what is he wearing?

5    A.    A white V-neck T-shirt.

6         MR. DAVIS:   Judge, would the record reflect that

7    she pointed to the defendant, Tim Brown.

8         THE COURT:   Court Reporter let the record so

9    reflect.

10   BY  MR. DAVIS:

11   Q.    Okay.   Now let's start out with what records did

12   you review of Tim Brown?

13   A.    I reviewed school records provided to me by your

14   office from Orange Brook Middle, and a few pages from

15   Apollo Middle School.

16   Q.    Let's start with the school records, what in the

17   school records helped you in regard to your evaluation?

18   A.    Well, I received them after my evaluation.   What

19   they basically did for me was verify the consistency of

20   Tim's intellectual deficit.

21   Q.    And would you tell us what was in those records

22   that was helpful with the validity of your evaluation?

23   A.    He had been retained several times and when

24   finally promoted to six grade to Apollo Middle, it was what

25   they call an "administrative promotion," meaning that he

1    was going to be too old and I think probably too physically

2    large to maintain him in the fifth grade elementary school

3    grade.

4        Q.   In which grades was he held back in?

5        A.   I'm not certain exactly how many grades they were

6    because by then, he was 13 years of age and still in fifth

7    grade.

8        Q.   Still in fifth grade?

9        A.   Yes.

10       Q.   And did you review any of the school records in

11   regard to any kind of psychological or I.Q test that they

12   did?

13       A.   They had done some group I.Q. testing and they

14   found that the verbal I.Q. was 58, the quantitative 58,

15   non-verbal 54 and this corresponds with -- I did some

16   testing and this is very consistent with the individual

17   I.Q. test I administered.

18       Q.   When were those equal of somewhere between 54 and

19   58?

20       A.   1988 report I am looking at he is, like I stated,

21   the form of 66 88.

22       Q.   Are those the type of tests and evaluations that a

23   psychologist such as yourself would use in either verifying

24   or helping you with an evaluation of a person?

25       A.   A school psychologist would use those group tests

1    to get an idea where each individual student is.  A

2    clinical psychologist would do more in depth individual

3    testing which I did.

4         Q.   In your evaluation, were they helpful in regard

5    to --

6         A.   Yes.

7         Q.   In what manner?

8         A.   One thing I wanted to see was if his performance

9    was consistently poor from the school records all along,

10   was he getting worse, was there any sign of improvement?

11   They were consistently poor.  There are also some notes

12   about his lack of attendance in school, not completing his

13   work.  He was obviously not motivated as a student.

14        Q.   Okay.  Were there any specific notes in his

15   evaluations that you found of interest in regard to whether

16   or not he could voluntarily waive his rights, or would it

17   be some-what influenced by authority figures or anything

18   along those lines?

19        A.   Actually, these reports did not specifically state

20   that.  They did keep writing to the mother who was involved

21   with him and was interested apparently in that he was not

22   completing work, not participating.  Very passive student.

23        Q.   Okay.  And now, I.Q. between 54 and 58 that they

24   tested, the school board testing him out in 1988.  What

25   type of classification would a psychologist give to that

1    level of I.Q?

2         A.    That's mild mental retardation.

3         Q.    Now, let's move on to, did you have an opportunity

4    yourself to interview Tim Brown?

5         A.    Yes, I saw him on four different occasions.

6         Q.    And when was that?

7         A.    Initially I saw him on September 30th, 1991, then

8    on October 7th, 1991, October 21st, 1991, and then finally

9    on December 16th, 1991.

10        Q.    And how much time altogether did you spend with

11   Tim Brown?

12        A.    Approximately five hours and 45 minutes.

13        Q.    And where was the evaluation being done?

14        A.    In the main jail, one of the private interview

15   rooms.

16        Q.    Did you do any psychological test?

17        A.    Yes, I did, after the first visit which was

18   clinical interview to establish rapport.  On the second

19   visit I administered the Wexler Intelligence Scale for

20   children.  The third evaluation which was the most recent

21   one and was rather lengthy, that's that individual test I

22   referred to and gives you a more accurate picture of a

23   fifteen-year-old's current function.

24        Q.    You did that on the second visit with him?

25        A.    Yes.

3

1    Q.   And would you explain to the Court what that test

2    entails?

3    A.   It's an I.Q. test with numerous sub-tests that I

4    did both the quantitative nonverbal functions of the

5    individual and the verbal functioning.

6    Q.   Is this the test that is recognized by the APA?

7    A.   Oh, yes, I would say it was the standard test that

8    is most commonly used, in fact, assuming the Broward County

9    School system will only accept this one for current, for

10   special education purposes.

11   Q.   What does that test entail?

12   A.   All of the questions are administered by me.  In

13   other words, I can't send in an assistant.  I can't leave

14   it with him every question is given by me and every

15   response is given by Tim, and I write down verbatim what

16   his answers are and according to very rigid procedure.

17   Q.   Okay.  And what were the results that you came up

18   with in that test that you did on Tim Brown?

19   A.   His verbal I.Q. was 60.  His performance I.Q. was

20   60.  And his full scale I.Q. was 56.

21   Q.   Could you explain that to the Court what you mean

22   by the verbal and performance and full scale I.Q?

23   A.   The verbal sub-test includes, for example,

24   information which gets on general fund of knowledge, do you

25   know what day comes after Thursday, for example, do you

1    know what oxygen is?  It also gets an abstract conception

2    such as why are red and blue alike.  And another verbal

3    sub-test is vocabulary where he is suppose to give the

4    meaning of different words at his average group like the

5    word, for example, "donkey." What is a donkey?

6         Q.   Let me ask you this about those test.  Can someone

7    fake bad on this test?  I mean, try to make themselves look

8    worse than they are?

9         A.   They can, but it would be fairly easy to detect

10   because they wouldn't know how to do it.  They would

11   probably do it in a way that would not be the way that

12   someone who is truly retarded would not be the same.

13        Q.   Did you see any indication on that test that Tim

14   Brown was trying to fake bad or malinger or give you a

15   score less than you should have gotten?

16        A.   Oh, no, I felt at no time was he trying to fake

17   bad.  I think he was doing his best.  In fact, sometimes he

18   got bored with the tests.  They weren't particularly

19   interesting to him, but I definitely thought he was making

20   every effort to give a true picture.

21        Q.   Would the school records that you reviewed show a

22   similar I.Q. test taken back in 1988 and also lend validity

23   to the tests that you took in 1991 on Tim Brown?

24        A.   Oh, yes.

25        Q.   And why is that?

1      A.    If, for example, he were trying to do worse on my

2   test, the scores would not have been almost exactly the

3   same.  He would have gotten much poorer scores on my test,

4   but you have a certain level of sophistication to try and

5   malinger.

6      Q.    Does he have that?

7      A.    No.

8      Q.    Okay.  What else but that comes of interest to you

9   in your evaluation?

10     A.    You mean the specific intelligence tests that I

11   gave him?

12     Q.    Yes.

13     A.    His best score on the verbal sub-test was complex,

14   which is interesting because that best score is still way

15   in the retarded range.  That sub-test is sometimes what we

16   call social judgment.  For example, what would you do if

17   someone wanted to fight with you?  His response was to walk

18   away from it.  Although it's a basic response, it's quite

19   an acceptable response.  So among other things, it said to

20   me he's not psychotic, he's not cognitively disorganized,

21   that he's not in touch with reality.  I think he, in that

22   sense, does not show any sign of major mental illness.  Of

23   course, that's based on all he tells, not just a few

24   answers.

25     Q.    Well, the I.Q. that you came up with 56, where

1    does that place him as far as a psychologist would be

2    concerned?

3        A.   Well, as I say, it's in the mildly retarded range,

4    which is someone who would be educationable but not someone

5    who's going to learn in the school system on his own.  He

6    would need special education.  For example, he is always

7    going to need some sort of special help.  He can be taught.

8    He has a minimal level of reading and writing; but it's

9    below third grade, and I don't think that that can be

10   helped.  I don't think he is going to improve to a point

11   where going to pick up a book and read with any interest.

12       Q.   What other test did you perform on Tim Brown?

13       A.   I also gave him the house drawing on the second

14   visit.  I gave him the person in the trees on the third

15   visit.  These drawings are a projective test again to exam

16   the -- not just the level of intellectual function kind of

17   personal organic, sometimes we can pick it up if you have

18   significant brain damage which would say to that we ought

19   to do more testing on the person, another test that looks

20   at organic possible organic bender, total computation, I

21   gave him that on the third visit.

22       Q.   How did he do on that?

23       A.   He did fairly well on the Bendergill altogether I

24   did not feel again any signs of gross organic damage.  His

25   drawings of the house and tree and person were -- again,

1  they were not disorganized or psychotic.  They were very

2  youthful, not something that a fifteen-year-old of average

3  intelligence would do, but definitely someone of lower

4  intelligence, very.

5  child-like, best way to describe him.

6      Q.   What other test did you do?

7      A.   I administered the W-R-A-T revised.  That's the

8  Wide Range Achievement Test.  That is the test that is

9  specifically assessing their achievement in spelling,

10  reading and arithmetic.  As I say, in reading and spelling,

11  he is just about at a third grade level; and arithmetic, he

12  was below the third grade level, which basically is

13  extremely poor.

14      Q.   Were there any other tests?

15      A.   I gave him the Rorschach project test of ink blots

16  as most people would call it.  Again, to get a personal

17  organizations look for signs of major mental illness, also

18  give you some idea of intellectual function.

19          He did the test extremely quickly.  There was no

20  imagination, no depth, no loss of reality contact, no

21  bizarreness, no unusual behavior, just again, primitive

22  child like.  And I also gave him the Thematic Aperception

23  Test which is the test whereby you show black and white

24  drawings, which is a standardized test which was developed

25  about 40, 50 years ago.  And for example, the first one

1   begins with a boy gazing at a violin whose very little

2   material and you want to see what that suggests to the

3   person to see what kind of stories they tell.  He was able

4   to tell the stories to the pictures which I gave him, some

5   insight as to how he thinks and feels.  But again, it was

6   on a basic level; for example, the boy looking at the

7   violin, all he could come up with was he is wishing he knew

8   how to play the violin.  Where someone with a higher level

9   of function is going do give usually more elaborate story,

10  maybe he practiced for ten hours a day; and he wishing he

11  could be a concert violinist, you know, like so and so,

12  give more details to the story, know of an idea of what's

13  going on in that person's mind in the drawing, and Tim did

14  very little of that, just basically responded to the overt

15  characteristics of the drawing without any other

16  imagination.

17      Q.   Now, these tests in your interviews, could you

18  reach a conclusion as to whether or not Tim Brown

19  psychologically and intellectually would have the ability

20  to understand legal rights?

21      A.   Only in a very, very basic way.  Could you be more

22  specific?

23      Q.   Would he understand that his rights to counsel and

24  things along long those lines, that is, going into Miranda

25  decision?

1      A.    I think based on his prior experience, he did not

2  fully understand that he could have had an attorney

3  present.  He stated that he wished he had his mother

4  present though.

5      Q.    Let me ask you this, did he appear -- can I have a

6  moment, Judge.

7          THE COURT:  Yes.

8  BY. MR. DAVIS:

9      Q.    I guess the bottom line question is would he be

10  easily led and influenced by authority figures such as the

11  police?

12     A.    Yes, I think he is easily led by almost anybody,

13  including his peers.

14     Q.    Did you have an opportunity to review his

15  statement?

16     A.    Yes, I did.

17     Q.    Okay.  Do you have the transcript there with you?

18     A.    Yes.

19     Q.    Did you see evidence of the way that he was led

20  within the statement itself?

21     A.    I certainly felt he was the vast majority of his

22  answers were yes, sir, yes, sir, no sir; mostly yes, sir's.

23  Seems that the questions were -- well, I don't know if the

24  questions were quite extensive, and all he had to do was

25  come up with a yes or no.

1        Q.    Do you have page 13 there in front of you, Doctor?

2        A.    Yes.

3        Q.    Okay.  Have you stopped at the page -- I think

4    that the police start asking him a number of questions, and

5    there is maybe 20 questions or 15 questions on there, and

6    in each one of them what is his response?

7        A.    Except for the first one, yes, me and him had

8    something that night yes, sir, yes, sir, yes, sir, yes,

9    sir.

10       Q.    Okay.  And as a matter of fact, doesn't Detective

11   Thomasevich at the bottom of that page make the statement,

12   now, you keep -- now, you know we are saying these things

13   to you Timmy and you keep saying yes, sir, All right, but I

14   wanted to -- you know, I want you to understand that we

15   don't want to put words in your mouth, okay.  Is that what

16   had happened?  And what was his response to that?

17       A.    Yes sir.

18       Q.    And the rest of the responses throughout the

19   statement are they -- you know, page 13 and 14 when they

20   keep going on after telling him he doesn't have to say yes

21   sir, that his responses are what?

22       A.    Well he again continues all with yes sir's but if

23   he truly understood that last statement that you just

24   referred to by Detective Thomasevich is that what happened

25   he saying yes sir, you put words in my mouth or yes sir,

1    everything I have been saying is what happened.

2        Q.   Is just for an example how he is easily led?

3        A.   Yes, sir, he's passive compliant.

4        Q.   And that comes from basically his lack of

5    intellectual ability, is that a fair statement?

6        A.   I think that's part of it.  Not all people who are

7    retarded are passive, although they tend to be not passive

8    contended compliant or want to appear to be better more

9    with it than they are so to hide the deficits, be compliant

10   in a situation rather than frankly show their ignorance.

11       Q.   Let me ask you a hypothetical.  If you have

12   someone with the intellectual abilities of Tim Brown, and

13   let's say you arrest that person, you put him into an

14   interview room, you shackle him in the interview room and

15   question him for an hour and 20 minutes or so, show him

16   pictures and other things that relate to the case.  Do you

17   think it's a kind of thing where you could get Tim Brown to

18   almost say anything you wanted him to say?

19       A.   I think you could.  I don't think that something

20   so fantastic, you know, the pink elephants, for example, as

21   I said he is grounded in reality; but I think you could

22   certainly twist words and get him to agree to anything

23   within the point.

24           MR. DAVIS:  Thank you, Doctor.  I don't have

25       anything further.

JUSTICE REPORTING SERVICE, INC.   523-6114

1           THE COURT:  Mr. Morton?

2                         CROSS EXAMINATION

3    BY. MR. MORTON:

4        Q.   Doctor, I have been provided with some records, I

5    suppose the same records that you reviewed.  I just got

6    them today a few moments ago.  I am going to do the best I

7    can.  I might have to go a little slowly.

8             First of all, before we get to the records, you

9    also examined Mr. Brown to determine if he was competent to

10   stand trial, correct?

11       A.   Yes.

12       Q.   And you have determined that he is competent to

13   stand trial, correct?

14       A.   I think he is competent overall, yes.

15       Q.   Given the legal standards and overall, he is

16   competent to know and understand the nature of the

17   proceedings, correct?

18       A.   Yes.

19       Q.   And he knows that he is on trial for a serious

20   charge, correct?

21       A.   Yes.

22       Q.   And he knows what the consequences of those

23   charges could be, am I correct?

24       A.   Yes.

25       Q.   And you also were asked to exam -- I don't know

1    specific what you were asked to exam because you were

2    appointed as a confidential psychologist initially,

3    correct?

4         A.   Yes.

5         Q.   And that means that you were to only report to Mr.

6    Davis your findings, am I correct?

7         A.   Correct.

8         Q.   Did Mr. Davis ask you to determine whether or not

9    Mr. Brown knows the difference between right and wrong?

10        A.   Yes.

11        Q.   And you determined that he does know the

12   difference between right and wrong, correct?

13        A.   Yes.

14        Q.   Now, with that background let me ask you a few

15   questions about persons who you talked to who are charged

16   with serious crimes, and they know what the consequences

17   could be.  One of the things that you have to look for and

18   be careful of is that the person doesn't try to fake or

19   pretend that he is in worse condition or that she is in

20   worse condition then he or she really is, correct?

21        A.   Correct.

22        Q.   Because there is a motive there to help oneself

23   when one is facing serious charges, correct?

24        A.   Yes.

25        Q.   Especially if you come in and you exam him or her,

1    that person may try to make you feel as though they are

2    crazy sometimes, correct?

3        A.    Sometimes.

4        Q.    Or that person may try to convince you by doing

5    things that would make them appear to be not competent to

6    stand trial, correct?  That is, not understand the nature

7    of the proceedings and consequences, correct?

8        A.    They may do that; but in my experience, most

9    defendants don't have that level of sophistication to know

10   what competency requires, but they may try.

11       Q.    I am not going to bicker with that as to who has

12   the sophistication; but certainly, that's a possibility,

13   correct?

14       A.    Yes.

15       Q.    And it has happened to you in the past, correct?

16       A.    Yes, I would say most defendants, if they are

17   trying to do that, are more concerned about the insanity

18   part of it.

19       Q.    Right.

20       A.    No, not the competency.

21       Q.    And obviously, Mr. Brown -- or did you talk to him

22   about your purposes, and why you were there?

23       A.    Yes.

24       Q.    What did you tell him?

25       A.    I explained -- actually, I believe the first

JUSTICE REPORTING SERVICE, INC.    523-6114

1    interview I was introduced by Mr. Davis.  He met me at the

2    jail, and he knew that the evaluation at that point was

3    confidential and that I was working with Mr. Davis to help

4    him and that anything he told me would go back to Mr.

5    Davis.

6        Q.   In other words, I don't know if you used the word

7    confidential, or did you use the word confidential?

8        A.   I usually do.

9        Q.   And he appeared to understand the word

10   confidential, correct?

11       A.   I think he understood the concept because Mr.

12   Davis was saying she is working with me, it's okay to talk

13   to her.

14       Q.   So now are you telling us that it is your opinion

15   that he did not understand the word confidential?

16       A.   I can't answer that because I am not sure if I

17   used the word confidential.

18       Q.   But certainly the concept was that you were going

19   to report to Mr. Davis and Mr. Davis only, correct?

20       A.   Yes, the concept was there.

21       Q.   And no one else could find out about what you had

22   only Mr. Davis wanted to know that, correct?

23       A.   Yes.

24       Q.   And now that concept of confidentiality is -- I

25   don't know if it is an abstract concept or not, but it

JUSTICE REPORTING SERVICE, INC.    523-6114

1    certainly shows a certain level of sophistication or

2    understanding am I correct, to understand that concept?

3        A.   I don't think its too high of a level though the

4    concept --

5        Q.   I didn't say it was a high level.  Certainly shows

6    a certain level of sophistication, doesn't it, to

7    understand the concept to be confidential?

8        A.   If the word is what you're looking at as opposed

9    to it's okay to talk to her, she is all right, more in

10   terms of street kind of getting along street smarts.

11       Q.   Well, you mentioned something that is pretty

12   interesting there.  There are some people who may not have

13   a certain level of achievement, shall we say,

14   intellectually, correct?

15       A.   Correct.

16       Q.   That is based on their formal education and their

17   performance in that area, they appear to have intellectual

18   deficits, correct?

19       A.   Correct.

20       Q.   And even though they have these intellectual

21   deficits they may be quote you say street smart, they may

22   still be able to function in society, correct?

23       A.   Yes.

24       Q.   They still are able to understand basic concepts

25   in order to get along in society, correct?

1    A.   Yes, but in Tim's case, he was still a minor

2    living at home dependent on his mother, so I don't know if

3    he would have been on his own functioning if he would have

4    been able to make a living and pay bills if that's what you

5    mean.

6    Q.   No, not necessarily.  When you say function in

7    society, meaning whether you are a minor at home or an

8    adult on the streets, so to speak, you still can function

9    properly and show adequate social behavior and to be able

10   to perform certain intellectual functions?

11   A.   Yes.

12   Q.   All right.  And did you check into Tim's or Mr.

13   Brown's background as to where he lived and who he lived

14   with and the kind of life style that he lived?

15   A.   Yes, I did.

16   Q.   And what did you find out?

17   A.   I found out that he was raised by a woman who had

18   taken him in when he was a baby, a woman who's married to

19   his father, that his biological mother was not the woman

20   who he calls mother who has been his mother, and that he

21   had several siblings.

22   Q.   Correct.

23   A.   And he had good relationship with his mother, Mrs.

24   Brown.

25   Q.   You talked to his mother?

JUSTICE REPORTING SERVICE, INC.   523-6114

1      A.    I spoke with her today for the first time.

2      Q.    Were there any indications to you -- this is the

3  first time you spoke to her, correct?

4      A.    Yes.

5      Q.    You reached your conclusions and opinions about

6  Timmy and his ability to function -- at least what he

7  understands about his Miranda rights -- you reached your

8  opinions before you spoke to his mother?

9      A.    Oh, yes.

10     Q.    Now, in speaking to his mother did his mother tell

11 you that Timmy was un-cooperative?

12     A.    No.

13     Q.    In fact he got along with his mother, correct?

14     A.    Yes.

15     Q.    Did he live with his mother?

16     A.    Yes.

17     Q.    And did he stay home all the time as far as if you

18 even got into that?

19     A.    Well, I discussed that with Tim.  What he did with

20 his time, and he did hang with his friends quite a bit.

21     Q.    Just sort of, in other words, we would say kind of

22 hang out on the streets?

23     A.    Or beach.

24     Q.    Beach, whatever.  By hanging out then on the

25 streets, without trying to be scientific about it or, you

1    know, to the degree of reasonable scientific certainty and

2    so forth, common sense tells you that you hang out with

3    other people on the beach or on the streets.  He's probably

4    hanging out with older people, correct, or younger people,

5    or people his age, correct?

6        A.   Yes, I didn't ask.  Some of his friends were older

7    friends; some I think were his own age.

8        Q.   And you can pick up certain kinds of concepts and

9    ideas based on that experiences, by hanging out on the

10   street, correct?

11       A.   I don't know how many concepts you can pick up, if

12   any.  You can certainly pick up ideas, behaviors, and many

13   different ways of speaking.

14       Q.   But certainly, you can pick up the knowledge and

15   understanding of various concepts that apply to us in every

16   day life in hanging out on the streets, can't you?

17       A.   Yes.

18       Q.   You didn't go into any details and talk to Timmy

19   about his -- or did you go into any details about his

20   hanging out or who he hung out with and the kind of things

21   he did.

22       A.   Yes, I did.

23       Q.   And what did you find out?

24       A.   You want to know specifically what he did with his

25   friends?

1     Q.   Yes, of course.

2     A.   He said that his --

3     Q.   And any other thing, too, that he told you about,

4  but we'll start off there.

5     A.   He did say that he was spoiled by his mother.  His

6  father had been a commercial truck driver, 18-wheeler

7  driver, so apparently there were things, resources he said

8  that he had everything he wanted in terms of clothes and a

9  stereo.  He indicated that there were some friends who

10  envied him for having more material goods then they did.

11       He also indicated that he had been in -- that he

12  got involved with some kids in the neighborhood when he

13  moved to the new neighborhood in Hollywood and that, in

14  fact, his words to me were that he liked to be with a lot

15  of people, liked to be with other peers.  And that he felt

16  he was popular and he had a girlfriend.  He also indicated

17  that he began to use marijuana and alcohol.  He said he

18  used cocaine and stopped after one week because he didn't

19  like it, didn't like the way he felt.  And then he began to

20  get into juvenile trouble for which he was in and out of

21  the detention center.

22       He also described a very brutal relationship with

23  his father.  The father, according to Tim -- and this was

24  verified by his mother this morning -- used to beat him and

25  the other siblings, and I think her also.  He was a very

JUSTICE REPORTING SERVICE, INC.    523-6114

206

8

1    violent man, so Tim spent a lot of time trying to get away

2    from his father.

3        Q.   When you looked at Tim's school records, you also

4    see that Tim was absent quite a bit from school, wasn't he?

5        A.   Yes.

6        Q.   In fact, you looked at some of the records

7    particularly when he starts -- I guess when he was in

8    second grade, third grade, in between 1986, there is a

9    letter from the school register to starting second grade at

10   Orange Brook Elementary.  I don't know if you have that,

11   and I will show to you part of the records I got this

12   morning that --

13       A.   Yes.

14       Q.   -- that it's been brought to my attention by our

15   school nurse that Timothy is not in compliance with the

16   Broward County School Board role for attendance in the

17   local school system, correct?

18       A.   Yes.

19       Q.   And certainly dated April 7th, 1986, right?

20       A.   Yes.

21       Q.   Certainly you would agree, Doctor, that one factor

22   in performing at grade level adequately would be to at

23   least attend school on a regular basis, don't you think?

24       A.   Yes, certainly for most children.  It could also

25   work the other way, however, because many students who are

1    not able to keep up with the work and are slipping behind

2    not only lose their motivation to go to school, but they

3    are afraid to go to to school because they are humiliated,

4    embarrassed or bored.

5         Q.   And quite frankly, the conclusion that we reach in

6    this area as to whether or not someone performs poorly in

7    school because they are not motivated or they are not

8    motivated because they perform poorly in school, you know,

9    which comes first, do you see what I am saying?

10        A.   Yes.

11        Q.   All right.   That's a matter of subjective opinion,

12   am I correct?

13        A.   No, I think that can be assisted with

14   psychological testing.   I am a little surprised that there

15   was no individual referral for Tim on the part of the

16   school system because the test such as the one I gave him

17   would help differentiate that particular question.

18        Q.   Well, let's take a look at some of the records

19   that you told us that Tim, Mr. Brown was very, I guess,

20   applicable type of person, he would just sort of go along

21   with the flow?

22        A.   Yes.

23        Q.   You sort of concluded from looking at the

24   statement that because of these numbers of "yes sir's," is

25   that an indication to you that he is that kind of person?

1       A.     That's one indication, yes.

2       Q.     When we look at the records in school and some of

3    the comments and the records, let's start with fourth

4    grade, which was a number of the records that you have.

5    Says Timothy has days -- you may have seen this, this one

6    is dated October 9th of 1987.

7       A.     Yes.

8       Q.     Timmy has days when his behavior is unacceptable,

9    correct?

10       A.     Yes.

11       Q.     In fact, these are notes I presume to the parents?

12       A.     Yes.

13       Q.     All right.  And says here that, "I am sorry to

14    inform you that Timothy is not producing quality for fourth

15    grade work," am I correct?

16       A.     Correct.

17       Q.     And "Hopefully, with your continuation of support,

18    Timothy will make an improvement," am I correct?

19       A.     Yes.

20       Q.     As well as an effort to do his part, correct?

21       A.     Yes.

22       Q.     That shows some concern on the part of the teacher

23    here that Tim was not putting forth his best effort, am I

24    correct?

25       A.     Yes.

209

1    Q.    Did you talk to his teacher about Timothy at all?

2    A.    No, I didn't, but I notice she also checked your

3    child's classroom behavior, she checked it "satisfactory,"

4    and then seems to equalize it and says he has days when his

5    behavior is unacceptable.

6    Q.    It's not the same record in the same year, same

7    teacher.  I believe it says, "R. K-h-a-p-i-n," correct?

8    A.    Yes.

9    Q.    In fourth grade, the record dated September 28th

10   of 1987, do you have that one?

11   A.    Yes, I have that one.

12   Q.    When it talks about behavior, am I correct?

13   A.    Yes.

14   Q.    Says that Timothy is dependable and willing to

15   assume responsibility, am I right?  Now, she checked under

16   behavior --

17   A.    Yes.

18   Q.    -- she checks, "Takes pride in doing neat and

19   careful work," correct?

20   A.    Yes.

21   Q.    "Obeys class rules and regulations," right?

22   A.    Yes.

23   Q.    "Follows instructions," right?

24   A.    Yes.

25   Q.    "Thinks and works independently," correct?

210

1      A.    Yes.

2      Q.    "Uses time to great advantage," correct?

3      A.    Yes.

4      Q.    "Begins and completes assignments on time,"

5   correct?

6      A.    Yes.

7      Q.    But then in the comments, she says, "Timothy

8   completes very few classroom assignments.  He does not

9   return his homework.  At this time, Timothy is doing poorly

10   academically," correct?

11      A.    Yes.

12      Q.    And she points out that Timothy's mother even

13   expressed concern and was grateful for the telephone call.

14   Apparently, she had made a point in telling her about this,

15   right?

16      A.    Yes.

17      Q.    So when we look at these records, the one dated

18   September, 1987, and we move to the one dated October of

19   1987, we see that the teacher finds Timothy's work is

20   satisfactory, looking at the one in October, 1987, correct?

21      A.    Yes.

22      Q.    But with just perhaps a few problems with behavior

23   from time to time, correct?

24      A.    Yes.

25      Q.    And basically, she thinks he should put forth a

1    little more effort, right?

2        A.   Yes.   I'm not sure how much initiative he takes,

3    many of things on the September 28th, 1987, that she checks

4    off that you had just read, some of that could be because

5    he is passive.

6        Q.   But we are guessing right now, correct?

7        A.   Correct.

8        Q.   Don't you think it would have been helpful,

9    Doctor, to talk to that teacher to find out a little more

10   about it?

11       A.   Yes.

12       Q.   Looking at the attendance records which you

13   concede might certainly effect to some extent ones

14   performance in school, correct, might have some impact on

15   it, correct?

