IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 955-7207-CIV-GRAHAM

TIMOTHY BROWN,                    :

     Plaintiff,                 :

vs.                              :

HARRY K. SINGLETARY,             :

     Defendant.                 :
_____/

## EXHIBITS TO TIMOTHY BROWN'S MOTION FOR CONSIDERATION OF ACTUAL INNOCENCE

## VOLUME III

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____
    Brenda G. Bryn
    Timothy M. Day
    Fla. Bar Nos. 0708224, 360325
    Assistant Federal Public Defenders
    One E. Broward Boulevard
    Suite 1100
    Fort Lauderdale, Florida  33301
    (954) 356-7436
    (954) 356-7556 (fax)

# INDEX TO EXHIBITS

1.  Timothy Brown's July 16, 1991 Statement to Detectives Carr and Thomasevich

2.  Crime Scene Map (Drawn by FPD Investigator Dennis Stinson)

3.  Keith King's June 4, 1991 Statement to Detectives Carr and Thomasevich

4.  Mary Pendergrass' June 10, 1992 Statement To Defense Investigator Gary Brodlieb

5.  Monica Cherise Willis' January 15, 1992 Affidavit

6.  Keith King's May 20, 1999 Statement to FPD Investigator Dennis Stinson

7.  Philip Howard's November 13, 1990 Statement to Detective Gucciardo

8.  Affidavit of FPD Investigator Marlon Johnson (December 20,1999)
    re: Interview with Philip Howard

9.  Excerpt from March 4, 1992 Deposition of Sergeant Richard Scheff

10. Affidavit of FPD Investigator Dennis Stinson re: May 21, 1999
    interview with Edward Davis

11. Edward Davis's February 28, 2002 Statement to BSO Major Tony Fantigrassi

12. Testimony of Sergeant Richard Scheff at Suppression Hearing (Excerpt re: Tim Brown)

13. Testimony of Detective James Carr at Suppression Hearing (Excerpt re: Tim Brown)

14. Testimony of Detective Eli Thomasevich at Suppression Hearing (Excerpt re: Tim Brown)

15. Testimony of Dr. Elizabeth Kaprowski at Suppression Hearing (Excerpt re: Tim Brown)

16. Dr. Kaprowski's Memo (12-6-92) re: Psychological Evaluation of Tim Brown

17. Findings of Judge John Frusciante, (Denying Motion to Suppress
    Tim Brown's July 16, 1991 Statement)

18. Behan's Autopsy Report

19. Trial Testimony of Medical Examiner Raul Vila

20. Trial Testimony of Bloodspatter Expert Charles Edel

21.     Trial Testimony of Ballistics Expert Dennis Grey

22.     Trial Testimony of Det. James Carr (Excerpt re: Tim Brown)

23.     Trial Testimony of Dr. Elizabeth Kaprowski

24.     Jury Instructions Re: Aiding/Abetting and Voluntariness of Defendant's Statement

25.     Jury Deliberations (Including Questions from the Jury and the Court's Answers)

26.     Affidavit of Dr. Richard Leo (December 22, 1999)

27.     Affidavit of Dr. I. Bruce Frumkin (December 21, 1999)

28.     Affidavit of Dr. Lenore E. Walker (December 22, 1999)

29.     Affidavit of Othalean Brown (December 21, 1999)

30.     BSO's New Policy and Procedure re: Interrogation of Suspects with Developmental Disabilities (November 17, 2001)

31.     BSO's "99-Page Report" of the Re-opened Investigation of the Behan Homicide

32.     Appendix D to the 99-Page Report -"Noteworthy Consistencies"

33.     Appendix C to the 99-Page Report - "Noteworthy Inconsistencies"

34.     Internal Affairs Complaint Against Detention Deputy Andrew Johnson (July 10, 1990)

35.     Internal Affairs Findings, Recommendation, and Order of Termination Of Detention Deputy Andrew Johnson (July 10, 1990)

36.     BSO's Flow Chart Re: Andrew Johnson's Motive in Behan Homicide

37.     Deposition of Brian Montgomery (July 8, 1992)

38.     Transcript of April 25, 2001 Conversation between Gwen Johnson and China (CI)

39.     Transcript of May 3, 2001 Conversation between Gwen Johnson and (CI)

40.     Transcript of May 31, 2001 Conversation between Gwen Johnson and China (CI)

41.     China's "Insurance" Letter

42.     Transcript of June 6, 2001 Conversation between Gwen Johnson and China (CI)

43.     Transcript of June 14, 2001 Conversation between Gwen Johnson and China (CI)

44.     Transcript of July 5, 2001 Conversation between Gwen Johnson and  China (CI)

45.     Transcript of August 2, 2001 Conversation between Andrew Johnson (AJ) and China (CI)
        (Traffic Stop by BSO Deputy Sudler)

46.     Transcript of August 16, 2001 Conversation between AJ, China (CI), Chico (Det. Cedeno),
        And "T" (Agt. Curry)

47.     Transcript of August 23, 2001 Conversation between AJ and Chico (Det. Cedeno)

48.     BSO's Report of August 23, 2001

49.     Transcript of August 3, 2001 Conversation between AJ, Chico (Det. Cedeno),
        and "T"(Agt. Curry)

50.     BSO's Report of August 31, 2001

51.     Transcript of September 27, 2001 Conversation between Gwen Johnson and China (CI)

52.     Transcript of October 4, 2001 Meeting in the BSO Undercover Office between AJ,
        Rollie (Agt. McKeen), Chico, (Det. Cedeno), and "T" (Agt. Curry)

53.     Newspaper Article (Sun Sentinel July 18, 1991) Shown to AJ
        during the October 14, 2001 Meeting in the Undercover Office

54.     AJ's Map of the Crime Scene (Drawn during the October 4, 2001
        Meeting in the Undercover Office)

55.     Transcript of October 4, 2001 Conversation between AJ, Chico (Det. Cedeno), Rollie (Agt.
        McKeen) and "T" (Agt. Curry) (Car Tour of Circle K)

56.     Transcript of AJ's February 8, 2002 "Job Interview" and Polygraph at BSO
        (Transcript prepared by Petitioner)

57.     Transcript of Final Portion of AJ's February 8, 2002 "Job Interview" and Polygraph at BSO
        (Partial Transcript prepared by BSO)

58.     Report of BSO Polygrapher Richard Hoffman re: AJ's February 8, 2002 Polygraph

59.     Transcript of March 13, 2002 Statement of Gwen Johnson to BSO Detective Bole and Major
        Fantigrassi (Recantation)

## (Index to Volume III)

23.   Trial Testimony of Dr. Elizabeth Kaprowski

24.   Jury Instructions Re: Aiding/Abetting and Voluntariness of Defendant's Statement

25.   Jury Deliberations Including Questions from the Jury and the Court's Answers

26.   Affidavit of Dr. Richard Leo (December 22, 1999)

27.   Affidavit of Dr. I. Bruce Frumkin (December 21, 1999

28.   Affidavit of Dr. Lenore E. Walker (December 22, 1999)

29.   Affidavit of Othalean Brown (December 21, 1999)

30.   BSO's New Policy and Procedure Re: Interrogation of Suspects with Developmental Disabilities (November 17, 2001)

31.   BSO's "99-Page Report" of the Re-opened Investigation of the Behan Homicide

AFTERNOON SESSION

1

2       MR. DAVIS:  Judge, as far as Dr. Koprowski is

3   concerned, there was some -- I am going to question

4   her very narrowly in regard to IQ.  And there are

5   some test results that were done in the school system

6   which confirmed her evaluation.  It wasn't what it

7   was based on, but it confirmed her evaluation.

8       My concern is I don't want Mr. Morton to be able

9   to question Dr. Koprowski on other areas within the

10  school records and certainly not - when we had the

11  motion to suppress, this issue came up, but her

12  testimony in the motion to suppress was much broader.

13      But in this area, I am just going to limit her

14  to that area of IQ number one, and her testing in

15  regard to that; and if the school records, I don't

16  know that the other school records are relevant but

17  if they are, there was some grades that took place

18  while he was in the detention center that Mr. Morton

19  questioned Dr. Koprowski on the school situation

20  while he was in the the detention center, where I

21  would just ask that there be no mention in regard to

22  the school at the detention center.

23      MR. MORTON:  I didn't intend to mention when he

24  was in school, when he was in the detention center.

25  I may talk about records, she'll explain them.  I

1       will not refer to them by title.

2               THE COURT:  Next?

3               MR. DAVIS:  I mean because there are is data

4       within the school records that confirmed the IQ.

5       Again, I am limiting her testimony to that area and I

6       would ask that there be a motion in limine in regard

7       to the fact that he can't then go into other areas

8       within the school records, outside of the scope.

9               MR. MORTON:  I will try to stay within the scope

10      of examination.  Of course I don't know how it's

11      going to come out or what.

12              THE COURT:  Anything she utilized to reach the

13      conclusion based upon information she reviewed, if

14      you're bringing that out on direct, it's certainly

15      fair game in cross.

16              MR. DAVIS:  I understand that.  I don't think

17      it's fair that if I bring out the IQ scores from

18      second and forth grade, that would open up all the

19      school records which caused some behavior problems

20      that went on when he was in school.

21              That's my point, Judge.  Because if she's going

22      to use the school records, Mr. Morton can argue

23      that's something she relied on as an expert.  I am

24      simply narrowing that to this one area.  It wouldn't

25      necessarily be, it would beyond the scope of that

1    area.  It's not beyond the scope of what she used, I

2    am purposely narrowing her testimony, not like it

3    went at the motion to suppress and that type of

4    stuff.

5         THE COURT:  Okay.

6         MR. DAVIS:  I mean, do I --

7         MR. MORTON:  I will definitely stay within the

8    scope of his cross - within the scope direct.

9         MR. DAVIS:  That's not an answer, Judge.

10        THE COURT:  You're asking for Mr. Morton to

11   commit himself prior to hearing question one.  There

12   may be subjects that come out as to what is and what

13   isn't open.  As you indicated at many stages during

14   the course of this trial, especially during the

15   defense case, you do not feel the necessity of having

16   to proffer, you don't want to tip what your questions

17   are going to be, what the potential answers are going

18   to be.  Therefore, I would find it virtually

19   impossible to rule on the specifics of what is and

20   isn't broachable in cross.

21        Mr. Morton is going to, his indication was, and

22   what would be my ruling is to stay within the

23   boundary of direct examination.

24        MR. DAVIS:  Can I have one moment, Judge?

25        THE COURT:  Take two.

2210

1           (Thereupon, a recess was taken, after which the

2      following proceedings were had:)

3           MR. DAVIS:  The other area, Judge, is that I am

4      not going to question, there is no issue in this case

5      in regard to either insanity at the time or

6      competency to stand trial.  I would ask also for a

7      ruling that there be no cross examination in regard

8      to those two issues.  I think they would just be

9      something that's going to confuse the jury.  It's

10     nothing that I am going to broach on my direct

11     examination.

12          MR. MORTON:  Well, I disagree with that.  If you

13     are talking about IQ and you're talking about mental

14     retardation, certainly the doctor is going to be able

15     to tell us if he has some other mental defect or

16     infirmity that might affect his knowing the

17     difference between right and wrong, or completely

18     understanding the nature of the proceedings against

19     him.

20          In fact, if Mr. Davis is bringing up the

21     voluntariness of the confession, then his ability to

22     know and understand things that are going on today,

23     for example.  The very nature of this proceeding, who

24     lawyers are, and be able to assist his lawyers, those

25     types of things are certainly relevant on his ability

2211

1    to voluntarily waive and knowingly and intelligently

2    waive his rights.

3        We're talking about intelligence here to some

4    extent.  The large part of the testimony is going to

5    become IQ.

6        MR. DAVIS:  I am not going to ask - that's my

7    point.  I am not going to ask the question whether or

8    not that Tim Brown could voluntarily waive his rights

9    and then if I don't ask that, I don't think it's fair

10    that Mr. Morton can even --

11        THE COURT:  Wait.  You can't ask a question

12    which leaves unanswered questions that relates to the

13    same issue.

14        MR. DAVIS:  Right.

15        THE COURT:  If you're saying that Mr. Brown has

16    an IQ of fifty-four --

17        MR. DAVIS:  Fifty-six.

18        THE COURT:  Last time I said fifty-six; you said

19    fifty-four.  However, if by virtue of the fact that

20    he has a low IQ, that's being elicited for some

21    purpose, that purpose as I would imagine is so that

22    you could argue to the jury in closing that your

23    client couldn't possibly know or could be easily

24    misled into giving a confession.

25        MR. DAVIS:  Then that's going to open up the

 1          door to Mr. Morton questioning Dr. Koprowski about

 2          what other contacts with the criminal justice system?

 3                    THE COURT:  I don't think that opens it up.  But

 4          I certainly think if we are going into an

 5          individual's IQ, which is their ability to understand

 6          an awful lot of what goes on around them, that cross

 7          examination into that issue and the surrounding

 8          issues certainly is permissible.

 9                    MR. DAVIS:  If he is going to ask that question,

10          I would like - I mean, I don't think that, you know,

11          if he asks that question and gets a response, that's

12          not going to open up the door for Mr. Morton to start

13          questioning about his previous contacts with the

14          criminal justice system, as far as whether or not he

15          can understand what is going on the courtroom,

16          because he's been in the courtroom before.

17                    THE COURT:  Is that your intent?

18                    MR. MORTON:  I was not going to ask her about

19          being in other courtrooms.  But I do believe, though

20          his ability to understand the nature of these

21          proceedings certainly would be relevant to his IQ.

22          Even with his low IQ, she still finds that he's able

23          to understand these proceedings with that IQ.  And

24          with that IQ, now perhaps it could open the door with

25          respect to the fact that intelligence not only

1    consists of the ability to perform certain verbal

2    matters, but based on past experience and based on

3    his past experience he may have --

4         MR. DAVIS:  See, that's exactly where he is

5    going with his questions.  That's not fair.

6         MR. MORTON:  We can go from there.  If we are

7    talking about knowingly and intelligently waiving

8    ones constitutional right --

9         MR. DAVIS:  That's why I am not going to ask

10   that, so Mr. Morton can get into that area.  If he is

11   going to be able to open up that door by asking that

12   question, that's not fair.

13        MR. MORTON:  If ultimately Mr. Davis is at all

14   suggesting to this jury that his intelligence makes

15   him mentally retarded, and therefore he cannot

16   normally and knowingly and intelligently understand

17   legal rights that were read to him, such as Miranda

18   and what they meant, to be in a position to knowingly

19   intelligently waive it.

20        I know he's not talking about going into the

21   issue of voluntariness, I know she's not going to

22   comment on voluntariness.  But if we're getting into

23   that, then certainly anything and everything that

24   might affect his ability to know and understand his

25   legal rights, including his past contacts --

1        THE COURT:  You start courting questions of this

2    witness which brings out his past experience and

3    exposure to the criminal justice system, then what we

4    have done for the last three weeks in all likelihood

5    has been a nullity.  Because in the event that he

6    were convicted, the appellate courts would find it to

7    be reversible error real quick.

8        MR. MORTON:  It depends upon what the questions

9    are.

10        THE COURT:  Right, but --

11        MR. MORTON:  I have no intent of going into that

12    now.

13        THE COURT:  So frame your questions carefully.

14        We'll do it side bar.

15        MR. DAVIS:  No, I need to get -- If I don't

16    bring that up, Judge, and he brings it up on cross

17    examination about ability to waive his rights, that's

18    going to be his cross examination and he thinks

19    that's going to then open up the door to his previous

20    contact with the criminal justice system --

21        THE COURT:  Mr. Morton by virtue of his

22    questions can't open the questions to anything.  It's

23    what you do in terms of your questions as to what

24    doors get opened.  And without a specific question by

25    question proffer, it is virtually impossible for me

1      to tell you what will and will not be admissible in

2      cross examination.

3          I can tell you that I don't believe that

4      Mr. Morton should go into any questions in cross

5      examination that deals with his past exposure to the

6      criminal justice system.  But as he correctly points

7      out, it all depends on the questions that are asked

8      in direct.

9          MR. DAVIS:  Fine.  I would ask that before he's

10     going to proffer that, they be proffered side bar.

11         THE COURT:  He said he would.

12         MR. DAVIS:  Fine.

13         THE COURT:  Now can we bring the jury in and go

14     back to work?

15         MR. MORTON:  Yes.

16         (Thereupon, the jury panel entered the

17     courtroom, and the following proceedings were had:)

18         THE COURT:  Mr. Davis?

19         MR. DAVIS:  Dr. Koprowski.

20  Thereupon,

21             DR. ELIZABETH KOPROWSKI

22     a witness, having been first duly sworn, was examined

23  and testified under oath as follows:

24         THE CLERK:  State your name, spell your last

25     name for the record.

1          THE WITNESS:  Elizabeth Koprowski,

2     K-O-P-R-O-W-S-K-I, Ph.D.

3                    DIRECT EXAMINATION

4          Q.   (By Mr. Davis)  Dr. Koprowski, what kind of -

5     what do you have your Ph.D in?

6          A.   I am a clinical psychologist.

7          Q.   What does that mean, clinical psychologist?

8          A.   I received a Ph.D in psychology from George

9     Washington University.

10          Q.   Where did you do your undergrad?

11          A.   Also at George Washington University.

12          Q.   How long had you been a psychologist?

13          A.   I have been licensed in Florida for twelve and a

14     half years, prior to that, for three years in Rhode

15     Island.  I did my internship in 1971 in Washington D.C.

16          Q.   What does it mean to be licensed?

17          A.   That means that you have to have pass initial

18     examinations in the study of psychology, perhaps a test in

19     the state law, depends on the state.

20          In other words, show certain competency in the field,

21     and you have go through approved programs, and have years

22     of required supervision.

23          Q.   Have you ever testified - well, have you been

24     qualified as an expert here in Broward County?

25          A.   Yes, many times.

1      Q.   In what regard as what?

2      A.   I testified as to the defendant's competence,

3  sanity, mitigating circumstances, those matters.

4      Q.   How many times have you been qualified as an

5  expert just here in the Seventeenth Judicial Circuit?

6      A.   About thirty-six times, give or take a few.

7           MR. DAVIS:   Judge, I would like to proffer

8      Dr. Koprowski as an expert.

9           MR. MORTON:   No objection.

10          THE COURT:   The Court will accept the witness as

11     an expert in her field.

12     Q.   (By Mr. Davis)  Well, first off, were you

13  appointed on this case?

14     A.   Yes, I was appointed by the Court.

15     Q.   And did you do an evaluation of Tim Brown?

16     A.   Yes, I did.

17     Q.   Okay, umm, do you see Tim Brown in the

18  courtroom?

19     A.   Yes, I do.

20     Q.   Would you, just for the record point out where

21  he is, and what he is wearing?

22     A.   He is sitting to my right at the defense table,

23  wearing and suit and tie.

24          THE COURT:   The record will reflect the

25     identification.

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

2218

1          MR. DAVIS:  Thank you, Judge.

2     Q.   (By Mr. Davis)  When did you see Tim Brown?

3     A.   I saw him initially September 30th, 1991 and

4  then on three other occasions, October 7th, 1991, October

5  21st, and December 16th.  So on four different occasions.

6     Q.   Did you perform any psychological tests in

7  regard to his IQ or his grade level standing?

8     A.   Yes, I did.

9     Q.   Okay.  Would you tell the Ladies and Gentlemen

10  what tests you did?

11     A.   I gave him the Wexler Intelligence Scale for

12  Children, which is the most recent.  The Wide Range

13  Achievement Test, form R-2.

14     Q.   How long would it take to give those tests?

15     A.   The WISC, Wexler Intelligence Scale for Children

16  takes approximately an hour and a half.

17     Q.   The other test?

18     A.   The other test is much briefer, I am guessing to

19  twenty to thirty minutes.

20     Q.   In regard to - what is IQ?

21     A.   IQ is what we call the intelligence quotient

22  it's a measure of verbal and performance, which is the

23  non-verbal inability of an individual and in this case,

24  this test is given by a psychologist.

25          It's not a group test, it cannot be given by

2219

1   someone without the proper doctoral training.

2        Q.   Did you come up with a score on the IQ test for

3   Tim Brown?

4        A.   Yes.

5        Q.   Would you tell the Ladies and Gentlemen what

6   that score was, or is there was more than one score?

7        A.   We scored - the verbal score was sixty, the

8   performance IQ is sixty.  The school score is fifty-six.

9   People may fall a full scale lower, but it's the score.

10       Q.   As far as his grade level, did you do a test in

11  regard to grade levels?

12       A.   Yes, the Wide Range Achievement Test involves

13  spelling mathematics and reading levels.

14       Q.   What grade level was Tim Brown in regard to

15  though those three areas?

16       How about one at a time.

17       A.   The reading level was below, was the beginning

18  of the third grade level, if I may find that exact test.

19       Q.   Take your time.

20       A.   The reading level is third grade, and his

21  mathematics was less than third grade.  He was actually in

22  that score in the half of percentile, which is that was

23  fifteen years, ten months.

24       Q.   Did you review some forth grade school levels in

25  regard to Tim Brown?

2220

1        A.    Yes, I did.

2        Q.    And do you have those with you?

3        A.    Yes, I do.

4        Q.    And did he -- When he was in forth grade, did

5    the school system do some standardized tests in regard to

6    IQ?

7        A.    Yes, apparently they did group testing of IQ.

8        Q.    And that group, what year would that have been

9    in?

10        A.    That was '87 and '88 that he was in forth grade.

11        Q.    Did the school system come up with a test score

12    in regard to Tim's IQ when he was tested in forth grade?

13        A.    Yes, they are called the cognitive ability test.

14        Q.    What was the result of those tests?

15        A.    His verbal was fifty-eight, his quantitative was

16    fifty-eight and non-verbal was fifty-four.

17        Q.    Do you find those scores consistent with the

18    scores that you found for Tim Brown?

19        A.    Yes, they are comparable.

20            MR. DAVIS:  Thank you, Judge, I have nothing

21        further.

22            THE COURT:  Mr. Morton?

23                    CROSS EXAMINATION

24        Q.    (By Mr. Morton)  So, Doctor, you were measuring

25    or asked to measure essentially Mr. Brown's intelligence

2222

1    Q.   What was of the achievement test designed to do

2    or to show?

3    A.   That was designed to measure how much spelling,

4    reading and arithmetic a student has actually learned.

5    It's not a test of general aptitude, it's a test of

6    achievement.

7    Q.   How much he has learned, correct?

8    A.   Yes.

9    Q.   And achieved in particular fields or particular

10   areas, am I correct?

11   A.   Yes.

12   Q.   What area were measured to determine how much he

13   has learned in those areas?

14   A.   As I say, just the three areas of reading,

15   spelling and arithmetic.

16   Q.   That's where you determine what grade level he

17   performed at, in those areas, correct?

18   A.   You get a score reflecting their grade level

19   performance of those three areas.

20   Q.   Now, the W-I-S-C test you say doesn't really

21   measure what is has learned?

22   A.   Overall, no.  There are some sub tests, some of

23   which reflect more learning than others.

24   Q.   So there are some sub tests to the WISC, being

25   which reflects what an individual has learned up until

```
 1    that point, some subject test, some parts to it?

 2        A.   Yes.

 3        Q.   That could affect the score, am I correct?

 4        A.   Yes.

 5        Q.   Make it lower if you haven't learned as much?

 6        A.   Correct.

 7        Q.   How much of the test would you say involves

 8    testing one has learned, the sub parts?

 9        A.   The one of the eleven traditional reflects the

10    learning, which is the information sub test.

11        Q.   Which consists of what?

12        A.   How do you boil water, what day comes after

13    Thursday.

14        You mean the specific items?

15        Q.   Yes.

16        A.   What are the four seasons of the year.

17        Q.   So it involves what one has learn in different

18    areas, from I guess seasons to cooking to what else sort

19    of subject matter?  You don't have to give me the

20    specifics.

21        A.   Geography, for example.

22        Q.   Go ahead.

23        A.   Hours in the day, how many make up a dozen.

24    What you might call mathematical concepts.

25        Q.   It deals with mathematical concepts, correct?
```

2224

1      A.   Correct.

2      Q.   All of rest the test has nothing to do wit what

3  you learned?

4      A.   No, I didn't say that.

5      Q.   There is some other aspects of learning that the

6  WISC test, what one has learned in the past, correct?

7      A.   Yes.

8      Q.   Give us, tell us all the others.

9      A.   Well, for example there is similarity tests, how

10  things are alike.

11      I mean, it's impossible to have an IQ test that

12  doesn't reflect what you learned in the world.

13      Q.   As a matter of fact, you would agree with the

14  statement that -- Let's talk about that for a while, I am

15  glad you brought that up.

16      How do you define intelligence?  I know this is a

17  subject matter of controversy in your field.

18      A.   Yes, with the number of graduates, there is a

19  number of classroom debates.

20      Q.   As it relates to tests that measure your

21  intelligence?

22      A.   That's one area of controversy.

23      Q.   That's a big area of controversy in your field,

24  isn't it?

25      A.   Yes.

2225

1          Q.    How does your field look at what is called

2     intelligence, tell me how you define intelligence, if you

3     can?

4          A.    Intelligence is not simply what one has learned,

5     but it's ones ability to learn and to process.

6          Some of these sub tests of the WISC being as well as

7     the adult version, try to measure an individual's ability

8     to conceptualize, the way they see the world.

9          Q.    So not only does it as you see it and I guess

10    the general consensus of the concept and measuring

11    intelligence, not to only measure what someone has learned

12    in the past, but to be able to have the ability to learn,

13    use abstract thinking, that type of thing, correct?

14         A.    Yes.

15         Q.    The IQ test is one of those, am I correct?

16         A.    Yes.

17         Q.    Now, am I correct, Doctor, that in your field as

18    far as the question of intelligence is concerned, that

19    testing has shown over the years and general indications

20    that there seems to be sometimes a fairly large, average

21    difference in the test scores, scores that measure

22    intelligence among various social classes, as well as

23    among certain ethnic groups, place of businesses, even

24    among some racial groups, am I correct?

25         A.    A significant difference of those groups?

2226

1          Q.    Yes.

2          A.    Yes.

3          Q.    And it is true, that we have seen that from

4    generation after generation, some of these average

5    difference seems to remain the same among various social

6    classes, ethnic groups and some racial groups, am I

7    correct?

8          A.    In the construction of the tests, the developers

9    are always trying to set the norms, using representative

10   samples.

11         For example, the United States population s racially,

12   socially, economically and ethically different, they just

13   don't use white middle or affluent subjects.

14         Q.    Right.   Nevertheless, on the average there

15   appears to be an average difference, rather, a large scale

16   difference between groups within certain classes and races

17   and ethnic classes?

18         A.    Yes.

19         Q.    Is intelligence solely a matter of heredity?

20         A.    No.

21         Q.    There are other things that affect intelligence,

22   such as a person's experience, am I correct?

23         A.    Yes.

24         Q.    Particularly ones exposure to learning

25   experiences, if one is not taught or educated or has the

2227

1      opportunity to learn as opposed to another one, then

2      because of these testing, that is they would test out to a

3      lower IQ, am I correct?

4          A.   Usually, yes.

5          Q.   So the types of school that a person comes from

6      may affect the intelligence quotient score, am I correct?

7          A.   It might.

8          Q.   If it was a type of school that is substantially

9      different in its learning opportunity or exposure, exposes

10     various kids to certain experiences, if there was a

11     substantial difference between the two schools, you might

12     expect a substantial difference in the intelligence

13     quotient?

14         A.   You could, yes.

15         Q.   Or the home?

16         A.   The home especially.

17         Q.   Especially.  Depending on what you're exposed to

18     in your experience in the home, correct?

19         A.   Yes.

20         Q.   A lot of those things when you talked about

21     based upon what has learned, such as geology, of course

22     you expect that in school, mathematics.

23         There are some things though in that subpart.  What

24     you would expect to have picked up in the home, am I

25     correct?

1        A.    Yes.

2        Q.    And if there is a substantial difference between

3   the experience or the home exposure or the conditions so

4   to speak, between certain individuals and children, you

5   might expect to see the difference in the intelligence

6   quotient.  Am I correct?

7        A.    Yes.

8        Q.    And the same is true with respect to ones social

9   experiences, as well.  I mean, that somehow is reflected

10  in the quote, measurement of intelligence, the IQ test, am

11  I correct?

12       A.    Yes.

13       Q.    So one has a substantially different social

14  experience, then you might expect a difference in the IQ

15  results, correct?

16       A.    Yes.

17       Q.    Would this be a fair statement, Doctor, based on

18  your study in the field of testing for intelligence, that

19  perhaps an individual difference within an ethnic or

20  racial group might be determined largely by heredity,

21  while the average difference between the groups may

22  largely be determined by environmental difference.

23       Would you agree with that statement?

24       A.    I'm not sure.  I would like to look at more

25  recent studies that may indicate that that's true.  That

2229

1    could well be true.

2        Q.   For example, haven't we found in this field of

3    measuring intelligence, that if some one comes from a

4    home, for example, of people who have fairly high

5    intelligent quotients, that their children might be

6    expected to have fairly high intelligence quotients,

7    correct?

8        A.   Yes, the best estimate of the child's IQ is the

9    average of the parents, unless there is a specific problem

10   or difficulty.

11       Q.   This bears out regardless of the association of

12   ethnic or racial groups that we may focus on?

13       A.   Yes.

14       Q.   And for example, if one is from a low social

15   background, if the parents have a somewhat fairly high

16   intelligence quotient, regardless of their social

17   experience or classification, the child might have a

18   fairly high IQ, correct?

19       A.   Yes.

20       Q.   Same is true with race, correct?

21       A.   Yes.

22       Q.   And even in your field of studies, the studies

23   are not quite sure whether or not that has to do with the

24   experiences and the exposure that parents might subject

25   the child to, as opposed to heredity,

2230

1    were still not clear on that, right?

2        A.    Right.

3        Q.    And even still your field has had to deal with

4    this notion of culture and all the actual test, the

5    validity of the test itself, am I correct?

6        A.    Cultural?  You mean culture bias?

7        Q.    Yes.

8        A.    Yes.

9        Q.    And there has been some controversy in the field

10   as to whether or not certain intelligence tests are

11   culturally biased, that is, in favor or prejudiced against

12   another group, based on what it's measurement is, correct?

13       A.    Yes.

14       Q.    There is no such thing though as a culture-free

15   test, would you agree with the statement?

16       A.    I know that psychologists are trying to develop

17   that all the time, they are attempting it.  Whether there

18   is, that would be knew, that I haven't heard of it yet.

19       Q.    That would be an exaggeration, this is a

20   culture-free test, because even when you're taking a test,

21   there still must be some sort of instructions that must be

22   communicated some way or certain ways, am I correct?

23       A.    Yes, instructions and ways of measuring.

24       Q.    And depending on how one communicates, for

25   example in your field, if we found that hispanic children

2231

1    generally perform higher in terms of the IQ results

2    because it's a Spanish IQ test as opposed to an English IQ

3    test?

4         A.   You mean one in their own language?

5         Q.   Yes.

6         A.   Yes.

7         Q.   There was there is a cultural difference,

8    correct?

9         A.   (Nods head)

10        Q.   And from that, we are better able to determine

11   ones so-called ability to learn and to have cognitive

12   skills, if we can't have a culturally free, unbiased

13   tests, correct?

14        A.   You could.

15        Q.   Right.  At best all we can expect is that the

16   test be at least culturally fair, as opposed to the

17   culturally free test, correct?

18        A.   Okay, yes.

19        Q.   But IQ alone, that is just the intelligence of a

20   particular person, would you agree, Doctor, cannot be used

21   to identify somebody, classify someone as mentally

22   retarded?

23        A.   I would not want to use it solely.

24        Q.   You need some other things, other than just the

25   actual test result, correct?

2232

1      A.   Yes.

2      Q.   Now the cut-off rate in terms of the mentally

3   retarded is what, seventy?

4      A.   Yes.

5      Q.   Tell us how the IQ test works in terms of what

6   we come up to with scores of one hundred?

7      A.   One hundred is average, and from ninety to one

8   hundred and ten is where most people will fall, that's

9   your average range of intelligence.

10          Eighty to ninety is going down, and Tim's level is

11   fifty-six, what we call mild retardation, a smaller

12   percentage will fall at level.  Over one hundred ten

13   conversely if you go up the scale, you get a decreased

14   percentage of the population scoring in the upper ranges.

15      Q.   Now, let's just go back to what we talked about,

16   the test includes what one has learned.  You had an

17   opportunity to examine the records of the schooling of

18   Mr. Brown.  Am I correct?

19      A.   Yes.

20      Q.   And those records went from, what?  Was it

21   preschool up to --

22      A.   First grade, there was no kindergarten records

23   available.

24      Q.   Up to what year?

25      A.   Seventh grade, a little bit of eighth grade.

2233

1    I'm not sure I have the complete records, by the way, but

2    I have what was provided.

3         Q.    I believe, according to our records -- Do you

4    have his actual birthdate, I remember he was about ten

5    days short of --

6         A.    On November 23rd, 1977, he was born.

7         Q.    1977.  You have records then that start at what

8    year?

9         A.    1983 first grade, his first-first grade so he

10   was eight; seven going on eight.

11        Q.    So he was seven going on eight when he started

12   first grade, correct?

13        A.    Yes.

14        Q.    It goes up to until, I guess you say how old was

15   he when you have the records of Tim?

16        A.    He was fourteen, fifteen when he was -- There

17   was still some school records that was when he was

18   supposedly in the eighth grade.

19        Q.    But, the records reflect that at some point he

20   dropped out of school, am I correct?

21             MR. DAVIS:  Can would he approach for a

22        moment?

23             (Thereupon, a side bar discussion was had as

24        follows:)

25             MR. DAVIS:  Judge, those eighth grade records

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

1    were the records that I was speaking of that were

2    down at the detention center.  I would like an

3    opportunity or if the Court would, instruct the

4    witness not to mention where those records were done.

5         THE COURT:  Didn't you already tell her about

6    it?

7         MR. DAVIS:  I didn't think it was going to be

8    brought up.  But I just want an opportunity that she

9    not --

10         MR. MORTON:  Why don't you have her turn around

11    and we'll just tell her.  Doctor, if you could turn

12    around.

13         THE COURT:  Do you want to advise her?

14    Where the eighth grade records came from can't

15    be mentioned.  That you have records from the eighth

16    grade is okay, but not where they come from.

17         Any problem?

18         MR. DAVIS:  No.  Thanks, Judge.

19         (Thereupon, the side bar discussion was

20    concluded.)

21         THE COURT:  Ready?

22    Q.   (By Mr. Morton)  These records were records that

23    you relied upon in reaching whatever conclusions as to

24    whether or not your testing was consistent of IQ

25    consistent with his background.

2235

1          You used his records to help you determine that?

2          A.   I compared the consistency, I wouldn't say I

3     relied upon.   I consider my own testings to be more

4     accurate.

5          Q.   You compared the consistency, correct?

6          A.   Yes.

7          Q.   And you examined his school performance from

8     first grade up until the eighth grade or so when the

9     records end.   Am I correct?

10         A.   Yes.

11         Q.   What year do the records end?

12         A.   1990/1991.

13         Q.   The school records stop in 1990?

14         A.   It's the 1990/1991 school year.

15         Q.   Do you know the particular month?

16         A.   First marking period is the only one that's

17    marked.

18         Q.   What date would that be?

19         A.   I'm not certain, but there are four marking

20    periods, so the first quarter of the '90.

21         Q.   Are there any dates shown on those documents?

22         A.   No.

23         Q.   And it does show all four marking periods?

24         A.   The last three are blank columns.

25         Q.   It only shows the first period of the 1990, to

2236

1    1991?

2         A.   Yes, correct.

3         Q.   In examining those records, let me ask you a few

4    questions.

5         We talked about the significance of one school or

6    learning, that is, what one does or achieve in school or

7    learning that might affect the intelligence quotient.

8    Aren't your records as you see them, don't they indicate

9    that Timothy spent a lot of time absent from school?

10        A.   His absentee rate definitely increased over

11   first-first grade to second-first grade, and then second

12   grade and then third grade was worse.

13        So yes, he was increasingly absent.

14        Q.   In fact, when you look at those records the

15   teacher was quite concerned about Mr. Brown's absences and

16   even notified his parents about it, am I correct?

17        A.   Yes.

18        Q.   And in deed during many of these years; his

19   attendance did not even meet the minimum requirement for

20   the school year, and that was so noted in the records.  Am

21   I correct?

22        A.   It may have.

23        Q.   I know we had this discussion before, but,

24   obviously when one's absent from school, certainly might

25   have an impact on what one learns, which could affect his

2237

1    performance on the IQ test.  Am I correct?

2         A.    Of course.

3         Q.    There was some, if we look at the records there,

4    you might be able to find them.  I believe in '85, '86,

5    '87, I talked about this before, there was some I believe

6    standard achievement tests that were given to, or there

7    was certainly some end of the year testing that was given

8    to Mr. Brown in those years?

9         A.    From my reading it looks like every year they

10   gave him a standard achievement test, yes.

11        Q.    Right.  There was one particular test that, let

12   me see if you have it a second.

13             MR. MORTON:  May I have just one minute, Judge?

14             THE COURT:  Sure.

15        Q.    (By Mr. Morton)  By the way, through out the

16   records in terms of his grades, he did receive C's and D's

17   for the most part, am I correct?

18        A.    First, second and third he did, I am looking at

19   forth grade now.  Up until forth grade.

20        Q.    Let's talk about forth grade.

21        A.    Then it was D's and F's.

22        Q.    Until up third grade he was performing in

23   mathematics at a C level, am I correct?

24        A.    Yes.

25        Q.    And, in fact, consistently until that point he

2238

1  was performing at an average level in mathematics,

2  correct?

3      A.   Yes - no he got a D there in the first grade.

4      Q.   Then thereafter?

5      A.   Yes, C's.

6      Q.   Now there a test in there, I believe where

7  it was tested in math.   Iowa Test of arithmetic skills?

8      A.   Yes, it looks like they gave that, yes.

9      Q.   By that, you test in a certain percentile?

10     A.   Yes.

11     Q.   What does the percentile mean, for example?

12     A.   For example, fifty percentile means fifty

13  percent of the people scored better, and fifty percent

14  scored worse than you, so that be would average.

15     If you got a ninety-nine percent, only one percent of

16  the people did better than you.

17     Q.   In fact, in his classroom work he was doing

18  okay, but for the fact of his absences, they were

19  concerned about that in first, second and third grade?

20     A.   Well, in measuring - the way I interpreted the

21  antellbinocular - in other words his hearing and vision.

22  I am not sure that his work was satisfactory.

23     Q.   Weren't there some comments from some of the

24  teachers that he had satisfactory work, but his absences

25  were of some concern?

2239

1          MR. DAVIS:  Are we speaking first, second and

2     third grade again?

3          MR. MORTON:  Yes.

4          THE WITNESS:  Frankly, I don't find, I don't

5     find any reference one way or the other for forth

6     grade.  No, there was a reference in 1986 that he

7     was - oh, no, I'm sorry.  That was the lack of the

8     physical, not his attendance.

9          Q.   (By Mr. Morton)  All right.  There was a Florida

10    statewide assessment program test or document I believe

11    you in his records, am I correct?  Something SSAT?

12         A.   Yes, third grade.

13         Q.   And that measured his performance and that's the

14    statewide test, correct?

