IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 955-7207-CIV-GRAHAM

TIMOTHY BROWN,                    :

     Plaintiff,                  :

vs.                              :

HARRY K. SINGLETARY,             :

     Defendant.                  :

_____/

## EXHIBITS TO TIMOTHY BROWN'S MOTION FOR CONSIDERATION OF ACTUAL INNOCENCE

## VOLUME IV

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____
     Brenda G. Bryn
     Timothy M. Day
     Fla. Bar Nos. 0708224, 360325
     Assistant Federal Public Defenders
     One E. Broward Boulevard
     Suite 1100
     Fort Lauderdale, Florida  33301
     (954) 356-7436
     (954) 356-7556 (fax)

# INDEX TO EXHIBITS

1.   Timothy Brown's July 16, 1991 Statement to Detectives Carr and Thomasevich

2.   Crime Scene Map (Drawn by FPD Investigator Dennis Stinson)

3.   Keith King's June 4, 1991 Statement to Detectives Carr and Thomasevich

4.   Mary Pendergrass' June 10, 1992 Statement To Defense Investigator Gary Brodlieb

5.   Monica Cherise Willis' January 15, 1992 Affidavit

6.   Keith King's May 20, 1999 Statement to FPD Investigator Dennis Stinson

7.   Philip Howard's November 13, 1990 Statement to Detective Gucciardo

8.   Affidavit of FPD Investigator Marlon Johnson (December 20,1999)
      re: Interview with Philip Howard

9.   Excerpt from March 4, 1992 Deposition of Sergeant Richard Scheff

10.  Affidavit of FPD Investigator Dennis Stinson re: May 21, 1999
      interview with Edward Davis

11.  Edward Davis's February 28, 2002 Statement to BSO Major Tony Fantigrassi

12.  Testimony of Sergeant Richard Scheff at Suppression Hearing (Excerpt re: Tim Brown)

13.  Testimony of Detective James Carr at Suppression Hearing (Excerpt re: Tim Brown)

14.  Testimony of Detective Eli Thomasevich at Suppression Hearing (Excerpt re: Tim Brown)

15.  Testimony of Dr. Elizabeth Kaprowski at Suppression Hearing (Excerpt re: Tim Brown)

16.  Dr. Kaprowski's Memo (12-6-92) re: Psychological Evaluation of Tim Brown

17.  Findings of Judge John Frusciante, (Denying Motion to Suppress
      Tim Brown's July 16, 1991 Statement)

18.  Behan's Autopsy Report

19.  Trial Testimony of Medical Examiner Raul Vila

20.  Trial Testimony of Bloodspatter Expert Charles Edel

21.    Trial Testimony of Ballistics Expert Dennis Grey

22.    Trial Testimony of Det. James Carr (Excerpt re: Tim Brown)

23.    Trial Testimony of Dr. Elizabeth Kaprowski

24.    Jury Instructions Re: Aiding/Abetting and Voluntariness of Defendant's Statement

25.    Jury Deliberations (Including Questions from the Jury and the Court's Answers)

26.    Affidavit of Dr. Richard Leo (December 22, 1999)

27.    Affidavit of Dr. I. Bruce Frumkin (December 21, 1999)

28.    Affidavit of Dr. Lenore E. Walker (December 22, 1999)

29.    Affidavit of Othalean Brown (December 21, 1999)

30.    BSO's New Policy and Procedure re: Interrogation of Suspects with Developmental Disabilities (November 17, 2001)

31.    BSO's "99-Page Report" of the Re-opened Investigation of the Behan Homicide

32.    Appendix D to the 99-Page Report -"Noteworthy Consistencies"

33.    Appendix C to the 99-Page Report - "Noteworthy Inconsistencies"

34.    Internal Affairs Complaint Against Detention Deputy Andrew Johnson (July 10, 1990)

35.    Internal Affairs Findings, Recommendation, and Order of Termination Of Detention Deputy Andrew Johnson (July 10, 1990)

36.    BSO's Flow Chart Re: Andrew Johnson's Motive in Behan Homicide

37.    Deposition of Brian Montgomery (July 8, 1992)

38.    Transcript of April 25, 2001 Conversation between Gwen Johnson and China (CI)

39.    Transcript of May 3, 2001 Conversation between Gwen Johnson and (CI)

40.    Transcript of May 31, 2001 Conversation between Gwen Johnson and China (CI)

41.    China's "Insurance" Letter

42.   Transcript of June 6, 2001 Conversation between Gwen Johnson and China (CI)

43.   Transcript of June 14, 2001 Conversation between Gwen Johnson and China (CI)

44.   Transcript of July 5, 2001 Conversation between Gwen Johnson and  China (CI)

45.   Transcript of August 2, 2001 Conversation between Andrew Johnson (AJ) and China (CI)
      (Traffic Stop by BSO Deputy Sudler)

46.   Transcript of August 16, 2001 Conversation between AJ, China (CI), Chico (Det. Cedeno),
      And "T" (Agt. Curry)

47.   Transcript of August 23, 2001 Conversation between AJ and Chico (Det. Cedeno)

48.   BSO's Report of August 23, 2001

49.   Transcript of August 3, 2001 Conversation between AJ, Chico (Det. Cedeno),
      and "T"(Agt. Curry)

50.   BSO's Report of August 31, 2001

51.   Transcript of September 27, 2001 Conversation between Gwen Johnson and China (CI)

52.   Transcript of October 4, 2001 Meeting in the BSO Undercover Office between AJ,
      Rollie (Agt. McKeen), Chico, (Det. Cedeno), and "T" (Agt. Curry)

53.   Newspaper Article (Sun Sentinel July 18, 1991) Shown to AJ
      during the October 14, 2001 Meeting in the Undercover Office

54.   AJ's Map of the Crime Scene (Drawn during the October 4, 2001
      Meeting in the Undercover Office)

55.   Transcript of October 4, 2001 Conversation between AJ, Chico (Det. Cedeno), Rollie (Agt.
      McKeen) and "T" (Agt. Curry) (Car Tour of Circle K)

56.   Transcript of AJ's February 8, 2002 "Job Interview" and Polygraph at BSO
      (Transcript prepared by Petitioner)

57.   Transcript of Final Portion of AJ's February 8, 2002 "Job Interview" and Polygraph at BSO
      (Partial Transcript prepared by BSO)

58.   Report of BSO Polygrapher Richard Hoffman re: AJ's February 8, 2002 Polygraph

59.   Transcript of March 13, 2002 Statement of Gwen Johnson to BSO Detective Bole and Major
      Fantigrassi (Recantation)

## (Index to Volume IV)

32.    Appendix D to the 99-Page Report -"Noteworthy Consistencies"

33.    Appendix C to the 99-Page Report - "Noteworthy Inconsistencies"

34.    Internal Affairs Complaint Against Detention Deputy
       Andrew Johnson (July 10, 1990)

35.    Internal Affairs Findings, Recommendation, and Order of Termination
       Of Detention Deputy Andrew Johnson (July 10, 1990)

36.    BSO's Flow Chart Re: Andrew Johnson's Motive in Behan Homicide

37.    Deposition of Brian Montgomery (July 8, 1992)

38.    Transcript of April 25, 2001 Conversation between Gwen Johnson and China (CI)

39.    Transcript of May 3, 2001 Conversation between Gwen Johnson and (CI)

40.    Transcript of May 31, 2001 Conversation between Gwen Johnson and (CI)

41.    China's "Insurance" Letter

42.    Transcript of June 6, 2001 conversation between Gwen Johnson and China (CI)

43.    Transcript of June 14, 2001 conversation between Gwen Johnson and China (CI)

44.    Transcript of July 5, 2001 conversation between Gwen Johnson and  China (CI)

45.    Transcript of August 2, 2001 conversation between Andrew Johnson (AJ) and China (CI)
       (Traffic Stop by BSO Deputy Sudler)

Appendix D

## **NOTEWORTHY CONSISTENCIES**

Legend

| | | | |
|---|---|---|---|
| PE | = | Port Everglades | (August 23, 2001) |
| VEH | = | Vehicle | (August 31, 2001) |
| BSO U/B | = | BSO Undercover Business | (October 4, 2001) |

ATTACHMENT / EXHIBIT 32

1

Potential Motive - **Consistent**
Johnson always stated his motive for the murder was because he was fired from BSO due to Brian Montgomery's Internal Affairs complaint against him.
BSO U/B - page 8-9.  PE - page 13-17.  BSO U/B - page 12-13.  BSO U/B - page 17-18.
VEH - page 10

It was confirmed that Johnson was fired as a result of an Internal Affairs investigation initiated by Brian Montgomery.

*This is confirmed by the Internal Affairs report.*
*(This documentation has been made a permanent part of the investigative case file.)*


Type Of Gun Used To Shoot The Deputy- **Consistent**
Johnson states he used a Smith and Wesson Model 66 (357). This is consistent with the rifling characteristics for the type of weapon the recovered projectile was fired from.
BSO U/B - page 22.  PE - page 22.  VEH - page 37.

*This is confirmed by ballistics report.*
*(This documentation has been made a permanent part of the investigative case file.)*


Number Of Shots Fired - **Consistent**
Johnson states he fired only one shot.  BSO U/B - page 24.

*This is confirmed by the Autopsy Report.*
*(This documentation has been made a permanent part of the investigative case file.)*


Type Of Projectile Used – Possibly **Consistent**
Johnson said he used a hollow point 357.  BSO U/B - page 29 and PE - page 22.

Ballistic tests show Behan was killed with a .357-jacketed projectile.  (Due to the condition of the projectile, further analysis could not be done to determine if it was a jacketed hollow point.  However, the recovered projectile could have been a hollow point.)

*This is confirmed by ballistic report.*
*(This documentation has been made a permanent part of the investigative case file.)*

2

<u>Where The Bullet Struck The Deputy – **Consistent**</u>
Johnson indicates by pointing to the left side of his face where he shot the deputy.
BSO U/B - page 53 - 55.

*This is confirmed by Autopsy report.*
*(This documentation has been made a permanent part of the investigative case file.)*


<u>Deputy's Attire - **Consistent**</u>
Johnson states he shot the deputy while he was in uniform.
PE - page 20 - 21.  PE - page 23.

*This is confirmed by initial crime scene reports.*
*(This documentation has been made a permanent part of the investigative case file.)*


<u>Where the Deputy Was Parked When He Was Killed - **Consistent**</u>
Johnson states the Deputy's vehicle was sitting at the Circle K at the corner of the wall.
BSO U/B - page 21.

Johnson later draws a map (made part of the case file) further describing where the deputy's vehicle was parked.  BSO U/B - page 53.

*This is confirmed by initial crime scene reports.*
*(This documentation has been made a permanent part of the investigative case file.)*

<u>Appendix C</u>

## **<u>NOTEWORTHY INCONSISTENCIES</u>**

<u>Legend</u>

PE          =      Port Everglades         (August 23, 2001)

VEH       =      Vehicle              (August 31, 2001)

BSO U/B   =      BSO Undercover Business   (October 4, 2001)

ATTACHMENT / EXHIBIT 33

1

Date Of The Murder – **INCONSISTENT**
Johnson puts the time of the incident in the early part of 1991 around January or February.  BSO U/B - page 20 and PE - page 2.

*This is confirmed by the initial original report.*
*(This documentation has been made a permanent part of the investigative case file.)*


Location Of Deputy At The Time Of The Shooting - **INCONSISTENT**
Johnson indicates that the deputy was getting into his car when he walked up and did him.  PE - page 18.

He later states he was sitting in the unit.  PE - page 23.

*The crime scene indicates Behan was sitting inside his police cruiser, working on a report, when he was shot. This is confirmed by the initial reports.*
*(This documentation has been made a permanent part of the investigative case file.)*


Distance From The Deputy When The Shot Was Fired - **INCONSISTENT**
At one point Johnson describes how he shot the deputy at point blank range.
PE - page 22.

At a later time, he estimates the distance to be six (6) feet away.  BSO U/B - page 29.

*Findings that describe gunpowder stippling on Behan's hand would suggest the distance to have been about 6-12" from his extended fingertips.  The gunshot wound to the left side of the face would have been from a distance of about two (2) feet. This is estimated by the autopsy report findings, which describes the injured areas with stippling.*
*(This documentation has been made a permanent part of the investigative case file.)*


Position Of The Deputy's Window- **INCONSISTENT**
Johnson states he shot the deputy through the glass.
BSO U/B - page 28 and BSO U/B - page 30.

*Behan's window was partially down and he was shot through the open window space. This is confirmed by the crime scene reports.*
*(This documentation has been made a permanent part of the investigative case file.)*

2

Other Vehicles In The Circle K Parking Lot  - **INCONSISTENT**
Johnson states there were no other vehicles in the parking lot at the time of the
shooting.  BSO U/B - page 21 and BSO U/B - page 41 & 42.

*There was at least one tow truck present.  This is confirmed by the 1990 witness
statement of Stephan Antonio.*
*(This documentation has been made a permanent part of the investigative case file.)*


Position Of The Deputy's Hands - **INCONSISTENT**
Johnson instructed the deputy to put his hands up prior to shooting him.
PE - page 21 and BSO U/B - page 56.

*The crime scene evidence shows Behan's left hand was actually outside of the partially
open window when shot. The location of the stippling on the fingertips would further
suggest Behan's fingers were more likely extended towards the gun when shot.  This is
suggested by the autopsy report findings and the crime scene findings.*
*(This documentation has been made a permanent part of the investigative case file.)*


Description Of Hallandale Beach Blvd In 1991 - **INCONSISTENT**
Johnson states the road was only one lane in each direction and has since been
widened. Hallandale Beach Boulevard has always been a four (4) lane road.
BSO U/B - page 23.

*This is confirmed by the original crime scene photos.*
*(This documentation has been made a permanent part of the investigative case file.)*


Who Was Part Of The Internal Affairs Complaint? - **INCONSISTENT**
Johnson states he knows for a fact that Behan was part of the complaint that got him
fired.  BSO U/B - page 69.

Johnson said he knows that he (Behan) was one of the officers on the scene (referring
to his burglary he reported originally to Brian Montgomery.)
BSO U/B - page 47.

*Employment records and the Internal Affairs Report confirm Behan was not part of the
complaint against Johnson. Behan could not have been present when Johnson claimed
he reported a burglary at his home prior to his employment with BSO on July 31, 1989.
Deputy Behan did not begin employment with BSO until September 4th, 1990.  Johnson
was terminated on July 10th, 1990, nearly two (2) months before Behan was hired. The
actual burglary report Johnson claimed he filed has never been confirmed nor has any
record of it ever been found.*
*(Behan's employment record, Johnson's employment record and the Internal Affairs
report have been made a permanent part of the investigative case file.)*

3

Name Of The Deputy Killed - **INCONSISTENT**
Johnson tells Chico he killed Brian, the deputy responsible for getting him fired.
VEH - page 12 and BSO U/B - page 12.

Johnson initially stated he saw him (referring to Brian) for two (2) nights because he used to always see deputies sitting out there (referring to Circle K.)
BSO U/B - page 19 and PE - page 18.

Johnson further claims he scouted him out (referring to Brian) for a couple of weeks.
BSO U/B - page 42.

Johnson states, "Needless to say he won't be getting nobody else fired." (Again referring to Brian)  PE - page 17.

When asked, "Was it the dude that cost you your job bro," he replies, "Yeah."
VEH - page 12

Johnson also comments, the deputy looked him "dead in the face...I just wanted him to see who it was" (again referring to the deputy that got him fired.)  VEH - page 27.

Johnson further comments, "I knew him because he was the one that launched the investigation against me..." VEH - page 29

While talking about the murder, Johnson stresses the importance of making sure you have the right "target" and not doing it on the spur of the moment.  VEH - page 57.

*Although Johnson consistently claimed he killed Brian (Montgomery) he never admitted he might have shot the wrong person until confronted by the undercover officers. It would also appear by Johnson's comments, he was certain that he had killed the deputy he intended to kill. At some point following the murder, it would seem reasonable to think Johnson would have learned from the overwhelming media accounts that Deputy Patrick Behan (not Brian Montgomery) was killed.  Obviously, Patrick Behan was killed and not Brian Montgomery. This is confirmed by the original report.*
*(This documentation has been made a permanent part of the investigative case file.)*

4

## Who Was Arrested - **INCONSISTENT**

Johnson first said that no one was ever arrested and further stated he wouldn't know if any one took the fall. PE - page 3 & 4.

At one point Johnson claimed they pinned it on the fact that a hooker did it.
BSO U/B - page 15 and PE - page 23.

Johnson later states he knows two kids, who confessed, are in jail for this who.
BSO U/B - page 37.

Johnson then later claims he never followed it and that he knew that they had "snagged" somebody, but he never cared.  BSO U/B - page 69.

Johnson claims he heard they had arrested somebody but they had to let him go because he had an alibi.  VEH - page 19.

*These particular inconsistencies are pointed out because it seems odd that Johnson would not have followed any arrests for his alleged crime more closely.  He remained in the local area in the years following the murder of Behan and continued to seek employment with other police agencies.  Regardless, Keith King and Tim Brown were arrested for the murder of Patrick Behan.  This is confirmed by the original investigative report completed by Detective Carr.*
*(This documentation has been made a permanent part of the investigative case file.)*

5

**NICK NAVARRO**
SHERIFF
BROWARD COUNTY
P.O. BOX 9507
FORT LAUDERDALE, FLORIDA 33310

June 21, 1990

**DATE:**

**MEMO TO:** Capt. Ralph Hernandez, Jr., Commander, Internal Affairs

Sgt. David J. Carry, Internal Affairs

**FROM:**

**SUBJECT:** COMPLAINT AGAINST DETENTION DEPUTY ANDREW JOHNSON, #5977

**ALLEGATION:** Conformity to Law, 2.2.28

Violation of Weapons Policy, 6.1(a)

Violation of Dept. of Detention Manual/
Firearms Policy, dated 6/8/88- 33.8.03 - ACA
2.5087

Truthfulness in Office Matters, 2.2.44

Change of Telephone and Address 2.2.62

**STATEMENTS:** Deputy Montgomery
Det. Dep. Andrew Johnson, Statement A & B

**EXHIBITS:** Memo from Deputy Montgomery

**NARRATIVE:**

On 6/5/90, I received a phone call, followed up with a memo
from Deputy Montgomery. Deputy Montgomery advised that he
has had three contacts with a Detention Deputy Andrew
Johnson while engaged in police activity. Deputy Montgomery
stated Dep. Johnson has showed up on three scenes in the
past two months, asking if he could assist him. Deputy
Montgomery advised that Dep. Johnson was always in uniform,
wearing a firearm and complete gun belt.

On 6/6/90, I took a sworn taped statement from Dep.
Montgomery. In brief, Dep. Montgomery stated the following.

Dep. Montgomery was stopped at a Circle K located at the
5600 block of Hallandale Beach Boulevard sometime in early
April 1990. Dep. Montgomery stated he did not know the
exact time and day, but believed it was between 12:00 a.m
and 1:30 a.m. At this time, a black male in full B.S.O.
uniform, including a firearm and gun belt exited a blue

ATTACHMENT / EXHIBIT 34

CAPTAIN RALPH HERNANDEZ                    -2-                    JUNE 21, 1990

Ford Probe and asked Dep. Montgomery if everything was
okay. Dep. Montgomery said yes and a conversation started.
The black male indentified himself as Dep. Andrew Johnson,
working District 2, Charlie Shift. Dep. Johnson advised
Dep. Montgomery that he was on his way home from a late
arrest. Dep. Montgomery asked Dep. Johnson where his radio
was and Dep. Johnson responded, "I just started, and the
District is short radios." Dep. Montgomery continued a
conversation with Dep. Johnson for approximately ten
minutes, then left the scene.

The next time Dep. Montgomery met Dep. Johnson was on
4/22/90 at approximately 11:15 p.m. Dep. Montgomery was
responding to a fight in progress in the 3200 block of S.W.
56th Avenue. Dep. Montgomery was traveling Code 3,
emergency lights and siren, following two other marked
units in the 5200 block of Hallandale Beach Boulevard when
he observed a blue Ford Probe following him and running red
lights, traveling in a Code 3 mode without blue lights and
siren. When Dep. Montgomery arrived at the fight location,
Dep. Montgomery observed Dep. Johnson exit the Ford Probe.
Dep. Johnson was in full uniform, including a firearm and
gun belt. Dep. Johnson asked Dep. Montgomery what was
going on. Dep. Montgomery advised him it was a domestic
fight. Dep. Montgomery talked to Dep. Johnson for a few
minutes, then Dep. Montgomery left the scene. Dep. Johnson
did not take any police action.

The next time Dep. Montgomery met with Dep. Johnson was on
6/5/90 at approximately 2:13 hours. Dep. Montgomery was
backing up an FHP Trooper in the 5000 block of Hallandale
Beach Boulevard when Dep. Johnson pulled up behind him,
driving a blue Ford Probe. Dep. Johnson exited the vehicle
in full uniform, including a firearm and gun belt.

Dep. Johnson asked Dep. Montgomery what was going on and he
said, "Just backing up a Trooper on a traffic stop." Dep.
Montgomery then asked Dep. Johnson where he was working
now. Dep. Johnson said, "I work the North Annex."

At this point, Dep. Montgomery was concerned that Dep.
Johnson had told him previously that he was a District 2
Deputy working Charlie Shift, and now he was a Detention
Deputy working the North Annex.

At this time, Dep. Montgomery called Sgt. Sagenkahn to the
scene fearing that Dep. Johnson was carrying a firearm and
acting without authority.

When Sgt. Sagenkahn arrived, he asked to see Dep. Johnson's
I.D. Card. At this time, Dep. Johnson produced a B.S.O.
I.D. Card identifying him as a Detention Deputy, I.D.#5977,

CAPTAIN RALPH HERNANDEZ          -3-          JUNE 21, 1990

working the Stockade. Sgt. Sagenkahn then asked Dep. Johnson if he was authorized to carry a gun. Dep. Johnson said yes, to and from work only. Sgt. Sagenkahn advised Dep. Johnson that it was not a good idea to stop and back up deputies on calls since he did not have the training a deputy receives.

Dep. Johnson stated he understood, but told Sgt. Sagenkahn that, "You wear green and white and I wear green and white. I consider myself the same as you and if I lose my job, I lose my job, but I'm still going to stop."

At this time, Dep. Johnson left the scene. Sgt. Sagenkahn instructed Dep. Montgomery to contact Internal Affairs to advise of Dep. Johnson's actions.

On 6/12/90 at approximately 10:50 p.m., Sgt. Ziegler and I set up to do a surveillance on Dep. Johnson on the west side of the Stockade, 5400 Powerline Road, Fort Lauderdale. However, shortly after Dep. Johnson exited the Stockade through the West Exit in his 1990 blue Ford Probe, Tag #HLV-92S, we lost sight of him traveling south on Powerline Road. Sgt. Ziegler and I did not make contact with him again during this surveillance, ending the surveillance at 1:00 a.m. on 6/13/90.

On 6/13/90 at approximately 10:50 p.m., Sgt. Ziegler and I were set up on the west side of the Stockade, while Det. Baughn was set up at the traffic light at Powerline Road and Commercial Boulevard. The surveillance began at approximately 11:08 PM when Dep. Johnson exited the west parking lot of the Stockade, turning south on Powerline Road. Dep. Johnson then turned east on Commercial Boulevard onto the entrance ramp of I-95, traveling south on I-95. At this time, Det. Baughn was following close behind Dep. Johnson's vehicle. Sgt. Ziegler and I were behind Dep. Baughn's vehicle. Shortly after Dep. Johnson drove onto I-95 southbound, he accelerated to a very high rate of speed. Sgt. Ziegler and I lost sight of Det. Baughn and Dep. Johnson at Oakland Park Boulevard traveling at 85 MPH. We could not even see the vehicles. Det. Baughn stated he was having trouble keeping up with Dep. Johnson traveling at approximately 100 MPH.

At State Road 84, Det. Baughn was stopped by a State Trooper and lost contact with Dep. Johnson. The surveillance was then set up at Dep. Johnson's listed residence, located at 6109 S.W. 40th Street, Miramar. The surveillance was ended at approximately 1:10 a.m. without further contact with Dep. Johnson.

CAPTAIN RALPH HERNANDEZ                    -4-                    JUNE 21, 1990

On 6.14.90 at approximately 10:50 a.m., I interviewed and took a sworn taped statement from Dep. Andrew Johnson, #5977. Also present was Attorney Cary Nutall from the PBA who was representing Dep. Johnson.

In brief, Dep. Johnson stated the following in regard to the memo written by Dep. Montgomery.

Dep. Johnson stated that he did not talk to Dep. Montgomery in early April, 1990 in the 5600 block of Hallandale Beach Boulevard. Dep. Johnson said he never told Dep. Montgomery that he was a District Two Deputy on the Charlie Shift. Dep. Johnson said the meeting that Dep. Montgomery refers to in early April never occurred.

Dep. Johnson stated he did remember responding to a fight call at the 3200 block of S.W. 56th Avenue, Pembroke Park, at approximately 11:00 p.m. in mid April but did not know the exact date. The date was recorded as 4/22/90 on Dep. Montgomery's Daily Patrol Log. Dep. Johnson said he saw the cars in a Code 3 mode on S.W. 56th Avenue, traveling south and he followed them to the scene. At that time, he talked to a deputy, asking him what was going on. The Deputy told him it was a domestic. Dep. Johnson stated he was wearing a uniform but not a gun. Dep. Johnson said he was on his way home and just stopped to see what was going on. Dep. Johnson said he did not talk to Dep. Montgomery at the scene as stated in Dep. Montgomery's memo.

Dep. Johnson states he did remember stopping to talk with Dep. Montgomery on 6/5/90 at approximately 2:15 hours. Dep. Johnson said he was working at the Stockade and was off duty at approximately 2:00 a.m. While driving home, west on Hallandale Beach Boulevard, he observed Dep. Montgomery stopped behind a Florida State Trooper at approximately the 5000 block, so he stopped to talk to Dep. Montgomery. Dep. Johnson said he talked to Dep. Montgomery about a burglary that Dep. Montgomery took at his house more than a year ago. In addition, Dep. Johnson asked Dep. Montgomery what was going on here. Dep. Montgomery said he was just backing up the Trooper.

Dep. Montgomery asked Dep. Johnson where he worked now and Dep. Johnson advised he was working in the Stockade. Dep. Johnson said he was in full uniform, including a firearm and gunbelt. When I asked Dep. Johnson why he was carrying a firearm, he said he knew he was not allowed to carry a firearm under B.S.O. Policy and Procedures, but he could carry a firearm under State Statute.

CAPTAIN RALPH HERNANDEZ                    -5-              JUNE 21, 1990

Dep. Johnson stated he did talk to Sgt. Sagenkahn who
responded to the scene and asked to see his I.D.  Dep.
Johnson also said he told Sgt. Sagenkahn that I wear the
same colors as you and as an officer, I am going to stop
and help if I see an officer that is in trouble.

Dep. Johnson also stated he assisted a Miramar officer with
an arrest on May 15, 1990.  Dep. Johnson stated he was on
his way home on May 15, 1990 and stopped in a Burger King
in the area of State Road 7 and Hallandale Beach Boulevard
to get something to eat.  As he exited Burger King, he
observed a Miramar officer having a confrontation with a
citizen at State Road 7 and Miramar Parkway.  Dep. Johnson
approached the Miramar officer and offered his assistance,
which the Miramar officer accepted.  Dep. Johnson was in
full uniform wearing a firearm and S&W Model 66 357 Mag.
Dep. Johnson stated that he did not have his firearm in a
gun belt while in Burger King, but did have it in his hand,
wrapped in a jacket.  Dep. Johnson stated he put the gun
belt on in the car prior to seeing the Miramar officer in
trouble.  Dep. Johnson stated he only assisted the Miramar
officer in handcuffing the suspect, then left the scene for
home.



I advised Dep. Johnson that the Internal Affairs Division
was conducting a surveillance on him on 6/13/90, beginning
at approximately 10:55 p.m. at the Stockade, located in the
5400 block of Powerline Road.  I asked Dep. Johnson what
speed he traveled, going south, on I-95 between Commercial
Boulevard and State Road 84.  Dep. Johnson stated 60 to 65,
then changed his statement to not over 85 MPH.  However,
Dep. Johnson stated he was speeding because he knew someone
was following him.

At this point I asked Dep. Johnson if he would submit to a
polygraph test.  Dep. Johnson agreed, however, Attorney
Nutall advised Dep. Johnson not to submit to the polygraph
exam.  Dep. Johnson still asked to submit to a polygraph
exam and an appointment was set up with Det. Tom Gill
immediately.

I escorted Dep. Johnson and Attorney Nutall to Det. Gill's
Office where Attorney Nutall approved the questions being
asked by Det. Gill.  After two polygraph test, Det. Gill
contacted me and advised that Dep. Johnson showed deception
on several questions and confessed that he lied to me on
several occasions during the original sworn taped statement.
See Det. Gills report for full details.

CAPTAIN RALPH HERNANDEZ          -6-          JUNE 21, 1990

Det. Gill and Dep. Johnson responded back to the Internal
Affairs Office where I took another sworn taped statement
from Dep. Johnson at approximately 2:45 p.m. on 6/13/90.

In brief, Dep. Johnson stated he deliberately lied to me
during the first statement. The following is the correct
answers to questions he lied about in the original sworn
taped statement.

#1. Dep. Johnson did have a conversation with Dep.
    Montgomery during which he told Dep. Montgomery that
    he was a District Deputy, but he did not remember
    which District he told Montgomery he worked in. He
    did state he worked the Charlie Shift.

