UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  95-7207-CIV-GRAHAM

02 JUN 17 PM 3: 12

CLARENCE HADDOX
CLERK U S. DIST. CT.
S.D. OF FLA - MIA

TIMOTHY BROWN,

      Petitioner,

vs.

HARRY K. SINGLETARY,

      Respondent.

_____/

---

## RESPONDENT'S RESPONSE ON THE MERITS OF THE PROCEDURALLY BARRED CLAIMS PRESENTED IN BROWN'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND THIRD AMENDED PETITION FOR WRIT OF HABEAS CORPUS

---

COMES NOW, Respondent, by and through undersigned counsel, and hereby responds to Brown's procedurally barred claims presented in Brown's Amended Petition for Writ of Habeas Corpus and Brown's Third Amended Petition for Writ of Habeas Corpus and states:

1.    On May 7, 2002, Petitioner, Timothy Brown ("Brown") filed his Amended Motion for Consideration of Actual Innocence as a "Gateway" Pursuant to Schlup v. Delo.[1]

2.    On May 21, 2002, this Court held a status hearing and gave Respondent (hereinafter "State") until June 14, 2002 to respond to that motion[2] and for the Court's convenience to respond on the merits to Brown's procedurally barred claims presented in

---

[1]  Schlup v. Delo, 513 U.S. 298, 327 (1995).

[2]  A response to Brown's claim of actual innocence as a gateway will be filed separately.



Brown's habeas corpus litigation.[3]   Even though the State is addressing claims presented in Brown's Amended Petition for Writ of Habeas Corpus ("1999 Amended Petition"), it is the State's position that Brown has abandoned those claims when he so announced and filed his Third Amended Petition for Wit of Habeas Corpus ("Third Amended Petition).   This Court should find that Brown has not established a gateway for the review of his procedurally barred claims, determine that the Third Amended Petition is a mixed petition, and resolved the sole exhausted claim related to the sufficiency of the evidence used to convict Brown of first-degree murder of Deputy Patrick Behan.

3.   A truncated procedural history of this case entails that Brow's conviction and sentence were affirmed by the Fourth District Court of Appeal, <u>Brown v. State</u>, 657 So. 2d 903 (Fla. 4th DCA 1995), and the mandate issued on August 18, 1995 (DE #97 pg 33). Four issues were raised on direct appeal, two of which became issues in the habeas litigation, the sufficiency of the evidence

---

[3]   The State addresses claims made in Brown's Amended Petition for Writ of Habeas Corpus filed in 1999, and his Third Amended Petition for Writ of Habeas Corpus filed in 2000.   Where an evidentiary hearing is conceded, the Respondent does not address the merits of the claim(s), but reserves the right to make an appropriate presentation should a hearing be ordered. During the course of this response, the Respondent will discuss claims made by Brown in his 1999 Amended Petition as well as the Third Amended Petition.   However, Respondent does not waive any argument that Brown has abandoned all claims except those in the Third Amended Petition.   Further, Respondent does not waive any argument challenging the credibility of the newly discovered evidence or any procedural defenses to the habeas litigation.

and whether Brown's confession should have been suppressed.

4.   Brown did not seek collateral review of his conviction with the state courts, instead, he proceeded directly to federal court, where, on December 27, 1995, he filed a pro se federal habeas corpus petition raising the sole issue of the sufficiency of the evidence. On February 6, 1996, the State responded (DE #1, 7).

5.   After appointing the federal public defender on March 14, 1997, the Magistrate Judge gave counsel leave to "file such other pleadings or memoranda", including "amendments to the pending pro se petition for habeas corpus relief to include any claims that were exhausted in the state forum...." (DE # 17).

6.   On May 24, 1999, Petitioner filed an amended petition which included eleven claims with multiple sub-claims (DE #70 "Amended Petition"). Claim A addressed the sufficiency of the evidence; Claim B challenged the voluntariness of Brown's confession; Claim C addressed whether the confession was made knowingly and intelligently; Claim D challenged the trial court's comment about the possible sentence; Claims E - J challenged trial counsel's effectiveness; and Claim K alleged ineffectiveness of appellate counsel. The State agreed Claims A and C of the 1999 Amended Petition were exhausted, but maintained that all other claims were not because the state courts had not been given an opportunity to review the facts and issues raised in the habeas petition (DE #78).

7.    When ordered to address the exhaustion of his claims, Brown admitted that the issues and/or facts of Claims B and E-K were not presented to the state courts, but asked that each be considered procedurally defaulted instead of unexhausted (DE #79). Both this Court and the Magistrate Judge concluded that only Claims A and C were exhausted (DE #97, 125). This Court gave Brown the option of abandoning his unexhausted claims and filing a second amended petition containing only Claims A and C or accepting a dismissal without prejudice (DE #125).

8.    On October 10, 2000, in contravention of this Court's order, Petitioner filed his Second Amended Petition and included Claim B (voluntariness of confession) arguing that it was a version of his original Claim B devoid of unexhausted facts (DE #126, 128). The State moved to have the second petition struck, and on November 2, 2000, this Court granted the State's motion and gave Brown three days to file an amended petition raising only Claims A and C or to accept a dismissal without prejudice (DE #129, 130). On November 8, 2000, Brown sought reconsideration by this Court[4], but also filed a Third Amended Petition which contained original Claims A and an amended Claim C. With respect to Claim C (re-titled as Claim B in the third petition), Brown added facts not presented in

_____

[4] On February 21, 2001, this Court denied Brown's request for reconsideration. The Eleventh Circuit Court of Appeals determined that it did not have jurisdiction to hear Brown's interlocutory appeal, and the United State's Supreme Court denied certiorari on February 19, 2002 (DE # 140, 144, 150, 154).

the 1999 Amended Petition (DE #132, 134). Subsequently, the State responded to the Third Amended Petition noting that it now was a mixed petition necessitating dismissal in that it contained a claim (Claim B - knowing nature of confession) which included factual assertions not presented to the state courts.

9.    Following his unsuccessful appeals, on September 10, 2001, Brown sought that his Second Amended Petition or Third Amended Petition be held in abeyance so that he could return to state court to exhaust his claims.  Prior to the Court ruling on the request, Brown learned of the Broward Sheriff's Office ("BSO") reinvestigation of the Behan homicide and the admissions by Andrew Johnson taking responsibility for the murder.  On February 14, 2002, Brown moved again to have this Court reinstate the Second Amended Petition and hold the matter in abeyance, however, he later he withdrew that request and asked that this Court hear the claims using Schlup as a gateway to the procedurally barred claims.

10.    On page 13 of Brown's Amended Motion for Consideration of Actual Innocence as a "Gateway" Pursuant to Schlup v. Delo, he admits that all but his claim challenging the sufficiency of the evidence (Claim A) are procedurally defaulted for not having raised the factual assertions in state court.  In spite of this concession, and as requested by the Court for its convenience, the

State will address the merits of the procedurally barred claims[5] identified above.

11.   The facts for **Claim B of the 1999 Amended Petition and Claim B of the Third Amended Petition** are included in the Report of Magistrate Judge, where a synopsis of the pertinent testimony presented at the suppression hearing was given (Report of Magistrate Judge 51-76, 81-88).  Additionally, in its Response to Amended Petition for Writ of Habeas Corpus, the State outlined the testimony given at the suppression hearing as well as during the trial of Brown which addressed the voluntariness and legality of the confession (State's Response to 1999 Amended Motion 17-45, 49-56).  Due to the length and prior thorough recitation of the suppression issue facts which covered more than 70 pages, the State relies upon its Response to the 1999 Amended Motion and the Report of the Magistrate in stead of reproducing the facts for a third time.  For the Court's convenience, copies of those documents are attached as Exhibits A and B.

12.   In reviewing a defendant's confession for voluntariness, federal courts must determine whether, in light of the totality of the circumstances surrounding the interrogation, the defendant's

---

[5] The parties agree that Claim A of the Third Amended Petition is exhausted.  As such, the State relies upon its Response to the Third Amended Petition in answering Brown's allegation that there was insufficient evidence to support his conviction.  That argument will not be reproduced here, but is incorporated by reference (Exhibit A).

confession was obtained in a manner compatible with the requirements of the United States Constitution, and was a product of the defendant's free and rational choice. See Miller v. Fenton, 474 U.S. 104 (1985); McCoy, v. Newsom, 953 F.2d 1252 (11th Cir. 1992); Leon v. Wainwright, 734 F.2d 770 (11th Cir. 1984). The reviewing court must consider the adequacy of the Miranda warnings, the defendant's characteristics and the circumstances of the police interrogation when determining the voluntariness of a confession. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973); Devier v. Zant, 3 F.3d 1445 (11th Cir. 1993). Factors examined by the federal habeas court in making this determination include whether the defendant has been subjected to violence or threats thereof, whether he had been given promises, the length of his detention, the duration and intensity of the interrogation, any physical deprivations of food, water, or sleep, denial of access to family, friends, or an attorney, the defendant's age, education, mental capacity, whether he was under the influence of alcohol or drugs during the interview, whether he was suffering from fatigue, and whether he refused to answer any questions. See Withrow v. Williams, 507 U.S. 680 (1993); Brooks v. Florida, 389 U.S. 413 (1967); Sims v. Georgia, 389 U.S. 404 (1967); Beecher v. Alabama, 389 U.S. 35 (1967); Garrity v. New Jersey, 385 U.S. 493 (1967); United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997). However, the defendant's personal characteristics are irrelevant

unless there is a showing of police coercion.  See <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986); <u>United States v. Rohrbach</u>, 813 F.2d 142, 144 (8th Cir. 1987).

13. "The test of voluntariness is not a 'but-for' test. [W]e do not ask whether the confession would have been made in the absence of the interrogation.  Few criminals feel impelled to confess to the police purely of their own accord, without any questioning at all.... Thus, it can almost always be said that the interrogation caused the confession." <u>Miller v. Fenton</u>, 796 F.2d 598, 605 (3d Cir.), <u>cert. denied</u>, 479 U.S. 989 (1986). "[D]etection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of law all responsible officers charged with the duty of law enforcement.... The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw..." <u>Haynes v. Washington</u>, 373 U.S. 503, 514-515 (1963).  In <u>Martin v. Wainwright</u>, 770 F.2d 918 (11th Cir. 1985), <u>modified</u>, 781 F.2d 185, <u>cert. denied</u>, 479 U.S. 909 (1986), this Court quoted with approval Justice Frankfurter's plurality opinion in <u>Culombe v. Connecticut</u>, 376 U.S. 568, 571 (1961):

> ... [W]hatever its outcome, such questioning is often indispensable to crime detection. Its compelling necessity has been judicially recognized as its sufficient justification, even in a society which, like ours, stands strongly and constitutionally committed to the

> principle that persons accused of crime cannot
> be made to convict themselves out of their own
> mouths.
>
> ... But if it is once admitted that
> questioning of suspects is permissible,
> whatever reasonable means are needed to make
> the questioning effective must also be
> conceded to the police.

<u>Martin</u>, at 924-925.

14. Additionally, where the state court has provided a full and fair hearing on the motion to suppress and the trial court's findings are not clearly erroneous, the federal habeas court should accept the state court's factual findings. In federal habeas review, this Court must afford the trial court's factual conclusions a presumption of correctness. <u>Arizona v. Fulminante</u>, 499 U.S. 279, 287 (1991)(finding that trial court's factual findings are entitled to great deference, but ultimate issue of voluntariness of confession is legal question); <u>Miller v. Fenton</u>, 474 U.S. 104 (1985); <u>Marshall v. Loneberger</u>, 459 U.S. 422 (1983); <u>Cunningham v. Zant</u>, 928 F.2d 1006 (11th Cir. 1991). In those instances where the state court failed to make express factual findings, the federal habeas court is permitted to "reconstruct the findings of the state trier of fact, either because [the state trial judge's] view of the facts is plain from his opinion or because of other indicia." <u>Townsend v. Sain</u>, 372 U.S. 293, 314 (1963), overruled on other grounds, <u>Keeney v. Tamayo-Reyes</u>, 112 S.Ct. 1715 (1992); <u>Tejada v. Singletary</u>, 941 F.2d 1551, 1563 (11th

9

Cir. 1992); <u>Fike v. James</u>, 833 F.2d 1503 (11 Cir. 1987). The
Supreme Court has recognized that a federal habeas court may
conclude that a state judge's failure to grant relief equates to an
express finding that a witness is not credible where it is clear
that the state judge would have granted relief had he found the
witness credible. <u>Marshall v. Loneberger</u>, 459 U.S. at 433, <u>citing</u>
<u>LaVallee v. Della Rose</u>, 410 U.S. 690 (1973). <u>See</u> <u>Tejada v.</u>
<u>Singletary</u>, 941 F.2d 1551, 1563 (11 Cir.), <u>cert.</u> <u>denied</u>, 112 S.Ct
1199 (1992).

15. An examination of the instant record reveals that Brown
received the full and fair hearing required by the constitution and
that the trial court considered[6] Brown's age, possible physical
and/or psychological coercion, his mother's absence from the
interrogation room, his mental ability, the fact Keith King
confessed implicating Brown in the murder, and that Brown had
admitted his involvement in the murder to other witnesses. Hence,
the trial court's findings should be afforded the presumption of
correctness and where no express findings were made, this court may
conclude that the state trial court rejected Brown's allegations.
Clearly, from the following rulings, the state trial courts
rejected the claims that the confession was not knowing and

---

[6] While the trial court considered Brown's age, mental
condition, mother's presence, and physical/psychological
coercion, the state appellate court did not consider all of these
issues, as such, the State maintains that the issue is not
exhausted.

10

voluntary.  In denying Brown's pre-trial request to suppress his July 16, 1991 confession, Judge Frusciante opined:

> **There has to be some independent way that the police will make it back to Mr. Brown on that date**.  Other than that particular statement made on November 15th.  Some of the things that I thought were significant were things such as the fact that the police allowed Mr. Brown to be free at one point to go into (sic) the system here, and be let out again.  As a matter of fact, I think it happened a couple of times once at least without their knowing, and I find it very difficult to believe that if they really had him as a suspect based upon that first statement, that he would have had such an opportunity.  I think there are, however, some problems perhaps for the State regarding the overall facts, and perhaps there will be some difficulty before the jury regarding certain matters such as Mr. McGill and the lack of pursuing Mr. McGill is troublesome to the Court.
>
> What I have to determine in my own mind is does it effect this particular motion, and I've come to the conclusion that it does not. I find that the **intelligence of the Defendant** being certainly a consideration for the Court as are a number of things, I think it was the Brewer case in fact cited in your motion, Counsel, brings the totality of the circumstances to the forefront as well as any individual case, and I'm looking at cases here such as Stokes where I'm concerned about the **parent going to the police station and not having an opportunity to be with the defendant**.  I failed to find that particular fact in this case that would conform to, or have this Court conform to the ruling in Stokes versus State.  And the **intelligence certainly I think is relevant**, and in some other cases referring to children as young as ten years old IQ's may be a little bit higher I think 68, 69, 70 someplace in that area, but it was a ten year-old as opposed to a **15 year**

old, and that wasn't sufficient enough to suppress the statement.

Although as you mentioned, Counsel, the State did not impeach the doctor, the fact is that I think much of what she said led the Court to believe this defendant had the **mental capacity** to understand the Miranda warnings that were given to him, and much of what he did not do well in school may have in fact been brought about by his not attending....

That's not a problem here again that this Court needs to address. It appears clear that in the first statement [Petitioner] was intoxicated and I see nothing in the statement that drugs were mentioned in Brewer. I see nothing in the second statement that shows signs of that at all. I believe that the **defendant freely and voluntary (sic) and knowingly and intelligently waived his rights in the second statement**, and as such this Court would rule that the motion in regards to the July statement be denied.

To sum it up as far as the two statements are concerned, the Defendant's motion regarding the first statement is granted. The Defendant's motion as it regards the second statement is denied.

(T 441-443)[7] (emphasis supplied). When the issue was revisited at trial by Judge Backman, the following ruling was entered (T 1624):

First the decision by Judge Frusciante to suppress the statement of Mr. Brown that was given on the 15th or the 16th of November, where there was a simple finding [Petitioner] was not advised of his Miranda warnings, accordingly the Court has suppressed the statement. There was no finding by Judge Frusciante that the statement given by Mr.

---

[7] "T" refers to the trial transcript supplied as part of the State's response to the 1995 Pro Se habeas Petition and the 1999 Amended Petition.

Brown at the time was in any way coerced or otherwise ill gotten, therefore suppressed.

The issue that's being raised at this time, the fact that a second statement was taken some eight months later, during the course of interrogation prior to the actual statement being given by Mr. Brown, the defendant in this case, either waived or made reference to the fact that Mr. Brown had given a prior statement and thereafter, Mr. Brown confessed.

And the statement or the issue that was being presented to the Court was by virtue of a first statement being suppressed, it mentioned as an inducement to the second that it too would have to fall.

I would submit that there are no cases either State or Federal that exactly address that issue in that form.  In fact, the cases that were given to the Court by the defense and the Court's own research with regard to the cases from the United States Supreme Court, all seem to indicate that it is just a factor that is taken into consideration with the totality of circumstances, that thereafter determine whether or not the second confession should fall.

The Court would make the **following finding**: The comments as I stated yesterday, this Court was not the Court that heard all the testimony that was presented over the hours.  However, the Court has had an opportunity to review the motion to suppress that was filed, the testimony that was presented during the course of trial, not the arguments, they are not reduced to transcript form; memorandums of law that was provided to the Court by defense, which by the way did raise and argue the issue in terms of the second statement having referenced to the first statement by the officer, so it is an issue that had been addressed.

**There has been no finding by Judge Frusciante, my predecessor, that the first statement was**

13

> **coerced. There is nothing in the record that**
> **indicates that it was as a result of the**
> **inducement of the officers indicating to Mr.**
> **Brown that he, in fact, or he had already**
> **previously confessed, and we have your**
> **confession, we can use your confession.** There
> was nothing of any of that nature that goes
> toward that issue that would show that the
> first confession was a significant inducement
> to get the second statement from Mr. Brown.
>
> Further, the record is clear that Judge
> Frusciante considered the **shackles, handcuffs,**
> **the mental status of Mr. Brown,** all in
> totality in determining whether or not to
> grant [the] motion to suppress the second
> statement or not. And it is this Court's
> ruling at this time that there is no basis by
> which I would disagree with the ruling of
> Judge Frusciante, and accordingly the request
> I take it for reconsideration of the issue, is
> denied.

(T 1624-1627) (emphasis supplied).

16. In **Claim B of the 1999 Amended Petition**, Brown asserts
that his confession was not voluntary because he was coerced
physically and psychologically to waive his Miranda rights. In
support of this claim, Brown points to (a) his age (15 at the time
of his July 1991 confession); (b) his IQ and "passive-compliant
personality; (c) the interrogation without the benefit of his
mother being present; (d) the small interrogation room; (e) the use
of handcuffs and shackles; (f) being struck in the face by
Detective Carr during the interrogation; (g) being a battered
child, thus he placated his abuser, Detective Carr, by confessing;
(h) having suffered multiple head injuries; (i) being suicidal; (j)

14

the fact that he **may** have been suffering auditory hallucinations during the interview (k) being threatened with the electric chair; (l) being informed that Keith King had implicated Brown in the murder; (m) being told others had implicated Brown in the murder; (n) being told he had to confess because he had confessed on November 15, 1990; (o) being shown crime scene photographs and being fed other information; (p) giving inaccurate information when compared with Keith King's statement.

17.   Whether a confession was voluntary depends upon the "totality of the circumstances," including "the crucial element of police coercion," "the length of the interrogation", "its location", "its continuity," "the defendant's maturity," "education," "physical condition," and "mental health," as well as "the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation." Withrow v. Williams, 507 U.S. 680, 693-94 (1993). The instant record refutes the allegations of abuse and/or coercion. However, the record does not address directly Brown's claims that he suffered multiple head injuries, was suicidal, and may have been experiencing auditory hallucinations when interviewed (**1999 Amended Petition 59 ¶ 87h-j**) as these matters were not presented to the state court.[8] Each contested allegation of **Claim**

---

[8]   While Brown did not present these claims to the state trial court, the record reflects that he showed no signs of mental illness, gross organic brain damage, or that he was not

**B of the 1999 Amended Petition** will be addressed below.  Where the record refutes the claim, citations will be given.

18.   In **sub-claim b**, Brown complains that given his IQ and passive-compliant personality, his confession was coerced (**1999 Amended Petition 58 ¶ 87b**).  The record established that Brown's psychology expert, Dr. Koprowski, stated she believed Petitioner's words could be twisted, not that the police twisted them; in fact, the police could not get Brown to agree to something that is fantastic and not based in reality. (T 193).  While the doctor opined Brown was led easily and was "passive compliant", she did not state he lied to hide his lack of comprehension; instead, **speaking in generalities**, the doctor reported that **some people** who are "passive compliant", **may** be "compliant in a situation rather than frankly show their ignorance." (T 193).  As such, the record refutes Brown's assertion that his mental condition led to a coerced confession.

19.   In support of the claim that his confession was involuntary, Brown points to the fact that his mother was not present during his interrogation (**1999 Amended Petition 58 ¶ 87c**).

---

grounded in reality (T 187-90).  Brown has failed to explain how his alleged prior head injuries, suicidal tendencies, or possible auditory hallucinations established that his confession was coerced.  Without more, Brown has failed to plead his claim sufficiently.  This, along with the fact that such allegations were not presented to the state court, makes the allegations suspect and this Court should decline to considered these unexhausted factual assertions in this claim.

16

Although Dr. Koprowski stated Brown had confided to her that he wished he had his mother during questioning (T 191), such comment was made after the fact, and after he was facing murder charges. (T 191). Conversely, both the taped interview and Detective Carr's testimony established Brown did not want his mother present during questioning. (T 148, 278, 289). According to Sergeant Scheff, while Mrs. Brown was called and came to the office, she did not ask to see her son. (T 148, 166-168). Moreover, the detectives who were interviewing Brown did not know his mother arrived until the interrogation was completed. (T 363, 398-399). There is no testimony supporting the allegation that the detectives mis-led Mrs. Brown or that Petitioner expressed a desire to have his mother present.

20. With respect to Brown's claim that he was questioned in a "small padded room" and that it "created an extremely coercive environment" (**1999 Amended Petition 58 ¶ 87d**), the record conclusively refutes the allegation. The interview room was approximately ten-by-ten or twelve-by-twelve, with central air-conditioning, fluorescent lighting, a desk, and a few chairs. (T 1725). Brown has not shown how the interview room created a coercive environment.

21. Likewise, the claim that Brown was handcuffed and shackled to the floor (**1999 Amended Petition 58 ¶ 87e**) is not supported by the record. Conversely to Brown's position, the

17

record reveals he was not handcuffed; however, he may have been shackled, but not to the floor. Scheff stated no restraints were used (T 34) while Carr stated leg shackles were used as part of standard operating procedure (T 281-282). While Thomasevich agreed shackles were used, and initially testified that to the best of his recollection Brown was attached to the floor, Thomasevich then remembered the floor ring had been removed by the time of the interview. (398 and 403). Clearly, handcuffs were not employed during the interview process and if shackles were used, they did were not attacked to the floor. In fact, this Court should find that the state trial judges who reviewed this issue found that restraints were not coercive.

22. Brown also maintains that he "was brutally struck in the face and knocked backwards by Detective Carr...." and that he was threatened with the electric chair (**1999 Amended Petition 59 ¶ 87f, g, and k**). The record evidence established that Brown was never abused physically while in police custody. Not only did Brown fail to make this allegations during the motion to suppress, but the record establishes that no physical or mental abuse took place. No officer threatened Brown. (T 34, 274-277, 280-282, 367-368, 375). In fact, he was permitted to use the restroom and was given soda and pizza. (T 274-275, 367-368). During his confession, Brown admitted he was comfortable, had been treated well and not treated, had been permitted to use the restroom, and had been given

18

cigarettes and water (T 1747).  Additionally, because there is no proof of any mental or physical abuse, Brown has not established that even if he were a "batter child", such caused him to "crumble" when confronted by the interrogating police officers.  There is no basis for overturning the ruling of the trial court that Brown's confession was voluntary.

23.  In **sub-claims h-j**, Brown asserts that he sustained head injuries inflicted by his abusive father, was suicidal at the time of his arrest, and may have been suffering from hallucinations (**1999 Amended Petition 59 ¶87h-j**).  While these allegation were not made in the state court, Dr. Koproski, Brown's mental health expert, reported the results of her psychological examination. According to Dr. Koproski, Brown's father was a commercial truck driver and "so apparently there were things, resources"; Brown "had everything he wanted in terms of clothes and a stereo." (T 205). However, Brown's father was also brutal toward his children; he "used to beat" Brown (T 205).  The doctor's psychological examination of Brown revealed no signs of mental illness or organic brain damage (T 187-90).  Further, Brown was grounded in reality and was competent to stand trial (T 193-94).  Clearly, the trial court rejected Brown's mental health factors as impacting the voluntariness of the confession.

24.  In Brown's **sub-claim l**, he suggests that the police coerced a statement from Keith King which implicated Brown in the

murder of Deputy Behan and that the police knew King's statement was false (**1999 Amended Petition 59 ¶ 871**).   While information obtained from King's June 4, 1991 statement was utilized in the investigation, there is no proof BSO believed the statement to be false nor is there proof King's statement was coerced. (T 160-161). Conversely, there were sufficient similarities between the two statements which indicated that Brown and King were recounting the same event.   Although acknowledging the statements contained inconsistencies, Scheff believed them to be of evidentiary value. He explained:

> Well, they both indicated -- first of all,
> they both named each other which I think was
> of primary importance.   They both described
> this attempt to go out and shoot somebody,
> almost a random, meaningless type of crime.
> They arrived on the bicycle together, one of
> them is being carried on the handle bars the
> other one is riding by --
>
> ...
>
> And they also agreed on -- again for whatever
> it is worth, the type of weapon that was used.

(T 160-161).   Hence, there is no basis for finding Brown's confession coerced merely because the police allegedly informed Brown that King had implicated him in the murder.   Habeas relief is inappropriate.

25.   Likewise, there is no validity to the claim that coercion should be found based upon Brown knowing that "other individuals" had come forward with information about Brown's involvement in the

murder (**1999 Amended Petition 59 ¶87m**).  There is no proof that all
of the statements from the "other individuals" were false or
coerced.  While some of these individuals may have changed their
stories, such does not establish coercion or falsity. (T 359-360).
While one witness, Andre Butler, recanted before the grand jury and
claimed he had been threatened by the police, Carr asserted the
allegations of threats were "totally false" (T 359-360).

26.  Brown's assertions that he was reminded of his November
15, 1990 (which was later suppressed) and that he was shown crime
scene photographs during his unrecorded pre-interview with the
police (**1999 Amended Petition 59 ¶87n and o**) do not support a
finding that the confession was involuntary.  The record reveals
that at no time was Brown threatened, coerced, or "fed" information
in order to get him to confess. (T 34, 160-1961, 274-277, 280-282,
367-368, 375, 399, 1736, 1747).  Although Carr and Thomasevich
spoke to Petitioner off tape for an hour, they did not show him
crime scene photographs until after they had obtained a verbal
statement. (T 399).  With respect to the allegation that the
detectives used the November 1990 confession, the trial court made
the finding:

> There has been no finding by Judge Frusciante,
> my predecessor, that the first statement was
> coerced.  There is nothing in the record that
> indicates that it was as a result of the
> inducement of the officers indicating to Mr.
> Brown that he, in fact, or he had already
> previously confessed, and we have your
> confession, we can use your confession.  There

21

> was nothing of any of that nature that goes
> toward that issue that would show that the
> first confession was a significant inducement
> to get the second statement from Mr. Brown.

(T 1626-1627). Clearly, the trial court's rejection of Brown's pre-trial motion to suppress his confession was a rejection of the claim that the police fed Brown information or coerced him into confession based upon the suppressed November 15, 1990 confession. See Tankleff v. Senkowski, 135 F.3d 235, 244-45 (2d Cir. 1998) (rejecting assertion that reminding defendant of prior un-Mirandized confession was of such force as to coerce second confession given after Miranda warnings). Brown is not entitled to another hearing on this matter or habeas relief.

27. As his last sub-claim, Brown admits that while he correctly recounted certain crime scene facts in his confession, others are demonstratively false (**Amended Petition 59-60 ¶87p, 1-4**). For support, he points to (1) his confessed friendship with Keith King, (2) the mode/direction of escape, (3) the number of times the gun was discharged, and (4) where the murder weapon was discarded. The allegation that certain facts did not support Brown's confession does not establish that the confession was coerced. What such alleged discrepancies suggest is that Brown either was intentionally deceptive or mis-remembered events. Nonetheless, the discrepancies do not support a finding of coercion; especially were other corroborating facts exist to establish Brown's involvement in the murder of Deputy Behan.

22

28. As recounted by Sergeant Scheff, BSO did not have a prime suspect after Jackie Bain (a person who claimed in the alternative that either she or another man killed the deputy) was institutionalized (T 134-35). BSO had no prime suspects until Brown was taken into custody (T 135). Prior to Brown's July 1991 arrest, BSO received calls from Alvis Crostwaite and Solomon Gibbs about Brown complicity in the homicide (T 135-37). Scheff explained the facts known to BSO before July 1991 as follows:

> Keith King, Keith King was probably the best single break that we received, at least in my opinion, in the case was when Detectives Thomasevich, and Carr were able to establish that the Keith -- that people were talking about the witnesses, were talking about that the Keith [Brown] had spoken to was not Keith Maddox, but another Keith, another young man named Keith King
>
> . . .
>
> And my detectives had, in fact, had an opportunity to take a post <u>Miranda</u> statement from **<u>Keith King in which he admitted his involvement and identified Tim Brown as being another person involved in the death and murder of Patrick Behan</u>** which was known to us on July 16th.

(T 33)(intervening question omitted) (emphasis supplied). Also, Scheff offered that although there were some inconsistencies in the **<u>statements of Brown and Keith King, they were generally consistent</u>**, "when one reads both statements, one can come away with the fact that **<u>the two individuals are talking about a similar event</u>**." (T 141, 144-145) (emphasis supplied). Scheff believed that the

statements had evidentiary value because:

> ... they **both named each other** which I think
> was of primary importance. They **both**
> **described this attempt to go out and shoot**
> **somebody**, almost a **random, meaningless type of**
> **crime**. They **arrived on the bicycle together**,
> one of them is **being carried on the handle**
> **bars** the other one is riding by --
>
> ...
>
> And they also agreed on -- again for whatever
> it is worth, the **type of weapon that was used**.

(T 160-61) (emphasis supplied).

29. Petitioner has not shown how the discrepancies between his statement and King's was "demonstratively false" or that these inconsistencies established a constitutionally infirm confession. The confessions were sufficiently consistent, especially on the salient points such as who the co-defendant's were with on the night of the murder, how they traveled together, the fact that they shot someone, and the reason for the killing. Brown has not proven his claim of constitutional error.

30. The record before both the judge hearing the suppression motion and the trial judge revisiting such motion, established that from the totality of the circumstances, Brown's confession was obtained properly. (T 441-443 and 1624-1627). Brown was not physically or mentally coerced by the police; no threats were made against Brown, he was not handcuffed, and no information was "fed" to him. (T 34, 160-61, 274-77, 280-82, 367-68, 375, 398-403, 1725,

24

1736, 1747).  While he was 15 at the time of his arrest and mildly retarded, his own expert psychologist agreed that a low I.Q. score did not mean Brown could not understand his rights (T 228-229).  In fact, the doctor stated Brown understood his rights, "I think it is totally misrepresenting his level of ability to say he wouldn't know what an attorney is or wouldn't know right from wrong or any of those issues." (T 240).  Dr. Koproski found Brown was grounded in reality, showed no signs of gross organic brain damage or mental illness (T 187-88, 193).  It was the doctor's opinion that Brown was competent to stand trial (T 194).  Further, Petitioner had been interrogated for other criminal matters (T 240) and the approximate length of the instant interrogation was 80 minutes during which time he was permitted to use the restroom and was given food and water. (T 367-368).

31.  Without question, a full and fair hearing was rendered on this matter by the state trial court.[9]  Based upon the record provided, it is clear that the trial court properly rejected Brown's claim that his confession was coerced.  As noted by the suppression hearing judge:

> … And the intelligence certainly I think is relevant, and in some other cases referring to children as young as ten years old IQ's may be a little bit higher I think 68, 69, 70 someplace in that area, but it was a ten year-old as opposed to a 15 year old, and that

---

[9] As this Court will recall, this issue was not presented to the state appellate court.

25

wasn't sufficient enough to suppress the statement.

Although as you mentioned, Counsel, the State did not impeach the doctor, the fact is that **I think much of what she said led the Court to believe this defendant had the mental capacity to understand the <u>Miranda</u> warnings that were given to him, and much of what he did not do well in school may have in fact been brought about by his not attending....**

That's not a problem here again that this Court needs to address. It appears clear that in the first statement [Petitioner] was intoxicated and I see nothing in the statement that drugs were mentioned in <u>Brewer</u>. I see nothing in the second statement that shows signs of that at all. **I believe that the defendant freely and voluntary (sic) and knowingly and intelligently waived his rights in the second statement....**

(T 441-443). When the motion to suppress was renewed, the trial court ruled:

Further, the record is clear that Judge Frusciante considered the shackles, handcuffs, the mental status of Mr. Brown, all in totality in determining whether or not to grant [the] motion to suppress the second statement or not. And it is this Court's ruling at this time that there is no basis by which I would disagree with the ruling of Judge Frusciante, and accordingly the request I take it for reconsideration of the issue, is denied.

(T 1626-1627). The trial court's explicit and implicit findings are supported by the record and should be afforded a presumption of correctness. <u>Marshall v. Loneberger</u>, 459 U.S. 422 (1983) (noting that federal court may presume trial court's failure to grant

26

relief is an express finding against the credibility of a witness where it is clear relief would have been granted had the trial court believed the witness); Townsend v. Sain, 372 U.S. 293, 314 (1963) (permitting federal habeas court to "reconstruct" state trial court's view of facts where plain from ruling or other indicia); Tejada v. Singletary, 941 F.2d 1551, 1563 (11 Cir. 1992); Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991).

32.  Moreover, there is no proof of physical or mental police coercion.  The trial court was informed of the interview room dimensions, the manner in which Brown was treated, his age, education and mental ability.  The totality of the circumstances led the trial court to find that the confession was not coerced. See Connelly, 479 U.S. at 167 (discussing proof of police coercion necessary to suppress confession); Clewis, 386 U.S. 707, 712 (finding that defendant's education is a factor to be considered in determining voluntariness of confession); Reck v. Pate, 367 U.S. 433, 441 (1961) (taking into account defendant's mental and physical condition, the length of confinement before confession and the location where the interrogation took place when determining voluntariness of confession); Fikes, 352 U.S. at 196 (taking into consideration defendant's mental health condition when assessing voluntariness of confession); Ashcraft, 322 U.S. 143, 153-54 (1944) (considering length of time of interrogation to determine voluntariness of confession).  Clearly, the trial court considered

27

the allegation the confession was obtained through coercion. However, the trial judge determined there was no evidence that Brown was coerced into confessing to the murder. After hearing extensive testimony, the court considering the motion to suppress found Brown had the mental capacity to understand his rights, that he was not intoxicated when questioned, and there was no coercion. (T 441-443). Additionally, when the motion was reconsidered by a different judge at trial, it was determined that Brown's prior contact with the police was not used in a coercive manner or as an inducement for the July 1991 confession. Moreover, neither Brown's mental state nor the use of shackles, required a finding of coercion. (T 1624-1627). Because the state court findings are afforded a presumption of correctness, Miller v. Fenton, 474 U.S. at 109, and there is no evidence the State forced Brown to admit his involvement in the murder, this Court should find the confession was obtained properly. Brown's constitutional rights were not violated and the admission of the confession at trial was correct. He is entitled to no relief. Connelly, 479 U.S. at 157.

33. Additionally, this Court should resolve the instant claim based upon the extensive and clear record; new facts may not be introduced at this stage of the proceedings and an evidentiary hearing on this matter is improper. Baldwin v. Johnson, 152 F.3d 1304 (11th Cir. 1998) (ruling petitioner not entitled to evidentiary hearing in order to develop facts he failed to show in

28

state court absent demonstrating cause and prejudice for the failure); <u>Mathis v. Zant</u>, 975 F. 2d. 1493 (11th Cir. 1992) (reversing district court's decision allowing petitioner to submit additional evidence and granting relief based on new evidence because petitioner failed to show cause and prejudice before district court reviewed evidence not presented in state court).

34.   In **Claim B of the Third Amended Petition**, Brown maintains that his confession was not knowingly and intelligently given (Third Amended Petition 49).   To support this claim, Brown cites ten factors[10]: (a) he was 15 at time of his arrest; (b) his I.Q. was 56; (c) juveniles of similar age and normal intelligence do not understand some of their <u>Miranda</u> rights; (d) black juveniles of similar age and substandard intelligence have poor comprehension of their <u>Miranda</u> rights; (e) there is no relationship between prior exposure to <u>Miranda</u> rights and an increase in an individual's

---

[10]   The State renews its argument presented in its Response to the Third Amended Petition, which has yet to be ruled on by this Court, that the inclusion of new facts in Claim B of the Third Amended Petition makes that petition a mixed petition, containing exhausted and unexhausted claims.   To the extent that **sub-claims c, d, and f** address how other individuals understand <u>Miranda</u> rights, these claims were not presented to the state courts at the trial or appellate levels and were not presented in the 1999 Amended Petition.   They should be stricken from this Court's consideration of this claim.   **Sub-claims e and i** were presented in part to the state courts, however, they were not presented as part of Claim C of the 1999 Amended Petition, thus, they should not be considered here as their inclusion is in violation of this Court's order that Claim C (as presented in the 1999 Amended Petition) was to be included in the Third Amended Petition.   The State does not waive any of its procedural defenses asserted here and previously.

understanding of those rights; (f) individuals with I.Q. scores comparable to Brown's do not learn by thinking/analyzing; (g) Brown read below the Third Grade level - he could not read the waiver of rights form and could not understand what it contained; (h) Brown had severe deficits in his verbal intelligence, thus, he could not understand the abstract concepts contained in his <u>Miranda</u> rights; (i) Brown did not understand the consequences of being interviewed without an attorney or his mother present (he wanted his mother during the interview); (j) Brown's poor overall functioning combined with his abusive home environment, stress of arrest/interrogation made it difficult to process information concerning his rights.   It is the State's position that Brown knowingly and intelligently waived his <u>Miranda</u> rights and confessed to the instant homicide.   Respondent disagrees that Brown's age, mental capacity, and reading ability in this instance establish his claim.   Relief should be denied.

35.   As a preliminary matter, **sub-claims c, d, and f** (**Third Amended Petition 50 ¶62c, d, f**) are addressed to how other persons of similar age, race, and mental ability as Brown would understand <u>Miranda</u> warnings or analyze a situation.   How other persons with similar personal characteristics would respond to or understand their <u>Miranda</u> rights is not a proper inquiry.   As noted by the Second Circuit Court of Appeals:

> A class-based facial challenge also is
> not the appropriate remedy for plaintiffs'

>Fifth Amendment challenge because the voluntariness of a confession depends upon an examination of the totality of circumstances in each individual case, *see Haynes*, 373 U.S. at 513-14, 83 S.Ct. 1336, including whether *Miranda* warnings were properly administered or waived, whether counsel was present, whether the defendant knew the nature of the offense with which he was charged, and the time elapsing between arrest and the confession, see 18 U.S.C. § 3501(b). Other relevant factors to be considered include the characteristics of the accused; the conditions of the interrogation and; the conduct of the law enforcement officials. *See Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041. Courts are directed to consider "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* (citations omitted). Given the varying backgrounds of the juveniles questioned by the Squad, the Squad's practices may be constitutional with respect to some juveniles but unconstitutional with respect to others.

Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 347-48 (2d Cir. 1998). Clearly, the focus must be on Brown and how he comprehended and waived his rights. As such, the fact that other black, mentally challenged teenagers with I.Q.'s in the 50's may not understand their Miranda rights gives no insight into how Brown comprehended his rights. There is no valid basis for opening up the inquiry to evidence how another individual would have chosen to exercise his Miranda rights.

    36. Because several of the issues presented in this claim

overlap with those presented in Claim B of the 1999 Amended Petition, the State reincorporates its analysis presented above. Further, the State directs this Court's attention to the fact that Petitioner's expert, Dr. Koprowski, testified that she found Brown was grounded in reality and that he showed no signs of gross organic brain damage or mental illness (T 187-88, 193). It was the doctor's opinion that Brown was competent to stand trial (T 194). She also opined, "I think it is totally misrepresenting [Brown's] level of ability to say he wouldn't know what an attorney is or wouldn't know right from wrong or any of those issues." (T 240). Moreover, it was pointed out that Brown had been through the criminal justice system before the Behan shooting and had been represented by counsel (T 228-231). In fact, as the trial judge noted during sentencing, even before the murder trial commence, Brown had approximately 30 juvenile and adult misdemeanor and felony conviction. The record established that his poor grades and reading ability may have been due in part to his lack of attendance at school more than just his mental capacity. (T 223-224). Dr. Koprowski admitted that a low I.Q. score did not mean Petitioner could not understand his rights, but that the totality of the circumstances had to be reviewed in order to determine whether Brown understood his rights. (T 228-229). The doctor's examination concluded with the following:

> [DEFENSE COUNSEL]: And when we're saying on
> direct examination that Tim Brown is easily

32

led and that he can be coerced into saying
anything by these authority figures such as a
police officer, were you saying that
concretely he wouldn't know what an attorney
was?

[DR. KOPROWSKI]:     No, no.   [Petitioner] does
understand those things.    I think it is
totally misrepresenting his level of ability
to say that he wouldn't know what an attorney
is or wouldn't know right from wrong or any of
those issues.    He had been questioned by
attorneys, by police before, and I think he
felt that this was, if I said what they wanted
him to say and I am not speaking to the
variety (veracity) of it, just his attitude,
that if he said what they wanted him to say,
it would be over and he would be going on as
he had before.

(T 240).

        37.    In <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986), the

Supreme Court stated:

        Echoing the standard first articulated in
        *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct.
        1019, 1023, 82 L.Ed. 1461 (1938), *Miranda*
        holds that "[t]he defendant may waive
        effectuation" of the rights conveyed in the
        warnings "provided the waiver is made
        voluntarily, knowingly and intelligently."
        384 U.S., at 444, 475, 86 S.Ct., at 1612,
        1628.    The inquiry has two distinct
        dimensions. *Edwards v. Arizona, supra*, 451
        U.S., at 482, 101 S.Ct., at 1883; *Brewer v.
        Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232,
        1242, 51 L.Ed.2d 424 (1977).    First, the
        relinquishment of the right must have been
        voluntary in the sense that it was the product
        of a free and deliberate choice rather than
        intimidation, coercion, or deception.  Second,
        the waiver must have been made with a full
        awareness of both the nature of the right
        being abandoned and the consequences of the
        decision to abandon it.  Only if the "totality
        of the circumstances surrounding the

> interrogation" reveal both an uncoerced choice
> and the requisite level of comprehension may a
> court properly conclude that the *Miranda*
> rights have been waived. *Fare v. Michael C.*,
> 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61
> L.Ed.2d 197 (1979). *See also North Carolina
> v. Butler*, 441 U.S. 369, 374-375, 99 S.Ct.
> 1755, 1758, 60 L.Ed.2d 286 (1979).

The reviewing court must look to the defendant's individual

characteristics and police action in determining whether there has

been a knowing and intelligent waiver. See <u>Henderson v. DeTella</u>, 97

F.3d 942, 948-49 (7th Cir. 1996) (concluding waiver was knowing and

intelligent; in spite of fact that defendant had a below-average

I.Q. and limited reading abilities, the evidence showed defendant

was able to comprehend and waive his rights, was competent to stand

trial, was cooperative and understanding of what transpired on day

of his arrest, and had acknowledged his rights when they were read

to him by the police); <u>Correll v. Thompson</u>, 63 F.3d 1279, 1288 (4th

Cir. 1995) (finding waiver of rights knowing and intelligent where

24 year old "streetwise" defendant with 68 I.Q. and numerous

experiences with police and <u>Miranda</u> warnings); <u>Vance v.

Bordenkircher</u>, 692 F.2d 978, 981 (4th Cir. 1982) (finding 15 year

old defendant with 62 I.Q., moderate mental deficiency, and mental

age of nine, had knowingly waived his rights where he was not

restricted from seeing mother, who was aware of son's arrest and

voluntarily chose not to accompany him to jail, and confession was

not result of extended interrogation or improper police pressure or

tricks); <u>United States v. Young</u>, 529 F.2d 193, 195 (4th Cir. 1975)

34

(noting defendant's "below-average I.Q., limited education and reading problems" are not the determinative factors in assessing the voluntariness of a waiver; instead, the "totality of the circumstances surrounding the waiver" must be assessed).

38. As found by the state court, Brown "had the mental capacity to understand his <u>Miranda</u> warnings that were given him", he was not under the influence of intoxicants at the time he gave his July 1991 statement, and that Brown gave a free and voluntary statement. (T 441-443). At trial, the court found that there was no evidence the November 1990 statement was used as an inducement for the July 1991 statement.   Further, the use of shackles was considered and rejected. (T 1624-1627).   The record also supports the conclusion that there was no coercion, physical abuse, or mental terror.  Brown was advised of his rights both verbally and in writing.   The length of his detention was short before he admitted his guilt; Brown was with the detectives for approximately 25 minutes before he confessed in the pre-taped interview while the total interrogation lasted approximately 80 minutes (T 1730-1731). In fact, during this short time in police custody, Brown was permitted to use the bathroom and was given sodas and pizza. (T 367-368).   Finally, his age, scholastic aptitude, and mental capacity did not preclude him from comprehending his rights or from making the knowing decision to talk to the police without an attorney, as was acknowledged by Petitioner's own psychologist. (T

35

187-94, 228-229, 240).

39.   As noted above, in considering a federal habeas petition, the state court's findings of fact are presumed correct.  <u>Miller v. Fenton</u>, 474 U.S. at 109; <u>See</u> <u>Jones v. Page</u>, 76 F.3d 831, 852 (7th Cir. 1996), <u>cert. denied</u>, 519 U.S. 951 (1996) (affording state court's factual conclusions presumption of correctness).  Giving the state court's findings the presumption of correctness they deserve, the totality of the evidence reveals Petitioner's confession was not coerced, but was given knowingly and intelligently after <u>Miranda</u> warnings had been waived.  This Court should deny Petitioner's requested relief.  <u>Connelly</u>, 479 U.S. at 167; <u>United States v. Rohrbach</u>, 813 F.2d 142, 144 (8th Cir.1987). Brown is not entitled to habeas corpus relief.

40.   In Brown's **Claim D of the 1999 Amended Petition**, he asserts that the trial court instructed the jurors improperly by informing them that Brown was facing a life sentence with a minimum mandatory term of 25 years imprisonment (**1999 Amended Petition 61**). Without support, Brown claims that this influenced the jury causing them to reach a guilty verdict where one would not have been reached otherwise.   The State disagrees.   The jury was never instructed to consider the possible sentence Brown faced.   Relief should be denied.

41.   Reference to a possible sentence was made at the request of defense counsel, and as a preliminary comment to the venire

36

before jury selection commenced (T 456, 462, 2560-61).   There was no objection to this statement until defense counsel raised the issue as part of his request for a reduced sentence (T 2561). Habeas relief is not warranted.

42.   Brown's defense at trial and reiterated in closing argument was that he did not kill Behan (T 2458).   Defense counsel told the jury that the State wanted the jury "to lock this kid up for the rest of his life...." (T 2482).   However, prior to deliberations and as part of the formal jury instruction, the jurors were instructed: "This case must be decided only upon the evidence that you heard from the answers of the witnesses, have seen in the form of exhibits introduced into evidence and **these** instructions."   Further, the trial court instructed the jury that: "**Your duty is to determine if the defendant is guilty or not guilty** in accordance with the law.   **It's my responsibility to determine what a proper sentence** would be if the defendant is guilty." (T 2526-27) (emphasis supplied).

43.   When faced with a constitutional challenge to a jury instruction in a habeas petition, the reviewing court must determine whether the alleged error was of constitutional dimension and if so, whether it was harmless. Calderon v. Coleman, 525 U.S. 141, 145-46, (1998).   Under Boyde v. California, 494 U.S. 370, 377-380 (1990), a constitutional error exists only where "there is a reasonable likelihood that the jury has applied the challenged

37

instruction in a way that prevents the consideration of constitutionally relevant evidence" or where there is a reasonable likelihood the instruction was ambiguous and it was reasonable that the jury misconstrued the instruction to prevent consideration of constitutionally relevant evidence. Id. at 377-380. See Victor v. Nebraska, 511 U.S. 1, 6 (1994) (stating "[t]he constitutional question in the present cases ... is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the [constitutional] standard"); Estelle v. McGuire, 502 U.S. 62, 72, and n. 4 (1991) (clarifying that the proper inquiry with respect to jury instruction is not whether instruction "could have" been applied unconstitutionally, but whether there is a reasonable likelihood that jury applied it in unconstitutional manner); Cage v. Louisiana, 498 U.S. 39 (1990) (finding jury instruction unconstitutional where there is reasonable likelihood that jurors understood the instruction to permit a conviction absent proof beyond a reasonable doubt).

44. Still, even finding an instruction is not constitutional does not end the inquiry. In order to grant relief, the unconstitutional instruction must be tested for its effect upon the jury under a harmless error analyzed. See Brecht v. Abrahamson, 506 U.S. 619, 637-38 (1993); O'Neal v. McAninch, 513 U.S. 432, 435-36 (1995) (employing harmless error test to instruction which

38

"violated the Federal Constitution by misleading the jury").  "The
court must find that the error, in the whole context of the
particular case, had a substantial and injurious effect or
influence on the jury's verdict." Coleman, 525 U.S. at 147.

45.  As reasoned in Coleman:

> We held in *Brecht* that a federal court
> may grant habeas relief based on trial error
> only when that error " 'had substantial and
> injurious effect or influence in determining
> the jury's verdict.' " 507 U.S., at 637, 113
> S.Ct. 1710 (quoting *Kotteakos v. United
> States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90
> L.Ed. 1557 (1946)). This standard reflects
> the "presumption of finality and legality"
> that attaches to a conviction at the
> conclusion of direct review. 507 U.S., at
> 633, 113 S.Ct. 1710. It protects the State's
> sovereign interest in punishing offenders and
> its "good-faith attempts to honor
> constitutional rights," *id.*, at 635, 113 S.Ct.
> 1710, while ensuring that the extraordinary
> remedy of habeas corpus is available to those
> " 'whom society has grievously wronged,' "
> *id.*, at 634, 113 S.Ct. 1710 (quoting *Fay v.
> Noia*, 372 U.S. 391, 440-441, 83 S.Ct. 822, 9
> L.Ed.2d 837 (1963)).
>
> A federal court upsets this careful
> balance when it sets aside a state-court
> conviction or sentence without first
> determining that the error had a substantial
> and injurious effect on the jury's verdict....
> The State is not to be put to this arduous
> task based on mere speculation that the
> defendant was prejudiced by trial error; the
> court must find that the defendant was
> actually prejudiced by the error. *Brecht,
> supra*, at 637, 113 S.Ct. 1710.

Coleman, 525 U.S. at 145-46.

46.  Here, Brown claims that the instruction was erroneous and

"since [the jury] already had doubts as to whether the evidence was sufficient -- [the instruction] could have influenced their decision-making process" (**1999 Amended Petition 61 ¶93**). Brown's claim must fail because the jury was **never instructed** to consider Brown's possible sentence or that Brown could be paroled after 25 years. In fact, the jurors were told that they were not to consider Brown's possible sentence during deliberations (T 2526-27). However, should the Court consider a comment made at the start of jury selection as an instruction, such does not amount to an error of constitutional dimension requiring relief.

47. Pursuant to section 775.0823, Florida Statutes (1990), a person charged with first-degree murder of a law enforcement officer engaged in the lawful performance of his duties, where the State did not or could not seek the death penalty, faced life imprisonment without parole. While, the trial court's pre-trial comment noting the possibility of parole was inaccurate (T 456, 462), it did not interfere with the jury's ability to considered constitutionally relevant evidence. It did not interfere with the jury's determination of Brown's guilt. Moreover, sentencing in a non-capital case is the sole province of the trial judge. <u>Justice v. State</u>, 658 So. 2d 1028, 1030 (Fla. 5th DCA 1995) (recognizing that "sentencing, so long as it is within the statutory maximums, has traditionally been the province of the trial court"), overruled on other grounds, 674 So. 2d 123 (Fla. 1996). As such, the

40

instruction given during jury selection must not be deemed unconstitutional under the facts of this case.

48. Here, the sworn jurors were not informed again of the sentence Brown faced upon conviction (T 2513-31), instead, when instructed before deliberations, the jury was told that the possible sentence was not its concern (T 2526-27). "A single instruction is not viewed in isolation, but in the context of the overall charge." United States v. Harrison, 34 F.3d 886, 889 (9th Cir. 1994). The jury was told to make a determination of guilt or innocence based upon the evidence and the present instructions (T 2526-27). Thus, there can be no question but that the pre-trial information was at worst harmless error.

49. All Brown brings forward is "mere speculation" as to how the sworn jury treated the pre-trial sentencing information. This is an insufficient basis for overturning a conviction especially where the jury was told not to consider sentencing issues and that the sole issue before it was the factual guilt or innocence of Brown.[11] Clearly, the jury was well aware of its responsibilities under the law as instructed by the judge just before deliberations. There is no evidence that Brown was prejudiced by any preliminary

---

[11] Further, the defense, in closing, noted that Brown faced life imprisonment then reminded the jury that the entire defense case focused upon the theory that Brown was not involved, that there was no credible evidence, including his confession, tying him to the homicide, and that the murder may have been linked to a scandal involving other BSO deputies (T 2448-86).

41

jury selection comment made by the trial court in this case. Coleman, 525 U.S. at 146 (concluding that "mere speculation that the defendant was prejudiced by trial error" is not sufficient to warrant habeas relief); Brecht, 507 U.S. at 637 (same). This Court should deny Brown relief.

50. **Claims E - K** address various aspects of trial and appellate counsel's representation. In order for Brown to obtain relief, he must show by a preponderance of competent evidence that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. 688, 688-94. See Williams v. Taylor, 120 S.Ct. 1495, 1511 (2000); Darden v. Wainwright, 477 U.S. 168 (1986); Chandler v. U.S., 218 F.3d 1305, 1312-13 (11th Cir. 2000).

51. The standard for evaluating "counsel's performance is 'reasonableness under prevailing professional norms.'" Chandler, 218 F.3d at 1313 (quoting Strickland, 466 U.S. at 688). However, "[t]he test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is ... whether what they did was within the 'wide range of reasonable professional assistance.' " Waters v. Thomas, 46 F.3d 1506, 1518 (11th Cir. 1995) (citations omitted). See Burger v.

42

Kemp, 483 U.S. 776 (1987).

52.  Under Strickland, "[j]udicial scrutiny of counsel's performance must be highly deferential." See Bolender v. Singletary, 16 F.3d 1547, 1557 (11th Cir. 1994).  The fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel. Chandler, 218 F.3d at 1314.  "[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'" Chandler, 218 F.3d at 1314 (quoting Darden v. Wainwright, 477 U.S. 168 (1986).  Explaining its definition of "strategy", the Eleventh Circuit Court of Appeals stated:

> trial counsel's course of conduct, ... was neither directly prohibited by law nor directly required by law, for obtaining a favorable result for his client.  For example, calling some witnesses and not others is 'the epitome of a strategic decision.' [Waters, 46 F.3d at 1512] (en banc); see also id. at 1518-19 (en banc); Felker v. Thomas, 52 F.3d 907, 912 (11th Cir. 1995) (whether to pursue residual doubt or another defense is strategy left to counsel, which court must not second-guess); Stanley v. Zant, 697 F.2d 955, 964 (11th Cir. 1983) (stating that reliance on line of defense to exclusion of others is matter of strategy).

Chandler, 218 F.3d at 1314 n.14.  See United States v. Fortson, 194 F.3d 730, 736 (6th Cir. 1999) (denying relief on ineffectiveness claim because reviewing court "[could] conceive of numerous reasonable strategic motions" for counsel's trial actions even though the district court did not make factual findings or grant an

evidentiary).  "Counsel's competence ... is presumed, and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."  Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) (citations omitted).  "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption. Therefore, 'where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.'"  Chandler, F.3d at 1314 n. 15 (quoting, Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999).

53.  Because there is a presumption of reasonableness, in order to establish that counsel's conduct was unreasonable, the petitioner must prove "that no competent counsel would have taken the action that his counsel did take." Chandler, 218 F.3d at 1315. See Waters, 46 F.3d at 1512 (en banc) (stating "[t]he test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."); Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir.1998) (noting that counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have made such a choice").

54. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. It is well recognized that "no absolute duty exists to investigate particular facts or a certain line of defense." Chandler, 218 F.3d at 1317.

55. In the event that deficient performance is established, a petitioner is required to demonstrate prejudice before he is entitled to relief. Prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

56. Turning to the claims of ineffective assistance and without waiving any procedural defenses raised previously, the State agrees that should this Court determine that Brown has met his burden under Schlup to obtain review of these procedurally defaulted claims, an evidentiary hearing is required in some instances, while in others, the claims are insufficient as a matter of law. Each claim will be addressed in turn.

57. **Claim E of the 1999 Amended Petition**. The State agrees that an evidentiary hearing would be appropriate except for the issues raised in ¶¶ 99 c and d, 103, and 104 (1999 Amended Petition pgs. 63, 65-66).

58.   With respect to **¶99 c and d of Claim E**, this information was known by the defense mental health expert, Dr. Koproski. (T 205).  In fact, she testified that Brown's father was brutal toward his children; he "used to beat" Brown (T 205).  As such, the record refutes Brown's assertion that this information was not presented at the suppression hearing.  Neither an evidentiary hearing nor relief is required in this case.  See, Chandler, 218 F.3d at 1317-18 n. 22 (noting that no absolute duty exists to investigate particular facts or defenses and that counsel's investigation need not be exhaustive; it only needs to be reasonable).

59.   Likewise, **Claim E ¶¶ 103 and 104** do not establish a ground for relief.  As an initial matter, these sub-claims are conclusory in nature and do not state how counsel was deficient and what prejudice resulted.  Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.  See Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998) (rejecting claim of ineffectiveness because it was pled in conclusory terms); Kinnamon v. Scott, 40 F.3d 731, 735 (5th Cir. 1994) (same); Anderson v. Collins, 18 F.3d 1208, 1221 (5th Cir. 1994) (same).  As such relief should be denied.

60.   However, should the Court find the matter pled properly, the question is not which experts defense counsel could conceivably have hired to examine the defendant, but whether the investigation counsel conducted was reasonable.  Strickland, 466 U.S. at 690-91

46

(opining, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."; <u>Waters</u>, 46 F.3d at 1512 (en banc) (stating "[t]he test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."); <u>Rogers v. Zant</u>, 13 F.3d 384, 387 (11th Cir. 1994) (recognizing that <u>Strickland</u> "reflects the reality that laywers do not enjoy the benefit of endless time, energy or financial resources."); <u>Oats v. Singletary</u>, 141 F.3d 1018, 1026 (11th Cir. 1998) (rejecting petitioner's claim that trial counsel should have obtained mental health expert to testify at suppression hearing); <u>White v. Singletary</u>, 972 F.2d 1218, 1224 (11th Cir. 1992) (reasoning that "given the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense. A reasonably competent attorney often must rely on his own experience and judgment, without the benefit of a substantial investigation, when deciding whether or not to forego a particular line of defense....").  Without question, the fact that defense counsel

47

presented only one mental heath expert at the suppression hearing cannot be deemed deficient performance merely because Brown wishes that trial counsel had asked for additional experts to evaluate Brown or can identify experts specializing in other areas of mental health who may be willing to render an opinion. The fact remains that trial counsel hired an expert psychologist who examined and testified on Brown's behalf. Wilson v. Greene, 155 F.3d 396, 401-04 (4th Cir. 1998) (affirming that a defendant is not entitled effective assistance of an expert mental health witness only the due process right to access to such witness). Counsel rendered effective assistance, and Brown is not entitled to relief.

61. **Claim F of the 1999 Amended Petition**. The State agrees that an evidentiary hearing would be appropriate, but does not waive any procedural defenses raised previously.

62. **Claim G of the 1999 Amended Petition**. Without waiving any procedural defenses, the State agrees that an evidentiary hearing would be appropriate.

63. **Claim H of the 1999 Amended Petition**, is addressed to a claim of ineffectiveness arising out of trial counsel's closing argument. Brown asserts that his counsel was ineffective for not having presented a different explanation in response to the State's closing argument related to what could be seen on the video tape of the Circle K on the night of Deputy Behan's murder. Relief is not warranted as Brown has failed to show that counsel's performance

was deficient, and Brown has failed to plead prejudice arising from counsel's actions.   Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.   <u>See</u> <u>Green</u>, 160 F.3d at 1043 (rejecting claim of ineffectiveness because it was pled in conclusory terms); <u>Kinnamon</u>, 40 F.3d at 735 (same); <u>Anderson</u>, 18 F.3d at 1221 (same).

64.   In making this argument, Brown misrepresents the record when he states that the "bicycle seen passing across the video **seconds** prior to the shooting, was ... Carl Wright." (1999 Amended Motion 71 ¶120) (emphasis supplied).   With respect to the video, the prosecutor directed the jury's attention to three points on the tape counter: (1) 720 - Deputy Behan exits the Circle K to complete his report; (2) 777 - asks jury to note object on tape and reminds jury that Brown confessed to being on a bicycle; (3) 944 - gunshot heard (T 2428-29).   Based on the counter alone, it is clear that the time between counter numbers 777 and 944 was not "seconds" as suggested by Brown here.   A view of the tape confirms that it is several minutes, not seconds.   Brown's slanting of the record does not further his claim of ineffective assistance of counsel.

65.   The jury saw the video tape, could make its own determination as to what was depicted on the tape, and the amount of time between the Deputy exiting the store, another customer entering, purchasing an item, leaving the premises, and the time a

49

gunshot was heard.  Responding to the State's closing, Brown's trial counsel reminded the jury of the person who entered the Circle K just after the point (777 on tape counter) where it appeared that a bicycle was seen, was the customer, Carl Wright. Defense counsel also noted that the bicycle was hardly visible. Both these arguments were accurate and reasonable in light of the video tape evidence.  Brown's second guessing of his counsel is improper and does not comport with the dictates of Strickland.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.  See Chandler, 218 F.3d at 1314 (agreeing that reviewing court may not second-guess counsel's performance and noting that deficient performance has not been shown where counsel merely took approach others would not have taken); Provenzano, 148 F.3d at 1332 (noting that counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have made such a choice"); Waters, 46 F.3d at 1512 (stating "[t]he test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.")

66.  Moreover, as noted above, the jury was able to view the

tape and draw its own conclusions.  The jury was free to agree with
or disregard the inferences the State drew from the evidence.  It
cannot be said that absent defense counsel's rebuttal argument the
jury would not have convicted Brown.  As such, no prejudice has
been shown and relief should be denied summarily.

67. **Claim I of the 1999 Amended Petition** is addressed to
trial counsel's actions surrounding the trial judge's comment to
the potential jurors that Brown faced a life sentence without a
possibility of parole for 25 years (1999 Amended Petition at 72).
Brown has failed to show that his counsel's performance was
deficient with respect to the actual jury instructions given before
deliberations and that prejudice arose from counsel's actions.  A
habeas court may deny relief were the claim is presented in a
conclusory manner as such are insufficient to raise a
constitutional issue.  See Green, 160 F.3d at 1043 (rejecting claim
of ineffectiveness because it was pled in conclusory terms);
Kinnamon, 40 F.3d at 735 (same); Anderson, 18 F.3d at 1221 (same).

68. However, for the Court's convenience, the following is
presented.  As the State noted in its response to Claim D above,
and specifically reincorporates here, the jury was not instructed
on the sentence Brown faced.  In fact, the jury was told that the
possible sentence was not to enter its decision making process, but
that they were to determine his guilt of innocence based upon the
evidence presented at trial and the instant instruction given by

the trial court. The jury was instructed that: "This case must be decided only upon the evidence that you heard from the answers of the witnesses, have seen in the form of exhibits introduced into evidence and these instructions." (T 2526). Further, the trial court instructed the jury that: "**Your duty is to determine if the defendant is guilty or not guilty** in accordance with the law. **It's my responsibility to determine what a proper sentence** would be if the defendant is guilty." (T 2526-27) (emphasis supplied).

69. These final instructions to the jury were proper, and Brown has not alleged otherwise. Given the fact that the jury was instructed properly and is presumed to have followed the law as instructed, Brown is unable to show either deficient performance arising from the initial comment before jury selection began or prejudice arising from that comment. Raulerson v. Wainwright, 753 F.2d 869, 876 (11th Cir.1985) (noting "[j]urors are presumed to follow the law as they are instructed"). Brown is unable to show that counsel failed to object to an incorrect instruction such that deficient performance and prejudice resulted. Relief must be denied. See Johnson v. Alabama, 256 F.3d 1156, 1184-86 (11th Cir. 2001) (rejecting claim of ineffective assistance of counsel because no prejudice shown - jury was instructed properly by judge)

70. **Claim J of the 1999 Amended Petition**. Without waiving its procedural defenses, the State agrees that an evidentiary hearing would be appropriate on the issue of ineffective assistance

52

of counsel for failure to present Edward Davis as a defense witness at trial.   However, the State does not waive any procedural defenses raised previously.

71.   **In Claim K of the 1999 Amended Petition**, Brown asserts that his appellate counsel rendered ineffective assistance of counsel because a transcription error on page 1754 was not corrected.   This error is cited by Brown as the "reasonable probability" his conviction was affirmed on appeal (1999 Amended Petition at 73 ¶127).   Such pleading does not satisfy the dictates of Strickland as it is pled in conclusory terms.   See Green, 160 F.3d at 1043 (rejecting claim of ineffectiveness because it was pled in conclusory terms).   However, turning to the merits of the issue, it is clear that counsel was not deficient in failing to correct the transcription error, but even if he were, no prejudice can be shown.

72.   When the portion of the confession challenged here is read in context, it is clear what the import of Brown's statements are.   Also, in the State's closing argument, the taped confession was replayed for the jury, and the omitted word "don't" is included in the transcript.   Contrary to Brown's assertion, there is no evidence that the majority of the appellate court did not read the confession in context, recognize that there was a transcription difference between the two reproductions of the taped confession, and reason that under either reading, Brown was admitting his

53

principle role in the murder of Deputy Behan.   Moreover, the discrepancy in transcription was used to Brown's advantage by the dissent on direct appeal review.   There can be no question that there is no constitutional error requiring habeas relief.

73.   In order to prove deficient performance, Brown must establish that counsel's actions were unprofessional, that a reasonable professional attorney would not have left this transcription error uncorrected. "The test for ineffectiveness is not whether counsel could have done more;   perfection is not required.   Nor is the test whether the best criminal defense attorneys might have done more.   Instead the test is ... whether what they did was within the 'wide range of reasonable professional assistance.'" Waters, 46 F.3d at 1518 (citations omitted).   The fact that the transcript could have been corrected does not show deficient performance.   Brown has noted that the word "don't" is missing.   A single word incorrectly recorded and left uncorrected in a transcript of over 2500 pages, surely cannot be considered an unprofessional error. Provenzano, 148 F.3d at 1332 (noting that counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have made such a choice").   However, even if it is unprofessional, Brown cannot show prejudice.

74.   The pertinent portion of Brown's confession follows:

> Q.   Okay, Now when is the first time that you start having conversations about him stating the he's gonna kill somebody?

54

A.   About two blocks before we got to Circle K.

Q.   Okay, and tell me exactly what you recall Keith King saying to you.

A.   He gonna kill somebody.

Q.   Okay.  What do you say to that?

A.   I called his bluff.

Q.   So you're calling his bluff, you don't believe it?

A.   Yes, sir.

Q.   Okay, you're basically telling him **that you believe** he's got like the nerve to do it?

A. Yes, sir.

(T 1753-54) (emphasis supplied).   The portion of the taped confession played during the closing argument is:

Q.   Okay.  Now, when is the first time you started having conversations about him stating that he's gonna kill somebody?

A.   About two blocks before we got to Circle K.

Q.   Okay, and tell me exactly what you recall Keith King saying to you.

A.   He gonna kill somebody.

...

Q.   What did you say to that?

A.   I called his bluff.

Q.   So you're calling his bluff.  You don't believe it?

55

A.   Yes, sir.

Q.   Okay.  You're basically telling him **that you don't believe** he's got like the nerve to do it?

A.   Yes, sir.

(T 2432, 2439-41 - Identified as State's Exhibit 32 at trial) (emphasis supplied) (Prosecutor's closing remarks omitted).  On direct appeal, the dissent noted:

> According to the July 1991 taped statement, recorded by a BSO deputy, on the evening of November 12, 1990, defendant met up with King.  The two began drinking alcohol and getting high on crack (cocaine) and marijuana. Afterwards, they rode off together on defendant's bicycle with King sitting on the handlebars.  While on the bicycle, King first showed defendant a gun.  Within two blocks of the Circle K convenience store, the scene of the shooting, King told defendant that he was going to kill someone.  Defendant's reaction on the tape to King's statement was, "I called his bluff," meaning that defendant "[didn't] believe it."   The specific questions and answers in defendant's taped statement concerning the subject are as follows:
>
> Q. So you're calling his bluff, you don't believe it?
>
> A. Yes, sir.
>
> Q. Okay, you're basically telling [King] that you believe he's got like the nerve to do it?
>
> A. Yes, sir.[3]

---

[3]   A psychologist testified at the suppression hearing that defendant had a "passive compliant personality" and that it

56

> would therefore be possible to "twist words
> and get [defendant] to agree to anything."
> She testified similarly at trial.  The fact
> that  defendant  evidently  agreed  to  two
> seemingly  conflicting  questions  bears  this
> out.

Brown, 657 So. 2d at 904 (J. Pariente, dissenting).

75.  There  can  be  no  question  that  the  import  of  Brown's

statement, with or without the word "don't" establishes that he is

involved in the planning stages of the murder, that he dares Keith

King to shoot someone, and that he assists King in leaving the area

of the crime.  Even though the dissent relied upon the incorrect

transcription, Brown's meaning was clear, he was calling King's

bluff - he did not believe King had the nerve to kill.  Also, as

noted above, the tape was transcribed correctly during the State's

closing argument (T 2440-41) and such was available to the direct

appeal court.  Any possible ambiguity was resolved against Brown.

76.  Furthermore, the fact that the word "don't" was omitted

improperly, but the preceding question and answer showed, Brown was

calling King's bluff and that he did not believe King (T 1754,

2441) undermines completely Brown's argument here.  Again, the

possible ambiguity was resolved against Brown.  With the word

"don't" excluded form one statement, different meanings are

possible as pointed out by the dissent.  Brown, 657 So. 2d at 904

n.3.  Yet, with the inclusion of the word "don't" in both

statements, they are in agreement and any benefit afforded by the

dissent is lost.  Id.  Brown has not proven prejudice as required by

Strickland. See Green, 160 F.3d at 1043 (rejecting ineffectiveness claim for not challenging completeness of record on appeal and finding that missing record involving suppression hearing witness and bench conferences was insufficient to show that appeal process was "fundamentally unfair").

WHEREFORE, based upon the foregoing, Respondent, by and through undersigned counsel, requests respectfully that this Court DENY Petitioner's writ of habeas corpus.

Respectfully submitted,

ROBERT A. BUTTERWORTH
ATTORNEY GENERAL

Celia Terenzio
Assistant Attorney General
Bureau Chief
Fla. Bar No. 656879


Leslie T. Campbell
Assistant Attorney General
Fla. Bar No.: 0066631
OFFICE OF THE ATTORNEY GENERAL
Criminal Appeals Division
1515 N. Flagler Drive 9th Floor
West Palm Beach, Florida 33401
Telephone: (561) 837-5000
Facsimile: (561) 837-5108

Counsel for Respondent

## CERTIFICATE OF SERVICE

I CERTIFY that I caused a true and correct copy of the foregoing to be served by U.S. Mail, to: Brenda G. Bryn, Assistant Federal Public Defender, 101 NE 3rd Avenue, Suite 202, Fort Lauderdale, FL 33301 and Timothy Day, Assistant Federal Public Defender, 101 NE 3rd Avenue, Suite 202, Fort Lauderdale, FL 33301 this __14th__ day of June, 2002.

Celia Terenzio
Assistant Attorney General

# APPENDIX A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

DOCKETED
JUN 23 1999
R.B.
ATTORNEY GENERAL

TIMOTHY BROWN,                  :

       Petitioner,       :

                    :

v.                              :     CASE NO.   95-7207-CIV-GRAHAM

HARRY K. SINGLETARY,            :

       Respondent.       :

## RESPONSE TO AMENDED PETITION FOR WRIT OF HABEAS CORPUS

Respondent, Harry K. Singletary, Secretary of the Department of Corrections, by and through undersigned counsel, hereby responds respectfully to the Amended Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254, and would submit that the writ should be denied as follows:

## I.   PRELIMINARY STATEMENT

Pursuant to this Court's order dated June 14, 1999, Respondent files its response to the amended petition. Respondent has prepared an new appendix to accompany this response, however, the transcripts filed previously have not been duplicated. Reference to the appendix documents will be by "Ex.", the transcript as "T"; and the amended petition as "AP". Each reference will be followed by the appropriate pages number(s).

Additionally, it must be noted that Petitioner has failed to give record citations to many of his "facts" and editorial



Brown v. Singletary #95-7207

comments. (AP 1-7).   Further, Petitioner relies upon newspaper articles, obviously printed after the trial concluded, as evidence. Such unsupported material should not be relied upon by this Court.

## II. CUSTODY

Petitioner, Timothy Brown, is subject currently to the lawful custody of the State of Florida at Avon Park Correctional Institution pursuant to a valid judgment of guilt entered by the Circuit Court of the Seventeenth Judicial Circuit, Broward County, Florida on October 21, 1993 in case number 91-14793 CF10B. (Ex. 1)

## III.   PROCEDURAL HISTORY

On December 19, 1995 Petitioner signed his pro se petition attacking the propriety of his conviction in case number 91-14793 CF10B.   Subsequently, the Federal Public Defender  was appointed and authorized to file an amended petition for writ of habeas corpus.  Such amended petition was filed on May 25, 1999 and raises claims of error in the trial proceedings as well as challenging the effectiveness of both trial and appellate counsels.

Petitioner and co-defendant, Keith King ("King"), were indicted for first degree murder. (Ex. 2).  King entered a guilty plea pursuant to an agreement.  Petitioner elected a jury trial and was found guilty as charged. (Ex. 3)  Petitioner was adjudicated guilty and sentenced to life imprisonment without possibility of parole. (Ex. 1 and 4).  A timely Notice of Appeal was filed.

On May 3, 1995, the Fourth District Court of Appeal ("Fourth District") per curiam affirmed without written opinion the conviction, however, one judge dissented. (Ex. 5). Petitioner raised four points in his appellate brief (Ex. 6), the State filed its answer brief (Ex. 7), and Petitioner replied (Ex. 8). The issues raised on appeal were:

> POINT I - APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN GRANTED.
>
> POINT II - THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE STATE'S PEREMPTORY CHALLENGE TO PROSPECTIVE JUROR DRIVER.
>
> POINT III - THE TRIAL COURT SHOULD HAVE GRANTED APPELLANT'S PRETRIAL MOTION TO SUPPRESS STATEMENT, AND SHOULD HAVE SUSTAINED HIS OBJECTIONS DURING TRIAL TO ALL TESTIMONY CONCERNING THIS STATEMENT.
>
> POINT IV - THE TRIAL COURT ERRONEOUSLY EXCLUDED RONALD MIDDLETON'S STATEMENT TO DEPUTY CARRY CONCERNING ADDITIONAL CORRUPTION BY BSO DEPUTIES PATROLLING THE AREA NEAR THE SCENE OF PATRICK BEHAN'S DEATH.

Petitioner's May 25, 1999 Amended Petition for Writ of Habeas raised the following grounds for relief:

> GROUND A - BROWN WAS DENIED HIS RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS, IN THAT THE STATE DID NOT PROVE BEYOND A REASONABLE DOUBT THAT HE AIDED AND ABETTED THE FIRST DEGREE MURDER OF DEPUTY BEHAN. (AP 55)
>
> GROUND B - BROWN WAS DENIED HIS RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS, BY THE ADMISSION INTO EVIDENCE OF HIS "CONFESSION", WHICH WAS COERCED AND INVOLUNTARY. (ap 57-58)

**GROUND C** - BROWN WAS DENIED HIS RIGHTS TO DUE PROCESS OF LAW GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS, BY THE ADMISSION OF HIS CONFESSION, WHERE HIS WAIVER OF HIS <u>MIRANDA</u> RIGHTS WAS NOT KNOWING AND INTELLIGENT. (AP 60)

**GROUND D** - BROWN WAS DENIED HIS RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS, BY THE TRIAL COURT'S ERRONEOUS INSTRUCTION TO THE JURY THAT [BROWN] WAS FACING A LIFE SENTENCE WITH A MINIMUM MANDATORY [TERM] OF 25 YEARS. (AP 61).

**GROUND E** - BROWN WAS DENIED HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, DUE TO COUNSEL'S OBJECTIVELY UNREASONABLE PERFORMANCE IN BOTH THE INVESTIGATION AND LITIGATION OF THE MOTION TO SUPPRESS HIS CONFESSION, WHICH PREJUDICED HIS DEFENSE. (AP 62)

    1.   TRIAL   COUNSEL   FAILED   TO DISCOVER, TO HAVE A TRAINED EXPERT ANALYZE, OR TO PRESENT TESTIMONY TO THE COURT. (AP 63)

    2.   TRIAL COUNSEL KNEW, BUT DID NOT DOCUMENT, CONVEY TO HIS EXPERT, HAVE HIS   EXPERT   ANALYZE,   OR   PRESENT AFFIRMATIVE TESTIMONY OR PROOF AT THE SUPPRESSION HEARING. (AP 63)

    3.   TRIAL COUNSEL KNEW OF, BUT DID NOT ALERT THE TRIAL COURT TO THE FALSITY OF SIGNIFICANT PORTIONS OF KING'S   STATEMENT,   WHICH   CARR   AND THOMASEVICH ALSO KNEW WERE FALSE BUT NEVERTHELESS   USED   IN   THEIR UNRECORDED PRE-INTERVIEW TO COERCE BROWN'S CONFESSION. (AP 63)

    4.   TRIAL COUNSEL KNEW OF, BUT DID NOT ALERT THE TRIAL COURT OF THE FALSITY OF SIGNIFICANT PORTIONS OF THE CLAIMED "OTHER STATEMENTS" FROM DETAINEES AT THE JUVENILE DETENTION HOME IMPLICATING BROWN, WHICH HAD BEEN COERCED BY CARR AND THOMASEVICH

AND RECANTED BY THE TIME OF THE SUPPRESSION HEARING. (AP 64)

5.    TRIAL COUNSEL KNEW, BUT FAILED TO ADVISE EITHER HIS "EXPERT" OR THE TRIAL COURT AS TO THE FALSITY OF BROWN'S STATEMENT [IN CERTAIN] RESPECTS, WHICH SUGGESTED THAT [BROWN'S] STATEMENT MAY HAVE BEEN COERCED. (AP 64-65)

6.    TRIAL COUNSEL SHOULD HAVE, BUT DID NOT CONSULT [SPECIFIC] EXPERTS, HAVE BROWN EVALUATED BY SUCH EXPERTS, OR PRESENT THE TESTIMONY OF SUCH EXPERTS AT THE SUPPRESSION HEARING TO PROVE THAT BROWN'S STATEMENT WAS INVOLUNTARY, AND/OR WAS MADE WITHOUT A KNOWING AND INTELLIGENT WAIVER OF HIS MIRANDA RIGHTS. (AP 65)

7.    COUNSEL DID NOT EXERCISE HIS STATUTORY RIGHT TO HAVE BROWN EVALUATED BY THREE EXPERTS. (AP 65)

8.    COUNSEL'S MOTION TO SUPPRESS FAILED TO CHALLENGE THE PROBABLE CAUSE TO ARREST BROWN BASED UPON THE ARRESTING OFFICER'S ACTUAL KNOWLEDGE OF THE FALSITY OF THE INFORMATION RECEIVED FROM KEITH KING, AND COUNSEL FAILED TO MOUNT SUCH A CHALLENGE AT THE SUPPRESSION HEARING. (AP 66)

9.    COUNSEL MISFOCUSED MUCH OF THE SUPPRESSION HEARING ON THE SEX SCANDAL AT THE CIRCLE K, AND THE INTERNAL AFFAIRS INVESTIGATION OF IT. (AP 66)

**GROUND F** - BROWN WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, DUE TO COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE HIS CHOSEN DEFENSE AND STAR WITNESS, AND PRESENTATION OF

A MISFOCUSED, INCREDIBLE, AND INTERNALLY-INCONSISTENT DEFENSE. (AP 67)

**GROUND G** - BROWN WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, DUE TO COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND PRESENT A DEFENSE TO THE FACT OF BROWN'S STATEMENT -- THE ONLY PIECE OF EVIDENCE INTRODUCED AGAINST BROWN -- WHICH NECESSARILY PREJUDICED HIS DEFENSE. (AP 68)

**GROUND H** - BROWN WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, DUE TO COUNSEL'S OBJECTIVELY UNREASONABLE PERFORMANCE AT TRIAL WHERE HE FAILED TO EFFECTIVELY REBUT THE PROSECUTOR'S MISLEADING SUGGESTION TO THE JURY THAT THE BIKE IN THE VIDEO WAS BROWN'S AND THAT THE VIDEO WAS THEREFORE CORROBORATIVE OF BROWN'S STATEMENT. (AP 71).

**GROUND I** - BROWN WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, DUE TO COUNSEL'S OBJECTIVELY UNREASONABLE PERFORMANCE AT TRIAL WHERE HE FAILED TO OBJECT TO THE [TRIAL] COURT'S ERRONEOUS INSTRUCTION TO THE JURY THAT BROWN FACED A SENTENCE OF LIFE WITH A MINIMUM MANDATORY [TERM] OF 25 YEARS, WHEN INDEED [BROWN] FACED AND RECEIVED A SENTENCE OF NATURAL LIFE. (AP 72)

**GROUND J** - BROWN WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, DUE TO COUNSEL'S OBJECTIVELY UNREASONABLE PERFORMANCE IN FAILING TO MOVE FOR A NEW TRIAL BASED UPON THE NEWLY DISCOVERED EVIDENCE OF EDWARD DAVIS' EXCULPATORY STATEMENT, WHICH PROVED BROWN'S STATEMENT TO BE FALSE. (AP 72).

**GROUND K** - BROWN WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL. (AP 73).

## IV.   STANDARD OF REVIEW

1.   **State court findings**.  Under Section 28 U.S.C. 2254(d), a federal habeas court may not grant relief for any claim adjudicated on the merits by a state court unless the state decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or the state court's determination of facts was unreasonable in light of the evidence.   See also Neelley v. Nagle, 138 F.3d 917 (11th Cir. 1998).

Under 28 U.S.C. 2254(e)(1), a state court's factual findings shall be presumed correct and the applicant for a writ of habeas corpus bears the burden of rebutting this presumption by clear and convincing evidence.

2.   **Evidentiary Hearings.**   Under the amended 28 U.S.C. 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant show that-
>
> (A) the claim relies on-
>
> (I)   a new rule of constitutional law, made retroactive to case on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

Furthermore, after receiving a state court hearing on the issue, a petitioner can only receive a federal evidentiary hearing on the same issue if he can show cause for his failure to develop facts in the state court proceedings and actual prejudice resulting from that failure, or if he can show that a fundamental miscarriage of justice would result from failure to hold such a hearing. C.f. Mathis v. Zant, 975 F. 2d. 1493 (11th Cir. 1992) (reversing district court's decision allowing petitioner to submit additional evidence and granting relief based on new evidence because petitioner failed to show cause and prejudice before district court reviewed evidence not presented in state court).

Here, Petitioner has failed to cite to any new law or new facts, he could not have discovered with due diligence, which would entitle him to an evidentiary hearing. He has also failed to show cause and prejudice for his failure to develop facts in the state court proceeding. Petitioner received a full and fair suppression hearing in state court on the issue of his confession and notably relies on testimony from that hearing to support his claims. Petitioner is simply dissatisfied with the trial court's findings, as well as with the Fourth District's subsequent opinion. Dissatisfaction with a state court's findings, however, is not a

valid basis to warrant a second evidentiary hearing.  Accordingly, the state submits that Petitioner's request for an evidentiary hearing on the exhausted claims, and especially on the unexhausted claims, is legally insufficient.  Further, 28 U.S.C. 2254(e)(2) mandates that he is not entitled to a hearing because he has not shown that a new rule of constitutional law with retroactive application affects his claims or that his claim relies on new facts, which could not have been discovered previously through due diligence.  See Baldwin v. Johnson, 152 F.3d. 1304 (11th Cir. 1998)(ruling that petitioner not entitled to evidentiary hearing in order to develop facts he failed to show in state court absent demonstrating cause and prejudice for the failure).

**V.    STATUTE OF LIMITATIONS**

The instant petition is **not time-barred** by the time limit provision of 28 U.S.C. §2244(d), which was signed into law on April 24, 1996, as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. §2244 and 2254).  The initial petition was filed on December 19, 1995, within a year of the conviction becoming final, and litigation has been pending since that time.

**VI.   EXHAUSTION OF REMEDIES**

It is well established that issues raised in a federal habeas corpus petition must have been presented fairly to the state courts and thereby exhausted.  Anderson v. Harless, 459 U.S. 4 (1982);

Brown v. Singletary #96-7207                    9

Hutchins v. Wainright, 715 F.2d 512 (11 Cir. 1983).   In order to fulfill the exhaustion requirement, which is premised on considerations of comity, a petitioner must have fairly presented the substance of each of his federal constitutional claims to the highest state Court.   See, e.g., Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971); Nelson v. George, 399 U.S. 224, 229, 90 S.Ct. 1963 (1970).   In Duncan v. Henry, 513 U.S. 364 (1995), the Supreme Court concluded that in order to give state courts a meaningful opportunity to correct alleged violations of prisoners' federal rights, these courts "must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." Id. at 365.   The state Court must have been put on notice that the petitioner was raising federal constitutional claims and must have been appraised of both the factual and legal bases of the claims.   See Upshaw v. Singletary, 70 F.3d 576, 578 (11th Cir. 1995).

"In general, a federal Court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies." Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir.), cert denied, 119 S.Ct. 405 (1998).   "A federal district Court ordinarily must dismiss a 'mixed' habeas petition (one which contains both exhausted and unexhausted claims) without prejudice -- allowing either resubmission of only exhausted claims or total exhaustion." Id. at 736 (citing, Rose v. Lundy, 455 U.S. 509, 519-

20, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982)). However, if the
Court finds that the unexhausted claims would be procedurally
barred, the Court considering the federal habeas corpus petition
could "just treat those claims now barred by state law as no basis
for federal habeas relief." Snowden, 135 F.3d at 737.

In the instant pleading, Petitioner attacks five areas of his
criminal proceedings; (1) the sufficiency of the evidence (**Ground
A**), the same issue raised as Point I on direct appeal; (2) the
voluntariness of his plea (**Grounds B and C**), similar to Point III
on direct appeal; (3) the giving of an allegedly erroneous pre-
trial sentencing instruction (**Ground D**); (4) the ineffectiveness of
trial counsel (**Grounds E-J** with sub-issues); and (5) the
ineffective assistance of appellate counsel (**Ground K**).   Only
**Grounds A, and C**, as framed here, were presented to the state
Court.  It is presumed that the state Court addressed the claims
Petitioner's raised in his direct appeal and rejected them.  Smith
v. Digmon, 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978).

The state Court has not had an opportunity to consider
Petitioner's **Grounds B and D through K**.   While Petitioner
challenged the voluntariness of his confession at both a pre-trial
suppression hearing and on direct appeal in state court, he asserts
a myriad of new facts in **Ground B, which are admittedly unsupported
and newly presented**.   He asks this Court to find the confession
coerced.  As presented by Petitioner, **Ground B** is not exhausted;

the state courts have not had an opportunity to consider the additional facts he now pleads. Having failed to raise these new facts, either at trial or collaterally, this issue is unexhausted; therefore, this Court should not entertain it. Moreover, it would be improper for this court to grant and evidentiary hearing on this issue and entertain the new facts not presented to the state courts. C.f. Mathis, 975 F. 2d. at 1493 (reversing district court's decision allowing petitioner to submit additional evidence and granting relief based on new evidence because petitioner failed to show cause and prejudice before district court reviewed evidence not presented in state court).

The only review Petitioner sought of his conviction was through his direct appeal. The issue of whether an erroneous instruction was given to the jury before the trial commenced was never presented to the state courts, hence, **Ground D is unexhausted**. Additionally, Petitioner failed to file a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, therefore, **Grounds E through J**, directed toward the effectiveness of trial counsel, have never been addressed by the state courts and **are unexhausted**. Finally, Petitioner did not file a petition for writ of habeas corpus in state court pursuant to Florida Rule of Appellate Procedure 9.140(j), thus, **Ground K is unexhausted**.

For the foregoing reasons, the Court must dismiss **Grounds B and D through K** as they are **unexhausted.** Further, because this Court is precluded from entertaining claims which have not been exhausted, the Court must **deny the evidentiary hearing** requested by Petitioner's these facts and claims asserted here have not been presented in the state forum. See Baldwin v. Johnson, 152 F.3d 1304 (11th Cir. 1998)(ruling that petitioner not entitled to evidentiary hearing in order to develop facts he failed to show in state court absent demonstrating cause and prejudice for the failure).

**VII. PROCEDURAL BAR**

If this Court concludes **Grounds B and D through K** are not exhausted and dismisses the instant petition without prejudice to refile, Petitioner would be barred procedurally in state court from raising these claims. In Sims v. Singletary, 155 F. 3d 1297, 1313 (11th Cir. 1998), the Eleventh Circuit Court of Appeals reasoned:

> A federal Court must dismiss those claims or portions of claims that either (1) have been explicitly ruled procedurally barred by the highest state Court considering the claims, Harris v. Reed, 489 U.S. 255, 261-62, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), or (2) are not exhausted but would clearly be barred if returned to state Court. Id. at 269-70, 109 S.Ct. 1038 (O'Connor, J., concurring); Coleman v. Thompson, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). This procedural bar applies to claims of ineffective assistance of counsel in habeas cases. Footman v. Singletary, 978 F.2d at 1211.

Sims, 155 F. 3d at 1313(emphasis supplied).

The Florida Supreme Court has stated, "We have repeatedly said that a motion under Rule 3.850 cannot be used for a second appeal to consider issues that either were raised in the initial appeal or could have been raised in that appeal." Parker v. State, 611 So.2d 1224, 1226 (Fla. 1992). See also, Medina v. State, 573 So.2d 293, 295 (Fla.1990). Those issues that could have been, but were not, raised on direct appeal are not cognizable through collateral attack and are barred procedurally. Harvey v. Dugger, 656 So. 2d 1253, 1256 (Fla. 1995); Johnson v. State, 593 So.2d 206 (Fla.), cert. denied, 506 U.S. 839 (1992).

As noted above, **Ground B**, all the new allegations, was not raised in the state court. Should this Court dismiss the petition, the issue would be time barred under Florida law. Given the nature of the allegations, each should have been known or could have been discovered with due diligence, therefore, Petitioner will be unable to show a basis for not bringing these facts to the trial court's attention or for not raising them in a collateral relief action. As such, the matter would be barred below and **Ground B** should be found procedurally **barred** here.

**Ground D** challenges the propriety of a jury instruction given pre-trial. This could have been raised on direct appeal, but was not, therefore, Petitioner would be barred from raising this issue in a motion for postconviction relief. Harvey, 656 So. 2d at 1256.

Moreover, "An error in instructing the jury cannot constitute a basis for habeas relief unless the error so infected the entire trial that the resulting conviction violates due process." Jacobs v. Singletary, 952 F. 2d 1282, 1291 (11th Cir. 1992)(quotation omitted). "It is not sufficient that the instruction was undesirable, erroneous, or even universally condemned." Id. (Quotation omitted.) "State Court jury instructions ordinarily comprise issues of state law and are not subject to federal habeas corpus review absent fundamental unfairness." Jones v. Kemp, 794 F. 2d 1536, 1540 (11th Cir.), cert denied, 479 U. S. 965 (1986). "A defective jury charge raises an issue of constitutional dimension only if it renders the entire trial fundamentally unfair." Carrizales v. Wainwright, 699 F. 2d 1053, 1055 (11th Cir. 1983). "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is 'couched in terms of equal protection and due process.'" Branan v. Booth, 861 F. 2d 1194, 1198 (5th Cir. 1976). Because the issue of alleged improper jury instructions is one of a state law claim nature and should have been raised in the state court, Petitioner is barred from raising it in this Court, and the instant petition on **Ground D should be dismissed.**

Additionally, it has been more than two years since Petitioner's sentence became final. The Fourth District issued its mandate in the direct appeal on August 18, 1995, thus, Petitioner's

two year time limit ran prior to August 18, 1997.  As a result, a motion for postconviction relief attacking trial counsel's actions would be denied by the state Court on a procedural time bar basis. Fla.R.Crim.P. 3.850.  <u>See also</u>, <u>Bolender v. State</u>, 658 So. 2d 82 (Fla.)(applying the two year time limit to postconviction relief motions), <u>cert. denied</u>, --- U. S. ----, 116 S. Ct. 12, 132 L. Ed. 2d 896 (1995).

In federal habeas corpus petitions, the procedural bar also applies to an untimely filed motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.850. <u>Whiddon v. Dugger</u>, 894 F. 2d 1266, 1266-67 (11th Cir. 1990).  Here, Petitioner cannot prove "cause and prejudice" for this default.  Petitioner made no attempt to raise the ineffective assistance of counsel claim within the two year limit.  Hence, this Court should find **Grounds E through J procedurally barred** and dismiss the petition.

Finally, a two year time limit applies to claims of ineffective assistance of appellate counsel.   Fla.R.App.P. 9.140(j)(3).  Because Petitioner did not seek relief by filing a petition for writ of habeas corpus in state Court within the allotted time, **Ground K is procedurally barred.**

Petitioner has not established, nor even pled, cause and prejudice for the failure to present these issue in the state court.  Hence, this Court must not grant and evidentiary hearing on these issues. <u>Baldwin</u>, 152 F.3d 1304 (ruling that petitioner not

entitled to evidentiary hearing in order to develop facts he failed to show in state court absent demonstrating cause and prejudice for the failure). As noted above, Petitioner has not established cause or prejudice for not filing for collateral relief in a timely fashion. Clearly, **Grounds B and D through K are procedurally barred** and must not be considered by this Court. As such, the instant petition contains both exhausted and unexhausted claims which are procedurally barred. It is a "mixed petition" and this Court may address the exhausted claims and "just treat those claims now barred by state law as no basis for federal habeas relief." Snowden, 135 F.3d at 735-37.

## VIII. MERITS

Counsel will address the merits of Grounds A, B, and C, but by so doing, does not waive the procedural arguments asserted above. Further, the State requests respectfully the opportunity to address Petitioner's other claims should this Court find them ripe for review.

### 1. Facts

### a. Suppression Hearing

Prior to trial, Petitioner filed a motion to suppress his November 15, 1990 and July 16, 1991 statements to the police. (Ex. 9 - 2792-2811). At the suppression hearing, Lieutenant Richard Scheff ("Scheff") testified that on November 13, 1990, he responded to the scene of Broward Sheriff Deputy Patrick Behan's

("Behan") murder. (T 6-7).  The shooting occurred at approximately 1:40 a.m. at the Circle K convenience store where Behan was taking a robbery report. (T 8-9 and 49).  It was while sitting in his vehicle, writing the report that Behan was shot and killed. (T 8).

Petitioner, first became know to the Broward Sheriff's Office ("BSO") on November 14, 1990. (T 12).  As Scheff explained:

> That came about through an individual by the name of Rob McGriff.  Mr. McGriff had contacted the Sheriff's office indicating that he had information concerning the death of Patrick Behan.  Detectives were assigned to pick up Mr. McGriff and interview him.  In fact, he was brought to my office and we were given information from Mr. McGriff that he knew who had shot Deputy Patrick Behan and identified the people who had been shot or had been involved in the incident that led to the shooting of Deputy Behan.  He identified those people as Tim Brown and another individual by the name of Keith Maddox.

(T 12 and 153).  After polygraphing Mr. McGriff and interviewing Keith Maddox, Scheff concluded that he had not been given the "real story." (T 12-14 and 153).  Confronted with Scheff's suspicions, Mr. McGriff admitted he was dying of AIDS and embellished his story in hopes of getting the reward money. (T 14-15).

On November 15, 1990, BSO detectives were advised Petitioner was in custody at the Hollywood Police Department on a "juvenile pick-up order." (T 16 and 153).  Detectives Gill and Illaraza met with Petitioner for approximately 15 to 20 minutes before Scheff and Sergeant Auer arrived. (T 15-16).  Unbeknownst to Scheff, Petitioner had not been read his <u>Miranda</u> rights. (T 17-18). When

Scheff entered the interrogation room, he learned Petitioner had informed the detectives Keith Maddox had shot Behan. (T 17). Describing the subsequent interview, Scheff stated:

> I asked Mr. Brown how he knew that Keith Maddox was the person that shot the deputy. He said that he had heard it. I said, well, where did you hear it from?" I expected to hear the name Rob McGriff, but I didn't. He said, "I heard it on the street." I stated pressing him as to, "Well, who told you on the street that Keith Maddox was the one that shot the deputy?" There was no response to that question immediately. He sat, he looked down, he waited a minute or two, and he looked back up and he said, "Keith didn't shoot the deputy. I did."

(T 19). It was at this point, Petitioner became a suspect in Scheff's mind. (T 20). Unsure of whether Petitioner had been Mirandized, Scheff withdrew and learned the <u>Miranda</u>[1] warnings had not been given. (T 19). Describing his thoughts of Petitioner's condition, Scheff admitted he "had the distinct impression that [Petitioner] was very much under the influence of narcotics." (T 19). <u>Because Petitioner was under the influence of cocaine</u>, Scheff "did not believe that in good faith [he] could give [Petitioner] his rights and expect that he could waive them." (T 21-22). The rationale behind ending the interview was explained by Scheff as follows:

> That's correct. I didn't think that [Petitioner] could. If he was involved in the

---

[1]     <u>Miranda v. Arizona</u>, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)

> death of Deputy Behan, I didn't think he could
> give us details that I was going to require.
> I didn't know whether he was involved or not.
> But if he was involved, I certainly wanted to
> be able to interview or interrogate him in a
> very detailed fashion. And clearly from his
> statement at that point in time, if he was
> (sic) involved, he wasn't going to be able to
> tell me, even if he chose to, in any sort of
> detail what had transpired.

(T 22). After the interview was terminated, Petitioner was

delivered into HRS custody for the juvenile pick-up order. (T 23).

Shortly thereafter, BSO learned of Jacqueline Bain ("Bain")

who claimed that Steve McGill (" S. McGill") was the person who had

shot Behan because McGill was angry "at the fact that [Bain] was

having a series of sexual encounters with the deputies assigned to

patrol in District 1." (T 23-24 and 49). The information related

to the allegation of sexual misconduct was turned over to Internal

Affairs. (T 24). Continuing with the murder investigation, BSO

determined S. McGill was not involved in the killing as he had been

in custody on that date. (T 24-25 and 153-155). Once this

information was know, Bain stated it was Curtis McGill ("C.

McGill") who shot the Behan. (T 25). Bain maintained this story

for several weeks, then finally informed the police that she was

the party responsible for Behan's death. (T 25).

While investigating Bain, BSO never dismissed Petitioner as a

potential suspect. (T 25-26). Moreover, the detectives

investigated all the leads which came to their attention. (T 155).

At no time did they stop investigating the leads after Petitioner's

November 15, 1990 statement. The investigation was not stopped because BSO was not "satisfied that [Petitioner] was the person that was involved with [the murder], simply because of the statement that he made on the 15th."(T 155-156). Even if Petitioner had not made an incriminating statement on November 15, 1990, and BSO had the Bain and McGriff leads, Scheff would have wanted to interview Petitioner. (T 157).

Because Petitioner was under the periodic supervision of HRS and based upon its reading of <u>Merrick v. Mississippi</u>, 498 U.S. 146, 111 S.Ct. 486 (1990), BSO did not interview him further. (T 26-27). However, during Petitioner's HRS detention, BSO received independent information that Petitioner had disclosed to other persons his involvement in the Behan case. (T 27-28 and 30). It was not until July 16, 1991, the date Petitioner's prior juvenile case was resolved and Petitioner was placed in Covenant House, that BSO had its opportunity to speak to him. (T 30). When Petitioner left the house, he was met by detectives and brought to the station. (T 30-31). When Petitioner arrived, Scheff talked with him in order to determine his mental state. (T 31 and 34). Based upon his observations, Petitioner was very different; he was not under the influence of any intoxicants, hence, Scheff felt comfortable permitting the interview to commence. (T 32 and 34).

Describing the interrogation, Scheff stated Petitioner was free to leave even though they had taken King's statement by that

time. (T 32).   Scheff maintained he would have been reluctant to arrest Petitioner at the commencement of the interview, although they had probable cause for such arrest. (T 32).   In response to the State's inquiry of what facts BSO had before the July 1991 interview, Scheff answered:

> Keith King, Keith King was probably the best single break that we received, at least in my opinion, in the case was when Detectives Thomasevich, and Carr were able to establish that the Keith -- that people were talking about the witnesses, were talking about that the Keith [Petitioner] had spoken to was not Keith Maddox, but another Keith, another young man named Keith King
>
> ...
>
> And my detectives had, in fact, had an opportunity to take a post <u>Miranda</u> statement for Keith King in which he admitted his involvement and identified Tim Brown as being another person involved in the death and murder of Patrick Behan which was known to us on July 16th.

(T 33)(intervening question omitted).

During questioning, **<u>Petitioner was not shackled</u>, <u>he was not chained to his chair or the floor</u>, <u>Petitioner was never beaten</u>**. (T 34).   Further **<u>Petitioner was not promised anything</u>** in order to convince him to give a statement. (T 34).   Once Scheff determined it was proper to interview Petitioner, Detectives Carr and Thomasevich conducted the interrogation. (T 35).

On cross-examination, defense counsel delved into the information Bain gave BSO as it related to the deputy's shooting,

and the alleged sexual favors that were rendered to BSO deputies by
Bain. (T 36-56, 64-66, 68-80, 90-93). Additionally, defense
counsel inquired into the internal affairs investigation this case
sparked. (T 80-93) Deputy Richmond's name was linked to the sex
scandal (T 44) and according to Bain, C. McGill was angry with
Deputy Richmond and had made threats against him. (T 45 and 49).
Additionally, on November 13, 1990, C. McGill had purchased from
Mr. Duhart the stolen Circle K cigarettes. (T 45-46). Scheff was
unable to confirm that Richmond was to have responded to the Circle
K robbery. (T 47-48). Additionally, defense counsel elicited
testimony that on November 15, 1990, Bain identified correctly the
murder weapon as a .38 caliber gun. (T 51 and 150). However,
Scheff explained that the caliber of the weapon used to kill Behan
was released to the press inadvertently and printed in the November
14, 1990 newspapers before Bain gave BSO that information. (T 51-52
and 150-151).

During the hearing, the trial judge advised the parties he was
interested in determining what information, independent of
Petitioner's November 1990 statement, did BSO have which linked
Petitioner to the murder. (T 54-56). As framed by the judge:

> ... I'm trying to see if [Petitioner] remained a
> suspect.    Forget about that statement,
> [Petitioner] was legitimately a suspect
> without that statement.
>
> The question is what influence did that
> statement have on his future on the pursuit of
> him in the future, and is there anything else

that may have made [BSO] aware or brought them to Mr. Brown as a suspect in this case....

(T 57).

Continuing, defense counsel elicited testimony related to the BSO sex scandal. (T 80-82). At one point, the Circle K manager, Roxanne Keidaish was considered a potential suspect because she left her employment the day after Behan was killed. (T 83). However, further inquiries established the resignation was planned prior to the murder. (T 83).

Scheff admitted seeing Bain committed for psychiatric evaluation. (T 93-95). It was Detective Carr who maintained contact with Bain while she was institutionalized. (T 97-98). However, by the time of the hearing, BSO had lost contact with her; the last Scheff knew she had been living in Cutler Ridge area at the time Hurricane Andrew struck[2]. (T 98).

A surveillance tape of the Circle K on the evening in question showed Mr. Duhart ("Duhart") stealing cigarettes. (T 99). Duhart was taken into custody within three to four hours of the murder and was questioned by Scheff and a gunshot residue test was performed on Duhart. (T 99-101).

Scheff was questioned in detail about the connection between Bain, the McGill brothers, Duhart, and the BSO investigation of these individuals. (T 99-115). Throughout this line of inquiry,

---

[2] Defense counsel announced that he had been unable to locate Bain. (T 173)

defense counsel intimated Detectives Carr and Thomasevich did not follow up on the connection between these parties and. (T 114-120). Further, police reports were not generated for some of these interviews. (T 116-118). Scheff admitted doing elimination prints on C. McGill and also that there was no forensic evidence linking Petitioner with the murder. (T 120-121).

Petitioner was 14 years old at the time of the crime. (T 122). It was affirmed that BSO had contacted the Hollywood Police in November 1990 to ask them to call BSO should they take Petitioner into custody. (T 122). Subsequently, the call came and BSO detectives went to the Hollywood station on November 15, 1990 and met with Petitioner. (T 122-123). Defense counsel pointed out that Petitioner was in custody when he was questioned by BSO, but Scheff countered that Petitioner was in custody for another case. (T 124).

Referring to his deposition comment that Petitioner was "like clay", Scheff explained:

> [Page] 78. What I was saying -- what I was trying to elude (sic) to in that statement was not that he was so easy to mold that you could just get him to say whatever you wanted him to, but that I was concerned that, that clearly he was not in possession of all his faculties; and whatever statement we got from him, I wanted it to be coming from him not from anything that we were suggesting to him.

(T 124-125).

The November 15, 1990 statement was not recorded because it was not an interrogation; essentially, it was a witness statement.

(T 127).   Petitioner's name was received from a source Scheff believed unreliable, but BSO was contacting Petitioner because he was somebody they could find easily and resolve the situation with Mr. McGriff and Keith Maddox. (T 127).   Scheff was surprised and unprepared for Petitioner's admission he had killed Behan. (T 127).

It was Scheff's testimony regarding the November 15, 1990 statement, that once he heard Petitioner admit involvement, he spoke to Petitioner for the sole purpose of determining for himself that Miranda warnings could be given. (T 128-129).   He admitted to thinking, "We have a confused kid, we are going to let him go." (T 129).   BSO's inability to re-interview Petitioner immediately was based upon an interpretation of Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). (T 129).

Scheff testified that BSO did not have a prime suspect after Bain was institutionalized.   (T 134-135).   In fact, BSO had no prime suspects until Petitioner was taken into custody. (T 135). During this time, BSO was receiving calls from Alvis Crostwaite and Solomon Gibbs about Petitioner, but BSO had no contact with Petitioner between November 15, 1990 and July 16, 1991. (T 135-137).   While an arrest warrant could have been obtained based upon King's June 4, 1991 statement implicating Petitioner in the murder, Scheff admitted a warrant was not sought. (T 138).   In response to defense counsels' inquiry, Scheff stated, "I will say this.   I would have advocated had we not gotten a confession from Tim Brown

that was consistent with the confession obtained from Keith King. I would have advocated that we release Tim Brown." (T 139 and 144-145).    Scheff  concluded  that  although  there  were  some inconsistencies in the statements of Petition and King, they were generally consistent, "when one reads both statements, one can come away with the fact that the two individuals are talking about a similar event." (T 141 and 144-145).

Scheff stated that Petitioner's mother was called to the police station on July 16, 1991. (T 148).  After arriving at the BSO office, Scheff talked to her at length. (T 148).  Petitioner made it known he did not want to see his mother and she never asked to see her son. (T 148).  It was Scheff's testimony that had Petitioner's mother made such a request, he would have permitted her to see the Petitioner. (T 148).

Additionally, Scheff averred that Petitioner did not give any specifics of the shooting in his November statement, nor did he give the police the names of the individuals who called later with information about Petitioner. (T 149).  Because BSO had not been able to interview Petitioner on November 15, 1991, Scheff was interested in having another opportunity to talk with him. (T 156).

While acknowledging the statements of King and Petitioner contained inconsistencies, Scheff believed them to be of evidentiary value.  He explained:

> Well, they both indicated -- first of all,
> they both named each other which I think was

> of primary importance.  They both described
> this attempt to go out and shoot somebody,
> almost a random, meaningless type of crime.
> They arrived on the bicycle together, one of
> them is being carried on the handle bars the
> other one is riding by --
>
> ...
>
> And they also agreed on -- again for whatever
> it is worth, the type of weapon that was used.

(T 160-161).

In response to the trial court's inquiry, Scheff answered that

Petitioner's mother "wanted an explanation of what had happened

here.  Her son was being arrested for murdering a police officer;

I guess she just didn't want to hear it over the telephone, she is

a very nice lady." (T 166).  Explaining further, Scheff testified:

> We called [Petitioner's mother] and explained
> to her the situation and that Tim had been
> linked to, the homicide; that we had him in
> our office and asked if she wanted to come
> down, and she said that she did and she did in
> fact drive down to our office.  She got there,
> I don't know, maybe 20 minutes or so after we
> made the phone call.  I met with her and this
> started.  She seemed to be -- she wasn't
> surprised by what had happened.  She didn't --
> I asked if she had any knowledge of what had
> happened because I believe we had some
> information that she might know something
> about it.  She indicated she did not have any
> specific knowledge of Tim's involvement in
> this case, but that he had been very
> troublesome.  She felt that the system had
> failed her in helping her raise him, and she
> did not want to see him.  She didn't --

(T 167-168).  The trial judge confirmed with Scheff that

Petitioner's name surfaced during the investigation through other

independent witnesses, and that BSO would have pursued this information even had Petitioner not made his November 15, 1990 statement. (T 168-169). Scheff revealed that other persons were telling BSO of Petitioner's involvement based upon his admissions to those people and that Petitioner never gave BSO the names of the people he told of his involvement in the murder. (T 168-169).

Dr. Elizabeth Koprowski ("Koprowski") was called by the defense and the State stipulated she was an expert in psychology. (T 179-180). Koprowski attested she had examined Petitioner and reviewed his school records which showed he had an intellectual deficiency. (T 180-181). I.Q. test results were included with the school records and showed a score of 58 on both the verbal and quantitative, but a 54 on the non-verbal portion of the test; these results equate to an evaluation of mild retardation. (T 182-184). Koprowski concluded from the school records his performance was poor consistently and he was not a motivated student. (T 183).

On four occasions between September 30, 1991 and December 16, 1991, Koprowski met Petitioner spending about six hours with him. (T 184). Psychological exams were administered and yielded a verbal I.Q score of 60, a performance score of 60, and a full scale I.Q. of 56, which is near a 6th grade level. (T 184-185 and 237). These scores showed Petitioner was in the "mildly retarded" range, but he did not show signs of major mental illness. (T 187-188). Petitioner was educable, however, not someone who would learn

through the school system; his reading, writing, and math skills were minimal, at or below a third grade level. (T 188-189). Koprowski described Petitioner as not disorganized or psychotic, but very child-like. (T 189). Based upon her examinations, Koprowski concluded Petitioner had the ability to understand his legal rights "only in a very, very basic way." (T 190).

In talking to Petitioner, Koprowski believed Petitioner did not understand fully he could have had an attorney, but that he wished he had had his mother present. (T 191). Koprowski opined that Petitioner "is easily led by almost anybody, including his peers"; he was passive, compliant (T 191-193).

Subsequently, Koprowski testified she was appointed initially as a confidential psychologist, to report to defense counsel only. (T 195). She revealed she had come to the determination Petitioner was competent to stand trial; Petitioner was competent to know and understand the nature of the trial proceedings. (T 194). Moreover, Koprowski agreed Petitioner knew right from wrong. (T 195).

During the course of her appointment, Koprowski investigated Petitioner's background and his family life. (T 199). Also Petitioner was raised by his step-mother, with whom he had a good relationship and called "mother" and that he had several siblings. (T 199). Koprowski acknowledged Petitioner's father had beaten his children (204-205) and had been murdered. (T 237-238).

It was pointed out Petitioner's deficiency in school may have been related to his poor attendance record. (T 213-224). Koprowski admitted that a low I.Q. score did not mean Petitioner could not understand his rights, but that the totality of the circumstances had to be reviewed in order to determine whether Petitioner understood his rights. (T 228-229). Koprowski agreed that Petitioner had been in the juvenile court system before the Behan shooting and that he had been represented by counsel. (T 230-231). The examination concluded with the following:

> [DEFENSE COUNSEL]: And when we're saying on direct examination that Tim Brown is easily led and that he can be coerced into saying anything by these authority figures such as a police officer, were you saying that concretely he wouldn't know what an attorney was?
>
> [DR.KOPROWSKI]:   No, no.  [Petitioner] does understand those things.   I think it is totally misrepresenting his level of ability to say that he wouldn't know what an attorney is or wouldn't know right from wrong or any of those issues.   He had been questioned by attorneys, by police before, and I think he felt that this was, if I said what they wanted him to say and I am not speaking to the variety (veracity) of it, just his attitude, that if he said what they wanted him to say, it would be over and he would be going on as he had before.

(T 240).

Detective Carr ("Carr") of BSO Homicide testified he was assigned to the Behan case on November 13, 1990. (T 239-241). Initially, he interviewed witnesses found at the crime scene and

did not become the primary detective until February 5, 1991. (T 242-243). Neither Carr nor his partner, Detective Thomasevich ("Thomasevich"), talked to any suspects until after February 5, 1991. (T 245-246).

In November 1990, Carr and Thomasevich met with Solomon Gibbs ("Gibbs") whose identity and connection with the case was developed through Hollywood Police Sergeant Allen. (T 248). Petitioner did not give BSO the name, Gibbs. (T 248). In April 1991, Carr and Thomasevich re-interviewed Gibbs and learned he had been party to a conversation with Petitioner in which it was revealed Petitioner and a "Keith" were involved in the Behan slaying. (T 249). Initially, the detectives believed Gibbs was referring to Keith Maddox, but when Gibbs said that the photo array he was shown containing Keith Maddox's picture did not contain a photograph of the "Keith" to which he was referring, additional inquiries ensued. (T 249-250). Gibbs was able to take the detectives to a foster home run by Mrs. Pengrass who gave them the name, "Keith King." (T 250). When a photographic line-up containing King's picture was shown to Gibbs, he positively identified King as the person to whom he was referring. (T 251).

Gibbs not only gave BSO the name, King, but led the detectives to other individuals who had information about the case. (T 255). Under questioning by the State, the following was revealed:

Q. And at that point, what other information, if any, did you have concerning Mr. Brown and Keith King?

A. Well, at that time, it had more or less a snowball effect. Solomon Gibs led us on to Alvis Crostwaite who basically gave us information pertaining to the defendant in regard to conversations that he was privy to.

Q. Between him and Mr. Brown, according to him?

A. No, from an Andre Butler concerning Mr. Brown which led us to a Christopher Ott then on to Andre Butler and so on. We spoke to approximately eight other people who either directly or indirectly spoke to Mr. Brown. At which time he had told them directly or indirectly that the was involved in this incident.

Q. And so it all started by Solomon Gibbs?

A. That's correct.

Q. And you never got the name Solomon Gibbs from Mr. Brown or anything Mr. Brown said to Detective Scheff?

A. No, sir, did not.

Q. Any of those names brought up mentioned by, in investigation by Timothy Brown?

A. No sir.

Q. Or from anything that Mr. Brown said to Detective Scheff two days later?

A. No, sir, absolutely not.

(T 255-256). It was stipulated that upon King's arrest, he

mentioned Petitioner in connection with the case. (T 264-265).

Based upon Carr's discussions with King on June 4, 1991, as well as

other witnesses, it was decided that Petitioner would be watched. (T 265-266). Not until July 16, 1991 were Carr and Thomasevich able to contact Petitioner. (267-268). At the time, all of Petitioner's juvenile criminal matters had been resolved. (T 268-270).

When Petitioner left the Covenant House[3] near 6:20 p.m. on July 16, 1991, Carr and Thomasevich followed. (T 271-272). Identifying themselves as BSO detectives, Petitioner was arrested for the murder of Behan, and immediately read his <u>Miranda</u> rights. (T 272). Petitioner acknowledged he understood his rights and stated he was willing to answer questions without counsel. (T 273). Then Petitioner inquired what was this about. (T 273). Without answering Petitioner's question, Carr placed him in the cruiser, told Petitioner not to talk at that time, but that everything would be explained once they arrived at the station, if Petitioner were willing to talk to the detectives. (T 273-274). Petitioner was not questioned during transportation. (T 274).

Arriving at the station at approximately 6:55 p.m., Petitioner was permitted to use the restroom and was given a soda. (T 274-275 and 277). At about 7:10 p.m., Petitioner was situated in an interview room where Carr, accompanied by Thomasevich the entire time, utilized a juvenile waiver of rights form to re-advised Petitioner of his rights. (T 275 and 277-279). Petitioner Indicated verbally and in writing he understood his rights. (T 275

_____

[3] Petitioner was awaiting a detention center bed. (T 271)

and 279). From his observations, Carr believed Petitioner "was not intoxicated in any way"; Petitioner's responses were very clear and precise; he understood what the officers were saying. (T 280).

No threats or promises were made to Petitioner either before the interrogation or during it, in order to get Petitioner to talk. (T 280-281). At no time before or during questioning did Petitioner ask for an attorney. (T 280-281). While Petitioner was handcuffed during his transportation to the station, the cuffs were removed, but he was shackled with leg irons; these were not attached to the chair or floor. (T 281-282). The use of shackles was standard policy, safety precaution, against escapes. (T 282). Under questioning by the prosecutor, it was revealed that Petitioner's initial conversation with the detectives was not recorded. (T 282). After talking for about one hour, a taped statement was given. (T 282). Describing the unrecorded questioning, Carr stated:

> Well, basically, we explained why he was there, what the reference was and some of the pertinent information we knew. Mr. Brown, in the beginning, denied being involved. Again, when we hit him with pertinent facts, things that we had known, then he started to advise us that he was and started to give us a detailed account of the incident.

> Well, when we originally talked to him, he began to deny it. We told him that we had Mr. King, that we had spoken to people like Solomon Gibbs, and we named some other people that we had statements from and some of the

pertinent conversations against him that he
had spoken to people about. And once we hit
him with some of these facts, and at that
point in time that's when he started to tell
us what happened.

...

Basically, at that time, he told us that he
was there, that he was with Keith King. They
had met down at his residence; and at the time
that they were getting high, he advised us
that they had been drinking and they had been
smoking.

(T 282-283)(prosecutor's questions omitted). After giving an

account of the crime, Petitioner repeated his story on tape; this

tape was played for the trial judge and re-transcribed by the Court

reporter. (T 284-310). While Petitioner confirmed the names of

people to whom he had confessed, the detectives had already spoken

to those people. (T 311). Carr had no difficulties communicating

with Petitioner. (T 311).

Carr stated he had no involvement with that aspect of the

sexual misconduct investigation, however, he did speak with Bain on

several occasions about other matters. (T 312). Additionally, he

discussed Bain's allegations with Scheff and Sergeant Auer

concluding the corruption allegations had nothing to do with the

murder. (T 312-313). While Carr initially had not ruled out Bain

as a possible suspect, after speaking with her, reviewing the case

file, and interviewing others, Carr concluded Bain "was not in fact

a suspect and did not have any pertinent facts whatsoever in this

case." (T 313). As explained by Carr:

> There was information that was even publicized
> in the newspaper that was common knowledge
> that Mrs. Bain could not even relate to me
> when she spoke to me.  She had contacted a
> pawn shop in the Dade County area.  I received
> a call from a gentleman that runs that pawn
> shop that she had called, and she was
> questioning trying to find out the difference
> between a .38 and a nine millimeter.  She --
> just speaking to her at great length on the
> telephone, Jacqueline Bain is an individual in
> my opinion that was just looking for
> attention.

(T 314).  Stemming from the investigation of Bain, Carr interviewed

Curtis McGill ("C. McGill") because there were some unanswered

questions.  (T 315).  Carr became convinced C. McGill was not a

suspect as a result of the interview based upon the following:

> [C.McGill] had given us a story, talked about
> a Mr. Duhart.  [C. McGill] was down on Wiley
> Street the evening of the incident, at which
> time he advised Mr. Duhart came by and was
> trying to sell a carton of cigarettes.  Mr.
> McGill bought half of that carton of
> cigarettes from Mr. Duhart.  At that time, he
> was approximately a mile, three quarters,
> almost two miles away from the Circle K.  He
> advised that he was with his girlfriend and
> provided us with her name and two different
> addresses.  Then we spoke to  Mr. Kevin Duhart
> who relayed the same information even to the
> fact that he had bought only half the carton
> of cigarettes.  And obviously, where Mr.
> Duhart was picked up almost two miles away by
> some road deputies and Mr. McGill being there,
> he could not have been back at the Circle K
> and been involved in any --

(T 315).

In response to a series of questions related to whether the

detectives were pressured to solve the case, Carr stated he

received no pressure to focus on or away from any particular individual; "[t]here was no pressure of any kind." (T 316-317).

Carr recognized that Duhart had a somewhat violent past and had had numerous encounters with law enforcement. (T 322-323). In spite of Duhart's criminal past, Carr did not pursue him intensely in relation to the murder investigation, however, Duhart was investigated heavily by other officers. (T 323-325). Characterizing C. McGill's criminal history as violent, Carr testified he was aware C. McGill had contact with Duhart close to the time Behan was shot and that Bain had accused C. McGill of the murder. (T 330-331). However, by the time Carr was assigned the lead in this case, C. McGill was no longer a suspect. (T 336-337). During the interview, C. McGill admits knowing Duhart and believes he knows Bain, although not by name. (T 340).

Admitting he knew of Petitioner's November 1990 statement, Carr noted he had been tasked to monitor Petitioner's HRS status. (T 349-350). It was Carr's testimony that after Petitioner's November 1990 statement, he investigated other leads and did not contact Petitioner. (T 355-356). Acknowledging Petitioner was "picked-up" on July 16, 1991 without an arrest warrant, Carr stated he had probable cause for the arrest. (T 356). In fact, after June 4, 1991 and the resolution of the Keith King and Keith Maddox confusion along with information developed from Frank Adderson and

others, Carr believed he as sufficient probable cause to arrest Petitioner. (T 357).

Defense counsel was permitted to read portions of Andre Butler's ("Butler") grand jury testimony into the record. (T 359). In such testimony, Butler alleges he was handcuffed and threatened to the point he "slipped" and told the police that Petitioner told him something about the murder, but that Petitioner had not told him anything. (T 359). Responding to the allegation of threats to Butler, Carr asserted they were "totally false." (T 359-360).

After the arrest and transportation to the police station, Carr asked Scheff to contact Petitioner's mother. (T 362-363). When the detectives emerged from the room after Petitioner had given his statement, Petitioner's mother was with Scheff. (T 363). During the interview, reference was made to the November 1990 statement, however, the "gist of the conversation" related to what Solomon Gibbs and other had stated. (T 367). Carr admitted he and Thomasevich must have left the interview room at a point in time because pizza and sodas were brought into the room. (T 367-368). Other than Scheff, no other deputies entered the room. (T 368).

It was Carr's testimony that he read the Miranda warnings to Petitioner and that Petitioner averred he understood those rights. (T 368). Although pictures of the scene were shown, Carr explained they were shown, "sometime after we were talking to him after he told us the pertinent facts." (T 369).

Detective Eli Thomasevich ("Thomasevich") explained he was at the crime scene and worked with his partner on some aspects of the investigation. (T 374-375). Thomasevich was present during Petitioner's arrest and for both the taped and unrecorded interviews. (T 375). At no time during the investigation was any pressure brought to focus upon Petitioner or arrest him for the murder. (T 375).

Having his attention drawn to Duhart and the stolen Circle K cigarettes, Thomasevich stated that by the time he arrived at the scene, Duhart was in custody and had spoken to several officers. (T 376). Thomasevich acknowledged Duhart had caused problems at the Circle K in the past and had been told by the police to stay out of the store. (T 377). During his deposition to defense counsel, Thomasevich stated that he had not had any contact with Duhart after November 13, 1990, however, at the suppression hearing, this mistake was corrected. (T 377-378). Thomasevich explained that the had forgotten that he and Carr had talked to Duhart once again after they had interviewed C. McGill. (T 378).

Confirming that no taped statement was taken from C. McGill, Thomasevich corrected his prior deposition and admitted that he interviewed C. McGill in March 1991 after he and Carr became the lead detectives. (T 382). The reason Thomasevich interviewed C. McGill was due to Bain"s allegations, although Thomasevich had never talked to Bain. (T 385).

Before interviewing C McGill, Thomasevich reviewed the police reports and noted there were a number of gun charges and violent crimes listed. (T 386-387). Thomasevich testified that during the interview, C. McGill stated "he remembered a pretty black woman that was in the store that he talked to several times but did not know her name." The detectives were unsure whether the "black woman" was Bain. (T 388-389). As recounted by Thomasevich, C. McGill and Duhart were not suspects in the murder case because it was determined they were miles away from the crime scene at the time of the killing. (T 392). Acknowledging he knew of the internal affairs investigation, Thomasevich attested he was the officer who took Deputy Williams's gun to be tested against the bullet which killed Behan. (T 395).

Thomasevich told the trial court a decision was made to arrest Petitioner based upon probable cause even though there was time to obtain an arrest warrant. (T 396-397). To the best of Thomasevich's recollection, Petitioner was shackled to the floor at the homicide office, however, he did remember that the floor ring had been removed by that time. (T 398 and 403). While he knew Petitioner was fifteen at the time of the arrest, Thomasevich did not call the Petitioner's parents and only after the interview was concluded did Thomasevich discover Petitioner's mother had been at the office. (T 398-399). Although Carr and Thomasevich spoke to Petitioner off tape for an hour, they did not show him crime scene

photographs until after they had obtained a verbal statement. (T 399). After having the opportunity to converse with Petitioner, Thomasevich described him to be of average intelligence. (T 403).

Countering the defense argument, the prosecutor maintained that in determining the issue of voluntariness and intelligent waiver of rights, the trial court must consider the totality of the circumstances, along with the conduct of the law enforcement officers. (T 420). In considering the actions of the police, the trial court should determine whether the police conduct amounted to a coercion that overcame the Petitioner's will. (T 420-421). When considering any alleged pressure brought to bear against the Petitioner, the trial court must focus upon the capacity of the Petitioner to resist such pressure. (T 421). As stated by the prosecutor:

> Let's accept that [Petitioner] has an IQ that is low, and Mr. Davis said Dr. Koprowski's testimony was not impeached.... [Petitioner] has scored on several tests over different periods of time at this level, and my only concern was whether or not the fact that his mental condition, even assuming his mental condition was one of having a low intelligence IQ, is that of such a nature that that fact in and of itself means that he cannot freely and voluntarily understand what happened. The doctor unequivocally said no, it does not.
>
> The doctor said on cross-examination you have to look at the totality of the circumstances, and the fact that the doctor clearly said it was my opinion that he even understood his rights in a basic sense. That was clearly the doctor's testimony that [Petitioner] understood that. But she went on to conclude

> based upon my analysis on the factual basis of
> this case, [Petitioner's] will of some sort
> was overcome, and he wanted his mother
> present.

(T 421-422).  Continuing, the prosecutor directed the trial judges

attention to <u>Colorado v. Connelly</u>, 479 U.S. 157, 167, 107 S.Ct.

515, 522, 93 L.Ed.2d 473 (1986) and the fact that low IQ alone does

not establish that a confession was involuntary, there has to be

something more, there has to be coercive police action.  It was the

State's position that, in spite of Petitioner's IQ and age, the

evidence established that the statements were voluntary; they were

not coerced. (T 426-430).  Finally, the prosecutor asserted that

the November statement did not taint the July 1991 confession and

pointed out the intervening events and the independent discovery of

facts connecting Petitioner to the crime. (T 430-433).   In

rebuttal, defense counsel attacked the State's assertion respecting

any taint or attenuation of the two statements. (T 436-438).

After suppressing the November 15, 1990 statement, Judge

Frusciante turned to the July 16, 1991 confessions. (T 441).

> There has to be some independent way that the
> police will make it back to Mr. Brown on that
> date.   Other than that particular statement
> made on November 15th.   Some of the things
> that I thought were significant were things
> such as the fact that the police allowed Mr.
> Brown to be free at one point to go into (sic)
> the system here, and be let out again. As a
> matter of fact, I think it happened a couple
> of times once' at least without their knowing,
> and I find it very difficult to believe that
> if they really had him as a suspect based upon
> that first statement, that he would have had

such an opportunity. I think there are, however, some problems perhaps for the State regarding the overall facts, and perhaps there will be some difficulty before the jury regarding certain matters such as Mr. McGill and the lack of pursuing Mr. McGill is troublesome to the Court.

What I have to determine in my own mind is does it effect this particular motion, and I've come to the conclusion that it does not. I find that the intelligence of the Defendant being certainly a consideration for the Court as are a number of things, I think it was the <u>Brewer</u> case in fact cited in your motion, Counsel, brings the totality of the circumstances to the forefront as well as any individual case, and I'm looking at cases here such as <u>Stokes</u> where I'm concerned about the parent going to the police station and not having an opportunity to be with the defendant. I failed to find that particular fact in this case that would conform to, or have this Court conform to the ruling in <u>Stokes versus State</u>. And the intelligence certainly I think is relevant, and in some other cases referring to children as young as ten years old IQ's may be a little bit higher I think 68, 69, 70 someplace in that area, but it was a ten year-old as opposed to a 15 year old, and that wasn't sufficient enough to suppress the statement.

Although as you mentioned, Counsel, the State did not impeach the doctor, the fact is that I think much of what she said led the Court to believe this defendant had the mental capacity to understand the <u>Miranda</u> warnings that were given to him, and much of what he did not do well in school may have in fact been brought about by his not attending....

That's not a problem here again that this Court needs to address. It appears clear that in the first statement [Petitioner] was intoxicated and I see nothing in the statement that drugs were mentioned in <u>Brewer</u>. I see nothing in the second statement that shows

> signs of that at all.   I believe that the
> defendant freely and voluntary (sic) and
> knowingly and intelligently waived his rights
> in the second statement, and as such this
> Court would rule that the motion in regards to
> the July statement be denied.
>
> To sum it up as far as the two statements are
> concerned, the Defendant's motion regarding
> the first statement is granted.   The
> Defendant's motion as it regards the second
> statement is denied.

(T 441-443).

### b.   The Trial

At trial, before Judge Backman, BSO forensic expert, James Kammerer explained he responded to the crime scene and searched for physical evidence of the crime, but found none. (T 1270-1273 and 1279-1280).   Behan's police car was "processed" for fingerprints, however, none matched the suspects here. (T 1281 and 1284-1287).

The crime scene was under the supervision of Deputy Larry Rogers ("Rogers"), who reported an extensive search of the area did not yield a weapon or shell casings. (T 1336-1337 and 1242-1248). Rogers confirmed BSO did not obtain fingerprint matches in this case. (T 1336).   Additionally, he was not aware of any physical evidence tying Petitioner to the murder. (T 1336).   A subsequent search of a nearby rock pit likewise did not yield any evidence. (T 1353, 1384, and 1895-1901).

Behan's autopsy was done by Assistant Medical Examiner, Raul Vila. (T 1301-1304).   According to him, Behan had a gunshot wound

to the left side of his face and the firearm had been discharged between 18 and 36 inches from Behan. (T 1307-1310 and 1315).

BSO shift supervisor, Brett Sagenkahn ("Sagenkahn"), was assigned to District 1 which included the Circle K market. (T 1386). Deputy DeGuiceis was assigned to patrol the area surrounding the Circle K on November 13, 1990. (T 1388). Other deputies assigned to adjacent areas included Deputies Wiener, Kaminsky, Richmond, and Behan. (T 1389). On the day in question, a theft of cigarettes was reported by the Circle K store. (T 1389). Being in the middle of a search for an escaped juvenile suspect, Mr. Pinero, the deputies asked to delay responding to the theft. (T 1389-1390). Ten to twenty minutes later, a deputy did respond to the Circle K, however, Sagenkahn was unaware of it until after the shooting. (T 1396). Shortly after Sagenkahn told Behan he would meet him at the Circle K to give him an application, Sagenkahn heard of the shooting and proceeded to the location. (T 1400).

A video tape of the Circle K and the confrontation between the clerk and the suspect, who took the cigarettes, was played for the jury. (T 1401-1402). The video showed Behan was the first officer to respond; Behan is seen talking to the clerk and then exiting to speak to Deputy DeGuiceis ("DeGuiceis") who had just arrived. (T 1402-1403 and 1406-1409). DeGuiceis identified the theft suspect as "Duhart". (T 1409). According to Sagenkahn, it was not unusual

for deputies to cover calls for their fellow officers; such, did not require special authorization. (T 1410).

Having heard of Behan's murder, Deputies Wiener ("Wiener") and Kaminsky ("Kaminsky") responded to the scene. (T 1442-1445). Deputies DeGuiceis and Richmond ("Richmond") arrived moments before Wiener and Kaminsky. (T 1445). Wiener observed that Richmond had removed the very bloody Behan from the sheriff's car and had commenced CPR. (T 1446). As part of Wiener's responsibility that day, he handled the initial investigation including securing the scene and recording names of witnesses. (T 1447).

Kaminsky attested that it was less than two weeks since his graduation from the police academy when he was assigned to District 1, and assisted in the Behan murder investigation. (T 1450-1451). It was his responsibility to block off the area so that the emergency helicopter could land. (T 1452).

DeGuiceis, working in the area of the Circle K received the initial dispatch of a reported theft. (T 1461-1464). Because he was advised by Richmond of a sighting of a juvenile escapee, DeGuiceis joined in that search. (T 1464). Later DeGuiceis went to the Circle K only to find Behan taking the report. (T 1465). According to DeGuiceis, he told Behan the theft likely was committed by Kevin Duhart ("Duhart"). It was decided DeGuiceis would conduct an immediate search of the area with Richmond as Behan had started the paperwork. (T 1467-1468). While searching

for Duhart, DeGuiceis heard the BSO broadcast of the shooting. (T 1477-1490). Returning to the Circle K, as Richmond arrived, DeGuiceis saw Behan with a gunshot wound to the head. (T 1481-1482). DeGuiceis then continues his search for Duhart finding him 10 to 12 blocks from the Circle K. (T 1483-1491).

Under questioning by defense counsel, DeGuiceis admitted both he and Richmond had been dispatched initially to handle the Circle K theft, but that it was Richmond who had radioed the other BSO officers about the escapee which prevented DeGuiceis and Richmond from handling the Circle K report. (T 1485). A police report was not filed by DeGuiceis regarding the theft even though Duhart admitted to stealing the cigarettes. (T 1485).

On November 13, 1990, local resident, Stephen Antonio, was inside the Circle K and telephoned 911 when Behan was shot. (T 1505-1506 and 1515). Looking out the door within five seconds of the shooting, Mr. Antonio saw nothing. (T 1516 and 1520).

Forensic crime scene detective, Jorge Corpion ("Corpion") arrived at the Circle K within four minutes of the radio announcement of the killing. (T 1523-1525). He assisted in securing Behan's automobile and processing it for fingerprints. (T 1528-1529). Photographs of the location of Behan's cruiser, as well as interior shots showing the blood spatter, were admitted into evidence (T 1532-1537). Describing the condition of Behan's car, Corpion stated it was parked facing north, with the head

lights and air conditioning on, engine running, and the driver's side window was halfway down. (T 1537-1539). Corpion was unaware of any forensic evidence involving Petitioner. (T 1555).

Charles Edel was accepted as an expert in the field of "blood stain interpretation." (T 1573-1575). He opined he believed Behan to have been sitting in the driver's seat with his left arm extended, that the bullet pierced his "hand leaving the deposit residue on the surface of it, piercing through, striking Mr. Behan in the side of the face and transversing through the head and coming, lodging" in the back of his head." (T 1584 and 1590-1591).

Dennis Grey ("Grey"), a firearms examiner with BSO, averred he examined Behan's shirt and the bullet extracted from his head. (T 1592-1595). While finding no gunshot residue on the shirt, there was residue on Behan's hand. (T 1597-1598). Because of this residue, Grey concluded the gun must have been discharged close to Behan. (T 1597-1598). The ammunition used in the killing was from either a .357 or .38 caliber weapon. (T 1603-1604).

After Grey testified, the Judge Backman revisited the defense motion to suppress. (T 1624). The trial court found the following:

> First the decision by Judge Frusciante to suppress the statement of Mr. Brown that was given on the 15th or the 16th of November, where there was a simple finding [Petitioner] was not advised of his <u>Miranda</u> warnings, accordingly the Court has suppressed the statement. There was no finding by Judge Frusciante that the statement given by Mr. Brown at the time was in any way coerced or otherwise ill gotten, therefore suppressed.

The issue that's being raised at this time, the fact that a second statement was taken some eight months later, during the course of interrogation prior to the actual statement being given by Mr. Brown, the defendant in this case, either waived or made reference to the fact that Mr. Brown had given a prior statement and thereafter, Mr. Brown confessed.

And the statement or the issue that was being presented to the Court was by virtue of a first statement being suppressed, it mentioned as an inducement to the second that it too would have to fall.

I would submit that there are no cases either State or Federal that exactly address that issue in that form.   In fact, the cases that were given to the Court by the defense and the Court's own research with regard to the cases from the United States Supreme Court, all seem to indicate that it is just a factor that is taken into consideration with the totality of circumstances,   that   thereafter   determine whether or not the second confession should fall.

The Court would make the following finding: The comments as I stated yesterday, this Court was not the Court that heard all the testimony that was presented over the hours.   However, the Court has had an opportunity to review the motion   to   suppress   that   was   filed,   the testimony that was presented during the course of trial,   not   the   arguments,   they   are   not reduced to transcript form; memorandums of law that was provided to the Court by defense, which by the way did raise and argue the issue in   terms   of   the   second   statement   having referenced   to   the   first   statement   by   the officer, so it is an issue that had been addressed.

There has been no finding by Judge Frusciante, my predecessor, that the first statement was coerced.   There is nothing in the record that indicates that it was as a result of the inducement of the officers indicating to Mr.

Brown that he, in fact, or he had already previously confessed, and we have your confession, we can use your confession. There was nothing of any of that nature that goes toward that issue that would show that the first confession was a significant inducement to get the second statement from Mr. Brown.

Further, the record is clear that Judge Frusciante considered the shackles, handcuffs, the mental status of Mr. Brown, all in totality in determining whether or not to grant [the] motion to suppress the second statement or not. And it is this Court's ruling at this time that there is no basis by which I would disagree with the ruling of Judge Frusciante, and accordingly the request I take it for reconsideration of the issue, is denied.

(T 1624-1627). As a result of the trial Court's ruling, the parties set about agreeing upon the portions of the taped statement which should be redacted. (T 1628-1638).

Admitting to having been fired from BSO sometime after the murder, Richmond stated he was on duty November 13, 1990 when Behan was killed. (T 1646 and 1653). Patrolling a half mile from the crime scene, Richmond responded immediately when he received the dispatch advising of the shooting. (T 1647-1648 and 1670). First to arrive, Richmond radio headquarters when he saw Behan slumped in his car and bleeding from the cheek. (T 1648-1649 and 1651). After checking for a pulse, Richmond removed Behan from the car. (T 1651). In so removing Behan, Richmond noticed the deputy had been writing a report. (T 1651).

On cross-examination, Richmond testified he saw Behan at the Circle K taking the report on the cigarette theft. (T 1653-1655). Leaving the Circle K, Richmond continued to patrol and look for Duhart. (T 1656 and 1659). While Richmond believed he was looking for some juvenile named "Pinero", he could not recall having seen the child or asking Sagenkahn for leave to continue to look for Pinero. (T 1661-1663).

As the initial responding deputy, Richmond did not see anyone fleeing the murder scene. (T 1670). According to Richmond, at first he was directed by BSO to not write a report, then he was ordered to produce a report in April 1991. (T 1670-1671).

Homicide Detective Carr testified that on February 5, 1991, he and Thomasevich were assigned as the lead investigators in the Behan murder. (T 1713-1714). It was Carr's account that he first became aware of the name "Timothy Brown" on November 25, 1990 which prompted him to conduct an interview of an individual on November 30, 1999. (T 1714). Subsequently, on April 26, 1991, Carr interviewed four other persons and in May 1991, Carr questioned six other individuals followed by a June 4, 1991 interview with another person. (T 1715-1716). Since the November 25 and 30, 1990 interviews, Carr had wished to question Petitioner. (T 1716). It was not until July 16, 1991 that Carr had such an opportunity. (T 1717). After Carr and Thomasevich advised Petitioner they were deputies with BSO, they told him he was under arrest for the murder

of Behan. (T 1720-1721). Petitioner was Mirandized at the scene, after which he agreed to talk to the police without the presence of an attorney. (T 1721-1722). The Petitioner was transported to the BSO station where he was made comfortable, given a soda, and permitted to use the restroom. (T 1721-1723). After these niceties, Petitioner was read his <u>Miranda</u> rights once again, and he signed a written waiver which was designed for juvenile arrestees and contained a few more questions than on the adult form. (T 1723 and 1727). Although shackled at the station, the Petitioner was not handcuffed. (T 1724-1725).

The interview room in which Petitioner was situated measured approximately ten-by-ten or twelve-by-twelve, with central air-conditioning, fluorescent lighting, a desk, and a few chairs. (T 1725). During the interview, Petitioner read along with Carr the <u>Miranda</u> warnings and noted his understanding of each right both verbally and in writing. (T 1727-1730). Carr and Thomasevich signed the form along with Petitioner. (T 1730). The detectives then interviewed Petitioner who, for 20 to 25 minutes, denied involvement. (T 1730-1731). At no time did Petitioner decline to answer the detectives's questions nor did he indicate he felt uncomfortable, threatened, or intimidated. (T 1731). Once Carr advised Petitioner that they had certain information (developed from November 25, 1990 through June 4, 1991) Petitioner admitted

his involvement in the death of Bean. (T 1732). The off-tape interview last approximately one hour. (T 1732).

During the confession, Petitioner related the events surrounding the November 13, 1990 murder. (T 1733). Petitioner told the detectives that he and Keith King ("King") had been getting high on crack and laced marijuana and that they had a .38 caliber black steel gun. (T 1733-1734). As explained by Carr:

> Petitioner indicated that the two [boys] went out on [Petitioner's] beach cruiser type bike, they were riding around, they were talking about killing someone. And as they rode towards the Circle K store, [Petitioner] indicated to us that the individual by the name of Mr. King had looked up, spotted the police patrol unit sitting there and basically indicated now he knew who.
>
> ...
>
> [Petitioner] told us that they pulled up towards the rear and that Mr. King had gotten off, he was on the handlebars, had gotten off, walked up to the side of the patrol unit. He even indicated about the limp that Mr. King walks with. Walked up to the driver's side door, pulled the weapon from his waistband and fired a single shot, shooting Deputy Behan.
>
> ...
>
> [Petitioner] advised that the two of them got back on the bicycle and crossed Hallendale Beach Boulevard, which would be going north down 40th Avenue. When they came to the area of Southwest 25th Street, approximately one hundred yards off the corner, there is a rock pit on that corner approximately one hundred yards, that the weapon was tossed in, over the fence and into the water there. It's a large dredging area.

...

> [King and Petitioner] had continued back down
> to the area of Wiley Street, where they had
> split up and Mr. Brown indicated that he had
> not seen Mr. King again from that time.

(T 1732-1735)(prosecutor's questions omitted).  At no time during

the interrogation was the Petitioner given any facts concerning the

homicide, however, in order to clarify the streets it which

Petitioner was referring, the detectives showed him a photograph so

that Petitioner could identify the direction he had King had run.

(T 1736).  Over defense counsel's objection, Petitioner's July 16,

1991 taped confession was played for the jury. (T 1746-1768).

In the taped statement, Petitioner admitted that as they

bicycled, they discussed for two blocks King killing somebody. (T

1753).  In response to this announcement, Petitioner "called

[King's] bluff", which Petitioner explained meant he didn't believe

he had the nerve to kill someone. (T 1754).  After King indicated

he had picked his target, he had picked the police officer, King

limped over to Behan's car and fired the weapon. (T 1755).  The

tape is devoid of any indication Petitioner did anything to stop

King or warn the deputy even though he saw Behan sitting in the car

doing paper work. (T 1755 and 1759).  Having discharged the gun

into Behan's head, King gets back on Petitioner's bicycle and

Petitioner pedals them away. (T 1755 and 1760).  They stay together

while King disposes of the gun in a rock pit and until they return

to Wiely Street. (T 1756 and 1761).  Petitioner confessed to having

told other people, including Andre Butler, about his involvement in the crime, and admitted that his initial denial of involvement in the murder was a "lie". (T 1762-1763 and 1766).

Carr testified a $130,000 reward was offered which generated numerous tips about the case. (T 1773). However, Carr denied that any pressure was applied to solve the case quicker. (T 1774).

As part of the investigation, Carr talked to Duhart and admitted to having visited C. McGill in prison. (T 1798). While acknowledging there were allegations concerning C. McGill shooting Behan, C. McGill was eliminated as a suspect because he was three and a half miles from the crime scene when Behan was shot. (T 1804-1806, 1811, and 1818-1819). Carr admitted knowing of Bain and her allegations about the murder. (T 1824-1825). He did not inquire into the sex scandal involving certain deputies and Bain. (T 1856).

The defense motion for judgment of acquittal asserted insufficient evidence to support the State's case. (T 1906-1907). It was the **defense's position that while Petitioner knew beforehand that King was preparing to shoot Behan**, there was no evidence Petitioner participated actively in the murder or shared any expected benefit. (T 1908-1911). In reply, the State pointed out that not only did the Petitioner concede he knew of King's intentions, but he encouraged King by daring him, calling his bluff, and telling him 'he does not have the nerve to do it. (T 1912). Additionally, the prosecutor reminded the trial court that

the Petitioner confessed of having helped King leave the area. (T 1913). The trial judge denied the motion. (T 1914).

Richmond was re-called as a defense witness and testified about the internal affairs investigation of him prompted by Bain's allegations of sexual misconduct by deputies. (T 1916-1935 and 1959-1964). The investigation was conducted by Sergeant David Carry ("Carry"). (T 1916-1917). Even though Carry's report recommended Richmond's dismissal, after arbitration, Richmond and BSO settled on a lump sum payment and a favorable recommendation. (T 1959-1964). Richmond denied the allegations of sexual misconduct. (T 1921-1923). Though he was the first deputy on the murder scene, he was told not to write a report, thus, he felt alienated by BSO homicide. (T 1957-1961).

David Carry ("Carry") testified he was assigned to the Internal Affairs Department during November 1990 through July 1991. (T 1965). Deputy Carry confirmed he investigated the charges leveled against certain deputies by Bain. (T 1967-1975). Carry claimed BSO homicide had ordered he shut down his investigation on November 19, 1990 and to reopen it on November 30, 1990. (T 1191-1194). The trial Court postponed ruling on the admissibility of Carry's proffered testimony related to other scandals involving BSO deputies as alleged by Ronald Middleton until the attorneys had an opportunity to do more research. (T 2030). When the defense request to use Mr. Middleton's statement was renewed and argued,

the trial Court found that Mr. Middleton was not unavailable, therefore, his statement could not be offered into evidence. (T 2162-2163).

Initially Bain claimed she could not recall working at Circle K or the Internal Affairs investigation. (T 2041-2044). However, once the media cameras were excluded from the courtroom, Bain admitted she had lodged a complain with BSO the day after the Behan killing related to "sexual extortion" involving certain BSO deputies. (T 2047-2048 and 2065-2066). The first complaint was filed with a "Deputy Douglas" sometime in June 1990. (T 2066). On April 13, 1990, while working at the Circle K, Bain was robbed and Deputy Chandler ("Chandler") responded. (T 2067). According to Bain, Chandler suggested the deputies could spend more time at the Circle K if she would perform oral sex upon them. (T 2067-2068). Complying, Bain performed oral sex upon both Chandler and Deputy Williams. (T 2068). It was Bain's testimony, Richmond was also involved in this plan. (T 2068). Once Bain filed her complaint with "Deputy Douglas", Richmond informed the Circle K manager, Roxanne Keidaish, of Bain's allegations. (T 2068).

After Behan was killed, Bain came forward with information that C. McGill had committed the murder. (T 2070-2071). According to Bain, Duhart was friendly with C. McGill and Bain knew both men who frequented the Circle K. (T 2071). It was to Detective Stephen

Wiley ("Wiley") that Bain disclosed her belief that Duhart and C. McGill were involved in the murder. (T 2072).

Subsequently, Scheff and Deputy Gucciardo "picked up" Bain. (T 2073). On November 15, 1990, after searching her home, the deputies transported Bain to the station where she was questioned by Wiley[4]. (T 2073). While admitting that as part of her statement, Bain told Wiley that C. McGill had shown her a .38 gun days before the crime and that C. McGill had stated "[he] got one of them" when referring to the murder. At trial, Bain denied making this claim. (T 2077-2079).

A week after giving her first statement, Bain began calling Fort Lauderdale Detective Mike Walley, claiming she knew the location of the murder weapon and that Behan was "shot by mistake", because he was not one of the deputies involved in the sex scandal. (T 2081-2082). Bain claimed the "cigarette theft call" was meant for Richmond, not Behan. (T 2082-2083). Additionally, Bain maintained C. McGill had had an altercation with Richmond stemming from "dirty looks" Richmond had given C. McGill over Bain's hairstyle. (T 2096-2098). It was Bain's perception, C McGill was angry that a white deputy had been "taking a black girl." (T 2098). Bain related that C. McGill told her he would kill Richmond and she admitted she had been placed in a mental institution at the

---

[4] Finishing her statement to Wiley, Bain gave additional statements to Sergeant Carry related to the sexual misconduct of the BSO deputies. (T 2074-2075).

direction of BSO, but had been released after six days. (T 2083-2084 and 2099).

Continuing, Bain asserted she did not know Petitioner; he was not involved in the crime, nor was she responsible for the murder. (T 20878-2088). Admitting she had confessed at one point to the murder of Behan, and that her allegation against C. McGill was false, at trial, she denied to having committed the murders and that she had created the dual personality story. (T 2088-2090 and 2105-2125). Later in Bain's testimony she confessed to having lied to BSO regarding how Behan was killed. (T 2121-2127).

Under questioning by the State, Bain denied a sexual relationship with C. McGill. (T 2135). She also affirmed to not having told Circle K store manager, Roxanne Keidaish, about the sexual extortion by the deputies when she was fired in June 1990. (T 2140). However, Bain claimed at trial that Ms. Keidaish was involved with Richmond at the time Bain made her allegations. (T 2144). Responding to the prosecutor, Bain agreed she had told Petitioner's investigator, Don Pierce, that she and C. McGill had conspired together to kill Behan. (T 2148-2149).

Deputy Chandler ("Chandler") testified he had been investigated by Internal Affairs relating to Bain's allegations. (T 2170-2171). Having been given immunity by BSO at the direction of the Sheriff, the grant did not protect Chandler from criminal prosecution. (T 2171 and 2183). Chandler denied having sex with

Bain or having admitted such to BSO detectives. (T 2173). Chandler also disavowed witnessing sexual activity between Bain and Deputy Charlie Williams. (T 2173-2178).

According to BSO deputy Faustino, in April 1990, he took a robbery report from Bain. (T 2185). At the time of their encounter, Bain did not appear "psychotic." (T 2186). In fact, she was cooperative. (T 2188).

Koprowski testified as an expert in clinical psychology. (T 2216-2217). As she testified during the suppression hearing, she met with Petitioner on four occasions between September and December 1991 and found Petitioner's IQ 60 verbal and 56 in other areas. (T 2218-2219). Petitioner was reading and performing mathematics at the third grade level. (T 2219). His IQ tests from school yielded scores of 54 verbal and non-verbal, and 58 quantitative. (T 2220). Koprowski acknowledged that IQ measurements remain controversial; the measurements are based upon school habits, experience, home life, and other factors. (T 2224-2228). Petitioner's excessive school absenteeism contributed to his low grades. (T 2335-2337).

The defense's renewed motion for judgment of acquittal was denied. (T 2248-2249). The State presented rebuttal witnesses.

Forth Lauderdale detective, Michael Walley, testified to his telephone conversations with Bain which were tape recorded. (T

2263-2266).   When discussing the Behan murder, the caller at times whispered, laughed, and threatened. (T 2268-2269).

On November 15, 1990, BSO Detective Stephen Wiley ("Wiley") had questioned Bain. (T 2273-2275).   It was Wiley's testimony that Bain had an odd laugh and whisper; she laughed throughout her interview. (T 2277).   According to Wiley, Bain told him that "McGill" had claimed to be responsible for the murder and admitted Richmond was the true target. (T 2278-2279).   At the time of the interview, Bain could not recall McGill's first name. (T 2279).

Once Bain was shown some photographs of McGills, she selected Stephen McGill's ("S. McGill") picture. (T 2279-2281).   After it was learned S. McGill had been incarcerated on November 13, 1990, Bain selected Curtis McGill's photograph. (T 2282-2283 and 2287). Bain admitted to having lied when she implicated S. McGill for Behan's murder. (T 2288).   Wiley identified Bain's voice as the person who had telephone Detective Walley. (T 2293-2295).

It was Wiley's testimony that Bain had accused C. McGill of talking of killing a cop four days prior to Behan's death, and of later calling her to confess to committing the murder. (T 2308-2310).   As part of her statement to Wiley, Bain asserted there had been no plan to kill anyone. (T 2311-2313).   Wiley was one of the officers who helped search Bain's home on November 20, 1990 after she had claimed she was going to mail BSO the murder weapon. (T 2320-2326).

Carry returned to testify for the State that his internal affairs investigation commenced on November 15, 1990 and ran through March 1991. (T 2333). None of the deputies were found to have had sex with Bain; although, charges against certain deputies were sustained based upon the deputies' failure to report the allegations. (T 2334-2335). The internal affairs charges against Richmond were sustained due to a finding he had sex with prostitutes, not with Bain. (T 2337-2338). Carry testified Bain admitted her sexual encounter with Deputy Williams was voluntary because she like the deputy. (T 2338-2339). It was confirmed by Carry that the Sheriff had ordered administrative immunity for Deputy Chandler. (T 2344). Once he had received immunity, Chandler admitted he had witnessed Bain and Deputy Williams engaged in sexual activity. (T 2346-2348).

Assistant State Attorney, Ken Schafer ("Schafer"), was assigned to the "special prosecution unit" investigating the sexual scandal. (T 2367-2368) While inquiring into these allegations, Bain claimed knowledge of information related to the Behan murder. (T 2370-2372). Based upon this, Schafer referred Bain to the prosecutor, Chuck Morton. (T 2378). When Bain demanded to see Mr. Morton privately, the interview was declined. (T 2379).

Returning to the stand, Carr acknowledged he was familiar with Bain's allegations against the BSO deputies and C. McGill's involvement. (T 2385-2386). It was Carr's assertion that BSO could

not corroborate Bain's charges against C. McGill. (T 2386).   The

final renewal for a judgment of acquittal was denied. (T 2388).

The jury's request for a transcript of Petitioner's July 16,

1991 statement, Detective Carr's trial transcript, and a copy of a

map showing a radius of 3.5 miles around the Circle K was responded

to as follows:

> ... in response at this particular time to your
> inquiries and consistent with my instructions,
> you can only review and utilize exhibits
> introduced into evidence. The transcript [and
> map are] not in evidence and therefore cannot
> be sent back.

(T 2537-2538).   Subsequently the Petitioner was found guilty as

charged. (Ex. 3 and T 2550).

### 2.   ARGUMENT

### a.   The Sufficiency of the Evidence

> **GROUND A** - UNDER THE APPLICABLE LEGAL STANDARD
> ANNOUNCED IN <u>JACKSON V. VIRGINIA</u>, 443 U.S. 307
> (1979) BROWN WAS NOT DENIED HIS RIGHT TO DUE
> PROCESS OF LAW - THE STATE, THROUGH THE
> EVIDENCE ADDUCED AT TRIAL, PROVED BEYOND A
> REASONABLE DOUBT THAT PETITIONER AIDED AND
> ABETTED THE FIRST DEGREE MURDER OF DEPUTY
> BEHAN. (restated)(AP 55)

Petitioner contends that the evidence adduced at trial was

insufficient to support his conviction alleging that the State

presented no evidence that Petitioner knew King was going to Kill

someone, that Petitioner intended to participate, and that he did

something to assist in the commission of the crime. (AP 55).   In

Petitioner's direct appeal, the Fourth District considered this issue and resolved it adversely to Petitioner.

A state prisoner may seek federal habeas corpus relief based on a claim that the evidence presented at the jury trial was insufficient to prove his guilt if such claim has been exhausted. Jackson v. Virginia, 443 U.S. 307, 320-21 (1979). However, federal habeas corpus relief is warranted only when "it is found that **upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.**" Jackson, 443 U.S. at 324 (emphasis supplied, footnote omitted); Fallada v. Dugger, 819 F.2d 1564 (11th Cir. 1987); Smith v. White, 815 F.2d 1401 (11th Cir. 1987); Martin v. State of Alabama, 730 F.2d 721 (11th Cir. 1984). Indeed, it is not required that the evidence rule out every hypothesis except that of guilt. Jackson, 443 U.S. at 326; Martin, 730 F.2d at 724. "In considering petitioner's claims of insufficient evidence, this court must view all of the evidence, together with all logical inferences flowing from the evidence, in the light most favorable to the government and must draw all credibility choices in favor of the finder of fact." United States v. Perez, 698 F 2d 1168, 1169 (11th Cir. 1983); United States v. Saget, 991 F.2d 702, 712 (11th Cir. 1993). Here, as in Jackson, when a court is faced with facts that support [at best] conflicting inferences, the court must presume the jury resolved such conflicts in favor of the prosecution, and must defer

to that resolution.   Clearly, in the instant case the jury, and the Florida courts have rejected Petitioner's claims that the evidence was insufficient to sustain his conviction.   Petitioner raised the sufficiency of the evidence as his first issue on direct appeal; this claim was rejected by two judges of the Fourth District in affirming his conviction without written opinion (Ex. 5); <u>Brown</u>, 657 So.2d 903, 903 (Fla. 4th DCA 1995).

The evidence adduced at trial is ample proof of Petitioner's guilt when considering the evidence in the light most favorable to the State.   As was argued in the state courts, the Petitioner, by his own confession, satisfied the requirements to become a principal in Behan's murder.   Petitioner discussed killing "someone" with King, pedaled King around on Petitioner's bicycle looking for a victim, dared/urged King to commit the murder, waited for King to kill the deputy, and then drove King away from the scene to dispose of the murder weapon.   At trial, the defense conceded that the Petitioner knew what was going to happen; King planned to kill someone and that someone became Deputy Behan (T 1907-1908).

Under Florida law, both the actor and those who aid and abet in the commission of a crime are principals in the first degree. See section 777.011 Florida Statutes (1989)[5].   In order to be

---

[5]   Section 777.011 Provides:
<u>Principal in [the] first degree</u>: Whoever commits any criminal offense against the

guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime. <u>Ryals v. State</u>, 112 Fla. 4, 150 So. 132 (1933); <u>Collin v. State</u>, 438 So.2d 1036 (Fla. 2d DCA 1983); <u>Charidoin v. State</u>, 362 So. 2d 398 (Fla. 2d DCA 1978); <u>Staten v. State</u>, 519 So.2d 622 (Fla. 1988). As is stated in <u>Staten</u>, "clearly, the getaway driver who has prior knowledge of the criminal plan and is 'waiting to help the [actor] escape' falls within this category, and is, therefore, a principal."

The evidence presented in this case was that Petitioner actively participated in the crime rather than merely having knowledge that an offense would be committed. Physically peddling King around on the handle bars of his bicycle, discussing the murder of "someone," daring King to have the guts to pull it off, standing by while the deputy is stalked and shot, and peddling King away from the scene and to the rock pit to dump the weapon is a combination of factors from which the jury could infer legitimately that Petitioner was an active participant in the crime. <u>See Stark v. State</u>, 316 So.2d 586, 587 (Fla. 4th DCA 1975) (where state relies on aiding and abetting theory, it can prove intent either by

---

State, … or aids, abets, counsel, hires, or otherwise procures such offense and such offense is committed or is attempted to be committed, is a principal in the first degree....

showing aider and abettor had the requisite intent himself, or knew the principal had that intent), <u>cert. denied</u>, 328 So. 2d 845 (Fla. 1976); <u>Staten</u> 519 So. 2d at 524 (evidence that defendant was present when robbery was proposed, defendant drove to scene, waited while crime took place then drove getaway car was ample support for defendant's conviction as principal).

Petitioner claims that while King told him he was going to kill someone, Petitioner did not believe him; that he did not know what was going to happen. (AP ¶ 83). There is no merit to this argument. As noted above, at trial Petitioner admitted he knew that King wanted to kill someone. (T 1907-1908). In fact, as stated by trial defense counsel, "Okay, I can accept that [Petitioner] knows what's going to happen because of the fact that [King] says he's going to shoot somebody and he shows [Petitioner] the gun." Moreover, Petitioner continued to pedal King for the two blocks they traveled to get to the Circle K and the victim, Behan. Nowhere in the statement does it say Petitioner attempted to dissuade King or that he tried to leave King's presence. The clear inference is that Petitioner knew King was in search of a victim, and Petitioner was ready and willing to drive King to that victim.

It is also asserted by Petitioner that his statement proves he does not believe King will kill someone. (AP ¶ 83) Respondent disagrees and directs the Court's attention to the pertinent portion of Petitioner's confession as transcribed at trial.

Brown v. Singletary #96-7207                    68

Q.   Okay. What happens then?

A.   So we just riding, we go up to the Circle K right there on the street straight off Hallendale Beach Boulevard.  As we ride up [King] said I'm gonna kill somebody.

Q.   Okay.  Now, when is the first time that you start having conversation about him stating that he's gonna kill somebody?

A.   About two blocks before we got to Circle K.

Q.   Okay, and tell me exactly what you recall Keith King saying to you.

A.   He gonna kill somebody.

Q.   Okay.  What do you say to that?

A.   **I called his bluff**.

Q.   So you're calling his bluff, you don't believe it?

A.   Yes, sir.

Q.   Okay, you're basically telling him that **you [don't]**[6] **believe he's got like the nerve** to do it?

A.   Yes sir.

_____

[6]  Petitioner asserts the tape contains the word "don't", but the transcript does not. (AP 22).  While this is true, it has **no bearing** on the jury's verdict.  The jury heard the tape and was not given any transcriptions for consideration.  Merely because the court reporter may have missed the word, does not mean that the jury did.  Furthermore, even if the jury and any appellate court omitted the word "don't" the import of "calling his bluff" expresses Petitioner's dare for King to complete his threat.  In fact, on the cold record, the omission of the word "don't" benefits Petitioner, whereas insertion of "don't" into the phrase "you [don't] believe he has the nerve to do it" makes it even clearer, Petitioner was daring/egging on King to kill "someone."

Brown v. Singletary #96-7207                69

(T 1753-1754).  The jury resolved any conflicting interpretation of the phrases "called his bluff" and "[didn't] believe [King] got like the nerve to do it" in favor of the State.   "To call" someone's bluff is to dare them to prove the boast or claim that was made.  By calling King's bluff, Petitioner dared King to follow through on his assertion he was "gonna kill somebody"; Petitioner stayed with King to find out if King had the nerve to pull the trigger and snuff out another human being's life.

Petitioner argues that the balance of his confession confirms he did not believe or know what was to follow. (AP 56 ¶ 84).  The Respondent would disagree based on Petitioner's own description of events. (his July 16, 1991 statement).  Not only did Petitioner get close to the police cruiser to see Behan's reaction to King's attack, but he waited for King to get back on the bicycle so Petitioner could help King flee the area. (T 1754-1755).  Contrary to his assertion, Petitioner knew before King pulled the trigger that the deputy was marked for death.  The phrase, "he's got him" was defined by Petitioner to mean that the victim had been chosen. (T 1754-1755).  After jumping off the bicycle, King limps over to Behan while Petitioner watches. (T 1755).  It was only after the killing was done that Petitioner panics and helps King speed from the area. (T 1755).  Clearly, the confession proves Petitioner knew who had been targeted, and waited in anticipation of the murder he had dared King to commit.

It must by remembered that the question of whether the evidence fails to exclude all reasonable hypothesis of innocence is for the jury to determine. Where there is substantial, competent evidence to support the jury verdict, the verdict should not be overturned. Jackson, 443 U.S. at 319 ("the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). The circumstantial evidence standard does not require the jury to believe the defense version of the facts on which the State has produced conflicting evidence. Cochran v. State, 547 So.2d 928, 930 (Fla. 1989) (given the conflict in physical evidence, defendant claimed that he "let [the victim] out of the car" while the evidence showed he dragged the victim's body, the jury properly concluded that defendant's version of events was untruthful).

The trial court denied the defendant's motions for judgment of acquittal properly and permitted the matter to go to the jury. Because the jury could have concluded reasonably that Petitioner intended to have the crime committed and assisted in its commission, Respondent maintains that Petitioner has failed to meet the standard for reversal under Jackson, and relief should be denied. The weight of the evidence was assessed by the jury, and this Court should decline to reassess the evidence adduced at trial. Eleuterio v. Wainwright, 576 F. 2d 194, cert. denied, 443

U.S. 915 (1979).  Because there is evidence in this case against Petitioner, there is no "sufficiency of the evidence problem" rising to constitutional proportions for federal habeas corpus relief.  <u>Talavera v. Wainwright</u>, 547 F.2d 1238 (5th Cir. 1979). Therefore, both the evidentiary hearing and relief should be denied for Ground A. <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).

   **b.    The Law Applicable to Grounds B and C – The Confession**

      In reviewing a defendant's confession for voluntariness, federal courts must determine whether, in light of the totality of the circumstances, the defendant's confession was obtained in a manner compatible with the requirements of the Constitution, and is a product of the defendant's free and rational choice.  <u>McCoy v. Newsome</u>, 953 F.2d 1252 (11th Cir. 1992); <u>Leon v. Wainwright</u>, 734 F.2d 770 (11th Cir. 1984); <u>See also</u>, <u>Miller v. Fenton</u>, 474 U.S. 104 (1985).  Courts look to both the characteristics of the defendant and the circumstances of the interrogation in considering whether the confession is voluntary.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973); <u>Devier v. Zant</u>, 3 F.3d 1445 (11th Cir. 1993).  Factors examined to make this determination include whether the defendant has been subjected to violence or threats thereof, whether the defendant had been given promises, the length of the defendant's detention, the duration and intensity of the interrogation, any physical deprivations such as lack of food or sleep, limits on access to family and friends, limits on access to counsel, the

adequacy of the warnings given the defendant as to his constitutional rights, the defendant's age, education, mental capacity, whether he was under the influence of alcohol or drugs, whether he was suffering from fatigue, and whether he refused to answer any questions. See <u>Withrow v. Williams</u>, 507 U.S. ___, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993); <u>Brooks v. Florida</u>, 389 U.S. 413 (1967); <u>Sims v. Georgia</u>, 389 U.S. 404 (1967); <u>Beecher v. Alabama</u>, 389 U.S. 35 (1967); <u>Garrity v. New Jersey</u>, 385 U.S. 493 (1967).

"The test of voluntariness is not a 'but-for' test. [W]e do not ask whether the confession would have been made in the absence of the interrogation. Few criminals feel impelled to confess to the police purely of their own accord, without any questioning at all.... Thus, it can almost always be said that the interrogation caused the confession." <u>Miller v. Fenton</u>, 796 F.2d 598, 605 (3d Cir.), <u>cert. denied</u>, 479 U.S. 989 (1986). "[D]etection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of law all responsible officers charged with the duty of law enforcement.... The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw..." <u>Haynes v. Washington</u>, 373 U.S. 503, 514-515 (1963). In <u>Martin v. Wainwright</u>, 770 F.2d 918 (11th Cir. 1985), <u>modified</u>, 781 F.2d 185, <u>cert. denied</u>, 479 U.S. 909 (1986),

this Court quoted with approval Justice Frankfurter's plurality

opinion in <u>Culombe v. Connecticut</u>, 376 U.S. 568, 571 (1961):

> ... [W]hatever its outcome, such questioning is
> often indispensable to crime detection.  Its
> compelling necessity has been judicially
> recognized as its sufficient justification,
> even in a society which, like ours, stands
> strongly and constitutionally committed to the
> principle that persons accused of crime cannot
> be made to convict themselves out of their own
> mouths.
>
> ... But if it is once admitted that questioning
> of suspects is permissible, whatever
> reasonable means are needed to make the
> questioning effective must also be conceded to
> the police.

<u>Martin</u>, at 924-925.  In federal habeas corpus proceedings, although

the ultimate issue of the voluntariness of a confession is a legal

question requiring independent federal determination, **<u>state court</u>**

**<u>factual findings are afforded a presumption of correctness</u>**.  <u>Miller</u>

<u>v. Fenton</u>, 474 U.S. at 109, 106 S. Ct. at 449; <u>Towne v. Dugger</u>,

899 F.2d 1104, 1106 (11th Cir. 1990); <u>Endress v. Dugger</u>, 880 F.2d

1244, 1249 (11th Cir. 1989); <u>Harris v. Dugger</u>, 874 F.2d 756, 761-

762 (11th Cir. 1989); <u>Colorado v. Connelly</u>, 479 U.S. 157, 167

(1986) (holding that voluntariness of defendant's waiver of his

<u>Miranda</u> rights is to be established by a "preponderance of the

evidence"); <u>Lego v. Twomey</u>, 404 U.S. 477 (1972) (voluntariness of

a confession established by "preponderance of the evidence").

In the instant case, the state trial court held a suppression

hearing and revisited the matter during trial.  After consideration

of the evidence and argument of counsel, the trial court held that Petitioner's July 16, 1991 confession was admissible. (T 441-443). In reviewing Petitioner's conviction, the Fourth District considered whether the confession was made voluntarily and whether the rights were knowingly waived under Issue III of the direct appeal. (Exs. 6-8). In affirming without written opinion, one judge dissenting, the Petition's confession was found to have been admitted into evidence at trial properly. (Ex. 5)

Here, the issues of voluntariness and waiver have been separated. Each will be addressed below, however, Respondent submits that a review of the transcript of Petitioner's interview by the police (T 1746-1768) reveals that in light of the totality of the circumstances, the confession was obtained in a manner compatible with the requirements of the United State Constitution.

> **GROUND B** - BROWN WAS NOT DENIED HIS RIGHT TO DUE PROCESS OF LAW - THE TRIAL COURT PROPERLY ENTERED INTO EVIDENCE PETITIONER'S "CONFESSION" WHICH WAS VOLUNTARY AND NOT COERCED. (restated)(AP 57-58)

Petitioner lists a number of "facts" (AP 58-60 ¶87), claiming them to be "circumstances" which, **if brought to the trial court's attention**, reasonably would have resulted in the suppression of the confession. (AP 60 ¶ 88). Clearly, Petitioner concedes the Florida courts have not been afforded the opportunity to contemplate these new allegations. As such, this Court may not consider these new "facts", nor must the Court grant an evidentiary hearing on this

claim. <u>Mathis</u>, 975 F. 2d. at 1493 (reversing district court's decision allowing petitioner to submit additional evidence and granting relief based on new evidence because petitioner failed to show cause and prejudice before district court reviewed evidence not presented in state court); <u>Baldwin</u>, 152 F.3d 1304 (ruling that petitioner not entitled to evidentiary hearing in order to develop facts he failed to show in state court absent demonstrating cause and prejudice for the failure). Moreover, the facts presented by the state courts, at both the suppression hearing and at trial, establish that the trial court considered Petitioner's claims his confession was coerced and that he did not make a knowing and voluntary waiver of his rights. Finding of fact were made, and as such, this Court is required to afford those facts the presumption of correctness. <u>Miller v. Fenton</u>, 474 U.S. at 109.

Petitioner gives no record citations for his new allegations, nor any supporting documentation to establish their veracity. Even though Petitioner has not met his burden of proving cause and prejudice, each contested allegation will be addressed below. Where the record refutes the claim, citations will be given.

> **b.** At his level of retardation, he could not understand compound or multiple questions, or the fact that his words were often twisted by the police. He often lied to hide his lack of comprehension and confusion.... (AP 58 ¶ 87b).

The record established that Petitioner's psychology expert stated she believed Petitioner's words could be twisted, not that

the police twisted them; in fact, the police could not get
Petitioner to agree to something that is fantastic and not based in
reality. (T 193). While the doctor opined Petitioner was easily
led and was "passive compliant", she did not state he lied to hide
his lack of comprehension; instead, **speaking in generalities**, the
doctor reported that some people who are "passive compliant", **may**
be "compliant is a situation rather than frankly show their
ignorance." (T 193).

> c.  ... [Brown] asked that [his mother] be
> present.  The officers knew that Mrs. Brown
> was at the Homicide Unit while Brown was being
> interrogated, but never told Brown.   In
> addition, they lied to Mrs. Brown, stating the
> Brown had already been taken away.... (AP 58 ¶
> 87c).

Although Dr. Koprowski stated Petitioner told her he wished he
had his mother (T 191), such comment was made after the fact, and
after he was facing murder charges. (T 191). Conversely, both the
taped interview and Detective Carr's testimony established
Petitioner did not want his mother present during questioning. (T
148, 278 and 289). Additionally, according to Scheff, while Mrs.
Brown was called and came to the office, she did not ask to see her
son. (T 148 and 166-168). Moreover, the detectives who were
interviewing Petitioner did not know his mother arrived until the
interrogation was completed. (T 363 and 398-399). There is no
testimony supporting the allegation the detective mis-led Mrs.
Brown.

> **d.** Brown was interrogated in a small padded
> room -- which created an extremely coercive
> environment. (AP 58 ¶87d)

There is no testimony supporting this fact.  The interview

room was approximately ten-by-ten or twelve-by-twelve, with central

air-conditioning, fluorescent lighting, a desk, and a few chairs.

(T 1725).  Petitioner has not established how this room created a

coercive environment.

> **e.** Brown was handcuffed to the chair and
> shackled to the floor. (AP 59 ¶87e).

Conversely to what Petitioner claims, the record reveals

Petitioner was not handcuffed; however, he was shackled, but not

necessarily to the floor.  Scheff stated no restraints were used on

Petitioner. (T 34).  Carr stated leg shackles were used as part of

standard operating procedure. (T 281-282).   While Thomasevich

agreed shackles were used, to the best of his recollection

Petitioner was attached to the floor, but then he remembered the

floor ring had been removed by that time of Petitioner's interview.

(398 and 403).

> **f.** Brown was brutally struck in the face....

> **g.** Brown was a battered child … [which
> made] him peculiarly sensitive to physical
> abuse of the type inflicted by Det. Carr, and
> made him crumble under the slightest amount of
> pressure.

> **h.** Brown had sustained multiple head
> injuries from the abuse inflicted by his
> father.

**i.**   Brown was suicidal....

**j.**   Brown may have been suffering from auditory hallucinations.... (AP 59 ¶87f-j)

There is no proof of these allegation.

**k.**   Brown was threatened that he would go the "electric chair".... (AP 59 ¶87k)

The record established that no officer threatened Petitioner. (T 34, 274-277, 280-282, 367-368, and 375). In fact, Petitioner was permitted to use the restroom, was given sodas, and pizza. (T 274-275 and 367-368).

**l.**   … even though the detectives knew that King's statement was false in numerous respects and that they had coerced King's statement as well.... (AP 59 ¶87l)

While information obtained from King's June 4, 1991 statement was utilized, there is no proof BSO believed the statement to be false nor is there proof King's statement was coerced. (T 160-161).

**m.**   Brown was told that "other individuals" had said that he was involved in the murder as well, even though the officers knew that these statements had been coerced and were false. (AP 59 ¶87m)

There is no proof all the statements from the "other individuals" were false or coerced. While some of these individuals may have changed their stories, such does not establish coercion or falsity. (T 359-360). While one witness, Andre Butler, recanted before the grand jury and claimed he had been threatened by the police, Carr asserted the allegations of threats were "totally false." (T 359-360).

Brown v. Singletary #96-7207                     79

n.       Brown  was  told  he  had  to  confess,
because  he  confessed  back  on  November  15,
1990, and they knew he was guilty.

o.   Brown  was  shown  the  crime  scene  photo,
and  was  fed  other  information  about  the  crime
by  the  officers  in  their  unrecorded  pre-
interview. (AP 59 ¶87n-0).

At  no  time  was  Petitioner  threatened,  coerced,  or  "fed"

information  in  order  to  get  him  to  confess.  (T 34, 160-1961, 274-

277, 280-282, 367-368, 375, 399, and 1736).  With respect to the

allegation  the  detectives  used  the  November 1990  confession,  the

trial  court  made  the  finding:

There  has  been  no  finding  by  Judge  Frusciante,
my  predecessor,  that  the  first  statement  was
coerced.   There  is  nothing  in  the  record  that
indicates  that  it  was  as  a  result  of  the
inducement  of  the  officers  indicating  to  Mr.
Brown  that  he,  in  fact,  or  he  had  already
previously  confessed,  and  we  have  your
confession,  we  can  use  your  confession.   There
was  nothing  of  any  of  that  nature  that  goes
toward  that  issue  that  would  show  that  the
first  confession  was  a  significant  inducement
to  get  the  second  statement  from  Mr. Brown.

(T 1626-1627).

p.   While  certain  well-known  details  of  the
crime  are  correctly  recounted  in  Brown's
statement,  other  information  he  recounted  was
demonstratively false. (AP 59 ¶87p).

Petitioner  has  not  shown  how  the  discrepancies  between  his

statement  and  King's  was  "demonstratively  false"  or  that  these

inconsistencies  established  a  constitutionally  infirm  confession.

It  is  well  settled  Miller v. Fenton,  474 U. S. at 109.

The record before both the judge hearing the suppression motion and the trial judge revisiting such motion, established that from the totality of the circumstances, Petitioner's confession was obtained properly. (T 441-443 and 1624-1627). While Petitioner was 15 at the time of his arrest and was mildly retarded, his own expert psychologist agreed that a low I.Q. score did not mean Petitioner could not understand his rights (T 228-229). In fact, the doctor stated Petitioner understood his rights, "I think it is totally misrepresenting his level of ability to say he wouldn't know what an attorney is or wouldn't know right from wrong or any of those issues." (T 240).

In addition to the reality Petitioner had been interrogated for other criminal matters (T 240), the length of Petitioner's interrogation was approximately 80 minutes during which time he was permitted to use the bathroom and was given food and water. (T 367-368). No threats were made against Petitioner and no information was fed to him. As noted by the suppression hearing judge:

> ... And the intelligence certainly I think is relevant, and in some other cases referring to children as young as ten years old IQ's may be a little bit higher I think 68, 69, 70 someplace in that area, but it was a ten year-old as opposed to a 15 year old, and that wasn't sufficient enough to suppress the statement.

> Although as you mentioned, Counsel, the State did not impeach the doctor, the fact is that I **think much of what she said led the Court to believe this defendant had the mental capacity to understand the** <u>Miranda</u> **warnings that were**

> **given to him, and much of what he did not do
> well in school may have in fact been brought
> about by his not attending....**
>
> That's not a problem here again that this
> Court needs to address. It appears clear that
> in the first statement [Petitioner] was
> intoxicated and I see nothing in the statement
> that drugs were mentioned in <u>Brewer</u>. I see
> nothing in the second statement that shows
> signs of that at all. **I believe that the
> defendant freely and voluntary (sic) and
> knowingly and intelligently waived his rights
> in the second statement....**

(T 441-443). When the motion to suppress was renewed, the trial

court ruled:

> Further, the record is clear that Judge
> Frusciante considered the shackles, handcuffs,
> the mental status of Mr. Brown, all in
> totality in determining whether or not to
> grant [the] motion to suppress the second
> statement or not. And it is this Court's
> ruling at this time that there is no basis by
> which I would disagree with the ruling of
> Judge Frusciante, and accordingly the request
> I take it for reconsideration of the issue, is
> denied.

(T 1626-1627).

Clearly, the trial court considered the allegation the

confession was obtained through coercion. However, the trial court

determined there was no evidence the Petitioner was coerced into

confessing to the murder. After hearing extensive testimony, the

court considering the motion to suppress found the Petitioner had

the mental capacity to understand his rights, that he was not

intoxicated when questioned, and there was no coercion. (T 441-

443).   Additionally, when the motion was reconsidered by a different judge at trial, it was determined that Petitioner's prior contact with the police was not used in a coercive manner or as an inducement for the July 1991 confession.   Moreover, neither Petitioner's mental state nor the use of shackles required a finding of coercion. (T 1624-1627).   Because the state court findings are afforded a presumption of correctness, <u>Miller v. Fenton</u>, 474 U.S. at 109, and there is no evidence the State forced Petitioner to admit his involvement in the crime, this Court should find the confession was obtained properly.   Petitioner's constitutional rights were not violated and the admission of the confession at trial was correct.   Petitioner is entitled to no relief. <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986).   This determination should be made from the extensive and clear record; new facts may not be introduced at this stage of the proceedings and an evidentiary hearing on this matter is improper. <u>Baldwin</u>, 152 F.3d 1304(ruling that petitioner not entitled to evidentiary hearing in order to develop facts he failed to show in state court absent demonstrating cause and prejudice for the failure); <u>Mathis</u>, 975 F.2d 1493 (reversing district court's decision allowing petitioner to submit additional evidence and granting relief based on new evidence because petitioner failed to show cause and prejudice before district court reviewed evidence not presented in state court.

**GROUND C** - PETITIONER KNOWINGLY AND INTELLIGENTLY WAIVED HIS MIRANDA RIGHTS, THEREFORE, HIS DUE PROCESS RIGHTS WERE NOT VIOLATED BY THE ADMISSION OF HIS CONFESSION INTO EVIDENCE. (restated) (AP 60)

Petitioner claims his waiver of the Miranda rights was not knowing and intelligent, because he has a low I.Q., is mildly retarded, and does not read well. The Respondent disagrees that age, mental capacity, and reading ability in this instance establish Petitioner's claim.

As noted above, Petitioner's own doctor opined, "I think it is totally misrepresenting his level of ability to say he wouldn't know what an attorney is or wouldn't know right from wrong or any of those issues." (T 240). Moreover, it was pointed out that Petitioner had been through the criminal justice system in the past and had been represented by counsel. (T 228-229). Further, it was established that Petitioner's poor grades and reading ability may have been due in part to his lack of attendance at school more than just his mental capacity. (T 223-224).

In considering federal habeas petition relief, the state court's findings of fact are presumed correct. Miller v. Fenton, 474 U.S. at 109. When evaluating the voluntariness of a confession, the court considers "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." Id. at 112. It is well established that the test is whether, under the

totality of the circumstances, the state obtained the defendant's statements by physical or psychological coercion or by improper inducement so that the person's will was overcome.  See United States v. Glover, 104 F.3d 1570, 1579 (10th Cir.1997).   In contemplating whether a particular confession is coerced, the court considers the following factors:  "(1) the age, intelligence, and education of the defendant;  (2) the length of [any] detention;  (3) the length and nature of the questioning;  (4) whether the defendant was advised of [his or] her constitutional rights;  and (5) whether the defendant was subjected to physical punishment." Id.  However, under Connelly, it is clear that the "... personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion. United States v. Rohrbach, 813 F.2d 142, 144 (8th Cir.1987)(quotations omitted).

Here, there is no proof of coercion, physical abuse, or mental terror.  The Petitioner was advised of his rights both verbally and in writing.  The length of his detention was short before he admitted his guilt; Petitioner was with the detectives for approximately 25 minutes before he confessed in the pre-taped interview.  (T 1730-1731).   The total interrogation lasted approximately 80 minutes.  In fact, during this short time in police custody, Petitioner was permitted to use the bathroom and was given sodas and pizza. (T 367-368).  Finally, the Petitioner's age, scholastic aptitude, and mental capacity did not preclude him

from comprehending his rights or from making the knowing decision to talk to the police without an attorney, as was acknowledged by Petitioner's own psychologist. (T 228-229 and 240).

As found by the state court, Petitioner "had the mental capacity to understand his Miranda warnings that were given him", he was not under the influence of intoxicants at the time he gave his July 1991 statement, and that Petitioner gave a free and voluntary statement. (T 441-443). Furthermore, at trial, the court found that there was no evidence the November 1990 statement was used as an inducement for the July 1991 statement, further the use of shackles was considered and rejected. (T 1624-1627). Giving the state court's findings the presumption of correctness they deserve, Miller v. Fenton, 474 U.S. at 109, the totality of the evidence reveals Petitioner's confession was not coerced, but was given knowingly and intelligently after Miranda warnings had been waived. This Court should deny Petitioner's requested relief. Connelly, 479 U.S. at 167; Rohrbach, 813 F.2d at 144. Additionally, this Court must deny the request for an evidentiary hearing as all the pertinent evidence is contained within the record. Baldwin v. Johnson, 152 F.3d 1304 (11th Cir. 1998); Mathis v. Zant, 975 F.2d. 1493 (11th Cir. 1992).

## IX.   CONCLUSION

Based upon the foregoing, the Respondent requests respectfully that this Honorable Court dismiss this petition and deny any and all relief requested.

Respectfully submitted,
ROBERT A. BUTTERWORTH
ATTORNEY GENERAL


CELIA TERENZIO
Assistant Attorney General
Bureau Chief
Fla. Bar No. 656879


LESLIE T. CAMPBELL
Assistant Attorney General
Fla. Bar No. 0066631

OFFICE OF THE ATTORNEY GENERAL
Criminal Appeals Division
1655 Palm Beach Lakes Blvd.
Suite 300
West Palm Beach, Florida  33401
Telephone:  (561) 688-7759

Attorneys for Respondent

## CERTIFICATE OF SERVICE

I CERTIFY that I caused a true and correct copy of the foregoing "Response to Amended Petition" to be served by U.S. mail to BRENDA G. BRYN, Assistant Federal Public Defender, 101 N.E. 3rd Avenue, Suite 202, Fort Lauderdale, Florida 33301 this 23RD day of June, 1999.

Celia Terenzio
Assistant Attorney General
Bureau Chief

Leslie T. Campbell
Assistant Attorney General

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TIMOTHY BROWN,                        :
                                      :
            Petitioner,               :
                                      :
v.                                    :        CASE NO.  95-7207-CIV-GRAHAM
                                      :
HARRY K. SINGLETARY,                  :
                                      :
            Respondent.               :

### INDEX TO APPENDIX AND APPENDIX TO RESPONSE TO
### AMENDED PETITION FOR WRIT OF HABEAS CORPUS

1.   Judgment for case number 91-14793 CFB

2.   Indictment in case number 91-14793 CFB

3.   Verdict form in case number 91-14793 CFB

4.   Sentence for case number 91-14793 CFB

5.   Opinion and Mandate in appellate case number 93-3759
     Brown v. State, 657 So. 2d 903 (Fla. 4th DCA 1995)

6.   Initial brief in appellate case number 93-3759

7.   Answer brief in appellate case number 93-3759

8.   Reply brief in appellate case number 93-3759

9.   Motion to Suppress in case number 91-14793 CFB

Respectfully submitted,
ROBERT A. BUTTERWORTH
ATTORNEY GENERAL

CELIA TERENZIO
Assistant Attorney General
Bureau Chief
Fla. Bar No. 656879

LESLIE T. CAMPBELL
Assistant Attorney General
Fla. Bar No. 0066631

OFFICE OF THE ATTORNEY GENERAL
Criminal Appeals Division
1655 Palm Beach Lakes Blvd
Suite 300
West Palm Beach, FL  33401
Telephone:  (561) 688-7759

Attorneys for Respondent

CERTIFICATE OF SERVICE

I CERTIFY that I caused a true and correct copy of the foregoing "Appendix" to be served by U.S. Mail to BRENDA G. BRYN, Assistant Federal Public Defender, 101 N.E. 3rd Avenue, Suite 202, Fort Lauderdale, Florida 33301 this _23ᴿᴰ_ day of June, 1999.

_____
Celia Terenzio
Assistant Attorney General
Bureau Chief


_____
Leslie T. Campbell
Assistant Attorney General

# EXHIBIT   1

[ ] In the County Court In and for Broward County

**CLOCK IN**

| DIVISION: | | **JUDGMENT** | 93-545167    T#003 |
|---|---|---|---|
| ☒ CRIMINAL | | | 12-01-93    10:28AM |
| [ ] TRAFFIC | | DIV.: __FD__ | |
| [ ] OTHER | | | |

3

THE STATE OF FLORIDA VS.

**Timothy Brown**

PLAINTIFF                              DEFENDANT

**CASE NUMBER**

91-147930FB

---

☐ PROBATION VIOLATOR           ST. ATTY.   C Morton
(Check if Applicable)                CT. RPTR.   D Guerra

The Defendant **Timothy Brown** being personally before this Court represented

by **LARRY DAVIS** , his attorney of record, and having:

(Check Applicable
Provision)

☒ Been tried and found guilty of the following crime(s)
☐ Entered a plea of guilty to the following crime(s)
☐ Entered a plea of nolo contendere to the following crime(s)

| COUNT | CRIME | OFFENSE STATUTE NUMBER(S) | DEGREE OF CRIME | ADD'L MONIES IMPOSED |
|---|---|---|---|---|
| I | Murder 1° | 782.04(1) | CF | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

and no cause having been shown why the Defendant should not be adjudicated guilty, IT IS ORDERED THAT the Defendant is hereby ADJUDICATED GUILTY of the above crime(s)

• • • • • • • • • • • • • • • • • • • •

The Defendant is hereby ordered to pay the sum of Fifty Dollars ($50.00) pursuant to F.S. 960.20 (Crimes Comp. Trust Fund). The Defendant is further ordered to pay the sum of Five Dollars ($5.00) as court costs pursuant to F.S. 943.25(4).

(Check if Applicable)

☐ The Defendant is further ordered to pay a fine in the sum of $ _____ pursuant to F.S. 775.0835. (This provision refers to the optional fine for the Crimes Compensation Trust Fund, and is not applicable unless checked and completed. Fines imposed as part of a sentence pursuant to F.S. 775.083 are to be recorded on the Sentence page[s].)

☐ The Court hereby imposes additional court costs in the sum of $ _____

Imposition of Sentence Stayed and Withheld (Check if Applicable)

☐ The Court hereby stays and withholds the imposition of sentence as to count(s) and places the Defendant on probation for a period of _____ under the supervision of the Department of Corrections (conditions of probation set forth in separate order).

Sentence Deferred Until Later Date (Check if Applicable)

☒ The Court hereby defers imposition of sentence until **Nov. 19, 1993**
(date)

☑ Pay $200 Trust Fund pursuant to F.S. 27.3455

The Defendant in Open Court was advised of his right to appeal from this Judgment by filing notice of appeal with the Clerk of Court within thirty days following the date sentence is imposed or probation is ordered pursuant to this adjudication. The Defendant was also advised of his right to the assistance of counsel in taking said appeal at the expense of the State upon showing of indigence.

COUNT(S) _____ _____ DAYS BROWARD COUNTY

JAIL W/CREDIT FOR _____ DAYS TIMES SERVED

2942

Form CC-251 Revised 10/90                Page 1 of 2

( ) CRIMINAL          ( ) ADJUDICATION WITHHELD
( ) TRAFFIC
( ) OTHER             (X) ADJUDICATED GUILTY

CASE NUMBER

91- 14793CFB

## FINGERPRINTS OF DEFENDANT

| 1. R. Thumb | 2. R. Index | 3. R. Middle | 4. R. Ring | 5 R. Little |
|---|---|---|---|---|



| 6. L. Thumb | 7. L. Index | 8. L. Middle | 9. L. Ring | 10. L. Little |
|---|---|---|---|---|



Fingerprints taken by:

_Shirley A. Sarris 4512_ Court Deputy
Name and Title

DONE AND ORDERED in Open Court at Broward County, Florida this 21 day of October A.D., 19 93 . I HEREBY CERTIFY that the above and foregoing fingerprints are the fingerprints of the Defendant Timothy BROWN . and that they were placed thereon by said Defendant in my presence in Open Court this date.

PAUL L. BACKMAN   JUDGE

2943

Page 2 of 2

# EXHIBIT   2

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA**

In the Circuit Court of the Seventeenth Judicial Circuit
of the State of Florida

For Broward County, at the ___Spring___ Term thereof, on the ___1st___ day of ___August___ in the year of our Lord One Thousand Nine Hundred and Ninety __one___ , to-wit: The Grand Jurors of the State of Florida, inquiring in and for the County of Broward, State of Florida, upon their oaths do present that _____

_____ KEITH KING and TIMOTHY BROWN _____

on the ___13th___ day of ___November___ , in the year of our Lord One Thousand Nine Hundred and ___Ninety___ , in the County of Broward, State of Florida, did then and there unlawfully and feloniously and from a premeditated design to effect the death of a human being, PATRICK KELLY BEHAN, did kill and murder the said PATRICK KELLY BEHAN, while the said PATRICK KELLY BEHAN was a duly qualified law enforcement officer engaged in the lawful performance of his duties for the Broward County, Florida Sheriff's Department, by shooting him with a firearm, to-wit: a handgun, a better and more particular description being to the Grand Jurors unknown,

against the form of the statute in such case pursuant to Section ___782.04(1)___ of the Florida Statutes, made and provided to the evil example of all others in the like case offending, and against the peace and dignity of the State of Florida.

A TRUE BILL:

_Stella M. Krayn_
FOREMAN

I HEREBY CERTIFY that I have advised the Grand Jury returning the Indictment, as authorized and required by law.

_Cu, B M—t_
**CHARLES B. MORTON, JR.**
Assistant State Attorney for the
Seventeenth Judicial Circuit of the State
of Florida, Prosecuting for said State

DEFENSE COUNSEL                              2571

91-14793CF-B

# IN THE CIRCUIT COURT
Seventeenth Judicial Circuit
County of Broward

STATE OF FLORIDA

VS

KEITH KING
TIMOTHY BROWN

INDICTMENT

For ___MURDER FIRST DEGREE___ ___SPRING___ Term, A.D. 19 __91__

A TRUE BILL

Found _[signature]_ FOREMAN

Filed AUG 1 1991

ROBERT E. LOCKWOOD Clerk

By _[signature]_ D.C.

___ASSISTANT STATE ATTORNEY___

---

## ORDER

THE COURT ORDERS that the Defendants to be admitted to bail upon posting bond in the sum of $____

DATED ____

____ CIRCUIT JUDGE

* * * *

## ORDER

THE COURT ORDERS that the Defendants to be held without bond.

DATED AUG 1 1991

C. LAVON WARD
CIRCUIT JUDGE

A TRUE COPY
Circuit Court Seal

'AUG -1 PM 8:35
...ITY COURT
FLORIDA

2572

# EXHIBIT  3

IN THE CIRCUTI COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY,     FLORIDA

CASE NO.: 91-14793 CF

JUDGE PAUL L. BACKMAN

STATE OF FLORIDA,                    :

       Plaintiff,                :

vs.                                  :

TIMOTHY BROWN                        :

       Defendant.                :

_____ :

## VERDICT

We, the jury, find as follows, as to the defendant in this case: (check only one)

_____✓____ a.   The defendant is guilty of Murder in the First Degree
as charged in the Indictment.

_____ b.   The defendant is guilty of the lesser included crime of Murder
in the Second Degree of a law enforcement officer who was
engaged in the lawful preformance of his duties.

_____ c.   The defendant is guilty of the lesser included crime of
Murder in the Third Degree of a law enforcement officer who
was  engaged in the lawful performance of his duties.

_____ d.   The defendant is guilty of Manslaughter of a law enforcement
officer who was engaged in the lawful performance of his
duties.

_____ e.   The defendant is not guilty.

SO SAY WE ALL

_____
F O R E P E R S O N     (signature)

GARY LAZAN
F O R E P E R S O N     (Print Name)

10/21/93
D A T E D

Filed In Open Court,
ROBERT E. LOCKWOOD, CLERK
OCT 21 1993
ON _____
BY _____

2940

# EXHIBIT   4

[ ] **17th Judicial Circuit In and for Broward County**
[ ] **In the County Court In and for Broward County**

**CLOCK IN**

**DIVISION:**
■ CRIMINAL
[ ] TRAFFIC
[ ] OTHER

**SENTENCE**
(as to Count _____ I _____ )

THE STATE OF FLORIDA VS.

Timothy Brown

PLAINTIFF                                    DEFENDANT

**CASE NUMBER**
91-14793CFB

The Defendant, being personally before this Court, accompanied by his attorney, **LARRY DAVIS**
and having been adjudicated guilty herein, and the Court having given the Defendant an opportunity to be heard and to offer matters in mitigation of sentence, and to show cause why he sentenced as provided by law, and no cause being shown,

_____ and the Court having on _____ deferred imposition of sentence until this date.

(Check one)         _____ and the Court having previously entered a judgment in this case on the defendant now resentences the defendant.

_____ and the Court having placed the Defendant on Probation/Community Control and having subsequently revoked the Defendant's Probation/Community Control.

IT IS THE SENTENCE OF THE COURT that:

_____ The Defendant pay a fine of $ _____ , pursuant to F.S. 775.083, plus $ _____ as the 5% surcharge required by F.S. 960.25.

___✓___ The Defendant is hereby committed to the custody of the Department of Corrections.

_____ The Defendant is hereby committed to the custody of the Sheriff of Broward County, Florida.

_____ The Defendant is sentenced as a youthful offender in accordance with F.S. 958.04

TO BE IMPRISONED (check one; unmarked sections are inapplicable)

___✓___ For a term of Natural Life.

_____ For a term of _____

_____ Said SENTENCE IS SUSPENDED for a period of _____ subject to conditions set forth in this Order.

If "split" sentence, complete    _____ Followed by a period of _____ on Probation/Community
either of paragraphs             Control under the supervision of the Department of Corrections according to the terms and conditions of supervision, set forth in a separate order entered herein.

_____ However, after serving a period of _____ imprisonment in _____
_____ , the balance of such sentence shall be suspended and the Defendant shall be placed on Probation/Community Control for a period of _____ under supervision of the Department of Corrections according to the terms and conditions of Probation/Community Control set forth in a separate order entered herein.

2943

Criminal **SENTENCE**
**TO COUNT _____ )**

CASE NO.
91-14793CFB

In the event the defendant is ordered to serve additional split sentences, all incarceration portions shall be satisfied before the defendant begins service of the supervision terms.

**SPECIAL PROVISIONS**
(As of Count _____ )

By appropriate notation, the following provisions apply to the sentence imposed:

**MANDATORY/MINIMUM PROVISIONS:**

FIREARM _____ It is further ordered that the three year minimum imprisonment provisions of Florida Statute 775.087(2) are hereby imposed for the sentence specified in this count.

DRUG TRAFFICKING _____ It is further ordered that the _____ mandatory minimum imprisonment provisions of Florida Statute 893.135(1) are hereby imposed for the sentence specified in this count.

CONTROLLED
SUBSTANCE WITHIN 1000
FEET OF SCHOOL _____ It is further ordered that the three year minimum imprisonment provisions of Florida Statute 893.13(1)(e)1. are hereby imposed for the sentence specified in this count.

HABITUAL FELONY
OFFENDER _____ The Defendant is adjudicated a habitual felony offender and has been sentenced to an extended term in this sentence in accordance to the provisions of Florida Statute 775.084(4). The requisite findings by the court are set forth in a separate order or stated on the record in open court.

HABITUAL VIOLENT
OFFENDER _____ The Defendant is adjudicated a habitual violent felony offender and has been sentenced to an extended term in accordance with the provisions of Florida Statute 775.084(4). A minimum term of _____ year(s) must be served prior to release. The requisite findings by the court are set forth in a separate order or stated on the record in open court.

LAW ENFORCEMENT
PROTECTION ACT _____ It is further ordered that the defendant shall serve a minimum of _____ years before release in accordance with Florida Statute 775.0823.

CAPITAL OFFENSE _____ It is further ordered that the Defendant shall serve no less than 25 years in accordance with the provisions of Florida Statute 775.082(1).

SHORT-BARRELED RIFLE,
SHOTGUN, MACHINE GUN _____ It is further ordered that the five-year minimum provisions of Florida Statute 790.221(2) are hereby imposed for the sentence specified in this count.

CONTINUING CRIMINAL
ENTERPRISE _____ It is further ordered that the 25 year mandatory minimum sentence provisions of Florida Statute 893.20 are hereby imposed for the sentence specified in this count.

2949

| DIVISION:<br>Criminal | SENTENCE<br>(AS TO COUNT _____ I _____ ) | CASE NO.<br>91-14793CFB |
|---|---|---|

**OTHER PROVISIONS**

**RETENTION OF**
**JURISDICTION** _____ The Court retains jurisdiction over the defendant pursuant to Florida Statutes 947.16(3).

**JAIL CREDIT** _____ It is further ordered that the Defendant shall be allowed a total of __839__ days as credit for time

incarcerated prior to imposition of this sentence.

**PRISON CREDIT** _____ It is further ordered that the Defendant be allowed credit for all time previously served on this count in the

Department of Corrections prior to resentencing.

**CONSECUTIVE/**
**CONCURRENT AS**
**TO OTHER**
**COUNTS** _____ It is further ordered that the sentence imposed by this count shall run _____ consecutive to _____ concurrent

with (check one) the sentence set forth in count _____ of this case.

**CONSECUTIVE/**
**CONCURRENT AS**
**TO OTHER**
**CONVICTIONS** _____ It is further ordered that the composite term of all sentences imposed for the counts specified in this order shall run

_____ consecutive to _____ concurrent with (check one) the following:

_____ Any active sentence being served.

_____ Specific sentences: _____

_____

_____

**PSI ORDERED** YES ☒ NO ☐

In the event the above sentence is to the Department of Corrections, the Sheriff of Broward County, Florida, is hereby ordered and directed to deliver

the Defendant to the Department of Corrections at the facility designated by the Department together with a copy of this Judgment and Sentence and

any other documents specified by Florida Statutes.

The Defendant in Open Court was advised of his right to appeal from this Sentence by filing notice of appeal within thirty days from this date with the Clerk

of this Court, and the Defendant's right to the assistance of counsel in taking said appeal at the expense of the State upon showing of indigency.

In imposing the above sentence, the Court further ~~recommends~~ _ORDER_ _____

NO Eligibility for PAROLE

_____

DONE AND ORDERED in Open Court at Broward County, Florida, this __19__ day of __November__ , 19 __93__ .

PAUL L. BACKMAN    JUDGE

2953

# EXHIBIT   5

657 So.2d 903, Brown v. State, (Fla.App. 4 Dist. 1995)                                    Page 1

**\*903** 657 So.2d 903

20 Fla.-L. Weekly D1070

**Timothy BROWN, Appellant,**
v.
**STATE of Florida, Appellee.**

No. 93-3759.
District Court of Appeal of Florida,
Fourth District.

May 3, 1995.
Rehearing and Rehearing En Banc Denied July 31,
1995.

Appeal from the Circuit Court for Broward County; Paul Backman, Judge.

Richard L. Jorandby, Public Defender, and Joseph R. Chloupek, Asst. Public Defender, West Palm Beach, for appellant.

Robert A. Butterworth, Atty. Gen., Tallahassee, and Patricia Ann Ash, Asst. Public Defender, West Palm Beach, for appellee.

PER CURIAM.

AFFIRMED.

GUNTHER and SHAHOOD, JJ., concur.

PARIENTE, J., dissents with opinion.

PARIENTE, Justice, dissenting.

Defendant, Timothy Brown, appeals his conviction as a principal for first-degree murder **\*904** and his sentence to life in prison without parole. Because I find the evidence presented by the state insufficient to prove that defendant had the necessary conscious intent to be convicted as a principal in the first degree, I agree with defendant that the conviction should be reversed.

This case arises from the tragic death of a sheriff's deputy (the victim), who died on November 13, 1990, from a gunshot wound to the head. At the time of the murder, defendant was fifteen years of age and mildly retarded with an IQ of 56. The sole evidence produced at trial linking defendant to the shooter, Keith King, was a statement given by

defendant in July 1991, eight months after the crime, to the Broward County Sheriff's Office (BSO). (FN1) Defendant asserts, and I agree, that his July 1991 statement was insufficient to convict him as a principal in the murder. (FN2)

According to the July 1991 taped statement, recorded by a BSO deputy, on the evening of November 12, 1990, defendant met up with King. The two began drinking alcohol and getting high on crack (cocaine) and marijuana. Afterwards, they rode off together on defendant's bicycle with King sitting on the handlebars. While on the bicycle, King first showed defendant a gun. Within two blocks of the Circle K convenience store, the scene of the shooting, King told defendant that he was going to kill someone. Defendant's reaction on the tape to King's statement was, "I called his bluff," meaning that defendant "[didn't] believe it." The specific questions and answers in defendant's taped statement concerning the subject are as follows:

Q. So you're calling his bluff, you don't believe it?

A. Yes, sir.

Q. Okay, you're basically telling [King] that you believe he's got like the nerve to do it?

A. Yes, sir. (FN3)

In the specific portion of the taped statement regarding the circumstances surrounding the actual shooting, defendant explained:

A. ... We get--we pulled up and saw the police so [King] said don't go out that way. So we ride that way. I pulled up anyway, you know what I am saying, I wasn't paying no attention around there. As I was still pulling, [King] jumped off the bicycle.... [King] told me to look up. I looked up. He said he's got him.

\*   \*   \*   \*   \*   \*

Q. What does that mean to you?

A. He's gonna kill somebody, that means--

Q. That that's the person he is gonna kill?

A. Yes, sir.

Copyright (c) West Group 1998  No claim to original U.S. Govt. works

657 So.2d 903, Brown v. State, (Fla.App. 4 Dist. 1995)                                    Page 2

Q. And do you see that police officer?

A. Yes, sir.

Q. And you know that that's who he's directing that comment to, that that's who he's got, that's who he's gonna kill?

*905 A. Yes, sir.

\* \* \* \* \* \*

A. And when [King] jumped off the bicycle, he made a limp over there to the car, like you know how he walk, he was limping over there to the car and he fired it....

After the shot was fired, defendant "panicked." King then jumped onto the bicycle with defendant and fired again. According to the statement, King later threw the gun in a rock pit. A murder weapon was never found.

Based solely on his taped statement, defendant was convicted of first-degree murder as a principal. No physical evidence or eyewitness testimony linked defendant to the shooting. Although fourteen witnesses testified for the state, the testimony primarily related to the circumstances of the actual shooting itself and what had caused the victim to be in the vicinity of the Circle K at 1:00 a.m., the time of the shooting. (FN4)

Both the actor and those who aid and abet the commission of a crime are guilty as principals in the first degree. See Sec. 777.011, Fla.Stat. (1993); Staten v. State, 519 So.2d 622 (Fla.1988); West v. State, 585 So.2d 439 (Fla. 4th DCA 1991). The rule applicable to an aider and abettor requires proof that the accused intended to participate in the crime and performed some act which assisted in its execution. Mere knowledge that an offense is being committed and "mere presence at the scene, including driving the perpetrator to and from the scene," is not sufficient without proof that the defendant intended to participate in the crime prior to its perpetration. Staten, 519 So.2d at 624 (citing Collins v. State, 438 So.2d 1036, 1038 (Fla. 2d DCA 1983)); see also West. On the other hand, as the supreme court observed in Staten, a getaway driver who has prior knowledge of the criminal plan and helps the perpetrator escape falls into the category of a principal in the first degree as an aider

and abettor. 519 So.2d at 624.

As stated by the first district in Evans v. State, 643 So.2d 1204, 1205-06 (Fla. 1st DCA 1994), review denied, 652 So.2d 818 (Fla.1995), a case reversing a conviction for aiding and abetting based on insufficient evidence where the sole evidence also consisted of the defendant's tape recorded statement:

To secure a conviction on an aider and abettor theory, the state must establish (1) that the defendant helped the person who actually committed the crime by doing or saying something that caused, encouraged, incited or otherwise assisted that person to commit the crime; and (2) that the defendant intended to participate in the crime. E.g., Howard v. State, 473 So.2d 841 (Fla. 1st DCA 1985). Given the evidence presented at trial, both the trial court and the jury were obliged to accept appellant's statement as true, because it was reasonable, unrebutted and unimpeached. E.g., Dudley v. State, 511 So.2d 1052 (Fla. 3d DCA 1987). In fact, but for appellant's statement, there was no evidence even placing appellant at the scene of the offenses.

In West, our court reversed a conviction because of the insufficiency of evidence showing the defendant's prior intent to participate in the crime. 585 So.2d at 440. We pointed to the fact that the circumstances of the crime itself indicated a "spontaneous decision by the assailants to commit the crime." Id. at 441. The evidence suggested that the crime was committed "on the spur of the moment without notice to" the defendants or at least "this is a reasonable inference to be drawn from the evidence presented." Id.

The evidence of defendant's intent to participate in this crime can only be derived circumstantially from the set of facts as contained in the statement. These facts are reasonably subject to inculpatory or exculpatory interpretation and therefore, in my opinion, are insufficient proof beyond a reasonable *906. doubt on the essential element of defendant's intent to commit this offense:

The ultimate question devolves here then as to whether a jury may be permitted to consider a single set of circumstances, which are at once susceptible of opposing reasonable hypotheses on the issue of guilt or innocence in a criminal case, and return a verdict of guilty based on their view

Copyright (c) West Group 1998  No claim to original U.S. Govt. works

657 So.2d 903, Brown v. State, (Fla. App. 4 Dist. 1995)                                    Page 3

of the more reasonable of the two. Clearly not, since it is the tendency to establish one fact to the exclusion of contrary facts which gives circumstantial evidence the force of proof in the first place; and when circumstances are reasonably susceptible of two conflicting inferences they are probative of neither. There simply would be no "proof."

Grover v. State, 581 So.2d 1379, 1381 (Fla. 4th DCA 1991) (citations omitted).

The question in this case of whether defendant intended to participate in the crime prior to its perpetration hinges on several sentences from defendant's taped statement. The initial statement by King that he was going to kill someone, made less than two blocks from the scene of the crime, evoked the equivocal response from defendant that he was calling King's bluff. A reasonable inference to be drawn from this response is that defendant, a fifteen-year old with limited mental faculties who was drunk and high on drugs, initially believed that King was not serious and that King would not kill anyone. If defendant thought King's statement was pure bravado, he could never have formulated an intent to participate in the murder. At most, defendant's statement established his possible foreknowledge that a crime might occur, nothing more. It certainly failed to exclude the reasonable hypothesis of innocence that defendant did not believe that King would kill anyone and was only joking with defendant.

As to the issue of defendant knowingly performing some act which assisted in the execution of the crime, there is no indication that defendant understood, even after King got off the bike, that he was assisting in a plan to kill somebody, a necessary element of aiding and abetting. In fact, as defendant rode his bicycle into the Circle K parking lot, King told him, "don't go that way," indicating towards the victim's vehicle; nonetheless, defendant "pulled up anyway ... [as he] wasn't paying no attention around there." It was only after King got off defendant's bicycle that King told defendant, "[I] got him," which defendant interpreted to mean that King was about to shoot the victim. I cannot accept the state's argument that a more reasonable interpretation of defendant's statement that he called King's bluff was that defendant dared King to kill someone and thereby encouraged him to shoot the victim. According to the taped statement, defendant

never uttered any specific words of encouragement and only became aware of the crime as it unfolded.

A reasonable inference to be drawn based on defendant's July 1991 taped statement is that the crime was in fact committed by King on the "spur of the moment" without any prior intent of defendant to participate or knowing assistance or active encouragement by defendant. Therefore, I find defendant's July 1991 taped statement an insufficient basis to support defendant's conviction as an aider and abettor. Accordingly, I would reverse and remand with directions that defendant be discharged.

FN1. An earlier statement taken on November 15, 1990, two days after the crime, was suppressed because defendant did not receive his Miranda warnings and appeared to be under the influence of narcotics at the time. In fact, investigating authorities did not continue questioning defendant at that time because of defendant's mental state. Defendant was not questioned again until eight months later, in July 1991, one month after King was arrested for the murder.

FN2. Defendant alternatively claims that the statement of July 1991 should also have been suppressed because the statement did not show, by a preponderance of evidence, that it was voluntarily given due to defendant's age, IQ and the psychological coercion from the November 15, 1990 statement, which had been suppressed, but which was used during the questioning in July. He also claims that he was not competent to voluntarily waive his Miranda rights as a result of his low IQ and mental status. Lastly, he claims that the fact that his legs were shackled during questioning added to the coercive aspect of the statement. I have serious doubts about the voluntariness of this statement given the totality of the circumstances. See Tennell v. State, 348 So.2d 937 (Fla. 2d DCA 1977); but see Bonifay v. State, 626 So.2d 1310 (Fla. 1993).

FN3. A psychologist testified at the suppression hearing that defendant had a "passive compliant personality" and that it would therefore be possible to "twist words and get [defendant] to agree to anything." She testified similarly at trial. The fact that defendant evidently agreed to two seemingly conflicting questions bears this out.

*906  FN4. Part of the defense at trial was not only that defendant did not give the statement

Copyright (c) West Group 1998  No claim to original U.S. Govt. works

657 So.2d 903, Brown v. State, (Fla.App. 4 Dist. 1995)          **Page 4**

voluntarily and that defendant was innocent of the shooting, but that the clerk at the Circle K had earlier implicated another person in the shooting. The defense also alleged that the Broward County Sheriff's Office was under great pressure to solve the murder pointing, for example, to the fact that during the early morning hours following the shooting, between 75 and 100 employees of the Broward County Sheriff's Office had been on the scene.

Copyright (c) West Group 1998  No claim to original U.S. Govt. works

# M A N D A T E

from

### DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

#### FOURTH DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable Bobby W. Gunther, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this day.

DATE:              August 18, 1995

CASE NO.:          93-3759

COUNTY OF ORIGIN:  Broward

T.C. CASE NO.:     91-14793 CF10B

STYLE:             Timothy Brown v. State

A TRUE
COPY

Marilyn Beuttenmuller, Clerk
District Court of Appeal
Fourth District

ORIGINAL TO:  Hon. Robert E. Lockwood, Clerk

cc:  Public Defender
     Attorney General - W. Palm Beach

     /SB

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

AUG 2 5 1995

CRIMINAL OFFICE
WEST PALM BEACH

# EXHIBIT   6

RECEIVED
DEPT. OF LEGAL AFFAIRS

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

JUN 16 1994

CRIMINAL OFFICE
WEST PALM BEACH, FL

TIMOTHY BROWN, )
)
    Appellant, )
)
vs. )    Case No. 93-3759
)
STATE OF FLORIDA, )
)
    Appellee. )
)
_____ )

## INITIAL BRIEF OF APPELLANT

On Appeal from the Circuit Court of the Seventeenth
Judicial Circuit of Florida, In and For Broward County
[Criminal Division].

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit of Florida
Criminal Justice Building/6th Floor
421 3rd Street
West Palm Beach, Florida 33401
(407) 355-7600

JOSEPH R. CHLOUPEK
Assistant Public Defender
Florida Bar No. 434590

Counsel for Timothy Brown

*Brief Due
July 5, 1994*

Case No.93-3759

Timothy Brown vs. State of Florida

CERTIFICATE OF INTERESTED PERSONS

    Counsel for defendant/appellant, Timothy Brown, who certifies that the following persons have or may have an interest in the outcome of this case:

    (1) Paul Backman, Circuit Court Judge

    (2) Timothy Brown, Appellant

    (3) Joseph R. Chloupek, Esq., Appellate Counsel for Appellant

    (4) Larry Davis, Trial counsel for Appellant

    (5) Charles Morton, Prosecuting Attorney

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . .  i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . ii

AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . .  2

SUMMARY OF THE ARGUMENTS  . . . . . . . . . . . . . . . . . 30

### POINT I

APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL
SHOULD HAVE BEEN GRANTED. . . . . . . . . . . . . . 33

### POINT II

THE TRIAL COURT ERRED IN OVERRULING APPEL-
LANT'S OBJECTION TO THE STATE'S PEREMPTORY
CHALLENGE TO PROSPECTIVE JUROR DRIVER.  . . . . . 38

### POINT III

THE TRIAL COURT SHOULD HAVE GRANTED APPEL-
LANT'S PRETRIAL MOTION TO SUPPRESS STATEMENT,
AND SHOULD HAVE SUSTAINED HIS OBJECTIONS
DURING TRIAL TO ALL TESTIMONY CONCERNING THIS
STATEMENT. . . . . . . . . . . . . . . . . . . . . 42

### POINT IV

THE TRIAL COURT ERRONEOUSLY EXCLUDED RONALD
MIDDLETON'S STATEMENT TO DEPUTY CARRY CONCERN-
ING ADDITIONAL CORRUPTION BY BSO DEPUTIES
PATROLLING THE AREA NEAR THE SCENE OF PATRICK
BEHAN'S DEATH. . . . . . . . . . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 50

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . 50

AUTHORITIES CITED

CASES                                                          PAGE

Arizona v. Fulminate, _____ U.S. ____ ,
      111 S.Ct. 1246, 1257 (1991) . . . . . . . . . . . . .  43

Blackshear v. State, 521 So. 2d 1083, 1084
      (Fla. 1988) . . . . . . . . . . . . . . . . . . . . .  38

Casey v. State, 266 So. 2d 366, 367-368
      (Fla. 1st DCA 1972) . . . . . . . . . . . . . . . . .  35

Collins v. State, 438 So. 2d 1036, 1038
      (Fla. 2d DCA 1983) . . . . . . . . . . . . . . . . .  34

Cooper v. Griffin, 455 F.2d 1142, 1144-1145
      (5th Cir. 1972) . . . . . . . . . . . . . . . . . . .  43

Croft v. State, 528 So. 2d 1279, 1281
      (Fla. 1st DCA 1988) . . . . . . . . . . . . . . . . .  35

Dudley v. State, 511 So. 2d 1052, 1057, n.7
      (Fla. 3d DCA 1987) . . . . . . . . . . . . . . . . .  37

Fields v. State, 402 So. 2d 486, 487
      (Fla. 1st DCA 1981) . . . . . . . . . . . . . . . . .  43

Files v. State, 613 So. 2d 1301, 1305
      (Fla. 1993) . . . . . . . . . . . . . . . . . . . . .  39

G. C. v. State, 407 So. 2d 639, 640
      (Fla. 3d DCA 1981) . . . . . . . . . . . . . . . . .  34

Gilday v. State, 168 So. 2d 205, 206
      (Fla. 3d DCA 1964) . . . . . . . . . . . . . . . . .  35

Gurganus v. State, 451 So. 2d 817, 823
      (Fla. 1984) . . . . . . . . . . . . . . . . . . . . .  48

Hall v. State, 421 So. 2d 571, 572
      (Fla. 3d DCA 1982) petition for review denied
      430 So. 2d 452 (Fla. 1983) . . . . . . . . . . . . .  43

Hill v. State, 547 So. 2d 175, 176
      (Fla. 4th DCA 1989) . . . . . . . . . . . . . . . . .  39

Hutchinson v. State, 309 So. 2d 184, 186
      (Fla. 1st DCA 1975) . . . . . . . . . . . . . . . . .  35

Johnson v. State, 408 So. 2d 813, 815
      (Fla. 3d DCA  1982) . . . . . . . . . . . . . . . . .  48

iii

Joiner v. State, 618 So. 2d 174
     (Fla. 1993) . . . . . . . . . . . . . . . . . . . 39

Layton v. State, 348 So. 2d 1242, 1244
     (Fla. 1st DCA 1977) . . . . . . . . . . . . . . . 47

Magna v.  State, 350 So. 2d 1088
     (Fla. 4th DCA 1977) . . . . . . . . . . . . . . . 47

Martinez v. State, 545 So. 2d 466, 467
     (Fla. 4th DCA 1989) . . . . . . . . . . . . . . . 43

Maugri v. State, 460 So. 2d 975 (Fla.  3d DCA 1984)
     cause dismissed 469 So. 2d 749
     (Fla. 1985) . . . . . . . . . . . . . . . . . . . 47

McClain v. State, 411 So. 2d 316
     (Fla. 3d DCA 1982) . . . . . . . . . . . . . . . 47

McKinnon v. State, 547 So. 2d 1254, 1256
     (Fla. 4th DCA 1989) . . . . . . . . . . . . . . . 39

Owen v. State, 432 So. 2d 579
     (Fla. 2nd DCA 1985) . . . . . . . . . . . . . . . 44

Owen v. State, 560 So. 2d 207, 211 (Fla. 1990)
     certiorari denied, _____ U.S. _____,  111 S.Ct. 152,
     112 L.Ed. 2d 118 (1991) . . . . . . . . . . . . . 45

Reddish v. State, 167 So. 2d 858
     (Fla. 1964) . . . . . . . . . . . . . . . . . . . 42

Rivera v. State, 510 So.2d 340, 341
     (Fla. 3d DCA 1987) . . . . . . . . . . . . . . . 47

Roman v. State, 475 So. 2d 228 (Fla. 1985)
     certiorari denied 475 U.S. 1000, 106 S.Ct. 1480,
     89  L.Ed.2d 734 (1985) . . . . . . . . . . . . . 42

Ross v. State, 386 So. 2d 1191, 1194
     (Fla. 1980) . . . . . . . . . . . . . . . . . . . 43

Scott v. State, 581 So. 2d 887, 893
     (Fla. 1991) . . . . . . . . . . . . . . . . . . . 36

Shockley v. State, 338 So. 2d 33, 35
     (Fla. 3d DCA 1976) . . . . . . . . . . . . . . . 35

State v. Blackmon, 37 Fla. Supp. 2d 107
     (11th Cir. 1989) . . . . . . . . . . . . . . . . 43

iv

State v. Castillo, 486 So. 2d 565
     (Fla. 1986) . . . . . . . . . . . . . . . . . 38, 39

State v. DiGuilio, 491 So. 2d 1129
     (Fla. 1986) . . . . . . . . . . . . . . . . . . 43

State v. Johans, 613 So.2d 1319, 1321
     (Fla. 1993) . . . . . . . . . . . . . . . . . . 38

State v. Neil, 457 So. 2d 481
     (Fla. 1984) . . . . . . . . . . . . . . . . . . 38

State v. Slappy, 522 So. 2d 18 (Fla. 1988)
     certiorari denied 487 U.S. 1219, 108 S.Ct. 2873,
     101 L.Ed.2d 909 (1988) . . . . . . . . . . . . . 38

State v. Word, 48 Fla. Supp. 2d 182
     (11th Cir. 1991) . . . . . . . . . . . . . . . . 43

Staten v. State, 519 So. 2d 622, 624
     (Fla. 1988) . . . . . . . . . . . . . . . . . . 33

Suggs v. State, 620 So. 2d 1231, 1232 (Fla. 1993)
     appeal after remand 624 So. 2d 833
     (Fla. 5th DCA 1993) . . . . . . . . . . . . . . 38

Suggs v. State, 624 So. 2d 833
     (Fla. 5th DCA 1993) . . . . . . . . . . . . . . 39

Tennell v. State, 348 So. 2d 937
     (Fla. 2d DCA 1977) . . . . . . . . . . . . . . . 43

Thompson v. State, 548 So. 2d 198 (Fla. 1989)
     appeal after remand 595 So. 2d 16
     (Fla. 1992) . . . . . . . . . . . . . . . . . . 42

Thompson v. State, 619 So. 2d 261, 265
     (Fla. 1993) . . . . . . . . . . . . . . . . . . 47

W. M. v. State, 585 So. 2d 979 (Fla. 4th DCA 1991)
     review denied 593 So. 2d 1054
     (Fla. 1991) . . . . . . . . . . . . . . . . . . 43

West v. State, 585 So. 2d 439, 441
     (Fla. 4th DCA 1991) . . . . . . . . . . . . . . 33

Wright v. State, 586 So.2d 1024, 1029 (Fla. 1991)
     appeal after remand 617 So. 2d 837
     (Fla. 4th DCA 1993) . . . . . . . . . . . . . . 40

Young v. State, 140 So. 2d 97
     (Fla. 1962) . . . . . . . . . . . . . . . . . . 42

FLORIDA STATUTES

     Section 90.804 (1) (e) (2) (c) . . . . . . . . . . . . . .  46

     Section 777.011  . . . . . . . . . . . . . . . . . . . . . .  33

FLORIDA CONSTITUTION

     Article I, Section 16  . . . . . . . . . . . . . . . . . .  38

## PRELIMINARY STATEMENT

Appellant was the Defendant and Appellee was the Prosecution in the Criminal Division of the Circuit Court of the Seventeenth Judicial Circuit, In and For Broward County, Florida. In the brief, the parties will be referred to as they appear before the Honorable Court of Appeal.

The symbol "R" will denote the Record on Appeal.

<u>STATEMENT OF THE CASE AND FACTS</u>

Appellant and co-defendant Keith King were indicted for first degree murder. Appellant was found guilty as charged after a jury trial (R 2550, 2940-2941). Appellant was sentenced to life imprisonment without possibility of parole (R 2568, 2548, 2590). Notice of Appeal was filed on November 9, 1993 (R 2954).

Prior to trial, Appellant filed a motion to suppress two statements (R 2792-2811). Testifying for the State at a hearing on this motion were BSO homicide deputies Richard Scheff, James Carr, and Eli Thomasevich (R 5, 241, 374). According to Scheff, a man named Rob McGriff called the Broward Sheriff's Office (BSO) on November 14, 1990 to identify Appellant and Keith Maddox as the men who shot deputy Patrick Behan (R 12). McGriff claimed that he was an eyewitness to the shooting (R 15). However, Scheff was subsequently informed by Metro-Dade homicide detectives that McGriff was "unreliable;" additionally, McGriff failed a BSO polygraph examination (R 13). Upon being confronted by Scheff, McGriff admitted lying about his allegations in order to collect reward monies being offered by both BSO and the Behan family (R 14, 106).

Nonetheless, Appellant was questioned on November 15, 1990 (R 15-16). Scheff testified that Appellant did not receive any <u>Miranda</u> warnings at this time, and appeared to be "under the influence" of narcotics (R 17, 19-20). According to Scheff, Appellant initially admitted seeing Keith Maddox shoot Behan; later, Appellant admitted that he himself shot Behan (R 18-19). However,

2

Appellant's intoxication caused Scheff to terminate all questioning of Appellant at that time (R 21).

Thereafter, BSO reinterviewed Appellant on July 16, 1991 (R 30). Scheff denied that Appellant was chained to the floor during his interrogation; Scheff also claimed no promises were given Appellant in return for this statement (R 34). In Scheff's opinion, Appellant was not "suggestible", although Scheff admitted stating in deposition that Appellant was "like clay" during Appellant's questioning (R 124-125).

Appellant's actual interrogation on July 16, 1991 was conducted by deputies Carr and Thomasevich. (R 244). Carr was informed by Scheff that Appellant "confessed" on November 15, 1990, but was too "under the influence" at that time to render a voluntary statement (R 252). Eventually, on June 4, 1991 Appellant's co-defendant, Keith King, was arrested after implicating both himself and Appellant in the Behan killing (R 263-265). Thereafter, Carr and Thomasevich arrested Appellant on July 16, 1991 for the murder of Patrick Behan (R 271-272). Appellant was read separate Miranda-warnings on the way to the police station and at the BSO substation where he was subsequently questioned (R 272-273). During questioning, Appellant was allowed to use the bathroom and was given a soda (R 274, 277). Appellant was then re-Mirandized, after which he agreed to speak with Carr and Thomasevich (R 275, 277, 279). According to Carr, Appellant did not appear to be "under the influence" (R 280). Moreover, Appellant appeared to understand the Miranda warnings he had been given, and

3

received no promises concerning his statement (R 280). Nor did Appellant ask for the presence of a lawyer during the interrogation (R 280-281). Likewise, no pressure was placed on Appellant, and no threats were made against Appellant (R 281). Carr did admit that Appellant's legs were shackled during questioning, although Appellant was not handcuffed (R 281-282). Carr admitted mentioning Appellant's November 15, 1990 statement implicating Appellant in the Behan shooting (R 367). Eli Thomasevich was present when Appellant gave his statement on July 16, 1991 (R 375). Thomasevich denied the existence of pressure from either BSO or the Behan family to either arrest Appellant or ignore other potential suspects involved in this case (R 375).

Testifying for Appellant at the motion to suppress hearing was Elizabeth Koprowski, a psychologist accepted without objection as an expert witness (R 179). Koprowski examined both Appellant and school records concerning his academic progress (R 180). Appellant had been retained "several times" in elementary school, and was "administratively" promoted from fifth to sixth grade (R 181-182). While in fifth grade (at the age of 13), Appellant had a verbal IQ of 58, a nonverbal IQ of 54, and a quantitative IQ of 58, all indicative of "mild retardation" (R 182, 184). Moreover, Appellant's school performance was "consistently poor" (R 183). As of 1991, Appellant had a verbal and performance IQ of 60, and a full scale IQ of 56. (R 185, 188). Koprowski found no evidence that Appellant was attempting to "fake" his IQ test results (R 186). Appellant's reading, spelling, and mathematical skills were at a

4

third grade level at the time Koprowski examined him (R 189). Additional testing disclosed that Appellant had a "child-like" lack of imagination and was easily influenced "by everyone" (R 189-191). In reviewing Appellant's July 16, 1991 statement to BSO, Koprowski noted that Appellant answered "yes, sir" or "no, sir" to virtually all questions put to him by police; Koprowski opined that this indicated a "passive compliant personality on [Appellant's] part" (R 191-192). Thus, it would be possible to "twist words and get [Appellant] to agree to anything," since Appellant could "only in a very, very basic way" understand his legal rights (R 190, 193). Nonetheless, Appellant was competent to stand trial, and was capable of understanding right from wrong (R 194-195).

On cross-examination, Koprowski admitted that Appellant's fourth grade teacher found some of Appellant's school work "satisfactory," in that Appellant received "C's" in language, spelling, and mathematics in the second grade (R 209-210, 214-218). Moreover, Appellant correctly answered 56 out of 67 questions on a Florida statewide assessment test given in 1986 (R 220-222). Finally, in 1990 (during the sixth grade) Appellant received both B's and C's for grades on various subjects in school (R 227). Koprowski admitted that Appellant's IQ score by itself did not mean that Appellant was not capable of understanding his right to silence (R 228-229).

At the close of testimony during the motion to suppress hearing, defense counsel argued that Appellant's July 16, 1991 statement was "tainted" by the prior statement from November 15,

1990, which was subject to suppression due to the failure of BSO to give Appellant a <u>Miranda</u> warning prior to the earlier statement (R 415). Additionally, according to the defense, Deputy Carr used the prior statement to "coerce" Appellant's July 16, 1991 statement (R 416). Additional coercion existed due to Appellant's age (15 in July, 1991), his being shackled in leg irons during the questioning, Appellant's low IQ, and the "pressure" put on Appellant during the July statement (R 416-417). Finally, defense counsel argued that there was no "attenuation" of the taint from the November, 1990 statement, since Appellant was reminded during the July statement of the November, 1990 statement, which itself caused psychological coercion for Appellant in July, 1991 (R 436-438). Ultimately, the trial court granted the motion to suppress as to the November 15, 1990 statement, but denied the motion to suppress as to the July 16, 1991 statement (R 441-443). Thereafter, the case proceeded to trial.

During voir dire, the prosecutor was discussing his theory of prosecution with prospective juror Driver when the following exchange occurred:

> [Prosecutor]: If they are equally responsible. In other words, whatever the other one did . . . [appellant] is considered equally responsible . . . under the law of principal. How about you, Mrs. Driver, what you think?
>
> Ms. Driver: Well, I look at this reasonable doubt in the King case, I see where those police officers, they were all gathered around, I saw the film, a lot of them did the punching and the kicking, yet, some of them didn't get the same punishment.
>
> [Prosecutor]: Which brings me to this ques-

6

> tion, I certainly can't answer and respond in
> any other case, particularly the one out in
> California.  You understand that?
>
> Ms. Driver: I am just taking that into con-
> sideration.
>
> [Prosecutor]: I am really glad you mentioned
> it. Some people have some concerns about that?
>
> Ms. Driver: I just see the law.
>
> [Prosecutor]: . . . if that were the law the
> judge were to instruct you could you agree to
> it as it relates to this case, [and] forget
> about what happened out in California?
>
> Ms. Driver: I mean, this I can't say.  We can
> judge after the fact.
>
> [Prosecutor]:   I understand your concern but
> do you think that's a fair law? . . . I am
> saying now is it a fair concept to you, is it?
> Does it sound like a fair concept?
>
> Ms. Driver: Yes.

(R 806-807).  Subsequently, the prosecutor moved to peremptorily

strike Ms. Driver as a juror from Appellant's case (R 990).

Defense counsel objected, noting that Driver was "another black

female," and demanded that the prosecutor provide a "race neutral

reason" for this challenge (R 990). The prosecutor responded:

> I am very uncomfortable with her answers
> concerning the Rodney King [case] how unjust
> and unfair that was, as we talked. In this
> particular case, it is the shooting of a white
> police officer.   I am uncomfortable [that
> Driver] is going to take the Rodney King case
> -- based on her explanation of that, and she
> could use this as an opportunity to get even.
> I can't predict that, but given her answers,
> I am particularly concerned about her prin-
> cipal responses and her reference to the
> Rodney King trial, I am not comfortable with
> having her as a juror, period. . . . and her
> analogy to the principal instructions as to .
> . . the Rodney King trial causes some great

7

> concern for me and that certainly [was] a
> verdict that was not pleasing [to] many of the
> African-American members of the community and ···· ·
> she clearly expressed that.

(R 990-991). The trial court overruled a defense objection to this

challenge (R 993). Prior to the jury being sworn, defense counsel

stated:

> As far as the court not granting my motion
> allowing [the prosecutor] to strike the black
> jurors at this particular time, I would just
> request that the Court strike the entire panel
> and let us begin anew.

(R 1194). After the jury was sworn, the case proceeded to the

evidentiary portion of trial (R 1200).

Fourteen witnesses testified for the State at trial. James

Kammerer was a BSO forensic services unit deputy; he responded to

a Circle K store located at 3990 West Hallendale Beach Boulevard

on November 13, 1990 in reference to the shooting of Deputy Patrick

Behan. (R 1270-1273). Kammerer searched the area for physical

evidence, but found only a beer can (R 1279-1280). Kammerer

"processed" Deputy Behan's vehicle for fingerprints, but found none

that matched any suspect in this case, including Appellant (R 1281,

1284-1287). The Circle K crime scene was supervised on November 13,

1990 by BSO homicide Deputy Larry Rogers (R 1336-1337). An

extensive search of the immediate area disclosed no weapon or empty

shell casings (R 1242, 1248). Like Kammerer, Rogers testified that

no fingerprints found on the scene matched any suspect in this case

(R 1336). Rogers was unaware of any physical evidence tying

Appellant to the murder of Patrick Behan (R 1366). Later, Rogers

supervised various BSO divers who searched a rock pit near the

8

area; however, these divers were unsuccessful in locating evidence (R 1353, 1384, 1895-1896, 1900-1901). On cross-examination, Rogers admitted that between "75 and 100" supervisors and administrative personnel, including then- Sheriff Navarro, were on the scene of Behan's murder on November 13, 1990, although Rogers claimed that this would "not [be] unusual" (R 1363, 1369).

Raul Vila, an assistant medical examiner for Broward County, conducted the autopsy of Patrick Behan (R 1301, 1304). Vila discovered a gunshot wound to the left side of Behan's face (R 1307, 1309-1310). Vila testified that Behan's head wounds suggested that the barrel of the weapon used to kill him was fired from a distance of between 18 and 36 inches (R 1315).

Brett Sagenkahn was the BSO supervisor for deputies patrolling the area which included the Circle K store (R 1385, 1387). Deputy Craig DeGuices was assigned patrol responsibility for an area that included this Circle K store; Patrick Behan and Robert Richmond were assigned nearby locations (R 1389). On November 13, 1990, BSO received a theft call from the Circle K Store at approximately 1:00 a.m. (R 1389). Thereafter, certain deputies, including Richmond, radioed back that they would need to delay responding to this theft because they were chasing an escaped juvenile suspect (R 1390). Sagenkahn proceeded to the crime scene when he heard that Behan had been shot. (R 1400).

During Sagenkahn's testimony, a videotape taken inside the Circle K store on the night of the shooting was played for the jury (R 1401). On the videotape, a man later identified as Kevin Duhart

9

is seen stealing a pack of cigarettes (R 1402). Deputy Behan was the first BSO officer to answer the store clerk's theft report; the tape showed the clerk describing the thief to Behan (R 1402). Duhart had told the clerk on tape "fuck you, you call the police" (R 1410). Behan then told the clerk that he was going to take the clerk's information on the case; thereafter, Behan returned with a clipboard, spoke to the clerk, then departed the Circle K store for his police cruiser (R 1406-1408). Sagenkahn testified that it was common for deputies to handle calls for each other outside of their assigned areas, as a matter of professional courtesy (R 1410).

Milton Wiener and Kenneth Kaminsky were BSO deputies who heard over police radio the call concerning Behan's murder, then drove to the scene (R 1442, 1444, 1450-1451). Upon arrival, both Wiener and Kaminsky testified that Richmond and DeGuices had already arrived at the Circle K (R 1445). Weiner found Richmond "very distraught" at that time (R 1448).

Craig DeGuices worked with Milton Wiener, Kenneth Kaminsky, Robert Richmond, and Patrick Behan patrolling an area near the Circle K in November, 1990 (R 1461). On November 13, 1990, DeGuices was initially dispatched to the Circle K store concerning a theft report (R 1464). However, Richmond radioed that a search was underway for a juvenile escapee; as a result, DeGuices joined in this search (R 1464). DiGuices later proceeded to the Circle K, where he saw Behan already present, taking the theft report (R 1465). DeGuices initially told Behan that the likely suspect in

10

this theft was Kevin Duhart (R 1466).  Since Behan began filling out paperwork on the theft, DeGuices decided to check the immediate area for Duhart, then radioed Robert Richmond to assist in this search (R 1467-1468).  While DeGuices was unsuccessfully searching for Duhart, Behan's shooting was broadcast over BSO radio (R 1477, 1479, 1480).  Thereafter, DeGuices and Richmond arrived simultaneously at the Circle K; it was DeGuices who found Behan dead from a gunshot wound to the head (R 1481-1482).  DeGuices then continued his search for Duhart, finding him 10 to 12 blocks away from the crime scene (R 1583-1491).

On cross-examination, DeGuices admitted that both Richmond and himself had been dispatched to the Circle K concerning Duhart's theft, and that it was Richmond who radioed other BSO deputies concerning the alleged juvenile escapee, which prevented both DiGuices and Richmond from arriving at the Circle K before Patrick Behan (R 1485).  Although Duhart admitted stealing cigarettes from the Circle K, DeGuices did not file any police report concerning Duhart's theft (R 1485).  DeGuices acknowledged that Robert Richmond showed him photographs of nude females while on duty.  (R 1496, 1499-1500).

Stephen Antonio was a tow truck driver who lived near the Circle K store in November, 1990 (R 1503, 1504).  (R 1504).  Antonio was inside the Circle K when Behan was shot, and called 911 to report the shooting (R 1505-1506, 1515).  Antonio looked out the door within five seconds' of the shooting, but saw nothing (R 1516. 1520).

11

Jorge Corpion, a BSO forensic crime scene detective, responded to the crime scene on November 13, 1990 (R 1523, 1525). Corpion arrived within four minutes of the initial radio call concerning the murder (R 1525). Corpion also helped process Deputy Behan's vehicle for fingerprints (R 1529). However, no forensic evidence from the crime scene tied Appellant to Behan's murder (R 1555).

Charles Edel, a BSO "blood stain interpretation" expert, examined Behan's vehicle. (R 1573-1576). Edel felt that Behan was seated in the driver's seat, with his left hand extended out the car window and his head tilted to the side, when the fatal shot was fired (R 1590). Thus, according to Edel, the bullet went through Behan's hand, then hit the side of his face (R 1591).

Dennis Grey, a BSO firearms identification examiner, testified that he examined the bullet taken from the head of Patrick Behan, as well as the shirt Behan was wearing at the time of the shooting (R 1592, 1594-1595). Grey found no gunshot residue on Behan's shirt, but did find gunpowder residue on the skin of Behan's hand, which Grey interpreted as meaning that the murder weapon was fired close to Behan's hand (R 1597-1598). Grey testified that the bullet used to kill Behan was either a .357 or .38 caliber projectile (R 1603-1604).

Robert Richmond was working for BSO on November 13, 1990 (R 1646). Richmond admitted that he had been fired from BSO at the time of trial, and had been "picked up" and sent to jail the night before his trial testimony by order of the trial judge (R 1653). Richmond was located a half mile away from the crime scene when

the radio message of Behan's shooting was broadcast (R 1647).
Richmond was the first deputy to reach the scene after the shooting
(R 1648).   Richmond testified that he drove to the Circle K store
prior to Deputy Behan's shooting, in response to a theft report;
however, he did not enter the premises, since Behan had already
arrived (R 1653-1654). After the shooting, Richmond "drove around"
looking for Kevin Duhart (R 1659).

At trial, Richmond could not recall chasing any juvenile
escapee, rather than responding to the Circle K, on November 13,
1990, and did not recall radioing Deputy Sagenkahn concerning any
"chase" (R 1661-1662).   Richmond testified that he saw no one
leaving the Circle K when he arrived on the scene shortly after
Behan's shooting (R 1670).   According to Richmond, BSO homicide
detectives told him not to write a report concerning events of that
night (R 1671).   Later, Richmond was ordered to write a report
three days before a defense deposition was scheduled (R 1672).

BSO homicide detective James Carr testified that he and Eli
Thomasevich became "lead investigators" in the Behan murder (R
1713).   After Appellant was arrested on July 16, 1991, he was
questioned by Carr and Thomasevich concerning Patrick Behan's death
(R 1714-1716, 1720). Defense counsel's renewed motion to suppress
appellant's statement was denied by the trial court (R 1719).

Initially, Appellant was questioned for one hour prior to
audiotaping his statement (R 1730).   For twenty to twenty five
minutes, Appellant denied any knowledge concerning this case (R
1731). However, after Carr told Appellant that Carr had developed

13

"certain information" suggesting Appellant's involvement, Appellant admitted meeting Keith King on November 12, 1990 (R 1733). Appellant stated that he and King began "getting high on crack [cocaine] and marijuana," after which Appellant and King rode off on Appellant's bicycle (R 1734). According to Carr, Appellant admitted that King showed Appellant a .38 caliber weapon, then began talking about "killing someone" (R 1734). As Appellant approached the Circle K store, King got off the bicycle, walked up to the side of Behan's vehicle, then shot Behan once in the head, after which Appellant and King rode away, later throwing the murder weapon in a nearby rock pit (R 1734-1735). Thereafter, Appellant's taped statement (State Exhibit 32) was played for the jury over defense counsel's renewed objection (R 1738-1739).

On this tape, Appellant again states that he and Keith King had been abusing alcohol and narcotics the evening Behan was killed (R 1752). As Appellant carried King on Appellant's bicycle, King displayed a .38 caliber weapon to Appellant (R 1752-1753). As Appellant approached the Circle K store on Hallandale Beach Boulevard, King said "I gonna kill somebody" (R 1753). According to Appellant, King began mentioning the possibility of murder "about two blocks before [they] got to [the] Circle K" (R 1753). After King's statement, Appellant "called his bluff," in that Appellant "[didn't] believe it" (R 1754). The specific questions and answers in the taped statement concerning this subject are as follows:

> Q: So you are calling his bluff, you don't believe it?

14

A:  Yes, sir.

Q:  Okay, you're basically telling [King] that you believe he's got like the nerve to do it?

A:  Yes, Sir.

(R 1754).  Appellant continued:

> We get -- we pulled up and saw the police so [King] said don't go out that way so we ride that way.  I pulled up anyway, you know what I am saying.  I wasn't paying no attention around here.  I was still pulling, [King] jumped off the bicycle . . . [King] told me to look up. I looked up.  He said he's got him . . .

Q:  What does that mean to you?

A:  He is going to kill somebody, that means --

Q:  That that's the person he is going to kill?

A:  Yes, sir.

Q:  Did you see that police officer?

A:  Yes, sir.

Q:  And you know that that's who he is directing that comment to, that that's who is got, that who he is gonna kill?

A:  Yes, sir. . . . and when [King] jumped off the bicycle, he made a limp over there to the car, like you know how he walk, he was limping over there to the car and he fired it and after he fired it I panicked and we jumped on the bicycle, we got across the street [from] the Circle K and he fired the gun again.

(R 1754-1755).  In the taped statement, Appellant admitted that he and King proceeded to a rock pit located near the Circle K, where King threw the murder weapon into the water (R 1756-1757).  Appellant never saw Keith King again after November 13, 1990 (R

15

1735, 1767). Appellant said that he and King did not enter the Circle K that night (R 1759). Appellant stated that he saw Behan inside the police vehicle "doing paper work" (R 1759). Appellant saw Behan "make a move" before being shot in the head by Keith King (R 1760). Appellant admitted telling various other people about the killing, and admitted that his initial denial of knowledge of the murder was "a lie" (R 1762-1763, 1766). Thereafter, the taped statement ended (R 1768).

Carr admitted that a $130,000.00 reward was eventually offered for information leading to the arrest of Behan's killers (R 1773). As a result, numerous people telephoned BSO with tips concerning the case (R 1773). However, Carr denied being pressured by BSO superiors to solve the case expeditiously (R 1774-1775).

Carr acknowledged speaking to Kevin Duhart "days" after the shooting, and admitted that he and Thomasevich visited Curtis McGill in prison on March 22, 1991 (R 1798). Carr acknowledged that he was aware of allegations concerning Curtis McGill and the Behan shooting at the time he and Thomasevich visited McGill (R 1804, 1811). Nonetheless, McGill had been eliminated as a suspect at the time of his questioning by Carr and Thomasevich (R 1805). Even so, a check of McGill's arrest record showed that he was not in custody on November 13, 1990 (R 1806). According to Carr, McGill stated that he was 3 1/2 miles away from the Circle K at the time Patrick Behan was shot (R 1818-1819). Carr was later "ordered" not to speak with Jackie Bain concerning her allegations about the Behan murder; Carr followed orders in this regard (R 1824-1825).

16

Nor did Carr speak to any of the BSO deputies accused of sexual extortion by Jackie Bain (R 1856).

After the State rested, the defense moved for a judgment of acquittal, arguing that the State had presented insufficient evidence in support of its theory of prosecution: to wit, that Appellant was a principal with Keith King in the murder of Patrick Behan (R 1906-1907). Specifically, defense counsel pointed out that while appellant had foreknowledge that King was going to shoot Behan, no evidence was presented that Appellant either intended to actively participate in the offense or share in an expected benefit from the shooting (R 1908, 1910-1911). This motion was denied by the trial court (R 1914). Thereafter, the defense presented seven witnesses during its case-in-chief.

Jackie Bain initially testified that she did not recall anything about her involvement in this case (R 2041, 2043). However, after the trial court ordered all television cameras and still photographers to exit the courtroom, Bain began testifying concerning the case (R 2047-2048, 2065). Bain had complained to BSO concerning "sexual extortion" the day after Patrick Behan's murder (R 2066). Bain had previously told a "Deputy Douglas" about the allegations in June, 1990 (R 2066). Bain had been robbed on April 13, 1990 while working at the Circle K store (R 2067). Deputy John Chandler, one of the deputies who responded to this incident, told Bain that if she "gave [us] . . . . head we'll be around more" (R 2067). In response, Bain performed oral sex on both Chandler and Deputy Charles Williams (R 2067-2068). According to Bain,

17

Deputy Robert Richmond was also involved in this sexual misconduct, which occurred 20 to 22 times between April and June, 1990 (R 2068).

After Bain complained to Deputy Douglas, Richmond told Bain's store manager, Roxanne Keidaish, about Bain's allegations (R 2068). Later, after Behan was killed, Jackie Bain told "someone" in BSO that she had information about the murder, and that a man named Curtis McGill had committed the crime (R 2070-2071). Bain testified that Kevin Duhart, the man whose theft of cigarettes triggered this incident, was a friend of Curtis McGill (R 2071). Bain knew both men from their patronage of the Circle K store (R 2071). Bain testified that she told Detective Stephen Wiley of the Broward Sherrif's Office that Duhart and McGill were involved in Behan's murder (R 2072). Bain had spoken to Wiley on November 15, 1990 (R 2072).

After Bain's initial phone call to BSO, Deputies Richard Scheff and Dominick Gucciardo "picked up" Bain after threatening to "knock down [her] door in thirty seconds" if she didn't answer (R 2073). After searching the house, these law enforcement officers took Bain to a BSO substation, where Wiley questioned her on November 15, 1990 (R 2073). After her statement to Wiley, Bain gave additional statements to Sergeant Carry concerning the sexual misconduct of BSO deputies (R 2074-2075). Bain told Detective Wiley that Curtis McGill had showed her a .38 caliber firearm "days before" the murder (R 2075-2076, 2079). Bain had told Wiley that McGill had said "[he] got one of them" in talking about the Behan

18

murder (R 2078). However, in trial Bain denied that Curtis McGill admitted shooting Behan (R 2077).

One week later, Bain called Detective Mike Walley of the Fort Lauderdale Police Department, telling Walley that she knew where the weapon that killed Patrick Behan was located, and that Behan was "shot by mistake," since he was not one of the deputies having sex with Bain (R 2081-2082). Additionally, Bain said that the theft call to the Circle K was meant for Robert Richmond, not Patrick Behan (R 2082). Bain told Walley that Curtis McGill and Robert Richmond had had a dispute at the Circle K Store concerning Jackie Bain (R 2083). Bain later told BSO that Robert Richmond and McGill had had a "run-in" months before the shooting; this dispute involved "dirty looks" Richmond had given McGill over Jackie Bain's hairstyle (R 2096, 2098). Reportedly, McGill was mad that Richmond, a "white" deputy, had been "taking a black girl" (R 2098). At that time, McGill told Bain he was going to kill Richmond (R 2099). Later, Bain was placed in a mental hospital by BSO, although she was released within six days (R 2083-2084).

Bain testified that she did not know Appellant, but that Appellant was not involved in the Behan murder; nor was Bain herself involved in this crime (R 2087-2088). Bain admitted at one point confessing to Detective Wiley that she shot Patrick Behan (R 2088-2089). Later, Bain told someone in BSO that her story concerning Curtis McGill and the murder of Patrick Behan was "untrue" (R 2105). Bain admitted initially telling police that she had killed four people, including her own infant son (R 2106-2107).

19

Reportedly, she had told police that a "different Jackie had compelled" her to kill (R 2108). However, at trial, Bain testified that she had committed no murders (R 2108-2110, 2115). Instead, she had "made up" the dual personality story (R 2110-2111). Bain admitted lying to BSO concerning how Behan was shot (she claimed he was shot through the passenger side window); according to Bain, she lied to BSO because they had been "lying to her" regarding their intent to prosecute the deputies who coerced sex from Bain (R 2121-2124, 2147). Bain had initially told the BSO deputies who went to her house on November 15, 1990 that she would identify Behan's killer if they promised to fire the deputies who had been sexually extorting her (R 2092-2093).

On cross-examination, Bain denied having any romantic relationship with Curtis McGill (R 2135). Bain admitted not telling Roxanne Keidaish about the alleged sexual extortion by BSO deputies when Bain was fired from the Circle K store in June, 1990 (R 2140). However, Bain insisted, Keidaish was "involved" personally with Robert Richmond when Bain accused the BSO deputies of sexual misconduct (R 2144). Bain admitted telling Don Pierce, defense counsel's investigator, that she and Curtis McGill had conspired to killed Deputy Behan (R 2148-2149). Bain also denied that the trial prosecutor, Chuck Morton, had refused to question her after Deputy Carry had brought Bain to Morton's office for questioning in March, 1991 (R 2152).

Robert Richmond admitted that BSO's internal affairs department had investigated him concerning the allegations of Jackie

Bain, with Detective Sergeant David Carry questioning Richmond in late 1990 (R 1916-1917).  Although Richmond was initially fired by BSO, he was subsequently ordered reinstated by an arbitrator; BSO later declined to obey the arbitrator's order of reinstatement (R 1963).  Richmond could not recall telling Carry that he knew Jackie Bain, but denied keeping nude photographs in his patrol vehicle or telling Carry that he did so (R 1921-1924).  Nor could Richmond recall telling Roxanne Keidaish, manager at the Circle K from June through November 14, 1990, to retrieve Circle K surveillance videos purportedly showing Jackie Bain performing oral sex on BSO Deputy Charlie Williams (R 1919-1920, 1923).  After receiving immunity from the Broward State Attorney's Office in March, 1991, Richmond was questioned concerning sexual activity between himself and various named prostitutes (R 1926).  However, Richmond could not recall telling Carry that he spoke with a prostitute concerning Behan's murder (R 1929).  Although Richmond was the first deputy on the crime scene, he was instructed by BSO's homicide division not to write a police report on the case (R 1957-1958).  As a result, Richmond felt "alienated" from the homicide investigation into Behan's murder (R 1961).

David Carry was an investigator for BSO's internal affairs division in November, 1990 (R 1965-1966).  On November 15, 1990, Carry met Jackie Bain concerning her allegations of sexual misconduct by various BSO deputies (R 1966).  Carry found Bain "ordinary, alert, [and] competent" (R 1968).  In this regard, Carry spoke to Deputy John Chandler, later "sustaining" Jackie Bain's charges

21

against Chandler (R 1982). Carry was told by BSO homicide detective Richard Scheff "to shut down" Carry's internal affairs investigation on November 19, 1990; that investigation was "reopened" on November 30, 1990 after certain BSO homicide detectives had Jackie Bain "committed" to a mental hospital (R 1987). Later, Carry began speaking with Jackie Bain again in February of 1991, taking her to the Broward State Attorney's Office for questioning (R 1991-1992, 1994).

On Carry's direct examination, the defense sought to proffer testimony concerning allegations made by a man named Ronald Middleton, who accused BSO deputies Williams and Gordon of being "paid off" to allow Middleton to steal cars; Middleton also allegedly claimed to have bribed Gordon to overlook a traffic infraction (R 1998-1999). Defense counsel stated that his investigator, Don Pierce, had attempted without success to serve a trial subpoena on Middleton, who had an outstanding bench warrant at the time of trial (R 1998-1999). According to defense counsel, Middleton's statements were relevant to show the existence of additional allegations of corruption against various BSO deputies who patrolled southern Broward County, and BSO's reactions to this information vis-a-vis the Patrick Behan murder investigation (R 2000, 2002-2003):

> . . . It goes to show the type of investiga-
> tion, it goes to show that [BSO] had to cover
> up. So in regard why they couldn't follow
> these leads, not only leads that led to Jackie
> Bain, but also led back to Middleton and all
> this stuff that was going on over there,
> that's why they couldn't do any investigation
> in regard to the Circle K, that is why it took

22

eight months to bring in [appellant].

Defense counsel suggested that Middleton's statements were admissible because Middleton was unavailable for trial as that term is defined by Florida Statutes, Section 90.804, and Middleton's statements were against his penal interest, since Middleton was admitting guilt to various criminal offenses (R 2001, 2003, 2054-2055). Finally, the defense argued, Middleton's statements were reliable in that a BSO polygraph examiner had concluded that Middleton showed "no indication of deception" concerning the statements (R 2156). In a proffer of the testimony sought, Carry testified that his internal affairs investigation also focused on deputies William Gordon and Charles Williams, based on the allegations of Ronald Middleton that he had paid Gordon a bribe to avoid a traffic offense, that Gordon had been paid money by a man named Julio Napoles to overlook the smuggling of untaxed cigarettes from Dade to Broward County, and that Middleton paid Gordon and Williams money to be allowed to steal cars (R 2013-2018). Also on proffer, Carry testified that Middleton underwent a polygraph examination by Robert Aldridge, a BSO polygraphist, who found "no significant reaction indicative of deception" (R 2021-2022). Also proffered was the testimony of Don Pierce, who stated that he attempted to serve a trial subpoena on Ronald Middleton, based on various addresses of prior court cases involving Middleton; however, Pierce was unsuccessful in this attempt (R 2029). The trial court declined to ruled on the admissibility of this evidence at the time Carry was testifying (R 2030).

23

During Jackie Bain's trial testimony, defense counsel renewed his request to present testimony that Ronald Middleton had accused various BSO deputies of corruption (R 2154). Defense counsel again argued that Middleton's statements were against his penal interest, since Middleton admitted having committed various crimes with these deputies (R 2154-2155). Defense counsel also argued that Middleton's statements were admissible as an exception to the hearsay rule under Chapter 90.804, since Middleton was unavailable to testify at trial (R 2155). Finally, defense counsel contended, Middleton's statements had indica of reliability, since Middleton had passed a BSO-inspired polygraph examination concerning the allegations (R 2156-2157). The trial court sustained the state's objection to this testimony, although the Court limited his basis for so ruling to a lack of evidence that Middleton was "unavailable" to testify (R 2162-2163).

BSO Deputy John Chandler admitted being investigated by internal affairs concerning Jackie Bain's allegations of sexual impropriety, and admitted that these allegations were "sustained" (R 2170-2171). Chandler was given immunity by BSO concerning his statements about Bain's allegations, the immunity having been granted by "direct order of Sheriff Nick Navarro" (R 2171). This grant of "immunity" did not protect Chandler from criminal responsibility; instead, it simply prevented him from being fired by BSO based on his statements to BSO investigators (R 2183). During trial, Chandler denied having sex with Jackie Bain, and denied admitting having done so to BSO homicide investigators (R 2173).

24

Likewise, Chandler denied witnessing sexual activity between Charlie Williams and Jackie Bain (R 2173, 2178).

Fred Faustino took a robbery report from Jackie Bain in April, 1990 (R 2185). At that time, Bain did not appear "psychotic" to Faustino during his ten minute conversation with her (R 2186). According to Faustino, Bain was cooperative with BSO in its request that she give a statement concerning her allegations (R 2188).

Dr. Elizabeth Koprowski was a clinical psychologist accepted without objection as an expert (R 2216-2217). Koprowski evaluated Appellant during four visits between September and December, 1991 (R 2217-2218). During these visits, Koprowski gave Appellant various psychological tests to measure his IQ (R 2218). Koprowski found Appellant's I.Q. to be 60 for the verbal and performance portions of the test and 56 on the "school" portion (R 2218-2219, 2221). Koprowski found Appellant at the "third grade level" regarding reading and mathematics (R 2219). Appellant's fourth grade I.Q. scores, based on tests given in 1987 and 1988, were 54 verbal, 58 quantatative, and 54 nonverbal (R 2220).

On cross-examination, Koprowski admitted that the measurement of I.Q. as a means of determining intelligence was "somewhat controversial" in the field of psychology (R 2224-2225). Thus, Koprowski admitted that I.Q. measurements are based partly on experience, home environment, school habits, and other factors (R 2227-2228). Nonetheless, Koprowski found Appellant "mildly retarded" (R 2232). Koprowski admitted relying partially on Appellant's school records in measuring his I.Q.; however, Koprowski admitted,

25

Appellant's excessive absenteeism from school undoubtedly contributed to his low grades (R 2235-2237).

After the defense rested, defense counsel renewed his previously-argued motion for judgment of acquittal, readopting the arguments previously made (R 2248-2249). This motion was again denied by the trial court (R 2249).

In rebuttal, the State presented four witnesses. Michael Walley of the Fort Lauderdale police department received a telephone call from Jackie Bain on November 20, 1990 concerning the Patrick Behan murder (R 2263-2265). These telephone conversations were taped by Walley (R 2266). According to Walley, the voice on the telephone "whispered at times, [laughed] at times, [and was] threatening at times" regarding specifics concerning the case (R 2268-2269).

Stephen Wiley, a BSO homicide detective, questioned Jackie Bain on November 15, 1990 (R 2273, 2275). According to Wiley, she never gave him a first name concerning "McGill" (R 2277). Wiley found that Bain had a "strange laugh and whisper," and laughed throughout her statement to Wiley (R 2277). Wiley testified that Jackie Bain told him that "McGill" claimed responsibility for Behan's death, although Robert Richmond was the target (R 2278, 2299). However, Jackie Bain could not recall McGill's first name (R 2279).

Subsequently, Wiley took Jackie Bain to BSO's records section, where he showed her booking photographs of "McGill" arrestees (R 2279). Amongst these photographs were pictures of Stephen and

26

Curtis McGill (R 2281). Bain initially identified Stephen McGill (R 2281-2282). However, according to Wiley, "it appeared" that Stephen McGill was in jail on November 13, 1990 (R 2282-2283). After Wiley told Jackie Bain that Stephen McGill was incarcerated on the day of Behan's death, Bain laughed, then asked to see a photograph of Deputy "Charlie," who Bain "loved" as "my favorite" (R 2284-2286). Later, Bain pointed out Curtis McGill's photograph (R 2287). Bain admitted lying to Wiley concerning Stephen McGill's identification as Patrick Behan's killer (R 2288). On November 20, 1990, Detective Walley telephoned Wiley concerning the phone calls he had received from Jackie Bain; in court, Wiley identified Bain's voice as the person who called Walley (R 2293-2295).

Bain told Wiley that Curtis McGill had talked about killing a cop four days before Behan's murder, and that the day after the killing, McGill called Bain to tell her that he was the one who committed this offense (R 2308-2310). Bain told Wiley there was no "plan" to kill anyone, but that Kevin Duhart and Curtis McGill were good friends (R 2311-2313). Bain had told Wiley on November 15, 1990 that she did not want to be involved in this case (R 2316-2318). On November 20, 1990, Wiley helped searched Bain's residence after Bain told Detective Walley that she was going to mail the murder weapon to BSO (R 2320, 2325-2326). Bain never told Detective Walley specifically that the motive, as she knew it, for Deputy Behan's shooting was sexual extortion (R 2327-2378).

David Carry testified that his internal affairs investigation of Jackie Bain's allegations took place between November 15, 1990

and March, 1991 (R 2333).   Although none of the accused deputies were found by internal affairs to have had sex with Bain, internal affairs "sustained" the charges against some deputies for failing to report Bain's allegations (R 2334-2335). Moreover, the internal affairs charges against Robert Richmond were sustained as to Richmond's sex with a prostitute, not with Jackie Bain (R 2337-2338). Additionally, Bain told Carry that her sexual activity with Deputy Charlie Williams was voluntarily undertaken, as she "liked him very much" (R 2338-2339). Carry admitted that Deputy DeGuices confirmed that Robert Richmond showed him nude photographs (R 2342). Carry denied that Sheriff Navarro himself ordered administrative immunity be given to Deputy Chandler (R 2344). Chandler had specifically denied witnessing sex between Jackie Bain and Deputy Charlie Williams; Chandler changed his testimony to internal affairs after being promised immunity based on his statement (R 2346, 2348).

Keith Schafer, an assistant state attorney, was working in a "special prosecution unit" concerning corruption in November, 1990 (R 2367). Schafer investigated Jackie Bain's allegations concerning BSO, questioning Bain on February 26, 1991 (R 2370, 2372). When Bain insisted that she had information concerning the Patrick Behan murder, Schafer referred her to Appellant's trial prosecutor, Chuck Morton, for questioning (R 2374-2375, 2377). However, when Schafer brought Jackie Bain to see Morton, Bain insisted on seeing Morton alone during the statement (R 2378). After Morton declined to question Bain alone, Bain left (R 2379).

28

Detective James Carr testified that he was familiar with Jackie Bain's allegations concerning sexual extortion and Curtis McGill (R 2385-2386). However, according to Carr, BSO could not corroborate Bain's allegations against Curtis McGill (R 2386). Defense counsel's renewed motion for judgment of acquittal, on the same grounds, was again denied by the trial court (R 2388).

During its deliberations, the jury requested:  (1) a transcript of Appellant's July 16, 1991 statement, (2) a transcript of James Carr's trial testimony, and (3) a map of the area surrounding the Circle K store within "3.5 miles" (R 2535,2537, 2539, 2908-2909,2913). Thereafter, Appellant was found guilty as charged (R 2550, 2940-2941).  This appeal follows.

## SUMMARY OF THE ARGUMENTS

### POINT I

Appellant's motions for judgment of acquittal should have been granted. Since the State presented no evidence that Appellant fired the gunshot that killed Deputy Behan, Appellant's guilt may only be established via the principal theory of criminal liability. However, in order to be convicted as a principal for a crime physically committed by another person, a criminal defendant must intend that the crime be committed and do some act to assist the other person in actually committing the crime. In this case, the state's evidence merely proved Appellant's presence at the scene of the crime, and his possible foreknowledge that the crime might occur. No evidence was presented showing either Appellant's intent to participate in this offense, or any act on his part that aided Keith King in the shooting of Deputy Behan. As a result, Appellant was improperly found to be criminally responsible for the actions of King in this case. Accordingly, Appellant's conviction and sentence must be vacated and remanded with directions.

### POINT II

The trial court erred in overruling Appellant's objection to the state's peremptory challenge of prospective juror Driver. In this case, the state's proffered reason as to Driver was neither reasonable on its face nor supported by the record. As a result, the State has failed to rebut the inference of discrimination arising from its use of a peremptory challenge to excuse Driver. As a consequence, this case must be reversed and remanded for a new

30

trial.

## POINT III

The trial court should have granted appellant's pretrial motion to suppress his July 16, 1991 statement and should have sustained Appellant's objections during trial to all testimony concerning the statement. It is the state's burden to show by a preponderance of the evidence that Appellant's statement below was voluntarily given. Here, the State failed to rebut either of Appellant's substantive arguments against admissibility: that the July 16, 1991 statement was tainted by Deputy Scheff's reference to Appellant's suppressed November 15, 1990 statement, and that mentioning the prior statement, along with Appellant's I.Q., age, the use of leg shackles, and other pressure applied on him by law enforcement officers rendered his later statement involuntary due to police coercion. As a result, Appellant's statement was involuntary, and thus should have been ruled inadmissible at trial. Moreover, the error was not harmless under the facts and circumstances of this case. Accordingly, reversal and remand with directions is required.

## POINT IV

The trial court should not have excluded the proffered testimony concerning statements given by Ronald Middleton to BSO internal affairs deputy David Carry concerning corruption by BSO deputies who patrolled near the crime scene in this case. The information supplied by Middleton was a relevant aspect of Appellant's theory of events -- that BSO steered its investigation of

31

Deputy Behan's killing away from the rampant corruption of some deputies assigned to the area surrounding the crime scene, which resulted in the failure to identify Behan's real killer(s). Moreover, this evidence was admissible as a hearsay exception under Florida Statutes, Chapter 90.804(1)(a)(2)(c), since Middleton was appropriately characterized as "unavailable" to testify at Appellant's trial, and Middleton's statements to Deputy Carry were against his penal interest, and were corroborated by a BSO polygraph examiner's conclusion that Middleton "showed no deception" when repeating his claim.  Finally, this error was not harmless under the facts of Appellant's case.  Thus, this cause must be reversed and remanded with directions.

ARGUMENT

POINT I

APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL
SHOULD HAVE BEEN GRANTED.

During trial, defense counsel moved for judgment of acquittal, arguing that the state's evidence was insufficient to prove appellant's guilt as a principal to this offense, which was the state's theory of prosecution below (R 1241, 1906-1907, 2248-2249). Specifically, the defense asserted that while it was clear that Appellant became aware that the co-defendant, Keith King, planned to shoot Deputy Behan, no evidence was presented showing that Appellant intended to participate with King in this offense, performed any act which aided King, or shared any benefit from the murder (R 1908, 1910-1911, 2248-2249). The trial court denied all three motions (R 1914, 2249, 2388). This was error.

Florida Statutes, Section 777.011 (1989) provides in pertinent part:

> Principal in [the] first degree: Whoever commits any criminal offense against the state, . . . or aids, abets, counsel, hires, or otherwise procures such offense and such offense is committed or is attempted to be committed, is a principal in the first degree . . .

Thus, Florida law would allow appellant to be convicted of first degree murder in this case if it can be said that he "aided and abetted" Keith King in the murder; that is, appellant must have both intended that the crime be committed and performed some act which assisted King in carrying out the crime, Staten v. State, 519 So. 2d 622, 624 (Fla. 1988); West v. State, 585 So. 2d 439, 441

33

(Fla. 4th DCA 1991).   However, neither mere knowledge that a crime is being committed nor presence on the crime scene are sufficient to support a criminal conviction on a principal theory, Staten, supra. at 624; West, supra. at 441.   Likewise, even foreknowledge that a crime is about to be committed and "questionable after-the-fact" behavior subsequent to the crime do not, either alone or together, establish guilt beyond a reasonable doubt pursuant to Section 777.011, see G. C. v. State, 407 So. 2d 639, 640 (Fla. 3d DCA 1981) and Collins v. State, 438 So. 2d 1036, 1038 (Fla. 2d DCA 1983) approved in Staton, supra. at 624.

In this case, Appellant told Deputy Carr that he and Keith King began to ride on Appellant's bicycle after both had been ingesting alcohol and narcotics on November 13, 1990 (R 1733-1734, 1752).   King, who had displayed a firearm to Appellant during the ride, told Appellant "I am gonna kill someone" within two blocks of the Circle K where Deputy Behan was sitting in his marked BSO vehicle (R 1734, 1753-1754).   Appellant responded by "calling [King's] bluff;" i.e., telling King he didn't believe King's words (R 1754).   As Appellant rode his bicycle into the Circle K parking lot, King told him "don't go that way" towards Behan's vehicle; nonetheless, Appellant "pulled up anyway. . . [as he] wasn't paying no attention around there" (R 1754).   King then jumped off Appellant's bicycle, telling him "[I] got him" (which Appellant took to mean that King planned on killing Behan) (R 1754-1755).   After King did in fact shoot Behan, Appellant and King rode away from the Circle K, after which King threw the murder weapon into a rock pit

34

(R 1755-1757). Appellant never saw King again after that day (R 1735, 1767).

The aforementioned facts, constituting that totality of the state's case against Appellant, show only that Appellant became aware of an inchoately-expressed thought by King to kill "someone" a minute or two before the event occurred; King did not inform Appellant that Behan had become King's target until moments before the act, after Appellant had already absentmindedly arrived on the scene. Appellant neither provided King with the weapon of Deputy Behan's death or selected any target for King's barely articulated desire to kill. At most, these facts show that Appellant was present when his co-defendant instantaneously developed, then articulated, a "spur-of-the-moment" plan to commit a crime; this scenario is insufficient as a matter of law to hold Appellant liable for King's crime, see and compare West, supra. at 440-441; Casey v. State, 266 So. 2d 366, 367-368 (Fla. 1st DCA 1972); Croft v. State, 528 So. 2d 1279, 1281 (Fla. 1st DCA 1988); Hutchinson v. State, 309 So. 2d 184, 186 (Fla. 1st DCA 1975); Gilday v. State, 168 So. 2d 205, 206 (Fla. 3d DCA 1964). Shockley v. State, 338 So. 2d 33, 35 (Fla. 3d DCA 1976), relied on by the state at trial, is distinguishable from Appellant's case, as the defendant in Shockley admitted knowledge of the co-defendant's plan to rob and kill that victim "a couple days before" the crimes.

Finally, since Appellant never admitted any intent to see Deputy Behan killed, by Keith King or himself, the evidence against Appellant on this point must be judged by the circumstantial

35

evidence rule:

> Where the only proof of guilt is circumstan-
> tial, no matter how strongly the evidence may
> suggest guilt, a conviction cannot be sus-
> tained unless the evidence is inconsistent
> with any reasonable hypothesis of innocence
> . . It is not enough that the facts may create
> a strong probability of guilt. . . .

Rager v. State, 587 So. 2d 1366, 1369 (Fla. 2d DCA 1991) (citations omitted). Thus:

> To be sufficient to convict, circumstantial
> evidence must be of a conclusive nature and
> tendency, leading on the whole to a reasonable
> and moral certainty that the accused and no
> one else committed the offense charged.

Scott v. State, 581 So. 2d 887, 893 (Fla. 1991). According to Appellant, he did not believe Keith King's stated intention to kill someone on November 13, 1990; moreover, Appellant "wasn't paying no attention" when King jumped off Appellant's bicycle at the Circle K Store (R 1753-1754). Nor did King direct Appellant to the Circle K; in fact, King told Appellant "don't go out that way" after seeing Behan's cruiser (R 1754). Since Appellant clearly did not provide King with any material assistance prior to Behan's shooting, the circumstantial evidence of Appellant's intent to participate in this crime can only be derived from one set of facts (his July 16, 1991 statement) which are reasonably subject to inculpatory or exculpatory interpretation. However, this is insufficient proof beyond a reasonable doubt on the essential element of Appellant's intent to commit this offense:

> Clearly, Appellant's hypothesis [of innocence] is
> not per se unreasonable [since] the foregoing cir-
> cumstances do not exclude it. Likewise it may be
> conceded that the state's hypothesis [of guilt] is

36

also not unreasonable and arguendo may even give rise to a strong inference of guilt. But again, where the <u>only</u> proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. . . . the ultimate question devolves here then as to whether a jury may be permitted to consider a single set of circumstances, which are at once susceptible of opposing reasonable hypotheses on the issue of guilt or innocence in a criminal case and return a verdict of guilty based on their view of the more reasonable of the two. Clearly not, since it is the tendency to establish one fact to the exclusion of contrary facts which gives circumstantial evidence the force of proof in the first place; and when circumstances are reasonably susceptible to two conflicting inferences they are probative of neither. There simply would be no "proof" (emphasis in original).

<u>Grover v. State</u>, 581 So. 2d 1379, 1381 (Fla. 4th DCA 1991) (citations omitted). Since Appellant's statement was not impeached or otherwise contradicted, its evidentiary facts must be accepted by Appellant's jury and, since the testimony was legally exonerating, the trial judge was obligated to grant Appellant's motion for judgment of acquittal below, <u>see</u> <u>generally</u> <u>Dudley v. State</u>, 511 So. 2d 1052, 1057, n.7 (Fla. 3d DCA 1987). Wherefore, Appellant requests that his judgment and sentence for first degree murder be vacated and remanded with directions to grant Appellant's motion for judgment of acquittal on Count I of the Indictment in this cause.

37

## POINT II

THE TRIAL COURT ERRED IN OVERRULING APPEL-
LANT'S OBJECTION TO THE STATE'S PEREMPTORY
CHALLENGE TO PROSPECTIVE JUROR DRIVER.

During jury selection, the trial court overruled a defense objection to the trial prosecutor's peremptory challenge of prospective juror Driver, a black female (R 990). This objection was erroneously overruled by the trial court, entitling appellant to a new trial (R 993).

Article I, Section 16 of the Florida Constitution guarantees a criminal defendant an impartial jury, State v. Neil, 457 So. 2d 481 (Fla. 1984) clarified sub. nom. State v. Castillo, 486 So. 2d 565 (Fla. 1986) and clarified State v. Slappy, 522 So. 2d 18 (Fla. 1988) certiorari denied 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988). As a consequence, a prosecutor may not attempt to utilize a peremptory challenge in a criminal case to exclude from a jury panel cognizable racial groups, Blackshear v. State, 521 So. 2d 1083, 1084 (Fla. 1988). Below, there was no factual dispute that Driver, as a black female, belonged to a protected class of potential jurors; moreover, since Appellant's October 4, 1993 beginning trial date (R 448) occurred subsequent to State v. Johans, 613 So.2d 1319, 1321 (Fla. 1993), no preliminary showing that there was a "strong likelihood" that Driver was challenged solely because of her race is required. Additionally, defense counsel properly preserved this issue for appellate review by moving to strike the entire jury panel before the serving jurors were sworn (R. 1194), Suggs v. State, 620 So. 2d 1231, 1232 (Fla.

38

1993) appeal  after remand 624 So. 2d 833 (Fla. 5th DCA 1993);
Joiner v. State, 618 So. 2d 174 (Fla. 1993); Blackshear, supra. at
1083, n.3, citing State v. Castillo, 486 So. 2d 565 (Fla. 1986).
Therefore, Appellant turns to the merits of this issue.

Once a party has met its initial burden an inference of
discriminatory use of a peremptory challenge arises, Slappy, supra.
at 22.  At that point, the burden of proving otherwise shifts to
the state to give "clear and reasonably specific race-neutral
reasons for its use of the questioned peremptory challenges," id.
at 22. To meet its burden, the state must show:  (1) the reasons
proffered for its challenge would be considered reasonable by some
people, and (2) the reasons must have record support, either from
the voir dire examination or be otherwise disclosed from the
record, Hill v. State, 547 So. 2d 175, 176 (Fla. 4th DCA 1989).
That is, the reasons must constitute more than a "mere assumption,"
McKinnon v. State, 547 So. 2d 1254, I256 (Fla. 4th DCA 1989).  A
trial court's application of this test for judging racial animus
in the use of peremptory challenges is itself subject to an "abuse
of discretion" standard on appellate review, Files v. State, 613
So. 2d 1301, 1305 (Fla. 1993).

In Suggs v. State, 624 So. 2d 833 (Fla. 5th DCA 1993), the
Fifth DCA held improper a prosecutor's peremptory challenge of a
prospective juror for whom the prosecutor had developed a "bad
feeling" due to the juror's response "I am going to look at the
evidence a bit more carefully" when informed that that defendant
had a prior criminal record, 624 So. 2d at 834.  The Fifth DCA

39

found that the articulated reason for excusal in that case was not "clear and logical, nor susceptible of [sic] appellate assurance it was not based on racial or other impermissible grounds" since "[b]ad feeling are not sufficient to withstand a <u>Neil</u> inquiry because it would be too easy to mask a racially motivated . . . basis for exercising a peremptory challenge," <u>id</u>. at 836 (citation omitted); <u>See also Wright v. State</u>, 586 So.2d 1024, 1029 (Fla. 1991) <u>appeal after remand</u> 617 So. 2d 837 (Fla. 4th DCA 1993). Likewise, in appellant's case the trial prosecutor was "very uncomfortable with Driver's response to questioning on the theory of principals criminal liability:

> MS. DRIVER:  Well, I look at this reasonable doubt in the King case, I see where those police officers, they were all gathered a-round, I saw the film, a lot of them did the punching and the kicking, yet some of them didn't get the same punishment.
>
> [PROSECUTOR]:  Which brings me to this question, I certainly can't answer and respond in any other case, particularly the one out of California.  You understand that?
>
> [MS. DRIVER]:  I am just taking that into considera-tion.
>
> [PROSECUTOR]:  I am really glad you mentioned it. Some people have some concerns about that?
>
> MS. DRIVER:  I just see the law.

(R 806).  As in <u>Suggs</u>, Driver's responses appear to merely show her desire to scrutinize the evidence against appellant carefully, rather than any blanket refusal to follow the law as stated.  As a result, the prosecutor's lack of "comfort" with Driver was simply too vague a reason as a matter of law to support her excusal from

40

Appellant's jury pool.  Wherefore, Appellant requests reversal of his conviction and sentence and remand with directions to grant him a new trial, unless this Court grants Appellant's sought-after relief under Point I, _supra_.

## POINT III

THE TRIAL COURT SHOULD HAVE GRANTED APPEL-
LANT'S PRETRIAL MOTION TO SUPPRESS STATEMENT,
AND SHOULD HAVE SUSTAINED HIS OBJECTIONS
DURING TRIAL TO ALL TESTIMONY CONCERNING THIS
STATEMENT.

The trial court denied Appellant's pre-trial motion to suppress as to Appellant's July 16, 1991 statement (R 443, 2815). During trial, the court overruled Appellant's objections to introduction of the taped statement (R 1719, 1739). This was error.

Before a criminal defendant's statement may be admitted at trial, the burden is on the state to show by a preponderance of the evidence that the statement was voluntarily given, Thompson v. State, 548 So. 2d 198 (Fla. 1989) appeal after remand 595 So. 2d 16 (Fla. 1992); Roman v. State, 475 So. 2d 228 (Fla. 1985) certiorari denied 475 U.S. 1000, 106 S.Ct. 1480, 89 L.Ed.2d 734 (1985); Reddish v. State, 167 So. 2d 858 (Fla. 1964). While a trial court has discretion to find a statement voluntary, this finding must be supported by competent, substantial evidence, Young v. State, 140 So. 2d 97 (Fla. 1962). Here, the trial court's finding that Appellant's July 16, 1991 statement was voluntarily given to Detective Carr was not supported by competent, substantial evidence. Appellant was fifteen years old at the time he was questioned (R 2571, 2773, 2808). He was mildly retarded, with a measured I.Q. of between 54 and 60 (R 182, 185, 236). Appellant had flunked two separate grades in school, and had been administratively promoted one other year (R 181-182). Finally, the investigating

42

law enforcement officers made reference to Appellant's November 15, 1990 statement, later suppressed by Judge Fruisciante, creating inappropriate psychological coercion against Appellant (R 367), cf. Martinez v. State, 545 So. 2d 466, 467 (Fla. 4th DCA 1989). Under these circumstances, the trial court's finding of voluntariness was erroneous, see Cooper v. Griffin, 455 F.2d 1142, 1144-1145 (5th Cir. 1972); Hall v. State, 421 So. 2d 571, 572 (Fla. 3d DCA 1982) petition for review denied 430 So. 2d 452 (Fla. 1983); Fields v. State, 402 So. 2d 486, 487 (Fla. 1st DCA 1981); Tennell v. State, 348 So. 2d 937 (Fla. 2d DCA 1977); State v. Word, 48 Fla. Supp. 2d 182 (11th Cir. 1991); State v. Blackmon, 37 Fla. Supp. 2d 107 (11th Cir. 1989); cf. Ross v. State, 386 So. 2d 1191, 1194 (Fla. 1980) (expert testimony that mildly retarded defendant could comprehend Miranda-warnings); W. M. v. State, 585 So. 2d 979 (Fla. 4th DCA 1991) review denied 593 So. 2d 1054 (Fla. 1991) (no expert testimony that defendant could not understand Miranda-warning).

Of course, Appellant is aware that the erroneous admission of involuntary statements is subject to harmless error analysis, Arizona v. Fulminate, _____ U.S. _____ , 111 S.Ct. 1246, 1257 (1991). In Florida, harmless error is judged by the standards announced in State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986). There, the Florida Supreme Court held:

> The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, there is no reasonable possibility that the error contributed to the verdict . . . . application of the test requires an examination of the

> entire record by the appellate court, includ-
> ing a close examination of the permissible
> evidence on which the jury could have legiti-
> mately relied, and in addition an even closer
> examination of the impermissible evidence
> which might have possibly influenced the jury
> verdict . . . the test is not a sufficiency of
> the evidence, a correct result, a not clearly
> wrong, a substantial evidence, a more probable
> than not, a clear and convincing, or even an
> overwhelming evidence test. Harmless error is
> not a device for the appellate court to sub-
> stitute itself for the trier-of-fact by simply
> weighing the evidence. The focus is on the
> effect of the error on the trier-of-fact. The
> question is whether there is a reasonable
> possibility that the error affected the ver-
> dict. The burden to show the error was harm-
> less must remain on the state. If the appel-
> late court cannot say beyond a reasonable
> doubt that the error did not affect the ver-
> dict, then the error is by definition harmful.

491 So. 2d at 1135 (citations omitted).

Examined in light of DiGuilio, the error in admitting Appel-
lant's statement unquestionably was not harmless. For one thing,
the statement was the only basis for prosecution in this case, as
no physical evidence placed Appellant at the scene of this crime,
cf. Owen v. State, 432 So. 2d 579 (Fla. 2d DCA 1985). Arizona v.
Fulminate recognized the obvious truism that:

> A full confession . . . [which] discloses the
> motive and means of the crime may tempt the
> jury to rely upon that evidence alone in
> reaching its decision . . . [for that reason,]
> a reviewing court [must] exercise extreme
> caution before determining that the admission
> of a confession . . . is harmless.

supra., 111 S. Ct. at 1258. That is, although there was cor-
roborating evidence of someone's guilt in the killing of Patrick
Behan, Appellant's statement was the "essence of the case against
him" on the crucial issue of identity; that is, who committed the

44

offense, <u>Owen v. State</u>, 560 So. 2d 207, 211 (Fla. 1990) <u>certiorari</u> <u>denied</u>, _____ U.S. _____, 111 S.Ct. 152, 112 L.Ed. 2d 118 (1991). Examining the permissible evidence on the issue of identity, we see no direct or circumstantial evidence identifying appellant as the perpetrator in this case. As a result, the impermissible evidence introduced against Appellant clearly created a "reasonable possibility" of affecting the jury's verdict by causing them to use the statement against Appellant on the issue of his identity as one of the perpetrators of the charged crime, <u>DiGuilio</u> <u>supra</u>. at 1138.

As a consequence, Appellant's conviction and sentence must be reversed and remanded with directions to grant Appellant a new trial. Needless to say, this issue would be mooted by this Court's reversal on Point I, <u>supra</u>.

<u>POINT IV</u>

THE TRIAL COURT ERRONEOUSLY EXCLUDED RONALD
MIDDLETON'S STATEMENT TO DEPUTY CARRY CONCERN-
ING ADDITIONAL CORRUPTION BY BSO DEPUTIES
PATROLLING THE AREA NEAR THE SCENE OF PATRICK
BEHAN'S DEATH.

During the defense-side testimony of David Carry, the trial
court sustained a state objection to testimony by Carry of a
statement given him by Ronald Middleton regarding the corrupt
practices of certain deputies patrolling a geographic area near the
Circle K Store prior to November 13, 1990 (R 2002, 2157, 2160,
2162-2163). That Court found that Middleton was not "unavailable,"
declining to rule on the defense's reliability claim or the state's
relevancy objection (R 2162-2163). This was error.

Defense counsel below sought to introduce Middleton's state-
ment as nonhearsay statements against his penal interest via
Florida Statutes, Section 90.804 (1) (e) (2) (c), which provides
as follows:

<u>Hearsay exceptions; declarant unavailable</u>

(1) <u>Definition of unavailability</u> -- "Un-
availability as a witness" means that the
declarant . . .

(e) is absent from the hearing, and the proponent
of his statement has been unable to procure his
attendance or testimony by process or other reason-
able means . . .

(2) <u>Hearsay exceptions</u> -- The following are
not excluded under Section 90.802, provided
that the declarant is unavailable as a witness
. . .

(c) <u>Statement against interest</u> -- The state-
ment which at the time of its making, . . .
tended to subject him to liability . . . . so
that a person in the declarant's position

46

> would not have made the statement unless he
> believed it to be true.  A statement tending
> to expose the declarant to criminal liability
> and offered to exculpate the accused is inad-
> missible unless corroborating circumstances
> show the trustworthiness of the statement.

Unquestionably, the proffered testimony of defense counsel's investigator, Don Pierce, that Pierce had unsuccessfully attempted to serve Middleton with a trial subpoena at various listed addresses (R 2029-2030), as well as counsel's unrefuted representation that BSO itself had not yet served an outstanding bench warrant on Middleton (R. 1998), was sufficient to establish Middleton as "unavailable" for trial below, see Thompson v. State, 619 So. 2d 261, 265 (Fla. 1993); Layton v. State, 348 So. 2d 1242, 1244 (Fla. 1st DCA 1977); see generally Magna v. State, 350 So. 2d 1088 (Fla. 4th DCA 1977); cf. Rivera v. State, 510 So.2d 340, 341 (Fla. 3d DCA 1987); McClain v. State, 411 So. 2d 316 (Fla. 3d DCA 1982). Counsel likewise offered "corroborating circumstances" to show the factual trustworthiness of Middleton's statement, in the form of the results of a BSO polygraph examination of Middleton disclosing "no significant reaction indicative of deception" (R 2001, 2021-2022), see generally Maugri v. State, 460 So. 2d 975 (Fla. 3d DCA 1984) cause dismissed 469 So. 2d 749 (Fla. 1985).  Finally, Middleton's admissions of bribery and automobile theft would "so far tend to subject [him] to criminal liability that a reasonable person in [Middleton's] position would not have made the statements unless he . . believed [them] to be true," Maugri, supra. at 977. Since this testimony was relevant to Appellant's theory of defense, in that it tended to show that BSO declined to investigate persons

47

connected to the Circle K area corruption, and thus failed to identify Behan's actual murderer(s) (R. 2000-2004, 2157-2162), the trial court's failure to permit admission of Middleton's allegations of corruption was error.

Nor can the error be considered harmless under the facts of this case.  In Gurganus v. State, 451 So. 2d 817, 823 (Fla. 1984), the Florida Supreme Court found the "proper test" for determining whether the exclusion of defense-related evidence is harmless to be:

> . . . whether there is a reasonable possibility that the lack of the evidence complained of might have contributed to the conviction . . .

(citations omitted). In this regard, where:

> . . . . relevant evidence tends in any way, even indirectly, to establish a reasonable doubt as to a defendant's guilt, it is error to deny its admission.

Story v. State, 589 So. 2d 939, 942 (Fla. 2nd DCA 1991).  In Appellant's case, the excluded evidence would have been corroborative of the defense's basic contention - that BSO had a motive to "shy away" from investigating potential suspects amongst the Circle K denizens of the June to November, 1990 time frame for fear of exposure of ongoing corruption by some of its deputies, see Dukes v. State, 442 So. 2d 316, 317 (Fla. 2d DCA 1983), and thus helped Appellant meet his burden of proving factually his theory of defense, Johnson v. State, 408 So. 2d 813, 815 (Fla. 3d DCA 1982). Since no evidence but his July 16, 1991 statement tied Appellant to this crime, Appellant vigorously contested at trial

48

the factual basis for his statements/confessions, and there was sufficient other evidence of BSO corruption to cloak the defense theory with colorable relevance and factual validity, the Middleton evidence was not "unnecessarily cumulative," <u>Dukes</u>, <u>supra</u>. at 317, and exclusion of this evidence cannot be deemed harmless, <u>Gurganus</u>, <u>supra</u>. at 823; <u>Johnson</u>, <u>supra</u>. at 815.,   On the contrary, this error entitles appellant to reversal and remand of his conviction and sentence with directions to grant him a new trial, subject to the relief sought on the grounds discussed under Point I, <u>supra</u>.

# EXHIBIT   7

*94-140015*

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

FOURTH DISTRICT

CASE NO. 93-3759

TIMOTHY BROWN,

Appellant,

vs.

STATE OF FLORIDA

Appellee.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ON APPEAL FROM THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
CRIMINAL DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ANSWER BRIEF OF APPELLEE

ROBERT A. BUTTERWORTH

Attorney General
Tallahassee, Florida

PATRICIA ANN ASH
Assistant Attorney General
Florida Bar No. 365629
1655 Palm Beach Lakes Boulevard
West Palm Beach, Florida
33401-2299
(407) 688-7759

Counsel for Appellee

No. 93-3759

<u>Timothy Brown v. State</u>

<u>CERTIFICATE OF INTERESTED PERSONS</u>

Appellee, the State of Florida, certifies that the following persons and entities have or may have an interest in the outcome of this case:

1.  Patricia A. Ash, Assistant Attorney General
    Office of the Attorney General
    (Counsel for Appellee)

2.  Robert Butterworth, Attorney General
    Counsel for Plaintiff/Appellee
    Joan Fowler, Senior Assistant Attorney General

3.  Joseph Chloupek, Assistant Public Defender
    Fifteenth Judicial Circuit
    (Counsel for Appellant)

4.  The Honorable Richard L. Jorandby
    Public Defender, Fifteenth Judicial Circuit

5.  Timothy Brown
    (Defendant/Appellant)

6.  The Honorable Michael J. Satz
    State Attorney, Seventeenth Judicial Circuit

:

94-140015WCR 93-3759
BROWN, Timothy
vs Florida, State of
4th District Court of Appeal
Patricia Ash

# TABLE OF CONTENTS

                                                          PAGE

CERTIFICATE OF INTERESTED PERSONS.........................i

TABLE OF CONTENTS........................................ii

TABLE OF CITATIONS.....................................iii

PRELIMINARY STATEMENT.....................................1

STATEMENT OF THE CASE AND FACTS...........................2

SUMMARY OF THE ARGUMENT...................................3

                    POINT I...........................5

    DEFENDANT'S MOTIONS FOR JUDGMENT OF
    ACQUITTAL WERE PROPERLY DENIED.

                    POINT II..........................8

    THE TRIAL COURT CORRECTLY OVERRULED
    DEFENDANT'S OBJECTION TO THE STATE'S
    PEREMPTORY CHALLENGE TO PROSPECTIVE
    JUROR DRIVER.

                    POINT III.......................14

    THE TRIAL COURT CORRECTLY OVERRULED
    DEFENDANT'S OBJECTION TO THE STATE'S
    PEREMPTORY CHALLENGE TO PROSPECTIVE
    JUROR DRIVER.

                    POINT IV........................17

    THE TRIAL COURT CORRECTLY OVERRULED
    DEFENDANT'S OBJECTION TO THE STATE'S
    PEREMPTORY CHALLENGE TO PROSPECTIVE
    JUROR DRIVER.

CONCLUSION..............................................19

CERTIFICATE OF SERVICE.................................19

## TABLE OF CITATIONS

CASE                                                              PAGE

Bonifay v. State,
    626 So. 2d 1310 (Fla. 1993).................................15

Charidoin v. State,
    362 So. 2d 398 (Fla. 2d DCA 1978)..........................5

Cochran v. State,
    547 So. 2d 928, 930 (Fla. 1989)

Collin v. State,
    438 So. 2d 1036 (Fla. 2d DCA 1983).........................5

Colorado v. Connelly,
    479 U.S. 157, 107 S.Ct. 515,
    93 L.Ed. 2d 473 (1986)....................................15

Files v. State,
    586 So. 2d 352 (Fla. 1st DCA 1991).........................9

Files v. State,
    613 so. 2d 1301 (Fla. 1992)...............................10

McClain v. State,
    411 So. 2d 316 (Fla. 3rd DCA 1982)........................16

Medina v. State,
    466 So. 2d 1046 (Fla. 1985)...............................15

Outlaw v. State,
    269 So. 2d 403 (Fla. 4th DCA 1972)
    cert. denied, 273 So. 2d 80 (Fla. 1983)...................16

Reed v. State,
    560 So. 2d 203, (Fla. 1990)................................9

Ross v. State,
    386 So. 2d 1191 (Fla. 1980)...............................15

Ryals v. State,
    112 Fla. 4, 150 So. 132 (1933).............................5

Stark v. State,
    316 So. 2d 586, (Fla. 4th DCA 1975)........................6

State v. Neil,
    457 So. 2d 481 (Fla. 1984).................................8

State v. Slappy,
   522 So. 2d 18 (Fla. 1988), cert. denied,
   487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988)....9,10

Staten v. State,
   519 So. 2d 622 (Fla. 1988)..................................6

Thomson v. State,
   548 So. 2d 198 (Fla. 1989)..................................15

Welton v. State,
   19 Fla.L.W. 1581 (Fla. 3rd DCA July 26, 1994)...............7


FLORIDA STATUTES

Section 777.011, Fla. Stat. (1985)............................5
Section 90.804 Fla. Stat. (1983)..............................16

## PRELIMINARY STATEMENT

The State of Florida was the prosecution in the trial court and Timothy Brown was the defendant. The parties shall be referred to as they stood below. References to the record on appeal shall be symbolized by "R".

## STATEMENT OF THE CASE AND FACTS

The State accepts the defendant's Statement of the Case and Facts as an accurate reflection of the case below but would object to the submission of facts concerning allegations of Jackie Bain or corruption in the BSO as these are not facts relevant to the issues raised in this appeal and are not part of defendant's argument.

The State would add that the statement made by Richard Scheff that defendant was "like clay" during his questioning on November 15, 1990 was explained by Scheff to mean "not that he was so easy to mold that you could just get him to say whatever you wanted him to, but that [Scheff] was concerned that, that clearly he was not in possession of all his faculties; and whatever statement [they] got from him, [Scheff] wanted it to be coming from him not from what [they] were suggesting to him," (R 125). Therefore, Scheff had no further contact with defendant for seven months.

## SUMMARY OF THE ARGUMENT

### Point I

Defendant's motions for judgment of acquittal were properly denied.  The defendant, by his own confession and concession by the defense, knew what King intended to do, peddled King about in search of a victim, dared King to kill, waited while King killed, and peddled King away from the scene to dispose of the weapon. The State presented evidence to show that defendant intended the crime to be committed and assisted King in committing it.  The jury determined that the evidence excluded all reasonable hypothesis of innocence and that verdict should not be reversed on appeal.

### Point II

The trial court did not err in overruling defendant's objection to the State's peremptory challenge of prospective juror Driver.  The State's proffered reason was reasonable and race neutral.

### Point III

The trial court properly denied defendant's motion to suppress his July 16, 1991 statement and overruled defendant's objections during trial to all testimony concerning the statement.  The State showed that defendant was given and understood his rights, did not want an attorney or his parents present, was not coerced in any manner and the statement was freely and voluntarily given.

<u>Point IV</u>

The trial court properly denied the defense's attempt to have testimony given by Ronald Middleton to BSO internal affair's deputy, David Carr, concerning corruption by BSO deputies who patrolled near the crime scene in this case. The defense proffered that the witness was unavailable because Don Pierce unsuccessfully attempted to serve Middleton using an address from a capius issued in January 1991. This did not, however, discharge the defense's burden of establishing that it had taken reasonable steps to procure the witness' attendance.

<u>ARGUMENT</u>

<u>POINT I</u>

DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL WERE PROPERLY DENIED.

During trial, the defense moved for judgment of acquittal, arguing the State's evidence was insufficient to prove defendant's guilt as a principal to the offense, which was the State's theory of the prosecution (R 1241, 1906-1907, 2248-2249). The defendant, by his own confession, discussed killing someone with Keith King, drove King around on defendant's bicycle looking for a victim, egged King on, waited for King to kill the deputy and drove King away from the scene to dispose of the weapon. The defense conceded that the defendant knew what was going to happen; Keith King planned to kill someone and that someone became Deputy Bahan (R 1907-1908).

Under the law of Florida, both the actor and those who aid and abet in the commission of a crime are principals in the first degree. See § 777.011, Fla. Stat. (1985)[1]. In order to be guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime. <u>Ryals v. State</u>, 112 Fla. 4, 150 So. 132 (1933); <u>Collin v. State</u>,

_____

[1] Section 777.011 provides:

> <u>Principal in [the] first degree</u>: Whoever commits any criminal offense against the State, ... or aids, abets, counsel, hires, or otherwise procures such offense and such offense is committed or is attempted to be committed, is a principal in the first degree...

438 So. 2d 1036 (Fla. 2d DCA 1983); Charidoin v. State, 362 So. 2d 398 (Fla. 2d DCA 1978); Staten v. State, 519 So. 2d 622 (Fla. 1988).

As is stated in Staten, "clearly, the getaway driver who has prior knowledge of the criminal plan and is 'waiting to help the [actor] escape' falls within this category, and is, therefore, a principal."

The defendant here argues that although the evidence clearly established that he knew a crime was going to be committed and had been committed when he drove King away on his bicycle, it did not establish beyond a reasonable doubt that he intended to participate in the crime. The evidence presented in this case was that defendant actively participated in the crime rather than merely had knowledge that an offense was being committed. Physically peddling King around on the handle bars of his bicycle, discussing the murder of "someone," daring King to have the guts to pull it off, standing by while the deputy is stalked and shot, and peddling King away from the scene and to the rock pit to dump the weapon is a combination of factors from which the jury could legitimately infer that defendant was an active participant in the crime. See Stark v. State, 316 So. 2d 586, 587 (Fla. 4th DCA 1975)(where state relies on aiding and abetting theory, it can prove intent either by showing aider and abettor had the requisite intent himself, or knew the principal had that intent), cert. denied, 328 So. 2d 845 (Fla. 1976); Staten 519 So. 2d at 524 (evidence that defendant was present when robbery proposed, defendant drove to scene, waited while crime took place

then drove getaway car was ample support for defendant's conviction as principal).

The defendant argues that there is only circumstantial evidence that he intended to participate in the crime. The State would disagree based on his own description of events (his July 16, 1991 statement). But the question of whether the evidence fails to exclude all reasonable hypothesis of innocence is for the jury to determine; and where there is substantial, competent evidence to support the jury verdict, the verdict should not be reversed on appeal. The circumstantial evidence standard does not require the jury to believe the defense version of the facts on which the State has produced conflicting evidence. Cochran v. State, 547 So. 2d 928, 930 (Fla. 1989)(given the conflict in physical evidence, defendant claimed that he "let [the victim] out of the car" while the evidence showed he dragged the victim's body, the jury properly concluded that defendant's version of events was untruthful); see also Welton v. State, 19 Fla.L.W. 1581 (Fla. 3rd DCA July 26, 1994)(the State is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events).

The trial court properly denied the defendant's motions for judgment of acquittal.

- 7 -

## POINT II

THE TRIAL COURT CORRECTLY OVERRULED
DEFENDANT'S OBJECTION TO THE STATE'S
PEREMPTORY CHALLENGE TO PROSPECTIVE
JUROR DRIVER.

Defendant alleges that the trial judge reversibly violated State v. Neil, 457 So. 2d 481 (Fla. 1984) by permitting the prosecution to peremptorily challenge prospective juror Mrs. Driver (R 990). The State disagrees.

In State v. Neil, the Florida Supreme Court decreed:

> [I]t is time in Florida to hold that jurors should be selected on the basis of their individual characteristics and that they should not be subject to being rejected solely because of the color of their skin...
>
> [To the effect this policy decision], trial courts should apply the following test. The initial presumption is that peremptories will be exercised in a nondiscriminatory manner. A party concerned about the other side's use of peremptory challenges must make a timely objection and demonstrate on the record that the challenged persons are members of a distinct racial group and that there is challenged solely because of their race. If a party accomplished this, then the trial court must decide if there is a substantial likelihood that the peremptory challenges are being exercised solely on the basis of race. If the court finds no such likelihood, no inquiry may be made of the person exercising the questioned peremptories.
>
> On the other hand, if the court decides that such a likelihood has been shown to exist, the burden shifts to the complained-about party to show that the questioned challenges were not exercised solely because of the prospective jurors' race. The reasons given in response to the courts inquiry need not be equivalent to those for a challenge for cause. If the party shows that the

- 8 -

challenges were based on the particular
case on trial, the parties or witnesses
or characteristics of the challenged
persons other than race, then the
inquiry should end and jury selection
should continue. On the other hand, if
the party has actually been challenging
prospective jurors solely on the basis
of race, then the court should dismiss
that jury pool and start voir dire over
with a new pool.

457 So. 2d 481, 482, 486-487.

The Florida Supreme Court further clarified the <u>Neil</u>

standards in <u>State v. Slappy</u>, 522 So. 2d 18 (Fla. 1988), cert.

denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988),

saying that if and when the burden shifts to the State, the

reasons proffered for the exercise of those challenges must be,

first, race neutral and reasonable and, second, not pretextual.

Then the trial judge must evaluate the reasons given to see if

they are credible in light of the circumstances and that they are

reflected in the record of the voir dire examination or

otherwise. The trial judge has broad discretion in making such a

determination and must be relied upon to be inherently fair and

color-blind for "only one who is present at the trial can discern

the nuances of the spoken word and the demeanor of those

involved." <u>Reed v. State</u>, 560 So. 2d 203, at 2026 (Fla. 1990).

Where the trial judge holds a <u>Neil</u> inquiry and has the party

exercising the challenge explain its rationale, determining that

the stated reasons are reasonable, race neutral and non-

pretextual, that court's findings are entitled to great deference

upon appellate review. <u>Files v. State</u>, 586 So. 2d 352 (Fla. 1st

DCA 1991). The standard of review, as reaffirmed by the Supreme

Court in <u>Files v. State</u>, 613 So. 2d 1301 (Fla. 1992), is whether or not there was an abuse of discretion.  As long as the reason espoused by the party is not invalid as a matter of law, the superior vantage point of the trial judge will be relied upon and the appellate court's judgment of a cold record shall still not be substituted for that of the trial judge.  <u>Id</u>, at 1304, 1305.

There are a number of factors set out in <u>State v. Slappy</u>, 522 So. 2d 18, at 22, which may be taken into account in determining whether a stated reason is race-neutral and non-pretextual.  Those are:

> 1.  alleged group bias not shown to be shared by the juror in question,
>
> 2.  failure to examine the juror or perfunctory examination, assuming neither the trial court nor opposing counsel had questioned the juror.
>
> 3.  singling the juror out for special questioning designed to evoke a certain response,
>
> 4.  the prosecutor's reason is unrelated to the facts of the case, and
>
> 5.  challenge based on reasons equally applicable to juror who were not challenged.

The State asked the prospective jurors what they thought about the law of principal, where two people can be equally responsible when one does the acting.  Mrs. Driver responded:

> How about you, Mrs. Driver, what do you think?
>
> MS. DRIVER:  Well, I look at this reasonable doubt in the King case, I see where those police officers, they were all gathered around, I saw the film, a

- 10 -

lot of them did the punching and the kicking, yet some of them didn't get the same punishment.

MR. MORTON: Which brings me to this question, I certainly can't answer and respond in any other case, particularly the one out in California. You understand that?

MS. DRIVER: I am just taking that into consideration.

MR. MORTON: I am really glad you mentioned it. Some people have some concerns about that??

MS. DRIVER: I just see the law.

MR. MORTON: In fact, the reason I'm asking this question is because all I am doing is explaining now what the law is, if you're selected to be on this jury, it's up to you to apply it. I'm asking you, if that were the law the Judge were to instruct you as to that law, could you agree to it as it relates to this case, forget about what happened out in California?

MS. DRIVER: I mean, this I can't say. We can judge after the fact.

MR. MORTON: But we're talking about a Broward County, State of Florida, State of Florida versus is Timothy Brown. In understand your concern. But do you think that's a fair law? I am not saying it was applied in California, different states have different laws.

Even if they had it, I'm not saying it was fairly applied out there. I'm saying now is it a fair concept to you, is it? Does that sound like a fair concept?

MS. DRIVER: Yes.

(R 806-807)

The defense objected to the striking of Ms. Driver. The State gave the following reason for the strike.

- 11 -

MR. MORTON:  [for the State] I am very uncomfortable with her answers concerning the Rodney King, how unjust and unfair that was, as we talked.  In this particular case, it is the shooting of a white police officer.  I am uncomfortable she's going to take the Rodney King case - based on her explanation of that, and she could use — this as an opportunity to get even.

I can't predict that.  But given her answers, I am particularly concerned about her principal responses and her reference to the Rodney King trial, I am not comfortable with having her as a juror, period.

For the record, no one else made any reference to the Rodney King trial.  It was certainly unsolicited on my part.  And her analogy to the principal instruction as to the relation to the Rodney King trial causes some great concern for me.  And that was certainly a verdict that was not pleasing many of the African American members of the community and she clearly expressed that.

THE COURT:  By the same token the outcome of that trial wasn't pleasing in an awful lot of communities.  It wasn't just limited.

MR. MORTON:  Were it a case not involving a shooting of a policeman.

THE COURT:  I understand, I think the facts and circumstances that are unique to this case, that the inclination of Ms. Driver to make a point with the respect to the very issues that are parallel, that is a sufficient race neutral reason that would warrant the State being able to utilize a peremptory.  I am going to deny any challenge with respect thereto.

(R 990-992).

The State's explanation was properly upheld by the trial court as race neutral.  The State sought to exclude her

- 12 -

based upon Ms. Driver's feelings toward the law of principal not on the basis of her race.

<u>POINT III</u>

THE TRIAL COURT CORRECTLY DENIED
DEFENDANT'S PRETRIAL MOTION TO SUPPRESS
STATEMENT.

The trial court's finding that defendant's July 16, 1991 statement was voluntarily given to Detective Carr was supported by competent, substantial evidence. The defendant was competent to stand trial and capable of understanding right from wrong (R 194-195). The defendant was capable of understanding his right to remain silent (R 228-229). There was no evidence of any "inappropriate psychological coercion" against defendant. (defendant's initial brief p.43). The defense questioned Detective Carr at the motion to suppress on January 8, 1993 only to the extent of the following:

> Q. Prior to the time of you going on the tape with Mr. Brown you're discussing with him the statement that he gave to Sergeant Auer and Gill and Ilarraza on November 15th?

> A. That was mentioned. The gist of the conversation was the facts that we had pertaining to Solomen Gibbs and the other people.

> Q. But the bottom line is he did mention the fact that he had confessed earlier in November of 1990, correct?

> A. It was mentioned, yes.

> Q. As some of information that you had against Mr. Brown, correct?

> A. As information that we had, yes.

(R 367).

The defendant was arrested and advised of his rights on July 16, 1991. (R 1721-1722). Defendant was again advised of

his rights using the Rights Waiver Form (R 1723). Defendant was given a juvenile waiver form which was read outloud to him as he read along (R 1727). The jury was shown the original form (R 1730).

Detective Carr attempted to contact the defendant's parents or guardian. Carr got no answer when he called. The defendant expressed his desire that his parents not be contacted (R 1728-1730, 1979). The defendant never felt threatened; he was given a soda, bathroom privileges and something to eat (R 1731).

The defendant made give a taped statement [2] which was introduced into evidence at trial without objection (R 1738). Defendant was again read his rights on the taped statement (R 1748).

A trial court's ruling on a motion to suppress is presumed correct. Medina v. State, 466 So. 2d 1046 (Fla. 1985). And a ruling on voluntariness will not be overturned unless clearly erroneous. Thomson v. State, 548 So. 2d 198 (Fla. 1989). Here, defendant went with the deputy willingly, never requested the presence of an attorney or his parents, even though that was offered, and specifically did not want his parents contacted. As stated by the United States Supreme Court "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'". Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed. 2d 473 (1986). The deputy's mentioning of the November 15, 1990 statement did not

---

[2] The taped statement was made a little over an hour after the signing of the waiver form (R 1793).

amount to coercion.   <u>Bonifay v. State</u>, 626 So. 2d 1310 (Fla. 1993).   Further, the fact of mental subnormality or impairment alone, as implied by the defendant, does not render a confession involuntary.   <u>Ross v. State</u>, 386 So. 2d 1191 (Fla. 1980); <u>Thompson v. State</u>, 548 So. 2d 198 (Fla. 1989).   Defendant has shown no error in the trial court's refusal to grant his motion to suppress.

<u>POINT IV</u>

THE TRIAL COURT PROPERLY EXCLUDED RONALD
MIDDLETON'S STATEMENT TO DEPUTY CARRY
CONCERNING ADDITIONAL CORRUPTION BY BSO
DEPUTIES PATROLLING THE AREA NEAR THE
SCENE OF PATRICK BEHAN'S MURDER.

The defense attempted to get into evidence statements made by Ronald Middleton to Detective Carry regarding information that he had of corruption by other officers, specifically, corruption by Deputy Gordon and Deputy Williams. (R 1998). The defense was attempting to show the alleged corruption that was going on in the sheriff's office in regard to the allegations by Jackie Bain (R 2000, 2158). The trial court did not find the proper showing of unavailability for the hearsay statement to be entered into evidence (R 2162-2163). The State objected to the fact of unavailability and on the ground of relevancy (R 2163).

Don Pierce, a private investigator, testified that he got Middleton's address from a capius issued January of 1991.[3] Pierce went to this address but was unable to find Middleton (R 2029). The trial court had determined that trying to find someone from a 1991 address did not meet the test of unavailability. (R 2028).

The burden of demonstrating unavailability of a witness for trial rests on the party seeking to use that witness' hearsay testimony. The responsibility for evaluating the adequacy of the showing of nonavailability rests with the trial judge and his determination on the issue will not be disturbed unless an abuse of discretion clearly appears. <u>Outlaw v. State</u>,

[3] Trial commenced October 6, 1993.

269 So. 2d 403 (Fla. 4th DCA 1972) cert. denied, 273 So. 2d 80 (Fla. 1983).

Section 90.804 Fla. Stat. (1983) provides a list of exceptions which permit use of hearsay testimony where the declarant is unavailable. Subsection (1) of the statute defines unavailability. The pertinent provision, Section 90.804(1)(e), permits the finding of unavailability where the declarant "[i]s absent from the hearing, and the proponent of his statement has been unable to procure his attendance or testimony by process or other reasonable means."

The defense did proffer that its witness was unavailable because Don Pierce unsuccessfully attempted to serve Middleton using an address form a capius issued in January 1991. That did not, however discharge its burden of establishing that it had taken reasonable steps to procure the witness' attendance. Compare McClain v. State, 411 So. 2d 316 (Fla. 3rd DCA 1982)(no steps taken to procure attendance) with Outlaw v. State, 269 So. 2d 403 (Fla. 4th DCA 1972) cert. denied, 273 So. 2d 80 (Fla. 1983)(a diligent, though unsuccessful, effort to procure attendance was sufficient to show unavailability).

The trial court correctly ruled the defense's showing of nonavailability inadequate.

## CONCLUSION

For the foregoing argument and authority, the State of Florida respectfully requests that this Court affirm the defendant's conviction and sentence.

Respectfully submitted,

ROBERT A. BUTTERWORTH
Attorney General
Tallahassee, Florida

PATRICIA ANN ASH
Assistant Attorney General
1655 Palm Beach Lakes Boulevard
West Palm Beach, Florida
33401-2299
Telephone (407) 688-7759
Florida Bar No. 365629

Counsel for Appellee

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by courier to: JOSEPH R. CHLOUPEK, Public Defender, 15th Judicial Circuit of Florida, Criminal Justice Building/6th Floor, 421 3rd Street, West Palm Beach, 33401 this 29th day of August, 1994.

Of Counsel

br

- 19 -

# EXHIBIT   8

94-140015

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

FOURTH DISTRICT

TIMOTHY BROWN,           )
                         )
          Appellant,     )
                         )
vs.                      )          CASE NO.   93-3759
                         )
STATE OF FLORIDA,        )
                         )
          Appellee.      )
                         )
_____)

### REPLY BRIEF OF APPELLANT

On Appeal from the Circuit Court of the Seven-
teenth Judicial Circuit of Florida, In and For
Broward County [Criminal Division].

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit of Florida
Criminal Justice Building
421 Third Street/6th Floor
West Palm Beach, Florida 33401
(407) 355-7600

Joseph R. Chloupek
Assistant Public Defender
Florida Bar No. 434590

Counsel for Appellant

RECEIVED
DEPT. OF LEGAL AFFAIRS

SEP 9 1994

CRIMINAL OFFICE
WEST PALM BEACH, FL

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . .   1

### ARGUMENT

### POINT I

APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL
SHOULD HAVE BEEN GRANTED. . . . . . . . . . . . . . . .   2

### POINT II

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S
OBJECTION TO THE STATE'S PEREMPTORY CHALLENGE TO
PROSPECTIVE JUROR DRIVER. . . . . . . . . . . . .   8

### POINT III

THE TRIAL COURT SHOULD HAVE GRANTED APPELLANT'S
PRETRIAL MOTION TO SUPPRESS STATEMENT, AND SHOULD
HAVE SUSTAINED HIS OBJECTIONS DURING TRIAL TO ALL
TESTIMONY CONCERNING THIS STATEMENT. . . . . . . .   10

### POINT IV

THE  TRIAL  COURT  ERRONEOUSLY  EXCLUDED  RONALD
MIDDLETON'S STATEMENT TO DEPUTY CARRY CONCERNING
ADDITIONAL CORRUPTION BY BSO DEPUTIES PATROLLING
THE  AREA  NEAR  THE  SCENE  OF  PATRICK  BEHAN'S
DEATH. . . . . . . . . . . . . . . . . . . . . . .   11

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . .   12

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . .   12

94-140015WCR 93-3759
BROWN, Timothy
vs Florida, State of
4th District Court of Appeal
Patricia Ash

## AUTHORITIES CITED

CASES                                                          PAGE

Bonifay v. State, 636 So. 2d 1310
     (Fla. 1993) . . . . . . . . . . . . . . . . . . . 10

Brown v. State, 624 So. 2d 299
     (Fla. 1st DCA 1993) . . . . . . . . . . . . . . . 8

Brumbley v. State, 453 So. 2d 381
     (Fla. 1984) . . . . . . . . . . . . . . . . . . . 5

Canakaris v. Canakaris, 382 So. 2d 1197
     (Fla. 1980) . . . . . . . . . . . . . . . . . . . 8

Duval Utility Co. v. Florida Public
     Service Commission,
     380 So. 2d 1028
     (Fla. 1980) . . . . . . . . . . . . . . . . . . . 6

Files v. State, 613 So. 2d 1301
     (Fla. 1992) . . . . . . . . . . . . . . . . . . . 8

Florida Rate Conference v. Florida Railroad
     & Public Utilities Commission,
     108 So. 2d 601
     (Fla. 1959) . . . . . . . . . . . . . . . . . . . 6

Gilday v. State, 168 So. 2d 205
     (Fla. 3d DCA 1964) . . . . . . . . . . . . . . . 5

Grover v. State, 581 So. 2d 1379
     (Fla. 4th DCA 1991) . . . . . . . . . . . . . . . 7

J.H. v. State, 370 So. 2d 1219
     (Fla. 3d DCA 1979) review denied
     379 So. 2d 209
     (Fla. 1979) . . . . . . . . . . . . . . . . . . . 5

McArthur v. State, 351 So. 2d 972
     (Fla. 1977) . . . . . . . . . . . . . . . . . . . 4

Outlaw v. State, 269 So. 2d 403
     (Fla. 4th DCA 1972) cert. denied
     273 So. 2d 80
     (Fla. 1973) . . . . . . . . . . . . . . . . . . . 11

Reeves v. State, 632 So. 2d 702
     (Fla. 1st DCA 1994) . . . . . . . . . . . . . . . 8

Stark v. State, 316 So. 2d 586
     (Fla. 4th DCA 1975) cert. denied
     328 So. 2d 845
     (Fla. 1976) . . . . . . . . . . . . . . . . . . . 5

## PRELIMINARY STATEMENT

Appellant was the defendant and appellee the prosecution in the Criminal Division of the Circuit Court of the Seventeenth Judicial Circuit, In and For Broward County, Florida. In this brief the parties will be referred to as they appear before this Court.

The symbol "R" will denote the Record on Appeal.

A.   We get -- we pulled up and saw the police so he say don't go out that way.  So we ride that way.  I pulled up anyway, you know what I am saying, I wasn't paying no attention around there.  As I was still pulling, he jumped off the bicycle.

Q.   Okay, now let me stop you for a minute.  Does he say anything before he jumps off the bike?

A.   He told me to look up.  I looked up.  He said he's got him.

Q.   He says he's got him?

A.   He's got him.

Q.   What does that mean to you?

A.   He gonna kill somebody, that means --

Q.   That that's the person he is gonna kill?

A.   Yes, sir.

Q.   And do you see that police officer?

A.   Yes, sir.

Q.   And you know that that's who he's directing that comment to, that that's who he's got, that's who he's gonna kill?

A.   Yes, sir.

Q.   Okay.

A.   And when he jumped off the bicycle, he made a limp over there to the car, like you know how he walk, he was limping over there to the car and he fired it and after he fired it, I panicked and we jumped off the bicycle, we got across the street from the Circle K and he fired the gun again.

Q.   Okay.  You say that you jumped back on the bicycle?

A.   Yes, sir.

Q.   And is he on the bicycle or is he running?

A.   He's on the bicycle.

- 3 -

Q.     Okay.   And you go across what, Hallandale Beach Boulevard?

A.     Yes, sir going back to Carver Ranches.

(R 1753-1755).  Accordingly, Appellee's claim that Appellant "by his own confession discussed killing someone with Keith King, drove King around on [Appellant's] bicycle looking for a victim, egged King on, waited for King to kill the deputy [, then] drove King away from the scene to dispose of the weapon," <u>Answer</u> <u>Brief</u> at p.5, is simply incorrect.   In fact, Appellant's statement indicates that only King mentioned killing anyone that night; Appellant's response to King disclaimed any belief in the reality of King's stated "intent." Since Appellant's words on the subject were the only evidence introduced at trial, his description of events stands unrebutted, and hence must be accepted as true for purposes of appellate review of evidentiary sufficiency in this case, <u>McArthur v. State</u>, 351 So. 2d 972, 976, n.12 (Fla. 1977).  Appellee's claim that Appellant admitted giving King a ride on Appellant's bicycle to assist King in finding a potential murder victim, then took King away from the crime scene as part of a preconceived plan, is likewise belied by reference to the printed transcript (R 1754-1755).  On the contrary, Appellant merely stated that he was present when King suddenly and without warning jumped off the bicycle to shoot Behan.  As to his departure from the scene with King, Appellant admitted this reaction was "panick[y]," not preconceived (R 1755).  Thus, Appellee's citation of <u>Staten v. State</u>, 519 So. 2d 622 (Fla. 1988) for the proposition that "clearly, [a] getaway driver who has prior knowledge of [a] criminal plan and [waits] to help the [perpetrator] escape" has no application to Appellant's case.

Instead, the undisputed facts as related by Appellant unequivocally establish a spontaneous, spur-of-the-moment, decision by Keith

King to kill Deputy Behan, which King formulated immediately before he acted, a decision which was communicated to appellant only after King began his solitary criminal action, see e.g. Gilday v. State, 168 So. 2d 205, 206 (Fla. 3d DCA 1964); J.H. v. State, 370 So. 2d 1219, 1220 (Fla. 3d DCA 1979) review denied 379 So. 2d 209 (Fla. 1979); see also Initial Brief at p.35. Appellee's citation to Stark v. State, 316 So. 2d 586 (Fla. 4th DCA 1975) cert. denied 328 So. 2d 845 (Fla. 1976) provides no authority to the contrary; actually, in Stark this Court reversed a criminal conviction secured on an aiding and abetting theory where, as here, the trial evidence failed to prove that defendant's specific intent to participate in the crime charged, compare Brumbley v. State, 453 So. 2d 381, 386 (Fla. 1984) (circumstantial evidence in first degree murder prosecution - that defendant "shrugged his shoulders" when codefendant suggested killing victim - failed to exclude reasonably hypothesis of lack of premeditation). Accordingly, Appellant's analysis of the facts of his case when compared to the applicable substantive rules of law remains unchallenged.

Nor does Appellee's discussion of the circumstantial evidence rule as applied to the question of Appellant's intent to participate in Deputy Behan's killing support affirmance. In Werner v. State, 590 So. 2d 431, 435 (Fla. 4th DCA 1991) approved 609 So. 2d 585 (Fla. 1993), this Court discussed the proper appellate methodology for reviewing circumstantial evidence cases:

> where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. . . Ordinarily, the jury makes that determination . . . However, as a threshold matter before the case goes to the jury, the trial court should determine if the state produced competent, substantial evidence of the defendant's guilt which is susceptible of

- 5 -

> only one inference . . . Evidence that leaves
> room for two or more inferences of fact, at least
> one of which is consistent with the defendant's
> hypothesis of innocence, is not legally suffi-
> cient to make a case for the jury . . . A motion
> for judgment of acquittal should be granted in a
> circumstantial case if the state fails to present
> evidence from which the jury can exclude every
> reasonable hypothesis except that of guilt . . .

(internal quotation marks and citations omitted).   In determining

whether "competent substantial evidence" supports a jury's verdict of

guilty in a circumstantial case, the Florida Supreme Court's definition

found in Duval Utility Co. v. Florida Public Service Commission, 380

So. 2d 1028, 1031 (Fla. 1980) applies:

> Competent substantial evidence is such evidence
> as will establish a substantial basis of fact
> from which the fact at issue can reasonably be
> inferred . . .

(emphasis supplied).   In applying the Duval Utility standard:

> . . . the substantial evidence rules is not
> satisfied by evidence which merely creates a
> suspicion or which gives equal support to incon-
> sistent inferences . . . Surmise, conjecture, or
> speculation have been held not to [constitute]
> substantial evidence . . .

Florida Rate Conference v. Florida Railroad & Public Utilities Commis-

sion, 108 So. 2d 601, 607 (Fla. 1959).   In Appellant's case, the

circumstantial evidence suggesting his intent to assist Keith King

below consisted in its entirety of the following facts:

> (1)  Appellant allowed King to continue riding
> on Appellant's bicycle after King claimed he
> wanted to "kill somebody,"
>
> (2)  King displayed a firearm to appellant prior
> to arrival at the Circle K store,
>
> (3)  Appellant drove King away from the scene of
> this crime after the fact,
>
> (4)  Appellant was in King's presence, both
> during the shooting and when King allegedly
> disposed of the murder weapon in a nearby rock-
> pit.

However, other evidence establishes Appellant's reasonable hypothesis of innocence (Appellant became aware of King's intent to kill Behan only immediately prior to this event, and had no intent to aid King's action):

(1) Appellant didn't believe King's initial stated intent to kill,

(2) Upon entering the Circle K parking lot, King told Appellant "don't go that way" (suggesting King had no preconceived plan to kill a law enforcement officer, or anyone else, at the Circle K),

(3) Appellant "wasn't paying [King] no attention" in the parking lot (suggesting Appellant was unaware of any plan by King to kill at the Circle K at that time),

(4) Appellant's awareness that Behan had become a target of King coalesced only when King said "[I've] got him" seconds before the shooting (R 1754-1755), and

(5) Appellant's "panick" after King shot Behan shows that he allowed King to flee the scene on the bicycle out of fear over King's act, not any intent to aid King's escape.

In this case, the totality of evidence concerning Appellant's criminal intent, established from one set of facts, was equally consistent with Appellant's innocence and guilt as a principal with Keith King in the death of Patrick Behan. Such a quantum of circumstantial proof does not constitute "competent substantial evidence" sufficient to support Appellant's conviction, since:

. . . when circumstances are reasonably susceptible to two conflicting inferences they are probative of neither. There simply would be no "proof" [of guilt beyond a reasonable doubt].

Grover v. State, 581 So. 2d 1379, 1381 (Fla. 4th DCA 1991). Therefore, Appellant remains entitled to reversal of his conviction and sentence and remand with directions to discharge Appellant under Count I of the indictment.

- 7 -

POINT II

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S
OBJECTION TO THE STATE'S PEREMPTORY CHALLENGE TO
PROSPECTIVE JUROR DRIVER.

Appellee recites the "abuse of discretion" standard for appellate
review of race-based peremptory challenges articulated in Files v.
State, 613 So. 2d 1301 (Fla. 1992) as if those words end all discus-
sion of this issue on appeal.  However, in another context the Supreme
Court discussed the jurisprudential limits on trial-level judicial
discretion:

> The discretionary power that is exercised by a
> trial judge is not . . . without limitations .
> . . The trial court's discretionary power is
> subject only to the test of reasonableness, but
> that test requires a determination of whether
> there is logic and justification for the result.
> The trial courts' discretionary power was never
> intended to be exercised in accordance with whim
> or caprice of the judge nor in an inconsistent
> manner.  Judges dealing with cases essentially
> alike should reach the same result.  Different
> results reached from substantially the same facts
> comport with neither logic nor reasonableness.

Canakaris v. Canakaris, 382 So. 2d 1197, 1203 (Fla. 1980).  In fact,
the appellate courts of this state continue to reverse criminal
convictions due to race-based peremptory challenges in spite of the
language used in Files, see e.g. Warren v. State, 632 So. 2d 204 (Fla.
1st DCA 1994); Reeves v. State, 632 So. 2d 702 (Fla. 1st DCA 1994);
Brown v. State, 624 So. 2d 299 (Fla. 1st DCA 1993); Stroder v. State,
622 So. 2d 585 (Fla. 1st DCA 1993).  As a result, Files does not
foreclose reversal in Appellant's case.

A case with "like" material facts as compared to the trial
court's inaction below is Suggs v. State, 624 So. 2d 833, 834 (Fla.
5th DCA), where a peremptory challenge to a black prospective juror
who caused that prosecutor "bad feelings" by expressing a desire to

- 8 -

<u>POINT III</u>

THE TRIAL COURT SHOULD HAVE GRANTED APPELLANT'S
PRETRIAL MOTION TO SUPPRESS STATEMENT, AND SHOULD
HAVE SUSTAINED HIS OBJECTIONS DURING TRIAL TO ALL
TESTIMONY CONCERNING THIS STATEMENT.

Appellant would rely on the arguments and authorities made in the Initial Brief on this issue.  Additionally, Appellant would note that no claim that prior statements induced without <u>Miranda</u> warnings affected the voluntariness of a subsequent statement made after a full <u>Miranda</u> warning was raised in <u>Bonifay v. State</u>, 636 So. 2d 1310 (Fla. 1993).  Accordingly, that case is not authority for affirmance on this issue.

<u>POINT IV</u>

THE TRIAL COURT ERRONEOUSLY EXCLUDED RONALD
MIDDLETON'S STATEMENT TO DEPUTY CARRY CONCERNING
ADDITIONAL CORRUPTION BY BSO DEPUTIES PATROLLING
THE AREA NEAR THE SCENE OF PATRICK BEHAN'S DEATH.

Appellee's focus on this issue is narrow, arguing only that defense attempts to locate Middleton were insufficient to establish his "unavailability" pursuant to Florida Statutes, 90.804(1)(e) (1990). However, defense investigator Don Pierce testified without contradiction that he attempted to serve a trial subpoena on Middleton at a number of listed addresses, not simply one address (R 2029-2030). In the case Appellee cites, <u>Outlaw v. State</u>, 269 So. 2d 403, 404 (Fla. 4th DCA 1972) <u>cert</u>. <u>denied</u> 273 So. 2d 80 (Fla. 1973), the attempt to serve a witness at multiple addresses was found to constitute a sufficient good faith effort to secure the witness' attendance at trial to render the witness "unavailable." <u>See also</u> <u>Initial Brief</u> at p.47. Accordingly, the trial court committed reversible error in excluding testimony given by Middleton to Deputy Carry. Appellant would request the same relief sought in his Initial Brief.

## CONCLUSION

Based on the foregoing arguments and the authorities cited therein, Appellant respectfully requests that this Honorable Court reverse the judgment and sentence of the trial court and remand this cause with proper directions.

Respectfully submitted,

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit of Florida
Criminal Justice Building
421 Third Street/6th Floor
West Palm Beach, Florida 33401
(407) 355-7600

JOSEPH R. CHLOUPEK
Assistant Public Defender
Florida Bar No. 434590

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof has been furnished to PATRICIA ANN ASH, Assistant Attorney General, Suite 300, 1655 Palm Beach Lakes Boulevard, West Palm Beach, Florida 33401-2299, by courier this 8 7th day of September, 1994.

Of Counsel

- 12 -

# EXHIBIT   9

STATE OF FLORIDA

    Plaintiff,

vs.

TIM BROWN,

    Defendant.

_____/

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

CASE NO: 91-14793 CF10

JUDGE: FRUSCIANTE

## MOTION TO SUPPRESS

COMES NOW, the Defendant, TIM BROWN, by and through the undersigned counsel, pursuant to the Rule 3.120, _Florida Rules of Criminal Procedure_ and moves this Honorable Court to Suppress the Statements of the Defendant in the above-styled cause and as grounds would state the following:

### SUMMARY

Deputy Patrick Behan was shot and killed for no apparent reason outside of a Circle K convenience store located at 3990 West Hallandale Beach Boulevard on November 13, 1990 at 1:42 a.m.

The investigation focused initially on the activities at the Circle K. The investigation revealed accusations that the Circle K was a headquarters for illegal activities and corruption in the Sheriff's department.

At the onset of the investigation, District I deputies of the Broward Sheriff's Office (BSO), were accused of being paid for protecting car thieves and overlooking other organized illegal activities. The investigators learned that deputies were having sex and drug parties with local prostitutes and were helping the prostitutes to steal from their "johns". They learned that

1

2792

numerous deputies were having sex at the Circle K with a female employee of the Circle K while on duty.

It became apparent that the Behan murder investigation could not go forward without disclosing these illegal activities. A decision was made to ignore the leads developed that were connected with the Circle K.

Instead, other leads were funneled into a task force at the homicide division under the direction of Sgt. Richard Scheff. The task force looked into and investigated over 150 leads. No progress was made despite thousands of man hours and over $100,000 offered in reward money.

As months went by, the press and Behan family kept the pressure on the BSO. Pressure to make an arrest in this case was also generated within the Sheriff's office itself. Sheriff Navarro stated to reporters that deputies would not rest until this case was solved.

In February of 1991 the task force was disbanded. Detectives Thomasevich and Carr were assigned as the lead detectives in this case. Detectives Thomasevich and Carr decided to go back to one of the early leads dismissed by the task force. They began to focus their investigation on Tim Brown.

On November 15, 1990, two days after the Behan murder, TIM BROWN, a 14 year old, mentally deficient, black male had allegedly confessed to the shooting of Deputy Behan. He was dismissed as a suspect and released because Detective Scheff

2

2793

thought he was not credible and "he was like clay and you could get him to say whatever you wanted to." Sgt. Scheff depo., 3/92, p.78.

Nine months later, on July 16, 1991, Tim Brown is arrested from an HRS program, without a warrant, by four homocide detectives and taken to the homicide office.   Tim Brown is shackeled to the floor and after hours of off-tape interrogation he gives a statement implicating himself.   Tim Brown's statement was coerced and is not voluntary and should be suppressed.

### FACTS

After hearing the gun shot that killed Behan, the store clerk, Tim Van Hoesen, called 911, and Deputy Robert Richmond was the first BSO deputy to arrive at the scene at approximately 1:44 a.m.

Moments later numerous other personnel from BSO responded to the scene.   The crime scene was roped off and road blocks were set up along the highways leading toward the Circle K.

Homicide detectives began their investigation by interviewing Tim Van Hoesen, the clerk on duty at the Circle K. Mr. Van Hoesen told the deputies that Deputy Behan had been in the store taking a shoplifting report called into the Sheriff's office by the clerk.

The call of the Petit Theft was dispatched to Units 111 and 112 of District I, BSO.   Deputy Behan was passing by and had stopped at the Circle K for coffee. Det. Carr depo., 2/92, p.17. "Behan was not dispatched, units 111 and 112 were dispatched, which were Deputy Richmond and Deputy Weiner, and as they were

3

2794

responding, in the interim, Deputy Behan just walked in to get a drink." Id.

The shoplifter was Kevin DuHart, a well-known trouble-maker at the Circle K. DuHart had come into the store and Van Hoesen had ordered him to leave as DuHart had previously been ordered off the premises. DuHart, before leaving the store, reached down and stole a carton of cigarettes and told the clerk to "Go ahead - call the police." This is confirmed from the video taken at the store. Circle K had two surveillance cameras mounted at the store.

While Deputy Behan was speaking with the store clerk, Deputy DeGeuices came into the store. In the Circle K DeGeuices told Behan that he would go through the area to look for DuHart. DeGeuices knew that the person who stole the cigarettes was Kevin DuHart as he had previous contact with him. Deputy Behan stayed at the Circle K store and took the information for his report. Deputy Behan was shot some twelve (12) minutes after he left the Circle K while in his car completing the incident report of the theft of the cigarettes at the Circle K. DeGeuices found DuHart within walking distance from the Circle K. Dep. DeGeuices depo., 10/30/92, p.14.

Kevin DuHart was questioned by numerous homicide detectives at the scene of the shooting and was later interviewed further at the Broward Sheriff's office. After hours of interviews and after a gun residue test is conducted, DuHart was dismissed as a possible suspect because detectives interviewing him thought, "...he was being honest with us." Sgt. Scheff depo., 2/92, p.23.

4

2795

After DuHart, the next lead comes from another Circle K employee, Jacqueline (Jackie) Bain when she called BSO and reported that she had information regarding the murder of Deputy Behan. Jackie stated she knows **who shot Deputy Behan** and **why he was shot.** She told the detectives that Deputy Behan was shot and killed by Curtis McGill, who was jealous of the deputies.

Jackie Bain told homocide detectives why Curtis McGill wanted to shoot a deputy. Jackie Bain's contact with BSO deputies started on Friday, April 13, 1990 when she was a victim of armed robbery. <u>Dep. Faustino depo., 10/92, p.9.</u> Bain informed homocide detectives soon after the robbery that she had been persuaded by BSO deputies into trying a "self-help plan" where she would perform oral sex on deputies resulting in their frequenting the store more often, thereby, providing additional protection. When BSO Deputies John Candler and Charles Williams arrived at the store after the robbery the following dialogue transpired:

> **"Deputy Candler said,** "The store gets robbed a lot and if you want us to hang out here a lot we're gonna need something from you". **Jackie said,** "What are you going to need?" and **Deputy Candler stated,** "Give us head whenever we come into the store."Jackie agreed and gave Williams his first sexual favor. Then, **Deputy Candler stated,** "Well you've got one who's gonna be here a lot"." <u>Cap. Hernandez Internal Affairs report, p.2.</u>

This arrangement went on for months.

Curtis McGill had been pursuing Jackie's affection while she was employed at the Circle K and had voiced jealous threats of killing Deputy Robert Richmond, District I, in retribution because of the attention Jackie had been giving him and the other deputies.

5

2796

<u>Jackie Bain statement, 11/15/90, p.7</u>.  In Jackie Bain's statement given to Deputy Wiley of the Homicide division on November 15, 1990, she told the detectives that McGill, four (4) days prior to the shooting, had not only told her that he was going to kill the deputy but had showed her the gun that he was going to use.  The gun was a .38 caliber.  <u>Id at p.8</u>.

When Jackie was asked by Detective Wiley whether McGill indicated a plan to get Richmond to a certain location, Bain indicated that Kevin DuHart (the cigarette thief) and McGill were good friends and that she also knew DuHart from the Circle K. <u>Ibid at p.11</u>.  Later in that same statement to Wiley, Bain said that McGill called her Tuesday morning, November 14th saying he killed the deputy. <u>Ibid at p.12</u>.  Deputy Behan was not the intended target of the assasin, nor, was he assigned to the zone in which the Circle K store was located.  At that time Deputy Behan had only been in District I for days.

According to testimony by John Auer, supervisor of the Homicide Unit, Jackie was interviewed on November 15 and stated the following:

> A.   She told us - detailed the entire account of the thing with the deputies and how Curtis McGill did this.
>
> Q.   You mean, in other words, that McGill was jealous because she was giving head to the deputies?
>
> A.   Um-hum (affirmative).  McGill was fond of Jackie Bain.  He knew Jackie Bain was having relations with the deputies.  McGill felt threatened by this.  Jackie did not return his affection and therefore -

6

Q.   He wanted to kill a deputy.

A.   - he killed the deputy.  He was out for Richmond, but Behan would suffice.

Lieut. John Auer depo., 4/15/92, p.30, ll. 3-14.

The mistake was confirmed when Jackie Bain placed a phone call to Deputy Mike Wally of Fort Lauderdale Police Department.  Bain told Wally that it was a mistake that Behan was shot - the bullet was meant for another deputy.

After spending hours with homicide detectives on November 15, 1990, detailing the reasons McGill had to be jealous of the BSO deputies, a decision was reached to have Jackie Bain speak with the Internal Affairs division of BSO.  That same day Jackie Bain gave a statement to Sergeants David Carry and Robert Zeigler of the Internal Affairs Unit who began an Internal Affairs investigation into the misconduct of District I deputies.

Jackie Bain informed Internal Affairs that she was having sexual relations with a number of deputies in District I.  Jackie Bain named, besides John Candler and Charles Williams, Deputies' Robert Richmond, Walter Avery and Dennis Harris as the District I Deputies she was having sexual relations with while working at the Circle K, while the deputies were on duty.

Jackie Bain, I.A. report, 11/15/90.  She accused Deputy Brian Montgomery and Sergeant Robert Helton of having knowledge of the activities of the others.

At the same time that Bain's information was coming into BSO, other information of corruption within District I of BSO was being developed.

7

2793

Ronald Middleton, a.k.a. Rockwell, an inmate in Broward County Jail, had contacted Homicide with information that related to the death of Deputy Behan. Middleton had been taken out of jail and spoken to by Detective Gill, a homicide detective. Middleton told Detective Gill of other police misconduct involving deputies using drugs and prostitutes and participating in possible shakedowns and other corruption. Det. Gill depo., 4/92, p.15. Middleton was driven around to point out the warehouses used by some of the deputies for sex and drug parties,

> "He seen a sheriff's car back there and he pulled back there to talk to the sheriff, or whatever, the deputy. When he went back there he seen Williams, Williams came up and he said he could smell pot or cocaine and that he when he walked up to the car he could smell pot coming from the car. He said that he was by a warehouse that was decorated inside it was decorated like a house that had a bed and a couch and furniture and so forth and that he thought they were using this as a meeting place the deputies there." Id at p.23.

The couch was apparently set up to accommodate prostitutes picked up around the Circle K area. On the streets of District I the deputies involved would rough up the prostitutes' paramours and would be paid percentages from the girls to show their gratefulness for the protection. Middleton's connection with the corrupt officers was working as a car wholesaler in the area of the Circle K. "He hung out in the Circle K so much they offered him a job there." Ibid at p.16.

Middleton stated he saw Deputy Williams using crack cocaine. Middleton also stated that Charles Williams had taken

8

money, as well as drugs from the dealers in the neighborhood without arresting them. He also stated that Charles Williams had Middelton's beeper number and would call him about cars he found and Middleton would go and steal the cars and sell them in Miami. Middleton stated that he would sometimes pay the deputies between two and three hundred dollars per car. He further stated that Deputies Williams and William Gordon were also involved in breaking into warehouses. Middleton also stated that Deputy William Gordon was paid by Julio, an owner of a store on Hallandale Beach Boulevard, to cover up for him when he bought stolen cigarettes from people from Miami. Middleton stated he was present on numerous occasions when Gordon was paid off by Julio.

To confirm the information given by Middleton, a polygraph was performed by Robert Ottlidge, through the Internal Affairs division. The report issued by Ottlidge, BSO polygraph division, stated Ronald Middleton answered the relevant questions truthfully. Based in part on the information given by Middleton the BSO testfired deputies' guns to see if any matched the gun used in the killing of Deputy Behan. Thomasevich depo., 8/92, p.13 & 14.

Middleton's information gave credibility to many of the accusations made by Jackie Bain. The revelations of these facts resulted in many closed door meetings at the upper level of BSO. Ibid at p.43.

A decision was made to shut down the Internal Affairs investigation. On November 19, 1990, the Internal Affairs

9

investigation was suspended by Captain Hernandez allegedly to allow the Homicide Unit to complete their initial investigation into the murder of Deputy Patrick Behan.

Report from Carry to Hernandez, 8/15/91.

On November 30, 1990, the Internal Affairs investigation was reopened. According to Sergeant Carry's report, Sergeant Scheff, supervisor of the Homicide Unit and Homicide Detective Thomas Gill advised Sergeant Carry that the initial homicide investigation was complete and the internal investigation could continue. Report of Carry to Hernandez, 8/15/91.

On November 27, 1990, Jackie Bain was brought to Broward County Mental Health Department to be hospitalized pursuant to the Baker Act. Jackie was taken to be hospitalized in the mental facility by Sergeant Richard Scheff, the supervisor of homicide.

In a report dated December 4, 1990, the evaluating clinical psychologist, John Spencer, of the Mental Health Division, recommended that Jackie Bain be discharged as her behavior did not at this time meet the statutory criteria for continued, involuntary hospitalization.

Other personnel within BSO had different opinions of Jackie's mental health. Sergeant Carry and Detective Faustino both stated that she did not appear to be crazy to either one of them and from the extended contact each had independently with her there was nothing about her that appeared weird in any way.

Sgt. Carry depo., 6/92, p.70 & Det. Faustino depo., 10.92, p.12.

10

2861

The next decision made was to cover-up the relationship and involvement of Curtis McGill and Kevin DuHart. McGill was the person Bain stated had shot and killed Behan. The police were aware from a day and a half after the shooting that there was a relationship between McGill and DuHart because Jackie told Detective Wiley they were friends. Bain statement to Dep. Wiley, 11/15, p.11. BSO decided to ignore the McGill lead. The first and only mention of McGill in any police report is by lead Detective James Carr in his police report completed after the arrest of TIM BROWN. In that report McGill is identified as the person who bought the stolen cigarettes from DuHart the night the deputy was shot.

Other than this mention in Carr's report there is no documentation of any contact of BSO with McGill. However, in deposition when Carr is asked about McGill, he reported that he and his partner, Detective Thomasevich, went to the prison where he was being held, some 5 to 6 hour drive, sometime before February 5, 1991, to speak with him about the night in question to find out if he had any information. Det. Carr depo., 4/92, p.19.

Carr stated that it was only then that BSO became aware that McGill had contact with DuHart on the scene by purchasing the stolen cigarettes from DuHart. Ibid. Detective Thomasevich stated during his deposition that he and Carr went to interview McGill pursuant to instructions from their supervisors. Like Carr, Thomasevich did not write a report of the interview because, "We

11

2802

did not feel there was a need to."  <u>Det. Thomasevich</u>
<u>depo., 8/92, p.32.</u>

Although, Thomasevich stated they were ordered to go and
speak with McGill, their supervisor, Sergeant Scheff, stated it was
the detectives decision to go and speak with McGill.
<u>Sgt. Scheff depo., 8/18/92, p.39.</u>  When Scheff was asked whether a
taped statement had been taken from McGill he stated there was not
one and he believed it was because McGill was in a "custodial
facility and it was very, very difficult for us to get tape
recorders into these prisons." <u>Id at p.38.</u>

It appears that <u>no</u> records or taped statements were taken
from Curtis McGill about his involvement with Jackie Bain, Kevin
Duhart or the purchase of cigarettes from Kevin DuHart.

According to Detective Thomasevich, the lead detective in
the homicide case, Kevin DuHart had not been interviewed after
November 13, 1990. <u>Det. Thomasevich depo., 8/92, p.31.</u>  Even after
BSO found out there had been contact between DuHart and McGill, the
person who Jackie Bain stated shot the deputy, there was no further
contact or discussions with DuHart.  Further, DuHart was never
charged with the theft of the cigarettes even though this was on
video and it ultimately lead to the death of Patrick Behan.

Barbara Spohn, the Assistant Manager at the Circle K,
stated —"we (Spohn and the clerk) thought something was funny
because it happened (cigarettes were stolen) and then when the guy
was leaving the store he told the clerk, "Go ahead call the cops.",

12

2803

well, everybody thought, you know he's the one who did it."
Barbara Spohn depo., p.20.

During the time the Internal Affairs Investigation was shut down, Jackie Bain was Baker Acted and the situation involving Kevin Duhart and Curtis McGill was mishandled, the Sheriff's office formed a task force to investigate leads unrelated to the Circle K coming in on Deputy Behan's death.

Over 150 tasks were compiled and assigned out to various detectives within BSO. By reviewing these task sheets and interviewing the various witnesses it became obvious that minimal effort was put into the investigation before dismissing possible suspects. Suspects who had both motive and opportunity were dismissed because of alibis given by family members and friends, or just based on "gut feelings" of the detectives involved. Other suspects were dismissed because they did not match the composite which was provided by Eddie Lopez, a.k.a. Chad Lopez, who lied to the police about his name because there was a warrant out for his arrest. Det. Gill depo., 4/92, p.60 & 61.

One of the more than 150 task sheets was an investigation of TIM BROWN. According to police detectives, TIM BROWN became a suspect due to accusations from Robert McGriff, a man who fabricated two suspects to collect the reward money. Robert McGriff, who has since died of AIDS, flunked the polygraph examination and then admitted to detectives that he had made up the story to collect the reward. Det. Scheff depo. 3/92, p.24.

13

2804

According to detectives involved in this case TIM BROWN allegedly, on November 15, 1990, confessed to the shooting of Deputy Patrick Behan.

On the morning of November 15, 1990, TIM BROWN, a 14 year old, could be found at District I on an unrelated juvenile pick-up order. Because McGriff had mentioned his name a few hours earlier, four homicide detectives decided to question him, without MIRANDA, to decide what information he might have of the shooting of Deputy Behan. TIM BROWN was not held, no written report about his statement was prepared and TIM BROWN was sent back to the Juvenile Detention Center. Detective Scheff declares, "I was not satisfied that he was the person that had shot Patrick Behan." Det. Scheff depo., p.78.

As the months go by BSO begins to experience a lot of pressure from the Press and the Behan family to solve the case. Detectives Thomasevich and Carr were assigned as the lead detectives and they state that they relied on the confession of TIM BROWN given in November of 1990, building their case around that. Det. Thomasevich depo., 8/92, p.137.

Detectives' Thomasevich and Carr used peers of TIM, namely, Andre Butler, Alvis Crostwaite, Frankie Adderson, Solomon Gibbs and Chris Ott to get incriminatory statements against TIM. Andre Butler reported to the Grand Jury that he was handcuffed, shackled and beaten by detectives into giving the derogatory statement against TIM BROWN. Grand Jury testimony 8/1/91. Other

14

2805

witnesses recanted their orignal statements during depositions or refused to be deposed.

On July 16, 1991, TIM BROWN was residing in an HRS residential program.  Without an arrest warrant, four homicide detectives went to the Convenant House - picked up TIM BROWN, handcuffed him and placed him in the back of an unmarked car.  He is taken to an interview room where he is shackled to the floor. He is interrogated without the benefit of counsel or parent for over an hour and a half. <u>Det. Carr, depo. 4/92, p.44</u>.  TIM BROWN then gives the inculpatory statement.

<u>**MEMORANDUM OF LAW**</u>

The aim of the rule that a confession is inadmissible unless it was voluntarily made is to exclude false evidence.  The case at large is a prime example of how 1) a murder can allegedly be solved based solely on false evidence which was extracted through detectives feeding a story to an impressionable, suggestible, mentally deprived juvenile; 2) a juvenile lacking education and sufficient mental ability can easily be lead during the custodial interview resulting in him repeating a tale told to him in the form of a confession.

A confession is not involuntary merely because the person making it is a juvenile, however, the United States Supreme Court has been particularly cautious in evaluating the voluntariness of juveniles' confessions in light of "authoritative opinion [that] has cast formidable doubt upon the reliability and trustworthiness of confessions by children."  <u>In Re: Gault</u>, 387 U.S. 1, 52 1967.

15

2806

Assuming a child has been informed of his Miranda rights the state must prove a knowing and intelligent waiver of rights before a juveniles admission or confession is held to be voluntary. McDole v. State, 283 S.2d 553 (Fla. 1073). To determine the validity of the child's waiver the Court must inquire into the totality of the circumstances surrounding the interrogation. Brewer v. State, 386 S.2d 232 (Fla. 1980). This includes an evaluation of the juvenile's age, intelligence, mental incapacity, education, social background, intoxication, drug condition, whether he has the capacity to understand the warnings given him and the consequences of waiving his rights. Fair v. Michael C., 442 U.S at 725.

Concluding a discussion of Defendant's personality traits it will be unanimously agreed upon that TIM BROWN is not mentally capable of intelligently waiving his rights. Unlike some states which have adopted the "interested adult" rule, and approach which, invalidates a juveniles waiver of rights unless a parent, guardian or attorney was present to assist the juvenile Florida considers the presence of a parent or an attorney as merely one of the factors to be considered in determining the validity of a waiver of rights. See E.G. State v. S.E.J., 399 S.2d 47 (Fla. 5DCA 1981). In the case at Bar, Tim's mother is brought to the station by Sergeant Scheff, but only after the conclusion of TIM'S taped statement. Det. Carr depo., 4/92, p.47.

A study of the legal and psychological capacities of juveniles and adults to waive their rights knowingly was done. The

2807

results are reported in Grisso "Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis", 68 California Law Review, 1134 (1980) and T. Grisso, <u>Juveniles Waiver of Rights: Legal and Psychological Competence</u> in 3 Perspectives in Law & Psychology (B. Sales ed. 1981). Grisso concludes that 1) as a class, juveniles younger than fifteen years of age do not understand at least some of their Miranda rights and therefore waivers cannot be considered meaningful; 2) as a class fifteen and sixteen year old juveniles with IQ's below 80 have no greater Miranda comprehension than the younger juveniles; 3) race is related only among juveniles with low IQ scores with black juveniles having poor Miranda comprehension.

TIM BROWN, at the time of his arrest on July 16, 1991, was fifteen (15) years old. School records reveal that he was administratively promoted to the fifth grade despite pleas from his previous teacher to retain him because he was unable to keep up on the fourth grade level (the average fourth grader is nine (9) years old.) School records further reveal that TIM'S I.Q. is 58.

His grades in reading, language, spelling, social studies and science were all D's (below average.) He received an F (failure) in math and two C's (average), one in handwriting and one in health. The behavior section of his report card indicated that TIM does not: obey class rules; listen and follow directions; complete work in assigned time; and think and work independently. The only satisfactory grade was in respecting authority. Having learned that TIM respects authority coupled with the knowledge that he cannot think and work independently, one can conclude it is

17

2803

highly unlikely that TIM voluntarily, knowingly and intelligently waived his rights. To further strengthen this point, please refer to some of the comments Detective Scheff made while interviewing TIM on November 15, 1990, "I really believe that there was something wrong with him." Sgt. Scheff depo., 3/92, p.43. "He was like clay and you could get him to say whatever you wanted to" Id at p.78.

All this is further confirmed by Dr. Koprowski, the court appointed psychologist who evaluated TIM BROWN. She saw him on the following dates: September 30, 1991; October 7, 1991; October 16, 1991; October 21, 1991. She performed the following tests: Bender Gestalt; Competency Screening Sheet (Person and Tree Drawing); Roschach and Thematic Apperception Test. Dr. Koprowski found that Tim has a full scale I.Q. of 56. His reading, writing and math skills are at a 3rd grade level or below. Tim is intellectually and emotionally immature and easily led by others.

During the interrogation by Detectives Thomasevich and Carr, which resulted in TIM BROWN giving inculpatory statements, there are numerous mentions of TIM'S prior interrogation which took place two days after the shooting (November 15, 1990), where TIM was being questioned in custody and where no Miranda warnings were given. Therefore, the second statement in July was tainted by the improperly obtained first statement.

State v. Madruga-Jiminez, 485 So.2d 462 (Fla. 3rd DCA 1986).

Furthermore, the warrantless arrest taints his confession from the outset. Osterle v. State, 382 So.2d 1293

2809

(Fla. 2nd DCA 1980).   It was well settled that in order to make a valid warrantless arrest under the Fourth Amendment to the United States Constitution and Article 12 of the Florida Constitution, probable cause or exigent circumstances must exist.  <u>Payton v. New York</u>, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); <u>New York v. Harris</u>, 495 U.S. ____, 110 S.Ct. 1640, 109 L.Ed.2d. 13 (1990), <u>Minnesota v. Olsen</u>, 495 U.S. ____, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). <u>D'Agostino v. State</u>, 310 So.2d 12 (Fla. 1975); <u>Sands v. State</u>, 414 So.2d 611 (Fla. 3rd DCA 1982).

TIM BROWNS' rights were further violated due to the fact that he was committed to the Department of Health and Rehabilitative Services (DHRS) at the time of the interrogation on July 16, 1992.  <u>Minnick v. Mississippi</u>, 111 S.Ct. 486 (1990).

The detectives' methods deprived TIM BROWN of the ability to knowingly waive his rights.  Consequently, TIM BROWN merely acquiesced to authority by speaking to the detectives.

**WHEREFORE,** the Defendant, TIM BROWN, by and through the undersigned counsel, respectfully requests this Honorable Court to enter its Order Suppressing the Statements made by the Defendant, TIM BROWN.

281

I HEREBY CERTIFY that a true and correct copy of the foregoing has been delivered to Charles Morton, Assistant State Attorney, 201 Southeast Sixth Street, Fort Lauderdale, FL 33301; Victor Tobin, Esq., Counsel/King, 1001 South Andrews Avenue, Suite 101, Fort Lauderdale, FL 33316; Chris Grillo, Esq., Co-Counsel/King, 888 Southeast Third Avenue, Suite 400, Fort Lauderdale, FL 33316; this 18 day of December, 1992.

LARRY S. DAVIS, P.A.
601 S. Federal Highway
Hollywood, Florida 33020
(305) 927-4249

By: _____
LARRY S. DAVIS, ESQ.
Bar Number: 437719

20

2811

# A P P E N D I X   B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 95-7207-Civ-GRAHAM
MAGISTRATE JUDGE SORRENTINO

TIMOTHY BROWN,                    :

        Petitioner,               :

v.                                :        REPORT OF
                                           MAGISTRATE JUDGE
HARRY K. SINGLETARY,              :
                                                  RECEIVED
        Respondent.               :        OFFICE OF THE ATTORNEY GENERAL

                                                OCT 15 1999

                                              CRIMINAL DIVISION
                                              WEST PALM BEACH

        Timothy Brown, a state prisoner confined at Avon Park
Correctional Institution, filed this petition for writ of habeas
corpus pursuant to 28 U.S.C. §2254 <u>pro se</u> in 1995, attacking the
constitutionality of his conviction of first degree murder
following a jury trial in Broward County Circuit Court case number
91-14793-CF-B. The Federal Public Defender subsequently was
appointed to represent the petitioner. [DE 17]


        The case was referred to the undersigned for consideration and
report pursuant to 28 U.S.C. §636(b)(1)(B) and Rules 8 and 10 of
the Rules Governing Section 2254 Cases in the United States
District Courts.


        This case has been pending longer than any other matter
currently within the court's Pro Se Division. Because of its
unusually long tenure before the Court and its present unusual
posture, a description of the relevant case history is in order,

before turning to discussion of the legal issues involved.

## I.   Background of This Federal Case

The petitioner, Timothy Brown, was convicted as a principal to first degree murder following a jury trial in Broward County in 1993.  The victim was Broward Sheriff's Deputy Patrick Behan, who was shot once in the head at close range while preparing a report in his police cruiser concerning cigarettes stolen from a Circle K convenience store in the early morning hours of November 13, 1990. [DE 7, Ex.2 at 2] Brown, who was fifteen when Behan was killed, was convicted after a jury trial as an adult and sentenced to life imprisonment without possibility of parole. [Id.] His codefendant, Keith King, who was 17 at the time of the crime and who may have been the shooter, pleaded guilty to manslaughter and was sentenced to 15 years in prison.

In his initial petition to this court, filed on December 27, 1995, Brown made the sole claim that the evidence was insufficient to sustain his conviction.  [DE 1] On February 6, 1996, the state filed its response to the order to show cause, supported only with the briefs from Brown's direct appeal and a copy of the appellate court's opinion. [DE 7] Review of those exhibits revealed that Brown's conviction and sentence were affirmed without written opinion on direct appeal.  Brown v. State, 657 So.2d 903 (Fla. 4

DCA 1995). [DE 7, Ex.1] However, one panel member filed a strong dissent, stating in part:

> At the time of the murder, defendant was fifteen years of age and mildly retarded with an IQ of 56.  The sole evidence produced at trial linking defendant to the shooter, Keith King, was a statement given by defendant in July 1991, eight months after the crime, to the Broward County Sheriff's Office (BSO). Defendant asserts, and I agree, that his July 1991 statement was insufficient to convict him as a principal in the murder.
>
> According to the July 1991 taped statement, recorded by a BSO deputy, on the evening of November 12, 1990, defendant met up with King. The two began drinking alcohol and getting high on crack (cocaine) and marijuana. Afterwards, they rode off together on defendant's bicycle with King sitting on the handlebars.  While on the bicycle, King first showed defendant a gun. Within two blocks of the Circle K convenience store, the scene of the shooting, King told defendant he was going to kill someone. Defendant's reaction on the tape to King's statement was, "I called his bluff," meaning that defendant "[didn't] believe it."
>
> *     *     *
>
> After the shot was fired, defendant "panicked." King then jumped onto the bicycle with defendant and fired again. According to the statement, King later threw the gun in a rock pit. A murder weapon was never found.
>
> Based solely on this taped statement, defendant was convicted of first degree murder as a principal. No physical evidence or eyewitness testimony linked defendant to the shooting.

Id.

3

The state argued in its initial response to Brown's §2254 application that because the weight of the evidence adduced at trial against Brown was assessed by the jury, no claim of constitutional dimension was presented in his habeas corpus petition. [Id. at 7] That argument was rejected in a supplemental order to show cause entered May 31, 1996, and the state was directed to file copies if the trial transcript and record on direct appeal on or before July 1, 1996. [DE 8]

The trial transcript was filed on June 27, 1996. [DE 10-16] At that juncture, apparently because the sufficiency of the evidence was the sole claim before this court, a copy of the transcript of the pretrial suppression hearing was not included.

On March 14, 1997, an order appointing the Federal Public Defender to represent the petitioner was entered. [DE 17] That order stated that "[i]n the light of the totality of the circumstances in this case, justice requires that the petitioner and the Court receive assistance in the presentation of his position." Counsel for the petitioner was directed to review the record of the case and was permitted to "file such other pleadings or memoranda" as may be appropriate, including "amendments to the pending pro se petition for habeas corpus relief to include any claims that were exhausted in the state forum...". [Id.]

4

Armed with that order, the Federal Public Defender undertook the representation of Brown, and has provided him with truly exemplary counsel. After first moving for [DE 19, 21] and receiving [DE 20, 22] extensions of time to review the record and prepare a memorandum, the petitioner sought [DE 23] and was granted [DE 24] permission to undertake discovery.[1] Additionally, the petitioner requested and received a stay of the briefing schedule pending the outcome of the discovery process. [Id.]

At that point, the case bogged down. The discovery process became protracted and contentious, as even a cursory review of the Court file indicates. The details of the discovery process to date are fully set forth in the petitioner's response to a motion for stay filed in Eleventh Circuit Court of Appeals [DE 52, exhibit], and repeating them here would needlessly lengthen this report. A hearing was conducted to attempt to resolve discovery disputes. [DE 32] The petitioner moved for the issuance of subpoenas duces tecum to both the Broward State Attorney's Office and the Broward

---

[1]Discovery was granted to the petitioner for good cause shown pursuant to Rule 6(a) of the Rules Governing §2254 Cases in Federal Courts. In Harris v. Nelson, 394 U.S. 286, 299 (1969), the Supreme Court held that "[w]here specific allegations before the court show reason to believe that the [habeas corpus] petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." The scope and extent of discovery in habeas cases "is a matter confided to the discretion of the District Court." Bracy v. Gramley, 520 U.S. 899, 909 (1997).

5

Sheriff's Office, to compel disclosure of materials removed from the State Attorney's investigative file prior to counsel's review, and for three boxes removed from the Sheriff's investigative file on Deputy Behan's death. That motion was granted by the undersigned on April 17, 1998. [DE 34]

Michael J. Satz, State Attorney of Broward County, moved to quash the subpoena issued to the Records Custodian of his office. [DE 37] Following a response in opposition from the petitioner, Satz's motion was denied on July 14, 1998. [DE 39] Motions for reconsideration of that order and for a stay of that order subsequently were denied by the District Judge. [DE 45]

On July 13, 1998, State Attorney Satz petitioned for leave to file an interlocutory appeal of the nonfinal discovery order. [DE 48] In addition, he filed a petition for writ of mandamus in the Eleventh Circuit Court of Appeals, seeking review of the discovery order. [DE 50]

Those motions and others were referred to the undersigned [DE 49], and on August 25, 1998, a report was submitted recommending that the motion for permission to appeal be granted, only to the extent that the Attorney General be permitted to submit a reasonable amount of the materials he believed was not subject to discovery for a review *in camera*. [DE 53] In all other respects, it

6

was recommended that the motion be denied. It was also recommended that the motion for stay pending the outcome of the mandamus proceeding before the Eleventh Circuit be dismissed as moot, because the appellate court had dismissed the mandamus petition without opinion on July 29, 1998. [Id.] In addition, it was stated in the report that:

> [T]he petitioner initially was permitted to engage in the discovery process prior to filing an amended petition. However, as is clear from this report, the discovery process in this case has become protracted, and further delay in the resolution of the petitioner's claims is to avoided if possible. Since the petitioner's counsel has already indicated that a voluntariness issue will be asserted in addition to the sufficiency of the evidence claim that is currently pending, it will prejudice neither party and may hasten the eventual resolution of this case to require the petitioner to submit an amended petition at this time, subject to further amendment at a later stage of the proceedings if events warrant.
>
> [DE 53 at 9]

On September 17, 1998, the District Judge entered an order adopting the foregoing recommendation. [DE 54] The petitioner was instructed to file an amended petition for habeas corpus relief within three weeks. [Id.] However, on October 9, 1998, the petitioner filed an unopposed motion to postpone filing the amended petition until after the *in camera* review of the discovery materials. [DE 55]

7

The discovery process went on in this vein, as reflected by the docket, with both *sides of the case opposing each other* at every turn. On April 23, 1999, an order was entered on discovery, after careful review of the box of materials submitted by Attorney General Satz for *in camera* review. [DE 69] It was noted in that order that at that juncture the only claim pending before the court was insufficiency of the evidence, and that the petitioner had indicated an intention to amend the petition to add a claim that his confession was involuntary. [Id.] The materials submitted for *in camera* review were held to be reviewable or not, based on their relevance to those two specific claims. The effect of the order was stayed for two weeks to allow the parties an opportunity to appeal the rulings made therein to the District Judge, but no appeal was taken.

It was against this backdrop that the amended petition eventually was filed on May 24, 1999. [DE 70] It will be discussed in greater detail infra.

## II. State Factual and Procedural History

Before turning to consideration of the issues that are cognizable in this federal proceeding, it is necessary to examine the history of Brown's state prosecution.

8

Brown and a codefendant, Keith King, were indicted for first degree murder in the death of Deputy Behan. Prior to trial, Brown filed a motion to suppress two statements he gave to the police. These statements will be discussed in greater detail *infra*, in connection with Brown's claims that his statements were not freely and voluntarily made. Briefly, an individual called the Broward Sheriff's Office ("BSO") the day Behan was killed and identified Brown and someone named Keith Maddox as the perpetrators. [T.12] Brown was brought in to give a witness statement the following day, and surprised the officers by stating that he shot Behan. [T.18-19] However, Brown had not received the *Miranda* warnings[2] when he made that statement, and the detective in charge decided to terminate the questioning without Mirandizing Brown because Brown was too intoxicated to understand his rights.

On June 4, 1991, Keith King was arrested after implicating both himself and Brown in Behan's death. [T.263-65] Brown was interviewed by BSO again in July, 1991, after being released from the custody of the Department of Health and Rehabilitative Services ("HRS") for convictions of armed robbery and burglary, and related the version of events described in the dissenting opinion on direct appeal, quoted *supra*, where Brown pedaled Keith King to the Circle K on the handlebars of his bicycle, King stated he would kill someone, Brown "called his bluff," and King shot Behan in the head.

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Brown's motion to suppress was granted as to the first statement and denied as to the second.  Following a jury trial, Brown was convicted of fist degree murder as a principal, and was sentenced to life in prison without possibility of parole. [T.2568, 2548, 2590] King accepted a plea agreement offered by the state and received a sentence of fifteen years imprisonment.[3]

Brown prosecuted a direct appeal, raising the following claims:

1.  His motions for judgment of acquittal should have been granted where there was insufficient evidence to prove his guilt as a principal to Behan's murder.

2.  The trial court erred in overruling his objection to the state's peremptory challenge of juror Driver.

3.  The trial court should have granted his motion to suppress the second statement, and should have sustained his objections during trial to all testimony concerning that statement.

4.  The trial court erroneously excluded Ronald Middleton's statement to Deputy Carry concerning corruption by BSO deputies near the scene of Behan's death.

[DE 7, Ex.2]

Brown's conviction and sentence were affirmed without written

---

[3]The petitioner, Brown, also was offered a plea to fifteen years, but elected to go to trial. [DE 60, ¶1]

opinion, with one panel member dissenting with an opinion, as quoted supra. Brown v. State, 657 So.2d 903 (Fla. 4 DCA 1995). [DE 7, Ex.1]

Brown pursued no state collateral proceedings. This federal petition was filed with the court on December 27, 1995.[4]

### III. Issues Presented

On May 24, 1999, three and a half years after this case was opened, Brown, through appointed counsel, submitted an amended petition for a writ of habeas corpus pursuant to §2254. [DE 70] Although permission had been given only to amend the petition to state "any claims that were exhausted in the state forum..." [DE 17], Brown in the amended petition raises the following claims:

1.  He was denied his right to due process because the state did not prove beyond a reasonable doubt that he aided and abetted the first degree murder of Deputy Behan.

2.  He was denied his right to due process by the admission into evidence of his confession, which was coerced and involuntary.

_____

[4]Through apparent clerical error, a duplicate of the initial petition in this case was filed and docketed as case number 95-7210-Civ-Gonzalez. Pursuant to a report and recommendation, that higher-numbered case was dismissed as duplicative of this one by order of the Honorable Jose Gonzalez, United States District Judge, on July 11, 1996.

11

3.  He was denied his right to due process by the admission of his confession, where his waiver of his <u>Miranda</u> rights was not knowing an intelligent.

4.  His right to due process was violated by a jury instruction which erroneously stated that he was facing a life sentence with a minimum mandatory term of 25 years.

5.  He received ineffective assistance of counsel in the investigation and litigation of the motion to suppress his confession for numerous reasons.

6.  He received ineffective assistance of trial counsel, due to counsel's failure adequately to investigate his star witness and his presentation of a misfocused, incredible and internally inconsistent defense.

7.  He received ineffective assistance of trial counsel because counsel failed to investigate and present a defense to Brown's statement.

8.  He received ineffective assistance of trial counsel because counsel failed to rebut the prosecutor's misleading suggestion that the bike in the surveillance video was Brown's.

9.  He received ineffective assistance of trial counsel because counsel failed to object to the erroneous jury instruction that Brown faced a life sentence with a minimum mandatory term of 25 years.

10. He received ineffective assistance of trial counsel because counsel failed to move for a new trial based on Edward Davis' exculpatory statement, which

12

proved Brown's statement to be false.

    11.  He received ineffective assistance of counsel on direct appeal.

As is apparent from the preceding discussion of the procedural history of Brown's state prosecution, most of these claims have never been presented in the state forum. Accordingly, upon review of Brown's amended petition, an order was entered, pointing out that the petitioner had been given leave only to make "amendments to the pending pro se petition for habeas corpus relief to include any claims that were exhausted in the state forum" [DE 17], and instructing him to file a memorandum of fact and law discussing whether the exhaustion requirement is satisfied as to each of the claims asserted in the amended petition. [DE 73]  The respondent was permitted to file a response to the petitioner's memorandum on the exhaustion requirement. [DE 77]

## IV.  Exhaustion

At the outset, it is necessary to stress the obvious: this is a federal habeas corpus proceeding pursuant to 28 U.S.C. §2254.  It is not a trial *de novo* aimed at finding guilt or innocence, nor is it a direct appeal to assess whether reversible error occurred before or during trial. It is a statutorily proscribed collateral proceeding designed by Congress strictly to ensure that state convictions comport with federal constitutional principles. Coleman

13

v. Thompson, 501 U.S. 1277 (1991); Cupp v. Naughten, 414 U.S. 141 (1973). A state defendant may avail himself of this statutory jurisdiction only if certain prerequisites are met, and even when jurisdiction does exist and no procedural impediments are present, the federal court is constrained to limit its inquiry only to matters of genuine constitutional dimension.

The first hurdle a federal habeas corpus petitioner must cross is the exhaustion requirement. Issues raised in a federal habeas corpus petition must have been fairly presented in the state courts and thereby exhausted. Anderson v. Harless, 459 U.S. 4 (1982); Hutchins v. Wainwright, 715 F.2d 512 (11 Cir. 1983). Exhaustion requires that a claim be pursued in the state courts through the appellate process. Leonard v. Wainwright, 601 F.2d 807 (5 Cir. 1979).

For a claim to have been "fairly presented" to the state courts, the federal claim must be that substantial equivalent of that presented in the state forum. Exhaustion therefore requires that both the factual substance of the claim, as well as the federal constitutional issue itself, must have been put before the state courts for determination. Anderson v. Harless, supra; Gray v. Netherlands, 518 U.S. 152 (1996); Duncan v. Henry, 513 U.S. 364 (1995); Picard v. Connor, 404 U.S. 270 (1971); Wyldes v. Hundley, 69 F.3d 247, 250-51 (8 Cir.), cert. denied, 116 S.Ct. 1578 (1996).

14

It follows that when a federal habeas petitioner raises a claim ostensibly presented in the state courts, but bases the federal claim on new factual allegations, new legal theories, or materially different and stronger evidence than was presented to the state courts, the claim has not been "fairly presented" at the state level, and exhaustion is not accomplished. <u>Givens v. Green</u>, 12 F.3d 1041 (11 Cir. 1994); <u>Landano v. Rafferty</u>, 897 F.2d 661, 671 n.13 (3 Cir. 1990); <u>Young v. Lynaugh</u>, 821 F.2d 1133 (5 Cir.), <u>cert. denied</u>, 484 U.S. 986 (1987); <u>Joyner v. King</u>, 786 F.2d 1317 (5 Cir.), <u>cert. denied sub nom. Joyner v. Phelps</u>, 479 U.S. 1010 (1986); <u>Rodriquez v. McKaskle</u>, 724 F.2d 463 (5 Cir.), <u>cert. denied sub nom. Rodriquez v. Procunier</u>, 469 U.S. 1039 (1984); <u>Burns v. Estelle</u>, 695 F.2d 847 (5 Cir. 1983); <u>Hart v. Estelle</u>, 634 F.2d 987 (5 Cir. 1981).

The exhaustion of state remedies is a condition precedent to federal habeas corpus relief, and the petitioner has the burden of proof on the exhaustion requirement. <u>Delaney v. Giarrusso</u>, 633 F.2d 1126 (5 Cir. 1981); <u>Donovan v. Delgado</u>, 339 F.Supp. 446, 454 (D. Puerto Rico 1971); <u>Garcia v. Ramirez</u>, 337 F.Supp. 39 (D. Puerto Rico 1971).

In this case, as the petitioner acknowledges in his memorandum of law on the issue of exhaustion [DE 79], the only claims raised in the amended petition that arguably have been exhausted in the

state forum are claims one, two and three of the amended petition, as listed above, concerning the sufficiency of the evidence and the admission into evidence of Brown's second statement to the police. These claims were all raised, at least to some extent, in Brown's direct appeal. The remainder of Brown's present claims, concerning the lawfulness of a jury instruction and the effectiveness of his representation both at trial and on direct appeal, have never been presented to the state forum and so are not exhausted.

The exhaustion requirement remains in effect despite the recent Congressional changes to habeas corpus jurisprudence. In a case very similar to the one at bar, a petitioner sought habeas corpus relief from a first degree murder conviction in Lambert v. Blackwell, 962 F.Supp. 1521 (E.D. Pa. 1997). The petitioner argued in that case, as Brown does here, that she had been convicted of a crime of which she was actually innocent, and that her conviction had occurred because "she was the victim of wholesale prosecutorial misconduct in connection with the prosecution of her case," id. at 1522, which was designed to cover up sexual and other misconduct by the police. As in this case, the court upon review of the initial pro se petition concluded that the interest of justice required the appointment of counsel, who after a delay of several months filed an amended petition on Lambert's behalf. Both sides were afforded discovery, after which a two-week evidentiary hearing was conducted. At its conclusion, the district court found that Lambert

16

had presented an "extraordinary ... unprecedented case" of actual innocence, id. at 1523, "... in which the principles of comity that inform the requirement of exhaustion, must give way to the imperative of correcting a fundamentally unjust incarceration." Id. at 1554. The court entered an order granting the writ, releasing Lambert from custody, and barring the Commonwealth of Pennsylvania from retrying her on the murder charge.

On review, the Third Circuit Court of Appeals reversed, holding that "we cannot dispense with consideration of the exhaustion and procedural default claims in favor of reaching Lambert's claim of actual innocence." Lambert v. Blackwell, 134 F.3d 506, 512 (3 Cir. 1998). The court noted that the Supreme Court made it clear in Rose v. Lundy, 455 U.S. 509 (1982), that a §2254 petition which contains both exhausted and unexhausted claims must be dismissed without prejudice, and explained:

> In endorsing rigorous enforcement of the total exhaustion rule, the [Rose v. Lundy] Court acknowledged the preference among federal jurists to allow state courts the initial opportunity to review and correct alleged violations of federal constitutional rights. This preference is derived from principles of comity. ... The Court further noted that adoption of a total exhaustion rule causes a reduction in piecemeal litigation, thereby increasing the likelihood that all claims will be reviewed in a single proceeding. ... Finally, the Court observed that the petitioner's interest in obtaining speedy relief in federal court on his claims would not be unreasonably impaired by requiring

17

total exhaustion.

Lambert, supra at 513, citations omitted.

Five years after Rose v. Lundy, in Granberry v. Greer, 481 U.S. 129 (1987), the Court held that even when the state in a §2254 proceeding fails to raise an arguably meritorious nonexhaustion defense at the district court level, the court of appeals may still consider the issue. The standard to be used to determine whether a federal court should address the merits of an unexhausted claim is whether, under the particular facts and circumstances presented, it is clear that the petitioner has failed to state a colorable federal claim, or whether the interests of justice and federalism would better be served by requiring exhaustion. Id. at 136. "If, for example, the case presents an issue on which an unresolved question of fact or of state law might have an important bearing, both comity and judicial efficiency may make it appropriate for the court to insist on complete exhaustion to make sure that it may ultimately review the issue on a fully informed basis." Id. at 134-35.[5]

---

[5]The Lambert court noted that two of the changes brought about by the amendments to the federal habeas corpus statutes enacted as the Antiterrorism and Effective Death Penalty Act ("AEDPA") are derived from Granberry: waiver of the exhaustion defense can no longer be inferred, and instead must be express, §2254(b)(3); and a district court is now empowered to **deny** a habeas claim despite the petitioner's failure to exhaust state remedies, §2254(b)(2). However, "[w]e note that section 2254(b)(2) does not provide the district court with the authority to **grant** relief on the merits

Based on these considerations, the Third Circuit in <u>Lambert</u> declined to rule out the possibility that the petitioner had raised colorable federal claims. 134 F.3d at 515. Since "[t]hese claims present unresolved questions of fact and state law ... the interests of comity and justice are better served by requiring complete exhaustion." <u>Id</u>.

In this case, as is apparent from the petitioner's well-reasoned and passionate submissions to the court, it cannot be said that his unexhausted claims of ineffective assistance of trial and appellate counsel, into which are interwoven numerous assertions of actual innocence, do not raise colorable federal issues. However, it is apparent that resolution of those claims devolves upon issues of fact and of state law that have never been presented to or ruled upon by the state tribunals.   In such circumstances, comity and justice plainly require exhaustion of those claims in the state forum.

---

where the petitioner fails to exhaust state remedies." <u>Lambert</u>, <u>supra</u> at 515 (emphasis added).

Although these changes are illustrative of the continued viability of the exhaustion principle, it should be noted that this petition was filed in December, 1995, and so is not subject to the habeas corpus amendments brought about by the AEDPA, which in pertinent part became effective on April 24, 1996, the date of their enactment. <u>Curtis v. Class</u>, 939 F.Supp. 703, 707 (D. S.D. 1996); <u>Leavitt v. Arave</u>, 927 F.Supp. 394, 396 (D. Idaho 1996). The new provisions of the AEDPA generally apply only to cases filed after the Act became effective. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997).

V.   Procedural Bar


Traditionally, when a habeas corpus petition contains both exhausted and unexhausted claims, it is subject to dismissal without prejudice to permit the petitioner an opportunity to exhaust his state court remedies.  Rose v. Lundy, supra.[6]  That rule has now been refined to hold that dismissal of an unexhausted federal claim is not warranted where further efforts to exhaust the claim in state court would be futile.  Givens v. Green, 12 F.3d 1041 (11 Cir. 1994); Collier v. Jones, 910 F.2d 770, 773 (11 Cir. 1990).  In situations where an unexhausted claim is irrevocably

_____

[6]Case law makes it clear that the full exhaustion requirement of Rose v Lundy survived the enactment of the AEDPA. In Duarte v. Hershberger, 947 F.Supp. 146 (D. N.J. 1996), where a §2254 petition was filed after the effective date of the AEDPA, the court declined to exercise the discretion now afforded by newly-enacted §2254(b)(2), see n. 4, supra, which empowers a district court in its discretion to deny an unexhausted claim. Instead, it reasoned, continued application of the "total exhaustion rule" of Rose v. Lundy will promote comity, "... serve to avoid piecemeal litigation and eventually decrease the burden on federal courts." Duarte, supra at 150. Requiring total exhaustion does not unduly burden petitioners, because those who submit unacceptable "mixed" petitions may either amend their petitions to remove the unexhausted claims or resubmit a federal petition following full exhaustion at the state level.  Id.

Not insignificantly, the conclusion of the courts in Duarte and Lambert, supra, is in keeping with the Supreme Court's unequivocal expression of its holding in Rose v. Lundy, supra at 510, where it stated that " ... a district court *must* dismiss such 'mixed petitions,' leaving the prisoner with the choice of returning to the state court to exhaust his claims or of amending and resubmitting the habeas petition to present only exhausted claims to the district court."

barred from consideration by the state courts, the federal courts may deem it procedurally barred as well.  Collier v. Jones, supra at 773(where dismissal to allow exhaustion of unexhausted claims would be futile due to state procedural bar, claims are procedurally barred in federal court as well); Parker v. Dugger, 876 F.2d 1470, 1477-78 (11 Cir. 1989) ("plain statement" rule of Harris v. Reed, 489 U.S. 255 (1989), does not apply when a claim was never presented in state court).

Application of the "futility doctrine" obviously turns on whether or not a return to the state forum truly would be futile. Lambert, supra at 517. Futility is found in various contexts, depending on the totality of the circumstances, including situations where an independent decision by the state's highest court clearly precludes relief, Allen v. Attorney General of Maine, 80 F.3d 569, 573 (1 Cir. 1996), and those where the petitioner's claims would be procedurally barred if presented in the state forum, by operation of a statue of limitation or otherwise. Gray v. Hoke, 933 F.2d 117, 120 (2 Cir. 1991).  However, in the latter instances, "... unless a state court decision exists indicating that the habeas petitioner is *clearly* precluded from state court relief, the federal habeas claim should be dismissed for nonexhaustion, even if it appears unlikely that the state will address the merits of the petitioner's claim." Lambert, supra at 517, citing Banks v. Horn, 126 F.3d 206, 211 (3 Cir. 1997)(emphasis

21

original). Thus,

> [i]f the federal court is uncertain how a
> state court would resolve a procedural default
> issue, it should dismiss the petition for
> failure to exhaust state court remedies even
> if it is unlikely that the state court would
> consider the merits to ensure that, in the
> interests of comity and federalism, state
> courts are given every opportunity to address
> claims arising from state proceedings. See
> Vasquez v. Hillery, 474 U.S. 254, 257, 106
> S.Ct. 617, 620, 88 L.Ed.2d 598 (1986) ...

Doctor v. Walters, 96 F.3d 675, 681 (3 Cir. 1996).

In Florida, claims concerning alleged ineffectiveness of trial counsel are properly brought by way of a motion for postconviction relief pursuant to Fla.R.Cr.P. 3.850, while claims of ineffective assistance of appellate counsel are addressed in a petition for habeas corpus relief to the appropriate district court of appeal. State v. District Court of Appeal, First District, 569 So.2d 439 (Fla. 1990). In this case, as noted above, Brown has not prosecuted any collateral proceedings in the state forum, so he would not be precluded from bringing claims five through eleven of this federal petition, as amended, by the Florida rule which prohibits successive applications for collateral relief. Kennedy v. State, 547 F.2d 912 (Fla.1989).

However, both motions filed pursuant to Fla.R.Cr.P. 3.850, State v. Morris, 538 So.2d 514 (Fla. 3 DCA 1989), and habeas corpus

22

petitions brought pursuant to Fla.R.App.P. 9.140(j), McCray v. State, 699 So.2d 1366 (Fla. 1997), are subject to a two-year limitations period from the finality of the conviction at issue. Since Brown's direct appeal concluded upon the denial of his motion for rehearing on July 31, 1995, it is apparent that an attempt to return to the state forum to exhaust his claims of ineffective assistance of trial and appellate counsel would be challenged as untimely filed.

Under Florida law, the exceptions to the two-year limitations period for collateral relief are claims of illegal sentence, claims of newly-discovered evidence, and claims based on a fundamental change in the law that has been held to apply retroactively. Howarth v. State, 673 So.2d 580 (Fla. 5 DCA), rev.denied, 680 So.2d 422 (Fla. 1996).

Among the numerous claims that Brown has brought for the first time at the federal level in this proceeding are at least two that appear to hinge squarely on newly-discovered evidence. In his motion to expand the record in this case [DE 80], Brown asserts that the trial transcript is incorrect in a material respect. The redacted audiotape of Brown's July 16, 1991, questioning by BSO officers, which was played for the jury at trial and sent with them into the jury room during deliberations, reveals that Brown was asked by one of the detectives, "Okay, you're basically telling

[King] you **don't** believe he's got like the nerve to do it?" to which Brown responded, "Yes sir." However, the trial transcript omits the word "don't" from the detective's question. [T.1754]

Brown argues that this mistake was critical to resolution of the central question of whether he had the requisite intent to aid and abet King in the commission of Behan's murder, or instead was stating that he in fact did not believe that King would commit such an act. [DE 80 at 3] To the extent that the appellate court on Brown's direct appeal may have considered the issue of the sufficiency of the evidence to sustain his conviction on the basis of a materially incorrect trial transcript, it is certainly possible that the two-year limitations provision for postconviction relief would be waived to consider the impact of this new evidence.

Even if the trial transcript error were not viewed by the state courts as newly-discovered evidence, a statement given to an investigator by codefendant Keith King clearly fits within that category. An investigator for the Federal Public Defender interviewed King on May 20, 1999, and obtained from him a taped statement. [DE 80, Ex.4] In it, King fully recants his 1991 statement to Detectives Carr and Thomasevich, and states that he never actually knew Brown, never hung around with him, and never went with Brown to the Circle K on the night of Behan's death. [Id.] In addition, the investigator has submitted his own affidavit

that a bystander witness, Edward Keith Davis, was approximately one block north of the Circle K on the night Behan died and heard the gunshot, but saw no one leave the Circle K premises on the night of the shooting riding a bicycle. [DE 80, Ex.5]

In Kendrick v. State, 708 So.2d 1011 (Fla. 4 DCA 1998), the summary denial of a motion for postconviction relief was reversed and the movant was held to be entitled to an evidentiary hearing on his claim of newly-discovered evidence where, six years after their trial, his codefendant gave a statement saying that the drugs belonged to him, not the movant, and that he had lied in telling the police that the drugs belonged to the movant. The court held that the statement qualified as newly-discovered evidence, and since it could not be said that it did not affect the verdict, an evidentiary hearing was required. See also, Roberts v. State, 678 So.2d 1232 (Fla. 1996)(claim that prosecution witness recanted testimony constituted newly-discovered evidence cognizable in a Rule 3.850 motion and required evidentiary hearing); State v. Gomez, 363 So.2d 624 (Fla. 3 DCA 1978)(treating as newly-discovered evidence the affidavit of movant's codefendant that he alone committed the robbery).

Pursuant to these and other Florida authorities, it is possible, even likely, that Brown will be able to obtain postconviction review in the state courts on his claim of newly-

discovered evidence in the form of codefendant King's recantation of his statement to the police implicating Brown in Behan's death, despite the fact that more than two years have elapsed since his conviction. It is unclear whether this would be sufficient under Florida law to also gain review of Brown's claims that he received ineffective assistance of counsel both at trial and on direct appeal, but since King's recantation bears directly on Brown's claim of actual innocence, which in turn is interwoven throughout all his arguments, it may well be that the claims are inextricably intertwined to the point that the state courts effectively would entertain them all.

In addition, at this juncture, state consideration of claim four of this federal petition, concerning an allegedly improper jury instruction, would be precluded by the Florida principle which holds that issues which could be but are not raised on direct appeal may not be the subject of a subsequent Rule 3.850 motion for postconviction relief.  Kennedy v. State, supra. Since this claim of trial court error was not raised on direct appeal, it was defaulted as a straightforward claim of substantive error.

However, in claim nine of this petition, Brown argues that his trial counsel rendered ineffective assistance by failing to object to the same allegedly erroneous jury instruction.  To prevail on a claim of ineffective assistance, a petitioner must demonstrate both

26

that his attorney's efforts fell below constitutional standards, and that he suffered prejudice as a result. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). If Brown is able to obtain state review of his claims of ineffective assistance of trial counsel, he will also effectively receive review of the propriety of the jury instruction, insofar as the court would have to consider whether counsel's failure to object caused Brown to suffer prejudice. To the extent that it is not futile to permit Brown an opportunity to exhaust his claims of ineffective assistance at the state level, it is also possible that the propriety of the assailed jury instruction is capable of receiving at least indirect review.

In situations such as this, where a federal court is uncertain how a state court will resolve a procedural default issue, dismissal of the claim without prejudice to permit exhaustion of state remedies, traditionally has been favored, to promote comity and federalism, the important underpinnings of the exhaustion doctrine. <u>Vasquez v. Hillery</u>, <u>supra</u>; <u>Doctor v. Walters</u>, <u>supra</u>. The petitioner in this case should not be troubled by this result, because it is preferable from his standpoint to the alternative, which would be to consider his unexhausted claims incapable of exhaustion at the state level and hence procedurally barred from federal consideration. <u>Collier v. Jones</u>, <u>supra</u>.

To overcome a procedural bar, a federal petitioner must

demonstrate objective cause for the failure to properly raise the claim and actual prejudice resulting from the error complained of. <u>United States v. Frady</u>, 456 U.S. 152, 168 (1982); <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

In his memorandum of fact and law on the issue of exhaustion [DE 79 at 6 - 7] the petitioner has assumed that his unexhausted claims are incapable of further state review, and argues that good cause is established for his failure to raise his unexhausted claims in the state forum, and that the procedural bar otherwise applicable to those claims thus is overcome, by two factors: 1) the ineffective representation provided by his trial counsel caused the complete default of claim four of this federal petition (erroneous jury instruction) and the incomplete factual development at the suppression hearing of claims two and three (voluntariness of the confession), and 2) Brown's mental deficiencies prevented him from realizing that state collateral proceedings were available to him to pursue his claims of ineffective assistance of trial and appellate counsel. If Brown's claims are deemed incapable of further state review and hence procedurally defaulted, he has failed with these arguments to demonstrate cause and prejudice sufficient to overcome that bar.

As the state argues in its response to the petitioner's memorandum of fact and law [DE 84], the petitioner's reliance on

the assertedly ineffective representation provided by trial counsel to establish cause for his procedural default of claim four and his partial default of claims one, two and three is misplaced, or at least premature. The law is well established that ineffective assistance of counsel cannot be urged as the cause to excuse a procedural default in a §2254 case unless it has first been exhausted in the state forum as an independent claim.

In <u>Murray v. Carrier</u>, 477 U.S. 478 (1985), the Supreme Court granted certiorari to consider the circumstances under which a §2254 habeas corpus petitioner could show cause for a procedural default by the shortcomings of counsel at trial. After tracing the history of its own decisions interpreting the cause and prejudice standard, the Court rejected the view that "ignorant or inadvertent attorney error" can constitute cause for trial error defaults. In language which is particularly relevant to the case at bar, the Court explained:

> ... [The cause and prejudice] standard rests not only on the need to deter intentional defaults but on a judgment that the costs of federal habeas review 'are particularly high when a trial default has barred a prisoner from obtaining adjudication of his constitutional claim in the state courts.' *Engle* [*v. Issac*], 456 U.S. [107, (1982)] at 128. Those costs, which include a reduction in the finality of litigation and the frustration of 'both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights,' *ibid.*, are heightened in several respects when a trial

29

> default occurs: the default deprives the trial
> court of an opportunity to correct any error
> without retrial, detracts from the importance
> of the trial itself, gives state appellate
> courts no chance to review trial errors, and
> 'exacts an extra charge by undercutting the
> State's ability to enforce its procedural
> rules.' *Id.*, at 129. ...

478 U.S. at 486-87.

The Court went on to hold that only attorney error that sinks to the level of constitutionally defective representation will suffice to constitute cause for a procedural default.

> ... So long as a defendant is represented by
> counsel whose performance is not constitu-
> tionally ineffective under the standard
> established in *Strickland v. Washington*, [*466
> U.S. 668 (1984)*], we discern no inequity in
> requiring him to bear the risk of attorney
> error that results in a procedural default.
> Instead, we think that the existence of cause
> for a procedural default must ordinarily turn
> on whether the prisoner can show that some
> objective factor external to the defense
> impeded counsel's efforts to comply with the
> State's procedural rule. Without attempting an
> exhaustive catalog of such objective impedi-
> ments to compliance with a procedural rule, we
> note that a showing that the factual or legal
> basis for a claim was not reasonably available
> to counsel, see *Reed v. Ross*, 468 U.S., at 16,
> or that 'some interference by officials, *Brown
> v. Allen*, 344 U.S. 443, 486 (1953), made
> compliance impracticable, would constitute
> cause under this standard.

477 U.S. at 488.

30

If a defendant in fact has received representation that constitutes a violation of the Sixth Amendment, cause exists for his procedural default. Id.  However, in such instances,

> ... **the exhaustion doctrine**, which is 'principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings,' *Rose v. Lundy*, 455 U.S. 509, 518 (1982), **generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.** The question whether there is cause for a procedural default does not pose any occasion for applying the exhaustion doctrine when the federal habeas court can adjudicate the question of cause - a question of federal law - without deciding an independent and unexhausted constitutional claim on the merits. But if a petitioner could raise his ineffective assistance claim for the first time on federal habeas in order to show cause for a procedural default, the federal habeas court would find itself in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available. The principle of comity that underlies the exhaustion doctrine would be ill served by a rule that allowed a federal district court 'to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,' *Darr v. Burford*, 339 U.S. 200, 204 (1950), and that holds true whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief.

477 at 489.

In this case, Brown's argument that his attorney's ineffective representation resulted in the procedural default of his jury instruction claim asks this court to place "itself in the anomalous position of adjudicating an unexhausted constitutional claim," an untenable situation that was squarely rejected in Murray, supra. Indeed, the inappropriateness of this position is highlighted here by the fact that Brown reiterates the argument that his lawyer rendered ineffective assistance by failing to challenge an erroneous jury instruction as a separate, independent claim of error (number 9 as listed above). However, the ineffective assistance claim is itself unexhausted, and Brown in turn attributes that procedural default claim to his mental deficiency and consequent lack of understanding of state collateral procedures. Such circuitous and convoluted reasoning – which would have this court excuse a double procedural default to reach a claim of state trial court error at the federal level in the first instance – does not comport with the purpose and scope of federal habeas corpus review.

Brown's attempt to cite his mental deficiency as cause for the procedural default of the remainder of his claims, concerning the allegedly ineffective assistance he received from both trial and appellate counsel, is not supported as a factual matter by the record.

32

As will be discussed again in connection with Brown's claim that his second statement to the police was not voluntary, testimony was received at the suppression hearing from psychologist Elizabeth Koprowski, who evaluated Brown. [T.180 et seq.] She reviewed his school records, administered an independent IQ test, interviewed him on four occasions, and concluded that Brown was mildly mentally retarded [T.184] with an IQ of around 56. [T.185] Although Brown was "passive" and "not motivated" as a student [T.183] and "child-like" in some of his responses [T.189], Dr. Koprowski found him to be competent overall [T.194] and aware of the difference between right and wrong. [T.190] He would understand his legal rights in a basic way. [T.229] Based on this testimony, the trial court found as fact at the conclusion of the hearing that "this defendant had the mental capacity to understand the Miranda warnings that were given to him, and much of what he did not do well in school may have in fact been brought about by his not attending." [T.442-43] This assessment does not indicate that Brown lacked the capability to properly pursue his state court avenues of relief.

Moreover, it should be noted that Brown's state conviction became final on August 18, 1995, upon issuance of the mandate on his direct appeal.[7] Despite his asserted mental deficiencies, he

---

[7]This date was obtained by telephonic inquiry to the Clerk of Florida Fourth District Court of Appeal.

filed this federal petition <u>pro se</u> on December 27, 1995, slightly more than four months later. It is reasonable to assume that someone capable of filing a federal petition would also have been capable of filing an application for relief in the state forum. Even were that not true, counsel was appointed to assist Brown in March, 1997 [DE 17], so any failure after that date to pursue procedurally appropriate remedies cannot be attributed to Brown's personal shortcomings.

Brown also asserts in his memorandum of fact and law on the issue of exhaustion [DE 79] that he is entitled to have his unexhausted claims heard in this proceeding because constitutional errors have resulted in the conviction of a person who is actually innocent of the crime. [<u>Id</u>. at 7] His argument in support of that position again illustrates that Brown would have this court stray far outside the appropriate scope of habeas corpus review.

The Supreme Court has stressed repeatedly that "[f]ederal courts are not forums in which to relitigate state trials." <u>Barefoot v. Estelle</u>, 463 U.S. 880 (1983). The determination of a defendant's guilt or innocence in a state trial "is a decisive and portentous event." <u>Wainwright v. Sykes</u>, <u>supra</u> at 90. "Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." <u>Id</u>.

34

As noted previously, it is the purpose of federal habeas corpus review only to ensure that individuals are not imprisoned in violation of the Constitution; it is not the function of habeas review to correct errors of fact. Herrera v. Collins, 506 U.S. 390, 400-01 (1993). This principle historically has been emphasized throughout habeas corpus jurisprudence. See, e.g., Moore v. Dempsey, 261 U.S. 86, 87-88 (1923)("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved."); Hyde v. Shine, 199 U.S. 62, 84 (1905)("[I]t is well settled that upon habeas corpus the court will not weigh the evidence."); Ex Parte Terry, 128 U.S. 289, 305 (1988)("As the writ of habeas corpus does not perform the office of a writ of error or an appeal, [the facts establishing guilt] cannot be re-examined or reviewed in this collateral proceeding.").

Based on these principles a claim of actual innocence based on newly discovered evidence does not state a ground for federal habeas relief absent an independent constitutional violation. Herrera, supra at 400. In Schulp v. Delo, 513 U.S. 298 (1995), upon which Brown principally relies, the Court held that a claim of actual innocence could in "extremely rare" and "extraordinary" cases avert application of a procedural bar to the merits of the accompanying constitutional claim. The standard governing such an inquiry is that first articulated in Murray v. Carrier, supra, at

35

496: the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." The Court stated:

> Though challenges to the propriety of imposing a sentence of death are routinely asserted in capital cases, experience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. [citation omitted] To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trust-worthy eyewitness accounts, or critical physical evidence - that was not pre-sented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

Schulp, supra at 324.

Moreover, satisfaction of the Carrier standard that a constitutional violations has "probably" resulted in the conviction of a factually innocent person requires a habeas petitioner to show something more than the existence of a reasonable doubt of his guilt:

> The meaning of actual innocence as formulated by ... Carrier does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty.

36

*   *   *

> Thus, a petitioner does not meet the
> threshold requirement unless he persuades
> the district court that, in light of the
> new evidence, no juror, acting reason-
> ably, would have voted to find him guilty
> beyond a reasonable doubt.

<u>Schulp</u>, <u>supra</u> at 329.

Against the backdrop of these controlling principles, Brown's attempt to bring himself within the "extremely rare" actual innocence exception falls short. Brown argues that no reasonable juror would have found him guilty of Behan's murder if various items of evidence had been presented or argued differently, including testimony that: 1) witnesses did not see Brown and King leave the Circle K on a bicycle; 2) the bicycle they saw on the Circle K video tape belonged to someone else; and 3) Brown was a battered child. [DE 79 at 8-9] Clearly, this argument would have the federal court revisit and reweigh evidence that was or could have been presented at the state trial. <u>Cf</u>. <u>Barefoot v. Estelle</u>, <u>supra</u>.

The principal piece of new evidence Brown has supplied is a statement given by Keith King to an investigator in May, 1999, recanting his earlier testimony that Brown was involved in Behan's shooting. [DE 80, Ex.4] Without passing on the credibility or

37

reliability of King's latter-day change of heart,[8] the existence of this newly-discovered evidence, as discussed earlier in report, has opened an avenue whereby Brown might receive state collateral review of his claim despite the passage or more than two years since his conviction became final. Kendrick v. State, supra. Since further attempts to exhaust the claim may well not be futile, its consideration by the federal court in the first instance is not appropriate.

Under these circumstances, Brown has failed to demonstrate cause and prejudice for his failure to raise his unexhausted claims in the state courts. Consequently, if those claims were deemed no longer capable of exhaustion and hence irrevocably defaulted, they would not be reviewable on the merits in this federal proceeding. Frady, supra. Dismissing this petition without prejudice to allow Brown an opportunity to return to the state forum with his unexhausted claims of ineffective assistance and actual innocence thus is not only legally correct, Doctor v. Walters, supra, but

---

[8]As Brown states in his motion to expand the record, "King is almost at the end of his 15-year sentence" that he received in a plea deal for his earlier testimony against Brown. [DE 80 at 5] Were the Court to reach the question of the probative value of King's recent statement, it would properly do so in connection with the evidence of guilt adduced at trial. Schulp, supra at 332. Since, as will be discussed infra, that evidence consisted primarily of Brown's own knowing and voluntary admission of guilt, it is by no means certain that King's statement would suffice to call into reasonable question Brown's factual guilt of Behan's murder.

also is more advantageous to the petitioner than the only other available option, to deem those claims forever procedurally barred from federal review.

One important point must be stressed at this juncture: as indicated, see n. 4, supra, this petition was filed prior to the effective date of the AEDPA, and so is not subject to its provisions. However, any future §2254 petition Brown may file after pursuing additional state court proceedings would be subject to the AEDPA, and specifically to its provision which provides that a one year period of limitations applies to a §2254 petition. The AEDPA limitations period is tolled by properly-filed state collateral proceedings. Gunther v. Holt, 173 F.3d 1328 (11 Cir. 1999).

As noted above, Brown's conviction became final on August 18, 1995, and he filed this federal petition on December 27, 1995, slightly more than four months later. It is unclear under the case law whether a §2254 proceeding that ultimately is dismissed for lack of exhaustion tolls the AEDPA limitations period. See, e.g., Sperling v. White, 30 F.Supp.2d 1246 (C.D. Cal. 1998) (holding the plain language and legislative history of the AEDPA support the conclusion that Congress did not intend for the limitations period for §2254 petitions to be tolled during the pendency of federal petitions); Vincze v. Hickman, 1999 WL 68330 *1 (E.D.Cal. Jan 13, 1999) (recognizing that tolling the limitations period to allow a

petitioner to file unexhausted federal habeas petitions invites a petitioner to purposely "stop the clock," thereby preventing effective timely review). Thus, it cannot be said with confidence that the time that has passed during the pendency of this federal proceeding will not count against Brown's limitations clock in the event he filed a second §2254 petition sometime in the future.

Nonetheless, either way, Brown has lost nothing. On the record as it presently stands, as will be discussed below, Brown is not entitled to federal relief on any of his three exhausted claims. If he returns to the state forum and prevails on his unexhausted claims, he would have no further need of federal redress. But if he does not prevail at the state level and a subsequent §2254 petition is deemed to have been untimely filed under the AEDPA, he will be in no worse position than he is at this juncture.

## VI. The Exhausted Claims

When a federal habeas corpus petition contains both exhausted and unexhausted claims and thus is subject to dismissal without prejudice, it is the prerogative of the petitioner to dismiss the unexhausted claims, to allow the federal court to reach the merits of the exhausted claims. Rose v. Lundy, supra. Because of the unusual posture of this case and in the interests of judicial economy and fairness, the following discussion of the merits of

40

Brown's exhausted claims is provided, to assist the Court and the parties in the event Brown chooses to exercise that option.

In short, if the Court were to reach the merits of Brown's presently cognizable claims on the record before it, Brown would not be entitled to federal relief.

### A. Claim One: Sufficiency of the Evidence

In his first claim, Brown argues that the evidence was insufficient to sustain his conviction of first degree murder as a principal. Both the petitioner [DE 79 at 11] and the respondent [DE 81 at 9] agree that this claim is appropriately considered solely on the existing record.

The standard for review of the sufficiency of the evidence on a petition for state habeas corpus relief is whether the evidence presented, viewed in a light most favorable to the state, would have permitted a rational trier of fact to find the petitioner guilty of the crimes charged beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); Smith v. White, 815 F.2d 1401 (11 Cir. 1987).

The standard of weighing the constitutional sufficiency of evidence is a limited one, Wilcox v. Ford, 813 F.2d 1140, 1143 (11

Cir. 1987), and when faced with a record of historical fact that supports conflicting inferences, the court in a federal habeas corpus proceeding must presume that the jury resolved such conflicts in favor of the prosecution, deferring to the jury's judgment as to the weight and credibility of the evidence. Id., at 1143, citing Jackson v. Virginia, supra, at 326; Machin v. Wainwright, 758 F.2d 1431, 1435 (11 Cir. 1985). The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant granting habeas relief. Wilcox v. Ford, supra, at 1143, citing Martin v. Alabama, 730 F.2d 721, 724 (11 Cir. 1984).

Under Florida law, both the actor and those who aid and abet his actions are liable for criminal actions. Florida Statute §777.011 provides:

> Principal in the first degree:
>
> Whoever commits any criminal offense against the State, ... or aids, abets, counsels, hires, or otherwise procures such offense and such offense is committed or is attempted to be committed, is a principal in the first degree...

Pursuant to this provision, a person may be convicted of a criminal offense if he aided and abetted its principals, even if he was not actually or constructively present at commission of offense. Voto v. State, 509 So.2d 1291, 1292-93 (Fla. 4 DCA

42

1987)(evidence sufficient to convict appellant as principal even though he never possessed cocaine); Ramirez v. State, 371 So.2d 1063, 1065 (Fla. 3 DCA), cert.denied, 383 So.2d 1201 (Fla.1980) (defendant can be convicted of aiding or abetting possession of drugs). In order to be guilty as a principal for a crime physically committed by someone else, a defendant must both intend that the crime be committed and do some act to assist the other person in actually committing the crime. Staten v. State, 519 So.2d 622 (Fla. 1988); Ryals v. State, 112 Fla. 4, 150 So. 132 (1933); Collin v. State, 438 So.2d 1036 (Fla. 2 DCA 1983).

Pursuant to these principles, "clearly, the getaway driver who has prior knowledge of the criminal plan and is 'waiting to help the [actor] escape' falls within this category, and is, therefore, a principal." Staten, supra at 624.

In this case, the petitioner was fifteen years old at the time of the crime. As the dissent on direct appeal described, the principal piece of trial evidence which linked the petitioner Brown to the asserted shooter, codefendant King, was Brown's own statement given to the police in July, 1991, in which he admitted meeting with codefendant King on the day of the crime. The two began "getting high on crack and marijuana," and then rode off together on Brown's bicycle. [DE 13 at 1753-54] King showed Brown a gun, and as the two rode around they began to talk about killing

43

someone. [Id. at 1754] As Brown rode towards a convenience store, King saw a police patrol unit parked there and said "now he knew who." [Id.] As Brown approached the rear of the vehicle, King got off the handlebars of the bicycle, walked up to the side of the patrol car, pulled the gun from his waistband, and shot Deputy Behan in the head. [Id.] King then got back on the bicycle, and Brown pedaled to a rock pit, where they disposed of the weapon. [Id. at 1756-57]

Brown stated that he and King talked about King's plans to kill somebody for about two blocks before they arrived at the convenience store. [DE 13 at 1753] As they approached the store, King told the petitioner to look up, and upon seeing the police cruiser King said "[I] got him." [Id. at 1753-54] Brown understood King to mean that the police officer was the person he intended to kill. [Id. at 1735] Brown saw Deputy Behan inside the cruiser "doing paper work," and also saw him "make a move" before being shot by King. [Id. at 1759-60] After the shooting, King got back on the handlebars of the bicycle, Brown pedaled the bicycle to the rock pit, and the gun was thrown away. [Id. at 1760-61]

Under these circumstances, where the petitioner peddled King around on the handlebars of his bicycle, discussed with King a plan to kill "someone," stood by while King approached the police car and shot the deputy in the head at pointblank range, and then

44

peddled King away from the scene of the crime to dispose of the weapon, there was sufficient evidence to allow a rational trier of fact to find that he both intended that the crime be committed and acted to assist King in committing the crime.

Much of the argument at trial, on appeal, and in this federal proceeding as to this claim has centered on the meaning of Brown's statement that he "called] [King's] bluff" after King announced that he was "gonna kill someone." [T.1734, 1753-54] At trial and on appeal [DE 7, Ex.2 at 36], Brown argued that his explanation that he "call[ed] [King's] bluff" should be interpreted to mean that he did not believe King's statement that he intended to kill someone, and so did not have the requisite participation in the King's murderous intent to have been a principal to Behan's killing. See Staten v. State, 519 So.2d 622, 624 (Fla. 1988). The state argued on the other hand, that Brown's statement is rightfully interpreted as meaning that he egged King on or dared him to shoot Behan, and so was complicit in the death.

In this federal proceeding, Brown strenuously reiterates his trial and appellate argument, urging this court to find that the statement at issue, combined with Brown's low IQ, does not lend itself to a reasonable inference that Brown had actual knowledge that a crime was about to occur. [DE 70 at 56] He argues that the fact that he was still "pulling" King on the handlebars of the

45

bicycle when King jumped off to shoot the deputy "clearly" shows that King's decision to kill Behan was a spontaneous act, because otherwise the boys would not have pedaled up beside the squad car and would have taken measures to avoid detection. [Id. at 56-57]

Deference must be paid to the jury's resolution of such conflicting inferences. Jackson v. Virginia, supra at 326; Wilcox v. Ford, supra at 1143. Where, as here, the jury heard the same arguments as to the competing inferences that could be attributed to the petitioner's statement that he "called [King's] bluff" and resolved that very subjective question in favor of the prosecution, this federal court may not interfere with the jury's function by reaching a contrary result. When the presumption in favor of the jury's resolution of the issue of intent is properly applied, the evidence was sufficient to sustain Brown's conviction as a principal to first degree murder under Florida law.

It should also be noted that the defense at trial made a thorough presentation to the jury of its theory that Behan was killed as the result of police misconduct centered at the Circle K. Jackie Bain testified that she was an employee of the Circle K who was robbed on April 13, 1990, and was promised greater BSO presence at the scene in return for sexual favors. [T.2067] Between April and June, 1990, Bain preformed these acts 20 to 22 times. [T.2068] She told the police the day after Behan died that his murder had

46

been committed by Curtis McGill, in corroboration with the individual who stole the cigarettes. [T.2071] Bain told the officers that Behan was "shot by mistake" because he was not having sex with her, and that the intended target was Deputy Richmond, with whom she had been having sex. [T.2081-84]

Bain testified that she did not know Brown, but knew that he was not involved in Behan's murder. [T.2087-88]

Testimony was also presented on the defense's alternate theory of the motive for Behan's death from former Deputy Richmond, who admitted that BSO's internal affairs division had investigated him concerning Bain's allegations of sexual misconduct. [R.1916-17] He was eventually fired by BSO. [T.1963] In addition, David Carry, an investigator for BSO's internal affairs department, testified that he interviewed Bain concerning her assertions of sexual misconduct and found her "ordinary, alert [and] competent." [T.1968]

Another BSO deputy, John Chandler, also admitted having been investigated by internal affairs, and told the jury that Bain's allegations of sexual impropriety had been "sustained." [T.2170-71]

On rebuttal, the prosecution presented four witnesses, in an attempt essentially to portray Bain as unstable and an untrustworthy witness.

Thus, when the jury found Brown guilty as a principal to Behan's murder, it necessarily rejected the defense's attempt to create a reasonable doubt of Brown's guilt by suggesting the alternate theory that Behan's killing occurred as the result of police misconduct at the Circle K. To the extent that the petitioner in this federal proceeding would have the court revisit the issue of Brown's guilt based on these allegations, his attempt must be rejected, because no showing has been made that would allow a federal court to reject the jury's resolution of the underlying issues of fact.

### B. Claim Two: Voluntariness of the Confession

In the second claim of the amended petition [DE 70 58-60], Brown asserts that his confession was coerced. He lists a number of circumstances which he argues combined to make his statement coerced both physically and psychologically. [Id.] AS will be discussed, many of those circumstances were considered and rejected by the state courts, while others have never been presented in that forum. To the extent that the claim is exhausted, it does not entitle Brown to habeas corpus relief.

Allegations of police coercion call into question the voluntariness, as opposed to the lawfulness, of an ensuing confession. Moran v. Burbine, 475 U.S. 412 (1986)("First the relinquishment of

the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than by intimidation, coercion or deception."); see also, United States v. Raymer, 876 F.2d 383 (5 Cir. 1989); Miller v. Dugger, 838 F.2d 1530 (11 Cir. 1988). For purposes of fourteenth amendment due process concerns, a finding that some form of government coercion motivated the rights waiver is a necessary predicate to finding that a confession was not voluntarily given. Colorado v. Connelly, 479 U.S. 157 (1986); Smith v. Zant, 887 F.2d 1407, 1428 (11 Cir. 1989)(en banc)(Kravitch, J., concurring in part and dissenting in part).

In federal habeas corpus proceedings, the ultimate issue of the voluntariness of a state confession is a legal question requiring independent federal determination. Miller v. Fenton, 474 U.S. 104 (1985); Lindsey v. Smith, 820 F.2d 1137 (11 Cir. 1987). Under some circumstances, findings of fact subsidiary to the issue of voluntariness are presumed to be correct if the petitioner received a full and fair hearing, and the findings are not patently erroneous or otherwise deficient pursuant to the factors listed at 28 U.S.C. §2254(d). Miller, supra.

The petitioner argues in his memorandum of fact and law on the issue of exhaustion [DE 79 at 11 et seq.] that an evidentiary hearing is required as to both the voluntariness and the lawfulness of his confession, in part because the trial court failed to make

49

explicit subsidiary findings of fact relevant to the merits of those claims. [Id. at 11-12] This argument overlooks the fact that the traditional statutory presumption of correctness accorded in §2254 proceedings to state court determinations of fact is applicable to implicit as well as explicit factual determinations. Marshall v. Loneberger, 459 U.S. 422 (1983); Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991).

Where a state court makes no express findings, a federal habeas court is entitled to "reconstruct the findings of the state trier of fact, either because [the state trial judge's] view of the facts is plain from his opinion or because of other indicia." Townsend v. Sain, 372 U.S. 293, 314 (1963), overruled on other grounds, Keeney v. Tamayo-Reyes, 112 S.Ct. 1715 (1992); see also Fike v. James, 833 F.2d 1503 (11 Cir. 1987). Accordingly, for example, if it is clear that the trial court would have granted relief sought by the petitioner had it believed the testimony of certain witnesses, "its failure to grant relief was tantamount to an express finding against the credibility of [those witnesses]." Marshall v. Loneberger, supra at 433, citing LaVallee v. Delle Rose, 410 U.S. 690 (1973); see also Tejada v. Singletary, 941 F.2d 1551, 1563 (11 Cir.), cert. denied, 112 S.Ct. 1199 (1992).

In this case, the trial court conducted a pretrial suppression hearing on Brown's claims that his confessions were coerced and

involuntary. The hearing lasted for two days and consumes approximately 450 pages of transcript. [DE 10-16] As will be seen, most of the "factual disputes" Brown enumerates as requiring resolution in this federal proceeding [DE 79 at 13-14] in fact were fully litigated at the state level. Without overburdening this report with the minutiae of that proceeding, following is a synopsis of the pertinent testimony presented.

At the time of Behan's murder, Richard Scheff was a sergeant in the BSO homicide unit, and initially was placed in charge of the investigation. [T.5] He first became aware of Brown's possible involvement in the killing the day after Behan's death, when an individual named Rob McGriff called BSO to say that he had information. He was brought into the station house and questioned, and he identified the people responsible for Behan's death as Brown and Keith Maddox. [T.12]  McGriff subsequently failed a polygraph test and admitted that he was dying of AIDS and needed the reward money. [T.14] He then explained that he got his information from Brown, whom he ran into in a bar called Godfathers near where Behan was killed shortly after the shooting. [T.14] Brown told McGriff that he and "Keith" were involved in the shooting, and McGriff decided to embellish his story by saying that he was an eyewitness to the crime. [T.14]

Brown was located by Hollywood police the following day.

[T.15] Scheff dispatched two of his deputies to meet with Brown, and then he himself went to the Hollywood police station, as well. [T.15] When Scheff arrived, he found Brown in an interview room with detectives Gill and Illaraza. [T.17] As Scheff entered the room, Brown was telling Gill that Keith Maddox had shot Behan. [T.17] Scheff asked Brown how he knew that, and expected Brown to answer that he heard it from Rob McGriff, but instead Brown said he "heard it on the street." [T.19] Scheff began to press him for more specific information, and "[t]here was no response to that question immediately. [Brown] sat, he looked down, he waited a minute or two, and he looked back up and he said, 'Keith didn't shoot the deputy. I did.'" [T.19]

Scheff and the other deputies withdrew from the room at that point, and Scheff determined that Brown had not been Mirandized. [T.19] Scheff explained that no warnings had been given at the outset of the interview because Brown was not personally a suspect in Scheff's mind until he uttered the statement that he had shot the deputy. [T.20] Scheff and the other deputies decided to reenter the interview room and talk to Brown about matters not pertaining to Behan's death, to get a feel for his mental state. [T.20] They did so, asking him casual questions about a preexisting juvenile pick-up order that was outstanding against him. [T.20] Brown would start a statement and then jump to something else, was not responsive, and exhibited "a bizarre quality" that gave Scheff "the

distinct impression that he was very much under the influence of narcotics." [T.19-20]

After about five minutes of talking to Brown, Scheff became very uncomfortable about proceeding because he "did not believe in good faith that [he] could give [Brown] his rights and expect that he could waive them because he seemed very, very high." [T.21] In fact, Scheff asked Brown that very question, and Brown admitted to being high on crack. [T.21] The detectives withdrew again and Scheff decided that it would be a mistake to proceed because he could not give Brown his rights and obtain an effective waiver. [T.21] Scheff did not know at that point whether Brown was involved in Behan's death, but if he was involved Scheff wanted to be able to interview him in a very detailed manner. [T.22] Scheff stated that since the crime was the murder of a deputy, he wanted to be sure in his mind and his heart that anyone he arrested was in fact the right person, and to accomplish that he needed a detailed statement he could compare with the physical evidence, and he could see that Brown was in no shape at that point to try to tell Scheff what happened. [T.22]

After the interview, Brown was transported to HRS custody pursuant to the juvenile pick-up order. [T.23] The investigation did not focus on him again for several weeks, because the detectives at that point came into contact with Jackie Bain, and

the focus of the investigation shifted to her. [T.23, 26] Bain was an employee of the Circle K convenience store where Behan was shot. She told BSO that a man named McGill had shot Behan because he was angry that Bain had sexual encounters with BSO deputies who came to the store. [T. 23] Several brothers named McGill lived in the area, and Bain picked Steven McGill out of a photo line-up as the man who shot Behan. [T.24] She also gave a statement to BSO Internal Affairs for its use in investigating her allegations of police misconduct. [T.24]

Upon investigation, the detectives discovered that Steven McGill had been in custody on the night of Behan's death. When confronted with that information, Bain stated that she had misled them, and that the real killer was Curtis McGill. [T.25] Ultimately, after several weeks, Bain stated that she personally had killed Behan. [T. 25]

Meanwhile, Brown remained in HRS custody. Scheff stated that he did not wish to reinterview Brown while he was confined at the juvenile detention center, because in such circumstances HRS workers often interfered. [T. 27] Scheff also became aware of a Supreme Court decision that he felt might apply to Brown, and he sought guidance on that issue from the Broward State Attorney. [T.27] He was advised that the case might apply and render any statements made by Brown inadmissible until his legal situation was

54

resolved. Under these circumstances, Scheff decided to refrain from additional contact with Brown until his situation with HRS was resolved. [T.27]

At the same time, Detectives Carr and Thomasevich had began to develop independent information about Brown from other individuals he had spoken to about the shooting, including both friends and others who were housed with his at the juvenile detention center. [T.28-30] In addition, in what Scheff characterized as their "best single break" [T.33], other detectives had learned that the individual named Keith who was also involved in the shooting was not Keith Maddox, but instead was a different person named Keith King. [T.33] The detectives took a post-Miranda statement from King in which King admitted his own involvement in Behan's death and identified the other participant as Brown. [T.33]

On July 16, 1991, Brown's juvenile criminal case had concluded, and he was sentenced to Covenant House. [DE 30] An hour after he arrived there, he walked out, but was located shortly thereafter near Covenant House by BSO deputies and brought in for additional questioning. Scheff and two other deputies spent a few minutes just talking to Brown "to get a feel for him," because Scheff was unsure of how much of his earlier demeanor had been due to cocaine intoxication and how much could be attributed to some organic brain dysfunction. [T.31] After speaking to Brown for three

or four minutes, Scheff saw a "very very different person" than he had seen before, and he felt comfortable that he could allow the questioning to continue. [T.31-32]

At that point, according to Scheff, Brown did not appear to be at all intoxicated, was responsive, was given no promises, and was not shackled, chained to the chair or floor, or beaten. [T.34] After Scheff had spoken to Brown for a few minutes, he left the room, and detectives Carr and Thomasevich took over the questioning. [T.32]

On cross examination of Scheff and of all ensuing prosecution witnesses, defense counsel Larry Davis focused on the theme of the defense which later would be presented at trial, which was that Brown was used as a scapegoat to cover up police misconduct in the form of coercing sex from employees at the Circle K. At the outset of Scheff's cross examination, the prosecutor objected on relevancy grounds to questions concerning police misconduct and sexual favors. The court overruled the objection to the extent that the defense contended that the police investigation was affected by such accusations, but admonished defense counsel to keep in mind that there was a point that should not be crossed in such questioning. [T.41]

Scheff then related that he and other detectives went to

Jackie Bain's apartment after receiving her call. [T.41] They were forced to stand outside and talk to her through a bathroom window for 15 to 20 minutes until she let them in. [T.42] Afterwards she went back to the homicide office with them and gave the names of 6 to 8 deputies with whom she was sexually involved. [T.44] By the time of the suppression hearing, two of those officers, Williams and Richmond, had been fired as the result of the ensuing internal investigation. [T.44]

Scheff described a myriad of illegal activities that came to light as the result of the internal affairs investigation which ensued from Bain's allegations. After she named "a number" of deputies who were involved in sexual misconduct at the Circle K, Bain picked Curtis rather than Steven McGill out of the photo line-up. [T. 70-72] She also began to make anonymous telephone calls to Detective Walley, to inform him that Behan's death was a mistake, and that Richmond in fact was the intended target. [T.74] During that same time frame, the detectives received a called from an incarcerated individual named Middleton, who related other illegal police activity.  Through these and other means, it came to light that various deputies were shaking down motorists for bribes [T.77], and taking prostitutes to warehouses they had leased for the purpose of crack and sex. [T.79] It was also discovered that the manager of the Circle K was having an affair with Deputy Richmond, and that her husband owned a gun, but the gun was checked

against the bullet that killed Behan and did not match. [T.81-82]

Scheff stated that he knew the internal affairs investigation was ongoing but it did not concern him. He pointed out that if he had been concerned, he would not have sent Bain to give internal affairs her statement, going so far as to have a deputy personally drive her there. [T.91] He and other homicide investigators shared information with internal affairs and contacted them with all reports of police impropriety. [T.91]

Scheff acknowledged that Bain eventually was committed pursuant to the Baker Act,[9] despite the fact that she had no psychiatric history. [T.94] He denied that this was done to keep her away from the internal affairs investigators. [T.91] In addition, Scheff stated that Kevin Duhart, whose theft of cigarettes resulted in Behan's presence at the Circle K, was tested for gunshot residue at the scene and when nothing was found to tie him to Behan's murder, was released to the custody of other deputies. The misdemeanor theft of the cigarettes was never prosecuted. [T.103]

When Brown gave his first statement on November 15, 1990, he was in custody only for a Hollywood juvenile charge. [T.124] Scheff considered that interview to be only a witness statement, and he

---

[9]Fla.Stat. §394.451 et seq.

58

did not intend to interrogate Brown, because he considered McGriff, the witness who had given Brown's name to the police, to be unreliable. Scheff was "very, very surprised" when Brown stated that he shot Behan. [T.127] Scheff didn't know what to make of the statement but was "certainly" interested in Brown. [T.129] The "game plan" was to keep an eye on him until he was released from HRS custody and then to talk to him again. [T.137]

By the time Brown was interviewed and gave his second statement in July, 1991, BSO already had King's statement implicating him in Behan's death. At that time, Scheff said that if they had not gotten a confession from Brown that was consistent with King's statement, he would have advocated that Brown be released. [T.139] In fact, however, Brown's statement on that date was largely consistent with King's, and Scheff deemed the fact that both boys described going to the Circle K on a bicycle to have been the most significant similarity. [T.140] Scheff acknowledged some inconsistencies but believed that to be expected, and opined that when the two statements are read together they are clearly describing a similar event, and both are casting themselves in consistent roles. [T.141] The inconsistencies were as to such details as whether Keith rode the bike with Tim or ran after the shooting, and whether or not they went to Tim's house afterwards. [T.142-43]

In Scheff's mind, the most important consistency in King's and Brown's statements was that each named the other as being involved, and both described the same attempt to go shoot somebody, "almost a random, meaningless type of crime." [T.160] They both described the same bicycle ride, and were consistent in their statements that Brown pedaled the bike while King rode on the handlebars. They also agreed on the type of weapon that was used. [T.160] Each boy did name the other as the actual shooter, but in Scheff's experience it is "fairly common" for one codefendant in such situations to try to place the greater blame on the other. [T.162]

Scheff stated that Brown's mother was contacted and came to the office. [T.148] She was advised as to Tim's situation, but Tim did not want her present. [T.148] Scheff spoke to her at length, for one-half to one hour, and stated that if she did not see Tim it was because she did not ask to do so. He stated that "[h]ad she wanted to see him, I certainly would have allowed her to see him." [T.148]

In response to a question from the court, Scheff stated that Brown's mother came in because she wanted an explanation of what was happening, and because she did not want to hear that her son was arrested for killing a cop over the telephone. [T.166] She arrived at the station about 20 minutes after being called, and Scheff met with her. [T.167] She did not appear surprised but said

she had no knowledge of her son's involvement in the case, although he had been very troublesome in the past and she felt that the system had let her down in her attempt to raise him. [T.167] Scheff characterized her as a "very nice lady" [T.166], but reiterated that she and Tim did not want to see each other. [T.158]

Lastly, in response to another question by the court, Scheff stated again that Brown's name was coming up in conversations with independent witnesses. Therefore, even if Brown had not blurted out his involvement during his statement on November 15, the police "certainly" would have pursued other information from him, because he was making statements to other independent witnesses that he was involved in Behan's death. [T.168-69]

On redirect, Scheff reiterated that Bain's story that she had information on Behan's death went through a metamorphosis, in that she accused first Steven McGill, then Curtis McGill, and finally herself. Because of this, the more time Scheff spent with her, "the more [he] became convinced she was a very disturbed young woman." [T.154] He emphasized that at that early stage of the investigation, BSO had a total of about 50 leads on different people who were potential suspects in Behan's death, and they were all followed up because the police were not convinced by Brown's first statement that he was actually involved in the killing. [T.155-56] However, regardless of these many leads, Scheff would

have wanted to re-interview Brown after the first statement, because it was not really an interview. [T.156]

Detective James Carr was a detective in the BSO homicide division on the night of Behan's death. [T.241] He and Detective Thomasevich were assigned to work on the task force investigating the crime, along with approximately 80 other detectives. [T.242] On February 5, 1991, Carr and Thomasevich were advised that they would be taking control of the case as lead investigators. [T.242] Until that point in time, Carr had not personally spoken to any of the potential suspects in the case. [T.243-44]

When Carr and Thomasevich were assigned as lead detectives, they studied the case file for "for quite some time" to decide what leads they would pursue. [T.246-47] One piece of information they decided to look into was word from a Sergeant Allen of the Hollywood Police Department, who had telephoned to say that two juveniles in the halfway house were talking about information concerning a deputy's shooting. [T.248] On April 26, 1991, Carr met with one of those juveniles, Solomon Gibbs. [T.249] Gibbs told Carr about a conversation he had had with Brown about the shooting of the deputy. [T.249] Brown had also provided information regarding the involvement of a person named Keith, and the detectives originally thought that Gibbs was referring to Keith Maddox. [T.250] However, Gibbs took them to a foster home, where the foster

mother gave them the name of Keith King [T.250], and Gibbs subsequently positively identified Keith King in a photo line-up. [T.249, 251]

Carr was apprized by Scheff of the statement Brown had made on November 15, 1990, and was told to "keep an eye on" Brown. [T.251-52] At that point, Brown was still incarcerated [T.254}, and there were "numerous conversations" between Carr, Scheff, Thomasevich, other detectives, and the State Attorney's office about interviewing him then. [T.254] However, there continued to be concern about interviewing Brown while he was in juvenile custody.

Meanwhile, after Carr's meeting with Solomon Gibbs, other information began to come in "a snow ball effect." [T.255] Gibbs led the detectives to eight other people who had spoken to Brown either directly or indirectly, and to whom he had stated that he was involved in Behan's murder. [T.255] All of these names were developed from information provided by Solomon Gibbs, whose name had been provided by the Hollywood Police; none came from anything Brown had earlier said to Scheff. [T.256]

After learning from Gibbs that the Keith who might be involved in the case was Keith King and not Keith Maddox, the detectives placed King under arrest on June 4, 1991, and brought him in for questioning. [T.263] During that interview he gave a sworn, taped

63

confession, implicating both himself and Brown. [T.264-65] At that point they began to "keep an eye on" Brown, who was still in juvenile detention. [T.264-66]

On July 2, 1991, Carr was contacted by the State Attorney's Office and advised that Brown would soon be released from the Juvenile Detention Center, and that he would be going to a shelter home. [T.267] Brown's charges of armed robbery and burglary of a residence had been resolved by a plea, and he had been sentenced to six months in the Youth Detention Center, but because that facility was full he would be temporarily assigned to Covenant House. [T. 268] On July 16, 1991, in the early morning, Carr again was contacted by the State Attorney and told that Brown would be leaving the Juvenile Detention Center and going to Covenant House that day. [T.267-68] He and Thomasevich went to Covenant House, and after about 20 minutes watched Brown leave and followed him. [T.268]

Carr and Thomasevich followed Brown as he proceeded north on A1A. [T.271] Just prior to his reaching Sunrise Boulevard, Brown was placed under arrest for Behan's murder and put in the police vehicle. [T.272] Using his wallet rights card, Carr advised Brown of his rights, and Brown indicated that he understood each one. [T.272-74] Carr then requested that they not talk further at that time, and stated that everything would be explained when they

64

reached the station. [T.273-74]

When they arrived at the office at about 5 minutes before 7:00 in the evening, Brown was if he needed to use the restroom, and he did. [T.274]  He was asked if he wanted something to drink, and Carr got him a soda. [T.274-75] They went into the interview room, and, again using the juvenile rights waiver form, advised Brown of his rights, and watched as he signed the form. [T.275] Brown was handcuffed as he was arrested, but the handcuffs were removed as soon as they reached the office. [T.281] Brown was shackled with leg irons during questioning, not to the chair or to the floor but just with his feet together. [T.282-83] Carr explained that shackling as a safety precaution is a policy in his office, because on two occasions when officers left the interview room they had escapes. [T.282]

Carr and Thomasevich talked to Brown for about an hour before they taped their conversation. During that period they explained to Brown why he was there, and some of the pertinent information known to the police. [T.282] In the beginning, Brown denied his involvement, but after hearing some of the things the police knew, such as the fact that Keith King had given a statement and that the police had interviewed Solomon Gibbs, he admitted his involvement and gave a detailed account of the incident. [T.283] Everything that Brown said about the incident during the pre-interview

eventually was reiterated on tape. [T.284]

The tape of Brown's confession was transcribed into the record. [T.293 et seq.] In addition to the facts of the crime as described infra in this report, Brown confirmed that he had told people after the fact about his involvement in the crime, both on the street and in the detention center. [T.302] He also stated that on the night of his statement he had falsely blamed Keith Maddox for the crime because he and Maddox had had a falling out over a gun. [T.304-05] Maddox was accusing Brown of having stolen a gun, while in fact Maddox had bought the gun for Brown. Brown denied ever having told his mother or his stepmother about his involvement in Behan's death [T.308], and stated that he and Keith King had not see each other since the night of the crime and had never sat down and talked about the incident. [T.310] Near the conclusion of the statement, the following exchange occurred:

> Q. [by Thomasevich]: Now, you know, we're saying these things to you, Timmy and you keep saying yes sir, all right, but I want – I wanted to – you know, I want you to understand that we don't want to put words in your mouth, okay. Is that what had happened?
>
> A. [by Brown]: Yes, sir.
>
> Q. Okay, now the reason why we're repeating to you is because you told us this earlier, right?
>
> A. Yeah.

Q.   Before we went on tape?

A.   Yes. sir.

Q.   Okay, is there anything we're saying that is not true or not so?

A.   Everything true on this type [sic] here.

[T.306]

The statement concluded at 8:35 p.m. [T.310] From the time Brown was picked up until he concluded his statement, about two hours and 15 minutes elapsed. [T.311]

Carr was not part of the investigation that dealt with the corruption allegations by Jackie Bain. [T. 317] He spoke to her on some occasions because she began to call the station house and ask to speak to anyone, and after a while when he was available she began to ask for him. [T.312] When he took over the investigation he did not rule her out as a suspect, but after speaking with her and with other people, Carr "came to a determination that Jacqueline Bain was not in fact a suspect and did not have any pertinent facts whatsoever in this case." [T.313] For instance, information was published in the newspaper about the case that was common knowledge that Bain did not know. [T.314] Carr also received a call from a man who ran a pawn shop, telling him that Bain had called the shop trying to find out the difference between a .38 and a nine millimeter gun. [T.314] In Carr's opinion, Bain was "an individual ... that was just looking for attention." [T.314] For

67

that reason, he came to the same conclusion Scheff had earlier reached, that Bain was not involved in Behan's death. [T.314]

Carr stated that he "absolutely" did not attempt to cover up any police corruption that might relate to Behan's death. [T.316] No pressure was put on him to cover up or ignore any information in the course of the investigation. [T.316] He made no independent decision to cover up any information or focus the investigation on Brown, and in fact "[o]n the contrary, sir. If Jacqueline Bain would have been a viable suspect in this case, if that was the case it would have been very easy because she [w]as an individual that would confess on a daily basis." [T.317] Carr also stated that there "absolutely" was no pressure from the police administrators or the Behan family to make a quick arrest, " ... this was over an 8-month investigation. There was no pressure of any kind."

On cross examination of Carr, defense counsel returned to the question of Jackie Bain's statement that "McGill had killed a police officer because he was jealous of her involvement with some of the deputies. [T.331] When Carr and Thomasevich went to Avon Park Correctional Institution to interview Curtis McGill, he said that he knew Jackie Bain because she worked at the Circle K, but denied any additional relationship. [T.323-24] During the interview with McGill, no taped statement was taken, and while there might have been written notes, they later were thrown away. [T.338-39] At

68

that point, McGill was not a suspect in Carr's mind. [T.339]

Carr stated that Andre Brown's assertion to the grand jury that he was pressured to name Brown as a suspect was "totally false." [T.359-60]

Carr reiterated on cross examination that Brown was placed under arrest before he was placed in the police car. He was handcuffed behind his back while being transported to the police station. During questioning his legs were shackled together, but were not attached either to the floor or the chair. [T.362-63]

When Carr came out of the interrogation room, Brown's mother was in Scheff's office talking to him. [T.363-65]

During the hour that Carr and Thomasevich spoke to Brown off the record, Brown continued to deny his involvement in Behan's murder for 20 to 25 minutes. [T.366] At that point Brown was shackled. [T.366] The statement that Brown had given in November, 1990, was mentioned, but the gist of the conversation was the information the police had obtained from Solomon Gibbs and other sources. [T.367]

Carr disagreed with Scheff's statement that if Brown had not confessed the second time he would not have been arrested. [T.370]

69

Carr stated that Brown "was placed under arrest that day. It was my decision as lead investigator, and I had enough probable cause, more than enough probable cause in my opinion to make the arrest, and that's exactly what I did." [T.370]

Defective Eli Thomasevich was partnered with Carr at the time they investigate Behan's death. [T.375] he was present when Brown was arrested and gave both his unrecorded and his recorded statements. [T.375] Thomasevich stated that during the course of the investigation, there was never any pressure from the department or its administration to arrest Brown, or to ignore other evidence or leads. [T.375] He also denied that any such pressure came from the family. [T.375]

Thomasevich stated that he found Brown to be of average intelligence. Brown gave the detectives no resistance, and Thomasevich recalled Brown being in shackles during questioning. [T.403]

At the conclusion of the suppression hearing, both counsel were permitted to make closing arguments. [T.404 et seq.] Defense counsel stressed the theory that the police had focused on Brown as their prime suspect to deflect attention from the revelations of police misconduct that had ensued from the information provided by Jackie Bain. In fact, according to the defense view, the killers

were likely to have been Bain's lover Curtis McGill and Kevin Duhart, the individual who stole the cigarettes that resulted in Behan's presence at the scene. In this scenario, Behan was killed accidentally, because the intended target was Deputy Richmond, and the motive was his sexual involvement with Bain. [T.410]

Defense counsel argued that the police waited to question Brown a second time until he was released from juvenile detention solely because "they wanted to wait until they could make sure that they could talk to these 15-year-old kids [sic] at that time without a lawyer there. That was there [sic] whole rational [sic] for not going and speaking to him. It didn't have anything to do with anything other than the fact that they wanted an opportunity to violate his rights." [T.405]

Defense counsel also argued that there was much inconsistency in the testimony of the police officers regarding the involvement of Jackie Bain and her connection with the police misconduct that occurred at the Circle K store where Behan died, and that because of these discrepancies "obviously they're not telling the truth as far as the information they had." [T.407] The court questioned counsel about his use of the term "coverup" and asked what the reason for it was, and counsel responded that "what comes out is there's all this wrongdoing going on at the Sheriff's Office, and the fact of the matter is they go after this lead from the

71

beginning because they had Jackie Bain as a prime suspect in this case ... and then they end up taking some woman who has never been Baker Acted before and they sent her in a mental hospital wiping their hands." [T.407-08]

Defense counsel continued to detail discrepancies in the officers' testimony, arguing that "the cream of the Sheriff's Office homicide detectives" would have been better able to trace the individuals involved in the Bain scenario, and that "the fact of the matter is that that testimony in regard to the work done by the Sheriff's Office on McGill and Duhart is just not credible." [T.409]

Defense counsel stressed to the court that Brown was placed under arrest and placed in the police car, and then taken to the station house, where he was put in the interview room in shackles. [T.415] Carr admitted that they talked to Brown about the information they had about him, including his own statement from November, 1990. "And that at that point they go ahead and talk to him for about an hour and twenty minutes, and they take pictures that they show to him, and they have him in there in shackles. They lie about whether his mother was there, or if she was called and came and didn't want to see him, and then they say they put him on tape and he gives his statement."

Counsel argued that Brown's second statement was tainted and fruit of the poisonous tree, because the police used the first statement to coerce Brown to make the second statement. [T.415-16] He further argued that Brown has a low IQ and is "easily coercible" [T.416-17], and that the police testimony was inconsistent and not credible. [T.417] Based on those considerations, counsel urged the court to suppress both of Brown's statements.

The prosecutor countered by arguing that the testimony about alleged police misconduct had nothing to do with the issues of whether Brown's statements were voluntary. [T.418] Instead, that determination turned on whether the evidence showed that the conduct of the law enforcement officers involved created pressure on Brown, and the extent to which Brown was capable of resisting any pressure if it did exist. [T.420-21]

Citing <u>Colorado v. Connally</u>, <u>supra</u>, the prosecutor stressed that the element of official police coercion is necessary for a statement to be suppressed. [T.423] The prosecutor urged the court to find that there was no evidence to support a finding that any official misconduct was involved in obtaining Brown's second statement. [T.429-30] He also argued that any taint that might otherwise have attached to the second statement was dissipated by the facts that: 1) eight months intervened between the two statements, 2) independent sources and evidence were developed

73

during that period, and 3) the police misconduct involving the first statement was only "technical" and not flagrant. [T.432-33]

The court questioned the prosecutor as to whether Dr. Koprowski had testified that Brown wanted his mother to be present during questioning. [T.422] The prosecutor responded that the doctor said that Brown "would have wanted his mother present, if he clearly understood what was going on he would have wanted his mother present. She did not say he wanted her present." [Id.]

On rebuttal, the petitioner's lawyer then cited several Supreme Court and other federal cases in support of his argument. [T.433-35] He also took issue with the prosecutor's recollection of the testimony as to whether Brown wanted his mother present, and that the doctor had said that Brown told her he had wished his mother was there. [T.439]

At the conclusion of the arguments, the court made the following ruling:

> As I look over this case I see that the initial statement made by the Defendant on November 15th is more troublesome to this Court that appears to be to [prosecutor] Mr. Morton. And as far as this, as far as this motion [to suppress] pertains to the statement by Mr. Brown on November 15th is concerned the Court will grant that motion.

Now we go on to the statement made on July 16.<sup>th</sup>

\*   \*   \*

There has to be some independent way that the police will make it back to Mr. Brown on that date. Other than [sic] that particular statement made on November 15th. Some of the things that I thought were significant were such as the fact that the police allowed Mr. Brown to be free at one point to go into the system here, and be let out again. As a matter of fact, I think it happened a couple times once at least without their knowing, and I find it very difficult to believe that if they really had him as a suspect based upon that first statement, that he would have had such an opportunity. I think there are, however, some problems perhaps for the State regarding the overall facts, and perhaps there will be some difficulty before the jury regarding certain matters such as Mr. McGill and the lack of pursuing Mr. McGill is troublesome to the Court.

What I have to determine in my own mind is does it effect [sic] this particular motion, and I've come to the conclusion that it does not. I find that the intelligence of the Defendant being certainly a consideration for the Court as are a number of things ... I'm looking at cases here such as Stokes where I'm concerned about the parent going to the police station and not having the opportunity to be with the defendant. I failed to find that particular fact in this case that would conform to, or have this Court conform to the ruling in Stokes versus State.

\*   \*   \*

75

It appears clear that in the first statement he was intoxicated and I see nothing in the statement that drugs were mentioned in Brewer. I see nothing in the second statement that shows signs of that at all. I believe that the defendant freely and voluntary [sic] and knowingly and intelligently waived his rights in the second statement, and as such this Court would rule that the motion in regards to the July statement be denied.

To sum it up as far as the two statements are concerned, the Defendant's motion regarding the first statement is granted. The defendant's motion as it regards the second statement is denied.

[T.441-43]

The petitioner argues in his memorandum of fact and law on the issue of exhaustion [DE 79] that an evidentiary hearing is required as to both the voluntariness and the lawfulness of his confession, in part because the trial court failed to make explicit subsidiary findings of fact relevant to the merits of those claims. [Id. at 11-12] AS stated earlier, this overlooks the fact that the traditional statutory presumption of correctness accorded in §2254 proceedings to state court determinations of fact is applicable to implicit as well as explicit factual determinations. Marshall v. Loneberger, 459 U.S. 422 (1983); Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991).

Where a state court makes no express findings, a federal habeas court is entitled to "reconstruct the findings of the state

76

trier of fact, *either because* [the state trial judge's] view of the facts is plain from his opinion or because of other indicia." <u>Townsend v. Sain</u>, 372 U.S. 293, 314 (1963), <u>overruled on other grounds</u>, <u>Keeney v. Tamayo-Reyes</u>, 112 S.Ct. 1715 (1992); <u>see also</u> <u>Fike v. James</u>, 833 F.2d 1503 (11 Cir. 1987). For example, if it is clear that the trial court would have granted relief sought by the petitioner had it believed the testimony of certain witnesses, "its failure to grant relief was tantamount to an express finding against the credibility of [those witnesses]." <u>Marshall v. Loneberger</u>, <u>supra</u> at 433, <u>citing</u> <u>LaVallee v. Delle Rose</u>, 410 U.S. 690 (1973); <u>see also</u> <u>Tejada v. Singletary</u>, 941 F.2d 1551, 1563 (11 Cir.), <u>cert.</u> <u>denied</u>, 112 S.Ct. 1199 (1992).

In the amended petition, Brown argues that the "totality of the circumstances" demonstrate that his confession was coerced both physically and psychologically. [DE 70 at 58] He enumerates the circumstances that he believes require that conclusion, including: his young age, his low IQ and passive-compliant personality, his mother's absence during his questioning, the use of leg shackles, and his history as a battered child.

However, as described both above and in the following section of this report, all of these circumstances in fact were argued extensively at the suppression hearing, and were considered by the trial court in arriving at its decision to admit Brown's second

statement into evidence.  It is not the province of a federal court sitting in habeas corpus review to revisit such factual determinations.  Instead, the presumption that such factual determinations were correct must be applied if the petitioner received a full and fair hearing, and the findings are not patently erroneous or otherwise deficient pursuant to the factors listed at 28 U.S.C. §2254(d).  Miller v. Fenton, 474 U.S. 104 (1985).  It is clear on this record that Brown received a full and fair hearing in the state forum on his claim that his second statement was coerced and involuntary, and the explicit and implicit factual findings reached by the trial court at the conclusion of that review are not patently erroneous.  Those findings lead to the conclusion that Brown's confession was voluntary, and that he is not entitled to habeas corpus relief on his second claim.  Lindsey v. Smith, 820 F.2d 1137 (11 Cir. 1987).

## C. Claim Three: Lawfulness of the confession

In the third claim of the amended petition, Brown argues that his confession was unlawful because his waiver of his Fifth and Sixth Amendment rights was not knowing and intelligent.  Were the court to reach the merits of this claim, Brown would be entitled to no relief.

As the Supreme Court in Moran, supra, stated:

78

> [A] waiver must have been made with a full
> awareness both of the nature of the right
> being abandoned and the consequences of the
> decision to abandon it. Only if 'the totality
> of the circumstances surrounding the inter-
> rogation' reveal both an uncoerced choice and
> the requisite level of comprehension may a
> court properly conclude that the <u>Miranda</u>
> rights have been waived.

475 U.S. at 421. The standard used to assess the validity of a

defendant's waiver of his <u>Miranda</u> rights is the test first artic-

ulated in <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938):

> A waiver is ordinarily an intentional relin-
> quishment or abandonment of a known right or
> privilege. The determination of whether there
> has been an intelligent waiver...must depend,
> in each case, upon the particular facts and
> circumstances surrounding that case, including
> the background, experience, and conduct of the
> accused.

<u>North Carolina v. Butler</u>, 441 U.S. 369 (1979).

     In order to effect an intelligent waiver, a defendant need not

understand all of the complexities of his Fifth Amendment rights

and the implication of his decision to waive them. What is consti-

tutionally required is that he understand only the core of the

Fifth Amendment guarantee. <u>Smith v. Zant</u>, <u>supra</u> at 1430. In

determining whether a rights waiver is valid, a court need only

inquire into whether the defendant understood that he had a right "not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time" and that "whatever he chooses to say may be used as evidence against him." <u>Colorado v. Spring</u>, 479 U.S. 564 (1986); <u>Smith v. Zant</u>, <u>supra</u> at 1430. Some authorities hold that a state court determination that a defendant's waiver of his <u>Miranda</u> rights was knowing and intelligent is a subsidiary question to which the §2254(d) presumption of correctness applies. See, <u>e.g.</u>, <u>Derrick v. Peterson</u>, 924 F.2d 813 (9 Cir. 1991).

The test of admissibility of a confession in the context of coercive circumstances has been variously stated, but essentially is that a confession must be the product of rational intellect and free will rather than being induced by conduct of state officials which might overbear the defendant's will to resist, thus constituting coercion. <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225 (1973); <u>Townsand v. Sain</u>, 372 U.S. 293 (1963); <u>Lynumn v. State of Illinois</u>, 372 U.S. 528 (1963); <u>Rogers v. Richmond</u>, 365 U.S. 534 (1961); <u>Brown v. Mississippi</u>, 297 U.S. 278 (1936).

In determining whether a defendant's will has been overborne,

80

the Court must consider the totality of all surrounding circum-stances, including both the characteristics of the accused and the details of the interrogation. _Schneckloth v. Bustamonte_, _supra_ at 226. As stated by the Supreme Court in _Schneckloth_, _Id._:

> Some of the factors taken into account have included the youth of the accused, _e.g._, _Haley v. Ohio_, 332 U.S. 596; his lack of education, _e.g._, _Payne v. Arkansas_, 356 U.S. 560; or his low intelligence, _e.g._, _Fikes v. Alabama_, 352 U.S. 191; the lack of any advice to the accused of his constitutional rights, _e.g._, _Davis v. North Carolina_, 384 U.S. 737; the length of detention, _e.g._, _Chambers v. Florida_, _supra_; the repeated and prolonged nature of the questioning, _e.g._, _Ashcraft v. Tennessee_, 322 U.S. 143; and the use of physical punishment such as the deprivation of food or sleep, _e.g._, _Reck v. Pate_, 367 U.S. 433. In all of these cases, the Court deter-mined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. _Culombe v. Connecticut_, [367 U.S. 568, 603]. (footnote omitted).

As with adult statements, the admissibility of a juvenile confession depends upon the totality of the circumstances under which it was made. _Gallegos v. Colorado_, 370 U.S. 49 (1962).

In this case, clinical psychologist Elizabeth Koprowski testified at the suppression hearing that she performed an evaluation of Brown. [T.180] She reviewed Brown's records from two

81

different middle schools after performing her own evaluation of him. [T.181] They revealed that Brown was retained several times and finally promoted to the sixth grade in a "administrative promotion." [T.181] Dr. Koprowski was unsure how many times Brown was held back, but knew that he was still in the fifth grade when he was 13. [T.182] Her review of Brown's school records showed that his performance was consistently poor, his attendance was not good, and he was not motivated as a student. [T.183] School officials "did keep writing to the mother who was involved with him and interested apparently" that Brown was not completing his work and not participating. Dr. Koprowski characterized Brown as a "very passive student." [T.182]

Dr. Koprowski stated that Brown's group IQ tests had shown his verbal IQ was 58, the quantitative was 58, and the non-verbal was 54. She said that these results were "very consistent" with the individual IQ tests that she administered to Brown. [T.182] Such an IQ level is classified as mild mental retardation. [T.183] It indicated that Brown "can be taught" but needs special help, and he has a minimal level of reading and writing capability, at about the third grade level. [T.188]

Dr. Koprowski spent a total of 5 hours and 45 minutes with Brown over the course of several visits. [T.183] In addition to IQ tests, she administered a psychological test commonly used by the

82

schools system for special education purposes [T.184-85] It revealed that Brown was not psychotic or cognitively disorganized, and that he showed no sign of major mental illness. [T.185]

Dr. Koprowski described various other tests she administered to Brown. [T.188-90] When asked if Brown psychologically and intellectually would have had the ability to understand his legal rights, she responded, "only in a very, very basic way." [T.190] She believed that he did not fully understand that he could have had an attorney present during questioning, but "[h]e stated that he wished he had his mother present though." [T.191]

When defense counsel asked if Brown could be easily led by authority figures such as the police, Dr. Koprowski responded, "Yes, I think he could be easily led by almost anybody, including his peers." [T.191] She noted that most of Brown's responses during his questioning consisted only of "yes, sir" [T.191-92], and she characterized him as a "passive compliant" person. [T.193] When defense counsel asked if Brown were shackled in an interview room and questioned for an hour and twenty minutes and shown pictures relating to the case, Dr. Koprowski stated that " ... I think you could certainly twist words and get him to agree to anything within the point." [T.193]

On cross examination Dr. Koprowski stated that she had

83

determined that Brown was competent to stand trial, and that he realized that he was on trial for a serious offense and understood the potential consequences. [T.194] She also determined that Brown knows the difference between right and wrong. [T.195]

Dr. Koprowski stated that individuals with intellectual deficits are still able to understand the basic concepts needed to function in society, as well as show adequate social behavior and perform certain intellectual functions. [T.198-99]

The doctor stated that she had learned that Brown was raised by the woman who was married to his father rather than by his biological mother. He had several siblings. [T.199] Brown had a "good relationship" with his stepmother [T.199], with whom he lived, and his stepmother told the doctor that they got along well. He was "spoiled" by his mother and had "everything he wanted" in terms of clothes and other possession. [T.205] However, his relationship with his father was "very brutal;" the father was "very violent" and would beat Brown, his mother and his siblings. [T.205-06] Brown's father eventually was shot and killed by his common-law wife because he was abusive to her. [T.237-38]

Brown told the doctor that he didn't stay home too much because he liked to "hang out" with his friends on the street or at the beach. [T.203] He felt he was popular and he had a girlfriend.

84

[T.205] He also began to use alcohol and marijuana, and he tried using cocaine but stopped after a week because he didn't like the way it made him feel. [T.205]

Brown then "began to get into juvenile trouble for which he was in and out of the detention center." [T.205, 224] Dr. Koprowski acknowledged that Brown had been in the court system before and had been represented by attorneys before. [T.230] She stated that Brown knew what a lawyer was understood "in a very basic way" what a lawyer could do for him, "that the lawyer was on his side." [T.231]

The prosecutor undertook a detailed examination of Brown's school records with the doctor, beginning in the second grade. [T.205 et seq.] It revealed that Brown received average and in some instances above average grades in various subjects. In addition, Dr. Koprowski testified that Brown answered 56 out of 67 questions correctly on a 1986 statewide assessment test. [T.220-22]

The doctor stated on cross examination that Brown's low IQ in and of itself would not prevent him from understanding what an attorney is, nor did it mean that he would not understand his right to speak to his mother. [T.228] The doctor agreed with the prosecutor's statement that a determination of whether Brown understood his legal rights would depend on the totality of the circumstances, not just on his IQ score. [T.229]

On redirect, when asked if her testimony that Brown is easily led and can be coerced meant that he wouldn't know what as attorney was, Dr. Koprowski clarified her opinion:

> No, no, he does understand those things. I think it is totally misrepresenting his level of ability to say that he wouldn't know what an attorney is or wouldn't know right or wrong or any of those issues. He had been questioned by attorneys, by police before, and I think he felt that this was, if I said what they wanted him to say and I am not speaking to the variety [sic][10] of it, just his attitude, that if he said what they wanted him to say, it would be over and he would be going on as he had before.

> [T.240-41]

As to Brown's signing of the rights waiver form itself, Detective Carr testified that he read the rights to Brown, and Brown was given a pen and answered each question in the space provided. [T.277-79] Carr stated that Brown did not appear to be intoxicated in any way. He appeared to understand what was being said to him, and "[h]e was very clear with his speech and very precise with his answers." [T.280] Carr testified that no one made any promises or threats to Brown to induce him to make a statement, and at no time did Brown request the presence of an attorney. [T.280-81] Brown never asked any questions about any of his rights, and never requested any clarification. [T.368]

---

[10]In context, it appears that the doctor may have said or may have meant to say "veracity" rather than "variety."

86

Brown did not testify at the suppression hearing or at trial. However, on the taped statement that he gave to Detectives Carr and Thomasevich, he stated for the record that he was comfortable, he understood that he was speaking to deputy sheriffs, that he had been treated right and given cigarettes, water, and an opportunity to use the bathroom, and that he had not been threatened. [T.288] Brown stated that he was not attending school at that time but had finished the eighth grade, and he acknowledged that the police had tried to contact his parents. [T.289] In response to the question of to whether he wanted his parents to be present, Brown wrote, "No." [T.289][11] He also again verified that he understood each of his legal rights. [T.289-92] Brown was then placed under oath [T.292], and recounted to the detectives his recollection of "pulling" Keith King on the handlebars of his bicycle to the Circle K, where Behan was killed.

At the conclusion of the suppression hearing, the court acknowledged that in assessing the totality of the circumstances concerning the admissibility of Brown's confession, his intelligence was "certainly relevant." However, the court went on to hold:

Although as you mentioned, Counsel, the

---

[11]It will be recalled that the trial court found as fact at the conclusion of the suppression hearing that Brown's mother was not denied the opportunity to be with her son at the police station. [T.442]

87

> State did not impeach the doctor, the
> fact is that I think much of what she
> said led the Court to believe that this
> defendant had the mental capacity to
> understand the Miranda warnings that were
> given to him, and much of what he did not
> do well in school may have in fact been
> brought about by his not attending.
>
>                   *    *    *
>
> It appears clear that in the first
> statement [Brown ] was intoxicated ... I
> see nothing in the second statement that
> shows signs of that at all. I believe
> that the defendant freely and voluntary
> [sic] and knowingly and intelligently
> waived his rights in the second statement
> . . . .
>
>                                   [T.443]

As described in the earlier section of this report dealing
with the exhaustion requirement, the admission of Brown's second
statement was challenged and affirmed without opinion on his direct
appeal.

In assessing whether a defendant has the requisite level of
comprehension intelligently to waive his rights, the "totality of
the circumstances" surrounding his interrogation are to be
considered. Moran v. Burbine, supra. Relevant to such an inquiry
are the background, experience and conduct of the accused. Johnson
v. Zerbst, supra. It is apparent from the transcript of the
suppression hearing that the trial court appropriately considered

88

each of these factors in deciding to admit Brown's second statement at trial.

At the outset of his interrogation, as described above, Brown signed a written waiver of his <u>Miranda</u> rights.   Courts recognize that "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but it is not inevitably either necessary or sufficient to establish waiver."   <u>North Carolina v. Butler</u>, <u>supra</u> at 373; <u>see also</u>, <u>United States v. White</u>, 451 F.2d 696, 700 (5 Cir.), <u>cert. denied</u>, 405 U.S. 998 (1972).   On the tape of the ensuing statement, Detective Carr read the rights waiver form aloud to him.

These and other circumstances require deference to the trial court's conclusion that Brown's  execution of the written waiver form was an informed choice.   It is undisputed that Detective Carr read the waiver provisions aloud to Brown as he followed along on the printed form.   Therefore, even if the petitioner's reading skills did not allow him to understand some of the written words, he would have heard them pronounced simultaneously by Detective Carr.   Since Brown indicated his understanding of each provision after hearing it recited aloud, his written waiver was valid.   <u>See</u> <u>United States v. March</u>, 999 F.2d 456 (10 Cir. 1993) (where uncontradicted testimony indicated that officers recited provisions

89

of waiver form aloud to defendant and defendant stated that he understood them and signed the form, waiver was informed and voluntary); United States v. White, supra at 700 (holding Miranda waiver valid where rights read aloud to defendant despite his below-average IQ, fifth-grade education, and poor reading ability). Therefore, although not solely determinative of the ultimate question of whether Brown's confession was constitutionally valid, his execution of the written rights waiver is at least one among the "totality of circumstances" which bear upon its resolution.

Another factor which courts consider relevant in determining whether a waiver of constitutional rights is valid is the extent of a defendant's prior experience with the criminal justice system. Fare v. Michael C., supra at 725; United States v. Gaddy, 894 F.2d 1307, 1312 (11 Cir. 1990); Smith v. Zant, supra at 1434. In this case, testimony revealed that Brown had been involved with the justice system on prior occasions, had spent time in juvenile detention, and in fact had been released to Covenant House from incarceration for armed robbery and burglary immediately prior to giving his statement in this case. Clearly, Brown was no novice regarding criminal proceedings, and his background and experience indicate that, as Dr. Koprowski acknowledged, he had at least a basic understanding of his right to have an attorney present during questioning.

90

A waiver is valid if a defendant understood the primary concepts that he need not talk to the police, could elect to talk only with counsel present, could discontinue talking at any time, and that anything he chose to say might be used as evidence against him. Colorado v. Spring, supra. Brown has failed to demonstrate that the trial court's finding that he understood these principles is not deserving of deference, and he is not entitled to relief on his third claim.

## V. Evidentiary Hearing

An evidentiary hearing originally was scheduled in this case. The necessity for such a hearing was obviated when Brown amended his petition to include multiple unexhausted claims, which as explained above require the dismissal of this petition for lack of full exhaustion of state court remedies. The hearing accordingly was canceled. [DE 93] It should be noted, however, that even if Brown were to abandon his unexhausted claims, an evidentiary hearing still would not be necessary in this case.

Both parties have agreed that a claim of insufficiency of the evidence to sustain the conviction is properly adjudicated on the record developed in the state forum. That leaves as the subject for a possible evidentiary hearing only Brown's claims that his confession was not voluntarily and lawfully made. However, as has

91

been discussed in detail, those two claims were the subject of a lengthy and detailed suppression hearing in the state court, and the admission of the confession was challenged on both voluntariness and lawfulness grounds on direct appeal.

The fact that the state court conducted a thorough evidentiary hearing on the issues regarding the confession became known to this Court only when the transcript of that hearing was belatedly filed in this proceeding, obviating the need for a federal evidentiary hearing.

It is settled that once a defendant receives a hearing in state court on an issue, that claim can be the subject of an evidentiary hearing in a federal habeas corpus proceeding only if he can show cause for his failure fully to develop the facts at the state level and actual prejudice resulting from that failure. Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992). Brown's argument that a evidentiary hearing is required in this case [DE 79] is flawed in two respects. First, as explained above, Brown's belief that this court need not defer to the trial court's factual findings because there were no express rulings on certain points is erroneous. Since the §2254 presumption of correctness applies to implicit as well as explicit factual determinations, Marshall v. Loneberger, supra, the trial court's omission of explicit rulings on issues that were fully litigated at the suppression hearing is not

controlling. For example, as can be seen from the foregoing summaries of the suppression hearing and trial testimony, issues such as whether Brown asked that his mother be present during questioning, whether he was shackled, and whether Brown was told that Keith King had already implicated him in Behan's murder [DE 79 at 13], were explored fully at that proceeding. By holding that Brown's confession was knowing, intelligent and voluntary, the trial court implicitly rejected Brown's version of these events, and that rejection is "tantamount to an express finding" and presumptively correct in this federal proceeding. Marshall v. Loneberger, supra at 433.

To the extent that Brown argues that the pertinent facts were not fully developed at the suppression hearing, at this juncture Brown cannot make the requisite showing of cause and prejudice to entitle him to a federal evidentiary hearing, Keeney v. Tamayo-Reyes, supra, because his asserted cause for the failure to fully develop those claims at the state evidentiary hearing was his lawyer's assertedly ineffective assistance, which in itself is an unexhausted claim which is not yet federally cognizable. Murray v. Carrier, supra.

## VI. Recommendation

For the foregoing reasons, it is recommended that this amended petition for writ of habeas corpus be dismissed for lack of

93

exhaustion of state court remedies. In the event that the petitioner elects to dismiss his presently unexhausted claims, it is recommended that the amended petition be denied on the merits of claims one, two and three.

Objections to this report may be filed with the District Judge within thirty days of receipt of a copy of the report.

Dated: October 14, 1999

Charles H. Seraphin

UNITED STATES MAGISTRATE JUDGE

cc: Brenda Bryn, AFPD
    Timothy Day, AFPD
    Federal Public Defender
    101 N.E. 3rd Avenue
    Suite 202
    Ft. Lauderdale, FL 33301


    Celia Terenzio, AAG
    Leslie Campbell. AAG
    Department of Legal Affairs
    1655 Palm Beach Lakes Blvd., #300
    West Palm Beach, FL 33401-2299

94