IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

95-7207-CIV-GRAHAM

TIMOTHY BROWN,                    :

       Petitioner,              :

                                  :

vs.                              :

MICHAEL W. MOORE,                :

       Respondent.              :

_____/



---

**TIMOTHY BROWN'S AMENDED CLOSING ARGUMENT ON THE
ISSUE OF THE UNCONSTITUTIONALITY OF HIS CONVICTION**

---

KATHLEEN M. WILLIAMS
Federal Public Defender

BRENDA G. BRYN
TIMOTHY M. DAY
Assistant Federal Public Defenders
Attorneys for Timothy Brown
Florida Bar Nos. 0708224, 360325
One East Broward Boulevard, Suite 1100
Ft. Lauderdale, Florida 33301
Tel. (954) 356-7436/7556



# CONTENTS

OVERVIEW: THE ANATOMY OF A TRAGEDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ACT I.  THE INTERROGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Ground 1:  Brown's Unknowing and Unintelligent Waiver of His *Miranda* Rights on July 13, 1990 (Ground C of the Amended Petition/Ground B of the Third Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A. Governing Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        (1).  What deference is due the state court determination on the "knowing and intelligent" waiver issue? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        (2). The legal standard for determining whether a *Miranda* rights waiver was "knowing and intelligent." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.  Brown Did Not Understand Any of His Core *Miranda* Rights at the Time that he Signed BSO's Juvenile *Miranda* Waiver Form . . . . . . . . . . . . 14

        (1). Neither the fact that Brown signed the *Miranda* form, nor his answers to specific questions on the form about understanding various rights, is probative of his actual understanding of his rights – under the totality of the circumstances here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        (2). On July 16, 1991, Brown could not read – and did not read – the *Miranda* form himself.  Detective Carr's claim to the contrary, that Brown read the form out loud, is not credible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        (3). As a 15-year old with a mental age of 7 or 8, Brown would NOT have the mental "capacity" to understand his *Miranda* rights as they were given to him – that is, with only a perfunctory reading of those rights from the juvenile *Miranda* waiver form . . . . . . . . . . . . . . . . . . . . 21

(4). Brown's prior juvenile arrests and experience with the juvenile justice system, are irrelevant to the issue here, given that the *Miranda* rights were not carefully explained to Brown on July 16, 1991 – the form was merely read. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

(5). Dr. Kaprowski was clear, and the other evidence shows, that Brown did NOT understand that he had a right not to talk to the police at all (his Fifth Amendment privilege against self-incrimination.) . . . . . . . . . . . . . . . . 34

(6). Dr. Kaprowski was clear, and the other evidence shows, that Brown did NOT understand that he had a right to consult with a lawyer prior to the interrogation, and to talk only with counsel present during the interrogation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

(7). Dr. Kaprowski was clear, and the other evidence shows, that Brown did NOT understand that he had a right to discontinue talking at any time. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

C.  Brown Did Not Understand the Consequences of Waiving his Rights, Despite Having Signed the Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

(1). BSO's Juvenile Rights Waiver form itself did not convey the warning about the consequences of waiver in "clear and unequivocal terms." Rather, contrary to the *Miranda* decision itself, the form  deceptively informed Brown that anything he might say would be used in court "EITHER FOR OR AGAINST [HIM]"
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

(2). Even if the form could somehow pass constitutional muster, Brown was only 15 with an IQ of 56 and a mental age of 7 or 8, and therefore did not have the mental skills to comprehend on his own, from the mere reading of this form, the future consequences of waiving his rights, and giving a statement to the detectives, without a lawyer – that whatever he said would be used against him in court . . . . . . . . . . . . . . 40

iii

(3) Dr. Kaprowski was clear, and the other evidence shows, that Brown did not understand the consequences of waiving his rights, and making a statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

D.   The Flexible Legal Standard for This Court's *De Novo* Determination – The "Totality of the Circumstances" . . . . . . . . . . . . . . . . . . . . 42

**Ground 2. The Coercion and Involuntariness of Brown's Taped Statement (Ground B of the Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

A.  Governing Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

(1). What deference is due the state court's "findings" on the voluntariness issue? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

(2).   The   legal   standard   for   determining "voluntariness" of a statement or confession . . . . . . . . . . . . . . . . . . . . . 46

B.  The "Totality" of Circumstances Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

(1).  Tim Brown was only 15 years old at the time of his July 16, 1991 arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

(2).  Brown had an I.Q. of only 56, and a mental age of 7 or 8.  He was childlike, passive compliant, and highly suggestible. Indeed, BSO knew that something was "not right" with Brown, from their prior encounter with him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

(3). BSO calculated the timing of Brown's arrest, and the manner in which the BSO placed him under arrest, to maximize Brown's fear and helplessness. . . . . . . . . . . . . . . . . . . . . . 52

(4). BSO created a coercive environment in the small interrogation room – by overpowering Brown in number, by shackling his legs, and *denying* him food . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

(5). BSO refused to permit Brown to speak with his mother before he waived his rights, or at any time before he made his taped statement – in clear violation of Florida law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

(6) Carr and Thomasevich refused to accept Tim's denials, and start to wear him down . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

(7) Carr and Thomasevich hammered on the fact that Keith King had already implicated Brown, although they knew that much of what King had said was false . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

(8) Carr and Thomasevich also reminded Tim that he had confessed before in his un-*Mirandized*, November 1990 statement (which had been deemed false at the time) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

(9) The ultimate coercive acts: Carr and Thomasevich threaten Tim with the electric chair, and then finally, there is a slap – and Tim cracks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

(a) Tim Brown's account – Why it is credible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

(b) Why Carr and Thomasevich's denials on this issue are not to be believed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

(i) The intake records – why they prove nothing. . . . . . . 77

(ii) The testimony of Det. Ilaraza – Why it is not persuasive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

(iii) The high profile nature of the case, the pressure that it generated and continues to generate, and the motive to testify falsely . . . . . . . . . . . . . . . . . . . . . . . . . 83

(iv) The inconsistencies with regard to showing Tim the photographs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

(v) Providing the facts to Brown – The relevance of John Wood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

(vi) The tale of the drawing on the "white piece of paper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

v

(vii) The matter of Eddie Lopez – suppression of evidence, false swearing under oath, and inconsistent testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

(viii) Demeanor on the stand and other credibility considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

(ix) The failure to tape record the "pre-interview" . . . . 130

(10). Understanding how and why Tim Brown caved in – when he caved in: The battered child syndrome, and Tim's extreme susceptibility to the detectives' coercive tactics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

(a) Brown was a severely battered child . . . . . . . . . . . . . . . . . . 134

(b) The post-traumatic stress disorder brought on by years of abuse . . . . . . . . . . . . . . . . . . . . . . . . . 136

(c) Susceptibility to – and caving in to – coercive tactics . . . . . 138

ACT II. THE SUPPRESSION HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

**Ground 3. Ineffectiveness of Trial Counsel in Failing to Properly Investigate and Litigate the Motion to Suppress** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

A. The Legal Standard for Determining Ineffective Assistance of Counsel Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

B. The Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

(1). Failure to document the slap during the interrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

(2). Even without photographs, failure to argue – and present evidence – of a slap, given that Tim specifically told Davis he had been slapped . . . . . . . . . . . . . . . . . . . . 144

(3). Failure to argue in the motion to suppress, that Tim had been threatened with the electric chair . . . . . . . . . . . . . . . . . . 145

vi

(4). Failure to investigate – or argue in the motion to suppress – Tim Brown's history of abuse, and the effect of that abuse upon the voluntariness of his confession; failure to elicit any testimony in this regard at the suppression hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

(5). Failure to investigate Tim's medical records from the Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

(6). Failure to make important connections between the IQ test, and Tim's ability to think critically and to make any kind of intelligent judgment or choice necessary to make a valid waiver of his rights . . . . . . . . . . . . . . . . . . . . 150

(7). Failure to present Mrs. Brown's testimony at the suppression hearing on the issue of when she was contacted, to counter the testimony of Sgt. Scheff . . . . . . . . . . . . . . . . . 151

ACT III. THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

**Ground 4. Ineffectiveness of Trial Counsel in Asking the Court to Instruct the Jury Venire that Brown was Facing a Life Sentence With a Minimum Mandatory of 25 Years, After Which He Would Be Eligible for Parole – When Indeed, Brown was Facing Mandatory Life Without Parole (Ground I of the Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

**Ground 5. The State Trial Court's Violation of Brown's Right to Due Process of Law, by Erroneously Instructing the Jury as to Brown's Parole Eligibility – Which was Never, Thereafter, Corrected for the Jury (Ground D of the Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

**Ground 6. Ineffectiveness of Trial Counsel in Failing to Understand that Brown's Statement Does not Prove Criminal "Knowledge" – an Essential Element of the Aiding and Abetting Offense – and Conceding the Presence of This Otherwise Missing Element in the Government's Case (and Brown's Guilt) in the Argument for a Directed Verdict** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

**Ground 7. Ineffectiveness of Trial Counsel in Failing to Put on Evidence to Prove – or Even Argue to the Jury – that Brown's Confession is False (Ground 6 of the Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

**Ground 8.  Ineffectiveness of Trial Counsel in Failing to Submit any Evidence as to the Involuntariness of the Confession, When This was an Alternative Basis for Acquittal (Ground G of the Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . 165

**Ground 9.   Ineffectiveness of Trial Counsel in Hinging his Unprovable Conspiracy Theory Defense on Jackie Bain, a Witness he Knows is Mentally Ill, a Witness who has Made Inconsistent Statements Contrary to the One Counsel Seeks to Have her Repeat for the Jury, and a Witness who has Claimed to Have Killed her Own Babies and Other Children (Ground F of the Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

**Ground 10.  Ineffectiveness of Trial Counsel in Failing to Explain to the Jury in Closing Argument that Brown Had No Knowledge of What Was to Occur, and Therefore, Was Not Guilty of Aiding and Abetting (Ground G of the Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

**Ground 11.   The Constitutional Insufficiency of the Evidence to Support Brown's Conviction in Violation of the Due Process Clause and *Jackson v. Virginia* (Ground A of the Amended Petition/Ground A of the Third Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

**ACT IV. THE MOTION FOR NEW TRIAL/SENTENCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

**Ground 12.  Ineffectiveness of Trial Counsel in Failing to Interview Edward Davis (the Only Eyewitness to the Killer of Patrick Behan), and Failing to Supplement the Motion for New Trial, or File a Motion for New Trial Based Upon Newly-Discovered Evidence of Davis' Testimony – Which Would Have Proven Brown's Confession to Be False** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

**ACT V. THE APPEAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

**Ground 13.  Ineffectiveness of Appellate Counsel in Failing to Correct the Error in the Transcript With Regard to the Meaning of "Called his Bluff" (Ground K of the Amended Petition)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

**ACT VI. FEDERAL HABEAS CORPUS RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

## OVERVIEW: THE ANATOMY OF A TRAGEDY

On September 9, 2002, this Court found that Tim Brown had proven his "actual innocence" under *Schlup v. Delo*, 513 U.S. 298 (1995). It was "inconceivable," the Court stated, "that a reasonable jury, upon hearing all of the details revealed to this Court, would convict Petitioner." But the question remains, irrespective of the fact that Andrew Johnson's admissions were not known before February 8th of this year, how did an innocent boy – a boy of only 14 at the time of the crime, and only 15 at the time of his interrogation – get convicted of this crime in the first place? How did a tragedy such as this occur?

In the second phase of the evidentiary hearing in this case, we have come to understand the anatomy of this tragedy, and indeed, it occurred in five (5) essential "acts." **"Act One"** of this tragedy was **"The Interrogation,"** and this interrogation must be understood in the context of the intense pressure upon the Broward Sheriff's Office to solve a crime involving one of their own, and their inability, for 8 months, to find the true perpetrator. Tim Brown, a mentally retarded boy of 15 with an I.Q. of 56 and a "mental age of 7 or 8" was an easy target. He did not understand his *Miranda* rights – in particular the importance of having an attorney present ***during*** any interrogation. He did not understand that he could remain silent and not talk – believing instead, that if he told the detectives whatever they wanted to hear, they would simply let him go home or back to the detention center. And clearly, he did not understand the consequences of giving up his rights, and making a statement admitting involvement in the crime. The detectives told him confusingly (as it is BSO's standard policy to do with juveniles), that anything he said would be used "for or against him." That was a misleading statement, however, and Brown fell right for it. Indeed, Brown did not – and with his I.Q. of 56 could not – understand the true consequences to his life of giving the detectives a

1

statement right then and there.  He wanted his mother present, and in fact, she could well have explained these consequences to him so that perhaps he might have made a knowing and intelligent decision as to whether or not to speak to the detectives without an attorney.  But the detectives made sure that Brown's mother was never even notified of the arrest, until *after* Brown made the statement they wanted.  At first, Brown denied his involvement in the crime.  But the detectives continued to tell him that they "knew" he did it.  They bombarded him with what others had said about him and the fact that months earlier, he had made a statement admitting responsibility for the homicide.  They knew that this prior statement was both false and uncounseled, but they used it to pressure Brown anyway.    And as Brown remained in that small interrogation room, with his legs shackled, attempting to deny the accusations, they threatened him with the electric chair, and Det. Carr slapped him across the face.  Brown finally caved in – as he was accustomed to do when his own father accused and beat him.  He told the detectives what they wanted to hear, mixing facts that they had told him others had said, and facts that he learned from the crime scene photos they showed him, with facts he made up himself.  In his mind, he needed to say anything he could to placate these detectives, and to get out of there alive.  After approximately 1 hour and 15 minutes of this unrecorded "pre-interview," the detectives convinced Brown to make a statement on tape.  And indeed, that taped statement – the only evidence that anyone ever had against him in this case – was the beginning of the end for 15-year old Tim Brown.

**"Act Two"** of Brown's tragedy was **"The Motion to Suppress,"** and it began with Tim meeting Larry Davis, who interviewed him, appointed a psychologist to evaluate him, and then filed a Motion to Suppress the taped statement.  And indeed, that statement should – and would, under the law – have been suppressed by the state court in this case, were it not for the utter ineffectiveness

2

of Davis in investigating and litigating the suppression issues.  Obsessed with conspiracy theories and the sex scandal involving BSO deputies at the Circle K, Davis ignored the fact that Tim Brown told him he was slapped.  Davis ignored it when Brown told him he was threatened with the electric chair.  Davis ignored the fact that Mrs. Brown told him that she saw bruises on Tim's face, and the fact that she could testify at the suppression hearing as to what Tim told her had happened.  Davis ignored other points that Mrs. Brown could have helped him establish as well – that the Broward Sheriff's Office intentionally chose not to contact her until Tim had already confessed, in clear violation of the governing Florida parental notification statute and caselaw construing it; and that Tim grew up in an extremely abusive home in which he was continually beaten by his father, which of course made him highly susceptible to the coercive tactics of the detectives here.  Davis knew about the abuse, but  never directed his psychologist, Dr. Kaprowski, to explore it any further, and Kaprowski, on her own, rendered her conclusions to Davis without ever speaking with Mrs. Brown or reviewing Tim's medical records from the jail (which would have shown her that he was suicidal at the time of his arrest and suffering from a major mental disorder).  Davis devoted little time to Tim Brown at the suppression hearing, focusing instead on the "sex for protection" scandal at the Circle K, in the hope that he might "discover" some evidence to support the "conspiracy" theory he was hoping to advance at trial.  In fact, Davis devoted question after question at the hearing to Jackie Bain, Curtis McGill, Robert Duhart, and Detective Richmond, but put on no evidence at all of police overreaching, threats, physical coercion, *or* of Brown's unique susceptibility to such tactics due to his abusive past.  It is no wonder therefore – with this lack of evidence – that the state trial judge found at the end of the suppression hearing, that Brown's statement was not coerced, but rather, was entirely voluntary.  And indeed, with regard to the *Miranda* waiver issue – an issue which Davis'

3

expert *did* thoroughly explore, and upon which she *did* offer unimpeached testimony that Brown did NOT understand his *Miranda* rights – Davis sat silently by as the judge applied an incorrect legal standard, and drew conclusions that were contrary to the very evidence the judge had found was "unimpeached." The chance to have the single piece of evidence against Brown suppressed, was bungled and ultimately lost.

   **"Act Three"** of this snowballing tragedy was of course, **"The Trial."** It began and ended with more errors – egregious errors – by Davis, errors that no reasonable attorney would have committed. Davis first, in voir dire, asked the trial judge to instruct the jury venire that this was a minimum "twenty-five to life" case – that is, that Brown was facing a minium mandatory 25 year sentence, but that he could be parole-eligible after that time. That, of course, was contrary to controlling law in Florida – and the judge clearly erred in so instructing the jury – because killings of police officers are punishable by mandatory life imprisonment. They are *never* parolable. But indeed, neither Davis, nor the court, ever corrected this misstatement of the law for the jury. And in fact, Davis did not merely misunderstand the penalty his client is facing. More egregious still, Davis did not understand the elements of the aiding and abetting offense with which Brown was charged; that "knowledge" of "what is about to occur" is a crucial element of the offense; and that if the government's only evidence against Brown was his statement, it would *not* have proven the necessary element of knowledge because Brown affirmed in his statement that he "did not believe" that Keith King would kill anyone. No reasonable attorney faced with evidence that his client had *no knowledge* that a murder was about to occur, would have conceded – as Davis did in his own motion for directed verdict – that indeed, Brown "knew what was going to happen." For indeed, "knowledge" was the missing element in the State's case. And in fact, the judge used this concession

4

as to the missing element of knowledge, to deny Davis' motion for directed verdict – a motion which might otherwise (and should otherwise) have been won.

Davis at that point had to convince the jury, in his own case-in-chief, that they should not convict Tim Brown. But – although he firmly believed that Brown was innocent – Davis at no time called a single witness or made a single argument to the jury, that would have led them to believe that Tim Brown's statement was false. For instance, Davis knew from the discovery he received from the State that Philip Howard was positioned on 40th Avenue in such a way, at the time of the shot, that he would have seen two boys on a bicycle crossing Hallandale if that had occurred. Davis, however, never interviewed Howard, never deposed him, and never called him as a witness at trial – even though Howard would have credibly testified (as he did in the first stage of the federal evidentiary hearing) that he never saw two boys on a bicycle crossing Hallandale, and thus, could have proven a crucial part of Brown's statement (the alleged escape route) to be false. And indeed, although the State's own witnesses testified that there never was a second shot and that no gun was ever found in the rock pit, Davis failed to use even *this* evidence to argue to the jury that Brown's statement was false. Nor did he point out to the jury that Brown knew nothing about the crucial fact that Behan's left hand was raised in a defensive posture when he was shot – and that what Brown said about the deputy reaching for his "stick" was a made-up fact, inconsistent with the medical evidence, and unobservable from the vantage point Brown described.

Rather than prove or at least argue the falsity of Brown's statement, as he easily could have in these ways, Davis – obsessed as he was with the sex scandal at the Circle K, and the idea of a BSO coverup – offered the jury instead a half-baked conspiracy theory with ever shifting possible perpetrators, but no certain perpetrator, of the murder. Davis hinged this defense on Jackie Bain, a

5

mentally ill witness who was Baker-acted prior to trial, and whom he never deposed. Davis knew (from discovery) that Bain had made numerous statements inconsistent with the theory he was asking the jury to believe – that Bain's boyfriend Curtis McGill killed Behan. Davis also knew that Bain not only misidentified Curtis McGill in a lineup, but claimed that she herself had killed Behan and run south on 40th (an account which BSO determined was not credible, due to the statement of Philip Howard whose account *was* credible). Finally, Davis knew that Bain told BSO that she had killed her own babies as well as other neighborhood teenagers who wouldn't mind their parents. But when Bain suddenly appeared during trial, Davis decided to put her on the stand anyway. And not surprisingly, everything Davis knew Bain had said to BSO before came out on the stand. It was suicide for the defense. In Davis' words, a "disaster." But as disastrous as Bain's testimony was, Davis remained glued to it even in his closing argument – so much so, in fact, that Davis failed to respond in any way to the prosecutor, Chuck Morton's closing argument as to Brown's "called his bluff" statement. Davis never told the jury that Brown had in fact explained in his statement that what he meant by the term "called his bluff" was simply "I did not believe him," and *that* is *not* proof of criminal knowledge. He did not explain for the jury that in fact, Brown's statement was an exculpatory, rather than inculpatory statement. He did not do or argue any of this, because he simply did not understand it himself. And therefore, Brown's jury retired to deliberate with no guidance whatsoever from Davis. Still, they agonized over Brown's fate for 14-hours – asking to rehear Det. Carr's testimony, and playing and replaying Brown's taped statement. But because Davis had offered no defense at all to this statement – either legal or factual – Act Three ended tragically again, with the jury finding Tim Brown guilty, as charged, despite the material falsity and legal

6

insufficiency of the evidence against him.  If they compromised on this verdict because they thought "at least Brown will be eligible for parole after 25 years," they were sorely wrong.

But this was not the end of Tim Brown's tragedy.  It continued into **"Act Four"** with **"The Motion for New Trial."**  As proof in point of his own ineffectiveness, Davis filed a motion for new trial within days of the return of the guilty verdict, asserting that the court erred in instructing the jury that Brown would receive a life sentence with a mandatory 25 years in prison – an instruction Davis himself had asked for.  Just after filing this motion, and still within the 10-day time limit for filing a motion for post-conviction relief, Davis acquired information about an actual eyewitness (the only eyewitness, in fact) to the Behan homicide.  On October 22, 1993, Davis' investigator Donn Pearce met with this eyewitness, whose name was Edward Davis.  Edward Davis told Donn Pearce that he was walking south on 40th Avenue towards the Circle K in the early morning hours of November 13, 1990, when he heard the gunshot, and saw a lone black male running westward behind the Circle K, through a "gap" between the store and the wall behind it.  Edward Davis did ***not*** see two black males on a bicycle crossing north on 40th across Hallandale.  He was standing at the precise place where Tim Brown had said they fired a second shot, and Davis saw no one and heard no shot.  Though Edward Davis could have exculpated Brown – proven key elements of Brown's statement to be false – Larry Davis did nothing with the information.  Incredibly, he did not supplement his pending motion for new trial (which the law allowed him to do) to include this newly-discovered evidence.  He put Pearce's memorandum in his file, and there remained the statement of the sole eyewitness to the killing of Patrick Behan.  The judge therefore denied Davis' motion for new trial, and sentenced Brown, as the statute mandated, to life imprisonment ***without*** parole. Act Four ended with Brown being sentenced, and his case being turned over to an appellate lawyer.

7

The final act, **"Act Five,"** of Brown's tragedy was **"The Appeal."**  It was Brown's final chance for relief from the state courts, but it was "botched" by Brown's appellate attorney who appealed based upon the legal insufficiency of the evidence (Brown's statement), but then failed to correct – or call the court's attention to – a glaring error in the transcript as to what Brown meant with regard to his statement that he called King's "bluff."  While the tape itself was clear that Brown *twice* averred that he *did not* believe King would kill anyone, the erroneous transcripts indicated that Brown first said he *did not* believe King, and then that he *did* believe him.  While Judge Pariente felt that these inconsistent statements failed to prove Brown's guilt as an aider and abettor, she could only dissent, as the other two judges on the panel disagreed, and – based upon the erroneous transcript they had before them – affirmed Brown's conviction *per curiam*.

**"Act Six"** of Brown's story, of course, has been this federal habeas corpus proceeding.  It has certainly been a long act in the play, but it has definitely *not* been tragic.  To the contrary, the Court has already found that Brown is "actually innocent" of the crime, and because Brown's innocence has "opened the gateway" to the proof of a multitude of constitutional claims, the story need not end tragically, as it started.  The Constitution of the United States is Brown's safety net. By safeguarding Brown's privilege against self-incrimination, and his rights to due process of law and to the effective assistance of counsel, it is our hope that the Constitution will turn Brown's tragedy to triumph.  It is the Constitution, ultimately, that is the vehicle that can set Timothy Brown, an innocent man, free.

## ACT I.  THE INTERROGATION

**Ground 1:  Brown's Unknowing and Unintelligent Waiver of His *Miranda* Rights on July 13, 1990 (Ground C of the Amended Petition/Ground B of the Third Amended Petition)**

**A. Governing Legal Principles**

**(1) <u>What deference is due the state court determination on the "knowing and intelligent" waiver issue?</u>** Throughout these proceedings, and in its pleadings, the State has greatly overstated the role of the "presumption of correctness" vis-a-vis the issue of whether Brown's waiver of his *Miranda* rights was "knowing and intelligent." We wish to clarify any confusion in that regard up front.  There is *no* presumption of correctness to be accorded Judge Frusciante's ultimate finding that Brown "knowingly and intelligently waived his rights" before making his July 16, 1991 statement. (Pet. Ex. 1006C at 443).  That is a purely legal conclusion, and it is not entitled to any "presumption of correctness," or deference.

By the express terms of the 28 U.S.C. § 2254(d)(1995), a "presumption of correctness" applies *only* to state court factual findings made after a hearing on the merits of the factual issue, and evidenced by "adequate written indicia" – and then again, only if none of the eight (8) exceptions to the "presumption" (detailed in § 2254(d)) apply.[1] The types of findings to which the

---

[1] Pursuant to § 2254(d)(1995), the presumption of correctness does *not* apply if the petitioner proves:

(1) that the merits of the factual dispute were not resolved in the state court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of

9

"presumption" apply are those of "basic, primary, or historical facts" underlying a constitutional

claim. *Townsend v. Sain*, 372 U.S. 293, 309 n. 6(1963); *Stokes v. Singletary*, 952 F.2d 1567, 1573

(11th Cir. 1992) ("facts 'in the sense of a recital of external events and the credibility of their

narrators'") (citations omitted).   The statutory "presumption" does *not* apply, however, to

conclusions of law, or even to mixed questions of law and fact.   *See Cuyler v. Sullivan*, 446 U.S.

335, 341-342 (1980).  It is clear in the Eleventh Circuit that a finding that a *Miranda* waiver was

"knowing and intelligent" is one of *law*, or at least a mixed finding.  Accordingly, it is entitled to no

"presumption of correctness" by a federal habeas court. *See Smith v. Zant*, 887 F.2d 1407, 1431

(11th Cir. 1989) (Kravitch, J. concurring in reinstatement of the district court's judgment granting

writ of habeas corpus) ("Of course, the ultimate question of the validity of a suspect's waiver of his

*Miranda* rights is ""'a legal question requiring an independent federal determination;'"" citing

*Lindsey v. Smith*, 820 F.2d 1137, 1150 (11th Cir. 1987) and *Miller v. Fenton*, 474 U.S. 104 (1985)).

---

the applicant in the State court proceeding;

(5) that the applicant was indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding;

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

Rather, without according any deference to Judge Frusciante's ultimate legal conclusion in this regard, or to the Fourth DCA's *per curiam* affirmance without opinion (which, by law, is *not* entitled to any presumption of correctness[2]), this Court must make its own *de novo* legal determination on the issue of whether Brown "knowingly and intelligently" waived his *Miranda* rights. And in making its own *de novo* legal determination in that regard, the Court must consider *not only* the evidence of record from the state suppression hearing, *but also*, the evidence Brown presented at the federal evidentiary hearing (that is, Brown's own testimony, and that of Mrs. Othalean Brown, Doug Bell, Donald Craig, Dr. Lenore Walker, Dr. Richard Leo, and even Larry Davis).

In weighing all of this evidence and testimony, and in attempting to determine the underlying facts relevant to this claim, the "presumption of correctness" will undoubtedly come into play because – as noted *supra* – credibility findings are entitled to the presumption of correctness, *see, e.g., Williams v. Johnson*, 845 F.2d 906 (11th Cir. 1988), and here, the state judge credited Dr. Kaprowski's testimony in its entirety. Judge Frusciante found, specifically, that "the State did not impeach the doctor." (Pet. Ex. 1006C at 442). Accordingly, in making its own *de novo* determination here as to whether Brown's waiver of his *Miranda* rights was knowing and intelligent,

---

[2]While the "presumption of correctness" does indeed apply to factual "findings" by state appellate courts, *Sumner v. Mata*, 449 U.S. 539, 546 (1981), this statutory presumption only applies where there are "adequate written indicia" of the factual determinations. *Sumner, id.* at 546-547; *Stokes v. Singletary*, 952 F.2d 1567, 1572 (11th Cir. 1992). Here, however, the Fourth DCA made no factual findings on the *Miranda* (or any other issue), affirming the lower court *per curiam* without a written opinion. *Brown v. State*, 657 So.2d 903 (Fla. 4th DCA 1995). Under such circumstances – where there are no "written findings, written opinion, or other reliable and adequate written indicia" of any findings which the court might have made – there is no "presumption of correctness." *See* § 2254(d)(1995); *see Stokes*, 952 F.2d at 1574 n. 11. This Court owes the Fourth DCA *no deference* on *any* issue raised here.

11

the Court must credit Dr. Kaprowski's findings, and her testimony, in their entirety. Again, the Court owes no deference at all, to Judge Frusciante's "finding" on the ultimate legal issue – that Brown knowingly and intelligently waived his rights – which (as will be explained *infra*) is actually ***contrary*** to what Dr. Kaprowski said in her testimony (that in her view, ***Tim Brown did NOT understand his Miranda rights, and the consequences of waiving them on July 16, 1991.***)

Admittedly, Judge Frusciante appeared to make some sort of finding relevant to the *Miranda* waiver issue – noting that he believed that Tim Brown had the "mental capacity to understand his *Miranda* warnings that were given him." (Pet. Ex. 1006C at 442-443). It is unclear what exact type of finding this is. It would appear to be in the nature of a finding of mixed law and fact, which – as noted above – would ***not*** be entitled to any presumption of correctness. If, however, it is deemed a factual finding, such a finding would not be entitled to any presumption for two reasons. First, it is not "fairly supported" by the record of the suppression hearing as a whole and the judge's own credibility findings. 28 U.S.C. § 2254(d)(8). Second, we have rebutted any possible presumption in this regard with "convincing testimony" at the evidentiary hearing. 28 U.S.C. § 2254(d) (1995).[3] As we will show *infra*, the testimony of Dr. Walker, Doug Bell, Mrs. Othalean Brown, Donald Craig, and Larry Davis, confirm and corroborate Dr. Kaprowski's (unimpeached) testimony and lend further support – overwhelming support, in fact – to a finding by this Court that Tim Brown did not

---

[3]The final paragraph of 28 U.S.C. § 2254(d)(1995) states: "In an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not support such factual determination, ***the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.***" (Emphasis added)

12

understand *either* his *Miranda* rights *or* the consequences of waiving those rights, simply from having BSO's standard Juvenile Rights Waiver form read to him on July 16, 1991.

(2) <u>**The legal standard for determining whether a *Miranda* rights waiver was "knowing and intelligent."**</u>   The starting point for determining the validity of any waiver of constitutional rights is always *Johnson v. Zerbst* , 304 U.S. 458, 464 (1938). In *Johnson v. Zerbst*, the Supreme Court explained that a waiver is "an intentional relinquishment or abandonment of a ***know***n right or privilege. The determination of whether there has been an ***intelligent*** waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." The Supreme Court has specifically held that a defendant's waiver of his *Miranda* rights may be deemed "knowing and intelligent" only where it is "made with a full awareness ***both*** of the nature of the right being abandoned ***and*** the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986)(emphasis added); *see also Smith v. Zant*, 887 F.2d 1407, 1430 (11th Cir. 1989) (en banc) (Kravitch, J.) (the Constitution requires "that the defendant know what he is waiving ***and*** the consequences of his decision") (emphasis added). We emphasize that – as a matter of law – ***both the rights themselves, and the consequences of waiver*** must be understood. Judge Frusciante, however, made no detailed findings as to Tim Brown's actual understanding of *either* his rights, *or* of the consequences of waiving those rights at the time that he waived them. ***Both*** of these crucial factual issues must be separately resolved, however, before this Court can determine as a matter of law whether the rights waiver was "knowing and intelligent."   Mere understanding of one right, or even all of the rights – without a concomitant understanding of the consequences of waiving each and every one of the rights – cannot ever be deemed a "knowing and intelligent" waiver.

13

Admittedly, a defendant need not understand "all the complexities of his fifth amendment rights and of the implications of a decision to waive those rights." *Smith v. Zant*, 887 F.2d 1407, 1430 (11th Cir. 1989) (*en banc*) (Kravitch, J., concurring in the reinstatement of the district court's opinion). However, he must at the very least clearly understand "that he had a right 'not to talk to law enforcement officers, to talk only with counsel present or to discontinue talking at any time,' and that 'whatever he chooses to say may be used as evidence against him.'" *Id.* While it is the State's burden at a suppression hearing, to prove that the defendant understood each of these rights *and* the consequences of waiving them, *see Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1988) (emphasis added), close examination of the testimony at the suppression hearing – in particular, the unimpeached testimony of Dr. Kaprowski – will show that the State clearly did *not* meet its burden there. While indeed, on habeas, the "courts 'will indulge every reasonable presumption against waiver,'" *Lindsey v. Smith*, 820 F.2d 1137, 1149 (11th Cir. 1987) (citing *Brewer v. Williams*, 430 U.S. 387, 404 (1977)), admittedly, the burden shifts to the habeas petitioner to prove – by a preponderance of the evidence – that his purported waiver of rights was ineffective, *Lindsey*, 820 F.2d at 1149, because he did not understand his rights and/or the consequences of waiving them. *See* Miller, 838 F.2d at 1537.

The following review of the evidence shows that  Brown has more than met his burden of proof, by the preponderance of the evidence, on *both* of these relevant factual issues – and accordingly, on the ultimate legal issue – here.

## B. Brown Did Not Understand Any of His Core *Miranda* Rights at the Time that he Signed BSO's Juvenile *Miranda* Waiver Form

While it would seem to go without saying, the Eleventh Circuit has repeatedly emphasized that "[i]f a defendant cannot understand the nature of the rights, he cannot waive them intelligently."

14

*Miller v. Dugger*, 838 F.2d 1530, 1539 (11th Cir. 1988).  The first question the Court must address

is therefore: "Could Brown understand the nature of his rights on July 16, 1991 when he waived

them?"  In making this determination, Brown's "mental capacity to understand" the nature of

*Miranda* rights is relevant, but not dispositive.  The ultimate question the Court must answer is

whether Brown ***actually*** understood the nature of each of his rights on July 16, 1991, in the manner

that they were administered to him, and at the time that he waived them.  Here, Det. Carr has said

that Brown was brought into the homicide unit at 6:55 p.m.; Brown went to the bathroom and was

given a soda, Det. Carr read Brown his rights from BSO's standard juvenile waiver of rights form,

Brown wrote "Yes" and "No" after the various questions on the form about those rights, and signed

the waiver by 7:10 p.m.  (Pet. Ex. 1006B at 276-279).  The entire process of reading the rights, and

filling in the responses, clearly lasted less than 15 minutes, because it took Carr a "few minutes" –

at least "a minute or two" – "to get some paperwork and stuff."  (EH10 at 29).  In determining from

what occurred here whether Brown had any actual understanding of his constitutional privilege

against incrimination, and his right to counsel as spelled out in *Miranda*, the Court should consider

the following:

> **(1).  <u>Neither the fact that Brown signed the *Miranda* form, nor his answers to specific</u>**

**<u>questions on the form about understanding various rights, is probative of his actual</u>**

**<u>understanding of his rights – under the totality of the circumstances here.</u>**  At the suppression

hearing, and in its federal pleadings on the *Miranda* waiver issue, the State's case for Brown's

understanding of his rights boiled down to the fact that he signed the *Miranda* waiver form.  Under

the law, however, the mere "recitals" of a 15-year old boy as to his understanding of *Miranda* rights,

has little weight.  In *Haley v. Ohio*, 332 U.S. 596 (1948), the Supreme Court rejected a contention

similar to the State's here, stating:

> [W]e are told that this boy was advised of his constitutional rights before he signed
> the confession and that, knowing them, he nevertheless confessed.  That assumes,
> however, that a boy of fifteen, without aid of counsel, would have a full appreciation
> of that advice and that on the facts of this record he had a freedom of choice.  We
> cannot indulge those assumptions.  Moreover, we cannot give any weight to recitals
> which merely formalize constitutional requirements.   Formulas of respect for
> constitutional safeguards cannot prevail over the facts of life which contradict them.

*Id.* at 601.

Tim Brown, of course, has explained that the answers he wrote down on the form were

indicated to him by Carr and Thomasevich themselves – by nodding their heads up and down or from

side to side.  (EH11 at 30-31).  What he says make sense, particularly given that there was at least

one demonstrably wrong answer on the form – which he could have only gotten from the detectives

themselves.  For next to the question "Have we tried to contact your parents/guardian?" Tim wrote

"Yes," even though he could not have had any personal knowledge as to whether that was true.

There was no phone in the room, and there is no record evidence that a call was ever made in

Brown's presence.  What they told him, he says, is that they were "going to contact my mother" if

he would answer their questions, that he didn't need his mother, and that he should answer their

questions and they might consider letting his mother come up and see him. (EH11 at 27).  But they

never told him that they had already attempted to contact his mother.  With this one demonstrably

wrong answer at least, therefore, the Court should have some doubt as to the veracity of the other

answers.  Clearly, none of the other "Yes" answers or "No" answers can be automatically presumed

correct here.

Carr and Thomasevich deny giving Brown any help with his answers.  Carr claimed that Tim Brown "appeared" (to Carr) to understand what they were saying to him, (Pet. Ex. 1006B at 280), and Thomasevich testified at the evidentiary hearing that "I know he had to print his name on the form, on the rights waiver form, and sign his name.  I assumed if he was able print and sign his name, he was in fact, able to read."  (EH13 at 86).  While we will discuss more fully *infra*, (in connection with the coercion issue), the various considerations the Court may take into account in resolving credibility issues between Tim Brown and these detectives (the experience with John Wood is particularly instructive in this respect), even if we take them at their word for a moment on this one particular issue, clearly the fact that Tim Brown signed the *Miranda* form and/or "appeared" to understand, would not in any way be dispositive of the issue of his actual understanding – when all of the other evidence in the case indicates that his answers on the form were not true and correct; he could not understand the rights even as explained on the form, and indeed, he did not on July 16, 1991 understand either the nature of his *Miranda* rights or the consequences of waiving them.

Initially, the Court should disregard Brown's answer on the form, to the question: "Can you read and write the English language?"  Brown wrote "Yes" to that question.  But indeed, as indicated *infra*, he could ***not*** read or write the English language – at least, on the level that a 15-year old should.  Due to his mental deficiencies, and embarrassment about them, (EH12 at 14), Tim Brown had a tendency to lie to cover his lack of comprehension – to indicate comprehension when indeed, he clearly could not comprehend.  As Dr. Kaprowski noted, Brown was extremely "passive compliant," and Dr. Leo has confirmed that passive compliant individuals "want to appear to be better, more with it than they are so to hide the deficits, be compliant in a situation rather than frankly show their ignorance. (Pet. Ex. 1006B at 193).  Dr. Kaprowski's testimony in that regard

17

was unimpeached. And in fact, Dr. Walker has testified that because Tim Brown was actually suffering from a post-traumatic stress disorder brought on by years of abuse at the hands of his father,[4] he was actually even "more compliant" than an average child, even an average retarded child, might be. "He went along with what they wanted him to say." (Pet. Ex. 1048 at 47).

On this question about his abilities, therefore, and on the other more substantive ones as well, it would be fair to assume that Brown "complied" with what the officers were indicating, or what he believed they expected him to say, because he was "passive compliant" and wanted to "hide his intellectual deficits. (Pet. Ex. 1006B at 193). That type of "going with the program" is common in individuals with severe mental deficits like Tim. In no sense, therefore, can Tim's answers on the *Miranda* form, or his alleged "appearance of understanding" control the legal issue here. What should control is the overwhelming evidence here of Brown's total lack of ***actual*** understanding.

(2) **On July 16, 1991, Brown could not read – and did not read – the *Miranda* form himself. Detective Carr's claim to the contrary, that Brown read the form out loud, is not credible**. While indeed, in the 11 years he has been in jail, Tim Brown has finally learned to read, (EH11 at 36),[5] the record is virtually undisputed in this case that at age 15, Tim Brown's reading level and his writing level were ***below*** a 3rd grade level. (Pet. Ex. 1006B at 188). Judge Frusciante credited that testimony, and it is entitled to the presumption of correctness here.

And in fact, at the evidentiary hearing, Dr. Kaprowski's assessment of Tim Brown's abilities in this regard has only been further corroborated by a host of other witnesses. Mrs. Brown testified

---

[4]We will discuss the abuse, and this post-traumatic stress disorder, in detail in connection with the involuntariness issue *infra*.

[5]The extent of Brown's reading ability, even now, is uncertain. Dr. Walker testified that Brown was not able to read the questions on the T.S.I. test. (Pet. Ex. 1048 at 72).

that her son "didn't read or write very good either." (EH11 at 52). Tim himself plainly told the Court that he *did not* read the form on July 16, 1991 – and *could not* have read it. (EH11 at 14). But perhaps the most compelling testimony on this issue came from Doug Bell, who was Tim's special education teacher at the Broward County Jail starting in September of 1991 (only two months after Tim's arrest and interrogation), until he was tried and convicted in 1993. (EH12 at 8-9, 11, 15).

Bell was mandated by the school system to see his special education students every day, that is, five days a week. On each of these visits, he would spend from a half an hour to an hour with Tim, depending upon what he could handle. (EH12 at 10-11). He would try to work with Tim on "basic things like reading, writing and arithmetic to get back to the three Rs." (EH12 at 10). But, Bell said, Tim "had a great deal of difficulty reading. I thought that he was at the grade two or three level. It was very limited. He needed a lot of help." (EH12 at 11). As to the type of words he was working with Tim on during this time period, Bell explained: "Well, initially, we tried something a little beyond him and then had to back off into early reading programs. So, we are talking four or five letter words." (EH12 at 12). And that was "one word at a time." (EH12 at 12). Bell is the single witness in this case with the best vantage point – both temporally, and due to his extensive contact with Tim Brown on the specific issue of reading – to determine Tim's reading abilities at the time of arrest. He has an impressive educational background with four different degrees, (EH11 at 8, 19), 14-years experience as a special education teacher with the Broward County School system, (EH11 at 7), all the required licenses and certifications, (EH11 at 8), and no motive *whatsoever* to testify falsely. He was not impeached in any way, and his testimony is both credible and convincing.

19

And in fact, were Bell's testimony not enough, Donald Craig who met Tim Brown in Avon Park Correctional in 1993, (EH11 at 65-66), and prepared both his habeas petition and his motion for bail (EH11 at 66-76), testified credibly as well that even when Brown got there, even after all of the time spent with Doug Bell at the Broward County Jail, Brown *still* could not read – or at least, read anything complicated or with any sort of understanding. (EH11 at 70). Craig says that when he met Tim, he could only read 'and,' 'the,' 'cat,' words that your fourth grade kid or fifth grade kid could read." (EH11 at 70). Craig, however, tried to help Tim improve himself, and in fact – both he and Tim say – Craig was instrumental in teaching Tim to read. "I helped him," Craig said. "I showed him how words he didn't know or didn't understand or were too big for him, I told him "What you have to do, Tim is break them down in syllables. If you break them down in syllables, you can pronounce them and you will be able to understand them. If you read the whole sentence it will give you the definition of them." (EH11 at 70-71). Craig worked with Tim in this way twice a week, and, he said, it seemed to help. (EH11 at 71). And in fact, Tim credits Craig and other inmates for the progress he has made in reading, and understanding, over the years. (EH11 at 14-15, 70-71).

Finally, Dr. Walker – who reviewed both Dr. Kaprowski's IQ testing and Tim Brown's school records – has corroborated Dr. Kaprowski's testimony that at the age of 15, Brown's reading level had "plateaued" out at a 2nd or 3rd grade level, didn't progress from that. In fact, she noted, his mathematical ability was even lower than that. (Pet. Ex. 1048 at 31-32, 46-47, 58). He is simply "promoted whether or not he learns." (Pet. Ex. 1048 at 38). He most definitely could *not* read the *Miranda* rights waiver form. (Pet. Ex. 1048 at 58). That is clearly not written on a 2nd grade reading level.

20

In the face of all of this testimony, Carr's testimony at the federal evidentiary hearing, that indeed, "he indicated that he was reading the form and *he read it out loud to me* and appeared to understand everything" (EH9 at 90) (emphasis added), rings decidedly untrue. Importantly, Carr failed to mention this presumably crucial fact in *any* of his prior deposition testimony, at the suppression hearing, or at trial where he maintained that he had merely read the form out loud to Brown, and that Brown had read along with him silently. (Pet. Ex. 1006B at 278; Pet. Ex. 1006L at 1727) . But  his testimony is not corroborated, but rather, contradicted by that of his former partner, Det. Thomasevich who conceded that he simply "assumed" that Brown could read because he printed his name on the waiver form and signed his name. (EH13 at 86).

When we discuss the coercion issue *infra*, we will discuss Carr's motive to embellish upon his prior testimony in an effort to maintain Tim Brown's conviction.   But the Court really does not even need to consider that at this point.   This is an easy credibility issue.   Based upon the overwhelming weight of the evidence on the issue on Tim Brown's reading abilities, former Detective (now Mr.) James Carr is simply not credible.

**(3). <u>As a 15-year old with a mental age of 7 or 8, Brown would NOT have the mental "capacity" to understand his *Miranda* rights as they were given to him – that is, with only a perfunctory reading of those rights from the juvenile *Miranda* waiver form.</u>**   It is undisputed in this case that Tim Brown was only 15 at the time of his arrest, and that Brown had a "consistent intellectual deficit."   Indeed, Dr. Kaprowski determined that on his I.Q. test, had a full scale I.Q. of 56 and a verbal I.Q. of 60.[6]   (Pet. Ex.1006B at 185).   Clinically, this is considered "mildly retarded,"

---

[6]The verbal subtest of the IQ test indicates, for instance, general fund of knowledge, ability to reason abstractly, vocabulary, and social judgment.  (Pet. Ex. 1006B at 186-187).

"not average. He is not close to average." Even his best score on the verbal subtests, Dr. Kaprowski explained was "still way in the retarded range." (Pet. Ex. 1006B at 187, 228). Dr. Kaprowski's use of the term "mildly retarded" should not in any way convey an incorrect impression of Tim's abilities. Dr. Walker has explained: "Mildly retarded, by the way, doesn't mean what the English translation means. It is a term of art that a psychologist uses. . . . .Mildly retarded is pretty severe. You can't learn in a regular classroom if you are mildly retarded. But it differentiates from moderate or severely retarded people that can't be left alone. They are in institutions, can't get out of bed. If you don't have those comparisons, you can't make those inferences." (Pet. Ex. 1048 at 54). Tim's test scores across the board placed him in the lowest one percent of our population. (Pet. Ex. 1048 at 57).

While it is perhaps self-evident that neither teenagers nor mentally retarded individuals would have a common understanding of *Miranda* rights in any way comparable to that of an adult of average intelligence, there should be no question whatsoever in the Court's mind that a 15-year old with an I.Q. of 56 would have tremendous difficulty understanding the *Miranda* rights. In the seminal research on this issue conducted by Dr. Thomas Grisso, *see* Tom Grisso, "Juveniles' Waiver of Rights: Legal land Psychological Competence," 3 Perspectives in Law and Psychology (B. Sales ed.1981); Tom Grisso, "Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis," 68 California Law Review 1134 (1980) – research which was in fact cited to the state court in Larry Davis' motion to suppress, (Pet. Ex. 1011 at 17) – Dr. Grisso demonstrated through his clinical studies that 15 year olds with IQ scores under 80 (like Tim Brown here), are comparable to juveniles under 15, who do not understand at least some of their *Miranda* rights. (Pet. Ex. 1048

at 68, 102-103). Even using a simplified version of the language in the *Miranda* warning, failed to cure these deficiencies. (Pet. Ex. 1048 at 102).

While Dr. Kaprowski was not apparently familiar with Dr. Grisso's research, she nevertheless concluded from her own testing and clinical interview with Tim Brown that Tim was in fact very childlike. (Pet. Ex. 1006B at 189). For instance, she explained that his answers on one of the IQ tests she administered were extremely "youthful" – "not something that a fifteen-year-old of average intelligence would do, but definitely someone of lower intelligence, very child-like best way to describe him." (Pet. Ex. 1006B at 189). On the Rorschach test, his answers as well were "primitive, childlike." (Pet. Ex. 1006B at 189). In fact, his mental age was not that of a fifteen year old, but rather, that of a 7 or 8 year old child. Dr. Walker reviewed Tim's various testing scores, and explained that "he was functioning [as] about a seven year old or eight year old." (Pet. Ex. 1048 at 32, 46-47, 71).

Doug Bell, who came in contact with Tim much closer to the time of his arrest than even Dr. Kaprowski, and had much more sustained contact with Tim for a period of almost 2 years, confirmed this assessment, but fleshed it out more concretely. Mr. Bell recalled that Tim had a "very limited mental capability. Didn't comprehend things very well or understand." (EH12 at 12). When the Court asked Bell if there was "any way to quantify the level of understanding," (EH12 at 12), Bell explained that Tim's understanding was "Well, very simplistic. He had to have things explained to him very carefully over and over again before he could grasp it." (EH12 at 12). But it was not only the inability to grasp or understand, but rather Tim's extreme child-like behavior – his obsession with coloring – which Bell was able to describe in a concrete way. The following testimony gives

23

the Court a virtual telescope back into who Tim Brown was, and what he really was like, at the time

of his arrest in this case:

> MR. BELL: [A]t that time he was fifteen, sixteen, seventeen when I was seeing him, in that range, and I thought he was really at a grade two or three level, which would be the eight or nine age level.
>
> When he didn't want to do a lot of work, the best I could get him to do was puzzles, maze-type puzzles and a maze-type thing, and he liked to color.
>
> I would leave work behind so he could color and offer him some pencil or crayons they were allowed to use. . . .
>
> I looked forward to seeing him and I think he looked forward to me coming by.
>
> I know he was quite perturbed on days sometimes when I didn't get by or didn't bring the colored pencil he asked for, or something like that.

(EH12 at 12-14). It is obvious that as Doug Bell explained at the hearing, coloring is **not** age

appropriate – in fact, it is "very abnormal" – for a 15-year old. Bell was a crucial witness, because

he gave the Court something Judge Frusciante never had in this case: a "birdseye view" into what

Tim Brown was truly like at the time of his arrest in this case. Bell himself drew us a compelling

mental picture of what this 15-year-old with a mental age of 7 or 8 or 9 was truly like. We ask the

Court to keep in mind this picture of a 15-year-old (a 6'1", 160-pound 15-year old) who would rather

"color" than anything else, in assessing whether Tim Brown truly understood his *Miranda* rights

here. Clearly, he did not.

We know from our own experience with our own children and their contemporaries, that

even the most intelligent 7 or 8 or 9 year old child would not be able to easily comprehend the nature

of the *Miranda* rights. As Dr. Walker has explained, the legal concept of a "right" – any "right" –

would be beyond the comprehension of a young child. A "right" is an abstract concept, and children

are concrete thinkers. (Pet. Ex. 1048 at 63). Abstract reasoning only becomes possible at the age

24

of about 11 or 12. (Pet. Ex. 1048 at 62). "If [Tim Brown] has a mental age of seven or eight, he's nowhere near the eleven or twelve year olds where you first start to use abstract concepts." (Pet. Ex. 1048 at 63). Clearly, therefore, Tim Brown had not attained any sort of ability to think abstractly in July of 1991. Dr. Walker explained that you need to have abstract concepts to do math, and "his math is even worse than his reading and spelling – somewhere between first and second grade in math. We really see a boy who just doesn't have that ability." (Pet. Ex. 1048 at 63). Clearly, therefore, when Tim Brown was read a "Statement of rights" form, and informed that he had certain "rights" he could not have had any idea whatsoever, without additional, and very careful explanation, as to what in fact the idea of "rights" meant. But herein lies the difference between an actual 7 or 8 year old, and a 15-year old with a mental age of 7 or 8. A real 7 or 8 year old would have no qualms about saying that he did not understand. Dr. Walker explained: "A fifteen-year-old functioning at a seven or eight year old level, especially a kid on the streets as he [has] been, he's going to cover up and not let anybody know when he knows or doesn't know so he seems okay. If you don't know what you are dealing with you can get fooled by it." ( Pet. Ex. 1048 at 64-65). *See also* Dr. Leo's Deposition, Pet. Ex. 1046 at 35-36 (mentally retarded individuals are not abstract thinkers; they pretend to understand, but they don't; they'll nod submissively without fully understanding; many think of the term "right" as meaning the direction "right").

Moreover, the form itself was confusingly worded with compound questions, and it required not only thinking about "abstract constructs" (which Brown was clearly incapable of), but also fairly advanced "sequential" thinking (which someone at Brown's IQ level was incapable of as well). Dr. Walker has explained that Tim's very low IQ prevented him from this "sequential" manner of thought:

25

They can't apply something from one event to another. They don't have that ability. They can't keep things sequentially in their head. With somebody with that low IQ, you have to say one thing, get your answer, then go to the next thing, get your answer. You can't give a compound question. They can't [] go to the door, open the door, go out the door, close the door. That is too much for a child of that intellectual ability. You have to say one thing at a time. Go to the door. Now you are at the door, now open the door. Now you opened the door, now go through the door. Now close the door. Otherwise, there's no understanding of it. . . .

So, for example, in the beginning of this statement it says "Are you comfortable?" That's one statement, he says yes. The second one, "Can you read and write the English language?" That is two things; read and write. Further down you have three, "you have the right to remain silent." That is you don't have to talk to me or answer any questions if you don't want to. Do you understand? That is too much already for someone with the IQ in the mid fifties to hold this in their head before they answer it. . . .

People who have higher intellectual ability can link them together because they have the abstract construct. We often put reading and writing together. We can put those togther but somebody that is retarded can't do that unless they have a lot of practice, again, again, again, and even then, there's a lot of research that says they can't do it the next time. They don't learn from experience like we do. There's a lot of rote learning they can learn from. It is different than people who are not retarded. The bottom statement here, for example, there's no way that he could understand, "I Timothy Brown have read this statement of my rights or have had it read to me." It's already two. "I understand what my rights are." That is three. "I am willing to make this statement," four, "and answer questions," five. "I do not wish an attorney present at this time," six. "No threats," seven, "or promises," eight, "have been made to me." "No pressure of any kind has been used against me," nine, "nor have I been tricked," ten, "or fooled," eleven, "into giving this statement," that is twelve. "I understand," thirteen, "and know," fourteen, "what I'm doing," that's fifteen. "I further expect that any statement will be used for," that's sixteen, "or against me" seventeen," in the court of law," eighteen. ***No way. Most children couldn't do it much less a retarded child to hold all of that in their head.***

(Pet. Ex. 89; Pet. Ex. 1048 at 53, 59-60).   It is significant, Dr. Walker points out, that the way the

form is constructed, the discussion of the "rights" is separated from the actual "waiver" of the rights,

which occurs at the end of the form. For instance, the detective informs: "You have the right to

remain silent, that is, you don't have to talk to me or answer any questions if you don't want to."

Brown is then asked "Do you understand?" But he does not then ask, "With that understanding, do

26

you want to give that right up and make a statement?" That does not occur until the very end of the form (in the final lengthy paragraph discussed by Dr. Walker above), and someone of Brown's IQ could not keep the concept of his right to remain silent or even "I don't have to talk" in his brain, for the entire time that the detectives read to him about other rights and other issues. By the time the "waiver" is called for, he would have no recall at all of the right to remain silent – although he would be asked to recall that right together with seventeen (17) separate other concepts grouped together in the final paragraph. (Pet. Ex. 89; Pet. Ex. 1048 at 62).

Dr. Leo has explained that because the mentally retarded do not have the psychological capacity "to understand the *Miranda* warnings as they're stated, and there's good research on that," (Pet. Ex. 1046 at 43), the necessary way to administer the *Miranda* warnings with mentally retarded individuals is to go through the rights set out in the form extremely slowly; stop at the end of each one; ask if he understands; ask him if he can give an example of what it means, and to restate what it means. (Pet. Ex. 1046 at 43-44). And indeed, as Dr. Walker has stated, the waiver question needs to be administered directly after the discussion of the "right." Dr. Leo has also stressed the crucial importance of having a juvenile's parent or guardian present, to assure proper understanding. (Pet Ex. 1046 at 44).

While Dr. Kaprowski did ***not*** make any of these important points about the *Miranda* form at the suppression hearing, what Dr. Walker and Dr. Leo have described is consistent with her findings. True, Dr. Kaprowski believed from her testing and clinical interview with Tim that he "***would have*** the ability" to understand "legal rights" in a "very, very basic way." (R. 190) (emphasis added). That is very different, however, from saying that Brown ***did understand*** his actual *Miranda* rights when he waived them, ***based upon the form read to him.*** And in fact, contrary to any

27

suggestion in this regard from Judge Frusciante, Dr. Kaprowski testified that she believed Brown *"did NOT fully understand" those rights when he waived them*.  It is therefore important to read the whole of Dr. Kaprowski's testimony on this point:

> MR. DAVIS: Now, these tests in your interviews, could you reach a conclusion as to whether or not Tim Brown psychologically and intellectually would have the ability to understand legal rights?
>
> DR. KAPROWSKI: Only in a very, very basic way.  Could you be more specific?
>
> MR. DAVIS: Would he understand his right to counsel and things along those lines, that is, going into [the] *Miranda* decision?
>
> DR. KAPROWSKI: I think based on his prior experience, he did not fully understand that he could have had an attorney present.  He stated that he wished he had his mother present though.

(Pet. Ex. 1006B at 190-191).

It is thus clear from this ***complete*** interchange, what Dr. Kaprowski meant – the distinction she was trying to draw.  That Tim Brown "would have the ability" to understand legal "rights" in some basic way, is a statement about his "potential" and it is consistent with the fact that at Brown's I.Q. level he was "educationable" (Pet. Ex. 1006B at 188).  His I.Q. level in and of itself would not mean that he could not ever understand those rights.  (Pet. Ex. 1006B at 229).  But Dr. Kaprowski was clear that with his intellectual deficits,  Tim could definitely ***not*** learn on his own.  (Pet. Ex. 1006B at 188 ).  He would need special education, she explained, and would always "need some sort of special help."  (Pet. Ex. 1048 at  188).[7]  "He could be taught." (Pet. Ex. 1006B at 188).  Dr.

---

[7]Mrs. Brown described giving Tim that "extra help" as a child, but that even then, he still could not learn.  She explained: that when Tim was young, she would teach him one minute how to spell a word, and about five minutes later he couldn't spell it, and "I would constantly do this with him and he still couldn't do it."  (EH11 at 52).  *See also* Dr. Walker's deposition (Pet. Ex. 1048 at 30).

Walker concurred in this assessment: "He can learn. He's educable." But "he needs special ways to be educated." At the time of his arrest, "he doesn't get it. The school records indicate he doesn't get it. He's in regular classes and he's promoted whether or not he learns." (Pet. Ex. 1048 at 38).

So therefore, while it is *theoretically possible* that with proper extra help – simple questions using simple language, slow simple explanations with concrete examples, and repetition, repetition, repetition (Pet. Ex. 1048 at 105) – someone of Brown's I.Q. level "would have the ability" to understand the nature of the *Miranda* rights "in a very, very, basic way," the mere reading of the *Miranda* waiver form – without any sort of special education or "teaching" about the rights – would *not* have conferred even that very, very basic understanding.[8]  And of course, the relevant legal inquiry is whether in fact Tim *actually understood* his rights on July 16, 1991, not whether he had the potential or capacity to understand.

And in fact, federal law is clear on this point.  Under controlling circuit precedent, a "knowing and intelligent" waiver *will not* be found where a suspect has a sub-normal I.Q., and a form – like the one here – is merely read to the suspect verbatim, without the concepts being carefully explained, or the suspect's answers being explored. In *Smith v. Kemp*, 664 F. Supp. 500 (M.D. Ga. 1987), *aff'd*, *Smith v. Zant*, 887 F.2d 1407 (11th Cir. 1989), for instance, the expert noted that the defendant with an I.Q. of 65 and mental abilities in the lowest 2% of the population would

---

[8]Donald Craig's experience with Tim Brown in preparing the habeas petition, supports this conclusion.  Craig says that he prepared the habeas petition Brown, read it to Brown, and Brown signed it, but Craig says: "basically, I know he couldn't understand it. You know, I knew it was going over his head, but I took my time with him." (EH11 at 70).  Tim confirmed that he signed that document, but he did not understand it.  (EH11 at 45-45).  Larry Davis' assessment of Tim was that it was not even any "use trying to go over specific things with Tim" because "there was no light there. It was just, it wasn't there." (EH8 at 168).  "He didn't have any fund of knowledge to deal with and it was difficult for him to keep track of what – it was just difficult for him to keep track." (EH8 at 170).

possibly have understood a *Miranda* warning if it were properly explained to him, **but the police did not take that time and did not provide the necessary explanation**. *Id.* at 504. In the absence of that explanation, the court found that the defendant (whose mental abilities were equivalent to that of a 10-year old child) did not knowing and intelligently waive *Miranda* rights – despite defendant's familiarity with the criminal justice system due to a prior conviction); *see also Henry v. Dees*, 658 F.2d 406, 411 (5th Cir. 1981) (granting habeas relief to petitioner who was an educable mental retardate with an I.Q. between 65 and 69, and reading skills on a second grade level; "When persons of markedly limited mental ability such as Henry, are questioned without the aid of counsel, issues of 'suggestibility and possible overreaching are raised' . . .Extra precautions must be taken. It must be painstakingly determined that they comprehend what events are transpiring. In addition, the presence of counsel should be assured absent an unmistakable, knowing waiver of that assistance").

And indeed, BSO itself has at least now understood that something more than a quick read-through is necessary for developmentally disabled subjects, as it has instituted new policies for interrogating developmentally disabled suspects. *See, e.g.*, Pet. Ex. 82 at 2 ("When advising developmentally disabled subjects of their constitutional rights, detectives will speak slowly and clearly and ask subjects to explain their responses rather than simply answer yes or no.")  Here Detective Carr simply read the form to Brown, and Brown responded with "Yes/No" answers. ***There was no extra explanation to Tim, nor any feedback from Tim that might support a finding of actual understanding.***

Without that,  the Yes/No answers of a ***15-year old*** with an IQ of 56, in response to the perfunctory reading of the rights form, are not legally sufficient proof of the requisite understanding required for a constitutional waiver here.  Under controlling precedent, ***juveniles*** with IQs and

30

reading levels comparable to Brown's, will *not* be deemed to have understood the *Miranda* rights, from the simple fact that the form was read – perfunctorily – to them. *Cooper v. Griffin*, 455 F.2d 1142 (5th Cir. 1972) (15 and 16-year old brothers with I.Q. between 61-67, with 2nd or 3rd grade reading levels, were incapable of making a knowing and intelligent waiver of *Miranda* rights; it is doubtful that they comprehended any of the words read to them; therefore they could not have made a knowing and intelligent waiver of their rights).

**(4). Brown's prior juvenile arrests and experience with the juvenile justice system, are irrelevant to the issue here, given that the *Miranda* rights were not carefully explained to Brown on July 16, 1991 – the form was merely read.** As indicated in *Smith v. Kemp* (discussed *supra*), where the defendant's age and I.Q. preclude him from understanding the *Miranda* rights without careful explanation, the fact that the defendant might have had previous encounters with the law, and Mirandized previously, is a non-factor. It does not tip or even affect the "totality of the circumstances" analysis. And apparently, that is the law in Florida as well. *See T.S.D. v. State*, 741 So.2d 1142 (3rd DCA 1999) (12-year old defendant, with 62 I.Q., who read at 3rd grade level, and had history of psychological problems, did not knowingly and intelligently waive his right to remain silent; contrary to the state, defendant's prior exposure to the juvenile system did not aid in his comprehension of *Miranda* rights). It is therefore legally irrelevant in this case, that Brown might have been read some form of *Miranda* rights at another time prior[9] – or even many times in the past.

---

[9]While we will withdraw our previous objection to the Court's consideration of Resp. Ex. 1001 (Brown's May 5, 1991 statement) on the grounds that such a statement is a confidential juvenile record, we *do* continue to object to the relevancy of Resp. Ex. 1001 pursuant to Fed. R. Evid. 106 (the rule of completeness), given that the State has *not* submitted the actual May 5, 1991 *Miranda* form which was allegedly read to and initialed by Brown *See* D.E.# 313 at 3-4 (incorporated herein by reference); EH13 at 98-99.

The law on this point is clear, in fact, because the clinical research done on this issue *is* clear – and has been for years. *See, e.g.*, *Smith v. Kemp*, 664 F. Supp. at 505 (noting that the defendant's psychologist had resisted the suggestion that prior experience with the law would be especially helpful to a retarded person's understanding of constitutional rights). Although Dr. Kaprowski was apparently unfamiliar with Dr. Grisso's research concerning the interplay between age, IQ, and experience with the law (she was a clinical, rather than forensic psychologist), Dr. Walker who is indeed a ***forensic*** psychologist[10] explained in her deposition testimony that in the clinical trials Dr. Grisso conducted in the early 1980s, Dr. Grisso found that while there is a direct correlation between age, IQ and understanding of the *Miranda* rights, for juveniles 15-years-old and younger prior experience with the law has no effect at all. In fact, regardless of their IQ, past exposure of these

---

Without this actual *Miranda* waiver form, the "recitals" in Resp. Ex. 1001 are not complete. They have no probative value. The Court similarly has no way to judge which "rights," if any, Brown was actually advised of in May of 1991. Respondent's Exhibit 1001 indicates that the police officer asked Brown only conclusory questions about the administration of his rights: "Were you read your rights as per *Miranda*?" "Was there a sheet given to you that had all your rights, that you put your name on and you answered yes to each of the questions?" and "You put your initials by each of your answers?" Brown's simple "Yes ma'ams" in response is not, however, competent proof that indeed he was actually advised of "all of his rights" "as per *Miranda*." Brown was a 15-year-old with an I.Q. of 56 and a mental age of 7 or 8, not a lawyer familiar with the *Miranda* decision. He would have no way of knowing what "*all* his *Miranda* rights were" or "whether he was read those rights *as per Miranda*." (Emphasis added). Dr. Walker has indicated that some of the juvenile records she reviewed contained different rights waiver forms, with different formulations of the rights. (Pet. Ex. 1048 at 66-68). For instance, in Pet. Ex. 1038 (Pet. Ex. 84), there is a form entitled "Your Rights in Court When Charged with Juvenile Delinquency," which speaks of his right to have a lawyer at the first hearing, not during the interrogation. (Pet. Ex. 1048 at 67). "Now its not just one form that he's exposed to continuously, but two different forms that put it in a different way." (Pet. Ex. 1048 at 66).

[10]While a "clinical psychologist" like Dr. Kaprowski is trained in the study of abnormal human behavior, a "forensic psychologist" like Dr. Walker is specially trained in the application of the study of both normal and abnormal behavior to answer legal questions. (Pet. Ex. 1048 at 8-9).

juveniles to *Miranda* rights would not automatically increase their understanding of those rights:

> What he has found is that there's a remarkable difference, significant difference between sixteen-year-olds and fifteen-year-olds. No matter what the IQ is, fifteen-year-olds do not have the ability in general to understand the waiver of Miranda where as a developmentally disabled fifteen-year-old is going to be much more likely to function at their age level, which in this case is seven or eight year old which makes him totally unable to understand what giving up a right or what a right is, so even if he was read it a number of times in the past, he's not going to be able to understand it, this particular next incident that occurs for him. . . .

> [K]ids don't learn from it, fifteen-year-olds and under don't learn. He's done it in a number of settings and a number of different ways. These are experiments where the kids are really not under the anxiety conditions as Tim Brown was.

(Pet. Ex. 1048 at 68-69). And indeed, irrespective of the Grisso research, Dr. Walker has explained that because of his IQ level, Tim Brown would not be able to think abstractly, or to "apply something from one event to another. [He doesn't] have that ability." (Pet. Ex. 1048 at 53). "Being exposed prior wouldn't have mattered . . . [because] it's not going to make him understand an abstract concept even if he's exposed to it a hundred times." (Pet. Ex. 1048 at 66).

And in fact, even without being familiar with the Grisso research, even Dr. Kaprowski agreed that "***based on his prior experience***, [Tim] did not fully understand he could have had an attorney present." (Pet. Ex. 1006B at 191). As Judge Frusciante found, her testimony was "unimpeached." The Court should presume that what she said is correct. Tim did not understand his *Miranda* rights, merely from his "prior experience." Nor did that prior experience make it any more likely that he intelligently waived them, after having the rights form read to him, on July 16, 1991.

Rather, what the actual evidence here shows is that Tim could hardly even focus on the form. He had problems concentrating and paying attention to start with due in part to a post-traumatic

stress disorder, (Pet. Ex. 1048 at 47, 69),[11] and he says that all he was thinking about at the time was how scared he was. (EH11 at 18). He signed the form and wrote answers to each question because he was young and suggestible, passive-compliant, and scared. But as he credibly told the Court when he testified, he did not understand *at all* what the piece of paper read to him meant. (EH11 at 14).

**(5). Dr. Kaprowski was clear, and the other evidence shows, that Brown did NOT understand that he had a right not to talk to the police at all (his Fifth Amendment privilege against self-incrimination.)** While Tim Brown says that he told the police at the outset that he did not want to speak to them, and that he wanted to speak to his mother, (EH11 at 26), there is no indication in the record that Tim knew that he had a legal right *not* to speak to the police at all. Rather, it was clear from Dr. Kaprowski's testimony at the suppression hearing, that she believed Brown had no understanding at all of his right not to talk to law enforcement officers – his Fifth Amendment privilege against self- incrimination (his "right to remain silent.") According to Dr. Kaprowski, Brown had been questioned by police before, and simply believed that "if he said what 'they' wanted it would be over and he would go home as he had before.'" (T. 240-241). Dr. Walker confirms that Tim believed, from his prior arrest experience, that he would be released if he simply told them what they wanted to hear. (Pet. Ex. 1048 at 44-45). Brown's belief in this regard resulted in a fundamental misunderstanding of his part of his right to remain silent. There is no contrary evidence in the record that at the time he waived his rights, Brown understood that he did not have to talk at all. That he could simply "button his lips" and remain silent.

---

[11] The reasons for and extent of this post-traumatic stress disorder, as documented and explained by Dr. Walker, will be discussed at much greater length in connection with the involuntariness claim *infra*.

**(6). Dr. Kaprowski was clear, and the other evidence shows, that Brown did NOT understand that he had a right to consult with a lawyer prior to the interrogation, and to talk only with counsel present during the interrogation**. At the suppression hearing, Dr. Kaprowski acknowledged that Tim had been arrested before and therefore *assumed* that he knew *what an attorney was* and *what a lawyer could do for him "in a very basic way, yes, that a lawyer was on his side"* (T. 230-231, 240).[12] However, knowing what an attorney *is* or what he can do for you "in a basic way," or even that a lawyer is on your side, is quite different from *understanding what it would mean to have an attorney present at one's interrogation and to knowingly waive that presence*.

And on this issue, which in fact is the crucial issue, Dr. Kaprowski's testimony was undisputed that she did *NOT* believe that Brown understood that he could have an attorney present at his interrogation:

> MR. DAVIS: Would [Tim Brown] understand that his rights to counsel and things along that lines, that is, going into [the] *Miranda* decision?
>
> DR. KAPROWSKI: I think based on his prior experience, he did not fully understand that he could have had an attorney present. He stated that he wished he had his mother present though.

(Pet. Ex. 1006B at 190-191).

Dr. Kaprowski was correct in stating that there was nothing in Brown's prior experience that would have allowed him to understand that he could speak to an attorney before he spoke with the detectives, or that he could have an attorney present with him during the interrogation, while he spoke. His prior experience with the law was only in the juvenile justice system, where juveniles

---

[12]Because Brown had been in the court system before, Dr. Kaprowski assumed that he had been represented by attorneys. (T. 230). She had no actual evidence of that fact, however.

meet their lawyers in court. There is no evidence that in any of his juvenile cases, Tim had ever had a lawyer present *during* questioning – *during* an adversarial interrogation the likes of which he had never before experienced.

Nor is there any evidence that the specific right to have an attorney present *during* questioning, was *ever* explained to Tim Brown on July 16, 1991, before he "waived" his rights. All Carr did to advise him of his *Miranda* rights, was to read him the Juvenile Rights Waiver form. And even if the perfunctory reading of the Juvenile Rights Waiver form had some legal significance here – which, under the law and the combination of Brown's age and IQ here it did not – *the form itself did not make the right to have an attorney present DURING questioning, clear:*

> You have the right to talk to an attorney and have him here with you *before* we ask you any questions. Do you know what an attorney is? [Brown wrote "Yes" here] Do you understand? [Brown wrote "Yes" here as well]

(Pet. Ex. 89) (Emphasis added). The form itself suggested only that there was a right to talk to an attorney *before* any further questioning. That is what the plain language written here said, and a juvenile like Brown who (because of his IQ) was an absolutely "*concrete*" and "*literal*" thinker, would have understood the word "before" to mean precisely what it said: "*before*." Not "*during*." And in fact, even if the Court could trust Brown's answers to the questions on the form (which, as indicated above, it cannot), the answers do not indicate anything other than understanding "what an attorney *is*." It would have been unclear to Brown, from the ensuing question: "Do you understand?" what exactly he was being asked to understand.

In short, there is no legal or factual basis in this case for the Court to find that Tim Brown actually understood that he had a right to have an attorney present during the interrogation. BSO's Juvenile Rights Waiver form specifically failed to so advise him – even if he could have understood

everything the form advised.  And for this reason, the form flunks even the most basic *Miranda* test.

For as the Supreme Court held in *Miranda*:

> [A]n individual held for interrogation must be clearly informed that he has the right
> to consult with a lawyer and to have with a lawyer and to have a lawyer present with
> him during interrogation under the system for protecting the privilege we delineate
> today.  As with the warnings of the right to remain silent and that anything stated can
> be used in evidence against him, ***this warning is an absolute prerequisite to
> interrogation.***  No amount of circumstantial evidence that the person may have been
> aware of this right will suffice to stand in its stead.  Only through such a warning is
> there ascertainable assurance that the accused was aware of this right.

384 U.S. 436, 471-472 (1966).  Under any construction of the evidence presented, there is no basis

to find that Brown understood that he in fact possessed such a "right."

### (7) Dr. Kaprowski was clear, and the other evidence shows, that Brown did NOT understand that he had a right to discontinue talking at any time.  While Dr. Kaprowski gave

no specific testimony as to whether Brown understood his right to cut off questioning, Brown's

belief that if he simply said what "they" wanted him to say, it would be over and he would go on as

he had before (Pet. Ex. 1006B at 240), undercut any presumption that Brown understood either of

these concepts.  Dr. Walker confirmed that Tim believed "*if he just told them what they wanted to

hear, he would go home. . . . That was in his mind, if he complied with what they wanted.*" (Pet. Ex.

1048 at 40, 54).

If Brown had attempted, at any time during the interrogation which followed to actually cut

off questioning, it might be reasonable to presume that he understood this right.  But in fact, Brown

never at any time attempted to cut off questioning.  When they accused him, he denied and denied

until he could deny no more.  He never at any time told the detectives that he did not want to speak

to them. (EH11 at 27).  There is therefore no basis for the Court to presume that Brown understood

that he could assert a "right" to discontinue talking at any time.

For all of these reasons, the preponderance of the evidence – in fact, the overwhelming weight of the evidence – in this case shows that Tim Brown did not actually understand each and every one of his *Miranda* rights, from Det. Carr's perfunctory reading to him of the Juvenile Rights Waiver form. If Brown did not understand his rights, he clearly could not have understood the consequences of waiver. Even assuming for the sake of argument, however, that he understood his *Miranda* rights, the evidence in this case should be clear that he most definitely did not grasp the consequences of waiving these rights.

### C. Brown Did Not Understand the Consequences of Waiving his Rights, Despite Having Signed the Form

In order to make a "knowing and intelligent" waiver, a defendant must understand "what he is doing" by "waiving" his rights. *Smith v. Zant*, 887 F.2d at 1428. The latter inquiry – the consequences inquiry – requires that the suspect be clearly warned, *and* clearly understand, that "anything said can and will be used against the individual in court." *Miranda v. Arizona*, 384 U.S. 436 (1966). "This warning is needed," the Supreme Court explained,

> in order to make [the suspect] aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system – that he is not in the presence of persons acting solely in his interest.

*Id.* at 469. For the *Miranda* waiver to be valid, the police must "fully apprise the suspect of the State's intention to use his statements to secure a conviction," *Moran v. Burbine*, 475 U.S. at 420, *and* the suspect must be "aware of the State's intention to use his statements to secure a conviction." 475 U.S. at 422. Here, Brown was neither fully apprised, nor was he aware of the State's intention to use his statement to secure his conviction. For these reasons, his purported "waiver" is

constitutionally invalid.

**(1). <u>BSO's Juvenile Rights Waiver form itself did not convey the warning about the consequences of waiver in "clear and unequivocal terms." Rather, contrary to the *Miranda* decision itself, the form deceptively informed Brown that anything he might say would be used in court "EITHER FOR OR AGAINST [HIM]."</u>** In *Miranda*, the Supreme Court was emphatic that if a person in custody is to be subjected to interrogation, the Due Process Clause requires that he "be informed in *clear and unequivocal terms*" not only that he has a right to remain silent, *id.* at 467, but that "the warning of the right to remain silent must be accompanied by the explanation that anything can and will be used against the individual in court." *Id.* at 468 (emphasis added). Here, there is NO EVIDENCE that the police "fully apprised" Brown in "clear and unequivocal terms" of the State's intention to use his statements to secure a conviction. Rather, all the detectives did was read Brown the BSO Juvenile Rights Waiver form (Pet. Ex. 89), which states, confusingly:

> **Should you talk to me, anything you say can and will be used in a court of law, *either for you or against you*. Do you understand?**

(Pet. Ex. 89) (Emphasis added). In Dr. Walker's opinion, the concept of anything that he might say being used "for or against him" in court, was an extremely abstract concept that Tim Brown "could not be expected to understand." (Pet. Ex. 1048 at 64).

But even if Brown could somehow have understood this confusing piece of advice, it is actually *wrong* advice. It does **NOT COMPLY** with the dictates of *Miranda* and *Moran v. Burbine*. It does not make clear to the suspect that what the detectives are after is evidence which will help convict. It does not make clear the truly "adversary" nature of what is about to occur. That indeed, they will be trying to do something that will ultimately hurt him, not help him. Clearly, the purpose of a post-arrest interrogation is not to do anything *"for"* an arrestee. And indeed, it is just such a

39

trick question which could confuse a juvenile, particularly, a mentally retarded juvenile like Brown, into waiving his rights.

BSO's Juvenile Waiver of Rights form – its *Miranda* form – is legally insufficient and unconstitutional under the *Miranda* decision itself.  On this alone, Brown's waiver should be found constitutionally invalid.

**(2) <u>Even if the form could somehow pass constitutional muster, Brown was only 15 with an IQ of 56 and a mental age of 7 or 8, and therefore did not have the mental skills to comprehend on his own, from the mere reading of this form, the future consequences of waiving his rights, and giving a statement to the detectives, without a lawyer – that whatever he said would be used against him in court.</u>**  Given Brown's mental condition, Dr. Walker did not believe that Brown could understand or did understood the consequences of going forward in an interrogation without an attorney.  (Pet. Ex. 1048 at 55).  The whole concept of a waiver, of making a choice between two courses of action (proceeding with or without a lawyer), is an abstract concept which Brown could not grasp.  (Pet. Ex. 1048 at 64).  Dr. Walker explained: "The concept of either for or against you, whatever you say could be used either one way or the other way, that is an abstract concept that something can be used one way or the other.  He wouldn't be expected to understand that."  As explained *supra*, Brown was like a 7 or 8 year old child, mentally.  As is true for most children, who deal in the "here and now," he wouldn't have the ability to go much beyond the present."  (Pet. Ex. 1048 at 65).  Moreover, "time is measured differently for children because time is an abstract concept.  So the idea of time; yesterday, today, tomorrow, are hard concepts for somebody who doesn't have the intellectual abilities."  (Pet. Ex. 1048 at 65).

Dr. Leo concurred explaining: "They [mentally retarded individuals] don't think through the

consequences of agreeing to things. They're present oriented; not future oriented. . . . They may not understand the gravity of the situation they are in." (Pet. Ex. 1046 at 36). In particular, he points out, mentally retarded individuals often do not grasp what the true purpose of an interrogation is – that it is accusatorial, and that the object is to get a confession. (Pet. Ex. 1046 at 36-37, 111). And indeed, Tim would not have understood that if he told them something that wasn't true, that would be hard to prove later on. Dr. Walker has said: "Because he knew it wasn't true, therefore in his simplistic way of thinking, how could they prove he did something he didn't do." (Pet. Ex. 1048 at 48).

**(3). <u>Dr. Kaprowski was clear, and the other evidence shows, that Brown did not understand the consequences of waiving his rights, and making a statement.</u>**   When asked "What did you think would happen to you if you gave a statement to the police officers?" Tim Brown explained: "I was assuming they was going to let me go back to my mother." (EH11 at 12). Both Dr. Kaprowski and Dr. Walker have testified that this is precisely what Tim Brown believed at the time. The have indicated that Brown believed that if he told them what they wanted to hear, "it would be over," and he could "go on" or "go home" as before. (Pet. Ex. 1006B at 240; Pet Ex. 1048 at 40, 45).

And in fact, from his prior experience with the law, that was the only frame of reference Tim Brown had. Every other time he had been arrested, he would call his mom, his mom would come to get him and bring him home – or on a few occasions he would have to spend 21 days in the Juvenile Detention Center. (EH9 at 51-52; EH11 at 18). Ron Nobles, Assistant Superintendent at the Detention Center, has confirmed that this is what would indeed occur.   (EH12 at 77-78).

Tim had no experience with what was happening to him at the homicide unit. He had no

41

basis for understanding, from his experience or otherwise, that if he talked to the officers, and said that he was not involved, they could wear him down until the point that he might say that he was indeed involved, and that then they would make sure that he would *never* go home.  He could not, under any stretch of the imagination, have fully grasped the consequences of giving up his right to remain silent and his right to have counsel present.

### D. The Flexible Legal Standard for This Court's *De Novo* Determination – The "Totality of the Circumstances"

It is unclear what legal standard Judge Frusciante was applying to the "totality of circumstances" before him.  Whatever it was, however, it was an erroneous one – patently inconsistent with the law in this circuit.  Although Judge Frusciante mentioned no case by name, he found significant to his ultimate determination, the fact that "in some cases referring to children as young as ten years old IQ's may be a little bit higher I think 68, 69, 70 someplace in that area, but it was a ten year-old as opposed to a 15 year old, and that wasn't sufficient enough to suppress the statement." (Pet. Ex. 1006C at 442).  That suggestion, however, is clearly contrary to controlling federal law on this constitutional issue.  In *Smith v. Zant*, 887 F.2d 1407 (11th Cir. 1989), for instance, Judge Kravitch (specially concurring in reinstatement of the district court's opinion), expressly rejected a similar conclusion of law by a state court.  In *Smith*, she said, the state court's view – as here – that "proof of a defendant's mental limitations without more would always be legally insufficient to establish the invalidity of the waiver, [] is inconsistent with the flexible approach required by *Johnson v. Zerbst*, 304 U.S. 458, 468 (1983)."  *Smith*, 887 F.2d at 1431 (Kravitch, J. concurring).

So while it would be error – as a matter of law – to conclude (as Judge Frusciante did here) that Tim Brown's mental limitations without more would be legally insufficient to establish the

42

invalidity of his rights waiver, we emphasize that we are *not* relying solely upon Tim Brown's mental limitations "in the abstract," but rather, upon the totality of many circumstances here (which includes precise evidence as to Brown's actual understanding on July 16, 1991) to show that any waiver he might have made was neither a knowing one nor an intelligent one, as to either his rights or the consequences of waiver. Considering all of the evidence in its totality, the Court should find that Tim Brown was unable to – and did not in fact – adequately process, understand, and intelligently waive any or all of the *Miranda* rights.

Without a proper understanding of the rights, nor the consequences of their waiver, Tim Brown's post-arrest statement was secured in violation of the Due Process Clause. Because his conviction was based entirely upon that statement, his conviction and current custody are unconstitutional. The Court should grant him the writ.

### 2. The Coercion and Involuntariness of Brown's Taped Statement (Ground B of the Amended Petition)

### A. Governing Legal Principles

**(1) <u>What deference is due the state court's "findings" on the voluntariness issue?</u>**  As with the *Miranda* waiver issue, the State – in its pleadings – has greatly overstated the role of the "presumption of correctness" vis-a-vis the voluntariness determination. Again, we wish to clarify any confusion in that regard up front. There is *no* presumption of correctness to be accorded Judge Frusciante's ultimate finding that Brown's statement was "voluntary." (Pet. Ex. 1006C at 443). That is a purely legal conclusion, and it is not entitled to any "presumption of correctness," or deference. *See  Miller v. Fenton*, 474 U.S. 104, 110, 115-116 (1985) ("the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination;" the "voluntariness" of a confession has "a uniquely legal dimension" and is "beyond the reach of § 2254(d)"); *Stokes v. Singletary*, 952

43

F.2d 1567, 1572 (11th Cir. 1992) (same). Clearly, this Court must make its own *de novo* determination of the voluntariness of the confession in this case by weighing the "totality of the surrounding circumstances." *See Miller*, 474 U.S. at 112 ("[T]he ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination.")

As to the particular circumstances to be weighed into this "totality," Judge Frusciante made only *one* "finding" of subsidiary "historical" fact – that Brown's case was not like *Stokes v. State*, 371 So.2d 131 (Fla. 1st DCA 1979), in which there was a "concern about the parent going to the police station and not having an opportunity to be with the defendant." (Pet. Ex. 1006C at 442). While this finding as to the non-existence of a coercive factor might otherwise be entitled to a presumption of correctness, *Miller*, 474 U.S. at 110-112, 116-117, here it is *not* entitled to such a presumption due to the application of *two* of the statutory exceptions: *First*, pursuant to 28 U.S.C. § 2254(d)(8), Judge Frusicante's finding was *not* supported by the record as a whole – namely, Sgt. Scheff's and Carr's testimony. Notably, at the suppression hearing, the State bore the burden of demonstrating statutory compliance with the parental notification statute, *see Ramirez v. State*, 739 So.2d 568 (Fla. 1999), and neither of these detectives could say *when* – precisely – Mrs. Brown was contacted (which was the dispositive fact under the statute and caselaw). At the very least, the state court record on this issue was ambiguous and confusing, and where that is the case, there is no presumption of correctness accorded the state court findings. *See* Liebman & Hertz, Federal Habeas Corpus Practice and Procedure § 20.3f at nn. 153-154 (1998 ed.) (and cases cited therein). *Second*, even if the judge's finding had been supported by the testimony of these officers, the material facts on this issue were not adequately developed due to Larry Davis' failure to call Mrs. Brown to testify

44

as to what had really occurred. *See* § 2254(d)(3). While the judge was rightly "concerned about the parent going to the police station and not having the opportunity to be with the defendant," he only "failed to find that particular fact" in Brown's case, because he had not heard from Mrs. Brown herself on the issue. Without the testimony of Mrs. Brown herself, the hearing held in state court on this issue cannot in any sense be deemed "full and fair" – the necessary prerequisite for the presumption to arise under § 2254(d).

In any event, even if a presumption applied, § 2254(d) allows a habeas petitioner to *rebut* that presumption with "convincing evidence." Here, we have presented the convincing testimony of Mrs. Brown to the effect that she was *never* even contacted in this case until *after* her son had confessed, and indeed, when she finally *was* contacted and went to the police station, she was not allowed to see her son. If the Court credits Mrs. Brown – and we will explain why it should – Judge Frusciante's contrary findings (made without the benefit of her testimony) are of no moment here.

It is important to point out that other than his *Stokes* finding, Judge Frusciante made no other findings of historical fact – either explicit or implicit – vis-a-vis the voluntariness issue. The Court is therefore absolutely free to make its own findings as to whether the Broward Sheriff's Office engaged in other coercive tactics, after considering all of the evidence in this case. Because Larry Davis (through his incompetence) offered no evidence at the state hearing as to the fact that Tim Brown was slapped or threatened by the detectives, there *were* no disputed factual issues vis-a-vis the voluntariness determination, which the state court was called upon to "find" (after judging credibility), and without "findings," there is nothing to which this Court need defer. The Court can and must judge credibility on these issues *de novo*.

45

### (2). **The legal standard for determining "voluntariness" of a statement or confession**.

As stated by Justice Frankfurter in *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961), the standard

for determining the "voluntariness" of a confession focuses upon whether the confession

> was the product of an essentially free and unconstrained choice by its maker? If it
> is, if he has willed to confess, it may be used against him. If it is not, if his will has
> been overborne and his capacity for self-determination critically impaired, the use of
> his confession offends due process.

*Id.* at 602. In determining whether a defendant's will was overborne in a particular case, the Court

must assess "the totality of all the surrounding circumstances – both the characteristics of the

accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 266 (1973).

Ultimately, the court must determine the psychological impact upon the accused of the tactics used.

Admittedly, the defendant's mental condition is never dispositive of the "voluntariness"

inquiry. A mental condition evidencing susceptibility to official coercion is legally significant vis-a-

vis the "voluntariness" determination *only if* indeed there is evidence of official coercion. *Colorado

v. Connelly*, 479 U.S. 157, 164 (1986); *see also id.* at 165 ("while mental condition is surely relevant

to an individual's susceptibility to police coercion, mere examination of the confessant's state of

mind can never conclude the due process inquiry").[13] But while indeed official coercion is a

"necessary predicate" to an involuntariness claim, *Connelly, id.* at 167 – an "integral element," *id.*

at 165 – there is no set form of coercion, no set formula or "amount" of coercion, that is legally

necessary to render a confession involuntary.

---

[13]This is, of course, different than the *Miranda* waiver issue, in which the defendant's mental
condition may well be dispositive of whether he knowingly and intelligently waived his *Miranda*
rights. While the existence of a coercive interrogation setting may certainly affect a suspect's ability
to understand his *Miranda* rights and appreciate the consequences of waiving them, official coercion
is *not* necessary to a finding of an "unknowing and unintelligent" waiver.

Clearly, to overbear a suspect's free will does not require torture. It does not even require any violence. Indeed, the Supreme Court itself has repeatedly admonished that "'coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition.'" *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (citing *Blackburn v. Alabama*, 361 U.S. 199 (1960)). And in fact, because the more crude interrogation techniques – involving brutality, or even threats of brutality – are so obviously "offensive to a civilized system of justice," *Miller*, 474 U.S. at 109, that they in and of themselves would require suppression of the confessions they produce, the Supreme Court itself has recognized that "interrogators have turned to more subtle forms of psychological persuasion." And where that is the case, "courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Connelly*, 479 U.S. at 164. "Involuntariness" is simply a state of mind that exists when the suspect's will is overborne. *Culombe*, 367 U.S. at 603, 605. And again, how easily the will is overborne depends very much on the "unique characteristics of a particular suspect." *Miller*, 474 U.S. at 109. *See id.* at 116 ("the techniques for extracting the statements, as applied to *this* suspect"). It is not just the IQ, but the actual psychological make-up of a suspect that is key.

Here, when the various tactics employed by BSO vis-a-vis Tim Brown are considered against the backdrop of Tim's age, IQ, very fragile mental state, and very fragile will to resist, it should be clear that his will was overborne, and that his statement was not in any sense "voluntary."

## B. The "Totality" of Circumstances Analysis

There has been much dispute in this case as to what occurred in the unrecorded "pre-interview:" whether Detective Carr slapped Tim Brown; whether either Detective Carr or Detective Thomasevich threatened Tim Brown with the electric chair; and/or whether they provided him with

facts that he parroted back in his taped confession (as they did, for instance, with John Wood).  We will discuss those issues at great length below, and catalogue the many reasons why the Court should credit Tim Brown, and *dis*credit both Detectives Carr and Thomasevich on these issue.  But before delving into those disputed issues – which will, of necessity, require credibility findings – we should start with some of the facts about Tim Brown, about his arrest, and about the unrecorded "pre-interview," which are *un*disputed in this case.  BSO knew that Tim Brown was a boy of only 15, and they did everything in their power to overpower this 15 year old, make him feel as helpless as possible, and extract a confession from him.  In fact, knowing that Tim Brown had once before confessed to involvement in the murder – but concluding at that time that he was not involved, but simply could be led to say anything at all that they wanted – BSO made sure to create the most coercive environment possible in which to interrogate Tim Brown a second time.  Only when they "got him" *where* they wanted him and *how* they wanted him – totally helpless – did they start their "overreaching."  And indeed, because of Tim's young age, his low I.Q., extreme suggestibility, and post-traumatic stress disorder which was a product of years of abuse at the hands of his own father, the very tactics designed to break Tim Brown's free will, did precisely that here.  While our discussion on this issue is organized "factor-by-factor," we want to stress that it was not any one factor – but all of them in their totality – that resulted in an involuntary statement by Tim Brown here.

**(1). <u>Tim Brown was only 15 years old at the time of his July 16, 1991 arrest</u>.**  Although Tim Brown is now a man of 26 – an "incredible hulk" weighing in most recently at 260 pounds – the Court must remember that Brown was a tall, slim boy of 15, weighing 100 pounds lighter in 1991, when he was confronted by BSO detectives.  The State has submitted pictures of Brown

48

around the time of his arrest in this case. We ask the Court to keep those pictures of Brown at 15

in mind when considering what happened to him in this case.

Under the law, a defendant's tender age at the time of his arrest and interrogation is one of

the totality of factors that can and should be weighed in determining whether his statement was

voluntary. Indeed, in *Haley v. Ohio*, 332 U.S. 596 (1948), a case involving circumstances similar

to those here, a 15-year old boy's statement was held to be involuntary. Justice Douglas, writing for

the Court, stated:

> What transpired would make us pause for careful inquiry if a mature man were
> involved. And when, as here, a mere child – an easy victim of the law – is before us,
> special care in scrutinizing the record must be used. Age 15 is a tender and difficult
> age for a boy of any race. He cannot be judged by the more exacting standards of
> maturity. That which would leave a man cold and unimpressed can overawe and
> overwhelm a lad in his early teens. This is the period of great instability which the
> crisis of adolescence produces. A 15-year old lad, questioned through the dead of
> night by relays of police, is a ready victim of the inquisition. Mature men possibly
> might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of
> tender years is a match for police in such a contest. He needs counsel and support
> if he is not to become the victim first of fear, then of panic. He needs someone on
> whom to lean lest the overpowering presence of the law, as he knows it, may not
> crush him. No friend stood at the side of this 15-year old boy as the police, working
> in relays, questioned him hour after hour, from midnight until dawn. No lawyer
> stood guard to make sure that the police went so far and no farther, to see to it that
> they stopped short of the point where he became the victim of coercion. No counsel
> or friend was called during the critical hours of questioning.

*Id.* at 599-600. Here, as in *Haley*, a young 15-year-old boy was questioned without lawyer, without

friend, and most importantly, without his mother. The Court in *Haley* refused to assume from the

mere "recitals" which accompanied Haley's confession, that indeed that 15-year-old understood his

*Miranda* rights. *See id.* at 601. Here, of course, we know that irrespective of the "recitals" Brown

made, he did ***not*** understand either his rights, ***or*** the consequences of waiving them. A mature man

might certainly have withstood the pressure here for a fairly lengthy time period. But the same

cannot be expected of a 15-year old boy – outnumbered by the police as both Brown and Haley were.[14] And indeed, while the full interrogation in *Haley* lasted 5 hours, and the one here only a little over an hour, there were additional factors in Brown's case that made even an interrogation of this length more than this particular boy could bear. We will discuss each of these factors in turn.

**(2). Brown had an I.Q. of only 56, and a mental age of 7 or 8. He was childlike, passive compliant, and highly suggestible. Indeed, BSO knew that something was "not right" with Brown, from their prior encounter with him.** Brown was not like ordinary 15-year-olds. He may have "looked" normal to Detectives Carr and Thomasevich in July of 1991, but looks can be deceiving. For while Tim Brown might have "looked" normal on the outside, and may have even "sounded" normal in superficial conversation, on the inside his brain was *not* normal. It was decidedly *below* normal. And in fact, as Dr. Walker and even the Supreme Court has now realized, with a full scale IQ of 56 (Pet. Ex. 1006B at 185-186), Brown was in the lowest 1% of our population. *See Atkins v. Virginia*, 122 S.Ct.2242, 2245 at n.5 (2002) ("It is estimated that between 1 and 3 percent of the population has an I.Q. between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition;" Atkins' full scale IQ was 59, which means he was in the lowest 1% of the population; in the over 40 capital defendants that the expert had interviewed, Atkins was only the second individual who met the criteria).

What did it mean, in practical terms, for this 15-year old boy to have an IQ of 56? As noted

---

[14]In *Haley*, five or six of the police questioned the defendant "in relays" of one or two each. *Id.* at 598. Here, the police presence was also overwhelming in that Brown was questioned by Carr and Thomasevich together, with Scheff coming in and out as well. This factor will be discussed in greater detail, *infra*.

*supra* in connection with the *Miranda* waiver issue, what it meant was that inside this boy of 15, there was a brain of a 7 or 8 or perhaps 9 year old child. Dr. Kaprowski, Dr. Walker, and Doug Bell have all confirmed that this was true – Bell, in fact, quite graphically with his testimony about the 15-year-old Brown's desire to color above all else. But, as noted *supra* as well, Tim's low I.Q. affected him in ways other than intellectual ability and maturity. According to Dr. Kaprowski, Tim had a "passive compliant personality" (Pet. Ex. 1006B at 193) and was "easily led by almost anybody" including the police (Pet. Ex. 1006B at 191). And in fact, as noted by Dr. Leo, the mentally retarded are commonly submissive, highly compliant, and suggestible. (Pet. Ex. 1046 at 36-37). At the suppression hearing, Dr. Kaprowski stated that if you placed Tim Brown in an interview room, shackled him, questioned him for an hour and 20 minutes or so, showed him pictures and other things that related to the case, you could get him to say anything that you wanted." (Pet. Ex. 1006B at 193). And in fact, as will be explained below, that is precisely what occurred here.

While BSO in this case might not have been aware of Brown's precise I.Q. when they decided to arrest him in July of 1991, they **were definitely** aware of his extreme suggestibility – from their prior encounter with him in November of 1990. Indeed, only days after Deputy Behan's murder, Tim Brown, who was only 14-years-old at the time, was brought in on a juvenile pick-up order, and questioned (without being *Mirandized*) as to whether he was involved in the Behan murder. According to the suppression hearing testimony of Richard Scheff, Brown first said that his friend Keith Maddox had shot the deputy, then he said he himself shot the deputy. But "he would start a statement and jump to something else. He did not seem to be terribly responsive. It was just a bizarre quality to me." (Pet. Ex. 1006A at 20). Scheff said that he "wanted to get a better feel for

Tim Brown in reference to a mental state at that point in time." (Pet. Ex. 1006A at 20). Ultimately, however, Scheff discounted Brown's statement entirely, saying that he thought that Brown was either under the heavy influence of narcotics, suffering from "some organic brain disfunction," or at the very least was "not in possession of all of his faculties." (Pet. Ex. 1006A at 31, 125). In his deposition, Scheff said that Brown was "like clay" in his hands, and that he could get Brown to say whatever he wanted him to say. (Pet. Ex. 1006A at 124-126). On November 15, 1990, when Scheff released Brown back to HRS custody, Scheff clearly "was not satisfied that [Brown] was the person that had shot Patrick Behan. (Pet. Ex. 1006A at 156).

Nevertheless, even if BSO had no idea how mentally deficient, immature, or suggestible Brown truly was, the caselaw is clear that I.Q., maturity, and suggestibility are factors that weigh into the "totality of circumstances" *irrespective* of whether the detectives knew or appreciated them at the time. Thus, irrespective of whether Carr and Thomasevich knew about Tim Brown's mental condition, or what was going inside his head, if any of their tactics had a more pronounced effect upon him because of his mental condition, this is a very significant factor in the totality. *See Connelly*, 479 U.S. at 164 ("As interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus.")

**(3). BSO calculated the timing of Brown's arrest and the manner in which he was placed under arrest, to maximize Brown's fear and helplessness.**   It is undisputed in this case that BSO carefully calculated when they would arrest Tim Brown.  Knowing that he was only 15 and that they had been able to get him to make a statement once before, they made sure to arrest him only when they felt they had a sure shot at getting him to make a statement about the Behan case this time

too. In fact, Sergeant Scheff, who was in charge of the investigation, testified at the suppression hearing that BSO declined to speak with Brown for a full 7 months between his November 1990 statement (which, of course, Scheff had determined to be false) and July 16, 2002, when he was released from the Covenant House, because of a concern that Brown would not "be willing to discuss the case with us," (Pet. Ex. 1006A at 137), so long as he was in HRS custody. So long as he had a right to an attorney, Scheff knew, "we would never get out of the starting block." (Pet. Ex. 1006A at 27). Clearly, an attorney would have advised Brown not to make any statement. (Pet. Ex. 1006A at 137). They wanted Brown alone, helpless.

So indeed, BSO waited until there would be no one near Tim Brown who could invoke his right to an attorney. They knew the date and time he would be released from Covenant House and, positioning themselves just outside, they waited for him to walk out alone. (Pet. Ex. 1006B at 267). Obviously hoping to capitalize on the element of surprise and fear, when Tim Brown walked out, Detectives Carr and Thomasevich testified at the suppression hearing that they followed him, quickly identified themselves as BSO detectives, handcuffed Brown with hands behind his back, and placed him under arrest for the murder of Deputy Behan. (Pet. Ex. 1006B at 271-272, 281, 361). Brown describes that he was walking only a few blocks from the Covenant House when two unmarked cars pulled up, and four detectives jumped out, handcuffed him, and arrested him. (EH11 at 7, 20). One of these detectives, Det. Carr, says that he placed Brown in the back of his van, read him his rights, and told him that everything would be explained to him back at the police station. (Pet. Ex. 1006B at 272-274). Ultimately, Brown was transferred form the van to the back of Detective Ilaraza and Detective Gucciardo's unmarked police car. (Pet. Ex. 1006 at 274). Neither detective said a word to Brown in the car ride to the homicide unit. (EH12 at 29). They arrived in the parking lot of the

station at approximately 6:55 p.m.  (Pet. Ex. 1006B at 274, 277).[15]  Brown still did not know what

he was arrested for.  He found out only when they took into the interview room.  (EH11 at 22).

**(4).  BSO created a coercive environment in the small interrogation room – by**

**overpowering Brown in number, by shackling his legs, and *denying* him food.**  In its opening

statement, the State attempted to paint a picture of a very friendly atmosphere in the interrogation

of Tim Brown.  It described for the Court an orderly procedure whereby Tim was arrested, taken to

the Broward Sheriff's Office, read his *Miranda* rights, and thereafter interviewed "cooperatively"

(without coercion) off the record, for approximately an hour – a "good portion" of which was

devoted to the detectives "providing for the creature comforts of Mr. Brown:"

> MR. DONNELLY: The detectives then conducted an interview with Mr. Brown that
> was not recorded, and that went on for approximately an hour.  A good portion of
> that interview, though, are the detectives providing for the creature comforts of Mr.
> Brown.  They ordered him pizza.  They let him use the restroom.  Detective Ilarraza
> observed this pre-interview from another room, but didn't participate with Detectives
> Carr and Thomasevich when they interviewed Mr. Brown.  The atmosphere in this
> pre-interview will show it was cooperative with Mr. Brown.

(EH8 at 21).  This is a false picture of what actually occurred.

The record is clear in this case that the only "creature comfort" provided to Mr. Brown, was

allowing him to go to the bathroom, and giving him a soda.  (Pet. Ex. 1006B at 274-275, 281).  As

Detective Carr explained at the evidentiary hearing, ***this took no more than 1-2 minutes***.  (EH10

at 29).  That is decidedly ***not*** a "good portion" of the unrecorded pre-interview.  Detective Ilarraza,

who claimed to have viewed an unidentified 20-minute stretch of the interview, saw nothing at all

---

[15]Contrary to the testimony of Carr and Thomasevich, who were the actual arresting officers, Sgt. Scheff – who had waited back at the Homicide Unit – claimed that Brown was not under arrest at the point he was brought in, he was merely brought in for questioning, and he was not even handcuffed. (R. 32, 143-144).

– no pizza or drinks given to Tim Brown. (EH12 at 46). Detective Carr's report made clear and Detective Thomasevich confirmed that Tim Brown was *not* given any pizza in this case until 9:00 p.m. – *after* he had made his taped statement admitting to being at the scene of the Behan homicide. (EH13 at 75). Denial of food is an effective technique for wearing down the suspect, priming him to confess. Indeed, it had certainly worked quite well with another suspect the year before – John Wood. (EH8 at 72).

But even if the detectives had, as Mr. Donnelly claimed, given Brown pizza at the outset – that would not have diminished the coerciveness of the interrogation environment, or proved its non-coerciveness. *Cf. Blackburn v. Alabama*, 361 U.S. 199 (1960) (notwithstanding one hour dinner break during lengthy confession, atmosphere was coercive to mentally-impaired defendant, who was placed in a small room, where he was outnumbered by at least 3 detectives, and "cut off from the moral support of friends and relatives"). As in *Blackburn*, Detectives Carr and Thomasevich here interrogated Brown continuously in a small room (ten by ten or twelve by twelve), while Sgt. Scheff was in there at the beginning (Pet. Ex. 1006C at 368; EH11 at 22), and then "several times . . . in and out." (Pet. Ex. 1006C at 399; Pet. Ex. 1006L at 1725). Clearly, Brown was overpowered in number by the detectives – in a manner comparable to the overwhelming in *Haley* as well.

And indeed, although Sgt. Scheff claimed at the suppression hearing that Brown was free to leave if he wanted to (Pet. Ex. 1006A at 32), that was absolutely untrue. Carr and Thomasevich had shackled Brown's feet together with leg irons – a fact which they conceded both at the suppression hearing (Pet. Ex. 1006B at 281-282; Pet. Ex. 1006C at 403), and at the federal evidentiary hearing. (EH9 at 88). The State failed to mention this fact, in its opening statement. But it is an important fact, which cannot be glossed over. Dr. Richard Leo, who is an expert in police interrogation,

coercive techniques, and false confessions (Pet. Ex. 1046 at 23) has explained that shackling "goes to the issue of whether the suspect perceives they have the ability to either terminate the interrogation or leave the interrogation environment. Something that many individuals, many researchers, would regard as inherently coercive. And so, it's – it's a coercive – potentially coercive influence on the decision to confess and cooperate." (Pet. Ex. 1046 at 70). And in fact, as Tim Brown explained, and Detective Thomasevich agreed as well at the suppression hearing,[16] his legs were not merely shackled together; they were also shackled to the floor. (Pet. Ex. 1006C at 398; EH11 at 7)[17] Donald Craig confirms that when he met Brown, Brown told him that he had been shackled to the floor. (EH11 at 77). In Dr. Leo's opinion, "shackling to the floor is highly unusual." (Pet. Ex. 1046 at 70).

And of course, it was only when the detectives had Brown in this small interrogation room, shackled, and outnumbered by three detectives (Carr, Thomasevich, and Scheff), (EH11 at 22), that they finally decided to tell Brown why he was there. And indeed, while he had been curious before, when they told him that he was under arrest for the first degree murder of Deputy Behan, he started to get scared. (EH11 at 7, 22).

Finally, Brown – like the defendant in *Blackburn* – was "cut off from the moral support of friends and relatives." The Court in *Blackburn* noted that such an attempt to cut the suspect off "is not infrequently an effective technique of terror." *Blackburn*, 261 U.S. at 280. The mentally impaired defendant in *Blackburn* was 24. The mentally impaired defendant here was only 15, with

---

[16]Detective Thomasevich now claims he is unsure whether Brown was shackled to the floor, as he "believes he remembers that the ring was missing from the floor." (EH13 at 71).

[17]Since Tim was left in the interview room alone after the conclusion of the interrogation (EH13 at 82), the Court may fairly assume that indeed, as Thomasevich testified, he was shackled to the floor.

a mental age of 7 or 8.   As noted in *Haley*, cutting off a 15-year old child from all possible support during a confrontation with the police, was quite a potent instrument of "terror."  The effect is even more potent, when that child of 15 has a mental age of 7 or 8.

**(5). BSO refused to permit Brown to speak with his mother before he waived his rights, or at any time before he made his taped statement – in clear violation of Florida law.**  As he sat shackled in the interrogation room, and was told that he was under arrest for the murder of Patrick Behan, (EH11 at 7, 27), Tim Brown was afraid.  Nothing like this had ever happened to him before. He had certainly been arrested before, but this was different.  He wanted his mother, and he told them so.  (EH11 at 27).  In fact, he always wanted his mother whenever he had gotten arrested in the past.  Tim testified, and Mrs. Brown confirmed, that every time he had been arrested before, he had called her, and she had come down to get him.  (EH11 at 18; EH9 at a 51-52). When he was picked up by Carr and Thomasevich, and taken to the homicide unit for questioning, he wanted his mother there very badly.  (EH11 at 27).  And indeed, though he signed the form Carr and Thomasevich put before him saying that he did not want a parent there, that simply was not true.

How do we know Tim is telling the truth?  Well first, he told Larry Davis in his very first interview, that he did want his mother there.  That is very plainly written in Davis' notes of his interview with Tim.  (Pet. Ex. 83; EH8 at 45).  Tim would have had no reason to make that up.  The notes indicate that he was telling Davis what happened from his memory. And he recalled that he wanted his mother there.  Dr. Kaprowski as well testified that Tim very much wanted his mother present there.  (Pet. Ex. 1006B at 191).  And, as Judge Frusciante noted, Dr. Kaprowski's testimony was "unimpeached."  Finally, Mrs. Brown has testified (and certainly was prepared to testify on this matter at the suppression hearing, if Larry Davis had bothered to call her as a witness), that indeed,

when she went to see Tim at the Detention Center, on that first Saturday after his arrest, he told her quite clearly that he had wanted her there.  (EH11 at 52).

Why then did he sign a form stating that he did not want his mother there?  The answer in two simple words: James Carr.  Carr is an imposing man.  He is not easily intimidated.  But he certainly is *intimidating* – and would have been intimidating to a 15-year old boy, a passive-compliant boy with a mental age of 7 or 8, a boy sitting with his legs shackled in a small room with Detective Carr, under arrest for first degree murder.  A boy with no way out.  Tim relates that the detectives told him all sorts of thing: that they were going to contact his mother, but then that he didn't need his mother,[18] and that he should answer their questions and they might consider letting his mother come up and see him. (EH11 at 27).  He felt powerless to keep insisting on her presence.  He therefore wrote down whatever Carr told him to write – including the fact that "Yes" they had attempted to contact his parents/guardian.  (Pet. Ex. 89).  Tim Brown had no knowledge at all as to whether or not that was true.  There is no evidence that he ever saw anyone "attempt" to contact his mother.  But Carr told him that "they" had done so, and Tim Brown wrote down whatever Carr told him to write.  This was the first step in overbearing Tim Brown's will.  And it worked.  Clearly, they needed to keep Brown isolated – without any parental support.

The problem was, however, that separate and apart from whether a juvenile suspect himself wishes his parent to be present before he is interrogated, *the law* nevertheless requires the police to

---

[18]This sounds remarkably similar to what these two detectives "snottily" told John Wood – that he "didn't need" a lawyer.  (EH10 at 77). Wood's testimony lends credibility to Brown's on this point.  It evidences the same disregard for a suspect's rights – the same effort to isolate, weaken, and coerce.  In fact, as Det. Thomasevich was forced to admit on cross-examination, on January 31, 1990, *after* Wood had already had counsel appointed, he and Carr interviewed Wood, and took a taped statement from him, in clear violation of his right to counsel.  (EH13 at 577-59).

contact the parent to see if *the parent* herself wishes to meet with her child before an interrogation occurs. Indeed, Florida law was well-settled even in 1991 that whenever *a child* is taken into custody, "the person taking the child into custody shall attempt to notify the parent, guardian, or legal custodian of the child. The person taking the child into custody shall continue such attempt until the parent, guardian, or legal custodian of the child is notified." Fla. Stat. § 39.037(2)(1991). *See Stokes v. State*, 371 So.2d 131 (Fla. 1st DCA 1979) (construing former Fla. Stat. 39.03(3)(a) (1977), which provided that whenever a person detains a child, "he must immediately notify the parents or legal guardian.") In *Stokes*, the Fourth DCA made clear that there must be a timely notification of a juvenile's parent – and that the statute "is not satisfied by a race of diligence between the parent and officer." *Id.* at 132. According to *Stokes*, the obligation of notifying the parent does not require "notice" at some later time to the parent, but rather, a "reasonable opportunity for them to confer with the parent." *Id.* What this means, the court explained, was that "where a parent requests to be present or makes herself reasonably accessible, it is error to proceed in questioning the juvenile without the parent." *Id. See also Dowst v. State*, 336 So.2d 375 (Fla. 1st DCA 1976) ("it is not left to the discretion of the interrogating officer to suspend the operation of this legislative mandate until after he obtains confessions from the youth").

Here, what occurred was precisely what *Stokes* decried "a race" – but a race in which BSO was the only participant. Mrs. Brown was not even given a chance. It is undisputed that Mrs. Brown was not contacted here before her son signed the *Miranda* form at 7:10 p.m. – at which time his interrogation started – *or* before he gave his taped statement. She was not given the opportunity to meet with Tim in any meaningful way – to help explain his rights to him, to help advise him as to whether he should waive them, or to be present with him during his interrogation. Rather, BSO

chose to jump the gun, to plow ahead with the *Miranda* form without contacting Mrs. Brown. Hopefully, they would get Brown talking, and hopefully – so long as his mother did not get involved – they would get a confession out of him.  And indeed, that is precisely what occurred here.

Mrs. Brown testified that on July 16, 1991, the night Tim was arrested she was at home, at 6640 Perry Street in Hollywood, with her grandchildren.  It was 9:00 p.m., and already dark out – in fact it had been dark out for approximately 30 minutes – when she had a knock at her door.  (EH9 at 52-53).  (She recalled the time because she always put her grandchildren to bed at 9:00 p.m., and she had just put them to bed).  (EH9 at 53).  She went to the door, and saw two BSO detectives standing there.  One was Sgt. Scheff.  She did not remember who the other was.  (EH9 at 52).  They told her that Tim had just been arrested for the murder of Patrick Behan.  (EH9 at 52).  That was the first that she had heard of the arrest.  She had a phone, and it was working at the time, but she had *not* received any phone call about Tim's arrest prior to this.  (EH9 at 53-54).

Mrs. Brown immediately told the detectives that she wanted to go see her son – first, she asked *could* she see her son – and they said "Yes."  (EH9 at 52).  So she borrowed her friend's truck and followed them to a warehouse where they were holding him, in between Commercial Boulevard and Prospect Road.  (EH9 at 53-54).  It took her approximately 30 minutes to drive there.  (EH9 at 55).  When she got there, they put her in a holding room herself.  She waited for approximately 20 minutes, and then an officer (whose name she did not recall) came out and told her: "Mrs. Brown, this is not going to be a Rodney King issue, but you cannot see your son tonight because they have carried him back to the scene of the crime."  (EH9 at 54-55).   So Mrs. Brown left, without ever seeing her son that night.  (EH9 at 54; EH11 at 16).  She was told that she could not see him until the following Saturday at the Detention Center, (EH11 at 52, 54), and she did not see him until that

time – 4 days later. (EH9 at 55; EH11 at 16-17).[19]

And when she saw Tim at the Detention Center, Mrs. Brown testified, he asked her why she did not come to see him that night. She told him that it was because they had kept him from her. (EH11 at 52). Brown confirms that his mother told him at that time that "she tried to come in and they just told her to keep waiting, keep waiting." (EH11 at 18). Mrs. Brown testified that Tim told her at that time that he had very much wanted her there that night. (EH11 at 52).

Mrs. Brown's testimony is credible. Her demeanor was straightforward and forthright on the stand. She was detailed as to what she recalled that evening (the time, for instance, because she had just put her grandchildren to bed, that Scheff was one of the officers who showed up at her house), and candid as to what she did not recall (for example, the name of the other officer who accompanied Scheff). The State did not impeach her testimony in any way on cross-examination. And indeed, they did not even attempt to cross-examine her on this issue. And in fact, the truth of Mrs. Brown's testimony was corroborated by Detective Carr himself, who acknowledged when he was deposed in 1992 that Mrs. Brown had been picked up by Sgt. Scheff, (EH9 at 115), and – although he did not know precisely when she was contacted (EH9 at 116) or when she arrived (EH9 at 113) – that she was outside the interrogation room when he finished with Tim Brown's taped statement, and exited himself. (EH9 at 114). However, it was Carr's belief that Mrs. Brown did not arrive at the office until *after* Tim had made the taped statement. (EH9 at 114-116). That, of course, is consistent with

---

[19]Ron Nobles, the Assistant Superintendent at the JDC, testified that parents can visit juveniles at the Detention Center on Wednesdays, Saturdays, and Sundays. (EH12 at 81). Mrs. Brown, however, was never told about a possible Wednesday visitation. She was told that Saturday was the first day she could see Tim at the JDC, and she did not question what she was told.

the timing Mrs. Brown described.[20]

Sgt. Scheff, by contrast, had testified at the state suppression hearing that he had "phoned" Mrs. Brown at some never-specified time,[21] and told her that Tim "had been linked to the homicide." According to Scheff, she arrived at the office 20 minutes "after we made the phone call." (Pet. Ex. 1006A at 167). But then again, Scheff claimed that Mrs. Brown did not actually want to see her son – that she drove 20 minutes to the homicide unit, and waited there until after the interrogation concluded, simply because "she wanted an explanation." (Pet. Ex. 1006A at 166). His own explanation for that seemingly illogical conduct: "I guess she just didn't want to hear it over the telephone." (Pet. Ex. 1006A at 166). Scheff's explanation, however, is itself illogical. It is contradicted by the evidence, and strains both credulity and common sense. Every single time that Tim had ever been arrested before, Mrs. Brown had been called, and she testified: "I would go and see my child." (EH9 at 51). There is no logical reason why she would not have wanted to see her child on this occasion – where he was being charged not with a petty, juvenile crime, but rather with first-degree murder of a police officer. There is no reason why she would have waited at the homicide office, unless she wanted to see Tim. And there is no reason at all that she would have been at the homicide unit so late in the evening, after Brown had confessed – unless she was not

---

[20]We do not believe Det. Ilarraza's newly-found testimony about a private "viewing room" is credible – given the failure of any of the players in this case, including Ilarraza, to mention that viewing room prior to 2002. However, if the Court *does* credit Ilarraza on that point, the Court should take note that Ilarraza claimed that Scheff was with him in the viewing room, until Ilarraza left (after which, Scheff presumably remained). That would mean – as Mrs. Brown's testimony suggests – that Scheff remained at the homicide station during the unrecorded pre-interview, and did not leave to notify her, until *after* Tim had already verbally confessed, and started his statement on tape.

[21]At the suppression hearing, Scheff provided no evidence as to the specific time he allegedly "phoned" Mrs. Brown. (Pet. Ex. 1006A at 148, 166, 167).

contacted until late in the evening, *after* Brown had waived his rights, spoken with the two detectives

off the tape, and "confessed." The court should find that Scheff's testimony is not believable, and

was an attempt to "cover" his – BSO's – failure to comply with the dictates of § 37.037(2)(1991).[22]

To the extent that Carr – at the evidentiary hearing – tried to cover for Scheff, and for

himself, by testifying that he himself had made "several attempts" to contact Mrs. Brown before

commencing his interview with Tim, (EH9 at 111), this is (1) not credible, given Mrs. Brown's

testimony that no one called her that evening; (2) not credible given Carr's failure to mention these

alleged "several attempts" at any time before the federal evidentiary hearing, (EH9 at 112); (3) not

credible given Carr's failure to mention these alleged "several attempts" when specifically asked at

both the suppression hearing, and at the federal evidentiary hearing, what he did when he brought

Tim into the homicide unit, and answering that he took Tim to the bathroom and brought him a soda

(Pet. Ex. 1006B at 274-275, 281; EH10 at 29); and (4) legally irrelevant, as the Florida Supreme

Court has held that "the statute would be rendered meaningless if all that is required are perfunctory

attempts to contact a juvenile's parents." *Ramirez*, 739 So.2d at 578 & n. 8 (even message left on

voice mail does not comply with the statute). Brown was brought into the homicide unit at 6:55

p.m., taken to the bathroom and provided a soda (which took 1-2 minutes), and then he was read the

rights waiver form and signed that form waiving his rights at 7:10 p.m. (Pet. Ex. 1006B at 275).

Carr has admitted that once he went into the interrogation room with Tim, all "contacting" was left

to Sgt. Scheff. (EH9 at 111-112 ). If Carr is to be believed, therefore, his "several attempts" to

contact Mrs. Brown would have occurred in the 1-2 minutes while Tim was taken to the bathroom.

---

[22]Separate and apart from the statute, BSO also had its own internal policy at the time to make every reasonable effort to contact a juvenile's parent "at the time of arrest, when you would bring the juvenile in." (EH9 at 110).

*Several attempts in a 1-2 minute period* are not the meaningful attempts to contact, that the law requires. Mrs. Brown might have been in the bathroom, or taking a shower. Carr obviously did not care. What is important here, if the Court credits Carr that he indeed made these calls, is that he did not continue to attempt – he did not actually wait to reach Mrs. Brown – before launching into the *Miranda* form with a juvenile. This is evidence of "bad faith," not "good faith," and is testament to an attempt to coerce here.

We believe, however, that the Court should discredit Carr's testimony at the evidentiary hearing, and Scheff's testimony at the suppression hearing, on this point. Rather, the Court should credit Mrs. Brown and find as a factual matter: (1) that the Broward Sheriff's Office did *not* contact (or attempt to contact) Mrs. Brown at the time her son was initially taken into custody, before he had waived his rights at 7:10 p.m., or before he had made an oral admission of guilt, to advise her that Tim had been taken into custody; (2) that rather, the Broward Sheriff's Office contacted Mrs. Brown *after* Brown had already waived his rights, made an oral statement, and concluded (or at least commenced) his taped statement; that (3) Mrs. Brown very much wanted to speak to her son, and was precluded from doing so by the Broward Sheriff's Office; and (4) the BSO clearly violated Fla. Stat. § 39.037(2) and the cases construing it.

Although the failure to comply with this statutory requirement does not render a confession involuntary *per se* in Florida, the Florida courts most definitely consider the fact that a juvenile's confession was given before he had an opportunity to talk with his parents or an attorney, to be "a factor militating against its admissibility." *Ramirez v. State*, 739 So.2d 568, 577. *See id.* at 578 n. 8 (Fla. 1999) (directing that confession be suppressed where a videotape revealed "that it was only after Ramirez confessed to the crime that the detectives beg[a]n to question Ramirez in earnest about

64

the whereabouts of his parents"). Here, as in *Ramirez*, and in direct violation of the statutory mandate, the evidence shows that Mrs. Brown was not contacted until *after* her son had confessed, At the very least, it should be clear to the Court that she was not given any meaningful opportunity to confer with her son *before* he confessed, or *before* he waived his rights and started to speak with the detectives, as the caselaw requires.

The rationale behind "the reasonable opportunity to confer" requirement, is that juveniles need both guidance and protection in dealing with law enforcement. As Dr. Walker has explained, juveniles think only in the present. (Pet. Ex. 1048 at 65). They do not and cannot appreciate future consequences of what they do (Pet. Ex. 1048 at 65) – including the consequences of speaking to police officers without a lawyer. It was to deprive Tim Brown of this very guidance and protection, to prevent him from invoking his rights, however, that the detectives here "engineered" Mrs. Brown's absence from the interrogation room. In fact, they intentionally kept Mrs. Brown out of the interrogation and "in the dark," for as long as necessary to assure that Tim *would make a statement* to the detectives (similar to the way they had orchestrated the arrest, to assure that Tim would *not* invoke a right to counsel). This was classic overreaching.

The Court should find that this is therefore a factor that Judge Frusciante would have considered very strongly as a factor militating against the voluntariness of the confession, had he heard Mrs. Brown's testimony at the suppression hearing. And it is a factor which this Court itself should consider very strongly, as militating against a finding of voluntariness, in its *de novo* review here. In fact, the cutting off of a juvenile suspect from all parental support is an *even stronger factor* in favor of *involuntariness* here than it was in either *Ramirez*, or *Haley*, because Tim Brown was

65

not merely a juvenile – but a ***mentally retarded*** juvenile,[23] who was even more  vulnerable than ordinary juveniles to this type of coercion due to his mental limitations.

As Dr. Leo has explained, mentally retarded adults are more vulnerable to coercive – and even the standard – interrogative techniques. And indeed, mentally retarded *juveniles* are the most vulnerable, and require the greatest duty of care in interrogations. Contacting the parent helps assure in particular, that the rights waiver is a knowing and intelligent one. (Pet. Ex. 1046 at 44, 69). But it will also help empower a juvenile to assert his right to cut off questioning, if need be, once the interrogation is in full swing. In determining here whether the refusal to allow Mrs. Brown to consult with Tim before his interrogation, or to be present with him during that interrogation, had a coercive influence upon him here, the Court may certainly consider the Broward Sheriff's Office's new guidelines for dealing with Developmentally Disabled Suspects (Pet. Ex. 82) – one of the purposes of which is to protect against  coercing false confessions. The new guidelines attempt to assure the presence of a parent in the interrogation room (whether the suspect is a juvenile or an adult), by stating categorically that "A developmentally disabled subject may not waive BSO's policy to notify an appropriate adult." And indeed, the new guidelines require that "Prior to interrogating a subject who is considered to be developmentally disabled, detectives will make a reasonable effort to notify and afford an appropriate adult the opportunity to be present during all questioning. If unable to make contact, detectives will record the date and time attempts were made and the reason the effort failed. If contact is made and the appropriate adult declines, the detective will document the date and time and reasons why." (Pet. Ex. 82 at 2).

---

[23]In *Ramirez*, the defendant was 17 years old, but was emotionally immature, such that his maturity level was that of a 13-year old or a 14-year old. However, "there was no evidence that he was, or is, in any way retarded or has a sub-normal I.Q." *Ramirez*, 739 So.2d at 582.

While admittedly, this BSO policy was not in effect at the time of Brown's arrest, it is nevertheless probative evidence in determining whether Brown's will was indeed overborne, and/or whether his statement may be deemed voluntary.  Given the concerns expressed in the new guidelines, and the premium placed upon assuring the presence of a mentally deficient suspect's parent, it would be reasonable for the Court to infer that interrogating Brown (who was mentally deficient) without giving him an opportunity to speak with his mother, or to have his mother present in the interrogation with him, had a profoundly coercive effect here.

Finally, in weighing the detectives' credibility generally as to the other disputed issues such as whether Brown was threatened with the death penalty or slapped during the unrecorded "pre-interview" that preceded his taped statement, the Court may properly consider their callous attitude to both mother and son here – in refusing to permit them to see each other for 4 days following the arrest – in disregard of the most basic "standards of decency." *Haley v. Ohio*, 332 U.S. at 600.  In *Haley*, the Supreme Court was outraged by the fact that for 5 days after the defendant's arrest, "his closest friend – his mother" was not allowed to see him.  The Court plainly rejected the state's contention that "these events are not germane to the present problem [the involuntariness of the confession] because they happened after the confession was made." *Id.*  Rather, the Court found, such post-confession conduct on the part of the police

> show such a callous attitude of the police towards the safeguards which respect for ordinary standards of human relationships compels that we take with a grain of salt their present apologia that the five-hour grilling of this boy was conducted in fair and dispassionate manner.  When the police are so unmindful of these basic standards of conduct in their public dealings, their secret treatment of a 15-year old boy behind closed doors in the dead of night becomes darkly suspicious.

*Id.*  The failure to allow Mrs. Brown to see her son immediately after his interrogation, when (at least in Carr's version of events) she was waiting outside the interrogation room when he exited, and

BSO's failure to even inform her that visiting was permitted at the Detention Center the next day – misrepresenting to her instead that she could not see her son until the visiting day on Saturday at the Center – are all highly suspicious. These are factors that clearly should weigh *against* the detectives' credibility vis-a-vis their contention that nothing improper occurred during their unrecorded "pre-interview."

**(6). Carr and Thomasevich refused to accept Tim's denials, and start to wear him down.** When Carr and Thomasevich told Tim Brown that he was under arrest for the first degree murder of Deputy Behan, Tim says that he told them "they was crazy. I didn't kill nobody." But they would not accept his denials. They told him, for instance, that Keith King had said "you killed somebody" – that he was in another room and was stating that "you was with him that night at the scene." (EH11 at 8). But Brown continued to tell them, "It wasn't me, I wasn't there." (EH11 at 8). "They said 'We know you did it. We know you did it. We know you did it.'" (EH 11 at 8). And it went on like this for some time. Tim kept saying "I didn't do it. I kept denying it." (EH11 at 8). And as Carr himself even admits, he kept telling Brown "I don't believe you." (EH9 at 94). While initially (when he was first taken in) he had told them that he didn't want to talk to them without his mother, (EH11 at 26), once it became clear that his mother was not going to arrive, his will to resist started to weaken. He let them accuse him and accuse him, question him and question him. He no longer could say: "I don't want to speak with you guys." (EH11 at 27).

Carr conceded at the suppression hearing that Brown denied his involvement for approximately 20-25 minutes. (Pet. Ex. 1006C at 366). Without a lawyer or his mother there to protect him – to remind him that, indeed, he had a right to cut off questioning at any time – it was difficult for Tim to keep defending himself against the barrage of attacks. While cutting off denials

is a standard interrogative technique used for adults, Tim was not an adult, and not a teen of "normal" intelligence. Dr. Leo notes, "it's very important with the mentally retarded to give them the opportunity to explain and not to cut off denials." (Pet. Ex. 1046 at 40). And with juveniles who are mentally retarded, Dr. Leo stressed the crucial importance of having a parent or guardian present. (Pet. Ex. 1046 at 41). But Tim Brown had no parent, and no chance to explain as his denials were cut off. And that is why they were able to wear him down here.

**(7). Carr and Thomasevich hammered on the fact that Keith King had already implicated Brown, although they knew that much of what King had said was false.** As noted above, the detectives admitted that they tried to overbear Tim's denials by "hitting" him with the "pertinent facts" that they had King in custody, and King had already implicated him. (Pet. Ex. 1006B at 283; EH10 at 89). Brown says so as well. He explains that what they said is that they had "witnesses stating that you killed somebody. We have another guy in another room [Keith King] stating that you was with him that night at the scene," and that King had said he (Brown) had killed Patrick Behan. (EH11 at 8, 33). What they did not tell him, however, was that they knew that much of what King said was false. According to the testimony the Court heard in the first phase of the evidentiary hearing in this case, by July 16, 1991, BSO had learned from speaking with Mary Pendergrass, King's foster mother, that she had never seen Brown and King together (EH4 at 107-108);[24] they knew from speaking with Monica Willis that King's account of meeting up with Brown

---

[24]At the evidentiary hearing Carr claimed not to recall if he had ever shown a photograph of Tim Brown to Mary Pendergrass (EH9 at 78), but then, when his recollection was refreshed by his deposition testimony, acknowledged that he had previously said he did go to her house, he did show her a photograph of Brown to Mrs. Pendergrass, and that Mrs. Pendergrass had identified Brown as being at her home several times and that he and Keith King had been "friends for a while." (EH9 at 80-82). Mrs. Pendergrass, however, testified credibly at the evidentiary hearing in Phase I of this case, that no one from BSO ever came to her house asking about Tim Brown; that indeed, she was

at his parent's house on Mayo Street was false (EH4 at 113-119)[25]; and they knew from Philip

Howard's statement, that King could not have escaped from the Circle K in the direction he

described because he would have run straight into the path of Philip Howard, who most definitely

did *not* see him that night.  (Pet. Ex. 91). Jackie Bain had actually described leaving the crime scene

in the very same way Keith King did, and Sgt. Scheff used Howard's statement to thoroughly

discredit Bain.  (EH8 at 79). Moreover, King's account of limping 12-14 miles to his residence,

while high on crack, lace, and marijuana was incredible on its face.  Knowing that King's statement

was false in these respects, it was clear that the only purpose of hammering Brown with the fact that

King had implicated him, was again to make Brown feel "caught" – "cornered" to such a degree,

that he too would confess.

      **(8). Carr and Thomasevich also reminded Tim that he had confessed before in his un-**

**_Mirandized_, November 1990 statement (which had been deemed false at the time).**  While as a

matter of law, the fact that Brown had made a prior unwarned statement would not presumptively

taint his second taped statement – so long as that second statement is deemed voluntary, *Oregon v.*

*Elstad*, 470 U.S. 298 (1985), where as here, the officers seize upon a prior  unwarned statement, and

use it intentionally to try to secure a second (warned) statement, it is clearly at least a factor to be

---

never shown a picture of Brown by anyone from BSO; and that she had never seen or heard of
Timothy Brown and told that to a BSO detective who called her.  (EH4 at 106-107).  Mrs.
Pendergrass has no motive to lie in this matter.  Carr did in 1992 when his deposition was taken, and
clearly, when his reputation is on the line, he does today.  If Mrs. Pendergrass had indeed said that
Tim Brown and Keith King were friends, the State would surely call her as a witness at Tim Brown's
trial.  But of course, it did not.  The Court should credit Mrs. Pendergrass on this disputed point.

    [25]The Court credited Monica Willis' testimony in its ruling on "actual innocence." (D.E. #
286 at 39).  Mr. Carr, of course, has denied that anyone from BSO ever went to the house on Mayo
Street, (EH9 at 87), spoke with Monica Willis, learned that Keith King's statement was false.  The
Court should discredit Carr on this point as well.

considered in determining whether the second statement is indeed voluntary. *See, e.g.*, *Elstad*, 470 U.S. at 316 (noting that in Elstad's case, the officers "did not exploit the unwarned admission to pressure [him] into waiving his right to remain silent"). The official pressure that decidedly did *not* exist in *Elstad*, most definitely *did* exist vis-a-vis Tim Brown here.

Indeed, Carr admitted at the suppression hearing that while Brown was denying his involvement, he and Thomasevich kept "hit[ting] him with pertinent facts, things that we had known" – including not only the fact that Keith King had implicated him, but also the fact that he had given a prior statement in November 1990. (Pet. Ex. 1006C at 366-367). While admittedly there is no record evidence that the detectives misrepresented to Brown that they could use that prior confession against him in a trial, (Pet. Ex. 1006L at 1626), there is also no evidence that they advised him that his prior unwarned statement would never be admissible against him. And clearly, there was no reason for this boy of 15 with a mental age of 7, to have assumed that they could *not* use his prior confession.

### (9). <u>The ultimate coercive acts: Carr and Thomasevich threaten Tim with the electric chair, and then finally, there is a slap – and Tim cracks.</u>

(a) **Tim Brown's account – Why it is credible.** Tim Brown testified at the evidentiary hearing that one of the detectives threatened him with the electric chair (EH11 at 12, 26), and that he was afraid for his life. And, he specified, it had been Detective Carr who stood over him at his right side (while he was seated at the table, shackled to the floor) and first slapped him with an open hand across the right upper portion of his face, (EH11 at 8, 24-25), and then punched him in his right side. (EH11 at 9, 24). Tim's account is corroborated by his mother, Othalean Brown; by his lawyer,

71

Larry Davis, and by the State's own photographs.[26]  Let us discuss each of these in turn.

Othalean Brown recalls that it was 3:00 on that first Saturday after his arrest (4 days later on July 20), that she first saw Tim. (EH9 at 55).  And when she saw him, she started to cry. (EH9 at 57).  What she saw – what made her cry – was a bruising on the right side of his face – across his nose and right along up under his right eye.  And when he turned over his lip and showed it to her, she also saw that his lip had been busted on the inside. (EH9 at 57-60; EH11 at 51, 53).  And indeed, Brown testified: "I showed her the wound that was inside my mouth.  She already seen where I was kind of swoll up across my nose." (EH11 at 17).

Othalean says she asked Tim what had happened to his face, (EH9 at 57), and says that he told her that Detective Carr had slapped him around, hit him across the nose and on his lip, and had threatened him with the electric chair. (EH11 at 51-53).[27]  Tim has confirmed that he told his mother when he finally saw her that he had been beaten, and that "they made me confess to a murder." (EH11 at 17).  Mrs. Brown says that he told her that he had made a statement, because he was afraid for his life. (EH11 at 52).

---

[26]We will withdraw our previous objection to the Court's consideration of the photographs on grounds that they are confidential juvenile records.  The Court may properly consider the photographs for resolving credibility here.

[27]Although Tim has said that indeed, when his mother came to visit him at the Detention Center, he pulled up his shirt and showed his mother where he had been punched, (EH11 at 34-35), Mrs. Brown did not recall Tim telling her that he was punched in the side. (EH11 at 53-54). To the extent that their testimony is inconsistent on this point, it may certainly be explained by the dimming of recollections over time.  And in fact, if Mrs. Brown's testimony had matched her son's in every single detail, it might actually be suspect because it is impossible for two individuals to remember every single detail consistently over an 11 year period.  As demonstrated quite vividly here, Mrs. Brown loves her son, and cares deeply about her son, but would not cross the line and lie to help him. Mrs. Brown was honest and forthright as to the details she recalled (and as to those that she did not recall, even if her recollection was at odds with Tim's). She has never equivocated in her testimony, and her credibility was not, in any way, impeached.

When she left Tim, Mrs. Brown found Larry Davis who was still at the Detention Center waiting to see Tim himself (she had met him in the lobby of the Detention Center for the first time that day). (EH9 at 56, 60). She "told him I wanted him to take a picture of Tim's face because he had got slapped around and he had bruises on his face and his lip." (EH9 at 60). According to Mrs. Brown, Davis said "that he would take care of it," (EH9 at 60), but he never did.

Although Davis is emphatic that such a conversation never occurred, (EH8 at 47), he does not dispute that he spoke with Othalean Brown at the Detention Center that day (because, of course, his notes indicate that). (Pet. Ex. 83; EH8 at 39-42). Nor does he dispute that when he interviewed Tim a week later, Tim told him that he had been "slapped." (EH8 at 49). Of course, Davis failed to recall even *that* crucial fact, until *we* examined his notes, and showed them to him three or four months before the hearing. (Pet. Ex. 83; EH8 at 48-50). In fact, even though the word "slapped" is quite plain in Davis' notes of July 27, 1991, (Pet. Ex. 83), Davis somehow managed to forget this crucial fact by the time he filed the motion to suppress. (EH8 at 50-51) ("I can't, I can't say that I remembered he told me he was slapped at the time I wrote my motion or argued my motion. I can't say that today.") Davis' recollection is clearly not, therefore, a trustworthy guide to what occurred. But his notes are. They are the best evidence we have of what Davis knew at the time here.

However, Davis' notes are sparse. They are not verbatim notes, or necessarily complete. Tim Brown obviously told Davis additional things that are not documented in his notes of the 27th. For instance, Tim says, he also told Davis that he was punched in the side, (EH11 at 43-44), although that is not spelled out in Davis' notes of the 27th. But indeed, these notes are only an outline of some topics mentioned. Davis himself acknowledged that there were other matters he spoke about with Tim Brown, that are not reflected in his notes. (EH8 at 45-46). Therefore, the

73

failure of Larry Davis to note certain facts, such as the punch, or the threat of the electric chair, does not mean that Brown never told him these occurred as well.

And indeed, while Davis was unsure at the hearing whether he ever learned from Tim that he was threatened with the electric chair, (EH8 at 143-145), Davis asked Det. Carr about *just that*, in cross-examining him at trial. (Pet. Ex. 1006M at 1782). As Davis was forced to admit at the hearing, he could *not* have asked Davis such a question, without having a good faith basis for that question. (EH8 at 144). The Court may properly infer that Davis' good faith basis on this issue – was what Tim Brown himself had told him. At the age of 15 and having an I.Q. of 56, Tim would not have had the mental acuity to understand the legal significance of the detectives' *mis*representation of the penalty he was facing – to "make it up" to support a coercion claim down the road. Tim clearly had no way of knowing that because he was a juvenile, he could never get the death penalty. He had every reason to believe that what the detectives were telling him was the truth – and he reported it to his mother and lawyer as if he believed it was the truth. There is no possible motivation he would have had to tell his mother and Davis that he was threatened with the electric chair, if that had not indeed occurred. And it is the same for the slap. To presume that Tim Brown made this up is to assume a level of mental acuity, reasoning ability, and legal sophistication on this 15-year-old's part (a 15-year old with a mental age of 7 or 8), that simply did not exist.

But indeed, even *if* Davis is telling the truth, that *he* did not see any bruises on Tim Brown's face on July 20 when he interviewed Tim, that is *not* dispositive of the issue of the slap here. Davis obviously spent only a few minutes with Tim on July 20. His notes reflect asking Tim information about biographical information, nothing more. If Davis did not ask Tim to show him the cut inside his lip, Tim may not have volunteered this information to Davis – who was still a stranger to him at

74

that time. And indeed, Davis never knew Tim Brown before July 20. He did not know how Tim Brown "normally" or "usually" looked. (EH8 at 48). He was in no position to judge if his lip was puffy or if he was bruised across the nose. Davis had no basis of comparison. Tim's own mother, however, *did*. And Othalean Brown, who had raised this boy from infancy, would have known every nook and cranny of his appearance, every line, every mark, what was "normal" and what was "different." And Othalean Brown saw her son on July 21, 1991, and knew that he had been beaten up – even before Tim told her. (EH9 at 57; EH11 at 51).

She has looked carefully and closely at the photographs which the State has offered into evidence (Resp. Ex. 16) – photographs which Sgt. Kammerer and Det. Carr say were taken on the night of Brown's arrest, at the homicide unit, just after his interrogation and before they left to go to the rock pit (EH10 at 42; EH12 at 59-60) – photographs which we will assume for the sake of argument were indeed taken at that time.[28] Mrs. Brown has examined the photographs and has identified a slight bruising across the nose (on the right upper portion) (EH9 at 59-60), and indeed, they also show a slight puffiness of the lip. This will be apparent to the Court as well, if it examines the pictures closely.

In no sense, however, should the photographs taken on July 16th, be considered an adequate representation of what Brown looked like on July 21st when Othalean saw him. Bruising and swelling may worsen – become more pronounced – over time. Our own experiences and common sense tell us that. There is therefore no reason for the Court to doubt Othalean Brown when she

---

[28]Kammerer acknowledged that he never mentioned taking these photographs previously – in his deposition testimony or at Brown's trial, nor could he locate any report which so indicated. Sgt. Kammerer claimed to base his testimony at the hearing on his recollection, and that alone. (EH12 at 66-73).

explains that Tim looked worse on July 20th when she saw him than he looked in the photo from the 16th – but that she could nevertheless see the beginning stages of his bruising in the photo submitted. Of course, we don't have a photo of Tim Brown on July 20th, because Larry Davis never took one – he never documented Tim's appearance on that date because, he says, he did not see anything. But that Larry Davis did not recognize bruising across the nose of Brown, does *not* rebut Othalean Brown's credible testimony on this issue. For indeed, not only was her testimony credible as a whole – Davis' was not (more on this, when we discuss the ineffectiveness claims) – but in fact, as in *Haley*, the Court may infer from the fact that the arresting officers *refused* to allow Othalean Brown to see her son – even after he had confessed – that they did not want her to see for herself, or hear from her that night, what had really gone on in the interrogation room. If it "wasn't going to be a Rodney King" incident, why not let Mrs. Brown see her son? The State has never given a reasonable answer to this question. Carr admits he was there (so Brown was obviously still there) when Carr came out of the interrogation room and saw Mrs. Brown. So why wasn't she permitted to see him? Very simply: They did not want disclosure of what had occurred during the "unrecorded" pre-interview.

**(b) Why Carr and Thomasevich's denials on this issue are not to be believed.** It is certainly not surprising that Detectives Carr and Thomasevich have denied that Tim was ever threatened with the electric chair (Pet. Ex. 1006M at 1782; EH13 at 86), or that he was slapped. (EH10 at 41; EH13 at 85). And in fact, we expect the State to argue that the detectives' testimony in this regard is supported by the (1) the intake form which notes no injuries to Tim Brown on the night of his arrest; and (2) Detective Ilaraza who heard no threat and saw no slap. This evidence, however, is *not* persuasive.

(i) <u>The intake records – why they prove nothing</u>. First, the State makes far too much of the intake records from the Detention Center. (Resp. Ex. 15).[29] True, Tim did not report his injuries to Gregory Mitchell, the intake officer at the time. (EH11 at 47) But when Mr. Donnelly questioned him as to why he did not, he credibly explained that Det. Carr had been the one to take him to the Detention Center, and he was scared to say anything. (EH11 at 46-47). When Mr. Donnelly asked "You weren't in fear of Detective Carr at that time, were you?" Brown said that indeed, "Yes," he was. (EH11 at 47). His emotion was palpable in recalling the incident, and in his explanation: "What do you expect a fifteen year old kid to do after he had ben beaten, then charged with a murder? What can you say?" (EH11 at 48). Mr. Donnelly responded that he should have said "I have been beaten." (EH11 at 48). But the State's own witness, Ron Nobles, the Assistant Superintendent at the JDC, confirmed Tim Brown's testimony – that such forthrightness was a bit much to ask of a juvenile under the circumstances. Indeed, Nobles explained that a fear of coming forward about injuries was common among the juveniles – like Brown – brought in by police officers: "[O]ften the kid comes in and says 'I have no injuries.'" (EH12 at 80). That is because they are usually accompanied by the police officers that caused the injuries – and they do not want to speak in front of the officers. (EH12 at 80). Det. Carr acknowledged that he was standing right there next to Tim Brown at the Detention Center, as they checked him, asked him if he was feeling alright, or had any "ailments or complaints at that time." (EH10 at 43-44).

That is why, Nobles says, the JDC has the "shower process." (EH12 at 80). "[D]uring the shower process we will see an injury that is not reported." (EH12 at 80). Here, however, the

---

[29]We withdraw our previous objection, and have no opposition to the Court's consideration of these juvenile records.

examination Detention Care Worker Greg Mitchell conducted of Tim Brown during the shower process was cursory at best.  Under the question on the detention card as to "Remarks (to include injuries, scars, tattoos, etc.)," Mitchell wrote "none."  (Resp. Ex. 15; EH12 at 89-90).  And on the "body chart" he marked a large "X" indicating that there were no injuries or scars on Brown's body. (EH12 at 91). We know, however, that ***that*** was incorrect – Mitchell admitted that at the hearing. (EH12 at 100-101). On July 16, 1991, Tim had a very obvious scar from a stab wound on his right side – a scar expressly noted, in fact, in the "Body chart" in the intake records from May 29, 1991 (Pet. Ex. 84; EH12 at 100-101). And it was on this very same right side, in approximately the same place, that Tim Brown said Carr punched him on July 16th. (EH11 at 9). If Mitchell missed the scar, he would certainly have missed any beginnings of a bruise in the same area, and there is no reason to believe that he would have been more particular about Tim's face.  Therefore, Mitchell's failure to note any injuries on Tim Brown on the evening of July 16, 1991 is ***not*** very compelling here. Mitchell processed hundreds of kids like Tim through the Detention Center.  (EH12 at 92).   He clearly did not examine Tim with a close eye – a "fine tooth comb" – as a mother would.  Mitchell candidly admitted that he might well have missed a bruise or abrasion, given the hour at which he performed the screening (5:00 in the morning).  (EH12 at 91, 99, 101; Resp. Ex. 15, "Body chart"). "That's what happens," he candidly explained.  Since he failed entirely to fill out other portions of the paperwork as to whether Tim had a headache, felt sick, dizzy, or had any "other" problem that night, (EH12 at 91, 97-98 – see Resp. Ex. 15, "Medical screening checklist"); since he clearly missed at least one certain obvious marks on Tim's body; since the hour was quite late and Mitchell may have been tired; since mistakes can and do happen; and since the bruising that Mrs. Brown observed on July 27th would not – in any event – have been as apparent just after the incident, Mitchell's

notations (or lack of notations) on the intake form are of little value to the determination of whether Det. Carr slapped Tim Brown.

(ii) <u>The testimony of Det. Ilaraza – Why it is not persuasive.</u>  Nor was the testimony of Det. Ilaraza as compelling as the State represented that it would be in its opening where we were informed (for the first time) that Detective Ilaraza had "observed the pre-interview from another room" and would testify that "there wasn't any physical coercion or psychological coercion on the parts of the detectives." (EH8 at 21). But in fact, when Det. Ilaraza testified, there were numerous reasons to question (1) the fact of his recollection (Was he really present in a secret viewing room on July 16, 1991, having never disclosed it before?), and (2) the significance of that recollection (where he only observed some unidentified 20-minute "slice" of the pre-interview).

First, the whole idea of a secret viewing room – and the secret viewing of Tim Brown's interrogation – is a novel claim in this case.  This was never mentioned by any detective here (Carr,[30] Thomasevich, Scheff, **or Ilaraza**) in their deposition testimony, and never mentioned at trial or at the suppression hearing.  In fact, Det. Ilaraza admitted that before the federal evidentiary hearing, "I don't think I ever talked about being in the viewing room." (EH12 at 40).  When he was asked by the defense attorneys at his deposition in 1993 what his involvement was in the Behan case, he carefully detailed his contact with Brown on November 15th, 1990, all the other tasks assigned to him by Sgt. Scheff and Sgt. Auer, and his assistance in the arrest of Tim Brown on July 16th.  (EH12 at 48-49).  But when he was asked whether he had any contact with Tim Brown when they got to the

---

[30]Carr, for instance, was asked at trial whether Scheff had an opportunity "to observe the fact that Tim Brown was in the interrogation room." (Pet. Ex. 1006C at 1779).  His response was that Scheff observed Brown there "when we brought him in, yes." (Pet. Ex. 1006 C at 1779).  Although Ilaraza now claims that Scheff was with him in the so-called "viewing room," it is significant that Carr made no mention of this when specifically asked at trial.

homicide unit – Ilaraza had said no.  (EH12 at 50).  His explanation that he thought the attorney

meant only "personal contact" (and that would not include visual contact via the TV monitor), is

unconvincing.  And in fact, when at the end of the deposition, after Ilaraza had described bringing

Tim Brown to the homicide unit, Larry Davis asked him a final question: "What else did you do on

the case?" Ilaraza's answer was "That's about it, that I can recall."  (EH12 at 52).  His explanation

now in 2002 for giving that answer: "To me, I didn't think that [viewing the interrogation of Tim

Brown] was actually doing anything on the case.  That was watching a monitor.  To me, I didn't take

that as doing something on the case."  (EH12 at 52).  If the purpose of a deposition is for the defense

attorneys to find out everything the detective did in the case (EH12 at 47), why was Ilaraza not

candid on this point?  Why did he fail to disclose the fact that he had viewed a portion of Tim

Brown's interrogation.  Or perhaps, he actually *was* candid in his deposition, and simply was ***not***

candid before this Court now.  That is what we believe the evidence here shows.

Why would Ilaraza change his testimony on this issue now?  The answer should be obvious:

The stakes in the Tim Brown case have become very high for BSO.  The public knows that BSO

has taken numerous false confessions from mentally challenged and innocent men – including Jerry

Townsend (who the Court heard about in Phase I) and John Wood (who the Court has now heard

about in Phase II).  This serves to explain the inconsistent, illogical, and highly questionable

testimony from at least four top ranking BSO officers (Fantigrassi, Hoffman, Carr, and

Thomasevich) here.  Ilaraza is no different in this regard.  He is therefore not entitled to the benefit

of any doubt on this issue.  For indeed, he never even mentioned the fact of his "viewing experience"

to the trial prosecutor Chuck Morton (who surely, any reasonable detective would have expected,

would have had a keen interest in knowing about what occurred in the pre-interview, in marshaling

as much support as existed to support what Carr and Thomasevich would say).  In fact, Ilaraza does not recall ever discussing his "viewing" with *any person at all*, until he brought it up with Mr. Donnelly, a few months ago when he learned of the allegations made concerning his fellow officer – James Carr.  (EH12 at 46-47). Surely, if his testimony is as important as the State asks the Court to believe here, one would have thought that *someone* at the State Attorney's Office would have been informed about it before the year 2002!  But it presumably was "news" to them, just like other testimony before this Court has been "news."  It should not, therefore, be credited here.

Even assuming for the sake of argument here that there *was* a secret viewing room at BSO, and even if the Court were to believe that while they never disclosed it before, several officers including Ilaraza viewed portions of Tim Brown's interrogation, it is absolutely unclear what Ilaraza actually viewed here.  His recollection in this regard is quite imprecise.  Ilaraza admittedly did *not* view the entire pre-interview – but only some unidentified 15 or 20 minute portion of it.  (EH12 at 31).  He claimed to have started his viewing *after* detectives Carr and Thomasevich had already started to interview Tim Brown (EH12 at 31), but he could not say "when during this hour to hour and twenty minutes interrogation [he] saw [his] twenty minute slice."  (EH12 at 39).

Ilaraza never wrote down the times that he was in the "viewing room," or took any notes as to what he observed.  (EH12 at 33-36, 39-40).  In fact, he has said that he cannot "remember exactly what was said in there between the detectives and Tim Brown" – because it had been 12 years. (EH12 at 31-32, 39). So when he was specifically asked by the State whether he heard any threats or promises being made to Mr. Brown, Ilaraza could not really say.  All he could say was that it "appeared to be no threats made" because he "didn't hear any raising of the voices."  (EH12 at 31-32). But of course, it is not necessary for an experienced detective to raise his voice to threaten a

81

juvenile with the electric chair.

Ilaraza denied ever seeing either of the detectives strike or punch Tim Brown. (EH12 at 32). But again, no one knows at what point precisely Ilaraza was in the viewing room. He says that for much of the time he was viewing the interrogation Brown was mostly "in denial," (EH12 at 32), but that this was "just your usual type of interview. They are questioning him and he is responding to the questions." (EH12 at 31-32). Ilaraza does not and cannot be precise as to what questions he heard the officers asking Tim Brown – whether it was the questions on the rights waiver form, or the questioning that occurred after he "started making admissions." (EH12 at 32). Any specifics he has recounted are particularly questionable given that his recollection in 1993 (when he denied doing anything else in the case) was certainly much stronger than his recollection in 2002. When questioned about the dimming of his recollection over time, Ilaraza protested, claiming that that is not necessarily so  because "sometimes, you know, you read or you get a chance to review reports and things might come back to you that didn't come back then" (EH12 at 53) – but then of course, he had to admit that he had *no* notes from the viewing room, he wrote *no* report of having been there (EH12 at 33-36), and the *only* reports he read in preparation for his testimony before this Court were the reports of Detective Gill and Detective Carr – *neither* of which refreshed his recollection about the viewing room.  (EH12 at 53-54).  Presumably, Ilaraza also reviewed his own deposition testimony from January of 1993, where even in the year and a half that had passed since the arrest, his recollection of what had occurred had dimmed.  For instance, while Ilaraza claimed at the hearing that Sgt. Scheff was in the viewing room with him that evening, (EH12 at 40), in his January 21, 1993 deposition (much closer to the actual event) he had not recalled whether Scheff had even been in the building when they brought Tim Brown in. (EH12 at 41-42).  And in fact, even at his 1993

82

deposition, he had been mistaken as to the date of Tim Brown's arrest – insisting that it occurred on the 15th – rather than the 16th of July. (EH12 at 42-44).

The long and short of all of this is simple: There are just too many reasons to doubt what Ilaraza is telling us now for the first time in 2002. His recollection of particular specifics of what went on, or did not go on, is not something that the Court should bet Tim Brown's life on. What he said – even if believed – is not specific enough to be deemed "corroborative" of the State's position on this issue. And in fact, what he said is not convincing at all, and should ***not*** be determinative of the credibility issue before the Court.

What the Court is therefore left with is the testimony of the two interested officers – partners for years. Both of these officers have maintained since the time of Tim's arrest, that they never did anything untoward towards Tim Brown. But there are substantial reasons to doubt them on this, to reject their protestations of perfect conduct – their denials of any threats or slaps.

(iii) <u>The high profile nature of the case, the pressure that it generated and continues to generate, and the motive to testify falsely</u>. It is generally agreed that the killing of a police officer is a different species of crime. It is certainly treated that way by the State Attorney's Office – Chuck Morton acknowledged that ***the*** State Attorney, Michael Satz generally tried all police officer homicides himself. (EH12 at 12). And of course, BSO had 80 different detectives working the Behan homicide for 8 months. For 8 months, however, it remained unsolved. One doesn't have to be a police officer, or an expert, (Pet. Ex. 1046 at 49), to understand the pressure that a case of this nature generated upon the Broward Sheriff's Office. Detectives Carr and Thomasevich were the lead detectives assigned to the Behan case as of February 1991. (Pet. Ex. 1006B at 244). And as each month passed, the pressure mounted. So when Detective Thomasevich testified at the suppression

83

hearing that there was no pressure from BSO's administration to arrest Tim Brown (Pet. Ex. 1006C at 375), and when James Carr testifies, as he did before this Court that there was no pressure upon him to solve this case "from anywhere" – "The only pressure there was to solve this case was probably pressure we put on ourselves, not from the administration or anyone in the Sheriff's Department" (EH9 at 106), these detectives are simply not telling the truth.

And in fact, pressure – intense pressure of the nature that existed here – can make people do and say things they might not do and say ordinarily. We have certainly seen that from the BSO officers (Fantigrassi and Hoffman) in Phase I of the evidentiary hearing in this case. But indeed, Carr and Thomasevich are under even more pressure than Fantigrassi and Hoffman were. For the Governor has specifically directed FDLE to investigate *them* – as to whether they committed any misconduct in securing Tim Brown's confession here. And indeed, the FDLE has already uncovered startling misdeeds by both of them, vis-a-vis the prior (undisclosed) photo lineup identification of Eddie Lopez. (We will discuss this more fully *infra*). So clearly the "pressure is on."

And in fact, it is on Carr in particular, as he is being investigated by the State Attorney's Office for fraud, forgery, and perjury in a statement he made to the very State Attorney's Office representing the State of Florida here.[31]  Under the law of this circuit, the fact that Carr – the lead detective in the Behan case, and key witness against Tim Brown – is being investigated for possible perjury committed even after the defendant's conviction, "would be beyond that of mere

_____

[31]While Carr refused to admit that he knew the nature of the charges being investigated (EH10 at 40), the Court is certainly aware of what the nature of these charges are from the parties' pleadings on the issue, the arguments in court on the issue, and the *Brady* evidence turned over. The Court may consider Mr. Carr's demonstrated lack of candor vis-a-vis knowing what the charges against him were, in determining whether the rest of his testimony before the Court is credible here.

impeachment" and would taint the initial conviction. *United States v. Espinosa-Hernandez*, 918 F.2d 911, 914 (11ᵗʰ Cir. 1990).

But irrespective of the possible perjury charge, Carr is also being investigated for the other offenses (fraud, forgery, uttering a forged instrument – all offenses suggestive of a character for untruthfulness). Clearly, the continual pendency of the investigation into any of these charges puts tremendous pressure on Carr, giving him an undeniable motive in this case to curry favor with the State Attorney's Office by offering favorable testimony in court. That motive helps, in part, to explain Carr's continual embellishments to his prior testimony. He has already been forced to resign his job at BSO. (EH10 at 38). He could now be looking at losing his liberty.

Ultimately, we are ***not*** asking the Court to rest its credibility determination merely upon the existence of pressure, of "motive" in the abstract, or even on the pending investigation of Carr for perjury and other crimes. Rather, the Court should base its determination on the numerous concrete examples of untruthfulness which we will detail below. For indeed, there is ***concrete*** evidence before the Court, suggesting that both of these officers were untruthful, and that what they say about Tim Brown's case simply cannot be trusted.

(iv) <u>The inconsistencies with regard to showing Tim the photographs.</u> At the suppression hearing, Det. Thomasevich admitted showing Tim pictures "after [he] made his "verbal [i.e., the unrecorded] statement." (It is unclear from their testimony how much of a verbal statement Brown made before they started showing him the photographs). (Pet. Ex. 1006C at 399). Carr, by contrast, at first claimed not to recall the precise time during the interview that he showed Brown the pictures, stating only that it was "some time ***during*** the interview." (Pet. Ex. 1006C at 369). But thereafter, Carr testified that indeed, he had shown Tim pictures – but only those of "where the Circle K was,"

"where the car was parked," and "how the police officer's car was backed into the lot" – "*after* he originally told us, yes, *to get the story straight*, so we could comprehend what he was telling us. He was being shown pictures. That was sometime after we were talking to him after he told us the pertinent facts." (Pet. Ex. 1006C at 369) (emphasis added). Of course, a taped statement – which is the product of "straightening" by crime scene photos shown to a suspect during an unrecorded "pre-interview" – cannot be deemed a product of the suspect's own free will.

Apparently, with time to reflect upon his testimony between the suppression hearing and the trial, Carr realized the *faux pas* both he and Thomasevich might have made in this regard. And for that reason, when he testified at trial, Carr changed his testimony 180 degrees (the state did not call Thomasevich to testify at trial). That Carr had previously given different testimony under oath at the suppression hearing (that they showed Tim crime scene photos *during* the interview), did not deter him from now claiming, contrarily, that in fact, he and Thomasevich did *not* show Brown *any* photos while Brown was on tape. According to Carr's trial testimony it was only "*after* [Brown] gave his [taped] statement that he was shown the photographs just in describing where he had fled from." (Pet. Ex. 1006M at 1785-1788, 1793-1794). It is clear from the taped statement, however, that Brown *was* indeed being shown photos while he was being recorded. There is no other reasonable inference to be drawn from Brown's many directional references in that statement – "right there,""right here," "that way," "over here," "the pawn shop right here," "we going straight down here," and "the rock pit on this side here." (Pet. Ex. 99 at 4-6). Carr was thus untruthful on this issue at Tim Brown's trial. And that, of course, calls into question the rest of his testimony.

But the Court need not rely merely on a "presumption of untruthfulness," for it had before it at the federal evidentiary hearing independent evidence of Carr's lack of credibility from his

continual inconsistencies on this very same point. At the evidentiary hearing, Carr backtracked from

his trial testimony, and testified that "just prior to going on tape," he showed Brown a single aerial

photograph of the intersection (and only that photo) "to get his direction of travel" "because he was

a little confused on the direction that they had ran from the scene" (EH9 at 98-99, 101) – it was not

"to get his story straight" (EH9 at 102). A few pages later in the transcript, however, Carr

backtracked again, stating that he was unsure whether the pictures were shown before the taped

statement: "It could have been during." (EH9 at 104). The inconsistencies and flip-flopping were

such that the Court at one point had to interject:

> THE COURT: Let me make sure I am clear.  I thought I heard you testify earlier that
> the photographs were shown prior to the tape-recorder being turned on.
>
> MR. CARR: The aerial photograph was.
>
> THE COURT: All right.  Did you just say something different or did I get the
> photographs mixed up?
>
> MR. CARR: No.  We were showing him – after he told us the story and gave us the
> pertinent facts, I believe before we turned on the recorder, possibly while we were
> talking on the recorder, he was pointing out the direction in the photograph also.

(EH9 at 104-105).  But again, when counsel called Carr's attention to his trial testimony to the effect

that they only showed Brown pictures after they concluded the taped statement, Carr stated: "That's

my answer today sir, as far as I can recall."  (EH9 at 106).

　　　　To recap therefore, Carr gave five (5) different versions –  inconsistent versions – in three

(3) separate proceedings as to what occurred vis-a-vis the pictures in this case:

> • Version # 1 (suppression hearing): The pictures of "where the Circle K was,"
> "where the car was parked," and "how the police officer's car was parked," were
> shown to Brown after Brown gave the "pertinent facts," before going on tape, "to get
> his story straight." (Pet. Ex. 1006C at 369).
>
> • Version #2 (trial): The pictures were shown after the taped statement concluded.

(Pet. Ex. 10061006M at 1785-1788, 1793-1794).

• Version #3 (evidentiary hearing): Only one aerial photograph was shown, and it was shown just prior to going on tape "to get his direction of travel" "because he was a little confused on the direction that they had ran from the scene." (EH9 at 98-99, 101).

• Version #4 (evidentiary hearing): The pictures were either shown prior to or during the taped statement. (EH9 at 104-105).

• Version #5 (evidentiary hearing): The pictures were shown only after the taped statement concluded. (EH9 at 106).

Due to these repeated inconsistencies, Carr's word on the issue of what pictures were shown when, cannot and should not be credited. And indeed, his lack of credibility on *this* issue, casts doubt on the entirety of his testimony under oath at the trial, suppression hearing, and federal evidentiary hearing.

But there is additional evidence as to Carr's lack of credibility, as well as evidence that his partner Mr. Thomasevich is no different in this regard. The first is the testimony of John Wood. The second is the incident involving the alleged drawing on the "white piece of paper." The third is these two officers' suppression of Eddie Lopez' prior identification of an individual other than Keith King, and their testimony under oath on the matter.

(v) <u>Providing the facts to Brown – The relevance of John Wood</u>. Tim Brown testified that Carr and Thomasevich showed him pictures of "the deputy,[32] the marked car, the rock pit." (EH11 at 10). And his testimony in this regard is corroborated, at least in part, by Larry Davis' notes of his first interview with Tim which reflect that he was "showed pictures of deputy." (Pet. Ex. 83). With an IQ of 56 and being only 15 years old at the time, Tim would not have had the mental acuity or

---

[32]At the hearing, Tim Brown explained that the picture was "of the body deputy Behan in some kind of medical room."(EH 11 at 10).

maturity to "make up" this fact to support a future coercion claim. He was simply telling his attorney what occurred – and that is indeed what occurred. And in fact, as noted *supra*, although Carr and Thomasevich denied showing Tim a picture of the deputy, they **did** admit (at least at the suppression hearing) showing him pictures of how the car was parked and the Circle K – as well as aerial photographs. Their insistence that he could not have gleaned any facts from the photos they showed him, is not supported by the evidence.

Nor are their claims to have told Tim nothing about what Keith King had said. Tim specifically testified at the hearing that Det. Carr told him about the bicycle, and they – not he – first said that it was a .38 caliber gun involved in the murder. (EH11 at 10-11). Although Carr has denied this, (EH10 at 30-31), his denial makes no sense. First, at the suppression hearing, Carr admitted that he told Brown the specifics ("the facts") of what other individuals had said – "people like Solomon Gibbs."[33] If he and Thomasevich told Brown some of these "pertinent conversations," (Pet. Ex. 1006B at 283), it is highly unlikely that they refrained from telling him the "most pertinent conversation" – what King himself had said. The State told the Court in opening statement that Carr and Thomasevich "presented [Tim Brown] what evidence they had accumulated and showed it to him." (EH8 at 21). Is it reasonable to assume, as the Detectives themselves now claim (contrary to the State's opening statement) that the most important piece of evidence they had "accumulated" – Keith King's statement implicating Tim Brown as the triggerman – was never shown to (or summarized or detailed for) Tim Brown? Is it reasonable to assume, in light of what occurred with

---

[33]Gibbs, and all of the "people like him," ultimately recanted their statements to Carr and Thomasevich, or were otherwise discredited. (EH9 at 33). One of them, Andre Butler, actually recanted in front of the grand jury, stating that he was pressured and threatened by Carr and Thomasevich. (EH9 at 34).

John Wood, that Carr is telling the truth when he claims that he "would not" *ever* give a suspect

pertinent facts of a crime scene (such as how an individual might have been found, how many times

he was shot, or how the vehicle was parked? (EH10 at 32). It is not.

And indeed, Carr's and Thomasevich's denials as to "giving" Tim Brown any of King's facts,

(EH10 at 30-31 ; EH13 at 87), or pointing out other key facts from the photos they had, must be

considered side-by-side with their denials of providing this other innocent, mentally impaired

individual the details he fairly convincingly parroted back in multiple taped statements. (Pet. Ex.

1020, 1021). This Court truly had a unique perspective in this regard from John Wood, an innocent

man with no motivation other than to tell the truth – to tell the Court what really happens in Carr and

Thomasevich's unrecorded "pre-interviews." John Wood explained quite credibly how it is that

innocent people are made to confess, and how they "learn" certain details which they recount in their

confessions. The long and short of it is, Carr and Thomasevich themselves "suggest" the facts to the

suspect in a variety of ways.

In his own case, Wood explained, Carr and Thomasevich held him at the Broward County

Jail for several days before he gave them a taped statement admitting to having committed the

murder of Chris Morris. (EH10 at 49). Wood was not placed under arrest during that time. (EH10

at 50). During this period, Carr and Thomasevich took him back and forth to the Broward Sheriff's

Office, always in handcuffs. (EH10 at 49-50). Each time they took him there, they were discussing

the facts of Morris' case, for instance, "how he was taped up and that he had been shot in his car."

(EH10 at 51). At first they suggested that they were just seeking information about the murder

(because he had been in Morris' apartment, and knew him). But Wood denied all involvement in

his first taped statement on January 26, 1990, (Pet. Ex. 1019), and within a short time they started

to accuse Wood himself of being involved himself. (EH10 at 51). He explained: "They said maybe I had a blackout, you know, I had had a fight with him and I shot him and that I had to come clean." (EH10 at 51). Wood confirmed that he was a Vietnam veteran suffering from a post-traumatic stress disorder, and that indeed, he did have blackouts. (EH10 at 52-53). And in fact, he had told the detectives that he suffered from blackouts. (EH10 at 73). Although Wood had no recollection at all as to being involved in the murder of anyone, (EH10 at 53), when they told him that he might have killed Morris in a blackout, Wood said: "Probably could have." (EH10 at 53).

When they took his second taped statement on January 27, 1990, (Pet. Ex. 1020), Wood gave them back the factual information relating to the murder of Chris Morris, that they had already led him to believe he had done. (EH10 at 53). For instance, he said that he duct-taped Morris up, placed him in the back seat of a car, and that he had shot him through the back window of his car in a secluded area. (EH10 at 53-54, 59). They also told him, and he adopted as well, the fact that a revolver was used, and they found five bullets there. (EH10 at 58). Finally, they told him, and he later said as well, that he might have thrown the gun in a lake behind the house. (EH10 at 59). Wood even went with these detectives to the house and showed them where he "might have thrown it." (EH10 at 59).

Each time they took him to their office, they kept discussing the case in front of him – giving him little "tidbits." (EH10 at 53, 55). They were usually not so blatant as to say: "Look, here's what happened." Rather, what they usually did was phrase their questions to him in such a way as to suggest the facts. For instance, "Where did you hide the duct tape?" (EH10 at 55-56). And of course, they did not record any of these encounters leading up to the taped statement(s). (EH10 at 74). Wood knew nothing about duct tape, or that the homicide occurred in a car, or where the car

was located, until he heard it first from these detectives. (EH10 at 55, 60). When he would deny

his involvement and their accusations, they would say: "Come on. You know better than that. You

must have been the one who did it." (EH10 at 56). And in fact, they were more blatant than this.

They kept telling him that he was lying, and made him take a polygraph test, and told him that it

showed that he was lying. (EH10 at 56-57). At some point in this bizarre odyssey, Wood asked

"Why don't I have a lawyer here?" The detectives responded: "You don't need a lawyer." (EH10

at 57). He described their attitude on this issue as "snotty." (EH10 at 77).

Ultimately, he gave in to them and gave them a statement (Pet. Ex. 1020) using their own

facts, because they kept "browbeating him," asking him the same questions over and over again

(EH10 at 55, 79). They tried to weaken his resistence by depriving him of sleep or food. (EH10 at

55, 72). "They made me feel like shit." (EH10 at 78). They "would pull me out before a meal," he

explained, "and bring me back after there was no meals, and keep me awake at night and there is no

sleeping in your bed during the day to sleep." (EH10 at 71). Wood had trouble sleeping anyway,

as he had flashbacks to Vietnam. (EH10 at 71). Being deprived of sleep at the regular hours made

this worse. Wood kept asking for a lawyer, and they kept telling him the same thing: "You don't

need one." (EH10 at 77-78). Finally, he became just too tired to press the issue any further. (EH10

at 78).

When it appeared that Wood had gotten certain facts wrong, he explained that they helped

correct those facts off-tape, and then on January 28, 1990 took a third taped statement. (EH10 at 75;

Pet. Ex. 1021). In that third statement, Wood answered "Yes" to questions by Thomasevich as to

whether he had been treated properly – "as a gentleman" – by himself and Carr. (EH10 at 81).

Wood explains, however, that he gave those "Yes" answers, "because I was afraid they were going

92

to keep me up all night again. I wanted to get some sleep. They kept keeping me up. They wouldn't let me sleep. They wouldn't let me eat. If I agreed with them, then I could get back to the jailhouse and get some sleep in the bed." (EH10 at 82). Wood was arrested on January 28, 1990, after making that third taped statement. ( EH13 at 91).

Soon thereafter, however, on January 31, 1990, Wood was exonerated and released. It is beyond dispute that he had no involvement whatsoever in this case. He was innocent, and his confessions to the crime were false. As it turned out, Morris' parents had hired Martin Rector to kill their son Chris. (EH10 at 63). Despite knowing that Wood was innocent, and that indeed, he had been appointed counsel,[34] Carr and Thomasevich cornered Wood one final time, and had him make a fourth and final taped statement. (Pet. Ex. 1022). We will discuss the substance of that statement at the end of this section. But for now, the Court should just keep at the back of its mind that these two detectives had no qualms whatsoever about trammeling on Wood's sixth amendment rights, and violating clearly established Supreme Court law, in order to get a taped statement from him. *See Michigan v. Jackson*, 475 U.S. 625 (1986) (once a defendant invokes his sixth amendment right to counsel at an arraignment or similar proceeding, the police may no longer question him, and any purported waiver of the right to counsel for police-initiated questioning is invalid).

What Wood described for this Court was compelling. His testimony was internally consistent, and made sense out of a phenomenon that is often difficult to understand: How is it that innocent people confess? How are they able to provide so many detailed facts in their statements? While admittedly, Wood did not recall being taken before a magistrate or meeting with appointed

---

[34]Under the law, once a defendant has appointed counsel, knowledge of that appointment is clearly imputed to the investigating officers. *Stokes v. Singletary*, 952 F.2d 1567, 1579 (11th Cir. 1992).

counsel (EH10 at 69-70), that is not reason to doubt his credibility as to the rest of his account here, in particular, how Carr and Thomasevich suggested the facts to him. Wood clearly suffered from blackouts, and one would not expect him to recall *everything* that happened during that particular and very traumatic time period in his life, 12 years ago. (EH10 at 70, 79). But while he may not have had a clear recollection of being appointed the public defender, what Wood described – how indeed, Carr and Thomasevich suggested the facts to him – is absolutely born out by close examination of each of his statements. Carr and Thomasevich's attempts at the evidentiary hearing, to deny suggesting the facts to Wood, are *not* credible in the least.

First, we should point out what Carr and Thomasevich knew before they picked up Wood. They knew from their initial investigation that the victim Chris Morris was shot six times in the head and abdomen with a lawnmower muffler used as a silencer which was apparently duct taped to the firearm. (EH 13 at 23, 24). Morris was found lying in the back seat of a vehicle with his hands and feet duct taped. The vehicle was located in Coconut Creek and was found with the back windshield of the vehicle shot through. (EH 13 at 39, 41, 49, 53). Mr. Morris had evidence of contact wounds indicating he was shot by a gun placed close to or in contact with his body. (EH 13 at 54-55).

Carr and Thomasevich focused on Wood as a possible culprit when they learned he was living with Morris at the time of the homicide. (EH 13 at 26). Carr and Thomasevich picked Wood up on January 26, 1990 and took a taped statement from him (Statement I) where he denied any responsibility for the killing. (EH 13 at 27). But then Carr and Thomasevich learned that Wood was a Vietnam veteran who was prone to blackouts, especially when drinking and who would do things and not remember them the next morning. (EH 13 at 30). Armed with this information Carr and Thomasevich picked Wood up again at 10:59 p.m. on January 27, 1990. (EH 13 at 30). Considering

Wood to be a suspect in the first degree murder of Chris Morris, they read him his rights, (EH 13 at 31), spoke to him for approximately one hour in an unrecorded "pre-interview," and thereafter obtained a full taped confession by Wood to the murder of Chris Morris (Statement II). (EH 13 at 34-35; Pet. Ex. 1020).

In this second taped statement, Wood related that he shot Chris Morris in the head and chest (EH 13 at 38), that he duct taped Morris' hands and wrist and feet (Petitioner's Exhibit 1020 at 10), stuffed a sock in the victim's mouth (EH 13 at 40), loaded him in a car (EH 13 at 40), threw the gun in a lake (EH 13 at 42) and cleaned himself of blood that was on him while discarding his bloody clothes (EH 13 at 42). Furthermore, he described using a lawnmower muffler as a silencer by duct taping the muffler to the barrel of the gun. The transcript of the statement provides a glimpse into the way Carr and Thomasevich suggested the "correct facts" to him. For instance, at first, Wood got the number of shots fired wrong. No problem:

DETECTIVE[35]: O.K.  How many times did you shoot him?

WOOD: Five times.  The gun, I emptied the gun out.

DETECTIVE: All right.  So you emptied the gun?

WOOD: Yeah.

DETECTIVE: All right.  The gun is a six shot?

WOOD: Right.

DETECTIVE: But you -- could it have been six shots that your fired at him?

WOOD: It's possible.

---

[35]The transcript does not specify whether it was Carr or Thomasevich asking these questions. It does, however, indicate that both detectives were present.

95

(EH 13 at 38-39; Pet. Ex. 1020 at 10).

Next, Wood got the location of Morris' body in the car wrong.  Again, no problem:

DETECTIVE:  OK.  So after you get him taped up what do you do?

WOOD:  Load him in the car?

DETECTIVE:  Where do you put him?

WOOD:        On the passenger side first. . . .

DETECTIVE:  OK.  Do you put him in the back seat at any time?

WOOD:  I don't remember putting him in the back seat, he might have been leaning over in the back seat. . . .

DETECTIVE:  No we're still on the seat he's in.  Was there at anytime that you put him into the back seat?

WOOD:  I can't recall putting him in the back seat, just the front, he fell over though.

DETECTIVE:  Fell over the seat?

WOOD:  Yeah.

DETECTIVE:  Into the back?

WOOD:  Yeah.

DETECTIVE:  Oh, between the bucket seats in the front?

WOOD:  Yeah, yeah.

DETECTIVE:  Oh, so that how he gets into the back seat.

WOOD:  I think so.

(Pet. Ex. 1020 at 11-13).

Finally, Wood couldn't get the city right where the car with the body was found. Again, no

problem:

96

DETECTIVE:  OK and what happens then?

WOOD:  Then we take him for a ride go Cypress Creek, Coconut Grove or can't remember.

DETECTIVE:  Coconut Creek.

WOOD:  Coconut Creek.

(Pet. Ex. 1020 at 12).

But as it turned out, even with this "extra help" on the facts, this Statement II was still materially false.  He had said, "I can't recall putting him in the back seat, just the front, he fell over though." (Pet. Ex. 1020 at 12).  So they brought Wood in on January 28, 1990, to make a third taped statement (Statement III).  At the hearing, Thomasevich claimed that the purpose in doing this was to "clarify" the facts in the previous statement (EH 13 at 47).  That, however, sounds remarkably similar to their explanation for showing Tim Brown crime scene photos.  Just as in Brown's case, they gave Wood another "half hour or so" of an unrecorded "pre-interview." (EH 13 at 46). But indeed, it thereafter became quite clear that "clarify" is their euphemism for "change."  For when Wood went on tape in Statement III, the following colloquy ensued:

DETECTIVE:  OK.  What do you do when you take control of the gun?

WOOD:  Put him in the car, tie him up.

DETECTIVE:  OK., did, where do you, first of all, where do you put him in the car?

WOOD:  In the back seat.

(Pet. Ex. 1021 at 6).

When cross-examined as to this fairly obvious change in Wood's statement, Thomasevich acknowledged that Wood had gotten this fact wrong in Statement II. (EH 13 at 47-48).  But he could not credibly explain either to counsel or to the Court, how in Statement III Wood miraculously got

this fact right:

> MR. DAY:  How did he get this right?

> MR. THOMASEVICH:  If you are inferring I told him to say that, counselor, no.

> THE COURT: I am not sure.  That is probably what he is going to argue, but how did he get it right?

> MR. THOMASEVICH:  Your Honor, that was the problem we were having with the whole case.  That's why we took four statements, which is very unusual to take from one suspect.

> That's why we continued the investigation after the arrest was made.  That's why we went to our supervisors and told him we cannot stop this investigation at this point because we don't think John Wood did this.

(EH 13 at 49).

But if they "don't think John Wood did this," then why did they arrest him after making this statement, charge him with the first degree murder of Chris Morris, and file a probable cause affidavit swearing under oath that Wood killed Morris?  (EH 13 at 61).  When confronted with that difficult question, Thomasevich reversed field:

> MR. DAY:  He is arrested for first degree murder?

> MR. THOMASEVICH:  Yes, sir.

> MR. DAY:  What date?

> MR. THOMASEVICH:  This was the 28th of January, 1990.

> MR. DAY:  Okay.  Did you believe on the 28th of January, 1990 that he had committed first degree murder?

> Mr. THOMASEVICH:  I believed that he did, but I had a lot of problems with it.

> MR. DAY:  Okay.  But you believed he was an individual that killed Chris Ray Morris?  Is that right?

> MR. THOMASEVICH:  At that point.

> MR. DAY:  That's why the probable cause affidavit is sworn to by Detective Carr?
>
> MR. THOMASEVICH: Yes.
>
> MR. DAY:  It lays out the facts that you and Mr. Carr believe John Wood is guilty of the first degree murder of Chris Morris.  Is that right?
>
> MR. THOMASEVICH:  Yes, sir.

(EH 13 at 91).

Thomasevich could not deny suggesting certain facts to Wood.  A comparison of Statement II and Statement III showed this just too clearly, for instance, with regard to the new fact of the location of the car. In Statement II, Wood had said this:

> DETECTIVE:  Okay.  Where did you drive the car to?
>
> DETECTIVE 2:  Let him think about that.
>
> WOOD:  I don't remember.
>
> DETECTIVE 2:  Yeah, this is important.
>
> WOOD:  Some place in Oakland.

(EH 13 at 52; Pet. Ex. 1020 at 12) .

> But in Statement III this is what occurred:
>
> DETECTIVE: O.K., what do you do after you tie him up?
>
> WOOD:  I take him out to Cypress Creek.
>
> DETECTIVE:  O.K.
>
> WOOD:  You know I -
>
> DETECTIVE:  To Coconut Creek you mean?
>
> WOOD:  To Coconut Creek.

(Pet. Ex. 1021 at 7).  Thomasevich conceded that this was a leading question.  (EH13 at 51)

But he denied that they had led Wood into giving his "new" facts about the contact wounds.

(EH13 at 55-56).  Statement III, however, shows clear leading on this issue:

> DETECTIVE 2: Now, where do you shoot him with the rest of the shots, where are you at that time, in the car, out of the car?

> WOOD:  Out of the car.

> DETECTIVE 2:  And where is Chris?

> WOOD:  Trying to get out the back door.

> DETECTIVE 2:  O.K., now do you know what the term contact wound is?

> WOOD:  No.

> DETECTIVE 2: O.K., contact wound is where the gun is put up to the body itself.

> WOOD:  Ahm.

> DETECTIVE 2:  And then fired, O.K.?

> WOOD:  Yeah.

> DETECTIVE 2:  And what it does, is it leaves burn marks -

> WOOD:  Powder burns?

> DETECTIVE 2: Powder burns.  O.K.  Now all the wounds that Chris had on him all had powder burns.

> WOOD:  Yeah.

> DETECTIVE 2:  Which means that the gun had to be placed against his body, it that correct?

> WOOD:  Yes.

> DETECTIVE 2:  Alright, so now you're standing where, at the backdoor?

> WOOD:  Yeah.

> DETECTIVE 2:  And where is Chris?

100

WOOD:  He's in the back seat.

DETECTIVE 2:  Alright, you say he's trying to get out?

WOOD:  Right.

DETECTIVE 2:  So when you fire the rest of the shots, the gun is actually up against his skin?

WOOD:  Right.

DETECTIVE 2:  O.K., do you remember exactly where you shoot him?

WOOD:  In the head, in the chest.

DETECTIVE 2:  Do you remember where you shoot him first or -

WOOD:  No, not where I shot him first, just his stomach, I remember that one real good.

DETECTIVE 2:  O.K., and that was a contact wound also?

WOOD:  Right.

DETECTIVE 2:  Now he also has a shot in his elbow, or actually his arm going out through the elbow.

WOOD:  That's where he grabbed my arm, trying to get out and get to the gun.

DETECTIVE 2:  O.K., and you shoot him against his arm?

WOOD:  Right.

DETECTIVE 2:  Then you, then there's wounds to the head is that correct?

WOOD:  Right.

DETECTIVE 2:  There's also a contact wound to the head?

WOOD:  Right.

DETECTIVE 2:  Did you put the gun right up to his head?

WOOD:  No, not that close.  Pretty close though.

101

(Pet. Ex. 1021 at 9-10).

In light of this fairly obvious leading in both Statement II and III, Carr and Thomasevich were *not* credible in contending that they did not provide Wood with any of the facts here. When asked where Wood would have gotten these facts, Thomasevich at first said "I don't know," but then "guessed" that he would have gotten them from Marty Rector. (EH 13 at 49-50). Carr himself was adamant, that Wood "absolutely" got all of the facts from Rector. (EH 9 at 159-160).

But of course, that is simply untrue. Carr and Thomasevich went back to Wood again on January 31, 1990, and took a fourth and final statement from him in violation of his right to counsel. (Statement IV). In that statement, they attempted to portray Wood as having gotten all the facts for his two false confessions from Rector. But that attempt failed. All Wood said in that final taped statement was that Rector told him that Morris was shot in a liquor store holdup a number of times, that he was shot twice by the attendant in the head, and that he was shot with a .38 special that had some sort of muffler as a silencer. (EH 13 at 62-65; Petitioner's Exhibit 1022 at 5-7). He never stated that Rector told him Morris' hands and feet were duct taped. (Thomasevich conceded this at the hearing, EH 13 at 65); Wood never stated that Rector told him the car was driven to Coconut Creek (Thomasevich conceded this as well, EH 13 at 65); Wood never stated that Rector told him that Morris was put in the backseat of the car (again, Thomasevich had to concede this, EH 13 at 66); Wood never stated that Rector told him that the back windshield was shot through (Thomasevich conceded this too, EH 13 at 66); and Wood never stated that Rector told him that Morris had contact wounds (again, Thomasevich was forced to concede this, EH 13 at 66).

In the face of all of this testimony, several things should be clear: (1) Carr and Thomasevich most definitely provided the details of this crime to John Wood by leading him both before and

102

during his statements on tape; (2) their denials of doing so are not credible; and (3) their denials of doing similarly with Tim Brown in his unrecorded "pre-interview" are also not credible. Importantly, Dr. Kaprowski noted that the numerous "Yes sirs" in Tim's statement were evidence that he was easily led by the police. (T. 191-192).[36] And indeed, if Tim Brown was led in his taped statement – as was Wood – it is certainly reasonable for this Court to assume that Brown had previously been led in the unrecorded "pre-interview" that was a rehearsal for that statement, as Wood was as well. For, as we have learned from the compelling testimony of Wood himself, that is the only way an innocent person is able to give "correct facts" or "matching facts" in his statement. And because Tim Brown is innocent, and – like Wood – would have had no other way of learning certain of the facts he recounted which matched King's and those of the crime scene (and because Brown just like Wood was suffering from a post-traumatic stress disorder that made him compliant with whatever they wanted him to say, *see* discussion *infra*), the Court should reject the denials of the detectives, as not credible. Rather, the Court should understand and find that such facts in Brown's statement came from one source and one source alone: Detectives Carr and Thomasevich. And indeed, the detectives' lack of credibility on this issue, should cast doubt on the entirety of their testimony on the issue of coercing Tim Brown.

(vi) <u>The tale of the drawing on the "white piece of paper."</u> Truly the most blatant proof of these detectives' lack of credibility is their testimony (for the first time at the federal evidentiary hearing ) as to a drawing that they claim Tim Brown made on a "white piece of paper" – a drawing

_____

[36]Dr. Kaprowski believed from her testing and interview of Tim, that with his mental deficiencies, he could be made to say almost anything the detectives wanted to say, if they kept him shackled, interrogated him relentlessly for an hour, and showed him crime scene pictures and other things that related to the case.. (Pet. Ex. 1006B at 193).

of the crime scene and his escape route. It was in response to a question concerning when he first showed the photographs to Tim Brown, that Carr brought up this alleged (but never-before mentioned) drawing:

> MR. DAY: And you had given us the time period, sir, as to when you first showed these photographs to Mr. Brown, and when was that sir?
>
> MR. CARR: Just like you read, sir. I don't recall exactly when the moment was. It was after he gave us the pertinent facts. He was confused on the direction and we showed him the aerial photographs so he could show us. *He was also drawing on a white piece of paper.*
>
> MR. DAY: And so that's before the taped statement?
>
> MR. CARR: It could have been. It could have been during.

(EH9 at 104) (Emphasis added).

> The next day, Carr was questioned further on the matter, and he elaborated:
>
> MR. DAY: Sir, did you indicate that Mr. Brown was, during this interrogation, writing on a piece of paper?
>
> MR. CARR: At one point in time, yes.
>
> MR. DAY: And what did you do with that piece of paper, sir?
>
> MR. CARR: It was in the case file.
>
> MR. DAY: Okay.  Who did you disclose that piece of paper to?
>
> MR. CARR: People that were there at the time, Detective Thomasevich, Sergeant Scheff.
>
> MR. DAY: What was being written on that piece of paper?
>
> MR. CARR: *He was trying to draw a diagram of the Circle K and how the vehicle was in and his route of travel.*
>
> MR. DAY: Okay.  So that would be certainly an important document that would indicate the suspect's knowledge of the case. Do you agree with that?

MR. CARR: Correct.

MR. DAY: Okay. And that was disclosed to the defense attorneys in the case?

MR. CARR: It was given to the State Attorney's Office with all the boxes and the files.

MR. DAY: Which State Attorney specifically was that given to?

MR. CARR: Who was handling the case back then, Chuck Morton.

MR. DAY: And you gave three depositions in this particular case. Is that right?

MR. CARR: Three depositions?

MR. DAY: Yes.

MR. CARR: I gave about eighteen hours of depositions. If it was over a period of that time.

MR. DAY: During these eighteen hours of depositions, was this piece of paper Mr. Brown wrote on, was that ever discussed between you and the defense attorneys?

MR. CARR: I don't know.

MR. DAY: Do you recall?

MR. CARR: I don't specifically recall.

MR. DAY: At the motion to suppress – were you present for that?

MR. CARR: Yes.

MR. DAY: Okay. And did you testify at that?

MR. CARR: Yes.

MR. DAY: Okay. And did you testify regarding the circumstances of the interrogation of Mr. Brown?

MR. CARR: Yes.

MR. DAY: And did you testify regarding the conversations that you had with him, Mr. Brown?

105

MR. CARR: Yes.

MR. DAY: Okay.  During the motion to suppress, sir, was the piece of paper Mr. Brown wrote on that you talked about here, was that offered into evidence?

MR. CARR: *It was part of the case file that was turned over to the State Attorney's Office, sir.*

THE COURT: I think he is asking if, to the best of your recollection, was this document a part of the evidence at the motion to suppress, if you know?

MR. CARR: Not that I recall.

THE COURT: At the trial, if you know?

MR. CARR: I don't recall.

MR. DAY: You don't recall at the trial either, sir?

THE COURT: No –

MR. CARR: I recall the trial.  I don't recall if it was, if – I don't know if it was there or not.  It never came up, as far as I know.

THE COURT: Would you elaborate?

MR. CARR: I only respond to questions I am asked, sir.  I don't recall being asked that question at the deposition or the trial.

(EH10 at 33-35).

Of course, this alleged drawing was *never* produced in discovery to trial counsel Larry Davis; *never* mentioned in any deposition testimony; *never* mentioned at the hearing on the motion to suppress; *never* mentioned at trial; it was *not* in the BSO case file or the Broward State Attorney's Office file made available to undersigned counsel pursuant to Public Records Act requests in 1997-1998; and it was *not* produced, mentioned, or argued by the State at the "actual innocence" phase of this hearing either.

To clarify what had occurred, the trial prosecutor, Chuck Morton was called to testify.  And

106

Mr. Morton – who both presented this case to the grand jury and tried the case – testified that indeed, he had "no independent recollection of receiving such a document [authored by Brown, indicating his direction of flight and where the vehicle was positioned]." (EH12 at 22).  He had no recollection of such a document ever being in the case file, ever being supplied to him by Detective Carr, ever being supplied to him by Detective Thomasevich, ever being the subject of inquiry in the motion to suppress, or ever being an issue at trial.  (EH12 at 23).  This alleged document, he testified, was "news to hm."  "I certainly didn't have any such document in my possession when I prosecuted the case.  It was news when I heard there may be such a document existing." (EH12 at 24).  And on cross he confirmed: "It was never part of any issue of discussion, as I can recall, when I prosecuted the case." (EH12 at 25).

Then the Court itself questioned Mr. Morton, asking him if in any of his interviews with Detectives Carr and Thomasevich, either of these detectives had made reference to a document authored by Brown during his post-arrest statement.  Mr. Morton answered as follows:

> MR. MORTON: Not with reference to a document authored by the defendant. I will say this: It has been a long time, Judge, and if there was such a conversation, it is also a possibility I may not recall it because it was not a big issue in the trial.
>
> THE COURT: Well, a document which is authored by one during a post-arrest interview would be a rather significant document, would it not?
>
> MR. MORTON: What I am saying was it was not a big issue during the course of the trial or the proceedings when I prosecuted it and the issue never came up, that is, a document that he actually authored.
>
> THE COURT: In a motion to suppress, such a document would likely be a significant one, would it not?
>
> MR. MORTON: I don't know if I can answer that on the document.  It certainly depends on the issues in the case. . . .

(EH12 at 15-16).  But indeed, on redirect, counsel asked Mr. Morton whether the issue of how the

107

vehicle was positioned as described by Mr. Brown would be an important issue. Morton candidly agreed that it was an important subject, and that any document alluding to how the vehicle was parked, would be an important document. (EH12 at 27).

Before the State called its witnesses, the Court instructed the State to ask any detectives it might call if they "were at all familiar with this document that was authored by the petitioner." (EH12 at 27). The State responded that it would ask the first one, Det. Ilaraza, but that "the detectives that we will call probably may not be in that position to know." The Court advised, however, "I just want you to be aware of my interest." (EH12 at 28). Nevertheless, when the State called Detective Ilaraza, it ignored the Court's inquiry and failed to ask any questions at all about the alleged diagram. The Court may certainly draw an adverse inference on this issue – and as to Carr's credibility – from the State's avoidance of the issue with Ilaraza. And indeed, when *we* asked Det. Ilaraza whether he saw anything on the table during the alleged 20-minute period of time that he watched the interrogation from the "viewing room," Det. Ilaraza noted that he did not.

It is extremely significant here, that despite the Court's notice of its interest as to the issue of the alleged diagram, and its directive to the State to question their witnesses about it, when the State called Thomasevich – who Carr had specifically said knew about the alleged diagram – it avoided all inquiry of Thomasevich about the underlying facts of what occurred during Tim Brown's interrogation, by asking him questions on direct only about the handling of John Wood. (EH13 at 4-19). The Court was rightly surprised by this tactic, and asked the State: "You are not going to ask him about the questioning of the petitioner in this case? . . . Isn't he a key witness?" (EH13 at 20). And the Court is correct. Thomasevich was a key witness as to the interrogation, and particularly on the issue of the alleged diagram which Carr claimed was drawn by Tim Brown. Nevertheless,

108

when we attempted to explore the issue of Tim Brown's interrogation on cross-examination, the State objected in an attempt to preclude any inquiry. The Court may properly infer from this that the State may not have wished to have been in the position of eliciting untruthful testimony. For that, indeed, was what Thomasevich offered when *we* questioned him on cross about the "white piece of paper:"

MR. DAY: Mr. Thomasevich, when you were in the interrogation room with Mr. Carr and Tim Brown –

MR. THOMASEVICH: Yes, sir.

MR. DAY: – did Tim Brown write on a white piece of paper?

MR. THOMASEVICH: Yes, sir.

MR. DAY: And have you previously testified and disclosed that to anyone?

MR. THOMASEVICH: No.

THE COURT: What did he write?

MR, DAY: What did he write?

MR. THOMASEVICH: It wasn't a writing.  It was a map or a little diagram, but didn't do a very good job, so that was set aside and that's when we decided to use the photographs because he was having a problem with north, south, east and west, and what direction the store was facing.

THE COURT: To the best of your recollection, what was included in the drawing of Mr. Brown?

MR. THOMASEVICH: To the best of my recollection, it was a rectangular shape which supposedly indicated the store.  I think some lines were drawn in front where the spots were supposed to be, the lined parking spots.  I believe he got as far as putting the vehicle, drawing what he believed to look like a vehicle.  The problem was when he started to show us which direction he was running.  He said "I ran across here," and he wasn't sure if he ran around the back.  At that point we decided to let him take the photograph and let him point to what he was talking about.

THE COURT: What happened to the drawing?

109

MR. THOMASEVICH: Honestly, I don't know.  I know everything was taken out of the room that night.  It certainly wasn't left in the room with Tim Brown.  I don't know if it was put in the file or not.  I don't know if it was put in the file or not.

THE COURT: Do you recall having discussions about the diagram between you and the Assistant State Attorneys or other police officers or detectives?

MR. THOMASEVICH: I do not.  I do not remember anybody asking about it. Truthfully, because it was never completed and we never used that to show his direction of travel and we used the photograph itself, I never really thought about it afterwards.

THE COURT: Yes, sir.

MR. DAY: Is this an important document, Mr. Thomasevich?

MR. THOMASEVICH: It is, apparently, now.  At the time, I didn't think it was.

MR. DAY: You didn't think that a diagram drawn by Tim Brown indicating where the Circle K was, the store, with the lines and the spots drawn where the vehicle was, you didn't think that was an important document?

MR. THOMASEVICH: No, sir.

(EH13 at 81-82).  Thomasevich admitted that he never disclosed the alleged document to Chuck Morton or to anyone else at the Broward State Attorney's Office; he never disclosed it to the defense attorneys; nor did he mention it in any of his depositions or at the suppression hearing.  (EH13 at 82-83).

This testimony, like Det. Carr's, is not honest and not believable.  As the Court itself pointed out in questioning Mr. Morton, any document drawn by a criminal defendant during his post-arrest interrogation and statement, would be a key document in any case – particularly one like this, were there is no evidence at all connecting the defendant to the crime, except for his taped statement.  If it was corroborative of the defendant's knowledge of the crime scene (like Andrew Johnson's diagram, Pet. Ex. 54), and therefore *inculpatory* to the defendant, it would most definitely be

110

disclosed to the defense, explored in depositions, sought to be suppressed, and if not, introduced at trial. But of course, that did not occur. On the other hand, if it was *exculpatory* to the defendant – as would be a drawing in which he "didn't do a very good job" (EH13 at 81), such as for instance, showing the car in the wrong place, the parking spots in the wrong place, the streets in the wrong place, etc. – that would likewise have been turned over to the defense. And indeed, even if the document was ambiguous as to whether it was inculpatory or exculpatory – it would still be considered a "statement" by the defendant, and would have to be disclosed. Under any interpretation of the circumstances here, the detectives would have had to understand the significance of any drawing by the defendant relating to the crime scene. Any claims to the contrary are not credible. The fact of the matter here is plain and simple: **NO SUCH DOCUMENT EVER EXISTED**.

The Court should therefore find that Detectives Carr and Thomasevich were not forthright under oath in this proceeding. Their testimony on this matter, under oath, was not fair play. Why should the Court then assume that they "played" by any of the "rules" in their unrecorded pre-interview? That – as Detective Carr claimed – they felt no pressure at all to solve this extremely high-profile case in 1991, or to maintain Brown's conviction in 2002? Why should the Court assume that they acted "cordial" at all times when they interrogated Tim Brown – and that the atmosphere in the pre-interview was at all times "cooperative"? (EH8 at 21). Why should the Court assume that Thomasevich spoke to Tim Brown in the same manner in which he testified in court? Why should the Court assume that neither of these detectives threatened Brown with the electric chair, and that Carr did not slap him? All they have to offer is their word, and they have both shown by their testimony before the Court on this issue and others, that their word is not trustworthy. The Court must keep this incident in mind in judging these detectives' credibility as to their denials that

Brown was ever threatened with the electric chair, or slapped.  But it should also consider the matter of Eddie Lopez.

(vii) <u>The matter of Eddie Lopez – suppression of evidence, false swearing under oath, and inconsistent testimony</u>  The Court will recall that in Phase I of the hearing in this case, the State called Eddie Lopez to testify that on July 30 of 1991 (8 months after the homicide), he had identified Keith King from a photo lineup, as the man who he saw running by his house on the night of the homicide.  (EH6 at 141-144).  Det. Thomasevich also testified at that hearing, and corroborated Lopez' account.  (EH7 at 6-7: Resp. Exs. 56 7 57).   Neither of these two witnesses ever mentioned that in fact, Lopez had identified a different individual – who was definitely not Keith King – on the same day of the homicide, November 13, 1990.  Thomasevich acknowledged that he had taken a taped statement from Eddie Lopez on November 13, 1990, a statement about having seen someone run by his home on the night of the homicide.  Thomasevich claimed that what was included in that tape-recorded statement was "the substance of [his] knowledge as to what Mr. Lopez told [him] that he observed." (EH7 at 29)

After the evidentiary hearing, and after the closing arguments on Phase I were filed, the FDLE advised that they had discovered in BSO's file a November 13, 1990 photo lineup identification form sworn to and signed by Lopez, notarized by Det. Carr, and indicating as well the presence of Det. Thomasevich, in which Lopez swore under oath that "the individual appearing in the picture in position number 5 is the same individual who committed the crime more specifically detailed in case number PK 90-11-314 (the Behan homicide case number). (D.E. # 282, Ex. 2; Pet. Ex. 1017). The FDLE searched BSO's files for the actual photo lineup spread shown to Lopez on November 13, 1990, but were unable to find the actual lineup that accompanied the form.  (D.E. #

112

282, Ex. 1).

So they decided to question Thomasevich – under oath (D.E. # 282, Exs. 3 & 4). They asked Thomasevich whether other than taking a statement and description from Lopez at his residence on November 13, 1990, "what was done with him, if anything, regarding any – any photographs, or photo lineup?" (D.E. # 282, Ex. 4 at 9). Thomasevich responded: "Nothing at that time." (D.E. # 282, Ex. 4 at 10). Thomasevich, in fact, affirmed that they had no suspects or pictures of suspects at that time. (D.E. # 282, Ex. 4 at 10). However, Thomasevich did recall that Lopez came into the police station to do a composite on November 13th, (D.E. # 282, Ex. 4 at 10), and therefore, Inspector Lober asked him:

> Q: On November 13, while he's down there in the composite, do you know whether or not Mr. Lopez was shown any photographs or photo line-ups?
>
> A: No, I don't believe so.  Not by me.  I – we didn't have suspects, so I don't – I don't see why we would have –

(D.E. # 282, Ex. 4 at 11).  The only thing Thomasevich claimed to recall about lineups is showing Lopez lineups of both Tim Brown and Keith King months after the murder.  (D.E. # 282, Ex. 4 at 11-12).  Thomasevich, in fact, had notarized Lopez' July 30, 1991 identification of Keith King, (D. E. # 282, Ex. 4 at 12), when he took a sworn tape recorded statement from Lopez at that time.  (D.E. # 282, Ex. 4 at 13).  Inspector Lober then showed Thomasevich a copy of the July 30, 1991 sworn taped statement, indicating that Thomasevich had asked Lopez whether they had contacted him on numerous occasions during the 8-month investigation, and showed him a photographic lineup, but that Lopez had never before been able to positively identify anyone.  Lopez had agreed that that was correct.  (D.E. # 282, Ex. 4 at 13).  Thomasevich stated that he did not remember having ever shown Lopez a prior photo lineup, but he agreed that his question to Lopez on July 30, 1991, and Lopez'

113

answer indicated that that had been the case.  (D.E. # 282, Ex. 4 at 13-14).  But it was absolutely clear, Thomasevich emphasized, that Lopez had never identified anybody else other than Keith King. (D.E. # 282, Ex. 4 at 14).

At that point, Inspector Lober showed Detective Thomasevich the November 13, 1990 photo-lineup affidavit, signed by "Chad E. Lopez," in which, indeed, it appeared that Lopez identified someone (photo no. 5) in a photo lineup shown him on the very day of Deputy Behan's murder. (D.E. # 282, Ex. 2; Ex. 4 at 15).  Thomasevich responded: "I can't imagine how.  I can't imagine how.  Um, we had no suspect on that night.  That would have been – the 13th would have been – it's the same.  7:00 p.m.?  I really don't know.  You'd have to ask Jimmy Carr because I don't recall." (D.E. # 282, Ex. 4 at 15).  Inspector Lober advised Thomasevich that the form indicated that "you both were there," (D.E. # 282, Ex. 4 at 15), to which Thomasevich responded: "Yeah."  (D.E. #282, Ex. 4 at 15).  Lober then asked Thomasevich if it was possible that they had photo lineups put together within 16 hours of the murder.  (D.E. # 282, Ex. 4 at 16-17).  Thomasevich responded: "[A]nything's possible.  The only thing I can tell you is, from what I recall, um, we had one person that had stolen some cigarettes that we had looked at. . . . And um, from what I remember we pretty much eliminated him because of the distance that he was at when he was picked up by the deputy. He was quite a distance away because, you know, in our opinion he couldn't have made it there, you know, so quickly. . . . I do not remember having a suspect back then on that same date, that we would have been showing photo lineups."  (Ex. 4 at 17-18).

Lober pointed out to Thomasevich: "You know, the thing that's significant is that, it wasn't just the fact that there was a photo line-up; but he actually picked somebody out."  (D.E. # 282, Ex. 4 at 18).  Thomasevich reiterated, "[T]o me this is a shock that you're showing me.  I don't

114

remember it." (D.E. # 282, Ex. 4 at 18).  When asked if he ever communicated information about a November 13, 1990 photo lineup ID to anyone, Thomasevich said that he did not, and that if Lopez had picked someone out, they would have zeroed in on whoever that photograph was.  (D.E. # 282, Ex. 4 at 18).  Duhart "was eliminated pretty – pretty early on," Thomasevich explained.  However, Thomasevich qualified, "I mean, he still was in the back of people's minds.  You know, they still felt that anything's possible.  But I don't think that they felt too strongly about him that night." (D.E. # 282, Ex. 4 at 20).

The FDLE then took a sworn taped statement from James Carr – who, unlike his partner Thomasevich, admitted at least some recollection of Lopez making a photo identification on November 13, 1990.  (D.E. # 282, Exs. 5 & 6).  Mr. Carr stated that he and Thomasevich met with Eddie Lopez on November 13, 1990, interviewed him, and took a sworn statement from him at approximately 2:47 p.m.  (D.E. # 282, Ex. 6 at 4-5).  "Either that next day or that evening into the 13th, the evening of the 13th, we might have shown him a photographic lineup, or the next day." (D.E. # 282, Ex. 6 at 7).  According to Carr, "I don't believe he picked anybody out.  I think he might have tentatively looked at an individual and said the subject looked like this, but I know it wasn't a positive identification."  (D.E. # 282, Ex. 6 at 7).  Carr stated that the lineup shown to Lopez on November 13, "would have been six photographs in a lineup similar to something like this [indicating the July 30, 1991 lineup]."  (D.E. # 282, Ex. 6 at 8, 10).

Lober then asked Carr about Lopez' July 30, 1991 identification of King from the photo lineup, and Lopez' statement to Thomasevich that he had previously "seen other photographs but not identified anybody."

Q: Is that what you recall?

115

A: Not positively identified anybody, yes.

Q: Okay.  Do you recall either yourself, or Detective Thomasevich, or anyone else showing him a photo lineup in which he identified someone other than Keith King?

A: Tentatively identified someone else, but not – he couldn't positively identify anybody else.

Q: Who was that?

A: *I believe it was Tim Brown*, and that would have been probably on the night of the 13th or into the 14th.  I can't remember.

Q: Okay.  Do you know where that photo lineup is?

A: Would have been – should be in the case file.  Should be a lineup with Tim Brown in it.

(D.E. # 282, Ex. 6 at 10-11) (Emphasis added).

At that point, FDLE Inspector Lober showed Mr. Carr Lopez' November 13, 1990 photo lineup affidavit – "the same type of form" used when Carr did the photo lineup with Lopez on July 30, 1991.  (D.E. # 282, Ex. 1; Ex. 6 at 11).  Carr acknowledged that this form had his handwriting, that Lopez had signed it as "Chad Lopez," and that he had picked out photograph 5.  (D.E. # 282, Ex. 6 at 11).  Carr offered this explanation: "I believe this was a lineup with Tim Brown in it, but he couldn't say for sure.  We asked him if anybody looked like someone he had seen out there and he picked photograph number five, but we never introduced it in court because he couldn't swear to it.  He couldn't be sure."  (D.E. # 282, Ex. 6 at 11).  Inspector Lober then asked Carr: "Now on November 13th he swore to it, correct?"  (D.E. # 282, Ex. 6 at 11).  Carr responded:

MR. CARR: Well, I had him fill out the form.  Is anybody that you see that you believe look like the guy or a guy that you saw out there that night, and he picked photograph number five, which I believe in the photographs, looking at the lineups, was Tim Brown, but he couldn't be positive so he wasn't swearing to it.  What he was saying is this guy in this photograph looks like a guy that I saw out there that night, but he couldn't swear to it.  And we never introduced it because he wasn't a

116

hundred percent.

(D.E. # 282, Ex. 6 at 12).  Carr acknowledged that the form stated "sworn and subscribed to," that

he himself signed it as a notary public, and that Lopez signed that photo number 5 "*is* the same

individual who committed the crimes."  Nevertheless, he claimed, he had used the affidavit form

before on "tentative IDs," (D.E. # 282, Ex. 6 at 22) –  "sometimes if we get a tentative, you know,

we'll have them sign it, you know, that they're tentatively identifying, say in this case photograph

number five as somebody that looks like the guy but they're not a hundred percent sure so we'll

never use it in court." (D.E. # 282, Ex. 6 at 19).  Carr conceded, however, that he had not made any

notations on the form suggesting that the identification was only a tentative identification. (D.E. #

282, Ex. 6 at 20).

Inspector Lober asked Carr what he did with the information about Lopez identifying Tim

Brown on November 13th – the same day as the murder.  (D.E. # 282, Ex. 6 at 15).  Carr responded:

> MR. CARR. Again, just for the purposes of the record, he tentatively identified a
> photograph as the guy that he had seen out there.  He could not be positive.  That
> information was just brought to, you know, individuals that were running the
> investigation.
>
> With the way the course of the investigation went at that time, I think was just put
> aside and, you know, left.  I don't think it was really that much follow up done with
> it after circumstances that took place the next day or two pertaining to Tim Brown
> and the investigation down at Hollywood.  I think it was just disregarded.

(D.E. # 282, Ex. 6 at 15).  According to Carr, Sergeant Scheff and Sergeant John Auer were the ones

in charge at that time – the ones who he "verbally told," and the ones who "disregarded any

information pertaining to [Tim Brown] based upon what their investigation showed at that point in

time." (D.E. # 282, Ex. 6 at 16-17).

When Inspector Lober asked Carr, however, what – without the actual photo lineup – would

117

allow him to recall that photograph number 5 in the lineup shown to Lopez on November 13 was Tim Brown, Carr stated that it was "not that I remember photograph number five," but that "we didn't even know about Keith King at that time. We didn't even have his name. It would have been Tim Brown or Kevin Duhart, the man that stole the cigarettes . . . . They would have been the only lineups that we, at that point in time, which would be on the 13th at seven p.m. in the evening, that we would have even known about in this investigation to show him pictures of." (D.E. # 282, Ex. 6 at 14). And indeed, when Inspector Lober asked Carr how had Tim Brown become a suspect on November 13th at 7:00 p.m., (D.E. # 282, Ex. 6 at 12), Carr explained that the information had come from Rob McGriff, but then Carr stated that actually he was not sure whether it was late into day on the 13th or into the 14th. "That is why I can't be 100 percent sure," he said, "if this was on Tim Brown or Kevin Duhart, who robbed the cigarettes, because I remember that we were showing photographs also of Kevin Duhart. . . . So he was another one that we would have been, at that point in time in the investigation, would have been the only two people that we would have known about. We would have certainly known about Kevin Duhart and then right into the late hours of the 13th, going into the 14th, we would have learned about Tim Brown." (D.E. # 282, Ex. 6 at 17).

Carr had conceded earlier, however, that Tim Brown was not picked up for questioning until November 14th. (D.E. # 282, Ex. 6 at 12). When Lober showed him *his own* report of the investigation, Carr was forced to acknowledge that it was not until 9:00 p.m. on the 14th – over 24 hours *after* Lopez signed the lineup affidavit – that McGriff was interviewed. (D.E. # 282, Ex. 6 at 21-22). Carr said that he did not recall, however, when the first call came in from McGriff. (D.E. # 282, Ex. 6 at 22).

In the "only other photo lineups and affidavits" that Inspector Lober was able to find in

118

BSO's file, Carr was able to identify only one "Photo 5" and that was a photo of Kevin Duhart. (D.E. # 282, Ex. 6 at 13). And indeed, the final portion of FDLE's interview with Carr suggests that the person Lopez identified on November 13, 1990 at 7:00 p.m. was *not* (as Carr had initially sworn) Tim Brown, but rather, *was* Kevin Duhart:

> Q: By looking at your report, and the information that you wrote on the affidavit, is there any way that you could have been shown a picture of Tim Brown to Chad Lopez?
>
> A: I wouldn't think so. Now, we might have done it on the 14th 'cause I know we showed, as I said before, we showed him several lineups in the course of this investigation. That's what I said before, I can't tell the time frame. If we were showing him the picture then prior to having this information, the only other person I can think that it would be would be Kevin Duhart.
>
> Q: Now, with that understanding, and just let's go with that for a second, is he then tentatively identifying Kevin Duhart as a person he saw running from the Circle K?
>
> A: He could have been, or it could have been positively identifying. At this point, I can't even remember.

(D. E. # 282, Ex. 6 at 21).

> But in fact, after concluding this sworn statement and realizing that:
>
> • Captain Scheff, his superior, had rejected as "nonsense" his contention that the affidavit in question would have ever been used to show a "tentative ID" (D.E.# 282, Ex. 10 at 19-23), and that if this was merely a "tentative ID," but he had enticed Lopez into signing a "positive ID" affidavit, he might have committed the offense of false swearing as a notary public (EH9 at 146-147);
>
> • Scheff had said, "I don't understand how do these guys, you know, forget that their witness identified someone else" (D.E. # 282, Ex. 10 at 24);
>
> • Scheff had told the FDLE that in his opinion, "this would be *Brady* material . . . . because it tends to undermine the credibility of Eddie Lopez," (D.E. # 282, Ex. 10 at 27); and
>
> • This Court had indeed suggested, in its "actual innocence" order, that Brown might indeed have a *Brady* claim against the State for suppression of exculpatory evidence (D.E. # 286 at 29-32, 49-50),

Carr's recollection changed again.  It did not appear to concern him that the Florida Attorney General's Office had already "leapt onto his bandwagon," responding to our *Brady* notice arguing: "that the new evidence was not *Brady*, and that it did not undermine Det. Thomasevich's testimony, because – as Carr had said – the prior ID was only a "tentative" one of "someone."  (D.E. # 283 at 7).  Basing their position on what Carr had said, they wrote: "The Court should have confidence that Lopez positively identified King alone." (D.E. # 283 at 6).

At the federal evidentiary hearing, Carr offered a new "version" of what had occurred – a version that he conceivably thought would help both him and his partner Thomasevich "wriggle" out of the web in which they were caught.  First, Carr tried to backtrack from the provable falsehoods – for instance, the one about Tim Brown, and the idea of a "tentative ID."  But then, caught in a web of misconduct and falsehood again and just as he did with the "white piece of paper" incident, Carr tried to escape from his web by spinning out more falsehoods:

> MR. DAY: [T]he first person that you said that Mr. Lopez identified was who, sir?
>
> MR. CARR: I said I didn't know if it was tentatively that he identified Mr. Brown or what that was pertaining to.  They held up the piece of paper, just as you did sir, and asked me twelve years later "What is this?" I said "I don't know.  I have to look at it and have the lineup that goes along with it."
>
> MR. DAY: Did you make a statement different from that, sir?
>
> MR. CARR: I told him possibly, like I said, could have been Tim Brown when they were looking for Tim Brown or possibly a tentative ID.  I wasn't sure. . . . Then after they went out of the room and found the lineup, we realized it was Kevin Duhart. . . .
>
> MR. DAY: [Y]ou would agree with me, sir, that this is not a photographic identification of Tim Brown?
>
> MR. CARR: I agree with you, yes, sir.  I never said – I was confused when they asked me twelve years later and didn't show me a lineup.

MR. DAY: Are you suggesting that the Florida Department of Law Enforcement did not handle this interview properly?

MR. CARR: I am not only suggesting it. I am saying it, sir.

When they showed me that, they had no lineup. They didn't know a lineup went with it. They had twelve boxes, they told me, and they couldn't find it.

After one gentleman left the room, he came back sometime later and found the lineup that goes with it. . . .

MR. DAY: And sir, in this sworn statement, were you shown a photographic lineup?

MR. CARR: Yes, they went out and found a photographic lineup.

MR. DAY: And they came back and showed that to you?

MR. CARR: One gentleman did, yes.

MR. DAY: That's when you, in this sworn statement, told them it was Kevin Duhart?

MR. CARR: That I believe it was Kevin Duhart. They said "How would he know that?" I said, "Check the booking number. Then they brought in a single photograph with Kevin Duhart. They lined it up with it and said "You know, we think you are right. It looks like that to us."

MR. DAY: That was on the taped statement you gave on the 21st?

MR. CARR: It should have been.

MR. DAY: Sir, I am going to show you that statement and ask if you can locate that for me, Mr. Carr.

MR. CARR: Instead of doing that, sir – I don't know if they shut off the tape or not. If it is not on there, it's not on there. Why don't you call them in and ask them? They would testify to that.

(EH9 at 130, 133-134, 140).

The problem with all of this is that, we know for a fact it is false. And, of course, the State

knows that it is false. For they themselves have acknowledged that the FDLE **never** found the actual

photo lineup associated with the affidavit. *See* D.E. # 283 (State's Response to Brown's *Brady*

Notice) at 7 (noting that "there is no photographic lineup associated with the November 1990 form,

no photo array to evaluate, no documentation as to who was depicted in photograph number five,

what that person looked like in 1990, or how others picture in the array appeared.  Brown would

have this Court speculate that it was a picture of Kevin Duhart.  However, without the lineup, it

cannot be known whether the person depicted was Duhart or whether he was someone who looked

like, but was not, King.")  To date, the State has not acted to correct Carr's testimony in this regard.

But besides the fact that this actual photo lineup array has never been located, there are

additional reasons to find Carr untruthful.  Carr's new spin on Pet. Ex. 107, was that it was actually

a ***positive*** identification on November 13, 1990 of ***Kevin Duhart, as the man who stole the***

***cigarettes*** – not as the killer of Patrick Behan:

> MR. DAY: Was this a positive identification by Mr. Lopez?
>
> MR. CARR: I believe it was.
>
> MR. DAY: Okay.  Have you made a statement different from that sir?
>
> MR. CARR: It depends on what you are talking about.
>
> If I was specifically asked if he identified the man in the petty theft of cigarettes, I
> would have to say that, yes, he did.
>
> If you are asking me about the Behan case and the only identification he made
> pertaining to that was Keith King, then I would have to say that would be my answer.

(EH9 at 140).  *See also* EH9 at 145-146.

The first problem with this, is of course, that as Carr himself conceded at the beginning of

his testimony, Lopez had never said that he "saw anything other than one black male that morning."

(EH9 at 124).  Carr's subsequent claim (in this same hearing) that in fact Lopez had positively

identified two different people he saw on the night of November 13th – one who stole the cigarettes,

122

and one who was involved in the murder (EH9 at 148) – is not credible. Carr admitted that there was nothing in Lopez' November 13 statement about identifying anyone for the theft of the cigarettes. (EH9 at 151-152). Carr's answer: "I wasn't questioning him about that at that time . . . I didn't work petty theft then. I wasn't concerned with the cigarettes. We did the lineup. He identified Mr. Duhart as the person involved with the cigarette theft. We were involved in the homicide investigation, sir." (EH9 at 152).

If this was not nonsensical enough, the icing on the cake came when Carr was questioned about the case number on the affidavit Lopez signed – which was the case number for the Behan homicide (PK 90-11-314). Specifically, Carr was asked to look at the actual photo-lineup affidavit, as in it, Lopez averred that the individual he had selected from the lineup "is the same individual who committed the crime more specifically detailed in case number PK90-11-314." (EH9 at 143). When asked what case number that referred to, Carr said: "Actually it refers to two, sir. . . . It refers to the petty theft of cigarettes at the Circle K on the same date as the homicide of Deputy Patrick Behan." (EH9 at 143). Carr claimed there would be a file in the Broward Sheriff's Office listing "PK 90-11-314" as the case number for Duhart's petty theft. (EH9 at 144). Upon further questioning, he elaborated:

MR. DAY: So, there will be a document that indicates that. Is that correct?

MR. CARR: There should be a police report that documents that.

MR. DAY: With that specific case number?

MR. CARR: Yes, sir.

MR. DAY: You saw that report with that specific case number?

MR. CARR: That was the case number they originally pulled when the cigarettes were stolen from the Circle K.

123

MR. DAY: My question to you is did you see a report on a petty theft that had case number PK 90-11-314?

MR. CARR: I have not seen it.  I have been told over the year it's the same report.

MR. DAY: So, there is no document you have seen, Mr. Carr, that would indicate that a petty theft by Kevin Duhart has case number PK 90-11-314?

MR. CARR: There is a 911 dispatch tape.  There is the police reporting of that petty theft, that they utilized the same case number, sir.

MR. DAY: My question to you, sir, is is there a report you have seen that documents that case number relates to a petty theft by Kevin Duhart?

MR. CARR: It was never completed.

MR. DAY: So, there is no record, no document that associates the theft with that case number?

MR. CARR: *It was the report that Deputy Behan was writing when he was murdered.*

(EH9 at 144-145) (Emphasis added).

What was Carr thinking?  Did he really think that no one would check what he was saying, merely because he said it under oath?  Did he not know that *that* report indeed still exists, and it is in evidence before this Court as Pet. Ex. 54?  And indeed, that report very clearly shows at the upper left hand corner that the case number for the case Behan was investigating – the case of the "theft of cigarettes" from the Circle K – was PK 90-11-*311*, *NOT* PK 90-11-*314* (which was the case number assigned to the Behan homicide).  Again, yet another example of dishonesty – dishonesty with impunity – in an attempt to maintain Tim Brown's conviction at any cost.

The Court has already found, in ruling on "actual innocence," that Carr's sworn testimony to the FDLE about Tim Brown being in the November 13, 1991 lineup "could not be true, as Tim Brown was not identified as a suspect until November 15, 1991." (D.E. # 286 at 15 n. 8).  The law

in this circuit is that perjury in a related or similar proceeding is certainly a factor this Court can take into consideration in determining a case agent's credibility. *See United States v. Espinosa-Hernandez*, 918 F.2d 911, 914 (11th Cir. 1990).    But the Court need not rely merely upon an inference to be drawn from perjury in the "related" FDLE proceeding, because it now has evidence from *this* proceeding – that Carr's testimony on the Lopez matter could not be true. For not only was Carr's testimony ever-changing, it was provably false before *this* Court. And that in turn may, and should, cause the Court to reject the entirety of his testimony.

(viii) <u>Demeanor on the stand and other credibility considerations</u>.   One of the most interesting points about demeanor in this case, is that the State apparently did not *want* the Court to judge Thomasevich's demeanor vis-a-vis the coercion issue. It attempted to restrict his testimony entirely to the single matter of John Wood, and asked the Court to determine Thomasevich's credibility from the *paper record* of the suppression hearing alone:

THE COURT: You are not going to ask him about the questioning of petitioner in this case?"

MR. DONNELLY: No, Your Honor.

THE COURT: Isn't he a key witness?

MR. DONNELLY: I believe his testimony is contained within the motion to suppress.

THE COURT: You don't want to go over that. Why.

MR. DONNELLY: Well, because his testimony, if we look at the issue contained within this case, Your Honor, it is whether or not it is a false, coerced or –

THE COURT: Yes, but there are a lot of allegations about certain things having occurred. I guess I am just a little surprised you wouldn't question him directly about any of those allegations.

MR. DONNELLY: Well, they were answered, I believe, in the motion to suppress.

125

(EH13 at 20).

But what the State did *not* advise the Court at that time, was that Thomasevich gave *no testimony at all* at the suppression hearing as to crucial issues such as whether Tim Brown was *slapped* or *threatened* during the interrogation. (Pet. Ex. 1006C at 374-404). Chuck Morton's direct examination of Thomasevich at the suppression hearing comprised only two (2) pages of transcript. (Pet. Ex. 1006C at 374-375). The most relevant things Thomasevich said in those two pages, were that (1) he was present during both Tim Brown's record and unrecorded statements, and (2) that there was no pressure brought to bear upon him by BSO to arrest Tim Brown. (Pet. Ex. 1006C at 375). But he said little more pertinent to the subject on cross. Larry Davis spent most of the cross on his Jackie Bain/McGill/Duhart obsession. (Pet. Ex. 1006C at 376-395). Davis elicited that Tim was interviewed while he was shackled to the floor, and never spoke with or saw his mother. (Pet. Ex. 1006C at 398). But Davis asked Thomasevich no questions – and Thomasevich, accordingly, gave no testimony – as to whether Brown was threatened or slapped. (Pet. Ex. 1006C at 396-403). Accordingly, the State was asking the Court to simply *assume* that Thomasevich would have denied any misconduct in the interrogation, and to find for the State on that basis. Clearly, that would have been error.

But the question remains: Why didn't the State want the Court to hear from Thomasevich himself on the pertinent issues? The answer is not clear. But what is clear is that Thomasevich, like Carr, is currently under investigation by the FDLE for misconduct vis-a-vis Tim Brown. Thomasevich already earned one strike against him at FDLE, after he failed to disclose Eddie Lopez' prior identification of another individual (other than King) on the night of the homicide. And indeed, maybe Thomasevich did not want to have to answer any other questions on that issue – to be put in

126

the position of confirming, or trying to distance himself from Carr.[37]  Maybe he didn't want to say

anything about the Behan case at all, and be held accountable for it by FDLE.  The Court had

instructed the State to have its witnesses testify about the alleged crime scene diagram on the "white

piece of paper," but maybe Thomasevich didn't want to have to testify on that matter under oath.

But the Court was right not to allow that.  It needed to hear Thomasevich testify about *this* case,

because his credibility in *this* case is directly at issue.

And in fact, when Thomasevich was required to testify about *this* case, the Court certainly

had reason to doubt his truthfulness.  He decided to back Carr whole heartedly – whether it was on

the matter of the phantom diagram Brown allegedly drew, or Carr's explanation for not recording

Brown's pre-interview (the rationale being, to "weed out the non-verbiage."[38]  (EH13 at 31).  And

---

[37]The State vigorously objected when counsel asked him "Did Mr. Lopez ever identify anyone else other than the identification that he gave to you on July 30th of 1991?"  (EH13 at 77).

[38]Carr himself seems to have made a "Freudian slip" on this matter, which he tried to backtrack from fairly fast after Mr. Day pointed it out:

MR. DAY: This was unrecorded.  Is that right Mr. Carr?

MR. CARR: Yes, it was.

MR. DAY: The purpose that it's unrecorded is what, sir?

MR. CARR: To weed out a lot of nonverbiage that, for a transcriber not to have to transcribe.

MR. DAY: Is that weeding out nonverbiage from you?

MR. CARR: No, usually from the defendant.

MR. DAY: Okay.  It would also weed out any nonverbiage from you.  Is that right?

MR. CARR: That would have to be correct.

indeed, it is quite interesting that in stark contrast to his agitated and defensive demeanor when he was cross-examined about John Wood, Thomasevich spoke quietly and calmly about Tim Brown, in an obvious effort to dispel any inferences of overbearing a young boy's will.  The following interchange is instructive in this regard:

> MR. DONNELLY: Would you describe your demeanor throughout the interview [with Tim Brown]?
>
> THOMASEVICH: My demeanor is, basically, the way I am speaking now, as I am speaking in this courtroom.
>
> MR. DONNELLY: And Detective Carr, would you describe his demeanor?
>
> THOMASEVICH: The same.

(EH13 at 85). If Thomasevich meant that Carr's demeanor was similar to his own, that is simply not believable. But if Thomasevich meant that Carr's demeanor in the interrogation was just like Carr's demeanor on the witness stand in this case, then *that* of course, lends credibility to everything Tim Brown has said.

For on the stand, Carr's "attitude" was the very type of attitude that could intimidate a mentally retarded 15-year-old into submission.  The Court may recall this telling interchange:

———————————

> MR. DAY: If there was any pressure brought to bear by you on an individual, that would not be recorded and that would be weeded out.  Is that right?
>
> MR. CARR: In the – on the verbiage that's off the tape, I think it would come through in the verbiage that's on the tape, though.
>
> MR. DAY: Well, there is no record of that, is there, sir?
>
> MR. CARR: No, sir.

(EH9 at 91).

128

MR. DAY: Mr. Carr, you did not want Andrew Johnson investigated for the murder of Patrick Behan in the reopened investigation. Do you agree with that?

MR. DONNELLY: Objection. Irrelevant.

MR. DAY: Your Honor, I believe it goes –

THE COURT: Overruled.

MR. DAY: You did not want that investigated. Do you agree with that?

MR. CARR: No, I don't agree with that at all.

MR. DAY: Did you tell Major Fantigrassi, "When I found out" – I'm sorry – "I told Fantigrassi I saw no merit in the case. That didn't make sense. It didn't wash. I told him they were going to end up with egg on their face and they were going to let a cop killer go free"?

MR. CARR: Oh, yes. I said that. But where did you get I didn't want him to be investigated out of that?

MR. DAY: Well, did you say to Major Fantigrassi when you found out that Major Fantigrassi was investigating the Behan case in the reopened investigation that you were extremely upset? Did you say that?

MR. CARR: I said that, and there was a reason for it. I also said we have an obligation to look into any information that comes in on any case.

You know, Mr. Day, you have a habit of just reading excerpts you want to. Please read all the information.

MR. DAY: If Andrew Johnson is the killer of Patrick Behan, [then] Tim Brown was innocent, would you agree with that, sir?

MR. CARR: If that were the case.

MR. DAY: If Andrew Johnson is the killer of Patrick Behan, then you took a confession from an innocent person. Would you agree with that sir?

MR. CARR: Fairy tale world, yes, I would agree with that, if it was the case.

MR. DAY: And then you would have egg on your face?

MR. CARR: But I don't.

(EH9 at 153-155). This is the side of James Carr that Tim Brown described in the interrogation room. Tim's denials of misconduct, and protestations of innocence were met with the same defiance, exhibited here.

(ix) The failure to tape record the "pre-interview." The final question to be addressed on the issue of credibility is, of course, the one the Court itself raised as to whether there is any inference that it may draw from the failure of BSO to tape record the "pre-interview" here ( EH13 at 108-109) – particularly if there was, as Det. Ilaraza said, a secret viewing room, equipped with two TV cameras inside the wall of the interrogation room, providing both sound and video to secret BSO observers. (EH12 at 31, 55). That question is one of first impression in the Eleventh Circuit, and we do not want to lead the Court in the wrong direction on it.

All of the *state* courts that have considered the issue appear to be fairly well agreed that recording of interrogations is not required under the Due Process Clause of the *Federal* Constitution. Nevertheless, the Supreme Court of Alaska has found that the failure to record the entire interrogation violates the due process clause in the Alaska constitution. *See Stephan v. State*, 711 P.2d 1156 (Alaska 1985) (unexcused failure to record entire interrogation violates suspect's right to due process of law under the Alaska Constitution, and any statement thus obtained is inadmissible). The Supreme Court of Minnesota has required recording pursuant to its "supervisory authority," *see State v. Scales*, 518 N.W.2d 587 (Minn. 1994) (mandating recording of all custodial interrogations including any information about rights, any waiver of those rights, and all questioning "in the exercise of our supervisory power to insure the fair administration of justice"). And the Supreme Court of New Hampshire has likewise concluded under its "supervisory jurisdiction over [its] trial courts to ensure the fair administration of justice" that the recording of an interrogation

130

must be complete to be admissible. *State v. Barnett*, 789 A.2d 629 (N.H. 2001).  Unfortunately, however, there are many other state courts that have concluded differently.  *See, e.g.*, Donovan and Rhodes, "Comes a Time: The Case for Recording Interrogations," 61 Mont. L. Rev. 223 at n. 52 (2000) (cases cited therein).  While the Florida Supreme Court has not yet addressed this issue, the 2nd DCA, at least has concluded that there is no authority requiring the taping of interrogations. *See State v. Williams*, 386 So.2d 27 (Fla. 2nd DCA 1980); *State v. Dupont*, 659 So.2d 405 (Fla. 2nd DCA 1995).

While a failure to record does not "constitutionally" require suppression, the Supreme Court of Montana has held that:

> [I]n the context of a custodial interrogation conducted at the station house or under similarly controlled circumstances, the failure of the police officer to preserve some tangible record of his or her giving of the *Miranda* warning and the knowing, intelligent waiver by the detainee will be viewed with distrust in the judicial assessment of voluntariness under the totality of circumstances surrounding the confession or admission.

*State v. Grey*, 907 P.2d 951 (Mont. 1995).  While such "viewing with distrust" appears to be the most reasonable approach to the issue particularly where the suspect is both a juvenile and mentally retarded (the same rationale would seem to apply to both unrecorded *Miranda* warnings and unrecorded "pre-interview" interrogations), we are still cautious about advocating such an inference here given federal law regarding the "failure to preserve evidence."  Under federal law, an adverse inference may be drawn from a party's failure to preserve evidence only if  "bad faith" is shown. *See, e.g., Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997); *see also Arizona v. Youngblood*, 488 U.S. 51 (1988) (adverse inference may be drawn from the destruction of evidence, only where there is a showing of "bad faith").  While we believe that an actual "adverse inference" is a stronger inference than a mere inference of "distrust," if the standard of review *were* one of "bad faith" we

131

do not believe that BSO's failure to turn the recorder on in Tim Brown's "pre-interview" would meet the "bad faith" standard. The reason: BSO "policy" did not require it.

That is not to say that we believe that BSO's *policy* of not recording pre-interviews – a policy no witness (or prosecutor) in this case was able to credibly justify (EH8 at 23, 25; EH12 at 56; EH9 at 91) – was devised and continues to this day in "good faith." It does not. In fact, it is premised upon a "bad faith" bet – a bet that in 99% of the cases of "swearing matches" between the word of a police officer and that of a criminal defendant, both judge and jury will believe the police officer. Unfortunately, however, even if this policy was devised in "bad faith," we cannot in "good faith" say that the detectives here acted in "bad faith" in failing to record Tim Brown's "pre-interview" – *if in fact that was permissible according to their policy at the time*.

Our bottom line is therefore this: The Court *need not* draw *any* inference at all from the failure to record the full interrogation in Tim Brown's case, in order to decide the credibility issues presented. The Court clearly has enough evidence of Detective Carr's and Detective Thomasevich's lack of credibility, to decide their credibility merely from the record as it stands now, without resort to any further inferences.

For sure, if BSO had recorded the entire interrogation of Tim Brown – from the minute he was taken into the interrogation room, through the reading of the rights form, the "pre-interview," and the final version of his statement – there would have been an inference in the *other* direction. Had there been a full recording available, the Court might well have been able to ignore the mountain of evidence detailed above as to these detectives' untrustworthiness. Without a full recording of everything that occurred here, however, there can be no presumption that because police officers are sworn to *enforce* the law, that they themselves *abide* by the law, and never *overstep* the

law in their dealings with criminal defendants.  James Carr and Eli Thomasevich must simply be
judged by the ***ordinary*** considerations governing credibility of ***ordinary*** witnesses – motive, bias,
inconsistencies between their testimony and that of other witnesses, the internal consistency of their
testimony, consistency of their testimony through various proceedings, and the basic sense or lack
of sense of what they say.  But the most important consideration, of course, is always their word –
most particularly, their word in the evidentiary hearing before this Court.  We believe we have
credibly shown, with substantial and specific evidence, why neither the word of James Carr nor that
of Eli Thomasevich should be credited.

Our burden in this civil habeas proceeding is only that of the "preponderance of the
evidence."  We do not have to prove what occurred in the interrogation room beyond ***all*** doubt, or
beyond even a ***reasonable*** doubt.  We do not even have to prove what occurred by ***convincing***
evidence, because the state court made no findings on the issue of the threat or the slap, and
accordingly, there is no presumption of correctness to rebut.  We believe that in light of all of the
evidence detailed above, we have met our burden on this issue – which is entirely one of credibility
– by the preponderance standard here.

**(10) <u>Understanding how and why Tim Brown caved in – when he caved in: The
battered child syndrome, and Tim's extreme susceptibility to the detectives' coercive tactics.</u>**
Tim Brown has described that he quickly caved in, and said "I did it," once Det. Carr slapped him.
(EH11 at 9, 24-25).  He explains: "I did it out of fear because they had hit me and I was scared."
(EH11 at 9).  "I confessed to the murder because I was scared."  (EH11 at 24).  When asked what
he thought would happen to him if he did not give the officers a statement, Tim Brown replied: "I
thought they was going to beat me again, sir, and I really thought I wasn't going to get up out there

with my life." (EH11 at 13). And in fact, with regard to being slapped by Det. Carr he said: "I never experienced anything like this before in my life. Yes, I had been in trouble numerous times, but I never experienced anything like this before." (EH11 at 25). Clearly, in Tim Brown's mind, it was the slap that "broke the camel's back."

While indeed Tim Brown did not actually perceive it, it was **not** simply this slap, but the **totality** of pressures – the snowballing of pressures which proceeded it – which together worked to break his will. The testimony of Dr. Walker can explain, however, why Tim Brown himself focused in so exclusively upon the slap at the hearing – why he recalled that one fact more clearly than anything else in the case. (EH11 at 23) Dr. Walker is an expert in the field of Battered Woman Syndrome, Battered Child Syndrome, and post-traumatic stress disorders. (Pet. Ex. 1048 at 9-10, 13-16). She has explained that Tim Brown was a severely battered child, who suffered years of brutal abuse at the hands of his father, and that this resulted in a post-traumatic stress disorder of severe proportion. (Pet. Ex. 1048 at 39).

(a) Brown was a severely battered child.   At the hearing, Mrs. Brown described this abuse in detail. She testified that her husband Arthur Brown was a drug addict who regularly beat both her and her kids – at least once or twice a week. (EH9 at 41, 43). Mrs. Brown explained that he hit her "with his fist. He kicked me, stomped me. Whatever he felt like he wanted to do, he did it." (EH9 at 43). But how he treated Tim was simply unconscionable. Mrs. Brown was overcome with emotion when she described: "If he didn't do what he was told to do when he was told to do it, he would hit him, man-handle him like a man, hit him with a two-by-four," (EH9 at 44), "with a vacuum hose," (EH9 at 45), or "he would take his fist and hit him and hit him so hard he would fall up against the front door and knock it off the hinge, and he would be upset about it and he would run

134

away from home." (EH9 at 44). Mrs. Brown feared that her husband would kill Tim one day "because he didn't care where he hit him or what he hit him with." (EH9 at 46). And in fact, Arthur Brown emotionally abused his son as well. "He threatened to kill him if he didn't do what he wanted him to do. He said he brought him into the world and he can take him out of the world" too. (EH9 at 45). This started when Tim was 8 or 9 years old, and it occurred every day or every other day in their household, until finally, in 1989 and again in 1990 she took out restraining orders against him, and Arthur Brown was removed from their home. (EH9 at 41-45; Pet. Ex. 1015 and 1010). By that point, however, Tim had gotten to the point that he didn't care if he lived or died. Tim told her that. (EH9 at 46-47).

Dr. Walker herself conducted extensive interviews with Mrs. Brown, Tim's sister Rhonda, and with Tim himself on this painful subject. (Pet. Ex. 1048 at 22). Mrs. Brown told Dr. Walker much of what she described in court, (Pet. Ex. 1048 at 23), but Tim and Rhonda recalled additional incidents, including one in which Arthur Brown attempted to set Rhonda's son (who was in a body cast) on fire. (Pet Ex. 1048 at 25-27). Rhonda recalled her father punching Tim in the head repeatedly with his fist, calling him names, telling him that he would never amount to anything. (Pet. Ex. 1048 at 26). Rhonda particularly recalled the incidents of Tim being beaten with the two-by-four, with the vacuum hose, and being thrown up against the door so hard that it came off the hinges and could not close. (Pet. Ex. 1048 at 26). Tim recalled these incidents as well. When he was hit with the two-by-four, he recalled that his body had been bruised, but that he had kept his shirt buttoned so people at school wouldn't see it. (Pet. Ex. 1048 at 27). He recalled being hit with the vacuum cleaner hose, but could not even say why. (Pet. Ex. 1048 at 27). He recalled his father threatening them with a gun, having sex with his sister Rhonda, and being physically violent towards

her and their mother as well.  (Pet. Ex. 1048 at 28).  Finally he recalled his father's verbal abuse –
that he was always yelling at him, cursing at him, and belittling him: "I helped bring you into the
word, I can take you out of the world;" "Son of a bitch, I'll put your ass in the grave;"  "You're
dumb;" "You're stupid;" "You'll never grow up, you'll never be anybody."  (Pet. Ex. 1048 at 28).
And what all of them – Mrs. Brown, Rhonda, and Tim – described  was that whenever Tim was
beaten, Rhonda was beaten, or Mrs. Brown was beaten, Tim's response was to leave: to run out of
the house and away.  (Pet. Ex. 1048 at 24, 27).

(b) The post-traumatic stress disorder brought on by years of abuse.  Dr. Walker found this
history of severe abuse, and Tim's response to it, to be crucial in  analyzing Tim's mental condition
at the time of his arrest, and his response to the detectives and to what occurred in the interrogation
room.  She explained that children who witness and experience such violence in their homes are
affected in their behavior (many become delinquent), their abilities to learn (lack of attention and
concentration), and their emotional development. (Pet. Ex. 1048 at 29-30, 36).  Most relevant to the
voluntariness issue here, the severe abuse could (and in Tim's case did) result in a post-traumatic
stress disorder (the emotional component of the Battered Child Syndrome) in which the child
"begin[s] to have intrusive memories of previous abuse cases," in which he would "tune out" what
is actually going on at the moment.  This "tuning out" would not only happen in school –
exacerbated in fact by Tim's "limited intellectual resources to start with" – but it would also come
into play whenever he perceived himself in a stressful situation.

When Dr. Walker examined Tim in 1999, she gave Tim the Trauma Symptom Inventory Test
to measure the impact upon him from his past trauma – to see if there were still any lingering effect.
And indeed, the test *did* show the effects of such trauma, even in 1999, which convinced Dr. Walker

that in 1991 at the time of Tim's arrest, this Post-Traumatic Stress Disorder was in full play.  What

Dr. Walker noted was that

> He was different than would be a normal child who wasn't exposed to trauma on scales that measured high levels of arousal or anxious arousal on questions that measured depression, intrusive experiences.  This means that he was still seeing symptoms or hearing symptoms that included flashbacks, which is really one of the most critical parts of a post-traumatic stress disorder.  That he had what we call "defensive avoidance" or the inability to really confront things so he would be much more likely to go along, to comply, or to just avoid whatever way he could.  Similar to sometimes he was – he ran away when he could physically but this is like running away mentally.

(Pet. Ex. 1048 at 33).

In Dr. Walker's expert opinion, this became a "chronic mental condition" for Tim.  It was

not just something that happened post-arrest, in prison, because "by the time I got to him, it was a

number of years later and it led to a long-standing mood change, so he had what we call a dysphoric

mood, not quite depression, but it is like being depressed, like a chronic sadness, if you will."  (Pet.

Ex. 1048 at 34).  Moreover, it might have created an actual psychiatric "disorder that underlays

everything else," and indeed, Tim not only said on the test that he still had suicidal thoughts, his jail

records show that he was having such thoughts and indeed, had attempted suicide close in time to

his arrest in this case.  (Pet. Ex. 1048 at 17-18, 34, 39).  Specifically, medical records both from the

Juvenile Detention Center and from the Broward County Jail document that Tim had both threatened

suicide and actually attempted suicide by cutting his wrists in the months preceding his arrest in

1991, and was treated with strong psychotropic medications for hallucinations, hearing voices and

other mental disorders in the months that followed his arrest.  (Pet. Ex. 84; Pet. Ex. 1036; Pet. Ex.

137

1037; Pet. Ex. 1048 at 17-18, 35, 107-110).[39]

(c) Susceptibility to – and caving in to – coercive tactics.  What all of this means, Dr. Walker explained, is not that Tim was out of contact with reality,[40] but simply "that when he gets overly stressed, he deteriorates into that kind of retreat, a withdrawal, kind of retreat that is psychotic and he goes into his own head."  (Pet. Ex. 1048 at 35).  Dr. Walker put together the totality of circumstances in this way to describe what was going on inside Tim Brown's head in the interrogation room:

> If you are always running away, a P.T.S.D. has what we call a "fight or flight response."  When you are exposed to trauma again and again and again, each time you are exposed, it is not just that traumatic event that you react to.  This is children and adults.  It is also your memories that come in your head of previous or fragments of memories of previous events and when that occurs, the first thing that people do not intentionally but it is an autonomic nervous system response is get yourself prepared, the fight response.  You are getting ready.  It is hyperarousal.  We see that on the T.S.I.  It is hyperarousal.  You are getting your body and mind ready to fight.  You can do all kinds of extraordinary things during that particular phase.  Most people if you get ready, you want to get out of there.  You are ready to flee.  That is the flight response.  But kids can't get out of there.  Even adults can't get out of there but especially a child.  They end up having to stay.  As he got older, he got out of

_____

[39]Neither Larry Davis nor Dr. Kaprowski ever requested or reviewed those records.  Accordingly, they were unaware that Tim was suicidal and was treated for a serious psychiatric condition.  While Dr. Kaprowski testified that Tim "did not show any sign of major mental illness," (Pet. Ex. 1006B at 187), and Judge Frusciante found all of her testimony "unimpeached," any implicit findings by the judge that Tim Brown was not suffering from any major mental illness, are not entitled to any "presumption of correctness."  These records and Dr. Walker's testimony in reliance upon them provide convincing evidence that Dr. Kaprowski was not adequately informed.  "You are not in a psychotic state all of the time.   That is part of the problem and if you are a streetwise kid like Tim Brown was, you may cover it up.  So if you are not really looking for it, you don't see it.  I read Dr. Kaprowski's testimony.  There's no place she says that.  There are a couple of places where she says in the IQ test she doesn't see mental illness there from the way he responded, but he was such a low level responder on the Rorschach Test, he just gave basic responses so she didn't see anything there.  It doesn't mean it wasn't there. (Pet. Ex. 1048 at 97).

[40]Dr. Walker is in agreement with Dr. Kaprowski on this narrow point.  (Pet. Ex. 1006B at 187, 193).

there physically when he could.  When he was younger as a child, he's going to get out of there mentally and that's what disassociation is.  That is the fancy psychological language we have for each way that he does it is what we are measuring, but that is the basic idea of what is happening.

Here we have a child who doesn't have a lot of resources to start with, is put in a situation where he better have a lot of resources because I'm talking about intellectual resources now, cognitive and social, emotional resources. The only thing he learns to do is go, get out of there, or fight back at times but not very well.  So for a long period of time he learned how to be emotionally placid, which he is.  There's no question about the descriptions of his behavior and my interview with him that this is a man who is whatever terms you want to use, retarded, intellectually compromised, developmentally disabled.  There is a lot of nice terms we use for it but the basic point is that he does not function like a normal person functions, you know, and then he has all this emotional stuff that he has to deal with on top of that. He loses the even little bits of cognitive abilities that he has.  He can learn.  He's educable.  He needs special ways to be educated.  He doesn't get it.  He's in regular classes and he's promoted whether or not he learns.  He's generally, the school records follow what Othalean Brown says.  He's generally pretty passive.  He just doesn't do what he's supposed to do until he gets older, and then he runs away and gets into some trouble.  Then he comes back again and it is kind of back and forth.

So we have an intellectually compromised child who is now emotionally compromised, as well, because of the abuse.  Those factors interacting together with no special care, no history of any treatment, no history of any special education.

(Pet. Ex. 1048 at 36-38).

So when, as Tim described to Dr. Walker, he was picked up by a number of detectives, taken

to the  station house where at first he denied any involvement in the killing, but then they told him

"We know you were [involved," and then threatened him with the electric chair, and then slapped

him in the face, (Pet. Ex. 1048 at 41), his post-traumatic stress disorder came into full play and he

caved in.   As Dr. Walker explained: "He was terrified, he was upset, he was in pain, and he was

scared" – even more frightened, perhaps, than the average child, and also more compliant.  (Pet. Ex.

1048 at 42, 47).

And in fact, Dr. Walker had little doubt that Tim was indeed in such a state of terror, fear,

139

and pain, because she saw Tim relive these feelings and emotions when he described for her what

had occurred:

> I observed him. In part of doing a clinical evaluation is not just what people say, but
> also their psychological demeanor. At the time that he described what happened to
> him, I could observe him in both the way he said it and in his demeanor that he was
> reliving some of what happened and it wasn't just the incident that was happening
> in the police station, it was also the beatings and the pain from his abuse as a child.
> All of that gets mixed together. That is P.T.S.D. That is why I diagnosed him as still
> having P.T.S.D. from my evaluation of him is that he still has those flashbacks and
> fragments of other things in his head at the same time. We have both what is
> happening and really happening and what is happening in his mind that impacted my
> opinion on his behavior at that point.

(Pet. Ex. 1048 at 42-43). "There were several times when we did stop. That is why I diagnosed him

as still having a post-traumatic stress disorder. At many points it was very difficult for him to go

on." (Pet. Ex. 1048 at 85).

> Dr. Walker believed that the flashbacks here were

> triggered by the same kind of threats, the same kind of feeling overpowered, that he
> can't go any place or run. It is that fight or flight response that is activated with that
> and the compliance. The I'm going to try to calm him down, protect myself, because
> I'm really going to get hurt. It is not conscious. This is an autonomic nervous system
> response so it may also be the same emotional feeling. Sometimes it is not
> conscious. In a kid like Tim who has so few limited verbal skills, the emotions
> would be more significant for somebody like him. He can tune out the verbal but
> once the threats are made and you start that emotional process, he can't tune it out.
> He doesn't have the ability.

(Pet. Ex. 1048 at 43). It would not take actual physical violence to bring the post-traumatic stress

response into play, however. As Dr. Walker explained, verbal abuse such as a threat – or some other

behavior that he would perceive as threatening – would be enough to trigger the P.T.S.D. response.

(Pet. Ex. 1048 at 44, 93-94). In Dr. Walker's opinion, merely being placed under arrest for first

degree murder, or Brown's having legs shackled, would not have been what elicited the response.

(Pet. Ex. 1048 at 94-95).

And indeed, when flight is simply not a possibility, the typical response of someone with a

P.T.S.D. to such a threat, would be "compliance." (Pet. Ex. 1048 at 44). Dr. Walker explained that

both

> children and adults learn that if you give the abuser what they want, they quit. They stop. Tim had been arrested before and released. He knew that if he just told them what they said they wanted to hear, they are going to help him. He's going to be released. He was sure if he just calmed them down he wouldn't get hurt anymore.
>
> . . . In my opinion he would have viewed them as being very threatening and scary and people he needed to calm down so he could go home. . . .He coped as he might with his father. He just said what they wanted him to say, even though he knew it wasn't true. . . . He believed that if he said what they wanted him to say he would go home. It would be finished. It is my opinion that he didn't comprehend the seriousness of the charges, or B, that if he told them something that wasn't true it was going to be hard to prove later on. Because he knew it wasn't true, therefore in his simplistic way of thinking, how could they prove he did something he didn't do.

(Pet. Ex. 1048 at 44-45, 48).

And thus, we understand how it was that Tim Brown finally broke down and provided his

taped statement, which was a false statement. Clearly, as Dr. Walker has explained, because of his

trauma, Tim – who was extremely suggestible to start with – would say anything to get away from

people whom he perceived as abusers like his father – including taking responsibility for a crime he

did not commit, making up facts to add to the information the officers had told him. (Pet. Ex. 1048

at 49, 96). That is what John Wood (another innocent man suffering from a post-traumatic stress

disorder) did as well when he perceived himself under attack by Detectives Carr and Thomasevich.

Based upon the totality of the evidence that has been presented in this case – testimony

which, for the most part, Judge Frusciante never heard – the Court should find that Tim Brown's July

16, 1991 taped statement was not "voluntarily" made. It was not a product of his own free will, but

rather, of coercion on the part of Detectives Carr and Thomasevich – to which he was extremely

vulnerable given his age, I.Q., and post-traumatic stress disorder from being a battered child. Accordingly, the Court should grant the writ.

## ACT II.  THE SUPPRESSION HEARING

### Ground 3. Ineffectiveness of Trial Counsel in Failing to Properly Investigate and Litigate the Motion to Suppress (Ground E of the Amended Petition)

#### A.  The Legal Standard for Determining Ineffective Assistance of Counsel Claims.

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that a defendant is denied the effective assistance of counsel if "counsel's representation fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.  With regard to any of the ineffectiveness of counsel claims here, to meet the first prong of the *Strickland* test, Brown must prove that "no reasonable attorney" would have taken the actions that Larry Davis did. *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000).  With regard to the second prong of the test, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  Notably, this standard of prejudice is *less than* a preponderance of the evidence.  In *Strickland* itself, the Court explained: "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

Claims of ineffective assistance of counsel may be judged individually, or cumulatively – as to both the unreasonableness, and the prejudice prongs of the claim.  *See, e.g, Henry v. Scully*, 78 F.3d 51, 53 (2nd Cir. 1996) ("We express no view regarding whether one or two of these errors would have constituted ineffective assistance, for the aggregate effect of these three instances of inaction

142

by defense counsel convinces us that . . . Henry received ineffective assistance of counsel.")  While we have broken up the various aspects of counsel's ineffective assistance here into broad but discrete categories for purposes of clarity, and chronology, the Court should not feel bound by our organization of these issues, and may indeed find that there was a snowballing of errors in this case, from the moment of Larry Davis' entry into it.  Clearly, the Court may assess the reasonableness of Davis' conduct, and the prejudice from his errors, on a cumulative or "aggregate" basis.

This "cumulative" approach to the issue is particularly appropriate vis-a-vis the motion to suppress.  While Brown can easily meet the *Chandler* standard of "unreasonableness" with respect to each and every one of Larry Davis' omissions recounted below, and competent representation on any one of these matters could have resulted in a different ruling at the suppression hearing, the suppression of the confession, and Brown's freedom – when considered cumulatively, the prejudice from the various omissions is manifest.  The Court need only compare the deficient presentation  at the suppression hearing, with the totality of circumstances and evidence documented *supra*, to find that but for Davis' cumulative omissions, there was a reasonable probability that the result of the suppression hearing would have been different.

### B. The Omissions

(1). <u>Failure to document the slap during the interrogation</u>.  As noted *supra*, Mrs. Brown says that when she spoke with Larry Davis at the Detention Center on that first Saturday, July 20, 1991, she specifically told Larry Davis to take pictures of the bruising on Tim's face, that he said he would, but that he never did. (EH9 at 56, 60).  Mr. Davis acknowledged that his notes indicated that he met both Tim Brown and Mrs. Brown at the Detention Center on July 20. (EH8 at 39-40, 42; Pet. Ex. 83).  However, he is emphatic that he never had any such conversation with Mrs. Brown about

143

the bruising, (EH8 at 47), and does not recall seeing any bruising on Tim Brown's face that day. (EH8 at 47). We have already explained *supra* at 72-75, why Davis' recollection should not be trusted on this point and ask the Court to refer to that discussion in deciding the issue of ineffectiveness here. But we do wish to reiterate that Davis certainly had no independent recollection of anything about that first meeting with Tim Brown, (EH8 at 41); his notes of that first encounter are extremely sparse – noting only height, weight, grade in school, etc. (Pet. Ex. 83); Davis also forgot that Tim Brown told him (at least at their next meeting) that he had been slapped (even though that is well-documented in Davis' notes) (Pet. Ex. 83; EH8 at 48-51); and Davis had never seen Tim Brown before July 20, and would have had no basis of comparison to determine whether indeed, he was bruised. (EH8 at 48).

In deciding this credibility issue, the Court should also compare the demeanor of Othalean Brown, to that of Larry Davis – as they testified before this Court. While Othalean was candid, and did not equivocate in any way, Larry Davis was highly defensive, and "wishy-washy" on most points. Simple questions calling for a "yes/no" answer elicited three-minute, winding answers. In Davis' own words, he tended to "babble on." (EH8 at 62). He was waffling and unsure of almost everything he said on the stand – except this. And *that* "exception to the rule" is not believable.

Accordingly, the Court should credit Mrs. Brown, and find that Davis' failure to document the crucial evidence of coercion – that Tim Brown had been slapped – was objectively unreasonable. No reasonable attorney would have failed to document such evidence.

(2). **Even without photographs, failure to argue – and present evidence – of a slap, given that Tim specifically told Davis he had been slapped.** We will not second guess Larry Davis' decision not to put Tim Brown on the stand at the suppression hearing. Tim was only 17 at the time,

144

and as the Court has heard, a 7 or 8 year old child mentally. Certainly, there are reasonable attorneys who would not put a mentally retarded teenager on the stand – even at a suppression hearing.

But we can say with certainty, that no reasonable attorney would have ignored the fact that his own client told him that he had been slapped (as documented in Davis' notes here). No reasonable attorney would have failed to mention that slap in the motion for suppress, as Larry Davis indisputably did here (EH8 at 50), would have failed to cross the detectives on that point at the suppression hearing (Pet. Ex. 1006B at 240 - 1006C at 371). And no reasonable attorney would have failed to put on positive evidence of such a slap, by calling Tim Brown's mother to testify as to the bruising she observed when she saw Tim, or at the very least, what Tim told her what occurred during his interrogation. Mrs. Brown was present at the suppression hearing and clearly available to testify as to the bruising that she saw on Tim, and what he told her when she went to see him on July 20. (EH9 at 66). And in fact, because hearsay is clearly admissible at a state suppression hearing, *see Lara v. State*, 464 So.2d 1173, 1177 (Fla. 1985) (hearsay is admissible at a suppression hearing); *Ferrer v. State*, 785 So.2d 709, 711 (Fla. 4th DCA 2001) (same), Mrs. Brown's testimony in this regard would clearly have been admissible, and compelling.

No reasonable attorney would have ignored this crucial evidence – or this straightforward, legally permissible way of proving it – in litigating a motion to suppress based upon the involuntariness of the confession.

**(3). <u>Failure to argue in the motion to suppress, that Tim had been threatened with the electric chair.</u>** Mrs. Brown could have offered her testimony on this point as well, as to what Tim told her about the threats. As indicated *supra*, Davis obviously knew that Brown said he had been threatened, because he cross-examined Det. Carr on this point at trial.

**(4).  Failure to investigate – or argue in the motion to suppress – Tim Brown's history of abuse, and the effect of that abuse upon the voluntariness of his confession; failure to elicit any testimony in this regard at the suppression hearing**.  Mrs. Brown told Larry Davis everything about Tim's childhood including how he had been abused.  (EH9 at 63).  She told him about the restraining orders that she had to take out against her husband, and also gave him a copy.  (EH9 at 64; Pet. Ex. 1010).  And indeed, Davis admits that he knew all about Tim's abusive past.  (EH8 at 130).

But Davis, despite all of his alleged experience in social work and mental health and with battered women, battered children, and post-traumatic stress cases in particular (EH8 at 134-135), did *not* understand the significance of this evidence.  He admits knowing about the Battered Woman Syndrome and post-traumatic stress disorders, and even knowing of Dr. Walker at the time he litigated the suppression motion, but, he says, "my thought process was never that I should hire an expert in battered child syndrome to deal with the motion to suppress.  It's not something that I thought of and discarded.  It is nothing that I thought of."  (EH8 at 134).  Davis claims he did not know anything specifically about the battered child syndrome at the time he litigated the motion to suppress.  He conceded, however, that he had the ability to find out back in '93 and '92.  But he made no inquiries whatsoever.  (EH8 at 138-139).

And because he himself did not grasp the significance of expert testimony on this point, Davis did not communicate to Dr. Kaprowski his psychologist, that this was a matter to be explored, or that it had legal significance vis-a-vis the involuntariness issue.  And in fact, Dr. Kaprowski, obviously unfamiliar with the battered child syndrome or the tell-tale signs of a post-traumatic stress disorder, did not realize the legal significance of Brown's abusive past herself.  Tim obviously told

146

her that his father had abused him – she admitted on cross-examination at the suppression hearing,

that Tim had told her of his brutal relationship with his father – but, in fact, she never discussed the

matter at all with Tim's family members before she formed her conclusions,[41] and conveyed them

to Larry Davis.  (Pet. Ex. 1006B at 203). And, while indeed, Dr. Kaprowski met (and spoke to) Mrs.

Brown for the first time before the suppression hearing, at which time Mrs. Brown confirmed what

Tim had told her about his abusive past, (EH9 at 65-66), even then Kaprowski still failed to grasp

the legal significance of it.

On redirect, at the suppression hearing, Larry Davis finally "woke up" to some of the facts

he knew about the abuse from Mrs. Brown, and therefore asked Dr. Kaprowski:

> MR. DAVIS: Now, also, Mr. Morton asked something with Tim's dad came up in
> cross-examining.  Are you aware of the fact, Dr. Kaprowski, that Tim's father was
> murdered and was shot by his common-law-wife at the time and that the prosecution
> didn't even prosecute the woman because he was being abusive to that woman and
> tied into the abuse that happened to Tim Brown when he was growing up?

(Pet. Ex. 1006B at 238).  But Dr. Kaprowski did not "wake up" – either to the facts or their legal

significance.  She answered:

> DR. KAPROWSKI: No, I was not aware that he had been shot and murdered by her,
> no, or that there had been no prosecution.  I was just simply told he had been
> murdered and that was recently that I was told.

(Pet. Ex. 1006B at 238).  At that point, realizing that his psychologist had missed this crucial issue,

Davis could have called Mrs. Brown to testify.  She was sitting right there, present in the courtroom.

---

[41]Speaking to family members is a basic mainstay of any competent mental health evaluation.
By contrast to Dr. Walker, Dr. Kaprowski never interviewed Tim's mother or sister.  (Pet. Ex. 1048
at 54-55).  In Dr. Walker's opinion, there was no "meaningful clinical interview regarding the abuse
of Tim Brown."  (Pet. Ex. 1048 at 55).  Not only was this incompetent on Dr. Kaprowski's part;
Larry Davis himself was incompetent for failing to realize his expert's omission in this regard,  and
in failing to direct her to go back and conduct a family interview.

147

Davis, however, never called her to detail the abuse, nor did Davis – in his final argument to Judge Frusciante – even argue that the fact of abuse had any weight in the "totality of circumstances" relevant to the voluntariness of Tim's statement. Clearly, neither Davis nor Dr. Kaprowski (who was absolutely incompetent on this point) alerted Judge Frusciante that Brown's very severe history of abuse could and would have made him vulnerable to the precise tactics which the detectives employed here. Davis "dropped the ball" on this, entirely. Because Dr. Kaprowski was "missing important information about Tim Brown's childhood, missing all of the []extensive abuse history that you need to understand some of the interaction problems" that Dr. Walker testified to, (Pet. Ex. 1048 at 52), Kaprowski failed to make the connection between the past history of abuse, and the circumstances of Brown's arrest, interrogation, and "confession," and Judge Frusciante had no basis to make that connection either.[42]  To assess the prejudice on this point, the Court need only compare the evaluation done by Dr. Walker, and her deposition testimony. *See* discussion of this testimony *supra.*

      **(5). Failure to investigate Tim's medical records from the jail.**  If it is not obvious already that Davis – through Dr. Kaprowski – failed to conduct a competent mental health evaluation of Tim Brown, that is further evident from Davis' failure to order, and Kaprowski's failure to consult,

---

[42]Obviously, the material facts on this matter were not "developed" at the state suppression hearing.  The fleeting reference to Tim's abuse came out almost by accident, in response to a question *on cross-examination* by ASA Chuck Morton, asking Kaprowski "Any other things, too, that he told you about?"  In response to this broad-based question, Dr. Kaprowski volunteered for the first time at the hearing, that Tim "described a very brutal relationship with his father.  The father, according to Tim – and this was verified by his mother this morning – used to beat him and the other siblings, and I think her also.  He was a very violent man, so Tim spent a lot of time trying to get away from his father." (T. 205-206).  That was the extent of the evidence on this point. Davis didn't argue its relevance in closing, and the court made no mention of factoring Brown's brutal relationship with his father into the "totality" of circumstances vis-a-vis voluntariness.

148

Brown's medical records from the Juvenile Detention Center and the Broward County Jail. (EH8 at 15).

As Dr. Walker has shown the Court, Tim's mental picture was much more complicated than Dr. Kaprowski described, or was even able to recognize. Dr. Kaprowski concluded that Tim was not emotionally disturbed or depressed, and showed no signs of mental illness, (Pet. Ex. 1006B at 187-188), but Tim's jail records – which Dr. Kaprowski never consulted – proved just the opposite. As Dr. Walker has indicated, these records prove that Tim was experiencing auditory hallucinations, was administered psychotropic medications by the jail on several occasions to reduce his depression, and that he had attempted suicide *twice* in the months just prior to his arrest. (Pet. Ex. 1048 at 17-18, 35, 107-110; Pet. Ex. 84; Pet. Ex. 1036; Pet. Ex. 10 37). Without these records and without understanding Tim's history of abuse, Dr. Kaprowski focused on "one tiny piece" (I.Q.), "rather than put the whole picture together." (Pet. Ex. 1048 at 52). Dr. Walker absolutely disagreed with Dr. Kaprowski's conclusion that Tim was not suffering from any psychiatric disorder, because "[h]e still had one when I saw him, you know, twelve years later. He still has an untreated psychiatric disorder. In the jails he's being treated for serious disorders that don't just pop up." (Pet. Ex. 1048 at 57).

Under the law of this circuit, it is ineffective assistance of counsel to fail to discover "readily discoverable" records of this precise nature. *See Middleton v. Dugger*, 849 F.2d 491, 494 (11th Cir. 1998) (defendant's hospital, prison, juvenile and court records were "readily discoverable" where federal habeas counsel presented testimony that someone with no legal training or experience had contacted the institutions possessing these records and had obtained copies; counsel's "failure to marshal this already existing mitigating evidence was outside the range of professional competent assistance"); *Baxter v. Thomas*, 45 F.3d 1501, 1513 (11th Cir. 1995) (counsel ineffective for failing

149

to request readily available records).

**(6). Failure to make important connections between the IQ test, and Tim's ability to think critically and to make any kind of intelligent judgment or choice necessary to make a valid waiver of his rights**. While there is no dispute here that Dr. Kaprowski properly determined Brown's IQ,[43] Dr. Walker has explained that she failed to make any connection between Tim's scoring on those tests, and his ability to think critically or making knowing and intelligent choices during his interrogation – in particular, with regard to waiving his rights. Dr. Walker has said:

> [S]he didn't really explain what that means, what the IQ means, that at least tested as he was that when someone has such a low IQ as he does, they don't have the ability to think about abstract constructs. They can't apply something from one event to another. They don't have that ability. They can't keep things sequentially in their head. With somebody with that low IQ, you have to say one thing, get your answer, then go to the next thing, get your answer. You can't give a compound question. They can't hold go to the door, open the door, go out the door, close the door. That is too much for a child of that intellectual ability. You have to say one thing at a time. Go to the door. Now you are at the door, now open the door. Now you opened the door, now go through the door. Now close the door. Otherwise, there's no understanding of it.

(Pet. Ex. 1048 at 53). In fact, Dr. Walker criticizes Dr. Kaprowski's failure to fully explain her

---

[43]While Judge Frusciante apparently got caught up in musings as to whether Brown's failure to attend school might have resulted in his low IQ, the issue of why Brown had such a low IQ is not a relevant consideration here. What *is* relevant is what Brown's IQ *was*, and the significance of that fact vis-a-vis the voluntariness of his confession. In any event, as Dr. Walker explained, "it is simply untrue" that in Tim Brown's case, his not attending school could have "caused" such a low I.Q. She explained: "Wechsler, the Wechsler Interlligence Scale for Children or the W.I.S.C., there's only one subtest that would be impacted by school learning and when you have somebody who is – their IQ is affected by school, what you see that scale is low and other scales that are not affected by school learning are higher, so you get like a saw tooth pattern or zigzag pattern on it. It is what we call intratest-scatter. . . . When you have a fifteen-year-old taking this test, you get plenty of data to see if there was intra or intertest scatter. You see none in Tim Brown's test. You see his IQ is not based on school learning. Yes, theoretically, it could be but this one wasn't. You never see that clearly in [Dr. Kaprowski's] responses, even though her test data show it." (Pet. Ex. 1048 at 56-57).

classification of Tim Brown as "mildly retarded:" "Mildly retarded, by the way, doesn't mean what the English translation means. It is a term of art that a psychologist uses. She never explains that. Mildly retarded is pretty severe. You can't learn in a regular classroom if you are mildly retarded. But it differentiates from moderate or severely retarded people that can't be left alone. They are in institutions, can't get out of bed. If you don't have those comparisons, you can't make those inferences. She didn't draw them altogether. (Pet. Ex. 1048 at 54).

**(7). Failure to ask Mrs. Brown when and how she was contacted by BSO, and failure to present Mrs. Brown's testimony at the suppression hearing on the issue of when she was contacted, to counter the testimony of Sgt. Scheff.** No reasonable attorney would have moved to suppress Brown's confession as coerced and involuntary, but then have failed to elicit key evidence of BSO's overreaching, in that they failed to contact Tim's mother until after he had confessed – in direct violation of Florida law. Davis was familiar with the caselaw on this issue. (EH8 at 139-140). And from his cross-examination of the detectives at the suppression hearing and trial, he appeared to understand that Mrs. Brown had not been contacted until *after* Brown gave his statement, or at the very least, that she was not contacted prior to the commencement of the interrogation. (Pet. Ex. 1006A at 148).

Davis' testimony on this point at the evidentiary hearing was somewhat surprising. When he was asked if he knew "that Mrs. Brown was not contacted by the Broward Sheriff's Office prior to the interrogation beginning with Tim Brown," Davis claimed: "I did not know that." (EH8 at 141). Well if he did not know that, he had a duty to find out. If he had merely asked Mrs. Brown, she would have told him what she told this Court. And when the detectives testified inconsistently on this point, Mrs. Brown was sitting there at the suppression hearing, (EH8 at 143), and could

indeed have cleared up the matter with credible testimony. Davis' failure to interview her on this crucial legal issue, and again, his failure to present her testimony at the suppression hearing, was objectively unreasonable.

Whether these omissions are judged individually, or cumulatively, Davis' investigation and litigation of the motion to suppress was unreasonable, and it prejudiced Tim Brown. The Court should grant the writ on grounds of constitutionally ineffective assistance in this regard.

## ACT III. THE TRIAL

Shakespeare wrote a "comedy of errors," but who could have ever written a "tragedy of errors" such as the trial in this case? And indeed, the reason that each of the errors here was so utterly tragic, so utterly prejudicial, is that the State's case against Tim Brown consisted of a single piece of uncorroborated evidence – his taped statement. Again, whether these errors are viewed individually, or cumulatively, Tim Brown was denied his constitutional rights to the effective assistance of counsel and to a fair trial.

### Ground 4. Ineffectiveness of Trial Counsel in Asking the Court to Instruct the Jury Venire that Brown was Facing a Life Sentence With a Minimum Mandatory of 25 Years, After Which He Would Be Eligible for Parole – When Indeed, Brown was Facing Mandatory Life Without Parole (Ground I of the Amended Petition)

Given that Tim Brown was charged with the first degree murder of a police officer, the governing penalty provision was Florida Statutes § 775.0823 (1990), entitled "**Violent offenses committed against law enforcement officers** . . ." It provided in pertinent part:

> Any provision of law to the contrary notwithstanding, the Legislature does hereby provide for an increase and certainty of penalty for any person convicted of a violent offense against any law enforcement or correctional officer . . ., which offense arises out of or in the scope of the officer's duty as a law enforcement or correctional officer . . . by imposing a mandatory minimum sentence without possibility of early release . . . as follows:

> (1) For murder in the first degree as described in § 782.04(1), if the death sentence is not imposed, a sentence of imprisonment for life without eligibility for release shall be imposed.

That penalty provision could not have been more clear.  Tim Brown was facing mandatory life without parole if he was convicted upon trial.  But Larry Davis – unbelievably – never knew that.  For all the time he spent taking depositions and preparing the case for trial, Davis never opened the statute book to check the applicable penalty for the homicide of a police officer.  No reasonable attorney would have failed to undertake this most elemental research, on a matter of so grave a concern to any client – particularly, a young boy of 15.

When Davis appeared for trial on October 4, 1993 (over two years after being appointed to Brown's case), he clearly did not understand the applicable penalty.  For indeed, on that first day of trial, just prior to the commencement of voir dire, Davis asked Judge Backman to specifically instruct the venire that Brown was facing *only a minimum mandatory 25 year sentence*:

> MR. DAVIS: We talked earlier last week, I don't think this is on the record this morning, but the Court is going to address the jury on facts, one there is not a possibility of the death penalty and I have no objection *as long as you let them know it's a minium of twenty-five to life.*

(Pet. Ex. 1006D at 456) (Emphasis added).  And indeed, at counsel's demanding, and although penalty was *not* a matter in which the jury had any say whatsoever in this case, Judge Backman (who obviously was unaware of governing law himself – at least during the trial), instructed the jury venire as follows:

> JUDGE BACKMAN: First and foremost, let me advise you inasmuch as this is a case that involves murder in the first degree, this is not a case for which the State of Florida will be seeking the death sentence.  This is a case that will be tried based upon the evidence, a finding of guilty or not guilty.
>
> If there's a finding of guilty the only sentence in the murder in the first degree that would be logical in this case, would be life imprisonment without the eligibility of

parole for a minimum mandatory of twenty-five years.

(Pet. Ex. 1006D at 462).

Brown can easily meet the *Chandler* standard of ineffectiveness here. No reasonable attorney would have asked the trial judge to misinform the jury venire that the defendant was facing a lesser penalty than he was, in actuality, facing. For indeed, to misinform the jury as to a lesser penalty, is a violation of due process under *Simmons v. Carolina*, 512 U.S. 154 (1994).

Davis left Brown's jury with this misinformation throughout the trial, and their deliberations. He at no point attempted to correct it, because he himself failed to understand that any misinformation had been conveyed. Indeed, it was only at some point *after* Brown had been convicted, that Davis realized his horrible error. And indeed, he tried desperately to undo his damage, by filing a motion for new trial asking the court to grant Brown a new trial, because "[t]he [c]ourt erred in instructing the jury that the Defendant would receive a life sentence with a minimum mandatory of twenty-five (25) years in prison." (Pet. Ex. 1007).[44] But it was too late. Judge Backman summarily denied the motion for new trial (Pet. Ex. 1006Q at 2560), and – in response to counsel's request that the court at least sentence Brown consistent with the erroneous instruction – explained to Davis that to do so would have been illegal. (Pet. Ex. 1006Q at 2561-2563).

The State's case against Brown was weak, and Brown's jury knew it. They had nothing at all to corroborate Brown's statement, and certain facts Brown recounted were clearly wrong (the second shot, the gun in the rock pit). It was clear from the course of the deliberations, that the jury was truly struggling with the case, and the question of Brown's guilt. The jury deliberated for

---

[44]A portion of this exhibit was obscured in the photo-copying, due to a "Post-It" sticker on top of the relevant portion. A clear copy of the same document can be found in D.E #16 at 2944-2946).

fourteen hours and played Brown's confession back over and over again.  They asked for a map of the Circle K, to see if Brown's statement was plausible.  But the court had no map to give the jury. Then they asked for Detective Carr's testimony – obviously looking at the issue of whether Brown's statement had been unknowing and involuntary.  But here again, Larry Davis had given them only the fact of Brown's low I.Q.  If the jury were truly troubled by the State's evidence, but felt bound by law to convict, they might well have thought about a "middle road."  If they believed Brown could be paroled after 25 years, they might have agreed to convict, with the hope that indeed, he would be paroled.  In *California v. Ramos*, 463 U.S. 992 (1983), the Supreme Court noted analogously, that "an instruction disclosing the Governor's power to commute a death sentence may operate to the defendant's distinct disadvantage." *Id.* at 1011.

The prejudice from counsel's error here is not dissipated in any way by the trial court's instruction to the jury that the court alone would determine sentence (Pet. Ex. 1006Q at 2526-2527). This did not in any way make clear to the jury that they were not to "consider" Brown's possible sentence during deliberations.  It clearly did not "cure" the erroneous instruction given, which was unmistakable that Brown would be eligible for parole after 25 years.  Therefore, even if the jury correctly understood that the trial judge would determine Brown's sentence, this would not have deprived them of their erroneous belief that Brown would not go to jail for life, even if they convicted him.  Without such a misunderstanding on the jury's part, there is a reasonable probability that the result of the proceeding would have been different.  At the very least, the Court should find, that it cannot have confidence in the outcome under the circumstances of this instruction, or under the combination of this error with the others.

155

**Ground 5. The State Trial Court's Violation of Brown's Right to Due Process of Law, by Erroneously Instructing the Jury as to Brown's Parole Eligibility – Which was Never, Thereafter, Corrected for the Jury (Ground D of the Amended Petition)**

As noted supra in connection with Ground 4, under *Simmons v. Carolina*, 512 U.S. 154 (1994), misinforming the jury as to the nature of the penalty, is a clear violation of due process. The State has never argued otherwise. While it has argued, rather, that Brown has not shown "harmful error" under the standard of *Brecht v. Abrahamson*, 507 U.S. at 619 (1993), to the extent Brown has proven *Strickland* prejudice, a "substantial and injurious effect or influence on the jury's verdict" is presumed.[45] Thus, to the extent that Brown has shown prejudice under *Strickland* from this same error, he has certainly met even the most stringent prejudice standard that could possibly apply here.

But it is actually questionable whether indeed prejudice must actually be shown given an error of this nature, or rather, whether it may properly be presumed under a "structural error" analysis. Counsel is unaware of any *Simmons*-error cases in which the "substantial and injurious effect of influence" standard has been applied. And indeed, on direct appeal, *Simmons*-error cases are generally treated as reversible *per se*.

Finally, even if the *Brecht* standard applies here, however, the State may not shift the burden of proof on the issue of "harmlessness." Under *Brecht*, it is the **State's burden** to prove harmlessness of any constitutional error. *Brecht v. Abrahamson*, 507 U.S. 619, 640 (Stevens, J., concurring). The petitioner need not prove that the error was indeed harmful. And under that

---

[45]As explained in *Kyles v. Whitley*, 514 U.S. 419 (1995), the Court need not conduct *Brecht* "harmless error" review of ineffective assistance of counsel errors. Where ineffectiveness of counsel is alleged, a petitioner need only prove that but for counsel's ineffectiveness, "the result of the proceeding would have been different." If "the result of the proceeding would have been different," then clearly the error can be said to have had a "substantial and injurious effect of influence in determining the jury's verdict." *Kyles*, 514 U.S. at 435-436.

156

standard with the burden on the State, the Supreme Court has held that where "the matter is so evenly balanced that [the Court] feels [itself] in virtual equipoise as to the harmlessness of the error," the Court must find that the error is not harmless, and rule in favor of the habeas corpus petitioner. *O'Neal v. McAnich*, 513 U.S. 432, 435 (1995).

Whatever the applicable standard here, and for the reasons set forth more fully in connection with Ground 5 as well, this error requires that the Court grant the writ.

> **Ground 6. Ineffectiveness of Trial Counsel in Failing to Understand that Brown's Statement Does not Prove Criminal "Knowledge" – an Essential Element of the Aiding and Abetting Offense – and Conceding the Presence of This Otherwise Missing Element in the Government's Case (and Brown's Guilt) in the Argument for a Directed Verdict**

Although Larry Davis offered many explanations at the evidentiary hearing, he offered no explanation at all for why he conceded Tim Brown's guilt in his argument to the court on his motion for directed verdict. For indeed, there is no explanation of such conduct – other than misunderstanding on Davis' part. Florida law was clear, that to find someone guilty for aiding and abetting, he must know what is going to happen, and with that knowledge, do something by which he intends to help commit the crime. That is what the "principal instruction" here instructed. (Pet. Ex. 1006Q at 2523)

Nevertheless, although Davis presumably was aware of the standard "principal instruction," and from that one would think that he would understand that "knowledge" was a key element of the offense, Davis certainly should also have been aware of the Florida Supreme Court's decision in *Staten v. State*, 519 So.2d 622, 625 (Fla. 1998) (aider and abettor must know about and intend to further the commission of the crime), as well as the Fourth DCA's decision in *Stark v. State*, 316 So.2d 586 (Fla. 4th DCA 1975) (state must prove either that aider and abettor had the intent to

commit the crime himself, or that he knew that the principal had that intent).

Given what Brown had said in his taped statement (that he did *not* believe Keith King when King said he wanted to kill someone) (Pet. Ex. 99), and given Florida law holding that *knowledge of what was going to happen* is a key element of any aiding and abetting offense, no reasonable attorney would have done what Davis did here. Specifically, at the argument on his motion for directed verdict, he *CONCEDED THE MISSING ELEMENT IN THE STATE'S CASE – KNOWLEDGE*:

> MR. DAVIS: Basically, [the principal theory] says that if two or more people help each other commit or attempt to commit a crime and the defendant in this case, Tim, is one of them, the defendant is a principal and must be treated as if he has done all the things the other person did. If Tim Brown, one, knew what was going to happen.
>
> *Okay, I can accept that [Tim Brown] knows what's going to happen because of the fact that he says he's going to shoot somebody and he shows him the gun.*

(Pet. Ex. 1006N at 907-1908).

This concession by counsel in his argument to the court on the directed verdict motion was equally if not more "unreasonable" than a concession in closing – which the courts have uniformly recognized is ineffectiveness *per se*. *See Young v. Zant*, 677 F.2d 792, 798-799 (11th Cir. 1982) (reversing district court's denial of writ of habeas corpus, where counsel conceded client's guilt of all crimes with which he was charged in guilt phase, due to mistaken belief that such an action was strategically necessarily to make a strong plea for mercy); *Cave v. Singletary*, 971 F.2d 1513 (11th Cir. 1992) (counsel ineffective where she misunderstood the elements of the charges faced by her client); *see also Scarpa v. Dubois*, 38 F.3d 1 (1st Cir. 1994) (counsel ineffective for arguing that defendant was "at best . . . a conduit; someone through whom . . . the money passed;" this half-baked theory evidenced a blatant misunderstanding of the charged crimes. Being a "conduit" denotes

158

acting as an agent or intermediary.  Persons who knowingly serve as agents or intermediaries in

narcotics transactions are punishable as principals;" counsel's blunder "cemented the prosecution's

case" "digging the hole deeper" than it already was for his client); *United States v. Swanson*, 943

F.2d 1070 (9th Cir. 1991) (concession of no reasonable doubt to only factual issue in dispute is

ineffective assistance); *State v. Carter*, 14 P.3d 1138 (Kan. 2000) (counsel ineffective in murder case

for conceding defendant's involvement despite defendant's protestations of innocence; counsel's

abandonment of his client in this regard, required the presumption of prejudice under *United States*

*v. Cronic*, 466 U.S. 648 (1984)).

And indeed, Davis' concession demonstrably prejudiced Brown here, as Judge Backman

specifically denied the motion for directed verdict due to Brown's alleged "prior knowledge" – on

the controlling authority of *Staten v. State*, 519 So.2d 622 (Fla. 1988).  The court explained:

> THE COURT: And what they said in that particular case and this is an individual
> who was a get away driver from a robbery.  And they said that a get away driver *who*
> *has prior knowledge of a criminal plan* and is waiting for the robbers to help them
> escape is properly convicted of the principal.  *Here you have knowledge on behalf*
> *of Mr. Brown* who transports Mr. King to the area, *knows what he's about to do*,
> stays there while the shooting takes place and thereafter takes him out of there.

(T. 1914) (Emphasis added).

Given the absence of any evidence of the requisite knowledge in Brown's statement, and the

court's obvious concern with the issue of knowledge – as evidenced in its ruling – Davis' concession

clearly prejudiced Brown.  Without that concession, this case should never have even gone to the

jury.  Without counsel's concession in this regard, Tim Brown would be a free man.

### Ground 7. Ineffectiveness of Trial Counsel in Failing to Investigate or Mount Any Defense at Trial to the Truth of Brown's Statement (Failure to Show How the Statement was False) (Ground G of the Amended Petition)

The evidence of a confession "may be the strongest type of evidence.  The most damning,

159

the most persuasive, the most prejudicial evidence on jurors." (Pet. Ex. 1046 at 74).  No reasonable attorney would have therefore failed to show – or even argue to the jury – that Tim Brown's confession was false, where the confession was the only piece of evidence the State had against Brown, and key facts in the confession were inconsistent with the known eyewitness and medical testimony.  While Larry Davis acknowledged at the hearing that he believed in 1990 as he believes today that Tim Brown was "innocent of this," (EH8 at 99); he knew that the taped statement was the only evidence against Tim Brown; and he knew that it most definitely *was* important to demonstrate that the statement was false (EH8at 54) – he nevertheless omitted to do anything at all at trial to demonstrate the falsity of the confession to the jury.  And that was not merely unreasonable.  It was unconscionable.

Most egregious here, is of course, Davis' failure to interview, and therefore failure to call Philip Howard as a witness at trial. Davis readily conceded that he knew of Philip Howard, and that he had Howard's November 13, 1990 statement to Det. Gucciardo.  (EH8 at 70; Pet Ex. 91). Although Davis claimed to have done "over one hundred depositions" in this case, he conceded that Howard was "not one of the people we deposed." (EH8 at 72).  In fact, although it was clear to Davis from Howard's statement that Howard never said he saw two boys on a bicycle riding north on 40th Avenue across Hallandale Beach Boulevard (as Brown described in his statement), Davis never  spoke to Howard in any fashion at any time. (EH8 at 72-73).  Davis claims that he never contacted Howard, because "part of the problem that I had with Mr. Howard is the timing of it."  But of course, had he bothered to interview Howard, he could have asked him any questions he had about the timing. (EH8 at 75).

The law is clear that the failure to interview a potential witness, is  objectively unreasonable.

160

*See, e.g, Strickland*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Holsomback v. White*, 133 F.3d 1382 (11th Cir. 1998) (having conducted no investigation to even contact potential witness, he "could not have made an informed tactical decision" not to call the witness); *Chambers v. Armontrout*, 907 F.2d 825, 828-831 (8th Cir. 1990) ("The decision to interview a potential witness is not a decision related to trial strategy. Rather, it is a decision related to adequate preparation for trial;" rejecting claim that decision not to interview a witness was reasonable because counsel had reasonably determined witness was not credible; counsel had no reasonable basis for so concluding, without meeting or speaking with the witness); *United States v. Gray*, 878 F.2d 702 (3rd Cir. 1989) ("Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made"); *United States v. Baynes*, 687 F.2d 659, 666 (3rd Cir. 1982) ("Although the decision whether or not to *utilize* a particular item of evidence may be a matter of trial strategy within the acceptable bounds of trial counsel's discretion, we believe the *failure to investigate* a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation") (emphasis in the original).

Davis, of course, was forced to concede prejudice on this point:

MR. DAY: Was it a mistake on your part not to interview Philip Howard?

MR. DAVIS: If Mr. Howard would have told me – if I would have interviewed Mr. Howard and he would have told me he saw down 40th Avenue and he could have seen the boys on the bike leaving the scene of the Circle K and contradicted that, that he had a clear line of sight, then yes, I should have spoken to him.

(EH8 at 75). That, of course, is precisely what Howard would have told Davis, if Davis had spoken to him. As Howard told this Court quite credibly in the Phase I hearing, he indeed had a clear line

161

of sight down 40th and across Hallandale, (EH3 at 45, 51, 59, 62-64), and he was "one hundred percent sure" that he did ***not*** see two boys on a bicycle. (EH3 at 51-53). The Court credited Howard's testimony, and indeed, specifically found that he "was in a position to see King on a bicycle." (D.E. # 286 at 24-25, 40). Prejudice – both from Davis' failure to interview Howard, and call him as a witness at trial – is therefore clear.

But even without Howard, there were ways to prove Brown's confession was false. Davis did none of these. First, he could have, but did not call Mary Pendergrass, Keith King's foster mother, who would have testified that King did not know Brown. Pendergrass could have also impeached Carr's deposition testimony that he showed her a picture of Tim Brown, and that she recognized him. (EH8 at 112-118). Nor did Davis call the store clerk Timothy Van Hoesen to testify that when he looked out across Hallandale, he never saw two boys on a bicycle, nor did he even argue to the jury, the adverse inference from the state's failure to call him. Nor did Davis even argue to the jury that the state's only close-to-the-scene witness, the trucker, Steven Antonio, never heard two shots, only a single shot – which is contrary to what Brown described. Davis even failed to mention to the jury in closing, that no gun was ever found in the rock pit, as Brown had described. Nor did he ever explain to the jury that the movement of the deputy Brown described was ***not*** the movement indicated by the medical evidence: a defensive movement with the left hand.[46] He even neglected to cross-examine Det. Carr as to any of these factual impossibilities, improbabilities, or

---

[46]Larry Davis' explanation for failing to bring out this point is that a "possible explanation" for what Brown was saying is that Behan was trying to grab King's "stick" (slang for "gun"). (EH8 at 81-82). This, of course, sounds like Davis might have been speaking to Major Fantigrassi, who in the Phase I hearing, attempted to float that same implausible explanation. (EH5 at 72-73). Davis' post-hoc justification in this regard, is not credible or legally significant. For clearly, no reasonable attorney would have failed to make ***any*** argument at all as to the falsity of Brown's statement, as Davis did here.

conflicts with other witness statements.  (Pet. Ex. 1006C at 319-371; EH8 at 56-57, 66).  Nor, he

admits, did he question any other of the State's witnesses on this issue.  (EH8 at 66).  And of course,

he concedes that he called no defense witnesses at all to demonstrate anything in Brown's statement

was false.  (EH8 at 66-69).

It would seem that Larry Davis didn't *himself* understand that these were demonstrable

falsities in Brown's statement, and points he needed to get across to the jury at trial.  When counsel

specifically asked Davis at the hearing: "There was evidence that existed that demonstrated that this

statement Tim Brown gave was false," Davis' knee-jerk response was "I don't agree with that

statement."  (EH8 at 69).

But if he did not understand that there was evidence that showed that Tim Brown's statement

was false, he needed to "get help."  And he could have and should have consulted and called a false

confession expert, who could have explained the issue first to Davis, and then, to Brown's jury.

With particular regard to the jury, such an expert could have explained the phenomenon of the false

confession.  And indeed, even in 1993, there was a firm body of research as to the "why" and "how"

of false confessions.  (Pet. Ex. 1046 at 120-121).

The Court must remember in this regard that Tim Brown's trial occurred in 1993 – well

before the tremendous breakthroughs had been made with DNA evidence, and before the public had

come to learn that indeed, innocent people can and do confess.  Given the belief of most people at

the time that if someone confesses to a crime he must be guilty, and their unwillingness to accept that

confessions might be false, (Pet. Ex. 1046 at 77), Davis truly needed someone to explain the

phenomenon of false confessions – the how and the why – to Brown's jury, so that Brown would

have a possibility of acquittal here.  Dr. Leo has explained that a false confession expert could have

first educated the jury about interrogation training and interrogation techniques. (Pet. Ex. 1046 at 74). "Most individuals don't know, lay individuals, that police go to specialized training schools to learn sophisticated interrogation techniques. That interrogation is not just a simple conversation. It's a very structured, persuasive, sometimes deceptive, sometimes coercive activity that has a certain set of goals." (Pet. Ex. 1046 at 74-75). Such an expert could have then explained how certain of those techniques – such as showing crime scene photos – can exert coercive pressure on innocent suspects, and how they particularly affect individuals with special disabilities making them more susceptible to the techniques and pressures of interrogation – the mentally retarded, juveniles, or other individuals who by personality are highly suggestible or compliant. (Pet. Ex. 1046 at 75, 83-84). The expert could have alerted the jury to the fact that false confessions do exist and are caused in some instances by the police – attempting to "open the trier of fact's mind up to a phenomena which goes beyond common knowledge, which is highly counter intuitive, so that they can fairly and evenhandedly evaluate the confession evidence that's presented to them." (Pet. Ex. 1046 at 76). Finally, the expert would explain the general principles for evaluating whether a confession is false. (Pet. Ex. 1046 at 76). In that regard, such an expert here would have highlighted for the jury the inconsistencies between Brown's "post-admission narrative" and known facts such as a single shot, the raised left hand, and the failure to find a gun in the rock pit. (Pet. Ex. 1046 at 54-56). And of course, if Davis had interviewed Philip Howard, and had called Howard as a witness, Howard could have directly disputed the idea of "two boys on a bicycle" riding across Hallandale Beach Boulevard. Then, the false confession expert could have explained to the jury the crucial significance of that testimony as well, as Dr. Leo did in his deposition here. (Pet. Ex. 1046 at 54).

Without *any* of this, however, not one single witness or argument supporting his claim that

164

Brown's confession was false, the jury had no reason to believe that Tim Brown was not guilty and to acquit him. No reasonable attorney would have failed to mount any sort of defense to the truth of the alleged confession.

The State cannot contest that there was no defense at all to the truth of the statement. Chuck Morton himself pointed out this glaring omission to the jury in closing argument. First, Morton told the jury to "Listen to [Brown's] confession and see how it was consistent with the facts of this case." (Pet. Ex. 1006Q at 2432). That was Davis' final opening. He could have and should have at the very least responded with the inconsistencies noted above. But he did not. (Pet. Ex. 1006Q at 2448-2486; EH8 at 67-68). And Morton seized on this in rebuttal, asking the jury rhetorically: "Did Mr. Davis choose to put on evidence that Mr. Brown's confession was not true? No he didn't." (Pet. Ex. 1006Q at 2496). Again, Morton said: "I told you earlier that if anything you should keep your eye on the ball. And indeed, the ball is the confession." (Pet. Ex. 1006Q at 2496). Davis, however, had clearly lost sight of that ball. Chuck Morton's last comment to the jury in this case before concluding his argument was: "After listening to the evidence, seeing how consistent it is with the facts, his confession is telling you the truth." (Pet. Ex. 1006Q at 2499).

Can there be any doubt in this regard, that Larry Davis' "dropping the ball" on this issue, prejudiced Tim Brown – particularly where the jury in this case deliberated for 14 straight hours, and played the tape over and over again in the jury room? (EH8 at 69). At the very least the Court should find that there was a "reasonable probability" that but for Davis' egregious omissions in this regard, the result of Brown's trial would have been diffrerent.

165

**Ground 8.  Ineffectiveness of Trial Counsel in Failing to Submit any Evidence as to the Involuntariness of the Confession, When This was an Alternative Basis for Acquittal (Ground G of the Amended Petition)**

Judge Backman instructed the jury in this case as follows:

A statement claimed to have been made by the defendant outside of court has been placed before you.  Such a statement should always be considered with caution and be weighed with great care to make certain it was freely and voluntarily made.

Therefore, you must determine from the evidence that the defendant's alleged statement was knowing, voluntarily and freely made.

In making this determination, you should consider the total circumstances, including but not limited to whether when the defendant made the statement, he had been threatened in order to get him to make it, and whether anyone promised him anything in order to get him to make it.

If you conclude the defendant's out of court statement was not freely and voluntarily made, you should disregard it.

(Pet. Ex. 1006Q at 2524-2525).

Larry Davis presented no evidence whatsoever in this case that Tim Brown's statement was not "freely and voluntarily made."  Davis knew from Tim Brown that he had been slapped, but Davis forgot that crucial fact when it came time to defend Brown at trial.  Clearly, Davis could have called Mrs. Brown who could have testified as to the bruises that she saw on Tim.  And at the very least, he could have cross-examined Carr on the issue.  Any reasonable attorney who had been told by his client that he had been slapped by Detective Carr, would have cross-examined Carr about such a slap.  Davis took great pains to point out that he "spent a lot of time with Detective Carr on his cross-examination," but he unreasonably failed to do even this .  (EH8 at 52).

Clearly, Davis would have created at least a reasonable doubt as to voluntariness, if he had called competent experts at trial, or if he had competently used the one expert he did call.  Davis should have called someone like Dr. Lenore Walker, who could have presented compelling test  as

166

to Tim's abusive past (Mrs. Brown could have also testified on this issue), and the effect of that

abuse upon him (a post-traumatic stress disorder), which would have made him extremely vulnerable

to the detectives' coercive tactics here.   No reasonable attorney would have completely ignored the

evidence of abuse, and the effect of such abuse, in defending a clearly abused child like Tim Brown.

And indeed, Davis could have but did not call an expert in coercive police tactics, such as Dr. Leo,

who could have explained how certain police tactics are particularly coercive vis-a-vis the mentally

retarded.  Instead, Davis offered the jury a single, legally insignificant piece of evidence on the issue

of involuntariness: Brown's low IQ.  (Pet. Ex. 1006P at 2207-2220).  As noted *supra*, with regard

to the voluntariness of a statement, a defendant's IQ has no independent legal significance without

*some* evidence of police overreaching.  *See Singleton v. Thigpen*, 847 F.2d 668, 670-671 (11th Cir.

1998) (citing *Colorado v. Connelly*).  Given the law, and the wealth of evidence Davis could have

presented to at least have raised a reasonable doubt in the jury's mind in this regard, Davis' decision

to call Dr. Kaprowski, but to "limit her to that area of IQ" was objectively unreasonable.

Davis' final omission in presenting an "involuntariness" defense to the statement, was his

failure to call Mrs. Brown.  She could have testified to the fact that she was not contacted until after

Tim had made his statement; and that even then, when she arrived at the station, she was not allowed

to see him.  Davis knew that the detectives' testimony was inconsistent on this point.  He could have

made a major issue out of this type of overreaching, and he would have had a credible and

compelling witness in Mrs. Brown.

No reasonable attorney would have failed to take advantage of the jury instruction on

"involuntariness" in any way.  In gauging the prejudice from Davis' omissions in this regard, the

Court should compare the showing at trial on this issue, to the showing Brown has made at this

evidentiary hearing.  The Court should grant the writ.

> **Ground 9. Ineffectiveness of Trial Counsel in Hinging his Unprovable Conspiracy Theory Defense on Jackie Bain, a Witness he Knows is Mentally Ill, a Witness who has Made Inconsistent Statements Contrary to the One Counsel Sought to Have her Repeat for the Jury, and a Witness who has Claimed to Have Killed her Own Babies and Other Children (Ground F of the Amended Petition)**

It has never been clear to us, what exactly Larry Davis' defense *was* in this case.  Davis himself has articulated it so many different ways, that it is truly difficult to tell.  At the evidentiary hearing for instance, he first stated: "My theory was, my theory was that the police could not solve this case because of the corruption, that they couldn't deal with the corruption, and Bain was part of that corruption. . . . [There was] a tremendous amount of pressure on the Sheriff's Office to come up with this and Tim was, basically, a patsy for the Sheriff's Office."  (EH8 at 60-61).  But then the theory changed to: "Bain's boyfriend, McGill was involved in the case and that she had called them, and that the fact was there was a motive for Deputy Behan being shot and killed, and that this was the motive, that McGill was getting back at him, but it was the wrong police officer that was shot."  (EH8 at 61).  But then it was also that this was some sort of "conspiracy," and Det. Richmond was the target of this "conspiracy" because it had been he who had gotten Jackie Bain fired.  (EH8 at 61).  But actually, he tried to explain, "My theory was that it was McGill [who killed Deputy Behan] from what Jackie Bain had said."  (EH8 at 63).  But that wasn't exactly it.  Rather, he explained, "My argument was 'Look, this wasn't investigated.'"  (EH8 at 64).  But when he was asked directly if his argument was that Tim Brown was not guilty because BSO failed to investigate the McGill/Bain motive, Davis could not say that.  "Not that they didn't investigate it, but they covered it up, and because of that fact they had to find someone to pin it on."  (EH8 at 65).  With that, finally Davis could say "absolutely:" "That was my argument."  (EH8 at 65-66).  If it was so difficult for Larry

Davis – Tim Brown's trial lawyer – to articulate his precise theory in this case, it would have been beyond difficult (impossible) for the jury to comprehend it.

We can assume for the purpose of this argument, that at the very least Davis' theory hinged in some way on the credibility of Jackie Bain. (EH8 at 146). No reasonable attorney, however, would have hinged his entire defense to a first degree murder charge, on a mentally ill witness like Jackie Bain. Before getting into Bain's mental illness and absolute lack of credibility, we should first point out that no reasonable attorney would ever proceed to trial on a defense based upon the credibility of a witness he has never interviewed, let alone deposed. And indeed, at the time Larry Davis picked the jury in Brown's case, made his opening statement articulating his defense, and began to cross-examine the government witnesses in an effort to prove his defense premised upon Bain's credibility, he had never spoken a single word to Jackie Bain.

But then Bain suddenly appeared mid-trial, during the defense case. Davis, at that point, insisted on his right to call Jackie Bain as a defense witness, telling Judge Backman: "I don't know what she's going to say either. But I think I have a right to call her as a witness." (Pet. Ex. 1006O at 2036). But in fact, he *did* know – or at least should have known, that she would say all of the absolutely ridiculous, incredible, disprovable, and mentally ill things she had told BSO all along. She would have to, for if she changed her testimony in any way, she would be impeached with all of her prior statements. And indeed, although Davis now claims that he spoke to Bain before putting her on the stand and "she laid out to us in cogent, coherent terms" "that McGill, basically, the whole defense, that McGill had shot the police officer," (EH8 at 147), *STILL* no reasonable attorney would have put Bain on the stand as Larry Davis did here. Even if Bain "was perfectly rational" when Davis interviewed her, he should have known that he was going to sink Tim Brown's case by calling

her.  This is why.

When Donn Pearce went out to pick up Jackie Bain the next day, "she refused to get involved." (EH8 at 148).  That should have been a "red flag."  Instead of realizing at that point that she would not be a friendly witness, Davis "went to Judge Backman to get a pick-up order for her." (EH8 at 148).  He had her arrested, and she was brought into court from the jail. (EH8 at 148-149). Any reasonable attorney would have realized that that would make her a hostile witness.  Davis, unfortunately, did not.  He put Bain on anyway.  And indeed, sure enough, Bain got on the stand and said that she did not even recall working at the Circle K.  (EH8 at 150).

This was not, however, merely a matter of Bain "not working out" or that she "was not a good witness" or that Bain's testimony "ultimately ended up being a disaster" – a reasonable strategy that happened to backfire.  (EH8 at 152, 158).  Davis had every reason to know *in advance* exactly what would happen when Bain took the stand – particularly on cross-examination.  Specifically, he knew from discovery that (1) Bain had been Baker-acted; (2) Bain had picked out Steven McGill, rather than Curtis McGill from a photo lineup (and it was determined that Steven McGill had been in custody at the time of the homicide); (3) Bain had made a statement saying that she herself had shot Deputy Behan through the passenger side, through a closed window, and that she had fled running south on 40th (which Sgt. Scheff had indicated was inconsistent with the account of Philip Howard); (4) Bain had said she was compelled to kill by the "inner Jackie" – a woman who lived inside of her;  (5) Bain had reported to BSO that she killed four people including her own infant (but it was later determined that her infant died of natural causes); (6) Bain had also indicated that she killed three teenagers in her neighborhood because they did not obey their mothers.  (EH9 at 19-30). All of these facts are clearly reflected in Sgt. Scheff's report, and the transcript of Bain's statement

170

– both of which Davis had received. (Pet. Ex. 1012 and 1013; EH9 at 22). Morton brought out every

one of these expected points in his cross, (Pet. Ex. 1006O at 2033-2143).

Larry Davis himself now admits that Bain was a "disaster" on the stand. And indeed, the

prejudice from her farcical testimony is fairly well-captured by these comments from **both** Chuck

Morton *AND* Larry Davis to the jury in closing:

> MR. MORTON: We're not dealing with facts with Jacquelyn Bain, we are dealing
> wiht fiction, we're dealing with fantasy. We're dealing with falsehoods, just–
> members of the jury, if I can put it in plain language, lies. (Pet. Ex. 1006Q at 2420);
>
> MR. MORTON: Miss Bain came in with this wild and incredible story. She said it
> to you, she said it to the police, the police investigated and no way was it
> corroborated. It shifted and it changed. It went from the McGills to one McGill who
> is in custody to another McGill. (Pet. Ex. 1006Q at 2430);
>
> MR. MORTON: You saw her testimony, you heard how, what her conduct and
> demeanor was throughout. This is a sick, sick, sick woman. (Pet. Ex. 1006Q at
> 2431);
>
> MR. DAVIS: I'm not going to stand up here and look you guys in the eye and say
> Jackie Bain is a stable person. I won't say that. Because is a stable person going to
> kill a police officer? Absolutely not. You know, she was calculated enough that she
> wouldn't come to court until we had her arrested. (Pet. Ex. 1006Q at 2475);
>
> MR. DAVIS: When she got up on the witness stand, this woman that was so crazy
> that she wouldn't talk until she got an attorney that was sitting right where John is
> sitting. So every time she needed to confer with her attorney, we would ask her
> questions, she would say wait a minute, I need to confer with my attorney. (Pet. Ex.
> 1006Q at 2476);
>
> MR. DAVIS: Does she have a motive? Is she weird enough and unstable enough to
> do this? Yeah. (Pet. Ex. 1006Q at 2477);
>
> MR. MORTON (REBUTTAL): You saw Jackie Bain's testimony in court. You saw
> Jackie Bain's behavior in court. Did you see her smile in court as Mr. Davis put her
> on the stand? She smiled and said no, I don't remember. I don't remember. In a
> matter as serious as this, this sick woman walks into the courtroom, looks you in the
> face, smiles when we're talking about the death of a deputy, and says, I don't
> remember. I can't read. . . . One thing Mr. Davis and I do agree on is that she's
> definitely calculated. That's all she was and that's all she is. But she's more than

171

that, she's a liar.  (Pet. Ex. 1006Q at 2487);

MR. MORTON: You saw Bain.  No corroboration whatsoever, including confronting Curtis McGill about it.  No corroboration whatsoever.  Listen to the changes in her story.  (Pet. Ex. 1006Q at 2494).

No reasonable attorney would have put a 15-year-old boy's fate in the hands of a sick, unstable liar like Jackie Bain.  The Court should have no doubt, from Bain's testimony, and from the closing arguments as to her complete lack of credibility, that Larry Davis' objectively unreasonable decision to put Bain on the stand was the "nail in Brown's coffin."  Clearly, as Chuck Morton made clear in closing, the trial had become a credibility match between "Bain or Brown's confession." Given that choice, and given *no reason at all from Larry Davis to doubt the truth of Brown's statement, or the sufficiency of that statement as a matter of law*, a conviction by this jury was a foregone conclusion.

### Ground 10. Ineffectiveness of Trial Counsel in Failing to Explain to the Jury in Closing Argument that Brown Had No Knowledge of What Was to Occur, and Therefore, Was Not Guilty of Aiding and Abetting (Ground G of the Amended Petition)

As should be obvious from Davis' concession of guilt in his argument on the motion for directed verdict, he clearly did *not* understand the fact that Brown's statement did not evidence guilty knowledge.  He did *not* grasp the fact that Brown had twice explained what he meant by "I called his bluff" and that what he said was "I didn't believe him."  And therefore, Davis could not and did not convey to this jury, *in any way*, the crucial fact that even if everything in Brown's statement were true, it was still clear that Brown did *not* believe that Keith King would kill anyone.  And indeed, if Brown did not "know" that was going to happen, the jury could not find him guilty as an aider and abetter under the instruction the Court would deliver.

No reasonable attorney would have failed to mount any challenge to the sufficiency of this

172

statement as to the missing element of "knowledge." But indeed, Larry Davis failed in this regard. (Pet. Ex. 1006Q at 2448-2486). Given the length of the jury's deliberations in this case, and the fact that the statement was the only piece of evidence against Tim Brown, the Court should find that Davis' failure to argue insufficient evidence of knowledge prejudiced Brown's defense, and was constitutionally ineffective.

The Court should grant the writ on this basis.

### Ground 11. The Constitutional Insufficiency of the Evidence to Support Brown's Conviction in Violation of the Due Process Clause and *Jackson v. Virginia* (Ground A of the Amended Petition/Ground A of the Third Amended Petition)

Without any guidance from defense counsel – who himself did not understand that Brown's statement was exculpatory, rather than inculpatory – the jury in this case convicted Tim Brown of aiding and abetting the Behan homicide. In reviewing the evidence for constitutional sufficiency pursuant to *Jackson v. Virginia*, 443 U.S. 307 (1979), this Court owes no deference, however to defense counsel's erroneous assessment of this issue, to Judge Backman's assessment at the motion for directed verdict, or to the jury's ultimate finding, or to the state appellate court's finding. The issue which Brown has raised in this regard is one of *law*, and this Court must review it *de novo*.

And indeed, even though we now know that Brown's statement was actually false, the Court must assume for the sake of this insufficiency argument that everything Brown said in his statement was true, and determine whether, even then, what Brown said in his taped statement proved him guilty of aiding and abetting first-degree murder. We believe that Florida law is clear, and was clear at the time, that Brown was not guilty of the offense with which he was charged.

All Brown admitted to in his statement was that he was *there* when King killed the deputy. He never admitted to prior knowledge that any crime would occur. And indeed, he specifically

173

stated that he did *not* believe any crime would occur.  Under those circumstances, where Brown's own statement was the sum total of the state's case against him, he was convicted in violation of due process of law.  The evidence – his statement – did not constitutionally support his conviction.

Pursuant to the "principal instruction" delivered in this case, it is clear that "knowledge" was a key element of the aiding and abetting offense.  That instruction specifically instructed the jury that "the defendant must be treated as if he had done all the things the other person or persons did, *if the defendant first knew what was going to happen*; second, intended to participate actively or by sharing an expected benefit; and third, actually did something by which he intended to help commit the crime." (Pet. Ex. 1006Q at 2523) (emphasis added).  *See also Staten v. State*, 519 So.2d 622, 625 (Fla. 1998) (aider and abettor must know about and intend to further the commission of the crime); *Stark v. State*, 316 So.2d 586 (Fla. 4th DCA) (state must prove either that aider and abettor had the intent to commit the crime himself, or that he knew that the principal had that intent).  Here, there was no evidence whatsoever that Brown "knew what was going to happen," when he pedaled King towards the Circle K.  For, as he *twice* explained to Detective Carr, *HE DID NOT BELIEVE KING WOULD KILL ANYONE.*

Contrary to the argument of Mr. Morton at the trial, there was no evidence here of a "dare" – only a statement by Brown that he "called [King's] bluff."  Detective Carr twice asked Brown what he meant by "called his bluff," and each time Brown – with his limited verbal abilities and I.Q. of 56 – explained that what *he* meant by the phrase "called his bluff," was simply that *he did not believe Keith King had the nerve to kill someone.*  In assessing the legal sufficiency of the evidence, Brown's explanation must be taken at face value.  No "conflicting" inference can be drawn from it.  Brown clearly did not *know* – when he was pedaling King – that King would actually kill

174

someone, or even that he actually intended to kill someone.  Brown therefore did not have the knowledge necessary to be found guilty as an "aider and abettor."

Clearly, there is no legal or factual basis for discounting Brown's own exculpatory explanation that he did *not* believe King.  The law is clear:  "a defendant's testimony denying guilt can establish sufficient evidence of his guilt *only* if other corroborative evidence of guilt exists for the charged offense."  *United States v. Gonzalez*, 183 F.3d 1315, 1325 (11th Cir. 1999) (emphasis added).  Here, however, there was no "other corroborative evidence" for the element of knowledge.  True, Brown said he continued to pedal King on the bicycle, but he described no actual "discussion" about the murder of *anyone*, on the way to the Circle K.  Brown simply said that King made a declaration that he was going to kill someone, and Brown stated that *he did not believe him*.

And therefore, if Brown did not believe King, there was no reason for Brown to give the matter any further thought.  Without the requisite knowledge of King's actual intent, the simple act of pedaling King forward was decidedly *not* criminal.  And indeed, the way in which Brown describes pedaling King into the Circle K actually confirms his *lack* of knowledge.  Brown stated that he "pulled" his bike up directly toward where the police cruiser was parked, until Keith King told him "don't go out that way." (Pet. Ex. 1006M at 1754).  According to the statement, Brown was still clueless as to the fact that a homicide was imminent.  Clearly, if Brown *knew* that King was looking for someone to kill, he would have steered clear of the police car.  But instead, Brown explained, "I pulled up anyway, you know what I'm saying.  I wasn't no paying attention around there.  As I was still pulling, he jumped off the bicycle. . ." (Pet. Ex. 1006M at 1754).  It was at *that* moment – and that moment alone – *after* the two had arrived at the Circle K, and King told Brown to "look up . . . I got him," that Brown says he finally *knew* that "[h]e gonna kill somebody." (Pet.

175

Ex. 1006M at 1754-1755). Once Brown says he had that knowledge, however, he speaks of no other act "by which he intended to help commit the crime." (Pet. Ex. 1006M at 2523).

Without prior knowledge that a crime was "going to happen," the acts Brown describes after the shooting have no legal relevance. Brown said that he simply observed King shoot the deputy, and then he panicked and help King flee. That, however, is not legally sufficient to prove that Brown "actually did something by which he intended to help commit the crime." It clearly cannot sustain his conviction for aiding and abetting a first degree murder. *See West v. State*, 585 So.2d 439 (Fla. 4th DCA 1991) (reversing defendant's conviction for aiding and abetting a murder, where the evidence showed "a spontaneous decision by the assailants to commit the crime," even though defendant was a passenger in the car from which the assailants exited, and defendant drove the vehicle away and later picked up the two assailants a short distance from the area of the shooting; "If anything, the evidence suggested that the crime was committed on the spur of the moment without notice to [the defendant]"); *Collins v. State*, 438 So.2d 1036, 1038 (Fla. 2nd DCA 1983) ("[m]ere knowledge that an offense is being committed is not the same as participation with criminal intent, and mere presence at the scene, including driving the perpetrator to and from the scene or a display of questionable behavior after the fact, is not sufficient to establish participation").

Contrary to Judge Backman at the argument on the motion for directed verdict, Brown's case cannot be analogized to *Staten v. State*, where the Florida Supreme Court (in an opinion by Judge Barnett), sustained the conviction of a getaway driver under an aiding and abetting theory. The defendant in *Staten* was present on numerous occasions when the crime was planned, and thus clearly had knowledge of "what was going to happen," when he accompanied the principal to the scene of the planned crime, and waited as the "getaway driver." There is nothing in Brown's

statement, by contrast, indicating that he accompanied the principal (King) to the crime scene with knowledge that a crime would occur, and with the express purpose to help him flee. Even assuming that Brown helped King "getaway," without prior knowledge that King would commit his crime, Brown would not be guilty of aiding and abetting the homicide.

The Court should therefore hold – as a matter of law – that Brown's statement was constitutionally insufficient to support his conviction for aiding and abetting Deputy Behan's murder. Accordingly, the Court should grant Brown the writ.

## IV. THE MOTION FOR NEW TRIAL/SENTENCE

### Ground 12. Ineffectiveness of Trial Counsel in Failing to Interview Edward Davis (the Only Eyewitness to the Killing of Patrick Behan), and Failing to Supplement the Motion for New Trial, or File a Motion for New Trial Based Upon Newly-Discovered Evidence of Davis' Testimony – Which Would Have Proven Brown's Confession to Be False (Ground J of the Amended Petition)

No reasonable attorney would have ignored the only eyewitness to the killing of Patrick Behan – when that witness only becomes available post-trial. Edward Davis was that witness. And he became available to Larry Davis within two (2) days of the verdict. Indeed, the verdict in this case was returned on October 20, 1993. Donn Pearce's memorandum to Larry Davis indicates that Larry had called him on October 22, directing him to make contact with a pubic defender named Cannarozzi whose client, Edward Davis, had said that he was an eyewitness to the killing of Patrick Behan. (EH8 at 86-87, 94; Resp. Ex. 19). Larry Davis apparently sent Pearce out to interview Edward Davis, and Pearce met with Davis soon thereafter, sending Larry Davis a memorandum as to his testimony. In Pearce's memo, he notes that Davis was living close to the scene of the murder, was walking to work, heard the shot and ran to a tree "at the corner of SW28th Street and 40th Avenue and saw someone running through a 'gap' between the Circle K and a wall somewhere

177

behind it. . . .The person ran behind the building and then east on Hallandale Beach Boulevard."
Pearce's memo also noted that "Davis then saw a white male come out of the building wearing a
plaid shirt along with a white male store clerk. They came out to a BSO police car. Plaid shirt
stayed. The clerk went back inside." (Resp. Ex. 19).

From this alone, Larry Davis knew or should have known that Edward Davis was indeed
where he said he was on the night of the murder at the time of the murder. He related accurate
details such as the number of people in the Circle K, and their actions following the shooting. The
timing he provided was correct as well. But the escape path of the assailant that Edward Davis
described did not match what Brown had said in his statement. And Edward Davis would have been
in a position to hear and see a second shot (if there had been one, as Brown alleged). But he did not.
(EH8 at 88- 92, 104-105). "If one believed Edward Davis' testimony," Larry Davis conceded at the
hearing, "then at that point that would be exculpatory information for [] Tim Brown. . . . Because
he said he saw someone else running, whoever he said he saw. Yes that would be evidence that
would indicate that Tim Brown and Keith King were not involved in this case. . . . He would have
been in the line of sight from where he said he was. . . . The bottom line is if Davis' information was
accurate, it means, you know, Tim wasn't involved in the case." (EH8 at 97). It would mean that
Tim Brown was innocent. (EH8 at 99). And indeed, Davis averred at the hearing that he had always
believed – not just now, but back then as well, that Tim Brown was "innocent of all this, [and]
wrongly convicted." (EH8 at 99).

Why did Davis not supplement his pending motion for new, to include Edward Davis' newly-
discovered exculpatory testimony? He acknowledged that the motion for new trial which he had
filed on October 29, 1993 was indeed a vehicle for bringing this exculpatory testimony before the

judge. (EH8 at 100; Pet. Ex. 1007). For indeed, Florida Rules of Criminal Procedure 3.580 and 3.590 allow a defendant to file a motion for new trial within 10 days of the verdict, and once a timely motion for new trial has been filed (and this indeed was a timely motion), it could have been supplemented to add additional grounds. (EH8 at 101).

But Larry Davis ignored Edward Davis. He never met with him, or even spoke to him over the phone. He filed his investigator's memo on Edward Davis away in his file, and forgot all about him. Larry Davis has now attempted to justify that egregious error by claiming: "I just didn't give it credibility." (EH8 at 98). But as we pointed out *supra* in connection with Philip Howard, it would have been impossible for Davis to determine whether what Edward Davis said *was* credible, without ever speaking to him. And indeed, this Court, having heard Davis testify at the Phase I hearing in this case, *has* found him credible. (D.E. # 286 at 23-24, 40).

Davis' omission in this regard was inexcusable. No reasonable attorney would have ignored the only eyewitness to the crime. No reasonable attorney would have ignored newly discovered exculpatory testimony. No reasonable attorney ever would have ignored Edward Davis, where his testimony could have secured a new trial and proven the falsity of Brown's statement. Clearly, with the benefit of Davis' testimony, there is a reasonable probability that the jury here would have acquitted Tim Brown. The prejudice from Davis' omission is therefore manifest.

## ACT V: THE APPEAL

### Ground 13. Ineffectiveness of Appellate Counsel in Failing to Correct the Error in the Transcript with Regard to the Meaning of "Called his Bluff" (Ground K of the Amended Petition)

Over a vigorous dissent by now-Justice Barbara Pariente, a two-judge majority of the Fourth District Court of Appeals affirmed Tim Brown's conviction, *per curiam*, without an opinion. *Brown*

179

*v. State,* 657 So.2d 903 (Fla. 4th DCA 1995). It is clear from the opinion, however, that the Court

relied upon the erroneous transcript of Brown's taped statement, rather than the actual evidence of

the tape itself. Specifically, the transcript here stated:

> Q: So you're calling his bluff, you don't believe it?
>
> A: Yes, sir.
>
> Q: Okay, you're basically telling him that *you believe* he's got like the nerve to do it?
>
> A: Yes, sir.

(Pet. Ex. 1006M at 1754) (Emphasis added). But it is clear from listening to the actual taped

statement, (Pet. Ex. 50), that what Carr had actually asked Brown in the second question, was the

exact same thing as he asked him in the first. The second question should have read: "Okay, you're

basically telling him that you *don't* believe he's got like the nerve to do it? *See* Pet. Ex. 99. The

omission of this single word "*don't*" from the transcript could have spelled the difference between

an affirmance, and a reversal for Tim Brown. No reasonable appellate attorney would have failed

to correct this glaring, and material, error.

For indeed, Judge Pariente, in her dissent, refers to Brown's response on this issue as

"equivocal," 657 So.2d at 906, and notes in a footnote that Brown "evidently agreed to two

seemingly conflicting questions." *Id.* at 903 n. 3. While Judge Pariente felt that this agreement to

two conflicting questions cast doubt on the voluntariness of the statement, *id.*, her other two panel

members might well have found that Brown's agreement to one of the questions – "You're basically

telling him you *believe* he's got like the nerve to do it" was proof of a "dare," *and* proof of "guilty

knowledge." Under these circumstances, this Court should find that appellate counsel's omission

was sufficiently prejudicial as to undermine confidence in the outcome reached by the Florida Fourth

DCA.  For this reason as well, the Court should grant the writ.

## ACT VI: FEDERAL HABEAS CORPUS RELIEF

This Court has the power to write a different ending to this story.  It need not end tragically

with an innocent man spending the rest of his life in jail.  Rather, given the evidence and argument

we have presented, it should end triumphantly, with an innocent man being set free.  And indeed,

as  a federal habeas court, this Court has the power to set Tim Brown free, because his conviction

was frought with constitutional error at every turn.

The Court may grant Tim Brown's release "outright" with an "***unconditional writ***" if it finds

that the evidence at Brown's trial (that is, his taped statement) was constitutionally insufficient to

support his  conviction.  (Ground 11, *supra*).  Outright release is the appropriate remedy for a

constitutional violation in habeas corpus, where re-prosecutution is barred for legal reasons.  Here,

of course, if Brown's statement is constitutionally insufficient to support his conviction under

*Jackson v. Virginia*, his conviction was obtained in violation of the Due Process Clause, and re-

prosecution by the State would be barred under the Double Jeopardy Clause..  *See, e.g., Greene v.*

*Massey*, 437 U.S. 19 (1978) (on habeas corpus review of state conviction, holding that where

evidence is constitutionally insufficient to support conviction, retrial is barred under Double

Jeopardy Clause); *Young v. Kemp*, 760 F.2d 1087, 1105 -1106 & n. 9 (11th Cir. 1985) (insufficiency

of the evidence finding by a federal habeas court must be given double jeopardy effect by state court;

citing *Tibbs v. Florida*, 457 U.S. 31, 41 (1982)); *see also Kelly v. Roberts*, 998 F.2d 802, 809 & n.

11 (10th Cir. 1993) (directing district court to grant the writ outright where evidence was

constitutionally insufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979), to support aiding and

abetting conviction). Clearly, Brown could not be re-tried by the State, if this Court were to find his

181

statement constitutionally insufficient to support his conviction.

If, however, the Court does *not* find that Brown's statement was constitutionally insufficient, but nonetheless finds that his conviction *was* unconstitutional for other reasons, the Court's power is of a slightly different nature. It would no longer have the power to release Tim Brown "unconditionally" (outright), but it would have the power to force the issue with the State by setting "conditions" for his release. What this means is that if the Court finds that Brown's statement was unconstitutionally obtained (without a knowing and intelligent *Miranda* waiver, or through coercion), the Court would issue a *"conditional writ"* (also known as a "release or retry order") granting Brown's release *if* the State does not retry him without his unconstitutionally-obtained statement, within a given period of time (anywhere from 30 - 120 days). The State would then have the *choice* to retry Brown without use of his unconstitutional statement, or allow the writ to issue, and Brown to be released. This would be the remedy as well, if the Court were to find that trial counsel was constitutionally ineffective in litigating the motion to suppress.

Alternatively, if the Court grants the writ based upon trial counsel's ineffectiveness at trial or post-trial (the failure to bring Edward Davis' newly-discovered testimony to the attention of the court), the State would have the *choice* to grant Brown a new trial with new counsel, or allow Brown to be released. Similarly, if the Court grants the writ based upon the due process violation created by the erroneous jury instruction, the State would have the *choice* to retry Brown without erroneously instructing the jury as it did in the first trial, or allow him to be released. Finally, if the Court grants the writ on the ground of ineffectiveness of appellate counsel, the State would have the *choice* to grant Brown a new direct appeal, or allow Brown to be released.

Although we have described the possible relief available to Tim Brown as "alternatives," the

182

Court clearly has the power to grant the writ on a multitude of grounds.  And indeed, we urge the Court to grant the writ on each and every one of the thirteen (13) constitutional grounds outlined herein, all of which are supported by the law and the preponderance of the evidence.

WHEREFORE, the petitioner, TIMOTHY BROWN, respectfully requests that the Court grant him the writ of habeas corpus, and release him from his unconstitutional custody.

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER


By: Brenda G. Bryn
Timothy M. Day
Florida Bar Nos. 0708224, 360325
Assistant Federal Public Defenders
Attorneys for Timothy Brown
One East Broward Boulevard, Suite 1100
Ft. Lauderdale, Florida 33301
Tel./FAX: (954) 356-7436/7556

183

# J U V E N I L E

### BROWARD SHERIFF'S OFFICE

### STATEMENT OF RIGHTS

NAME *Timothy Brown*　　DOB *11-23-75* ADDRESS *6640 Perry ST* PHONE *963-9909*
GIVEN　　　　　　　　　　　　　　　　DAY,DATE
BY: *Grant Skrmoszivich* CASE # *PK96-11-319* TIME: *7/66/91-19:14* LOCATION *B.S.O.*

Before I ask you any questions, I want to advise you of your rights under the law.

Do you understand that I am a Deputy Sheriff? *YES*

Are you comfortable? *YES*   Has anyone threatened you? *NO*

Can you read and write the English language? *YES*

What school do you go to? *NO*　　　　　　　　Grade? *8*

Have we tried to contact your parents/guardian? *YES*

Do you want your parents, guardian or legal custodian here before we proceed further? *NO*

You have the right to remain silent, that is, you don't have to talk to me or answer any questions if you don't want to.  Do you understand? *YES*

You have the right to talk to an attorney and have him here with you before we ask you any questions.  Do you know what an attorney is? *YES*   Do you understand? *YES*

If you can't afford an attorney and you want one, we will get an attorney for you before we ask you any more questions.  Do you understand? *YES*

If you decide to answer my questions now without an attorney present, you will still have the right to stop answering my questions at any time until you talk to an attorney.  Do you understand? *YES*

Should you talk to me, anything you say can and will be used in a court of law, either for you or against you.  Do you understand? *YES*

Are there any questions? *NO*

Knowing and understanding your rights, are you willing to answer my questions without an attorney here? *YES*

I, *Timothy Brown*　　　　　, have read this statement of my rights or have had it read to me and I understand what my rights are.  I am willing to make a statement and answer questions.  I do not wish an attorney present at this time.  No threats or promises have been made to me.  No pressure of any kind has been used against me, nor have I been tricked or fooled into giving a statement.  I understand and know what I am doing.  I further expect that any statement will be used for or against me in a court of law.

SIGNATURE: *Timothy Brown*

OFFICER'S SIGNATURE: *James F. Porcar.*

WITNESS SIGNATURE:

▱ REFUSED　　▱ DENIAL　　▱ VERBAL ADMISSION　　▱ WRITTEN STATEMENT

Petitioner's Exhibit 89

BSO PP417 (NEW 3/85)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was mailed and fed-exed this 7th day of November, 2002 to Assistant Attorney Generals Celia Terenzio and Lesley Campbell, 1515 N. Flagler Drive, 9th Floor, West Palm Beach, Florida 33401; and mailed to Assistant State Attorney Tim Donnelly, 17th Judicial Circuit, 201 S.E. 6th Street, Fort Lauderdale, Florida 33301.

184