16       A.   Yes.

17       Q.   We find that in grade four -- I know if you have

18   that record from Orange Brook Middle, same teacher Khapin?

19       A.   I probably do.

20       Q.   Yes, that's it.   You see right up there at the top

21   when it talks --

22       A.   Days absent.

23       Q.   -- Yes, days absent.   Out of 136 days, he was

24   present 136 days, correct?

25       A.   Yes.

212

1    Q.    And he was absent some 44 days?

2    A.    Yes.

3    Q.    Am I right?

4    A.    Yes.

5    Q.    We look at -- saw another record here that was

6    brought to my attention, and of course, when we talk about

7    these days present and number of days absent, here's

8    another record that for the entire year we are talking

9    about during the four periods, see that, correct?

10   A.    Yes, that's for the year.

11   Q.    And there was another one that I saw, I just want

12   to get it on the record.  That was, by the way, that was

13   grade four, correct?

14   A.    Yes.

15   Q.    In grade two this time in H-a-l-l --

16   A.    Yes, I have that one.

17   Q.    -- Is the teacher and we look at the number of

18   days absent and days present?

19   A.    Yeah, that's grade three.  Grade two he was --

20   looks like 18 days absent, present 153.  Grade three he was

21   absent 52 days and present 118 days.

22        THE COURT:  Excuse me, it was my understanding

23        that he was left back in a certain one of those grades,

24        and for the propose, if you use the year, not just the

25        grade.

JUSTICE REPORTING SERVICE, INC.    523-6114

213

1      BY  MR. MORTON:

2          Q.   All right.   Then let's do it this way.   In the

3      year of 1985 and '86, that year it says here grade two, but

4      that year was 153 days total, correct?

5          A.   Yes, I think.

6          Q.   Days present, and 18 absent?

7          A.   I think I can clarify that for the record.   In

8      first grade where he is only absent 3 days and present 174,

9      1983 and 1984 school year that year he was retained.   They

10     did not have records from kindergarten so he was retained

11     in first grade, his grades were C's and D's and then he

12     repeated first grade, absent 12 days, present 168 '84, '85

13     he was promoted then he was promoted in second grade and

14     third grade, fourth grade he was administratively promoted

15     to sixth grade Apollo Middle School.

16         Q.   And I just look at kind of a correlation here

17     perhaps from the records and the second grade -- and we

18     will use the year because he was retained in first grade,

19     am I correct?

20         A.   Yes.

21         Q.   Was '85 and '86 was absent, present 153 days and

22     absent 18, correct?

23         A.   Yes.

24         Q.   And they have C's an D's as far as his grades are

25     concerned, am I correct.

214

1      A.    Yes.

2      Q.    And of course, at this point, there has been

3    know -- I guess official determination as to whether or not

4    those C's and D's are due to lack of effort, we don't know

5    that for sure right now, do we?

6      A.    No, there is no indication that they tested him,

7    there especially.

8      Q.    And I do notice, though, and I see a couple of

9    slashes here, it has level one, two note, do you see that

10   in the subject area?  Subject reading, Language, and

11   Spelling Handwriting and Mathematics?

12     A.    Yes, I see those.

13     Q.    There are some C's, for example, had task level

14   one and then it has a two next to it, correct?

15     A.    Yes.

16     Q.    Did you find out what that meant?

17     A.    No, I don't understand that notation.  It's not on

18   any of the other records.

19     Q.    Right.  And then it has grade C and C after that

20   as if your saying level one grade C level two grade C?

21     A.    That's what it looks like, yes.

22     Q.    And on the Language, and this is 1985, '86 when he

23   is in the second grade, correct?  These C's an D's you're

24   talking about --

25     A.    Well, he also received C's and D's in first grade

JUSTICE REPORTING SERVICE, INC.   523-6114

215

1    the first time around.

2        Q.   We are going do continue as we get going.

3    Language it says level two and has another level two grade

4    C, grade C, correct.

5        A.   Yes.

6        Q.   So average at least at that point in reading and

7    in Language, correct?

8        A.   Yes.

9        Q.   Spelling two has level two again then it has D and

10   C, correct?

11       A.   Yes.

12       Q.   I don't know if on the one hand it was a D and on

13   the other hand it was a C, appears somewhere between

14   average and below average spelling, correct?

15       A.   Yes, below average I would say.

16       Q.   Handwriting level two, level two it says again and

17   we move on to the grade and it says A, am I correct?

18       A.   A in handwriting, yes.

19       Q.   And then a C, correct?

20       A.   Yes.

21       Q.   Mathematics which is a cognitive skill, am I

22   correct?

23       A.   Yes.

24       Q.   Level two level two it says, correct?

25       A.   Yes.

216

1        Q.    And there it has two C's and C and C, correct?

2        A.    Yes.

3        Q.    Which again appears the teacher is indicating that

4    he is performing at an average level at this time, correct?

5        A.    Yes.

6        Q.    Social Studies and level two level two it says --

7    and goes on to say C and another C, correct?

8        A.    Yes.

9        Q.    Science and health B and C, correct?

10        A.    Yes.

11        Q.    And then we drop down to I guess level three down

12    at bottom, right?

13        A.    Third grade.

14        Q.    That's 1986 and '87, right?

15        A.    Yes.

16        Q.    We see C's and D's at this point in all these

17    areas now, right?

18        A.    Correct.

19        Q.    He seems to have dropped down a little, correct?

20        A.    Correct.

21        Q.    Reading level, Language, reading was C at this

22    time, correct?

23        A.    Yes.

24        Q.    Language was D, correct?

25        A.    Yes.

```
1        Q.   Spelling was D, correct?

2        A.   Yes.

3        Q.   Handwriting was C, correct?

4        A.   Yes.

5        Q.   Mathematics a cognitive skill was C, correct?

6        A.   Yes.

7        Q.   Which I believe represents average, even in third

8   grade, correct?

9        A.   Yes.

10        Q.   Social Studies D, correct?

11        A.   Yes.

12        Q.   And Science and Health --

13        A.   D.

14        Q.   D.  And when we look at second grade it's 153 days

15   attend and 18 absent, right?

16        A.   Yes.

17        Q.   And then when we see the drop in grades 108 days

18   present and 52 days absent?

19        A.   118 days present, yes.

20        Q.   52 days absent, correct?

21        A.   Yes.

22        Q.   Now at least we know that at this point '85 and

23   '86 he was performing average, correct, make C's, right?

24        A.   Yes.

25        Q.   And it appears to be somewhat -- I would say we
```

218

```
1    could conclude motivated, right?

2        A.   I don't know.

3        Q.   All right, but at least he is performing average

4    at that level, right.

5        A.   Yes.

6        Q.   Including Mathematics, a cognitive skill, right?

7        A.   Yes.

8        Q.   And then we go to third grade and his attendance

9    level goes up, goes up much higher.  Lack of attendance

10   goes up much higher, correct?

11       A.   Yes.

12       Q.   And he gets his C's and D's, correct?  He still

13   performs average in Mathematics, am I correct?

14       A.   Yes.

15       Q.   And when we get to third grade there is -- I mean

16   1986 and '87 -- looks like a copy of the same thing.  Well,

17   no I take that back.

18       A.   But he's in the Math on the Iowa test of basic

19   skills he is in the third percentile so although he is

20   getting C's in his classroom work he is in the third

21   percentile on the national test.

22       Q.   Right.  I am not saying he is a genius I am not

23   saying that but when it comes to doing his work in basic

24   mathematics skills at that level the teacher sees him

25   performing as average, correct?
```

1       A.     Yes.

2       Q.     And when we look at -- I suppose you probably have

3    this third grade, this appears to be --

4       A.     Yeah, says third.

5       Q.     Florida Statewide Assessment program for Timothy

6    Brown, correct, you have that record right?

7       A.     I think I do, I need to locate it.

8       Q.     The SSAT one.  One is Mathematics and one is

9    communication skills, correct?

10      A.     Yes.

11      Q.     His level of performance -- by the way let's just

12   mark these four identification purposes.

13      A.     Yes, I have located them.

14             MR. MORTON:  Do you have any objections to

15      introducing this just for the purpose of this hearing?

16             THE COURT:  Excuse me, Mr. Morton, could you hold

17      on the doctor needs to make a phone call unrelated to

18      your testimony.

19             MR. MORTON:  I'd like to offer this into evidence

20      at this time.

21             MR. DAVIS:  I have no objections for the purpose

22      of this hearing only, Judge, and I know the doctor

23      needs to make a phone call.

24             THE COURT:  We'll make this --

25             MR. MORTON:  What time is your plain by the way?

JUSTICE REPORTING SERVICE, INC.   523-6114

1          THE WITNESS:  12:45

2          THE COURT:  You'll make it.

3          (Thereupon, a short recess was taken, after which

4     the following proceedings were had.)

5          THE COURT:  Whenever Mr. Morton is ready.

6          MR. MORTON:  All right, and I believe that's in

7     evidence now as State's Exhibit one and two.

8          MR. DAVIS:  Can I see which ones you're putting

9     into --

10         MR. MORTON:  The Florida Statewide Assessment

11    program which in grade three for him the year would

12    have been 1986 and '87.

13         MR. DAVIS:  The only problem is just those are my

14    copies, and as long as I can get them back before the

15    end of the hearing.

16         MR. MORTON:  I just want them for the Judge to

17    review.

18  BY MR. MORTON:

19    Q.   In the complications skills they have some basic

20  functions there I guess at this level, grade three,

21  correct?

22    A.   Yes, such as identify the meanings of frequently

23  used words in context.

24    Q.   Right, and identify the meanings of compound

25  words, correct?

221

1        A.    Yes.

2        Q.    And the meaning of contractions, right?

3        A.    Yes.

4        Q.    And determine the main idea stated in a paragraph,

5    right?

6        A.    Which he did not achieve.

7        Q.    The others he achieved?

8        A.    The other skills he achieved.   Identifying the

9    main idea he did not.

10       Q.    Identifying different details in the selection he

11   achieved?

12       A.    Yes.

13       Q.    Followed written direction he achieved?

14       A.    Yes.

15       Q.    Distinguished between real and unreal actions in

16   the events in the paragraph he achieved?

17       A.    Yes.

18       Q.    Arrange four pictures in a sequential pattern in

19   writing skills he achieved?

20       A.    Yes there are 42 complete forms of questions, name

21   and age he achieved?

22       A.    Yes.

23       Q.    Spell words, meaning, writing, three grades to

24   achieve?

25       A.    Yes.

JUSTICE REPORTING SERVICE, INC.   523-6114

1      Q.    Use a period or question mark, declarative,

2    interrogatory he didn't achieve?

3      A.    No.

4      Q.    Capitalize the first word in the sentence.  The

5    pronoun "I" in the persons name, he did not achieve that

6    skill, correct?

7      A.    Right.

8      Q.    According to the totals here the number of correct

9    items that he had to deal with were a total of 67, right?

10     A.    Yes.

11     Q.    And he got 56 correct?

12     A.    Yes.

13     Q.    And out of these skills achieved according to this

14   nine skills achieved out of twelve, right?

15     A.    Yes but these skills are in second grade level.

16   Basically the test was being administered in October of '86

17   testing on what he achieved through second grade.

18     Q.    What part was that, I just want to know how he is

19   progressing at school at this point?

20     A.    Yes.

21     Q.    And then Mathematics, without going through the

22   whole thing, we will let the Judge see it.  There were two

23   areas, skill levels and Mathematics that he he did not

24   achieve, correct?

25     A.    Right.  He could not identify one half, one third,

1    or one fourth of a given region.  He could not subtract a

2    basic  faction through 18, vertical, horizontal notations,

3    could not select a clock that shows the stated time on the

4    hour and half hour.

5         Q.   All the rest of the functions on Mathematic

6    functions he achieved, correct?

7         A.   Yes.

8         Q.   11 out of the, just 11 out of 14 skills he

9    achieved, correct?

10        A.   Yes.

11        Q.   Number of items he got correct out of 67 were 55,

12    right?

13        A.   Yes.

14        Q.   That was during the year of '86 and '87, right?

15        A.   Yes, October of '86.

16        Q.   And on that Statewide Test, he achieved all those

17    things, that was in spite of getting C's and D's in class

18    when his absentee period goes up, correct?

19        A.   The '86 '87 record I think was reflected at the

20    end of the school year.

21        Q.   Right.

22        A.   Yes, it was, yes.

23        Q.   Basically Mrs. Khapin in the later part of

24    December of 1986 and '87 in making a comment in the

25    progress report her first statement -- and I am showing you

1    this record and it has an exclamation point, correct?

2        A.    Yes.

3        Q.    It goes on to say he is extremely behind in his

4    work.  Math and Language skills are very weak.

5        A.    Very week.

6        Q.    The first sentence she says Timothy is absent too

7    much, she puts an exclamation point, doesn't she?

8        A.    Yes.

9        Q.    By the way, the second grade teacher, Annie Hall,

10   I could see that on the Florida State Achievement Test, you

11   didn't talk to her either, did you?

12       A.    No.

13       Q.    Didn't talk to Mrs. Khapin?

14       A.    No.

15       Q.    You mentioned that Timothy had told you about

16   problems he got into as a juvenile, correct?

17       A.    Yes.

18       Q.    Which means he became obviously tied up in the

19   juvenile justice system, right?

20       A.    Yes.

21       Q.    He was arrested for delinquent crimes before this

22   happened, am I correct?

23       A.    That's what he told me, yes.

24       Q.    And you know that he did spend some of his time,

25   some of his time in the juvenile detention center, am I

1    right?

2         A.    Yes, I did.

3         Q.    I don't have those files with me, I left them

4    upstairs; but when he spends time in the detention center,

5    they still provide or at least the detention center seeks

6    to provide or continue education for the children, am I

7    correct?

8         A.    Yes.

9         Q.    There was a record in there when he was in the

10   juvenile detention center from April 23rd of 1990 until May

11   17th of 1990, do you have that record, at least it was in

12   the records I got from Mr. Davis?

13        A.    Yes, I think I do.

14             MR. DAVIS:   Could I see that check?

15             MR. MORTON:   Sure.

16             THE WITNESS:   There were also many transfers back

17        and forth.

18   BY MR. MORTON:

19        Q.    I am interested in this detention center record,

20   let's talk about it.   I guess it's a student withdrawal

21   form, is that what it is?

22        A.    May I see that?   I can't seem to locate mine.   I

23   had it.

24        A.    Yes.

25        Q.    And it appears to be done by Mrs. Finger, at least

1    that's the name down at the bottom there?

2         A.    Yes.

3         Q.    And it talks about Timothy when he was in the

4    juvenile detention center April 23rd of 1990 correct?

5         A.    Yes.

6         Q.    Withdrew May 17th of 1990, correct?

7         A.    So approximately three weeks.

8         Q.    Yes, approximately three weeks, just three weeks,

9    and the school he was attending at the time was Apollo

10   Middle?

11        A.    He was in the transitional sixth grade there.

12        Q.    And that was some of the records I think that you

13   have in your file, right?

14        A.    Yes.

15        Q.    And I am not saying what is the performance level

16   or the level of class work in the detention center.  I am

17   not commenting on that you are not an expert on that.

18        A.    No, I am not at all.

19        Q.    But I was just curious because when we look at

20   this, was a reporting period where Timothy was attending

21   classes in Business Education, correct?

22        A.    Well, they list Business Education, English,

23   physical education, Health, and Social Studies.

24        Q.    And this was during the reporting period for

25   whatever it was, right?

1     A.    Yes, yes the fourth quarter probably.

2     Q.    And in 1990 during this period of time when he

3  attended they had grades the level he was performing before

4  the withdrawal grades, correct?

5     A.    Yes.

6     Q.    When he withdrew his performance level in Business

7  Education was B, right.

8     A.    Yes.

9     Q.    In English it was B, correct?

10     A.    Yes.

11     Q.    Physical Education B, right.

12     A.    Yes.

13     Q.    Health C, correct?

14     A.    Yes.

15     Q.    Social Studies C, correct?

16     A.    Yes.

17     Q.    So he had in these areas, apparently, according to

18  this Mrs. Finger, an above average performance when he

19  withdrew in these areas according to whatever the contents,

20  correct?

21     A.    My concern is --

22           THE COURT:  One at a time.

23  BY MR. MORTON:

24     Q.    We don't know what the contents --

25     A.    My concern is very much what standard are they

1    teaching and grading.

2        Q.    I agree, but have you talked to Mrs. Finger?

3        A.    No, but I do know Tim's I.Q. and he is not

4    average.  He is not close to average.

5        Q.    All right.  And does that mean that a person then

6    can not understand basic concepts such as the right to

7    remain silent because they have a low I.Q. is that what

8    you're telling me?

9        A.    No, I think that concept you can understand.  As I

10   said he is mildly retarded he was capable --

11       Q.    Does it mean that he would not know what an

12   attorney is because he has a low I.

13       Q.    In an of itself, is that what it means?

14       A.    No, no.

15       Q.    And does it mean that if he had a right to have

16   his mother present or wanted his mother present if he was

17   talking to the police, he wouldn't be able to understand

18   just an I.Q. score itself?

19       A.    No.

20       Q.    And, in fact, I can go on and on and on, because I

21   sort of jotted words down here.  I think this is what you

22   meant when Mr. Davis asked you in direct examination if he

23   could understand things.  He asked you had this question

24   about the Miranda warnings and rights and all that stuff,

25   as we know the terminology.  I believe your response was I

1       am not going to have the court reporter read it back, but

2       tell me if I characterized it fairly.  It says he would

3       understand legal rights in a basic way?

4            A.   Yes.

5            Q.   Is that what you said?

6            A.   Yes.

7            Q.   But then you concluded in this particular

8       circumstance, as you went on and asked questions right

9       after that, you said in your opinion based on his prior

10      experience he did not understand and you began to talk

11      about he wished his mother was there and so forth, do you

12      remember some of that testimony?

13           A.   Yes, I remember.

14           Q.   So I just want to get it straight then that

15      professionally, Doctor, and I know you're honest.  Your low

16      I.Q. in and of itself doesn't mean he could not understand

17      those rights at his level, correct?

18           A.   Yes, that's correct.

19           Q.   And we have to take the circumstances in its

20      totality in order to determine that, right?

21           A.   Very much so.

22           Q.   Finally, he was recently according to a record in

23      September of 1990 which brings us closer to the time and

24      period, apparently assigned to Driftwood Middle School.

25      Did you know about that?

1    A.    No, I didn't see --

2    Q.    And he was assigned to Driftwood Middle School in

3    an alternative program, did you know that?

4    A.    No.

5    Q.    His teacher was, her name was Jodie -- I am sorry,

6    Jodie Perry (phonetic).  Do you know anything about her?

7    A.    No.

8    Q.    You never talked to her?

9    A.    No.

10   Q.    Do you think it might have been helpful to talk to

11   the teacher who last had him before he got arrested for

12   this particular offense?

13   A.    It might have been helpful, but I don't think it

14   would have changed my assessment of him.  It was done over

15   the course of several months.

16   Q.    I know it wouldn't have changed your opinion, but

17   it may have been helpful?

18   A.    Any information may have been helpful.

19   Q.    Yes.  Now, am I correct, Doctor, that Mr. Brown

20   had been in the court system before, correct?

21   A.    Yes, he had.

22   Q.    And we know that Mr. Brown had been represented by

23   attorneys before, correct?

24   A.    I would assume so.

25   Q.    You would assume at least he had been?

1      A.    Correct.

2      Q.    If you knew that the last legal problem he had

3  before he was arrested was in the juvenile center and it

4  was arrest for armed robbery, I believe, on the theft case

5  and ultimately that was disposed of, you would assume that

6  he had a lawyer represent him during those things, those

7  serious charges, right?

8      A.    Yes.

9      Q.    And so you would assume that even before that with

10  all his other problems he was represented by lawyers,

11  correct?

12      A.    Yes.

13      Q.    And that he knew what a lawyer was, correct?

14      A.    Yes.

15      Q.    And that he knew what a lawyer could do for him,

16  correct?

17      A.    They could do in a very basic way, yes, that the

18  lawyer was on his side, yes.

19      Q.    These questions you say that they indicate that he

20  was sort of going along with the program or very, I guess,

21  manipulated.  You see a lot of yes, sir, yes, sir, yes,

22  sir, correct?

23      A.    Correct.

24      Q.    And I am not going to go through each and every

25  one of those because the specific ones that were brought

1    out was the one on page 13, and we will just talk about

2    that on cross examination; and we are going to play the

3    tape so the Judge can hear the rest of it because it is up

4    to him to decide.  Let's look at that question you are

5    talking about, starting on page 13 or at least the

6    conversations with Detective Thomasevich.

7         A.   Yes.

8         Q.   And it says, "Now, you know we are saying these

9    things to you, Timmy," and he keeps saying, yes sir, all

10   right."  So Detective Thomasevich seems to have some

11   concerns as to whether or not he was put the words into

12   Timothy's mouth, correct?

13        A.   It sounds like it, yes.

14        Q.   Because I want you to understand that we don't

15   want to put words in your mouth, okay.  And then he says is

16   that what had happened, and again he says," yes, sir,

17   right"?

18        A.   Yes.

19        Q.   You pointed that out?

20        A.   Yes.

21        Q.   And you said, "Well, I don't know if that really

22   means,' yes, sir, you are putting words in my mouth,' or

23   'yes, sir, I understand, and you're not putting words in my

24   mouth.'"  Do you  remember you said you didn't know which

25   one it might be, right?

233

1      A.    I said it was a possibility.

2      Q.    But if we continue on because notice -- correct

3   if I am wrong, Detective Thomasevich goes on to say, okay

4   now along the same concept the reason why we are repeatin

5   this to you is because you told us this earlier, right?

6   And his answer is, "Yeah, correct"?

7      A.    Correct.

8      Q.    Or if the transcript is accurate and then

9   Thomasevich says before we went on tape meaning you told

10  these things before we went on tape, answer is, "Yes, sir

11  correct"?

12     A.    Correct.

13     Q.    And Thomasevich says, Okay, is there anything

14  we are saying that is not true or not so?"  He was trying

15  to clarify that himself, right?

16     A.    It seems that way, yes.

17     Q.    And Mr. Brown responded everything true on this

18  tape here?

19     A.    Well, there is no question mark, everything tru

20  on this tape here.

21     Q.    At which seems to be indicating what my answers

22  what you're saying, everything on this tape is true, ri

23     A.    Yes.

24     Q.    And Thomasevich says, "Okay, I'm saying what w

25  have been discussing with you and what we are saying yo

1    things out of his memory.  He was not accurate concise

2    chronological of his life, not that I felt he was being

3    evasive.  These things were not that important to him.

4         MR. MORTON:  I don't have any further

5    questions.

6         MR. DAVIS:  Just a couple, Judge.

7                    RE-DIRECT EXAMINATION

8    BY MR. DAVIS:

9    Q.   Dr. Koprowski, Mr. Morton seemed to be indicating

10   to us in his cross examining that because Mr. Brown was in

11   trouble he was trying to fake his I.Q. and trying to

12   malinger, I guess, in some fashion.  Do you have the I.Q.

13   evaluation that was done in 1988 there in front of you?

14   A.   I don't have the actual test, I just have the

15   school --

16        MR. DAVIS:  I'd like to mark that, put that

17        into evidence if you don't have any objection to

18        that, Mr. Morton.

19        MR. MORTON:  No.

20   BY MR. DAVIS:

21   A.   I will find it.  It was '88.  Here's one copy.

22   Once it's in the school record, apparently it stays

23   permanent record so it's reprinted each school year.

24        MR. DAVIS:  I'm just going to mark that as Defense

25        Exhibit A for identification purposes only, and as long

1    as Mr. Morton doesn't have an objection I'll question

2    Dr.  Koprowski on it.

3         MR. MORTON:  What are you talking about?

4         MR. DAVIS:  The I.Q. that's in here.

5         THE COURT:  Mr. Morton, do you have an objection

6    to that rather than going through and setting all this

7    predicate for it?

8         MR. DAVIS:  I don't think I'm going to have the

9    doctor --

10   BY MR. DAVIS:

11        Q.  Doctor, this testing that was done on Tim Brown

12   was done in what year, 1988?

13        A.  Yes.

14        Q.  And in the year 1988, he was then charged with the

15   crime that we are here in front of the court with today?

16        A.  Oh, no.

17        Q.  And his I.Q. which is indicated in here then, if

18   you would give that to the Judge.  In 1988, he was tested

19   out a what level?

20        A.  58 verbal 58 quantity, 54 nonverbal.

21        Q.  Okay.  Now, that was consistent with the I.Q.

22   levels that you obtained during your evaluation; is that

23   correct?

24        A.  Right, approximately three years later.

25        Q.  So is there any indication in your mind that there

1    was not malingering going on?

2         A.   Yes, that is a good indication in my mind that

3    there is no malingering.  He had no reason in '88 to try

4    and do poorly on the school standardized test.

5         Q.   Was your testimony earlier also that there was

6    other ways that you could make a determination if someone

7    was trying to fake bad or on the I.Q., in the test you were

8    giving him?

9         A.   Yes, certainly.  I look at the pattern of

10   responses the quality of the poor responses, someone who is

11   brighter but trying to look stupid, frankly, is going do

12   give probably very difficult quality of bad responses.

13        Q.   Okay.  Now you also mentioned and you couldn't

14   find that in Tim Brown, I guess?

15        A.   No, I did not because the other test are

16   indicative the intellectual function, even the Rorschach

17   shows his child like primitive but not psychotic.

18        Q.   You don't have any doubt in your mind that his

19   I.Q, the full scale I.Q. is around 6th grade do you?

20        A.   No, I don't.

21        Q.   Now, also, Mr. Morton asked something with Tim's

22   dad came up in cross examining.  Are you aware of the fact,

23   Dr. Koprowski, that Tim's father was murdered and was shot

24   by his common-law-wife at the time and that the prosecution

25   didn't even prosecute the woman because he was being

JUSTICE REPORTING SERVICE, INC.    523-6114

1    abusive to that woman and tied into the abuse that happened

2    to Tim Brown when he was growing up?

3        A.   No, I was not aware that he had been shot and

4    murdered by her, no, or that there had been no prosecution.

5    I was just simply told he had been murdered and that was

6    recently that I was told.

7        Q.   Further, Doctor, is there anything that you went

8    over with Mr. Morton in the school records where Tim

9    like -- what does it mean when you said he was third

10   percentile on national average in math, what does that

11   mean?

12       A.   That 97 percent of the second graders, I think,

13   were third graders, did better on the test then Tim did.

14       Q.   How old was Tim Brown at that point?

15       A.   I believe he was 11 when he was in third grade.

16       Q.   You should be in about fifth grade when you're 11?

17       A.   Eleven, approximately, yes.

18       Q.   So he is at an age where you should be fifth

19   grade, but yet he is scoring on the third percentile on the

20   math test on the third grade level?

21       A.   Yes.

22       Q.   And that third percentile, would that -- if you're

23   doing percentiles, would that equate to an I.Q. that you

24   came up with around in that same area?

25       A.   Yes.

1     Q.   Was there anything at all that Mr. Morton went

2     over with you on cross examination, as far as the results

3     of his school records and absence, his grades or anything

4     in there, the fact that he had grades that he got when he

5     was in the juvenile detention center for three weeks,

6     anything at all that he went over with you that changes

7     your opinion at all?

8     A.   No, nothing changes my opinion.  I did find one

9     piece of information from Driftwood Middle which Mr. Morton

10    may not have had.  When he was there for the first marking

11    period he received all F's, this was his alternative

12    program.

13         MR. MORTON:  I just got what Mr. Davis gave me

14        this morning and that wasn't in there.

15    BY MR. DAVIS:

16    A.   I am sorry.  I didn't locate this earlier.  That

17    was the beginning of 1990, the 1991 school year before he

18    was --

19    Q.   That was in the alternative program at Driftwood

20    Middle?

21    A.   Yes.

22    Q.   And when we're saying on direct examination that

23    Tim Brown is easily led and that he can be coerced into

24    saying anything by these authority figures such as a police

25    officer, were you saying that concretely he wouldn't know

Fax to

1-305 927-1653

Larry Davis

from Elizabeth Kyprowski Pho

12·6·92

(305) 786-0512

one page to follow

ATTACHMENT / EXHIBIT _16_

Memo to: Larry Davis

Re: Tim Brown        91-4793 CF 10B

Date: 12-6-02

From: E. Koprowski

Tim Brown was seen on 9-30-91 (1½ hours interview); 10-7-91 (1½ hrs - given the WISC-III & House Drawing) 10-21-91 (1½ hrs. - given the WRAT-R², Bender Gestalt, Competency Screening Sheet, Person + Tree Drawings) 12-16-91 (1¼ hrs. Rorschach + Thematic Appreception test given.)

Results: WISC III    Verbal IQ. 60
                  Performance IQ 60, Full Scale 56
              = Mild Retardation

WRAT-R²    Reading   3rd grade (2%'ile)
                    Spelling  3rd grade (1%'ile)
                    Arithmetic  below 3rd grade (.05%'ile)

Bender     No clear signs of organic brain damage. Impoverished life; potential was probably higher originally. No psychosis or depression - avoids emotions.

Is very easily led by others - low sense of self or self esteem. Intellectually & emotionally very immature. Judgment is poor because of these deficits.