15         A.   Yes.

16         Q.   That measured his performance in certain areas,

17    such as identifying the meaning of compound words, am I

18    correct?

19         A.   Yes.

20         Q.   Meaning of contractions.  Am I right?

21         A.   Yes.

22         Q.   Identifying a main idea in a particular

23    paragraph?

24         A.   Yes.

25         Q.   Being able to distinguish between real and

2240

1    unreal action.  Am I right?

2         A.    Yes.

3         Q.    How did he performed on that particular test?

4         A.    Well, that's the test - part of the test of

5    communication skills you were just reading, some of the

6    skills that apparently they are assessing, those are under

7    reading, communication skills and he received a "no", in

8    terms of did not achieve the skill in determining the main

9    idea stated in a paragraph.

10        Q.    Let's go down the line, see what he did achieve,

11   why don't you do that?

12        A.    Frequently used words in context, skill

13   achieved, yes.  Identify the meaning of a compound words,

14   yes, achieved the skill.  Identifying the meaning of

15   contractions, yes, achieved the skill.

16        As I just stated, determining the main idea stated in

17   a paragraph, no, he could not identify.    Follow written

18   directions, yes, he did achieve that skill.  Difference

19   between real or unreal actions, or in events in a

20   paragraph, yes, he did achieve that skill.

21        Q.    Was there a part that deals with mathematics as

22   well?

23        A.    Yes, mathematics, do you want me to read the

24   list of skills?

25        Q.    Sure.

2241

1         A.    Count the number of objects in the set of less

2    than one hundred, yes, he did.  Write the numbers before,

3    after or between a given whole number less than one

4    hundred, yes.  Identify one half, one third or one forth,

5    he could not do that.

6         Add two, two digits numbers vertically and

7    horizontally with no regrouping, yes, he could do that.

8    Subtract two digit numbers in a vertical and horizontal

9    notation, no, he could not do that.  Subtract one digit

10   numbers from two digit numbers, with no regrouping, yes he

11   could.

12        Do you want me to keep going?  There are more than

13   that.

14        Q.    Yes.

15        A.    Okay.  Select a clock that shows a stated time

16   on the hour and half hour, no, he could not do that.

17   Identify a circle, rectangle, square and triangle, yes.

18        Solve real world problems involving addition.  Solve

19   real world problems involving subtraction, yes, he could.

20   Identify a set of coins equal in value to a set of coins

21   up to twenty-five cents, yes.

22        Add to solve real world money problems, not more than

23   fifty cents  yes, he could.

24        Q.    Basically in the overall test I think there was

25   something like sixty-seven he was asked to do?

2242

1    A.   I didn't count them all up.

2    Q.   He got about fifty-six correct?

3    A.   Yes, fifty-five correct of sixty-seven.  Eleven

4  skills achieved out of fourteen.

5    Q.   Now, intelligence quotient shall we say or IQ

6  test scores can change and school achievement can change

7  drastically over the year, am I correct?

8    A.   Yes, in theory, IQ is more stable construct but

9  in fact, it may change as we find under both adverse and

10  positive conditions.

11    Q.   And certainly that might change depending on how

12  much more one learns or how much less one learns as one

13  moves along in a chronological age, am I correct?

14    A.   Learns and is exposed, and the experience in the

15  world.

16    Q.   Right, am I correct?

17    A.   Yes.

18    Q.   Because when we are really measured or the IQ,

19  we were supposed to be able to come up with the IQ and

20  it's supposed to mean the same thing for any individual,

21  regardless of age whether he is eight or sixty-five?

22    A.   Yes.

23    Q.   His mental age divided by chronological age,

24  times one hundred?

25    A.   That's the old formula.

```
 1          Q.    And the concept that deals with it?

 2          A.    Yes.

 3          Q.    That in and of itself, that you wouldn't

 4    certainly base whether or not someone is mentally retarded

 5    on the score itself, you would like other things, am I

 6    correct?

 7          A.    Yes.

 8          Q.    His social adjustment, that certainly might have

 9    some merit.  Am I correct?

10          A.    Their level of social functioning?

11          Q.    Yes.

12          A.    Yes.

13          Q.    And by the way, the teachers that talked with

14    Mr. Brown, before you reached your opinions or conclusions

15    you wrote in your report concerning this -- You wrote a

16    report to Mr. Davis, correct?

17          A.    No.

18          Q.    You never wrote a report to Mr. Davis?

19          A.    No.

20          Q.    You wrote a report, though?

21          A.    Yes.

22          Q.    You had not talked to any of the teachers in his

23    school?

24          A.    In the last few months, I was able to reach one

25    teacher.
```

2244

1      Q.   But before that, in speaking to Mr. Davis

2    telling him about your opinions and conclusions, you had

3    not talk to any teacher, had you?

4      A.   Correct.

5      Q.   And, in fact, in another proceeding when you

6    testified, which I believe was back in January of 1993,

7    January 8th of 1993, you don't have any reason to doubt

8    that date, correct?

9      A.   No.

10      Q.   You testified, you had not talked to any of the

11    teachers then?

12      A.   I had not.

13      Q.   I questioned you about that?

14      A.   Yes, you did.

15      Q.   You thought personally perhaps it might be

16    helpful to have some of that information?

17      A.   I thought it might be useful.

18      Q.   Also in speaking to Mr. Brown, you were able to

19    determine that he hung out a lot with other people in his

20    friends, am I correct?

21      A.   Yes.

22      Q.   As he put it, out on the streets, basically the

23    beach area and so forth, correct?

24      A.   Yes.

25      Q.   And in so doing, that might affect, that

2245

1   experience may have an impact on some form or fashion on

2   his ability or manner in which he functions in society?

3          A.   That's a very circular experience.

4          Q.   He could be hanging out with people that are

.5   older than him for example, correct?

6          A.   Yes.

7          Q.   Certain concepts or certain things that he could

8   learn not necessarily just in school, am I right?

9          A.   Yes.

10          Q.   As a matter of fact, you pointed out the home is

11   the most important?

12          A.   Yes, especially the early years.

13          Q.   Many children who have -- There is a difference

14   between what we call intelligence or intelligent behavior,

15   there is a slight difference?

16          A.   Yes, intelligence is contact the intelligent

17   behavior is something that's more easily measured.

18          Q.   Right.  With respect to your measuring

19   intelligence you may measure someone with a lower IQ, but

20   still that person may be capable of intelligent behavior?

21          A.   They may function at a level that's higher, if

22   that's what you are saying.

23          Q.   Yes, function at a level that's higher then a

24   theoretical score, correct?

25          A.   Yes.

1      Q.    In fact, many children who have low IQ's as

2   measured by tests, function perfectly well outside of

3   school, don't they?

4      A.    I would ask to define what you mean by function.

5   Make change, read a bus schedule, being able to make a

6   meal, following written instructions?

7      Q.    Where they don't function well at a higher level

8   than their test scores would indicate.

9      A.    Some may and some may not.

10      Q.    But many of them do.  Am I correct?  Many

11   children with low IQ scores do function at a level above

12   their IQ, correct?  I am not saying --

13      A.    Some do and some may appear to.

14      Q.    Okay.  Isn't it true, Doctor, that even after

15   leaving the school, most so-called quote, low

16   IQ, end of quote, people do function successfully and

17   blend in the general population?

18      A.    Many do.

19         MR. DAVIS:  I am sorry, I am going to object.

20      You can answer if --

21         THE WITNESS:  Many do and many are lost and many

22      are homeless.

23      Q.    (By Mr. Morton)  But the ones that do, you

24   wouldn't necessarily consider them even though they may

25   have a low score, some of them may not rally be in terms

2247

1    of what you define as mentally retarded, correct?

2        A.   Yes, but as you yourself indicated, the mental

3    retardation is more than just a score.

4            MR. MORTON:   Thank you, ma'am.

5            THE COURT:   Redirect examination?

6            MR. DAVIS:   Just a couple.

7                    REDIRECT EXAMINATION

8        Q.   (By Mr. Davis)  Dr. Koprowski, did you indicate

9    that Tim Brown had to repeat first grade?

10       A.   Yes.

11       Q.   He had to do it twice?

12       A.   Yes.

13       Q.   And --

14       A.   He was administratively promoted to the sixth

15   only because of his age.  He went from forth to sixth

16   grade.

17       Q.   But he had repeated first grade twice?

18       A.   He did two years of first grade.

19       Q.   The teacher that you spoke to was what grade?

20       A.   That was his forth grade teacher.

21       Q.   And did she indicate anything about Tim's

22   functioning in school that was useful in your evaluation

23   or that confirmed your evaluation?

24       A.   What she said confirmed my clinical impressions.

25       Q.   What was that?

1     A.   Except that she had not seen the level of

2   retardation per say.  He functioned very low in her

3   communications because she was apparently quite involved

4   with him.

5        That he did not complete the work that he was

6   doing, very very poorly in his basic skills.

7     Q.   I am sorry, did he also repeat forth grade?

8     A.   He was also administratively promoted, there was

9   no fifth grade.  She suggested that apparently to the

10  administrator person, because of his age that he would

11  have been too old for fifth grade.

12       So apparently there was a transitional probation that

13  I am not familiar with, the detail for sixth grade.

14            THE COURT:  Any recross examination?

15            MR. MORTON:  No, Your Honor.

16            THE COURT:  You're excused.

17            Mr. Davis?

18            MR. DAVIS:  Judge, I will rest at this

19       particular time.

20            THE COURT:  John, I need you to take the jury

21       out for a minute.

22            (Thereupon, the jury panel left the courtroom,

23       and the following proceedings were had.)

24            MR. DAVIS:  Judge, I would like to renew my

25       previous motion for directed verdict and add a couple

1       the testimony given in court?

2               You may rely on your own conclusion about a

3       witness.  A juror may believe or disbelieve all or

4       any part of the evidence or the testimony of any

5       witness.  Expert witnesses are like other witness,

6       with one exception.  The law permits an expert

7       witness to give an opinion.  However, an expert

8       witness is only reliable when given on a subject

9       about which you believe that person to be an

10      expert.

11              Like other witnesses, you may believe or

12      disbelieve all or any part of the expert

13      testimony.

14              If one or more persons help each other commit

15      a crime and the defendant is one of them, the

16      defendant must be treated as if he had done all

17      the things the other person or persons did, if the

18      defendant first knew what was going to happen;

19      second, intended to participate actively or by

20      sharing an expected benefit; and third, actually

21      did something by which he intended to help commit

22      the crime.

23              Help means to aid, plan or assist.  To be a

24      principal, the defendant does not have to be

25      present when the crime is committed or attempted.

ATTACHMENT / EXHIBIT 24

1        The constitution requires the State to prove

2   its accusation against the defendant.  It is not

3   necessary for the defendant to disprove anything.

4   Nor is the defendant required to prove his

5   innocence.  It is up to the State to prove the

6   defendant's guilt by evidence.

7        The defendant exercised a fundamental right

8   by choosing not to be a witness in this case.  You

9   must not view this as an admission of guilt or be

10  influenced in any way by his decision.  No juror

11  should ever be concerned that the defendant did or

12  did not take the witness stand to give testimony

13  in the case.

14       A statement claimed to have been made by the

15  defendant outside of court has been placed before

16  you.  Such a statement should always be considered

17  with caution and be weighed with great care to

18  make certain it was freely and voluntarily made.

19       Therefore, you must determine from the

20  evidence that the defendant's alleged statement

21  was knowing, voluntarily and freely made.

22       In making this determination, you should

23  consider the total circumstances, including but

24  not limited to whether when the defendant made the

25  statement, he had been threatened in order to get

1    him to make it, and whether anyone had promised

2    him anything in order to get him to make it.

3        If you conclude the defendant's out of court

4    statement was not freely and voluntarily made, you

5    should disregard it.

6        Now, during the trial I have permitted those

7    jurors who wanted to take notes.  You may take

8    your notes with you to the jury room and use them

9    during your deliberations if you wish.  As I told

10   you at the beginning of the trial, your notes are

11   intended to be an aid to your memory and should

12   not take prescedence over your own independent

13   recollection.  Those jurors who have not taken

14   notes, should rely on their own memory of the

15   evidence and should not be influenced by the fact

16   that another juror has taken notes, since the

17   notes are only for the note taker's own personal

18   use in assisting his or her memory of the

19   evidence.

20       At the end of your deliberations, please tear

21   out from your pads any notes you made and give

22   them to your foreperson.  The bailiff will collect

23   your notebooks and pencils when you return to the

24   courtroom, and I will ask the foreperson to give

25   me your notes when your verdict is returned.  I

that.  It's really your comfort level as to

whether or not you want to talk with the lawyer,

whether you want to talk to the press or whether

you want to talk to anybody else.  It's your

decision.

If anybody approaches you, and you don't want

to talk to them, tell them to leave you alone.  If

they don't leave you alone, come and see me.  I

will tell them to leave you alone.  At this

particular time, I assure you that they will.  So

on behalf of all of us, thank you.

Shirley, if you will do the exchange?

MR. DAVIS:  We'll go through the evidence.

THE COURT:  That would be a good idea.

MR. DAVIS:  I would like to renew all the

previous motions filed with this Court.

THE COURT:  Duly noted for the record and

same rulings.

(Thereupon, a recess was taken, after which

the following proceedings were had:)

THE COURT:  I asked that both counsel and

Mr. Brown return to the courtroom.  The jury has

sent out a request for a transcript of the

confession.  That's what the note says.  I suggest

we get together to determine the appropriate

ATTACHMENT / EXHIBIT 25

1   response to their inquiry.

2       Obviously, it's a matter that has not been

3   introduced into evidence, the transcript is not an

4   admissible item and accordingly, we need to deal

5   with the response.

6       MR. MORTON:  After giving it some thought,

7   Judge, I would prefer that you bring the jury out

8   rather than just sending a note back, it's not in

9   evidence, only consider the tape.  I would prefer

10  that the Court say to the jury that transcripts

11  are not necessarily considered to be accurate and

12  reliable, and that in this case the attorneys

13  agreed that the tape is the best evidence to

14  consider.

15      MR. DAVIS:  No way, am I going to accede to

16  saying the transcript -- You're going to bring

17  them and tell them it's not accurate?  I just say

18  you send back a note.  Why troop them back through

19  here, have them go back and forth for no reason.

20  The transcripts are not in evidence and that's the

21  end of it.  To bring them in here and tell them

22  the transcripts aren't accurate --

23      MR. MORTON:  They aren't.  Some of these are

24  not accurate.  That's why they are not allowed

25  back.

MERIT REPORTING OF SOUTH FLORIDA, INC., (305) 463-9505

```
1          MR. DAVIS:  That's not the point.

2          MR. MORTON:  It's up to the Court.  That's

3     precisely the point.  Many jurors saws us using

4     transcripts and from that, they would perhaps

5     believe the transcript is, in fact, an accurate

6     reflection of what Mr. Brown said.

7          That transcript is nothing more than what

8     someone else was able to determine Mr. Brown said

9     from the tape.  And varying portions in the tape

10    read unintelligible and this jury could assume

11    that that transcript was something that should --

12         THE COURT:  They have another question.  This

13    asks for a map of the Circle K and streets around

14    the Circle K.  Then there is a circle, that's what

15    I was pondering.  It says 3.5 five in the middle,

16    which is an indication to me they want a map that

17    shows and 3.5 mile circumference.

18         MR. DAVIS:  The same response, that wasn't

19    placed into evidence.

20         THE COURT:  See if this is an acceptable

21    response which I will redraft to include the

22    second inquiry, but I think addresses the point.

23    That is, in response at this particular time to

24    your inquiries and consistent with my

25    instructions, you can only review and utilize
```

1    exhibits introduced into evidence.

2         The transcript is not in evidence and

3    therefore cannot be sent back.

4         MR. DAVIS:  I would put the transcript and

5    the map.

6         THE COURT:  There was never a map that was

7    even referenced.

8         MR. DAVIS:  That's fine.

9         MR. MORTON:  That's fine, Judge.

10        MR. DAVIS:  What I would do on the second

11   note is say, see first note.

12        THE COURT:  How about if I say the same

13   applies to your second request.

14        MR. MORTON:  Upon consideration, it may be

15   best to bring them out here and tell them that

16   because they keep having questions.

17        THE COURT:  Hopefully, hopefully the manner

18   in which this is framed, they will understand they

19   cannot have anything that wasn't introduced into

20   evidence.

21        MR. DAVIS:  I think this covers it, Judge.

22        MR. MORTON:  Okay.

23        THE COURT:  Is that okay with you, Mr. Brown,

24   that I send back a note advising them as to this

25   matter?

1          THE DEFENDANT:  Yeah.

2          (Thereupon, a note from the Court was sent

3     back to the jury, after which the following

4     proceedings were had:)

5          THE COURT:  Any objection to the Court's

6     handling of the inquiry by the jury?

7          MR. DAVIS:  No, Judge.

8          THE COURT:  Just for the record, they did

9     send a preliminary note requesting all the

10    evidence, the lawyers in the presence of the

11    defendant had an opportunity to go through each

12    and every one of the exhibits.  The exhibits

13    supplied, were those that were reviewed by both

14    counsel.

15         MR. MORTON:  Right.  Thank you, Judge.

16         (Thereupon, a recess was taken, after which

17    the following proceedings were had:)

18         THE COURT:  The request from the jury is they

19    want transcripts of Carr's testimony.  Now we need

20    to deal with that.  The jury is, I take it under

21    the impression that they can just have transcripts

22    as opposed to just having the testimony re-read.

23    My understanding is that only one of the three

24    times that Detective Carr testified is ready in

25    transcript form.  That's his major testimony, from

1     when he testified the second time during the

2     State's case in chief.

3          So, we have two options at this time.  The

4     first option is that I can advise the jury that

5     there are no transcripts available, if they would

6     like his testimony re-read to them.  Both of the

7     court reporters are presently here.

8          Linda, you need time to go get your notes.

9     That's not a long process.

10         MR. MORTON:  Can she read from the transcript

11    that's she's already provided, but not provide it

12    to the jury?

13         MR. DAVIS:  Why don't you run twelve copies

14    of the transcript?

15         THE COURT:  That's a question of what the two

16    of you want to do.  What I am telling you is that

17    only one of the three times is in transcript form.

18    The first time which was very short testimony is

19    not and his rebuttal is not.

20         MR. DAVIS:  Right, I don't think they are

21    interested in the first time when he said he got

22    the tape or the second time when Mr. Morton asked

23    him whether or not he investigated McGill, I

24    think.  If you want to read that back to them,

25    fine.  But I think they want the testimony of when

1      he was --

2          THE COURT:  First of all, I am not going to

3      guess what the jury wants.  I have no qualms about

4      asking the jury specifically what it is they want.

5      Do you want me to communicate back in writing or

6      do you want me to just bring them in and ask them?

7          MR. MORTON:  Just bring them in and ask them.

8          MR. DAVIS:  I think it would be better to do

9      it writing.

10         THE COURT:  Well, there is certainly no

11     traffic out there right now, but I don't see any

12     upside to bringing them in, other than giving them

13     exercise.

14         MR. MORTON:  It's up to you.  If all they

15     want is the second testimony when he was called by

16     the State and it's already in transcript form, it

17     could be re-read, we don't have to send it back.

18     Whatever you want to do as far as I am concerned.

19         THE COURT:  Do you have an objection of

20     having copies made and sending the transcript

21     back?  Have you read the transcript?

22         MR. MORTON:  I have not read the transcript.

23         THE COURT:  Have you read the transcript?

24         MR. DAVIS:  Of course.

25         MR. MORTON:  I would rather have it read,

2542

1      rather than the jurors -- It's much different than

2      having them focus in --

3           THE COURT:  I don't have any difficult with

4      that, it's probably a more proper way in which to

5      do that.

6           MR. DAVIS:  Well, if they ask for the

7      transcript, it's going to take two hours to read

8      back or maybe two and a half hours to read the

9      transcript.

10          THE COURT:  They are asking for the

11     transcript, it is not evidence in the case.  If

12     they are asking for testimony to be re-read, which

13     effectively is what this request is, I can have it

14     re-read.

15          If both parties agree to a transcript going

16     back, that's certainly an option that exists.

17     However, only one of the parties is willing to do

18     that.  Therefore, this Court cannot exceed to the

19     request of one.

20          MR. DAVIS:  I don't know if Mr. Morton is

21     objecting.

22          THE COURT:  He certainly is.

23          MR. MORTON:  I don't want it to be sent back

24     and each of the individual jurors having a

25     transcript and focusing on different aspects.

1          THE COURT: Let me do this, frame a response

2     in writing which effectively will indicate to them

3     if they would like Detective Carr's testimony to

4     be re-read, that I am more than willing to make

5     those arrangements and will do that for them.  If

6     they would kindly specify which time they want, or

7     if they want all of them.  Any problem with that?

8          MR. MORTON:  No, Your Honor.

9          THE COURT:  How's this, you requested

10    Detective Carr's testimony, I can have it re-read

11    to you.  I need to know which one of the three

12    times he testified you want.  Any problem?

13         MR. MORTON:  No, Your Honor.  Not from the

14    State.

15         MR. DAVIS:  No, no problem.

16         THE COURT:  And we'll await their response.

17         (Thereupon, a recess was taken, after which

18    the jury panel entered the courtroom, and the

19    following proceedings were had:)

20         THE COURT:  Good evening.  Let me see if I

21    can deal with your latest requests.  One is an

22    opportunity to go out to dinner, the other is for

23    the re-reading of Detective Carr's testimony.

24         I believe you indicated that you wanted the

25    three times during which he testified, correct?

1          THE JURY:  Yes.

2          THE COURT:  Going out to dinner, let's talk

3     about that first.  Going out to dinner, we have

4     two options.  I can certainly let you go out to

5     dinner, as you know you have to go as a group.  It

6     isn't as easy as sending you out for breakfast and

7     lunch.  The closest place I can send you for

8     dinner is Two-Guys Restaurant.  Any of you know

9     where that is?  In all likelihood you would have

10    to walk.

11         Some of you may like that idea.  The

12    alternative is I can order from Two-Guys, you can

13    stop your deliberative process if you want or you

14    can continue your deliberations and when dinner

15    arrives, you can stop.

16         Those are really the two options that I have

17    for you in terms of dinner.  It's really your

18    choice, if you think you need the opportunity, you

19    want to get out, that's fine.  We'll take those

20    arrangements.  Any idea?

21         A JUROR:  We'll order in, please.

22         THE COURT:  We'll be happy to.  We have both

23    court reporters that took notes here, they are

24    prepared to read back for you.  I can tell you

25    collectively the three times Detective Carr

2345

```
 1        testified should take between two and two and a
 2        half hours worth of testimony.  You are all aware
 3        of that.
 4             And if you want it, that's fine.  The
 5        question I really have is, for Detective Carr's
 6        testimony, do you want to do it tonight or do you
 7        want it first thing tomorrow morning?
 8             A JUROR:  Tonight.
 9             THE COURT:  Before dinner or after dinner?
10             A JUROR:  Can we listen to part?
11             THE COURT:  Mr. Davis, Mr. Morton, do either
12        of you have any objection to the jury's request?
13             MR. MORTON:  I do have a suggestion.  It will
14        take a while for the order to come over.  We can
15        let them choose their dinners, read the testimony.
16        By the time we finish a certain portion of it,
17        then dinner will be in.
18             THE COURT:  I believe that's what their
19        present request is.  Anybody have an objection to
20        any of that?  And here comes John with the menus.
21             MR. DAVIS:  Can we order too, Judge?
22             THE COURT:  As long as you have money.
23             Linda, are you finished in there?
24             MS. AUKAMP:  Mine is very short.
25             THE COURT:  Why don't I let you guys go back
```

2546

1      into this jury room with the menus, write down

2      everything you want, send it out.  As soon as you

3      are ready with that, we'll come back and we'll

4      start.

5           A JUROR:  Can we have ten minutes to go down

6      and smoke a cigarette?

7           THE COURT:  Sure.

8           (Thereupon, a recess was taken, after which

9      the following proceedings were had:)

10           THE COURT:  With regard to the rereading of

11      Detective Carr's testimony, there are a number of

12      items I want to address.  The first deals with

13      objections that are raised that are overruled.

14      It's my understanding that all they are supposed

15      to hear the question and the answer when it's

16      overruled.  When there is an objection which is

17      sustained, that question and answer and the

18      objection and sustaining isn't even mentioned.

19           It's just question, answer, question, answer.

20      Is that an acceptable procedure to both the State

21      and the defense?

22           MR. MORTON:  Yes.  By that I believe that

23      once we get to an objection, the court reporter

24      will say there was an objection made and overruled

25      without reading any of that?

2347

THE COURT:  My intent was or my belief is

that if it's objected to and overruled, that the

objection and overruled would not be read.  The

question would be read, the answer would be read

as if it's straight testimony.

Where there's an objection that was

sustained, it wouldn't say objection, the question

wouldn't be read and then the answer that might

have been stricken wouldn't be read.

The other issue that deals with the

confession of Mr. Brown that comes in during the

second testimony of Detective Carr, does anybody

have an objection with regard to that portion

simply being referenced by the court reporter that

the tape was introduced into evidence as an

exhibit, that Mr. Brown's statement was played?

MR. MORTON:  I have no objection, since they

have it in the jury room with them.

MR. DAVIS:  I certainly don't have an

objection.

THE COURT:  Side bars certainly will not be

read, colloquies.

MR. DAVIS:  But you will tell the jury that's

how, let them know that the testimony --

THE COURT:  I am going to advise them as

2548

1      follows:  First, that the testimony that will be

2      re-read will be strictly question and answer.

3      Questions will be omitted where the objection was

4      sustained, where they are overruled they are are

5      going to hear testimony.

6          The tape, if you want, I will even reference

7      the tape isn't going to be replayed for them,

8      because they have in their possession as evidence

9      the tape.  I will also reference the fact that

10     while some of this testimony may be in transcript

11     form, transcripts are not evidence, they are not

12     submittible to a jury for their consideration and

13     accordingly, that is the reason it is being

14     re-read.

15         MR. DAVIS:  Fine.

16         MR. MORTON:  Just one other thing.  I noticed

17     that a number of them brought their note pads out,

18     but when the testimony is re-read, shouldn't they

19     have the opportunity to continue to take notes?

20         MR. DAVIS:  I would ask that they do.

21         THE COURT:  I will advise them inasmuch as

22     neither one of you have an objection to that

23     procedure.  I will ask them whether they want to

24     go and get their notes pads and take notes.  That

25     will be their option.

```
 1                    (Thereupon, the jury panel entered the

 2           courtroom, the requested testimony was re-read,

 3           after which the following proceedings were had out

 4           of the presence of the jury:)

 5                    THE COURT:  Just for purposes of the record,

 6           the Court had the testimony of Detective Carr

 7           re-read, the three portions that the jury

 8           requested.  Prior to the reading, the Court had

 9           instructed the jury with regard to the ground

10           rules, which counsel for the State and the defense

11           in the presence of the defendant had discussed.

12                    Was everything in accordance with how we

13           discussed and what we agreed to?

14                    MR. MORTON:  Yes, Judge.

15                    MR. DAVIS:  Yes, Judge.

16                    THE COURT:  Any objection to the re-reading

17           and the procedure that was employed by the Court

18           insofar as the request of the jury?

19                    MR. MORTON:  No, Your Honor.

20                    MR. DAVIS:  No, Your Honor.

21                    (Thereupon, a recess was taken, after which

22           the following proceedings were had:)

23                    THE COURT:  The jury has sent out an

24           indication that they have reached their verdict in

25           this case.
```

2550

```
 1              (Thereupon, the jury panel entered the

 2       courtroom, and the following proceedings were

 3       had:)

 4              THE COURT:  Members of the jury, have you

 5       reached your verdict in this case?

 6              MR. LAZAN:  Yes, we have.

 7              THE COURT:  Mr. Foreperson, if you would

 8       kindly hand the verdict to the bailiff please.

 9              Madam Clerk, would you kindly publish the

10       jury's finding.

11              THE CLERK:  In the Seventeenth Judicial

12       Circuit, in and for Broward County, Florida, case

13       number 91-14793 CF, Paul L. Backman.  State of

14       Florida versus Timothy Brown, defendant.  We the

15       jury find as follows as to the defendant in this

16       case:

17              The defendant is guilty of murder in the

18       first degree as charged in the indictment.  So say

19       we all, Gary Lazan, foreperson.  October 21st,

20       1993.

21              THE COURT:  Anybody wish the jury polled with

22       respect to their verdict in this case?

23              MR. DAVIS:  Yes, Judge.

24              THE COURT:  In a moment, Suzanne is going to

25       call each of your names individually and ask you
```

1          whether the verdict as just published represents

2          your individual verdict.

3               I would appreciate you all responding either

4          yes or no.

5               THE CLERK:  Greg Lazan, is this your true

6          verdict?

7               MR. LAZAN:  Yes, it is.

8               THE CLERK:  Gregory Bellew, is this your true

9          verdict?

10              MR. BELLEW:  Yes, it is.

11              THE CLERK:  Janet Marlow, is this your true

12         verdict?

13              MS. MARLOW:  Yes, it is.

14              THE CLERK:  Jacqueline Haag, is this your

15         true verdict?

16              MS. HAAG:  Yes, it is.

17              THE CLERK:  Mary Shafer, is this your true

18         verdict?

19              MS. SHAFER:  Yes, it is.

20              THE CLERK:  Diane Nickum, is this your true

21         verdict?

22              MS. NICKUM:  Yes, it is.

23              THE CLERK:  Rosemary Johnson, is this your

24         true verdict?

25              MS. JOHNSON:  Yes, it is.

1              THE CLERK:  Lana Montgomery, is this your

2       true verdict?

3              MS. MONTGOMERY:  Yes, it is.

4              THE CLERK:  Dale Dietzman, is this your true

5       verdict?

6              MR. DIETZMAN:  Yes, it is.

7              THE CLERK:  Melody Rhoads, is this your true

8       verdict?

9              MS. RHOADS:  Yes, it is.

10             THE CLERK:  Giovanna Alessi, is this your

11      true verdict?

12             MS. ALESSI:  Yes, it is.

13             THE CLERK:  Craig Branston, is this your true

14      verdict?

15             MR. BRANSTON:  Yes, it is.

16             THE COURT:  Thank you.  Members of the jury,

17      let me take this opportunity on behalf of all of

18      us to thank you for your time, your consideration

19      and certainly the patience that you displayed

20      during the course of trial.

21             I also want to take this opportunity to

22      explain the very special privileges that you now

23      enjoy.  First of all, I am sure you will be

24      pleased to know that for the next year you are

25      exempt from further jury service.  So should you

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 95-7207-CIV-GRAHAM

(Magistrate Judge Sorrentino)

TIMOTHY BROWN,                    :

    Petitioner,               :

vs.                               :

HARRY K. SINGLETARY,              :

    Respondent.               :
_____/

## AFFIDAVIT OF RICHARD LEO, Ph.D., J.D.

BEFORE ME personally appeared Richard Leo, Ph.D, J.D., who after being duly sworn deposes and says:

1.    I am an Assistant Professor of Criminology, Law and Society and an Assistant Professor of Psychology and Social Behavior at the University of California, Irvine.

2.    I am an expert in the area of police interrogation, coercive influence techniques, and false confessions. I have been conducting research in the area of interrogation and confession for almost a decade. In this time, I have evaluated over 400 cases involving interrogations and confessions. I have also published numerous peer-reviewed scientific articles on this topic, and I have testified on 19 occasions on the subject of interrogation and confession in federal, state, and military courts in eight states. I have also consulted on several dozen cases that have not gone to trial. A copy of my resume is attached and incorporated by reference.

ATTACHMENT / EXHIBIT 26

3.       The subject of influence, manipulation and coercion during police interrogation has received a great deal of attention in the scientific community in the United States. This is a subject that has been extensively researched and written about by social scientists and legal scholars. It is well established in the scientific community that false confessions sometimes occur in response to physical force and psychological methods of interrogation. It is well established that certain psychological methods of interrogation exert a coercive effect on the decision-making of individuals under interrogation. It is well established that certain methods of interrogation, including implicit or explicit promises of leniency and threats of greater punishment, are correlated with the likelihood of eliciting false confessions. There exist well-established, generally accepted principles in the scientific community for objectively evaluating the likely reliability or unreliability of police-induced statements from individuals under interrogation.

4.       A confession is universally treated as damning and compelling evidence of guilt, and it is likely to dominate all other case evidence. As many investigators have recognized, the problems caused by police-induced false confessions are significant, recurring and deeply troubling. (See Richard A. Leo and Richard J. Ofshe, The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation, 88 J.CRIM.L. & CRIMINOLOGY 249 (1998).

5.       Police elicit false confessions so frequently that social science researchers, legal scholars, and journalists have discovered and documented numerous case examples in this decade alone. (See Richard A. Leo and Richard J. Ofshe, The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation, 88 J.CRIM.L. & CRIMINOLOGY 429 (1988); Richard J. Ofshe & Richard A. Leo, The Decision to

2

Confess *Falsely:* Rational Choice and Irrational Action, 74 Denv. U.L. Rev. 979 (1997); Richard J. Ofshe & Richard A. Leo, The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions, 16 Stud.In.L.Pol., & Soc'y 189).

6. Furthermore, the social science research demonstrates that mentally deficient individuals are highly susceptible to giving statements that are false. Indeed, a disproportionate number of individuals who make false confessions have sub-normal I.Q.s or impaired mental functioning. Such individuals are more likely to acquiesce to authority, are more eager to please, are more suggestible, and therefore are predisposed to be more vulnerable to the tactics and pressures of modern accusatorial interrogation.

7. American police are poorly trained about the dangers of interrogation and false confession. Rarely are police officers instructed in how to avoid eliciting confessions, how to understand what causes false confessions, or how to recognize the forms false confessions take or their distinguishing characteristics. Instead, some interrogation manual writers and trainers persist in the unfounded belief that contemporary psychological methods will not cause the innocent to confess—a fiction contradicted by all of the research on police interrogation. This fiction perpetuates the commonly held belief that only torture can cause an innocent suspect to confess, and it allows some police to rationalize accepting coerced and demonstrably unreliable confession statements as true. Shoddy police practices derive in large part from poor interrogation training. Influential manuals teach police to use tactics that have been shown to be coercive and to produce false confessions. Such texts also mislead interrogators into believing that a suspect's guilt can be inferred on the basis of pseudoscientific claims about the meaning of demeanor and behavior analysis, and they fail to educate

3

police about the social psychology, variety and distinguishing characteristics of interrogation-induced false confessions.

8.      Social science research has demonstrated that even a factually unsupported and disconfirmed confession is often sufficient to lead a trier of fact to judge the defendant guilty beyond a reasonable doubt. In a recent study, false confessors (i.e., individuals whose confessions would eventually be proven false) whose cases proceeded to trial had a 73% change of being convicted. Despite the absence of any physical or other significant credible evidence corroborating the confession, a false confessor was approximately three times more likely to be found guilty at trial than to be acquitted (73% vs. 27%). These data demonstrate that a false confession is an exceptionally dangerous piece of evidence to put before a jury even when the other case evidence weighs heavily in favor of the defendant's innocence. (See Richard A. Leo & Richard J. Ofshe, The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogations, 88 J.CRIM.L. & CRIMINOLOGY 429 (1998).

9.      I have reviewed the following materials regarding Timothy Brown:

a.      Transcript of statement given by Timothy Brown to the Broward Sheriff's Office on July 16, 1991.

b.      Taped recording of statement given by Timothy Brown to the Broward Sheriff's Office on July 16, 1991.

d.      Transcript of statement given by codefendant Keith King given to the Broward Sheriff's Office on June 4, 1991.

e.      Broward Sheriff's Office Investigative Report compiled by Detective James Carr.

4

f.        Excerpts from a transcript of a hearing on the motion to suppress statements conducted in Broward County Circuit Court.

i.        Affidavit of Dennis Stinson regarding interview of Edward Davis.

j.        Affidavit of Marlon Johnson regarding interview of Phillip Howard.

k.        Statement of Monica Willis.

l.        Statement of Mary Pendergrass.

m.        Statement of Mrs. Othalean Brown

n.        Information from defense counsel concerning Brown's low I.Q., history of physical abuse by father, and account of being punched in the face and threatened with the electric chair in the unrecorded interrogation that preceded his taped statement.

10.    Based on the materials provided to me, it is my understanding that:

a.        This was an extremely high profile homicide investigation of the shooting of a police officer. The investigation was undertaken for many months by a task force of 80 police officers.

b.        Broward Sheriff's Office Detectives Carr and Thomasevich interrogated Timothy Brown for more than one hour on July 16, 1991. According to Brown, he was threatened with the electric chair, verbally abused, and hit in the face by the detectives, prior to his statement. This is corroborated by evidence of actual bruising observed by Timothy Brown's mother the day after the interrogation. This interrogation was unrecorded and therefore the detectives have deprived the finder of fact of evidence to support the claim of coercion.

c.        There are numerous instances in which Timothy Brown's recitation of the facts is inconsistent and in conflict with the known facts of the case. For instance, Brown claims that after

the shooting he and King hopped on a bicycle and essentially went north on 40th Avenue in Hallandale. Edward Davis states that he was north of the store, on 40th Avenue, coming south, at the time of the shooting and saw a lone black male run behind the patrol car through a wall by the Circle K and travel in a direction completely different than what Brown states. Davis saw no one come north on 40th Avenue. Phillip Howard says he was south of the store coming north on 40th at the time of the shooting and only saw a cab leave the area heading south and saw no black males traveling in either direction.

d.      Furthermore, Brown relates that a second shot was fired. This statement is false according to Edward Davis, Phillip Howard and the witnesses inside the Circle K store who relate that they heard one shot.

e.      Brown also claims that as he was traveling north on 40th Avenue (previously shown to be contradicted by the known evidence) he and King threw the gun near a rock pit. A gun was never found in or near the rock pit, even after extensive searching by the Broward Sheriff's Office.

f.      Finally, Brown states that just prior to the shooting, the Broward Sheriff's Office deputy "reached for his stick." This would be down toward the floor. This is inconsistent with the medical evidence which demonstrates that the deputy raised his hand, in a defensive action and was shot through the finger in addition to the wound to the head.

g.      Additionally, King and Brown's statements are inconsistent, and King's is inconsistent with other evidence as well. Brown claims that the two pedaled away on the bike and returned to Wiley Street and separated. King says the two ran in separate directions and King ran back to Brown's house on Mayo Street and talked with Brown and his parents. However, the

6

Browns moved from that address on Mayo months before the shooting. The night of King's statement BSO surrounded the house on 5717 Mayo Street and confronted the owner Monica Cherise Willis who stated she was living at that house on the night of the shooting and had no contact with Keith King, Tim Brown or anyone else that evening.