#2. Dap. Johnson was infact wearing a firearm while at the
    scene of the fight at the 3200 block of S.W. 56th
    Avenue on 4/22/90. Dep. Johnson still maintained that
    he did not speak with Dep. Montgomery at that time.
    Dep. Johnson still maintained he did not run any red
    lights on the way to this fight call and did not
    follow the marked units that were traveling west on
    Hallandale Beach Boulevard, Code 3.

#3. Dep. Johnson was carrying a firearm on a gun belt
    while in the Burger King on May 15, 1990.

#4. Dep. Johnson had no idea he was being followed on
    6/13/90, traveling home on I-95. He just said that
    because I told him Internal Affairs was surveilling
    him. Dep. Johnson stated he was traveling in excess
    of 90 MPH on I-95 between Commercial Boulevard and
    Hallandale Beach Boulevard.

#5. Dep. Johnson did not tell me the whole truth to the
    best of his knowledge on the original sworn taped
    statement.

FINDINGS:

This investigation supports the following violations of
B.S.O. Policy and Procedures.

2.2.44   Official Reports/Truthfulness in Office Matters:

         A. An employee will not make false statements in
            any communication, verbal or written, concern-
            ing official matters.

Dep. Johnson violated this policy by lying to me during the
original sworn taped statement, and by telling Dep.
Montgomery he was a District 2 deputy, working the Charlie
Shift.

*13*

CAPTAIN RALPH HERNANDEZ                    -7-                    JUNE 21, 1990

**2.2.28    Conformity to Laws:**

Employees will obey all laws of the United States,
State of Florida and of the local jurisdiction. An
indictment or information filed against an employee
for the violation of any law may be cause for
placing that employee on administrative leave or
suspending him (with or without pay).

Dep. Johnson violated this policy by traveling in excess of
90 MPH on Interstate 95 between Commercial Boulevard and
Hallandale Beach Boulevard on 6/13/90 at approximately
11:10 p.m. to 11:20 p.m.

In addition, Dep. Johnson ran a red light at the 5200 block
of Hallandale Beach Boulevard following marked B.S.O. units
traveling Code 3 to a fight call on 4/22/90 at approximately
11:15 p.m.

**6.1.    GENERAL:**

As long as members of the public are victims of
violent crimes and law enforcement officers are
confronted with deadly force in the performance
of their duty, it will remain necessary for
deputy sheriff's to be properly armed.

A.  All employees of the Broward Sheriff's
    Office, when not expressly authorized by the
    Sheriff, are prohibited from carrying weapons
    or firearms either manually or concealed
    while on duty, and/or while in any official
    uniform, or while acting under color of the
    authority of the Sheriff's Office.

Dep. Johnson violated this policy by carrying a firearm and
a gun belt in plain view while wearing a Broward County
Sheriff's Office Detention Deputy uniform. Dep. Johnson is
still on probation; has never been to the B.S.O. Range to
qualify, and did not have permission to carry a firearm by
Sheriff Navarro.

**2.2.62    Change of Telephone and Address:**

Any change of an employee's telephone number or
address will be reported within 24 hours to the
employee's immediate supervisor and the
Communications Division.

Dep. Johnson violated this policy by changing his address
from 6109 S.W. 40th Street, Miramar to 6015 S.W. 33rd
Street, Miramar, without advising the Agency of the change
of address.

CAPTAIN RALPH HERNANDEZ          -8-                JUNE 21, 1990

33.8.03   **Department of Detention Manual Administrative Order 83.1**

Governing the carrying of firearms by Detention Personnel in the performance of their duties

I.  Detention personnel shall not carry firearms on his/her person while off duty under any circumstances without written authorization from the Sheriff.

Deputy Johnson violated this order by carrying a firearm in uniform off duty, without written permission from the Sheriff.

The violations of the aforementioned Policy and Procedures are Sustained.

DJC:gn

STATE OF FLORIDA
DEPARTMENT OF LAW ENFORCEMENT
CRIMINAL JUSTICE STANDARDS AND TRAINING COMMISSION

FLORIDA DEPARTMENT OF
LAW ENFORCEMENT,

     Petitioner,

-vs-                        CASE NUMBER: C-1912

ANDREW JOHNSON,
Certificate Number: 03-89-502-06,

     Respondent.
_____/

## FINAL ORDER

This cause came on to be heard before the Criminal Justice Standards and Training Commission (hereinafter referred to as the "Commission") at a public meeting on October 24, 1991, in Gainesville, Florida. Pursuant to Administrative Complaint, it was alleged that Respondent violated specified sections of Chapter 943, Florida Statutes. At the Respondent's election, the hearing was conducted in accordance with the provisions of Section 120.57(2), Florida Statutes. Respondent was duly notified of the hearing. The facts are not contested. Respondent appeared pro se at the proceedings.

## FINDINGS OF FACT

1. The Commission has jurisdiction over the subject matter and the parties thereto.

2. The allegations of fact set forth in the Administrative Complaint are approved and adopted and incorporated herein by reference as the findings of fact of the Commission.

## CONCLUSIONS OF LAW

1. The conclusions of law alleged and set forth in the Administrative Complaint are approved and adopted and fully incorporated herein by reference as the conclusions of law of the Commission.

2. The violations set forth warrant disciplinary action by the Commission.

3. There is competent and substantial evidence to support the Commission's Findings and Conclusions.

THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED:

That Respondent Andrew Johnson's certificate as a Correctional Officer shall stand suspended for the period of July 10, 1990 through October 24, 1991.

Pursuant to Section 120.59, Florida Statutes, the parties are hereby notified they may appeal this Final Order by filing one copy of a Notice of appeal with the clerk of the agency and by filing the filing fee and one copy of a Notice of Appeal with the District court of Appeal within thirty (30) days of the date this Order is filed.

This Order shall become effective upon filing with the Clerk of the Department of Law Enforcement.

DONE AND ORDERED this 10th day of December, 1991.

CRIMINAL JUSTICE STANDARDS
AND TRAINING COMMISSION

EDWARD M. SPOONER
CHAIRMAN

FILED WITH THE CLERK OF THE
CJS&TC THIS 10th DAY OF
December, 1991
BY: Julie Dukes-Hasey

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished to ANDREW JOHNSON, 1311 Northwest 190 Street, Miami, Florida 33169, by U.S. Mail on or before 5:00 P.M., this 13<u>rd</u> day of December, 1991.

cc:   All Counsel of Record

STATE OF FLORIDA
CRIMINAL JUSTICE STANDARDS AND TRAINING
COMMISSION

CRIMINAL JUSTICE STANDARDS
AND TRAINING COMMISSION,

        Petitioner,

vs.                                              CASE NO.  C-1912

ANDREW JOHNSON,

        Respondent.
_____/

## ADMINISTRATIVE COMPLAINT

    The Criminal Justice Standards and Training Commission, hereinafter referred to as the Commission, files this Administrative Complaint against the Respondent, Andrew Johnson.  The Commission seeks to impose disciplinary action upon the referenced individual based on the following allegations:

    1.   Respondent was certified by the Criminal Justice Standards and Training Commission on November 16, 1989 and was issued Certificate Number 03-89-502-06.

    2.   On or about June 14, 1990, Respondent, Andrew Johnson, did then unlawfully and knowingly made false statements during an internal investigation conducted by the Broward County Sheriff's with the intent to mislead members of the Broward County Sheriff's department regarding allegations of violations of departmental policy and procedures.

    3.   The actions of the Respondent did violate the provisions of Section 943.1395(5),(6), Florida Statutes and Rule

- 2 -

11B-27.0011(4)(c), Florida Administrative Code, in that
Respondent has failed to maintain the qualifications established
in Section 943.13(7), Florida Statutes, which require that a
correctional officer in the State of Florida have good moral
character.

4.   This Administrative Complaint is issued pursuant to
Sections 120.60, and 943.1395(5),(6), Florida Statutes.  Any
proceedings concerning this Complaint shall be conducted pursuant
to Section 120.57, Florida Statutes, and Chapter 11B-27, 28-1,
28-5, and 28-6, Florida Administrative Code.

WHEREFORE, it is alleged that the Respondent, Andrew Johnson
is guilty of violating Sections 943.1395(5),(6), and 943.13(7),
Florida Statutes and Rule 11B-27.0011(4)(c), Florida
Administrative Code.

NOW, THEREFORE, The Florida Criminal Justice Standards and
Training Commission hereby complains against Andrew Johnson and
alleges that an appropriate penalty, as provided in Section
943.1395(5),(6), should be imposed for the reasons set forth
above and in accordance with the Election of Rights Form (to
which is attached an Explanation of Rights Form) attached hereto
and incorporated herein.

- 3 -

BY ORDER OF THE CRIMINAL JUSTICE STANDARDS AND TRAINING
COMMISSION THIS _____ DAY OF JUNE. 1991.

JEFFREY W. LONG, Director
Division of Criminal Justice
Standards and Training

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been
served pursuant to Section 120.60, Florida Statutes, this _____
day of June 1991, to Andrew Johnson, at 1311 N.W., 190 Street,
Miami, Florida 33169.

JEFFREY W. LONG, Director

5.  Please note that Chapter 943.1395(5)(c), Florida Statutes, states, "when an officer's certification is revoked in any discipline, his certification in any other discipline shall simultaneously be revoked."

PART II.  ELECTION OF RIGHTS

I have read the Explanation of Rights form and understand my options.  (If you do not understand these options, please consult with your attorney or contact the Division, telephone number (904)487-4922 before executing this form.)

SIGNIFY YOUR ELECTION BY CHECKING THE APPROPRIATE BOX

1.  ( )  I do NOT dispute the allegations of fact in the Administrative Complaint/Statement of Denial but do wish to be accorded an informal hearing or proceeding pursuant to Section 120.57(2), Florida Statutes, at which time I will be permitted to submit oral and/or written evidence in mitigation of the Administrative Complaint/Statement of Denial to the Commission.

2.  ( )  I DO dispute the allegations of fact contained in the Administrative Complaint/Statement of Denial and request this to be considered a petition for a formal hearing pursuant to Section 120.57(1), Florida Statutes, before a hearing officer appointed by the Division of Administrative Hearings.  Those material facts which I dispute are:

(a) _____

_____

(b) _____

_____

RECEIVED
AUG 2 1 1991
Division of Criminal Justice
Standards and Training

3.  ( )I do NOT dispute the allegations of fact in the Administrative Complaint and do hereby AGREE TO RELINQUISH MY CERTIFICATION to the Criminal Justice Standards and Training Commission.  I understand my rights to consult with an attorney and to request a hearing if probable cause were determined to exist.  I further acknowledge that my giving up this certification is voluntary and that this relinquishment is permanent, with no opportunity of reinstatement.

Regardless of which option I have selected, I understand that I will be given notice of the time, date, and place when this matter will be considered by the Commission for final action at a regularly scheduled meeting.

PLEASE MAIL FORM TO:         PLEASE HAVE SIGNATURE
Division of Criminal Justice       NOTARIZED
  Standards and Training
Bureau of Standards/Revocation
Post Office Box 1489
Tallahassee, Florida 32302

_____
(Respondent's Signature)
1311 NW 190 St
(Current Address)
Miami, Fl. 33169
(305) 654-0578
(Phone Number)

SWORN AND SUBSCRIBED to before me

this 19th day of August, 1911.

_____
NOTARY PUBLIC, STATE OF FLORIDA
AT LARGE.
My Commission expires:
    Notary Public, State of Florida
    My Commission Expires Feb 28 1994

_____
(Respondent's Attorney)


_____
(Phone Number)

U

## PROBABLE CAUSE DETERMINATION

Case# C-1912                    DA        Corr. Cert. #03-89-502-06
                                          SS# 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
                                          Date Issued 11-16-89

ANDREW JOHNSON                  Age 21

<u>Andrew Johnson</u> was terminated from the Broward County Sheriff's
Office on July 10, 1990, for violation of departmental rules and
regulations.

On three separate occasions Johnson, a detention deputy, stopped
to assist a law enforcement deputy who was engaged in police
activity.  Johnson was always in uniform, wearing a firearm and
complete gun belt.

During a sworn taped statement, Johnson denied talking to the law
enforcement deputy on two of the three occasions.  He also denied
he had told the law enforcement deputy on one of the occasions
that he was assigned to a particular patrol shift.

After two polygraph tests, it was determined that Johnson showed
deception on several questions and confessed that he lied on
several occasions during the original sworn taped statement.

No formal charges were filed.

This case is being presented to the Commission pursuant to the
provisions of Section 943.13(7), Florida Statutes and Rule 11B-
27.0011, Florida Administrative Code.

## CRIMINAL JUSTICE EMPLOYMENT HISTORY

Employed with the Broward County Sheriff's Office on July 31,
1989.  Terminated July 10, 1990.

Per FDLE — no other documented
employment in ~~local~~ corrections

Certificate is inactive
— to reactivate must complete
68-hour review course & pass
state exam.

Broward Sheriff's Office
Professional Compliance - Report by Accused Employee
**Closed Records Only**

**Accused: 05977 Deputy Andrew Johnson**

| PC Case # | Status | Nature of Complaint | Sworn | Position |
|---|---|---|---|---|
| **01-90-0067** | **Closed** | **Service Related** | **Detention** | **Deputy** |

Assigned Department:  Detention/Main Jail
Non PC Investigator:   03814 Sgt. John Stevenson
Incident Date:  01/14/1990       Assigned Date: 01/14/1990     Completed Date:   01/18/1990
Charge(s):
2.2.75 Unsatisfactory Performance
Final Disposition: 01/18/1990 Sustained
Discipline/Corrective Action:  Written Reprimand

| | | | | |
|---|---|---|---|---|
| **01-90-0130** | **Closed** | **Service Related** | **Non Sworn** | **Deputy** |

Assigned Department:  Detention/Main Jail
Non PC Investigator:   01832 Sgt Joseph Mahoney
Incident Date:  01/21/1990       Assigned Date: 01/22/1990     Completed Date:   01/30/1990
Charge(s):
2.2.74 Meeting Office Standards
Final Disposition: 01/30/1990 Sustained
2.2.75 Unsatisfactory Performance
Final Disposition: 01/30/1990 Sustained
Discipline/Corrective Action:  Counsel

| | | | | |
|---|---|---|---|---|
| **04-90-0486** | **Closed** | **Service Related** | **Detention** | **Deputy** |

Assigned Department:  Detention/Main Jail
Non PC Investigator:   00000
Incident Date:  04/13/1990       Assigned Date: 04/13/1990     Completed Date:   00/00/0000
Charge(s):
2.2.77 Break Procedures
Final Disposition: 04/24/1990 Not Sustained
Discipline/Corrective Action:  Counsel

| | | | | |
|---|---|---|---|---|
| **05-90-0582** | **Closed** | **Conduct Related** | **Detention** | **Deputy** |

Assigned Department:  Detention/Stockade
Non PC Investigator:   03380 Sergeant Kenneth Day
Incident Date:  05/01/1990       Assigned Date: 05/03/1990     Completed Date:   05/14/1990
Charge(s):
2.2.19 Misuse of Police Radio
Final Disposition: 05/14/1990 Sustained
Discipline/Corrective Action:  Counsel

| PC Case # | Status | Nature of Complaint | Sworn | Position |
|---|---|---|---|---|
| 06-90-0657 | Closed | Service Related | Detention | Deputy |

Assigned Department:  Detention

Non PC Investigator:   03033 Sgt. David Carry

Incident Date:  06/05/1990      Assigned Date:  06/06/1990      Completed Date:      06/21/1990

Charge(s):

2.2.28 Conformity to Laws To Wit -

Final Disposition:  06/21/1990 Sustained
6.1 Violations of Weapons Policy

Final Disposition:  06/21/1990 Sustained
33.8.3 Department of Detention Manual, Section

Final Disposition:  06/21/1990 Sustained
2.2.44 Official Reports/Truthfulness in Office Matters

Final Disposition:  06/21/1990 Sustained
2.2.62 Change of Telephone & Address

Final Disposition:  06/21/1990 Sustained
Discipline/Corrective Action:  Termination

| 06-90-0687 | Closed | Service Related | Detention | Deputy |
|---|---|---|---|---|

Assigned Department:  Detention/Stockade

Non PC Investigator:   03193 Sgt. Christopher McCrerey

Incident Date:  05/27/1990      Assigned Date:  05/31/1990      Completed Date:      06/08/1990

Charge(s):

2.2.74 Meeting Office Standards

Final Disposition:  06/08/1990 Sustained
Discipline/Corrective Action:  Counsel

BROWARD COUNTY SHERIFF'S OFFICE

## DISCIPLINARY ACTION RECOMMENDED
## OR
## COUNSELING REPORT

NAME: Andrew Johnson     CCN: 5977     DATE: July 10, 1990

CLASSIFICATION: Deputy

DATE OF HIRE: July 31, 1989

DEPARTMENT: Detention     DIVISION:     UNIT/SECTION: Stockade

EMPLOYEE STATUS: ☒ PROBATIONAL     ☐ PERMANENT     ☐ OTHER

You are hereby charged with violating the Sheriff's Office Policy and Procedure Manual.

| CHARGE | SECTION & PARAGRAPH |
|---|---|
| Conformity to Law | 2.2.28 |
| Violation of weapons policy | 6.1(a) |
| Violation of Dept of Det. Manual firearms policy dated 6/8/88 | 33.8.03 – ACA 2.5087 |
| Truthfulness in Office matters | 2.2.44 |
| Change of telephone and address | 2.2.62 |

(Attach additional sheets as necessary)

FACTS: Description of specific actions, statements made by employee; attach statements of witness, if any and attach copies of documents if appropriate. Also state reasons for recommendations.

See attached I.A. Report

*Sergeant Christ. McGinley*  319

Supervisor's Signature/CCN

*Sergeant Christopher McGinley*

Print Supervisor's Name/Date

(Attach additional sheets as necessary)

In signing this Report I acknowledge only that it has been discussed with me and that I have received a copy. I understand that I may orally or in writing and that such response will be made a part of this Report and taken into consideration prior to a final determina made.

*Andrew J.C. Johnson*  7/10/

Employee's Signature / Date

## IF OTHER THAN COUNSELING, THE FOLLOWING MUST BE COMPLETED:

RECOMMENDED ACTION:
- ☐ Written Reprimand     ☐ _____ Day(s) Suspension     ☐ Demotion
- ☒ Dismissal     Effective Date(s) _____     ☐ _____ Day(s) Loss of Leave

FINAL RECOMMENDATION _____

DISTRICT/DIVISION APPROVAL: *Capt. Ron Barthy*  #1386
Signature & Title.     Date

ATTACHMENT / EXHIBIT 35

Department Head     Date

DISTRIBUTION:   White copy to Employee – Green to Internal Affairs
Yellow to Division/District File after Department Approval

BSO-A-18     (JANUARY 1990)

BROWARD COUNTY SHERIFF'S OFFICE

## DISCIPLINARY ACTION RECOMMENDED
## OR
## COUNSELING REPORT

NAME: Andrew Johnson   CCN: 5977   DATE: July 10, 1990

CLASSIFICATION: Deputy   DATE OF HIRE: July 31, 1989

DEPARTMENT: Detention   DIVISION:   UNIT/SECTION: Stockade

EMPLOYEE STATUS:
☒ PROBATIONAL   ☐ PERMANENT   ☐ OTHER

You are hereby charged with violating the Sheriff's Office Policy and Procedure Manual.

| CHARGE | SECTION & PARAGRAPH |
|---|---|
| Conformity to Law | 2.2.28 |
| Violation of weapons policy | 6.1(a) |
| Violation of Dept of Det. Manual firearms policy dated 6/8/88 | 33.8.03 – ACA 2.5087 |
| Truthfulness in Office matters | 2.2.44 |
| Change of telephone and address | 2.2.62 |

(Attach additional sheets as necessary)

**FACTS:** Description of specific actions, statements made by employee; attach statements of witness, if any and attach copies of other documents if appropriate. Also state reasons for recommendations.

See attached I.A. Report

Failed to meet probationary standards.

Supervisor's Signature/CCN: Sergeant Christpr McPhee 3193

Print Supervisor's Name/Date: Sergeant Christopher McCagey 7-10-

(Attach additional sheets as necessary)

In signing this Report I acknowledge only that it has been discussed with me and that I have received a copy. I understand that I may respond orally or in writing and that such response will be made a part of this Report and taken into consideration prior to a final determination being made.

Employee's Signature / Date: A.C. Johnson 7/10/90

## IF OTHER THAN COUNSELING, THE FOLLOWING MUST BE COMPLETED:

RECOMMENDED ACTION:
☐ Written Reprimand   ☐   Day(s) Suspension   ☐ Demotion
☒ Dismissal   Effective Date(s) _____   ☐   Day(s) Loss of Leave

FINAL RECOMMENDATION: Dismissal

DISTRICT/DIVISION APPROVAL: Capt. Ron Bartley #1396   7-10-9(
Signature & Title.   Date

Department Head _____   7-13-90
Date

DISTRIBUTION:   White copy to Employee – Green to Internal Affairs
Yellow to Division/District File after Department Approval

BSO-A-18   (JANUARY, 1990)

SHERIFF
BROWARD COUNTY
P.O. BOX 9507
FORT LAUDERDALE, FLORIDA 33310

**DATE:** July 10, 1990

**MEMO TO:** Director H.B. Wilber, Main Jail
Department of Detention

**FROM:** Captain D. Bartley, Facility Commander *DB*
Stockade

**SUBJECT:** DEPUTY ANDREW JOHNSON

Deputy Andrew Johnson was suspended after pre termination hearing on July 10, 1990 at approximately 2:45 P.M. A recommendation of dismissal was reached. At this time his badge, name tag and Sheriffs I.D. was turned over to me pending your review of this action.

Board members were Captain D. Bartley, Lieutenant F. Tighe, Lieutenant R. Einig, Sergeant Camacho, Sergeant Day, Sergeant McCrerey, and Sgt. David Carry of Internal Affairs.

DB/pm

SHERIFF'S OFFICE

BROWARD COUNTY, FLORIDA

TERMINATION

A Commanding Officer desiring to terminate employment of any personnel under their command shall execute this form in triplicate and forward same to the Sheriff.

NAME: **JOHNSON, Andrew [CCN 5977]**          DATE: **July 13, 1990**
          **[D.O.H. 07/31/89]**

DIVISION: **Department of Detention**          RANK: **Deputy Sheriff/Detention**

-------------------------------------------------------------------

I hereby request termination of the above named employee of the Broward County Sheriff's Office, Broward County, Florida for the following reasons:

**Violation of policies and procedures, Sections 2.2.28, 6.1(a), 2.2.44, and 2.2.62; and Department of Detention Manual, Section 33.8.03.**

**Recommendation for termination is based on a Pre-Disciplinary Hearing Committee and Report of Internal Affairs.**

**Employee currently in probationary status.**

| | | |
|---|---|---|
| COMMANDING OFFICER | Detention DIVISION | July 13, 1990 DATE |
| H. B. WILBER, Director | | |

ACTIONS OF THE SHERIFF:                    POH — 7/31/89

(APPROVED) - DISAPPROVED     _7-20_ , 19 **90** TIME _4:00 PM_

EFFECTIVE AT          **July 10,** , 19 **90** TIME **5:00 p.m.**

PAY TERMINATES AT     **July 10,** , 19 **90** TIME **5:00 p.m.**

TO BE PAID _____

_Nick Navarro_
SHERIFF OF BROWARD COUNTY

BSOA-P #13

BROWARD SHERIFF'S OFFICE

**MEMO TO:**   Andrew Johnson   CCN# 5977

**FROM:**   Captain D. Bartley, Facility Commander
Stockade

**SUBJECT:**   **Notice of Disciplinary Action**

This is to inform you that the undersigned has determined that you have violated the rules and regulations of the Broward Sheriff's Office, as described herein:

Rules and/or regulations violated:   __See attached I.A. report__

_____

_____

The pertinent facts surrounding the incident (dates, times, locations): _____

_____See attached I.A. report_____

_____

_____

Substantiating violation, documents and/or evidence: _____

_____

_____

In accordance with the obligations and responsibilities of my rank and position as a supervisor, the following disciplinary action will be taken:

[ ] Written Reprimand      [ ] Demotion      [X] Dismissal

[ ] ___ Day(s) Suspension   [ ] ___ Day(s) Loss of Leave   Effective Date(s): _____

---

__7-10-90__
(Date)

__Capt. Don Bartley__
(Signature of District/Division Commander)

If other than a written reprimand, the following approval is required:
_Dismissal_

__7/13/90__
(Date)

__Will__
(Signature of Department Director)

The Sheriff, or his designee, must approve all demotions and dismissals:

_____         _____
(Date)                      (Signature of Sheriff)

cc: Department Director – District/Division Commander – Personnel Division – Internal Affairs

BSO-SIU #49 [Rev. Jan 1984]

**NICK NAVARRO**
SHERIFF
BROWARD COUNTY
P.O. BOX 9507
FORT LAUDERDALE, FLORIDA 33310

DATE:       July 6, 1990

MEMO TO:    Deputy Andrew Johnson #5977

FROM:       Captain D. Bartley

SUBJECT:    <u>PRE-DISCIPLINARY HEARING</u>

You have been alleged to have engaged in the following conduct:

The pertinent facts surrounding the incident (dates, times locations) are:  <u>See attached I.A. report</u>
_____
_____
_____

If this information is correct, your actions would constitute a violation of:

Rules and/or regulations violated:  <u>See attached I.A. report</u>
_____

and would warrant disciplinary action, including the possibility of your termination.

I am conducting a hearing regarding the above charges. I am hereby advising you of your right to respond in writing to this memorandum with respect to the charges enumerated herein, as well as your right to respond verbally to me, as I am the official charged with the responsibility of making the final determination regarding this investigation.

Accordingly, I am inviting you to appear at my office at <u>the Stockade at 2:00 P.M.</u> in order to discuss this matter. At that meeting, should you choose to attend, you will be given the opportunity to present any information, documentation or other evidence which you feel may be helpful to you in resolving this matter. At the <u>July 10th</u> meeting, you may be accompanied by legal counsel if you so desire.

I want to make it clear to you that, although the above meeting is part of a fact-finding process, if the information brought to my attention proves correct, it is possible that disciplinary action will be taken against you at that time.

-2-

Also, if you fail to appear at the meeting or to respond to this memorandum by ___July 10, 1990_____, and if the information presented to me leads me to believe that you have engaged in the conduct specified, I will make my decision as to what disciplinary action, if any, to take against you based upon the information that is presented to me at that meeting.

Also, I want to make it clear to you that I am reserving the right to consider additional charges, if any, that are brought to my attention as my investigation proceeds.

If you have any questions or require additional information, call me immediately.

**NICK NAVARRO**

SHERIFF
BROWARD COUNTY
P.O. BOX 9507
FORT LAUDERDALE, FLORIDA 33310

**DATE:**      July 2, 1990

**MEMO TO:**   Director Harold Wilber, Department of Detention

**FROM:**      Lt. Rick Frey, Acting Commander, Internal Affairs

**SUBJECT:**   <u>**COMPLAINT AGAINST DEPUTY ANDREW JOHNSON, #5977**</u>

Attached are the results of the investigation conducted by
Sgt. David Carry of this unit relative to the above
subject case.

Please be advised that the allegations of this investigation
have been Sustained. Your recommendations in writing are
to be forwarded to this office within ten (10) working
days.

If we can be of further assistance to you in this matter,
please contact our office.

RF/gan

Attachment

7-3-90  Captain Bartley
Please handle

Rec'd 7-5-90

**NICK NAVARRO**
SHERIFF
BROWARD COUNTY
P.O. BOX 9507
FORT LAUDERDALE, FLORIDA 33310

**DATE:**    June 21, 1990

**MEMO TO:**    Capt. Ralph Hernandez, Jr., Commander, Internal Affairs

**FROM:**    Sgt. David J. Carry, Internal Affairs

**SUBJECT:**    <u>COMPLAINT AGAINST DETENTION DEPUTY ANDREW JOHNSON, #5977</u>

**ALLEGATION:**    Conformity to Law, 2.2.28

Violation of Weapons Policy, 6.1(a)

Violation of Dept. of Detention Manual/ Firearms Policy, dated 6/8/88- 33.8.03 - ACA 2.5087

Truthfulness in Office Matters, 2.2.44

Change of Telephone and Address 2.2.62

**STATEMENTS:**    Deputy Montgomery
Det. Dep. Andrew Johnson, Statement A & B

**EXHIBITS:**    Memo from Deputy Montgomery

**NARRATIVE:**

On 6/5/90, I received a phone call, followed up with a memo from Deputy Montgomery. Deputy Montgomery advised that he has had three contacts with a Detention Deputy Andrew Johnson while engaged in police activity. Deputy Montgomery stated Dep. Johnson has showed up on three scenes in the past two months, asking if he could assist him. Deputy Montgomery advised that Dep. Johnson was always in uniform, wearing a firearm and complete gun belt.

On 6/6/90, I took a sworn taped statement from Dep. Montgomery. In brief, Dep. Montgomery stated the following.

Dep. Montgomery was stopped at a Circle K located at the 5600 block of Hallandale Beach Boulevard sometime in early April 1990. Dep. Montgomery stated he did not know the exact time and day, but believed it was between 12:00 a.m and 1:30 a.m. At this time, a black male in full B.S.O. uniform, including a firearm and gun belt exited a blue

CAPTAIN RALPH HERNANDEZ                -2-                JUNE 21, 1990

Ford Probe and asked Dep. Montgomery if everything was
okay. Dep. Montgomery said yes and a conversation started.
The black male indentified himself as Dep. Andrew Johnson,
working District 2, Charlie Shift. Dep. Johnson advised
Dep. Montgomery that he was on his way home from a late
arrest. Dep. Montgomery asked Dep. Johnson where his radio
was and Dep. Johnson responded, "I just started, and the
District is short radios." Dep. Montgomery continued a
conversation with Dep. Johnson for approximately ten
minutes, then left the scene.