Cannot read waiver of rights.

Lies to hide his lack of comprehension or confusion but cannot keep track of inconsistencies.

3

```
 1    State of Florida      )
                            :ss        J. John Frusciante
 2    County of Broward     )

 3
                    IN THE CIRCUIT COURT OF THE
 4                 SEVENTEENTH JUDICIAL CIRCUIT,
               IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6
      STATE OF FLORIDA,          )
 7                               )
             Plaintiff,          )
 8                               )
      vs.                        )   Case No.   91-14793 CF B
 9                               )
      TIMOTHY BROWN,             )
10                               )
             Defendant.          )
11    -------------------------X

12

13            Proceedings had and taken before the Honorable John

14    Frusciante, one of the Judges of said Court, Ninth floor,

15    Room 950, Broward County Courthouse, Fort Lauderdale,

16    Broward County, Florida, on the 7th day of January, 1993

17    commencing at or about the hour of 10:00 o'clock a.m. and

18    being a Motion to Suppress hearing.

19

20

21    APPEARANCES:

22            CHARLES B. MORTON, JR., Esquire
              Assistant State Attorney,
23            On behalf of the Plaintiff.

24            LARRY S. DAVIS, Esquire,
              Appearing on behalf of the Defendant.
25
```

ATTACHMENT / EXHIBIT 17

1      ruling now.

2           MR. DAVIS:  I supplied the Court with a memorandum

3      with all the case laws, all the cases that were

4      mentioned.

5           THE COURT:  I'll just be a moment or two here.

6      Let me begin by saying that we as judges have to so

7      often set aside other personal likes, dislikes, social

8      views, religious views, as the case may be in

9      determining the cases before us.  And that's one of the

10     things that judges have to do, and one of the things

11     that generally people have a very difficult time in

12     accepting.  When you run for a judge you end up having

13     to face specific questions; one of the things that you

14     want I think in a judge is to be able to have them set

15     aside their personal views and thoughts in favor of the

16     laws that's presented, not only today but over the last

17     200 years in our country.  And when we make decisions

18     like this we have a number of things that are fed into

19     us.

20          We have to determine what it is and what we think

21     is appropriate in making the determinations that we do.

22     And it may leave us with feelings that we don't

23     particularly like.  And to some it may feel that our

24     decision is inappropriate.  It's difficult to have a

25     decision made like this where you have both sides very

7

1    comfortable with the Court's ruling.

2         As I look over this case I see that that initial

3    statement made by the Defendant on November 15th is

4    more troublesome to this Court than appears to be to

5    Mr. Morton.  And as far as this, as far as this motion

6    pertains to the statement by Mr. Brown on November 15th

7    is concerned the Court will grant that motion.

8         Now we go on to the statement made on July 16th is

9    it?

10        MR. DAVIS:  Yes, sir, July 16th.

11        THE COURT:  There has to be some independent way

12   that the police will make it back to Mr. Brown on that

13   date.  Other then that particular statement made on

14   November 15th.  Some of the things that I thought were

15   significant were things such as the fact that the

16   police allowed Mr. Brown to be free at one point to go

17   into into the system here, and be let out again.  As a

18   matter of a fact, I think it happened a couple times

19   once at least without their knowing, and I find it very

20   difficult to believe that if they really had him as a

21   suspect based upon that first statement, that he would

22   have had such an opportunity.  I think there are,

23   however, some problems perhaps for the State regarding

24   the overall facts, and perhaps there will be some

25   difficulty before the jury regarding certain matters

1    such as Mr. McGill and the lack of pursuing Mr. McGill

2    is troublesome to the Court.

3         What I have to determine in my own mind is does it

4    effect this particular motion, and I've come to the

5    conclusion that it does not.  I find that the

6    intelligence of the Defendant being certainly a

7    consideration for the Court as are a number of things,

8    I think it was the Brewer case in fact cited in your

9    motion, Counsel, brings the totality of the

10   circumstances to the forefront as well as any

11   individual case, and I'm looking at cases here such as

12   Stokes where I'm concerned about the parent going to

13   the police station and not having the opportunity to be

14   with the defendant.  I failed to find that particular

15   fact in this case that would conform to, or have this

16   Court conform to the ruling in Stokes versus State.

17   And the intelligence certainly I think is relevant, and

18   in some other cases referring to children as young as

19   ten years old IQ's may be a little bit higher I think

20   68, 69, 70 someplace in that area, but it was a ten

21   year-old as opposed to a 15 year old, and that wasn't

22   sufficient enough to suppress the statement.

23        Although as you mentioned, Counsel, the State did

24   not impeach the doctor, the fact is that I think much

25   of what she said led the Court to believe that this

1    defendant had the mental capacity to understand the

2    Miranda warnings that were given to him, and much of

3    what he did not do well in school may have in fact been

4    brought about by his not attending.  Something that I

5    look forward to seeing less of from so many of the

6    people before me and having them pursue that education

7    much stronger with much stronger vigor then he appeared

8    to be doing at this time.

9         That's not a problem here again that this Court

10   needs to address.  It appears clear that in the first

11   statement he was intoxicated and I see nothing in the

12   statement that drugs were mentioned in Brewer.  I see

13   nothing in the second statement that shows signs of

14   that at all.  I believe that the defendant freely and

15   voluntary and knowingly and intelligently waived his

16   rights in the second statement, and as such this Court

17   would rule that the motion in regards to the July

18   statement be denied.

19        To sum it up as far as the two statements are

20   concerned, the Defendant's motion regarding the first

21   statement is granted.  The Defendant's motion as it

22   regards the second statement is denied.  This case is

23   set for trial on February 1st and I expect to be on

24   track with that date, and to proceed accordingly.  Is

25   there anything else that needs to come before the Court

OFFICE OF THE MEDICAL EXAMINER
DISTRICT 17 BROWARD COUNTY FLORIDA
NIVERSITY OF MIAMI DEPARTMENT OF PATHOLOGY
5301 SW 31 AVE FT.LAUDERDALE, FLORIDA 33312-6199

O—1885                                                              90—1885

atrick K      Behan  29 Yr. Anglo     Male    6 ft 4 in 193 lbs
                                                        DOB-04/09/61
    HOME      11470 NW 36th Place SUNRIS sT, BROWARD  , FL          ( 601 )

    DEATH     Memorial Hospital HOSPITAL
              TIME OF DEATH  OCCURRED       2:26 AM 13 NOV 1990 TUE SURVIVED 0 yrs 0 Da 1 H

    INCIDENT  3990 W 'Hall'dale  HLLANDALE, BROWARD  , FL          ( 1006 )
              TIME                           1:05 AM 13 NOV 1990 TUE

THER INVESTIGATING AGENCY BSO        (PK90-11314)

ARRATIVE SUMMARY                                                rnr 90111411


    According to BSO information, the deceased had responded to the
Circle K Convience store in reference to stolen cigarettes. The de-
ceased obtained the necessary information for his report and was in
his car initiating a report on the theft. The officer had originally
parked his police car in front of the store, but after completing his
investigation, he backed his car in at the west end of the parking lot
to write the report. The store clerk and a tow-truck driver were in-
side the store when they heard a gunshot. The went outside and did not
see any vehicle or person except the deputy and his car. They ap-
proached the deputy's car and noted that he was injured and bleeding.
The store clerk called '911' and the tow-truck driver positioned his
vehicle to prevent any cars from entering the parking lot. The
cigarette theft suspect was apprehended and questioned about the
shooting. The driver's window of the police car was down about 8 to 9
inches from being totally closed. The deputy's weapon was still hol-
stered and had not been fired. He suffered a gunshot wound thru the
left ring and middle finger which then apparently entered the left
cheek area of the victim. There was no exit wound noted. No shell
casings were found at the scene. The victim was airlifted to Hlwd
Memorial Hospital ER however all efforts were unsuccessful. No
suspect(s) are in custody, nor was any weapon recovered.
    NOK:Wife: Gina Behan:11470 NW 36th Place: Sunrise, Florida 33304
AUSE OF DEATH:   GUNSHOT WOUND OF HEAD

ANNER OF DEATH: Homicide

UTOPSY   8:00 AM 13 NOV 1990 TUE BY DR.R.I.VILA MD

UNERAL HOME: F.HUNTER

**FINAL**

ATTACHMENT / EXHIBIT 18

                uuh              I g5ggHHe            rf

Patrick Kelly BEHAN    Nov. 13, 1990                    90-1885

AUTOPSY REPORT
UNIVERSITY OF MIAMI DEPARTMENT OF PATHOLOGY
DISTRICT 17 (BROWARD COUNTY) MEDICAL EXAMINERS' OFFICE
5301 SW 31 AVENUE
FORT LAUDERDALE, FLORIDA 33312

**CAUSE OF DEATH:**

Gunshot wound to head

**MANNER OF DEATH:**

Homicide

Raul I. Vila MD
Associate Medical Examiner

RIV/slm

printed November 14, 1990                         page 1

Patrick Kelly BEHAN    Nov. 13, 1990                90-1885

## EXTERNAL EXAMINATION:

The body is that of a 6 feet 2 inch 183 pound  muscular white  male appearing older than the stated age of 29 years. The hair is brown.  No lacerations or contusions are evident on the uninvolved scalp. The irides are blue. The pupils are symmetrical. The sclerae and conjunctivae are  free  of  any petechiae.  The  nostrils and ears are within normal limits. No lacerations or contusions are evident on  the  lips.  All the teeth are present and natural. The neck, chest and abdomen are symmetrical and within normal limits. The  antecubital  fossae,  popliteal  fossae  and  wrists  along with the remaining upper and lower extremities not involved by trauma are  within  normal  limits.  The  The external genitalia is within normal limits.

Along with the body at the morgue is received  a  white BSO  uniform shirt, cut open uniform trousers, a badge and a back panel of a bullet proof vest along  with  white  shorts and T-shirt. The body is received with the left hand bagged.

## EVIDENCE OF RESUSCITATION:

An endotracheal tube is evident and in  place.  A  neck brace  is  correctly in place. Catheters are present in each antecubital fossa and are correctly in place. An identification tag is present in the left wrist.

## GUNSHOT WOUNDS:

Radiological examination  is  performed  to  assist  in localizing the projectile.

A penetrating gunshot wound of the  left  side  of the  face  is  evident.  The  entrance wound is 6-3/4 inches below the top of the head and 2-3/4 inches anterior and  1/2 inch below the left external ear meatus. The wound is irregular and 2 x 2.2 cm with an anterior inferior marginal abrasion ranging in width from 0.5 to 0.7 cm. The remaining marginal abrasion is 0.1 cm wide. No stippling or powder  residue is evident around the wound.

The pathway of the projectile includes skin and  subcutaneous  tissue,  then through the upper portion of the left maxillary bone continuing through the  base  of  the  skull, through  an  eggshell  fractured  defect  in the left medial fossa. The projectile then continues through the left cerebral  hemisphere,  through  a defect in the anterio-inferior temporal lobe exiting through the medial aspect of the  left cerebral  hemisphere  then  continuing  through the pons and

Patrick Kelly BEHAN   Nov. 13, 1990          90-1885

right anterior cerebellar region,   then   continuing   through
the medial aspect of the posterior parietal anterior occipi-
tal lobe of the right cerebral hemisphere and exiting on the
right   occipital,   posterior parietal area on the right side
and through a 4 x 3 cm elliptical defect  with  ectocranial
beveling  on  the  posterior  parieto-occipital  area on the
outer cranial vault. It then continues to  the  subcutaneous
tissue where a deformed light metal fragment is encased. Two
other pieces including a deformed light metal medium caliber
projectile and a deformed copper colored jacket fragment are
evident in the right cerebral hemisphere near the exit site.
All  the  fragments  are placed in an envelope sealed signed
and given to the detective present at the autopsy. The path-
way  of  the  projectile is left to right, front to back and
slightly upward.

     A graze type gunshot wound is evident in  the  3rd  and
4th digits  of  the left hand with the one in the 3rd digit
measuring 6 x 2.5 cm. The one on the 4th digit is 3.5 x  0.5
cm.  Both  these  wounds  are roughly elliptial to irregular
with the wound in the 3rd digit having a  marginal  abrasion
of 0.5 cm wide posteriorly and proximally with the remaining
marinal abrasion posteriorly 0.1 cm wide. In the  4th  digit
the  marginal  abrasion posteriorly and proximally is 0.8 cm
wide with the remaining margin 0.1 cm. Anteriorly the margi-
nal  abrasion is 0.1 cm wide for the wound in the 3rd digit.
A contusion of 1.5 x 0.9 cm is evident in the wound of  the
3rd  digit distally. In the 4th digit anteriorly is a 0.4 cm
wide marginal abrasion proximally with the remaining  margi-
nal  abrasion  0.2  cm wide. Both these wounds are 19 inches
from the elbow and at the  midline  of  the  anterior  upper
extremity.   Stippling is evident throughout the palm of the
left hand most prominent in the distal  aspect  of  all  the
digitis  of  the  left hand. Stippling is evident for a dis-
tance of 12 cm superiorly and 11 cm laterally, 5 cm medially
and  4.2 cm inferiorly. Fractures of the medial and proximal
phalanges of the 3rd digit are present  and  these  protrude
posteriorly.  The  pathway  of  the projectile of this graze
type gunshot wound is front to back. Extravasation of  blood
is  evident  within  the wound along with maceration of soft
tissue, muscle, vessels and nerves of the fingers.

     On  reflection  of  the  scalp  extensive  galeal    and
subgaleal  extravasation  of  blood  is  evident  around the
gunshot wound region. Extensive maceration of  brain  tissue
and  extravasation  of blood is evident throughout the brain
parenchyma. Subarachnoid extravasation of blood  is  evident
throughout  the  entire  brain.  In the medial aspect of the
inferior surface of the frontal lobe in the anterior frontal
region  is  a 5 x 7 cm superficial cortical contusion. In the
base of the skull  are  several  irregular  to  semicircular

Patrick Kelly BEHAN    Nov. 13, 1990                    90-1885

fractures on both the anterior left and right sides of the base of the skull and roughly an S-shaped fracture is evident through the left medial and posterior base of the skull. A roughly transverse fracture is evident in the posterior base of the skull on the right side extending from the exit wound site to the foramen magnum.

INJURIES:

A less than 1 cm abrasion is evident in the left side of the head with an overlying a light metal fragment. This fragment is placed in the envelope where the projectiles of the gunshot wounds were placed.

Several small deep abrasions are present in the left upper eyelid measuring 3 x 2 cm medially and the one laterally at 2 x 1 cm. A superficial abrasion is evident on the left side of the head in the scalp region of 0.5 x 0.2 cm.

INTERNAL EXAMINATION:

The pericardial sac, pleural cavities and peritoneal cavity are smooth lined with no evidence of nodularities, hemorrhage or accumulation of fluid.

The heart is in its normal anatomical position and weighs 430 grams. The left main coronary artery and the left anterior descending coronary have approximately 50% atherosclerotic narrowing with minimal calcification for the first several centimeters. The left anterior descending coronary and the remaining coronary vessels have less than 20% atherosclerotic narrowing. No myocardial bridging is noted. The vasculature of the heart is right dominant. All the valves are smooth lined, pliable and translucent with no evidence of stenosis or dilatation. The myocardium and endocardium are free of any recent or old infarctions. The aorta is tan and smooth with no evidence of narrowing or calcification noted.

The right and left lungs weigh 310 and 260 grams respectively. The outer surfaces are tan to blue and smooth with some anthracotic pigment deposition. The sectioned surfaces are minimally congested with some crepitance still noted. They are minimally collapsed. The upper and lower bronchial tree along with the vasculature is not obstructed and within normal limits.

The liver is weighs 1630 grams with a tan smooth outer and sectioned surface. No evidence of nodularities,

Patrick Kelly BEHAN    Nov. 13, 1990              90-1885

hemorrhage or fatty change is present. The gallbladder and biliary tree are free of any obstruction.

The stomach and esophagus have a smooth lined mucosa with some thickening of the distal esophageal mucosa with minimal sloughing. No evidence of nodularities, erosion or hemorrhage is present in the esophageal or stomach mucosa. No pill like contents are present in the stomach. Approximately 100 cc of brown granular material is present in the stomach contents. The remaining gastrointestinal tract is within normal limits.

The spleen weighs 240 grams with a blue smooth capsular surface and a dark red sectioned surface with prominent white pulp.

The pancreas has a bossalated outer and sectioned surface which is tan and with no evidence of hemorrhage, calcification or nodularity on section. The adrenals have a yellow cortical surface and a dark tan unremarkable sectioned surface with no evidence of enlargement, nodularities or hemorrhage. The bones of the pelvis, vertebrae and extremities not involved by trauma are within normal limits.

The right and left kidney weighs 130 and 140 grams respectively. The cortical surfaces are dark tan and smooth with no evidence of scarring. The sectioned surface have normal demarcation of the corticomedullary junctions. The pelvic and calyceal systems are within normal limits. The ureters are not dilated and the bladder is unremarkable. Slight enlargement of the prostate is evident, however, it is non-nodular and soft.

The neck organs are in their normal anatomic position. Careful neck dissection fails to reveal any evidence of hemorrhage, nodularities or trauma. The cartilages and bones are intact. The inner surfaces are unobstructed. The thyroid is non-nodular, not enlarged and unremarkable on serial sectioning.

No enlargement of the lymph nodes is evident.

The outer cranial vault and base of the skull not involved by trauma is within normal limits. The reflected scalp has no evidence of galeal or subgaleal extravasation of blood in the areas not involved by trauma. The brain is symmetrical and weighs 1620 grams. In the nontraumatized areas normal gyri and sulci are evident. The sectioned surfacs have normal demarcation of the gray and white cortical matter. The midbrain, upper medulla and cerebellum are symmetrical and unremarkable in the nontraumatized areas. Some

Patrick Kelly BEHAN   Nov. 13, 1990                    90-1885

extravasation  of  blood is evident in the brain parenchyma.
No pigmentation of the  substantia  nigra  is  present.  The
cerebrovasculature  not  involved  by  trauma along with the
membranes is within normal limits.

Patrick Kelly BEHAN   Nov. 13, 1990                    90-1885

**AUTOPSY FINDINGS:**

1.  Penetrating gunshot wound of the left side of the face
    extending left to right, front to back and slightly
    upward

2.  Graze type gunshot wound in the left 3rd and 4th
    digits extending in an anterior to posterior direction
    with stippling evident in the anterior aspect of the
    left hand

3.  Single atherosclerotic coronary vessel disease proxi-
    mal

4.  Prominent white pulp of spleen


Raul I. Vila MD
Associate Medical Examiner


RIV/slm

Head, surface and skeletal anatomy, lateral view.

Name _Patrick Benan_

Autopsy No. _90-1885_

Age _29_   Race _W_   Sex _M_   Date _11 / 13 / 90_



Broward County Medical Examiners Office
TOXICOLOGY REPORT
5301 SW 31st Avenue, Ft. Lauderdale, FL 33312       tel. (305)765-5190

TOX CASE NUMBER 90   1612
Behan Patrick Kelly                                    29 yo White Male
Broward Medical Examiners Office          Case Number   90-1885

Specimens Collected: 11/13/90
Specimens Received:
Analysis Completed:  11/20/90

Specimens Received: Blood(Heart) Gastric Liver Urine

Tests Requested:    Alcohol Drug Screen

| Specimen | Test | | Result |
|----------|------|---|--------|
| Blood(Heart) | G.C. | absent | ethanol |
| Urine | T.L.C. | | drugs not detected |
| Urine | EMIT | | drugs not detected |

Gene DeTuscan
Toxicologist

Homicide R.I. Vila M.D.

Skull, base, inferior and superior views (plus calvarium).

Name _Patrick Behan_          Autopsy No. _90-1885_

Age _29_  Race _W_  Sex _M_     Date _11 13 90_







R                                          L

INNER VIEW OF SKULL

BOARD OF COUNTY COMMISSIONERS

BROWARD COUNTY, FLORIDA

## BODY DIAGRAM



Front                                    Back

Decedent's
Height _____ inches

Name _____

Examined

By _____ Date _____

BOARD OF COUNTY COMMISSIONERS

BROWARD COUNTY, FLORIDA

90-1885

## BODY DIAGRAM



Front

Back

BROWN HAIR

TEETH present + nat.

BLUE

NECK BRACE

MOUSTACHE   ET

O

CATH

CATH

IO TAG

lite BSO uniform shirt
w/ green uniform trousers
+ pr
ar panel tr Bullet jacket
+ta sheets
+ 4 Pr Latt nal
4 / 4th light left hd

| Decedent's Height | 6 2 | inches |

143 lbs

Name   Bohan, PATRICK

Examined
By   Raul d Vila, M.D.   Date 11-13-90

1301

1  Whereupon,

2                            RAUL VILA

3       was called as a witness on behalf of the State of

4  Florida, and having been first duly sworn, was examined

5  and testified as follows:

6            THE CLERK:  Please state your name and spell

7       your last name for the record.

8            THE WITNESS:  My name is Raul Vila, V - as in

9       Victor, I-L-A.

10                        DIRECT EXAMINATION

11       Q.   (By Mr. Morton)  Sir, you told us who you are by

12  telling us your name, now tell us who you work for and the

13  kind of work you do?

14       A.   I am an Assistant Medical Examiner of pathology

15  with the University of Miami, School of Medicine.  Also a

16  Deputy Chief Medical Examiner here in Broward County.

17       Q.   I take it in order to become a deputy associate

18  or deputy medical examiner in pathology in the University

19  of Miami, you must have had a certain amount of training

20  and education, am I right?

21       A.   Yes.

22       Q.   Let's start out with your education as it

23  relates to your field?

24       A.   Okay.  Well, after graduating from medical

25  school in 1982, I proceeded to the University of South

1   Florida, College of Medicine where I did training in

2   atomic and clinical pathology from 1983 to 1987.  At that

3   point I went down to the University of Miami, School of

4   Medicine in the Dade County Medical Examiner's Office

5   where I did my fellowship in forensic pathology.

6           And from there, I went to medical examiner's

7   District 19 and 21st, which included everything north of

8   Broward County up to Indian River County, where I was an

9   associate medical examiner until the year 1989, at which

10  time I joined the University of Miami again and the

11  Broward County Medical Examiner's Office.

12      Q.   So over the years between your education and

13  your experience, how long have you been involved in

14  forensic pathology?

15      A.   About six years.

16      Q.   I take it over that period of time you have done

17  autopsies, am I correct?

18      A.   Many.

19      Q.   Approximately how many, just if - not precise,

20  but if you know the general area?

21      A.   Over two thousand.

22          MR. MORTON:  Your Honor, at this time I'd like

23      to offer Dr. Vila as an expert in the field of

24      forensic pathology.

25          MR. DAVIS:  No objection.

---

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1          THE COURT:  The Court will accept the Doctor as

2     an expert in his field.

3          Q.   (By Mr. Morton)  Well, you mentioned two terms.

4     You mentioned pathology and forensic pathology?

5          A.   Uh-hum.

6          Q.   Tell us about the first term, pathology.  First,

7     what is --

8          A.   Pathology is coming from the Greek, patho, which

9     means to study and ology - I am sorry, ology means study

10    and patho, which means disease.  So it's the study of

11    disease.

12          For example, when you go to the hospital and you

13    have a biopsy done on a lung, breast or colon, anything

14    that a person has to interpret, that person is the

15    pathologist.  When you have blood drawn and the blood is

16    taken down for analysis,  he person that interprets that

17    lab result and what it means is a pathologist, so that's

18    atomic and clinical pathology.

19          When you finish training in that field, you may

20    further educate yourself by doing an extra training

21    program in the field of forensic pathology.

22          Q.   So forensic pathology, then, is a specialty of

23    pathology?

24          A.   That's correct.

25          Q.   And tell us what forensic pathology specializes

1   in?

2       A.   Forensic pathology deals mainly with the terms

3   of the cause of death in people who die by violent means

4   and by natural diseases that is undocumented or people who

5   die suddenly and unexplained.

6           For example, if a young person dies suddenly

7   when in apparently good health, a medical examiner,

8   forensic pathologist, will try to determine why that

9   person died.  If you die in an accident, a suicide or

10  homicide in Broward County, then that falls also under

11  jurisdiction of medical examiner or forensic pathologist

12  who does autopsies and determines why you died.

13      Q.   And being in forensic pathology, then, the field

14  then also offers itself for courtroom presentation to

15  determine cause and manner of death, right?

16      A.   That's correct.

17      Q.   Well, in that capacity, did you get involved in

18  investigating the cause and manner of death of a person we

19  know as Deputy Patrick Behan?

20      A.   Yes, I did.

21      Q.   Tell us when and how you got involved?

22      A.   I was called early in the morning of November

23  13th that the officer had been shot and that same morning

24  I performed the autopsy.  The body was brought to the

25  medical examiner's office and given a sequential number.

1      Q.   What number were you given and describe that

2  process?

3      A.   90-1885.  In other words, that was case or the

4  body number one thousand eight hundred eighty-five that

5  had come to that office that year.

6      Q.   Now, do you, as a medical examiner, ever go to

7  the scene of a crime?

8      A.   Yes.

9      Q.   To determine preliminary cause and manner of

10  death?

11      A.   Yes.

12      Q.   Did you do that in this case?

13      A.   No, the body had been already removed to the

14  hospital and in that case, for us, there is no scene, so I

15  did not go to the scene of the occurrence.

16      Q.   What time did you begin your autopsy?

17      A.   The autopsy was begun early in the morning and

18  it was completed around - well, actually I started around

19  8:00 a.m., it was done around - before 10:00, more or

20  less.

21      Q.   8:00 a.m. on November 13th of 1990?

22      A.   1990, yes.

23      Q.   Was that a - what day was that?  Was that a

24  Monday, Tuesday or Wednesday, if you can see from your

25  records what day that was?

```
 1            A.    I don't recall that.

 2            Q.    Okay.

 3            A.    Tuesday.  Is that correct?

 4            Q.    According to your notes and the incident time.

 5            A.    Yes.

 6            Q.    All right.  Tell us what an autopsy consists of?

 7            A.    The autopsy, which of course is used by the

 8    medical examiner pathologist to arrive at a cause of

 9    death, is composed of two parts.  The first part is called

10    an external examination in which the external body is

11    examined, any evidence of trauma or natural disease is

12    documented.  Then the internal aspect of autopsy where the

13    organs are removed and you actually see the - any evidence

14    of trauma internally and also natural disease.

15            Q.    Is there another phase of the autopsy that's

16    sometimes referred to as the toxicology?

17            A.    Yes.

18            Q.    Tell us about that?

19            A.    In the process of doing an autopsy, blood and

20    tissues are removed and sent to the toxicology lab for

21    analysis.

22            Q.    And for your interpretation, as well?

23            A.    That's correct.

24            Q.    Tell us - start off with external examination of

25    Deputy Patrick Behan.  Did you examine the body for his
```

1   height and weight to see if it was consistent with his

2   stated age?

3        A.   He was six feet two inches, a hundred and

4   eighty-three pound muscular white male.  He appeared

5   slightly older than the stated age of twenty-nine.

6        Q.   Tell us more about your external examination as

7   it relates to your determination of cause and manner of

8   death?

9        A.   There was nothing remarkable externally about

10  him other than the trauma.  He had evidence of

11  resuscitative efforts within endotracheal tubes and

12  catheters in the body.  Then, of course, he had a gunshot

13  wound to the left side of the face.

14       Q.   In the process of your autopsy, is there a

15  method by which you or the agency that's interested in the

16  autopsy will document the autopsy and the injuries to the

17  body?

18       A.   Yes, we not only document it by diagram, but

19  also photography.

20       Q.   Let me show you a series of photographs, they

21  will be State's Exhibit C, D, E, F and G for

22  identification.  Take a look at these photographs and I

23  want you to, first of all, take a look at each one, see if

24  you can recognize them and tell us how you recognize them

25  initially?

```
 1        A.   I recognize the picture because the body has

 2   an - or the photograph has a number 90-1885, which is the

 3   number we gave the deceased and it seems to be found in

 4   all the pictures.  Yes.

 5        Q.   And are these pictures fair and accurate

 6   representations of the injuries that you saw externally to

 7   the body?

 8        A.   Yes, they are.

 9        Q.   And will these photographs assist you in

10   explaining to the jury and helping the jury to understand

11   your findings in and conclusion as to the cause and manner

12   of death as to Deputy Patrick Behan?

13        A.   That's correct.

14             MR. MORTON:  Your Honor, I'd like to offer these

15        exhibits into evidence.

16             THE COURT:  Mr. Davis?

17             MR. DAVIS:  Yes Judge, same objections that we

18        had when we were at side bar.

19             THE COURT:  State's D, E, F and G for

20        identification will come in as -- Is C included?

21             MR. MORTON:  C.

22             THE COURT:  C through G will come in as 7, 8, 9,

23        10 and 11, respectively.

24             (Whereupon, the above-mentioned documents were

25        received into evidence as State's Exhibits 7 through
```

```
 1          11, respectively.)

 2                  MR. MORTON:  Your Honor, may I move this out?

 3                  THE COURT:  You certainly may.

 4          Q.   (By Mr. Morton)  Before I ask you to step down

 5     and use these photographs to assist you in explaining your

 6     testimony and helping us understand your testimony, please

 7     tell us in general description, please, of the nature of

 8     the injuries you saw as it related to your determinative

 9     cause of death and their locations?

10          A.   Well, let's start from the head down.  A gunshot

11     wound, what we call a penetrating gunshot wound of the

12     left side of the head was noted.  A penetrating injury or

13     gunshot wound as opposed to a perforating gunshot wound is

14     one in which the projectile is actually recovered from the

15     body and a perforating gunshot wound, the bullet goes

16     through and through and there is no evidence of the

17     projectile.

18              In this case, the projectile remained within the

19     body, so we call it a penetrating gunshot wound.  It was

20     in the left cheek area where the entrance wound was

21     located.

22          Q.   All right.  What other injuries did you see?

23          A.   There was also an injury of the hand, a graze

24     type injury between the third and the fourth digits of the

25     left hand.
```

1    Q.   Would that be commonly referred to as the middle

2   finger and the ring finger?