11.     It is my professional opinion that the statement given by Timothy Brown on July 16, 1991 is very likely an unreliable statement and also is likely to be a false confession. Importantly, the Broward Sheriff's Office detectives failed to preserve for the triers of fact the interrogation process even though audio taping was obviously available. I base my professional opinion that Timothy Brown's statement is unreliable and likely false on the application of generally accepted principles (in the social science, legal, and law enforcement communities) in the analysis of the reliability of police-induced statements. It is generally recognized that a reliable admission should be corroborated by existing physical evidence, should lead to credible derivative evidence, should be able to explain anomalies, should be inherently plausible, and, most importantly, should demonstrate guilty knowledge (in the suspect's post-admission narrative). By contrast, a false admission should not be corroborated by the crime scene or physical evidence, may mis-describe the crime facts or strain plausibility, should not lead to any derivative evidence or explain away anomalies, and, most importantly, should fail to demonstrate guilty knowledge (but instead will demonstrate ignorance) in the suspect's post-admission narrative. (See Richard A. Leo and Richard J. Ofshe, The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation, 88 J.CRIM.L. & CRIMINOLOGY, 429 (1998); and Richard J. Ofshe and Richard A. Leo, The Decision to Confess Falsely: Rational Choice and Irrational Action, 74 DENV.L.REV. 979 (1997)). Based on the findings delineated in paragraph 10, I conclude that

7

Timothy Brown's statement is not corroborated by physical or medical evidence, did not lead to any derivative evidence or explain away anomalies, and fails to demonstrate guilty knowledge. Brown discloses no detail that only the true perpetrator of the crime would know. And importantly, the statement is *disconfirmed* by physical and medical evidence.

12.     In sum, it is my professional opinion that Tim Brown's statement is very likely unreliable and likely to be false. Additionally, it may be the product of coercion.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Richard Leo, Ph.D., J.D.

Sworn to and subscribed before me by _Richard Leo_, who is personally known to me/produced the following form of identification: _____ on this 22nd day of _December 1999_.

_____
Notary Public, State of ~~Florida~~ Connecticut
My Commission Expires: County of Fairfield

H:\WPDOCS\BROWN\LEO.AFF

SUSAN R. WASILKO
*NOTARY PUBLIC*
MY COMMISSION EXPIRES OCT. 31, 2001

8

May, 1999

**Richard A. Leo, Ph.D., J.D.**

## CURRICULUM VITAE

## ADDRESSES

**University**                                    **Residence**

University of California, Irvine              12 Blake Court
Department of Criminology, Law and Society    Irvine, CA 92612
2367 Social Ecology II                        (949) 856-0447
Irvine, CA 92697-7080

Phone: (949) 824-1560
FAX:   (949) 824-3001
Email: rleo@uci.edu

## PERSONAL

Social Security Number:   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
Birthdate:                November 2, 1963

## ACADEMIC POSITIONS

| | |
|---|---|
| 7/97 - Present | Assistant Professor of Criminology, Law and Society University of California, Irvine |
| 10/98 - Present | Adjunct Professor Psychology and Social Behavior University of California, Irvine |
| 8/94 - 5/99 | Assistant Professor of Sociology University of Colorado, Boulder |

| 3/95 - 5/99 | Adjoint Professor of Law<br>University of Colorado, Boulder |
| 10/96 | Visiting Professor of Sociology<br>Nankai University, Tiangen, China |

## EDUCATION

| 8/90 - 8/94 | Ph.D in Jurisprudence and Social Policy<br>University of California, Berkeley |
| 8/92 - 5/94 | J.D., Boalt Hall School of Law<br>University of California, Berkeley |
| 9/87 - 6/89 | M.A. in Sociology<br>University of Chicago |
| 9/81 - 5/85 | A.B. in Sociology, with Honors<br>University of California, Berkeley |

## ACADEMIC SPECIALIZATION

The Sociology of Police
Crime and Criminal Justice
Criminal Procedure
The Sociology of Law
Social Psychology

## RESEARCH SPECIALIZATION

Police Interrogation
False Confessions
Miscarriages of Justice
Coercive Persuasion

2

## PUBLICATIONS

### BOOKS

Richard A. Leo.   Police Interrogation in America (Under contract with New York University Press).  Expected publication date: 2000.

Richard A. Leo and George C. Thomas, III., Eds (1998).  The Miranda Debate: Law, Justice and Policing.  (Boston: Northeastern University Press).  ISBN #: 1-55553-338-8.

### ARTICLES

Richard A. Leo and Welsh S. White (1999).   "Adapting to Miranda: Modern Interrogators' Strategies For Dealing With The Obstacles Posed By Miranda." Forthcoming in The Minnesota Law Review.

Richard J. Ofshe and Richard A. Leo (1999).  "The Truth About False Confessions, Research and Advocacy Scholarship."  Forthcoming in The Criminal Law Bulletin.

Richard A. Leo and Richard J. Ofshe (1998).  "Using the Innocent to Scapegoat Miranda: Another Reply to Paul Cassell."  The Journal of Criminal Law and Criminology Volume 88, No. 2.  Pp. 557-577.

Richard A. Leo and Richard J. Ofshe (1998).  "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation."  The Journal of Criminal Law and Criminology.  Volume 88, No. 2.  Pp. 429-496.

Richard A. Leo (1997).  "The Social and Legal Construction of Repressed Memory." Law & Social Inquiry, Volume 22, Number 3.  Pp. 653-693.

Richard A. Leo and Richard J. Ofshe (1997).  "Missing the Forest for the Trees: A Response to Paul Cassell's 'Balanced Approach' to the False Confession Problem." Denver University Law Review.  Volume 74, Number 4.  Pp. 1135-1144.

Richard J. Ofshe and Richard A. Leo (1997).  "The Decision to Confess Falsely: Rational Choice and Irrational Action."  Denver University Law Review.  Volume 74, Number 4.  Pp. 979-1122.

## BOOK CHAPTERS

Richard A. Leo (1998). "Miranda and the Problem of False Confessions" in Richard A. Leo and George C. Thomas, III., Eds. The Miranda Debate: Law, Justice and Crime Control (Boston: Northeastern University Press). Pp. 271-282.

Richard A. Leo (1997). "Some Thoughts about Police and Crime," in Lawrence Friedman and George Fisher, Eds. (1997). The Crime Conundrum: Essays on Criminal Justice (Boulder: Westview Press). Pp. 121-125.

## SHORT PUBLICATIONS

Richard A. Leo (1998). "Civil Rights and Civil Liberties: Videotaping the Police." Criminal Justice Ethics. Volume 17, Number 1. Winter/Spring 1998. Pp. 44-45.

Richard A. Leo (1998). "False Confessions and Miscarriages of Justice." The Defender (January, 1998). Pp. 3-6.

Richard A. Leo (1998). "Witness for False Confession No Expert." The Forensic Echo: The Monthly Newsmagazine of Psychiatry, Law & Public Policy. Vol II, No. 3 (February, 1998). Pp. 14-15.

## REPRINTED ARTICLES

David T. Johnson and Richard A. Leo (1999). "The Yale White-Collar Crime Project: A Review and Critique," in Michael Levi Fraud: Organizational, Motivation, and Control, Volume II (England: Ashgate Publishing Ltd).

Richard A. Leo (1998). "Inside the Interrogation Room," in Joshua Dressler and George C. Thomas III, Cases and Materials on Criminal Procedure (West Publishing). Pp. 566-568, 598, 673-676.

Richard A. Leo (1998). "The Impact of Miranda Revisited," in Richard A. Leo and George C. Thomas, III., Eds. The Miranda Debate: Law, Justice and Crime Control (Boston: Northeastern University Press). Pp. 208-221.

Richard A. Leo (1998). "From Coercion to Deception: The Changing Nature of Police Interrogation in America," in Richard A. Leo and George C. Thomas, III., Eds. The Miranda Debate: Law, Justice and Crime Control (Boston: Northeastern University Press). Pp. 65-74.

Jerome H. Skolnick and Richard A. Leo (1992). "The Ethics of Deceptive Interrogation." Revised and expanded as a chapter in John Bizzack (Ed), Issues In Policing: New Perspectives. (Lexington: Autumn House Publishing). Pp. 75-95. Reprinted in The Boalt Hall Transcript, Spring, 1993. Pp. 21-23; The Leadership Journal (January-March, 1993). Pp. 23-27; and Michael C. Braswell, Belinda R. McCarthy and Bernard J. McCarthy (1998) Justice, Crime and Ethics. Third Edition. (Cincinnati: Anderson Publishing Co.). Pp. 109-124.

## PRESENTATIONS AT PROFESSIONAL MEETINGS

"False Confessions: Causes, Consequences, Solutions." Paper to be presented at the Annual Meetings of the American Society of Criminology. Toronto, Canada. November, 1999.

"Science in the Courtroom." The Annual Meetings of the American Society of Criminology. Washington, D.C. November, 1998.

"The Social Psychology of False Confessions." The Annual Meetings of the American Sociological Association. San Francisco, CA. August, 1998.

"The Psychology of Confession Evidence: From the Ivory Tower to the Realities of Practice." The Annual Meetings of the Law and Society Association." Aspen, CO. June, 1998.

"The Truth About False Confessions: What Criminologists Should Know." The Annual Meetings of the Academy of Criminal Justice Sciences. Albuquerque, NM. March, 1998.

"Police Interrogation, False Confessions and Expert Witnesses." The Annual Meetings of the American Society of Criminology. San Diego, CA. November, 1997.

"The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" (with Richard Ofshe). The Annual Meetings of the Law and Society Association. St. Louis, Missouri. May, 1997.

"Coerced False Confessions." The Annual Meetings of the American Society of Criminology. November, 1996. Chicago, Illinois.

6

"Deception by Sociologists."   The Annual Meetings of the American Sociological Association.  August, 1996.  New York, N.Y.

"Between Reality and Metaphor: A Friendly Critique of <u>The Myth of Repressed Memory</u>."  The Annual Meetings of the Pacific Sociological Association.  March, 1996.  Seattle, WA.

"The Context and Outcome of Police Interrogation: A Quantitative Analysis."  The Annual Meetings of the American Society of Criminology.  November, 1995.  Boston, MA.

"Interrogation and Surveillance: Changing Trends in Police Detection and Social Control."  The Annual Meetings of the American Sociological Association.  August, 1995.  Washington, D.C.

"False Memory, False Confession: When Police Interrogations Go Wrong."  The Annual Meetings of the Law & Society Association.  June, 1995.  Toronto, Canada.

"Trial <u>and</u> Tribulations: Courts, Ethnography, and the Need for an Evidentiary Privilege for Academic Researchers."   The Annual Meetings of the Pacific Sociological Association.  April, 1995.  San Francisco, CA.

"Westville Revisited: A Contemporary Analysis of Order, Legality, and Crime Detection."  The Annual Meetings of the American Society of Criminology.  Miami, FLA, November, 1994.

"The Historical Sociology of the Third Degree in America: Analyzing the Rise and Fall of a Violent Social Practice."  The Annual Meetings of the American Sociological Association.  Los Angeles, CA, August, 1994.

"The Impact of <u>Miranda</u> Revisited: Analyzing an Old Question with New Data."  The Annual Meetings of the Law & Society Association.  Phoenix, AZ, June, 1994.

"Police Interrogation as a Confidence Game."  The Annual Meetings of the Western Society of Criminology.  Berkeley, CA, February, 1994.

"Inside the Interrogation Room: A Participant Observation Study of Custodial Police Questioning."  The Annual Meetings of the American Society of Criminology, Phoenix, AZ, October, 1993.

"Criminal Interrogation and Confessions Revisited: An Analysis and Critique of Inbau and Reid's Police Training Manuals and Courses."   The Annual Meetings of the American Society of Criminology, New Orleans, LA, November, 1992.

7

"Police Interrogation and Social Control." The Annual Meetings of the Law and Society Association, Philadelphia, PA, May, 1992.

"From Coercion to Deception: An Empirical Analysis of the Changing Nature of Police Interrogation in America." The Annual Meetings of the American Society of Criminology, San Francisco, CA, November, 1991.

"The Social Psychology of Coerced-Internalized False Confessions" (with Richard J. Ofshe). The Annual Meetings of the American Sociological Association, Cincinnati, OH, August, 1991.

## PRESENTATIONS AT UNIVERSITIES AND PROFESSIONAL ORGANIZATIONS

"Litigating a False Confession Case." National Seminar on Mental Illnes and the Criminal Law, Sponsored by the Federal Defender Training Group. Washington, D.C. June, 1999.

"Analyzing Coerced and/or False Confessions." National Association of Criminal Defense Attorneys. St. Louis, Missouri. March, 1999.

"False Confessions: Inside the Interrogation Room from Coercion to Deception." Advanced Criminal Defense Practice Conference. Criminal Defense Attorneys of Michigan. Detroit, Michigan. March, 1999.

"Adapting to Miranda: Modern Interrogators' Strategies For Dealing With The Obstacles Posed By Miranda." School of Law, University of Southern California. March, 1999.

"The Social Psychology of Police Interrogation and False Confession." Department of Psychology, Friday Afternoon Social Psychology Symposium. University of California, Santa Barbara. Santa Barbara, CA. January, 1999.

"The Social Psychology of Police Interrogation and False Confession." Department of Psychology and Social Behavior. University of California, Irvine. Irvine, CA. January, 1999.

"The Regulation and Memorialization of Confessions." The National Conference on Wrongful Convictions and the Death Penalty. Northwestern University School of Law. Chicago, IL. November, 1998.

"Analyzing Coerced Confession Cases." Annual Conference of the Arizona Attorneys for Criminal Justice. Tucson, AZ. September, 1998.

8

"Miranda and the Adversary System: Lessons for Japan." Center for the Study of Law and Society.  University of California, Berkeley.  Berkeley, CA. April, 1998.

"The Truth About False Confessions: Understanding Their Causes and Consequences." The Center for Legal Studies, Wayne State University.  Detroit, MI. April, 1998.

"Coerced Statements, False Confessions and Creating Memory, Part II." The Federal Judicial Center.  Seminar for Federal Public Defenders.  Atlanta, GA. March 23, 1998.

"Coerced Statements, False Confessions and Creating Memory, Part I." The Federal Judicial Center.  Seminar for Federal Defender Investigators and Paralegals.  San Diego, CA. March 17, 1998.

"The Causes and Consequences of False Confessions." Department of Sociology.  The University of Washington, Seattle.  Seattle, WA. January, 1998.

"The Decision to Confess." The University of Denver College of Law, Symposium on Coercion, Exploitation and the Law.  Denver, CO. March, 1997.

"Police Interrogation, False Confessions, and Expert Witnessing."  The University of Colorado, Boulder.  Department of Sociology, Graduate Student Forum.  March, 1997.

"Explaining False Confessions."  The University of Colorado, Boulder, School of Law. February, 1997.

"False Confessions and Miscarriages of Justice Today."  A Day of Contrition-Revisited: Contemporary Hysteria Condemns the Innocent."  Conference sponsored by The Justice Committee.  Salem, MA.  January, 1997.

"False Confessions: Documenting, Explaining and Preventing Miscarriages of Justice." Department of Criminology, Law and Society.  University of California, Irvine. November, 1996.

"Police Interrogation in America." Department of Criminology, Chinese People's Public Security University."  Bejing, China.  October, 1996.

"The Principles and Practices of Criminal Law in the United States."  School of Law, Tsingua University, Bejing, China.  October, 1996.

"Police Interrogation and False Confessions in America."   Supreme People's Procuratorate of the People's Republic of China."  Bejing, China.  October, 1996.

9

"Is Miranda Enough or Should We Video-tape All Confessions?"  Seton Hall University Law School, Newark, New Jersey.  October, 1996.

"Secrecy and the Interrogation of Suspects."  Conference on "George Simmel's Actual and Potential Impact on Contemporary Society."  University of Colorado, Boulder. April, 1996.

"The Social and Legal Construction of Recovered Memories."  Department of Legal Studies, University of Delware at Newark.  Newark, DE. November, 1995.

"The Social Meaning of the O.J. Simpson Case."  Department of Sociology, Diversity Forum.  University of Colorado, Boulder.  October, 1995.

"The Mythology and Sociology of Recovered Memories."  Department of Sociology, Northern Arizona University.  Flagstaff, AZ.  October, 1995.

"False Confessions and Miscarriages of Justice: A Preliminary Study."  Departments of Sociology and of Criminal Justice, Northern Arizona University.  Flagstaff, AZ. October, 1995.

"Police Interrogation: Empirical Observations, Legal Questions, Ethical Dilemmas." School of Law, University of Colorado, Boulder.  February, 1995.

"Violence, Civility and Social Change: The Case of American Police Interrogation in the Twentieth Century."  Department of Sociology, University of Minnesota, Minneapolis. January, 1995.

"The Sociologist as Detective: Reflections on the Methodology and Ethics of Fieldwork Inside the Police Interrogation Room."  Department of Sociology, EPOS (Ethnomethodological, Phenomenological, and Observational Sociologies) faculty and students at the University of California, Los Angeles.  October, 1994.

"Violence, Civility and Institutional Change: The Case of American Police Interrogation."  Department of Sociology, University of Colorado, Boulder.  January, 1993.

"The Ethics of Deceptive Interrogation" (with Jerome H. Skolnick).  The Boalt Hall Faculty Colloquium, School of Law.  University of California, Berkeley.  September, 1991.

"Research on Police Interrogation: Some Thoughts and Questions About the Permissible Limits of Deception."  Jurisprudence and Social Policy Program, Friday Forum. University of California, Berkeley.  May, 1991.

10

## GRANTS AND AWARDS

The Ruth Shonle Cavan Young Scholar Award (1999).   American Society of Criminology. (Given to Recognize Outstanding Scholarly Contributions to the Discipline of Criminology).

Grant ($1,000). "Miscarriages of Justice in America; Understanding the Causes, Exploring the Consequences, Solving the Problem." University of California, Irvine. School of Social Ecology. 1998-1999.

Conference Support Grant ($2,500). "Miscarriages of Justice: Understanding the Problem and Finding Solutions." Principal Investigator (with William Thompson). Conference to be held at U.C. Irvine. February, 2000.

Faculty Career Development Award, University of California, Irvine. 1998-1999.

Fellow, Earl Warren Legal Institute. University of California, Berkeley, Boalt Hall School of Law. Criminal Justice Program (10/98-Present).

Small Grant ($600). University of Colorado, Boulder. Council on Research and Creative Work. "The Ethics of Police Deception." December, 1996.

Small Grant ($600). University of Colorado, Boulder. Council on Research and Creative Work.   "The Third Degree in America and the Rise of Police Professionalism: A Historical and Sociological Analysis." October, 1996.

Small Grant ($600). University of Colorado, Boulder. Council on Research and Creative Work. "Police Interrogation Practices in International Perspective: A Comparative Study of the United States and China." July, 1996.

Small Grant ($600). University of Colorado, Boulder.  Graduate Committee on the Arts and Humanities. "The Ethics of Deception, Manipulation and Coercion in Police Interrogation: A Comparative Analysis of the United States, England, Japan and China." July, 1996.

Small Grant ($600). University of Colorado, Boulder. Council on Research and Creative Work.  "Understanding Coerced-Internalized False Confessions." July, 1995.

Small Grant ($600). University of Colorado, Boulder. Council on Research and Creative Work. "Police Professionalism and the Rise of Scientific Crime Detection." July, 1995.

11

Small Grant ($600). University of Colorado, Boulder. Graduate Committee on the Arts and Humanities. "The Third Degree in America: A Historical Analysis." February, 1995.

Small Grant ($600). University of Colorado, Boulder. Council on Research and Creative Work. "Miscarriages of Justice in America: When Innocent Suspects are Wrongfully Convicted." January, 1995.

Small Grant ($600). University of Colorado, Boulder. Council on Research and Creative Work. "Police Interrogation Practices in International Perpective: A Comparative Study of the United States and Japan." December, 1994.

## COURSES TAUGHT

Interrogation, Confession and the Law (Spring, 1999; Spring, 1998).

Miscarriages of Justice (Fall, 1998; Spring, 1998).

Introduction to Criminology, Law and Society (Fall, 1998; Winter, 1998).

American Criminal Justice System: An Advanced Overview
        (Spring, 1997; Spring, 1996; Spring, 1995).

Criminal Justice in the United States: An Introduction (Spring, 1997).

Graduate Seminar: Police; Sociology of Policing (Winter, 1999; Spring, 1996).

Police Interrogation and False Confessions (Spring, 1996; Fall, 1995).

Police, Law and Society (Fall, 1995).

Critical Thinking: The Social Psychology of Influence, Persuasion and Coercion
        (Fall, 1995; Spring, 1995).

Sociology of Law (Fall, 1994).

Sociology of White-Collar Crime (Fall, 1994).

12

## FORMAL POLICE INTERROGATION TRAINING AND COURSEWORK

| | |
|---|---|
| 3/93 | Attended and participated in one week advanced interrogation training course taught by the Federal Law Enforcement Center (FLETC). Glynco, Georgia. Received certificate. |
| 1/92 | Attended and participated in one week interrogation training course taught by the San Mateo Community College, Administration of Criminal Justice Department. San Mateo, California. Received certificate. |
| 11/91 | Attended and participated in two day advanced interrogation training course taught by Reid & Associates. San Francisco, California. Received certificate. |
| 3/91 | Attended and participated in three day introductory interrogation training course taught by Reid & Associates. Los Angeles, California. Received certificate. |
| 12/90 | Attended one-day in-house interrogation training course for Sergeants. Criminal Investigation Division, Oakland Police Department. Alameda, California. |

## PROFESSIONAL ACTIVITIES

*Editorial Board Member*, Law & Society Review (1/98-Present)

*Ad Hoc* Journal Reviewer for:

Law & Society Review (1999, 1998, 1997, 1996);

Sociological Forum (1999, 1998);

Justice Quarterly (1998);

The Sociological Quarterly (1998);

Law & Social Inquiry (1998, 1997);

Studies in Law, Politics and Society (1996);

The Journal of Criminal Law and Criminology (1996);

13

Social Problems (1996);

The American Journal of Sociology (1995);

The Journal of Research in Crime and Delinquency (1995).


Membership Committee, Law and Society Association (1998-1999).

Student Prize Committee, American Sociological Association, Sociology of Law Section. (1998-1999).

External Reviewer, Grant Proposal. Ohio University. Athens, Ohio. 1999.

Chair, "Offenders and Effectiveness of Law." Annual Meetings of the Law and Society Association. May, 1997. St. Louis, Missouri.

Committee member, "Graduate Student Paper Prize Award," Sociology of Law Section, American Sociological Association. 1996-1997.

Program Committee Member, the American Sociological Association, the Sociology of Law Section for the Annual Meetings of the American Sociological Assocation. August, 1996. New York, New York.

Co-Chair (with Kai Erikson), "Deception in Sociological Research" Panel. Annual Meetings of the American Sociological Association. August, 1996. New York, N.Y.

Chair, "Author Meets Readers" Panel for Elizabeth Loftus, The Myth of Repressed Memory. Annual Meetings of the Pacific Sociological Association. March, 1996. Seattle, Washington.

Organizer, "Crime, Law and Society in the 1990s" Panels. The Annual Meetings of the Pacific Sociological Association. March, 1996. Seattle, Washington.

Chair, "Aftershocks of the O.J. Trial: Testifying and Other Issues." Panel held at the Annual Meetings of the American Society of Criminology. November, 1995. Boston, MA.

Chair, "Patrol Aspects of Policing." Panel held at the Annual Meetings of the American Society of Criminology. November, 1995. Boston, MA.

Discussion Leader, "Conference on Crime and Criminal Justice," Center for Research on Legal Institutions, Stanford University, School of Law. October 6-7, 1995.

Chair, "Law & Society Perspectives on the The O.J. Simpson Trial." Annual Meeting of the Law & Society Association. June, 1995. Toronto, CANADA.

Chair, "Author Meets Critics" Panel for Donald Black, The Social Structure of Right and Wrong. Annual Meeting of the Law & Society Association, June, 1994. Phoenix, AZ.

Chair, "Author Meets Critics" Panel for Setsuo Miyazawa, Policing in Japan. Annual Meeting of the Law & Society Association, May, 1993. Chicago, IL.

## PROFESSIONAL MEMBERSHIPS

American Society of Criminology
American Psychological Association
Law and Society Association
American Sociological Association
American Psychology-Law Society
Academy of Criminal Justice Sciences
Pacific Sociological Association
Society for Applied Sociology
American Association of University Professors
Boalt Hall Alumni Association

## REFERENCES:   Available on Request.

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 95-7207-CIV-GRAHAM

(Magistrate Judge Sorrentino)

TIMOTHY BROWN,                    :

    Petitioner,                   :

vs.                               :

HARRY K. SINGLETARY,              :

    Respondent.                   :
_____/

## AFFIDAVIT OF DR. I. BRUCE FRUMKIN

BEFORE ME personally appeared Dr. I. Bruce Frumkin, who after being duly sworn deposes and says:

1.    I have a Ph.D. in Clinical Psychology and am a Diplomate in Forensic Psychology, from the American Board of Professional Psychology.

2.    I have been declared an expert in Forensic Psychology numerous times in both state and federal courts. In an expert capacity, I have oftentimes been asked to assess a defendant's psychological functioning as it pertains to his ability to make a knowing, voluntary, and intelligent waiver of *Miranda* rights.

3.    A psychological evaluation of Timothy Brown was conducted on September 10, 1999 and September 24, 1999. The following procedures were administered: Clinical interview, Wechsler Adult Intelligence Scale-III (WAIS-III), Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Gudjonsson Suggestibility Scale (GSS), Wide Range Achievement Test-3 (WRAIT-3),

ATTACHMENT / EXHIBIT __27__

Comprehensive of Miranda Rights (CMR), Comprehension of Miranda Rights-Recognition (CMR-R), Function of Rights in Interrogation (FRI), Rey Memory Test, Validity Indicator Profile (VIP), and Word Recognition Test.

Mr. Brown was seen for a total of a little over 7 hours. In addition, materials relating to the case were reviewed.

4.      Based on my clinical interview of Mr. Brown, the results of testing conducted, and review of materials, I am of the opinion that at the time of the police interrogation, it would have been highly unlikely that Mr. Brown could have understood or could have made intelligent use of his *Miranda* rights. This is based upon several factors:

First, results from the Wechsler Adult Intelligence Scale-III (WAIS-III) administered on September 24, 1999 indicates Mr. Brown has a Verbal IQ score of 66, which places him in the lower 1st percentile range compared to others his age. Mr. Brown was 15 at the time of the police questioning. Results from a major research project conducted by Dr. Tom Grisso in the late 1970's indicate that 15 and 16 year-olds with IQ scores under 80 do not understand *Miranda* as well as adults or those juveniles of higher intelligence. Mr. Brown's verbal intelligence is significantly lower than 80. Also, individual subtest scores on the WAIS-III show that Mr. Brown's knowledge of the meaning of vocabulary words (Vocabulary) is at the lower 1st percentile range, his verbal abstract reasoning skills (Similarities) is as the lower one-half of the 1st percentile range, his judgment and common sense (Comprehension) is a the lower 2nd percentile range, and his short-term memory, attention, and concentration is at the lower 2nd percentile range. These test scores are also consistent with his low school performance. In fact, his intellectual deficits are likely the major cause of his poor school performance.

2

Second, past history and psychological testing are consistent with an individual who currently has and probably had at the time of the police questioning, serious psychological disturbances. He is a high-strung, sensitive, highly labile individual who has always found it difficult to get close to people. He was raised in an abusive environment. He turned to substance abuse as a form of self-medication. He has suffered from depression and shortly after his incarceration but prior to his conviction, he made a suicide attempt. He was prescribed psychotropic medication in the jail. Mr. Brown's poor level of overall functioning combined with the stress from the police interrogation would have made it very difficult, even apart from his intellectual deficits, to adequately process information the police gave to him about his rights. Furthermore, based upon research done by Dr. Grisso, we know that past exposure to *Miranda* rights would not automatically increase one's understanding of those rights. Therefore, Mr. Brown's past contact with law enforcement and the juvenile justice system would not necessarily have increased his understanding of the *Miranda* rights. According to the research, there is no simple relationship between the two.

In sum, it is my professional opinion that it is highly unlikely Tim Brown could have fully understood or known his *Miranda* rights, or could have made an intelligent waiver or such rights when he gave a statement to Broward Sheriff's Office detectives on July 16, 1991.

Even if Mr. Brown could have understood or could have made an intelligent waiver of his *Miranda* rights at the time of the police questioning, it is unlikely that during the time period for pursuing state Habeas remedies he had the mental capacity to appreciate his legal position, understand the nature and object of Habeas proceedings, understand the Habeas claims he could or should have brought, and/or present his case for Habeas relief in a rational manner. Habeas concepts are at a much more sophisticated level than the *Miranda* warnings.

3

Finally, questions are raised concerning the voluntariness of Mr. Brown's *Miranda* waiver and confession. While much depends upon how the courts weigh or interpret alleged police misconduct (Mr. Brown stated the police beat and threatened him with the electric chair, and refused his request to have his mother present), Mr. Brown's score on the Gudjonsson Suggestibility Scale was in the upper 95th percentile for interrogative suggestibility. This test consisted of Mr. Brown being presented with a short story containing 40 facts. Mr. Brown yielded to misleading questions not much more than the average person. Yet when he was told he made a number of errors (*whether he did or not*), he shifted to different responses to an extreme degree (upper 99th percentile). Research conducted by Gudjonsson shows that individuals who give false confessions have significantly higher suggestibility scores than those who have not given false confessions.

I declare under penalty of perjury that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

Dr. I. Bruce Frumkin

Sworn to and subscribed before me by ___I. Bruce Frumkin___, who is personally known to me/produced the following form of identification: ___Drivers License___ on this ___21___ day of ___December___, 1999.

Notary Public, State of Florida

My Commission Expires: 5-18-2000

MONICA MEZA
Notary Public, State of Florida
My Comm. Expires May 18, 2000
No. CC 540011
Bonded thru Official Notary Service
1-(800) 723-0121

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 95-7207-CIV-GRAHAM

(Magistrate Judge Sorrentino)

TIMOTHY BROWN,                        :

     Petitioner,                   :

vs.                                   :

HARRY K. SINGLETARY,                  :

     Respondent.                   :
_____/

## AFFIDAVIT OF DR. LENORE E. WALKER

BEFORE ME personally appeared Dr. Lenore E. Walker, who after being duly sworn deposes and says:

1.     I am Dr. Lenore E. Walker and I hold a license to practice psychology in the states of Florida, Colorado and New Jersey. I earned a doctorate in psychology from Rutgers, The State University of New Jersey in 1972, a master's degree in psychology from City College of the City University of New York in 1967 and a bachelor's degree in psychology from Hunter College of the City University of New York in 1962. I am in the independent practice of psychology since 1975. Currently, I am Professor of Psychology at Nova Southeastern University and Coordinator of the Forensic Psychology concentration since 1998. I am also the Executive Director of the Domestic Violence Institute, a not-for-profit organization with affiliate centers around the world. I have published 11 books, approximately 60 peer-reviewed articles or book chapters, and given numerous

ATTACHMENT / EXHIBIT 28

training workshops for the past 20 years on the topic of interpersonal and family violence. My credentials are set out in detail in the accompanying resume.

2.      I was hired by the Federal Public Defender's Office for the Southern District of Florida to assist them in preparing the Habeas Corpus case of <u>Timothy Brown v. Singletary</u>, Case No. 95-7207-Civ-Graham. They specifically asked if I could review records, interview Mr. Brown and his family to determine if in my professional opinion he was abused as a child and if so, did the psychological effects from abuse cause him to respond to police officers interrogation techniques as if he was being abused leading him to make false and incriminating statements about the crime for which he was convicted.

3.      I have reviewed the following documents to assist me in forming my forensic psychological opinion in this case:

Educational records including:

Florida Cumulative Guidance Record listing all schools in which Timothy Brown was enrolled from 1983 to 1990.

Standardized test scores from 1982 (kindergarten).

Standardized test scores and grades from 1983 (first grade).

Standardized test scores (California Achievement) from 3/83 (first grade).

Standardized test scores (California Achievement) from 4/85 (first grade).

Registration in another school 11/85.

Letter to mother re: physical exam 11/86.

Standardized test scores from 4/87 (third grade).

Letter re: administrative promotion 9/87 (fourth grade) also stating 52 days absent in third grade and 4 out of 8 days at beginning of school - 12 years old.

2

Letter sent home re: no homework and poor grades 9/87 (fourth grade).

Letter sent home re: interim conference poor grades, work effort and sometimes unacceptable behavior 10/87 (fourth grade).

Interim Progress Report - poor language and math skills - 12/87 (fourth grade).

Interim Progress Report and Parent Letter - poor basic skills and absent a lot even with one on one peer coaching - 2/28 (fourth grade).

Standardized test scores from 4/88 - (Iowa Tests of Basic Skills) Functioning below third grade level and IQ estimated at 58 - (fourth grade).

Administrative promotion to fifth grade because he was 13 years old 6/88.

Standardized test scores from 4/89 (Iowa Tests of Basic Skills). No change from previous year. IQ still at 58. (Sixth grade - Middle school).

Record of entering Broward Detention Center on 3/89 (4/16/90).

Referral to school social worker 8/89.

Standardized test scores from 3/90 (Iowa Tests of Basic Skills) Incomplete but appears to still be between third and fourth grade levels. (Seventh Grade in Detention Center).

Duval Start Center in Jacksonville requested Timothy's school records with registrar's signature in parent's place.

Records to go back to Apollo Middle School on 5/90. However, records indicate he never showed up there or formally withdrew even though other records indicate he entered Duval Start Center on 10/24/89. Not sure of discharge date but at some point goes to Driftwood Middle School and by 11/89 he is out of school with all failing grades in eighth grade.

Transmittal letter of school records from attorney Larry Davis to Dr. Elizabeth Kaprowski.

12/2/93 - Test of Adult Basic Education - Reading Level 3.2; Math Computation & Concepts 2.0; Language 1.5 - Total Grade Level 2.2.

Juvenile records:

3

| | | |
|---|---|---|
| 12/19/85 | Trespassing | Disposition by Arbitration 1/9/86 |
| 1/29/88 | Retail Theft (Seen taking items from Penny's by security). | Dismissed 12/15/88 as unable to locate child. |
| 1/17/89 | Burglary/Received stolen property (broke in truck, took a CB radar detector, stereo, portable TV and cassette tapes). | Committed 3/89. |
| 1/24/89 | Retail Theft (broke into store and removed drill 'bite'). | |
| 2/15/89 | Auto Theft (with a friend took a car from Maroone Chevrolet and went for a joy ride. Caught and arrested). | Committed 3/89. |
| 3/29/89 | Resisting arrest without violence. | Community Control 5/10/89. |
| 4/2/89 | Broke into a van to remove key box with keys to several autos at Maroone Chevrolet. | Community Control 5/10/89. |
| 5/3/89 | Retail Theft (observed in K-Mart taking a baseball cap without paying for it. | Community Control 6/30/89. |
| 5/8/89 | Auto Theft (tried to steal auto out of a parking lot but arrested. | Community Control 7/13/89. |
| 5/11/89 | Trespassing/Loitering (arrested after being repeatedly warned from Palm Gardens complex because he had broken into several vending machines previously. | Commitment 7/17/89. |
| 5/23/89 | Loitering/Prowling | Commitment 10/11/89. |

4

| | | |
|---|---|---|
| 3/29/90 | Loitering/Prowling (standing on Wiley St. engaging in 'hand to hand' exchange with unknown white male and was arrested. | Community Control 5/30/90. |
| 12/6/90 | Escape (ran from commit-ment program). | 90 days detention. Sent to Covenant House where released 3/1/91. |
| 5/5/91 | Burglary (arrested for armed burglary for robbing $5.00 from a woman who said he threatened to shoot her with a gun. He maintained that he did have a gun but he never pointed it at her or threatened to shoot her with a gun. Gun never found as he said he gave it to a friend. | Detained and released 5/29/91. |
| 5/5/91 | Officer arrest record indicates statements made by Timothy included "If I give her her $5.00 back, will that settle everything?" | |
| 5/5/91 | Timothy's statement to the police - he insists he did not take out the gun nor threaten or point it at her. Detective asked questions and he answered yes or no. | |
| 5/29/91 | Burglary. | Detained and released 6/16/91. |
| 7/16/91 | Manslaughter. | Juvenile and waiver to adult 8/2/91. |

Medical records:

School immunization records.

Speech and language screening 9/84 (first grade).

Visual Screening 2/85 (first grade), 11/85 (second grade), 9/86 (third grade).

Hearing Test 11/85 (second grade).

Student Health exam 9/86 (third grade).

Growth chart indicates always big for age (6'2", 207 lbs. by age 15).

Scoliosis screening positive 11/88 (sixth grade).

Medical records from Hollywood Memorial Hospital
    2/8/89 stab wound in chest - hemopneumothorax - intensive care 2 days,
    4 days in hospital

Hollywood Memorial Hospital
    10/90 stab wound to head - metal foreign object overlying left parietal bone
    near midline. Records indicate Timothy didn't let doctor's remove metal
    object nor stitch up his head wound. He wanted to leave hospital AMA. Mom
    was there near tears stating she was tired of son's behavior, she had no
    control over him and to "let him go". Timothy walked out of hospital.

5/29/91 - Community control records indicate that Ms. Brown stated Timothy had
been living at large for 4 months and threatening suicide with at least one attempt
with a knife. She said she thought he may be mentally ill. HRS report indicates that
he cut his wrists in 2/91 while detained at Juvenile Detention Center and 5/91
contemplated running a car off the road but stopped himself. Recommended he be
placed on suicide precaution with one-on-one supervision to stop him as he
couldn't guarantee he wouldn't try again while in detention then.

Medical records from jail since arrest:

10/91          Tells nurse he hears voices call him in his dreams. Can't sleep but
               won't go for psychological interview even though he wants more
               medications to sleep.

10/22/91       Tells medical provider he is innocent of charges and didn't know the
               person. Medical provider notes Timothy is depressed but he "does
               not want nor would profit with talk therapy at this point".

12/30/91       Nurse refers him to psychiatrist as he again states he hears voices
               calling his name and he is unable to sleep. Sad affect. History of
               schizoaffective disorder.

6

| 1/2/92 | Apparently seen by doctor who gives him medication and diagnoses him with hallucinations, insomnia and depression and suggests ruling out schizoaffective disorder. Medication appears to be Trilafon 4 mg. And Sinequan 50 mg. |
|---|---|
| 2/11/92 | Placed on suicide watch. Said he was having dreams about killing himself and woke up trying to stab himself. Medication increased to 100 mg. Sinequan. |
| 3/2/92 | States he feels better and hallucinations and bad dreams ceased. Sleeps better. |
| 6/27/92 | Suicide watch again because found out father died from gunshot wound two weeks earlier. Discontinued 7/3/92 as he said he was better. Refused one-on-one with doctor. |
| 3/2/93 | Says he hears voices "once-in-a-blue-moon" and is stable on medication but notes flat affect. |
| 10/20/93 | Fell and hit head on sink. Nurse noted minor trauma to superior right orbit. He denies vision changes or headache. Gave ice-pack. |

Transcript of Suppression Hearing 1/10/93 and Judge's ruling.

Dr. Kaprowski's testimony at suppression hearing, at trial and 12/6/92 handwritten report faxed to attorney.

Presentence Investigation Report.

Tape of Timothy Brown's statement, transcript and redacted transcript from trial.

Restraining Order obtained by Othalean Brown against Arthur Brown 5/7/90 and made final 5/30/90.

Witness statements and investigation into Alona Mae Brown's shooting Arthur Brown to death on 4/26/92. No charges were filed against her ruling it self-defense.

4.       I interviewed Mr. Timothy Brown (DC #901588) at the South Florida Reception

Center on September 3, 1999 for approximately 2 hours. In addition, I administered the Trauma

7

Symptom Inventory (TSI), a standard psychological test that measures the psychological effects from abuse trauma.