The next time Dep. Montgomery met Dep. Johnson was on
4/22/90 at approximately 11:15 p.m. Dep. Montgomery was
responding to a fight in progress in the 3200 block of S.W.
56th Avenue. Dep. Montgomery was traveling Code 3,
emergency lights and siren, following two other marked
units in the 5200 block of Hallandale Beach Boulevard when
he observed a blue Ford Probe following him and running red
lights, traveling in a Code 3 mode without blue lights and
siren. When Dep. Montgomery arrived at the fight location,
Dep. Montgomery observed Dep. Johnson exit the Ford Probe.
Dep. Johnson was in full uniform, including a firearm and
gun belt. Dep. Johnson asked Dep. Montgomery what was
going on. Dep. Montgomery advised him it was a domestic
fight. Dep. Montgomery talked to Dep. Johnson for a few
minutes, then Dep. Montgomery left the scene. Dep. Johnson
did not take any police action.

The next time Dep. Montgomery met with Dep. Johnson was on
6/5/90 at approximately 2:13 hours. Dep. Montgomery was
backing up an FHP Trooper in the 5000 block of Hallandale
Beach Boulevard when Dep. Johnson pulled up behind him,
driving a blue Ford Probe. Dep. Johnson exited the vehicle
in full uniform, including a firearm and gun belt.

Dep. Johnson asked Dep. Montgomery what was going on and he
said, "Just backing up a Trooper on a traffic stop." Dep.
Montgomery then asked Dep. Johnson where he was working
now. Dep. Johnson said, "I work the North Annex."

At this point, Dep. Montgomery was concerned that Dep.
Johnson had told him previously that he was a District 2
Deputy working Charlie Shift, and now he was a Detention
Deputy working the North Annex.

At this time, Dep. Montgomery called Sgt. Sagenkahn to the
scene fearing that Dep. Johnson was carrying a firearm and
acting without authority.

When Sgt. Sagenkahn arrived, he asked to see Dep. Johnson's
I.D. Card. At this time, Dep. Johnson produced a B.S.O.
I.D. Card identifying him as a Detention Deputy, I.D.#5977,

CAPTAIN RALPH HERNANDEZ          -3-          JUNE 21, 1990

working the Stockade. Sgt. Sagenkahn then asked Dep. Johnson if he was authorized to carry a gun. Dep. Johnson said yes, to and from work only. Sgt. Sagenkahn advised Dep. Johnson that it was not a good idea to stop and back up deputies on calls since he did not have the training a deputy receives.

Dep. Johnson stated he understood, but told Sgt. Sagenkahn that, "You wear green and white and I wear green and white. I consider myself the same as you and if I lose my job, I lose my job, but I'm still going to stop."

At this time, Dep. Johnson left the scene. Sgt. Sagenkahn instructed Dep. Montgomery to contact Internal Affairs to advise of Dep. Johnson's actions.

On 6/12/90 at approximately 10:50 p.m., Sgt. Ziegler and I set up to do a surveillance on Dep. Johnson on the west side of the Stockade, 5400 Powerline Road, Fort Lauderdale. However, shortly after Dep. Johnson exited the Stockade through the West Exit in his 1990 blue Ford Probe, Tag #HLV-92S, we lost sight of him traveling south on Powerline Road. Sgt. Ziegler and I did not make contact with him again during this surveillance, ending the surveillance at 1:00 a.m. on 6/13/90.

On 6/13/90 at approximately 10:50 p.m., Sgt. Ziegler and I were set up on the west side of the Stockade, while Det. Baughn was set up at the traffic light at Powerline Road and Commercial Boulevard. The surveillance began at approximately 11:08 PM when Dep. Johnson exited the west parking lot of the Stockade, turning south on Powerline Road. Dep. Johnson then turned east on Commercial Boulevard onto the entrance ramp of I-95, traveling south on I-95. At this time, Det. Baughn was following close behind Dep. Johnson's vehicle. Sgt. Ziegler and I were behind Det. Baughn's vehicle. Shortly after Dep. Johnson drove onto I-95 southbound, he accelerated to a very high rate of speed. Sgt. Ziegler and I lost sight of Det. Baughn and Dep. Johnson at Oakland Park Boulevard traveling at 85 MPH. We could not even see the vehicles. Det. Baughn stated he was having trouble keeping up with Dep. Johnson traveling at approximately 100 MPH.

At State Road 84, Det. Baughn was stopped by a State Trooper and lost contact with Dep. Johnson. The surveillance was then set up at Dep. Johnson's listed residence, located at 6109 S.W. 40th Street, Miramar. The surveillance was ended at approximately 1:10 a.m. without further contact with Dep. Johnson.

CAPTAIN RALPH HERNANDEZ                -4-              JUNE 21, 1990

On 6:14:90 at approximately 10:50 a.m., I interviewed and
took a sworn taped statement from Dep. Andrew Johnson,
#5977. Also present was Attorney Cary Nutall from the PBA
who was representing Dep. Johnson.

In brief, Dep. Johnson stated the following in regard to
the memo written by Dep. Montgomery.

Dep. Johnson stated that he did not talk to Dep. Montgomery
in early April, 1990 in the 5600 block of Hallandale Beach
Boulevard. Dep. Johnson said he never told Dep. Montgomery
that he was a District Two Deputy on the Charlie Shift.
Dep. Johnson said the meeting that Dep. Montgomery refers
to in early April never occurred.

Dep. Johnson stated he did remember responding to a fight
call at the 3200 block of S.W. 56th Avenue, Pembroke Park,
at approximately 11:00 p.m. in mid April but did not know
the exact date. The date was recorded as 4/22/90 on Dep.
Montgomery's Daily Patrol Log. Dep. Johnson said he saw
the cars in a Code 3 mode on S.W. 56th Avenue, traveling
south and he followed them to the scene. At that time, he
talked to a deputy, asking him what was going on. The
Deputy told him it was a domestic. Dep. Johnson stated he
was wearing a uniform but not a gun. Dep. Johnson said he
was on his way home and just stopped to see what was going
on. Dep. Johnson said he did not talk to Dep. Montgomery
at the scene as stated in Dep. Montgomery's memo.

Dep. Johnson states he did remember stopping to talk with
Dep. Montgomery on 6/5/90 at approximately 2:15 hours.
Dep. Johnson said he was working at the Stockade and was
off duty at approximately 2:00 a.m. While driving home,
west on Hallandale Beach Boulevard, he observed Dep.
Montgomery stopped behind a Florida State Trooper at
approximately the 5000 block, so he stopped to talk to Dep.
Montgomery. Dep. Johnson said he talked to Dep. Montgomery
about a burglary that Dep. Montgomery took at his house
more than a year ago. In addition, Dep. Johnson asked Dep.
Montgomery what was going on here. Dep. Montgomery said he
was just backing up the Trooper.

Dep. Montgomery asked Dep. Johnson where he worked now and
Dep. Johnson advised he was working in the Stockade. Dep.
Johnson said he was in full uniform, including a firearm
and gunbelt. When I asked Dep. Johnson why he was carrying
a firearm, he said he knew he was not allowed to carry a
firearm under B.S.O. Policy and Procedures, but he could
carry a firearm under State Statute. *(if qualified)*

*What type of weapon?*
*How long carried?*
*Qualified?*

CAPTAIN RALPH HERNANDEZ                    -5-              JUNE 21, 1990

Dep. Johnson stated he did talk to Sgt. Sagenkahn who responded to the scene and asked to see his I.D. Dep. Johnson also said he told Sgt. Sagenkahn that I wear the same colors as you and as an officer, I am going to stop and help if I see an officer that is in trouble.

Dep. Johnson also stated he assisted a Miramar officer with an arrest on May 15, 1990. Dep. Johnson stated he was on his way home on May 15, 1990 and stopped in a Burger King in the area of State Road 7 and Hallandale Beach Boulevard to get something to eat. As he exited Burger King, he observed a Miramar officer having a confrontation with a citizen at State Road 7 and Miramar Parkway. Dep. Johnson approached the Miramar officer and offered his assistance, which the Miramar officer accepted. Dep. Johnson was in full uniform wearing a firearm and S&W Model 66 357 Mag. Dep. Johnson stated that he did not have his firearm in a gun belt while in Burger King, but did have it in his hand, wrapped in a jacket. Dep. Johnson stated he put the gun belt on in the car prior to seeing the Miramar officer in trouble. Dep. Johnson stated he only assisted the Miramar officer in handcuffing the suspect, then left the scene for home.

I advised Dep. Johnson that the Internal Affairs Division was conducting a surveillance on him on 6/13/90, beginning at approximately 10:55 p.m. at the Stockade, located in the 5400 block of Powerline Road. I asked Dep. Johnson what speed he traveled, going south, on I-95 between Commercial Boulevard and State Road 84. Dep. Johnson stated 60 to 65, then changed his statement to not over 85 MPH. However, Dep. Johnson stated he was speeding because he knew someone was following him.

At this point I asked Dep. Johnson if he would submit to a polygraph test. Dep. Johnson agreed, however, Attorney Nutall advised Dep. Johnson not to submit to the polygraph exam. Dep. Johnson still asked to submit to a polygraph exam and an appointment was set up with Det. Tom Gill immediately.

I escorted Dep. Johnson and Attorney Nutall to Det. Gill's Office where Attorney Nutall approved the questions being asked by Det. Gill. After two polygraph test, Det. Gill contacted me and advised that Dep. Johnson showed deception on several questions and confessed that he lied to me on several occasions during the original sworn taped statement. See Det. Gills report for full details.

CAPTAIN RALPH HERNANDEZ              -6-              JUNE 21, 1990

Det. Gill and Dep. Johnson responded back to the Internal
Affairs Office where I took another sworn taped statement
from Dep. Johnson at approximately 2:45 p.m. on 6/13/90.

In brief, Dep. Johnson stated he deliberately lied to me
during the first statement.  The following is the correct
answers to questions he lied about in the original sworn
taped statement.

#1.  Dep. Johnson did have a conversation with Dep.
     Montgomery during which he told Dep. Montgomery that
     he was a District Deputy, but he did not remember
     which District he told Montgomery he worked in.  He
     did state he worked the Charlie Shift.

#2.  Dep. Johnson was infact wearing a firearm while at the
     scene of the fight at the 3200 block of S.W. 56th
     Avenue on 4/22/90.  Dep. Johnson still maintained that
     he did not speak with Dep. Montgomery at that time.
     Dep. Johnson still maintained he did not run any red
     lights on the way to this fight call and did not
     follow the marked units that were traveling west on
     Hallandale Beach Boulevard, Code 3.

#3.  Dep. Johnson was carrying a firearm on a gun belt
     while in the Burger King on May 15, 1990.

#4.  Dep. Johnson had no idea he was being followed on
     6/13/90, traveling home on I-95.  He just said that
     because I told him Internal Affairs was surveilling
     him.  Dep. Johnson stated he was traveling in excess
     of 90 MPH on I-95 between Commercial Boulevard and
     Hallandale Beach Boulevard.

#5.  Dep. Johnson did not tell me the whole truth to the
     best of his knowledge on the original sworn taped
     statement.

**FINDINGS:**

This investigation supports the following violations of
B.S.O. Policy and Procedures.

### 2.2.44    Official Reports/Truthfulness in Office Matters:

A.  An employee will not make false statements in
    any communication, verbal or written, concern-
    ing official matters.

Dep. Johnson violated this policy by lying to me during the
original sworn taped statement, and by telling Dep.
Montgomery he was a District 2 deputy, working the Charlie
Shift.

CAPTAIN RALPH HERNANDEZ                 -7-              JUNE 21, 1990

2.2.28    __Conformity to Laws:__

> Employees will obey all laws of the United States,
> State of Florida and of the local jurisdiction.  An
> indictment or information filed against an employee
> for the violation of any law may be cause for
> placing that employee on administrative leave or
> suspending him (with or without pay).

✓ Dep. Johnson violated this policy by traveling in excess of
90 MPH on Interstate 95 between Commercial Boulevard and
Hallandale Beach Boulevard on 6/13/90 at approximately
11:10 p.m. to 11:20 p.m.

✓ In addition, Dep. Johnson ran a red light at the 5200 block
of Hallandale Beach Boulevard following marked B.S.O. units
traveling Code 3 to a fight call on 4/22/90 at approximately
11:15 p.m.

6.1.     __GENERAL:__

> As long as members of the public are victims of
> violent crimes and law enforcement officers are
> confronted with deadly force in the performance
> of their duty, it will remain necessary for
> deputy sheriff's to be properly armed.
>
>     A.   All employees of the Broward Sheriff's
>          Office, when not expressly authorized by the
>          Sheriff, are prohibited from carrying weapons
>          or firearms either manually or concealed
>          while on duty, and/or while in any official
>          uniform, or while acting under color of the
>          authority of the Sheriff's Office.

Dep. Johnson violated this policy by carrying a firearm and
a gun belt in plain view while wearing a Broward County
Sheriff's Office Detention Deputy uniform.  Dep. Johnson is
still on probation; has never been to the B.S.O. Range to ?
qualify, and did not have permission to carry a firearm by
Sheriff Navarro.

2.2.62    __Change of Telephone and Address:__

> Any change of an employee's telephone number or
> address will be reported within 24 hours to the
> employee's    immediate    supervisor    and    the
> Communications Division.

✓ Dep. Johnson violated this policy by changing his address
from 6109 S.W. 40th Street, Miramar to 6015 S.W. 33rd
Street, Miramar, without advising the Agency of the change
of address.

CAPTAIN RALPH HERNANDEZ              -8-              JUNE 21, 1990

**33.8.03**    **Department   of   Detention   Manual   Administrative**
            **Order 83.1**

            Governing  the  carrying  of  firearms  by  Detention
            Personnel in the performance of their duties

            I.   Detention  personnel  shall  not  carry  firearms
                 on  his/her  person  while  off  duty  under  any
                 circumstances  without  written  authorization
                 from the Sheriff.

Deputy  Johnson  violated  this  order  by  carrying  a  firearm  in
uniform  off  duty,  without  written  permission  from  the
Sheriff.

The  violations  of  the  aforementioned  Policy  and  Procedures
are  Sustained.

DJC:gn

# MOTIVE



Late 1988 – Early 1989
Andrew Johnson is the victim of a residential burglary

Deputy Brian Montgomery responds to the scene

According to Johnson, Montgomery makes derogatory statements regarding his chances of being hired

Johnson encounters Montgomery on two separate occasions when he stops to assist District 1 road patrol deputies

April, 1990

June, 1990
Montgomery initiates an Internal Affairs complaint against Johnson

September 4, 1990
Deputy Patrick Behan is hired by BSO

During the encounter Montgomery sees Johnson's L.E. study books and learns he is attempting to become a BSO Detention Deputy

July 31, 1989
Johnson is hired by BSO as a Detention Deputy

April, 1990
Johnson is wearing a firearm while in uniform during the encounters and lies to Montgomery regarding his employment status

July 10, 1990
Johnson is ultimately terminated

November 13, 1990
Deputy Behan is shot and killed in front of the Circle K, SW 40th Ave and Hallandale Beach Blvd.

ATTACHMENT / EXHIBIT 36

```
 1                          IN THE CIRCUIT COURT OF THE SEVENTEENTH
                            JUDICIAL CIRCUIT      IN AND FOR BROWARD
 2                          COUNTY                         FLORIDA

 3                          FELONY DIVISION

 4                          CASE NO. 91-14793CF10A

 5                          JUDGE FRUSCIANTE

 6    STATE OF FLORIDA,     )
              Plaintiff,    )
 7                          )
                            )
 8    vs.                   )
                            )
 9    KEITH DONAHUE KING,   )
              Defendant.    )
10    _____ )

11                          Office of Electronic Court Reporters
                            16 Southeast 6th Street
12                          Fort Lauderdale, Florida
                            July 8, 1992      3:22 p.m.
13

14

15                              DEPOSITION OF:

16                          BRIAN MONTGOMERY

17    APPEARANCES:          (No appearance on behalf of the State.)

18                          VICTOR TOBIN, ESQ.,
                            Special Public Defender,
19                          Appearing on behalf of the Defendant.

20

21

22

23

24

25
```

ATTACHMENT / EXHIBIT 37

1

2

## I N D E X

3

4

THE DEPOSITION OF BRIAN MONTGOMERY                    PAGE

5

6

7    Direct Examination
      by Mr. Tobin                                        4

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                              C O R R E C T I O N S

4

5        PAGE        LINE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
                              _____
24                            BRIAN MONTGOMERY

25

1    The deposition of BRIAN MONTGOMERY, taken on behalf

2 of the Defendant, at the Office of Electronic Court

3 Reporters, 16 Southeast 6th Street, Fort Lauderdale,

4 Florida, Seventeenth Judicial Circuit, Broward County,

5 Florida, on July 8, 1992, beginning at 3:22 p.m., before

6 Sharon K. Wrone, an Electronic Court Reporter of the

7 Seventeenth Judicial Circuit.

8    Sworn in by Sharon K. Wrone, a duly-commissioned

9 Notary Public, in and for the State of Florida, at Large.

10       * * * * *

11 WHEREUPON:

12       BRIAN MONTGOMERY

13 having first been duly sworn, was examined and testified as

14 follows:

15 DIRECT EXAMINATION

16 BY MR. TOBIN:

17  Q Would you please state your name and occupation.

18  A Brian Montgomery, M-O-N-T-G-O-M-E-R-Y, deputy

19 sheriff for the Broward County Sheriff's Office.

20  Q For how long?

21  A For the Sheriff's Office going on six years.

22  Q Before you worked for BSO who?

23  A Plantation Police Department.

24  Q You work in District I?

25  A I did, yes.

1    Q    Were you working District I in November of '90?

2    A    Yes.

3    Q    Road Patrol?

4    A    Yes.

5    Q    November 13th of '90, I believe that's the date of

6    Patrick Behan's death.  Do you recall that day -- in and about

7    that day, rather?  I realize you may not recall everything

8    about that day, but do you recall when Pat --

9    A    I recall that day, yes.

10   Q    Do you remember learning of the death of Patrick

11   Behan?

12   A    Yes.

13   Q    Do you remember where you were or what you were

14   doing?

15   A    Yes.

16   Q    What were you doing?

17   A    Sleeping.

18   Q    Did you get a call?

19   A    I got a phone call.

20   Q    Do you know how it came to pass that Pat Behan was

21   working that night?

22   A    All I know is I -- to tell you the truth, I don't

23   remember if that was his night off, or he was scheduled to

24   work, or whatever, but we had permanent zones.  I worked the

25   same zone.  For some reason I needed the night off, either for

1   personal reasons or for training, and somehow he had to work

2   that night and ended up working my zone while I was off.

3       Q    Do you remember what zone that was?

4       A    I always worked -- the area is designated as 102

5   zone.

6       Q    102 zone.  Did that encompass the Circle K?

7       A    No.

8       Q    Do you know or recall what zone the Circle K was

9   contained within?

10      A    Yeah, it's in 112 zone.

11      Q    So when I read on the dispatch sheets Alpha 102, is

12  that the way she would call someone in that --

13      A    Right, Alpha meaning the midnight sheet, 102 being

14  the zone.

15      Q    Had you ever worked to your knowledge the zone

16  containing the Circle K?

17      A    Have I ever?

18      Q    Yeah, let's leave it at ever.

19      A    Yeah.  I mean, I'm sure I probably worked there a

20  couple times.

21      Q    How long did you work Alpha 102?

22      A    I mean, almost my entire time down there.

23      Q    Your supervisor would have been who?

24      A    At the time?

25      Q    Yeah.  Who was the sergeant?  Was that Sagenkhan?

1    A    Sagenkhan.

2    Q    Sagenkhan.  Was that your sergeant?

3    A    Sergeant Sagenkhan, yeah, he was my sergeant.

4    Q    Now I know there's a north end and a south end of

5    District I.

6    A    Correct.  Correct.

7    Q    102 is in, what, the north or the south?

8    A    South.

9    Q    And the Circle K?

10    A    South.

11    Q    Did you ever learn why, as I understand the

12    situation, Deputy Behan for some reason went to the north end

13    and then returned to the south end?

14    A    I never heard that before.

15    Q    When you learned of the shooting of Deputy Behan

16    what did you do?  Did you go to the scene or anything?

17    A    I went directly to the scene.

18    Q    So what time would you have gotten there?

19    A    I have no idea.

20    Q    Daylight out yet?

21    A    No.

22    Q    What did you do when you got there?

23    A    Responded directly to the scene.  Basically just

24    responded to the scene.  Then I was there approximately 20

25    minutes and they said we were all going to go back to the

1    office.

2         Q    Then you have a debriefing of sorts.

3         A    Right.

4         Q    As best you can, being a road patrolman, because you

5    have other duties, did you do any type of investigation?

6         A    No.

7         Q    Did you hear any scuttlebutt on the street about who

8    may or may not have done this?

9         A    No.

10        Q    Do you know if you ever talked to Tim Brown or Keith

11   King, the defendants?

12        A    No.

13        Q    Did you know this McGill family or know of them?

14        A    McGill?  Oh, yeah.

15        Q    Do you know which of the McGills you knew?

16        A    Curtis McGill.  There's so many of them.  I know

17   them all by -- it's been a long time since I've been down

18   there.

19        Q    What district are you working in?

20        A    Now I work Pompano, which is District III.  I

21   haven't been down in District I for a year.

22        Q    Did you know the McGills by way of arresting them?

23        A    Arresting them, calls at their house, seeing them on

24   the street.  There's a whole --

25        Q    Whole flock.

1      A    Yeah.

2      Q    How about this Kevin Duhart?  He's the one who

3    allegedly stole the -- not allegedly, I watched him on

4    videotape steal the cigarettes.

5      A    Right.  I know him, too.

6      Q    Did Duhart and the McGills -- I guess they knew each

7    other or --

8      A    Right.

9      Q    -- are there a lot of Duharts down there, too?

10     A    No.  In Carver's Ranches you'll have a lot of family

11   members that will be related but have different names.  So by

12   the saying, is there a lot of Duharts, no.  Family members or

13   brothers and sisters, probably yes.  I mean there can be a

14   whole family and have like five different names.

15     Q    How about this Keith Maddox?  Did you ever come --

16     A    No.

17     Q    It doesn't ring familiar with you.

18     A    (No verbal response.)

19     Q    Anything else you know about the case that we

20   haven't discussed?

21     A    No.

22     Q    Did you know this Jackie Bain?

23     A    I knew her just from the store.

24     Q    By -- from a distance.

25     A    Correct.

1      Q    Just so I'm clear on it and the record's clear on

2  this: You were not on duty the evening of the shooting?

3      A    No, I was not on duty.

4      Q    How far would 102 be from 112 -- is that what the

5  Circle K?

6      A    (Nods head in the affirmative.)

7      Q    What is the relative distances between the two

8  zones?

9      A    It's --

10     Q    Five minutes?

11     A    It's a tricky question because 112 is split up.  So

12 in actuality, there's a part of 112 zone at another Circle K

13 that borders 102 zone.  Spitting distance.

14     Q    So there are areas where they may even --

15     A    One side of the street is 102, one side is 112.

16          MR. TOBIN:  Okay.  Thank you for coming.  I

17 appreciate your help.

18

19          AND FURTHER DEPONENT SAITH NOT.

20

21    _____
      Witness

22

23

24

25

# C E R T I F I C A T E

STATE OF FLORIDA   )

COUNTY OF BROWARD  )


I, AGNES M. SCHASCHL, being an Electronic Court Reporter of the Seventeenth Judicial Circuit, as authorized by Rule 2.070(c), Florida Rules of Court, and Administrative Order 7.06.1, Seventeenth Judicial Circuit, hereby certify that the foregoing transcript, pages 1 to and including 10, is a true and accurate transcription of the record of the proceedings.

I further certify that BRIAN MONTGOMERY was given notice July 15, 1992, by telephone*, that the transcript must be read and signed by August 14, 1992, at 3:00 p.m., or it will be filed with the appropriate Clerk of Court without further notice.

Dated this 16 day of July, 1992, in the City of Fort Lauderdale, Broward County, Florida.


_____
AGNES M. SCHASCHL
ELECTRONIC COURT REPORTER/NOTARY PUBLIC

*Left message at the District III station for Deputy Montgomery regarding reading of this transcript.

**Case No. 230137-Z**
**Miami-Dade PD**

Gwen:   Where you been?  Get over here.

CI:       You ain't wanna go over to the Pizza Hut?  Could have ~~set~~ *sat* there.

Gwen:   No I thought about it -  it's more comfortable just sitting here, for you.

CI:       For me?

Gwen:   (laughing) Yeah.

CI:       *Why you say* ~~(Inaudible)~~ For me

Gwen:   It is.

CI:       (laughing) ~~(Inaudible)~~ *where* that looney tune make~~s you hear~~ *sure he in Ft. Lauderdale.* (inaudible).

Gwen:   (Inaudible) I hafta hide you ~~(inaudible)~~ *in there*.

CI:       Where you going to hide me at?

Gwen:   I don't know - somewhere.

CI:       At least you don't have (inaudible) the oldman ain't got no gun – he got a gun - you got a gun?

Gwen:   Ain't got no gun.  ~~(Inaudible)~~ *Everytime he* shot somebody he throw it away.

CI:       What gun?  The one *you say* /they throw up, he broke up?

Gwen:   Hum-Mmmm

CI:       Mmmm.  (Indaudible)  a better way ~~to do the kid~~ *you kidding me, or...*?

Gwen:   He aint gonna do nuthin, we wouldn't do nothin, you just act like it aint nothin.

CI:       Mmmmm. (inaudible) the gun to shoot somebody.   What ~~are you~~ thinking ~~of~~ *he a mobster* ~~Bosco~~ or something?  Yea tell me about that - what about that man, the one that cost him his job?

Gwen:   What - which one?

CI:       The one that cost him his job, he had to, he had to walk ~~the bone that~~ *up on at* ~~(inaudible)~~. *7-11*

Gwen:   Which one?

**Case No. 230137-Z**
**Miami-Dade PD**

CI:      He said 7-11 or something.

Gwen:  Oh yeah, that's the one he killed, that was a officer, he killed that ~~boy~~ *police officer* (inaudible).

CI:      Yeah, at a 7-11.

Gwen:  Yeah he was sittin in his car, you *don't* remember that.

CI:      No.

Gwen:  Yea, officer was sittin in his car, 7-11, blow his head off.

CI:      Over a job?

*Gwen : Nobody...*

**Break (telephone call – didn't transcribe)**

CI:      So, you didn't find no place or nothing?

Gwen:  I know how (inaudible)

CI:      *I'm serious now* (~~Inaudible~~) see the money coming now unless you gonna get his, put it aside until you ready to make the move.  Which one you want to do?

Gwen:  I'm gonna put it in the bank,  but I'm gonna use it.

CI:      Okay.  That girl still going on the trip?

Gwen:  I don't know, I didn't even ask ~~him~~ *her*

CI:      Child....(inaudible) boy that's ~~balls~~ *ballsy*...(laugh)  that is she..she, I mean...

Gwen:  I didn't even ask him..

CI:       If he actin like that over that (inaudible)

Gwen:  Boy I made it real cold in here, didn't I?

CI:      Nah it ain't  even ~~woke~~ *WARM* me up.  No (inaudible) you ain't my boo...

Gwen:  I'm your boo.  Put that in your (~~inaudible~~). *little bag*

CI:      Yea you right then, cause you know that fool if he..if he..if he can do something (~~inaudible~~) *to all of us*

2

**Case No. 230137-Z**
**Miami-Dade PD**

Gwen: I know

CI:     But to both of us, (inaudible) they ain't goin to be able to help us. At the wrong
        time...

Gwen: It ain't nothing like that.. I don't think. If he catch you here, what can he do?
       Nothin, so what what you visiting me here.

CI:     You sure?

Gwen: I'm not sure, he crazy. You don't know how crazy ones gonna act.

CI:     Hmm. At least he throwed all the guns away, huh.

Gwen: Mmmmm

CI:     We ain't gotta worry about that, huh. Man Shoot.

Gwen: That what they told old (inaudible) white Todd. They said..cause Todd had a little crush
       on me. They told Todd..said Todd you better leave Ms. Johnson alone boy.

CI:     Yea,  cause what's his name..madman..madman max.

Gwen: I'm not scared of him..he can die just like anybody else.

CI:     I know, but...we just gonna just go ahead and leave him go on with everybody
        else business cause he like he's tryin to do that anyway and he's going to get to
        play.

Gwen: I know.

CI:     Then you gotta be (inaudible)

Gwen: I know

CI:     Don't think I ain't jittery, you know what I'm sayin..I'm tryin to be cool but..you
        know I'm jittery too now.

Gwen: (inaudible)

CI:     May try to double back. Long as he ain't got no more guns..(inaudible).

Gwen: He ain't got no more guns. Plus we ain't gonna be here long. Because it's
       already seven o'clock now and

**Case No. 230137-Z**
**Miami-Dade PD**

CI:     Yea and I got to

Gwen: (inaudible)

CI:     And I got to go.

Gwen: Took so long to get over here.

CI:     Mmm.  So...

Gwen: Go back over there and pickup Bot *DoC* and take her to Ft. Lauderdale I guess.  Jesus Christ.  I'm the runninest woman.  You think you run a lot.

CI:     Yea?