3    A.   Yes, sir.  The body in the atomic terms, first

4   digit is the thumb, then second, third, fourth and fifth

5   are the digits.

6    Q.   Would you step down, please?

7    A.   Sure.

8    Q.   First I show you what has been introduced into

9   evidence as State's Exhibit 10 in evidence.  Take a look

10   at that photograph and please explain to us what it shows

11   and how it relates to some of your findings and opinions

12   and conclusion in this case?

13    A.   As I was explaining earlier, the entrance wound

14   was in the left cheek area, very wide hole that it

15   produced in the face.

16    Q.   Now that wound which is a wide wound on the

17   face, how would you describe that wound in medical terms

18   as far as the method in which the projectile or the bullet

19   entered the cheek?

20    A.   It had to have had a marginal abrasion that was

21   inferior.

22    Q.   Tell us what you mean by that?

23    A.   Just a second.

24    Q.   Are you familiar with the term irregular?

25    A.   Yes.

1      Q.   Tell us what that means.

2      A.   The wound is no circular.  It's not a perfectly

3  round hole.  In areas where there is bone underneath the

4  skin, many times you don   - where the bone is very close

5  to the skin, you don't get a perfectly round hole, for

6  example, as opposed to the chest area, in this area, there

7  is both - underneath the skin there is room for the hole

8  not to be as unperfect.

9      Q.   What other factors would cause the wounds other

10  than just closeness to the cheek of the bone?

11      A.   Fragmentation of the bone, et cetera.  Other

12  things can cause that.

13      Q.   All right.  Are there situations in which a

14  bullet may actually go through another object before

15  hitting the skin?

16      A.   That's correct.  If you have an intermediary

17  object, something that's in between the body and the gun

18  and the projectile hits that intermediary object and gets

19  waffled and irregular, it will produce a rather irregular

20  shaped hole on the body.

21      Q.   Tell us how a projectile normally travels when

22  it's entering the body?

23      A.   Normally it's - the hole is, you know, there is

24  a little bit of movement, but it's very straight and

25  it's - the pathway tends to be more - form a more - a

1    nicely shaped wound.

2        Q.    Is the bullet rotating as it leaves the --

3        A.    It can rotate as it goes into the body.

4        Q.    If it hits something in between, what happens?

5        A.    There is a lot more whack on the projectile.

6    Now this entrance wound is what we call a marginal

7    abrasion.   On the diagnosis, this was anterior and

8    interior.

9        Q.    What does that mean?

10       A.    That's where the skin in the area which is

11   coming into the body rubs the bullet, rubs the skin as it

12   goes in and produces an abrasion or a scrape, as you will,

13   of the skin.   And it's, in general, very indicative of the

14   projectory in which the projectile is traveling,

15   generally.

16       Q.    All right.  Do you see any other markings or

17   other --

18       A.    There was a scrape or several abrasions on the

19   skin on this side here and --

20       Q.    Tell us what you are pointing to.

21       A.    Right here in the upper lid of the --

22       Q.    Is that that dark coloration of the - on the

23   photograph?

24       A.    The red area of coloration, that would have

25   been - could have been produced from fragments, from the

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1    intermediary object, which in this case, a graze wound,

2    which produced fragmentation of bone and could have

3    produced those injuries.

4           And then a small abrasion or scrape in the left

5    side of the forehead in which we recovered a small, a

6    minute fragment of metal from the projection.

7       Q.   Consistent with being metal from the projectile?

8       A.   Yes.

9       Q.   I see one other, looks like reddish mark up

10   there?

11      A.   That was also another little scrape.

12      Q.   Could that be consistent from fragmentation from

13   a metal bullet?

14      A.   Yes.  Yes.

15      Q.   Now as far as the distance of the barrel to the

16   cheek bone where the entry was made, are medical examiners

17   able to give us some idea of the approximate distance?

18      A.   Yes.

19      Q.   How?

20      A.   Gunshot wounds are normally labeled into

21   contact, intermediate and distant.  Those are general

22   terms that we use for gunshot wounds?

23           When a pro - when a gun is next to the skin or

24   very close to it, it's called a contact gunshot wound and

25   you see a lot of powder around the wound, or inside the

1314

1    wound with a very extensive hole in the entrance side.

2              If the wound is intermediate, from about one

3    inch to twenty-four to thirty-six inches, depending on how

4    many factors, including the bullet, the amount of powder,

5    the gun that was used, et cetera, you get what is called

6    stippling.

7         Q.   What is stippling?

8         A.   Stippling is minute lesions on the skin produced

9    from burned on powder.  As the projectile is fired, it

10   produces a characteristic pattern around the wound

11   indicative of an intermediate gunshot wound.  In other

12   words, twenty-four to thirty-six inches, more or less in

13   that general area.

14        Q.   So then if it's a contact wound, then you would

15   see the gases and the burning powder?

16        A.   Yes.

17        Q.   Inside the skin?

18        A.   Inside or around the wound.

19        Q.   Or around the wound.  And if it is an

20   intermediate, which is two to what?

21        A.   One and a half to two, up to eighteen,

22   twenty-four, thirty-six, depending on who you read in the

23   literature, and the powder that you use, the bullet, the

24   gun; a lot of factors are involved.

25        Q.   Two to twenty-four inches, you would say?

1    A.   That would be correct.

2    Q.   You would then see this stippling effect that

3 you talked about?

4    A.   Right.

5    Q.   Would you be able to see any of that on this

6 particular - these particular wounds to the face?

7    A.   In this particular wound to the face, no, I did

8 not see stippling.

9    Q.   So how would you classify them, the wounds as

10 far as the distance of the barrel to the face?

11    A.   With just this wound, without any stippling or

12 the powder, we classify it as a distant gunshot wound.  In

13 other words, more than eighteen to twenty-four, thirty-six

14 inches.

15    Q.   Okay.  More than eighteen inches?

16    A.   Right.

17    Q.   Can you affix a definite amount of distance in

18 your field --

19    A.   No.

20    Q.   -- when you talk about distant wounds?

21    A.   No.

22    Q.   Tell us what does it mean, just more than

23 eighteen inches up until how far?

24    A.   Forever.

25    Q.   You can't do that medically, can't make a

1    determination?

2         A.    No.

3         Q.    You can only tell us it was more than eighteen

4    inches from the face?

5         A.    That's correct.

6         Q.    You mentioned the hand wound?

7         A.    Yes.

8         Q.    Let me show you what has been marked as State's

9    Exhibit 8 for identification purposes and tell us if you

10   recognize State Exhibit 8?

11        A.    That's the graze wound on the third and fourth

12   digits.

13        Q.    Tell us what you see in that photograph and any

14   remarkable finding or findings that you feel may be

15   related to determining the cause of death and what may

16   have happened in this case?

17        A.    This is the one digit and this is the other

18   digit and you see the wound that's gone between them, it

19   did fracture a bone in those areas and actually went

20   through the skin but did not - obviously did not stay in

21   the finger.

22             And then, I believe this is the palm of the

23   hand, because there is minute fragments of what appear to

24   be lesions.

25        Q.    As compared to State Exhibit 9?

```
 1        A.    Right.   This is the palm of the hand and this is

 2   the back of the hand and here is the wounds again.

 3        Q.    We'll put them together.

 4        A.    Notice this little marking.

 5        Q.    You are now referring to Exhibit 8, right, this

 6   is 9 above?

 7        A.    That's correct, and you see these little

 8   markings here on the palm side of the hand, but you don't

 9   see them on the back of the hand.   This is very typical of

10   stippling pattern on the palm of the hand.

11        Q.    Stippling, is that the stippling effects you

12   were referring to?

13        A.    That's correct, from the projectile.

14        Q.    The lesions you are talking about.   All right.

15   And you found those - and you saw these on the palm side

16   of the finger?

17        A.    That's correct.   They were actually through the

18   palm more prominent in the digit area, the finger area.

19        Q.    All right.   You did not see it --

20        A.    On the posterior side, no.   On the back of the

21   hand, no.

22        Q.    Okay.   All right.   So what does that indicate to

23   you now that you see the stippling effects at least on the

24   hand?

25        A.    That indicates to me that the hand was obviously
```

1    within an eighteen inch area that we talked about before,

2    stippling or intermediate gunshot wound.

3         Q.    So the hand was at least eighteen inches or the

4    gun was within eighteen or twenty-four inches down to an

5    inch and a half, the hand was at least within that

6    distance from the gun?

7         A.    That's correct.

8         Q.    Even though it was farther from the face?

9         A.    That's correct.

10        Q.    Okay.  Can you tell or could you tell the

11   direction that the bullet was traveling based on the

12   lesion effect of the stippling that you talked about?

13        A.    Not from the stippling of the hands, lesions,

14   no.  I can only say the projectile went across the finger,

15   but I can't go any further than that.

16        Q.    Again, look at State Exhibit 7.  What does that

17   show?

18        A.    If you see here, the stippling is probably

19   better illustrated here.  There is - these little minute

20   lesions that you see on the hands are very typical of

21   stippling.  It's little lesions produced by the burn on

22   burn powder on the hand.

23        Q.    From that, would you be able to tell us if the

24   barrel was pointing at the palm of the hand or the back of

25   the hand when it was discharged?

1        A.    Obviously to the palm of the hand.

2        Q.    Taking a look at the final exhibit, State's

3  Exhibit 11, and do you recognize State Exhibit 11?

4        A.    Yes.

5        Q.    Tell us what that's about.

6        A.    This is one of the small abrasions that - or

7  lesions produced in the skin probably from fragments of

8  bone or maybe even a fragment of projectile.

9        Q.    Now where was that lesion located?

10        A.    That's on the side of the head.

11        Q.    All right.

12        A.    By the hair line.

13        Q.    You may be seated.

14        A.    Thank you.

15        Q.    The wounds and the lesions that you have noted

16  and we have seen through these photographs and that you

17  have described for us, were those essentially the

18  significant injuries that you noted in your external

19  examination?

20        A.    Yes.

21        Q.    All right.  Anything else as far as your

22  external examination is concerned that we should discuss

23  in determining the cause and manner of death or perhaps

24  determination, what may have happened?

25        A.    No, that's - that's it.

1        Q.   Let's move to the internal examination.  Tell us

2   what you found.

3        A.   The internal examination organs of the body were

4   not really significant.  Mr. - Officer Behan had a - one

5   coronary artery that was a little more occluded than a

6   normal coronary artery is.  One of the arteries that

7   irrigates the heart, so basically it was - he was a man,

8   his internal organs more or less were consistent with his

9   age.  Now in the head region where the - obviously the

10  trauma occurred from the gunshot wound.

11       Q.   Tell us about that.

12       A.   Uh, the officer had a extensive fracture of the

13  base of the skull and, of course, fractures to the outer

14  cranium and extensive trauma to the brain itself from the

15  gunshot wound.

16       Q.   Describe that trauma for us to the head area and

17  the brain as you noticed it internally?

18       A.   The pathway of the projectile went through the

19  left and right cerebral hemispheres of the brain.  In

20  other words, both sides of the brain was very extensive

21  with extensive hemorrhage and destruction of brain tissue.

22       Q.   And how far across within the cranium and

23  through the brain itself did it travel?

24       A.   Yes, it fractured the other side of the head and

25  the bullet actually lodged underneath of the skin on the

1    other side of the brain, after fracturing the other side

2    of the brain.

3         Q.   So it went through the brain penetrating the

4    brain in its entirety, but never really --

5         A.   Exited the skin.  But it did fracture the bone

6    on the side.

7         Q.   Show us the area, again, where the - at least

8    parts of the projectile lodged?

9         A.   More or less in this area.

10        Q.   What area is that you are pointing to?

11        A.   The back of the head towards - a little bit

12   above the ear.

13        Q.   On the right side?

14        A.   Yes.

15        Q.   At what angle or shall I say not angle, but path

16   did the projectile travel as you would - as it relates to

17   the front or back, up or down?

18        A.   With the body -- May I step down a second?

19             MR. MORTON:  Sure.  Please.

20             THE WITNESS:  With the body in the anatomic

21        position, that is with the palms standing forward,

22        that's normally how we illustrate pathways through

23        the body, so that we all talk in one uniform

24        language, the projectile went front to back, left to

25        right and upward; in other words, in this direction.

1          Q.    Well, is it possible, then, for someone to be

2     seated - hypothetically - in a car, for example.  Assume

3     he was shot in a car, seated in the front seat and the gun

4     pointed either level or slightly downward in the face, can

5     that still produce an upward angle?

6          A.    Yes, I think it can.

7          Q.    Tell us how?

8          A.    Well, if the individual moves his head in this

9     direction, for example, and the gun comes this way, as you

10    see, when it hits the body, it looks like it's going

11    across, but then when you bring it up, it's going upward.

12         Q.    When you bring it up in the anatomic position it

13    goes up?

14         A.    In the anatomic position.

15         Q.    So because of the numerous positions the head

16    can turn and twist and go at different angles, it may

17    create an upward or a downward angle, regardless of the

18    position of the barrel?

19         A.    That's correct.

20         Q.    Thank you, Doctor.  Anything else about the

21    internal examination that would be significant in your

22    determination to the cause of death?

23         A.    No.

24         Q.    How about the toxicological examination?

25         A.    The toxicological examination was essentially

1    negative, nothing there.

2        Q.   No alcohol, no drugs?

3        A.   Nothing.

4        Q.   Based on your examination of the body externally

5    as well as the internal examination as well as the

6    toxicological examination, Doctor, do you have an opinion

7    as to the cause of death of Deputy Patrick Behan?

8        A.   Gunshot wound to the head.

9        Q.   Now, Doctor, you mentioned earlier that in the

10   course of your jurisdiction, that you also were asked not

11   only to determine the cause of death as a medical examiner

12   but the manner of death.  Tell us what you mean by the

13   manner of death and how do you classify it, how do you

14   make that determination?

15       A.   Manner of death are classified, of course, into

16   accident, homicide, suicide or undetermined.  When an

17   individual is killed in the hands by another individual

18   with an intent to harm, we call it a homicide.

19       Q.   How did you classify the death of Patrick Behan

20   in this case?

21       A.   A homicide.

22       Q.   Was that based to a reasonable degree of medical

23   certainty on your external and internal and toxicological

24   findings?

25       A.   Yes.

```
 1         Q.   Now, sir, I want - once you finish your autopsy

 2    and you make your determination to the cause of death, do

 3    you yourself preserve or collect any evidence for future?

 4         A.   Yes.

 5         Q.   Tell us what you do.

 6         A.   Well, we obviously use a standard protocol and

 7    assign it and give - put it into the file.  We also take

 8    the projectile that's removed and seal and sign it and

 9    give it to the detective at the autopsy, et cetera.

10         Q.   Let me show you what has been marked for

11    identification purposes as State's Exhibit - a photograph,

12    and it's not for identification, in evidence as State's

13    Exhibit 6.  Do you recognize that photograph?

14         A.   Yes.

15         Q.   What is State's Exhibit 6?  Tell us how do you

16    recognize it?

17         A.   That's a photograph of a projectile removed from

18    Officer Behan.  It has his name on it, has his autopsy

19    number on it, also.

20         Q.   All right.  And does it have your initials on

21    it?

22         A.   My initials are, right, also on the paper, yes.

23    And the back of that is signed and sealed.

24         Q.   Is that a fair and accurate representation of

25    the projectiles, how they appeared when you first removed
```

26                                          327

Behan's body?

    correct.

et me show you what has been marked as

 Double B for identification purposes.

:lope and the contents, please, tell us if

-e envelope from the contents?

:s the envelope in which I placed a

 has the name of the officer, Behan, it has

ber, projectile, my initials and in the

:e.  This is the envelope in which I placed

after I removed it from the body.

:ght.

-is is the projectile I removed from the


  Does it appear to be in substantially the

-ow as it was when you removed it from the


it does.

a look at State's Exhibit H for

purposes, the envelope and the contents

e if you recognize the envelope and the

w?

is an envelope that contains the skin from

 finger.  It has the officer's name on it

    mber and in the back I signed it.


May I use your

 at the contents,

way, does it

ls as well as --


kin here that I


ea of the ring

scribed around the


ntially the same

 it?

bit dryer now.


is time I'd like

which is the

the section of

 evidence.


in as State's

1328

1    Q.    (By Mr. Morton)   Once you collect those items

2    and initial them and package them, what do you then do

3    with them?

4    A.    They are given to the detective present at the

5    autopsy.

6    Q.    For future analysis, perhaps?

7    A.    Yes.

8    MR. MORTON:  I don't have any further

9    questions, Judge.

10   THE COURT:  Cross?

11   MR. DAVIS:  None, Judge.  No questions.

12   THE COURT:  You're excused.

13   What we'll do at the present time in

14   consideration of the hour, we'll break for lunch,

15   we'll pick up immediately following lunch.

16   Please remember as we do break not to discuss the

17   case amongst yourselves, don't permit anyone to say

18   anything to you or in your presence about the case.

19   If anyone attempts to do it, tell them you're on

20   the jury trying the case, tell them to stop, if there

21   is a problem, walk away, find the bailiff and the

22   bailiff will notify me.

23   Additionally, as you return to the courtroom or

24   the courthouse, you may run into one of the lawyers,

25   the defendant, one of the witnesses in the case.

1   Please remember you still can't talk to them and they

2   can't talk to you.  It's not that they don't like you

3   and don't want to talk to you, it's that during the

4   entire course of the trial neither one of you can

5   have interaction with the other.  So if any of them

6   attempt to approach you and talk to you, step away.

7        With regard to the note pads, if you would

8   kindly make sure to please leave them in your seat,

9   turn them over so they're lying face down.  Please

10  put your name on the front sheet so we know who each

11  pad belongs to and there won't be any confusion.

12  Please be careful in terms of being near a TV in

13  terms of news broadcast.  Please be careful in terms

14  of papers and we'll pick up at 2:00.  Have a nice

15  lunch.

16       (Whereupon, the jury was excused from the

17  courtroom and a lunch recess was taken, after which

18  the following proceedings were had:)

19

20

21

22

23

24

25

1572

1      I mean, if they really want to find him, I am sure

2      they are going to find him.

3          MR. MORTON:  Well the writ of attachment was

4      given to Tom Daysie, my investigator who also has

5      arrested authorities and worked in construction with

6      the Broward County Sheriff's Office.  He has a

7      specific person he calls because in these matters we

8      generally like the Broward Sheriff's Office.

9          THE COURT:  I am sure given the nature of these

10     proceedings they will use all their powers and due

11     diligence to secure his attendance.

12         All right, let's go.

13         (Whereupon, the jury was returned to the

14     courtroom, after which the following proceedings were

15     had:)

16         THE COURT:  Mr. Morton?

17         MR. MORTON:  Chuck Edel.

18

19

20

21

22

23

24  Whereupon,

25                 CHARLES EDEL

ATTACHMENT / EXHIBIT 20

1573

1    was called as a witness on behalf of the State of

2    Florida, and having been first duly sworn, was examined

3    and testified as follows:

4         THE CLERK:  State your name and spell your last

5         name for the record, please.

6         THE WITNESS:  Charles, middle initial F.,

7         Edel, E-D-E-L.

8                   DIRECT EXAMINATION

9    Q.    (By Mr. Morton)  All right, sir, you've told us

10   who you are by telling us your name, tell us who you work

11   for and what kind of work you do at this time?

12   A.    I'm deputy sheriff with the Broward Sheriff's

13   Office and currently assigned to the patrol division of

14   the Broward Sheriff's Office.

15   Q.    How long have you been with the Broward

16   Sheriff's Office?

17   A.    Uh, since 1981.  I had a nine month leave where

18   I was with the Broward County State Attorney's Office and

19   then came back to the sheriff's office.

20   Q.    You worked with our office in what capacity,

21   sir?

22   A.    As an investigator.

23   Q.    What period of time is that we are talking

24   about?

25   A.    Uh, September of 1990 and I came back to the

1    office nine months later.

2        Q.    While you were working for the state attorney's

3    office, did you also work with or did you work with the

4    Broward Sheriff's Office in any capacity?

5        A.    Yes, sir.  On numerous occasions I was contacted

6    by the sheriff's office to assist them in homicide

7    investigations.

8        Q.    In what way?

9        A.    In the area of blood stain interpretation.

10       Q.    And you worked in the area of bloodstain

11   interpretation for the Broward Sheriff's Office before

12   working with the state attorney's office?

13       A.    Yes, sir.

14       Q.    Tell us, then, basically about your training in

15   order to be involved in bloodstain interpretation?

16       A.    My basic training started back in 1980.

17       Q.    Who were you working with then?

18       A.    I believe I was with the Dania Police Department

19   at the time, just prior to the Broward Sheriff's Office.

20            I began my training in the area of bloodstain

21   interpretation where I took an assortment of basic courses

22   in that particular field.  I think four or five classes,

23   each consisting of approximately forty hours.  Then in '81

24   I began higher educations in that particular field with

25   college and, again, with advanced courses in bloodstain

1    interpretation.

2         I studied under a gentleman by the - under the

3    name of Professor Herbert Leon McDonald, primarily the

4    individual who put the mathematics and the physics with

5    the bloodstain.  He came up with the discipline itself.  I

6    worked under his toolage for approximately two years as an

7    intern.  From there I went on to teach with Mr. McDonald

8    or Professor McDonald and then subsequently went out on my

9    own teaching, and have taught from New York to Florida to

10   San Francisco and back again.

11        Q.   As far as your experience in investigating

12   scenes or crime scenes for bloodstain interpretation, how

13   many of those over the span of your career have you done?

14        A.   In just bloodstain interpretation, maybe a

15   couple of thousand.  In standard homicide investigations,

16   I don't even want to venture a guess.

17        MR. MORTON:  At this time, Your Honor, I'd like

18        to offer Mr. Edel as an expert in the field of

19        bloodstain interpretation.

20        THE COURT:  Any voir dire?

21        MR. DAVIS:  No, Judge, I don't have to proffer

22        that.

23        THE COURT:  The Court will accept the witness as

24        an expert in his field.

25        Q.   (By Mr. Morton)  November of 1990 did you get

1576

```
1    involved in assisting the Broward Sheriff's Office in

2    investigating the shooting death of Deputy Patrick Behan

3    as it relates to your specialty of bloodstain

4    interpretation?

5         A.    Yes, sir, I did.

6         Q.    Tell us how you got involved?

7         A.    At 7:05 a.m. I was contacted by Major Walter

8    Lawn of the Broward Sheriff's Office requesting my

9    assistance in this investigation.  He told me that

10   Mr. Behan had been shot during the evening hours and that

11   the vehicle or, excuse me, the early morning hours and

12   that the vehicle had been towed to Mac's Towing located in

13   Dania, Florida.

14        Q.    Did you go to Mac's Towing?

15        A.    That is correct, I did.

16        Q.    When did you go to Mac's Towing?

17        A.    Umm, I left my house almost immediately, I

18   responded to Mac's, I venture to say I got there within

19   thirty minutes of the request.

20        Q.    What did you do at Mac's Towing to assist you in

21   your bloodstain analysis and interpretation?

22        A.    I met with Detective Corpion who was on the

23   scene.  I asked him to direct me to the car, asked him

24   what areas had been processed and so forth so I wouldn't

25   cross contaminate and there I viewed the hood of the car,
```

1577

1      the interior of the car and requested Detective Corpion to

2      take certain photographs for me to help make my evaluation

3      in the scene.

4          Q.   All right.  With respect to medical information

5      as it deals with the autopsy --

6          A.   Yes, sir.

7          Q.   -- do you use that type of information in the

8      normal course of your practice and also to assist you in

9      bloodstain interpretation?

10         A.   Yes, sir.

11         Q.   And is that the type of information in addition

12     to what you examine at the scene and the photography, that

13     is the medical autopsy information, is that the type of

14     information that you rely upon in your field in order to

15     reach your opinion, sir?

16         A.   Yes, sir.  In this particular case I went to the

17     autopsy itself and there I viewed Deputy Behan and the

18     injuries to his person.

19         Q.   What else did you examine or look at before you

20     came up with your conclusions other than what you've

21     already discussed at this time?

22         A.   Well, that was primarily my main areas.  I spoke

23     with Dr. Vila and I requested Detective Shinaberry, who

24     covered the full postmortem, to take certain photographs

25     of Deputy Behan's left hand depicting certain areas of

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1  that area pertaining to the left hand and the ring finger

2  and what appeared to be stippling on the hand at that

3  time.

4      Q.   All of this information that you gathered you

5  used in making your materials as to - or at least your

6  bloodstain interpretation as to what may have happened in

7  this particular case?

8      A.   Yes, sir.  The main question asked of me was

9  primarily the posture of Deputy Behan at the time he was,

10  in fact, shot.

11     Q.   As a result of reaching your opinions and

12  conclusions in this case, did you generate a diagram in

13  some way to show your findings and to help explain your

14  conclusions?

15     A.   Yes, sir, that is correct.

16     Q.   Let me show you what has been marked as State's

17  Exhibit Double F for identification purposes and ask if

18  you recognize Double F?

19     A.   I do, sir.

20     Q.   What is Double F?

21     A.   Is a computerized composite of the shooting as I

22  interpreted it.

23     Q.   From the bloodstain analysis that you have done?

24     A.   Yes, sir.  Now that is a two-dimensional

25  drawing.  It doesn't show exact proportionment inch by

1    inch, but very close as to, I feel, how he was at the time

2    of the shooting.

3         Q.    In other words it's not really to scale and it's

4    not three-dimensional type of diagram that gives you at

5    least better perspective?

6         A.    Correct, sir.

7         Q.    But as far as the diagram itself in terms of

8    your testimony and the jury understanding your testimony,

9    your opinions, your findings and your conclusions --

10        A.    I think it will help the jury better understand

11   my findings at the scene.

12        Q.    All right.  When you say that it's computer

13   generated, tell us how that works and the reservation

14   information that's placed into the computer to come up

15   with this drawing, how that's done?

16        A.    It's just a standard computer with a - it's a

17   McIntyre Computer.  It used what's called a drawing

18   program, if you will, which places pixels, which are dots

19   of black imagery on a white screen and you actually draw

20   with the mouse or the tools in the drawing program onto

21   the computer screen.

22        Q.    So it is your drawing but it's done through the

23   mechanics of the computer?

24        A.    It is, sir.

25        Q.    And it is a fair and accurate representation of

1    your findings and your opinions from your conclusions as

2    far as the bloodstain analysis is concerned?

3        A.   That's correct, sir.

4        Q.   And the questions that you were asked to answer,

5    it's a fair rendition of your --

6        A.   Yes, sir.

7        Q.   -- your opinions.

8        MR. MORTON:  I offer State Exhibit Double F into

9    evidence, Your Honor.

10       MR. DAVIS:  No objection, Judge, other than what

11   was raised before.

12       THE COURT:  Double F for identification will

13   come in as State's Exhibit 29.

14       (Whereupon, the above-mentioned item was

15   received into evidence as State's Exhibit 29.)

16       Q.   (By Mr. Morton)  I am going to have the witness

17   step down, if you would, please, and we are going to use

18   several items.  State Exhibit - computer generated diagram

19   State Exhibit 29, and I am going to use that in

20   conjunction with some photographs as you testify with that

21   so these photographs also aid and help aid the jury in

22   assisting and understanding your findings and conclusions?

23       A.   Yes, sir.

24       Q.   All right.  Showing State's Exhibit 29 -- Of

25   course, make sure you stand to the side so all the jury

1    members can see it.  All right.  As far as the injuries

2    are concerned from the medical examiner's office, I have

3    here three main photographs.

4              State Exhibit 10, State Exhibit 8 and State

5    Exhibit 9.  10 showing the wounds to the face, 8 showing

6    the palm side of the hand, which is 8, and 9 showing the

7    backside of the hand.  Did you observe those wounds?

8         A.   I did, sir.

9         Q.   And did they assist you in your analysis and

10   interpretation in this case?

11        A.   They did.

12        Q.   All right, show us how.

13        A.   They showed me the directionality in which the

14   projectile or the bullet traveled as they pierced through

15   the hand.  We can see by Exhibit Number 8, the finger

16   structure, if you will, you can see a portion of the

17   projectile as it made contact with the hand.  A

18   projectile, if you will, when -- May I have a, umm,

19   drawing device, a crayon or something?