5.      I interviewed Ms. Othalean Brown who is Timothy Brown's stepmother who raised him from the time he was two weeks old.  There was no contact with his biological mother who was not married to his father at the time of Timothy's birth.  Although the Brown children knew about her and the child from their father, he was married to Othalean Brown at the time and was present in the family until Ms. Brown and he separated in May 1990.  The history, which is summarized below, was one of very severe violence towards Ms. Brown, Timothy and the other siblings.

6.      I interviewed Rhonda Brown (12/10/65), Timothy's 33 year old sister who lived with him until his arrest.  She verified Ms. Brown's description of the violence in the home and added other incidents that Ms. Brown had not remembered.

7.      The history given by Timothy Brown, his mother (which is what he calls Ms. Othalean Brown) and his sister, Rhonda Brown is a typical pattern of very severe domestic violence that affected all members of this family.  Timothy Brown was born with a blood clot on his brain which took one month to go away.  His biological mother was known to be using alcohol and crack cocaine during her pregnancy with him.  He had numerous head injuries during his childhood and early adolescence, some that may have resulted in loss of consciousness.  He was stabbed in the head when he was 14 years old and part of the metal object was left in his head.  Medical records verify this.  His school records indicated Timothy Brown had a great deal of difficulty in learning but was never tested by school psychologist nor placed in special education classes.  He was retained in first grade and then administratively promoted until sixth grade when he finally dropped out of school.  Essentially, however, he did not learn much after third or fourth grade when his reading and math scores remained

at about the third grade level. His attendance became erratic during fourth grade also. His IQ was measured at around 58 through most of elementary and middle school which indicates that he was unable to learn much more using mainstream education. There is some indication that Timothy was absent a great deal from school which may have influenced his lack of learning. However, Ms. Brown states that she now has a grandson who has had many of the same educational problems that Timothy had when he was growing up and the school does provide special education for that child, which has resulted in his ability to learn more and remain in school, unlike Timothy.

Ms. Brown also states that Timothy Brown was mentally unstable during his childhood years and associates the worst times with the severe beatings from Mr. Arthur Brown, Timothy's father. She says that Mr. Brown would beat him with a 2 x 4 board or anything he could get his hands on across the head and back usually. One time he hit him so hard he fell up against the front door and broke the frame. Timothy also saw Mr. Brown beat his sister and his mother and would get in the middle to try to stop them but would more often get himself hurt too. She says the beatings worsened when Timothy was around 12 to 15 years old (during the period when he was getting into trouble) as Mr. Brown was using crack cocaine at the time. Timothy became suicidal during the few months prior to his arrest and was having auditory hallucinations. One time Mr. Brown tried to get in the window and Ms. Brown shot a gun into the flowerbed to keep him away. The police arrested her. The last incident prior to Ms. Brown obtaining a restraining order keeping Mr. Brown out of the house had resulted in his being arrested for domestic violence. He had hit her so bad that her lip was bleeding and he also hit Timothy as he tried to defend his mother. Interestingly, Mr. Brown was shot and killed in 1993 by his new wife, who was not prosecuted for the act.

Rhonda Brown described their childhood similar to both Timothy Brown and Othalean Brown. She remembered her father taking her to the house where Timothy was after he was born and finding him lying in his own vomit and wet. She would clean him up, change and feed him and just hold him. Sometimes they would go into the house and he would be alone, his mother would not be there. She felt the blood clot on the top of his head from the first time she saw him. When he was around two weeks old, she and her father took the child to her mother who then raised him as her own. She says that Timothy was a very sweet child who loved cartoons and would play with the pots. He treated her own children who came to live with them very nicely and protected them. He got along with lots of kids, both older and younger than him. Rhonda remembered several serious battering incidents from their father:

> When he was 5 or 6 years old, their father's watch was missing and Mr. Brown beat Timothy "upside his head against the closet door", like he was a man on the street".

> He would be punched in the head repeatedly by the father's fists and called names, including being told he would never be this or that.

> He beat Timothy with a vacuum hose.

> He beat Timothy with a 2 x 4 board that he had also used on Rhonda, twisting her hand on it.

> He'd beat Timothy against the door lots of times. It was so hard that it knocked the door off the hinges and it could hardly be closed.

> He witnessed the father pouring gasoline on her and threatening to light it.

> Last time Mr. Arthur Brown physically beat her mother, Timothy was there and got beaten also. She heard Timothy threaten to kill their father if he kept putting his hands on their mother. He then ran out the door and didn't come back for a couple of days.

10

8.      Ms. Brown described difficulties in getting Timothy to listen to her after he was
around 12 years old (1988-1990).  Prior ro that he was compliant and was a follower.  In fact she
describes him as being very easily led by others.  As he got older, she felt his friends were always in
trouble.  The neighborhood they lived in was a rough one and he lived for periods on the street and
in other neighbor's houses when he was not in the detention center or in treatment facilities during
the year or two prior to this arrest on July 16, 1991.  Ms. Brown stated unequivocally that she knew
her son asked for her to be there and that when she went down to see him the police refused to permit
her to be there with him.  When she finally got to see him a few days later he was all bruised up and
told her that the police beat him up so he would say that he committed the shooting when he denied.
She also said that when she listened to the tape of Timothy giving his statement, she could hear him
sniffling and softly crying in the background.

9.      The interview with Timothy Brown brought out even more abuse incidents that he
could still remember and describe:

> Timothy's nephew, Calvin, who was living with them at the time (Timothy was
> around 13 or 14) was hit by a car and came home from the hospital in a body cast.
> He says that his father was using drugs and had an 'attitude problem' at that time,
> 'fussing and fighting'.  The father and his sister had a few words' and Mr. Brown
> took a canister of gasoline and threatened to throw it on the nephew in the cast and
> "kill him" by "setting his body on fire".  They calmed down the father who left for a
> few days but the same thing happened again when he returned after a few days.

> When he was around 13, his father woke him from sleep by beating him with a 2 x 4.
> His whole body was bruised and when he went to school, he kept his shirt buttoned
> so they wouldn't see it.

> When he was younger he remembered getting beaten with the rubber hose from the
> vacuum cleaner but doesn't remember why.

> He remembers some of the bad things his father used to say to him such as: "I helped
> bring you into this world and I can take you out of this world".  He would use foul

11

language and call Timothy a "son-of-a-bitch", "I'll put your ass in the grave", "dumb", "stupid", " you'll never grow up", "you'll never be nobody".

His father would threaten all of them with his gun.

Timothy described one time walking in on his father who was on top of Rhonda kissing her and touching her naked body. He had intercourse with her at gunpoint. He only saw it one time but knew it happened a lot.

He saw his father beating Rhonda, hitting her with his bare hands, slapping, kicking, grabbing her by the hair, and hitting 'upside' her head.

As he got older, he would run away when he believed his father was getting ready to beat him. He would stay with a friend for several days. His mother didn't know this friend who also was on Wiley Street.

He remembers seeing his father hitting his mother just like he would hit his sister and sometimes would try to protect her but would often end up getting hit too.

When he was around 12 years old he remembers seeing his father and mother fighting in the kitchen. His father jumped on his mother. Timothy had a piece (gun) from a friend with no clip and one bullet in the chamber. He thought his father was coming toward him and pulled up his shirt telling his father to leave his mother alone while showing him the gun. The father left the house for several days. Timothy said he gave the gun back to his friend because it didn't have a clip.

10.     Timothy Brown described the circumstances under which he gave the statement to the detectives which resulted in his arrest in July 1981. He discussed his school problems stating that he felt different from the other kids because the work was so hard for him and once he fell behind, he couldn't catch up. He remembers his mind 'drifting' even though he would stay there and try. He didn't get enough sleep at night and often his mind would drift off and he didn't come back to reality until he heard the bell ringing. Even if he didn't understand what was happening, he learned how to pretend that he did and agree and go along with it. He said that when questioned by the detectives about this present incident, he did the same thing. He denied being at the scene the night it happened

12

and said that he made up the story. He said he was 'forced' to say it and he was 'jumped on' by Detective Carr.

Mr. Brown's descriptions including being grabbed during a smoke break at Covenant House by officers from the homicide division. There were two unmarked cars that were outside and they grabbed him, handcuffed him and put him in the back of one of the cars. He asked them what he was being charged with and they wouldn't say anything. He remembers being shackled and handcuffed to the floor and told he was being charged with first degree murder of a law enforcement officer. He says he told them they were 'crazy' and had the wrong man but they kept on. Carr hit him in the face with the palm of his hand and told him, 'we know you did it'. Detective Carr was the one who raised Keith's name. Timothy said he had seen Keith on the street but didn't hang with him as he liked to fondle kids, so no one 'messed' with him. The detectives told him, "We have his (Keith's) confession indicating you're the trigger man" and showed him pictures of the car scene showing how the detective had the car parked. They threatened him that he would get the electric chair if he didn't tell them the 'truth'. They made all kinds of threats that scared him.

Timothy Brown stated that part of the confession he made up and part of it they told him how to answer. They told him that while the tape was on, when the detective moved his head up and down, then Timothy was to say "yes, sir" and when he moved his head from side to side, he was to say "no". He said that the story about the bike and another kid being with him was not true -- it was make-believe. He says he was 14 years old at the time and he believed them when they said that if he would make the statement into the tape recorder, then they would let him go. They told him that he would only have to spend a few days in the detention center and they would let him go. He said that he asked to see his mother and they told him that they called her and she was there but wouldn't

13

let him see her.  Each time he would ask for her, they would change the subject to something else.  They told him if he gave the answers they told him to give, then he would see her.  He remembers showing his attorney, Larry Davis the bruises when he came to see him in the detention center.  He said he was going to take pictures of it, but Timothy says he didn't do it.  He also remembers showing his mother the bruises.

11.      A review of Dr. Elizabeth Kaprowski's psychological evaluation of Timothy Brown was reviewed by reading the notes she submitted to attorney Larry Davis, her testimony at the hearing on the Motion to Suppress his statement on January 23, 1993 and her testimony at trial.  Dr. Kaprowski administered the Weschler Intelligence Scale for Children, Third Edition (WISC-III) , the Bender-Gestalt Visual Motor Test, the Wide Range Achievement Test (WRAT), the Person-Tree drawings, a competency screening sheet, the Rorschach and Thematic Apperception Test.  Dr. Kaprowski's findings were as follows:

> Intellectual level on the WISC-III - Verbal IQ=60, Performance IQ=60, Full Scale IQ=56.  This is in the mild retardation range of cognitive abilities equivalent to a 7 or 8 year old in comprehension abilities and judgment.

> WRAT- Reading(2 %ile) and Spelling (1 %ile) Levels - 3rd grade -- Arithmetic - Below 3rd grade and in .05 percentile.

> No gross organic abnormalities seen on the Bender Gestalt or the WISC-III.

> Emotionally immature and intellectually immature, easily led by others, low self-esteem, cannot read waiver of rights, lies to hide his lack of comprehension or confusion but can't keep track of inconsistencies.

> Review of school records indicates the consistency of Timothy's intellectual deficits throughout his school history and supported her findings that his poor performance was not due to malingering but truly a lack of intellectual capacity.

14

Dr. Kaprowski's testimony at the suppression hearing as well as at trial indicates that she was unfamiliar with the translation of psychological data to forensic settings. She was unable to explain the meaning of the results of the tests she administered and reviewed from the school and how that impacted Timothy's ability to think, solve problems, and make good judgments. In particular she was unable to explain that he could not have been intellectually capable of understanding that the detectives threats and promises to let him go home were probably a technique to get him to say what they wanted him to say in the same way that a seven or eight year old child would not be able to understand or comprehend what it meant. Tim Brown scored lower than 1 % of the population on whom the WISC-III was standardized. His even scores across the subtests indicate that the low IQ score was due to limited intellectual abilities and true retardation, not emotional factors or not attending school. It is not just his school work that suffered from his low intellectual abilities but also his ability to think critically, make judgments, hold more than one or two things in his memory at one time, or use ideas and concepts in an abstract way.

Timothy Brown could not have been expected to understand that if he told the detectives a lie about being at the crime scene when he really had not been there, that it could be charged with murder and it might be difficult to prove that he wasn't there at trial. He also could not have been expected to understand the consequences of going into the interrogation without the presence of his mother or his attorney. He would be unable to comprehend some of the compound and multiple questions that the detectives asked him. He also would have been expected to be confused by some of the questions asked of him -- especially when the detectives appeared to have been twisting his words. However, he was also unable to admit that he didn't understand as he was afraid that he

15

would be further hurt and punished. He also had learned not to admit when he didn't comprehend a situation and just try to get by with pretending he was following along.

Dr. Koprowski's conclusions that Timothy Brown was not emotionally disturbed or depressed because of findings on one subtest of the WISC-III is clearly below the standards of psychological practice. Although she states that she administered the Rorschach and TAT tests, there is no record of the results on these tests. In fact, the jail records indicate that Timothy Brown was experiencing auditory hallucinations, was severely depressed, and may have had a schizo affective disorder which is considered a major mental illness. The jail psychiatrist administered several medications including 4 mg of Trilafon and 100 mg of Sinequan and then added Cogentin which successfully eliminated the auditory hallucinations and his affective mood improved significantly reducing his depression. Ms. Brown stated that he was suicidal several months prior to his arrest and that she was aware he was hallucinating at different times during his turbulent childhood. Timothy Brown stated he would make his mind 'drift off' and not come back to reality until something like the bell caught his attention. He likened this state of mind to the similar state of mind he had during the interrogation that led to his statement.

12.    It is my professional opinion that at the time of the interrogation that led to his statement, Timothy Brown was a 15 year old, mentally retarded boy functioning at around a seven year old level intellectually, who had been severely abused by his father and exposed to his father's violence towards his mother, sister, nephews, and also witnessed his father's sexual abuse of his sister. Children who have been abused learn to say and do whatever they have to do to placate and please the abuser. They are particularly sensitive to what the abuser wants them to do and say and often attempt to prevent further abuse by giving in, even if it is not true. The detectives overwhelmed

16

Timothy Brown in number and surprise when they arrested him eight months after the homicide took place. They lied to him by telling him that the co-defendant had confessed to Timothy having been the shooter, but Tim knew he hadn't even been with King. Then, they reminded him that he had already confessed to being the shooter when they interviewed him and let him go back in November. He reports that they yelled and screamed at him, hit him in the face and head, and then demanded that he make a statement into the tape recorder using the prompts that they gave him. He said he was afraid of what they would do to him, so he told them what they wanted. Even if he was confused, the detectives supposedly supplied the answers to their questions for him so all he had to do was answer 'yes sir' and 'no sir' when they moved their heads appropriately.

Timothy would be expected to view the detectives as abusers as their behavior was as he described his father's abusive behavior. Being hit on the head or in the face while being screamed and yelled at, threatened with worse harm including death, is similar to what he remembers his father doing to him. Thus, it is expected to cause flashbacks to fragments of memories of other abuse situations. He would be expected to try to deal with the feelings of anxious arousal and fear by telling the abuser whatever he wanted to hear, especially since he could not run away. Even the taped recording of the statement sounds stilted and not spontaneous. Ms. Brown notes that she can hear him sniffling and crying during parts of it.

13.     Research indicates that children who are exposed to abuse during their formative childhood years often develop a Post Traumatic Stress Disorder in addition to other mental disorders such as depression. Most people who are exposed to trauma have a 'fight' or 'flight' response to the fear that they experience. If this occurs on a regular basis, the physiological reaction may cause permanent damage to the developing brain structure. Research indicates that in children the

17

biochemicals may damage the development of the midbrain structure that controls emotions. There are also data that high levels of anxiety can cause hyper arousal which makes a person much more sensitive to danger. Thus, even if the abuse was not the same from the detectives during the interrogation that Timothy received from his father, there would still be a trauma response because similar feelings would be aroused.

PTSD responses can be measured by psychologists both in clinical interviews and through standardized psychological testing. I administered the Trauma Symptom Inventory (TSI) by reading the items to him to try to determine if Timothy Brown still evidenced the negative effects of trauma or a diagnosis of PTSD. In September 1999, with no treatment indicated in the records other than medication for depression and hallucinations, Timothy Brown's TSI scores were significant for PTSD. He was significantly elevated on scales that measured Anxious Arousal, Depression, Intrusive Experiences (including flashbacks and hearing voices), Defensive Avoidance (compliance to avoid further harm), Dissociation (making his mind go away), Impaired Self Reference (low self esteem), and Tension-Reduction Behavior. Further, the summary scores indicate this is a chronic mental condition that comes from experiencing trauma and leads to a longstanding dysphoria or chronic sadness. His responses on the test indicate that he still has suicidal thoughts and believes that he has been unfairly treated. He may well still have a psychotic disorder that together with his PTSD and intellectual retardation leaves him with few resources with which to cope with his strong feelings of sadness.

14.     In addition to his intellectual and emotional limitations at the time of the statement, Timothy had further vulnerability in terms of his physical condition. He had not been living at home consistently during the year prior to the incident and year prior to the statement and subsequent

18

arrest. From 1989 through 1991 he had been arrested and sent to the detention center, sometimes for 21 days, approximately 15 or more times. Most of the arrests were for misdemeanor and loitering types of offenses including some petty theft. He denies being a serious substance abuser mostly drinking occasionally and using marijuana and for one week tried snorting cocaine which he didn't like. He says that he did earn around $100 per week selling drugs and the one prior arrest where a woman claimed he stole $5 from her at gunpoint he denied, saying her accusation was motivated by her anger at him for selling her bad drugs which he claims not to have had any knowledge of doing until it happened. He was in and out of treatment facilities and when back 'home' he says that he stayed with friends when he was unable to stay at home. He was a large child, growing to most of his 6'2" height by the time he was 15 years old and may have looked much older than his intellectual and social abilities at the time. He was stabbed under the arm and in the lungs by a mentally unstable woman in 1989 and almost died from loss of blood, and was also stabbed in the head with a metal object. His anger at his father, whose abusive and philandering behavior was known in the family, was a factor in his acting-out behavior at the time. He observed his father holding his sister at gunpoint, observed him pouring gasoline on his sister and her son who had just been hurt in a car accident, and tried unsuccessfully to stop his father from beating up his mother. He had at least two suicide attempts and several other times he had suicidal thoughts which he claims took effort to stop himself from killing himself. He heard voices, was out of touch with reality for periods of time, and was clearly depressed. His relationships with others were very tangential. He could not read or compute math like others his age and he did not comprehend much about the world that could help him see that he had choices to make something of himself.

19

15.    In my professional opinion, based upon my clinical interviews and the material I reviewed, Timothy Brown was psychologically vulnerable to being coerced and was coerced into saying anything those police detectives wanted him to say, including taking blame for a murder that he did not commit nor was present at when it occurred.

I declare under penalty of perjury that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NAUGHT.


_____
DR. LENORE E. WALKER



Sworn to and subscribed before me by Dr. Lenore Walker, who is personally known to me/produced the following form of identification: _____ on this 22nd day of December, 1999.

_____
Notary Public, State of Florida

My Commission Expires:

Alicia J. Payton
Commission # CC 856558
Expires Aug. 1, 2003
Bonded Thru
Atlantic Bonding Co., Inc.

20

## RESUME

**DR. LENORE E. A. WALKER**                                November, 1998

Licensed Psychologist
Diplomate in Clinical Psychology
American Board of Professional Psychology
Fellow Academy of Clinical Psychology

WALKER & ASSOCIATES
50 South Steele Street, Suite #850
Denver, Colorado 80209
(303) 322-3444
FAX (303) 322-0103
Internet: 74443.1415@Compuserve.com

SOUTH FLORIDA OFFICE
915 Middle Riverfiver #212
Ft. Lauderdale, FL 33304
(954) 920-1389
FAX(954) 920-5279
Cellular - (954) 261-2119
Pager: 1-800-616-8038

## CURRENT POSITIONS

President and C.E.O.
WALKER & ASSOCIATES
Clinical & Forensic Psychologist
Independent Practice of Psychology
Licensed in Colorado, Florida & New Jersey

Professor of Psychology
Center for Psychological Studies
Nova Southeastern University
Ft. Lauderdale, FL

1

President and C.E.O.
ENDOLOR COMMUNICATIONS, INC.

Executive Director
DOMESTIC VIOLENCE INSTITUTE

## CURRENT CERTIFICATION AND LICENSURE

| | |
|---|---|
| National Academy of Practice in Psychology | 1986 |
| Fellow of the American Psychological Association | 1983 |
| American Board of Professional Psychology<br>Diplomate in Clinical Psychology | 1979 |
| Colorado License as a Practicing Psychologist (#419) | 1975 |
| Florida License as a Practicing Psychologist (#5102) | 1994 |
| New Jersey License as a Practicing Psychologist (#1003) | 1974 |
| National Registry of Health Service Providers<br>in Psychology | 1974 |

## EDUCATIONAL BACKGROUND

| | | |
|---|---|---|
| Rutgers - The State University of NJ<br>School of Psychology | Ed.D. | 1972 |
| City College of the City University of NY<br>Clinical School Psychology | M.S. | 1967 |
| Hunter College of the City University of NY<br>Psychology Major | A.B. | 1962 |

## TEACHING APPOINTMENTS

| | | |
|---|---|---|
| Nova Southeast University<br>Center for Psychological Studies<br>Ft. Lauderdale, FL | Adjunct Professor<br>Forensic Psychology Practicum | 1998 |

2

| University of Denver<br>Graduate School of<br>Professional Psychology | Adjunct Professor<br>Practicum Supervisor | 1976-1994<br>1995-Present |
|---|---|---|
| European Educational Organization<br>School of Psychology, Athens, Greece | Special Advisor | 1990-1992 |
| Caribbean Center<br>Puerto Rican Institute of<br>Psychology<br>San Juan, Puerto Rico | Consultant | 1986-1990 |
| Colorado Women's College<br>Denver, Colorado | Associate Professor<br>Chairperson<br>    Tenured<br>    Assistant Professor<br>    of Psychology | 1977-1981<br>1977-1980<br>1978<br>1975-1977 |
| University of Pittsburgh<br>Semester-at-Sea<br>Institute for Shipboard<br>Education | Visiting Professor<br>S.S. Universe<br>Around the World Program | Spring 1981 |
| College of Medicine and<br>Dentistry of New Jersey<br>Rutgers Medical School<br>Institute of Mental Health<br>Sciences, Piscataway, NJ | Assistant Professor<br>of Psychiatry | 1972-1975 |
| Rutgers University<br>Ph.D. Program in Clinical<br>Psychology<br>New Brunswick, NJ | Assistant Professor<br>of Psychology<br>(Joint Appointment) | 1973-1975 |
| Rutgers University<br>Graduate School of<br>Applied and Professional<br>Psychology | Assistant Professor<br>(Joint Appointment) | 1974-1976 |

3

## CLINICAL PSYCHOLOGY EXPERIENCE

| | | |
|---|---|---|
| Independent Practice of Psychology | | 1972-Present |
| Expert Witness Testimony | | 1977-Present |
| | | |
| Community Mental Health Center | Coordinator | 1972-1975 |
| Rutgers Medical School | Educational Outreach | |
| | Services | |
| | Director of School/ | |
| | Community Psychology. Internship Program | |
| | | |
| Middlesex County Medical | Staff Psychologist | 1969-1972 |
| Health Clinic | | |
| New Brunswick, NJ | | |
| | | |
| Coney Island Hospital | Staff Psychologist | 1967 |
| Maimonides Medical Center | Intern | 1967 |
| | | |
| New York City Board of | Elementary Grade | 1962-1968 |
| Education - District 21 | Teacher - Emotionally | |
| Coney Island, Brooklyn, NY | Disturbed Children | |

## RESEARCH

| | | |
|---|---|---|
| NIMH GRANT | | |
| #RO1 MH30147 | The Battered Woman | 1978-1981 |
| | Syndrome Study | |
| | Principal Investigator | |
| | | |
| DHHS GRANT - Office on | Services to Battered | 1977-1978 |
| Human Development | Women Project | |
| | Consultant | |

## SPECIAL TESTIMONY

Testified as invited speaker to Congressional Committee of Judiciary on legislation pertaining to admissibility of Battered Woman Syndrome testimony in criminal homicide and domestic and child abuse cases.                                                                 1992

Testified as invited speaker to Senate Committee on Labor & Human Resources, Subcommittee on Child & Human Resources on S1843/HR29771, Domestic Violence Treatment Prevention Act

February 6, 1990

Testified as invited speaker to Congressional Subcommittee on Children, Youth, and Families - Violence Against Women Hearings                              September 1987

Testified as consultant to Attorney General's Task Force on Family Violence.       1983

Testified as invited speaker to President Reagan's Task Force on Victims of  Crime and Violence, Denver, Colorado.                                                1982

Testified as invited speaker to the Congressional Committee on Science and Technology, DISPAC Subcommittee, on research and treat-treatment alternatives for battered women to assist the government's legislative support for funding.                       February 15, 1978

Testified as invited speaker at the United States Commission on Civil Right's Consultation on battered women in Washington, D.C.                              January 31, 1978

Testified in support of legislation pending the Congress to fund programs for domestic violence.                                                         March 1978

Testified as an expert witness in criminal and civil trials in state and federal courts where interpersonal violence is an issue across the United States.                       1977-Present

## FORENSIC TESTIMONY

Qualified as a clinical psychologist with expertise in interpersonal violence, family violence, violence against women and children, sexual harassment, and impact of trauma and testified as an expert witness in criminal and civil cases in approximately 35 states and Federal Court jurisdictions.

## SELECTED CONSULTING AND BOARD POSITIONS

Judicial Training for Judges on Violence in the Family         1998, 1995, 1994
Jerusalem, Israel

Colorado Legislature's Battered Woman Syndrome                1994-1995
Task Force, Chair Subcommittee on Battered
Women in Prison

Broward County Public Defender's Office                       1993-Present
Ft. Lauderdale, Florida

American Psychological Association (APA)
Elected to Council of Representatives                         1984-1988
                                                             1994-1997

| | |
|---|---|
| Board of Directors | 1988-1989 |
| Nominee for President | 1989-1990 |

| | |
|---|---|
| JurisMonitor, Inc., Boulder, Colorado | |
| Consultant | 1990-1995 |
| Director | 1994-1995 |

| | |
|---|---|
| Ministry of Justice, Costa Rica with | 1990-1994 |
| United Nations ILANUD Project in | |
| Central America | |

| | |
|---|---|
| Ministry for Equality of Women and Men | 1988-1992 |
| Athens, Greece. | |

| | |
|---|---|
| Women's Forum Foundation of Colorado | |
| Director and Treasurer | 1985-1988 |

| | |
|---|---|
| Women's Forum of Colorado | |
| Director and Secretary | 1985-1987 |

| | |
|---|---|
| U.S. Surgeon General Conference on Interpersonal Violence | |
| Leesburg, Virginia | September 1985 |

| | |
|---|---|
| National Institute of Justice | |
| Office on Victims and Criminalization of Domestic Violence Programs | 1984-1987 |

| | |
|---|---|
| Coalition for Justice for Abused Women in Denver, Colorado (JAWS) | |
| And Project Safeguard | 1982-1990 |

Consultant to numerous battered women shelters, programs, and task forces throughout the world. Keynote speaker at international conferences.

## TASK FORCES, COMMITTEES AND ADVISORY POSITIONS

| | |
|---|---|
| Chair, APA President's Task Force on Violence | 1994-1996 |
| and the Family | |

| | |
|---|---|
| Chair, APA Board of Director's Task Force on Child | 1989-1991 |
| Abuse Policy | |

| | |
|---|---|
| Joint Council on Professional Education in Psychology | |
| Division 35 Representative | 1989-Present |

| | |
|---|---|
| APA Liaison to the DSM-IV | 1987-1994 |
| APA Liaison to the DSM-IIIR | 1986-1987 |
| Committee on Legal Issues | 1989-1991 |
| Public Information Committee | 1986-1988 |
| Committee on International Relations in Psychology | 1992-1995 |
| Chair | 1995 |
| APA Council of Representatives | 1994-1997 |
| Chair of Women's Caucus | 1985-1988 |
| Community Responsibility Center, Women's Community Corrections Program, Advisory Board Member | 1982-1984 |
| Colorado Women Psychologists and Colorado Women's Bar Association Joint Committee on Sexual Abuse of Children | 1982-1984 |
| Colorado Association for Aid to Battered Women (CAABW) A Founder and Board Member | 1977-1980 |
| Elected Colorado Delegate to the National Women's Conference, Houston, Texas | November 1977 |

## PROFESSIONAL ASSOCIATIONS

| | |
|---|---|
| American Psychological Association | Member 1974 |
| | Fellow 1983 |
| Board of Directors | 1988-1989 |
| Liaison to Board of Professional Affairs | |
| Liaison to Committee on Legal Issues | |
| Pubic Information Committee | |
| Committee on Legal Issues | 1989-1992 |
| Committee on International Relations in Psychology | 1992-1995 |
| Chair | 1995 |
| Council of Representatives | 1984-1988 |
| Division 35 | 1994-1997 |
| President - Division 35(Women) | 1989-1990 |
| Chair - Women's Caucus of Council | 1985-1988 |
| Executive Board Member Division 43(Family) | 1987-1988 |
| Executive Board Member Division 46 (Media) | 1993-1995 |
| Treasurer | 1996-1998 |
| | 1998-1990 |
| Executive Board Member Division 51 (Men) | 1996-1997 |
| Treasurer - Division 52 (International) | 1999 |

7

| | |
|---|---|
| President - Division 12 Section 4 (Women) | 1998 |
| Chair - Committee on Women's Issues | |
|     Division 41 | 1982-1987 |
| Chair - Committee on Family Violence | |
|     Division 43 | 1984-1988 |
| Representative to Group on Restructuring | 1987-1988 |
| | |
| Feminist Therapy Institute | |
|     Founding Member and First Chairperson | 1982-1984 |
|     Steering Committee | 1982-1988 |
| | |
| Women's Coalition for Legislative Action | |
|   Association for Advancement of Psychology-- | |
|   Psychologists for Legislative Action Now | |
|   Co-Chair | 1986-1992 |
| Colorado Psychological Association | Full Member |
| Colorado Women Psychologists | Full Member |
| Florida Psychological Association | 1995 |
| Association for Women in Psychology | |
|   Member of Delegation to NGO Forum | Full Member |
|   UN Decade for Women Conference | |
|   Nairobi, Kenya | July, 1985 |

## CURRENT JOURNAL EDITORSHIPS

| | | |
|---|---|---|
| Journal of Traumatic Stress | Editorial Board | 1987-1994 |
| Professional Psychology | Editorial Board | 1986-1989 |
| Violence and Victims | Special Associate Editor | 1986-Present |
| RESPONSE and Violence Update | Editorial Board | 1984-1995 |
| Victimology | Editorial Board | 1984-Present |
| Journal of Child Sexual Abuse | Editorial Board | 1992-1994 |
| Journal of Emotional Abuse | Editorial Board | 1994-Present |
| Women and Therapy | Editorial Board | 1992-1995 |
| | | |
| American Psychologist | Special Editor | |
| | International Psychology | 1995-1999 |
| Psychotherapy | Special Editor Issue on | |
| | Family Violence | 1998 |

## HONORS AND AWARDS (Partial List)

| | |
|---|---|
| APA and National Women's Health Coalition | May 1994 |
|     Distinguished Contribution Award | |
| APA Committee on Women in Psychology | 1992 |
|     Distinguished Woman Psychologist Leader Award | |
| APA Board of Professional Affairs | 1987 |
|     Distinguished Professional Contributions to Psychology | |
|     in the Public Interest | |
| World Victimology Leadership Award | Italy, 1987 |
| Colorado Women's Hall of Fame | 1987 |
| Colorado Working Women's Award | 1987 |
| Hunter College Alumni Hall of Fame | 1986 |
| Women Who Care Award - Colorado | 1984 |
| Colorado Salute to Women Award | 1980 |

## TELEVISION APPEARANCES
Numerous Local TV and radio documentaries and news shows

| | |
|---|---|
| Ted Koppel - Nightline | Today Show |
| Good Morning America | Oprah Winfrey Show |
| CBS Morning News | Phil Donahue Show |
| CBS News with Dan Rather | Hour Magazine |
| 48 Hours | Sally Jesse Raphael |
| CNN and TBS | Joan Rivers |
| Dateline with Maria Shriver | Geraldo |

**VIDEO**

The Abused Woman: A Survivor Therapy Approach. Assessment and Treatment of Psychological Disorders Video Series. New York: Newbridge Communications.

Feminist Psychotherapy: Video in series by Wiley. 1998.

**PUBLICATIONS**

Walker, L.E.A. (1999). Psychology and violence around the world. *American Psychologist.*

Walker, L.E.A. & J.R. Meloy (1998). Domestic violence and stalking. Chapter in J.R. Meloy (Ed). *Stalking.(pp. 139-161).* New York: Academic Press.

Walker, L.E.A. & Levant, R.F. (In press).

Walker, L.E.A. (1996). Assessment of abusive spousal relationships. Chapter in Kaslow, F. (Ed.). *Handbook of Relational Diagnosis and Dysfunctional Family Patterns.* New York: Wiley.

Walker, L.E.A. (1995). Current Perspectives on Men Who Batter Women: Implications For Intervention and Treatment to Stop Violence Against Women:Comments on Gottman, Jacobson, Rushe, Wu Short, Babcock, La Taillade, Waltz. (1995)*"The relationship between heart rate reactivity, emotionally aggressive behavior, and general violence in batterers",* Journal of Family Psychology, 9.

Walker, L.E.A., Price, R.L., Wilk, D., Rogers, S. (1995). *Domestic Violence and the Courtroom: Understanding the Problem...Knowing The Victim.* American Judges Foundation, Inc., National Center for State Courts: Williamsburg, VA.

Walker, L.E.A. (1995). The Transmogrification of a feminist foremother. *Women and Therapy* New York: Haworth Press.

Walker, L.E.A. (1995). Understanding Battered Woman Syndrome. *Trial Magazine,* ATLA, February, 1995.

Walker, L.E.A. (1994). Survivor Therapy. A training video. New York:Newbridge Communications.

Walker, L.E.A. (1994). Abused women and survivor therapy: A practical guide for the psychotherapist. Washington, DC:American Psychological Association.

Walker, L.E.A. (1994) The importance of knowing what you know and don't know. In The

10

Forum section. Ethics and Behavior. Vol.4, No.2:162-167.

Walker, L.E.A. & Levant, R. (1993). Intergender dialogue with psychologists. The Independent Practitioner, 13.

Walker, L.E.A. (1993) Are personality disorders gender biased? Yes! In S.A. Kirk and S.D. Einbinder (Eds.) Controversial Issues in Mental Health.(pp. 21-30). New York: Allyn and Bacon.

Walker, L.E.A. (1993) The battered woman syndrome is a psychological consequence. In R.J. Gelles & D.R. Loeske (Eds.) Current controversies on family violence. (pp. 133-152) Newbury Park: Sage.

Walker, L.E.A. (1993) Legal self-defense for battered women. In M. Hansen & M. Harway (Eds.), Battering and family therapy: A feminist perspective. (pp. 200-216). Newbury Park: Sage.

Walker, L.E.A. (1992) Battered women as defendants. Chapter in N. Zoe Hilton (Ed.) Legal Responses to Wife Assault: Current Trends and Evaluation. (pp. 233-257). Newbury Park:Sage.

Walker, L.E.A. (1992) Battered Women Syndrome and self-defense. Notre Dame Journal of Law, Ethics, and Public Policy, Vol 6, Issue #2, 1992:321-334.

Walker, L.E.A. (in press) Racism and violence against women. Chapter in J. Adleman & G. Enguidanos (Eds.) The significance of racism in the psychology of women: Building consciously anti-racist models of feminist therapy. New York: Haworth.

Walker, L.E.A. (1991) Post-traumatic stress disorder in women: Diagnosis and treatment of Battered Woman Syndrome. Psychotherapy, 28 (1), 21-29.

Walker, L.E.A. and Corriere, Sandra (1991) Domestic Violence: International perspectives on social change. In E. Viano (Ed.) Victim's rights and legal reforms:International perspectives. Proceedings of the Sixth International Institute on Victimology, (1990). Onati Proceedings, #9. (135-150). Onati, Spain : University of Onati Institute for Sociology & Law.

Walker, L.E.A. (1990) Psychological assessment of sexually abused children for legal evaluation and expert witness testimony. Professional Psychology : Research and Practice, 21 (5), 344-353.

Walker, L.E.A. (1990) Violence in the family. F. Kaslow (Ed.) Voices in family psychology. (pp. 139-158) Beverly Hills: Sage Publications.

Brown, L.S. & Walker, L.E.A. (1990) Feminist therapy perspectives on self disclosure. In G. Striker & M. Fisher (Eds.) Self disclosure in the therapeutic relationship. (pp. 135-154) New York: Plenum.

11

Walker, L.E.A. (1989) Terrifying Love: Why battered women kill and how society responds. New York: Harper/Collins.

Walker, L.E.A. (1989) When the battered woman becomes the defendant. In . E. Viano (Ed.). Crime and its victims: International research and public policy. Proceeding of the Fourth International Institute on Victimology, NATO Advanced Research Workshop, Il Ciocco, Tuscany, Italy. (pp. 57-70). New York: Hemisphere Publishing.

Walker, L.E.A. (1989) Psychology and violence against women. American Psychologist, 44, 695-702.

Walker, L.E.A. & Dutton-Douglas, M.A. (1988). Future directions: Development, application and training of feminist therapists. In M.A. Dutton & L.E.A. Walker (Eds.), Feminist psychotherapies: Integration of therapeutic and feminist systems. (pp. 276-300). Norwood, N.J.:Ablex.

Douglas, M.A. and Walker, Lenore E. (Eds.) (1988) Feminist psychotherapies: therapy and feminist systems. New York, Ablex Publishing Co.

Walker, L.E.A. (1988) The impact of forensic issues on women's rights. In Prentky R.A. & V.L. Quinsey (Eds.) Human sexual aggression: Current Perspectives. (pp. 361-372) New York: NY Academy of Sciences.

Walker, Lenore E.A. (Ed.) (1988) Handbook on sexual abuse of children: identification, treatment and legal issues. New York: Springer Publishing.

Walker, L.E.A. and Bolkovatz, M.A. (1988) Play therapy with sexually abused children. In L.E.A. Walker (Ed.). Handbook on sexual abuse of children. (pp. 249-269) New York: Springer.

Walker, L.E.A. (1988) New techniques for assessment and evaluation of child sexual abuse victims: using anatomically "correct" dolls and videotape procedures. Handbook on sexual abuse of children. (pp. 175-197) New York: Springer.

Walker, Lenore E.A. (1987) Assessment and intervention with battered women. In Keller, P.A. and Heyman, S.R. (Eds.) Innovations in clinical practice: a source book. Vol. 6 (pp. 131-142) Sarasota, FL: Professional Resource Exchange, Inc.

Walker, L.E.A. (1987) Inadequacies of the masochistic personality disorder diagnosis for women. Journal of Personality Disorders, 1 (2):183-189.

Walker, L.E.A. (1987) Interventions with victim/survivors of interpersonal violence. In I. Weiner & A. Hess (Eds.) Handbook of Forensic Psychology. (pp. 630-649) New York: Wiley.

12

Walker, L.E.A. and Edwall, G.E. (1987) Domestic violence and determination of visitation and custody. In D.J. Sonkin (Ed.) <u>Domestic violence on trial: psychological and legal dimensions of family violence.</u> (pp. 127-152) New York: Springer.