Gwen: An he....

CI:     So what you go to the school..or what

Gwen: Ft. Lauderdale the school.

CI:     Oh.  So he ain't working at that place no more then?

Gwen: No..he  not working with that, he tryin to get that commercial together.

CI:     Ohhh.

Gwen: He's goin to make a lot of money of that commercial, then he just got his little lawsuit comin in

CI:     What about..what about the man that cost him the job..the job out there?

Gwen: He workin on that too.

CI:     He don't see the man or nothin?

Gwen: Not yet, but I know he's gonna kill him.

CI:     Great day, he crazy *a.h.*

Gwen: He gonna kill that man.

CI:     What the other one done to him..he must a really crossed him up?

Gwen: Yeah.

4

**Case No. 230137-Z**
**Miami-Dade PD**

CI:      What he do? Did he tell you?

Gwen:    What? The officer?

CI:      Yeah.

Gwen:    It's something about they both – he went…he showed up on the scene where he
         wasn't supposed to show up on..he was off duty and he showed up, on the
         scene and the officer, he was helping the other officer subdue the criminal or
         sumpin. And then this officer seen him there and say, hey you're not even
         supposed to be here, white guy. He said man I'm helping a fellow
         officer, he said, we'll see about that. The next thing uhm..internal affairs calling
         him it's a big thing.

CI:      And just got rid of him, just like that?

Gwen:    Mmmmhmmm

CI:      That was stupid. Unless he busted the dude up real bad.

Gwen:    Yeah, it was a confrontation - was a bad scene.

CI:      Oh yeah, he must have broke some bones or something.

Gwen:    It was a bad scene and they just blamed it on him. But, he..he said he all he did
         was like held the guy, but they like broke the guy arm..oh man, it was
         awful, so they got a scapegoat, so they put it on him and which he wasn't
         supposed to be there. But I used to tell him that all the time, I said these people
         in Ft. Lauderdale is prejudiced, Umm, I said (inaudible) these officers..these
         officers nasty, just cause you got on a uniform don't mean nothing to them, you
         still a nigger.

CI:      Yeah.

Gwen:    But you know he didn't believe me. So…..

CI:      And then the next day, you know he was out a jail, he lost a job.

Gwen:    Mhmm

CI:      And he couldn't get back no kind of way?

Gwen:    Well, he went to the military.

CI:      Oh, oh man .

Case No. 230137-Z
Miami-Dade PD

Gwen: Went to the military, yeah.

CI:     (Inaudible) Caught with a white dude or cracker. *Where he up the a*

Gwen: They caught him with the dude? *Where he up*

CI:     Yea

Gwen: He must a watched him and know were he be at..at what time. *and*

CI:     Damm

Gwen: They had..they had another guy in jail for that, you know that.

CI:     They did what?

Gwen: They had another guy in jail for that.

CI:     Oh.

Gwen: And the guy didn't even look like..the picture that they had of him - the
        sketch

CI:     Yeah.

Gwen  The (inaudible) of seeing him, but he had on like all black, yeah he had
        on all black I think, he had a scully on...

CI:     Jamaican trait (laughing) we got to move.

Gwen: I know we got the go.

CI:     (Inaudible) Let me give you some money – your grandchild – you got the move *– that will be a glad time*
        baby, (laugh)(inaudible) hell, you know I was so bad last night when I went to
        sleep man..I didn't even know..

Gwen: What?

CI:     About what..what went down like that, I didn't even (inaudible) even when you
        be tryin to smile and then you..you help people.  That's where you got that from
        your momma.

Gwen: Yea

CI:     But you (inaudible) I know

**Case No. 230137-Z**
**Miami-Dade PD**

Gwen: Sometime we used to come pick ya'll up man, I just....

CI:    Be (inaudible) Ogden

Gwen: Nah ah then he be carring on, I don't be sayin nuthin.

*No Ogden*

CI:    You're a trip man

Gwen: That's them that be carring on.

CI:    I don't know how..I don't know how you do it..but.

Gwen: Easy, I got patience, I tolerate.

CI:    Yea, patience with me.

Gwen: (laugh).

**Stopped transcribing at 18:10:06**

7

Case No. 230137-Z
Miami-Dade PD
5/3/01

**Started Transcribing @ 20:08:32 Hours**

CI:     See this dude here, he don't look nothing like AJ looka there.  Black, (inaudible).

Gwen:  What made you cut that out?

CI:     I was read , I read a lot of stuff, I read (inaudible) Spiderman stuff in there and  I saw this over there by Spiderman stuff.  Who was that?

Gwen:  They was (inaudible).

**Stopped @20:08:49 Hours**

**Started Transcribing @20:21:03**

CI:     Why were you lookin so serious when you looked at, at, at the paper, you lookin serious. Why you looking serious?

Gwen:  I don't know.

CI:     Huh?

Gwen:  I don't know, I was thinking about something.

CI:     What you thinking about?  What!

Gwen:  Nothin.  (inaudible).  What year this is (inaudible)?

CI:     (Inaudible).

Gwen:  (Two one right?)

CI:     Yeah.

Gwen:  That happened in what 90?

CI:     I don't know. You still bringin'(inaudible)?  (Inaudible) cause it says on the question, questions concerning (inaudible) this, this old raggedy car, this thang here

Gwen:  (Cough/inaudible).

ATTACHMENT / EXHIBIT 39

Page 1 of 13

Miami-Dade PD
5/3/01

CI:     (Inaudible) I like the part where we just take off.

Gwen: Listen, can't nobody get in this car unless you let him in.

CI:     Okay.

Gwen: Now if you bold enough to let somebody in this car while you sittin in here.

CI:     (Inaudible) (lingering) questions.

Gwen: So who you want me to show this (to)?

CI:     No don't show him (laugh), don't show, (inaudible) ugly (inaudible).

Gwen: (Laugh) What, you want to solve the case? (Laugh)

CI:     (Laugh) No.

Gwen: (Inaudible) No you wanna solve that one?

CI:     (Inaudible) I just what I said, said, said (inaudible).

Gwen: You wanna solve that one?

CI:     How you gonna solve a case like that?

Gwen: (Inaudible/what you gonna do)?

CI:     (Laugh) That fool might kill both of us.

Gwen: I know (laugh).

CI:     Shoot.

Gwen. (Me and you) know who did it.

**Case No. 230137-Z**
**Miami-Dade PD**
**5/3/01**

CI:      I'm tryin' tell ya he'll kill both of us.  I ain't goin' out  (inaudible)…

Gwen: …  (Inaudible) show him the paper?  Want me to show him?

CI:      No don't show him the paper, he may start going off on you. And you don't need that.

Gwen: Huh?

CI:      (Inaudible).

Gwen: Huh?

CI:      Just tell him you want out, you want out.  When you get ready to move, (inaudible) AJ I want out, and you gone bout your business.  So he won't come around bothering (us).

Gwen: Oh.

CI:      That's if you serious about moving.

Gwen: I'm serious.

CI:      I'll see.  I'll see.

Gwen: I'm serious baby!

CI:      Well just, let him know to leave us alone…

Gwen: … I'm  serious.

CI:      … cause we don't want no pop up, you ain't got no children for him to show up.

Gwen: I know.

Miami-Dade PD
5/3/01

CI:      (Me) and you...

Gwen: He ain't gone know where I live at.

CI:      He'll find out through Dot 'nem somebody or follow.

Gwen: Uh uh.

CI:      Don't tell me he ain't gonna find out, he think he an investigator.

Gwen: You just don't know, a lot of times I move out and let my family know where I live at.

CI:      If one of them know, I bet you a hundred dollars he'll find where you stay. And see me over there, then it's gone be on part two.

Gwen: You ain't got to worry about that.  You don't have to worry about that.

CI:      You be have me going and looking over my shoulder, you got my back? (Laugh)

Gwen: Oh I shoulda black,  backed the car in?

CI:      That's what I'm sayin.  You don't listen to me.

Gwen: I didn't hear you say that baby!...

CI:      ... (Inaudible).

Gwen: ... don't tell me bout I don't listen to you...

CI:      ... (Fool) over, he like to sneak up on people, and shoot he ain't fina (inaudible) I ain't got nothing to shoot back.

Gwen: He ain't got nothin' to shoot with either.

Case No. 230137-Z
Miami-Dade PD
5/3/01

CI:     How you know?  You don't know.  The man probably got another gun and didn't even tell you nothing.

Gwen: Well he got it hidden  real good (from me).

CI:     Well.

Gwen: What made you get that out of that paper?

CI:     (Inaudible) Spider man stuff in there and I , I  I read a lot of stuff in the paper.  I ain't got nothin to do, when I didn't have a (car)  I usually be reading, now that I got a (car) I be movies all the time.

Gwen: Uhm.

CI:     But that's better, don't you think that's better, backing in there?

Gwen: I 'll, I'll run him over.

CI:     Well, yeah that cop (you could) have ran him over.  You see he ain't (dead), you see where he at.

Gwen: (Laugh)

CI:     Talkin' bout run him over.  I'm surprise he didn't get no shots off. He (inaudible)…

Gwen: … Who the cop?

CI:     Yeah to buss his but, you know usually cops shoot back

Gwen: How you gone shoot back when you sittin in the car?

CI:     He got a gun right on his hip.

Case No. 230137-Z
Miami-Dade PD
5/3/01

Gwen: (But you don't ever) suspect nobody gonna put a gun (through) your head and blow your, blow your head off like that? Huh?

CI: Oh. He ain't had time to react or nothin' he, on the paper it said 1:45 in the morning.

Gwen: Umm huh.

CI: Shit, that's a creepin' motherfucker and then you worry about why I'm looking over my shoulder...

Gwen: ...(Laughing)

CI: ... Shit. I ain't comin around you no more without my gun. You forget that.

Gwen: Don't be totin' that gun with you. The police stop you...

CI: ...(Inaudible) I'm a give you something.

Gwen: That's right.

CI: Why don't I go, you can buy one registered right?

Gwen: Um huh.

CI: Well good, I'm a make sure I buy you one. (Inaudible) down payment first, get you little ~~snug~~ *snub* nose.

Gwen: (Laugh)

CI: You laughin now, if we gone make your move, you gotta do (inaudible) I mean thirteen years for what you been through it don't make no sense.

Gwen: I know. I told you. That's why I told you because I am moving.

CI: Mmm huh.

**Case No. 230137-Z**
**Miami-Dade PD**
**5/3/01**

Gwen: I'm through with this.

CI:     Yeah  see we just want to see what his reaction is (inaudible) you don't want no backlash.

Gwen: Mmm huh.

CI:     Cause me and Bass'll go get him (laugh).

Gwen: I told you, anything happen to me, car accident, whatever...

CI:     ...Uh huh.

Gwen: ... that nigga killed, he too slick, he killed me.

CI:     Mmm huh. He'll probably try to do it like that too.

Gwen: (Have me comin up missin?)

CI:     Mmm huh, some kind of way a accident and have him a hurt a little bit too.

Gwen: Yeah.

CI:     He (can drive)...

Gwen. ... Act like...

CI:     ...yeah cause he's so strong he could drive off a cliff and, and you know somethin' like that.

Gwen: Yeah.

CI:     And you could get all messed up, and he could brace his self.

Gwen: He good.

Case No. 230137-Z
**Miami-Dade PD**
5/3/01


CI:       Cause you know as long he go to the hospital too it'll look good.

Gwen:   He good.  Or he might act like somebody robbed him.  I told Bass all that stuff, I said anything happen to me, even a mistake, kill him.

CI:       Mmmum

Gwen:   Anything, anything.  Cause he...

CI:       ... Think he so smart.

Gwen:   That's right he real slick, when he kilt that officer,

CI:       (Man).

Gwen:   He creeped up on him,  killed him.

CI:       What he do with the gun?

Gwen:   I told you he broke it all to pieces.

CI:       Shit.

Gwen:   Over there by New Way Church, dropped some pieces there, dropped them in different places.

CI:       New Way?  Talkin bout Victor Curry church?

Gwen:   Uh uh, 22nd Avenue and 167th (inaudible) down there.

CI:       Ain't no New Way over there.

Gwen:   New Way is on 22nd Avenue and a hundred and uhm 67th , 22nd Avenue.  There's a church right there, big church right there on the corner, and there's another church across the street from there.


Page 8 of 13

Case No. 230137-Z
Miami-Dade PD
5/3/01

CI:     Oh those two where the, the pastor shot his woman?  (Inaudible) where the pastor wife shot him?

Gwen: (May be.) In this, that big open field, he dropped some of it there and some of it.

CI:     Man.

Gwen: He better be glad I ain't no tattletale, call anonymous and tell on him(inaudible).

CI:     If he start botherin (inaudible) when you leave.

Gwen: (Laugh)

CI:     You might have no choice (laugh) shoot.  Cause ah...

Gwen: ...(Tell on him/inaudible huh?)

CI:     ... he sneaky like that, he feel like you, you the only one know.

Gwen: Uh huh.

CI:     He might you know...

Gwen: ... I was thinkin about that too.

CI:     Yeah, I'm (both talking)  sayin he just like that, he could be in New York and send somebody back, at you.

Gwen: I know.

CI:     And here I am with ya laying (inaudible) kissing  all up and another motherfucker come shoot (both laughing), and then when he gone I thank we safe.  (Inaudible) be that slick, and all he gotta do is account for where he at.  If he in New York, or California (with this girl) and somebody come back here and do somthin, they can't do nothin to him.  You be fried bacon.  I think I'll buy you one, you ain't you ain't you ain't been no (joint) you could carry one.

Page 9 of 13

Case No. 230137-Z
Miami-Dade PD
5/3/01

Gwen: I know.

CI:     Shoot,  (inaudible) I don't know, but I'm getting (inaudible).

Gwen: Yeah, right.

CI:     You keep talkin bout you alright, you better just get on in there and listen, just
        play it off.

Gwen: Yeah right.

**Stopped at 20:29:03**

**Started again at 20:55:25**

Gwen. Isn't that something?

CI:     What?

Gwen.: If they bring that case back up?

CI:     They was talking bout it in  the paper (inaudible) cause they, they (inaudible) they
        saying in here that the place the guy was somewhere else or some junk.

Gwen: I told you that guy didn't do that, I done told you who did it.  I remember that one
        real good.  When he came back.

CI     When he came back?

Gwen: After he had already did it,  he came back home.

CI:     He told you?  Or, you just figured it out?

Gwen: Uh uh, he told me and I know the officer.  I know who it is, I (inaudible).

CI:     What you (inaudible) for?  You know him personally?

Page 10 of 13

Case No. 230137-Z
**Miami-Dade PD**
**5/3/01**

Gwen: No I just know him, for what he look, what he looked like, I know. Oh God look at all this water!

CI:  No don't go there, try to go that way. You goin in the deep end.

Gwen: (Inaudible).

CI:  Oh.

Gwen. Go another way?

CI:  Oh, so he must be was at that ah Internal Affairs thing when he cost what's his name that job.

Gwen: Umm?

CI:  AJ his job. He was, he a redneck?

Gwen: Yep.

CI:  He was nasty?

Gwen: Nasty, nasty, nasty. They should think about that, and they (can come) up dead. (Both laughing). It coulda been another officer! Right?

CI:  Yeah but shoot...

Gwen: ... No they always...

CI:  ... the way it was done...

Gwen: ... wanna think it's civilian.

CI:  Yeah that's right, and them two dudes probably got a long record.

Page 11 of 13

Case No. 230137-Z
Miami-Dade PD
5/3/01

Gwen: Umm huh.

CI:     And they put it right on them.

Gwen: Umm huh.

CI:     I wonder how they got it to stick.

Gwen: I don't know.

CI:     It said in here that....

Gwen: I know they didn't do it, I know who did it.

CI:     Well we just got to get you far far away from him (inaudible).

Gwen: (Laugh)

CI:     Don't be laughin, all your hard time's over jack.

Gwen: Oh God.

CI:     See when I get with somebody I be with 'em ten, fifteen years.  You know I had
         mistress for twenty years.

Gwen: Yeah?

CI:     Twenty!

Gwen: My friend had a, her friend for a long time, and she fooled around and told her
         cousin, and her cousin told...

CI:     ...That's how it always leak out.

Case No. 230137-Z
Miami-Dade PD
5/3/01

Gwen:   Her cousin told her uhm, her boyfriend and her boyfriend told her husband.  And that's that how (I finally) found out.  But my, my, my friend was in love with that dude.  She loved him.  They used to stay off from work the whole day and stay in a hotel, all day long.

CI:     All day long?

Gwen:   Mmm huh.  She, I mean she, that was an affair.

CI:     A real one huh?

Gwen:   Mmm huh.

CI:     Why you give me on that side?  I got...ah I'm tellin  now you slackin, now you gotta go home now.

Gwen:   (Laugh)

CI:     You used to be on top of everything, now you know to put me out by the door.

Gwen:   Let me get you safe, to your car.

CI:     Yeah.

**Stopped at 20:58:21**

STATEMENT OF:                                                    CASE#:

# CD#1
# (1 ON 1 HOTEL)

**19:24:15**

     ... (knock on the door).

B/M.         (Inaudible) for hundred miles?

B/F.          Maaaan.

B/M.         You got caught...

B/F.          ... (Inaudible).

B/M.         You got caught in traffic?

B/F.          (Inaudible).

B/M.         (Inaudible).

B/F.          (Inaudible) foolin' with ha. Take me here take me there. (Inaudible).

B/M.         (Laugh).

B/F.          (This room alright).  This used to be something else (inaudible).

B/M.         What the, name of the hotel?

B/F.          Yeah.  It used to be something else, remember?

B/M.         What? Ah, ah,...

ATTACHMENT / EXHIBIT 40

STATEMENT OF:                                                    CASE#:

B/F.          ... (Inaudible).

B/M.          I forgot the name.

B/F.          (Inaudible) name of it.  Where you go this from (inaudible)?

B/M.          Huh?

B/F.          Where you got this from?

B/M.          The kitchen.

B/F.          What?

B/M.          (Inaudible), I ate mind, my bacon.  Bought you a lil mild, Tom Collins.  And some cherries (if you wanna chill).

B/F.          (Laugh).

B/M.          You wasn't followed was you?  (Laugh) Don't be talk bout, what you mean you don't know.  There you go with that again. Talk bout, like it's casual.  You wasn't followed?

B/F.          Uh uh.

B/M.          Where Archie?

B/F.          He went to spend some time with some friends but uhm.

B/M.          Oh so you in another car?  Your car stick out. I parked mine way round there.

STATEMENT OF:                                         CASE#:

B/F.        I know I saw yours.

B/M.        It good?  Ah man.

B/F.        You been here since what time?

B/M.        Huh?

B/F.        You been here since what?

B/M.        (Inaudible) like bout a hour.

B/F.        I ain't, I thought maybe you wasn't gone make it.  So I just
            went doing what, what, what I was doing.

B/M.        Ahh. (Murphy) found her a place?  (Inaudible) (Murphy)
            looking?

B/F.        Huh?

B/M.        (Inaudible/Murphy) she fina pull up or what she gone do?

B/F.        Nah.  She, got to do some other thangs.

B/M.        Oh.  Boy that'll be funny all three of yall being, be
            (inaudible/laughing) guide lee. I bet (Deek) gone say what's
            going on all yall moving up.

B/F.        (Inaudible).

B/M.        The only person that don't have problems is, is you, and
            Chontay. (Inaudible) really, yeah and, and AJ gone really too.

STATEMENT OF:                                        CASE#:

B/F.       He say he not.

B/M.       What ~~(inaudible)~~ *Fran* told you?  What ~~(inaudible)~~ *Fran* told you?

B/F.       I'm just going by what the man say.

B/M.       Yeah okay.  Wait til you see that shoe on the other fit, on the other foot.  The real (the rock star) gone come out him then.  We ain't got nothing to (scare him off) we got to get somethin' on his butt to get him off of us.

B/F.       (Laugh).

B/M.       And he coming man I'm telling you.  We got, can't nothing work without a plan, now if we gone, both of us got good mind we got to put somethin' together.  What you thank? Alright you sittin' there like you cool (inaudible) your  eyes gone be  big (laugh) bigger than you (inaudible/laugh)…

B/F.       … Uh uh.

B/M.       (You gone) come to the door, thanking it's me it being like your girl, come to the door (inaudible) aah. But me and you gone have to (inaudible)  that's if you're  serious about your forty one (fake out), if you ain't then you can gone then (inaudible), stay on over there.  (You) act like you wanna stay.

B/F.       (I don't act like I wanna stay nothin').

B/M.       (Laughing).

STATEMENT OF:                                                    CASE#:

B/F.        (Inaudible).

B/M.        Huh?

B/F.        (Inaudible).

B/M.        What?

B/F.        Because I'm cool?

B/M.        Yeah you too cool for me.  Who you thank, if he find out bout it
            who  you thank he gone get first me?

B/F.        Uh uh he probably get me first.

B/M.        And the he gone have to deal with (Bass) and he don't wanna
            deal with that.  He can't go, New  York ain't farther enough.

B/F.        (Laugh).

B/M.        Nah you know that.  What he'll try to expose (inaudible) first
            and then try to do something or just do something?  Whatchu
            thank you know him better than me.  Just the thought me huh?
            Huh?

B/F.        Well number one, he know how people think of me so, he'll try
            to damage my name real bad.

B/M.        How he gone do that?

B/F.        Tell people bout me and you.  Make me look bad.

STATEMENT OF:                                      CASE#:


B/M.        Oh.  (And me)?

B/F.        Uh uh I guess (Von) be mad with you, tryin' to throw your stuff
            out.

B/M.        Shoot, that ain't (gone be enough).

B/F.        What!

B/M.        That ain't gone be enough (inaudible) he won't be satisfied
            with that, that ain't gone be just enough.

B/F.        Gone try and hurt somebody?

B/M.        Somebody!

B/F.        (Laugh).

B/M.        (Laugh)  You still ain't getting it (inaudible) we gone have to
            go talk, we gone have to go leave (inaudible) ah a note or letter
            or something.  Maybe we'll write a letter and leave it to (Phil).
            You trust (Phil)?  You trust Phil?

B/F.        What kinda letter I need to leave?

B/M.        A letter in case somethin' happened cause the one you're talkin'
            bout with Bass 'nem that ain't nothin'.

B/F.        That is somethin'.

STATEMENT OF:                                         CASE#:

B/M.        That's just they word!

B/F.        I know what um doing.

B/M.        Oh you know what you doing huh?  'Dem bullets start flying
            whatchu whatchu gone do?

B/F.        (Laugh).

B/M.        (Inaudible) if he gone leave, that'll be fine, but if he try to creep
            back down here.  You too cool for me.  I used to be like that.

B/F.        (Laughing/both laughing).

B/M.        Umm. You got a napkin?

B/F.        (Inaudible).

B/M.        You look like you ~~tied~~ tired?

B/F.        A lil bit.

B/M.        Yeah.  Take a squirt.  (That's mine here), this  yours
            (inaudible).  It'll be sweet if we didn't have no problems
            afterwards.

B/F.        (Laughing).

B/M.        Just like just like the number, the number man say,  you good
            for me you good for me....

STATEMENT OF:                                    CASE#:

B/F.        (Laugh)

B/M.        (Inaudible).

B/F.        A good business partner.

B/M.        Yeah!  New business partner cause uhm, it released a lot of
            stress off me today bout cause I was thinking bout that.  See
            cause I was fina go to Orlando (inaudible) and trip.   See how
            you did that, that's good now why why can't I get that home?

B/F.        (Cause) I don't  know.  I been around, she ain't been around.
            You gotta tell ya what…

B/M.        … Well when (both talking) well when it come to the gangster
            tip I been around, and I'm tellin' you.

B/F.        (Laugh).

B/M.        That's so funny (inaudible).  Okay.

B/F.        (What you) worrin' bout?

B/M.        I'm worried bout them coming.  After we getting settle…

B/F.        … (Wait/inaudible).

B/M.        … Huh?

STATEMENT OF:                                                    CASE#:


B/F.        Wait till (inaudible), how you know, the person he with my make him happy.

B/M.        If it made him happy he'd a been eager to go.  He wanna hold on you because, ain't nobody gone do him like you do him. And you know that.  Those other women tell him nigga you betta get out my face.

B/F.        (Laugh).

B/M.        I ain't your what?  And he probably what you say she Dominican or something? Cause boy, if if, if, if one shot get fired that mean he missed. Whow! You'll know we'll know who it is right off.  See and me and Bass don't need no charges you know what I'm saying?  Why we gotta get ourself messed over him?  Cause look like, that's Tom Collins it's good. What?  That's Tom Collins.

B/F.        (Inaudible).

B/M.        You don't like it?

B/F.        Uh uh.

B/M.        Why?  Got lemon in it.  That's Lemonade in it.

B/F.        Who told you I was crazy about Lemonade?

B/M.        Are you?

B/F.        Uh uh.  You know what I drink?  I drink pina colada.

STATEMENT OF:                                              CASE#:

B/M.        Well put some pineapples in there and pina colada and make
            your own fruit juices in that. Put 'em in there, put your
            strawberry in there with (that)...

B/F.        ... Uh uh, I'm alright baby.

B/M.        Check (inaudible)...

B/F.        ...You drink that.

B/M.        Well check this out then.

B/F.        What that is?

B/M.        That's ah (inaudible).

B/F.        I don't know I got some water, see I know.  I bought my own
            water.

B/M.        How we gone celebrate with some damn water?

B/F.        (Laughing).

B/M.        (Inaudible) you getting like The Rock over there now you
            getting like Rock.  All my suggestions you, you  just brushing
            'em off see there.  You getting like Rock.  (Inaudible) all the
            other traits come out (laugh).

B/F.        Who?

STATEMENT OF:                                           CASE#:

B/M.        You getting like Rock.

B/F.        Uh uh you gone see me this is what I am.

B/M.        Cool?  Umm. (Inaudible) getting something on him where
            he'll...

B/F.        ...The only time you'll have a problem with me is uhm. Oh I
            don't like lies. Just tell the truth.

B/M.        Shoot you too cool you're take anything I ain't, why I
            (inaudible) lie to you for? Shoot.  What's his name just come
            clean yeah yeah (inaudible).

B/F.        (Laugh).

B/M.        I 'm a be cool too I'm a say nah ain't no action (laugh) but I
            just want us to be safe man, and see that's my main priority
            cause I don't want us to be packing and all that kind of junk,
            going out to eat and stuff.  You know he sneaky as hell.

B/F.        Baby, did I tell you if was rough, I'll be away for about a
            month, and I'll be back okay.

B/M.        Yeah, and I'm a be here!  You gone! (To Detroit/laughing).
            You gone to Detroit, I'm here , I'm the sittin duck...

B/F.        ... I might in I might be in New York.

B/M.        How the hell you gone go to New York that's where he gone
            be?

STATEMENT OF:                                              CASE#:

B/F.          He ain't gone be in New York.  He gone be here.

B/M.          I wanna get somethin' on him and let him know hey, you try
              something I'm turn your butt in nigga…

B/F.          … (Inaudible).

B/M.          …You know what I'm sayin'?  That's what I wanna do.  I
              might not have time to say nothing to him huh?

B/F.          Hum.  Well.

B/M.          It's a big step.  Now if he pull up and don't come back, it's for
              ah what they call that?  Happy and ever after?

B/F.          He gotta find me first baby.

B/M.          Huh, that's so hard to find.  (Oh) you thank he gone find you,
              all he gotta do is hang round, your sister's house, wherever, in
              the car somewhere, and here you riding up.  Followed you right
              to your gate.  You don't look in your mirror. Hum.

B/F.          Then I'll know to look in my mirror.

B/M.          I thank, just like I was thanking I was thanking last night I say
              dog with all this, going on, when stuff go down, at like that
              (inaudible) I say man we can just, we can just take, take a letter
              to (inaudible/phone ringing).  You know what I'm sayin?  Just
              take a letter to (inaudible/phone ringing/inaudible).  You don't
              thank so?  Hello, (inaudible) yeah. (Inaudible).

STATEMENT OF:                                                                          CASE#:

B/F.          (Inaudible)

B/M.          (I'm a be out late today/noise in background). 1:30, be hanging
              out.  Uuuh.  (Good huh?)

B/F.          Huh?

B/M.          (Inaudible)..

B/F.          I know I look like I put a bunch of junk in my system.  (Laugh).

B/M.          (Why)?

B/F.          But I don't.  (Inaudibie)..

B/M.          I know I know right (now that you're sayin') not only do I, I
              worry all the time I'm always thinking, I think about stuff. I'm
              always thinkin' bout stuff.

B/F.          Well you should stop thinking about that. Let's wait til we get
              to that point…

B/M.          … Without a plan!

B/F.          (Laughing).

STATEMENT OF:                                                    CASE#:

B/M.        Without, without a plan man please. I wanna have something to
            back him but I don't, (inaudible) I ain't got no forty thousand
            for no lawyer, thirty thousand that what it gone cost.  He
            ~~Side 4B~~
            ~~(inaudible)~~ on us,  don't give us chance to say anything, that's
            why I say, we outta write, write stuff, I write it down and let's
            give it to Phil.

B/F.        Baby let me tell you somethin', if somethin' happened I'll go
            work for the attorney and work it off.

B/M.        Man, who uhm, ah (both talking)…

B/F.        … I got Joe.

B/M.        … Henry (inaudible).

B/F.        I got Joe.  Joe is ah, ah whatcha call 'em he called me the other
            day asked me did I wanna work.  I don't like foolin' with Joe
            too much, he be beggin' for pussy.

B/M.        (Laugh).

B/F.        But if somethin' happened to you!  I'll go work for him.