20        Q.   Okay.

21        A.   Thank you, sir.  When a projectile travels

22   through an item, directionality, this being the

23   projectile, it sets up an energy field and as it does, the

24   entry area sets up in this fashion, this would be the

25   entry hole and as it goes out the opposite end, it sets up

1    another hole, in most cases larger.  It's called an energy

2    cone or an energy field.  This causes a blowing out to

3    occur.

4        Q.    And also I have here, which would be helpful as

5    well, State Exhibit 7.  Right now the State Exhibit,

6    that's 9?

7        A.    9.  This would be the damage caused by the

8    projectile as it exits the hand.

9        Q.    That's State Exhibit 9, correct?

10       A.    Yes, sir.  And following the path of the

11   projectile we observed and in the hand itself, these small

12   specks, which is called tattooing or stippling.  And if

13   you notice, the tattooing or stippling is primarily

14   condensed in the upper portion of the finger showing that,

15   to me, the majority of the powder was dispersed at that

16   particular point, putting this portion of the hand closer

17   to the barrel of the weapon.

18       Q.    That is State Exhibit - look at the back so we

19   know for the record.

20       A.    Number 7.

21       Q.    Number 7.

22       A.    That showing these particles being deposited

23   onto the hand's surface.

24       Q.    Okay.  Now you, are now referring to - when you

25   are showing the particles, you are talking about the

1   Exhibit --

2        A.    Number 29.

3        Q.    -- 29, which is your computer generated diagram,

4   right?

5        A.    Yes, sir.  On this roof or the surface of the

6   car we found small high velocity droplets of blood.  High

7   velocity blood is blood that is in a - almost an atomized

8   form.  It is the same thing you would see coming out of an

9   aerosol can or something of that nature, very small

10  specks.  The reason this occurs is the high energy

11  produced by the projectile as it pierces the hand.  As we

12  look at the surface of the car --

13       Q.    I have two photographs here, they may be

14  helpful.  One is just a general roof, which is State

15  Exhibit on the back there --

16       A.    Number 18.

17       Q.    -- 18.  Then Number 19 is a closer view of that

18  state exhibit?

19       A.    19.  Okay.  Showing you this would be the driver

20  side window of the car.  This being the front windshield.

21  So we are looking at this particular area right in here,

22  referring back to State Exhibit 29.

23              And as we look on the surface of this, we see

24  specks of blood on the surface and those specks of blood

25  are of high velocity nature and they streak across the

1584

1    surface of the hood in this fashion and they all come sort

2    of in a cone shape where the hand causes - or the

3    projectile piercing the hand causes the blood to spatter

4    up onto the surface of the hood in the fashion that you

5    see.

6        Q.    For the record, you are using this red marker

7    pen to show on your Exhibit 29 the blood spattering,

8    correct?

9        A.    Yes, sir, that is correct.

10       Q.    When you say cone shape, give us an idea what

11   you are talking about?

12       A.    Same thing with the energy cone that I showed

13   you before right here.  When the projectile passes out, it

14   causes the blood to be projected in a conical shape or

15   spread out shape as a shotgun, if you would, when the

16   pellets come out of a shotgun, they spread out.  The same

17   way that the energy does in this particular case.

18       Q.    All right.  Continue.

19       A.    That's how that particular blood got on to the

20   surface of the car, in that fashion.  As the hand is

21   projected out from the car window, the bullet piercing the

22   hand leaving the deposit of residue on the surface of it,

23   piercing through, striking Mr. Behan in the side of the

24   face and transversing through the head and coming

25   lodging --

1585

1     Q.   I notice in your diagram you have what appears

2     to be the window up in the car?

3     A.   Slightly up, yes, sir.

4     Q.   Why did you do that?

5     A.   Because when I examined the window itself, I

6     found ninety degree specks of blood on the surface of

7     that, depicting that that window was up when the contact

8     was made.

9     Q.   Of course, did you see the photograph of the car

10    at the scene and, of course, showing the same thing?

11    A.   Not when I made my initial findings.

12    Q.   Ultimately have you seen it since?

13    A.   Yes, sir.

14    Q.   And have you seen the car?

15    A.   I have.

16    Q.   That was showing you State's Exhibit 15.  What

17    else did you find in as far as spatter is concerned and

18    how did it help you with your determination?

19    A.   There was a considerable amount of blood on

20    the - there was a considerable amount of blood staining on

21    the car's interior and the clothing of Deputy Behan.

22    Q.   Before we move to there, I want to show you

23    State Exhibit 20, and what represents the doorguard just

24    where the window is.

25    A.   Yes, sir, that would be right here.  This area

1   that we are looking at would be right up in here where we

2   have also blood on the surface of that particular area.

3        Q.   All right.  And as far as the directionality,

4   would that also assist you?

5        A.   Yeah.  That was at a ninety degree impact.

6   These are elliptical shape only because of the angle in

7   which they struck the surface, a plain coming across or

8   skimming across the top of the car.

9        Q.   Would the blood here be of a different type

10  shape?

11       A.   Yes, sir, that would be spheroid shape or round

12  in shape.

13       Q.   Why, because of the angle in which it strikes?

14       A.   Absolutely.

15       Q.   Is a different angle striking?

16       A.   Correct.

17       Q.   All right.  You mentioned the inside of the car.

18       A.   Yes, sir.

19       Q.   I have a series of photographs, State's Exhibit

20  21, 23 and 22.

21       A.   State's Exhibit 21 depicts the interior of the

22  car in the seat area.  We call these void areas for normal

23  reasons, there's nothing there where we have blood onto

24  the other surfaces.  We can see that using a little bit of

25  imagination that a leg was there at one time blocking the

1   blood from making contact as you would sit in your chairs.

2   Now if blood came down onto the surface of the - of

3   your --

4            MR. DAVIS:  Excuse me, I am going to object

5        as far as saying the jury sitting with blood on

6        their chairs.  I mean --

7            MR. MORTON:  It's just a demonstration,

8        Judge.

9            MR. DAVIS:  Yeah, but still.

10           THE COURT:  Come on, let's not make reference

11       to the jurors as being a part of any of this.

12       Q.   (By Mr. Morton)  Just use a person.

13       A.   If blood was deposited onto myself seated in a

14   chair and my body would block that particular area from

15   blood making contamination onto the surface.  The blood

16   that we see in --

17       Q.   What exhibit was that?

18       A.   That was Exhibit Number 21.

19       Q.   All right.

20       A.   -- 22 is this area of the car, a closer shot of

21   this.  This is blood projecting out from the original area

22   of blood splashing and the blood being projected out and

23   this is a type of spattering that you would get in that

24   fashion.

25       Q.   All right.

1    A.    And --

2    Q.    23?

3    A.    -- 23 depicts just an area where that blood

4    splashed on to make this type of debris blood splashing

5    into blood and this was the original area.

6    Q.    All right.  Now I want to show you what is in

7    evidence before we proceed because I will have some

8    questions later on.  The items that were found in the car,

9    as you can see there is - appears to be some documents and

10    clipboard, am I correct?

11    A.    Yes, sir.

12    Q.    Okay.  Other items that were found that were

13    blood stained, they were in a composite exhibit now in

14    here, State Exhibit 27, which is now in evidence.  I want

15    you to take a look at some of these items.  One, I am

16    showing you now, one is a report that has some spatter on

17    it?

18    A.    Yes, sir.

19    Q.    And the other one in here is a schedule of some

20    sort that has spatter on it?

21    A.    Yes, sir.

22    Q.    As well as a daily log that has a little spatter

23    on it, can you see?

24    A.    Correct.

25    Q.    And then a second report, it appears to have a

1    different type of stained blood on it?

2         A.   Yes, sir.

3         Q.   See that.  And the jury has seen all of that.

4    What is the difference between the type of blood that you

5    see that's stained, what is it called as far as the

6    stained blood on this one report as compared to the

7    different spattering that you see on the other documents?

8         A.   The first are the large - the large amount area

9    of blood is that consistent with arterial bleeding, large

10   amounts of blood coming from a bleeding vein or artery or

11   something of that nature where it is actually pumped onto

12   the surface.

13        The second, third or - I guess it would be

14   second, third and fourth report that you saw had medium

15   velocity blood.  Blood that is casted onto the surface

16   from another area.'.

17        Q.   All right.  Now how can that occur assuming, for

18   example, a person is in a seated position, the large

19   amount of blood?  What would you call that?  Is that like

20   casting blood or how would you call that as opposed to

21   high velocity spatter?

22        A.   Medium velocity blood that is projected from

23   another source.

24        Q.   All right.

25        A.   The first is the - the heavier is the arterial

1590

1      blood, like I stated before, a breached artery or vein is

2      pumping the blood, that is the energy that is causing the

3      blood to be casted.

4           Q.   All right.  And assuming he was in a seated

5      position on the driver's side, where would that particular

6      report, the one with the heavier stain blood would have

7      been or do you have a theory as of that as opposed to the

8      other that had high velocity blood on it?

9           A.   I would say that probably would be closer to his

10     lap area.

11          Q.   All right.  Now taking all of this together,

12     having seen the documents, the injuries, your photographs,

13     your personal observation of the scene itself, do you have

14     an opinion as to the position of Deputy Behan when he was

15     shot as well as the projected path or the projectory of

16     the bullet as he was sitting in the car?  Do you have an

17     opinion?

18          A.   Yes, sir.  He was in a seated posture behind the

19     driver's wheel of the motor vehicle with his left arm

20     extended in this fashion out the window with his head

21     tilted to the side and the projectile entering the hand

22     coming through and transversing through the head and

23     coming to rest, the projectile, at the back of the head.

24          Q.   Tell us the basis of that opinion just in

25     summary and why?

1    A.   Due to all the bloodstains being casted onto the

2    surface of the car, the side of the car, the stippling on

3    the side - on the palm area of the hand, the projectory in

4    the facial structure as it went through the face cavity

5    itself and landed in a position that it did.

6         The blood being casted into the lap area and

7    being spattered from that particular area shows me that

8    there was a venous bleeding of some sort causing that

9    pumping to occur onto his person.

10   Q.   Looking again at State Exhibit 21, which is the

11   interior and looking at it from the driver's side, the

12   blood that appears at the front of the seat appears to be

13   slightly different from blood - let me turn it to the

14   jury - the front of the seat on the driver's side appears

15   to be slightly different from the blood that's to the side

16   of the seat near the center console.

17   A.   Yes, this is accumulated blood.  This is a

18   swiping of blood.  This happened, in my opinion, as Deputy

19   Behan was being removed from the car and the blood that

20   was on his person was transferred onto the surface of the

21   seat.

22        MR. MORTON:  Thank you very much, sir.  No other

23        questions.

24        THE COURT:  Cross?

25        MR. DAVIS:  I don't have any cross.

1592

```
 1              THE COURT:  You're excused.
 2              THE WITNESS:  Thank you, Your Honor.
 3              THE COURT:  Mr. Morton?
 4              MR. MORTON:  Dennis Grey.
 5    Whereupon,
 6                          DENNIS GREY
 7         was called as a witness on behalf of the State of
 8    Florida, and having been first duly sworn, was examined
 9    and testified as follows:
10              THE CLERK:  Please state your name and spell
11         your last name for the record.
12              THE WITNESS:  Dennis Grey, G-R-E-Y.
13                     DIRECT EXAMINATION
14         Q.   (By Mr. Morton)  Good afternoon, sir.
15         A.   Good afternoon.
16         Q.   You have told us your name, now tell us who you
17    work for and the kind of work you do?
18         A.   Employed with the Broward County Sheriff's
19    Office, I am assigned to the crime laboratory and I
20    specialize in firearms identification.
21         Q.   What is firearms identification?
22         A.   Firearms identification is given a specific
23    bullet and a specific firearm, you can determine whether
24    that bullet was fired in that firearm.
25         Q.   I take it in order to become an expert, at least
```

ATTACHMENT / EXHIBIT 21

1593

1    work in the field of firearm identification, you must have

2    had a certain amount of training as well as experience,

3    correct?

4        A.   Yes, sir.

5        Q.   Tell us first about your training.

6        A.   I received a Bachelor of Science Degree in

7    Chemistry from the University of Miami.  I received a

8    year's on-the-job training in the Dade County Public

9    Safety Department learning the field of firearms

10   identification, which entailed learning the theories of

11   firearms identification, visiting arms manufacturing to

12   see how firearms are manufactured as well as ammunition

13   plant to see how ammunition is manufactured, and it was

14   basically on-the-job training.

15       Q.   Tell us how long have you been working in this

16   field now?

17       A.   Been with the sheriff's office going on

18   twenty-one years next month.

19       Q.   And your working in this field for twenty-one

20   years, how many analysis or comparisons have you done in

21   this, in firearms identification?

22       A.   I have examined thousands of firearms.  I've

23   made thousands of examinations.

24            MR. MORTON:  Your Honor, at this time I'd like

25       to offer Dennis Grey as an expert in the field of

1        firearms identification.

2            MR. DAVIS:  No problem.

3            THE COURT:  The Court will accept the witness as

4        an expert in his field.

5        Q.    (By Mr. Morton   Now, Mr. Grey, tell us if you

6    ever were asked in your capacity as a firearms

7    identification expert from the Broward Sheriff's Office

8    crime laboratory, were you ever asked to get involved in

9    assisting in the investigation of the shooting death of

10   Deputy Patrick Behan?

11       A.    Yes, I was.

12       Q.    Tell us how you got involved?

13       A.    Some items of evidence was submitted to the

14   laboratory on the 13th of November, 1990 by Detective

15   Shinaberry, who is assigned to the crime scene unit of the

16   sheriff's office.

17       Q.    What was submitted to you at that time?

18       A.    He submitted one projectile, which I labeled

19   eight, which was recorded to have been removed from the

20   decedent's body.  A section of what was reported to have

21   been skin removed from the middle finger of the decedent's

22   body and also one class A uniform shirt reported to have

23   been removed from the decedent.

24       Q.    What is a projectile, what -- Why don't you

25   answer the first?

1595

1       A.    A projectile is part of the cartridge, which

2    when the weapon is fired, leaves the barrel and flies

3    towards its target.

4       Q.    What were you asked to do with the material that

5    was submitted to you?

6       A.    They wanted me to determine the caliber of the

7    projectile and the possible firearms that may have fired

8    the projectile for investigative purposes.

9       Q.    And the shirt that was presented to you, what

10   were you asked to do with that?

11      A.    They wanted me to look for gunshot residue to

12   determine whether the muzzle of the weapon was in close

13   proximity of the - to the target when the firearm was

14   fired.

15      Q.    And when they submitted the shirt to you, the

16   shirt was bloody, am I correct?

17      A.    Yes, sir.

18      Q.    I have here a photograph State Exhibit Z for

19   identification purposes, do you recognize State Exhibit Z?

20      A.    It represents the shirt that I received.

21      Q.    Is it a fair and accurate representation of the

22   way the shirt appeared when you examined it?

23      A.    Correct.

24            MR. MORTON:   I offer State Exhibit Z into

25            evidence, Your Honor.

1      MR. DAVIS:  No objection.

2      THE COURT:  State's I for identification will

3      come in as State's Exhibit 30.

4      (Whereupon, the above-mentioned item was

5      received into evidence as State's Exhibit 30.)

6      Q.   (By Mr. Morton   I will publish and while I am

7   publishing, I ask you this question:  Did you, in fact,

8   examine the shirt for the presence of gunshot residue to

9   make a determination as to the proximity of the barrel?

10      A.   Yes, sir, I did.

11      Q.   And what were your findings?

12      A.   There was no gunshot residue on the shirt.

13      Q.   We'll talk about what that means in a second.

14   Let's move on now to your working with the skin.  You said

15   you had a section of the skin, am I correct?

16      A.   Correct.

17      Q.   Let me show you what has been introduced into

18   evidence as State Exhibit 13, the envelope and its

19   contents.  Take a look at that, tell us if you recognize

20   it?

21      A.   Yes, the outer envelope has my laboratory case

22   number and my initials pertaining to this case on the

23   manila envelope as well as the Ziploc baggy.  The inner

24   envelope also has my laboratory case number and initials

25   pertaining to this case.  I opened it on the topside here,

1   it was sealed when I got it.  I opened it down here and

2   when I was done, I resealed it and the seals are still

3   intact today.

4       Q.   All right.  Take a look at it and what were you

5   looking for when this is - when you examined that section

6   of skin?

7       A.   The presence of gunshot residue.

8       Q.   Tell us what were your findings?

9       A.   I found a particle which was consistent with

10  smokeless gun powder.

11      Q.   Tell us what you mean by smokeless gun powder?

12      A.   That's the propel in which is loaded in

13  cartridges, modern ammunition which the weapon is fired.

14  The smokeless gun powder  ould be ignited, it starts to

15  burn, it will give off a gas which pushes the projectile

16  from the cartridge and down the barrel of the weapon.

17          When the weapon is fired, not only does the

18  projectile leave the muzzle of the weapon, but so does

19  partially burned gun powder particles as well as certain

20  smoke, and if the target is close enough to the muzzle

21  when the weapon is fired, these by-products of the

22  explosion can be distributed on to the target.

23      Q.   Now let's talk about those two findings.  With

24  respect, then, to the finding of particle that was

25  consistent with smokeless gun powder, what does that mean

1598

1  to you as it relates to the distance between the muzzle

2  and the target that was struck, meaning the hand, the

3  section of the hand or finger from where that skin was

4  removed?

5       A.   It means the muzzle of the target was in close

6  proximity.  How close I cannot determine because I did not

7  have the firearm which was involved in this case, which

8  you need to make an exact determination.

9       Q.   Are there any parameters in which you are

10  willing to testify to a reasonable degree of science to a

11  reasonable degree?

12       A.   Well, I can certainly estimate within three

13  feet.  Exactly how close, I couldn't say without having

14  the weapon.

15       Q.   Could it be closer than even three feet?

16       A.   It's possible, but without the weapon and doing

17  the test, I could not say it.

18       Q.   And with respect to your finding of no residue

19  on the shirt, what does that mean as far as the distance

20  is concerned to a degree of reasonable scientific

21  certainty?

22       A.   At this point it would seem the decedent's hand

23  was out in front of his shirt so that would take up the

24  gunshot residue.  It would be consistent with not finding

25  any on the shirt.

1          Q.    Now let's move to the projectile that you

2     examined.  You mentioned earlier that you didn't have a

3     firearm in this particular case to actually make a

4     comparison with the projectile that was purportedly

5     removed from the body of the deceased, am I correct?

6          A.    Correct.

7          Q.    So even though you don't have a -- Well, let me

8     ask you this question first.  I will rephrase it again.

9     Even though you do not have a weapon for comparison

10    purposes, were you - are you still able to examine a

11    projectile and still reach some conclusions about that

12    projectile in terms of the gun, the nature of the gun, the

13    type of gun, the type of weapon that may have fired that

14    projectile to a degree of reasonable scientific certainty

15    in spite of the fact that you do not have a weapon?

16         A.    Yes, sir.  You can make some facts about the

17    projectile from the projectile itself.

18         Q.    All right.  Now tell us how did you go about

19    doing that and then I will ask you your opinion after you

20    tell us that?

21         A.    You actually visually look at the projectile,

22    you weigh the projectile, you measure the diameter of the

23    projectile, you look for - you count the number of lands

24    and grooves on the projectile, which is the rifling in the

25    barreling, which is nothing more than raised and depressed

1500

1    portions in the barrel, which make the projectile rotate

2    as it leaves the barrel when it's fired.

3              The whole purpose of rifling is to impart

4    rotation of spin on the bullet so when it leaves the

5    barrel, it flies towards the target more accurately.  If

6    the barrels weren't rifled, the bullet would begin to

7    tunnel immediately after leaving the barrel and you

8    wouldn't be able to hit targets beyond fifty-five feet.

9         Q.   So using the analogy when throwing a football --

10        A.   It spirals nicely.  It's going to fly to the

11   target more accurate as opposed to jumping.

12        Q.   So those lands and grooves are within the

13   barrel, they create markings, the riflings in the barrel

14   of the gun, am I correct?

15        A.   Correct.  They are imparted on a projectile as

16   it's passed down the barrel.

17        Q.   Okay.  And as far as making an identification,

18   what is the basis for the theory of the identification as

19   it relates to those lands and grooves and the rifling

20   characteristics?

21        A.   When the projectile passes down the barrel, the

22   markings which are in the barrel, which are placed there

23   during the manufacturing process and the life of the

24   weapon are imparted on to the projectile and their

25   firearms identification is no two barrels have same

1601

1    results at the time of manufacturing.

2            It's sort of like fingerprints.  So if you can

3    match a projectile barrel, you can say that projectile was

4    fired from that gun and no other gun in the world.

5        Q.    Has anyone found two barrels that have identical

6    rifling characteristics?

7        A.    No, sir.  I have done tests where I have taken

8    consecutively serialized barrels and compared them and you

9    can determine the difference between the two.

10       Q.    As a result of these rifling characteristics,

11   even though you do not have a firearm, would that enable

12   you to tell something about the kind of projectile it is

13   and the type of weapon that fired that project?

14       A.    Yes, it can.

15       Q.    All right.  You have in front of you now, I

16   believe, State Exhibit what?

17       A.    12.

18       Q.    12.  Tell us -- Take a look at State Exhibit 12,

19   the envelope and its contents?

20       A.    Again, the outside envelope has my laboratory

21   case number and initials.  The inner envelope also has the

22   laboratory case number, my initials and the letter A and

23   also the pill box which I placed the projectile in while

24   it was in the laboratory.

25       Q.    How do you recognize it?

1        A.    The projectile has my laboratory case number and

2    initials and the letter A inscribed on it.

3        Q.    How do you manage to do that?

4        A.    With an electric scribe and it's on both

5    portions of the projectile.

6        Q.    Is this - is it in substantially the same

7    condition now as it was when you examined it?

8        A.    Yes, sir, it is.

9        Q.    How do you examine a projectile in order to see

10   the rifling characteristics?

11       A.    You use what's called a comparison microscope.

12   A comparison microscope is nothing more than two compound

13   microscopes which are placed side by side and they are

14   connected together with what's call an optical bridge,

15   which enables you to see two images under one eye piece at

16   the same time.

17            So if we had a gun in this case, I would fire

18   test the weapon, place the test on one side of the

19   microscope, the evidence on the other side and then

20   compare them microscopically looking for those individual

21   markings to determine whether they were fired in the same

22   gun.

23       Q.    Did you examine State Exhibit 12, the projectile

24   in this particular case?

25       A.    Yes, sir, I did.

1      Q.   Based on your examination of the rifling

2  characteristics, are you able to at least - do you have an

3  opinion to a degree of scientific certainty as to the type

4  of weapon or weapons that could have fired that

5  projectile?

6      A.   First of all, it was my opinion that projectile

7  A was either a .357 Magnum or .38 Special copper jacket

8  and fired bullet.

9      Q.   Tell us why.

10     A.   Why? Based on the rifling characteristics and

11  the measurement of the rifling.  This projectile was

12  rifled with five lands and grooves with a right-end twist

13  and had certain measurements, which fit a .38 Special and

14  .357.

15          The reason I have to say .38 Special or .357,

16  because the bullet .38 Special or .357 can be loaded in

17  either a .357 Magnum cartridge or .38 Special cartridge.

18  It's the same bullet, has the same bullet diameter.  It

19  could have the same weight, they can use that bullet

20  interchangeably.

21          So with the bullet by itself, you can't

22  determine whether specifically it's a .357 Magnum or .38

23  Special in this particular case.

24     Q.   And was the weight of the bullet then consistent

25  with being a .38?

1    A.    Or .357.

2    Q.    Or a .357 or a copper jacket?

3    A.    Correct.

4    Q.    What is a copper jacket?

5    A.    A copper jacket bullet is a bullet which has a

6    led core and is surrounded by a copper jacket and it's the

7    copper jacket portion which comes in contact with the

8    barrel and that's where you look for the markings to make

9    the comparison.

10    Q.    As far as the manufacturer of a gun that could

11    have fired this kind of projectile given the rifling

12    characteristics, were you able to at least limit it to a

13    degree of scientific certainty as to the characteristics?

14    A.    Yes, sir.  Based on the five lands and grooves,

15    to the right-end twist and measurement of those lands and

16    grooves, it was my opinion the revolver that could have

17    fired this projectile were either INA, which is a

18    Brazilian manufacturer, Lama, which is a Spanish

19    manufacturer, Rhuger, which is domestic, Smith & Wesson,

20    which is domestic and Taurus, which is now domestic along

21    with foreign manufacturers which are sold under various

22    trade names.

23    Q.    In this particular case after examining that

24    projectile, State Exhibit 12, in your opinion that was

25    either by a .357 Magnum or a .38 Special?

16

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1605

1        A.    Yes, it is.

2              MR. MORTON:  Thank you.  No questions.

3              THE COURT:  Cross?

4              MR. DAVIS:  No cross at this point.  I think I

5        might want to call Mr. Grey back to the stand later

6        on.

7              THE COURT:  Okay.  You are excused for the

8        moment.

9              MR. DAVIS:  Judge, can we approach?

10             THE COURT:  Why not.

11             (Whereupon, counsel for the respective parties

12       and the court reporter approached the Bench, after

13       which the following proceedings were had out of the

14       hearing of the jury:)

15             MR. DAVIS:  Judge, here's the deal.  If he is

16       going to call -- You are going to call Carr now,

17       right?

18             MR. MORTON:  Yeah.

19             MR. DAVIS:  All right.  Well, the other thing

20       about it is, I would just ask that there would be no

21       discussions about any statements that Mr. Brown made

22       prior to the time that this Court makes a final

23       ruling in regard to the admissibility of the

24       statement prior to the time that I have an

25       opportunity to voir dire him in some limited areas

1710

1    you are still under oath in these proceedings.

2           THE WITNESS:  Yes, sir.

3           THE COURT:  Mr. Morton?

4    Thereupon,

5                   DETECTIVE JAMES CARR

6        a witness, having been previously duly sworn, was

7    examined and testified under oath as follows:

8                   DIRECT EXAMINATION

9        Q.   (By Mr. Morton)  Good afternoon, sir, and how

10   are you?

11       A.   Fine.

12       Q.   You already told us your name.

13       A.   James Francis Carr, detective, homicide

14   division.

15       Q.   You told us that yesterday and you are still

16   under oath.

17       A.   Yes.

18       Q.   You told us that you worked as a detective for

19   the Broward County Sheriff's Office, homicide unit?

20       A.   That's correct.

21       Q.   How long have you worked as a police officer?

22       A.   Twenty years.

23       Q.   How long with Broward Sheriff's Department?

24       A.   I've been with the Sheriff's Department thirteen

25   years.

ATTACHMENT / EXHIBIT 22

1711

1    Q.   How long have you been in the homicide division?

2    A.   Seven and a half years.

3    Q.   And I take it then on November of 1990 you were

4    working in that capacity, too.  Is that correct?

5    A.   That is correct, sir.

6    Q.   Did you initially get involved on the 13th of

7    November, 1990 in the investigation involving the death of

8    the Deputy Patrick Behan?

9    A.   Yes, I did.

10   Q.   Tell us how you initially got involved in that

11   investigation?

12   A.   I was contacted at approximately 1:55 in the

13   a.m. to respond the 3990 West Hallandale Beach Boulevard

14   at the Circle K.

15   Q.   Did you, in fact, respond?

16   A.   Yes, I did.  I arrived approximately 2:30 a.m.

17   Q.   What was your initial role there at the scene

18   when you responded?

19   A.   To interview a number of persons that were on

20   the scene.

21   Q.   Did you, in fact, do that?

22   A.   Yes, I did.

23   Q.   How long were you there at the scene?

24   A.   For several hours.

25   Q.   And at that time, were you asked on that

1712

1    particular day to do anything else on the day of the

2    homicide, regarding the death of Patrick Behan other than

3    interviewing the persons and the witnesses?

4        A.    Yes, I was.

5        Q.    What were you asked to do?

6        A.    We conducted a canvass of the area, going

7    basically door-to-door residences in that particular area.

8        Q.    When did you do that?

9        A.    That was later on the 13th, towards the

10   afternoon hours, after twelve in the afternoon.

11       Q.    Who assisted you in that?

12       A.    Detective Thomasevich.

13       Q.    Let's talk about that.  Who is Detective

14   Thomasevich?

15       A.    He is my partner in the homicide of division.

16       Q.    Tell us how the organizational structure of the

17   homicide division works and how your assignments are made.

18       A.    When a homicide comes in, they would send a team

19   that would be two investigators that worked together on

20   the homicide.  They wouldn't at that time send them out,

21   usually a supervisor or two supervisors would also respond

22   to the scene.

23       Q.    So you worked as partners?

24       A.    That is correct.

25       Q.    About how many people did you have in the

1713

1    homicide division at that time?

2        A.    In the homicide division we had ten at that

3    time.

4        Q.    When you are assigned as teams to investigate a

5    homicide, does that team become the so-called lead

6    investigators?

7        A.    Normally it would, yes.

8        Q.    And in this particular case were you assigned as

9    the lead investigator, with your partner, Thomasevich?

10       A.    Yes.

11       Q.    Were the two of you assigned as lead

12   investigators in this case?

13       A.    No, we were not at that time.

14       Q.    How was the investigation at least set up

15   initially after the shooting?