Thyfault, Roberta K., Browne, Angela and Walker, L.E.A. (1987) When battered women kill: evaluation and expert witness testimony techniques. In D.J. Sonkin (Ed.) <u>Domestic violence on trial: psychological and legal dimensions of family violence.</u> (pp. 71-85) New York: Springer.

Walker, L.E.A. (1986) A response to Elizabeth Schneider's describing and changing: Women's self-defense work and the problem of expert testimony on battering. <u>Women's Rights Law Reporter. 9</u>(3-4):223-225.

Sonkin, D.J. Martin, D. and Walker, Lenore E. (1985) <u>The male batterer.</u> New York: Springer.

Walker, Lenore E. (1985) Psychological Causes of Family Violence, Chapter in Lystad, M. (Ed.) <u>The violent home.</u> New York: Bruner/Mazel.

Walker, L.E. and Browne, A. (1985) Gender and victimization by intimates. <u>Journal of Personality, 53:</u>179-195.

Rosewater, L.B. and Walker, Lenore E. (Eds.). (1985) <u>Handbook of feminist therapy: women's issues in psychotherapy.</u> New York: Springer.

Walker, Lenore E. (1985) Feminist forensic psychology. Chapter in L.B. Rosewater & L.E.A. Walker (Eds.) <u>Handbook of feminist therapy: women's issues in psychotherapy.</u> New York: Springer.

Walker, Lenore E.A. (1985) Feminist therapy with victims/survivors of interpersonal violence. Chapter in L.B. Rosewater & L.E. A. Walker (Eds.) <u>Handbook of feminist therapy: women's issues in psychotherapy.</u> New York: Springer.

Walker, L.E. (1984) <u>The battered woman syndrome.</u> New York: Springer.

Walker, L.E. (Ed.)(1984) <u>Women and mental health policy.</u> Beverly Hills: Sage.

Walker, L.E. (1984) Battered women, psychology and public policy. <u>American Psychologist, 39</u> (10):1178-1182.

Walker, Lenore E. (1984) Victimology and psychological perspectives on battered women. <u>Victimology: an International Journal.</u> 8(1-2:82-1).

13

Walker, Lenore E. (1983, June)  Sexual assault of children: <u>Trial Talk.</u>

Walker, Lenore E.  (1983)  The Battered Woman Syndrome:  Results and discussion. Chapter in D. Finkelhor, R. Gelles, G. Hotaling & Mr. Straus (Eds.),  <u>The Dark Side of Families.</u> Beverly Hills: Sage Publications.

Walker, Lenore E. (1982) Thyfault, R.K. and Browne, A.  Beyond the juror's ken.  <u>Vermont Law Review,</u> Fall 1982.

Walker, L.E. (1981) Battered women,sex roles, and clinical issues.  <u>Professional Psychology,</u> <u>12</u> (1):81-91.

Walker, Lenore E.  The Battered Women Syndrome Study.  Final Report to N.I.M.H. Grant #R01MH30147, July 1982.

Walker, L.E. (1981)  A feminist perspective on domestic violence.  Chapter in R. Stuart (Ed.) <u>Violent Behavior:  Social Learning Approaches to Prediction, Management, and Treatment.</u> (pp. 102-113) New York:Bruner/Mazel..

Walker, L.E. (1980)  Battered women.  In A. Brodsky & R. Hare-Mustin (Eds.) <u>Women and</u> <u>psychotherapy: An assessment of research and practice.</u>  (pp.339-363).  New York: Guilford.

Walker, L.E. (1979) <u>The Battered Woman.</u>  New York:  Harper & Row.

Walker, L.E.  (1978)  Battered women and learned helplessness.  <u>Victimology: an</u> <u>International Journal, 2</u> (3-4):525-534.

Walker, Lenore  E.  (1978, February)  Research and treatment alternatives for battered women and their families.  Testimony submitted to Congressional Committee on Science and Technology, <u>DISPAC Subcommittee Hearings on Domestic Violence.</u> Washington DC.

Walker, Lenore E. (1978, January)  Treatment alternatives for battered women: a response to Murray Straus.  <u>U.S. Commission on Civil Rights Consultation on Battered Women.</u> Washington DC.

## <u>KEYNOTE SPEECHES AND PAPERS PRESENTED</u>

Walker, L.E.A. (1997). Advanced Issues in Domestic Violence.  Workshop for Florida Psychological Association, Ft. Lauderdale, FL. Dec. 1997.

Walker, L.E.A. (1997). Expert Witness Testimony in Criminal Cases.  Workshop for Florida Psychological Association, Ft. Lauderdale, FL. Dec. 1997.

Walker, L.E.A. (1997).  Domestic Violence and Survivor Therapy.  Workshop for Broward County Mental Health Association. Ft. Lauderdale, FL, November.

Walker, L.E.A. (1997).  Assessment and Treatment of Abused Women.  Workshop and Invited  lecture at International Association of Applied Psychology Regional Conference.  Mexico City, July.

Walker, L.E.A. (1997).  Battered Women as Survivors.  Workshop for Psychological Association of Alberta. Calgary, CN. May.

Walker, L.E.A. (1997).  Domestic Violence: Perpetrators and Victims. Workshops for Advocates and Professionals.  Santa Rosa, CA., May.

Walker, L.E.A. (1997).  Psychology and Violence and the Family.  Workshop for Maine Psychological Association. April.

Walker, L.E.A. (1997).  Survivor Therapy Techniques with Abused Women.  Workshop for APA Midwinter Psychology Conference.  St. Petersburg, FL., March.

Walker, L.E.A. (1997). Domestic Violence Issues for Advocates, Judges, and Psychotherapists.  Workshops for Orange Country Psychological Association, Battered Woman Shelter, and Judge's meeting. January.


Walker, L.E.A. (1996). Survivor Therapy.  Workshop at Milton Erikson Foundation Short Term Therapy Conference, San Francisco, CA. December 1996.

Walker, L.E.A. (1995). Women as Survivors: Feminist Therapy Techniques. State of the Art Workshop at Milton Erikson Foundation Evolution of Psychotherapy Conference. Las Vegas, NV. December, 1995.

Walker, L.E.A. (1995). The Patient/Therapist Relationship. Panel with Miriam Polster, Arnold Lazarus, & James Bugental. Milton Erikson Foundation, Evolution of Psychotherapy Conference. Las Vegas, NV. December, 1995.

Walker, L.E.A. (1995). PTSD and Abuse. Panel with Donald Meichenbaum, Cloe Madanes, & Francine Shapiro. Milton Erikson Foundation Evolution of Psychotherapy Conference. Las Vegas, NV. December, 1995.

Walker, L.E.A. (1995). The Media and the O.J. Simpson Trial. Broward County Public Defender's Office, Ft. Lauderdale, FL., November 17, 1995.

15

Walker, L.E.A. (1995). Workshop on Psychology of Domestic Violence . Old Dominion University, Norfolk, VA., November 19, 1995.

Walker, L.E.A. (1995). Psychological Impact of Domestic Violence and Rape. Invited presentation at Judicial Training Institute, Neve Ilan, Jerusalem, Israel, October, 1995.

Walker, L.E.A. (1995). Understanding Domestic Violence, Random Assaults, and Homicides: Clinical, Forensic and Legal Strategies for Trial. Keynote Speaker. Alternatives to Sexual Abuse, Portland, OR., October 20, 1995.

Walker, L.E.A. (1995). Dynamics of Domestic Violence and Efficacy of Psychological Treatment. Training workshop at the American Judges Association Annual Meeting, New Orleans, LA, October, 10, 1995.

Walker, L.E.A. (1995). Domestic Violence. Keynote Speaker. Lawyers Against Domestic Violence, Alburquerque, NM, September 8, 1995.

Walker, L.E.A. (1995). Battered Woman Syndrome: Forensic Adaptations in the Future. In Feminist Forensic Psychology: An Emerging Field of Feminist Practice, L. Brown, Chair. Symposium at American Psychological Association 103rd Annual Meeting, New York, August, 1995.

Walker, L. E. A. (1995). Psychology and the O.J. Simpson Trial.  F. Farley, Chair. Symposium at American Psychological Association 103rd Annual Meeting, New York, August, 1995.

Walker, L.E.A. (1995). Presidential Task Force on Violence and the Family: Issues and Dilemmas. Chair. Symposium at American Psychological Association 103rd Annual Meeting, New York, August, 1995.

Walker, L.E.A. (1995). Domestic Violence Litigation, American Trial Lawyers Association Annual Meeting, New York, July, 1995.

Walker, L.E.A. (1995). Gender Issues in the Victimization of Women. XXV Congreso Interamericano de Psicologia, San Juan, Puerto Rico, July, 1995..

Walker, L.E.A. (1995).  The Psychology of Women and its Applications to Women's Lives and the Discipline of Psychology. Symposium with F. Denmark, M. Gindes, I. Deitch, S. Cannetto, and C. Antonopoulou,  European Federation of Professional Psychology Meeting, Athens, Greece, July, 1995.

Walker, L.E.A. (1995).  Intimate Violence: International Trends, Current Solutions. Panel with Emilio Viano and Margherita Repetto Alaia.  Instituto Italiano di Cultura- Law, Justice &

16

Society Series, Washington, DC,  June 23, 1995.

Walker, L.E.A. (1995). Domestic Violence Workshops: Assessment of Domestic Violence, Survivor Therapy Intervention Strategies, Offender-Specific Intervention with Perpetrators, Psychologists and the Legal System.  Florida Psychological Association Annual Meeting, Key West, FL., June 1995.

Walker, L.E.A. (1995). Abused Women and Survivor Therapy: Violence and the Family Plenary Workshop. Florida Association of Marriage and Family Therapists Annual Meeting, May 19, 1995.

Walker, L.E.A. (1995).  Battered Women Syndrome:Identifying and Treating Survivors. Keynote Lecture, Arkansas Medical Society, Hot Springs, AK, May 5, 1995.

Walker, L.E.A. (1995).  Survivor Therapy Workshop at Ohio Psychological Association, Columbus, OH., April,  1995.

Walker, L.E.A. (1995).  Psychology of Domestic Violence.  Two Day Workshop, Tokyo Institute of Psychiatry, Tokyo, Japan, April 1995.

Walker, L.E.A. (1995). Survivor Therapy and the Abused Woman.  University of Denver, Graduate School of Professional Psychology, Continuing Education Program, March, 1995.

Walker, L.E A. (1995)  MidWinter Psychotherapy Meetings.  New Orleans, March 1995.

Walker, L.E.A. (1995).  Battered Woman Syndrome.  University of Kentucky School of Medicine, Grand Rounds, February, 1995.

Walker, L.E.A. (1995).  Feminist Forensic Psychology, Psychology of Women Midwinter Meeting, Boston, MA. February, 1995.

Walker, L.E.A. (1994).  Domestic Violence Courts in the United States.  Invited presentation at Judicial Training Institute, Jerusalem, Israel. October, 1994.

Walker, L.E.A. (1994). Psychotherapy with Women and Battered Woman Syndrome. Invited presentation at International Conference on Domestic Violence, Amsterdam, The Netherlands., October, 1994.

Walker, L.E.A. (1994). Analyzing the Bobbitt Case. Presentation to the Federal Public Defenders Association.  Atlanta, GA., October 5, 1994.

Walker, L.E.A. (1994). Keeping Kids Off  Death Row.  Presentation to Florida Public Defenders  Life Over Death conference.  Ft. Lauderdale, FL., September, 1994.

17

Walker, L.E.A. (1994). Love and Violence: A Community Response. Workshop presented to Telluride Tomboy House, Telluride, CO., September 7, 1994.

Walker, L.E.A. (1994, August). Miniconvention on Domestic Violence. Chair, American Psychological Association annual meeting, Los Angeles, CA., August 13, 1994.

Walker, L.E.A. (1994). Use of psychological research as an expert witness in cases involving violence against women. Invited Presentation for Science Weekend. American Psychological Association 102nd annual meeting, Los Angeles, CA., August 12, 1994.

Walker, L.E.A. (1994). Feminist Psychology. Presentation at American Psychological Association 102nd annual meeting, August 14, 1994.

Walker, L.E.A. and Huntley, Robert. (1994). Battered Woman Syndrome in Civil Cases. Presentation to American Trial Lawyers Association, Domestic Violence Litigation Section, July, 1994.

Walker, L.E.A. (1994). Battered Woman Syndrome and the Lorena Bobbitt case. Presentation to the Virginia Bar Association., Virginia Beach, VA., June 1994.

Walker, L.E.A. (1993, March) Psychology & Law : Violence Against Women Guest speaker at symposium to Pepperdine Law School, Malibu, CA.

Walker, L.E.A. (1993, March) Sex Roles, Lies & Judaism: Morality and Jewish Men panel participant , Jewish Community Center, Denver, CO.

Walker, L.E.A. (1993, March) Abuse & Addictions : Women as Perpetrators. Mile Hi Council on Drugs & Alcohol, Denver, CO.

Walker, L.E.A. (1993, January) Training workshop for the Department of Social Services of Boulder County. Boulder, CO.

Walker, L.E.A. (1993, January) Training session for Jewish Family Services. JTFFV (Jewish Task Force on Family Violence) of the Allied Jewish Federation of Denver, Denver, CO.

Walker, L.E.A. (1992, November) Understanding and Curtailing Domestic Violence, Guest speaker; Psychology of Domestic Violence & the Medical Needs of Victims, workshop; and Law Enforcement & Legal Issues, discussion to St. Clair Community College. Port Huron, MI.

Walker, L.E.A. (1992, November) Keynote speaker for Women's Crisis Center. Norwalk, CT.

Walker, L.E.A. (1992, November) <u>Spousal Abuse</u> Guest speaker to members of Adult Institute of Jewish Studies. Denver, CO.

Walker, L.E.A. (1992, October) <u>Jewish Community Response to Family Violence: A Model. Judaism, Feminist & Psychology Conference. Seattle, WA.</u>

Walker, L.E.A. (1992, October) Guest speaker & panel discussion for Austin, TX Chapter of *B'Nai B'rith* Women, Austin, TX.

Walker, L.E.A. (1992, October) <u>Dynamics of Battering Relationships: Legal & Psychological Responses,</u> plus panel discussion and mock trial for The American Judges Assn. Miami, FL.

Walker, L.E.A. (1992, October) Keynote and guest speaker for P.E.A.C.E. Initiative & other groups. San Antonio, TX.

Walker, L.E.A. (1992, October) <u>Domestic Violence & Traumatic Stress Disorders: Clinical and Forensic Issues</u> Workshop presented to Tennessee Psychological Assn., Nashville, TN.

Walker, L.E.A. (1992, October) <u>Assessment & Intervention of Battered Woman Syndrome</u> Workshop presented to Northern Carolina Psychology Assn., Raleigh, NC.

Walker, L.E.A. (1992, September) <u>Why Battered Women Kill</u> Guest speaker at the Third Annual McGuire Memorial Conference on Family Violence, given by the Family Violence Task Force. Billings, MT.

Walker, L.E.A. (1992, June) (1) <u>Battered Women Who Kill in Self-Defense</u>; (2) <u>Feminist Therapy with Women Survivors of Physical & Sexual Violence</u>; (3) <u>Forensic Psychology, PTSD, & Abused Women</u>. PTSD Conference. International Society for Traumatic Stress Studies, Amsterdam.

Walker, L.E.A. (1992, May) <u>Terrifying Love and Domestic Violence in the Deaf Community</u> Keynote speaker by Perspectives, Inc. Bloomington, MN.

Walker, L.E.A. (1992, March) <u>Violence Against Women: Overview, Research & Treatment</u> Keynote speaker and full day sessions. Federation for Community Planning 50th Anniversary Health & Human Services. Cleveland, OH.

Walker, L.E.A. (1992, March) <u>Psychology, Battered Women and the Law.</u> School of Law at the University of Texas at Austin & Texas Journal of Women & the Law, Austin TX.

Walker, L.E.A. (1992, March) Featured speaker at dinner with Lindsey Wagner, etc. Bethlehem Project, Inc. Redlands, CA.

Walker, L.E.A. (1992, February) <u>Feminist Psychology & Violence Against Women. Invited</u> speech, Association for Women in Psychology, Long Beach, CA.

Walker, L.E.A. (1991, November) Keynote address and panel: <u>Health Care Protocol Project, Domestic Violence: A Multidisciplinary Approach</u>, Continuing Education Program, Southeastern CO Area Health Education Center, Inc., Canon City, CO.

Walker, L.E.A. (1991, November) <u>Domestic Violence in the Courtroom</u>. "A Symposium on the Battered Women Syndrome", Keynote speaker, given by Broward County Public Defenders Office, Ft. Lauderdale, FL.

Walker, L.E.A. (1991, November) <u>Violence in Intimate Relationships</u>. 20th Annual Lewis H. Loeser Memorial Lecture, Montclair, N.J.

Walker, L.E.A. (1991, November)AAUW) Educational Equity Roundtable, Denver, CO.

Walker, L.E.A. (1991, October) <u>Abuse in the Jewish Home? Never!</u> Speech presented to "A Time for Understanding: The Jewish Community Response to Family Abuse Conference" Jewish Community Center, Denver, CO.

Walker, L.E.A. (1991, October) Workshop on <u>Working with Battered Women</u>, training session. Also public address on <u>Battered Women in our Community</u>, and participation in mock trial--<u>You as the expert witness</u>, with Stop Violence, Prairie Village, KS.

Walker, L.E.A. (1991, October) Workshop on <u>PTSD & Battered Women: Clinical & Forensic Issues</u>. Georgia Psychological Assn., Atlanta, GA.

Walker, L.E.A. (1991, October) <u>Going to Court: Preparing Professional to Testify for Battered Women</u>. Keynote address and workshop. Alternative for Battered Women, Inc. Rochester, NY.

Walker, L.E.A. (1991, September) Seminar leader & Guest speaker for Hubbard House on Domestic Violence Issues. Jacksonville, FL.

Walker, L.E.A. (1991, September) Ninth National Conference on Child Abuse & Neglect. Denver, CO.

Walker, L.E.A. (1991, July 28) Keynote speaker on Domestic Violence. 13th National Lesbian & Gay Health Conference with NLGHF & George Washington University Medical Center. New Orleans, LA.

20

Walker, L.E.A. (1991, July) <u>Battered Woman Syndrome: Cross Cultural Issues</u>. presented at Interamerican Society of Psychology Meetings. Also: <u>Topics on Maltreatment of Children and Women</u> Family Violence Project Workshop with Dra. Giocinda Batres. San Jose, Costa Rica.

Walker, L.E.A. (1991, June)Battered Woman Syndrome, Women who kill their batterers, & The legal use of the Syndrome for women who plead self-defense. Guest speaker at luncheon for the Harvard School of Public Health. Boston, MA.

Walker, L.E.A. (1991, May) <u>Psychology & Violence Against Women & Issues Raised By Mandated Child Abuse Training</u>. NY State Psychological Association, Montauk (Long Island), NY.

Walker, L.E.A. (1991, May) <u>Diversity & the Future of Psychology</u>. Invited speaker for the Colorado Psychological Association Annual Convention. Denver, CO.

Walker, L.E.A. (1991, April) <u>Sentencing Battered Women and Men Who Were Victims of Child Abuse</u> with Betsy Biben, Public Defense Service. Second National Conference on Sentencing Advocacy. Washington, DC.

Walker, L.E.A. (1991, April)  Guest speaker in symposium on <u>Women's Issues in Psychology</u>. Keynote address: <u>Psychology's Role in the Violence against Women.</u> presented at the University of Georgia *Psi Chi* Chapter, 15th Annual Convention for Behavioral Science, Athens, GA.

Walker, L.E.A.  (1991, April) guest speaker for Mile Hi Council on Alcoholism & Drug Abuse. Denver, CO.

Walker, L.E.A. (1991, March) <u>Love & Violence: Assessment & Treatment of Domestic Violence</u>. Family Advocacy Program, U.S. Army. El Paso, TX

Walker, L.E.A. (1991, February) <u>What Do Women Want Anyhow? Can Professional Schools Do Better Than Freud?</u> Guest speaker and paper presented for NCPPS, Tucson AZ.

Walker, L.E.A. (1991, January) <u>Love & Violence: Victims & Perpetrators: What can be done at home, in the streets and in the courts.</u> with Lucy Friedman, PhD, Detective Lydia Martinez and Judge R. Price.

Walker, L.E.A. (1991, January) <u>Abused Mothers, Infants and Substance Abuse: Psychological Consequence of Failure to Protect</u>. American Psychological Assn. Division on Clinical Psychology (12) and Georgetown University Child Development Mid-Winter Conference, Scottsdale, AZ, Jan. 19-20, 1991.

Walker, L.E.A. (1990, November) Battered Woman Syndrome, PTSD, Legal Defense and

Treatment Issues. Invited Speaker and Workshops at Medical Congress, San Jose, Costa Rica.

Walker, L.E.A. (1990, November) <u>Perspectives on Domestic Violence</u>. Panel with Michael Lindsey & Judge Fred Rodgers. Spousal abuse in custody disputes, Denver, CO.

Walker, L.E.A. (1990, November) <u>The Battered Woman Defense (Civil and Criminal) and the Bad Witness Pitfalls</u>. Keynote speaker for the National Domestic Violence Awareness Month Planning Commission of Dade County, FL.

Walker, L.E.A. (1990, November) <u>Domestic Violence and the Battered Woman</u>. Guest speaker for the Betterment Series Workshop with Dr. Leonard Haber, City of Miami Beach, FL.

Walker, L.E.A. (1990, October) <u>When Battered Women Fight Back</u>. Santa Barbara, CA.

Walker, L.E.A. (1990, October) <u>A Problem of Crisis Proportion: Overview of Family Violence</u>. Keynote address to St. John's Marian Center, Springfield, MO.

Walker, L.E.A. (1990, October) Women's Judges Conference. Memphis, TN.

Walker, L.E.A. (1990, September) <u>Victim Services: Looking Ahead to the 21st Century</u>. Keynote address to Office of Criminal Justice Planning, Sacramento, CA.

Walker, L.E.A. (1990, August) <u>Love and Violence: Training Workshop for Family Advocacy and Mental Health Staff</u>, U.S. Army, Honolulu, HI.

Walker, L.E.A. (1990, August) <u>Who is the Client: Domestic Violence is a Crime.</u> Keynote address to Colorado Domestic Violence Coalition Conference. Denver, CO.

Walker, L.E.A. (1990, August) <u>The Perils of Pauline: Women in Psychology Leadership Position.</u> American Psychological Association Convention, Boston.

Walker, L.E.A. (1990, August) <u>Insuring Practice for Women: How to be Effective with State Legislators, Getting your Message Across.</u> APA Convention, Boston.

Walker, L.E.A. (1990, August) <u>Feminist Contributions to Professional Psychology.</u> Invited Presidential Address, Division 35, APA Convention, Boston.

Walker, L.E.A. (1990, August) <u>Feminist Issues in Child Custody Disputes.</u> Workshop with Phyllis Chesler and Geraldine Stahley, APA Convention, Boston.

Walker, L.E.A. (1990, July) <u>Women Who Kill.</u> Address to medical staff, Bethesda PsychHealth Hospital, Denver, CO.

Walker, L.E.A. (1990, June) <u>Keynote address:</u> Haven House, Shelter for Battered Women, Annual Awards Luncheon, Pasadena, CA.

Walker, L.E.A. (1990, May) <u>Battered Women and Psychology.</u> Invited Address to European Educational Organization, Athens, Greece.

Walker, L.E.A. (1990, May) <u>Domestic Violence.</u> Invited Lecture to Women's Political Party, Athens, Greece.

Walker, L.E.A. (1990, May) <u>International Perspectives on Domestic Violence.</u> Workshop presented at Victimology Institute, University of Onati Institute on Sociology and the Law. Onati, Spain.

Walker, L.E.A. (1990, May) <u>Domestic Violence Issues for the 90's: The Power to Survive, the Courage to Prevail.</u> Keynote address and training seminar with judges. Sexual Battery Committee, Gainesville Commission on the Status of Women, Gainesville, Florida.

Walker, L.E.A. (1990, May) <u>Alcohol and Today's Woman: Keynote Address.</u> Mile High Council on Alcohol and Drug Abuse Conference, Denver, CO.

Walker, L.E.A. (1990, May) <u>Domestic Violence: Bad for Business.</u> Luncheon Speaker Rotary Club of Denver.

Walker, L.E.A. (1990, May) <u>Love and Terror:  Violence Against Women and Children.</u> Workshop Michigan Women Psychologists, Rochester, Michigan.

Walker, L.E.A. (1990, May) <u>Stopping Family Violence: Treatment Approaches that Work.</u> Workshop with Daniel Sonkin. Montana Chapter of National Association of Social Workers and University of Montana Department of Social Work, Missoula, Montana.

Walker, L.E.A. (1990, April) <u>Feminist Psychology.</u> Invited Speaker, Western Psychological Association, Los Angeles, CA.

Walker, L.E.A. (1990, April) <u>The Media's Impact on Domestic Violence.</u> Keynote address Women's Crisis Center of Douglas County, Highlands Ranch, CO.

Walker, L.E.A. (1990, March) <u>The Challenge for the 90's: Breaking Through Economic Barriers for the Homeless.</u> Panel of HUD, Denver, CO.

Walker, L.E.A. (1990, March) <u>Post Traumatic Stress Disorder and Battered Women: Clinical and Forensic Issues.</u> Maryland Psychological Association and Women's Bar Association of Maryland, Columbia, MD.

Walker, L.E.A. (1990, February) <u>Battered Women: Local Response.</u> California Polytechnic State University, San Luis Obispo, California.

Walker, L.E.A. (1989, November) <u>Helping Without Harming: Clinical and Ethical Standards.</u> Workshop with Kenneth Pope, Massachusetts Psychological Association, Boston.

Walker, L.E.A. (1989, November) <u>Child Sexual Abuse.</u> Training Workshop, New Mexico Psychological Association, Albuquerque, NM.

Walker, L.E.A. (1989, November) <u>Domestic Violence and Post Traumatic Stress Disorder: Assessment, Intervention and Legal Issues.</u> Workshop, Illinois Psychological Association, Chicago, IL.

Walker, L.E.A. (1989, October) <u>The Second Decade: Moving to the Head of the River.</u> Keynote Address. Texas Council on Family Violence, Austin, TX.

Walker, L.E.A. (1989, October) <u>Domestic Violence and Legal Issues.</u> University of Houston, School of Law. Houston, TX.

Walker, L.E.A. (1989, October) <u>Is Family Treatment an Appropriate Modality for Addressing Family Violence: Point-Counterpoint.</u> American Medical Association Family Violence Prevention Conference, Chicago, IL.

Walker, L.E.A. (1989, September) <u>What Does a Woman Want? Can Professional Schools Do Better Than Freud?</u> Guest Speaker at Founder's Day Banquet, Oregon School of Professional Psychology, Pacific University, Portland, OR.

Walker, L.E.A. (1989, September) <u>Terrifying Love and the Psychology of Battering Relationships.</u> Keynote Speaker with Daniel O'Leary. University of Texas, Southwestern Medical Center, Dallas, Texas.

Walker, L.E.A. (1989, September) <u>Battered Women Who Love Too Much?</u> Keynote Speaker, Pennsylvania Coalition Against Domestic Violence, Pittsburgh, PA.

Walker, L.E.A. (1989, August) <u>Liability Risks in Working with Victims of Child Abuse.</u> APA Convention, New Orleans.

Walker, L.E.A. (1989, August) <u>Ethical Issues in Working with Battered Women who Kill.</u> APA Convention, New Orleans.

Walker, L.E.A. (1989, August) <u>Battering and Abuse Clients: Mental Health Issues.</u> Airlie Death Penalty Conference, Virginia.

Walker, L.E.A. (1989, July) <u>Prosecuting Domestic Violence Crimes.</u> Workshop with Karen Steinhauser. State Bar Association of Arizona Continuing Education Workshop, Phoenix, AZ.

Walker, L.E.A. (1989, June) <u>Self Defense and Battered Woman Syndrome</u> and <u>Psychological Evaluations in Child Sexual Abuse.</u> 17th Annual Public Defenders' Training Seminar, Lexington, KY.

Walker, L.E.A. (1989, March) <u>Diagnosis and Treatment Issues in Post Traumatic Stress Disorders.</u> Workshop Colorado Psychological Association, Colorado Springs, CO.

Walker, L.E.A. (1989, February) <u>Women at Risk: Innovations in Employment.</u> Homeless Children, Youth and Families Committee, Federal Programs in Denver, CO.

Walker, L.E.A. (1988, December) <u>Diagnosis and Violence Against Women.</u> Invited Keynote Address to International Conference on Women's Mental Health. Amsterdam, The Netherlands.

Walker, L.E.A. (1988, November 21) <u>Love and Violence.</u> Workshop presented in Honolulu, HI.

Walker, L.E.A. (1988, November 22) <u>DSM III: Science or Politics.</u> Workshop presented for Hawaii Psychological Association, Honolulu, HI.

Walker, Lenore E.A. and Williams, Tom. (1988, November 12) <u>Post Traumatic Stress Disorder: Diagnosis, Treatment and Forensic Applications.</u> University of Denver School of Professional Psychology, Denver, CO.

Walker, Lenore E.A. (1988, October 8) <u>Teenagers as Victims and Perpetrators of Intrafamilial Violence.</u> Presentation at Ameri-can Medical Association National Conference on Adolescent Mental Health, Chicago, IL.

Walker, Lenore E.A. (1988, September 30) <u>Women Therapists as Healers: Doing What Comes Naturally.</u> Keynote address at Conference on Women and Psychology. Washington State Psychological Associa-tion, Tacoma, WA.

Walker, Lenore E.A. (1988, September 30) <u>Assessment, Intervention and Forensic Issues in Working with Women Victim/Survivors of Violence.</u> Expert Witness testimony. Workshop at Conference on Women and Psychology. Washington State Psychological Association, Tacoma, WA.

Walker, Lenore E.A. (1988, September 13) Dialogue with Ted Millon and Lenore E.A. Walker on DSM-III-R Personality Disorders. University of Miami, FL.

Walker, Lenore E.A. (1988, September 7-9) Professional Workshop on Domestic Violence. Three-day workshop to Family Service Center. U.S. Marine Corps, Camp LeJeune, N.C.

Walker, Lenore E.A. (1988, August) Battered Women Who Kill in Self Defense: National Policy Implications. Presented in L.B. Rosewater (Chair) Battered Women Who Kill: National Political Implications. American Psychological Association Annual Convention. Atlanta, GA.

Walker, Lenore E.A. (1988, July) PTSD and the DSM-III-R, Science or Politics. Presentation at Victimology Congress, Il Ciocco, Italy.

Walker, Lenore E.A. (1988, July 13-15) Love and Violence: State of the Art: Prevention and Treatment of Domestic Violence. Three-day workshop Family Services Center, U.S. Marine Corps, Recruit Depot. San Diego, CA.

Walker, Lenore E.A. (1988, June 21) Violence in Families: A Clinical Approach. Keynote speech and workshop leader. Department for Mental Health and Mental Retardation Services, Frankfurt, KY.

Walker, Lenore E.A. (1988, May 21) What We Need to Do to Stop Violence in the Home. Keynote Address, Conference on Violence in the Family, Family Service of Philadelphia.

Walker, Lenore E.A. (1988, May 1-3) An Overview of Violence Against Women. Keynote Address presented at Conference on Battered Women and Justice, St. Louis, MO.

Walker, Lenore E.A. (1988, April 18) Love and Violence. Keynote Address and Workshop on Clinical Intervention. Presented at Washington Association of Child Abuse Councils, Seattle, WA.

Walker, Lenore E. A. (1988, April 29-30) Forensic Psychology with Cases of Interpersonal Violence. Workshop presented to Ohio Psychological Association, Columbus, OH.

Walker, Lenore E.A. (1988, February 27) Psicologia de la Mujer (Psychology of Women). Workshop presented to Puerto Rico Institute of Psychology. San Juan, Puerto Rico.

Walker, Lenore E.A. (1987, October 29-30) Battered Women and Children. Workshop presented at Ohio Psychological Association. Dayton, OH.

Walker, Lenore E.A. (1987, November 5) The Mental Health of Victims. Keynote Address presented at Missouri Institute of Psychology, University of Missouri. St. Louis, MO.

Walker, Lenore E.A. (1987, September 9) Stop the Violence. A Keynote Address to South Carolina Conference on Domestic Violence. Columbia, S.C.

Walker, Lenore E.A. (1987, October) Keynote Address. Conference of Battered Women. Norfolk, VA.

Walker, Lenore E.A. (1987, August) Politics, Science and the Practice of Psychology. Psi Chi Distinguished Lecturer. American Psychological Association Annual meeting. New York, NY.

Walker, Lenore E.A. (1987, August) Women Treating Women: A Feminist Therapist Views the Case. D. Cantor (Chair) Women Treating Women Symposium. American Psychological Association Annual Meeting. New York, NY.

Walker, Lenore E. A. (1987, July) The Diagnosis of Women's Mental Health: Science or Politics. Presentation at Third International Interdisciplinary Congress on Women. Dublin, Ireland.

Walker, Lenore E.A. (1987, July) Feminist Psychologists and Public Policy. Panel Presentation at Third International Interdisciplinary Congress on Women. Dublin, Ireland.

Walker, Lenore E.A. (1987, January) The Impact of Forensic Issues on Women's Rights. Presentation to Conference on Human Sexual Aggression. New York Academy of Sciences. New York, NY.

Walker, Lenore E.A. (1986, November) Family Violence and Sexual Assault. New Castle, WY.

Walker, Lenore E.A. (1986, October) Feminist Scholarship. Panel at Clark Conference on Psychoanalytic Training for Psychologists. Worcester, MA.

Walker, Lenore E.A. (1985, April 26) Women's and Children's Perspective of Courts and Judges. Keynote Address to Superior Court Judges Association of Washington. Pasco, WA.

Walker, Lenore E.A. (1985, April 17-20) Child Custody in Battering Relationships. Presentation at Fourth Annual Advanced Feminist Therapy Institute. Miami, FL.

Walker, Lenore, E.A. (1985, March 29) The Phenomenon of Battering. Keynote Speech to Conference on Battering sponsored by Grassroots Battered Women's Shelters. Newton, MA.

Walker, Lenore E.A. (1985, March 18) Spouse Abuse: The Problem and the Abused Woman. Keynote Speech and All Day Workshop presented to the National Crime Prevention Institute on Preventing Family Violence: Child and Spouse Abuse, University of Louisville. Louisville, KY.

Walker, Lenore E.A. (1985, February 4) Family Violence Colloquium. Presented at University of Massachusetts Department of Psychology. Amherst, MA.

27

Walker, Lenore E.A.   (1984, December 6)   <u>Defending Battered Women Who Defend Themselves.</u>  Program presented at the National Legal Aid & Defender Association Conference. Denver, CO.

Walker, Lenore E. A. (1984, November 11-17)  <u>Roundtable Discussion on Recent Findings and Future Directions.</u>  At Third International Institute on Victimology.  Lisbon, Portugal.

Walker, Lenore E.A.  (1984, October 25-27)   <u>Intervention by Criminal Justice Agencies - Spouse Abuse.</u>  Invitational Paper prepared for the Family Violence as a Crime Problem meeting. National Institute of Justice.  Washington DC.

Walker, Lenore E.A.  (1984, October 18)  <u>Understanding Domestic Violence: Current Issues and Perspectives in Law, Police Enforcement and Mental Health.</u>  All day workshop sponsored by Alternatives to Sexual Abuse.  Vancouver, WA.

Walker, Lenore E.A.  (1984, October 16)  <u>The Battered Woman Syndrome.</u>  Keynote Speech at the YWCA Wife Abuse Service Workshop. Memphis, TN.

Walker, Lenore E.A.  (1985, September 21)  <u>Battered Women and Justice.</u>  Keynote Speech at Conference in Jefferson City, MO.

Walker, Lenore E.A.  (1985, September 20)  <u>Battered Women in Prison.</u>  Speech to Inmates at Renz Correctional Facility.  Jefferson City, MO.

Walker, Lenore E. A.  (1985, August 24-28)   <u>The Expert Witness for Women Victims.</u>  Continuing Education Workshop at the American Psychological Association Annual Convention. Toronto, Canada.

Walker, Lenore E.A. (Chair) (1985, August 24-28)  <u>Making Peace at Home: Models for Ending Family Violence. Eliminating Sexism to End Battering Relationships.</u>  Symposium at American Psychological Association Annual Convention.  Toronto, Canada.

Walker, Lenore E.A.   (1985, August 7)   <u>The Battered Woman Syndrome Study: Psychological Profiles.</u>  Second National Conference for Family Violence Researchers, University of New Hampshire.  Durham, NH.

Walker, Lenore E.A.  (1984, June 9)  <u>Making Waves: Stopping Men's Violence.</u>  Keynote Speech to California Anti-Sexist Men's Political Caucus.  Sonoma, CA.

Walker, Lenore E.A.  (1984, June 8)  <u>Domestic Violence: Myth vs. Reality.</u>  Keynote Speech at Sonoma State University.  Santa Rosa, CA.

Walker, Lenore E.A. (1984, May 3) <u>Spouse Abuse During Pregnancy.</u> Presentation to Child Birth Educators Conference at Swedish Hospital. Denver, CO.

Walker, Lenore E.A. (1984, March 16) <u>Psychotherapy with Women.</u> Presentation at El Paso County Psychological Society Mid-Winter Meeting. Colorado Springs, CO.

Walker, Lenore E.A. (1984, March 4-6) <u>Keeping Ourselves Safe.</u> Lecture Series presented at The Palms at Palm Springs, CA.

Walker, Lenore E.A. (1984, March 2) <u>Roundtable Discussion of Subcommittee on Sexual Exploitation of Clients by Therapists.</u> Presented at Mid-Winter Convention of APA Division 29 and 42. San Diego, CA.

Walker, Lenore E. (1984, March 2) <u>Issues in Battered Women Self Defense Cases.</u> Presented at Mid-Winter convention of APA Division 29 and 42. San Diego, CA.

Walker, Lenore E. (1984, February 4) <u>Forensic Psychological Issues in Working With Women.</u> Continuing Education Workshop at University of Denver School of Professional Psychology.

Walker, Lenore E. A. (1984, January 28) <u>Women Who Kill Their Batterers in Self Defense: A Psychological Profile.</u> Keynote Speaker at CLE Seminar Representing Battered Women: Domestic Violence in Self Defense, Custody, and Tort Cases. Northwest Women's Law Center. Seattle, WA.

Walker, Lenore E.A. (1984, January 27) <u>Families in Turmoil.</u> Keynote Speaker. Sacred Heart Medical Center. Spokane, WA.

Walker, Lenore E.A. (1983, December) <u>Aetiology and Treatment of Victims of Domestic Violence.</u> All day continuing education workshop at Nova University. Ft. Lauderdale, FL.

Walker, Lenore E.A. (1983, October) <u>Defending Women Who Defend Themselves.</u> Keynote Speech to Montana Trial Lawyers Association-. Billings, WY.

Walker, Lenore E.A. (1983, October) <u>Children of Domestic Violence Families.</u> Workshop presented at Colorado Society of School Psychologist's Conference. Vail, CO.

Walker, Lenore E.A. (1983, September) <u>Sheltering Battered Women and Their Children.</u> Keynote Speech to Florida Refuge Network. Ft. Lauderdale, FL.