B/M.        But (inaudible) AJ'll be clear.  How ya gone get him?

B/F.        Huh?

STATEMENT OF:                                                    CASE#:

B/M.       How ya gone get him without no proof?  No letter to to leave....

B/F.       ... You say it's cost thirty thousand dollars, if we do somethin' to him right?  Didn't you say that?

B/M.       Yeah if he if he come and try to hurt us and or something like that.

B/F.       Okay 'den.  I already got a lawyer. (Inaudible) worry bout stuff for?

B/M.       What (inaudible) told you?

B/F.       If  I was a man, and I caught my wife,  with some other man, I'll just say,  oh that's how ya doing it?  Okay.

B/M.       I done you when the shoe be on the other foot, then you round (inaudible) trippin', so ah, I want, (inaudible) let's, like I say I wanna write it and then you can you can take it to Phil, I'll get one and (inaudible) take it...

B/F.       ... Write what baby!

B/M.       Write all that what happened in the in the at the thang! And give it to Phil to to seal and hold it for us in case somethin' happened to one of us.

B/F.       Chontay already know.

STATEMENT OF:                                              CASE#:

B/M.        What Chontay gone do!

B/F.        She gone testify she gone tell.

B/M.        She ain't got no proof!  That's his word against hers.

B/F.        Baby, if something happened to me, or you, he dead.  So
            whatcha worried bout that for?  (Both talking)…

B/M.        … Why can't we, why can't we just back him off with with
            with with, with, with the truth?  Flash it in (the) face say, we'll
            turn your butt in if you try something.  Then he may go
            (inaudible) and just leave.

B/F.        Uh uh. He ain't gone do that.

B/M.        What he'll do?

B/F.        Try to get one of us.

B/M.        He'll try to what?

B/F.        Try to kill us.

B/M.        Both us?  Ah shit!  That's why I, what I'm a do…

B/F.        … Baby listen, if you that worried bout it then just me and you
            just won't do that we won't get together okay?

STATEMENT OF:                                                    CASE#:

B/M.        (Inaudible)…

B/F.        … I don't want you to worry about that.

B/M.        I ain't worried about it but it (both talking)…

B/F.        … Me and you…

B/M.        … it's a safety thang to do…

B/F.        … me and you won't get together okay?  Alright?

B/M.        See, there you go.  There you go.

B/F.        What?  Cause I don't want you worried.

B/M.        It ain't being worrying…

B/F.        … I'll eliminate…

B/M.        … it's being cautious.

B/F.        I will eliminate any problems, for you.  If I'm a problem for
            you, I'll get out ya life.  That's the way I am.  I don't need no
            problems (from nobody).  Okay baby?

B/M.        What's wrong with some insurance?

STATEMENT OF:                                                CASE#:


B/F.        (Laugh).

B/M.        That's what I'm saying if we gone, we gone be dealing with
            each other (inaudible) insurance, you know I ain't been I been
            out of circulation a long time.

B/F.        Baby, don't worry bout that.  When you decide to, get together,
            start to spend time with me (inaudible).

B/M.        You act like ah Chontay 'nem like they, ah like they, they
            hitman (and woman) they ain't no hit (laughing).

B/F.        You don't know what my children (are).

B/M.        (Laugh) Like they hitman and woman.

B/F.        You don't know what my children are okay.

B/M.        I'm asking you can you trust (Phil)?

B/F.        I don't know I gotta see.

B/M.        With, with a letter, you can trust him with a letter saying if
            anything happen…

B/F.        … I gotta see.

B/M.        … you, take this to so and so.  See cause what they gone do and
            why you want them to get all messed up if something was to
            happened?

STATEMENT OF:                                              CASE#:

B/F.          (Inaudible).

B/M.          Just cover our self!  That's what I'm sayin'.

B/F.          Baby.  Everythang gone be alright, everythang (inaudible)
              everythang.  AJ  know I know all his business and everythang
              okay?

B/M.          That's that's why he ain't gone let you go and you know it. You
              know he ain't gone let you go.

B/F.          (I know all his)…

B/M.          … Tell the truth.

B/F.          Yeah he say he gone let me go!   (Hell), he not gone be,
              begging nobody to be with him.  Oh you shoulda heard him he
              gave me a good lil speech.

B/M.          When?

B/F.          The other day.  He gave me a good speech.   (Laugh).

B/M.          What he say?

B/F.          He say he uhm, he ain't gone be chasing after me running me
              down…

B/M.          … (Inaudible) told you you hard head too.

STATEMENT OF:                                                CASE#:

B/F.        (Laugh) I'm not hard headed, I'm just telling you what he said.
            He said I'm not gonna do that.

B/M.        Uh huh.  Knowing that you know what you know (inaudible)…

B/F.        … Humiliating him and, (inaudible) some words he used you
            know when he get upset he start speaking a lil proper?

B/M.        Oh yeah?

B/F.        Uh huh.  (Inaudible) proper, start using all the big words on
            me.

B/M.        (Laugh).

B/F.        I say oh.

B/M.        Well I'm a write it down.

B/F.        He start speaking big words I start speaking Spanish.  I don't
            speak, I understand Spanish I say well I don't understand your
            big words so…

B/M.        … And you gone on with your cool self…

B/F.        … so you go, we both doing the same thang.  We, we speaking
            where we can't understand each other.

STATEMENT OF:                                                    CASE#:

B/M.        Well I got me a lawyer friend you ask you ask you ask Phil,
            will he hold, a letter for, for me and you.  Cause I'm shole'
            (inaudible) we can, we can go where we wanna go. Then I'll be
            covered.  And…

B/F.        … Baby.

B/M.        After I write the letter I'm a stamp, the, the lil thang to it.

B/F.        Baby.

B/M.        That's all I'm saying!

B/F.        Baby.  Why is you worryin' about that?  Why are you worryin'
            about that?

B/M.        Because we gone be seeing each other more and more!  And
            you talking bout going to (inaudible) for thirty days!

B/F.        How we gone see each other more and more?  Number one, you
            are married.

B/M.        Uh huh.

B/F.        We you come up there, you gotta come over there a certain time
            you gotta to leave!  (Inaudible), it's gone be alright I'm tellin'
            ya.  Okay?  It's gone be okay.  I can see if you was single I was
            single, no it ain't like that.  So what you worried about that for?

B/M.        What you talking bout the relationship part or or the part where,
            he, he gone flip?  What you talkin' bout?  That's what I wanna
            know I shole' like to know.  Which one you talkin' bout?

STATEMENT OF:                                          CASE#:

B/F.        I talking about me and you spending some much time together.

B/M.        Yeah.

B/F.        How much how much time you gone have for me?  You gone be working, that's number one.  Right?

B/M.        Uh huh.

B/F.        I'm a be working.

B/M.        I'm a schedule some out of town trips in Palm Beach and you can be up there with me, staying overnight.  Oh so you ain't wanna (get out) I'm, you told me you want to get out.  And I'm just looking after our interest for when you get out.

B/F.        Baby!  I'm a get out.  Jesus Christ!  You, you, I'm gonna get out.  But I'm not worried about him.  He the least of my worries, I'm not worried about him.  The only person I worry about is, is ah Dot.

B/M.        What about Dot.

B/F.        I wouldn't want her to find out that I was with you like that.

B/M.        Um.

B/F.        Deek,  he okay.  But Dot.

STATEMENT OF:                                                      CASE#:

B/M.        (Laugh)  What Dot'll say?  You had to get that (fuck), you had
            to get some didn't you?  You shoulda say AJ wasn't serving
            me, (inaudible) Barbeque buddy (laugh).  (Inaudible).

B/F.        (Inaudible) I'm just go let (inaudible) you gone and play your
            cards.

B/M.        (Inaudible)…

B/F.        … If I have to.  If I have to I will put a hole right there.  (He)
            don't believe me.  I'll kill him.

B/M.        You ever thought he'll get to you first.  You don't even look in
            your mirror (both talking) you could be followed.

B/F.        That's now!  But then I know to protect myself I have go back
            to being gangster!

B/M.        (Laughing).

B/F.        Looking over my shoulder!  Coming out like!

B/M.        (Laughing).

B/F.        Please I'm not…

B/M.        …So what you gone do (use a restraining order)?

B/F.        I'm not an innocent person here.

STATEMENT OF:                                                    CASE#:

B/M.        I know you ain't innocent.

B/F.        Okay.  You know what you dealing with?

B/M.        What?

B/F.        You dealing with a street person now okay?

B/M.        We both street.

B/F.        Okay we street.  Okay we know how niggas creep up, lay down
            on the ground by ya car waiting for ya to come and all that bull!

B/M.        Yeah.

B/F.        We know that stuff!  We know how niggas do.  AJ (track) a
            nigga come on top of your roof!  He come through your
            window on your behind.  Cut the uhm, wires and stuff, I know
            all this stuff!  He ain't got nothin' new, I know everythang he
            do.  I know how he, he creep, I know what he do I know how
            he do it, I know what color to wear, I know I been with him!  I
            know I know everythang he done done, I know all his criminal
            acts, I know, (inaudible).  I know everythang!  Okay?  So I
            know how to protect myself from him.

B/M.        We can use that (both talking) to protect our self we ain'y got to
            mess with him or me and Bass getting' in trouble.  We can just
            well we're turn your butt in (nigga) you try something.

STATEMENT OF:                                                    CASE#:

B/F.        He know I can turn him in, he know…

B/M.        … Well that's what I'm sayin'!

B/F.        He know I know.

B/M.        You can't turn him in with no bullets in your butt.

B/F.        I want me and him to just part peaceful.

B/M.        That's what I'm talking bout.  Then you…

B/F.        … You go your way…

B/M.        … have smooth sailing from there.

B/F.        I'll go my way.

B/M.        (Inaudible) what trip me out is how he found out, (inaudible) found out how that uhm, where he was at that night?  He followed him?

B/F.        He studied him.  He (get) your schedule where you gone be at.

B/M.        Your schedule!  How the hell he gone get a man schedule?

B/F.        He used to work!  He used to work for the police department, he know, find out where you gone be at, stuff like that.  What area you in.

STATEMENT OF:                                          CASE#:

B/M.        Damn.

B/F.        What nights you off.

B/M.        Lord ~~ham~~ have mercy.

B/F.        He fina get, he fina get that guy on the job.  Another guy.

B/M.        Well we betta pull out fore he, fore he, if he fina get that other
            guy then we betta pull out.

B/F.        He fina get that guy.  Cause he already, right now, he over to a
            party where they guy gone be at. (Right now)...

B/M.        ... Right now!

B/F.        Uh huh.

B/M.        He crazy man.  I wish I (can get me some money)...

B/F.        ... He called.

B/M.        ... (inaudible) pull  your butt outta there.

B/F.        He called the other dude and told the other dude he say set it up,
            get him invited to that party, and that's where he at right now.

B/M.        The man don't even know? (Laugh).

STATEMENT OF:                                          CASE#:

B/F.        He working on it.  You know he act like he alright with the
            man.

B/M.        Umm.

B/F.        Tonight he'll be sittin' down drinking with and talking with
            him.

B/M.        (Inaudible).

B/F.        AJ is terrible.  He (inaudible).  I had to stop him from killing
            uhm, Chontay's, one of Chontay friends. I had to stop him.

B/M.        And how you gone stop him from messing with me?  I ain't
            scared now you know, you know what I'm saying?  And I know
            you ain't scared.

B/F.        I'm really not scared.

B/M.        You know who the scary one in the family Wayne (laugh).

B/F.        Thank you.  Now Wayne, he would, Wayne wouldn't probably
            wouldn't even be with me.

B/M.        Uh huh.

B/F.        A woman like me. With a nigga like AJ?

B/M.        Cause he scared.  But it ain't that, you know…

B/F.        … I scared.

STATEMENT OF:                                                    CASE#:

B/M.        … you you a good person and you help people, but you got you
            been in misery all these, (inaudible)…

B/F.        … All them years.

B/M.        Well you know you gone…

B/F.        … I had not one year…

B/M.        … scream when you get out of this.

B/F.        I had not one year of happiness.  Not one year.

B/M.        Uhm.

B/F.        Not, not one year of happiness.

B/M.        So somebody, so he had somebody to invite somebody to,
            (inaudible) to the party?

B/F.        Uh huh.

B/M.        Oh boy.  (Inaudible).

B/F.        That's where he at right now.

B/M.        See I know my, when my intuition be botherin' me bout
            something, I be on target I ain't last this long…

B/F.        … (Inaudible) something else.

STATEMENT OF:                                          CASE#:

B/M.        … being stupid.  Huh.

B/F.        (Inaudible) he like.  And he ever like, like me and you seeing
            each other now, if he ever just roll round your house, and say ah
            man, you know and start talking all with  with ya and then say,
            hey let's take a ride man.  Don't get in that car.  Don't you get
            get in that car…

B/M.        … (I gotta ya).

B/F.        Don't you get in that car.

B/M.        I gotta ya.

B/F.        Don't get in the car with him.

B/M.        I got it cause he may find out before we even know
            (inaudible)…

B/F.        …That's right, and he good at that kind of stuff, and he won't
            say nothing.

B/M.        You know what I'm a do?

B/F.        Just don't even get in the car.

B/M.        I'm glad you told me.

B/F.        Say man I'm I'm busy man.

B/M.        Yeah I'm (both talking) waiting on a call or something.  I ain't
            crazy…

STATEMENT OF:                                                    CASE#:

B/F.        … Yeah.

B/M.        … (inaudible), I ain't never (inaudible).

B/F.        Don't get in that car cause he is so good, that dude, I mean, Oooo!  (Jesus!)

B/M.        Lord ham mercy.

B/F.        Umm!  AJ good.  He real good.  I told that boy…

B/M.        … He a schemer.

B/F.        … I, I told that boy, I say listen listen listen, the best thang you could do is try to make up with Chontay and try to, try to uhm, talk with AJ you know like tell him everythang alright you know you not gone bother Chontay you know, you know talk with him talk to him.  A whole week, AJ wore his fatigues a whole week.

B/M.        What fatigues?

B/F.        He got some fatigues (inaudible).

B/M.        Army fatigues or black  fatigues?

B/F.        Army fatigues and he got some black to put on, all black (inaudible) and he paint his face black, everythang.

B/M.        Paint his face black!

STATEMENT OF:                                                    CASE#:

B/F.        Cause he got some black stuff that he use, which he got from
            the military.  He can paint his self green like the trees, you
            know he look like the trees…

B/M.        … That's what he had that night when he creeped up on the
            (officer)?

B/F.        Yeah.

B/M.        What?

B/F.        He had on black.

B/M.        Yeah?

B/F.        ~~(Inaudible)~~ He had on black.  He had on a skully a black skully.

B/M.        (Inaudible)…

B/F.        … He is something else (I'm telling ya).

B/M.        Damn!

B/F.        He is something else.

B/M.        So he came home with all that junk on his face?  (Laughing)
            Why you ain't run?  (Coughing).

B/F.        Cause I know him.  I know AJ.  I know him good.  And he
            know the type of person I am he know that I'm not gone tell on
            him, I'm not gone bother him.  He know that.

STATEMENT OF:                                                    CASE#:

B/M.        (Grade day).

B/F.        Only thang is that if he trying to hurt somebody, that I know,
            you know is not necessary that's, that's not good don't do that.
            Now I told him don't bother that guy because it's too soon, but
            it's eatin' at him.  Everyday he be sitting like in a zone like.

B/M.        Yeah?

B/F.        Uh huh, and he be telling me (inaudible) don't come in this
            space right here! You know that's when I know he like really
            tripping out real bad.  So I just stay away I don't even walk
            (inaudible) if I have to get something…

B/M.        … (Inaudible).

B/F.        … (inaudible) I don't even go that way!

B/M.        You said (inaudible) for another gun he probably got another
            gun.  He got to.

B/F.        I don't know.

B/M.        What he gone…

B/F.        … If he got a gun he don't have it somebody else keeping it for
            him.

STATEMENT OF:                                          CASE#:

| | |
|---|---|
| B/M. | His cousin huh? |
| B/F. | Yeah. |
| B/M. | (Making a noise). |
| B/F. | He ain't got it with him he ain't got it in the house, cause I already looked for it.  He ain't got it in the house. |
| B/M. | Um.  (Inaudible)… |
| B/F. | … And one time I was made.  And I asked him did he have a gun.  And he said no, ain't no gun in here. |
| B/M. | Recently? |
| B/F. | Yeah, he said no ain't gun in the house.  First I said you have a gun?  And he thought about it then he say, no ain't no gun in here, like that. |
| B/M. | He throwing you off. |
| B/F. | Yeah ain't no gun in here (inaudible). |
| B/M. | You could tell when he lyin. |
| B/F. | Then I started looking for the gun. I say (maybe) he got a gun in here but he ain't got no gun because, when he got mad, at the guy, somethin' bout the guy was telling him about move your A out the way or somethin' (inaudible), he woulda went and got that gun,  and put it to his head. I know he woulda. But, (inaudible)… |

STATEMENT OF:                                                            CASE#:

B/M.        ...He came (loaded the other night huh)?

B/F.        Huh?

B/M.        (Inaudible) a 45?  A revolver?

B/F.        (What?)

B/M.        What he like army 45?

B/F.        He like uhm.

B/M.        You know the one like (making noise) or the, or the one
            revolver?

B/F.        He had a revolver but, he prefer to have like that, (inaudible)
            like that, he prefer to have that.

B/M.        Oh (inaudible)...

B/F.        ... But then he, send, then he don't really need a gun, he'll
            rather kill you with his hand.

B/M.        He ain't that he ain't no damn ninja.  Hell (laugh).

B/F.        He can.  He can kill you with, with his bare hand.

B/M.        Like how?

STATEMENT OF:                                                    CASE#:

B/F.        Ask Bass!  Bass will tell ya.  He, AJ can kill ya with his bare
            hands, he learned how to do it.

B/M.        What he ah, ah special forces or something?

B/F.        That's what he was in, he know how to kill you with his bare
            hands, I'm telling ya he trained…

B/M.        … He won't kill me with damn bare hands.  He gone have to
            (burn me).

B/F.        He trained, he can kill you with his bare hands, and he told me
            how to kill to kill somebody, if they come up on me how to get
            'em.  But he ain't gone tell me too much cause he don't want
            me to.

B/M.        He talkin' shit.  He ain't no damn…

B/F.        … Alright…

B/M.        … masonry like he ah….

B/F.        … Okay!

B/M.        I know he…

B/F.        … Don't believe me.

B/M.        … he can creep a person (inaudible) and shoot somebody…

STATEMENT OF:                                                    CASE#:

B/F.        … Okay you don't believe me, okay, I'm tellin' ya now.

B/M.        So if he ask me to get in the car I might as well get in the car
            shooting huh? (Laugh)

B/F.        (Don't get in the car.)

B/M.        Nah I ain't.

B/F.        Don't trust that don't ride with him.  Because he ain't been
            round your house right?

B/M.        Uh uh.

B/F.        Riding off with you no where right?

B/M.        Nah.

B/F.        Okay.  So I  wouldn't even trust that.  I don't trust, don't trust
            him.  Don't trust him.

B/M.        (Inaudible).

B/F.        See the way he get rid of me he gotta get rid me, (inaudible)…

B/M.        … Accidentally?  A accident?

B/F.        Yeah, see he can't just, kill me like that.  He has got to, slowly
            poison me, you know he got to do somethin' like that he can't
            just kill me cause they gone know he did it.  So he got to, do it a
            slick way.

STATEMENT OF:                                      CASE#:

B/M.      And you don't wanna leave no evidence ah, damn, (you know) let me write this shit down.  You trippin man.

B/F.      (Laughing).

B/M.      (Inaudible)...

B/F.      ... You gotta write that down?

B/M.      Yeah man shit.

B/F.      Do not write it down, they already got it...

B/M.      ... (Inaudible).

B/F.      ... they already know. Listen.

B/M.      What about for me!

B/F.      Uhm, I'm already covered, you covered too...

B/M.      ... (Inaudible)...

B/F.      ... since you was with me.  (Inaudible) me and you covered. Don't worry about AJ.

B/M.      You got your letter already then? Huh?

B/F.      Don't worry about AJ.

STATEMENT OF:                                              CASE#:

| | |
|---|---|
| B/M. | See there you, see you ain't no dummy now you got your letter! Where mine? |
| B/F. | You gone be alright! |
| B/M. | Ain't no (laughing) you got me (fucked) up.  Nah man I want something, let me take mine to my uhm, let me (inaudible) a lawyer I can trust. |
| B/F. | Okay wherever you  wanna take it you go head take it because I'm tellin' you, ain't nothin' gone happened.  Nothin' gone happened to you. |
| B/M. | Well what make you thank he gone come to the house and give me a ride? |
| B/F. | I'm just, I just, I just was thinking hypothetically.  Cause you know. |
| B/M. | Yeah. |
| B/F. | I know this probably how he gone do this guy. He gone take him for a ride. |
| B/M. | Shit, man. |
| B/F. | He gone hit him one time and he gone be dead.  One time. |

STATEMENT OF:                                              CASE#:

B/M.        With his bare hand?

B/F.        With his bare hand he gone give him…

B/M.        … At a party?

B/F.        A, no!  When he riding with him (inaudible) temple blow.  He gone hit him right in his temple and kill him.  You know people can hit ya right there and kill ya.

B/M.        Nah.

B/F.        You ain't know that?

B/M.        It gotta to be something real like a hammer.

B/F.        He gone hit you, the last guy, that he hit, he knocked all his teeth a loose and every thang, he got, ooh man he got in trouble for that.  They had to wire that guy's mouth ah man he got in trouble for that.

B/M.        What guy?

B/F.        A guy, that he did that to.

B/M.        When, at a club?

B/F.        When he was in the military.

B/M.        Oh so now he a marksman with his hand he.

STATEMENT OF:                                            CASE#:

B/F.        If he do it again, they say he gone have to register, his hands.

B/M.        Yeah?

B/F.        I'm tryin' to tell ya!  You don't believe me.

B/M.        I believe you now.  See you ain't tell me bout that.

B/F.        He knocked that guy teeth out…

B/M.        … And then you tell me I'm I'm worrying.

B/F.        He…

B/M.        … Looka me.

B/F.        He knocked that guy teeth, all a loose and all that they had to wire all his mouth (inaudible) he got in trouble for that.  He almost got put out.

B/M.        You know what I'm a do that clip I got I'm a write down events, and I'm a take mine somewhere…

B/F.        … You know what you funny?

B/M.        … Ain't no laugh you laughing…

B/F.        … you funny.

STATEMENT OF:                                                          CASE#:

B/M.          Funny my (ass)…

B/F.          … You fun-ny!

B/M.          Shooot.  Funny nothin'.

B/F.          Stop worrying about him.

B/M.          I'm fina write my shit down boy…

B/F.          … You sick. Don't worry bout him.  He'll be alright.

B/M.          Yeah he shole' gone be alright cause I ain't fina be riding round
              with no bullet proof vest on (laughing).  And he gone, and
              stupid (inaudible) will let him in the house (laughing).  You
              want some more fruit?  They good huh?

B/F.          Uh uh she don't be letting nobody in the house no more!

B/M.          No more?

B/F.          Uh uh.

B/M.          She almost let (inaudible) in there today, my, and my daughter
              was there.

B/F.          When?

B/M.          That time he came to the house.

STATEMENT OF:                                                    CASE#:

B/F.        When?  When you, when you was sleep?

B/M.        Nah I wasn't there.  He ah when when...

B/F.        ... I was with (Bird)!

B/M.        He came to the door or something or (inaudible)...

B/F.        ... They ain't let him in!

B/M.        Oh okay.

B/F.        They won't let him in!

B/M.        Oh.

B/F.        Man you family (got) funny, they ain't let nobody in.  They
            shole' ain't.  I was standing, I stood to the door like that and
            (Alfia) seen me and (Alfia/inaudible) open that door let me in.

B/M.        (Laughing/Alfia) saw you (inaudible) sista (inaudible).

B/F.        That's right.  (Alfia) tried to open that door let me in boy.

B/M.        (Inaudible).

B/F.        But (~~Jonathan~~) Johnson you know.  He, it's gone be okay.  Cause he
            wanted out of his marriage, like I want out, everythang will be
            alright.

STATEMENT OF:                                              CASE#:

B/M.      And he feel like you gone be safe with his secret?

B/F.      Yeah because he knew, he know me he know that I'm not gone
          tell on him.

B/M.      Oh okay.

B/F.      He know I'm not gone tell on him, I never, thirteen years we
          been together I never told on him, I never, told, no law 'nem or
          nothin', in fact when it was time for me to testify for him I just
          said good things about him and (inaudible), he know that.

B/M.      Oh.

B/F.      He know that like he know his name.  He said now Gwen, she
          ain't gone rat me out.  She ain't gone tell on me.

B/M.      He got too much sense or too much slick.

B/F.      Well he know that,  see he know that I'm, I was his friend first,
          see he know I'm a friend.

B/M.      What?

B/F.      (Inaudible) friend, a real friend, you friend ain't gone do that
          they gone be down with you.  They gone tell you when you
          wrong.  But they gone be down with you.

B/M.      Ain't  you down with me?

STATEMENT OF:                                              CASE#:

B/F.        Yeah I'm down with you.  Yeah.

B/M.        Got your letter (inaudible) leave me in the dark (laugh).

B/F.        I ain't gone leave you in the dark.

B/M.        Who you gave your's to?

B/F.        (I ain't gone leave you in the dark).

B/M.        Who you gave your's to?  You gave yours to Bass huh?
            (Inaudible).

B/F.        Uh uh I got ah, I got, I, I added some ah, amended ah my ah, ah
            will, I put a extra paper with my will.

B/M.        Yeah!

B/F.        (Inaudible) will (inaudible) last will and testament, a lot of
            black people don't have that.  And you need that, you need your
            last will.

B/M.        And then you got a sealed envelope with it?

B/F.        Uh huh.

B/M.        In case (both talking) accident or anything?

B/F.        Yeah I'm gonna amend it again because ah.

STATEMENT OF:                                              CASE#:

B/M.        In the event that something (inaudible).

B/F.        Cause I wanna leave Wayne two dollars.

B/M.        Just for a joke huh?

B/F.        No it ain't no joke it's just that, I don't want Chontay to have
            no problems with nobody trying to take nothing from her.  So I
            gotta leave everybody (some/inaudible), and they have to be
            satisfied with that they can't, tied it up in probate, they can't
            mess with nothing.

B/M.        Okay what you, what you got in your letter?

B/F.        What I got in there!  It's, I got some things about AJ in there,
            (inaudible) bad stuff.  (noise in background)

B/M.        Badder that what we, what, (inaudible) already?  Shit!
            (Inaudible) um using mine (laugh).  In the event.

B/F.        (Laughing) You know what, put that that down.

B/M.        In, the…

B/F.        … You got a pad too. What you got that pad for!

B/M.        … (Nah) this pad was in here.

B/F.        Oh I fina say!

STATEMENT OF:                                                      CASE#:

B/M.         That pad was in there.

B/F.         You got a pad!

B/M.         (Laughing/inaudible) that pad was over there with that right there, somebody left it in here.

B/F.         You got a pad?

B/M.         You damn right.

B/F.         (Laughing).

B/M.         (Inaudible) it was just on the table and I was just doodling waiting on you…

B/F.         …You crazy.

B/M.         … you took so long.  In the event…

B/F.         … Baby, ah you crazy!  You crazy!

B/M.         … that.

B/F.         You are crazy.

B/M.         … something.

B/F.         You know what you need to stop.

STATEMENT OF:                                               CASE#:

B/M.          … (laugh) something.

B/F.          You need to stop.

B/M.          (Inaudible/both talking)…

B/F.          … Baby if you that paranoid I told you man you need to (both talking/inaudible)…

B/M.          … I'm covering ourselves!

B/F.          Me and you just have to stop seeing each other if you getting that…

B/M.          … Nah you ain't fina go back to him is that what it is? (Inaudible)  back to him?  Huh?

B/F.          (laughing).

B/M.          (laughing/inaudible).

B/F.          What um…

B/M.          … Uh huh.

B/F.          … what um going back there for?

B/M.          But look how you do all the right moves.  You did all the right moves you covered yourself well.

STATEMENT OF:                                              CASE#:

B/F.        (Inaudible).

B/M.        (Inaudible) right there?

B/F.        (Inaudible) car right there.

B/M.        Why you ain't park by me?  (laugh/both talking) you…

B/F.        … I ain't scared.

B/M.        … is something.

B/F.        Let me tell ya something I (inaudible), the only person…

B/M.        … (Inaudible).

B/F.        … um scared of is God and Dot.  (laugh) That's it.  I ain't
            scared of AJ.

B/M.        I ain't scared either but I'm…

B/F.        … If AJ came in right now and caught me and you here, and
            took the car or whatever.

B/M.        He gone have to have more than his, dead blows with his hands
            to deal with me cause I can work a lil somethin' somethin' too.

B/F.        You know some Ka-razy.

B/M.        Yeah.

STATEMENT OF:                                             CASE#:

B/F.        I know when he got that special training I know he was gone try
            to use it.  But he gone go to jail (hand clapping) the next person
            (hand clapping) he touch, he going to jail, he know it already.
            So let him (he do it).

B/M.        He might do that guy in a slick way though, betta than you
            know what I'm sayin'?

B/F.        (Let him do it).

B/M.        He may stabbed that dude up or something.

B/F.        He gone kill him with his hands. And I know he is.  So he gone
            get in trouble.