16       A.    Initially later on, on the 13th, there was a

17   task force that was set up approximately eighty personnel

18   from the Broward Sheriff's Department.

19       Q.    Were you a part of that task force?

20       A.    Yes, I was.

21       Q.    Was your partner a part of that task force?

22       A.    Yes.

23       Q.    Did the two of you work together on whatever

24   tasks you were assigned to?

25       A.    Yes, we did.

1714

1    Q.   So this set up was something different that

2  being assigned as a lead investigator?

3    A.   That is correct.

4    Q.   At some point in time did you and your partner

5  ever become or were assigned as the lead investigators on

6  the case?

7    A.   Yes, on February 5th of 1991.

8    Q.   Now let's talk about you and your partner's

9  investigation, if you investigated with him up until you

10  became -- Well, from the point of the shooting on November

11  13th up until July of 1992.  Let's talk about that, your

12  assignment.

13    Now, did there ever come a time, without telling us

14  what the information was, that you in your investigative

15  capacity received information regarding Timothy Brown's

16  possible involvement of the Patrick Behan case?

17    A.   Yes.

18    Q.   Without telling us that information and what it

19  was, when did you first receive that information?

20    A.   The first information I received came in on

21  November 25th of 1990.

22    Q.   Did you act upon that information?

23    A.   Yes, I did, at that time on November 30th, I

24  interviewed an individual.

25    Q.   After November 30th, did there come another

1715

1    time, we're talking now between that time and July, 1991

2    that you received any other information, other than the

3    November 25th and then the November 30th information

4    regarding possible Timothy Brown's involvement.

5              MR. DAVIS:  I am going to object to this line of

6         questioning.  I think it's hearsay.

7              THE COURT:  Simply calls for a yes or no.

8              MR. DAVIS:  It's still talking about

9         information.

10             THE COURT:  Objection overruled.

11             THE WITNESS:  On April 26th of '91, I

12        interviewed four individuals.

13        Q.   (By Mr. Morton)  After April of 1991, up until

14   July of 1991, did you receive any other information other

15   than the information you received on April 26th, in

16   addition to what you received on the 25th and 30th that

17   you acted upon?

18        A.   Yes, in May of 1991, I interviewed six

19   individuals.

20        Q.   Six different individuals?

21        A.   That is correct, sir.

22        Q.   And after May and July of 1991, did you receive

23   any other information that you acted upon as it relates to

24   Timothy Brown?

25        A.   Yes, on June 4th, 1991, I interviewed another

1    individual.

2         Q.    Now the information that you received on

3    November 25th, 30th, 1990, that was before you became lead

4    investigator in the case of February, 1991, correct?

5         A.    Yes, that was while we had the task force.

6         Q.    From that point on up until the time that you

7    became the lead investigator in the case -- By the way,

8    was your partner Eli Thomasevich also privied to this

9    information since you work as a team?

10        A.    Yes, he was.

11        Q.    He accompanied you in all or some of these

12   matters?

13        A.    Yes, he did.

14              MR. DAVIS:  Objection, Judge.

15        Q.    (By Mr. Morton)  On all or just some?

16        A.    In all.

17        Q.    From that point from November up until you

18   became lead investigator, did you ever consider

19   interviewing Mr. Timothy Brown?

20        A.    Yes, I did.

21        Q.    By the way, do you see him in the courtroom?

22        A.    He is sitting next to Mr. Larry Davis.

23              MR. MORTON:  Let the record reflect this witness

24   has pointed to the accused.

25              THE COURT:  The record will so reflect the

1717

1       identification.

2       Q.    (By Mr. Morton)  Did you interview him from

3  November to February 5th after receiving that information?

4       A.    No, I did not.

5       Q.    From April and May and June, when you received

6  the other additional information did you consider

7  interviewing Mr. Brown?

8       A.    Yes, I did.

9       Q.    Did you interview him?

10      A.    No, I did not.

11      Q.    When was the first time you got or did anything?

12      A.    It was on July 16th, 1991.

13      Q.    Thank you.

14           MR. MORTON:   Before we proceed, may we approach

15      the bench?

16           (Thereupon, a side bar discussion was had as

17      follows:)

18           MR. MORTON:   I just want some guidance in this

19      direction, because I don't want prejudice his client.

20      I would like to do this outside the presence of the

21      jury in terms of how he wants me to phrase these

22      questions.

23           The way he comes in contact with Mr. Brown was

24      that he was in the residential program, in fact, he

25      mentioned that in his opening statements that they

1718

1    pick him up as he left the residential program, then

2    from there they took him to the police station.  From

3    there then came their oral interview, after that the

4    taped interview.

5        If -- All my questions somehow intimate that.

6    And, in fact, he was in custody, he was serving his

7    six month sentence when he was let go.

8        MR. DAVIS:  That's not correct.

9        MR. MORTON:  That's their understanding.  That's

10   why I don't want to bring any of this out, he was at

11   the residential program until they had room for him

12   to go there.  He walked away from the that

13   residential program.  They had him under --

14       MR. DAVIS:  This is the way -- Why don't you ask

15   him was he - did you pick him up at the residential

16   HRS program.

17       MR. MORTON:  Whatever you want me to do, because

18   we just can't have this in a vacuum.  They are

19   entitled to at least some of the circumstances of how

20   it came about.  I think I was careful about that with

21   my other questions, because that would be hearsay and

22   anything else.

23       THE COURT:  Can't you ask him if there came a

24   time when he came into direct contact with Mr. Brown,

25   and what was the result of that contact?

1719

1       MR. DAVIS:  Why don't you just ask him, did you

2   end up having contact with Mr. Brown at an HRS

3   residential program?

4       While we're here.  Judge, if this is okay with

5   Mr. Morton and the Court, I would like to this time

6   protect Mr. Brown's rights in regard to this and

7   object to the playing of the tape as opposed to

8   coming back right before the tape is played just so

9   the record is preserved.

10      THE COURT:  What you are doing is you are

11  renewing your motion that was brought before Judge

12  Frusciante and I ruled on it this morning.

13      MR. DAVIS:  That's correct.

14      THE COURT:  The Court is going to re-affirm the

15  rulings not only by Judge Frusciante, but by the

16  Court itself, after reviewing all of the necessary

17  documentation that was brought to the Court's

18  attention by counsel, will re-adopt all the rulings

19  that were made there from.

20      MR. DAVIS:  That's the way you are just going to

21  ask him about, did he come in contact with him in a

22  residential program?

23      MR. MORTON:  Okay, fine.

24      THE COURT:  Fine.

25      (Thereupon, the side bar discussion was

1       concluded.)

2               THE COURT:  Mr. Morton?

3               DIRECT EXAMINATION CONTINUED

4       Q.   (By Mr. Morton)  On July 16th, I guess we were

5    talking about 1991, was that outside of a residential

6    program for HRS?

7       A.   Yes, it was.

8       Q.   And just the location without telling us the

9    program or anything, where were you?

10      A.   We were off of Baker Street in Fort Lauderdale,

11   off of A1A.

12      Q.   When you say we, who is we?

13      A.   Myself and Detective Thomasevich, my partner.

14      Q.   Where did you first see him?

15      A.   At that location at approximately 6:20 in the

16   evening.

17      Q.   And at that time, where at that location did you

18   see him and what did you do?

19      A.   We followed him to the corner of Sunrise

20   Boulevard and A1A, where myself and Detective Thomasevich

21   asked him his name, after we identified ourselves as being

22   deputy sheriffs with the Broward Sheriff's Office.

23      He advised Tim Brown, at which time I placed Tim

24   Brown under arrest for the murder the Deputy Patrick

25   Behan.

1721

1    Q.    Was your partner Thomasevich with you when you

2   placed him under arrest at that time?

3    A.    Yes, he was.

4    Q.    By who and how was he transported to the Broward

5   Sheriff's Department?

6    A.    At that time two additional detectives from our

7   unit, Detective Gucciardo and Detective Illarazzo pulled

8   up.

9        At that time I proceeded to advise Mr. Brown of his

10  rights, and placed him in the back seat of Detective

11  Gucciardo's vehicle.  They transported Mr. Brown back to

12  our office at that time.

13   Q.    What -- Tell us how did you advised him of his

14  rights.

15   A.    I read them from a rights card that I keep in my

16  wallet.

17   Q.    Do you have that with you?  Is this the same

18  rights card?

19   A.    Yes.

20   Q.    Could you read to us what you read to Mr. Brown?

21   A.    I advised him after he identified himself as

22  Timothy Brown, I advised, Timothy, you have the right to

23  remain silent.  That is, you need not talk or answer any

24  questions at this time.  Do you understand?  He

25  acknowledged with a yes.

1    Anything you do say can and will be used against you

2    in a court of law. Do you understand? He advised with a

3    yes, he acknowledged.

4        You have the right to speak to an attorney and have

5    him here with you before we ask you any questions. Do you

6    understand that? He advised yes.

7        If you cannot afford an attorney and you want one,

8    one will be the appointed to you before we ask you any

9    questions. Do you understand? He advised with a yes.

10       If you decide to answer questions now without an

11   attorney present, you will still have the right to stop

12   answering my questions at any time until you speak to an

13   attorney. Do you understand? Again, Mr. Brown answered

14   with a yes.

15       And then, have you previously requested an attorney

16   or wished to have an attorney? He advised us no at that

17   time.

18       Knowing and understanding the rights as I explained

19   to you, are you willing to answer questions now without an

20   attorney present? He advised us yes, he wanted know what

21   this was about at that time.

22       At that time I placed him into the vehicle, told him

23   that we would talk to him when he was transported down to

24   our office.

25       Q.   That was by Gucciardo and Illarazzo?

1723

1        A.    That is correct, sir.

2        Q.    How far away were you from the location of your

3    office at that time?

4        A.    Several miles.  We were on Sunrise and A1A.  Our

5    office is at Prospect Road at the 3500 block.  We arrived

6    back at the office at approximately five minutes of seven.

7        Q.    Would you tell us what did you do when you got

8    back -- By the way, before we do that.  Did you follow the

9    car that Mr. Brown was in or did it follow you?

10       A.    Yes, myself and Detective Thomasevich followed

11   the vehicle back to our office.

12       Q.    When you got there with Mr. Brown, what did you

13   do then?

14       A.    Once we arrived, Mr. Brown was made comfortable,

15   he advised that he wanted to use the rest room which we

16   escorted him to.

17       After which, he was given a soda to have something to

18   drink and we were in an interview room at that time.  At

19   approximately, I believe it was ten after seven, he was

20   advised of his constitutional rights by utilizing a

21   Right's Waiver Form, which he answered the questions and

22   signed.

23       Q.    That is a written Right's Waiver Form?

24       A.    Yes, sir.

25       Q.    What time was this that you began to advise him

1724

1    of that?

2          A.    At approximately ten minutes after seven.

3          Q.    That was approximately ten minutes after --

4          A.    Yes, but we arrived about five minutes to seven.

5          Q.    Describe where you put him.

6          A.    We were in an interview office room at the

7    criminal investigation division of the Sheriff's Office.

8    It's maybe, I don't know, ten-by-ten, twelve-by-twelve

9    size room.

10         Has a desk with some chairs, similar to what counsel

11   is sitting at.

12         Q.    When he was arrested, was Mr. Brown handcuffed?

13         A.    Yes, he was.

14         Q.    Was he handcuffed when he came into your office?

15         A.    Yes, when we arrived he had like shackles on

16   only.

17         Q.    Did he have leg shackles on when you arrested

18   him?

19         A.    No, he did not.

20         Q.    You handcuffed him when you arrested him, tell

21   us why you did that?

22         A.    Well, it's procedure when we arrest somebody and

23   especially for a crime such as this, he was handcuffed for

24   the safety of the officers that were transporting him.

25         Q.    So it's a required policy?

1    double G for identification purposes.

2         A.   Yes.

3         Q.   Is that the written rights form that you used in

4    advising Mr. Brown of his rights again?

5         A.   Yes, it is.

6         Q.   And is it in substantially the same condition

7    now as it was when you used it to advise him of his

8    rights?

9         A.   Yes, it is, sir.

10        Q.   Are there any alterations, modifications,

11   deletions or anything?

12        A.   No, sir.

13             MR. MORTON:   I offer State's Exhibit double

14        G for identification in evidence, Your Honor.

15             THE COURT:   Any objection?

16             MR. DAVIS:   No.

17             THE COURT:   Double G will come in as State's

18        Exhibit No. 31.

19             (Thereupon, said document was marked and

20   received into evidence as State's No. 31.)

21        Q.   (By Mr. Morton)  Showing you now, handing you

22   what is State's Exhibit No. 31.  And that is the written

23   form you used; am I correct?

24        A.   Yes, sir, it is.

25        Q.   I notice up at the top of the form it has the

1    A.    Yes, sir, it is.

2    Q.    Once you unhandcuffed his hands, when did you

3 put the shackles on him?

4    A.    After we arrived at our office.

5    Q.    Why did do that?

6    A.    That was for security risk, so he couldn't get

7 up and escape.  We took the cuffs off his hands.

8    Q.    Now in the room, you described the room that you

9 placed him in, correct?

10   A.    Yes, sir.

11   Q.    Describe the lighting conditions and basically

12 the room itself, as far as the air condition and so forth.

13   A.    It's central air conditioned, it's fluorescent

14 lighting, similar to what is here in this courtroom today.

.5   Q.    Okay.

16   A.    Again, it's maybe ten-by-ten or

17 twelve-by-twelve.  It has a desk and a few chairs around

18 it.

19   Q.    Is that the only interview room you have?

20   A.    There is two identical rooms like that.

21   Q.    Do you have the written Right's Waiver Form that

22 you used to advise Mr. Brown of his rights?

23   A.    Yes, I do.

24   Q.    May I have it please?  Thank you.

25        I show you what's been marked as State's Exhibit

1727

1    word juvenile.  Why do you have the word juvenile at the

2    top of that form?

3        A.    Because the form pertains to juveniles.  That is

4    different than that of an adult's waiver form.  There are

5    a few added questions on it.

6        Q.    With respect to him being a juvenile, how old

7    was he at that time?

8        A.    He was fifteen years of age at that time.

9        Q.    Show us how you used that Right's Waiver Form,

10   State's Exhibit 31 to advise Mr. Brown of his rights.

11       A.    Okay, well, it starts off at the top -- The

12   print is done my by myself.  It starts off with name, date

13   of birth, home address, the phone number.  It says given

14   by, it's printed my name and also Detective Thomasevich

15   who was present.

16       It has the case number, the date and the time.  July

17   16th, 1991 and has 19:10 hours which is 7:10 in the

18   evening.  It has location which is the Broward Sheriff's

19   Department.

20       Q.    Continue.  What did you do?

21       A.    Then with Timothy reading along with me, I read

22   the form out loud.

23       Before I ask you any questions, I want to advise you

24   of the law.  Do you understand that I am a deputy sheriff?

25   Timothy Brown was holding a pen and he acknowledged by

1    writing on a line that's next to each and every one of

2    these that I am reading, he put a yes.

3         Q.    That is his handwriting?

4         A.    Yes.

5         Are you comfortable?  Again he indicated with a yes.

6         Has anyone threatened you?  He indicated by writing a

7    no.

8         Can you read and write the English language?  He

9    indicated by writing a yes.

10        What school do go to?  He put no.  I asked him about

11   that, he was not attending school at that time.  It says

12   grade.  I asked him what grade he had finished.  He told

13   me the eighth grade.  He wrote an eight on that line.

14        Have we tried to contact your parents or guardian?

15   Which at that time we had, and there was no answer.  He

16   wrote a yes.  Do you want your parents, guardian or legal

17   custodian here before we proceed any further?  Timothy

18   wrote a no on that line.

19        You have the right to remain silent.  That is, you

20   don't have to talk to me or answer any questions if you do

21   not want to.  Do you understand?  Timothy wrote a yes.

22        You have the right to talk to an attorney and have

23   him here with you before we ask you any questions.  Do you

24   know what an attorney is?  Timothy wrote yes.  And we

25   discussed that.  He knew an attorney was a lawyer, he told

us.  Do you understand?  He wrote yes.

If you cannot afford an attorney and you want one, we'll get an attorney for you, before we ask you anymore questions.  Do you understand?  Again on that line Timothy wrote a yes.

If you decide to answer questions now without an attorney present, you will still have the right to stop answering my questions at any time until you talk to an attorney.  Do you understand?  Again, Timothy wrote a yes on that line.

Should you talk to me, anything you say can and will be used either for you or against you.  Do you understand?  He wrote a yes on that line.

Are there any questions you have, we asked.  Timothy wrote no, on that line.

Knowing and understanding these rights, are you willing to answer any questions now without an attorney here?  He wrote yes.

Then it says I, and he printed his name, Timothy Brown, have read this statement of my rights or have had it read to me, and I understand what my rights are.  I am willing to make a statement and answer questions.  I do not wish an attorney present at this time.  No threats or promises have been made to me, no pressure of any kind has been used against me, nor have I been tricked or fooled

1   into giving a statement.  I understand and I know what I

2   am doing.  I further expect that any statement will be

3   used for or against me in a court of law.

4       Then has a signature line, and Timothy Brown signed

5   his name.  I signed as a witness and my partner Detective

6   Thomasevich also signed as a witness.

7       Q.   And I forgot to ask, is this the original?

8       A.   That is the original.

9            MR. MORTON:  The jury can look at that at any

10      time, Judge.

11      Q.   (By Mr. Morton)  At that time once you finished

12  advising Mr. Brown of his rights using the Right's Waiver

13  Form, that's the second time you've done that, at least

14  the second time you advised him of his rights?

15      A.   That is correct, sir.

16      Q.   Did you proceed to interview him?

17      A.   Yes, we did.

18      Q.   Tell us what did you say?

19      A.   We started to talk to Timothy about the murder

20  of Deputy Patrick Behan.

21      Q.   When you started off speaking to him, was the

22  conversation between the two of you recorded at this time?

23      A.   Not at this time it was not.

24      Q.   Who was present?

25      A.   Myself and Detective Thomasevich.

14

1    Q.   Continue as you start out.

2    A.   At this time we started talking to him about the

3    homicide.  And in the very beginning, in the interim he

4    denied knowing what we were talking about or knowing

5    anything.

6    Q.   How long did you talk to where he denied his

7    involvement?

8    A.   Twenty, approximately twenty to twenty-five

9    minutes.

10   Q.   And did you continue with your interview after

11   that?

12   A.   Yes, we did.

13   Q.   At any time during the course of your interview

14   at this particular time, did Mr. Brown indicate to you

15   that he did not want to answer any of your questions?

16   A.   No, absolutely not.

17   Q.   At any time did he indicate to you that he

18   wanted an attorney present?

19   A.   No, absolutely not.

20   Q.   At any time did he indicate to you that he was

21   uncomfortable, felt threatened or intimidated?

22   A.   No, on the contrary.  He was given soda, taken

23   to the bathroom and later on he had something to eat.

24   Q.   What - how did you continue and where did you

25   continue your interview?

1    A.   I told Timothy Brown that I had certain

2  information --

3    Q.   Is this the information that you referred to as

4  we discussed earlier without telling us what that was?

5    A.   Yes.

6    Q.   And as you confronted him with that information,

7  tell us what happened.

8    A.   Timothy Brown admitted to his involvement and

9  verbally was able to have advise the events that occurred

10 of November 13th, 1990, leading to the death of Deputy

11 Patrick Behan.

12    Q.   So after you confronted him with that

13 information you had received during the course of your

14 interrogation, he admitted to you that he was involved in

15 Deputy Behan's death?

16    A.   Yes, that's correct.

17    Q.   When and how far into the interview?

18    A.   We spoke to him for approximately an hour off

19 the tape.

20    Q.   How long had you been speaking to him after you

21 confronted him with the information that you had and his

22 admission, how much time elapsed from the time you first

23 came in until the time he made his admission?

24    A.   Approximately thirty, thirty-five minutes.

25    Q.   Then over the thirty, thirty-five minutes or so,

1733

1   you did talk to him about his involvement in Deputy

2   Behan's case?

3        A.   That's correct.

4        Q.   You were are not recording?

5        A.   No.

6        Q.   Who is present at this time?

7        A.   Myself and Detective Thomasevich and Mr. Brown.

8        Q.   Same room?

9        A.   Same room.

10        Q.   Continue.  What did he tell you at this time?

11        A.   He relayed to us the fact of what transpired

12   that evening, leading up to the death of Deputy Behan.

13        Q.   Tell us what he told you.

14        A.   He said that he met with another individual

15   where they were getting high on crack, marijuana.  They

16   smoked marijuana and what he indicated, it was laced.

17        Q.   Did he tell you who that individual was?

18        A.   Yes.

19        Q.   Who did he say that person was?

20        A.   Keith King.

21        Q.   Continue.

22        A.   He told us that the two were getting high and

23   that the one individual had a weapon and he described that

24   weapon to us.

25        Q.   What weapon did he describe?

1734

1    A.   A .38 caliber of black steel, two inches with

2    round handle, rusted.

3    Q.   Continue, please.

4    A.   He indicated that the two went out on his black

5    beach cruiser type bike, they were riding around, they

6    were talking about killing someone.  And as they road up

7    towards the Circle K store, he indicated to us that the

8    individual by the name of Mr. King had looked up, spotted

9    the the police patrol unit sitting there and basically

10   indicated now he knew who.

11   Q.   Continue, please in the oral conversation.

12   A.   He told us that they pulled up towards the rear

13   and that Mr. King had gotten off, he was on the

14   handlebars, had gotten off, walked up to the side of the

15   patrol unit.  He even indicated about the limp that

16   Mr. King walks with.  Walked up to the driver's door,

17   pulled the weapon from his waistband and fired a single

18   shot, shooting Deputy Behan.

19   Q.   What other details did he give you about that

20   shooting?

21   A.   He advised that the two of them got back on the

22   bicycle and crossed Hallandale Beach Boulevard, which

23   would be going north down 40th Avenue.  When they came to

24   the area of Southwest 25th Street, approximately one

25   hundred yards off the corner, there is a rock pit on that

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1735

1    corner approximately one hundred yards, that the weapon

2    was tossed in, over the fence and into the water there.

3    It's a large dredging area.

4        Q.    And?

5        A.    They had continued back down to the area of

6    Wiley Street, where they had split up and Mr. Brown

7    indicated that he had never seen Mr. King again from that

8    time on.

9        Q.    Now he told you that Mr. King has a limp.  Am I

10   correct?

11       A.    That's correct.

12       Q.    And have you seen or have you observed Mr. King

13   walking yourself?

14       A.    Yes.

15       Q.    Does he have a limp?

16       A.    Yes, he has a definite limp.

17       Q.    You said he described that they had come up from

18   the rear of the car?

19       A.    That is correct, on the driver's side.

20       Q.    Did Mr. Brown tell you the direction that they

21   came from before spotting him?

22       A.    That they had come up Hallandale Beach

23   Boulevard.

24       Q.    So now after you spend the next thirty minutes

25   or so speaking to Mr. Brown about his involvement along

1    with that of Keith King, what did you do then?

2        A.    We took a recorded taped statement.

3        Q.    To go over the things that he had told you?

4        A.    That is correct.

5        Q.    During the course of your interview with him

6    before you went on tape, did you give him any facts, that

7    is concerning the homicide itself and how it happened?

8        A.    No, absolutely not.

9        Q.    When you did discuss your investigation with

10   him, what portion of your investigation did you discuss

11   with him?

12       A.    After he gave us the statements, we were trying

13   to get information.  He was trying to rely - he wasn't

14   clear on the streets and which direction that they were

15   running, other than being able to tell us, and we showed

16   him photographs, just indicating by pointing on that

17   photograph what he was trying to explain to us.

18       Q.    And how about the information, don't tell us

19   what it is that you received over the course of your

20   investigation, if you did discuss that with him as well

21   before you went on tape?

22       A.    Yes.

23       Q.    That was the other investigation information you

24   discussed with him?

25       A.    Yes, it was.

1      Q.    About what time did you start the recorded

2    statement?

3      A.    It was about 8:15 that evening.

4      Q.    Did you bring the recorded statement with you

5    today?

6      A.    Yes.

7      Q.    Would you take it out, please?

8      I show you what's now been marked as State Exhibit

9    double H for identification purposes.  Take a look at the

10   envelope and the contents.  What is it?

11     A.    This is the envelope that back on July 16th, '91

12   that I filled out myself, put the case number, the

13   offense.  My name is on there and Mr. Brown's, and this is

14   the recorded tape conversation that I took.  The cassette

15   with Mr. Brown's name was also dated.

16     Q.    That's your handwriting?

17     A.    That is my handwriting.

18     Q.    Is that how you recognize it?

19     A.    Yes.

20     Q.    Is it in substantially the same condition now

21   looking at it, as when you recorded you and Mr. Brown of

22   July 16th, 1991?

23     A.    Yes, it appears so.

24     Q.    Have you had the opportunity to listen to that

25   tape?

1738

1    A.   Yes.

2    Q.   When you listened to it, was it a fair and

3  accurate representation between the conversation of you

4  and Mr. Brown when you spoke to him?

5    A.   Yes, it was.

6    Q.   Have there been any alterations, modifications

7  or deletions in any manner?

8    A.   No.

9         MR. MORTON:   I offer it into evidence, Your

10   Honor.

11        MR. DAVIS:   No objection.

12        THE COURT:   Double H will come in as State's

13   Exhibit 32.

14        (Thereupon, said cassette tape was marked and

15   received into evidence as State's Exhibit No. 32.)

16        MR. DAVIS:   Can we approach?

17        (Thereupon, a side bar discussion was had as

18   follows:)

19        MR. DAVIS:   Just so - I am probably paranoid.

20   Just so the record is clear, I continue my objection

21   as before, but this is a copy that's coming in.   The

22   jury is not going to know it's the copy.

23        THE COURT:   The original which had been marked

24   double H is going to now become marked as a court

25   exhibit, it will be placed in the file.

1739

1    What will be substituted is State's Exhibit 32,

2    which is a copy of the redacted tape that the two of

3    you had an opportunity to review, that is in

4    substantial conformity with the agreement of in terms

5    of what was being redacted.

6         MR. DAVIS:  But over the objection in regard to

7    redactions.

8         THE COURT:  Correct.

9         MR. DAVIS:  I think just the fact that the jury

10   can listen to the tape and hear the spaces on their

11   own, there is really no need for the explanation.

12        MR. MORTON:  The gaps they may have some

13   questions of the tape, as well as the voluntariness

14   of the statement based on some moments of silence or

15   seconds of silence.  I think they need an

16   instruction.

17        THE COURT:  Those were matters that were

18   requested by the defense.  So it's certainly nothing

19   the State's done that caused any of those gaps.

20        MR. MORTON:  That's all I want the jury to know.

21        MR. DAVIS:  So what are you going to do?

22        THE COURT:  Simply tell them they are hearing a

23   cassette recording that may contain some gaps, that

24   those again have nothing to do with the substance of

25   the conversation, that they are not to consider those

1740

1    in any respect.   Something to that effect.

2         MR. DAVIS:   Over my objection.

3         THE COURT:   Do either of you require the audio

4    portion to be transcribed by the court reporter at

5    this time?

6         MR. DAVIS:   Yes.

7         MR. MORTON:   Yes.

8         (Thereupon, the side bar discussion was

9    concluded.)

10        MR. MORTON:   Your Honor, at this time I would

11   like to publish State Exhibit 32 by playing it.

12        THE COURT:   Members of the jury, in a moment, a

13   cassette record is going to played for your

14   listening.

15        There may appear during the course of this tape

16   to have some gaps.   Those gaps are not in any respect

17   for your consideration, they are not substantial in

18   terms of your consideration and you're only to

19   consider the contents of what you hear and nothing

20   more.

21        And you may publish it.

22        MR. MORTON:   Thank you, Judge.

23            DIRECT EXAMINATION CONTINUED

24   Q.   (By Mr. Morton)   Who does most of the speaking

25   on the tape initially?

1741

1     A.    Myself.

2     Q.    Does your partner Thomasevich ask any questions

3  during the course of the tape?

4     A.    Yes, he does.

5     Q.    And will the difference in his voice be

6  noticeable when the tape comes on?

7     A.    Yes, sir, it will.

8           (Thereupon, the trial proceedings were concluded

9  in Volume XIII.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    Thereupon, the proceedings are continued from Volume XII:

2              (Thereupon, the cassette tape was played as

3         follows:)

4              DETECTIVE CARR:  Testing one, two, three, four.

5    One, two, three, testing, testing.

6              MR. MORTON:  Is that your voice?

7              THE WITNESS:  Yes, sir.

8              DETECTIVE CARR:  This is to be a sworn taped

9         statement in reference to BSO case number

10        PK90-11-314.  The offense is classified as a homicide

11        of a deputy sheriff, which occurred on November 13th,

12        1990, on a Tuesday morning in or around 1:45 in the

13        a.m.  This incident occurred in the Circle K parking

14        lot, located at 3990 West Hallandale Beach Boulevard.

15             This statement's being taken by Detective Carr

16        and Detective Thomasevich of the Broward County

17        Sheriff's Homicide Division.  It's being taken on the

18        16th of July, 1991, at approximately 20:15 hours.