Walker, Lenore E.A. (1983, August) <u>Law and Public Policy: Women's Issues.</u> Symposium presented at the American Psychological Association. Anaheim, CA.

Walker, Lenore E. (1983, June)  <u>The Nurse's Role in Battered Women Cases.</u>  Presented at the National Association of College of Obstetricians and Gynecologist Nurses.  Washington DC.

Walker, Lenore E. (1983, May)  <u>Domestic Violence Workshop.</u>  Keynote and leader of two-day workshop for Alberta Battered Women Coalition in Edmonton, Canada.

Walker, Lenore E. (1983, April)  <u>Psychology and the Law: Battered Women.</u>  Keynote presentation to Minnesota Women Psychologist Association and Minnesota Bar Association in Minneapolis, MN.

Walker, Lenore E. (1983, March)  <u>Battered Women Self Defense Cases.</u>  Presented as an open lecture and discussion following PBS documentary TV show.  Pensacola, FL.

Walker, Lenore E. (1983, March)  <u>Psychology of Battered Women and Shelter.</u>  Training workshop with Battered Women Task Force.  Key West, FL.

Walker, Lenore E. (1983, March)  <u>Psychology of Battered Women and Their Abusers.</u>  Presented at Nova University.  Ft. Lauderdale, FL.

Walker, Lenore E. (1983, March)  <u>Psychology of the Battered Woman and Religion.</u>  Women in Ministry Conference, University of Denver, Iliff School of Theology.  Denver, CO.

Walker, Lenore E., Rosewater, Lynne B., Boyd, Vicki and Klingbeil, Karil. (1983, March)  <u>Battered Women Self Defense Cases.</u>  Presented at the Association for Women in Psychology, Seattle, WA.

Walker, Lenore E. (1983, January)  <u>The Psychology of the Battered Woman.</u>  Keynote Speeches to Nueces County Bar Association, Psychology Association, and Women's Shelter members.  Corpus Christi, TX.

Walker, Lenore E. (1983, January)  <u>Psychological Perspectives of Battered Women.</u>  Keynote Speeches to Nueces County Bar Association, Psychology Association, and Women's Shelter members.  Corpus Christi, TX.

Walker, Lenore E. (1982, November)  <u>Training Mental Health and Shelter Workers in Psychology of the Battered Woman.</u>  Taos, NM.

Walker, Lenore E. (1982, October)  <u>Domestic Violence: The Battered Women.</u>  Keynote Speech and Consultation to Jane Addams School of Social Work Institute for Research and Policy Studies.  University of Chicago, Chicago, IL.

Walker, Lenore E. (1982, October)  <u>Women Victims and Perpetrators of Crimes.</u>  Invited

testimony to the President's Task Force on Victims of Crime.  Denver, CO.

Walker, Lenore E.  (1982, April)  <u>Feminist Forensic Psychology.</u>  Paper presented at Advanced Feminist Therapy Institute. Vail, CO.

Walker, Lenore E.  (1982, January)  <u>Sexism in the Courts.</u>  Invited faculty at California Mid-Career Judges College.  Berkeley, CA.

Walker, Lenore E.  (1982, January)  <u>Victimology and the Battered Woman.</u>  Visiting faculty. Invited Presentation at the International Conference on Victimology, Institute for the Higher Studies of Criminal Sciences.  Sicily, Italy.

Walker, Lenore E.  (1981, December)  <u>Battered Women: An International Perspective.</u> Invited Presentation at International Inter-disciplinary Congress on Women.  Haifa, Israel.

Walker, Lenore E.  (1981, August)  <u>Mid-Life Crisis for Women.</u> Invited Symposium presented at Annual Meeting of the American Psychological Association.  Los Angeles, CA.

Walker, Lenore E.  (1981, August)  <u>Battered Women Who Kill:  Standards and Techniques.</u> Symposium presented at Annual Meeting of American Psychological Association.  Los Angeles, CA.

Walker, Lenore E.  (1981, July)  <u>Methodological Issues in Studying Battered Women.</u> Presented at National Conference of Family Violence Researchers.  University of New Hampshire.

Walker, Lenore E.  (1981, May)  <u>Self-Defense for Women in the Criminal Justice System.</u> Discussion Leader.  Hutchens Center for the Study of Democratic Institutions.  Santa Barbara, CA.

Walker, Lenore E.  (1981, May)  <u>Violence in the Family: Spouse Abuse in Focus.</u>  Keynote Address at the University of California.  Santa Barbara, CA.

Walker, Lenore E.  (1980, November)  <u>Love and Violence II.</u>  Men Who Batter Conference sponsored by District Attorney's Office.  San Francisco, CA.

Walker, Lenore E.  (1980, October)  <u>Psychology of Domestic Violence: Theory, Opinions, Research.</u>  Invited Keynote Address at the Psychological Association of Alberta.  Jasper, Canada.

Walker, Lenore E.  (1980, May)  <u>Family Violence and Self-Defense.</u>  Keynote Speech at Eastern Wyoming College.  Torrington, WY.

Walker, Lenore E.  (1980, May)  <u>Family Violence:  A Private Matter...A Community Concern.</u>  Keynote Address at the University of Oklahoma Law Center.  Norman, OK.

Walker, Lenore E. (1980, April)  <u>Feminist Psychology.</u>  Invited Address.  Annual meeting

31

of Rocky Mountain Psychological Association. Tucson, AZ.

Walker, Lenore E. (1980, April) <u>Psychosocial Characteristics of Battered Women.</u> Symposium presented at Rocky Mountain Psychological Association Annual Meeting. Tucson, AZ.

Walker, Lenore E. (1980, March) <u>Battered Women.</u> Keynote Address. First Annual Institute on Domestic Violence. Cleveland, OH.

Walker, Lenore E. (1980, March) <u>Feminist Success.</u> Invited Speech at the 7th Annual National Conference on Feminist Psychology. Association for Women in Psychology. Santa Monica, CA.

Walker, Lenore E. (1980, March) <u>Towards a Theory of Feminist Therapy.</u> Symposium presented at Division 29 Mid-Winter Meeting. San Diego, CA.

Walker, Lenore E. (1980, March) <u>How Therapists Cope with Stress.</u> Symposium presented at Mid-Winter Meeting Division 29, APA. San Diego, CA.

Walker, Lenore E. (1980, February) <u>Battered Women.</u> Keynote address at Violence Against Women Conference, La Junta, CO.

Walker, Lenore E. (1980, January) <u>The Problems of Family Violence and Self-Defense.</u> Keynote address at the National District Attorneys' Association Institute. Colorado Springs, CO.

Walker, Lenore E. (1980, January) <u>Feminists and Men in Relationships.</u> Workshop presented with Elizabeth Rave, Ph.D. at Women of the West Conference, University of Northern Colorado. Greeley, CO.

Walker, Lenore E. (1979, October) <u>Violence Against Women and Children.</u> Keynote address. Second Northwest Conference on Violence Against Women and Children. Seattle, WA.

Walker, Lenore E. (1979, September) <u>Emerging Conceptualization of Sex Role Issues in Clinical Supervision: Designing a Model Training Program in Feminist Psychology.</u> Symposium presented at the Annual Meeting, American Psychological Association.

Walker, Lenore E. (1979, September) <u>Children as Victims of Pornography and Prostitution.</u> Symposium presented for the Annual Meeting, American Psychological Association. NYC.

Walker, Lenore E. (1979, September) <u>Social Consequences of Feminism and the Battered Women Movement.</u> Symposium at the Annual Meeting of the American Psychological Association. New York, NY.

Walker, Lenore E. (1979, June) <u>Legal and Psychological Perspectives of Family Violence.</u>

32

Keynote address.  University of Texas at Arlington, Second Annual Forensic Social Work Conference. Arlington, TX.

Walker, Lenore E. (1979, May) <u>Breaking the Cycle of Domestic Violence.</u> Keynote address at the Conference on Family Violence, School of Social Work, West Virginia University. Morgantown, WV.

Walker, Lenore E. (1979, May) <u>Domestic Violence.</u> Keynote speech. National Association of Counsel for Children. Keystone, CO.

Walker, Lenore E. (1979, April) <u>Learned Helplessness and the Battering Cycle.</u> Keynote address. Action for Eastern Montana Family Violence Conference. Glendive, MT.

Walker, Lenore E. (1979, April) <u>The Psychology of the Battered Woman.</u> Invited address, Rocky Mountain Psychological Association Annual Meeting. Las Vegas, NV.

Walker, Lenore E. (1979, March) <u>Survival Skills for the Expert Witness.</u> Presented to the Colorado Psychological Association, Mid-Winter Conference. Colorado Springs, CO.

Walker, Lenore E. (1979, February) <u>Love and Violence.</u> Keynote address for Marin County Conference. Marin Couty, CA.

Walker, Lenore E. (1979, January) <u>Domestic Violence and the Abused Woman.</u> Keynote address for the Colorado Juvenile Council Conference on Domestic Violence. Denver, CO.

Walker, Lenore E. (1978, October) <u>A Psychological Perspective on Domestic Violence.</u> Keynote address at the National Conference of Christians and Jews. Tenth Annual National Institute on Community Involvement and the Criminal Justice System. Los Angeles, CA.

Walker, Lenore E. (1978, September) <u>Violence Against Women: Psychotherapy Models.</u> Presented at the Colorado Mental Health Conference. Keystone, CO.

Walker, Lenore E. (1978, September) <u>The Batterer and His Family: A Private Practice Model.</u> Presented at the Colorado Mental Health Conference. Keystone, CO.

Walker, Lenore E. (1973, June 10) <u>Battered Women.</u> Workshop presented at the National Association of State Commissions on Women. Jackson Hole, WY.

Walker, Lenore E. (1978, June 17) <u>Learned Helplessness and Battered Women.</u> Keynote address presented at the Conference on Domestic Violence. Billings, MT.

Walker, Lenore E. (1978, April) <u>Violent Crimes at Home: Battered Women.</u> Presented at the Symposium at Rocky Mountain Psychological Association Conference. Denver, CO.

33

Walker, Lenore E. (1978, March) <u>Feminist Therapy and Battered Women.</u> Paper presented at the Division 29 APA Mid-Winter Meeting. Scottsdale, AZ.

Walker, Lenore E. (1978, February 25) <u>Cycles of Battering and How to Break Them.</u> Keynote address at the Conference on Violence Against Women. UCDavis, CA.

Walker, Lenore E. (1977, December 1-4) <u>Feminist Therapy Training Issues.</u> Mini-conferences on Feminist Psychotherapy presented in conjunction with Division 35, APA Mid-Winter Executive Board Meeting. Denver, CO.

Walker, Lenore E. (1977, October 14-16) <u>Battered Women as Victims.</u> Keynote address at Violent Crimes Against Women Confer-ence. Missoula, MT.

Walker, Lenore E. (1977, September 30) <u>In-Patient Treatment for Batterers.</u> Consultation with Dr. Morton Flax at American Lakes V.A. Hospital. Tacoma, WA.

Walker, Lenore E. (1977) <u>Mental Health Services to Battered Women and Their Families in Colorado.</u> Presented with panel at Colo-rado Mental Health Conference. Vail, CO.

Walker, Lenore E. (1977, September 16-18) <u>Women Working with Women.</u> Presented with Gretchen Groth at the Colorado Mental Health Conference. Vail, CO.

Walker, Lenore E. (1977, August 20) <u>The Victimization of Battered Women.</u> Presented at the Colorado Rural and Mountain Women's Conference. Breckenridge, CO.

Walker, Lenore E. (1977, June 3-5) <u>Violence Against Women.</u> Colorado Women's Conference for International Women's Decade. Boulder, CO.

Walker, Lenore E. (1977, May 4) <u>Treatment Alternatives for Battered Women.</u> National Organization of Human Services Sixth Annual Convention. Denver, CO.

Walker, Lenore E., Leidig, Marjorie, Flax, Morton and Fields, Marjory. (1977, August) <u>The Battered Women Syndrome Revisited.</u> Presented at Division 32 and 35, APA Convention.

Walker, Lenore E. (1977, May 2) <u>Battered Women.</u> Conference on Violent Crimes Against Women. University of Washington, Seattle WA.

Walker, Lenore E. (1977, April 1) <u>Battered Women as Victims.</u> Colorado Women's College Conference on Battered Women. Denver, CO.

Walker, Lenore E., Schreiber, Karen, Flax, Morton. (1976, September) <u>The Battered Women Syndrome.</u> Workshop presented at Division 32, APA Convention, Washington DC.

Walker, Lenore E. (1976, January) Depression and Women. Aurora Mental Health Center Community Programs for Women. Aurora, CO.

Walker, Lenore E., Klein, Judith, Rothberg, Meyer and Schreiber, Karen. (1975, June) Therapeutic Techniques for Liberating Men and Women. New Jersey Association for Mental Health Conference. Newark, NJ.

Walker, Lenore E., Clark, Ronald, Peterson, Mayfield, Gillespie, Joan and WEstrate, Ronald. (1975, May) Preventive Mental Health Consultation Programs in a Community Mental Health Center. Symposium at the New Jersey Psychological Association. Somerset, NJ.

Walker, Lenore E. and Brady, Patricia. (1975, April) The Interdependence of the School Psychologist and the Community Mental Center. National Association for School Psychologists. Atlanta, GA.

Walker, Lenore E. (1974, November 7) The School Change Game. Rocky Mountain Conference on Mental Health Goes to School. Arapahoe Mental Health Center. Denver, CO.

Walker, Lenore E. (1974, October 9) The Psychology of Women: Does It Exist? Edison Township School System. Edison, NJ.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 95-7207-CIV-GRAHAM

(Magistrate Judge Sorrentino)

TIMOTHY BROWN,                          :

      Petitioner,                    :

vs.                                     :

HARRY K. SINGLETARY,                    :

      Respondent.                    :

_____/

## AFFIDAVIT OF OTHALEAN BROWN

BEFORE ME personally appeared Othalean Brown, who after being duly sworn deposes and says:

1.     My name is Othalean Brown.

2.     I was married to Arthur Brown, Timothy Brown's father, and have raised Timmy since he was a few weeks old. I am the only mother he has ever known, and we have always been very close.

3.     Timmy's father beat him brutally when he was growing up -- from when he was approximately 11 onward. I recall one incident when he beat Timmy with a 2 x 4 piece of wood, and another with a vacuum cleaner hose. And there were many incidents when he simply beat him with his fist -- including one where he hit Timmy so hard up against a door that the door frame actually came loose. Timmy was submissive. He would take the beating, and then go and hide.

4.     However, Timmy often talked to me of wanting to kill himself, because he was so

ATTACHMENT / EXHIBIT 29

tired of his dad beating him up.

5.      On the Tuesday night in July when Timmy was arrested, I did not receive any phone call from the Broward Sheriff's Office. Rather, after it was already dark (approximately 9 p.m.), two detectives (one of whom I believe was Sgt. Richard Scheff) came and knocked on my door (I was living on Perry Street at the time), and told me that Timothy had been charged with the Behan murder. They asked me if I would like to talk to him, and I told them that I most definitely would.

6.      I borrowed my boyfriend's truck, and followed the officers to a building that looked like a warehouse near Commercial Boulevard and Prospect, and they escorted me up the steps. They put me in a room with a table and chair, and no windows. I sat there for approximately 20 minutes.

7.      At that point, one of the officers came into the room and said to me, "Mrs. Brown, this is not going to be a Rodney King affair." Then they told me that I could not see Timmy because he had already been taken to the scene of the crime.

8.      I never saw Timmy that night.

9.      The officers told me that I could see him on Saturday, which was the visiting day at the detention center.

10.      When I saw Timmy that Saturday, his face was all bruised up and swollen. When I asked him what had happened to his face, he said that one of the detectives had beaten him the night they arrested him , because he would not admit that he killed the deputy. Timmy told me that he was scared they would kill him. He said he was afraid for his life.

11.      Timmy asked me why I didn't come to see him the night of his arrest. Every time before this when Timmy had gotten in trouble, he had always notified me, and had wanted me there to see him.

2

12.    Larry Davis was visiting Timmy that Saturday also, and I met him at that time.  I told

Mr. Davis that I was upset about Timmy's face, and I asked him to take a picture of it.  Davis said

that he would take care of it.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Othalean Brown


Sworn to and subscribed before me by _____, who is personally

known to me/produced the following form of identification: FL ID _____ on this 21st

day of _____, 1999.


_____
Notary Public, State of Florida

My Commission Expires:                

Alicia J. Payton
Commission # CC 85655
Expires Aug. 1, 2003
Bonded Thru
Atlantic Bonding Co., Inc



**Date:**          November 17, 2001                                                          **G.O. 01-33**

**To:**            All Personnel

**From:**          Sheriff Ken Jenne

**Subject:**       GENERAL ORDER - ADDS SECTION 13.2.15 ENTITLED "INTERROGATION OF SUSPECTS WITH DEVELOPMENTAL DISABILITIES" TO THE POLICY AND PROCEDURES MANUAL

The following policy will be effective immediately:

**13.2.15      Interrogation of Suspects With Developmental Disabilities:**

A.    General: BSO recognizes that developmentally disabled suspects require special care and sensitivity when dealt with in a custodial situation. BSO's foremost concern is to ensure subjects understand their constitutional rights and are not taken advantage of. Although the potential for obtaining a false confession will always be inherent with the detective's role as interrogator, this policy is intended to minimize the potential of developmentally disabled subjects offering a false confession during the course of a criminal investigation. Through innovative training and sound policies and procedures, BSO can better protect the rights of these vulnerable persons while still arriving at the truth and avoiding false confessions and/or false testimony implicating others.

B.    Disclaimer: This policy was enacted to assist detectives in evaluating and working with persons considered developmentally disabled. Detectives are not psychologists or psychiatrists. Their conclusions concerning the mental state of a person may not always be accurate. A good faith effort will be made, based on specialized training, to recognize the characteristics of a developmentally disabled person and deal with the situation as mandated by BSO policies and procedures.

C.    Definitions:

1.    Appropriate Adult: A parent, relative, guardian, or other person responsible for the subject's care or custody.

2.    Corroborating Evidence: This includes any form of connective physical evidence to include, but not be limited to serological, hair, fiber, and latent or patent fingerprint evidence. This also includes conclusive eyewitness observations positively linking the suspect to the crime at the time of its occurrence.

3.    Developmentally Disabled: A person who is in a state of arrested or incomplete development of mind, which originates during the developmental period and is associated with recognizable significant impairment of intelligence and social functioning.

ATTACHMENT / EXHIBIT 30

4.   False Confession: Full or partial admissions of guilt that are unfounded and without merit.

5.   Post Confession Analysis: Supervisory review of any confession obtained from a developmentally disabled person.

6.   Post Confession Analysis Team: A specially trained team consisting of a psychologist, assistant state attorney, and Criminal Investigation commander, who will be tasked with reviewing confessions from the developmentally disabled that lack any corroborating evidence.

D.   Custodial and Non-custodial Interrogations of Developmentally Disabled:

1.   Detectives will make observations of any person they intend to interrogate in an effort to determine if the person exhibits any outward characteristics of a developmentally disabled person.

2.   Detectives will notify their immediate supervisor upon recognizing they may be questioning a subject who is considered developmentally disabled as soon as practical.

3.   Prior to interrogating a subject who is considered to be developmentally disabled, detectives will make a reasonable effort to notify and afford an appropriate adult the opportunity to be present during all questioning. If unable to make contact, detectives will record the date and time attempts were made and reason the effort failed. If contact is made and the appropriate adult declines, the detective will document the date and time and reasons why. A developmentally disabled subject may not waive BSO's policy to notify an appropriate adult.

4.   Detectives will inquire from the subject and/or appropriate adult if the developmentally disabled subject's dysfunction triggers fits of aggression or other unstable emotions and if prescribed medications are required. Any information provided will be documented in the written report, to include:

   a.   If the subject is prescribed medication, type of medication, and when was it last taken.

   b.   Does the subject regularly comply with medication.

5.   In accordance with Section 13.2.2A, developmentally disabled suspects will be advised of their constitutional rights (Miranda Warning).

6.   When advising developmentally disabled subjects of their constitutional rights, detectives will speak slowly and clearly and ask subjects to explain their response rather than simply answer yes or no.

7.   In all cases, a second detective will be present to witness subjects being advised of their constitutional rights.

8.   In all cases, a second detective will be present during the interrogation process.

9.     Detectives will be required to document the details of the interrogation.

10.    During the course of the interrogation, detectives should:

a.     Realize the developmentally disabled are easily persuaded.

b.     Use simple language and speak slowly and clearly.

c.     Use concrete terms and ideas.

d.     Avoid questions that tell the subject the answer detectives expect.

e.     Repeat questions from a slightly different perspective to ensure the subject understands the line of questioning.

f.     Avoid leading or suggestive questions.

g.     Minimize questions that require a simple yes or no response.

h.     Realize developmentally disabled are eager to please and often respond to questions in a manner they think pleases the detective.

11.    A supervisor will be required to monitor all interrogations of any person considered to be developmentally disabled.

12.    Detectives will attempt to conduct the interrogation during reasonable hours and within a reasonable period of time, unless exigent circumstances dictate otherwise.

13.    Detectives will ensure adequate breaks are provided and any apparent needs met.

14.    Developmentally disabled subjects will not be left unattended in an interview room. Subjects will be physically monitored the entire time they are in BSO's custody or control.

15.    Confessions will be tape recorded if possible. Recordings will include an introduction stating the date, time, location, case number, persons present, and recognition that the statement is being taken from a developmentally disabled person.

E.    Post Confession Analysis:

1.     Any confession offered by developmentally disabled will undergo a Post Confession Analysis (PCA) by the unit supervisor. The PCA will be conducted prior to subjects being charged with the crime they admitted to.

2.     Any confession offered by developmentally disabled subjects that lacks any corroborating evidence will undergo a review by the Post Confession Analysis Team (PCAT) prior to them being charged with the crime they admitted to.

3.     The PCA review process, whether conducted by the unit supervisor or PCA team, will evaluate the validity of the confession using, at a minimum, the following criteria:

a.   Was the appropriate adult notified and given the opportunity to be present during the interrogation.

b.   Did developmentally disabled subjects understand their constitutional rights.

c.   Was the developmentally disabled subject able to provide an accurate description of the major and minor details of the crime and its scene.

d.   Were there any unusual or unique elements to the crime or its scene that were not publicly known that the developmentally disabled subject was able to provide.

e.   Did the developmentally disabled subject provide information that led to the discovery of evidence previously unknown.

f.   What type of evidence exists that positively links the subject to the crime.

g.   How conclusive is the evidence.

h.   Would there be any logical explanation concerning why evidence might not conclude that the confessor is the suspect.

i.   How credible is the witness testimony.

j.   Are the witness accounts consistent with the subject's account of what happened.

k.   Were the witness identifications done within proper policy and procedure and all photographic line-ups developed using Standard Operating Procedures.

l.   Were leading or suggestive questions avoided as much as possible.

m.   Was the interrogation process conducted within a reasonable duration of time and during reasonable hours.

n.   Were adequate breaks provided and apparent needs of the developmentally disabled subject met.

4.   Upon completion of the PCA, a determination will be made whether to charge the developmentally disabled subject with the crime or release the subject pending further investigation. This decision will be based on the credibility of the confession offered and any corroborating evidence.

5.   Prior to releasing the subject, the reviewing supervisor or PCA team will take into consideration any apparent factors that might lead them to believe the subject may be mentally ill and the subject is a threat to the subject or others. In such cases, a psychiatric evaluation will be sought.

6.   If released, the subject will be released to an appropriate adult.

F.    Collection of Evidence From Developmentally Disabled: The use of any consent to search form will be prohibited when dealing with developmentally disabled subjects. Unless exigent circumstances exist, a search warrant will be required for the collection of any serological, hair, or fiber evidence collected directly from the subject.

G.    Transporting/Booking of Developmentally Disabled:

   1.   Detectives will be responsible for notifying the transportation or booking deputy that the prisoner is developmentally disabled. Any medications or other apparent needs will be brought to the attention of the transportation or booking deputy upon transfer of the prisoner.

   2.   Detectives and Booking staff will personally notify Classifications and medical staff that the prisoner may be developmentally disabled, so appropriate placement and medical arrangements can be made.

   3.   If the subject meets Baker Act criteria, detectives will comply with Section 10.18.

H.    Training Requirements:

   1.   All detectives will receive yearly specialized training to assist them in recognizing the following characteristics of developmentally disabled persons:

      a.   May not communicate at age level which may include having a limited vocabulary; having a speech defect; having difficulty understanding or answering questions; not possessing skills to read or write; and mimicking responses or answers.

      b.   May not behave at age level which may include preferring younger persons (children) for friends; having inappropriate interactions with peers of the opposite sex; being easily influenced by and anxious to please others; exhibiting a low frustration tolerance; and exhibiting signs of difficulty in making change, using the telephone, telling time, etc.

      c.   May not understand consequences of situations which may include not recognizing the seriousness of the situation; may not reflect on actions and acts impulsively; and trying to please others and disregarding legality of actions.

      d.   May not behave appropriately during police custodial situations which may include not understanding their rights; being overly willing to confess; having difficulty recalling facts or details of the offense; being overwhelmed by police authority; not wanting their disability noticed; and telling what they think others want to hear.

   2.   All detectives will receive annual specialized training on how to properly question developmentally disabled suspects to avoid leading questions that may prompt them to make false confessions. This training will also include:

      a.   How to recognize warning signs of a false confession.

Page 5 of 6

G.O.01-33

b.   How to formulate questions that will help corroborate a confession when there is no evidence or credible witness testimony linking the suspect to the crime.

c.   How to identify psychological factors that influence innocent suspects to confess falsely.

d.   How to recognize certain personalities and characteristics that are more prone to suggestibility.

SHERIFF KEN JENNE

NOTE: File this General Order within the current Policy and Procedures Manual.

Page 6 of 6

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## VICTIM

Deputy Patrick Behan

Broward Sheriff's Office

## SUBJECT

Andrew H. Johnson

Black Male

Date of Birth: 02-07-70

1876 Southwest 177th Terrace

Miramar, FL   33029

954-435-4710

ATTACHMENT / EXHIBIT 31

1

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## CIVILIAN WITNESS

Gwenda G. Johnson

Black Female

Date of Birth: 03-30-57

1704 Northwest 192nd Street

Miami, FL

305-970-2177


## CIVILIAN WITNESS

Confidential Informant #3063


## CIVILIAN WITNESS

Edward Keith Davis

Black male

Date of Birth: 12-08-69

1106 Northwest 2nd Street

Dania, FL

954-927-3066

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## LAW ENFORCEMENT WITNESSES

### Broward Sheriff's Office

Major Anthony Fantigrassi

Criminal Investigations Division

954-321-4200


Detective Michael Bolé

Criminal Investigations Division

954-321-4200


Detective Peter Sudler

Criminal Investigations Division

954-321-4200


Sergeant Dennis Gavalier (Retired)

Strategic Investigations Division

954-831-8972


Sergeant Dan Christopher

Strategic Investigations Division

954-831-8972

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Broward Sheriff's Office - continued

Detective Perry Hendrick

Strategic Investigations Division

954-831-8972


Detective Angelo Cedeño

Strategic Investigations Division

954-831-8972


Detective Scott Pitocchelli

Technical Support Unit

954-321-5050


Detective Joe Baxter

Technical Support Unit

954-321-5050


Richard Hoffman

Polygraph Unit

954-831-8114

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Miami-Dade Police Department

Sergeant Tom Williams

Special Investigations - Narcotics Unit

305-576-8853

Detective Tom O'Keefe

Special Investigations - Narcotics Unit

305-576-8853

## U.S. Bureau of Alcohol, Tobacco and Firearms

ATF Agent Vince Curry

305-716-3019

ATF Agent Steve McKeen

305-716-3019

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

**NARRATIVE**

**Monday, April 23, 2001**

Miami-Dade Police Department Narcotics Detective Tom O'Keefe contacted Sergeant Dennis Gavalier, of the Broward Sheriff's Office Major Narcotics Unit, in reference to information he received from a confidential source. The information pertained to the homicide of Deputy Patrick Behan who was killed outside a Pembroke Park convenience store on November 13, 1990.

Detective O'Keefe stated the C.I. was a very reliable source that had provided information to the Miami-Dade Police Department for the past eight (8) years. According to Detective O'Keefe, the C.I. had a proven track record for "making" substantial cases and was known for his honesty and integrity.

On April 23, 2001, the C.I. told Detective O'Keefe he had been in contact with a black female who stated her husband killed a Deputy Sheriff at a convenience store several years ago. Based on the information from the C.I., Detective O'Keefe believed the officer being referred to was Deputy Patrick Behan. Arrangements were made for the following day to discuss the investigation further.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

**Tuesday, April 24, 2001**

At approximately 10:00 am, Sergeant Gavalier spoke with Detective
Tom O'Keefe who stated his confidential source had gathered
information from the wife of the subject. The wife of the subject
stated her husband killed a police officer at a convenience store
several years ago. Detective O'Keefe stated the subject,
identified as Andrew Johnson, was possibly a former BSO Detention
Deputy who was fired after an Internal Affairs investigation on
or about the time Deputy Behan was murdered. Detective O'Keefe
told Sergeant Gavalier he would make the confidential source
available to BSO.

Sergeant Gavalier notified SID Lieutenant Kevin Tyrie of his
conversations with Detective O'Keefe. Detective O'Keefe spoke
with Lieutenant Tyrie and arrangements were made for the
confidential source to be interviewed at the BSO Public Safety
Building.

At approximately 4:30 pm, Sergeant Gavalier, Miami-Dade Detective
Sergeant Tom Williams and Detective Tom O'Keefe escorted the
confidential source to the conference room of the BSO Criminal
Investigations Division. Major Tony Fantigrassi proceeded to

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

interview the C.I. During this interview, the C.I. stated he met
Gwenda Johnson and her husband Andrew Johnson (a.k.a. "A.J."),
Black Male, Date of Birth: 02-07-70, at church where he
befriended her. The source reported Mrs. Johnson had been
confiding in him about her abusive husband and that she was
considering leaving him. The source claimed she also told him her
husband Andrew killed a policeman at a convenience store in
Broward County several years ago. Mrs. Johnson told the C.I.
Andrew Johnson had worked for BSO as a Detention Deputy and was
fired after an Internal Affairs investigation. It was the C.I.'s
understanding, from the wife, that Andrew Johnson stalked the
deputy prior to the killing and the act was a "payback" for
losing his job at BSO. The source further stated Mrs. Johnson was
with Andrew Johnson when he dismantled the firearm into three (3)
pieces and discarded it in three (3) different locations. It was
later verified that Andrew Johnson did in fact work for BSO in
the early 1990's and was fired after an Internal Affairs
investigation.

BSO and Miami-Dade Police Department agreed upon sending the
confidential source to meet Gwenda Johnson to possibly gain
additional information and verify what the confidential source
reported. The C.I. would wear a recording device and the

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

conversation would be monitored by detectives.


**Wednesday, April 25, 2001**

At approximately 6:00 pm, Sergeant Gavalier, Sergeant Williams and Detective O'Keefe met with and briefed the confidential source regarding his objectives. He was equipped with a recording device and a wireless transmitter.


At approximately 6:45 pm, the confidential source arrived at the Valencia Isle Apartments (North Miami) where Mrs. Johnson and Andrew Johnson lived. At approximately 6:56 pm, Gwenda Johnson met the C.I. at the complex and led him into her apartment. At an opportune time, the C.I. inquired about the alleged police killing. Gwenda Johnson told the C.I. Andrew killed the officer while he was sitting in his car, at a 7-11.


Apparently, Andrew Johnson was a former BSO Detention Deputy who, at some point, had attempted to assist uniformed officers in subduing a suspect on the side of the road. During the incident a confrontation ensued that led to an internal affairs investigation. The investigation resulted in the termination of Andrew Johnson. Mrs. Johnson told the C.I. her husband became the scapegoat of the investigation because he was not supposed to be

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

on the scene. Mrs. Johnson further stated her husband must have watched and knew where the officer was going to be. She also stated there was another individual in jail for the crime. Mrs. Johnson said the person in jail did not look like the sketch of the alleged suspect. Mrs. Johnson described her husband clothing on the night of the murder as all black, including a "skully" on his head. After the conversation about her husband killing a police officer, the C.I. and Mrs. Johnson had a general conversation until he left the premises at approximately 7:19 pm.

At approximately 7:30 pm, the C.I. was debriefed and the recording device and transmitter were retrieved.

For specific details regarding this operation, please refer to the actual recordings and the transcriptions of April 25, 2001.

**Thursday, April 26, 2001**

Major Tony Fantigrassi asked to meet with Detective Pete Sudler and me in private. Major Fantigrassi explained that a confidential informant utilized by the Miami-Dade Police Department had come forward with information regarding the 1990 killing of Broward Sheriff's Deputy Patrick Behan. Major Fantigrassi briefed us as to the recent events and the new

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

information.

At approximately 2:00 pm, a copy of the recording was given to Major Fantigrassi, who in turn, played it for Detective Sudler and me. Major Fantigrassi stated the allegations would be further investigated. Subsequently, he assigned us a list of tasks.

**TASK LIST:**

1.  Review Andrew Johnson's Personnel File

    Johnson's file was reviewed. It was determined he was terminated from BSO approximately 4 months prior to the Behan Homicide.

2.  Obtain A Printout Of Andrew Johnson's Internal Affairs File

    According to Professional Compliance, the Internal Affairs file of Andrew Johnson had been destroyed. A copy of documentation outlining the complaint against Johnson and the proceedings leading to his termination were obtained from the Florida Department of Law Enforcement/Criminal Justice Standards and Training Commission. In addition, it appeared that Johnson was in possession of a Smith & Wesson Model 66 .38 caliber revolver. This firearm's ownership

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

history subsequent to the Internal Affairs investigation is
unknown.

3.    Review Andrew Johnson's Criminal History

Intelligence checks revealed Johnson was arrested in 1994 by
the Metro Dade Police Department for sexual battery, armed
burglary and armed robbery. Johnson was acquitted of all the
charges. Johnson was also arrested in February 2000 for
refusing to sign a traffic citation, careless driving and
violating municipal speed. Johnson was convicted by plea and
was sentenced to time served.

4.    Obtain Andrew Johnson's Miami-Dade Arrest Reports

(Determine if any firearms were recovered at the time of
Johnson's arrest.)

A copy of the entire case file was obtained from Miami-Dade
Police. Detective Sudler spoke with Sergeant Mallory who
handled the case when she was a Sex Crimes detective.
According to Sergeant Mallory, there was no doubt in her
mind that Johnson committed this crime. She felt that two
things led to his acquittal: A key piece of evidence was
lost and (2) Johnson had hired a very good attorney. At the
time of Johnson's arrest a Smith & Wesson Model 10 .357

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

revolver was recovered and placed into evidence. However, it
was determined Johnson's employer, Omni Security, was the
actual owner of the firearm.

5.   <u>Run An ATF Firearms Check On Andrew Johnson</u>
     (Determine if he is associated with any firearms.)
     An ATF check revealed there was no record of any firearm
     transactions involving Johnson. A second request was made to
     ATF requesting a firearms check for Gwenda Johnson and a
     recheck of Andrew Johnson. No records were found.

6.   <u>Compare Andrew Johnson's Fingerprints With The Unidentified</u>
     <u>Latents From The Behan Crime Scene</u>
     The BSO Fingerprint Unit compared Johnson's latents to those
     lifted at the scene. No identification was made.

7.   <u>Check If Andrew Johnson Qualified At the BSO Range With A</u>
     <u>Firearm</u>
     The Training Division was not able to locate a firearms
     qualification record for Andrew Johnson.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

8.  Research Andrew Johnson's 1991 Pompano Beach Police Officer

    Application

    After an extensive search, no file was found on Johnson.


9.  Obtain A Copy Of Andrew And Gwenda Johnson's Marriage

    Certificate

    A copy of the marriage certificate from the Broward County

    Clerk's Office was obtained. It documented their marriage in

    October 1989.


10. Obtain The Analysis Of The Behan Projectile From The BSO Lab

    BSO Firearms Examiner Dennis Grey reviewed his 1990 analysis

    of the projectile. In Grey's original report he stated,

    "Projectile (A) is either a .357 Magnum or 38 Special copper

    jacketed bullet. Revolvers manufactured with rifling

    characteristics similar to evidence projectile (A) are: INA,

    Llama, Ruger, Smith & Wesson, Taurus, and some foreign

    manufacturers sold under various trade names. With regards

    to the current investigation, Grey stated that "comparison

    microscope examination" with a potential suspect firearm

    might be possible, but highly unlikely, due to the very poor

    condition of the recovered projectile.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

11.   Research Employment Records For Gwenda and Andrew Johnson

      According to the Social Security Administration, there was
      no record for Gwenda Johnson. Andrew Johnson last worked for
      the Randstad Corporation (a temporary employment service)
      from June 1, 2000 to April 3, 2001. When the corporation was
      contacted they could not find records of where in Florida he
      actually worked.

12.   Research Vehicles Registered To Gwenda And Andrew Johnson

      C.I. and S.I.D. Analysts completed background checks for
      both Andrew and Gwenda Johnson. The checks included a list
      of all vehicles registered to the Johnsons.

13.   Research Andrew Johnson's Military Records

      A formal request for Johnson's military record was made to
      the Department of Defense. His military record reflected he
      joined the Marine Corps in April 1992. He was "Honorably
      Discharged" for medical reasons. However, he was demoted
      from an "E2" to an "E1" based on an incident in which he
      struck another Marine.

Friday, April 27, 2001

At approximately 3:00 pm, Major Fantigrassi, Sergeant Gavalier,

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Detective Sudler and I met at the Broward Sheriff's Office
Criminal Investigations conference room. During this meeting the
assigned tasks were reviewed and the decision to have the
confidential source meet again with Gwenda Johnson was confirmed.
The purpose of another meeting was to attempt to record
additional conversations in order to verify the allegations that
Andrew Johnson killed a police officer.

Arrangements were made with Miami-Dade Police Department
Detective Tom O'Keefe to utilize the C.I. in an undercover
capacity to meet with Gwenda Johnson on May 2, 2001. (Note: This
meeting was postponed due to an unrelated incident that occurred
involving Miami-Dade Police Department personnel. The meeting was
rescheduled for May 3, 2001.)

**Thursday, May 3, 2001**

SID Lieutenant Kevin Tyrie asked that I bring him a copy of the
recorded conversations between the confidential source and Gwenda
Johnson. A copy of the recording was delivered to Lieutenant
Tyrie. He subsequently assigned it to an SID secretary for
transcription.

At approximately 5:00 pm, Detective Sudler and I met Sergeant

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Gavalier and Miami-Dade Police Detective Tom O'Keefe at the
McDonald's Restaurant located in the Publix Plaza on NW 186th
Street, near I-75 in Miami-Dade County. Shortly after our
arrival, we were introduced to the confidential source. We
briefed him regarding the information being sought from Gwenda
Johnson. The C.I. was equipped with a wireless recording device
and subsequently made contact with Gwenda Johnson. The two spoke
while seated in the C.I.'s vehicle. Three (3) unmarked police
vehicles remained in the area during the meeting. During the
meeting, the C.I. was able to discuss the police killing by
showing Mrs. Johnson only the headline portion of a newspaper
article about the Behan Homicide published on April 29, 2001.
(This was done so any information Mrs. Johnson might offer to
this investigation would not be corrupted by what she read in the
newspaper.) Mrs. Johnson reiterated her husband killed a police
officer by "sneaking up on him and shooting him in the head."
She also reiterated her husband broke the gun into pieces and
discarded it in three (3) different places. Gwenda Johnson stated
Andrew threw a piece of the gun in an empty field by the New Way
Church located at 168th Street and NW 22nd Avenue in Miami. Mrs.
Johnson also stated the people they arrested did not commit the
crime and she "knows who did it."