B/M.        That's why he…

B/F.        … Because they gonna know, they gonna, they gonna, like my
            brother told me, the one (inaudible) they gone check everybody
            out, they gone check out that man last, person that he roamed,
            they gone check out all that stuff, and when they find out how
            he did and they gone say, it was a special way the way
            (inaudible) then they gone convert back to that person
            (inaudible) karate person or, yeah them people gone sit down
            and analyze that thing (and go), ah that person (was a), military
            person.  And then they gone start looking back up everybody
            that came in contact with him that was that in military.  They
            gone catch his butt, we may not even have to worry about him.
            That might be his final, kill, you know.

STATEMENT OF:                                      CASE#:

B/M.        Shoot.  If the guy ain't looking for it, the guy (inaudible) see the (element surprise) is the best thang, now if the guy don't know he at the party, he gone know he there, he can wait for him in the parking lot.  And he can be, and just like you say paint his self up and it's dark and it's raining!

B/F.        He got all his stuff with him, I know.

B/M.        Right now?

B/F.        Yeah he got a, a thang full of stuff.

B/M.        I just hope we ain't the target you looked (both talking) you looked in your mirror while you was coming over here?

B/F.        No.

B/M.        See there, you see there, you you…

B/F.        … (Laugh).

B/M.        Let me take me a drink you round here bull shitting (both laughing).

B/F.        Don't worry about it.  and I told him before too. I say anything happened to me, I got everything written down, my whole life.

B/M.        So what he said bout that?

STATEMENT OF:                                           CASE#:

B/F.        He talkin bout  yeah, you did that?  Talkin bout who got that?
            And I said…

B/M.        … Who got, see that, wee that who got that?

B/F.        I say it's sealed up and put away.  I say cause I  I never know
            what may happened, so I got everythang my life, talking bout
            me too? I say  yeah bout you I had to, had to put everythang in
            there.  He talking bout ah man…

B/M.        … That was smart.

B/F.        … he talking bout…

B/M.        … he ain't know you was that smart.

B/F.        He talking bout ah man, why you did something like that?  I say
            I never know.  Anythang might happened.  I never know.

B/M.        And he ain't…

B/F.        … he say but you not, you not putting all that stuff in the book
            are you?  I say no I'm not putting it in the book, but,  I had to
            do that, I had to (inaudible), and boy he was sitting (inaudible),
            man if I was bout to kill ha I betta do it.

B/M.        Yeah.                    what you sitting
                                     there looking at?

B/F.        (Laugh).

STATEMENT OF:                                          CASE#:

B/M.        Yeah.  You say he was looking in a days, in the corner over there?

B/F.        He was like.  (both laughing)…

B/M.        … Why you taking my pen?  Gimme my pen.  (laughing).  See I paid all that money for the drank and you didn't even drank it man.

B/F.        (Inaudible).

B/M.        I drunk mine you ain't, gimme my pen, let me finish my, finish the letter fore we go to details man.  Come on man stop (laughing).  Got your letter but left me hanging.  Why you ain't type me one up while you was in the office? (noise in back ground).  And kept…

B/F.        … You don't need one.

B/M.        (Inaudible).

B/F.        If somethin' was to happened to you I'm still here.  What do you need a letter for?  If somethin' was to happened to me and you both the letter will be opened…

B/M.        … I'm talkin' bout me.

STATEMENT OF:                                                CASE#:

B/F.        Okay.  I'm here, to say whatever I think it was that guy right
            there.

B/M.        And, and yeah?  What proof do you have?  What, why why you
            feel that way?

B/F.        If he do somethin' to you,  I'm a kill him myself.  Okay?  I'm a
            kill him myself okay?  (Inaudible) just like…

B/M.        … Can I finish my letter please?

B/F.        Just like Chontay say if Kevin kill her friend she gone kill
            Kevin.

B/M.        She crazy bout that dude over Kevin huh?

B/F.        She love him. (noise in background).  When you love
            somebody you love 'em…

B/M.        … Gimme the pen back!

B/F.        Uh uh.  You don't need to write that.  So  (Fon) can read it.

B/M.        Nah.

B/F.        You ain't going to nobody tonight, you going home and she
            gone read that.

STATEMENT OF:                                                              CASE#:

B/M.        Nah I'm a hide it, for real…

B/F.        … (Inaudible) you can't hide it you don't have no she, she, she
            be in everythang, she be looking in everythang.  Checking
            everythang!

B/M.        How you know?

B/F.        Cause I know I shoulda even told you that but.  Don't take that
            home.

B/M.        See there, you checking out my end, but I ain't, when I'm
            tellin' you bout your end it's good.  You don't need your letter I
            got my letter!

B/F.        I have a last will and testament I have an addendum, to it…

B/M.        … I can go (both talking) I can go right to the ah (inaudible)
            and get me and last will and testament, and put it right there.

B/F.        I'll put you one together.  You want me to put it together for
            (ya)?

B/M.        Yeah!

B/F.        Momma Lou got  ha's too?

B/M.        Yeah she got one but I ain't got none.

STATEMENT OF:                                                    CASE#:

B/F.        Okay.  I'll put yours together for you.  I'm a give you the uhm, I'm a give you the…

B/M.        … Okay.

B/F.        … rough draft and then you fill in everythang you want stuff like that, and then I'll, I'll um type it up and put it together for you and then we'll go, go a notary, cause I can't notarized it cause I'm gone be the one put it together.

B/M.        Then when we gone do this?

B/F.        Maybe I can notarized it…

B/M.        … I'm…

B/F.        …Next week, I'll do it for you…

B/M.        … I'm, I'm serious cause I ain't fina be hanging without nothin' to fall back on.  Okay, I do that and then ah I want the letter, with with the goods on him attached to mine.  That's right we'll do that next week.  Done deal?  Um for real…

B/F.        … Why…

B/M.        …And then…

STATEMENT OF:                                                    CASE#:

B/F.          … why you put the (both talking)…

B/M.          … and then I ain't gone mention no mo, I ain't gone mention it no mo then that gone be it I want…

B/F.          … Why you want to put the letter…

B/M.          … You got your letter!

B/F.          Because I need it. You don't need it.

B/M.          Oh I'm Superman?

B/F.          Uh uh.

B/M.          I'm Superman? I don't need the letter? How you playin' you got you you covered, man you ain't thankin' rational now you thankin' like (Fon) now.

B/F.          I ain't thankin' like no (Fon).

B/M.          You is.

B/F.          I never thank like ha.

B/M.          (Laugh).

B/F.          Don't even associate myself with (inaudible).

STATEMENT OF:                                                         CASE#:

B/M.        You…

B/F.        … That's whop.

B/M.        (You, is it) whopped.  But you leaving my end whopped.
            (noise in background).

B/F.        Uh huh.

B/M.        Alright.  Ah I ain't leave all this up to you now let me take
            some responsibility, cause…

B/F.        … (Inaudible).

B/M.        I betta look at the news tonight (laugh) you might be done done
            that joker in tonight.

B/F.        (Inaudible) yet.

B/M.        Huh?

B/F.        If he call me early, he call me early, then he didn't do it, but if it
            be getting' late late and he ain't called me yet. (Inaudible).

B/M.        (You was gone be with me late) late late.

B/F.        He might need me to pick him up.

STATEMENT OF:                                                          CASE#:

B/M.        Oh.

B/F.        But I'll drop him off and come back.

B/M.        That's right we got this til tomorrow jack.

B/F.        Huh.

B/M.        We can even come it he morning too.  Eat breakfast…

B/F.        … What time checkout?

B/M.        Eleven tomorrow.

B/F.        You ain't getting' up that early.  When you butt get up early?

B/M.        (Inaudible) I was up early this morning.  Couldn't sleep.

B/F.        Well that's, that's new for you?

B/M.        Nah not, not lately.

B/F.        When you start getting' up early?

B/M.        I (inaudible) I'm the ones who Alfia's up every morning.

STATEMENT OF:                                        CASE#:

B/F.        Yeah.

B/M.        He won't let nobody else wake him up.

B/F.        Really?

B/M.        Yeah man uhm, and that's a good thang you is sharp, you
            covering yourself.

B/F.        I covered everythang and he know, he know it I told him.

B/M.        Wait til I get some money…

B/F.        … (Inaudible).

B/M.        … I'm a get you, get you something, (since) you carried your
            name.  You're probably get you a permit and everythang.

B/F.        Uh huh if I have to kill him I'll kill baby.

B/M.        No.  He gone make yours look like an accident he'll go off cliff
            in the car he stronger than you.  You'll fly through the window
            and be all bust up. Just, just thanking.

STATEMENT OF:                                                CASE#:


B/F.        (Inaudible) and I done told him this he know, if I die…

B/M.        … Boy he gone (risk Bass some) freedom, you know.

B/F.        Mysteriously, if I die mysteriously he got to go.  He got to go…

B/M.        … That man can be in New York (inaudible)…

B/F.        … I got so many people looking to get him.  When I went up there with my uncle…

B/M.        … Well you know I'm one of 'em.

B/F.        I talked with my uncle.

B/M.        You told him too?

B/F.        My uncle say you know I got friends, I got friends, I got friends, I say I know (inaudible), cause my uncle killed a guy right down there by the store, in New York.  All this sons (inaudible).

B/M.        AJ know him?

B/F.        Yeah he know my uncle.

B/M.        Oh so they know each other from New York?

STATEMENT OF:                                          CASE#:

B/F.        Who?  My uncle?

B/M.        Yeah.

B/F.        He know him because I introduced him to my uncle.  He know
            my uncle.  I like to show him who I got!  He know my uncle!

B/M.        (Inaudible) what I got?

B/F.        (Laughing)…

B/M.        (Laughing) you done lost your mind.

B/F.        What you talkin' bout what you got?

B/M.        (Inaudible) my letter so when we gone do this next week?

B/F.        I'm a put your will together but I don't know bout no letter.

B/M.        Hold up now what the (inaudible) what the will gone do?

B/F.        A lot!…

B/M.        … Without…

B/F.        … a lot.

B/M.        … without…

STATEMENT OF:                                              CASE#:


B/F.          … you don't even have a will?

B/M.          That's…

B/F.          … People can come bugging (Fon) and stuff somethin'
              happened to you.

B/M.          I'm talkin' bout the specified the will and the letter of attach.
              Am um gone do it or not or which  what it's gone be or you
              faking me out?

B/F.          Baby, I don't fake and play don't you see that by now?

B/M.          (Inaudible).

B/F.          (That wasn't) faked.

B/M.          See you got the real deal with yo letter, (inaudible) alright.

B/F.          (Inaudible). You know what (laughing/inaudible) you gotta
              have his full name you crazy…

B/M.          …Uh huh.

B/F.          … A Johnson can be anybody…

B/M.          … (laughing).

B/F.          A Johnson can be anybody.

STATEMENT OF:                                           CASE#:

B/M.        Shoot.

B/F.        (laughing).

B/M.        And…

B/F.        … Alias Hot Chocolate, (inaudible).

B/M.        (Inaudible) do alias (inaudible) type this over and seal it
            notarize and gave me a letter too.  You can't covering me.

B/F.        I am covering you.

B/M.        No you ain't.  (Inaudible) I (inaudible) event.

B/F.        Baby I told you, I'm gonna do another thing too.  I did that, to
            protect myself.  So now I'm gonna do somethin' else, and
            include you.

B/M.        It gone include me?  When?  Next week?

B/F.        Yeah!  Next week.

B/M.        Okay.

B/F.        I woulda did it today…

STATEMENT OF:                                        CASE#:

B/M.        … Cause.

B/F.        .. but ah Henrietta moved in her office and.

B/M.        Oh she moved…

B/F.        … I couldn't do too much stuff so.  I woulda did it today (I'm gonna).

B/M.        What about my will?…

B/F.        …I'm a amend my will cause I wanna change it, cause I wanna give Wayne two dollars.  Cause I know he be the main one fighting.

B/M.        Yeah over money.

B/F.        That's (inaudible)…

B/M.        … I don't like, these thangs good to talk about (they ain't, I don't like to talk/inaudible) but these things are good, just in in the event you never know.

B/F.        Uh huh.

B/M.        You know my momma always say that always have something, to fall back on…

STATEMENT OF:                                          CASE#:


B/F.        … And see yo, yo, yo other family members could give…

B/M.        … Some, some…

B/F.        …(Fon) a  lot of static and then they'll tie the money up.

B/M.        I ain't thanking bout the money I mean (inaudible) go of natural causes…

B/F.        … (Laughing).

B/M.        … you know what I'm sayin'?  Insurance gone take care of whatever.

B/F.        Yeah but then, don't you have a big policy on you?

B/M.        Yeah.

B/F.        Okay 'den.

B/M.        That, that's nothin', I'm I'm talkin' bout other than, natural, natural death…

B/F.        … (Laughing)…

B/M.        … you know (inaudible) how (he) gone (inaudible) I got hit in the temper I'm dead?  What kinda shit is that?

STATEMENT OF:                                    CASE#:

B/F.        Ooh Ooh ooh ooh…

B/M.        … (Laughing)  Shit…

B/F.        … I mean dead like that.  (finger popping).

B/M.        (Laughing)  How you do it?  (finger popping/inaudible/both laughing).

B/F.        Break your neck.  You gone.  One twist, you gone.

B/M.        Uh uh.

B/F.        (Inaudible).

B/M.        (Shoot).

B/F.        Uh huh.

B/M.        I'm a, I'll hide this from ha I ain't make let her see it.

B/F.        Man put that up!

B/M.        I ain't fina  let!   I ain't gone, let (inaudible)…

B/F.        … Don't do nothin'!

B/M.        … just, you just gone lay, you just lay down let me do this.

STATEMENT OF:                                           CASE#:

B/F.      Don't do that tonight baby!

B/M.      When you gone, when I'm a do then?

B/F.      Next week.

B/M.      Alright.  Shit.

B/F.      Next week you gone get everything settled.

B/M.      Alright.  Before you make the move.  We'll be straight.

B/F.      I ain't worried about him.

B/M.      On the night, (inaudible/both talking)…

B/F.      … everything gonna be so, nice.

B/M.      That's  what I want it to be nice.  But he, but after (both talking) after that…

B/F.      … He probably gonna help me put the stuff in the truck and everything.

B/M.      Yeah with a smile  and then be looking at ya sayin' uh huh.  On the first night when everybody know where I am at somebody else, I was right here among a lot of people.  Somebody from New York he can get a old, a old drop shot come flyin' down and give him money.  People do favors.  And New York is wild with, ten times wilder than here.

STATEMENT OF:                                                    CASE#:


B/F.          (Inaudible).

B/M.          So…

B/F.          … I know.

B/M.          Okay 'den so (inaudible) as long as we know, what we dealing
              with we can do that ah, bout…

B/F.          … (Inaudible).

B/M.          Huh?

B/F.          (Inaudible).

B/M.          Show my clip, what I'm a do (inaudible) when we do mine I'm
              a put that, that clip in there and staple it.  (Laugh).  Shoot, so
              I'll let 'em know what (inaudible) exactly what I'm talkin' bout
              so it ain't no guessing.  Shoot.  (Inaudible) now I'm packin'
              (inaudible) you got me out there, (inaudible).

B/F.          (Inaudible) packing.

B/M.          Why you don't want me to pack?  You don't want me to
              (inaudible)?  Hold up!  You want me to be bare, bare naked?

B/F.          Nah nah baby you don't have to pack (inaudible).

B/M.          Oh.  Oh he (phone ringing) he gone.  Oh Lord ham mercy.

STATEMENT OF:                                                    CASE#:

B/F.        (Inaudible).  (static/noise in background).

B/M.        Yeah hello.  (Inaudible/noise in background/inaudible/laugh).
            (Inaudible) the whole thang next week (inaudible).

B/F.        (Inaudible).

B/M.        So we gone do it all and do a will  together.  Hook it up.  Yeah
            (inaudible) I'm feelin' (inaudible/noise in background/
            inaudible).

B/F.        (Inaudible).

B/M.        (Inaudible) yeah, (did I) yeah. I fina (inaudible/noise in
            background/inaudible) yeah but (she) gone (he) gone
            (inaudible).  Okay (inaudible/laugh) alright I'll be home later.
            I'll just be there a lil late but, dog man, (inaudible) (she) call
            like (he do).  You cold?

B/F.        (Inaudible).

B/M.        You cold?

B/F.        (Inaudible/I'm alright).

B/M.        (Inaudible) strawberry.

STATEMENT OF:                                         CASE#:

B/F.        Uh uh (inaudible).

B/M.        (Inaudible).

B/F.        You can save that drink for (you) for later on.

B/M.        (Inaudible)?  You hangin' out late tonight?  Huh?  We ought to
            ride by the party (inaudible/laughing) let's go ride by the party
            (laughing), see if we see any  ambulance and police (laughing).

B/F.        No he ain't go do it (there).

B/M.        (Dang). See how he do.

B/F.        But he gone do it though.  If he don't do it tonight, (inaudible).

B/M.        Yeah?

B/F.        (That man gone).

B/M.        You don't wanna be round him when he go down. You know?
            He probably, he'll (probably) get away (inaudible) especially
            when you got somebody covering you.  That ain't nothin'.

B/F.        How he gone get out this one he betta shot that man.  Bet not
            kill him with his hands.

B/M.        Dog.

STATEMENT OF:                                          CASE#:

| | |
|---|---|
| B/F. | I told him, do not do that with (inaudible), do not do it. (That's all he thank about/inaudible). |
| B/M. | Oh boy. Um. What he'll say if you told him not to do it he'll listen to you?  Or he ain't studin' you? |
| B/F. | Well he say he wasn't gone do it right then.  (phone ringing/ inaudible) (hey, that's yours)? |
| B/M. | Yeah, yeah (inaudible) like what?  (What he doing?) Put him on the phone. (noise in background/knocking on the door/door opens and close sound).  Alfea, I want you to go in that room and stop acting up you hear me?  When you get off and then you tell your momma you sorry  and go in that room right now! Bye.  Yeah, that's what I told him  to go in the room.  Ah, alright, I told him what to do.  Bye. (Inaudible). |
| B/F. | Uh huh. |
| B/M. | (Inaudible). |
| B/F. | (Inaudible). |
| B/M. | (Inaudible) now talkin' bout going to the Chinese (inaudible). |
| B/F. | (Inaudible/both talking)..... |

STATEMENT OF:                                          CASE#:

B/M.        ... come back.  (Inaudible).

B/F.        (Handle yo business).  Go handle your business!

B/M.        Come on, (inaudible) ride with me?

B/F.        No I ain't ridin' with you!  (Inaudible) where you gone put me at?  You gotta go (take the Chinese food) home?  Where you go, where I'm a stay?

B/M.        (Laugh)You can stay down at the store at the corner I'll come back and getcha come on (and ride), I don't wanna ride by myself. (Inaudible), tonight, unless you plan on going by the party.

B/F.        I ain't going by no party.  (Inaudible).

B/M.        (Inaudible) drop it off?

B/F.        (Inaudible).  Why you ain't get two keys?

B/M.        (Inaudible).  I ain't know (inaudible).

B/F.        (Inaudible).

B/M.        I'll just follow you and uhm, I'll just go get the rice and and drop, and come back and get you and come on back.  You wanna do it like that?  Where you gone drop the car you don't know?

STATEMENT OF:                                                                    CASE#:

B/F.        Drop it I was gone drop the car off at ah, that ah (Bass house/inaudible).

B/M.        But what if he call for you to pick him up?

B/F.        He wouldn't do that if the car is at (Bass) house cause he got the truck.

B/M.        Oh he got the red truck?

B/F.        Uh huh.

B/M.        He creepin' in the red truck?

B/F.        Um huh.

B/M.        Hum.  Where that's out in the Broward area (where that)?

B/F.        Where he at?

B/M.        Yeah.

B/F.        West, Broward, out west.

B/M.        Um.

B/F.        He out west.

B/M.        Um.  Where yall used to live out there, yall used to live out that way didn't yall before?

STATEMENT OF:                                                    CASE#:

B/F.        Uh huh.  (Inaudible).

B/M.        (Inaudible).

B/F.        (Inaudible) come in come in.

UNK.        Yeah.

B/F.        Where you at (inaudible)?

UNK.        I'm at the flower shop.

B/F.        (Inaudible/noise in background) You by yourself?

UNK.        No (Raychelle) with me.

B/F.        Okay.  You goin' off somewhere tonight?

UNK.        Yeah I plan on going but you know how that it.

B/M.        Um.

B/F.        Yep I know how that is.  Alright, I was trying to get you to drop
            me off somewhere, don't worry about.

UNK.        You need to be dropped of where?

B/F.        I need to be dropped off somewhere, but, don't worry about it.

STATEMENT OF:                                                    CASE#:

UNK.        You need to be dropped off now?

B/M.        (Inaudible).

B/F.        Don't worry about it.  (Inaudible).

B/M.        (Inaudible).

B/F.        (Inaudible) should I leave my things here?  Or bring 'em with me?

B/M.        (Inaudible), nah bring 'em (inaudible).

B/F.        (Huh?)

B/M.        What's in that bag?

B/F.        My stuff.

B/M.        What stuff? (laugh).

B/F.        My stuff.  Stuff I need.

B/M.        (Inaudible).

B/F.        (Inaudible).

B/M.        (Inaudible/noise in background).... End of conversation.

            (INAUDIBLE / END OF TAPE).

I want it to be know that;

ANDREW Johnson A.K.A. A.J. can be Responsable for my Death.

that A.J. Kill a Cop in Broward County at the 7: 11. St. 10 year ago. the facts revearing to be heard. the detail as follow. he shot the late one might come here new way church, Pises at the gun.

ATTACHMENT / EXHIBIT 41

STATEMENT OF:
DATE: 06-06-01
CASE#:
GWEN DESCRIBES THE NIGHT OF THE INCIDENT

Gwen.     Don't you like 'em?

B/M.      I used to like 'em.  But all that dressing up in Ninja and shit
          and coming in bushes and all that.

Gwen.     No I say you like that movie Scar Face?

B/M.      Yeah, yeah. And but who he thank he is with the, with the
          Ninja shit?

Gwen.     (Laugh)  That's him...

B/M.      ...With the paint, the, the paint and all that?

Gwen.     That's him.

B/M.      He still got that shit?

Gwen.     He still got it and I don't even know where it's at?  I done
          looked everywhere for that stuff I was gone throw it away.

B/M.      Uh huh.

Gwen.     (Inaudible).

ATTACHMENT / EXHIBIT 42

STATEMENT OF:
DATE: 06-06-01
CASE#:
GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        He don't want you to know.  He got it (inaudible)...

Gwen.       I don't know...

B/M.        ...and he don't want you to know.

Gwen.       ... where that stuff at.

B/M.        He shole' was, how he gone take that other dude out the
            other night not with his bare hand.

Gwen.       Yes he was.

B/M.        Please.

Gwen.       He ain't had nothing with him I don't think.

B/M.        Nigga got army paint and shit on...

Gwen.       ... (Inaudible) gotta be back.

B/M.        I don't wanna see that fagot.

Gwen.       (Laugh).  He'll be back.

STATEMENT OF:

DATE: 06-06-01

CASE#:

GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        Look bad as it is.

Gwen.       (Inaudible) that's right.  That's another thang, you be hanging with them gay people Ooh who who.  That's another thang I used to be tellin' my brother I say you be messin' with them women, you be messin' with other women.

B/M.        (Inaudible).

Gwen.       (Make your luck bad).

B/M.        Yeah.  Just do my (inaudible).

Gwen.       Huh baby?

B/M.        That look crazy don't it?

Gwen.       It is crazy.

B/M.        He looking for some money that's been dropped.

Gwen.       And he look just like somebody I met, I went to school with.  You know I ain't been able to get me no fish the only fish I can get like is at Burger King or McDonald?

STATEMENT OF:
DATE: 06-06-01
CASE#:
GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        Um, I got some fish home.

Gwen.       Don't tell me bout your fish at home what you done
            promised me so much stuff ain't gave me none of 'em.
            Starting with the chicken wings.

            (Three forty/inaudible).

B/M.        You promised me everything was gone be straight, after we
            make the (inaudible) move don't look like it's gone be.

Gwen.       I betcha.

B/M.        You betcha what?

Gwen.       I betcha it be straight.

B/M.        I think you should let me handle it.  Other than you getting'
            all, and and gettin', you don't want me to handle it?

Gwen.       Whatever you want to do baby.

B/M.        Nah don't be talkin' that ever wanna do stuff let me handle
            him.  I'll step to his butt.  (Inaudible).

Gwen.       He gone say, what yall doing together?  What you gone say?

STATEMENT OF:
DATE: 06-06-01
CASE#:
GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        Taking, taking care some business and other thangs.  And you can't, we ain't gone have you disturbing it.  What you thank?

Gwen.       I don't really care because, well I told you once I give him the divorce papers, I have nothing to do with him, I don't even want to deal with him I don't even want to be his friend.  I don't want to hold conversation with him.

B/M.        Oh okay.

Gwen.       I don't wanna have nothing to do with him.  I wanna do like this wash my hands.

            (Have nice day.  You wanna ketchup?)

Gwen.       You want ketchup baby?

B/M.        No.

Gwen.       No.  French fries hot? No they ain't hot. (Inaudible) baby?

B/M.        (Inaudible).

Gwen.       (Inaudible) (making a noise) every other day.

STATEMENT OF:
DATE: 06-06-01
CASE#:
GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        (Inaudible).

Gwen.       Did you say outta gas (inaudible)?

B/M.        Outta gas.

Gwen.       (Inaudible)every other day, (inaudible), outta gas.
            (Inaudible) cause Chontay used to love (inaudible), I mean,
            (inaudible).  Remember the other day she seen (inaudible),
            down there?  His lil boy got in trouble whatever,
            (inaudible)(down) at the criminal court.  (Inaudible) they
            call him (inaudible).

B/M.        Uh huh.

Gwen.       And he say what you doing down here?  (Inaudible) I got
            some uhm, cases, I got some people down here.  You do!
            You still working in in, in that?  (Inaudible) do something
            but smile.  (Inaudible)

B/M.        (Inaudible).

Gwen.       Say (inaudible) was so shocked, you still work?  Yeah I still
            work.

STATEMENT OF:

DATE: 06-06-01

CASE#:

GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        (Inaudible) dog gone unnecessary garbage (inaudible)...

Gwen.       ... Why they, why they can't give us that money and let us go lay on him. Me and (Fon) was talking about man we'll be on vacation, having a good time (inaudible).

            (Phone ringing)

B/M.        You just might as well head back toward the car.

Gwen.       (Inaudible) baby. Let me show you (inaudible) answer it, tell ha you doing something you'll call her back in a minute. She get worried when she when you don't answer the phone. Answer the phone (inaudible), I'm busy I'll call ya right back. So call her and say I'll call you right back I'm busy. When you don't answer the phone then that make her go crazy. What he doing he can't answer the phone? (Inaudible/noise) answer the phone, yeah I'm a be there in a lil bit.

B/M.        (Yeah)?

Gwen.       Yes. (Inaudible) especially when you with somebody understand know you married and stuff. Sometime I wish I woulda never gave up on my old friends, I had some good friends. Good friends. Had the type of friends you pick up the phone and say hey listen I want to make a trip, I don't have nothing, I need (inaudible). AJ is the worst thing I ever had before in my life. I ain't never (inaudible).

STATEMENT OF:

DATE: 06-06-01

CASE#:

GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        Uh, uh.

Gwen.       I ain't seen my brother in a couple of days I don't know
            what happening with him.

B/M.        You thank he thank you  serious when you say you leaving?

Gwen.       He know that's why he acting like that he know I'm leaving.
            You know people, yeah I think (he) got a little sense that
            people ain't gone keep putting up with your stuff.  Twenty
            something years and stuff like that I think, I think he got a
            little sense to know that.

B/M.        Then he gone feel like (you) forcing his hand, you leaving
            with, all his business you know.

Gwen.       I'm not gone tell on him like that.  I told him I'm writing a
            book.

B/M.        You gone write a book?

Gwen.       I started already.

B/M.        You can't put (no junk) like that in no book.

Gwen.       Don't tell me I can't.  You'll be reading it.

STATEMENT OF:

DATE: 06-06-01

CASE#:

GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        (Inaudible) what... -

Gwen.      ... (And then I'll) be using my name and stuff man you
            (inaudible).  (Inaudible) it ain't gone be like that.

B/M.        You got it detail by detail?  Huh?

Gwen.      Yeah but it's gone be different.

B/M.        Different name I know.

Gwen.      It's gone be different names and it's gonna be different.  It's
            gonna be different.  Names gonna be changed.

B/M.        What, what...

Gwen.      ... They told, they told somebody about this building, and
            they came here Monday ah.

B/M.        (Ain't) you gotta see a publisher about a book?

Gwen.      I got a publisher.  My auntie is a publisher.

B/M.        Damn you serious huh?

Gwen.      Uh huh.

STATEMENT OF:

DATE: 06-06-01

CASE#:

GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        You got you a title?

Gwen.       I don't have a title for it yet.  That's what really holding me
            up.

B/M.        (Dog).

Gwen.       Uhm, this the church right here.  This the one they trying to
            get, and it's suppose to be hush hush.  **(END AT 22:16:32).**

**(START AT 22:20:01)**

B/M.        Oh.  (Inaudible/chewing) what he say?  What they gone do
            to me?  (laugh)  What he said?

Gwen.       He was, he was kinda upset a lil bit but he tried to not show
            it.  Bout that.

B/M.        That you...

Gwen.       ... Man!

B/M.        ... that you was gone sugar coat it though you can put it in a
            way where ain't nobody gone know nothing.

Gwen.       I know.

STATEMENT OF:
DATE: 06-06-01
CASE#:
GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        Then you…

Gwen.       … I had the raw version but I'm a change it.

B/M.        The raw version?