19        This will be a statement of one Timothy Brown, being

20        take at this time.

21             Q.   (By Detective Carr)  Okay, sir, for the

22        record would you please state your full name.

23             A.   Timothy Brown.

24             Q.   Okay, Timothy, what is your date of birth

25        and your home address?

EXHIBIT B

1747

```
 1              A.    11-23-75, 6640 Perry Street.

 2              Q.    Okay, and the phone number there?

 3              A.    963-9919.

 4              Q.    Okay, Timothy.  Before I go any further and

 5      speak to you in regard to this incident, a little

 6      earlier I had advised you of your rights, is that

 7      correct?  And you had filled out this form that's in

 8      front of us here tonight?

 9              A.    Yes, sir.

10              Q.    Okay.  Just for the purposes of the record,

11      I am going to read this here.  It says them Timothy

12      Brown, before I ask questions, I want to advise you

13      of your rights under the law.  Do you understand that

14      I am deputy sheriff, and there's a yes next to that

15      after that.  Did you write that yes?

16              A.    Yes, sir.

17              Q.    You understand that?  Are you comfortable

18      at this time?

19              A.    Yes, sir.

20              Q.    Have we treated you right, you had

21      cigarettes, you had water, you got to go to the

22      bathroom?

23              A.    Yes, sir.

24              Q.    Okay, has anyone threatened you?

25              A.    No, sir.
```

1748

1    Q.   Okay, can you read and write the English

2    language and you wrote a yes.  Is that correct?

3         A.   Yes, sir.

4         Q.   Okay, and it says what school do you go to

5    and you put no.  You're not attending school now?

6         A.   No.

7         Q.   And you finished at the eighth grade?

8         A.   Yes, sir.

9         Q.   Okay, and then we put - have we tried to

10   contact your parents or guardian and you answered

11   yes.  And we have, correct?

12        A.   Yes, sir.

13        Q.   Okay, do you want your parents, guardian or

14   legal custodian here before we proceed any further,

15   and you wrote in no.

16        A.   No, sir.

17        Q.   Okay.  Okay, then it goes on to say your

18   rights.  You have the right to remain silent.  That

19   is, you don't have to talk to me or answer any of my

20   questions if you do not want to and I asked do you

21   understand and you wrote a little yes?

22        A.   Yes, sir.

23        Q.   Okay, you have the right to talk to an

24   attorney and have him here with you before we ask you

25   any questions.  Then the form states, do you know

1    what an attorney is and we discussed that, and you

2    put yes, that you do?

3         A.   Yes, sir.

4         Q.   Okay.  Do you understand that and it says.

5         A.   Yes, sir.

6         Q.   If you cannot afford an attorney, and you

7    want one, one will be appointed to you before I would

8    ask you any questions.  And it says do you understand

9    and you wrote a yes?

10         A.   Yes, sir.

11         Q.   And you understand that?

12         A.   Yes, sir.

13         Q.   Okay, if you decide to answer my questions

14    now without an attorney present, then you will still

15    have the right to stop answering my questions any

16    time, okay, until you talk to an attorney.  Do you

17    understand that?

18         A.   Yes, sir.

19         Q.   Okay.  Should you talk to me, anything you

20    say can, and will be used against you or in a --

21    Either for or against you, it states okay and it says

22    do you understand that?

23         A.   Yes, sir.

24         Q.   Okay and you put a yes there.  Are there

25    any questions at this time?

1        A.   No, sir.

2        Q.   Knowing and understanding these rights, are

3   you willing to answer questions now without an

4   attorney here, and you put yes?

5        A.   Yes, sir.

6        Q.   Okay.  Then it says I, and it's printed

7   Timothy Brown, you wrote that?

8        A.   Yes, sir.

9        Q.   Have head this statement of my rights or

10  have had it read to me and I understand what my

11  rights are.  I am willing to make a statement and

12  answer questions.  I do not wish an attorney at this

13  time.  No threats or promises have been made to me,

14  no pressure of any kind has been used against me, nor

15  have I been tricked or fooled into giving this

16  statement.  I understand and I know what I'm doing.

17       Okay.  And then it goes on with the signature

18  here.  Okay.  And it says Timothy Brown?

19       A.   Yes, sir.

20       Q.   You signed that?

21       A.   Yes, sir.

22       Q.   Okay.  And then I - myself and Detective

23  Thomasevich had signed that as witnesses.

24       Okay.  Also Timothy, before we go on, I need to

25  advise you as well as being a detective with the

1   Broward County Sheriff's Homicide Division, I am also

2   a notary public with the State of Florida.

3       What this means I am empowered to take a sworn

4   statement from you.  Okay?

5       A.   Yes, sir.

6       Q.   I am gonna be placing you under oath and

7   you're gonna be swearing to tell me the truth in

8   regard to this incident.  Okay.

9       Also if we found that you lie, okay, a charge of

10  what's called perjury can be weighed against you,

11  which means, that's when you lie under oath and you

12  understand that?

13      A.   Yes, sir.

14      Q.   Would you raise your right hand, please.

15  Let the record reflect that the subject has raised

16  his right hand.

17      Do you solemnly swear to tell the truth and

18  nothing but the truth, so help you God?

19      A.   Yes, sir.

20      Q.   Okay, put down your hand.  Timothy, let's

21  go back eight months ago, back to November 13th,

22  1990.  We had been discussing an incident that

23  occurred at the Circle K convenience store in

24  reference to a deputy sheriff.

25      I want you in your owns words to tell me what

1    happened on that night, who you were with and where

2    you first met this individual that evening, and take

3    it from there.

4         A.    Keith King.

5         Q.    Okay.  Mr. Keith King.  And you identified

6    Keith King earlier from a photographic lineup?

7         A.    Yes, sir.

8         Q.    Okay.  Tell me about that, how long have

9    you known Keith King?

10        A.    Since I lived down here.

11        Q.    About how many years ago was that?

12        A.    Say five years now.

13        Q.    Okay.  So on this night, you meet Keith,

14   Keith King, where do you meet him at?

15        A.    On Wiley Street.

16        Q.    All right.  Tell me what happens?

17        A.    So all right, we already been drinking and

18   all that, snorting powder, and smoking lace --

19        Q.    You were smoking what?

20        A.    Lace.

21        Q.    Okay.

22        A.    "UNINTELLIGIBLE"  So then we just get in

23   the black bicycle and we go up to the Circle K.

24   He - we - he had a .38 on him.  It was black with a

25   brown handle.  It was rusted a little bit, even

1    though it was already used.

2         Q.   Okay.  Now how - who has the gun, him?

3         A.   Keith King.

4    THOMASEVICH:  Where does he carry it on him?

5         A.   Right here.

6    THOMASEVICH:  In his waistband?

7         A.   Yes, sir.

8         Q.   (By Detective Carr)  Okay.  Now, how -

9    who's riding the bike?  How are you two riding on the

10   bicycle?

11        A.   I'm pulling him.

12        Q.   You're pulling him.  That means you're

13   peddling and he's on what, the handle bars?

14        A.   The handle bars.

15        Q.   Okay.  What happens then?

16        A.   So we just riding, we go up to the Circle K

17   right there on the street straight off of Hallandale

18   Beach Boulevard.  As we ride up, he said I'm gonna

19   kill somebody.

20        Q.   Okay.  Now, when is the first time that you

21   start having conversations about him stating that

22   he's gonna kill somebody?

23        A.   About two blocks before we got to Circle K.

24        Q.   Okay, and tell me exactly what you recall

25   Keith King saying to you.

1    A.   He gonna kill somebody.

2    Q.   Okay.  What do you say to that?

3    A.   I called his bluff.

4    Q.   So you're calling his bluff, you don't

5    believe it?

6    A.   Yes, sir.

7    Q.   Okay, you're basically telling him that you

8    believe he's got like the nerve to do it?

9    A.   Yes, sir.

10   Q.   Okay, so what happens then?  What does he

11   say?

12   A.   We get - we pulled up and saw the police so

13   he say don't go out that way.  So we ride that way.

14   I pulled up anyway, you know what I am saying, I

15   wasn't paying no attention around there.  As I was

16   still pulling he jumped off the bicycle.

17   Q.   Okay, now let me just stop you for a

18   minute.  Does he say anything before he jumps off the

19   bike?

20   A.   He told me to look up.  I looked up.  He

21   said he's got him.

22   Q.   He says he's got him?

23   A.   He's got him.

24   Q.   What does that mean to you?

25   A.   He gonna kill somebody, that means --

18

1          Q.    That that's the person he is gonna kill?

2          A.    Yes, sir.

3          Q.    And do you see that police officer?

4          A.    Yes, sir.

5          Q.    And you know that that's who he's directing

6 that comment to, that that's who he's got, that's who

7 he's gonna kill?

8          A.    Yes, sir.

9          Q.    Okay.

10         A.    And when he jumped off the bicycle, he made

11 a limp over there to the car, like you know how he

12 walk, he was limping over there to the car and he

13 fired it and after he fired it, I panicked and we

14 jumped on the bicycle, we got across the street form

15 the Circle K and he fired the gun again.

16         Q.    Okay.  You say that you jumped back on the

17 bicycle?

18         A.    Yes, sir.

19         Q.    And is he on the bicycle or is he running?

20         A.    He's on the bicycle.

21         Q.    Okay.  And you go across what, Hallandale

22 Beach Boulevard?

23         A.    Yes, sir going back to Carver Ranches.

24         Q.    Okay.  Now, what's over there across

25 Hallandale Beach Boulevard?

1756

1       A.    A rock pit on this side here.

2       THOMASEVICH:   Before that.

3       Q.    (By Detective Carr)  All right.  But before

4   we hit the rock pit, you're telling me there was

5   another --

6       A.    There's a car, a car place and a pawn shop

7   on this side.

8       Q.    Okay, so you're actually -- When you cross

9   Hallandale Beach Boulevard, you're going past the

10  pawn shop?

11      A.    Yes, sir.

12      Q.    Okay.

13      A.    And we in the center.  Cross up over here,

14  the pawn shop right here.  We going straight down

15  here and the rock pit on this side here.

16      Q.    Okay.  Now what do you's do?

17      A.    We fired -- Before we got back to the first

18  block, we fired it off again.

19      Q.    And this is after you're across and away

20  from the Circle K?

21      A.    Yes, sir.  Yes, sir.

22      Q.    He fires the gun, what, up in the air?

23      A.    Yeah.

24      Q.    Okay.

25      A.    Then we get half way down, we get half down

1    on 40th and we throw the pistol.

2         Q.    Where does he throw the pistol?

3         A.    By the rock pit, by the gate.

4         Q.    Now, you know where that pistol is?

5         A.    If we go back and look for it, yes, sir.

6         Q.    Okay.  Now, let me back up and go over a

7    couple of things that I just want to clarify.  Do you

8    remember what you were wearing that night?

9         A.    Yes, sir.

10        Q.    What?

11        A.    White T-shirt, some burgundy

12   "UNINTELLIGIBLE" and some blue cut-off pants.

13        Q.    Okay, you're talking --

14        A.    A white T-shirt --

15        Q.    Work pants, cut-offs?

16        A.    Yeah.

17        Q.    Okay.  And you indicated that the same

18   sneakers that you have on here tonight are the

19   sneakers you were wearing then?

20        A.    Yes, sir.

21        Q.    And you remember that?

22        A.    Yes, sir.

23        Q.    Now you said you had a white T-shit on?

24        A.    Yes, sir.

25        Q.    Now, do you remember what you did with that

1758

1    T-shirt that night?

2         A.    I took it off and put it in my back pocket.

3         Q.    Okay, so you didn't have a shirt on?

4         A.    I took it off when we got across

5    "UNINTELLIGIBLE" and I put it in my back pocket like

6    it's hanging out now.

7         Q.    Okay.  Do you remember what Keith King was

8    wearing?

9         A.    Bugle Boy and a silk and he had on --

10        THOMASEVICH:  Bugle Boy pants?

11        A.    Bugle Boy shorts.

12        THOMASEVICH:  Cut-offs?

13        A.    No, they were, they were made shorts, Bugle

14   Boy shorts --

15        THOMASEVICH:  Okay.

16        A.    And white silk.

17        THOMASEVICH:  White silk what?

18        A.    Silk shirt, one of them silks.

19        THOMASEVICH:  Was it, is it a collared shirt or

20   is it an open shirt or --

21        A.    No, it's like one of those --

22        Q.    (By Detective Carr)  V necks?

23        A.    Yes, sir.

24        Q.    Okay, now neither one of you's went into

25   the Circle K store?

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1    A.   No, sir.

2    Q.   Okay.

3    THOMASEVICH:  Do you remember how the deputy's

4    car was parked?

5    A.   Backwards.

6    THOMASEVICH:  Okay.  So he was backed into the

7    spot?

8    A.   Doing some paperwork.

9    THOMASEVICH:  You saw him doing the paperwork

10   when you pulled up there?

11   A.   Yes, sir.  The guy had it - he had his

12   passenger's light on with his head down with a pen in

13   his hand.

14   THOMASEVICH:  Okay, when you said passenger's

15   light, you mean the light inside the car?

16   Q.   (By Detective Carr)  The dome light it's

17   called?

18   A.   Yes, sir.

19   THOMASEVICH:  Okay, and that was on?

20   A.   Yes, sir.

21   THOMASEVICH:  All right.  Now when he - when

22   Keith King goes up to the car, does the deputy see

23   him or does the deputy say anything to him or

24   anything like that to him?

25   A.   When the deputy tried to make a move, he

1   fired this gun, a shot.

2       THOMASEVICH:  Did you see the deputy move?

3       A.   Yes, sir.

4       THOMASEVICH:  Did you see where the deputy was

5   hit?

6       A.   In the head.

7       THOMASEVICH:  Okay.  What happened after he hit

8   the deputy, did you see what happened to the deputy?

9   Did he, you know --

10      A.   No, sir --

11      THOMASEVICH:  -- did he try to move or did he --

12      A.   No, sir.

13      THOMASEVICH:  Okay.

14      A.   He tried to grab his stick, that's all I

15   remember.

16      THOMASEVICH:  But what I am saying is, you

17   didn't stay around long enough to see what he did --

18      A.   No, sir.

19      THOMASEVICH:  -- after he was shot?

20      A.   No, sir.

21      Q.   (By Detective Carr)  Okay.  So you go back

22   down 40th towards that rock pit?

23      A.   Yes, sir.

24      Q.   And you say that - that you's hide the gun

25   down there somewhere?

1        A.    Threw it.

2        Q.    Okay.  But you can show us.  What do you do

3    after that?

4        A.    We go back to Wiley Street.

5        Q.    Two of you's go back down Wiley Street?

6        A.    He - he get off - he get off up there and I

7    went back - I went to Godfather.  I see nobody up

8    there, so I went to Wiley Street.

9        Q.    All right.  You are saying that you's

10   actually separate when you get back down there?

11       A.    Yes, sir, and I bumped into a Terrance

12   Warner.

13       Q.    A Terrance who?

14       A.    Warner.

15       Q.    Warner?

16       A.    Yeah.

17       Q.    Okay.

18       THOMASEVICH:  Did you tell Terrance about this?

19       A.    No, sir.

20       THOMASEVICH:  We - originally when we took you

21   in here, we told you about all these people that we

22   had spoken to?

23       A.    Yes, sir.

24       THOMASEVICH:  That you had told about the

25   killing of deputy.

1       A.   Yes, sir.

2       THOMASEVICH:  Is that correct?  Did you in fact

3    tell these people about the killing of the deputy?

4       A.   Yes, sir.

5       THOMASEVICH:  Okay.  Where did you tell most of

6    these people?  Where was it when you told them the

7    story?

8       A.   On Wiley Street.

9       THOMASEVICH:  Okay, now did you ever tell Tony

10   Hayes about this?

11      A.   Yes, sir.

12      THOMASEVICH:  Okay, but when did you tell Tony

13   Hayes about the deputy being killed?

14      A.   Before I --

15      THOMASEVICH:  Where was it that you told him?

16      A.   Over there "UNINTELLIGIBLE" over there by

17   the pawn shop.

18      THOMASEVICH:  Did you ever go over to his house

19   and talk to him about it?

20      A.   Uh-huh, talk - we used to go to - one time

21   we go to his house and "UNINTELLIGIBLE"  he used to

22   let us use his car a lot.  It's a blue Nova.

23      THOMASEVICH:  Okay.  Now originally, in fact I

24   believe it was - it was a day or two after the deputy

25   was killed, you had spoken to some detectives from

1     our unit here, right, from the Homicide Unit?

2          A.   Yes, sir.

3          THOMASEVICH:  Okay, and as a result, they had

4     let you go that night, right?  They had talked --

5          A.   Yeah.

6          THOMASEVICH:  Now, you know, we're saying these

7     things to you, Timmy, and you keep saying yes, sir,

8     all right, but I want - I wanted to, you know, I want

9     you to understand that we don't want to put words in

10    your mouth, okay?   Is that what had happened?

11         A.   Yes, sir.

12         THOMASEVICH:  Okay, now the reason why we're

13    repeating this to you is because you told us this

14    earlier, right?

15         A.   Yeah.

16         THOMASEVICH:  Before we went on tape?

17         A.   Yes, sir.

18         THOMASEVICH:  Is there anything that we're

19    saying that is not true or not so?

20         A.   Everything true on this tape, here.

21         THOMASEVICH:  Okay.  I'm saying what we've been

22    discussing with you and what we are saying that you

23    told us before, is it all true?

24         A.   Yeah, some of it.

25         THOMASEVICH:  What do you mean some of it?

1764

1       A.   Well, before here, yes, sir.  All this

2   here, yeah.

3       THOMASEVICH:  All right.  What you're saying is

4   you lied the first time, is that what you're saying?

5       A.   Yes, sir.

6       THOMASEVICH:  Okay.

7       Q.   (By Detective Carr)  Okay.  We had been

8   talking here for about an hour before the tape.  Is

9   that correct?

10      A.   Yes, sir.

11      Q.   Okay.  And we basically were telling you

12  about the investigation and things that we had known?

13      A.   Yes, sir.

14      Q.   And in the beginning, you were denying it

15  and saying that you weren't involved and saying

16  that --

17      A.   Yes, sir.

18      Q.   Now, basically you were lying at the time.

19      A.   Yes, sir.

20      Q.   Okay.  And now you're telling us the truth?

21      A.   Yes, sir.

22      Q.   Okay.

23      THOMASEVICH:  Is there anything else that you

24  want to add to this tape, Timmy, that maybe we're

25  forgetting to ask you that would be important to the

1765

1    case?

2         A.   No, sir.

3         THOMASEVICH: is that just about everything that

4    happened that night?

5         A.   Yes, sir.

6         Q.   (By Detective Carr)  Okay, Timmy, we had -

7    we had mentioned some people that we had spoken to,

8    people you had spoken to and told about this.  Are

9    there other people that you had confided in about

10   being involved in the death of the deputy sheriff

11   that you had told?

12        A.   No, sir.

13        THOMASEVICH: Let me ask you something, Timmy.

14   Did you ever tell your mother about this?

15        A.   No, sir.

16        THOMASEVICH: Were there ever some letters that

17   were written back and forth between you and your

18   mother, where you mentioned about the fact that you

19   were involved with this deputy?

20        A.   No, sir.

21        THOMASEVICH: The reason I am saying that is

22   because one of the boys mentioned something to him

23   about letters with your mother?

24        A.   No, sir.

25        THOMASEVICH: Okay.  Did your step-mother know

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1766

1     about it?

2          A.   No, sir.

3          THOMASEVICH:  Okay.  Did you talk to Andre

4     Butler about this?

5          A.   Yes, sir.

6          THOMASEVICH:  When did you talk to him about

7     that?

8          A.   After the incident happened.

9          THOMASEVICH:  All right.

10         A.   That was about the day – I forgot what day

11    it happened on.  Like a week later.

12         Q.   (By Detective Carr)  It was actually early

13    Tuesday morning.  It was a Monday night into the

14    early part, 1:45 on a Tuesday morning.

15         A.   Yes, sir.

16         Q.   So that would have been what, that actual

17    day, that Tuesday?

18         A.   Yes, sir.

19         Q.   Well, how did you know about that rock pit,

20    you lived in that area a while?

21         A.   Yes, sir.

22         Q.   And you used to swim there?

23         A.   Yes, sir.

24         Q.   Okay.  And you never told any of these

25    people what you did with the gun or what was done

1    with it, you and Keith?

2         A.   No, sir.

3         THOMASEVICH:  Did you ever see Keith after the

4    night that this happened?

5         A.   No, sir.

6         THOMASEVICH:  Okay, and Keith King, I believe

7    was - was he is jail at that time or did he go to

8    jail?

9         A.   I don't know, sir.

10        THOMASEVICH:  Okay.  But what I'm asking you is

11   the night that this happened or the morning that this

12   happens, Tuesday morning, okay.  Now you guys finally

13   split up, right?

14        A.   Yes, sir.

15        THOMASEVICH:  Did you ever see Keith King

16   again --

17        A.   No, sir.

18        THOMASEVICH:  From that day until today?

19        A.   No, sir.

20        THOMASEVICH:  Okay, so you've never sat down and

21   talked about the story about what happened?

22        A.   No, sir.

23        THOMASEVICH:  Okay.

24        Q.   (By Detective Carr)  Okay, Tim.  Is there

25   anything else we forgot to ask you, anything you can

1768

1    think of that may be important?

2         A.   No, sir.

3         CARR:   Okay, the time concluding this statement

4    is gonna be at approximately 8:35 hours, this date.

5         (Thereupon, the cassette tape was concluded.)

6              DIRECT EXAMINATION CONTINUED

7         Q.   (By Mr. Morton)   In the taped statement, it

8    mentions at least he said he had his shirt hanging out,

9    like he had it now.   Describe what he was talking about.

10        A.   He had taken off his shirt and would put it like

11   in his back pocket and have it hanging down.

12        Q.   Was that the way he had his shirt when you first

13   saw him on July 16th?

14        A.   Yes.   When we had first observed Timothy Brown

15   he had taken off his shirt, put it back on.   Taken it off

16   and put it back on, numerous times.

17        Q.   During the course of speaking to him before you

18   went on the tape, did you or your partner ever discuss the

19   potential penalties that he was facing?

20        A.   Just that he could face possible life in prison

21   which was explained to him, twenty-five years.

22        Q.   Did you try to threaten him with that in any

23   way?

24        A.   Absolutely not.

25        Q.   As the investigator in this case, did you ever

1    talk to, and don't tell us what was said, a Kevin Duhart?

2    A.   Yes, I did.

3    Q.   And are you aware of his whereabouts today?

4    A.   He is deceased.

5         MR. MORTON:  Mr. Davis and I are willing, I

6    believe, to enter into a stipulation concerning

7    Mr. Duhart, Kevin Duhart, he is now deceased.  And he

8    was killed in an automobile accident, March of 1993

9    of which he was the victim of a hit and run DUI

10   driver, who is now charged with that offense along

11   also he hit another victim.

12        The defendant's name is Brennan, B-R-E-N-N-A-N,

13   K-R-U-M-E-N-A-K-E-R.  It is filed under 93-4295

14   CF10A.  The defendant is charged with striking and

15   killing Mr. Duhart on March 9th of 1993.

16        MR. DAVIS:  That's correct.

17        THE COURT:  Pursuant to that stipulation, the

18   jury will consider that fact as being established.

19   Q.   (By Mr. Morton)  Sir, does the fact that

20   Mr. Krumanaker is charged with killing Mr. Duhart, is he

21   associated with the Broward Sheriff's Office in any way?

22   A.   Absolutely not.

23        MR. MORTON:  I don't have any further questions,

24   Judge.

25        THE COURT:  John, do me a favor, take the jury

1770

1    out.

2         (Thereupon, a brief recess was taken, after

3    which the following proceedings were had:)

4         MR. MORTON:  Before we proceed, Judge, there is

5    just one matter I want to bring to the attention of

6    the Court.

7         I don't know where Mr. Davis' cross examination

8    is going to go.  But if there is one area that he

9    intends to cover with this officer, which pertains to

10   a domestic matter between him and his wife, what, how

11   many months ago?

12        THE WITNESS:  Six.

13        MR. MORTON:  No charges were ever filed, if he

14   wants to go --

15        MR. DAVIS:  I am not going to talk to him about

16   that.  I don't care about that.

17        MR. MORTON:  Okay, fine.  I was going to move to

18   have that stricken, that is non-proper cross

19   examination.

20        MR. DAVIS:  Of course not.  It has nothing to do

21   with this case.

22        MR. MORTON:  But everything else seems to be

23   though.

24        THE COURT:  As soon as you two are finished, let

25   me know so I can bring the jury back in.

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1771

1       MR. DAVIS:  I'm done, Judge.

2       THE COURT:  Good.  Bring the jury in.

3       (Thereupon, the jury panel entered the

4   courtroom, and the following proceedings were had:)

5       THE COURT:  Cross, Mr. Davis?

6                   CROSS EXAMINATION

7       Q.   (By Mr. Davis)  Detective Carr, I think you

8   testified that you were the lead detective in this case,

9   correct?

10      A.   I believe I testified after February 5th, 1991.

11      Q.   Right.  And you were partner, Eli Thomasevich,

12  he was co-lead detective?

13      A.   That's correct.

14      Q.   Your supervisors, one of them was Richard Scheff

15  and one of them was John Auer?

16      A.   Right.

17      Q.   Scheff was the one that was coordinating this

18  task force that you were testifying about earlier,

19  correct?

20      A.   No.

21      Q.   Wasn't he and Auer the supervisors assigning out

22  the tasks and keeping logs?

23      A.   They were two of the individuals, there were

24  several others.

25      Q.   They were the people in homicide that were

1776

1       Q.   I understand.  But all the homicide people were

2   working on this case, correct?

3       A.   At certain times.

4       Q.   Let's talk about Mr. Brown, Tim Brown's

5   statement if we could.

6       When you went out to the program which you testified

7   on direct, you didn't have an arrest warrant, did you?

8       A.   No, I did not.

9       Q.   You know what an arrest warrant is?

10      A.   Certainly do.

11      Q.   When you get an arrest warrant, you take the

12  information that you have and you go see like - not

13  necessarily Judge Backman, but any Judge who will then

14  sign off, it gives you the power to arrest, correct?

15      A.   Yes, if we're talking about arrest warrants.

16      Q.   You used arrest warrants before in the homicide

17  cases that you have worked, correct?

18      A.   I have used them on some cases and I don't use

19  them on others.  It depends on the circumstances.

20      Q.   In this case there was no warrant?

21      A.   No.

22      Q.   When you got and you picked Mr. Brown up, there

23  was, there was four homicide detectives there?

24      A.   Originally there was two, and two others showed

25  up afterwards.

1777

1    Q.   Right.  Had you requested backup?

2    A.   No, we did not.

3    Q.   Those were sent out through Detective Scheff,

4 correct?

5    A.   I can't say who they were sent out by.  I don't

6 know who sent them out.

7    Q.   And when you picked them up - when you picked

8 Tim up, at that point you handcuffed him?

9    A.   Correct.

10    Q.   Behind his back, correct?

11    A.   That is correct.

12    Q.   And you put him in the back of Detective

13 Gucciardo's vehicle?

14    A.   Correct.

15    Q.   And then he was transferred to the homicide

16 office?

17    A.   Correct.

18    Q.   He was under arrest at the time you picked him

19 up, you told him so, as you testified?

20    A.   Yes, he was.

21    Q.   When you brought him back in there to the

22 homicide office, Detective Scheff was there, was he not?

23    A.   Sergeant Scheff.

24    Q.   Yes?

25    A.   Yes.

1    Q.   He was one of the - he was your supervisor,

2    correct?

3    A.   One of them.

4    Q.   Right.  And prior to the time that you went out

5    to pick up Tim Brown and arrest him, you had spoken to

6    Richard Scheff and also spoken with your partner Eli

7    Thomasevich, Detective Thomasevich, correct?

8    A.   I have spoken to them all day.  I don't know

9    what you're referring to.

10   Q.   You got together, you talked about the

11   conversation that you're going to go out and pick up Tim

12   Brown and make an arrest?

13   A.   No, that's not correct, Sergeant Scheff was not

14   there.

15   Q.   So your testimony is that Sergeant Scheff wasn't

16   there when you and Detective Thomasevich made the decision

17   to go out and pick up Tim Brown?

18   A.   That was made by myself and my partner.

19   Q.   And Scheff was not there?

20   A.   He was not there, part of the decision.

21   Q.   That's not the question.

22   A.   No, he was not there.

23   Q.   Now, when you got back, Sergeant Scheff came in

24   the room to speak with Tim, correct?

25   A.   That's correct.

1    Q.   And umm, as a matter of fact, Sergeant Scheff

2    was in and out of that room on a few occasions prior to

3    the time that you began your taped statement with Tim?

4         A.   I don't know that that's true.  He had left, I

5    don't recall him ever coming back in the room.

6         Q.   But he did have an opportunity to observe the

7    fact that Tim Brown was in the interrogation room and

8    under arrest, correct?

9         A.   When we brought him in, yes.

10        Q.   Now you stated on direct examination that you

11   had asked Tim about whether or not he wanted his mother to

12   be contacted?