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

that the area described by Mrs. Johnson actually existed. Also discussed was the date for the next meeting between the C.I. and Mrs. Johnson. The night of May 7, 2001 was tentatively agreed upon.

Later in the afternoon, Detective Sudler and I traveled to the Miami-Dade Police Department's Sexual Battery Unit located at 7955 NW 22nd Street, in Miami. We were provided with a copy of the entire case file regarding the 1994 Armed Sexual Battery arrest of Andrew Johnson.

While en route back to BSO Headquarters, we drove to the New Way Church located at 168th Street and NW 22nd Avenue in Miami. Upon our arrival, we observed a large church located on the northwest corner of the intersection. The rear of the property was a very large open field measuring approximately 50 acres, dotted with various shrubbery and trees.

**Monday, May 7, 2001**

Sergeant Gavalier contacted me and confirmed the confidential source would be meeting with Mrs. Johnson on the evening of May 8, 2001.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

also made with the C.I. and a brief discussion took place

regarding what information was being sought. The C.I. was asked

to drive by the New Way Church located at 16800 NW 22nd Avenue,

in Miami and attempt to have Mrs. Johnson expound on where her

husband threw the gun allegedly used in the Behan Homicide. The

C.I. was also asked to prod Mrs. Johnson with the idea of coming

to the police with the information regarding the homicide. It

should be noted the recording device used during this encounter

did not allow us to listen to the conversation as it was being

taped.


The C.I.'s vehicle was equipped with a recording device before he

picked up Mrs. Johnson. The two began to drive toward the New Way

Church, however, Mrs. Johnson told the C.I. to turn around and

drive in a different direction. The C.I. spoke with Mrs. Johnson

about moving out and leaving her husband. The two talked about

making the move when Mr. Johnson was out of town on business. The

C.I. inquired about what he would do if Mr. Johnson came after

him. The C.I. told Mrs. Johnson he would call the police if Mr.

Johnson attempted to harm him and he would wave a copy of the

newspaper article at him if he tried anything. According to the

C.I., the conversation was limited regarding the homicide. He

felt when Mrs. Johnson actually moved out he would be able to

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

convince her to become cooperative with the police. The C.I.
departed the area at approximately 10:00 pm. Miami-Dade
Detectives placed the tape into evidence.

No pertinent information about the Behan Homicide was recorded
during this operation. For that reason, the recording was not
transcribed.  For specific details regarding this operation,
please refer to the actual recordings of May 17, 2001.

**Monday, May 21, 2001**

At approximately 3:00 pm, Major Fantigrassi, Lieutenant Tyrie,
Sergeant Gavalier, Detective Sudler and I met in the Criminal
Investigations conference room. The purpose of the meeting was to
discuss the progress of the investigation. Many ideas were
discussed as to the direction the investigation should go. It was
agreed the C.I. would be brought to the Public Safety Building in
order to discuss new ideas. In addition, he would also assist in
the transcription of the previously recorded conversations.

**Tuesday, May 22, 2001**

At approximately 4:30 pm, Miami-Dade Detective Tom O'Keefe
brought the C.I. to the Public Safety Building. Sergeant
Gavalier, Detective Sudler and I were also present. A brief

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

discussion took place regarding what the C.I.'s conversation should be during the next encounter with Mrs. Johnson. Major Fantigrassi was not available for this meeting and it was agreed the C.I. would return to the Public Safety Building on Thursday, May 24th for another meeting.

**Thursday, May 24, 2001**

The C.I. was brought to the Public Safety Building to assist in the transcription of the recorded conversations with Gwenda Johnson. Upon completion, Sergeant Gavalier paid the C.I. $1000.00 and escorted him out of the building. (This was the first of several payments made to the C.I. by the Broward Sheriff's Office for his work on this case. For a complete record of all payments made, please refer to the reports generated by S.I.D. detectives.)

At approximately 7:00 pm, Sergeant Gavalier, Detective Sudler and I then met Detective Tom O'Keefe at the rear of the Publix Plaza on NW 186th Street, near I-75 in Miami-Dade County. When the C.I. arrived, he was briefed as to what information should be sought from Mrs. Johnson. The C.I. was equipped with a recording device prior to meeting Mrs. Johnson.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

After the meeting with Mrs. Johnson, the C.I. was debriefed. We were unable to listen to the conversation while it was being recorded. The C.I. told us he reiterated to Mrs. Johnson the importance of knowing details of the homicide in the event Andrew Johnson should retaliate against either one of them. Mrs. Johnson agreed to show the C.I. where Andrew Johnson threw the gun pieces on the night of the incident. She also agreed to sit down and write down the events surrounding the Behan Homicide. When detectives attempted to make copies of the recording they found the recording device was inoperable and the conversation had not been recorded.

### Thursday, May 31, 2001

The next meeting between the confidential source and Mrs. Johnson occurred at the El Palacio Resort Hotel, located at 16805 NW 12th Avenue in Miami. The purpose of the meeting was to set up surveillance with the assistance of Miami-Dade Detectives and their Technical Support Unit. The meeting between the C.I. and Mrs. Johnson was videotaped and audio taped from the room next door. Sergeant Gavalier, Detective Sudler and I briefed the C.I. prior to the meeting. He was asked to try to convince Mrs. Johnson to write out the events involving Andrew Johnson and the murder of Deputy Behan. The C.I. was given $40.00 to pay for food

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

and drinks during the encounter.

At approximately 7:20 pm, the C.I. met Mrs. Johnson in the hotel lobby and escorted her to Room 115. When the C.I. asked Mrs. Johnson to write down the events of the murder, so they would have "insurance" in the event A.J. came after them, she refused. The C.I. tried to convince her to write something down throughout the entire meeting. Mrs. Johnson stated she already had a letter written out and that he (the C.I.) had nothing to worry about. During the course of the evening, Mrs. Johnson stated Andrew Johnson "watched the deputy" and "knew his schedule and days off." Mrs. Johnson also stated she knew all of Andrew Johnson's criminal activity during the last thirteen (13) years. However, she did not confide in the C.I. about what specific crimes her husband might have committed. The hotel room surveillance ended when Mrs. Johnson and the C.I. departed for dinner. Detective Sudler and I accompanied the Miami-Dade Detectives to their office in order to obtain copies of the audio and videotapes. Detective Sudler later telephoned the C.I. who stated he could convince Mrs. Johnson to write down specifics regarding the Behan Homicide during another meeting.

For specific details regarding this operation, please refer to

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

the actual recordings and the transcriptions of May 31, 2001.


**Friday, June 1, 2001**

Detective Sudler and I met with Major Fantigrassi. Major
Fantigrassi was briefed regarding the previous day's operation.
In addition, other options and scenarios were discussed that
might further the investigation.


**Wednesday, June 6, 2001**

At approximately 6:30 pm, Detective Sudler and I met Sergeant
Gavalier and Miami-Dade Detective Tom O'Keefe at the McDonald's
Restaurant located in the Publix Plaza on NW 186th Street, near
I-75 in Miami-Dade County. The purpose of the meeting was to
coordinate another contact with the confidential source and
Gwenda Johnson.


The C.I. arrived at approximately 7:00 pm and was briefed
regarding the information he was to obtain from Mrs. Johnson. The
C.I. placed a telephone call to Mrs. Johnson and learned she
would not be available until later in the evening.


At approximately 9:30 pm, the C.I., who was equipped with a
recording device, finally made contact with Mrs. Johnson. Due to

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

the fact they drove throughout the area in Mrs. Johnson's
vehicle, we were unable to monitor their conversation.

At approximately 10:45 pm, the C.I. returned with the recording
device. During the debriefing, the C.I. stated he was able to
gather additional information regarding Andrew Johnson's alleged
involvement in the Behan Homicide. Mrs. Johnson spoke of the
night of the incident and recalled being asleep when her husband
came home. Mrs. Johnson stated her husband woke her up and asked
her to take a ride. He told her he "did a job" and had to get rid
of the gun. Mrs. Johnson told the C.I. Andrew Johnson, "Put the
gun to his (deputy's) head and shot him." Mrs. Johnson also told
the C.I. her husband "got the wrong guy." She stated he didn't
get the one that wrote the complaint. He settled for someone
else. Mrs. Johnson told the C.I. she was writing a book about the
incident, however, she was changing the names of the individuals
involved. Mrs. Johnson also stated she had prepared a written
will that outlined the events of Andrew Johnson's role in the
killing in the event anything suspicious should ever happen to
her. The C.I. made arrangements for Mrs. Johnson to take him to
her sister-in-law's law office so she could help him prepare a
will for himself. The C.I. planned on retrieving a copy of Mrs.
Johnson's will and then forwarding it to detectives. The meeting

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

at the attorney's office was tentatively scheduled for the next day.

For specific details regarding this operation, please refer to the actual recordings and the transcriptions of June 6, 2001.

**Friday, June 8, 2001**

It was determined aerial photographs of the church field (where the alleged murder weapon was disposed was) would be needed. This would provide everyone involved, including the BSO Crime Scene Unit, with a clear understanding of what a thorough search of the field would encompass.

Later in the day, Crime Scene Detective Terry Gaddis and I flew to the church field in the BSO helicopter. Detective Gaddis proceeded to photograph the field from the air. Subsequent to the flight, Crime Scene Sergeant Stewart Mosher reviewed the photographs and determined it would take his detectives approximately two (2) days to search the entire field using metal detectors, rakes and shovels. All information regarding the potential search of the field was forwarded to Major Fantigrassi.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Monday, June 11, 2001

Major Fantigrassi, Sergeant Gavalier, Detective Sudler and I met to discuss what direction the investigation should go. It was agreed the C.I. was obtaining valuable information and was gaining the confidence of Mrs. Johnson. It was further agreed another meeting should be set up between the C.I. and Mrs. Johnson in an attempt to gather more information regarding the book and the will she referred to. Also, Sergeant Gavalier stated he requested the C.I. be compensated weekly for his work. Sergeant Gavalier stated he was in the process of requesting the C.I. be paid $500.00 per week.

## Wednesday, June 13, 2001

Detective Sudler and I attempted to locate the offices of "Omni Security" in North Miami in an effort to locate any of Andrew Johnson's employment records. (Johnson was employed with Omni Security at the time of his arrest in Miami-Dade County for Sexual Battery.) It was determined Omni Security was no longer in business. However, other tenants in the building stated the company might have reopened under the business name of "Vista Security." A records check for such a company revealed no such security company with that name.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Thursday, June 14, 2001

At approximately 3:15 pm, Detective Sudler and I met with
Detectives from the Miami-Dade Police Department at NW 183rd
Street and US 441, in North Miami Beach. The purpose of the
meeting was to record and monitor a preplanned meeting between
the confidential informant and Gwenda Johnson at the office where
her purported will was located. During the last meeting with Mrs.
Johnson, the C.I. had expressed an interest in formalizing a will
of his own in the event harm was to come to him from Mrs.
Johnson's husband. The C.I. was once again supplied with a
recording device. In addition, detectives would be able to
monitor the meeting via a second device the C.I. would have in
his possession.

At approximately 3:45 pm, the C.I. met with Mrs. Johnson at her
office, 99 Northeast 183rd Street, Miami, across from where we
were located. However, the meeting was cut short due to the fact
Mrs. Johnson claimed the C.I. was late and her "Attorney"
(believed to be her sister-in-law) was no longer available. It
was agreed the C.I. would meet with Mrs. Johnson later in the
evening.

At approximately 8:30 pm, another meeting took place between the

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

C.I. and Mrs. Johnson at the same office complex. From monitoring the conversation, it appeared Mrs. Johnson was assisting the C.I. in preparing a will, with Mrs. Johnson actually typing on a computer. The meeting lasted about one (1) hour until approximately 9:30 pm, when Mrs. Johnson left the office complex in her vehicle.

The C.I. returned to the area where we were monitoring and was debriefed. He told us Mrs. Johnson did, in fact, begin to prepare legal documents for him. However, since she did not complete them, she stored them in her office computer. No new information was learned as a result of this meeting. However, according to the C.I., Mrs. Johnson was prepared to show him where (in the church field) her husband had thrown the gun. The C.I. was paid $500 in U.S. funds provided by the Broward Sheriff's Office.

For specific details regarding this operation, please refer to the actual recordings and the transcriptions of June 14, 2001.

**Monday, June 25, 2001**

Detectives Sudler and I met with Sergeant Gavalier and Lieutenant Kevin Tyrie to discuss gaining greater access to the C.I. It was agreed we would meet with our Miami-Dade counterparts and request

31

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

we be allowed to contact the C.I. directly and utilize our
agency's Technical Support Unit to record all future meetings.
This would accomplish several objectives: (1) Free up the Miami-
Dade detectives for their own investigations, (2) Establish a
better and more regular means of contacting the C.I., (3) Allow
this investigation to move forward without potential scheduling
conflicts with the Miami-Dade detectives.


**Thursday, June 28, 2001**

Detective Sudler, Sergeant Dennis Gavalier and I met with
Sergeant Tom Williams and Detective Tom O'Keefe of the Miami-Dade
Police Department. Proposals were made and subsequently accepted
in which the Broward Sheriff's Office would be allowed to have
direct access to their C.I. for any future operations in this
investigation. These arrangements alleviated the Miami-Dade
Police Department from incurring any future costs associated with
this investigation and also allowed them to continue work on
their own investigations. It was also agreed all future
(recording) operations would be handled by the BSO Technical
Support Unit.


**Friday, June 29, 2001**

Detectives Sudler and I met with the C.I. at the rear of the

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

Publix Plaza on NW 186th Street, near I-75 in Miami-Dade County.
The C.I. was informed as to the developments concerning direct
communications with him. He agreed with the arrangements that had
been made between both agencies. He agreed to stay in contact
with detectives on a daily basis.

Arrangements were made to meet the following Tuesday, at the same
location, in an attempt to further the conversations between the
C.I., and Mrs. Johnson concerning the murder of Deputy Behan.

**Monday, July 2, 2001**

Detectives Sudler and I met with Technical Support Lieutenant
Pete Achilarre and his detectives, Scott Pitocchelli and Joe
Baxter. A briefing was held in which all parties were informed as
to the progress of the investigation. Lieutenant Achilarre agreed
to have Pitocchelli and Baxter available for all future
operations.

**Tuesday, July 3, 2001**

At approximately 6:45 pm, Detectives Sudler, Pitocchelli, Baxter,
Hendrick (S.I.D.) and I met with the C.I. at the rear of the
Publix Plaza on NW 186th Street, near I-75 in Miami-Dade County.
(Detective Perry Hendrick was present due to Sergeant Gavalier's

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

retirement.) No one from the Miami-Dade Police Department was
present for this operation. The C.I. was equipped with recording
and transmitting equipment. He stated he had made arrangements to
meet with Mrs. Johnson at her sister-law's office located at 99
Northeast 183rd Street, Miami.

After wiring the C.I., we followed him to the office complex and
waited across the street in the BJ's Plaza. He entered the office
building at approximately 7:40 pm. It should be noted the
transmitting equipment did not function properly and we were
unable to monitor the conversation between the C.I. and Mrs.
Johnson.

A short time after entering the office building, at approximately
7:55 pm, the C.I. emerged with Mrs. Johnson. While Mrs. Johnson
walked to the C.I.'s vehicle, Detective Sudler telephoned the
C.I. and learned she had received a telephone call from her
husband, Andrew Johnson. He requested she bring him a credit card
so he could pay for a towing charge incurred while he was
illegally parked in downtown Miami. The C.I. informed Detective
Sudler that Mrs. Johnson requested he drive her to meet with her
husband.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

At approximately 9:00 pm, the C.I. returned to the rear parking lot of BJ's Plaza where the transmitting/recording equipment was retrieved from him. Arrangements were made to meet again on Thursday, July 5, 2001.

No pertinent information about the Behan Homicide was recorded during this operation. For that reason, the recording was not transcribed.  For specific details regarding this operation, please refer to the actual recordings of July 3, 2001.

**Thursday, July 5, 2001**

At approximately 6:30 pm, Detectives Sudler, Hendrick, Baxter, Pitocchelli and I met with the C.I. at the rear of the BJ's Plaza located at US 441 and NE 183rd Street in North Miami. The C.I. was wired and then drove to Gwenda Johnson's house. He picked her up and drove her back to her sister-in-law's office where additional paperwork concerning the C.I.'s will and "insurance letter" were completed. (Again, Mrs. Johnson appeared to store her work in her office computer.)

Afterwards, the C.I. and Mrs. Johnson drove to the church field. The C.I. was able to convince her to point out the location where A.J had thrown the gun. She did so from the C.I.'s moving car.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

When the C.I. suggested he stop the car and they get out on foot, she refused to get out and narrow down the area. According to Mrs. Johnson, the gun had been "broken down" in several pieces and was thrown from their moving car by (passenger) Andrew Johnson. Mrs. Johnson was driving at the time. Specifically, the gun was thrown into the swale/field area (the north side of the roadway) while the couple was driving westbound in the 2300 to 2500 block of NW 167th Street. (A Miami-Dade Police records check of the area where the parts of the gun were allegedly discarded did not reveal any calls for service involving found firearms or parts of firearms.)

The C.I. drove Mrs. Johnson to her home. He then returned to the BJ's Plaza where the recording/transmitting equipment was retrieved. Arrangements were made for another meeting the following week.

For specific details regarding this operation, please refer to the actual recordings and the transcriptions of July 5, 2001.

**Thursday, July 12, 2001**

Detectives Sudler, Hendrick, Baxter, Pitocchelli and I met with the C.I. at the rear of the Publix Plaza on NW 186th Street, near

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

I-75 in Miami-Dade County. The purpose of the meeting was for Technical Support Detectives Baxter and Pitocchelli to assess the feasibility of installing recording and transmitting equipment in the C.I.'s car. In addition, the C.I. discussed the possibility of spending time with Andrew Johnson as a way to further the investigation. The rationale for this would be to engage Johnson in conversation inside the C.I.'s vehicle regarding the Behan Homicide.

At the conclusion of the meeting arrangements were made for the C.I. to bring his vehicle to the Public Safety Building on Tuesday, July 17, 2001, so the appropriate recording equipment could be installed in his vehicle.

**Friday, July 13, 2001**

Along with several members of the BSO Crime Scene Unit, I began to search the area where Mrs. Johnson had told the C.I. her husband had thrown the gun on the night of the homicide. The area searched on this date was approximately 75 feet in (north) from the roadway and the entire "church field" portion of the area. (Approximately the 2300 – 2400 block of NW 167th Street.) In addition to myself, the following individuals took part in this search:

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

Sergeant Jim Kammerer

Detective Terry Gattis

Detective David Currie

Detective Joe Torok

Detective Clark Hodges

Detective James Kinney

Detective Mark Suchomel

Crime Scene Technician Bruce Link

Crime Scene Technician Steven Yuresko


Arrangements were made to complete the search on Wednesday, July 18, 2001.


(Note: On both days, the individuals taking part in the search were dressed in plainclothes and driving unmarked police vehicles.)


**<u>Tuesday, July 17, 2001</u>**

The C.I. brought his vehicle to the Public Safety Building so Technical Support Detectives Baxter and Pitocchelli could install the appropriate recording equipment.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Wednesday, July 18, 2001

Detectives from The Crime Scene Unit, Career Criminal Unit and Fugitive Unit completed the search for the gun in the remaining area of the church. Nothing was found. Specifically, the total search encompassed an area approximately 75 feet in (north) from the roadway from the 2300 to the 2500 block of 167th Street.

In addition to myself, the following individuals took part in this search:

Sergeant Jim Kammerer

Detective Pete Sudler

Detective Terry Gattis

Detective Rich Engels

Detective Clark Hodges

Detective Chris Seaman

Detective Lori Bell

Detective Ignacio Vila

Detective Bryan Holmes

Detective Kelvin Phillips

Detective Richard Askintowicz

Detective Jamie Garrison

Detective Carl Sosnoski

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Detective John Wright

Detective Nick Morazzo

Detective Charles Lehman

Crime Scene Technician Bruce Link

Crime Scene Technician Steven Yuresko

For specific information regarding this search, please refer to Sergeant Kammerer's Memo #JK01-45, which has been made a permanent part of this case file.

At this point in the investigation, it was decided to create a situation in which the police would stop Johnson and the C.I. while Johnson was a passenger in the C.I.'s car. The police officer would be "played" by Detective Pete Sudler who would drive a marked BSO unit and be wearing a Class A uniform. The conversation would lead to a discussion in which Johnson would be "recognized" by Sudler as being a former BSO Corrections Deputy who had been terminated. After the traffic stop, the C.I. would continue the conversation and would attempt to obtain the following: (1) Additional information about Johnson's termination, (2) Who was responsible for making the official complaints against him and (3) What type retribution Johnson availed himself to. The entire conversation would be videotaped

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

and audio taped by the equipment already installed in the C.I.'s

vehicle.


**Thursday, July 26, 2001**

Detective Sudler telephoned Robert Hart of the Miami-Dade Police

Department Crime Lab. The purpose of the contact was to determine

if the Miami-Dade Police still possessed the bullets that were

test fired in the gun that was confiscated from Andrew Johnson at

the time of his 1994 arrest. The ballistics test would be

compared with the bullet retrieved in the Behan homicide.


At approximately 11:00 am, Detective Sudler made contact with Mr.

Hart at Miami-Dade Police Headquarters. Sudler completed a

property receipt and took possession of the evidence.


At approximately 3:00 pm, Detectives Hendrick, Sudler and Cedeño

met with Major Fantigrassi. The purpose of the meeting was to

discuss the payment structure for the C.I. It was determined the

C.I. would be paid as he produced information, rather than on a

weekly basis. Major Fantigrassi was also brought up to date

regarding the retrieval of the test-fired bullets from Miami-Dade

Police Department.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

At approximately 6:45 pm, Detectives Sudler, Hendrick and Cedeño
met with the C.I. at the rear of the Publix Plaza on NW 186ᵗʰ
Street, near I-75 in Miami-Dade County. The purpose of the
meeting was to discuss additional scenarios of how to get Andrew
Johnson into the C.I.'s vehicle so a traffic stop could take
place. One of the scenarios discussed was that the C.I. would
contact Andrew Johnson and tell him he had a "high roller" friend
who was seeking to hire someone to videotape an upcoming bachelor
party. (According to the C.I., Andrew Johnson videotaped parties
as a part time job for extra money). The C.I. would then set up a
meeting between Detective Cedeño and Andrew Johnson. After this
encounter, the pre-arranged traffic stop would take place. During
the meeting, Detective Cedeño would also attempt to establish a
relationship with Andrew Johnson and further attempt to gather
information regarding his alleged involvement in the Behan
homicide.

During the meeting the C.I. telephoned Andrew Johnson and asked
if he would be interested in videotaping a friend's party. Andrew
Johnson was very interested and told the C.I. to have his friend
call him. This call was placed in the presence of Detective
Sudler, Hendrick and Cedeño. The C.I. provided Andrew Johnson's
telephone number. It was decided Detective Cedeño would place a

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

call to Johnson at a later time.

The C.I. was also told he would no longer be paid on a weekly basis, but only when he provided useful information to the investigation. No money was paid to the C.I. at this meeting. The meeting concluded at approximately 7:30 pm.

**Thursday, August 2, 2001**

At approximately 6:00 pm, Detectives Hendrick, Cedeño, Baxter, Pitocchelli and I met with the C.I at the rear of the Publix Plaza on NW 186th Street, near I-75 in Miami-Dade County. The purpose of the meeting was for Technical Support Detectives Baxter and Pitocchelli to complete the installation of video and audio recording equipment for future meetings between the C.I. and Johnson.

A scenario was created in which the C.I. was going to introduce Johnson to the undercover officers. The officers would then attempt to hire Johnson to perform video work for them. The officers would be driving an expensive Mercedes Benz to lend credibility to their persona. After the meeting, Detective Pete Sudler, in full uniform and driving a marked patrol car would initiate a traffic stop and ultimately "recognize" Johnson as a

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

former BSO Corrections Deputy who was fired. Once the traffic stop was completed, the C.I. would attempt to further the conversation involving Johnson's history with law enforcement.

At approximately 6:10 pm, once the installation was completed, the C.I. left to pick up Johnson for the prearranged meeting with Detective Cedeño and an undercover agent from the ATF. The meeting was at "The Booby Trap II" strip club located at 5775 West Hallandale Beach Boulevard in Unincorporated Broward County.

The C.I. and Johnson met the undercover officers in the parking lot of the Booby Trap II at approximately 6:35 pm. Detective Cedeño played the role of "Chico" and ATF Agent Vince Curry played the role of "T." (It was later learned from the undercover officers that Johnson was agreeable to perform videotaping work for them at a later date.) This meeting was not recorded.

At approximately 8:05 pm, after the meeting concluded, the C.I. and Johnson left the Booby Trap II and began to drive back to Miami-Dade County.

At approximately 8:10 pm, Detective Sudler initiated the traffic stop at State Road 7 and SW 37th Street in Miramar. Detective

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Sudler was equipped with a recording device and the marked patrol car he was driving was equipped with a DUI camera. During and after the traffic stop Johnson made several negative references to law enforcement and spoke of his hatred of police officers. He also claimed he knew who had shot a police officer years earlier. According to Johnson, the officer was sitting in his patrol car at the time he was shot. He told the C.I. the individual had never been caught.

After the traffic stop, the C.I. dropped Johnson off and drove back to the rear of the Publix where he was debriefed and certain pieces of the recording equipment were removed from his vehicle.

For specific details regarding this operation, please refer to the actual recordings and the transcriptions of August 2, 2001.

**Wednesday, August 8, 2001**

At approximately 2:25 pm, the C.I. brought Johnson to another prearranged meeting with Detective Cedeño and an ATF Agent Curry. The meeting took place inside Detective Cedeño's Ford Excursion in the Home Depot parking lot of the Oakwood Plaza in Hollywood. The purpose of the meeting was to ascertain if Johnson was willing to perform some video work early next week for Detective

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Cedeño. Johnson agreed to videotape a meeting between Cedeño and
an unknown individual at a yet to be determined location.

No pertinent information about the Behan Homicide was recorded
during this operation. For that reason, the recording was not
transcribed.  For specific details regarding this operation,
please refer to the actual recordings of August 8, 2001.


**Tuesday, August 14, 2001**

At 11:00 am, Major Tony Fantigrassi met with Lieutenant Kevin
Tyrie, Detectives Sudler, Cedeño, Hendrick and I. The purpose of
the meeting was to decide what direction the (afternoon) meeting
between Johnson, the C.I. and the undercover officers should
take. It was decided Johnson would complete his paid videotaping
assignment and hopefully further develop his rapport with the
undercover officers.

At approximately 4:00 pm, Detectives Sudler, Hendrick, Cedeño,
Baxter, Pitocchelli and I met with the C.I at the rear of the
Publix Plaza on NW 186th Street, near I-75 in Miami-Dade County.
The purpose of the meeting was for Technical Support Detectives
Baxter and Pitocchelli to reinstall audio and video equipment in
the C.I.'s vehicle. The scenario called for the C.I. to pick up

43

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Johnson and drive him to the Oakwood Shopping Center in
Hollywood. BSO Undercover Detective Cedeño, assisted by ATF
Undercover Agent Vince Curry, would then instruct Johnson on what
they wanted videotaped.

Shortly after the C.I. left to pick up Johnson, he telephoned
Detective Sudler and informed him Johnson had decided to drive
his own vehicle and follow the C.I. to the meeting place.

At approximately 5:20 pm, the C.I. and Johnson arrived at the
Home Depot parking lot and met with the undercover officers. The
C.I. gave Johnson a camcorder, which had been supplied to him by
Technical Support Detective Scott Pitocchelli. The undercover
officers made a telephone call to Detective Perry Hendrick and
told him to meet them in the Home Depot parking lot. (Hendrick
was playing the role of an associate of the undercover officers.)
Once Hendrick arrived, Johnson videotaped the meeting from the
driver's seat of the C.I.'s car. The C.I. sat in the passenger
seat during the taping. During the meeting, an empty package was
transferred from Hendrick's vehicle (a Mercedes) to Cedeño's
vehicle (a Ford Excursion).

After the meeting, the undercover officers met and "debriefed"

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Johnson. The camcorder was returned to the undercover officers and Johnson was paid $200 for his work. (At the previous meeting he had been paid $200 for agreeing to do the work.)

The next meeting, for dinner and drinks, was scheduled for Thursday, August 16, 2001. Johnson and the C.I. then left the area in their respective vehicles.

After the operation the C.I. was met at the rear of the Publix and debriefed. He stated Johnson was disappointed because he was only paid $200 for the actual "shoot" and he was used to getting paid more. However, the C.I. was confident Johnson was aware he was videotaping criminal activity and he would show up for the dinner invitation offered by BSO (Undercover) Detective Cedeño.

No pertinent information about the Behan Homicide was recorded during this operation. For that reason, the recording was not transcribed.  For specific details regarding this operation, please refer to the actual recordings of August 14, 2001.

**Thursday, August 16, 2001**

At approximately 5:00 pm, Detectives Sudler, Hendrick, Baxter, Pitocchelli and I met with the C.I at the rear of the Publix

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Plaza on NW 186th Street, near I-75 in Miami-Dade County. The
appropriate recording equipment was installed in the C.I.'s
vehicle. The C.I. proceeded to drive to the Booby Trap II strip
club where previous meetings had taken place. The C.I. arrived at
the club at approximately 6:00 pm and met with Johnson (who had
driven there by himself) and undercover Detectives Cedeño and ATF
Agent Vince Curry.

At approximately 6:30 pm, the group left in Detective Cedeño's
vehicle and traveled to the "15th Street Fisheries" restaurant in
Fort Lauderdale. Cedeño was equipped with a recording device.

On the way to the restaurant, Cedeño and Curry exited the vehicle
at the "Circle K" store located at SW 40th Avenue and Hallandale
Beach Boulevard to make a purchase. (This is the location where
the Behan Homicide took place.) Cedeño left the recording device
inside the vehicle while he and Curry went inside the store. (A
subsequent review of the recording revealed there was no
conversation between the C.I. and Johnson regarding the murder
during this time.) During the trip to the restaurant, while
driving on Hallandale Beach Boulevard, Johnson made a comment to
the effect that he wanted to "Blow up" the Sheriff's Substation.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Plaza on NW 186th Street, near I-75 in Miami-Dade County. The
appropriate recording equipment was installed in the C.I.'s
vehicle. The C.I. proceeded to drive to the Booby Trap II strip
club where previous meetings had taken place. The C.I. arrived at
the club at approximately 6:00 pm and met with Johnson (who had
driven there by himself) and undercover Detectives Cedeño and ATF
Agent Vince Curry.

At approximately 6:30 pm, the group left in Detective Cedeño's
vehicle and traveled to the "15th Street Fisheries" restaurant in
Fort Lauderdale. Cedeño was equipped with a recording device.

On the way to the restaurant, Cedeño and Curry exited the vehicle
at the "Circle K" store located at SW 40th Avenue and Hallandale
Beach Boulevard to make a purchase. (This is the location where
the Behan Homicide took place.) Cedeño left the recording device
inside the vehicle while he and Curry went inside the store. (A
subsequent review of the recording revealed there was no
conversation between the C.I. and Johnson regarding the murder
during this time.) During the trip to the restaurant, while
driving on Hallandale Beach Boulevard, Johnson made a comment to
the effect that he wanted to "Blow up" the Sheriff's Substation.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

At approximately 7:00 pm, when the group arrived at the restaurant. The recording device was left in the vehicle due to the loud background noise inside the restaurant. According to Cedeño and Curry, no admissions about the murder were mentioned during dinner. However, Johnson did speak of his military experience. He stated he had previously owned a Model 66 Smith and Wesson revolver and had to dispose of it at some point. He did not elaborate about the reason for discarding the gun.

At approximately 8:45 pm, the group left the restaurant. On the ride back to the Booby Trap II (where Johnson and C.I.'s vehicles were located) the conversation continued about guns and ammunition. There were no references to the murder during the ride home.

For specific details regarding this operation, please refer to the actual recordings and the transcriptions of August 16, 2001.

Once Johnson was dropped off, at approximately 9:05 pm, all parties traveled back to the Publix for a debriefing and the removal of the recording equipment from the C.I.'s vehicle.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information


## Tuesday, August 20, 2001

Detectives Sudler, Hendrick, Cedeño, ATF Agent Curry, the C.I. and I reviewed the recording of the August 16th scenario at a BSO undercover facility. During the review of the recording, the C.I. telephoned Johnson and handed the telephone to Detective Cedeño. Cedeño told Johnson the C.I. had made him aware of his monetary difficulties. He told Johnson he was giving the C.I. $200 to give to him. A Thursday, August 23rd meeting was agreed upon.


## Thursday, August 23, 2001

At approximately 2:00 p.m., the C.I. and Johnson arrived at the Oakwood Plaza and met with Detective Cedeño, who was again assisted by ATF Agent Vince Curry. The purpose of the meeting was for the group to have lunch at a beachside restaurant. Once the meeting was completed, Detective Cedeño planned to invite Johnson to accompany him for a drive so they could speak alone. Detective Cedeño would then attempt to solicit information from Johnson regarding his involvement in the Behan Homicide. The vehicle used to transport the group (Cedeño's Chevrolet Suburban) was equipped with a recording device.

At approximately 2:03 pm, Detectives Sudler, Pitocchelli and Baxter watched from a nearby parking lot as the C.I., Johnson,

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Detective Cedeño and ATF Agent Curry departed the Oakwood Plaza in Cedeño's Suburban. Once all the parties were a safe distance away, Detectives Pitocchelli and Baxter installed recording equipment in the C.I.'s vehicle. The purpose for this installation was to record any conversation between the C.I. and Johnson during their drive back to Miami.

At approximately 2:25 pm, the group arrived at Shula's Steakhouse located on A1A in Fort Lauderdale. Detective Hendrick arrived at the restaurant in his own vehicle and was present for the lunch. During the ride to the restaurant, ATF Agent Curry showed Johnson a MAC-10 machine gun with a silencer. The purpose of showing the MAC-10 was to attempt to get Johnson to talk about guns. Johnson appeared intrigued by the weapon, but stated he had never used one. Before entering the restaurant, ATF Agent Curry gave the machine gun to Detective Hendrick, who in turn delivered it to Detective Pitocchelli. (Pitocchelli was parked nearby to ensure the weapon remained in police custody at all times.)

At approximately 3:45 pm, the lunch meeting ended. The conversation in the restaurant was recorded. There was no conversation regarding the Behan Homicide.

52

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

When the group exited the restaurant, Johnson entered Cedeño's vehicle. The C.I. and Agent Curry drove away with Detective Hendrick. Detective Cedeño drove Johnson to a secluded area of Port Everglades and began to ask him about his criminal past. During their conversation, Johnson told Detective Cedeño he had "put the hammer on a po-po." Johnson elaborated by telling Cedeño that in 1989 he was the victim of a residential burglary while living in Carver Ranches. Johnson stated the deputy who came to take the report saw his law enforcement books sitting on a table. He explained to the deputy he was trying to get hired by BSO. According to Johnson, the deputy was very condescending and told him he would never get hired because of where he lived. Johnson stated he was hired by BSO as a corrections officer five months later.

Johnson told Cedeño about another incident. While driving home from work one night, he observed a State Trooper friend of his named Tony Lee. When Johnson stopped to speak with him, the same BSO Deputy who told him he would never get hired was present. According to Johnson, when the deputy saw he was carrying a firearm while in uniform, he notified his sergeant and an Internal Affairs investigation was launched. The investigation resulted in Johnson being terminated. Johnson told Detective

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Cedeño this made him angry and it was his motive for killing the deputy. Johnson also stated as the uniformed deputy was getting into his car, he walked up on him "and did him." He told Cedeño it "was point blank range." When asked if the deputy saw him coming, Johnson replied, "Oh yeah he saw me…I was the last person he saw." Johnson added the deputy "put his hands up like I asked him to and I offed him." Johnson stated he fled in his personal vehicle parked nearby. Johnson also stated he disposed of the Model 66 Smith & Wesson he used to kill the deputy.

At approximately 4:15 pm, Detective Cedeño and Johnson arrived at the Embassy Suites Hotel parking lot, 1100 Southeast 17th Street, Fort Lauderdale and picked up the C.I. and Agent Curry. Detective Hendrick departed in his own vehicle.

At approximately 4:30 pm, Detective Cedeño dropped off the C.I. and Johnson at the Oakwood Plaza. Detectives Sudler, Pitocchelli and Baxter ensured the C.I. and Johnson left the area before meeting with Detective Cedeño and Agent Curry. The recording equipment was removed and a short debriefing took place.

While Detective Cedeño and Agent Curry drove to the BSO Headquarters, Detectives Sudler, Pitocchelli and Baxter met the

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

C.I. at the rear of the Publix Plaza on NW 186th Street, near I-75 in Miami-Dade County. The recording equipment was removed from the C.I.'s vehicle. These recordings revealed no pertinent information regarding the Behan Homicide.

For specific details regarding this operation, please refer to the actual recordings and the transcriptions of August 23, 2001.

All detectives and Agent Curry returned to the BSO Headquarters. Major Fantigrassi was briefed later in the day.

**Monday, August 27, 2001**
At approximately 12:30 pm, Detectives Sudler and Hendrick met the C.I. at the rear of the District 5 Substation, 200 NW 27th Avenue Ft. Lauderdale. At this meeting the C.I. was paid $500.00 and advised he would be notified of the next planned contact with Johnson.

**Tuesday, August 28, 2001**
At approximately 11:00 am, Detectives Sudler, Cedeño and Hendrick met with Major Fantigrassi. The purpose of the meeting was to discuss the next contact with Johnson. It was decided Detective Cedeño would call Johnson directly and set up a time and place to

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

meet. During their time together, Detective Cedeño would attempt to elicit additional information regarding the Behan homicide. The C.I. would not be present during this meeting. Friday, August 31, 2001 was tentatively scheduled for this next encounter, with a specific plan to be finalized before then.