Gwen.       Of the incident I had the raw version, but I know I can't use
            that.

B/M.        Tell me the raw version.        *20:20:48*

Gwen.       Exactly what happened.

B/M.        And?

Gwen.       Oh I never told you what happened?

B/M.        You told me pieces, you ain't told me from jump street.
            What happened?

Gwen.       I was sleep.

B/M.        You was sleep.

STATEMENT OF:
DATE: 06-06-01
CASE#:
GWEN DESCRIBES THE NIGHT OF THE INCIDENT

Killed the cop

| | |
|---|---|
| Gwen. | And I woke up and he was gone. So when he came back, and I saw the way he was dressed and (inaudible), oh my God this man (inaudible) and he said uhm, he say I just got through doing a job come help me I gotta go get rid of the gun. I say doing, you just got through doing what? Taking care of business. Come go with me so me and him got in the car and, we start taking the gun a loose, we start throwing it and, I said what happened? Which I really knew what had happened to tell you the truth. I already knew he had just, got through offing somebody. He say I got him, I got that cop, he was sitting in the car. He said I got him! |
| B/M. | Oh yeah? |
| Gwen. | And then, this the part, the actual guy! That wrote the report up, he didn't get him. He got the guy, the actual one that testified, that's who he got. The one that he shoulda got was the one that wrote, wrote it up and stuff like that, that's who he shoulda got. |
| B/M. | It was two of 'em? |
| Gwen. | (But), yeah but he settled for him. And then I read in the paper I read the incident, and they say the guy walked away on foot, they had a sketch of a guy with a skully on and all like that. |

/kw                     Page 12 of 15

STATEMENT OF:
DATE: 06-06-01
CASE#:
GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        Uh huh.

Gwen.       That had that.  (Inaudible).

B/M.        Well what about the other guy?

Gwen.       The one that he didn't get?

B/M.        Yeah.

Gwen.       Oh I don't know.

B/M.        But he the one that did the most damage to AJ didn't he?

Gwen.       Yep.

B/M.        Well why he oh I guess had, he settled for him huh?  (But), damn.

Gwen.       He was sitting in his car writing his report.  (AJ put) that gun to his head, (bloop/making a noise).

B/M.        What the other one name?

Gwen.       I don't know.

STATEMENT OF:
DATE: 06-06-01
CASE#:
GWEN DESCRIBES THE NIGHT OF THE INCIDENT

B/M.        Oh but these, they was buddies?

Gwen.       Partners.

B/M.        And they just both got together to, to, to, to make him loose
            his job?  Just like that?  Shhh.

Gwen.       Broward County used to be real prejudice during that time.
            Nick Navarro was the sheriff.

B/M.        I remember Nick.  (Damn shole' remember Nick).

Gwen.       Like (he) said  if he coulda killed Nick he woulda killed him.

B/M.        (Laugh) He couldn't get to Nick (laugh).  Uhh, uhh, so
            that's how you, you can hook it up in the book but you just
            use different names and just use any old, any old state.

Gwen.       Yeah.

B/M.        That'll throw, throw people off.

Gwen.       Yeah.

B/M.        That's good.  So, so.  **(END AT 22:24:04).**

STATEMENT OF:  GWEN & CHINA

# (6-14-01)

(START AT 21:28:30)

China.        He came home, destroyed the gun, where the gun was?  Where he throwed the gun?

Gwen.        (All by New Way) and (everywhere).

China.        One piece by New Way?  New Way.

Gwen.        New Way over there in that empty (inaudible).

China.        New Way, Church.

Gwen.        Bet not let your wife get to that.

China.        You just gone type it up tomorrow after, tomorrow afternoon after we gone (inaudible) morning and the the (inaudible) and where the other one  piece went?

Gwen.        It's (inaudible) by difference parts anyway baby, all down there (inaudible) down there, difference places (inaudible).

China.        By the church?

Gwen.        Baby you thank they gone cut down all that grass and stuff look for that?

China.        I don't know.

Gwen.        They gone (comb) that area for that?

China.        Well just New Way Church...

ATTACHMENT / EXHIBIT 43

STATEMENT OF:  GWEN & CHINA

Gwen.        … You worried about nothing, you don't have to worry about that…

China.       …New Way Church.

Gwen.        … cause if he catch…

China.       … pieces.

Gwen.        … me and you.

China.       Yeah.

Gwen.        If he catch me and you together like that, he know that I been doing stuff for you and stuff like that (you) ain't got to worry bout that.

China.       Uh huh.

Gwen.        If he if he find out where I live at, and he see you coming out of there late at night or something, that's a different story.

China.       After we move.

Gwen.        That's right.

China.       Okay.

Gwen.         So you ain't even got to worry bout that.  But now he know I be doing stuff (for you).

STATEMENT OF:  GWEN & CHINA

China.       So where can I, okay I that's what I know that's what I'm saying, I'm looking at after thang get comfortable, then boom! You going home to your own place you happy you ain't going through that bullshit no more, I'm over there chillin'. Coming out the partment after you done been cooking with a toothpick in (her) mouth, and boom I'm all (fucked up/laughing) cause you gone be cooking both of us like to cook.  So I'm  looking a head a head a down the line, shoot.  I may go over there and find that lil piece myself and put it in a safety deposit box.  You thank it's still over there?

Gwen.        I thank it's still there.

China.       What part he threw over there all the whole piece or?

Gwen.        I'll show you (where it's at).

China.       Yeah show me shit cause I ain't man, you know what I'm sayin'.  That's bout it then huh?

Gwen.        Uh huh.

China.       So put this in the …              ‒

Gwen.        … (Inaudible).

China.       … huh?

Gwen.        (Inaudible) envelope right there.

Page 3 of 19

STATEMENT OF:  GWEN & CHINA

China.      Where it's at?

Gwen.      If that woman get that envelope.

China.      (Inaudible) ain't fina get no envelope.  What this is?  You got
            two of 'em over here?  (Inaudible)…

Gwen.      … That's,  for our, that's our stuff.

China.      Okay.  Okay.

Gwen.      I mean…

China.      … New Way Church…

Gwen.      … you is trippin'.

China.      (Inaudible) the church.

Gwen.      Trippin' trippin' trippin'.

China.      I'll, I'll add a lil more to it, later on I just wanna…

Gwen.      … you know you just trippin' so  bad.

China.       So you type it up for me and put it in here.

Gwen.      You trippin' real bad.

STATEMENT OF:  GWEN & CHINA

China.       Okay trippin'.  When I tell you to duck you just betta duck.
             Man you get up that early and get that that food?

Gwen.        It's...

China.       (Both talking) and it's way out there too I thank....

Gwen.        No it's not it's 62nd and 32nd Avenue, (61st)  (inaudible), we
             don't  go way out there to that other place.  A lot of people go
             there we don't go to that place we go to (inaudible).

China.       What made you thank (him), (inaudible) made you thank
             (inaudible) ask you about that will?  What, and stuff like that?
             What come through your when he when he said he want to see
             all the wills?

Gwen.        (Inaudible) he stupid.

China.       I know he stupid but I'm sayin'.  Shoot. He must be tryin' to
             cash in and run to, run to New York.  Me and Bass have to
             catch a flight to go get that nigga right on over there in New
             York.  I believe Bass'll do something for me you know what
             I'm sayin?  You know what I', sayin'?

Gwen.        Bass don't play.

China.       That's what I'm sayin' you know he, he serious about his mom.
             That's what I'm sayin' that, he won't move nothin' much for
             me bout I know he will (phone ringing), oh, he'll move for you.

STATEMENT OF:  GWEN & CHINA

Gwen.     Yeah (noise in background), oh (Lakisha), call Lakisha for me
          and get that number (inaudible) the number  (Inaudible).

China.    (Inaudible/noise in background).

Gwen.     (Inaudible).

China.    (Inaudible) where?  What they got you doing?

Gwen.     (Inaudible) somethin'.

China.    For me?

Gwen.     He go in my stuff.

China.    Oh put another address?  That's my stuff?

Gwen.     Uh uh.

China.    (Inaudible) stuff (inaudible).  So uhm, if she have to be to work
          round nine you can't wait a lil later to go get the food?  I can go
          right after that.  You can come and scoop me, we can, we can
          eat breakfast or go get the food eat breakfast and then come on
          back.

Gwen.     Baby wait a minute let me let me (inaudible) you are doing
          what?  You are...

China.    ... All I got to do is drop...

STATEMENT OF:  GWEN & CHINA

Gwen.　　　　… taking the car.  Where you taking the car?

China.　　　　Somewhere just to put a starter on there.

Gwen.　　　　I know but where?

China.　　　　(Inaudible).

Gwen.　　　　You don't know where?

China.　　　　Over on 17th and 57th, Ben.

Gwen.　　　　Okay (when you gone) drop your car off?

China.　　　　Yeah, and then by time me and you get through it'll be ready, you know then I'll go and pick up my check.  You know what I'm sayin?

Gwen.　　　　How long you thank it's gone take your car?

China.　　　　(Inaudible) that other, that other money (inaudible) pocketbook, the rest of the money, you know what I'm sayin'?  The (inaudible), the car ain't gone be ready til, for the, uhm maybe two hours, (inaudible) a starter don't take nothin' to put on.

Gwen.　　　　So you (inaudible/static).

China.　　　　Yeah.  Then, we can come finish this up.  This letter up and then, and and this, you can type everything up (inaudible) and then we can find, you can probably ask (inaudible) where we can go to get a P O box or…

STATEMENT OF:  GWEN & CHINA

Gwen.        … (Inaudible)…

China.        … bank volt.

Gwen.        (Inaudible).

China.        Oh. Well we gone, we just walk in the bank and ask 'em for one?  How much it cost?

Gwen.        No I'll call the bank and see (inaudible).

China.        Okay.  Yeah if I can get a lil, one with a lil draw or safety deposit box, I'll go in the bushes and find that (inaudible) put it right there (laughing) and I'll be (straight).   Talkin bout (inaudible) he probably ain't gone do nothin' but cry, (inaudible) two three months to cry.  That nigga a be in New York gone.

Gwen.        (Uh huh).

China.        I don't know, I don't wanna be screaming at you from beyond.

Gwen.        (Inaudible).

China.        Huh.  (Inaudible)…

Gwen.        …You never met no family like our family okay?

China.        I hear ya, (inaudible/static) I don't know bout that (inaudible) he ain't nothin' to me (laugh).

Page 8 of 19

STATEMENT OF:  GWEN & CHINA

Gwen.        I know somebody'll kill him right now?  (For fun).

China.       (What) his cousin.

Gwen.        For fun okay.  I know somebody'll kill him for fun, right now.

China.       And he so sneaky he ain't, he ain't gone let you know when get ready to do something that's (what bother), scare me but him, he ain't gone let you know nothin'.  He just gone creep. (tapping noise) You know what I'm sayin?  So uhm,  so tomorrow we got a whole day together.  What I can do, once like  (this thang) get I can drop it off (inaudible), and give her the key and we can take on off, that time it'll be lunch time we can go to Red Lobster.  (Inaudible) a lil change (inaudible)…

Gwen.        … Drop her off where?  You gone drop….

China.       … I can drop the truck off, at her job cause she maybe getting off round six or somethin', or five.

Gwen.        Oh.

China.       Sometime nine to five or nine to six, and (inaudible) then she can have ha own, the truck'll be riding good, and then me and you can dip.  (Inaudible).

Gwen.        (Laugh).

Page 9 of 19

STATEMENT OF: GWEN & CHINA

China.    See ya gotta ya gotta (inaudible) the tune up.  You (looked at me funny) when I told (inaudible) she need a oil change (laugh/static).

Gwen.    (Inaudible).

China.    Huh?  (inaudible/static).

Gwen.    See he might be looking in my stuff (inaudible) stuff on him, cause I don't trust him far as I can see him.

China.    Oh.

Gwen.    (Inaudible).

China.    (Inaudible), I'm surprise you don't sleep with a gun up under your pillow.

Gwen.    (Um if was)  like that you know I'll be real nice to him and stuff but (inaudible) my nerves (inaudible)...

China.    ... And you ain't stop doing that, but I'm sayin'.

Gwen.    (Inaudible).

STATEMENT OF:  GWEN & CHINA

| | |
|---|---|
| China. | Like I say I'm coming down stairs (both talking) out the nice townhouses, toothpick in my mouth, (inaudible/static), you done cooked stew beef, done left, done put the (inaudible) on it (laugh), I come down to the car, and he come round the corner lookin' like a ninja (both laughing/coughing)… |
| Gwen. | … You  crazy. |
| China. | And shoot, no baby  whatever we get we getting' a garage.  We getting a garage and pull right on out the garage.  I'm serous man cause ah, (you can put) bout seven, to ten grand down on somethin' nice. |
| Gwen. | I know. |
| China. | (I spent a lot of money) on the (penthouse) I had on the outside. |
| Gwen. | I know we do need to get something where you can go directly in your car. |
| China. | That's right.  And you can pull on off… |
| Gwen. | … I been thinking about that I been thinking about what… |
| China. | … That's right.  (Both talking) they got condo's like that. |
| Gwen. | I know I was thinking about 'em. (Both talking/inaudible)… |

STATEMENT OF:  GWEN & CHINA

China.        … (inaudible) man the money coming now you gotta gone
              (inaudible)…

Gwen.         … Some things…

China.        … do this.

Gwen.         … that I gotta do, take care of business.

China.        I'll put me a ziplock bag, (inaudible), all my goods in there
              (inaudible), you know (inaudible) how ya do it?
              (Inaudible/laughing), like Bass say they do what they gotta do,
              and I gotta do what I gotta do (laughing).  I know (inaudible).
              (Yeah that) joker there got too many tricks up his sleeve for me.

Gwen.         Huh.

China.        And he look like he always thinking too!  Don't he?

Gwen.         Like I told you, (I told you) I say come by the house
              (inaudible), come by the house.

China.        Who?

Gwen.         You.

China.        Shit.  I don't know what I was thanking bout them first couple
              times (laughing).

STATEMENT OF:  GWEN & CHINA

Gwen.       Come, I say come by while he there.

China.      Oh.

Gwen.       (Inaudible) and stuff.

China.      Oh you still need that?

Gwen.       (Yeah he still) need that.  You know you start coming round
            there so if he catch you round there he know you come round
            there already.  You gotta play cool man.

China.      Nah I'm cool…

Gwen.       … (both talking).

China.      …  but man this a life and death situation.

Gwen.       See I don't want to come to your house no more cause that girl
            done told your wife (inaudible).

China.      Yeah but she ain't payin' that no (ttention).

Gwen.       (Inaudible).

China.      She all hooked on, I like red women, (inaudible), I know that
            ain't for ya  (inaudible)…

Gwen.       … Oh.

STATEMENT OF:  GWEN & CHINA

China.          ... this, this what she always sayin'.  Every woman you ever
                had was red.  She ain't know I had no lil chocolate bar like you.
                (Laughing) One with some sense.

Gwen.           Yeah.

China.          One with some know how to help me get up the ladder of
                success.

Gwen.           (So you like red women)?

China.          That's what she always sayin'.

Gwen.           Well my brother (inaudible) like, used to like red women
                (inaudible).

China.          Yeah?

Gwen.           And now they'll mess with a dark one.

China.          Uh huh.

Gwen.           (Inaudible) all 'em.

China.          What that you doing now?

Gwen.           (Inaudible) in case he go in my purse (inaudible) see what I
                been doing, he'll see that I got some stuff that I'm doing. Okay?

STATEMENT OF:  GWEN & CHINA

China.     Oh okay.  Well I got the folder right there.  And ah after I, I'll thank of some more stuff to put, (inaudible) you can type the rest up tomorrow (inaudible) time.  I need to put my stuff together.  Then I ask (inaudible) when she wanna come I mean whenever she want you to come by, and you know go over it with her (both talking)...

Gwen.      ...(Yeah when she wanna).

China.     (Inaudible).

Gwen.      Yeah hen she wanna get with me and you know.

China.     Yeah.

Gwen.      I'll get it together for ha.

China.     (Both talking/inaudible)...

Gwen.      ... All she got, all she got to do is make a list of all her children, what she wanna leave them, I gotta have they name they first name.  And all that stuff.  Fix it up, it's easy to get a will, a lot of people don't know that.  (Inaudible) look at this how she messed the thang up right here.

China.     (Inaudible).

Gwen.      I hate for ha to bother stuff (inaudible) tell ha that.

STATEMENT OF:  GWEN & CHINA

China.          … (Inaudible)…

Gwen           … (inaudible)…

China.          (Inaudible).

Gwen.          I say leave it for me I'll do it, leave it (inaudible) I'll do it.

China.          (Inaudible) done made me change stuff in your will now you
                know that (inaudible).

Gwen.          Huh?

China.          (Inaudible) (he) made you change stuff in your will that's
                (inaudible/laughing) if I was you I'll be packin' everyday boy
                you got, you, you stronger than me.

Gwen.          (Inaudible) which way he went.

China.          He (inaudible) backtrack me when I'm in a in another car.

Gwen.          (Laughing).

China.          The car parked somewhere (inaudible) her momma used to do
                that to me.  When I used to go on (inaudible) Street a lot…

Gwen.          … yeah?

China.          … (inaudible), her momma rode up in there up in there in day
                and I (inaudible) and I saw her momma car (inaudible), and I
                was living with them then.

STATEMENT OF:  GWEN & CHINA

Gwen.        Uh huh.

China.       And I (inaudible) said her momma musta (inaudible) her
             boyfriend he musta took her out there.

Gwen.        Really.

China.       Yeah we talking bout way back in the seventies.

Gwen.        Yeah?

China.       Seventy nine, her momma uhm, uhm rode up in the lil lil
             (inaudible)…

Gwen.        … (Her momma) was looking for you?

China.       She was probably coming from there saw the car, and musta
             turned around or something, or she was with her man she was
             with her man.

Gwen.        Okay so but what did you do?  She told, she told her you was
             there?

China.       I wasn't clear on it but I, after I got home I  knew it was her,
             cause how she was looking, she was waiting up for me.
             Looking stupid…

Gwen.        … So what did he say?

STATEMENT OF:  GWEN & CHINA

China.   Where you was and, and just was looking stupid like she had, like she had done been through a lot with her momma, so I know what time it was.  (Inaudible).

Gwen.   (What did I say?)  her momma might say,  come on, he'll turn it down (inaudible/both talking)...

China.   ... So tomorrow, so tomorrow (inaudible) wrapped up,  we go head and take care this and ah, and ah that'll be it, (inaudible), and I'll get me a ziplock bag out there, and find...

Gwen.   ... (For what)?

China.   ... and find me a piece of the gun and...

Gwen.   ... It's tall grass and stuff.

China.   How tall?  It ain't been cut?

Gwen.   Nope I thank it's been cut.

China.   Well then that's good.  I'll find it.

Gwen.   (Inaudible).

China.   Huh?

STATEMENT OF: GWEN & CHINA

Gwen.        (Inaudible).

China.       Yeah early.

Gwen.        I'm a be out early cause I gotta be down there a quarter til so.

China.       Quarter til eight?

Gwen.        That's right I gotta be at the, not to eight, quarter til nine I gotta be ...

China.       ... Well maybe I'll catch you when you back and then  but don't eat no breakfast.

Gwen.        Alright.

China.       And we'll go where you wanna, cause you ain't tried the boil fish yet.  (STOPPED ON 21:42:40

Page 19 of 19

STATEMENT OF
DATE: 07-05-01
CASE#:

**(BEGIN AT 20:52:00)**

Gwen.        (Inaudible/noise).

B/M.         (She) just going overboard with this.

Gwen.        So she turned back around say I forgot my (inaudible), she was trying to be nosey.

B/M.         (Inaudible) she ackin' all...

Gwen.        ...Gone finish up your letter.

B/M.         I did I finished up in the truck.

Gwen.        Oh.

B/M.         I just finished...

Gwen.        ...Okay.

B/M.         ... it up and ah.

Gwen.        (You see) ain't no air in here?

B/M.         Who?

Gwen.        You feel air?  Ain't no air in here.

ATTACHMENT / EXHIBIT 44

STATEMENT OF:
DATE: 07-05-01
CASE#:

B/M.        (Inaudible).

Gwen.       (Inaudible) told you that (talking together) no, (inaudible) I be
            in here some time.

B/M.        I know…

Gwen.       … Some time I stay in here, til 9:00.

B/M.        You do?  And the air be gone?

Gwen.       Yeah, I be still working.  (Inaudible).

B/M.        Okay so I'll finish this and put the (clip) in here.

Gwen.       You got everything finish?

B/M.        Yeah, (inaudible).

Gwen.       Okay.

B/M.        I should put these together.

Gwen.       Yeah put 'em in a envelope and, let me do the tape thing,
            (inaudible) and then after the tape thing.

B/M.        What's the tape thang?

Gwen.       Put the tape all on it, with the tape, and then we gone get 'em
            sealed.

STATEMENT OF
DATE: 07-05-01
CASE#:

B/M.        (Inaudible).

Gwen.       AJ gotta sealer but I ain't let him seal 'em.

B/M.        Uh uh you gotta go (by the thang show/inaudible) the diagram…

Gwen.       … (Inaudible).

B/M.        (Inaudible).

Gwen.       You know you crazy.

B/M.        (Laugh).

Gwen.       Put the stuff together.

B/M.        I ain't marked the spot. I gotta the other pieces to the thang in that (inaudible).

Gwen.       I told you. It's on the east side, right here. It's all around…

B/M.        … That's, that's the front.

Gwen.       That's the front of the church.

STATEMENT OF
DATE: 07-05-01
CASE#:

B/M.        See there.

Gwen.       (The church) the eastside, coming from which way?  Which
            way are?  Okay you doing it…

B/M.        … Facing it.

Gwen.       The church is on this side, right, 22nd Avenue.  So, that would
            have to be the…

B/M.        … See this is west and the back of it, facing it is the west.

Gwen.       Yeah it have to be the west.

B/M.        That's right.

Gwen.       The west, it's on the west side.

B/M.        Back there?

Gwen.       Back there on that side all (inaudible) but it's near, near the ah,
            that express way, 826.

B/M.        The Expressway right there!

Gwen.       Okay.  So it's (inaudible)…

STATEMENT OF
DATE: 07-05-01
CASE#:

B/M.        … Man (inaudible) you don't even know where it's at.

Gwen.       Yes I do!

B/M.        You talk bout west, first you said east…

Gwen.       … Because I was coming from, I was coming from the, that's
            the west, that's west I got it wrong.  It's on the west.

B/M.        (Inaudible/talking together) I finish (inaudible/noise) know
            something up.  (Inaudible) thang with (Deek) (inaudible)…

Gwen.       … (Inaudible) a lot of people suppose to be going to support
            (Deek).  All his well wishers.

B/M.        I wish I could cook (inaudible).

Gwen.       Yeah.

B/M.        (Inaudible/noise). **(END AT 20:55:12)**


**(BEGIN AT 21:04:46)**
Gwen.       Okay that's the church way over there.

B/M.        Right.

Gwen.       I told you long here, then he started dropping the pieces along
            here.

STATEMENT OF
DATE: 07-05-01
CASE#:

B/M.        (Inaudible).

Gwen.       I told you that.

B/M.        Around where?

Gwen.       (Inaudible) any of these trees, all out here.

B/M.        Oh pull over.

Gwen.       What (inaudible)…

B/M.        … Where (talking together)…

Gwen.       … Right here!

B/M.        Right on the side right here in this lil old grass?

Gwen.       Right, right over there, it wasn't like that, this grass was tall.
            They just cut this stuff.  When he threw all that stuff out there it
            was tall, he threw it all long (there).

B/M.        Just throw'd, just throw's it out the window right here?

Gwen.       Throw'd yeah throw'd it all way back over there.

STATEMENT OF:
DATE: 07-05-01
CASE#:

B/M.            (Slow down.)

Gwen.           Baby it's 24th Avenue if you wanna say between 24th and 27th, see, they done cut this stuff, this stuff was not like this it was all…

B/M.            … Was it right here or back there is that's what I'm…

Gwen.           … All along here he throw'd the pieces from, from 24th Avenue all the way up here to 27th, bout right here I guess, 25th.

B/M.            25th he stopped?

Gwen.           He throw'd the pieces all along there.

B/M.            Well that's close to the edge of the street then.

Gwen.           Yeah.

B/M.            He didn't get out and (slang) 'em or just slung 'em from…

Gwen.           … (Inaudible).  Where do you want to park at?  I mean where do we get the gas?

STATEMENT OF:
DATE: 07-05-01
CASE#:

B/M.        Right here right here fore we run out.  You want something to drink?

Gwen.       No baby. **(END AT 21:05:55).**

**(START AT 21:12:19)**

B/M.        (Inaudible) that lil spot we just (inaudible) that ain't no way, ain't no way I'll find nothing over there it's gone huh?

Gwen.       What baby?

B/M.        The lil pieces of gun?

Gwen.       I don't know.

B/M.        I thought he got out and threw 'em.

Gwen.       With a metal detector they can find (anything).

B/M.        (Inaudible) right there, all that traffic going by unless a car ran out and mashed it in the dirt.

Gwen.       Up in the thing?  It's, it's.

B/M.        What?

STATEMENT OF:
DATE: 07-05-01
CASE#:

Gwen.     He threw it up in the sand, up in the, in, up in between them
          trees (inaudible). If anything metal over there they'll pick it up.
          But I don't even know why you worried about this.  I don't
          even know why you (inaudible) stuff.

B/M.      You keep saying (inaudible), mighty funny you got you a fat
          letter, wanna leave me out to dry.

Gwen.     I'm not leaving you out…

B/M.      … Who gone…

Gwen.     … to dry.

B/M.      Who gone take up my slack if somethin' happened to me?
          (Van) got your back who got my back nobody (laughing). Why
          you hair keep sticking up right there,  you must me scratching.

Gwen.     (Inaudible) need to be (fixed)…**(STOPPED AT 21:13:19).**

Case No. 230137-Z
Miami-Dade PD
8/2/01

CI:            Keep forgettin I'm in Broward

Dep. Sudler :  How ya'll doin?

CI:            Okay

Dep. Sudler:   What's going on?

CI:            Nothing

Dep. Sudler:   Good, let me see your  license & registration.

CI:            Mmmm.

Dep. Sudler:   Let me guess, you ain't from Broward County are ya?

CI:            No.

Dep. Sudler:   You got anything in the glove box? Bro?

CI:            No, I ain't got nothing in there by my registration.

Dep. Sudler:   Alright get it for me.  You know what the speed limit is on this road.

CI:            I think 40.

Dep. Sudler:   You think.

CI:            I think, yea.

Dep. Sudler:   How come you ain't got your headlights on?

CI:            We just turned the corner, we just got in the truck.

Dep. Sudler:   I see...

Target:        It's smelling so bad in here from fish.

Dep. Sudler:    Just a minute, alright

Target:        Alright, you was askin questions, I'm just responding.

Dep. Sudler:   You know they got seatbelt laws here too.

ATTACHMENT / EXHIBIT 45

1

Case No. 230137-Z
Miami-Dade PD
8/2/01

| | |
|---|---|
| CI: | Yea |
| Dep. Sudler: | This your car? |
| CI: | It's my wife's car.  I know the registration some where in this, damm! |
| Dep. Sudler: | Where you coming from. |
| CI: | Just down the street there, just turned the corner tried to get on home, that's hard to do, we're like coming from in Broward, uh. |
| Dep. Sudler: | Alright |
| CI: | Damm man, got to be somewhere in there. |
| Dep. Sudler: | The cars registered to your wife? |
| CI: | Yes, the car and (inaudible). |
| Dep. Sudler: | Anything in this car I need to know about? |
| CI: | No, nothing but the smell, other than the smell, no. |
| Dep. Sudler: | Drugs, Guns, weapons? |
| Target: | No. |
| CI: | Not that I know of. |
| Dep. Sudler: | Bro you got anything on you I need to know about? Huh. |
| Dep. Sudler: | Huh? |
| Target: | No. |
| Dep. Sudler: | (Inaudible) |
| Target: | (Inaudible) I used to do the job what you do. |
| Dep. Sudler: | Oh yea. |
| Target: | Yea. |
| Dep. Sudler: | Got some ID on ya? |
| Target: | Damm |

2

Case No. 230137-Z
Miami-Dade PD
8/2/01

Dept. Sudler:   Don't rip the car apart.  Is all the information on here correct?

CI:             Yes.

Dep. Sudler:    License straight?

CI:             Yep.

Dep. Sudler:    Your license straight?

Target:         I'm okay.

Dep. Sudler:    Stay in the car.

CI:             (Inaudible) see how they do...

Target:         Don't worry about it man.

CI:             Why they do dumb ass shit like that?

Target:         I don't know man.

CI:             Askin me all stupid questions man.

Target:         (Inaudible)

CI:             Who the fuck is that?

Target:         Supervisor – undercover

CI:             Yea, we can't come to Broward?

Target:         Naw that's how it is bro, don't worry about it.

CI:             Shhh

Target:         Just runnin,  you know try to write us both a ticket for our seat belts.

CI:             Damm, they just talk to you any kinda way.

Target:         (Inaudible) he ain't gonna talk to me any kind a way when he realizes what I do, you know.

CI:             (inaudible) you trippin.  You think anything's gonna show up?