13        A.   That is correct.

14        Q.   And from what you said on direct examination, he

15   stated he did not?

16        A.   That is correct.

17        Q.   But, Mrs. Brown did eventually show up at your

18   homicide office, did she not?

19        A.   Yes, she did.

20        Q.   You didn't know she was there until after you

21   had finished your statement in the interrogation room with

22   Tim, correct?

23        A.   That is correct.

24        Q.   So she didn't have an opportunity to speak with

25   Tim prior to the time that you spoke to him?

1     A.    No, I wasn't even aware that she was there until

2   I came out.

3     Q.    Because you talked about on direct examination,

4   the juvenile waiver form?

5     A.    That is correct.

6     Q.    That the juveniles have protections built in

7   that adults don't?

8     A.    Correct.

9     Q.    Isn't it a fact, Detective, that the protections

10  that are built in as something to look at is whether or

11  not a guardian is contacted, a mother or father is

12  contacted, that's why you asked about that, correct?

13    A.    No, that's not correct.  One of the guidelines

14  is that you attempt to contact a guardian and that's what

15  he was doing.  Sergeant Scheff kept --

16    Q.    You can't tell us what he was doing.  Hopefully

17  he will will come in here and tell us himself.

18        That is something that you need to be concerned about

19  when you are talking with a juvenile?

20    A.    Yes.

21    Q.    And the reason I guess is, if you know, is

22  because juveniles are considered to be more susceptible to

23  pressures --

24        MR. MORTON:  Judge, forgive me for interrupting

25    again.  It's calling for him to speculate on the

3

1    reason why certain things are done.

2         THE COURT:  He can only answer based upon his

3    training, experience and knowledge, not speculation.

4         MR. MORTON:  I am objecting, the question is

5    calling for an answer --

6         THE COURT:  Rephrase your question, Mr. Davis.

7    Q.   (By Mr. Davis)  Now, I believe you testified

8    that you removed the handcuffs from Tim when you got into

9    the interrogation room?

10   A.   That is correct.

11   Q.   But then you placed shackles on him?

12   A.   Correct.

13   Q.   Umm, these shackles, shackle Tim to the floor of

14   the office?

15   A.   No, they do not.

16   Q.   They just shackle his legs together?

17   A.   That is correct.

18        MR. DAVIS:  One moment, Judge.

19   Q.   (By Mr. Davis)  Now you stated that you were

20   speaking to Tim off the tape?

21   A.   Correct.

22   Q.   I guess he was denying involvement to you?

23   A.   In the beginning.

24   Q.   And then you and Detective Thomasevich and

25   Sergeant Scheff continued to talk to him about the case?

1782

1     A.    No, that's not correct.

2     Q.    You and Detective Thomasevich continue to talk

3  to him about the case?

4     A.    That is correct.

5     Q.    And you began to tell him about the penalties, I

6  think you stated when you were talking on direct with

7  Mr. Morton?

8     A.    That is correct.

9     Q.    And you never told him he was facing the

10  possibilities of the electric chair?

11     A.    Absolutely not, it doesn't apply.

12     Q.    And umm, you knew that at that particular time?

13     A.    That's correct.

14     Q.    That it didn't apply?

15     A.    That's correct.

16     Q.    When you were speaking with Tim, you were trying

17  to get him to cooperate; that's a fair statement?

18     A.    I would like him to have cooperated with us yes,

19  and he did.

20     Q.    Part -- Is it your testimony that you were not

21  trying to frighten him with the possible penalty while you

22  were talking to him?

23     A.    No, I was not.  As anybody that's in that

24  position, they have a right to know what they are facing,

25  I was just explaining it to him.

1  Q.   And you were explaining this is while he is

2  still denying his involvement or is this after he's making

3  these admissions to you?

4  A.   This was when we first started talking to him.

5  Q.   So while he is denying involvement with this

6  case, you're telling him about the penalty that he is

7  facing?

8  A.   No, sir, that is not correct.   This is when we

9  first started talking to him.   We sit him down, we tell

10  him again what he is charged with.   We tell him basically

11  what he is faced with.

12  Q.   Do you tell him that if he cooperates with you

13  and gives you a statement that, you know, he wouldn't be

14  facing the rest of his life in prison or the twenty-five

15  years to life, whatever you told him or the electric

16  chair?

17  A.   Is that a question?   I never said that to him.

18  I never said that.

19  Q.   This wasn't an inducement to try to get him to

20  say anything?

21  A.   On the contrary, he gave a statement and he's

22  here today.

23  Q.   That's my point.   That's exactly the point.

24  So what I am trying get to is that if you are telling

25  him about the penalties before he is giving you any

1784

1    information, what is the purpose of it, other than to try

2    to get --

3         A.   To let him know what he is facing.

4         Q.   Now, you are speaking to him off the tape for

5    approximately an hour, correct?

6         A.   Correct.

7         Q.   You mentioned something on direct examination

8    that you are showing him pictures of the area and the

9    scene, you just said picture.

10        What were you showing him a picture of that scene?

11        A.   It was an aerial shot of the parking lot and

12   Hallandale Beach Boulevard and 40th Avenue.

13        Q.   Umm, did you not show him -- I mean, you had all

14   the pictures from forensics, right?

15        A.   I believe we did, yeah.

16        Q.   And you had pictures, did you not of the

17   deputy's car that had been parked in there backwards?

18        A.   That was the area.

19        Q.   So from the information that you were showing

20   Tim Brown and this is prior to the time you're going on

21   tape, right?

22        A.   No, that's not true.  Tim Brown had already told

23   us and described where the deputy's car - how it was

24   parked.  All we were trying to do was get the avenue that

25   he advised that they had fled from.

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1    Q.   The question though is did you not show him

2  pictures prior to the time you go on tape with him?

3    A.   No, I can't say exactly when we did.  It was

4  after he gave his statement that he was shown the

5  photographs just in describing where he had fled from.

6    Q.   Let me do it this way.  Did you show him any

7  pictures before you went on tape with him?

8    A.   I don't believe we did.

9    Q.   None?  Did you show him pictures while you were

10 on tape with him?

11   A.   Not while we were on the tape.

12   Q.   Not while you were on tape?

13   A.   No.

14   Q.   Your testimony is after you are off the tape?

15   A.   As far as I can recall.

16   Q.   Let's look at the -- Do you have a copy of the

17 transcript there with you?

18   A.   I believe I do.

19   Q.   Why don't you turn to page seven of that and

20 this is while you are taking the statement, right?  And

21 here you say, the rock pit you are telling me there was

22 another - and then a car place and a pawn shop on this

23 side.

24   Isn't that what he says there?

25   A.   Yes.

1     Q.   So when you are talking to him on the tape

2   again, when he is saying on this side, what he's saying,

3   you're showing a picture and he is pointing out.  Is that

4   not a fair statement?

5     A.   No.

6     Q.   Well, let's go down here.  Next question here

7   you cross to the pawn shop?

8     A.   Yes, sir.

9     Q.   The next question, you cross over here.  No.

10   You say, okay.  You cross over here?  You see that?

11   Aren't you using a picture for that?

12     A.   No, sir.

13     Q.   Then when he says the pawn shop, we're going

14   straight down here?

15     A.   No, sir, I don't recall a photograph.

16     Q.   On this side, the rock pit.  You weren't using

17   the --

18     A.   Sir, the rock pit is not even in the

19   photographs.  I couldn't possibly use the photographs.

20     Q.   No?  Well, let me show you the photographs.

21     A.   Not in the photographs I had.

22     Q.   Well, let's see, Detective.  Let's see

23   photographs that's been marked State number three, I guess

24   in evidence and isn't this a rock pit?

25     A.   That is a rock pit.

1787

1    Q.   Are you telling the ladies and gentlemen that

2  you don't have this photo?

3    A.   I did not have that photograph at the time.

4    Q.   And when he says here on his tape, we're going

5  straight down here and the rock pit is on this side here,

6  are you telling the ladies and gentlemen that you are not

7  having him point out a picture?

8    A.   I did not, I never had that photograph at the

9  time of his arrest.  The only photographs that I had of

10 the area was right over Hallandale Beach Boulevard and

11 Southwest 40th Avenue.

12   Q.   You're the lead detective, didn't the forensic

13 people give you the photographs that they had?

14   A.   I did not have those photos at that time.

15   Q.   Come on, you're working on a case for eight

16 months, eight months you're going out, you sit down you

17 plan to go out, you pick up Tim Brown, and you are telling

18 me you don't know about the photographs.  Is that your

19 testimony?

20        MR. MORTON:  That's argument, Judge.

21        THE COURT:  Rephrase it.

22        MR. DAVIS:  I don't know how to rephrase that.

23   Q.   (By Mr. Davis)  Isn't it a fact that you had the

24 photographs from the forensic people?

25   A.   I had photographs of the crime scene and aerials

1    over the Circle K and Southwest 40th Avenue.  I did not

2    have those areas that you just indicated to me at that

3    time.

4        Q.   So you it wouldn't affect your testimony and you

5    didn't show him any photographs until after he had, or do

6    you want to change?

7        A.   As far as I can recall, I do not recall showing

8    him any photographs until after we --

9        Q.   That's a little different now from I didn't do

10   it, now I don't recall.

11       A.   I am telling you, I don't recall showing any

12   photographs until after we took the statement from him.

13   We were trying to identify what he was describing here in

14   his statement.

15       Q.   When he says the car place and the pawn shop on

16   this side, what is he - is he just pointing without any

17   kind of reference?

18       A.   Yes, that's why we decided we needed the

19   photographs to try to understand what he was trying to

20   describe to us.

21       Q.   Now, when we were listening to the tape and the

22   rights that you read him, I mean, he didn't ask you any

23   questions about any of his rights, did he?

24       A.   No, he seemed to understand them quite well.

25       Q.   He didn't ask for any details?

1    A.    No.

2    Q.    And in his three pages of rights that you read

3  into the record, it was the same thing, he didn't ask you

4  any questions or any details?

5    A.    We just discussed if he knew what an attorney

6  was, he knew that an attorney was a lawyer.

7    Q.    Now, something else.  You were taking this

8  statement from Tim Brown in July of '91?

9    A.    Correct.

10    Q.    And Patrick Behan is shot in November 13th,

11  correct?

12    A.    Yes.

13    Q.    And apparently Tim tells you in his statement

14  that he's drinking and doing coke and smoking lace,

15  correct?

16    A.    Yes.

17    Q.    But he still could describe for you in quite

18  detail the clothes that he was wearing and the clothes

19  that this Keith King was wearing?

20    A.    Yes.

21    Q.    I mean, down to the type of shirt, sneakers and

22  pants.  Everything else, over eight months later while he

23  was supposed to be all drugged up?

24    A.    Yes.

25    Q.    Now, I believed you mentioned that you talked to

1    a number of individuals.  I think I wrote them down and

2    again, we can't get into what if anything they told you,

3    but you mentioned four individuals on the 26th.  Six some

4    time in May and another person in January.  Correct?  So

5    we have eleven people?

6         A.    June.

7         Q.    Excuse me.  Thank you for clarifying it.  Eleven

8    people that you were speaking to, correct?

9         A.    Correct.

10        Q.    Now any of those eleven people victim of a hit

11   and run that you know that are deceased at this particular

12   time?

13        A.    Not that I am aware of.

14        Q.    Now, the statement card that you read in the

15   record, I think that was placed into evidence by

16   Mr. Morton.

17        You told this jury that you picked up Tim Brown at

18   6:20 I think you said?

19        A.    That is correct.

20        Q.    Do you have - you prepared a police report?

21        A.    Yes, I did.

22        Q.    That's the thing you have in front of you?

23        A.    Correct.

24        Q.    And that police report was prepared some weeks

25   or at least after the time that Tim Brown had been

1    arrested, correct?

2         A.    Yes.

3         Q.    And that police report - I mean, you prepared

4    that police report, correct?

5         A.    That is correct.

6         Q.    You were named lead detective, so you know the

7    contact of people that you talked to and what was done as

8    far as the investigation of this case, correct?

9         A.    Correct.

10        Q.    And the police report that you prepared that we

11   got a copy of through discovery, it doesn't have any times

12   or dates when it was prepared, correct?

13        A.    That is correct.

14        Q.    Okay.  So we don't really know, I mean, you

15   can't testify when that report was done?

16        A.    It was done at the time of the determination of

17   the end of the investigation.  When it was transcribed and

18   typed?

19        Q.    Or when it was written, can you say as far as

20   the date and time?

21        A.    It was written over probably a couple weeks

22   period of time.

23        Q.    And the things like you are testifying about,

24   the time of picking Tim Brown up at 6:20, that's something

25   that is contained in your police report?

1792

1    A.    That is correct.

2    Q.    However, you don't have anything that documents

3    that, other than what is in your police report?

4    A.    I had notes at the time, which the report is

5    compiled from.

6    Q.    And those notes that this is compiled from, you

7    destroyed those notes?

8    A.    After a report is written, the notes are thrown

9    away.  Everything is compiled into a chronological report.

10   Q.    So, I mean, I mean as far as whether or not that

11   would reflect what is in your notes, there is no way of

12   determining that other than what you are now saying in

13   front of the ladies and gentlemen?

14   A.    That's right.

15   Q.    And as far as the time frames involving Tim, I

16   mean, you don't have anything that documents the fact that

17   you picked him up, except what you wrote into your report,

18   weeks after the arrest, correct?

19   A.    That is correct, that is the time that he was

20   picked up.

21   Q.    Okay.  As far as the facts of what time the

22   statement itself was taken, again, that's something there

23   is no documentation for, other than what you put down on

24   the statement itself?

25   A.    That's on the tape itself, it's on the Right's

1793

1      Waiver Form.

2          Q.    On the Right's Waiver Form?

3          A.    19:10 hours.

4          Q.    Okay?

5          A.    Top left-hand side.  Do you have it with you?

6      It was turned into evidence.

7          Q.    Why don't you show me where it says that time?

8          A.    Date, time.

9          Q.    Oh, there it is.  I see.  Okay.  19:50.  But

10     again that's your handwriting that's putting that in

11     there?

12         A.    Yes.

13         Q.    Now 19:10 is ten minutes after seven?

14         A.    That is correct.

15         Q.    So at ten minutes after seven, Tim has signed

16     this Right's Waiver Form, correct?

17         A.    Correct.

18         Q.    The statement itself begins at --

19         A.    20:15.

20         Q.    Which would be a little over an hour from the

21     time he signs the Right's Waiver Form?

22         A.    Correct.

23         Q.    During that time again, you are talking to him

24     but again as you told us today, you are not showing him

25     any pictures until after his statement?

1794

```
 1        A.    Correct.

 2        Q.    Now, you asked Tim Brown about the rock pit?

 3        A.    Correct.

 4        Q.    Where it said over here?

 5        A.    He took us to it later on.

 6        Q.    That rock pit though, he tells you he knows

 7   about the rock pit, he swims in that rock pit?

 8        A.    That he used to, yes.

 9        Q.    Tim Brown is a kid from that neighborhood,

10   correct?

11        A.    Yes.

12        Q.    Now, going back to the juvenile thing for a

13   minute.  I guess, when you are speaking with or say when

14   you were speaking with Tim, do you try to make a

15   determination as to whether or not you believe someone is

16   real smart, is intelligent?

17        A.    I'm sorry?

18        Q.    In other words, when you are speaking with

19   someone, let's take someone in Tim's position.  You bring

20   someone down, you have them in your interrogation room,

21   you have the shackles, they've been brought in by four

22   homicide detectives, do you try to make a determination

23   prior to the time that you're going to take a confession

24   from somebody, as to whether or not you think you are

25   smarter?
```

1795

1    A.   Whether I am smarter than him?

2    Q.   Yeah.

3    A.   No, sir, I speak to them on the same level I

4    speaking.  I make a determination based on whatever they

5    are speaking to me about.

6    Q.   One of the things that you are trying to get

7    when you are talking back and forth is whether or not you

8    can out think somebody, correct?

9    A.   No.

10   Q.   Is it your testimony, Detective Carr, you don't

11   try to make these determinations as to whether or not you

12   believe you can out maneuver somebody?

13   A.   No, I don't think it's trying to out maneuver,

14   trick or be smarter than somebody.  You hit them with

15   facts, pertinent information that's relevant to the case.

16   Q.   Let me ask this, when you were speaking with Tim

17   Brown, did you feel that you could out smart him, that you

18   were smarter than him?

19   A.   I think I just indicated, it was a matter of

20   hitting him with pertinent information and facts that we

21   were aware about the case, that made him decide to tell

22   the truth and know that we knew what we were speaking

23   about.

24   Q.   You've taken a lot of confessions in your

25   career, have you not?

1796

1    A.    Yes, I have.

2    Q.    And I mean, that's something that you try to do

3    in every case?

4    A.    Correct.

5    Q.    It makes it a lot easier to convince a jury when

6    you have a statement from someone, correct?

7    A.    It helps.

8    Q.    So you didn't try to make a determination in

9    regard to Tim Brown, whether you thought he was dealing

10   with a full deck?

11   A.    No.

12   Q.    Are you testifying today that you don't believe

13   in your position, while you were questioning him that you

14   think you could have out maneuvered or out smarted him?

15   A.    It's not a matter of out maneuvering or out

16   smarting him, the position that we knew that we were

17   speaking about, we had details and information that was

18   related to us that we were able to talk to Tim about.

19   Q.    The Sheriff's Office has a lot of modern

20   equipment to work with, do you not?

21   A.    As far as what?  We have helicopters.

22   Q.    You have it all.  You have videotape equipment,

23   like you taped the scene here, didn't you?

24   A.    That is correct.

25   Q.    You didn't try and video tape the confession or

1797

1    the interview with Tim Brown?

2         A.    No, we never do that.

3         Q.    But you do have that capability?

4         A.    We record the conversation on the tape.

5         Q.    But if you had a video, you could show, you

6    know, whether or not one is looking at pictures, whether

7    or not one is pointing out, where they are pointing out,

8    and get a better feeling for the person you are talking

9    to, correct?

10        A.    Yeah, if I had a video and I was making a movie,

11   I guess I could do that.

12        Q.    We're not talking about making a movie.  We're

13   talking about a homicide case where you have the

14   capability to take videotapes to bring it to the ladies

15   and gentlemen, but you didn't do it.

16        A.    We've never done that.

17        Q.    Well, let's move on to, you mentioned Kevin

18   Duhart on direct examination?

19        A.    Correct, it was mentioned, he was deceased.

20        Q.    Correct.  And Kevin Duhart was the individual

21   that had stole the cigarettes?

22        A.    That is correct.

23        Q.    You were aware of the fact that he had gone in,

24   he had been a trouble maker there, correct?

25        A.    That is correct.

1869

1    request that you instruct Mr. Davis not to ask a

2    question that he knows calls for hearsay, or is

3    based, would be based on hearsay.  I seek you to

4    instruct him not to continue to do this, requiring me

5    to get - I think he is competent enough counsel to

6    recognize and realize.

7        I think this is purposely being done on his part

8    to try to get information out in front of the jury,

9    that he never will get in or anticipate that he is

10   not going to get, for me to continue to object and

11   this Court knows and Mr. Davis knows what a hearsay

12   question is.  I think it's quite unfair to the State.

13       MR. DAVIS:  I don't have any more questions.

14       (Thereupon, the side bar discussion was

15   concluded.)

16       THE COURT:  Redirect examination?

17       MR. MORTON:  Yes.

18                REDIRECT EXAMINATION

19   Q.   (By Morton)  Any reward money that was offered

20   in this case, has it ever been offered to or paid to

21   anyone as far as your knowledge?

22   A.   No, it has not.

23   Q.   The arrest warrants, method of arresting someone

24   who may have committed a felony, is that the only method

25   by which you can arrest someone for committing a felony?

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1870

1       A.   No, it is not.  You can act on what is called

2   probable cause.

3       Q.   Without an arrest warrant?

4       A.   Yes, sir, without an arrest warrant.

5       Q.   Let me show you a series of pictures that are in

6   evidence, see if you can recognize any of the pictures,

7   recognize them as any of the pictures that you might have

8   used on July 16th when you spoke to Timothy Brown.

9       I think you were already shown State's Exhibit 3 and

10  4, that's 3, and that's 4.

11      A.   Yes, sir.

12      Q.   Those are not the photographs that you --

13      A.   No, sir.

14      Q.   By the way, do you know even know if the rock

15  pit that was described in the statement given by Mr. Brown

16  is even shown in these photographs?

17      A.   No, I do not.

18      Q.   These photographs you have had an opportunity to

19  see as the lead investigator?

20      A.   Yes, I have but not at that time.

21      Q.   Do you know if these were the photographs that

22  were taken that same day?

23          MR. DAVIS:  This is leading the witness.

24      Q.   (By Mr. Morton)  Do you know if these were taken

25  that night or the same day the homicide occurred?

1871

1       A.    No, I do not know that.

2       Q.    How about State's Exhibit 1 and 2.  Do you

3   recognize any of these two pictures?

4       A.    Yes, I do.

5       Q.    Which one, the one in my right or left?

6       A.    I recognize both of them.

7       Q.    Any of these two pictures, the pictures you used

8   with Timothy Brown?

9       A.    I believe the one in your right.

10      Q.    That's State's Exhibit 1.  Do you know when this

11  picture was taken?

12      A.    That would have been that evening on the 13th of

13  November.

14      Q.    Okay.  Show us then what you were referring

15  to -- Does this show first of all a rock pit anywhere?

16      A.    No, it does not.

17      Q.    If you would step down and show the members of

18  the jury what you were doing when you were speaking to

19  Mr. Brown concerning the photographs?

20      A.    He was indicating how he came up Hallandale

21  Beach Boulevard, they went to the back of the vehicle,

22  where they left the bicycle.

23          THE COURT:  Detective Carr, can you angle

24      yourself either doing it on both sides for the jury

25      or just give both sides an opportunity to see?

1872

1    THE WITNESS:  He indicated how they came up on

2    the bicycle, how the suspect walked down the

3    driver's side, how the shot was fired, they exited

4    out, crossed on 40th Avenue, Hallandale Beach

5    Boulevard and over in this area, where the pawn shop

6    is.  That he was going down 40th Avenue all the way

7    down to where a rock pit was.

8    Q.    (By Mr. Morton)  Nowhere in this aerial

9    photograph does it show the area of the pawn shop that was

10   referred to?

11   THE COURT:  Can you please indicate which --

12   MR. MORTON:  State's Exhibit No. 3.

13   THE WITNESS:  Here's the store, the pawn shop.

14   And this is Southwest 40th Avenue, the rock pit which

15   would be down here, north, and this would be the pawn

16   shop right over off this corner.

17   Q.    (By Mr. Morton)  The rock pit would be where?

18   A.    I don't even know if it is in this photograph.

19   Q.    And would the rock pit be shown in State's

20   Exhibit No. 4?

21   A.    No, this would be the Southwest 40th Avenue

22   going north and the rock pit would have to be somewhere

23   around here.

24   Q.    You may be seated.

25   When Mr. Davis questioned you about the transcript

1873

1    and page seven you were using the word here and here and

2    here and here --

3         A.    No.

4         Q.    -- tell us what you were doing, were why you

5    using that terminology?

6         A.    We were trying to get an understanding for what

7    Mr. Tim Brown was telling us.  He was the one, he was

8    saying over here, and he was doing like sign language

9    across there, over there.

10        That's why we decided afterwards to get the

11   photographs to get a better understanding of what he was

12   talking about.

13        He would across Hallandale by the pawn shop, we knew

14   where he meant, we wanted to get a better idea of where he

15   ran or actually road the bicycle.

16        Q.    At some point in time, did you ask Mr. Brown to

17   take you to the particular rock pit that he was

18   describing?

19        A.    Yes, that was on - that was on the evening of

20   July 16th, after the statement was taken.  Mr. Brown

21   agreed to accompany us to that area and we took him there,

22   where he pointed out the location, also simulating how the

23   weapon was thrown.

24        Q.    Was there a search of that area done?

25        A.    Yes, there was.

1874

```
1    Q.   And was there any gun located?

2    A.   No.

3    Q.   Was Detective Rogers part of that search team?

4    A.   Yes, he was.

5    Q.   The people Mr. Davis referred to --

6         MR. DAVIS:  Objection, Judge can we go side bar?

7         (Thereupon, a side bar discussion was held as

8    follows:)

9         MR. DAVIS:  I believe Mr. Morton is going to ask

10   something about some kind of relation between Tim

11   Brown and the people - I don't think that he can ask

12   that.  I certainly didn't open the door by asking him

13   how many people he spoke to, because he is the one

14   that gave me the number.

15        MR. MORTON:  He asked the questions as to

16   whether or not any of these people are still alive.

17   And he was suggested by that, that apparently that

18   the State should call these witness.

19        I can establish to see if these people have any

20   special relationship with the defendant, because if

21   they have with the defendant, then certainly I think

22   this is relevant that they are just as able to --

23        MR. DAVIS:  He can't put that in front the jury

24   with that kind of question.  I knew where he was

25   going with that.
```

1875

1       THE COURT:  What is the specific question you

2    want to ask?

3       MR. MORTON:  The people that he referred to in

4    the statement where he claims he spoke to, what was

5    his relationship with those people.

6       THE COURT:  You mean what is Carr's

7    relationship?

8       MR. MORTON:  Timothy Brown.

9       THE COURT:  How would he know?

10      MR. MORTON:  Based on what Timothy Brown said.

11      THE COURT:  Where did raise that on cross?

12      MR. DAVIS:  I didn't say anything about it in

13   cross.

14      MR. MORTON:  He asked if those people, the

15   people that he spoke to concerning statement that

16   Mr. Brown said, he told these people about the

17   incident, he asked if they were still alive.  They

18   are not dead, like Mr. Duhart.  He asked that

19   question on cross examination.

20      And I think I am entitled since they are still

21   alive, I can ask what his relationship is with these

22   people.

23      THE COURT:  That question that Chuck just

24   indicated, were you referring to those individuals

25   that were mentioned in the statement?

1876

1      MR. DAVIS:  No, because he didn't say anything

2   about the statement.  He didn't say anything about

3   the statement, he said that he talked to some people

4   that give him information.  All I did was ask whether

5   or not those people were still alive.

6      MR. MORTON:  Now I can ask him if the people

7   that were mentioned in the statement, were those

8   people some of the people that he spoke to in the

9   information that he acted upon on the dates that he

10   acted upon without asking --

11      THE COURT:  Wait a minute.  The trouble I'm

12   having with this and that's why I asked during your

13   direct examination of this officer, you asked a

14   series of dates and a series of individuals that gave

15   him information.

16      When Larry got up and started his cross, I think

17   he started something to the effect well, these eight

18   or nine individuals that you spoke to, because you

19   were concerned that he was going to start to get into

20   the context of each and every one; that's where I

21   thought that question was directed not to the

22   individuals contain within the statement.

23      MR. MORTON:  He asked if there was eight or nine

24   people that he spoke to, if they were still alive.

25   My question now is, are any of those eleven people

1877

1     that he asked, people that are contained within the

2     statements that he confronted.

3         THE COURT:  As long as you phrase it that way, I

4     think you can ask it.  If he says yes, did Mr. Brown

5     explain to you the relationship --

6         MR. DAVIS:  Okay, that's way beyond the scope of

7     cross examination.  He is getting into things he

8     didn't get into on direct.  I didn't open the door to

9     that.

10        MR. MORTON:  That's in response to his cross, he

11    is asking if those people are still alive.

12        THE COURT:  Those are the people that were a

13    direct relationship of what the State raised in

14    direct examination.

15        MR. MORTON:  He raised it on cross examination

16    again about their being alive.  I am going to ask of

17    these people that are alive, are they people that he

18    referred to in the statement and if he discussed the

19    relationship.

20        THE COURT:  Hang on, because you're going to win

21    a little and lose a little.

22        I going it permit you to ask the first question,

23    the second one as to the relationship, I don't think

24    so.  I think that's far beyond the scope.

25        MR. MORTON:  Okay.  Fine, fine, fine.

1881

1      MR. MORTON:  I have no further questions.

2                  RECROSS EXAMINATION

3      Q.   (By Mr. Davis)  Detective, this picture that's

4 marked as State's No. 2 in evidence, you stated this is a

5 picture that you were using when you were speaking with

6 Tim Brown?

7      A.   One like that, yes.

8      Q.   That's where it shows Deputy Behan's car backed

9 in?

10     A.   Correct.

11     Q.   But these pictures here that Mr. Morton was

12 showing to you on redirect examination, those are

13 certainly not the only photos that you had, right?

14     A.   No.

15     Q.   I mean you had probably one hundred or two

16 hundred different photos that had been taken by the

17 forensic people, correct?

18     A.   I had several, I wouldn't say that many.

19     Q.   Scores of pictures, fair?

20     A.   A number of them, yes.

21          MR. DAVIS:  Thank you.

22          MR. MORTON:  No questions.

23          THE COURT:  You're excused.

24          I think we'll call it a day.  And in

25     consideration how patient you were today, I am going

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed on this

2nd  day of  May, 2002 to Assistant Attorney General Celia Terenzio, 1515 N. Flagler Drive,

Suite 900, West Palm Beach, Florida 33401.

Brenda Bryn

S:\BRYN\BROWN\Exhibits.wpd