**Friday, August 31, 2001**

At approximately 1:30 pm, Detective Cedeño and ATF Agent Curry met Johnson at the Home Depot parking lot, in the Oakwood Plaza in Hollywood. Detective Cedeño was equipped with a recording device and the vehicle used for the operation (a 2001 Mercedes) was similarly equipped. Detectives Sudler and Pitocchelli monitored the meeting from one undercover vehicle, while (S.I.D.) Sergeant Christopher and Detective Baxter monitored from a separate vehicle. Johnson left his vehicle at the Home Depot and traveled with Cedeño and Curry to the CheeseCake Factory in the city of Boca Raton. During lunch, Sergeant Christopher and Detective Baxter monitored Cedeño, Curry and Johnson from a nearby table in the restaurant. After lunch, Detective Cedeño, ATF Agent Curry and Johnson shopped at the Boca Town Center Mall located adjacent to the restaurant. Detective Cedeño purchased two (2) shirts for Johnson.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

At approximately 4:00 pm, the group drove back to the Home Depot. During the drive back, Detective Cedeño asked Johnson to retell his story regarding the police killing to Agent Curry. Johnson told Curry about his encounters with the BSO Deputy while attempting to get hired as a corrections officer. Johnson stated he was the victim of a burglary at his home in Carver Ranches. When the deputy (alleged to be Brian Montgomery) was taking the report, he noticed Johnson's corrections books on a table. According to Johnson, the deputy belittled him by saying he would never make it because of where he lived. Johnson explained that approximately five months later, he was hired by BSO as a corrections officer. According to Johnson, one night he was on his way home from work and stopped to talk to a State Trooper friend of his who was in the process of arresting someone. Also present on scene was the same deputy who told him he would never make the (BSO) department. The deputy questioned Johnson as to why he was carrying a firearm while in uniform. This inquiry led to an Internal Affairs investigation that resulted in Johnson's termination. Johnson explained it was his first real job and he was angry. Johnson further explained he walked up on the deputy while he was in his car and shot him. Johnson stated the shooting occurred at the Circle K Food Store located at 40th and Hallandale Beach Boulevard. When asked what he did with the gun,

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

Johnson stated he threw the gun in different places. He described one area as being off the turnpike and NW 41st Street in Miami. Johnson stated the gun (a Model 66 Smith & Wesson) was not retrievable because buildings have been erected in the area where he had thrown it.

Detective Cedeño told Johnson his "bosses" stated there was no one walking the streets that had "offed a cop." Detective Cedeño further told Johnson his bosses stated there were two (2) other people "doing time" for this incident. Johnson claimed to have no knowledge of this; only saying the police arrested someone but had to let them go. Johnson also claimed this was the first time he was speaking of the murder since it happened. Johnson claimed his wife had no knowledge of the incident.

Detective Cedeño explained his big boss "Rolie" would be coming to town soon and he would be asking Johnson more details about this crime. The reason given to Johnson was that "the bosses" wanted to be sure this incident would not resurface while he was employed in their organization. Johnson agreed to meet with the "big boss" and show him exactly where he had disposed of the murder weapon. Johnson told Detective Cedeño he would be busy with school the following week, but asked him to call if anything

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

came up.

For specific details regarding this operation, please refer to the actual recordings and their transcriptions.

Johnson was dropped off at his vehicle at approximately 4:45 pm. When Johnson complained of being short on cash. Detective Cedeño gave him $200.00. Sergeant Christopher and Detective Baxter followed Johnson from the parking lot and ensured he left the area.

All parties met back at the Broward Sheriff's Office Headquarters where copies of the audio recordings were made. It should be noted the recorder carried by Detective Cedeño malfunctioned. Therefore, only conversations taking place in the Mercedes were recorded.

**Wednesday, September 5, 2001**

At approximately 9:30 am, Detectives Sudler and Hendrick met the C.I. at the rear of the BSO District 5 Substation. The C.I. was paid $500.00 after a brief discussion regarding any contact he had with Johnson. No significant information was obtained.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Thursday, September 20, 2001

At approximately 5:00 pm, Detective Cedeño and ATF Agent Curry attended the Commencement Program for the Art Institute of Fort Lauderdale in a "show of support" for Johnson. The event took place at the War Memorial Auditorium in Fort Lauderdale. At the conclusion of the ceremony, Johnson was given a graduation gift in the form of $1000 from Detective Cedeño (Chico). Detectives Hendrick, Sudler and I monitored the ceremony from outside. After the ceremony Detectives Cedeño and Curry stated Johnson seemed very pleased with their attendance and somewhat surprised at the gift. No conversations about the murder took place.

## Friday, September 21, 2001

A strategy meeting was held in the C.I. conference room. In attendance were Major Fantigrassi, S.I.D. Lieutenant John Lamont, Detective Sudler, Cedeño, Hendrick and I, as well as ATF Agents Curry and Steve McKeen. McKeen was slated to play the part of the big boss, "Rolie." It was decided the majority of the next meeting with Johnson and Rolie would take place at an S.I.D. undercover business location.

## Monday, September 24, 2001 & Tuesday September 25, 2001

Further strategy meetings were held. In attendance for these

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

strategy sessions was Richard D. Walter, a Forensic Psychologist who had previously reviewed some of the undercover audio tape recordings involving Johnson. Walter is a charter member and co-founder of the Vidocq Society, a Philadelphia based organization (named after Eugène François Vidocq an 18th century French detective) dedicated to assisting law enforcement in solving old cases, especially "Cold Case Homicide."

At the expense of the Broward Sheriff's Office, Walters was flown to Fort Lauderdale for the purpose of collaborating with law enforcement and to offer his expertise on interacting with Johnson. He was briefed as to the progress of the investigation and made suggestions to the undercover officers on how they might extract additional information about the crime from Johnson. He recommended the undercover officers "challenge" Johnson when he once again recited his involvement in the Behan Homicide.

**Thursday, September 27, 2001**

At approximately 4:30 pm, the C.I. arrived at the rear of the District 5 Substation and met with Detectives Sudler, Baxter, Pitocchelli and I. The purpose of the meeting was to prepare the C.I.'s vehicle for audio and video taping for a meeting he was having with Gwenda Johnson later in the evening. In addition, the

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

C.I. was instructed to challenge Mrs. Johnson about what she had related to the C.I. in the past concerning the murder of Deputy Behan.

After the C.I. and the vehicle were prepared, all parties reconvened in the BJ's parking lot located at the southeast corner of US 441 and NW 183rd Street in Miami-Dade County. From that point the C.I. telephoned Mrs. Johnson and made arrangements to pick her up.

At approximately 6:40 pm, the C.I. picked Mrs. Johnson from her office, 99 Northeast 183rd Street, Miami, and drove her to a nearby fast food restaurant where he purchased food for the both of them. The C.I. parked his vehicle at a nearby park. As they ate their food the C.I. began to probe and challenge her as to whether or not her husband was truthful regarding his involvement in the Behan Homicide. However, each time the C.I. challenged her as to A.J.'s involvement, she reiterated how strongly she felt that he had committed the murder. When the meeting between the C.I. and Mrs. Johnson ended, the C.I. drove to the rear of the BJ's Plaza. The recording equipment was removed and he was debriefed.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Detectives Sudler and Pitocchelli observed this meeting from an undercover vehicle.

At approximately 11:30 am, Johnson and Detective Curry met Detective Cedeño at the Denny's restaurant located in the area of I-95 and Stirling Road. The group remained there and ate a light meal.

At approximately 12:25 pm, the group departed for Executive Airport to meet Rolie's jet. Johnson continued to ride in Curry's Suburban, with Detective Cedeño driving the Mercedes. Detectives Sudler and Pitocchelli observed this meeting from an undercover vehicle.

At approximately 12:45 pm, a private Lear jet, with Rolie onboard, began to taxi from the east side of Executive Airport to a secluded area in the northwest corner of the airport. Johnson, along with Detective Cedeño and Agent Curry were waiting with their two (2) vehicles (the borrowed Mercedes and the Chevy Suburban).

At approximately 12:55 pm, the Lear jet arrived at the rendezvous point. Detective Cedeño met Rolie as he deplaned and escorted him

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

to the Mercedes. Johnson remained in the front passenger seat of the Suburban with Agent Curry. The group then departed for an undercover BSO business in Fort Lauderdale. Detective Hendrick and I monitored the meeting from the public observation area located in the southwest corner of the airport.

Up to this point in the operation, none of the day's events were videotaped or audio taped.

At approximately 1:10 pm, the group entered the undercover BSO business. The business was equipped with both audio and video recording equipment. Detectives Sudler and Pitocchelli monitored the meeting from an undercover vehicle parked behind the business.

Prior to the meeting, BSO Detective Cedeño and ATF Agent McKeen were supplied with a detailed list of questions to ask Johnson regarding his role in the homicide. (A complete list of these questions can be found on Appendix A: Rolie's Questions For Andrew Johnson.) The purpose for Johnson's meeting with Rolie was so Rolie could challenge version of the events Johnson had described to Detective Cedeño on previous occasions. This was accomplished when Rolie presented Johnson with a copy of an old

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

newspaper clipping detailing the arrest and confessions of two
(2) suspects in 1991. Johnson maintained he was responsible for
the murder of the officer (he referred to as "Brian"), regardless
of who was arrested and who had confessed. At one point in the
meeting, Rolie asked Johnson to draw a diagram of the Circle K
store, where the deputy was parked and how he approached the
deputy's vehicle. Johnson used the back of the newspaper article
to draw his diagram. (The article and Johnson's drawing on the
back have been made a permanent part of this case file.)

For the remainder of the meeting Johnson went on to reiterate
some of the details of the murder he claimed he had committed.
During the course of his admissions a number of inconsistencies
regarding what he was claiming had occurred and what had actually
occurred at the crime scene were noted. For example, at one point
Johnson stated the deputy was getting into his vehicle when he
approached him. At another point he stated the deputy was getting
out of his vehicle. Another inconsistency dealt with the position
of the driver's window when the deputy was shot. Johnson stated
the window was in the up position when he shot through it.
Johnson also stated he fired from a distance of about six (6)
feet.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

For a detailed list of inconsistencies please refer to Appendix
C: Noteworthy Inconsistencies.


New information offered by Johnson regarding his involvement in
the Behan Homicide was as follows: During the conversation with
Rolie, Johnson was challenged as to his credibility when Rolie
produced the newspaper clipping indicating two (2) suspects had
been arrested and had confessed to the Behan Homicide. Although
Johnson was caught off guard by Rolie's newspaper clipping and
subsequent "angry" (Spanish) conversation with "Chico" (Detective
Cedeño), he maintained he was responsible for the murder. When
shown a newspaper photo of Deputy Behan, he agreed that Behan was
the Deputy he had shot, however, he conceded Behan was not the
Deputy who had instigated the charges that led to his dismissal.
Throughout the course of the investigation Johnson never claimed
he had shot the wrong deputy. He always stated his target was the
Deputy responsible for his dismissal. This deputy was identified
through Internal Affairs records as Deputy Brian Montgomery.


The meeting at the undercover facility concluded at approximately
2:15 pm. The group then left the undercover business to take a
"tour." This tour was at the behest of Rolie and utilized only
the Suburban vehicle. (This vehicle had been previously wired for

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

video and audio. However, one of the audio sources did not function.) The purpose of the tour was for Johnson to point out all the locations where he disposed of the dismantled gun.

At approximately 2:45 pm, the group arrived at the Circle K store located on Hallandale Beach Boulevard and SW 40th Avenue, where Deputy Behan was murdered. Johnson, who was seated in the rear passenger seat, provided the directions to the location.

After driving through the Circle K parking lot for a short time, Johnson directed Detective Cedeño to drive east on the street directly behind the Circle K (SW 30th Street). Johnson indicated he had parked his car on this street, east of the Circle K on the night of the incident. He was not specific as to an exact location. He stated he had left the area by first driving to I-95 and then heading south.

Johnson then directed the undercover officers to a body of water located southeast of the intersection of NW 27th Avenue and NW 175th Street in Miami-Dade County. He pointed out the canal/lake area where he threw the firearm's cylinder into the water.

Next, Johnson explained he threw the grips of the gun in a nearby

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

dumpster.

Finally, Johnson directed the undercover officers to the area of NW 41st Street and the Florida Turnpike. He stated he threw the frame of the firearm into a marshy area east of the Turnpike. (It should be noted there was no 41st Street exit for the Turnpike in 1991. Since then, a housing development has been built in the area, making the recovery of any potential piece of evidence impossible.)

After completing the tour with the undercover officers, the group had lunch at the Outback Steakhouse in the City of Pembroke Pines. No new information was developed. (ATF Agent McKeen recorded this conversation.)

After the meal, Johnson was driven back to his vehicle in the Oakwood Plaza.

(Note: The audio track of the video in the Suburban did not function, therefore the video has no sound. However, the backup audiotape recorder did capture the conversation.)

For specific details regarding this operation, please refer to

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

the actual recordings and the transcriptions of October 4, 2001.

As a result of Johnson directing the undercover officers to the canal where he disposed of the firearm cylinder, arrangements were made to search the canal utilizing both BSO and Miami-Dade Police divers.

**Tuesday, October 16, 2001**

Dive Team personnel from both the Broward Sheriff's Office and the Miami-Dade Police Department searched the canal where Johnson allegedly disposed of the gun cylinder. This canal is located in the 2600 block of NW 175th Street, in unincorporated Miami-Dade County (Carol City). The search did not result in locating the cylinder.

For specific details regarding the search of this body of water, please refer to the BSO Dive Unit Reports.

**Monday, October 29, 2001**

Major Fantigrassi met with Sergeant Brian Montgomery. The purpose of the meeting was to ascertain if Sergeant Montgomery had any recollection or documentation of his 1990 interactions with Johnson. Montgomery recalled some of his interactions with

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Johnson and stated he would attempt to locate his "Red Books" which might provide him with more exact details.

## Thursday, November 1, 2001

Sergeant Montgomery informed Major Fantigrassi he was not able to locate any of his Red Books from 1990.

During the course of this investigation, we attempted to locate records documenting the burglary incident/report Andrew Johnson referred to. Deputy Brian Montgomery allegedly authored this report prior to Johnson employment at BSO. We have been unable to locate any records concerning this incident.

## Friday, November 2, 2001

Detective Sudler contacted retired BSO Sergeant Brett Sagenkahn. Sagenkahn was Deputy Brian Montgomery's road patrol supervisor during the confrontations between Montgomery and Johnson. Sagenkahn recalled the incidents regarding Johnson showing up on calls in District One, and remembered initiating the Internal Affairs complaint. Sagenkahn stated he threw away all of the documentation he had on the incident while moving to his new residence.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Monday, November 5, 2001

Detective Sudler and I began the process of reviewing all the undercover recordings. After these recordings were reviewed, the pertinent sections of the recordings were transcribed. This process was completed in the early part of January 2002. The recordings and the transcripts were then incorporated into a case-filing package.

## Friday, November 30, 2001

Detectives Sudler and Pitocchelli retrieved the recording equipment that had been previously installed in the C.I.'s vehicle. (The C.I. had been involved in an accident. His vehicle was very badly damaged and was not drivable.)

## Thursday, December 13, 2001

Arrangements were made with the C.I. to have Gwenda Johnson become a passenger in his vehicle and drive Northbound on I-75 from NW 187th Street. The scenario was planned to unfold as follows: After conducting the traffic stop on the C.I.'s vehicle, both the C.I. and Mrs. Johnson would be invited to accompany Detective Sudler and I to the Public Safety Building to discuss Andrew Johnson's involvement in the Behan Homicide. This scenario was constructed due to the fact the C.I. had informed us A.J. had

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

moved out of the apartment he shared with Mrs. Johnson. According to the C.I., Mrs. Johnson was very upset with the situation and had given the C.I. a "Green Light" to contact someone in law enforcement concerning A.J.'s involvement in the Behan Homicide.

At approximately 10:00 am, the C.I. telephoned Mrs. Johnson and requested she meet him immediately in the Publix parking lot, near the intersection of I-75 and NW 186th Street. She agreed and the C.I. drove to the area. Detectives Sudler, Baxter, Pitocchelli and I followed. (Note: Due to the C.I.'s recent car accident, he was given $500 for this operation and instructed to rent a vehicle.)

At approximately 10:45 am, Mrs. Johnson was observed making contact with the C.I. as she entered his vehicle. Together, they drove west on NW 186th Street and then entered the northbound lanes of I-75. Shortly thereafter, Detective Sudler and I conducted the traffic stop in my unmarked vehicle. We invited both the C.I. and Mrs. Johnson to accompany us to BSO Headquarters. The C.I. and Mrs. Johnson agreed.

At approximately 12:30 pm, shortly after arriving at the Public Safety Building, Major Tony Fantigrassi and I began to interview

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Gwenda Johnson. She was very cooperative and proceeded to detail her knowledge of her husband's involvement in the Behan Homicide. The following is a summary of her statement:

According to Mrs. Johnson, she was aware of the circumstances surrounding "A.J.'s" termination as a BSO Corrections Deputy. She recalled how a Deputy named Montgomery had made a complaint to Internal Affairs concerning A.J. showing up at police calls and traffic stops. She described A.J. repeatedly talking in his sleep about how he was going to "get" Montgomery for costing him his job with BSO. She specifically recalled A.J. using Montgomery's name in his sleep. She estimated A.J. dreamt the same dream and talked in his sleep approximately two (2) to three (3) times per month.

In addition to talking in his sleep about Deputy Montgomery, Mrs. Johnson stated A.J. also spoke in his sleep about, what she perceived to be, the night of the Behan Homicide. She described how A.J. appeared to be "narrating" his actions that night saying things such as: "I am walking," "I kneel down to ask the officer a question" "I shoot the officer," "I am running." She went on to state the sleep talking usually began with A.J. repeating the words, "Wrong guy," "Wrong guy." When asked if she ever attempted

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

to verbally communicate with A.J. during his sleep talking, she stated she had tried. However, she was not able to obtain any definitive answers from him. When she specifically asked him whether or not he killed a cop, he replied, "Don't ask me anything crazy." Apparently, he was aware of his sleep talking and ordered her not to talk to him during such occurrences.

Other than the night of the officer's murder, Mrs. Johnson stated sometimes A.J. spoke in his sleep about killing a man by breaking his neck from the back seat of a vehicle. At the time of this dream he spoke of wearing fatigues. He also spoke of killing a person with a knife in a field. It was due to these self-described "crazy stories" that she was not completely convinced whether or not A.J. had actually killed the officer.

When specifically asked about whether or not she accompanied A.J. to dispose of the gun on the night of the murder she described the following incident: She recalled a night when A.J. came home very late and woke her up and telling her he just killed someone. He requested she accompany him to dispose of a gun. She remembered he was wearing military type clothing and had applied face paint around his eyes. He was wearing a "skully" type of headgear. Apparently, A.J. had already "broken" the gun apart

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

prior to Mrs. Johnson accompanying him. The gun was thrown in a field somewhere in Dade County not far from where they were living at the time. The car A.J. was driving was a Ford Probe she described as being "airplane blue" in color.

Mrs. Johnson stated she believed the sleep talking incidents began approximately two (2) years after the Behan Homicide.

Mrs. Johnson also described how she had started to write a book about her life, which included her married life to A.J. She stated she was not able to locate two (2) computer disks on which the book was being written. She suspected A.J. might have taken them from her possession.

When asked about criminal activity A.J. might had been involved in during their thirteen (13) year marriage, she stated she knew of the rape charge from Dade County and another incident in which he was suspected of "touching a little girl."

When Mrs. Johnson was asked about whom A.J. associated with, her demeanor drastically changed. She proceeded to describe A.J.'s associate "Chico." (Chico is BSO Undercover Detective Cedeño.) From what A.J. told her, Chico was a very dangerous criminal from

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

South America.

At the outset of the interview, Mrs. Johnson stated A.J. had recently moved out of their apartment. She was uncertain what their future together held. At the conclusion of the interview she agreed to try to assist investigators in determining whether or not A.J. was involved in the Behan Homicide. She stated she would attempt to convince him to move back home and would record his sleep talking. She further agreed to allow a hidden recording device to be installed in her bedroom.

After the interview, Mrs. Johnson and the C.I. left the Public Safety Building. The C.I. drove her back to her apartment.

Afterwards, the C.I. met with Detectives Sudler, Baxter, Pitocchelli and I, at the rear of the Publix Plaza. The C.I. stated his undercover status did not appear to have been compromised. Although he questioned Mrs. Johnson about 'her interview with law enforcement, she did not share any details with him.

**Wednesday, December 19, 2001**

I received a telephone call from Gwenda Johnson. She stated A.J.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

was living with another woman and her efforts to convince him to move back home did not seem to be working. Mrs. Johnson was instructed to continue making efforts to encourage A.J. to move back in with her.

**Thursday, January 17, 2002**

At approximately 10:00 am, I met Gwenda Johnson at the Publix Store on NW 186th Street, near I-75 in Miami-Dade County. The purpose of the meeting was for me to transport her to the Public Safety Building for a meeting with Major Tony Fantigrassi.

At approximately 11:00 am, Mrs. Johnson met with Major Fantigrassi and me. She stated A.J. was still living away from their apartment and although she had repeatedly requested he move back home, he had not done so. She did not feel he was going to move back home in the near future. The outcome of the meeting was as follows: Mrs. Johnson would continue her efforts to get A.J. to move back home. In doing so, she would recruit her mother to intervene on her behalf and ask A.J. to move back home for a "30 day trial period." (Mrs. Johnson's mother is a member of the church and apparently was highly respected by A.J.)

At the conclusion of the meeting, I drove Mrs. Johnson back to

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

the Publix in North Miami.


**Tuesday, January 22, 2002**

I received an urgent page from Gwenda Johnson. In the subsequent telephone conversation Mrs. Johnson stated she and her mother had spoken to A.J. and asked him to return home in order to give the marriage another try. A.J. responded by stating he had put his marriage behind him and was going to start a new life. He went on to tell her he had obtained a job with a television station in the West Palm Beach area. Mrs. Johnson did not know which particular station he was talking about or when he was starting the new job. She concluded by stating she did not feel A.J. would be returning to live in their apartment.


**Thursday, January 24, 2002**

Major Fantigrassi and I traveled to the Office of the Broward County State Attorney and met with Broward State Attorney Michael Satz and Assistant State Attorneys Ralph Ray, Chuck Morton and Caroline McCann. All were briefed as to the progress of the investigation. At the conclusion of the meeting all parties were in agreement that a thorough interview of Andrew Johnson was a critical remaining task in the investigation.

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

### Friday, January 25, 2002

I left a message with Gwenda Johnson's mother (Pastor Ealey) requesting Andrew Johnson telephone me at the Broward Sheriff's Office in reference to a recruitment drive. My previous research had revealed Johnson attempted to re-apply to the Broward Sheriff's Office several times since his termination. Gwenda Johnson felt A.J. would leap at the opportunity to work for BSO again. (This scenario was constructed so it would hopefully unfold with A.J. submitting to a pre-employment polygraph examination and then a subsequent psychological examination.)

### Wednesday, January 30, 2002

I left a second message at Pastor Ealey's residence requesting Andrew Johnson call me. The message was left with a female identifying herself as Elaine.

At approximately 4:45 pm, Andrew Johnson left a message on my voice mail stating he had received my message and could be reached at 954-435-4710. Another message was left at that telephone number asking Johnson to call. (Note: The recorded telephone greeting was that of a female.)

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Thursday, January 31, 2002

At approximately 1:00 pm, I picked up Gwenda Johnson from her place of work, 99 NE 183rd Street, North Miami. I transported her to the Public Safety Building for further interviews concerning her knowledge of the homicide. During this interview she admitted that A.J. had directly confronted her (not in his sleep) about shooting the wrong officer. He swore her to secrecy and threatened her life if she ever told anyone. At the conclusion of the interview Polygraph Examiner Richard Hoffman conducted a polygraph test on her. Hoffman concluded Mrs. Johnson's overall test results were "Inconclusive."

For Specific detail regarding the polygraph examination of Gwenda Johnson, please refer to Richard Hoffman's Polygraph report.

At the conclusion of the polygraph, I drove Mrs. Johnson back to her place of work, where her car was located.

At approximately 5:00 pm, (while Gwenda Johnson was being interviewed) Andrew Johnson telephoned me in reference to his eligibility for rehire at BSO. I directed Johnson to drive to the Public Safety Building the next day (Friday, February 1st) and pick up an application packet. I told him I would leave the

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

application at the front desk in the lobby. Arrangements were then made to speak with him on the following Tuesday (February 5th) and possibly meet with him to go over his completed application packet.

## Tuesday, February 5, 2002

I received a telephone call from Andrew Johnson. Johnson stated he had completed his application. Arrangements were made to meet with Johnson at 11:00 am at the Denny's restaurant located at I-95 and Sheridan Street in Hollywood.

At approximately 11:00 am, I met with Andrew Johnson at the Denny's restaurant. I reviewed his application and related materials. He spoke briefly about the circumstances surrounding his termination, specifically the incidents involving Deputy Brian Montgomery.

He stated Montgomery was a "racist." He described an incident that occurred prior to his being hired as a corrections deputy. Johnson had been the victim of a residential burglary and Montgomery was dispatched to take the report. When Montgomery left Johnson's residence, he observed Montgomery rip up the burglary report he had just filled out. In addition, Montgomery

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

made comments to Johnson suggesting Johnson did not stand much of a chance of obtaining employment with BSO.

During another encounter, Johnson approached Montgomery just to say "Hello" and "Do you remember me?" when he saw him in the Circle K store at 56th Avenue and Hallandale Beach Boulevard. He cited this incident as being what sparked Montgomery to make the Internal Affairs complaint.

At the conclusion of the meeting, I told Johnson I would be contacting him in reference to setting up appointments for the various stages of the BSO hiring process.

**Wednesday, February 6, 2002**

I telephoned Andrew Johnson and informed him I had arranged for him to take a pre-employment polygraph test on Friday, February 8, 2002 at 9:00 am at the Public Safety Building.

**Thursday, February 7, 2002**

I telephoned Andrew Johnson and confirmed the polygraph test appointment for the next day.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Friday, February 8, 2002

At approximately 8:00 am, I met with Major Fantigrassi, Polygraphist Richard Hoffman and Detective Scott Pitocchelli. The purpose of the meeting was to review the arrangements for the day's events. It had been previously determined that all the activities in the polygraph room would be video taped and audio taped. Detective Pitocchelli had installed the appropriate recording device in the Monitor Room prior to the Johnson's arrival.

At approximately 8:30 am, I telephoned the front desk and learned Andrew Johnson had arrived. I proceeded to the lobby area and observed Johnson had already received a visitor's pass. I then escorted him to the second floor, Criminal Investigations reception area. I requested he sign the Criminal Investigations Visitor's Log Book, which he did. The log reflects Johnson's arrival at 8:46 am.

At approximately 9:05 am, Polygraphist Richard Hoffman met Johnson in the reception area and escorted him to the Polygraph room. Major Fantigrassi, Detective Pitocchelli and I watched the interview/polygraph from the Monitoring Room via closed circuit television. The entire proceeding was recorded on videotape.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Some highlights from Johnson's interview/polygraph test:

(1)   Johnson told Hoffman the story of how he was terminated by BSO in 1990. He blamed Deputy Brian Montgomery for his dismissal and referred to him as a "racist."

(2)   He stated the firearm he was carrying when he was off-duty (a Smith and Wesson, Model 66, 4 inch barrel) was stolen from his vehicle while he was at a nightclub in Dade County.

(3)   He told Hoffman about his association with individuals he believed were drug dealers (He described the undercover officers). He ultimately admitted he told these individuals he shot and killed Deputy Montgomery at the Circle K store. He stated he mixed fact with fiction to impress these people.

(4)   Johnson stated other than the media reports about the Behan Homicide, he was able to obtain some information about the case while videotaping a deputy-involved accident, for the new media, at the same Circle K several years earlier. He also was aware of the prostitution scandal that resulted from the murder investigation.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

After performing the last polygraph test, Examiner Hoffman left the polygraph room to analyze the charts. I entered the room and spoke with Johnson about what he actually told the drug dealers. He described his statements to them as "fool's talk." He further stated after meeting with the "Big boss" he drove with them to the Circle K. He then showed them where he discarded the pieces of the gun. One piece went into a dumpster in the area of NW 175th Street and 27th Avenue in Miami-Dade County and the other piece was thrown in the area of the Florida turnpike near, what is now, the 41st Street exit. He described the gun as being a 9mm Glock.

(Note: Johnson's statement is inconsistent with what he had told undercover officers during previous operations. He previously stated he had thrown a piece of the gun, which he described as a Smith and Wesson, Model 66 in a canal/lake.)

I returned to the room a short time later with a manufactured "Wanted" poster displaying a photograph of Detective Cedeño as a drug dealer wanted by the DEA. Johnson identified the photograph as being the drug dealer he knew as "Chico." I told him another BSO detective would be talking to him shortly regarding his knowledge of these drug dealers.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information


A short time later, I introduced Major Tony Fantigrassi as
another BSO detective who was working the Chico case. Major
Fantigrassi further interviewed Johnson about his knowledge of
Chico and the other drug dealers. At the same time he questioned
Johnson as to what exactly he told them about the murder of the
police officer. Johnson continued to state he had mixed fact with
fiction when he took credit for the deputy's murder while
speaking with the drug dealers.

At approximately 5:15 pm, Major Fantigrassi and I escorted
Johnson into a conference room where the polygraph charts
(several feet in length) were affixed to the wall. He was
confronted with the audio and videotapes on which he had
implicated himself in the murder of Deputy Behan. During the
entire time in the conference room, while watching and listening
to himself on video and audio tape, Johnson stood firm as to his
story that he mixed fact with fiction in trying to impress the
drug dealers. He claimed his motivation for fabricating the story
was to illicit additional monies from them to pay for camera
equipment.

At approximately 7:30 pm, Johnson was escorted back into the

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

polygraph room. He once again retold the story of how he made up

his involvement in the Behan Homicide in order to impress the

individuals he believed to be drug dealers. This was done for the

purpose of videotaping Johnson's statement to Major Fantigrassi

and me.

At approximately 8:30 pm, due to the overwhelming media attention

to the case, I drove Johnson's car from the front of the Public

Safety Parking Lot to the secure rear parking lot.

At approximately 8:35 pm, I escorted Johnson to his car and he

left the Public Safety Building compound.

**Monday, February 11, 2002**

During his interview, Johnson had stated the Smith and Wesson

Model 66 he had carried during his encounters with Deputy

Montgomery was stolen from his vehicle while he was at a

nightclub call "Platinum" located at 119th Street an 17th Avenue,

in Miami-Dade County. According to Johnson, the club was now

called the "Golden Rock." A check revealed the address of the

Golden Rock as being 1610 NW 119th Street, in Miami. Contact was

made with Miami-Dade Police Department Records Division asking

them to check if Andrew Johnson had ever reported a gun stolen in

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

a vehicle burglary from that location or from any other location
in Miami-Dade County.

**Tuesday, February 12, 2002**

Miami-Dade Police Records faxed all the incidents involving
Andrew Johnson. No record of a car burglary or stolen gun was
found. Johnson's wife, Gwenda, made no record of a stolen gun
either. I left a message for Johnson asking him to call me with
the correct information.

(Note: Several additional checks using Gwenda Johnson's maiden
name [Ealey], as well as the names of other members of her family
were done. No record of a vehicle burglary, involving Andrew
Johnson's Smith and Wesson, Model 66 firearm could be located.)

At approximately 12:00 noon Major Fantigrassi called Detectives
Cedeño, Hendrick and me into his office and assigned us follow-up
tasks. Specifically, Cedeño and Hendrick were tasked to follow-up
on the addresses contained in Johnson's original personnel file.
I was tasked with attempting to locate any employment
applications Johnson may have made with the local police
agencies.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

Later in the day, arrangements were made with the Miami Police
Department for me to review the applications Johnson made with
them in 1991 and 1998.

**Wednesday, February 13, 2002**

At approximately 10:00 am I received a call from Andrew Johnson
as a result of an earlier message I had left on his answering
machine requesting information about the gun he reported stolen.
He referred me to his attorney, Joseph Gibson, (305-377-2525).

When I telephoned Mr. Gibson, he stated he would attempt to
obtain the information I was requesting. I informed him I was
attempting to verify information Johnson had voluntarily offered
to us during his interview.

At approximately 2:00 pm I drove to the Miami Police Department
and reviewed and copied portions of the two (2) applications
Johnson had made with them. (In both instances he was not hired.)

At approximately 4:30 pm I telephoned the Discovery Channel in
Miami (listed on the 2002 BSO application) and spoke to Johnson's
ex-supervisor, Bobby Owens. Mr. Owens confirmed Johnson had been
terminated for unsatisfactory work.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Thursday, February 14, 2002

Crime Analyst Patrice Muchow and I collaborated in the preparation of additional flow charts depicting Andrew Johnson's life history, employment history, education, and the progression of the investigation.

## Friday, February 15, 2002

I emailed District One Chief David Rahinsky and asked him to investigate whether any of the deputies under his command recalled the accident Johnson described as having taken place at the same Circle K where Behan was killed. (During his interview he stated it was at this accident scene, while videoing for the media, that he learned some of the details of the Behan Homicide.)

## Monday, February 18, 2002

I received an email from Chief Rahinsky informing me that no one recalled the accident Johnson had described.

## Tuesday, February 19, 2002

I received a telephone call from Gwenda Johnson. She stated

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

A.J.'s attorney had contacted her asking for more specific information about the car burglary in question. She told me she told his attorney she recalled the incident but not the specific date or whether or not a gun was taken. She did recall several other cars at the Golden Rock nightclub were also burglarized and it might have been a friend's car that was broken into, not just her and A.J.'s vehicle.


**Thursday, February 21, 2002**

After lengthy research, I was able to locate the deputy-involved accident Johnson was apparently referring to in his statement. The accident occurred on September 30, 1999 at the intersection of SW 40th Avenue and Hallandale Beach Boulevard (PK-99-09-1003). This accident involved a deputy sheriff who struck a van in the intersection while responding to a call. After being struck, the van came to rest in the gas pump area of the Circle K. Arrangements were made to obtain records reflecting which deputies were working at the time of the accident.


**Monday, February 25, 2002**

As a result of a previous request, I received a list of deputies who were working in the District One Area on the night of the deputy-involved accident (September 30, 1999). I contacted the

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

following deputies:


Sergeant Robert Freshwaters

Deputy Mitch Zion, CCN#: 2523

Deputy Angelo Portoro, CCN#: 9178

Deputy Michael Gebert, CCN#: 6659

Deputy Jon VonKossovsky, CCN#: 2822

Deputy Eugene Legra, CCN#: 9177

Deputy Kelly Baranyai, CCN#: 5765

Deputy Richard Pulido, CCN#: 7665

Deputy John Ziegler, CCN#: 8377

Deputy David Wood, CCN#: 8220


Sergeant Freshwaters remembered responding to the scene of the deputy-involved accident on September 30, 1999. He stated several representatives from the media were also present at the scene. He recalled Deputy David Wood being assigned to the specific area where the media representatives were setting up their equipment.

When I telephoned Deputy Wood, he told me he remembered being assigned to the southwest corner of the intersection of Hallandale Beach Boulevard and Southwest 40th Avenue, across the street from the Circle K. He specifically recalled this was the

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

same area where the media had set up there cameras. He stated he
was aware the Behan Homicide had occurred at that same location,
however, he did not have a specific recollection of speaking to
anyone from the media about the case.

**Tuesday, February 26, 2002**

I telephoned the office of Bill Burnett who was Johnson's
employer when the deputy-involved accident took place. I left a
message requesting he contact me. Later in the day Mr. Burnett
telephoned me and stated he would attempt to search for
documentation reflecting Johnson's presence at the scene of the
accident. Burnett did have an independent recollection as to
Johnson shooting video footage at the scene.

**Wednesday, February 27, 2002**

Johnson's former employer, Bill Burnett, telephoned me. He stated
he had located paperwork documenting Johnson had been assigned to
the deputy vs. van accident on September 30, 1999. He
subsequently faxed me the documentation. (He later supplied me
with Johnson's employment application as well as other paperwork
relating to Johnson's employment.)

**Thursday, February 28, 2002**

94

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

Major Tony Fantigrassi and Detective Doug Lashbrook obtained a
sworn taped statement from Edward Keith Davis. He stated on the
day of the Behan Homicide, he was walking to the Circle K store
from his house, located at 4110 Southwest 28th Street.  While
standing at the intersection of Southwest 28th Street and
Southwest 40th Avenue, he heard a single gunshot from the
direction of the Circle K. He ran behind a nearby tree and
observed a black individual run from the area of the (Deputy
Behan's) parked BSO patrol car on the west side of the store.
The black individual ran towards the rear of the store and
disappeared into the darkness.  Davis proceeded to run westbound
on SW 28th Street. He then circled back towards his residence. He
made no further observations.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

## Conclusion

During the afternoon hours of Friday, February 8, 2002, due to circumstances beyond our control, the local media became aware that Andrew Johnson was being interviewed at the Public Safety Building about the 1990 Patrick Behan Homicide. The extensive media coverage that followed, though quite inaccurate at times, changed the course of this investigation. For all intent and purposes, this investigation was brought to a halt. This was due to several reasons:

(1)   The media reported on the interactions of our undercover officers with Andrew Johnson. Our undercover officers were therefore compromised and could no longer take part in any future scenarios involving Andrew Johnson.

(2)   The media reported about the interactions of our confidential informant with Gwen Johnson. Although Gwen Johnson had agreed to cooperate with law enforcement, we were no longer able to utilize the confidential informant in gauging Mrs. Johnson's voracity. In addition, due to the extensive media coverage, Mrs. Johnson was no longer in a position to extract information about the homicide from Andrew Johnson.

(3)   The media reported Andrew Johnson voluntarily came to the Broward Sheriff's Office complex under the pretense that

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

he was there for a job interview. This precluded us from further interviewing Johnson during future scenarios which, to him, would have also appeared to have been part of the BSO hiring process. These (future) scenarios had already undergone extensive planning and were considered in the interest of continuing this investigation in hopes of corroborating any previous admissions.

(4)   As a result of the extensive media coverage, Andrew Johnson is now aware he was the focus of the Patrick Behan Homicide investigation. There have been several telephone conversations with him subsequent to February 8, 2001. However, on February 13, 2001 he refused to further speak about the investigation. He referred us to his attorney.

Other than the admissions made by Johnson during the undercover operations of August 23rd, August 31st, and October 4th, we have not been able to corroborate or substantiate his alleged role in the Patrick Behan Homicide. We have not been able to locate any physical evidence or independent witness testimony, beyond Gwen Johnson (now separated) that supports his admissions to our undercover officers during the course of the investigation.

PK-90-11-314
Patrick Behan Homicide
Supplement – New Information

While thoroughly examining those admissions, we have noted a number of troubling inconsistencies with the known facts of the crime and its scene. Those inconsistencies have been documented and noted in Appendix C. Appendix D documents the portion of Johnson's admissions we found to be consistent with the crime and its scene.

Additionally, we found it odd that in the months and years following the murder, Andrew Johnson consistently sought employment with various local law enforcement agencies, including the Broward Sheriff's Office. It is reasonable to believe that Johnson, having killed a police officer, would have been somewhat hesitant to do so knowing he would be subjected to a thorough background investigation, a polygraph examination and a psychological evaluation during the hiring process. Instead of avoiding the scrutiny these pre-employment screenings would bring upon him, he sought it. When he failed to meet the standards of one police department, he applied to another.

At this point in the investigation we are unable to continue in the direction that we had hoped for. Unfortunately, all of the sources of information we had cultivated during the course of the

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

10-month investigation, including Johnson himself, have been

compromised and are not in a position to offer additional

information, either directly or covertly. Consequently, we will

forward the findings of our investigation, up to this point, to

the Broward State Attorney's Office and the U.S. Attorney's

Office for their review and/or prosecutorial considerations.

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

**PK-90-11-314**
**Patrick Behan Homicide**
**Supplement – New Information**

Detective Michael Bolé, CCN: 4224
March 7, 2002

Major Anthony C. Fantigrassi, CCN: 0928
March 7, 2002

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed on this

2nd   day of  May, 2002 to Assistant Attorney General Celia Terenzio, 1515 N. Flagler Drive,

Suite 900, West Palm Beach, Florida 33401.

Brenda Bryn

S:\BRYN\BROWN\Exhibits.wpd