3

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

| | |
|---|---|
| Target: | No, on me? On me? |
| CI: | Yea. |
| Target: | It just shows that I was a former officer. |
| CI: | (Inaudible) the car for guns. |
| Target: | You can't search a car without no probable cause, and I'll tell them. Don't worry (inaudible) I mean you can't search a car without no probable cause. |
| CI: | (inaudible) Man I'll (inaudible). I don't know, I don't know nothing about procedure, all I know is license and registration, that's all I know of. |
| Target: | They can't search your car without probable cause. |
| CI: | You don't want (inaudible). He think we in to somethin |
| Target: | You can't, see that's what you call the DUB. |
| CI: | What's that? |
| Target: | DWB, driving while black. That's all this is, is driving while black. |
| CI: | It's 40? |
| Dep. Sudler: | Computer's slow. |
| Target: | I don't know, I didn't look at it. |
| CI: | It is slow. |
| Dep. Sudler: | I need to get some information from you. Andrew everything on here is correct. |
| Target: | Everything is perfect. |
| Dep. Sudler: | I can't hear you. |
| Target: | Everything is perfect. |
| Dep. Sudler: | You still stay in Miami? |
| Target: | Yes |

4

Miami-Dade PD
8/2/01

Dep. Sudler:    Huh?

Target:    Yes

Dep. Sudler:    You look familiar as shit man.

Target:    I should.

Dep. Sudler:    Why?

Target:    You pulled me over while I was in the news truck one night.

Dep. Sudler:    Me?

Target:    Yea, you and uh if it wasn't, no actually it wasn't that, I was on the scene. You all had some serious uhm incidents. I been on a lot of your crime scenes. I remember your face. When I was with Met..Metro Video News, when I worked for NBC 6.

CI:    He used to do what you do.

Target:    I do..when I worked with the news..Metro Video News.

Dep. Sudler:    That's where you're at now?

Target:    NBC 6. That's that's the news chopper you see fly over everyday, you see all the traffic.

Dep. Sudler:    Man..I ain't never seen you on no scene.

Target:    That's amazing

Dep. Sudler:    I don't know about that.

Target:    You probably won't, because my face is always stuck in a camera, I'm always shooting. I'm a shooter.

Dep. Sudler:    What do you mean, what was he saying that you used to do what I do.

Target:    Oh..I was a Deputy Sheriff too.

Dep. Sudler:    For what County?

Target:    For BSO, Broward Sheriff's, when Nick Navarro era was here. I still got..with the PBA.

5

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

Dep. Sudler:    You was a Deputy on the road?

Target:    Not on the road, in the jails.

Dep. Sudler:    When?

Target:    In 89 and 90 then I left, yea.

Dep. Sudler:    See that's where I know you from.

Target:    Really?  Yea I was a Deputy.

Dep. Sudler:    Where did you work?

Target:    I worked out of uhm main jail, pompano and stockade.

Dep. Sudler:    I worked in the jail a while back.

Target:    Really, then that's probably where you know me from.

Dep. Sudler:    I know it,  I'll think about it in a minute, I know you from somewhere.

Target:    It had to be out there with the news, because I was always on the crime scene.

Dep. Sudler:    What academy did you go through.

Target:    I went to 89...89, academy of 89.

Dep. Sudler:    (inaudible) I think about...

Target:    (Inaudible) that's cool.

Dep. Sudler:    I'll think about it, I never forget a face.

Target:    I know, that's the only..either with the news or when I was with BSO.

Dep. Sudler:    1704 is where your still living at, right?

Target:    Yea.

Dep. Sudler:    You work at, what's the name of the company?

Target:    It's Metro Video News.

Dep. Sudler:    Metro Video News?

6

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

| | |
|---|---|
| Target: | Yea. That's my media ID. For when I'm on crime scenes, any kind of crime scene when I'm shooting. |
| Dep. Sudler: | Where you guys coming from tonight? |
| Target: | We just coming from a business meeting, I just went and met some people about some business, I'm a shooter so I do a lot of production. |
| Dep. Sudler: | Here..in Broward County? |
| Target: | In Broward, Dade..it doesn't matter. |
| Dep. Sudler: | You met in Broward County. |
| Target: | Yea we just met right up in Hallandale, right by uhm Daniels Bible Book Store. I just met the guy. By Daniels Bible Book Store. |
| Dep. Sudler: | Alright, give me a minute. |
| CI: | Damm that's how you handle them. |
| Target: | You just talk crime (inaudible) you know (inaudible) then normally they just say okay cool. |
| CI: | I gotta learn that. |
| Target: | Yea, (inaudible) you deal with them a lot..that's all. |
| CI: | (Inaudible) fucked up... |
| Target: | Yea. |
| CI: | We ain't seeing no dirt bags while they standing..you know. Talkin about do you know the speed limit around here? |
| Target: | Computer's slow, see they never see you fidget so they can't guesstimate, they can't guess about and write you a ticket (inaudible), they gotta write you a ticket (inaudible). |
| CI: | Yea. |
| Dep. Sudler: | I'm still waiting, Bro. |
| Target: | That's cool. |

7

Case No. 230137-Z
Miami-Dade PD
8/2/01

| | |
|---|---|
| Dep. Sudler: | So you worked..you worked in the jail back in 89-90? |
| Target: | Uh hum. |
| Dep. Sudler: | Who's some of the people you used to work with. |
| Target: | Lt. R.J. Huff, Deputy uhh Johnson, uh... |
| Dep. Sudler: | You ever work the road. |
| Target: | No.  Only thing I did with the road was when I did transportation.  I did some transportation. |
| Dep. Sudler: | I know you man from some where...I just can't... |
| Target: | That's gotta be the only place. |
| Dep. Sudler: | No, cause I went out to the road back..just about in 1990. |
| Target: | Yea. |
| Dep. Sudler: | (Inaudible) |
| Target: | That's gotta be..yea that's gotta be the only place.  Uhm..yea that's gotta be the only place.  I remember your face.  I know that for a fact. |
| Dep. Sudler: | I know..I remember you. |
| Target: | That's cool. |
| Dep. Sudler: | How come....what happened?  You left? |
| Target: | Yea.  I left..I'm more of a you know media..I like the camera stuff, I love and |
| Dep. Sudler: | You know how much money we make now? |
| Target: | Uh? |
| Dep. Sudler: | You know how much money we make now? |
| Target: | Yea but I do you know how much money I make now.  The deal I just came from is very lucrative I was about to make you guys would probably be looking to make in four months is what I'm looking to make on this one deal.  You understand..and that's with overtime, I'm just being |

8

Case No. 230137-Z
Miami-Dade PD
8/2/01

                        real..that's you know I like the camera, I like to shoot. I like to get the shot. That's just me.

Dep. Sudler:    Hey man you look nervous.  You alright?

Target:          Straight.

Dep. Sudler:    Ain't no warrants gonna come back on my computer comes up is there?

Target:          No.

Dep. Sudler:    No?

Target:          I'm straight.

Dep. Sudler:    You ever have any trouble with the police?

Target:          I've had trouble with the police before.

Dep. Sudler:    You did? (Inaudible) I know you but I..I can't...

Target:          You can look at me all day, I'm telling you

Dep. Sudler:    You used to be thinner?

Target:          Uh?

Dep. Sudler:    You used to be thinner maybe?

Target:          Yea, I was smaller.. I just gained like in the last year and a half fifty pounds.  You eat good when you working..doing good business. You eat pretty good.

Dep. Sudler:    I don't know man.

Target:          You guys still not..not toppin uh Palm Beach..Palm Beach is topping you guys out anyway.  I was thinking about it but...

Dep. Sudler:    Yea, but who wants to live in Palm Beach.

Target:          Exactly.  Well it's not bad..it's just a matter if you want to relocate, matter of whether you want to relocate.  Nobody really want to relocate.

Dep. Sudler:    How tall are you?

Target:          Six.

9

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

Dep. Sudler:    Six foot?  What you weigh?

Target:         Two forty-nine..two forty-five, about two forty-five.

Dep. Sudler:    What about you, how tall are you?

CI:             About 5'8"

Dep. Sudler:    About 5'8"?  And how much you weigh?

CI:             225.

Dep. Sudler:    You been eatin good too, huh?

CI:             Yea.  I'm a long shoreman.

Dep. Sudler:    Who else did you used to work with that I would know.

Target:         (Inaudible) with Discovery channel....

Dep. Sudler:    No..no..no at BSO.

Target:         Uhm,  Deputy Johnson, she left, Uh, Booker, you know Booker?

Dep. Sudler:    Yea.

Target:         Okay, Booker, uhm,  jesus Christ....I was just looking at....

Dep. Sudler:    You were in transportation, right?

Target:         No.  I worked the jail and I did some transportation because of the times
                that we did, I did transportation driving back and forth.  I just you know,
                as shotgun, never driving, I just worked transportation.

Dep. Sudler:    I'll think of it, give me a minute.  I never issued a ticket or stopped you or
                uh nothing like that, give me a minute.

Target:         Nope.  Never had any problems with you.

CI:             You said the computer ran (inaudible).

Target:         No...He just kind of waste time, try and see what he can do.

CI:             Cause all I (inaudible)

Case No. 230137-Z
Miami-Dade PD
8/2/01

| | |
|---|---|
| Target: | He's fishin |
| CI: | (Inaudible) cross the street |
| Target: | He's fishin to see what you gonna do, he fishin to see, just, he's fishin….. |
| CI: | If I had mine (Inaudible). |
| Target: | Smile, just smile, just smile. |
| CI: | He (inaudible) asked me if I had mine… |
| Target: | Just smile.  Just smile…. |
| CI: | Tell me I look nervous, just like I got (inaudible) all I got is child support and I done took care of that. |
| Target: | All you got to do is smile, don't worry about it. |
| CI: | He nasty man…you know what? |
| Target: | Huh?  When you got two black men sitting in a car calm it's (inaudible) unbelievable to them, so it's always something with us, so don't worry about it.  It's always something (inaudible) |
| CI: | What they tryin to do is piss you off. |
| Target: | Yea.  And then see when you make the wrong move or you get mad, that's when they gotcha, so you don't play those games.  You play your game. |
| CI: | Yea but what happens when they disrespect you in the…in the worst way? |
| Target: | Guess what? That's what, that's when you see them on the news dead, cause somebody kill em. |
| CI: | No. |
| Target: | Trust me.  When I told the cop before how nasty he was to me. |
| CI: | Yea. |
| Dep. Sudler: | Now I know where I know you from. |
| Target: | Where's that? |
| Dep. Sudler: | Now I know where I know you from. |

11

Case No. 230137-Z
Miami-Dade PD
8/2/01

| | |
|---|---|
| Target: | Where? |
| Dep. Sudler: | I used to work District 1. |
| Target: | Yea. |
| Dep. Sudler: | Now I know where I know you from. |
| Target: | Yea, where's that. |
| Dep. Sudler: | You didn't leave, you got shitcanned. |
| Target: | Yea. |
| Dep. Sudler: | That's what happened. |
| Target: | Yea I did. |
| Dep. Sudler: | Bro, I came out on the road it was about 1990. |
| Target: | Yea. |
| Dep. Sudler: | And I remember you used to come out, you used you guys used..... |
| Target: | I never did anything that they accused me of. |
| Dep. Sudler: | What did they accuse you of. |
| Target: | They accused me of playing road patrol in my personal vehicle. |
| Dep. Sudler: | Dude, cause I was there one night. |
| Target: | No. I..was, you know I live right off from Miramar off Hallandale, and everytime ya'all had something and I was coming home and Lt. what's his name, god I cannot remember his name, but he sent me home late me one, the night when Brian McNulty, when Brian..I think it's McNulty, but Brian he ah asked me what was I doing cause he saw me pass by, and I said I'm coming from work. |
| Dep. Sudler: | I was working in the District then. |
| Target: | Oh you was there then? |
| Dep. Sudler: | That's right |

12

Miami-Dade PD
8/2/01

| | |
|---|---|
| Target: | See and that's when I, but you see I end up, I ended up |
| Dep. Sudler: | You were stopping in your personal car. |
| Target: | I stopped and said hi to them, I said hi to you guys. |
| Dep. Sudler: | That's (inaudible). |
| Target: | But I never stopped..no..I don't have to lie to you. |
| Dep. Sudler: | But you got fired over there? Right? |
| Target: | I got canned because..you know why I got canned?  Because any and this is the honest reason why they tell you this..if you look it up in my file. They said any kind of investigation come up against you during your first year of probation,  they..they're allowed to terminate you. |
| Dep. Sudler: | Let me ask you a question.  How hard is it, let me tell you what, I worked the jail a short time... |
| Target: | Yea. |
| Dep. Sudler: | I have never, I never met someone from the jail and I'm serious, I've been with the Agency awhile |
| Target: | Uhuh. |
| Dep. Sudler: | That didn't fuck up in their first year. |
| Target: | And you know what..and that.. |
| Dep. Sudler: | They didn't (inaudible) |
| Target: | And that's...that's what my PBA representative was saying |
| Dep. Sudler: | Dude, you couldn't make 12 fucking months without getting in trouble? |
| Target: | No I made the..I was at the eleventh month and they frickin.. |
| Dep. Sudler: | They don't fire people (inaudible). |
| CI: | It's cause you black. |
| Target: | Cause you ain't black, you saying that they don't and I'm sittin here, and you sittin there. |

13

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

Dep. Sudler:   Yea.  I've been here awhile, I know man

Target:   Well that's cool.  Well you know your business, I know my business.  I know what happened to me and I know what they talked to me about.  So you know....I didn't argue with it, hey, I was still, I'm still capable of going to any agency, but I choose not to. I decided to go elsewhere.

Dep. Sudler:   I know the dude you're talking about man.

Target:   Yea.

Dep. Sudler:   I know the dude your talking about.

Target:   And he's a Sergeant now I think in Pompano.

Dep. Sudler:   Yup.

Target:   He's the same, same one...but you were there...

Dep. Sudler:   He trained me.

Target:   Huh?

Dep. Sudler:   He trained me.

Target:   Yea.  He's the same one, when I first met him and I told him that I was going to be on BSO he told me you will never make the department.   I was living in Carvers Ranches and they broke into my house and he came and he was the investigative officer.  And I had my corrections and police book sitting there (inaudible) sitting there, and he told me ah you'll never make it.  I said why? He said look where you come from, look where you live.

Dep. Sudler:   You what I..you know what I remember.  I remember that I don't know you was working..you were coming home and shit and you were wanting to be a police so bad and that's you know you were stopping people and you know

Target:   I never stopped anybody.  That was a lie.  I never stopped anybody.  And that was a lie.  And if you look at my file, then you go (inaudible).

Dep. Sudler:   I ain't looking in your file.

Target:   But I'm telling you, if you was to do it..and I can bring you my file

Dep. Sudler:   Now I know that where I remember you from.

14

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

Target:          Yea.

CI:              He told you you would never make it?

Target:          He told me I would never make the department, and I was wearing the same uniform..(inaudible)

CI:              What kind of shit is that?

Target:          That's alright. Listen I don't worry about it, another persons opinion of you don't make you who you are.

CI:              Damm..

Target:          Just going to straight out tell you

CI:              Yea...but you.....

Dep. Sudler:     Hey, let me just check my computer, I'll be right back.

Target:          Alright, no problem.

Dep. Sudler:     Alright, ain't nothing in this car right, that I need to worry about?

Target:          No..no..no, we straight.

Dep. Sudler:     Alright, sit still.

CI:              (Inaudible) that shit. How can he walk up to you and tell you..they must be redneck nasty.

Target:          He was a bigot just like this guy and he loved that guy that trained him. You could tell by the way he talked to you.

CI:              Those are the kind that wind up dead.

Target:          Somebody don't..somebody hurt him..knock him out and put him over by the Ranches while he was talking junk, him and his partner..and then knocked him out.

CI:              What you mean knock him out.

Target:          Knock him out when he's trying to pull over somebody, hit him the head and knocked him out and put the..and emptied the gun and put it right there by there dead, by there head.

15

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

CI:              While they was knocked out?

Target:          While they was knocked out and the lights...


Dep. Sudler:     Alright bro...look here.

Target:          Yea.

Dep. Sudler:     You know I could stack you with a some tickets right

Target:          Yea

Dep. Sudler:     You know that right.

Target:          Yea.

Dep. Sudler:     You need to wear your seatbelt,

Target:          Alright.

Dep. Sudler:     You need to put your lights on.

Target:          Okay.

Dep. Sudler:     Alright?

Target:          Appreciate it.

Dep. Sudler:     Even though your partner messed up with us.  I'll cut you a break and give you a little courtesy.

Target:          I didn't mess up with ya'll, because guess what I still do some of your ah what's your name, I just finished working on some of your dui videos.

Dep. Sudler:     Oh yea.

Target:          Yea, the guys pulling me over (laugh) but that's what it is, driving while drunk, and a lot of people not wearing their seatbelts.

Dep. Sudler:     Alright, be cool.

Target:          Go figure..right.

Dep. Sudler:     Alright, get going.

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

| | |
|---|---|
| Target: | Take care, alright. Nasty man woo that's why I tell you dude don't worry about that. Nasty. They going to tell..they going to say what they want to say about you. Just keep get on that main street. So we can get out of Broward County. |
| CI: | See how nasty he was. |
| Target: | He just wanted to find out so bad. |
| CI: | What do you mean? |
| Target: | He wanted to find out so..what you find out |
| CI: | What do you mean? |
| Target: | What that make you..that don't make you no better than me.. I make more money that you anyway. |
| CI: | What he mean, they canned you? (Inaudible) talking about. |
| Target: | I was with..I was there when ah..ah that same cop filed falsified charges against me. |
| CI: | Put your seatbelt on. |
| Target: | Filed falsi..filed falsified charges against me, and..and had me investigated and that's what happened. Once your investigated after any.. they investigate you see here what happened out in.. cause he can't guess what to give you a ticket on. |
| CI: | That's right. |
| Target: | (Inaudible) I tell my people you got to calm down. They want to keep you afraid, they know black people afraid of the police. I ain't afraid of them. (Inaudible) go to jail, I got a lawyer, I got a good lawyer. I got a lawyer that just as good as Johnnie Cochran. My lawyer eat them for lunch. My lawyer got somebody out of jail and got his job back and he was on camera and he was a correction officer. He was on camera giving the inmate the key and the inmate turned around and opened the cell and walked out. That beat all. |
| CI: | Yea but man, (inaudible) you know… |
| Target: | Yea but, that's what I'm telling you, it doesn't work like that. |

17

Case No. 230137-Z
Miami-Dade PD
8/2/01

CI:        If he's doin people like that....

Target:    They think..they think that they getting over but they getting killed, in the long run. I don't worry about them, because I'm gonna see him, again I'm standing over there by them shootin it.

CI:        Yea.

Target:    Their partner right down here why got killed and was there shootin it.

CI:        Which one?

Target:    The one..the one that I know who smoked him

CI:        He got smoked?        *Video*

Target:    Yea he got smoked, si~~ttin in~~ his car.

CI:        His partner?

Target:    One of his partner's, *used to work right here*, ~~used to work right here~~, they got smoked. District one.

CI:        Some nigger knocked him off?

Target:    No..knocked him off.  Killed him, shot him in the head, 357.

CI:        Goddamm

Target:    Blew his head off.

CI:        Cause he was the same kind of redneck like that.

Target:    Same kind of redneck like that.

CI:        They must be got a Klan meeting down there man when they act like that.

Target:    That's how they act. So I don't worry about it.  Like I said, I see them, you get pulled over, I get pulled I don't get nervous when they pull me over.

CI:        What about the dude that knocked him off.

Target:    They never got him.

CI:        Huh?

18

Miami-Dade PD
8/2/01

| | |
|---|---|
| Target: | They never got him. |
| CI: | What?  He in Miami? |
| Target: | He down here. |
| CI: | Damm. |
| Target: | That's why I tell you, a lot of people don't know the things I know, and don't know what I've been through and what I've seen. |
| CI: | 357?  How many times did he hit him? |
| Target: | One time. |
| CI: | Damm. |
| Target: | (Inaudible) |
| CI: | See they know that..so they..so they really got..so they don't know who did it then? |
| Target: | Nope. |
| CI: | Damm…(inaudible) that still don't change their attitude though. |
| Target: | Nope they don't.  They still act like they..you see like that.  He's trying to degrade me and demoralize me, by saying all that.  I make more money than him.  I can look at him in the face and say I make more money than you. |
| CI: | Talkin about you got canned.  You was stopping… |
| Target: | So what. |
| CI: | Wit..with your car. |
| Target: | He lied, cause he never stopped me.  And he never saw me pull over, not nobody can ever say the saw me pull over anybody in my unit, in my car.  Never!  And my wife will tell you I never did that. |
| CI: | So what about the guy that just ran up the false report and cost you your job? |
| Target: | Now he's a Sergeant in Pompano.  I know who he is.  He's the one that got knocked out.  That's his buddy.  He love him. |

19

Case No. 230137-Z
Miami-Dade PD
8/2/01

CI:            They all run together.

Target:        Yea.

CI:            You see that? Boy a nigger ain't got a chance in Broward.

Target:        I know it.

CI:            Boy you..you stay on this end of town man.

Target:        (Inaudible) I tell people like that when..after they give me a ticket.  I
               said..oh well, one day I'll see..I'll be on the scene and you'll be the victim.
               I'll be video taping it.

CI:            Somebody going to shoot em in the head.

CI:            Now all them cars went by and he saw these two black people in the car.

Target:        Yea that's all it was.

CI:            I'm glad we weren't into nothing like that.

Target:        Muhm

CI:            He really would have got nasty, if he thought we had some money.

Target:        Yea.

CI:            You see that.

Target:        (Inaudible) when you look like you got money or you look like you doin
               better than they are.  Oh yea you got..you got (inaudible) I make more
               money than you and I look good and I gained weight, and I'm still
               married.  How long you been married?  You got divorced since then.

CI:            (Inaudible)

Target:        Yea,  I know who he is, he play the role, I told you I know all these, most
               of these cops.  I see them all the time.  So I know em, I don't say nothing,
               I don't let them know I know them.

CI:            Damm.

Target:        Yea..yea you look familiar.

20

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

CI:          Yea you need some more gangster to take care of (inaudible)

Target:      They don't want to cross me, cause they don't want me going into ~~at~~ gangster mode. They can be in a patrol car, I don't care, I'll go ~~after~~ them. in their unit and all before you get that radio (inaudible) off.  Look at his hair..(inaudible).          ↳ to that

CI:          Look at his hair (laugh).

Target:      Hey, see what this guys doing..see what this guys doing.

CI:          Huh.

Target:      See what this guys doing.  Pull up in there. (inaudible) lets see what this guys doing.                     and let Gwen come ⤏ get me.

~~Target:~~
CI:          I get my ass out there (~~inaudible~~). (Inaudible) full of shit though...

Target:      Yea.

CI:          Man that's just put a bad feeling all (inaudible)...

Target:      That's what I'm telling you man, don't worry about it.  That's what I do, I don't worry about it.

CI:          Yea, but they been getting away with it for so long man.

Target:      Yea they get away with it until, you gotta understand, why you think I don't feel sorry for cops that get killed.  Because they did something wrong in the past and it..it just came back to them, (inaudible).

CI:          Well that dude that did it he must be a true gangster.

Target:      What this guy..he don't really, he don't (inaudible) he's not in it, not in it at all.  Pull up, pull up.

CI:          Back up.

Target:      Yea just a little bit.  Let me see (inaudible).

CI:          Damm, get my high down man

Target:      Yea.

CI:          Tired of getting stepped on by the man.

21

Case No. 230137-Z
Miami-Dade PD
8/2/01

| | |
|---|---|
| Target: | Yea I know, but you what, as long as they got a badge they think their superman. |
| CI: | (Inaudible) don't get the car (inaudible) though. |
| Target: | Yea. |
| CI: | (Inaudible) know man. |
| Target: | Well you see, he still could give you a ticket for not showing your registration. |
| CI: | But he know (inaudible). |
| Target: | He won't then, he was looking for something else. |
| CI: | Alright. |
| Target: | He's gone. |
| CI: | He gone? |
| Target: | Yea, he's gone.  Go back, you know what go back past there, cause she probably, you know what let me call her, I got the cell phone. |
| CI: | Yea. |
| Target: | Yea, don't let that stress you man.  You can't ..you can't let that stress you cause that's why your blood pressure go up. |
| CI: | Yea, but look how they been handling us man. |
| Target: | Yea. |
| CI: | I thought that kind of junk was in the past. |
| Target: | No..no it will never be in the past.  White boys always think they are better than you when they got a badge.  Remember that.  They think they're better than you anyway. |
| CI: | Boy it's going to be just like they do in what is that in LA?  Seven hundred and fifty six minutes..god daug. |
| Target: | Twelve hundred man, I had twelve.  I had twelve. |

Case No. 230137-Z
Miami-Dade PD
8/2/01

CI:         You know what I'm saying tho man..I mean..I mean they know its wrong and they just keep doing it, you know.

Target:     (Right, where are you, where are you, okay, alright go Pat's house.) Yea they know. They know man. Don't worry about that. Don't sweat that one bit. Don't let that run your pressure up man.     *(talking on cell)*

CI:         What he did to that dude McNulty, he slap and beat him up?

Target:     What?

CI:         The dude that popped him with that 357, he beat him up or somthin?

Target:     He did something to him. Did something to him, they guy got pissed off came back and killed him.

CI:         Crazy....dude killed a cop.

Target:     Yea, (inaudible) you know you get the death penalty for that.

CI:         For what?

Target:     Killing a cop.

CI:         Oh yea.

Target:     Yea you get the death penalty, but killing a cop, to me killing a cop is like killing the next man the street he ain't nobody better than me, he ain't no better than the next man.

CI:         Not when you got that uniform and that badge on he going to treat you like you ain't nothing.

CI:         Yea.

Target:     That's what make me want to kill them more.

CI:         Man...(inaudible)

Target:     (Inaudible) and what if we was two white boys, you think he would have done that?

CI:         No he wouldn't.

CI:         He wouldn't have even stopped us.

23

**Case No. 230137-Z**
**Miami-Dade PD**
**8/2/01**

| | |
|---|---|
| Target: | And first of all it wasn't even dark enough for me to put on the lights.  He kept you there for long enough for the lights to go down, and he know that I know better.  I would have took that junk to court and talked to the judge and tell him your honor, it was still light that's how he saw, we looked in his car plain as day. |
| CI: | God damm, that's a damm shame,  I ain't been stopped in a long time and been treated like that. I ain't lying.  Last time I was treated like that I was in Kissimmee, going to Orlando.  In Orlando, (inaudible) |
| Target: | They got rednecks, they a bunch of rednecks. |
| CI: | Yea but it started here, then it go farther back, maybe you oughta get a .357. |
| Target: | (Inaudible) |
| CI: | You can see where, that way you catch them at the turnpike, like Orlando.  When they don't have a uniform on, you know what I mean.  Especially when one do you wrong. |
| Target: | Oh (inaudible) I walk up on one of them at my video store,  the one that was doing me wrong when I was locked up. |
| CI: | He didn't even know you. |
| Target: | He didn't know me.  And every time he see me he turned his head and tried to walk the other way.  He don't try to be around cause he know how bad he did me and he know I smoke him, and he know I'm a Marine, and he know I  see it one way or the other, but I tell him to, I don't see..I don't care nothing about you nigger cause you got a badge. I had a badge, I kill you just the way you stand, and I'll kill you before you can get to your gun. |
| CI: | Yea. |
| Target: | I don't need no gun to shoot you.  I'll cut your throat, give you a Colombian necktie.  You ~~know what I mean~~. *don't know me.* |
| CI: | Yea man. |
| Target: | I'm Jamaican, I walk with a knife. |
| CI: | Yep, raised with a knife. |
| Target: | Yea, please.  I came out my womb I had a knife. |

Case No. 2301137-Z
Miami-Dade PD
8/2/01

| | |
|---|---|
| CI: | Mmmmm, hey dude bad man |
| Target: | Yea, but you see, that's the problem most our people don't know our rights so they treat us bad. |
| CI: | And they scared of them. |
| Target: | And they scared of them. |
| Target: | They treat us bad because we don't know our rights.  But if you know your rights and you sittin there you're all calm and collected, you see how he deal with you, trying to make small talk. |
| CI: | And then try to put you down. |
| Target: | The try to put me down cause they felt better.  But you know I got em, Yea, like look I still make more money than you, |
| CI: | You kept throwing that at him. |
| Target: | Oh yea, I make more money than they do.  You how much we make now. So what you make 35 grand a year, salary he topped out at what 44?  You make 44 thousand a year, I make that kind of money. |
| CI: | And with the deal we just got. |
| Target: | That's the reason why I make that kind of money. |
| CI: | Man. |
| Target: | I'm good at what I do, I don't need to go and harass people. |
| CI: | To be harass you (inaudible) somewhere, I don't know what I'd be doing. |
| Target: | Don't do it man.  Cause he, to be honest with you he was nicer than what you normally would expect. |
| CI: | What. |
| Target: | Considering the fact that he couldn't give you a ticket.  Trust me, he was nicer than what you could expect. |
| CI: | Probably cause the computer come back |

25

**Miami-Dade PD
8/2/01**

Target:         No, the computers alright.  He can't give me no ticket.

CI:             Cause I wasn't speeding.

Target:         You wasn't speeding, he couldn't get you for the lights for that time that
                he say, and he couldn't guesstimate on your speed.  And he, and in order
                for them to cite me, you gotta prove why you cite me.

CI:             Yea.

Target:         Why did you stop me in the first place.

CI:             Yea man. That makes you want to do something to them.

Target:         Hey, you out here with my woman, she's out here with my woman

Target exited the car at this point.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed on this

2nd   day of  May, 2002 to Assistant Attorney General Celia Terenzio, 1515 N. Flagler Drive,

Suite 900, West Palm Beach, Florida 33401.

Brenda Bryn

S:\BRYN\BROWN\Exhibits.wpd